# 20-4238-cv

## United States Court of Appeals

*for the*

## Second Circuit

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC,
LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,
ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

– v. –

CITY OF NEW YORK, a municipal entity, MAYOR BILL DE BLASIO, as
Mayor of the City of New York, COMMISSIONER LOUISE CARROLL,
Commissioner of New York City Department of Housing Preservation &
Development, COMMISSIONER JONNEL DORIS, Commissioner of
New York City Department of Small Business Services,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 16 (Pages A-563 to A-838)

JAMISON DAVIES
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street
New York, New York 10007
(212) 356-2490

CLAUDE G. SZYFER
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Plaintiffs-Appellants*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated July 10, 2020 ................................. A-14

Notice of Motion for Preliminary Injunctive and
Declaratory Relief, dated July 22, 2020 ............... A-78

Declaration of Stephen P. Younger in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated July 22, 2020 ............... A-80

Exhibit 1 to Younger Declaration -
July Reopening Survey Summary ........................ A-107

Exhibit 2 to Younger Declaration -
Partnership for New York City – A Call for
Action and Collaboration........................................ A-109

Exhibit 3 to Younger Declaration -
The New York Times Article: New Threat to New
York City: Commercial Rent Payments Plummet,
dated May 21, 2020 ................................................. A-177

Exhibit 4 to Younger Declaration -
The Real Deal Article: About 25% of NYC
renters didn't pay in May: survey, dated
May 19, 2020 ........................................................... A-183

Exhibit 5 to Younger Declaration -
Complaint in *The Gap, Inc. v. 44-45 Broadway
Leasing Co., LLC*, dated June 23, 2020................. A-187

Exhibit 6 to Younger Declaration -
Complaint in *The Gap, Inc. v. 170 Broadway
Retail Owner, LLC*, dated July 2, 2020.................. A-213

ii

**Page**

Exhibit 7 to Younger Declaration -
Complaint in *Bath & Body Works, LLC v. 304
PAS Owner LLC*, dated June 8, 2020 ..................... A-237

Exhibit 8 to Younger Declaration -
Complaint in *Victoria's Secret Stores, LLC v.
Herald Square Owner LLC*, dated June 8, 2020 .... A-258

Exhibit 9 to Younger Declaration -
The New York Times Article: Tenants' Troubles
Put Stress on Commercial Real Estate, dated
June 5, 2020 ............................................................. A-282

Exhibit 10 to Younger Declaration -
The New York Times Article: 5 Ways the
Coronavirus Has Changed Suburban Real Estate,
dated July 17, 2020 ................................................. A-289

Exhibit 11 to Younger Declaration -
The New York Times Article: Coronavirus
Escape: To the Suburbs, dated May 8, 2020 .......... A-299

Exhibit 12 to Younger Declaration -
Snapshot: IBO's Updated Economic and Revenue
Forecast and Review of the Adopted Budget for
2021, dated July 21, 2020 ...................................... A-310

Exhibit 13 to Younger Declaration -
New York City Independent Budget Office –
Focus on: The Executive Budget, dated
May 2020 ................................................................. A-351

Exhibit 14 to Younger Declaration -
The New York Times Article: N.Y.C. Budget and
a Cut to N.Y.P.D. Funding, Explained, dated
July 1, 2020 ............................................................. A-377

iii

**Page**

Exhibit 15 to Younger Declaration -
Chapter 23 of the New York State Session Laws
of 2020, effective March 3, 2020............................ A-385

Exhibit 16 to Younger Declaration -
New York State Assembly Memorandum in
Support of Legislation submitted in Accordance
with Assembly Rule III, Sec 1(f) ............................ A-388

Exhibit 17 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202, dated March 7, 2020 ...................... A-390

Exhibit 18 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.3, dated March 16, 2020 ................. A-394

Exhibit 19 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.6, dated March 18, 2020 ................. A-397

Exhibit 20 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.7, dated March 19, 2020 ................. A-400

Exhibit 21 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.8, dated March 20, 2020 ................. A-403

Exhibit 22 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.16, dated April 12, 2020 ................. A-406

Exhibit 23 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.28, dated May 7, 2020 .................... A-409

Exhibit 24 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.38, dated June 6, 2020 .................... A-413

iv

**Page**

Exhibit 25 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.48, dated July 6, 2020 ................... A-416

Exhibit 26 to Younger Declaration -
Chapter 125 of the New York State Session Laws
of 2020, effective June 17, 2020 .......................... A-420

Exhibit 27 to Younger Declaration -
Chapter 127 of the New York State Session Laws
of 2020, effective June 30, 2020 .......................... A-423

Exhibit 28 to Younger Declaration -
Proposed Int. No. 1914-A ..................................... A-426

Exhibit 29 to Younger Declaration -
Proposed Int. No. 1932-A ..................................... A-430

Exhibit 30 to Younger Declaration -
Proposed Int. No. 1936-A ..................................... A-434

Exhibit 31 to Younger Declaration -
Transcript of Remote Hearing, dated
May 13, 2020 ......................................................... A-438

Exhibit 32 to Younger Declaration -
New York City Council Article: New York City
Council Announces COVID-19 Legislative
Relief Package To Be Introduced on Wednesday,
dated April 21, 2020 .............................................. A-516

Exhibit 33 to Younger Declaration -
Transcript of Remote Hearing, dated
April 28, 2020 ........................................................ A-525

Exhibit 34 to Younger Declaration -
Transcript of Remote Hearing, dated
April 29, 2020 ........................................................ A-669

v

**Page**

Exhibit 35 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure and Government Affairs
Division, dated April 28, 2020 ............................... A-959

Exhibit 36 to Younger Declaration -
The Council of the City of New York Briefing
Paper and Committee Report of the
Governmental Affairs Division, dated
April 29, 2020 ........................................................ A-973

Exhibit 37 to Younger Declaration -
The Council of the City of New York Committee
Report of the Governmental Affairs Division,
dated May 13, 2020 ................................................ A-1052

Exhibit 38 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure Division, dated
May 13, 2020 ........................................................ A-1108

Exhibit 39 to Younger Declaration -
Summary – Brooklyn Chamber of Commerce
Surveys .................................................................... A-1114

Exhibit 40 to Younger Declaration -
MetLife & U.S. Chamber of Commerce Small
Business Coronavirus Impact Poll, dated
June 3, 2020 ........................................................... A-1116

Exhibit 41 to Younger Declaration -
NYC's Nightlife Economy Impact, Assets, and
Opportunities .......................................................... A-1132

Exhibit 42 to Younger Declaration -
Emails, dated June 19, 2020 ................................... A-1213

vi

**Page**

Exhibit 43 to Younger Declaration -
The Stoop NYU Furman Center Blog Article:
Understanding the Potential Magnitude of Rent
Shortfalls in New York Due to COVID, dated
June 4, 2020 ............................................................ A-1216

Exhibit 44 to Younger Declaration -
Small Business First – Better Government
Stronger Businesses ................................................ A-1229

Exhibit 45 to Younger Declaration -
Guaranty, dated October 18, 2018 ......................... A-1278

Declaration of Santo Golino in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 22, 2020 .......................................................... A-1281

Declaration of Ling Yang in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 9, 2020 ............................................................ A-1323

Declaration of Marcia Melendez in Support of
Plaintiffs' Motion for a Preliminary Injunction,
dated July 9, 2020 .................................................. A-1330

Notice of Motion to Dismiss, dated August 12, 2020    A-1336

Declaration of Carlos F. Ugalde Alvarez in Support
of Defendants' Motion to Dismiss and in
Opposition to Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 12, 2020 ..................................................... A-1338

Exhibit A to Alvarez Declaration -
Chapter 23 of the New York State Laws of 2020 ..    A-1366

Exhibit B to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202 dated March 7, 2020 ................................ A-1370

vii

**Page**

Exhibit C to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.3 dated March 16, 2020 ........................... A-1374

Exhibit D to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.5 dated March 18, 2020 ........................... A-1377

Exhibit E to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.6 dated March 18, 2020 ........................... A-1381

Exhibit F to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.7 dated March 19, 2020 ........................... A-1384

Exhibit G to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 ........................... A-1387

Exhibit H to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.9 dated March 21, 2020 ........................... A-1390

Exhibit I to Alvarez Declaration -
New York State Gubernatorial Executive Order
Nos. 202.13, 202.14, 202.18 dated March 29,
2020, April 7, 2020 and April 16, 2020 ................. A-1393

Exhibit J to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.16, dated April 12, 2020........................... A-1404

Exhibit K to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.28, dated May 7, 2020 ............................. A-1407

Exhibit L to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.29, dated May 8, 2020 ............................. A-1411

viii

**Page**

Exhibit M to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.31, dated May 14, 2020 .......................... A-1413

Exhibit N to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.34, dated May 28, 2020 .......................... A-1416

Exhibit O to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.35, dated May 29, 2020 .......................... A-1419

Exhibit P to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.36, dated June 2, 2020 ............................ A-1422

Exhibit Q to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.38, dated June 6, 2020 ............................ A-1425

Exhibit R to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.39, dated June 7, 2020 ............................ A-1428

Exhibit S to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.41, dated June 13, 2020 .......................... A-1431

Exhibit T to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.45, dated June 26, 2020 .......................... A-1434

Exhibit U to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.48, dated July 6, 2020 ............................ A-1437

Exhibit V to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.49, dated July 7, 2020 ............................ A-1441

ix

**Page**

Exhibit W to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.50, dated July 9, 2020 .............................. A-1443

Exhibit X to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.53, dated July 21, 2020 ........................... A-1445

Exhibit Y to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................ A-1448

Exhibit Z to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ..................... A-1452

Exhibit AA to Alvarez Declaration -
Administrative Order No. AO/68/20, dated
March 16, 2020 ...................................................... A-1454

Exhibit BB to Alvarez Declaration -
Administrative Order No. AO/127/20, dated
June 18, 2020 ......................................................... A-1464

Exhibit CC to Alvarez Declaration -
Administrative Order No. AO/131/20, dated
June 23, 2020 ......................................................... A-1474

Exhibit DD to Alvarez Declaration -
Administrative Order No. AO/143/20, dated
July 7, 2020 ............................................................ A-1480

Exhibit EE to Alvarez Declaration -
Chapter 112 of the New York State Laws of 2020
and Chapter 126 of the New York State Laws of
2020 ....................................................................... A-1482

Exhibit FF to Alvarez Declaration -
Chapter 125 of the New York State Laws of 2020     A-1492

x

**Page**

Exhibit GG to Alvarez Declaration -
Chapter 127 of the New York State Laws of 2020     A-1501

Exhibit HH to Alvarez Declaration -
Introduction No. 1914............................................     A-1504

Exhibit II to Alvarez Declaration -
Introduction No. 1932............................................     A-1508

Exhibit JJ to Alvarez Declaration -
Introduction No. 1936............................................     A-1516

Exhibit KK to Alvarez Declaration -
Transcript of Meeting, dated April 22, 2020..........     A-1520

Exhibit LL to Alvarez Declaration -
Committee Report of the Infrastructure and
Governmental Affairs Divisions, dated
April 28, 2020........................................................     A-1620

Exhibit MM to Alvarez Declaration -
NYU Furman Center Article: What are the
Housing Costs of Households Most Vulnerable to
Job Layoffs? An Initial Analysis, dated
March 30, 2020......................................................     A-1634

Exhibit NN to Alvarez Declaration -
The New York Times Article: 11 Numbers That
Show How the Coronavirus Has Changes N.Y.C.,
dated April 20, 2020 .............................................     A-1643

Exhibit OO to Alvarez Declaration -
Transcript of Hearing, dated April 28, 2020 ..........     A-1654

Exhibit PP to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. No. 1936...........................     A-1798

xi

**Page**

Exhibit QQ to Alvarez Declaration -
Briefing Paper and Committee Report of the
Governmental Affairs Divisions, dated
April 29, 2020 ........................................................ A-1906

Exhibit RR to Alvarez Declaration -
New York City Comptroller Scott M. Stringer:
City must take immediate action to prepare for
economic impacts of COVID-19 and protect vital
services for most vulnerable New Yorkers, dated
March 16, 2020 ...................................................... A-1985

Exhibit SS to Alvarez Declaration -
New York State Restaurant Association,
Restaurant industry impact survey: New York
State, dated April 2020 .......................................... A-1991

Exhibit TT to Alvarez Declaration -
National Bureau of Econ. Research Article: How
are small businesses adjusting to COVID-19?
Early evidence from a survey, dated April 2020 .... A-1993

Exhibit UU to Alvarez Declaration -
Info. Station Article: How important are small
businesses?, dated January 3, 2017 ....................... A-2030

Exhibit VV to Alvarez Declaration -
United States Small Business Administration,
Small Businesses generate 44 percent of U.S.
economic activity, dated January 30, 2019 ............ A-2034

Exhibit WW to Alvarez Declaration -
N.Y.C. Department of Small Business Services,
Comprehensive Guide to Commercial Leasing in
New York City ...................................................... A-2037

xii

**Page**

Exhibit XX to Alvarez Declaration -
Entrepreneur Article: Hayden Field, 5 most
common red flags entrepreneurs should know
before signing a commercial real estate lease in
New York, dated June 6, 2019 ............................... A-2078

Exhibit YY to Alvarez Declaration -
Transcript of Hearing, dated April 29, 2020 .......... A-2091

Exhibit ZZ-1 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2381

Exhibit ZZ-2 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2550

Exhibit ZZ-3 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2745

Exhibit ZZ-4 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2925

Exhibit ZZ-5 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-3128

Exhibit AAA to Alvarez Declaration -
Intro. No. 1914-A ................................................. A-3335

Exhibit BBB to Alvarez Declaration -
Intro. No. 1932-A ................................................. A-3339

Exhibit CCC to Alvarez Declaration -
Intro. No. 1936-A ................................................. A-3344

Exhibit DDD to Alvarez Declaration -
Intro. No. 1914- A's Plain Language Summary ..... A-3348

xiii

**Page**

Exhibit EEE to Alvarez Declaration -
Intro. No. 1932- A's Plain Language Summary ..... A-3350

Exhibit FFF to Alvarez Declaration -
Intro. No. 1936- A's Plain Language Summary ..... A-3352

Exhibit GGG to Alvarez Declaration -
Committee Report of the Infrastructure Division,
dated May 13, 2020 ................................................ A-3354

Exhibit HHH to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3360

Exhibit III to Alvarez Declaration -
Committee Report of the Governmental Affairs
Divisions, dated May 13, 2020 ............................. A-3368

Exhibit JJJ to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3425

Exhibit KKK to Alvarez Declaration -
City Council's Meeting ......................................... A-3438

Exhibit LLL to Alvarez Declaration -
Letter from the City's Office of the Mayor, dated
May 26, 2020 ....................................................... A-3516

Exhibit MMM to Alvarez Declaration -
Commercial Harassment Law, effective
May 26, 2020 ....................................................... A-3519

Exhibit NNN to Alvarez Declaration -
Guaranty Law, effective May 26, 2020 ................. A-3523

Exhibit OOO to Alvarez Declaration -
Residential Harassment Law, effective
May 26, 2020 ....................................................... A-3528

Exhibit PPP to Alvarez Declaration -
Local Law No. 62 of 2020 .................................... A-3533

xiv

**Page**

Exhibit QQQ to Alvarez Declaration -
Local Law No. 63 of 2020.....................................  A-3536

Exhibit RRR to Alvarez Declaration -
Resolution No. 1349 of 2020.................................  A-3540

Exhibit SSS to Alvarez Declaration -
Resolution No. 1350 of 2020.................................  A-3543

Exhibit TTT to Alvarez Declaration -
Document Produced by Plaintiff Jarican Realty
Inc., dated July 31, 2020.........................................  A-3546

Exhibit UUU to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC...........................................................................  A-3580

Exhibit VVV to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC...........................................................................  A-3595

Letter from Arthur Kats to the Honorable Ronnie
Abrams, dated August 13, 2020............................  A-3614

Brief of Amicus Curiae Volunteers of Legal Service
in Opposition to Plaintiffs' Motion for
Preliminary Injunctive and Declaratory Relief,
dated August 13, 2020 ............................................  A-3617

Declaration of Arthur Kats in Opposition to
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 13, 2020............  A-3646

Exhibit 1 to Kats Declaration -
The New York Times Article: How Prepared Is
the U.S. for a Coronavirus Outbreak?, dated
February 29, 2020.................................................  A-3658

xv

**Page**

Exhibit 2 to Kats Declaration -
New York Times U.S. COVID-19 Map and Case
Tracker, last visited August 11, 2020 ..................... A-3669

Exhibit 3 to Kats Declaration -
The New York Times Article: New York City
Region Is Now an Epicenter of the Coronavirus
Pandemic, dated March 22, 2020 ......................... A-3687

Exhibit 4 to Kats Declaration -
New York Times N.Y. Covid-19 Map and Case
Tracker, last visited August 11, 2020 ..................... A-3693

Exhibit 5 to Kats Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-3704

Exhibit 6 to Kats Declaration -
The Wall Street Journal Article: Times Square Is
Eerily Empty During the Pandemic, but
Advocates Are Focused on a Comeback, dated
May 19, 2020 ......................................... A-3707

Exhibit 7 to Kats Declaration -
Report Published by the U.S. Small Business
Administration's Office of Advocacy: Small
Business GDP: 1998-2014 .................................... A-3711

Exhibit 8 to Kats Declaration -
Office of the N.Y. State Comptroller, Small
Business in New York State: An Economic
Snapshot 1, dated 2019 ......................................... A-3787

Exhibit 9 to Kats Declaration -
U.S. Small Business Administration's 2019 Small
Business Profile for the State of New York ........... A-3792

xvi

**Page**

Exhibit 10 to Kats Declaration -
The New York Times Article: One-Third of New
York's Small Businesses May Be Gone Forever,
dated August 3, 2020 ............................................. A-3797

Exhibit 11 to Kats Declaration -
The Wall Street Journal Article: Amid
Coronavirus Shutdowns, Landlords Often
Determine Fate of Small Businesses, dated
June 4, 2020 ............................................................ A-3802

Exhibit 12 to Kats Declaration -
Article: For Small Businesses With High Rents,
Coronavirus Aid Falls Short .................................. A-3808

Exhibit 13 to Kats Declaration -
Article: On a Vibrant Street in Brooklyn,
Businesses Are Struggling for Survival ................. A-3814

Exhibit 14 to Kats Declaration -
Brooklyn Chamber of Commerce, July
Reopening Survey Summary, dated July 2020 ...... A-3820

Exhibit 15 to Kats Declaration -
The Wall Street Journal Article: Small Business
Sector Highly Vulnerable to Coronavirus Crisis,
dated April 7, 2020 ................................................. A-3822

Exhibit 16 to Kats Declaration -
U.S. Fed. Reserve Bank of N.Y., 2020 Report on
Employer Firms: Small Business Credit Survey,
dated 2020 .............................................................. A-3825

Exhibit 17 to Kats Declaration -
Fed. Reserve Bank of N.Y., Can Small Firms
Weather the Effects of COVID-19?, dated
April 2020 .............................................................. A-3863

xvii

**Page**

Exhibit 18 to Kats Declaration -
Local Law 53 ......................................................... A-3867

Exhibit 19 to Kats Declaration -
Local Law 55 ......................................................... A-3871

Exhibit 20 to Kats Declaration -
Committee Report of the Governmental Affairs
Division on Local Law 53 .................................... A-3876

Exhibit 21 to Kats Declaration -
Testimony of the Volunteers of Legal Service
Microenterprise Project Int. Nos. 1914 & 1932 .... A-3932

Exhibit 22 to Kats Declaration -
Partnership for New York City: A Call for Action
and Collaboration.................................................. A-3936

Letter from Jeffrey Turkel to the Honorable Ronnie
    Abrams, dated August 25, 2020............................. A-4004

Reply Declaration of Stephen P. Younger in Further
    Support of Plaintiffs' Motion for Preliminary
    Injunctive and Declaratory Relief and in
    Opposition to Defendants' Motion to Dismiss,
    dated August 26, 2020 ........................................... A-4030

Exhibit 1 to Younger Declaration -
Rentec Direct's August 2020 Rental Trends
Report ................................................................... A-4043

Exhibit 2 to Younger Declaration -
New York Hospitality Alliance's July 2020 Rent
Report ................................................................... A-4046

Exhibit 3 to Younger Declaration -
Sydney Pereira New Article: Thousands of New
Yorkers at Risk of Eviction as Cuomo's
Moratorium Expires............................................... A-4056

xviii

**Page**

Exhibit 4 to Younger Declaration -
News Article: Retail Chains Abandon Manhattan:
It's Unsustainable...................................................... A-4067

Exhibit 5 to Younger Declaration -
Screenshot of Post from Newman Ferrara LLP's
Website....................................................................... A-4077

Exhibit 6 to Younger Declaration -
Complaint in *The Maramont Corporation v.
Generation Next Realty, Inc.*, dated July 20, 2020   A-4082

Exhibit 7 to Younger Declaration -
Report: Landlords and Renters Struggling to
Make Ends Meet During COVID-19 Uncertainty,
dated August 20, 2020 ........................................... A-4094

Exhibit 8 to Younger Declaration -
Press Release: Small Property Owners of New
York Announces Majority of Owners and
Managers of Small Properties Are Working with
Tenants by Reducing, Forgoing, and Offering
Rent Concessions, dated August 25, 2020............. A-4111

Exhibit 9 to Younger Declaration -
The New York Post Article: New Yorker's Keep
Moving Out of the City to Suburbs, Other States,
dated August 11, 2020............................................. A-4115

Exhibit 10 to Younger Declaration -
The New York Times Article: Movers in N.Y.C.
Are So Busy They're Turning People Away,
dated August 20, 2020 ........................................... A-4120

Exhibit 11 to Younger Declaration -
CNBC Article: Retail Rents Plummet Across
New York City, as America's Glitzy Shopping
Districts Turn Into Ghost Towns, dated
August 2, 2020....................................................... A-4130

xix

**Page**

Exhibit 12 to Younger Declaration -
The City Article: New York's Rent Drops as
Vacancies Increase. Could Rent Regulation Be
Next Thing to Fall?, dated July 27, 2020............... A-4138

Exhibit 13 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ......................... A-4148

Exhibit 14 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ...................... A-4152

Exhibit 15 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.57, dated August 20, 2020 ....................... A-4154

Exhibit 16 to Younger Declaration -
New York City Council Bill Int. No. 2007-2020 ... A-4157

Exhibit 17 to Younger Declaration -
New York State Senate Bill No. S8904 ................. A-4160

Exhibit 18 to Younger Declaration -
August 2020 Resolution ........................................ A-4163

Exhibit 19 to Younger Declaration -
Gotham Gazette Article: Requestions for
Emergency Rent Grants Fell During Pandemic,
But Expected to Skyrocket When Evictions
Resume, dated July 24, 2020 ................................. A-4179

Exhibit 20 to Younger Declaration -
New York State Senate Bill No. S8139 ................. A-4187

Exhibit 21 to Younger Declaration -
New York State Senate Bill No. S8190-A ............. A-4191

Exhibit 22 to Younger Declaration -
New York State Senate Bill No. S8125-A ............. A-4201

**xx**

                                                              **Page**

Exhibit 23 to Younger Declaration -
Screenshot from New York City Department of
Health, dated August 19, 2020 ............................... A-4204

Exhibit 24 to Younger Declaration -
Guidance Published by Centers for Disease
Control and Prevention: COVID-19 Pandemic
Planning Scenarios ................................................ A-4210

Reply Declaration of Santo Golino in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 ........................................... A-4219

Reply Declaration of Marcia Melendez in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 21, 2020 ..................................................... A-4242

Declaration of Elias Bochner in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 25, 2020 ............ A-4245

Reply Declaration of Carlos F. Ugalde Alvarez in
Further Support of Defendants' Motion to
Dismiss, dated September 2, 2020 ........................ A-4250

Amended Complaint, dated September 2, 2020 ........ A-4268

Transcript of Oral Argument, dated
September 11, 2020 ............................................... A-4334

Notice of Appeal, dated  December 21, 2020 ............ A-4394

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              38

1

2    proceedings where nonpayment could be an issue but is

3    not explicitly stated.

4        And further, it's only I believe less or a little

5    bit more than 30-days longer than the current state

6    moratorium.  So, even if more than half of New York

7    City's renters are covered by the federal moratorium,

8    come the end of July, we will see the same thing that

9    we will see at the end of June likely.

10       SPEAKER JOHNSON:  Thank you.  I have more

11   questions but I want to go back to the Chairs, so

12   they can get through some of their questions and then

13   we'll go to the Council Members.  I can come back

14   later to ask the rest of my questions for this panel.

15       So, I turn it back to either Chair Cornegy or

16   Chair Cohen.

17       CHAIRPERSON CORNEGY:  Thank you Speaker Johnson.

18   Both Barika and Mike have alluded to this fine line

19   that has to be drawn and the governor has to be

20   involved while protecting you know, tenants, small

21   homeowners as well not burdening them and it's a

22   delicate balance.  As the Chair of the Committee, I

23   am also faced with doing that and I'm acutely aware

24   that the input of the state and federal government in

25   doing that is essential.  I just wanted to ask

A-564

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          39

1

2   statistically, do you know the ratio between big

3   buildings and big building owners as landlords as

4   compared to small homeowners?  I had heard that there

5   is a statistic that there actually maybe more small

6   homeowners responsible for the makeup of tenancy,

7   that it actually is big buildings.  I just wanted to

8   know, I know you probably, the two of you I know you

9   probably know.  I'm just curious as to what that is.

10      MICHAEL MCKEE:  Barika, you want to go first.

11      BARIKA WILLIAMS:  I mean, I actually don't know

12   that number off the top of my head but I could

13   probably get it for you in about two minutes.  So, if

14   you give me a second Council Member, I can pull that

15   but I also would say one thing that's a little bit

16   challenging here is that sometimes it's not a clean

17   break between the size of the building.  It's really

18   about the type of owner, right.  We've seen big

19   investment firms and specifically hedge firm

20   companies buy up a series of buildings across an

21   entire neighborhood but these are one to four family

22   homes, so Bushwick is one of the places that's been

23   rampant for this.  We want to treat them who have

24   investors and backers and reserves very differently

25   than the understanding of a first time homebuyer who

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        40

1

2    is likely being supported by some of the groups that

3    you will hear from today; Impact, Chhaya, right,

4    CNYCN, some of these groups that are really trying to

5    build new homeownership across the city.  And part of

6    their ability to pay for the mortgage is that first

7    time homeowner collecting rent or in one or two units

8    of somebody that they know and they have a

9    relationship with and they are trying to support

10   their tenant.  Those are two very different things

11   and the hard thing is that by slicing it just by

12   stock, they kind of get blurred together.

13        CHAIRPERSON CORNEGY:  So, Mike, before you try —

14        MICHAEL MCKEE:  Well, I don't have exact numbers

15   for you but we can certainly dig that up.  The data

16   show very clearly that the majority of rent

17   stabilized apartments in New York City are owned by

18   large landlords.  There is no question about that but

19   it's also true that a majority of owners are small

20   landlords who own one or two buildings.  And as

21   Barika pointed out, there are small landlords and

22   there are small landlords and in fact, one of the

23   thing predatory investors have done in the aftermath

24   of the 2008 economic crisis is they went around the

25   country and bought up mobile home parks and they

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          41

1

2   bought up even single family homes that have been

3   foreclosed and turned them into rental properties

4   where they are gouging and evicting people.

5       So, the mere size of the building is not what you

6   need to look at.  You need some kind of system where

7   you can actually ascertain who people are.  Just for

8   example, there is a very famous landlord from

9   Brooklyn who comes to the Rent Guidelines Board every

10  year and testifies that he is a small landlord.

11  Well, when he started out doing this back in the

12  1980's, he owned one 20-unit building.  He now owns

13  nine 20-unit buildings.  All rent stabilized, of

14  course, now he has some deregulator departments

15  thanks to Peter Vallone and thanks to George Pataki

16  but you know, he's done very well under rent

17  stabilization.  He owns 180, 9 times 20, 180

18  apartments and he bought these new building while he

19  was running his original stabilized building.

20      So, it's not cut and dried and you can't simply

21  go by the size of the building.  You have to go by

22  pattern of ownership and other factors but we can

23  certainly prepare numbers for you that will help you

24  understand who owns what.

25

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            42

1

2      CHAIRPERSON CORNEGY:  Well, I appreciate that but

3   I also know that it is very difficult to do that

4   because as you mentioned, you have these hedge funds

5   who are operating as individual LLC's to some degree.

6   So, trying to get the cumulative affect of their

7   buying power sometimes is difficult.  We've tried to

8   look into, but you know, LLC's federally are

9   protected from who their owners are.  So, we know

10   that that is happening as well.

11      I just want to be mindful because there are some

12   small homeowners who while their tenants will be

13   getting some help and some relief, they still, are

14   subject to rising energy costs and things like that

15   that kind of make it difficult.  So, I'm just, I'm in

16   precarious position, I'm screaming at the governor

17   just like you guys are because we need help.  We need

18   to be able to disseminate you know, who is who.

19   That's going to be very important to do and we don't

20   have a whole bunch of time to do it.  So, I look

21   forward to working with the entire first panel to

22   make sure that we continue some of this apart and

23   target those that we need to target and support and

24   help those that we need to help in terms of

25   homeowners and/or landlords.

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                           43

1

2      So, we got to walk and chew gum at the same time.

3   Andy?

4      CO-CHAIR COHEN:  Thank you very much Rob.  I'll

5   be very brief.  Mike, in your testimony, you talked

6   about calls that you are taking now as a volunteer.

7   What do you tell tenants who call now who can't pay

8   the rent?  Is Mike able to hear me?

9      MICHAEL MCKEE:  I'm sorry, my internet is

10  apparently unstable.  I keep getting this prompt

11  saying your internet connection is unstable.

12     So, I heard part of what you said Council Member.

13     CO-CHAIR COHEN:  What I was wondering is you said

14  that you are volunteering and taking calls from

15  tenants.  I'm just curious, what are telling tenants

16  today who call and say they can't pay their rent?

17     MICHAEL MCKEE:  Well, you have to deal with it

18  first as a matter of common sense.  It's a question

19  between feeding your family and paying the landlord.

20  There is no choice, you have to feed your family.

21     I do tell people that if you can put aside some

22  of the rent, you should do that because down the

23  road, just the ability to pay partial rent might be

24  useful in terms of individual negotiations in a

25  landlord/tenant proceeding.  But of course, there are

A-569

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                           44

1

2    people that can't do even that and it's you know, we

3    refer people to local community groups, we refer

4    people to lawyers when they need a lawyer.  There is

5    not a lot you can tell people except that you know,

6    hunker down, and get through this and stay safe.

7        You can't tell people to save money when they

8    don't have an income but it all depends on the

9    individual situation when you talk to the tenant who

10   is calling in.  We also have resources that we refer

11   people to —

12       CO-CHAIR COHEN:  I think we lost Mike again.

13       MICHAEL MCKEE:  I think there are even more who

14   won't be able to pay on May 1st and there are other

15   tenants who can pay but who are going to withhold

16   rent out of solidarity which I have no problems with

17   if they want to do that but ultimately this has to be

18   a government solution.

19       CO-CHAIR COHEN:  Briefly, Caryn Schreiber from

20   Legal Aid, in your testimony also, you said that you

21   had some suggestions on possibly improving the bill.

22   I don't know if you submitted written testimony in

23   which those suggestions were made otherwise, I'm

24   interested in them.

25       Can we unmute Legal Aid?  You are unmuted.

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        45

 2        CARYN SCHREIBER:  Yes, thank you for that

 3      question.  We did submit written testimony that

 4      outlines some our recommendations.  I was out of time

 5      and was unable to get to them.

 6        CO-CHAIR COHEN:  If you have them for the record,

 7      that's fine.

 8        CARYN SCHREIBER:  Okay, thank you very much Mr.

 9      Chair.

10        CO-CHAIR COHEN:  Thank you Rob.  Austen, I'm

11      done.

12        AUSTEN BRANDFORD:  Great, any more questions from

13      Speaker Johnson?

14        SPEAKER JOHNSON:  No, we can go to the other

15      members, I can come back after them.  I don't want to

16      hold up the other members who are waiting.

17        AUSTEN BRANDFORD:  Okay, sounds good.  So, I will

18      now call on Council Members to ask questions in the

19      order they have used in the Zoom raise hand function.

20      I'd like to also note that Council Members Torres,

21      Yeger and Powers have already raised their hands to

22      ask questions of the Administration after their

23      testimony.

24        Council Members, please keep your questions to

25      four minutes including responses.  If there is a
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1    LICENSING                                      46
```

2   second round of questions Council Members questions

3   will be limited to two minutes.  A Sergeant at Arms

4   will keep a timer and let you know when your time is

5   up.  Our first question will come from Council Member

6   Yeger followed by Council Member Cabrera.

7        SERGEANT AT ARMS:  And Council Member Yeger, your

8   clock will start when you begin your testimony.

9        COUNCIL MEMBER YEGER:  I'm not testifying, I'm a

10  member of the Council.  How are you, thank you.

11       First of all, I'd like to echo Mr. Speaker, I

12  agree with a portion of his opening statement that we

13  do need rent cancellations, we do need reductions.  I

14  also believe as Mr. McKee said, and Mike McKee has

15  been a leader in tenant advocacy, so this is an

16  important point from him that that has to go hand and

17  hand with relief for landlords.  So, particularly

18  small landlords, I'm not worried about the very large

19  landlords, I am worried about the small landlords.

20  Excuse me, I have some background noise, but my

21  question more importantly is to Ms. Schreiber and

22  since you are the only lawyer on the panel, I wanted

23  to ask you this question.  With regard to your

24  Introduction 1912, my understanding and you can

25  correct me if I'm wrong is that the authority of a

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
         LICENSING                                          47
 2    Sheriff or a Marshal to execute a judgement comes

 3    from state law.  And state law particularly the CTLR

 4    with respect to execution is what a Sheriff perceives

 5    it contained the word shall.

 6       Do you believe that the City Council has the

 7    authority to supersede state law and to replace the

 8    word shall when a Sheriff receives a lawfully

 9    received an executed and commit execution or money

10    judgement execution or a warrant.

11       CARYN SCHREIBER:  So, thank you very much for

12    that question Council Member Yeger.  We believe, well

13    with regard to City Marshals specifically, that the

14    Mayor has the authority to direct City Marshals to

15    stop enforcement of judgements and that the City

16    Council has the power to legislate here as a result.

17       COUNCIL MEMBER YEGER:  Okay, and that the City

18    Council, not withstanding the fact that if a judge or

19    clerk of the court or an officer of the court signed

20    an execution that says at the top, the people of the

21    State of New York to any Sheriff or Marshal and gives

22    it to a Sheriff, the Sheriff can put it aside because

23    we passed a law that says so?

24       CARYN SCHREIBER:  I think that the Sheriff would

25    not be placing the judgement aside indefinitely.  It
```

A-573

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          48

1

2  could be exe— it will be executed let's say, not

3  could.  It will be executed when the moratorium is

4  lifted and it would not be flying in the face of

5  state law to say that that judgement is going to be

6  paused for lack of a better word for now.  Until such

7  time has passed that it makes sense for the community

8  at large for judgements to resume being enforced.

9     COUNCIL MEMBER YEGER:  I appreciate that very

10  much.  Well, the Sheriff is going to come on and

11  testify in a little while and I'm interested in

12  hearing his opinion on this topic.  But I appreciate

13  all of the advocates who came today and the important

14  work that you do.  Of the lawyers who are on the

15  front line and Mike McKee who is a legend in tenants

16  rights and tenants offenses and I'm a tenant too and

17  you know, I can pay my rent, so I'm going to and I

18  will.  But there are a lot of people who are

19  suffering right now and can't.  And I'm going to use

20  the remaining clock that the Sergeant has at 40

21  seconds to say that I do believe there are things

22  that the City Council can do to relieve the burden on

23  the owners in addition to the tenants because it

24  can't just be that tenants stop paying rent simply

25

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          49

1

2   because we say so and not withstanding that they are

3   not able to afford it.

4       Tenants who don't pay rent and can't afford it

5   will never be able to make that up and that's going

6   to leave a hole.  And we have to do it on both ends,

7   we have to help the tenants and freeze their rent and

8   we also have to help the landlords and we can do it

9   on taxation.

10      We can do something to relieve the tax burden by

11  stopping the interest payments on late payments.

12      SERGEANT AT ARMS:  Time expired.

13      COUNCIL MEMBER YEGER:  Okay Serg.  We can stop

14  the interest on late payments and allow the owners to

15  have a little bit of float so that they don't have

16  the proverbial gun to their head on making payments

17  at the same time that they are not receiving an

18  income.

19      So, that's why your advocacy on this Mike is so

20  important because you are recognizing that it does

21  come from both ends.  We can't just stop it on one

22  end, we do also have to help those people who have

23  those 20 unit buildings before they get the other 8

24  20-unit buildings.

25

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          50

1

2      And so, I want to thank you all.  Thank you very

3   much Mr. Chair and I yield back.

4      AUSTEN BRANDFORD:  Thank you.  We will now hear

5   from Council Member Cabrera followed by Council

6   Member Powers.

7      SERGEANT AT ARMS:  And your clock will start now.

8      COUNCIL MEMBER CABRERA:  Thank you so much.

9   First, I want to wish our Speaker a super happy

10   birthday and the lord bless you and give you many,

11   many more years.

12      SPEAKER JOHNSON:  Thank you.

13      COUNCIL MEMBER CABRERA:  And also, I want to

14   thank the Speaker, the Chairs for being so

15   parsimonious with your questions to get to the rest

16   of us.  I know I can speak on behalf of my

17   colleagues; we really truly appreciate it.

18      My question is in regards — I have a couple of

19   questions real quick.  Does it make more sense to

20   have to state and the city come up with a fund that

21   pays for those who are struggling with the rent?  For

22   those who were unemployed, we know the full list.

23   There are people who are employed.  There are people

24   who actually make more money than ever.  But we have

25   a big segment that is in a tremendous need.  Doesn't

A-576

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1     LICENSING                                        51
```

1

2    it make more sense to have the state and the city

3    come up with a fund to pay for those rent, just like

4    Delaware.  This is not unprecedented.  The State of

5    Delaware pay for the rent for all the renters?

6        My second question because I'm going to run out

7    of time is that if the nonprofits organizations are

8    excluded, wouldn't it make also sense to include

9    those landlords, they have the same business plan,

10   they have the same agreements with HPD when it comes

11   to, you know, many of them they have Title 11.  There

12   were agreements in place to be able to have low rent.

13   And also, the last thing is Assemblywoman Inez

14   Dickens; I was in a meeting the other day and she was

15   very much afraid of landlords or minority owned

16   landlords that could essentially be wiped out if they

17   are not able to collect rent and we could see pretty

18   much the end of a generation of minorities who own

19   property.

20       So, here trying to find that balance, which I

21   know is very difficult.  So, I'll turn it over to the

22   panel for some wisdom.

23       BARIKA WILLIAMS:  So, I think — this is Barika.

24   I think I can pick up on the minority landlords and

25   CDC's.  I think we see those as being interrelated.

A-577

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              52

1

2   We do have some large landlords who are minority

3   owned but by and large that's rarer in the city.

4      I was able to pull those numbers and just so

5   folks know, I think it's about 13 percent of

6   landlords own one building or less in New York City

7   as compared to 27 percent that own 61 buildings or

8   more.  So, that's sort of the spread that we're

9   talking about.  There is relatively few buildings

10  that are owned by small landlords.  But in both cases

11  when it comes to CDC's, when it comes to some of our

12  community controlled, like CLT'S or our limited

13  equity co-ops and then also our MWBE developers.

14  They face slightly different challenges.  Our

15  affordable housing have so many regulations that are

16  put on them by HPD but also at the federal level that

17  dictate their contracts, what they can collect in

18  rents but also what they can charge, how much they

19  can have in reserves.

20     And so, they don't have the ability to sort of

21  pull in from other buildings and other locations.

22  Likewise, though there are concerns similarly for our

23  minority developers and landlords sometimes because

24  we do know that they are underbanked and often

25  underserved.

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                    53
 2      SERGEANT AT ARMS:  Time is expired.
 3      BARIKA WILLIAMS:  On loans and they get higher
 4    rates.
 5      COUNCIL MEMBER CABRERA:  Thank you.
 6      AUSTEN BRANDFORD:  Thanks Council Member.  The
 7    next person is going to be Council Member Powers
 8    followed by Council Member Koo, but first I want to
 9    remind everyone to identify to whom your questions
10    are directed, so they can be unmuted to.  Council
11    Member Powers.
12      SERGEANT AT ARMS:  And your clock will start now.
13      COUNCIL MEMBER POWERS:  Great, thank you.  Happy
14    birthday Mr. Speaker.  I hope you are enjoying it and
15    thanks to everybody for your testimony and everybody
16    viewing at home.  I hope everybody is safe and
17    healthy.
18      This is directed to any members of the panel, I
19    guess I can start with Mike McKee, but other folks
20    are obviously helpful to join in.  I wanted to echo
21    some of the comments that were made earlier.  I do
22    think that it's important that we, at the state and
23    local level, you know, ensure that folks are not
24    being evicted at this point and time based on loss of
25    income or inability to move out of an apartment.
```

A-579

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                      54
```

 2   There is just so many reasons why we need to make

 3   sure that people have some housing stability but

 4   particularly right now.

 5       I am concerned that we also should be providing

 6   people with the ability and a better ability to pay

 7   their rent in the meantime which is good for all

 8   stakeholders that we're talking about here.  And you

 9   know, we put out some proposals and suggest some

10   things like flexibility in terms of using the

11   security deposit to be able to pay the next months

12   rent.  Obviously, that only covers one month but you

13   know to give you a bridge in the time period that

14   we're talking about.

15       My landlord has offered rent deferral programs to

16   be able to pay part of your rent or just to be able

17   to push a months rent back and pay later, which I

18   also have some concerns.  But enhance rent programs,

19   things around SCRIE to enhance the SCRIE program for

20   people in need.

21       For me, it's really important that we also make

22   sure people can find ways and creative ways to make

23   sure that people have the ability to pay rent and I

24   wanted to hear ideas or thoughts on in addition to

25   just an eviction moratorium, other ways that the city

A-580

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                    55
 2  or state can be interceding to help people be able to
 3  pay the rent and what creative measures you might be
 4  able to employ right now to not just shift the
 5  onerous over to those who own property some are mom
 6  and pop, some are large but to actually assist with
 7  the tenants ability to pay right now.
 8      MICHAEL MCKEE:  Well, that's a mouth full.
 9      COUNCIL MEMBER POWERS:  That's a mouth full, I'm
10  sorry.
11      MICHAEL MCKEE:  I'm not sure which part of the
12  question —
13      COUNCIL MEMBER POWERS:  Well, just other ideas.
14      MICHAEL MCKEE:  If I could back just a little bit
15  Council Member.  I think we all need to acknowledge
16  that during the 25 years that we had vacancy
17  decontrol in effect and other deregulation
18  amendments, and I want to remind you that it was not
19  the republicans in Albany who first stuck us with
20  permanent vacancy decontrol.  It was the democrats in
21  the New York City Council in 1994 under the
22  leadership of Speaker Peter Vallone.
23      But during that 25 years that we had vacancy
24  decontrol and other weakening amendments in effect,
25  most of which were repealed last year, thank God.
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                       56
 2   There was a huge hit on affordability to housing, not
 3   just rent regulated housing but housing in general in
 4   the downstate region.  And we are still living with
 5   the effects of that hit on affordability.  Rents are
 6   much less affordable now than they were 25 years ago.
 7   25 years ago, no one thought that $2,000 a month
 8   would be a normal rent in Brooklyn or Queens.  In
 9   fact, Council Member after Council Member that we
10   were trying to convince to vote against Peter Vallone
11   Decontrol bill from Brooklyn, Queens, and the Bronx
12   all said, "I don't have any apartments in my district
13   renting for $2,000 a month."  And we said, just pass
14   this bill and wait ten years and you will and who was
15   right?  Were we right or were they right?  I rest my
16   case.
17       But there are a whole bunch of things that could
18   be done.  We won a lot of things last year but we did
19   not get everything we need.  There was no rent
20   rollback.
21       SERGEANT AT ARMS:  Time expired.
22       MICHAEL MCKEE:  The apartments that were
23   deregulated were not reregulated and we did not get
24   good cause eviction passed for small buildings.
25   Those are things that need to be done.
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                    57
 2       COUNCIL MEMBER POWERS:  Mike and amen and I
 3     certainly don't have any apartments at [INAUDIBLE
 4     1:04:26] I think at this point in my district, but
 5     I'm just wondering if there are things right now you
 6     think that or Legal Aid or ANHD or others that we
 7     should be doing in addition to extending an eviction
 8     moratorium, just as a flexibility.
 9       So, I see others raising their hand, I think
10     Barika had her hand up to, so.
11       BARIKA WILLIAM:  No, Council Member Powers and
12     we're happy to have those conversations and work with
13     you on some of those ideas.  There's been
14     conversations around things like waiving security
15     deposits and allowing tenants to use them around
16     accessing the reserves.  Around letting tenants
17     amortize their rent over the following year to break
18     a current lease early without a penalty.  But some of
19     what Mike is talking about but I think sort of our
20     larger point and push and this is why it's important
21     for Council Member Cabrera's earlier question.  It's
22     important for everybody to understand the scale and
23     volume.
24       So, if we were talking, there's almost 3.5
25     million rental units in just the city, assuming that
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            58

1

2   they rent at just $1,000 a piece which is a low ball

3   number.  So, you know, I'm rounding this down and

4   assuming that people can't pay for three months,

5   that's over a half, that's a half a billion dollar

6   price tag right there, right.

7       So, I think it's key for us to all sort of

8   understand what volume we're expecting and that's

9   with just five percent of people not being able to

10  pay their rent for three months.

11      COUNCIL MEMBER POWERS:  Thank you.  I'll give my

12  time back, thanks.

13      AUSTEN BRANDFORD:  Thank you.  Next, we'll hear

14  from Council Member Koo who will be followed by

15  Council Member Torres.  Council Member Koo?

16      SERGEANT AT ARMS:  Council Member Koo, your clock

17  will start now.

18      COUNCIL MEMBER KOO:  Thank you.  Happy birthday

19  Speaker and I want to thank everyone who come in to

20  testify today.  And I support the spirit of the

21  intent of Intro. 1912 and 1926 but I have a few

22  questions for the first panel.  You mentioned people

23  have no jobs and they have no money to pay for the

24  rent.  But I thought we have this unemployment

25  insurance.  Everyone has money coming from the state

A-584

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                        59
 2   and on top of that the federal government is giving

 3   $600 per week to adults who collect unemployment.

 4       So, just a rough estimate, an average worker,

 5   even though they are not working, they collect

 6   unemployment, they will get like $3,000 a month.

 7       So, I mean, some of them might have other

 8   circumstances but I think many of them are able to

 9   pay their rent.  If they are not able to pay the

10   rent, where did the money go?  If you have $3,000 a

11   month, per month from the government and you buy food

12   and you pay bills, and unemployment wages, everyone

13   don't pay rent.  All the landlords are going to go

14   bankrupt.

15       So, how do we help all these landlords,

16   especially the small ones?  Many landlords have their

17   own obligations.  They have to pay mortgage,

18   utilities and property tax and don't forget property

19   tax is one third of the city revenues.  If the

20   landlords don't pay tax, the city will go bankrupt

21   immediately.

22       So, we all have to understand there are good

23   intentions but then there are unintended

24   consequences.  We don't want those things to happen

25   to adults.  They are paying property tax to the city
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                          60
2    and if they don't pay tax the city will get broke in

3    a minute.  So, can any one of you answer these

4    questions?

5        MICHAEL MCKEE:  I'll take a stab at it Council

6    Member.  First of all, just let me point out that

7    most people who have filed for unemployment have yet

8    to receive any benefits at all.  In fact, there was a

9    study that was released yesterday Pew Search outfit

10   that found that 29 percent of Americans; this was a

11   national survey who filed unemployment claims in

12   March have actually received unemployment benefits

13   and that means 71 percent have not.  Plus $1,200 a

14   month that the federal government has graciously

15   granted to individuals, I mean, that's a joke.

16       So, I don't really have any response to your

17   larger questions about what are we going to do to

18   keep the housing market from collapsing but

19   obviously, this has to be a government solution and

20   it's going to involve money.

21       COUNCIL MEMBER KOO:  I thought if they were

22   approved, they can get unemployment retroactively.

23       MICHAEL MCKEE:  Well, look, yeah but they don't

24   have it now.

25

A-586

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        61

 2       COUNCIL MEMBER KOO:  Well, they are soon to have

 3     a bunch of money coming.

 4       MICHAEL MCKEE:  I have a friend who have been

 5     trying to apply for unemployment for three weeks and

 6     she can't get through.

 7       BARIKA WILLIAMS:  Mike, the other thing that I

 8     would add into this is that it's very clear that

 9     there are huge parts of New York City's population

10     who are ineligible to even quality for unemployment,

11     because of their documentation status, because they

12     operated in a cash economy, because they were out of

13     employment too long prior to this.

14       So, there's also a huge set of people who have

15     been shut out, which is heavily our immigrant

16     population and our Black and Brown populations which

17     is the same set of populations that, and especially

18     for our Asian population who have suffered from this

19     crisis almost a full month before almost every body

20     else in the city, right.

21       So, I think there are some key things that we

22     know and we've heard are huge gaps in even that one

23     time stimulus check or the $600 bump consistently.

24

25
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                      62
 2        I know there are some others; I think I saw
 3     Caryn.  There are some others who can speak to this
 4     later.
 5        COUNCIL MEMBER KOO:  Alright, thank you.
 6        AUSTEN BRANDFORD:  Next, we'll hear from Council
 7     Member Torres followed by Council Member Lander.
 8     Again, a reminder to choose who you are directing
 9     your questions to so we can unmute them to.
10        SERGEANT AT ARMS:  And your clock will start now.
11        COUNCIL MEMBER TORRES:  Thank you.  I want to
12     wish the Speaker a happy birthday.  I have a question
13     about harassment, I'm curious to know from any of the
14     advocates, what cases of COVID-19 harassment have you
15     seen on the ground and do you think Intro. 1936 is
16     sufficiently brought to capture those cases?  And I'd
17     be curious to know what suggestive revisions you have
18     the bill.
19        CARYN SCHREIBER:  Mike, do you want to go ahead?
20        MICHAEL MCKEE:  Caryn, I think maybe that's a
21     better question for you.
22        CARYN SCHREIBER:  Sure, thank you for that
23     question Council Member Torres.  So, in terms of what
24     we would recommend, it's just a suggestion that the
25
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                   63
 2   bill could include an additional definition of a

 3   person impacted by COVID-19.

 4       We proposed including a catch all provision for a

 5   person who may be impacted for the purposes of the

 6   legislation but doesn't fall into one of the

 7   categories listed.

 8       In terms of what we are seeing on the ground, we

 9   are hearing about harassment based on a perception of

10   lost income or following a renters attempts to

11   discuss with the landlord that they have lost income

12   and would like to set up some sort of payment plan

13   and in a particularly insidious turn because of the

14   eviction moratorium that's currently in place, we

15   believe that this harassment is going on to get

16   tenants to in some way voluntarily involuntarily

17   move.

18       A way of a work around, around the current

19   moratorium and we expect that this behavior will only

20   escalate and get worse as the months go by and folks

21   continue to be unable to pay some or all of the rent.

22       COUNCIL MEMBER TORRES:  And I'll just make one

23   general comment here, where as a city we're facing a

24   humanitarian crisis, a nightmare that poses a

25   systemic risk to working families, to small property
```

A-589

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                        64

2   owners, to even the city which disproportionately

3   depends on property taxes.

4       And as has been pointed out, you know, there is

5   risk in freezing evictions without cancelling rent.

6   And there is risk in cancelling rent without

7   subsidizing it and as far as I can tell, there is no

8   means of subsidizing without federal intervention and

9   I'm pessimistic about the prospects for federal

10  support.

11      So, in the absence of federal support, what's the

12  exit strategy from this nightmare?  For me, there's a

13  real quandary about how to move forward.

14      MICHAEL MCKEE:  I think your question is well

15  taken and I don't think any of us has an answer.  I

16  mean, state and federal government have got to step

17  up and it's going to involve money and you know, as

18  Barika pointed out, we have thousands and thousands

19  of people who don't qualify under any of these

20  programs and they are going to be left out on the

21  cold which is why we are calling for universal rent

22  forgiveness or cancellation, not means tested.

23  Because if you have a means test, his or hers and

24  undocumented tenants, they are going to be excluded

25  and that's not right.

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          65

1

2      COUNCIL MEMBER TORRES:  And it's worth pointing

3  out that many working families have been slow to

4  receive their stimulus checks because of under

5  banking.  Not everyone has a bank account that allows

6  for direct deposit.

7      MICHAEL MCKEE:  Right.

8      COUNCIL MEMBER TORRES:  There is just infinite

9  ways in which COVID-19 has brought to light deeper

10  inequalities in America but I thank you all for your

11  testimony.

12      AUSTEN BRANDFORD:  Okay.  Next, we will be

13  hearing from Council Member Lander followed by

14  Council Member Louis.

15      SERGEANT AT ARMS:  Council Member Lander, your

16  clock will start now.

17      COUNCIL MEMBER LANDER:  Thank you very much to

18  the Chairs and I'll join in the birthday wishes to

19  the Speaker.

20      I'm going to follow up on both of Council Member

21  Torres's questions and I guess, first Ms. Williams,

22  first of all, welcome to the Council of sorts and

23  your role.

24      You know, I think you said that you would provide

25  a little data to the Council and I think after this

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          66

1

2    dialogue about how many New Yorkers and especially

3    what percent of tenants roughly will not be eligible

4    for unemployment insurance and federal stimulus,

5    would be really helpful here.  Because it is true

6    that part of the idea of unemployment insurance is to

7    enable people to have the resources that they need to

8    pay their bill.  So, it's taking too long, a lot of

9    people won't get what they need but as people start

10   to get those and it is income replacement, you know

11   that for people in something of a position to cover

12   their expenses but as  you point out, there's a very

13   high percentage of New Yorkers who will not be

14   receiving any relief because of the callus

15   xenophobic.  We just shouldn't let that sit as though

16   that's like reasonable.  What we have are a set of

17   xenophobes running the senate and the White House and

18   as a result, a whole set of hard working New York

19   families who just as much as everyone of us on this

20   call need a place to live and food to eat are going

21   to have no relief.

22       So, I think it would be helpful if you could just

23   help us document what percent of New York tenants are

24   being left out in the cold because that is a piece of

25   why New York City and New York State have an extra

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        67
 2   responsibility to step up and do something here.  So,
 3   is that something that you could help with?
 4      BARIKA WILLIAMS:  Yeah, absolutely.
 5      COUNCIL MEMBER TORRES:  And then I guess, I do
 6   want to just ask a little, I understand you know,
 7   Michael you're right that we need federal
 8   intervention here but I do think it's worth like
 9   going a little further on how we think about that
10   because if what we're saying is, some version of
11   those of us that are lucky enough to still you know,
12   have our income and you know, pay rent and pay
13   mortgage but there's a whole lot of people who can
14   you know, pay rent and pay mortgage but there's a
15   whole lot of people who can't and how that's going to
16   work its way through the system.
17      It's not that hard to imagine that the federal
18   reserve or a set of banking institutions in
19   partnership with the federal government could
20   actually imagine some reasonable guidelines.  So,
21   that you know, where tenants can't pay and therefore
22   were multifamily building owners with tenants who
23   can't pay their mortgage, they can expect to relate
24   to their lending institutions in a way that says,
25   yes, we're like all in a shared crisis.  Here is some
```

A-593

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          68

1

2    set of provisions for how to deal with it in ways

3    that don't put people on the streets and we haven't

4    heard anything about that at the national level.  I

5    know that's not your job or the job of today's

6    hearing but I wonder, Barika, this is something that

7    you, you know, the housing market and its

8    interconnectedness pretty well.  Like can you just do

9    a little more thinking with us assuming we start the

10   ball rolling with this legislation and we push it up

11   to the state with the rent and mortgage moratorium

12   legislation.

13       What do we expect at the level above that to kind

14   of hold our system together for the next year, not

15   put people on the street but then still leave us the

16   housing economy as we move forward beyond that?

17       BARIKA WILLIAMS:  So, I mean, I think what this

18   bill and this legislation seem like they are doing is

19   creating sort of a bubble around the New York City

20   housing stock, so that when we get to what in

21   vernacular, we're all calling the 91st day.  Which

22   could be at 91 or could be at 120 or right whatever

23   day that that is.

24       So, when we get to that 91st day, how are we not

25   in a place where to Caryn's point, we don't have you

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        69

1

2     know, thousands of people run in and file evictions,

3     right.  That creates an enormous strain right there.

4     So, we want to prevent that but what we also need to

5     ensure is that we're not delaying that a year out, so

6     that we're looking at having that same exact

7     circumstance, just maybe trickled out over a longer

8     period of time or delayed a longer period of time.

9     And I think that's where it goes to okay then, what

10    is the state going to be stepping —

11         SERGEANT AT ARMS:  Time is expired.

12         BARIKA WILLIAMS:  In to do in the interim and

13    then what is the federal government going to be

14    stepping in to do and those solutions might not be

15    the same for everybody or they might not be the same

16    depending on what point and time you're in.  Whether

17    it's you know, one year out or it's six months out or

18    two years out.

19         COUNCIL MEMBER TORRES:  Thank you very much and

20    I'm pleased to sign onto both pieces of the

21    legislation being heard today with thanks to their

22    sponsors.

23         AUSTEN BRANDFORD: Okay, next we'll have Council

24    Member Louis followed by Council Member Chin.

25

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        70
 2        SERGEANT AT ARM:  Council Member Louis, your time
 3      will start now.
 4        COUNCIL MEMBER LOUIS:  Good afternoon everyone.
 5      I want to wish Speaker Johnson a very happy birthday
 6      and thank you Chair's Cornegy and Cohen for hosting
 7      this hearing.  I'm getting a lot of emails from
 8      different small businesses in regards to this bill,
 9      so I am assuming this question could go to Caryn or
10      anyone on the first panel.  But the question is, for
11      big businesses like Kings Plaza, City Point, those
12      locations are in Brooklyn.  If they were to commence
13      an action for eviction before the New York enforced
14      policy, are City Marshals still prohibited from
15      evicting?  And if so, how does 1912 help or hurt
16      small businesses?  Thank you.
17        CARYN SCHREIBER:  Thank you Council Member.  Just
18      so I can make sure I understand your question.  Will
19      City Marshals be able to evict currently or if, or
20      while the state moratorium is in effect or if the
21      1912 moratorium was in effect or all three?
22        Oh, Council Member, I think you are muted.
23        COUNCIL MEMBER LOUIS:  Can you hear me now?
24        CARYN SCHREIBER:  Yes, I can thank you.
25
```

A-596

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                        71
 2      COUNCIL MEMBER LOUIS:  Perfect.  Currently or
 3    during the New York on pause, were they able to evict
 4    after.  Will they still be able to evict if they
 5    already had come into action before hand and how does
 6    1912 help or hurt the small businesses in the bigger
 7    conglomerate?  I don't know if you are familiar with
 8    Brooklyn or Kings Plaza more or City Point, if there
 9    was a smaller business within and they were about to
10    get evicted, before New York on pause, how does this
11    bill help or hurt them?  Thank you.
12      CARYN SCHREIBER:  So, it's my understanding that
13    after the moratorium ends, any notices of eviction
14    which are legally required before a Marshal can
15    execute a warrant of eviction, must be reserved.
16      So, if an eviction was scheduled for let's say
17    March 20 or maybe like March 21st, and that eviction
18    did not happen, the warrant wasn't executed.  The
19    notice of eviction will need to be reserved again
20    either when you know, when they are able to, when
21    this current moratorium ends and/or when the Marshals
22    begin serving notices of evictions again in order to
23    execute them.
24      And this I mean, having notice served again is
25    extremely important whether for residential tenants
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                      72
 2  at risk of eviction or commercial tenants at risk of

 3  eviction, so that the tenant is on notice and is

 4  aware that the eviction can be scheduled and is

 5  coming up.

 6     And in terms of how a moratorium would benefit

 7  small businesses that may have been at risk of

 8  eviction prior to it going into effect this will

 9  hopefully allow those small businesses along with

10  other renters an opportunity to devise a plan,

11  hopefully with the assistance of government funding

12  to stave off that eviction.  And delaying that

13  eviction will provide some opportunity for them to do

14  that whereas right now, they don't have a chance of

15  preventing that eviction from going forward.

16     COUNCIL MEMBER LOUIS:  Alright, thank you.

17     CARYN SCHREIBER:  Thank you.

18     AUSTEN BRANDFORD:  Now, I'll turn to Council

19  Member Chin who will be followed by Council Member

20  Grodenchik.

21     SERGEANT AT ARMS:  Council Member Chin, your

22  clock will start now.

23     COUNCIL MEMBER CHIN:  Thank you.  Thank you to

24  the panel, thank you to the Chair and happy birthday

25  to our Speaker.  What I wanted to raise is that in my
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    73
 2   district particularly, I do have a lot of small

 3   property owner that are legacy owners.  That are

 4   owned by you know, families for generation.  They all

 5   wanted to build things or family association based on

 6   last name or the part of China that the immigrated

 7   from.  And they are working with their tenant and

 8   trying to work with them.  They are not evicting them

 9   because they can't pay rent but what they are asking

10   the city for is, you know, help them out with the

11   property tax issue.

12       What about you know, deferring a portion of the

13   property tax or delaying payment, so that they can

14   also meet their needs?  And that's something that

15   they are asking the city.  At the same time,  you

16   know, the water charge are going up.  You know,  a

17   lot of people are home, they use more water and water

18   bills are coming due.

19       So, they are really asking for deferral of these

20   payments you know, hopefully after the crisis is

21   over.  So, that's something that we have to look at

22   what we can do as a city for some of these good

23   property owners who are supporting their tenant.

24       At the same time, we still have some really bad

25   property owners who are using these times to raise
```

A-599

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          74

1

2   rent.  They are issuing new leases to residents and

3   they are asking for a huge rent increase or that they

4   are trying to evict them and not allow them to have

5   secession rights, that they have to fight for it.  I

6   mean those are the cases that we're still getting and

7   also some landlords not providing heat and hot water.

8       So, I think what the bill in terms of the

9   harassment, I wanted to ask Caryn from the Legal Aid

10  Society, in terms of and maybe Mike.  Is there other

11  tenant harassment issues?  Are they also coming into

12  your office and to the hotline and how are we helping

13  these tenants because right now, the courts are

14  closed.  But they need to prepare to fight the

15  harassment or fight the evictions.  Thank you.

16      CARYN SCHREIBER:  I can start Mike if that's okay

17  with you.  So, in terms of certainly we are hearing

18  from tenants about landlords not maintaining

19  essential services like hot water or heat during the

20  night or even during the day when it's still cold.

21  And the housing courts remain open for those types of

22  emergency housing part proceedings related to

23  repairs.  The housing courts are also open for

24  illegal evictions or lockout cases because any

25  eviction right now is an illegal eviction and

A-600

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                         75
 2   unfortunately, those types of cases are still being

 3   filed.  People are being unlawfully locked out of

 4   their homes and certainly, we are also hearing about

 5   tenants who are being made to feel that they need to

 6   leave their homes because of the impact that COVID-19

 7   has had on them, either as people who are potentially

 8   exposed or are sick with COVID-19 or those who have

 9   lost income as a result of the pandemic and the

10   shutdown.

11        COUNCIL MEMBER CHIN:  Thank you.

12        AUSTEN BRANDFORD:  We'll now turn to Council

13   Member Grodenchik who will be followed by Council

14   Member Rosenthal.

15        SERGEANT AT ARMS:  Council Member Grodenchik,

16   your time is starting now.

17        COUNCIL MEMBER GRODENCHIK:  Thank you very much.

18   Thank you Chairs, happy birthday Speaker.  Ms.

19   Williams, do we have an estimate or Mr. McKee or

20   anybody, do we have an estimate on how many people

21   you feel are going to be in danger of not being able

22   to pay their rent on a long term basis in the City of

23   New York?  How many units?  Are we talking 10,000

24   units, are we talking 100,000?  Because that is

25   really a big part of this issue here.  You know if
```

Case 20-4238, Document 36, 02/11/2021, 3035040, Page60 of 297

A-601

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                      76

1

2    it's 100,000, it's a big, big, big issue.  If it's

3    10,000, much more manageable.

4        I think Ms. Williams is talking but —

5        BARIKA WILLIAMS:  There we go.  I think the best

6    way that we've had to look at the numbers, so some

7    people are looking at the numbers based on

8    unemployment.  The other side and the other way that

9    we've looked at these numbers is based on the loss of

10   —

11       COUNCIL MEMBER GRODENCHIK:  I don't have much

12   time; do you have an estimate?

13       BARIKA WILLIAMS:  We think currently in the first

14   month and a half, it's about 30 percent loss of rent

15   role for many of our members.

16       COUNCIL MEMBER GRODENCHIK:  And how many people

17   would that be with 30 percent of what?

18       BARIKA WILLIAMS:  If we were looking across the

19   entire city's rental population, that would be one

20   million.

21       COUNCIL MEMBER GRODENCHIK:  How many units are

22   there of rental housing in this city?

23       BARIKA WILLIAMS:  About 3.5 million.

24       COUNCIL MEMBER GRODENCHIK:  Okay, so that is

25   almost —

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                                77

1

2      MICHAEL MCKEE:  Roughly 2 million rental units.

3      BARIKA WILLIAMS:  Oh, sorry, yeah, 2 million

4   rental, 1.5 homeowner.

5      COUNCIL MEMBER GRODENCHIK:  Okay, well, I do

6   think you know, I was involved in the early 90's

7   because I'm old in the co-op and condo crisis when

8   you were able to take a building that had 15 percent

9   you know join and then you know, people were in

10   danger of losing everything.  We were able to put

11   together in the Queens Borough Presidents Office

12   under the great leadership of Claire Shulman, we were

13   able to save the units of 20,000 homeowners in Queens

14   and it also helped of course the renters as well

15   because they weren't dispossessed either.  And I

16   really think Brad Lander hit at it, but I think that

17   we are going to need a holistic solution where the

18   banks who made these loans are willing to step

19   forward and everybody, I think is going to have to

20   eat something here.

21      I'm not sure that a blanket noneviction procedure

22   will be the answer but I think we definitely need to

23   have an answer to this and I want to thank the Chairs

24   for leading this discussion today on these important

25   pieces of legislation.  But I really think that we

A-603

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                          78
 2  are going to need really everybody kicking in and I
 3  think my colleague Margaret Chin was also quite
 4  correct in saying that property taxes are something
 5  we're going to have to look at.  They are out of
 6  control in the City of New York.  We could put liens
 7  on property taxes, put a lien on an apartment
 8  building until it's sold, so the city wouldn't be
 9  losing out.  But I think really from where I'm
10  looking at here, this is going to take a very, very
11  large solution.
12     And I thank you, I thank the panel for being here
13  today and helping me to clear my head so to speak and
14  start to think about this issue a little more
15  clearly.
16     With that I waive the balance of my time.  Thank
17  you very much.
18     AUSTEN BRANDFORD:  Thank you.  Next, we'll turn
19  to Council Member Rosenthal and follow back to our
20  Chair's and Speaker Johnson for any final questions.
21     SERGEANT AT ARMS:  Council Member Rosenthal,
22  your time will start now.
23     COUNCIL MEMBER ROSENTHAL:  Thank you very much.
24  Thank you all for your testimony.  I would like to
25  also try to get to some numbers and think about for
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            79

1

2    the purpose of helping the city bring this to the

3    attention of the federal government because I really

4    do think at the end of the day, the city is not going

5    to be able to bail out you know, renters or small

6    property owners.  And of course, we all want to

7    prevent some sort of venture capitalist from coming

8    in and swooping everything up and making it ten times

9    worse.

10       And I'm listening to each of you go back and

11   forth on the numbers and just having a hard time

12   trying to fine tune it.  You know, if you say we have

13   2 million renters, how many people in New York City

14   are on unemployment, a half a million now?  Not quite

15   sure.  And then add on that, everyone who can't even

16   get unemployment insurance.  Can we start to quantify

17   the magnitude of it that way?

18       BARIKA WILLIAMS:  So, I would say, I think one of

19   the, I'm hearing a lot about the numbers.  I think

20   one of the challenges here is that these are moving

21   numbers.  We're pulling things from different

22   resources.  They are not disaggregated and we can't

23   line them up.

24       So, we've got a set of population primarily

25   focused in our Asian communities that were impacted,

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    80
 2   had a rent loss, really largely before any of this

 3   tracking started.  So, put them on a months impact

 4   ahead of everybody else.  Then we start from

 5   tracking, if we use unemployment, we're skipping some

 6   of the other populations highlighted before, right.

 7   If we're looking strictly at the loss of rent roles,

 8   that doesn't necessarily speak to people who have

 9   lost well, sorry, unemployment also doesn't speak to

10   the fact that people might be taking unemployment but

11   still trying to pay their rent or still paying a

12   portion of their rent, right.

13      So, that doesn't necessarily fully line up with

14   the ability to pay or not pay your rent although we

15   expect and fully anticipate that that's a core part

16   of the population that isn't able to pay.  And then,

17   we've got another set of the population that isn't

18   tied to unemployment at all, it's sort of separate

19   from this.  Maybe is still employed, has had huge

20   reductions in their incomes, they are working part

21   time and they are also struggling to pay rent.  They

22   might be paying half, they might be paying a quarter,

23   they might be paying zero.  And so, all of those

24   numbers, right and then each two weeks, we probably

25   scale that number up proportionally because there is
```

A-606

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          81

1

2     more and more people impacted.  So, that's one of the

3     struggles right now for anybody being able to track

4     this.

5       COUNCIL MEMBER ROSENTHAL:  And I would add to

6     that, how do we expect people to ever be able to make

7     up the rent?  It's not going to happen.

8       BARIKA WILLIAMS:  Right.

9       MICHAEL MCKEE:  A lot of these jobs, they are

10    gone.  They are not coming back plus there are people

11    leaving the city because of lost of income, loss of

12    employment and how you calculate this, I mean, good

13    luck with it but as Barika points out, it's a moving

14    target.  It's going to be big; it's going to big;

15    it's going to be a lot.

16      COUNCIL MEMBER ROSENTHAL:  Yeah, I agree with you

17    on that.  I just think you know we got low —

18      SERGEANT AT ARMS:  Time expired.

19      COUNCIL MEMBER ROSENTHAL:  Okay, thank you for

20    keeping me on the clock, but thank you to the

21    panelists for all your hard work, everything you are

22    doing to keep our tenants safe.  There is no question

23    the federal government is going to have to come in

24    and there is no question but that banks are going to

25    have to step up.  That's who was bailed out last time

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                      82
 2    around and this time they need to bail out everyone

 3    else.

 4       Thank you.

 5       AUSTEN BRANDFORD:  Thank you.  Just circling back

 6    to Speaker Johnson for any final questions and moving

 7    on to Administration testimony.

 8       SPEAKER JOHNSON:  Thank you Austen.  I just want

 9    to quickly go back and ask, is the new economy

10    project on?

11       MICHAEL MCKEE:  Yes.

12       SPEAKER JOHNSON:  Okay, I wanted to ask you guys,

13    you guys have been fighting for a broad set of

14    emergency measures to protect New Yorkers health,

15    safety and financial security including advocating

16    for a moratorium on debt collections in New York

17    State.  Can you talk about the short and long term

18    harmful impacts of money judgements and other debt

19    collection measures on New York City's low income

20    communities and communities of color?

21       ANDY MORRISON:  Absolutely, so, already debt

22    collection, predatory debt collection is a scourge in

23    low income communities and communities of color and

24    what we've seen over the years particularly through

25    our financial justice hotline is debt collectors
```

A-608

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1   LICENSING                                          83

2   using and abusing our courts to get judgements

3   against New Yorkers violating their due process using

4   all kinds of shady tactics to get judgment and then

5   enforce those judgements against New Yorkers to

6   siphon massive amounts of wealth from communities.

7       So, it's an issue that exacerbates and

8   perpetuates racial and economic inequality in our

9   city and again, to underscore, these are the same

10  communities that have been particularly harmed by

11  COVID-19 and are subject to all kinds of racial and

12  economic inequities.

13      And so, in the short term, the moratorium is

14  needed as our other immediate remedies to some of the

15  issues that we've seen New Yorkers facing.  In the

16  long term, what we're hearing from a lot of our

17  community partners and organizations that we've

18  worked with is that, while we need to really stretch

19  the bounds of the city's authority and our creativity

20  to address the immediate issues people are facing and

21  while we need to pressure the state and the federal

22  government to do more, we also need to be thinking

23  about building alternative institutions.  And New

24  York City is fortunate in one way that it has laid a

25  lot of critical groundwork for worker cooperatives,

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            84

1

2   community land trusts.  There's an exciting movement

3   for a public bank, which would over the long term

4   address a lot of the issues that have been surfacing

5   throughout this hearing from the banks not serving

6   communities equitably, to landlords harassing and

7   exploiting their tenants and the list goes on and on.

8       And so, there's a lot of excitement and

9   enthusiasm for building new institutions and economic

10  models that would create and build resiliency and

11  build institutions that are rooted economic and

12  racial justice and equity.  And so, we really

13  strongly encourage the Council to be thinking about

14  that as we move into this economic recovery phase.

15  To be thinking about the types of initiatives the

16  city can adopt to really recreate an economy that

17  works for everybody.

18      SPEAKER JOHNSON:  Thank you Andy and do we have

19  someone from the Community Service Society CSS on?

20  No, no one from CSS or do they need to be unmuted?

21      BARIKA WILLIAMS:  I think Sergeant it's Oksana.

22      MICHAEL MCKEE:  Oksana is here, online.

23      BARIKA WILLIAMS:  Yeah, she's here.

24      SPEAKER JOHNSON:  Okay, hold on a second.

25  Oksana.

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          85

1

2      OKSANA MIRONOVA:  Thank you.  Thanks, Barika.

3      SPEAKER JOHNSON:  Hi Oksana, so, first before I

4  ask my question, I just want to really extend my

5  condolences to you and to the entire CCS family in

6  New York City lost a legend and you lost a colleague

7  in Tom Waters who such a giant in the housing

8  community and fighting against poverty in New York

9  City for decades and we know that COVID-19 took his

10 life and we're sending our condolences to you all at

11 CSS and the Broader Tenant Movement is mourning Tom's

12 loss as well.  We really appreciate CSS's continued

13 dedication to fighting for the most vulnerable during

14 this time where your mourning Tom's loss, so thank

15 you for being here.

16     You all done a lot of work to show that many New

17 Yorkers were in crisis even before COVID.  That 30

18 percent of New Yorkers were falling behind on rent

19 before the virus hit.  I wanted to ask, what percent

20 of New Yorkers do you think are falling behind rent

21 right now as a result of this crisis and what are the

22 risks that those tenants are going to face and what

23 risk does the city face if we don't step up to

24 protect them now?

25

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        86

 2        OKSANA MIRONOVA:  Absolutely.  Thank  you and

 3    thank you so much and thank you for listening to our

 4    testimony and yeah, I really appreciate the statement

 5    about Tom, it's difficult to believe that he's gone.

 6        So, we know that from the data that was available

 7    from the CUNY public health research; they've been

 8    doing a survey every single week about the number of

 9    people who are effected by COVID-19.  And from our

10    own research about the number of people who have less

11    than $1,000 in savings which is 70 percent of low

12    income people have less than $1,000 in savings.

13        At the end of March, there was probably about

14    126,000 people who were I don't want to say were

15    likely to fall behind on rent but who lost most of

16    their income and also didn't have enough money in the

17    bank to make a months' worth of rent.

18        So, that's 126,000 renters, specifically in the

19    private market, so that's excluding everyone who gets

20    Section 8.  Excluding everyone who lives in public

21    housing because we're making the assumption with the

22    Cares Act that their rent is going to be covered at

23    least for the next couple of months.

24        There is no guarantees beyond that but for the

25    foreseeable future.  So, that's 126,000 people in
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              87

1

2  late March.  We don't have figures for April, we

3  don't know what's going to happen in May but the

4  harsher social distancing rules went into effect I

5  think on March 16th.  So, and lots of people lost

6  jobs after that, so that number is much larger by

7  now.

8       SPEAKER JOHNSON:  Thank you.  Thanks, Oxsana.  I

9  just want to, yeah Barika, go ahead you are unmuted.

10      BARIKA WILLIAMS:  I just, since we've gotten a

11  lot of questions about specific data, I think Oxsana

12  can probably chime in on this and tell me if she

13  disagrees, but I think one thing you all could do and

14  especially you Speaker, could maybe help us with one

15  thing we know would aid a lot of our analysis is

16  being able to get the unemployment data disaggregated

17  at something other than the citywide or county level.

18      So, when we just get that big number, it's really

19  hard to do anything with.  That translates into very

20  different rents, very different numbers of people in

21  different places.  One thing that we've been trying

22  to figure out with New York State DOL, I'm not sure

23  where they are but if we could get that number at

24  some sort of smaller geography and with more

25  frequency, I think that would be hugely helpful.

A-613

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                    88
 2       SPEAKER JOHNSON:  Thank you.  I appreciate you
 3     all testifying today under these trying
 4     circumstances.  I want to thank all the Council
 5     Members who I have been listening to all their
 6     questions, very thoughtful questions, I appreciate
 7     it.  And I just want to say you know, the Council is
 8     doing the best that we can.  We are trying here to
 9     give some level of protection to renters, to tenants,
10     to New Yorkers who we know are vulnerable and
11     suffering but again, I think it's just important for
12     the public to understand and realize that with one of
13     the worst economic situations the city has ever been
14     in, with a $2.5 billion budget shortfall in the
15     current fiscal year that we're in, not even talking
16     about next fiscal year which begins on July 1st.  We
17     estimate that that number is upwards of another $5
18     billion, so we're somewhere near $8 billion in the
19     hole and that number could grow.  The city doesn't
20     have the resources and money to be doing many of the
21     things that we all know is the right thing to do,
22     which is why we need federal help and federal
23     intervention to help us here.
24       There was a bill I know that was put forward by
25     some Assembly Members and Senators calling for a $10
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                          89

2    billion program from the federal government to

3    actually compensate landlords for tenants who can't

4    pay their rent.  So, landlords could still pay their

5    property taxes and real estate taxes which then

6    wouldn't undermine the city's budget.

7        We know there is another bill that would cancel

8    rent but by Senator Gianaris but we want to do

9    anything we can but ultimately when you've seen these

10   really outrageous statements by the Senate Majority

11   Leader Mitch McConnell, saying that states and local

12   governments should just declare bankruptcy, the human

13   impact, the toll that that would have on New York

14   City is beyond comprehension.  And so, his comments

15   softened just a little bit yesterday but we know how

16   he really feels.  We really need in this next

17   stimulus bill a significant amount of money for New

18   York City to protect the social safety net.

19       Our north star in this process is to protect

20   people that are vulnerable.  To protect New Yorkers

21   that were struggling and vulnerable before this

22   crisis hit to protect children and seniors and

23   tenants in low income communities and communities of

24   color and immigrant communities, people that we knew

25

A-615

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                    90
 2    were struggling before COVID-19 slammed into our

 3    city.

 4        So, throughout this budget process and through

 5    our advocacy to both the state and our federal

 6    representatives, we are going to continue to push for

 7    money and programs that will help New Yorkers that

 8    need it most right now.

 9        I really appreciate all of you and your

10    organizations joining us today for this important

11    call.  It's a nice way to spend my 38$^{th}$ birthday on

12    this Zoom conference and I just wanted to thank you

13    all for being here today and I'm happy to either turn

14    it back to Chair Cohen or Chair Cornegy or to the

15    Committee Counsel so that we can hear from our next

16    witness.

17        AUSTEN BRANDFORD:  I can now call on members of

18    the Administration to testify.

19        So, today we will be hearing testimony from Dana

20    Sussman of the Commission on Human Rights and Sheriff

21    Joseph Fucito of the Department of Finance.  AnnMarie

22    Santiago Department Housing Preservation and

23    Development will also be available for questions.

24

25
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    91
 2         Can the three of you please raise your right

 3   hands.  We will administer the oaths once; we will

 4   unmute you to affirm individually at the end.

 5      Do you affirm to tell the truth, the whole truth

 6   and nothing but the truth before this Committee and

 7   to respond honestly to Council Member questions?

 8      PANEL:  Yes.

 9      AUSTEN BRANDFORD:  Dana Sussman?

10      DANA SUSSMAN:  Yes.

11      AUSTEN BRANDFORD:  Sheriff Fucito?  Sheriff?

12      JOSEPH FUCITO:  Yes.

13      AUSTEN BRANDFORD:  Great.  AnnMarie Santiago?

14   AnnMarie?

15      ANNMARIE SANTIAGO:  Yes.

16      AUSTEN BRANDFORD:  Great, wonderful.  You may

17   begin when you are ready.

18      DANA SUSSMAN:  Alright, I think I am starting.

19   Good afternoon Speaker Johnson, Committee Chairs

20   Cornegy and Cohen and the members of the Committees.

21   I am Dana Sussman, Deputy Commissioner for Policy

22   Intergovernmental Affairs at the New York City

23   Commission on Human Rights.  Thank you for convening

24   today's hearing to address the critical needs of New

25   Yorkers during the COVID-19 pandemic.  We know that
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                92
 2  many of us are now struggling and may be mourning a

 3  loss of friends and family and co-workers and I want

 4  to take a moment to acknowledge that during this

 5  incredibly difficult time.

 6      As you likely know, the Commission is the local

 7  law enforcement agency of Civil Rights Law

 8  Enforcement Agency that enforces the New York City

 9  Human Rights Law, one of the broadest and most

10  protective anti-discrimination and anti-harassment

11  laws in the country, now totaling 26 protected

12  categories across nearly all aspects of city living:

13  housing, employment and public accommodations, in

14  addition to discriminatory harassment and bias-based

15  profiling by law enforcement.  By statute, the

16  Commission has two main functions.  First, the

17  Commission's Law Enforcement Bureau enforces the City

18  Human Rights Law by investigating complaints of

19  discrimination from the public, initiating its own

20  investigations on behalf of the City, and utilizing

21  its in house testing program to help identify

22  entities breaking the law.

23      Second, the Community Relations Bureau, which is

24  comprised of Community Service Centers in each of the

25  City's five boroughs, provides free workshops on
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                        93

2   individuals right and businesses, employers and

3   housing providers obligations under the City Human

4   Rights Law and creates engaging programming on human

5   rights and civil rights issues.

6       Before turning to Intro. 1936, I'd like to

7   highlight some of the important work that the

8   Commission is doing to address discrimination and

9   harassment that we have seen emerging in the midst of

10  the current public health crisis posed by COVID-19.

11  In the context of the COVID-19 pandemic, we have seen

12  a multitude of ways in which the City Human Rights

13  Law intersects with the rapidly changing needs of New

14  Yorkers in crisis.  Starting in January, the

15  Commission began to monitor and increase in anti-

16  Asian discrimination and harassment, including

17  scapegoating, fearmongering, and the spread of

18  misinformation, as news about COVID-19 started to

19  emerge.

20      In February, the Commission started to receive

21  its first reports of New York City-based incidents of

22  discrimination and harassment targeting Asian New

23  Yorkers.  At the same time, the Commission's East

24  Asian Communities Liaison Flora Ferng and other

25  members of the community outreach team were working

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          94

1

2    regularly with community leaders of Asian and Pacific

3    Islander or API communities throughout New York City

4    to provide information and resources about the

5    Commission's work.

6        From February through mid-April, the agency

7    recorded 284 reports of harassment and discrimination

8    related to COVID-19, over 40 percent of which or 115

9    identify incidents of anti-Asian harassment or

10   discrimination.  And I'd just like to note that we

11   released numbers last week.  The numbers I'm

12   reporting out today are updated as of earlier this

13   week, so the numbers are slightly higher.

14       By comparison, during this same time period in

15   2019, the Commission had received just five reports

16   of anti-Asian discrimination.  This influx in reports

17   and cases resulted in the Commission's April

18   announcement of the formation of a COVID-19 Response

19   Team to handle reports of harassment and

20   discrimination related to the outbreak.  The Response

21   Team is comprised of staff from the Law Enforcement

22   Bureau and the Community Relations Bureau working in

23   coordination to quickly and efficiently track and

24   respond to the sharp increases in reports of

25   harassment and discrimination connected to the

A-620

1    COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                      95

2    pandemic.  The COVID-19 Response Team has now taken

3    action in 176 of those reports, including, for

4    example, conducting early or emergency intervention,

5    providing know your rights information about how to

6    request a reasonable accommodation, referring the

7    individual to another service or agency, or

8    commencing an investigation.

9        In addition, the Commission has opened active

10   investigations into 26 matters spanning

11   discrimination in housing, public accommodations, and

12   employment on the basis of race, national origin,

13   disability, and lawful source of income.

14   Additionally, the Response Team has now successfully

15   resolved and closed ten matters of COVID-19 related

16   harassment and discrimination so far.

17       The Commission's Community Relations Bureau or

18   CRB has also held bystander intervention trainings

19   with the Center for Anti-Violence Education, which

20   provide techniques to safety de-escalate a bias

21   incident in real time and just earlier this week or

22   late last week, were recently piloted in Mandarin.

23       In early March, CRB co-sponsored community forums

24   in Sunset Park Brooklyn and Manhattan's Chinatown

25   educating Asian communities of their rights and

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                    96
 2  protections under the law.  The Commission has held

 3  virtual town halls, in partnership with sister

 4  agencies, elected officials and community based

 5  organizations highlighting workplace rights related

 6  to COVID-19, reporting discrimination and harassment

 7  related to COVID-19 and responding to hate and bias

 8  with restorative justice measures among other topics.

 9      The Commission continues to produce and promote

10  content to provide key information to impacted

11  communities on their rights in several language

12  including many of those spoken by Asian New Yorkers

13  facing heightened harassment and discrimination

14  including Cantonese, Fujianese, Korean, Mandarin and

15  Tagalog with additional language forthcoming.  The

16  Commission staff currently speak over 30 languages.

17      Shortly after the outbreak began, the Commission

18  launched an online resource page outlining New

19  yorker's rights and protections around COVID-19

20  related harassment and discrimination in housing,

21  employment and public accommodations which is

22  regularly updated.  The page is available at

23  nyc.gov/stopcovidhate.  The commission also currently

24  has a paid campaign running on social media platforms

25
```

A-622

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                      97
```

1

2    directing people to our resources on their rights as

3    they relate to COVID-19.

4        Turning now to Intro. 1936, most cases of housing

5    discrimination against a person with suspected or

6    confirmed COVID-19, or against a person carrying for

7    someone with a suspected or confirmed case, are

8    protected under the City Human Rights Law's broad

9    protections based on actual or perceived disability

10   or a person's association with someone with a

11   disability.

12       In addition, essential workers who may face

13   housing discrimination because they are at risk of

14   exposure to COVID-19 are protected by the City Human

15   Rights Law's protections based on lawful occupation.

16       The Commission's Law Enforcement Bureau has

17   directly received 228 COVID-19 related inquiries, 44

18   of which are in the housing context.  The Commission

19   has provided tenants and co-op residents with

20   information regarding the City Human Rights Law and

21   in some cases, contacted management companies or co-

22   op boards to advise them of their responsibilities

23   under the law.  For example, where restrictions on

24   residents to reduce the spread of COVID-19 did not

25   allow for accommodations for residents with

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                       98
 2   disabilities.  For example, in situations in which

 3   buildings are not permitting or facilitating

 4   deliveries to the door of individuals with

 5   disabilities unable to exit their apartment due to

 6   their limitations or immunocompromise conditions,

 7   COVID-19 self-quarantine, or because they are unable

 8   to lift or otherwise carry packages due to a

 9   disability.  The Commission's Law Enforcement Bureau

10   is able to intervene and provide inquirers with

11   information about their rights to request a

12   reasonable accommodation.

13      While Intro. 1936 does not amend the City Human

14   Rights Law, it does amend or seek to amend the

15   Housing Maintenance code's language on protected

16   categories with respect to tenant harassment which

17   was modeled after language in the City Human Rights

18   Law to protect against harassment based on a person's

19   protected status.

20      That 2017 addition of those protected categories

21   with respect to tenant harassment and housing code,

22   allows tenants to choose whether to file a

23   discrimination claim with the Commission or can take

24   a case to housing court.  Because of the substantial

25   overlap between existing protections in the City
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        99
 2   Human Rights Law and the Housing Maintenance Code,

 3   several of the protections contemplated in 1936

 4   already exist to protect tenants against harassment

 5   in housing.

 6       As I said before, this is true for cases of both

 7   confirmed or suspected COVID-19, or when an

 8   individual has a relationship or association with

 9   someone with an actual or suspected case of COVID-19,

10   including for example, family members who reside in

11   the unit.

12       It is important to note that if a tenant chooses

13   to prevent claim under this provision in housing

14   court, they typically will be precluded from bringing

15   the same claim at the Commission.  Currently,

16   remedies in housing court are usually limited to

17   civil penalties ranging from $1,000 to $10,000

18   compared to remedies at the Commission, which include

19   uncapped compensatory damages to the victim, civil

20   penalties of up to $250,000 and other affirmative

21   relief.  Because the remedies in housing court are

22   more limited than at the Commission, it is vital that

23   tenants understand the options available to them and

24   are able to make an informed decision regarding the

25   venue they choose.  To the extent that New Yorkers
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    100
   2    experience discrimination or harassment with respect

   3    to any of the protected categories articulated in the

   4    City Human Rights Law, we always encourage them to

   5    contact the Commission.

   6        The Commission recognizes that people who have

   7    COVID-19 are at risk of contracting the virus and/or

   8    are essential workers must be able to live safely and

   9    securely and should never, under any circumstance,

  10    have to contend with discrimination harassment.  We

  11    are committed to working with the Council to ensure

  12    that he devastating impacts of this public health

  13    crisis are not unnecessarily compounded and that new

  14    Yorkers can live peacefully in their homes, free from

  15    harassment.  We are acutely aware of the

  16    vulnerabilities of New Yorkers right now and the

  17    Commission is ever more committed to defending the

  18    human rights of all New Yorkers, especially those

  19    impacted by COVID-19.

  20        Thank you for convening today's hearing and I

  21    look forward to your questions.

  22        AUSTEN BRANDFORD:  Thank you.  A quick reminder

  23    that if you mute yourself, you cannot unmute

  24    yourself.

  25        Sheriff Joseph Fucito?
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                      101
 2      JOSEPH FUCITO:  Good afternoon members of the

 3    Committee on Consumer Affairs and Business Licensing

 4    and Committee on Housing and Buildings.  I am Sheriff

 5    Joe Fucito and I am here today to discuss proposed

 6    Intro. 1912.

 7      Before I do, I want to take the time to thank the

 8    City Council for its efforts to tackle the many

 9    hardships facing New Yorkers during the COVID-19

10    pandemic and beyond.  We have all been touched by

11    this crisis, my office included, with the loss of

12    loved ones.  Sheriff's Public Safety Officer Serge

13    Paul passed away last week after a brave struggle

14    against COVID-19.  He was a dedicated law enforcement

15    officer, husband, and father and I would be remiss if

16    I did not publicly acknowledge his dedicated service

17    and sacrifice.

18      The Sheriff's Office fully appreciates what we

19    believe is the Council's intention to provide relief

20    to New Yorkers from debilitating seizures of property

21    and monetary assets.  However, Intro. 1912, while

22    well intended, raises significant legal concerns for

23    my office.  The work of our Office is integrally

24    related to the work of the judicial system and

25    governed by State Law.
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1  COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
   LICENSING                                      102

2      May I take a moment to provide a quick

3  explanation about judgement enforcement matters.  A

4  judgement is the final outcome of a court case.  A

5  judgment resolves the contested issues and terminates

6  a lawsuit, since it is regarded as the court's

7  official pronouncement of the law on the action that

8  was pending before it.  The judgment states who has

9  won the case and what remedies are awarded to that

10  prevailing party.  Remedies may include monetary

11  damages, injunctive relief,

12      or both.

13      Judgements are enforced by writs of execution,

14  which can be addressed to the Sheriff or in New York

15  City to the Marshal, commanding them to give the

16  plaintiff possession of land; or to enforce the

17  delivery of personal property which was the subject

18  of an action, or to collect the amount of the

19  judgment, depending on the relief sought in the

20  underlying case.

21      As I've described, judgment and execution

22  enforcement are mandates that come from the court.

23  They are under the governance of the State court

24  system and implemented through the State Civil

25  Practice Law and Rules.  Indeed, they represent the

A-628

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                                    103

1

2   core function of the judiciary branch and the

3   ultimate expression of its independent decision

4   making authority.  We believe that Intro. 1912 would

5   require actions that interfere with this well

6   established structure.

7       The bill assigns duties to the Sheriff that

8   presupposes the Sheriff has control over the judgment

9   and execution process.  However, that is not the

10  case.  The Sheriff is an officer of the court and

11  wholly guided by the exacting statutory steps set

12  forth in the CPLR which preclude the Sheriff's

13  personal judgment or outside review.

14      Courts have repeatedly held that a Sheriff cannot

15  look behind the court mandates or review them for

16  error and can be penalized for doing so.  For these

17  reasons, it is our view that the Sheriff could not

18  comply with the directives of Intro. 1912 without

19  violating the panoply of State laws that govern the

20  Sheriff's role as the civil enforcement official of

21  the courts.

22      In my role as Sheriff, I am not a heartless bill

23  collector, but rather an officer of the court who has

24  the duty to enforce the laws enacted for the

25  protection of the lives, persons, property, and

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        104

1

2  health of our citizens.  I hope that my testimony

3  today has conveyed my passion for following the law

4  and having the Office of the Sheriff working

5  productively and cooperatively for the betterment of

6  all New Yorkers.

7      Thank you for your time and I will now take any

8  questions.

9      AUSTEN BRANDFORD:  Thank you.  We will now open

10  it up for questions from Speaker Johnson and the

11  Chair's.

12     SPEAKER JOHNSON:  Thank you very much.  I really

13  appreciate your patience.  I know you guys waited for

14  a while to testify.  So, Sheriff, I want to thank you

15  for your patience and I want to give you our

16  condolences on the loss of someone in your office,

17  I'm really sorry.  As you said, this is touching all

18  of our lives and we want to remember all of the folks

19  that have been serving New York City, especially the

20  city workers.  So, thank you for acknowledging this

21  wonderful person who served the City of New York.

22     I wanted to ask you Sheriff; do you have any

23  policies that guide how you decide to prioritize your

24  enforcement actions?  Are you trying to avoid

25  targeting low income New Yorkers right now?

A-630

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                        105
 2      JOSEPH FUCITO:  Part of our protocols during this
 3    COVID-19 emergency is we're looking at emergency type
 4    orders and orders that affect public safety.
 5      So, right now, orders of protection are still
 6    being enforced, mental hygiene warrants are still
 7    being enforced.  Things that involve public safety,
 8    we are enforcing.
 9      Things that require the types of court process
10    that require the seizure of money and property, we're
11    looking at very carefully.  There are certain
12    protections in place that are only available when the
13    court system is open and fully functioning.  So,
14    those are items that we take a careful look at
15    because whenever we seize money or property, those
16    remedies should be available to the person.  They
17    should be able to be able to go to court and look to
18    have protection granted by the court.
19      So, right now we're not conducting any property
20    seizures but that's simply because the court system
21    is not fully open and those remedies are not
22    available to them except for very limited
23    circumstances.  So, the types of orders we are
24    carrying out you would be considering emergency type
25    orders.
```

A-631

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              106

1

2      SPEAKER JOHNSON:  Sorry about that.  Is it safe

3  to say Sheriff and so, I assume it is because of the

4  answer to the question you just gave.  Is it safe to

5  say that you are enforcing judgments during this

6  crisis?

7      JOSEPH FUCITO:  Yes.

8      SPEAKER JOHNSON:  And what if you go and the

9  person says they have COVID-19?

10     JOSEPH FUCITO:  Well, the idea of enforcement

11  doesn't necessarily work that way.  If we have to

12  serve an order of protection on somebody and they

13  have COVID-19, the Deputy Sheriff has to serve that

14  person.  So, our officers have to wear protective

15  gear.  We try to have as limited contact as possible

16  the person within the confines of the order.

17     So, whatever the order tells us to do, we still

18  have to carry out even though COVID-19 is going on

19  but we can take obvious safety precautions for our

20  officers.

21     SPEAKER JOHNSON:  Thank you and if the state

22  moratorium lapses, are you going to rely on the

23  courts to determine whether someone is protected by

24  the federal moratorium?

25

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                      107
 2      JOSEPH FUCITO:  We have to.  Unfortunately, in my

 3    role as Sheriff, while I have personal opinion and

 4    like said, my personal feeling is I think that these

 5    concepts are very good to explore.  In my role as

 6    Sheriff, I have to be somewhat agnostic and stand

 7    offish, neutral.  I can't really weigh in on these

 8    positions and I have to rely on the court to be the

 9    best guide for what the Sheriff is supposed to do.

10      SPEAKER JOHNSON:  Thank you Sheriff and thank you

11    to the members of the Administration.  I turn it back

12    to the Committee Counsel.

13      AUSTEN BRANDFORD:  Thank you Speaker.  Any

14    questions from the Chair's?

15      CO-CHAIR COHEN:  Austen, I'm going to defer.  I'm

16    going to let the Committee Members ask and then I'll

17    come back.

18      AUSTEN BRANDFORD:  Okay, great.  I will now call

19    on Council Members in the order they have used the

20    Zoom raise hand function with a quick reminder that

21    Council Members Torres, Yeger and Powers raised their

22    hand previously to ask questions at this time.

23      Council Members, please keep your questions to

24    four minutes including responses.  If there's a

25    second round of questioning, Council Member questions
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    108
2    will be limited to two minutes.  The Sergeant at Arms

3    will keep a timer and let you know when to start and

4    when your time is up.  We will begin with Council

5    Member Torres followed by Council Member Yeger.

6       SERGEANT AT ARMS:  And your clock will start now.

7       COUNCIL MEMBER TORRES:  Thank you.  I have a

8    question for the Sheriff.  Sheriff, imagine for a

9    moment the Council were to go forward with Intro.

10   1912, so it's the law of the city and then a judge

11   were to issue an eviction warrant.  In the event of a

12   conflict between the local law and a judicial order,

13   how would the Sheriff's respond and I'm curious to

14   know how the Marshal's respond.  I know DOI is not

15   present at the moment but what would you do in the

16   event of a conflict between a judicial order and the

17   local law?

18      JOSEPH FUCITO:  The law is very clear on it.

19   That the Sheriff can't look behind a judgement.  In

20   fact, most of the case law in New York involving a

21   Sheriff questioning an order happened here in New

22   York City and it's a very well settled law that if

23   the Sheriff is ordered to do something, he can't look

24   behind the reasoning of the court and he must carry

25   out the mandate according to its command.  That was
```

```
            COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
            COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1          LICENSING                                      109
 2   the whole principle by having a Sheriff be the

 3   ministerial officer for the court and for the Sheriff

 4   carrying out those duties, the Sheriff is granted

 5   quasi-judicial immunity.  Meaning that even if that

 6   action were to disobey a current law, a Sheriff would

 7   be immunized for carrying it out.  That is the

 8   protection that is granted the Sheriff because he is

 9   carrying out the will of the court.

10       COUNCIL MEMBER TORRES:  So, even if we were to

11   enact the law, you would not enforce it over a

12   judicial order, is that—

13       JOSEPH FUCITO:  If the Sheriff fails to act, he

14   can be held in contempt.  There are two types of

15   contempt in New York State.  There is a criminal

16   contempt which is punitive and there's a civil

17   contempt which is coercive.  The court could apply a

18   criminal contempt to me which would jail me for 30-

19   days and a civil contempt which could jail me

20   indefinitely until I perform the act.

21       An example was recently you had a county clerk

22   who refused to take marriage licenses.  That's a

23   ministerial act and if a Sheriff is required to carry

24   out a ministerial act and he refuses; he faces

25
```

A-635

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              110

1

2  probably the most severe punishment available under

3  the law for an officer.

4      So, I face both a personal liability, criminal

5  and civil but if I carry out the order, I am fully

6  immunized and I have the full backing of the court to

7  do so.

8      COUNCIL MEMBER TORRES:  So, since you're an agent

9  of the state court, neither a federal and/or a local

10  moratorium is viable without the buy in of the court,

11  is that what you are saying?

12      JOSEPH FUCITO:  Yes.  Unfortunately, the court in

13  the court room, the courts process really controls

14  what the Sheriff does and since the Sheriff has no

15  ability to look behind the courts order, then

16  whatever the court tells the Sheriff to do, the

17  Sheriff must do.  The Sheriff leaves these issues for

18  the litigation in court.  That's why a lot of civil

19  process has a notice requirement.  The Sheriff give

20  notice before he does something and that gives the

21  person the opportunity to go to court to make these

22  claims.

23      Many of these issues that you are bringing

24  forward are claims that would be appropriately made

25  in court not to the Sheriff.

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                      111
 2        COUNCIL MEMBER TORRES:  This might be a question
 3    for HPD but suppose in the absence of a moratorium,
 4    is there anything that the city could do, the Council
 5    could do to address egregious case of rent gouging in
 6    an attempt to exploit the COVID-19 crisis?
 7        DANA SUSSMAN:  So, I don't know that we are
 8    prepared to comment on that.  I haven't heard that as
 9    a suggestion at this point Council Member but we can
10    certainly take that back to see if there has been any
11    discussion around that particular issue.
12        COUNCIL MEMBER TORRES:  Thank you.  I see my time
13    is about to expire, so thank you for affording me the
14    opportunity.
15        AUSTEN BRANDFORD:  Thank you.  Now, we'll hear
16    from Council Member Yeger followed by Council Member
17    Powers.
18        SERGEANT AT ARMS:  And your clock will start now.
19        COUNCIL MEMBER YEGER:  Thank you very much.
20    Sheriff, thank you for being here.  First, I just
21    want to echo Mr. Speaker's comments anytime somebody
22    in our greater family of New York City employees is
23    taken, it's a shock not just for the greater system
24    but obviously to the employees who are close with
25    that person and your office being the small office
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          112

1

2    that it is, I'm sure, I have no doubt that it's

3    hitting you folks at the Department of Finance pretty

4    hard and I want to express my condolences.

5        Sheriff, in your opening testimony and in

6    Councilman Torre's questions, you really did allude

7    to many of the items that I wanted to talk to you

8    about today and some of which I discussed with the

9    earlier panel.  But I just, I want to get some more

10   information a little bit, just so that we can have

11   some clarity.

12       So, if I may, when did you start working at the

13   Sheriff's office?

14       JOSEPH FUCITO:  1988.

15       COUNCIL MEMBER YEGER:  Okay, so I'm going to say

16   at least for myself, as for a good number of my

17   colleagues in the Council.  I would think it's fair

18   to say you probably have a greater understanding of

19   your powers and authorities than I do.  I just want

20   to focus I think on some of the remedies.  Since it's

21   so clear to me that this law cannot be enforced.

22   Introduction 1912.  If it were to be enacted, you

23   would not be legally allowed to follow it under any

24   circumstances.

25

A-638

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        113

2        I don't doubt for one second that the Mayor would

3    not fire you for not following an unlawful act of

4    this Council.  I know for sure that the Mayor values

5    his oath.  I know you value your oath.  I value my

6    oath as a member of the Council but I also value my

7    oath as an officer of the court and a Sheriff is an

8    officer of the court, an arm of the judicial system.

9        So, I want to focus on some of the remedies that

10   can be done instead.  My understanding obviously is

11   that your powers come from the CPLR and from state

12   law but clearly, if the Chief Judge of the State of

13   New York were tomorrow to issue an order directing

14   judges in the state that they may not issue

15   execution, is it fair to say that you would not

16   receive executions because judges would stop issuing

17   them?

18       JOSEPH FUCITO:  Yes, if the court directed us, we

19   would do it.

20       COUNCIL MEMBER YEGER:  Alright, so you know the

21   obvious solutions to these problems don't come from

22   the well intentioned efforts here in the Council, but

23   the notion that there are places in this state that

24   govern your activity and you do not have the ability

25   to decide to refuse to execute on an execution that

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                              114

2    you receive but more to the point that you stated

3    earlier, there are remedies should you receive an

4    execution.

5         Number one, is there are notice provisions,

6    correct?

7         JOSEPH FUCITO:  Correct.

8         COUNCIL MEMBER YEGER:  Okay, and number two is

9    when you actually seize property, you don't

10   immediately that day or the next morning turn it

11   over.  You actually hold it for quite a while to

12   allow for within the confines of the Sheriff, so that

13   the debtor can actually collaterally attack the

14   execution and the underlying judgment if necessary,

15   is that correct?

16        JOSEPH FUCITO:  Correct.

17        COUNCIL MEMBER YEGER:  Well, there are remedies

18   as we know.  My concern of course is as I've said

19   Sheriff and you may not necessarily be aware of this

20   but I say this for the greater public, I have in my

21   time in the Council been, I believe, very protective

22   of the authorities of the Council.  I believe that

23   the council has authorities as it is stated in our

24   Charter and under state law but it is limited and

25   when it is limited, we should not try to cross that

```
                COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1              COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
                LICENSING                                    115
 2   line.  We should respect the authority of the law.

 3   In this case the state is the place that needs to

 4   make these instructions to you and I would suggest to

 5   my colleagues that is a better way to go with respect

 6   to the good intentions of this law and with that I

 7   yield back my time, thank you.

 8        AUSTEN BRANDFORD:  Thank you.  Next, we will be

 9   hearing from Council Member Powers followed by

10   Council Member Cabrera.

11        COUNCIL MEMBER POWERS:  Mr. Sheriff, how are you

12   doing?

13        JOSEPH FUCITO:  How are you sir?  Nice to see

14   you.

15        COUNCIL MEMBER POWERS:  Nice to see you again.  I

16   hope you are hanging in there.  I'm very sorry to

17   hear about your employee or your colleague that

18   passed away and wishing all of you the best.  And

19   thank you to everybody else as well from HPD and

20   Human Rights.

21        Just two very quick questions, just as I'm

22   looking at this, the 1912, we were told by tenants

23   today and I actually have a legislation around

24   security deposits in the City Council and I'm

25   wondering if on the other side of this equation,
```

A-641

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                          116
 2   would your ability to do money judgments, I'm just

 3   looking at the bills.  Would you ability to do money

 4   judgements here affect a tenant who is suing the

 5   landlord to get their security deposit returned to

 6   them and would you be able to take action in that

 7   case?

 8        JOSEPH FUCITO:  Well, supposing that there was a

 9   ban and as I said earlier, we don't think we would be

10   able to carry through on it.  The ban would work both

11   ways.  In fact, it would probably impact; the state

12   has a tribunal community and housing renewal.  They

13   actually have a tribunal where they award triple

14   damages to a tenant who has been rent overcharged.

15        So, the workings of the justice system on both

16   sides would be impacted by this type of legislation.

17        COUNCIL MEMBER POWERS:  Meaning that If there was

18   a rent overcharge or I guess a security deposit

19   issue, you would and you were meant to on behalf of

20   the tenant help them out or restore their money or

21   damages that you would — at least for this period of

22   time be able to do that?

23        JOSEPH FUCITO:  Correct, the Sheriff is

24   everyone's Sheriff.  We carry out the mandates of the

25
```

A-642

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                    117
  2   court and everybody is entitled to have their

  3   judgement enforced impartial.

  4     COUNCIL MEMBER POWERS:  Understood and you would

  5   be able to then do it after this period ended?  You

  6   know, I understand there is a constitutional question

  7   here that you are raising but let's just say we were

  8   able to figure that issue out, you would be able to

  9   do it but it would be at the end of that period and

 10   time.

 11     JOSEPH FUCITO:  I don't want to speak to what the

 12   legislation would look like.  I could only speak to

 13   if the appropriate remedies were available to stop

 14   the Sheriff, the Sheriff would be stopped and we'd

 15   follow the directions that we're authorize to follow.

 16     COUNCIL MEMBER POWERS:  Okay, and I applaud this

 17   because I don't always know the exact intersection of

 18   where you hand over to the Marshals but I know the

 19   Marshals have some jurisdiction over things like

 20   parking tickets and I think other tickets that are

 21   unpaid in the city.

 22     JOSEPH FUCITO:  A quick reference.  The Sheriff

 23   is a law enforcement agency.  We are like a small

 24   police agency that handles the enforcement of court

 25   orders.  The courts that we handle are all the courts
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    118
 2  in New York City.  So, all the courts in the city and

 3  the state.  The Sheriff is the enforcement officer.

 4  The Marshal is the enforcement officer for the civil

 5  court of the City of New York.

 6      They work in a similar fashion but I don't want

 7  to speak for them.

 8      COUNCIL MEMBER POWERS:  Okay, and I think I am

 9  confident that they will be you know, probably

10  testifying later today.  But just my question that

11  is, maybe you can speak on this issue and then I'll,

12  if the Marshals do testify, I'll ask this question.

13      For things like red light camera tickets,

14  speeding tickets, I guess parking tickets too.  Is

15  that impacted by this legislation if we are looking

16  to — I guess it takes some action related to things

17  that many issues we talk about like speeding and red

18  light cameras and things like that.

19      JOSEPH FUCITO:  Yes.

20      COUNCIL MEMBER POWERS:  How is that impacted?

21      JOSEPH FUCITO:  Most of these public safety

22  judgment enforcement in the city relies on judgement.

23  So, like, building code violations, fire code

24  violation, speeding violations, all of those

25
```

A-644

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      119
2   ultimately culminate into a decision that's docketed

3   with the New York City Civil Court as a judgement.

4       COUNCIL MEMBER POWERS:  And that would be put on

5   pause for the time period.

6       JOSEPH FUCITO:  Yes, the legislation has that

7   view.

8       COUNCIL MEMBER POWERS:  Okay, great, thank you.

9   Thanks for answering my questions, but my times up

10  anyway.  Thanks.

11      AUSTEN BRANDFORD:  Thank you.  We'll now here

12  from Council Member Cabrera followed by Council

13  Member Chin.

14      SERGEANT AT ARMS:  And your clock will start now.

15      COUNCIL MEMBER CABRERA:  I'm going to use a very

16  short amount of time because my questioned was

17  answered by the questions that were asked by my

18  colleagues.

19      Thank you so much, I'll pass.

20      AUSTEN BRANDFORD:  Council Member Chin?

21      SERGEANT AT ARMS:  Your clock will start now.

22      COUNCIL MEMBER CHIN:  Yes, thank you.  Thank you

23  to the panel.  I first wanted to really thank the

24  Deputy Commissioner Sussman from Human Rights

25  Commission for working with our community, in
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                    120
 2   fighting xenophobia and hate crime and we got to do

 3   more to educate.  I think the bystander training are

 4   great.  My staff is all taking it and we want to urge

 5   more people to report the hate crime that is

 6   happening unfortunately.

 7       My question is, two things, I don't if someone

 8   from Department of Finance is here.  One of the

 9   things that I talked about earlier was you know,

10   support for property owners, small property owners

11   who are providing affordable housing, rent regulated

12   housing and they need relief and I talked about

13   property tax deferral but we know the city needs

14   money and the only way we can get out of this mess is

15   we get the federal dollars.  But in our City Council

16   response to the Mayor that I think there was

17   precedent set I guess back in the economic crisis in

18   the 70's that large property owner, commercial

19   property owner that could afford to pay property tax

20   up front, that we should encourage them to do that so

21   that we can give a deferral program to the smaller

22   property owner who are providing affordable housing

23   in our district.

24

25
```

A-646

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1  COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    121
  2     I don't know if anybody can answer that.  If

  3  there is anybody from Department of Finance.  If not,

  4  we'll bring it back to the Administration.

  5     And the other question is to Deputy Commissioner

  6  Santiago in HPD.  You know, during this time, as I

  7  said, we still have predatory landlords, bad

  8  landlords who are still doing tenant harassment.  So,

  9  I'm just interested to see like, how many cases have

 10  HPD been working on?  The Commissioners HIPAA rights

 11  gave us some really good statistics in terms of

 12  complaints and so, if you can address that issue,

 13  that would be great.

 14     ANNMARIE SANTIAGO:  So, as you know the Mayor has

 15  supported us greatly in tenant harassment initiatives

 16  and HPD had started and has an anti-harassment unit,

 17  which tenants can contact and we have continued to

 18  receive complaints during this period.

 19     Most are around heat, hot water.  We are still

 20  responding with inspections to those conditions and

 21  we're taking information from tenants to follow up

 22  once we're in a better state to do full building

 23  inspections because that is what mostly what the

 24  anti-harassment unit does.

 25
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                    122
 2      So, we've received about 60 complaints during
 3   this period and we're continuing to reach out to all
 4   of those tenants who contact us to make sure that
 5   once we can continue with our anti-harassment
 6   inspections, do inspections for violations,
 7   conditions in the buildings, we will be ready to
 8   continue that.
 9      COUNCIL MEMBER CHIN:  Do you know if all those
10   complaints came in through HPD or are some of them
11   from referrals, from elected officials office or
12   could maybe base —
13      ANNMARIE SANTIAGO:  The vast majority have been
14   through 311 who refers them to HPD.
15      COUNCIL MEMBER CHIN:  Okay, alright.  Thank you.
16      ANNMARIE SANTIAGO:  Your welcome.
17      AUSTEN BRANDFORD:  Thank you.  We will now circle
18   back to our Chair's and Speaker for any final
19   questions for the Administration before moving to
20   public testimony.  Chair's?
21      CO-CHAIR COHEN:  I appreciate that.  I did want
22   to say thank you to the Administration for your
23   patience.  I know the hearing has been long, so I
24   want to say thank you for that.
25
```

A-648

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    123
   2       To HPD, I wonder if I really, maybe I should have
   3    asked this at the last panel but I'm of some thought
   4    that perhaps you know, eviction is a legal proceeding
   5    in the state of New York.  Housing court is uniquely
   6    set up to deal with those and we've talked about you
   7    know, tenants and landlords and property owners all
   8    differently situated.  Maybe housing court isn't
   9    really the best place to try to sort this out as the
  10    time, when the time comes, as opposed to looking, I
  11    mean it would be great to find some macro policy that
  12    just solved everyone's problem in one great piece of
  13    legislation but I wonder if HPD has any thoughts on
  14    you know, maybe the individualized approach at
  15    housing court might be the way to go, or if you have
  16    thoughts one way or the other.
  17       ANNMARIE SANTIAGO:  I think as some of the
  18    advocates said, housing court would be totally
  19    overwhelmed if and when we ever got to a position
  20    where all of these cases and all of these people,
  21    that they are talking about at risk, wound up in
  22    eviction proceedings or wound up in some other
  23    proceedings in housing court.
  24       I think the Mayor you know, is continuing to look
  25    and has advocated for a lot of the initiatives that
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        124

1

2   have been talked about today.  Again, we continue to

3   look to our federal and state partners for financial

4   support.  You know, getting ahead of this before it

5   has to come before housing court or any other type

6   of, I think judicial or administrative body on an

7   individual case by case basis, is really how this

8   would have to be addressed.

9       So, I know that there are many people working on

10  this issue looking for guidance, looking for support

11  from outside the city and I think that that would be

12  the way that we all should continue to push.

13      CO-CHAIR COHEN:  I certainly agree that obviously

14  that we need federal support.  I know that you know,

15  the Speaker has been a very loud voice on that.  I've

16  spoke to my congressional representative about the

17  city's needs.  I know that we all will.

18      Thank you very much.  Austen, do we have

19  everybody?

20      CHAIRPERSON CORNEGY:  I just wanted to ask one

21  point question.

22      CO-CHAIR COHEN:  Oh, please Rob.

23      CHAIRPERSON CORNEGY:  Sorry.  I'm pretty sure

24  that with this esteemed group of Council Members this

25  may have been asked, but I'm just curious whether or

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                    125
 2   not there's a belief that there is enough resources

 3   to actually effectively and efficiently look at

 4   tenant harassment cases.

 5        So, I don't know if someone asked.  I don't know

 6   if there is a complaint being made by HPD about the

 7   staff size and the requirements now that have

 8   expanded their duties but I'm just curious as to

 9   whether or not there is an opinion that the necessary

10   resources are already in existence or are there more

11   resources needed to do this job?  Especially the job

12   of investigating these cases effectively.

13        ANNMARIE SANTIAGO:  So, I think there are a

14   couple of different issues on the table here Council

15   Member.  So, you know that the Mayor is in full

16   support of anti-tenant harassment measures and I

17   think between HPD, DOB, HRA, a number of agencies who

18   deal with tenant harassment generally a lot of

19   resources have been put forth.

20        If you are speaking specifically about the COVID

21   related cases that we are talking about today, I

22   don't want to speak on behalf of the commission who

23   testified about their resources and what they've been

24   doing.  So, I would defer to them, specifically in

25   that area.
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                    126
 2      CHAIRPERSON CORNEGY:  Well, I won't hold up

 3    moving forward because again, I believe that my

 4    colleagues who I am very proud of, of being a member

 5    of this body, have probably asked questions that are

 6    relevant to the questions that I was going to ask.

 7    So, thank you though for appearing today.

 8      ANNMARIE SANTIAGO:  Your welcome, thank you.

 9      AUSTEN BRANDFORD:  Great, with no further

10    questions from Chair's, we'll be turning to public

11    testimony.  Thank you all for waiting.

12      I'd like to remind everyone that unlike our

13    typical Council hearings, we'll be calling

14    individuals one by one to testify.  Once your name is

15    called, a member of our staff will unmute you and the

16    Sergeant at Arms will give you the go ahead to begin.

17      Your testimony will be limited to two minutes and

18    a Sergeant at Arms will let you know when to begin

19    and when your time is up.

20      Please wait for the Sergeant at Arms to announce

21    you can begin before delivering your testimony.  I

22    would now like to welcome Ava Farkas to testify.

23      SERGEANT AT ARM:  Ava, your clock will start when

24    you begin your testimony.

25
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                      127
 2      AVA FARKAS:  Sorry, I just heard my name, can you

 3    give me one second.

 4      Okay, thank you very much, thank you.  I just

 5    wanted to thank Speaker Johnson and the Committee on

 6    Housings and Buildings and the Committee on Consumer

 7    Affairs and Business Licensing for having this

 8    hearing.

 9      My name is Ava Farkas and I am here to testify in

10    strong support of Intro.'s 1912 and Intro. 1936.  Met

11    Council's mission is to fight for housing as a human

12    right.  The fact that it is not a human right has

13    exacerbated this current COVID-19 crisis and its

14    health impacts.

15      92,000 New York State residents are homeless and

16    cannot shelter in place and if we do not have a plan,

17    post eviction moratorium then millions more will find

18    themselves in the same predicament.

19      I want to thank members of the City Council for

20    supporting one of the critical services that Met

21    Council provides which is our tenant rights hotline,

22    which is now more important than ever for New

23    Yorkers.

24      Our hotline calls are confirming what everyone

25    knows that tenants who were barely able to afford
```

A-653

```
          COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
          LICENSING                                       128
   2   their rent before the pandemic are completely unable

   3   to now.  Our hotline calls have gone from questions

   4   about getting repairs to questions almost exclusively

   5   about inability to pay the rent, either due to

   6   layoff, reduction in hours or a roommates layoff or

   7   reduction in hours.  We have also gotten at least one

   8   call from a healthcare worker whose roommate and

   9   primary tenant has been harassing her into leaving

  10   the apartment before her sublease is up.  So, Intro.

  11   1936 is critically important.

  12       In addition, we conducted a survey with our base,

  13   556 people responded, so this is a self-selecting

  14   survey but I want to share the data with all of you.

  15   Of the 556 people who took our survey about how

  16   COVID-19 is impacting their ability to pay rent, 80

  17   percent —

  18       SERGEANT AT ARMS:  Time is expired.

  19       AVA FARKAS:  Sorry.  My time up?

  20       AUSTEN BRANDFORD:  If you have additional

  21   testimony, we will review all written testimony

  22   submitted.

  23       AVA FARKAS:  Okay.

  24

  25
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                    129
 2       AUSTEN BRANDFORD:  We will make sure we look at
 3     it.  Alright, next, I would like to welcome Julia
 4     Duranti-Martinez to testify.
 5       SERGEANT AT ARMS: And Julia, your clock will
 6     start when you begin your testimony.
 7       JULIA DURANTI-MARTINEZ:  Hi, good afternoon
 8     Chair's Cohen and Cornegy and Committee Members and
 9     thank you for the opportunity to testify.
10       My name is Julia Duranti-Martinez and I'm a
11     Campaign Coordinator at New Economy Project.  As my
12     colleague Andy Morrison noted on the first panel, in
13     addition we are also working to expand community land
14     trust in New York City, including through a citywide
15     community land trust discretionary funding
16     initiative.
17       We welcome the steps the Council has taken to
18     combat housing discrimination and displacement during
19     the COVID-19 crisis through Intro.'s 1912 and 1936.
20     In addition to protecting New Yorkers from harassment
21     and evictions, it is critical that Council support
22     community led institutions like Community Land Trust
23     to ensure a just recovery in New York City's
24     communities of color and to the communities interest
25
```

A-655

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        130
```

2   and lease use of the land for permanently affordable

3   housing and other local needs.

4      As community governed organizations, CLT'S have

5   the relationships and trust to address rapid response

6   needs during times of crisis and more than a dozen

7   emerging CLT's citywide are engaged in COVID-19

8   mobilization efforts from conducting wellness check

9   calls to residents and connecting tenants to legal

10  assistance to distributing food and supplies to

11  elderly and homebound community residents.

12  Nationally, CLT's also have a track record of

13  stabilizing housing for low income families in

14  communities, including preventing park closures in

15  the wake of the 2008 financial crash and aiding in

16  recovery efforts after the hurricanes in Puerto Rico.

17     Now more than ever, New York City has to invest

18  in proven community led solutions like CLT'S to

19  strengthen and stabilize neighborhoods that have long

20  born the brunt of housing in public health crisis.

21     We urge City Council to sustain and expand its

22  support for CLT's and community led cooperative

23  economic development.  We are calling for renewed

24  fiscal year 2021 discretionary funding which will

25  directly support the hardest hit neighborhoods and

A-656

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1       LICENSING                                    131
 2   build institutions that will be crucial to prevent

 3   evictions, foreclosures, and speculation in the wake

 4   of economic devastation brought by COVID-19.

 5       SERGEANT AT ARMS:  Time expired.

 6       AUSTEN BRANDFORD:  Thank you.  We would now like

 7   to welcome Joseph Condon to testify.

 8       SERGEANT AT ARMS:  Joseph, your clock will begin

 9   when you begin your testimony.

10       JOSEPH CONDON:  Good afternoon and thank you for

11   the opportunity to provide testimony.  Thank you,

12   Committee Chairs, thank you Speaker Johnson.  My name

13   is Joseph Condon and I am providing this testimony on

14   behalf of the Community Housing Improvement Program,

15   also known as CHIP.

16       CHIP is an organization made up primarily of

17   small and medium sized owners and operators of rent

18   stabilized housing in New York City.  Our members run

19   hands on small businesses by managing their own

20   buildings and becoming long term fixtures in their

21   communities.

22       During the COVID-19 pandemic, these members and

23   their staff are on the frontlines making sure people

24   have safe, clean properly functioning apartment

25
```

A-657

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                       132
 2  buildings to live in while the shelter in place order

 3  is in effect.

 4      Because our members are community oriented, they

 5  are extremely sympathetic to the painful financial

 6  circumstances that COVID-19 has created.  According

 7  to a survey of our members, more than 50 percent of

 8  them have already entered into payment agreements

 9  with tenants who have been impacted by COVID-19.

10  Another 25 percent of our members who responded said

11  that they expect to offer some relief on a case by

12  case basis moving forward and almost all of our

13  members have provided information on employment

14  benefits and other benefits to their tenants.

15      Now, we understand that not everyone who has lost

16  income will be eligible for those benefits, nor will

17  those benefits make up all of the lost income for

18  those who are eligible.  But CHIP members and other

19  property owners are working with these tenants to

20  figure things out.  Property owners and managers are

21  in the best position to deal with a variety of

22  circumstances tenants are facing.  But if everyone

23  else who can pay rent just stops paying, the ability

24  of an owner to provide relief to those who can't get

25  it anywhere else is significantly diminished.
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    133
   2    Despite this being a time where we need to put

   3    politics aside and work together, many tenant

   4    activists are using the COVID-19 crisis as an

   5    opportunity to push a political agenda.  Cancelling

   6    rent without also providing relief for the expenses

   7    of small property owners is not a workable option and

   8    should not be realistically considered by these

   9    committees, unless there is some commencement relief

  10    on the expense side.

  11        SERGEANT AT ARMS:  Time up.

  12        JOSEPH CONDON:  Relief in the area of property

  13    taxes is an excellent compliment to any moratorium.

  14    Between 30 and 40 percent of a tenants rent payment

  15    goes to the city in the form of property taxes but

  16    only focusing on one side of the equation, these

  17    proposals add fuel to the political fire of anti-

  18    housing activists who are calling for a rent strike

  19    for all.  This is one of the main reasons CHIP

  20    opposes 1912.

  21        CO-CHAIR COHEN:  Thank you for your testimony.

  22        JOSEPH CONDON:  Thank you.

  23        AUSTEN BRANDFORD:  Thank you.  We'd now like to

  24    welcome David Chemtob to testify.

  25
```

A-659

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      134
 2        SERGEANT AT ARMS:  David, your clock will begin

 3    when you start your testimony.

 4        DAVID CHEMTOB:  Can everyone see me?  Can you

 5    hear me?

 6        CO-CHAIR COHEN:  Yes.

 7        DAVID CHEMTOB:  Okay, dear honorable members of

 8    the New York City Council.  Thank you for hearing my

 9    testimony today.  Now that you are considering new

10    legislation in the wake of this COVID-19 pandemic to

11    allow tenants not to pay rent.  I would like to ask

12    the Council Members who are in favor of this a few

13    questions.  Landlords are currently providing crucial

14    and essential services to their tenants.  Those

15    essential services could only continue if landlords

16    could continue to collect their rent.  Specifically,

17    how are landlords expected to pay for heat and hot

18    water if tenants are not going to be paying rent?

19    How do you expect landlords to pay for water and

20    sewage that allows tenants to take showers and to go

21    to the bathroom?

22        Landlords are paying supers and porters to put

23    the garbage that tenants are generating today.  How

24    will landlords continuing to clean up and mop public

25    spaces without the critical cash flow that comes from
```

```
                  COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
                  COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1                LICENSING                                    135

 2    rent collections?  How does City Council expect

 3    landlords to pay property taxes without rent?

 4    Property taxes have skyrocketed in the last three

 5    years to a level as equal to 35 percent of our rental

 6    income.  Why is the landlord trying to collect termed

 7    as harassment?  Is a landlord not entitled to collect

 8    rent for providing shelter, heat, hot water, and

 9    cleaning services and etc., to their tenants?

10        Why are we even using the term harassment?  All

11    we want to do is just collect the rent on an

12    apartment so we can continue paying our property

13    taxes, paying our supers, paying the oil company

14    that's going to deliver oil tomorrow.

15        We got to pay ConEdison to keep the elevators

16    rolling.  Why is government considering to throwing

17    the burden of this pandemic completely on the

18    landlords?  Why is City Council not considering a

19    bill to allow people to walk into a local

20    supermarket, pick up some groceries and walk out

21    without paying?

22        SERGEANT AT ARMS:  Time expired.

23        DAVID CHEMTOB:  Thank you and good luck.

24        AUSTEN BRANDFORD:  Thank you.  We would now like

25    to welcome Kenneth Litwack to testify.
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1   LICENSING                                          136

2       SERGEANT AT ARMS:  Kenneth, your clock will begin

3   as you start your testimony.

4       KENNETH LITWACK:  Good afternoon Chairman

5   Cornegy, Cohen and Speaker Johnson and the members of

6   the Committee.  I want to thank you for this

7   opportunity to testify before you today on behalf of

8   the Marshals Association of the City of New York.  I

9   am going to speak in opposition to Intro. 1912.

10       Since 1979, when I was first appointed as Council

11   in the Inspector General to the New York City

12   Sheriff, I've been involved in this aspect of the

13   law.  I became Director for the Marshals Bureau for

14   the New York City Department of Investigation after

15   serving for the Sheriff and that is the unit that is

16   responsible for regulating New York City Marshals

17   pursuant to state law.  I'd like to point out to you

18   that Marshals employ approximately 250 people or New

19   Yorkers whose lives would be deeply impacted by the

20   long term disruptions to their operations.

21       Our first objection to Intro. 1912 is that the

22   City Council does not have the jurisdiction or legal

23   authority to enact such a measure.  There is no

24   statutory basis that would permit the City Council to

25   restrain a Marshal or a Sheriff's functions.

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            137

1

2    Marshals act pursuant to court orders which command

3    them to act and are part of a complex system where it

4    is the duty of judges to determine the special

5    circumstances of a particular case.

6        Section 16092 of the New York City Civil Court

7    Act specifies that it is the [INAUDIBLE 2:38:46]

8    which has the regulatory authority over Marshals.

9    Marshal is an independent officer whose position was

10   created by the state legislature and his powers and

11   duties are prescribed by state statute.  In addition

12   to the civil court act Marshals yet their powers,

13   which are defined by the New York State CPLR.

14       Our next objection is that while we understand

15   the intent of this legislation is to help those in

16   need, which have been negatively impacted by COVID-

17   19, we believe the proposal —

18       SERGEANT AT ARMS:  Time expired.

19       CO-CHAIR COHEN:  Austen, can we give the Marshal

20   a little more time.  I think this testimony is

21   particular germane, I just want to let him finish,

22   alright.

23       KENNETH LITWACK:  Thank you.

24       SERGEANT AT ARMS:  I will restart the clock at

25   two minutes.

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                      138
 2      CO-CHAIR COHEN:  Thank you.
 3      KENNETH LITWACK:  If the proposed legislation
 4    were enacted as written, it would negatively impact
 5    small claims court and a needy plaintiffs ability to
 6    enforce a money judgement.  As a result of this
 7    legislation, plaintiffs would have no way of
 8    recovering money they are legally entitled to which
 9    adds insult to injury during these trying times.
10      New York City Marshals enforce approximately
11    2,000  to 2,500 money judgments in small claims court
12    each year.  It is imperative that the Council
13    consider the budgetary implications of this bill.  We
14    are a key part of an approximate $80 million in
15    revenue that the city collects in judgements every
16    year on parking, speed, red light violations, camera
17    violations, as low as environment control board
18    violations.
19      This is a significant source of annual revenue
20    for the City of New York and is needed more than ever
21    as the city's budget deficit continues to expand.
22    Furthermore, the money judgments Marshals execute in
23    these categories serve as a deterrent to this type of
24    behavior and further the goals of the city's safety
25    programs like Vision Zero.
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          139

1

2      I'd also like to point out that putting aside

3   these objections, in the past Marshals have

4   cooperated with the city in for example during 911

5   and during Hurricane Sandy, in cutting back on

6   evictions through the city and working with the city.

7   I'm very sensitive to these issues.  We look forward

8   to working with the Council on this issue and I am

9   happy to answer any question you may have.

10     CO-CHAIR COHEN:  Thank you very much.

11     AUSTEN BRANDFORD:  We will now turn for any

12  questions from the Chairs.  We have a question from

13  Council Member Yeger.

14     COUNCIL MEMBER YEGER:  Thank you Mr. Chairman.

15  Mr. Lipblack, I'm glad you are here to testify

16  because you are adding clarity to a place where the

17  Sheriff was not able to opine.  He limited his

18  opinions to his own powers of authority but it's very

19  clear from what you are saying that should the

20  Council, and this goes to a very similar question

21  that I asked earlier.  Should the Council pass this

22  law and the law says that you are to ignore a

23  lawfully delivered execution.  You would not be

24  empowered to abide by the Council law, you would have

25  to abide by your powers as stipulated by Section 1609

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                     140
 2    of a civil court act and Article 52 of the PPLR, is

 3    that correct?

 4       KENNETH LITWACK:  That is absolutely correct.  If

 5    would be improper and illegal for a Marshal to refuse

 6    a command of the court.

 7       COUNCIL MEMBER YEGER:  Okay, I have nothing

 8    further.  Thank you, Mr. Chairman, I yield back.

 9       AUSTEN BRANDFORD:  Alright, with no more

10    questions, this concludes the public testimony.  So,

11    if inadvertently forgotten to call on someone who

12    registered to speak, that person can raise their hand

13    using the Zoom raise hand function in the next minute

14    or so, we'll try to hear from you now.  We will wait

15    for a minute.

16       Seeing none it looks like we can turn this back

17    to the Chair's here for some closing remarks.

18       CHAIRPERSON CORNEGY:  So, Andy, I don't know if

19    you want to go first.  You kind of held this down.

20       CO-CHAIR COHEN:  I'll be very brief.  I really

21    just want to say thank you to everybody who

22    testified.  I think I mentioned this in my opening

23    but it took an enormous amount of work on part of the

24    staff to bring this hearing off and a tremendous

25    amount of prep you know from our committee, my
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                      141
 2  Legislative Director Patty, like, it was enormous
 3  amount of work and I don't want to hurt my arm
 4  patting us on the back here but I thought this went
 5  very, very well and I want to say, thank you for
 6  everybody participating and I want to say thank you
 7  for your partnership Rob, I think you did a good job.
 8      CHAIRPERSON CORNEGY:  Thank you.  I'd like to say
 9  for those who are watching an essential function of
10  the council is to meet and to advocate through
11  legislation and policy on behalf of the voice of the
12  city.  I think this was a balanced effort at looking
13  at what we're facing as it relates to tenant
14  displacement during COVID.  But I think what we heard
15  was testimony that you know, that applicates on
16  behalf of small landlords as well, which demonstrates
17  the need to get this right and to make sure that you
18  know that we don't have a singular focus and as a
19  Council, we have a duty to hear these things and this
20  is unique environment to do it in.  I have to say
21  that I've never been prouder of the Council to honor
22  its commitment to act on behalf of its citizens even
23  in this unique way.
24      I want to thank all the staff that was involved
25  because what people don't know is you see this couple
```

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1       LICENSING                                      142
 2   of hours of hearing and of testimony but there were
 3   countless hours put in prior to and in countless
 4   hours that will be put in in debriefing and making
 5   sure we have all of the information.  So, I want to
 6   personally thank all the staff involved, including
 7   the Security staff who make sure that those who are
 8   supposed to be here are here and those who are not
 9   are not allowed to disrupt this.  So, thank you again
10   and I think this is the part Austen where I gavel
11   out.  With my favorite drum sticks by the way.  So,
12   [GAVEL], this conclude the hearing of Housing and
13   Buildings and with my partnership with Andy Cohen.
14   Thanks Andy.
15       CO-CHAIR COHEN:  Great job Rob, thank you.
16       CHAIRPERSON CORNEGY:  Thanks Mike.
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

World Wide Dictation certifies that the

foregoing transcript is a true and accurate

record of the proceedings. We further certify that

there is no relation to any of the parties to

this action by blood or marriage, and that there

is interest in the outcome of this matter.



Date ____April 1, 2018_____

A-669

# Exhibit 34

1

```
CITY COUNCIL
CITY OF NEW YORK

----------------------- X

TRANSCRIPT OF THE MINUTES

            Of the

COMMITTEE ON SMALL BUSINESS JOINTLY
WITH THE COMMITTEE ON CONSUMER
AFFAIRS AND BUSINESS LICENSING

----------------------- X

                    April 29, 2020
                    Start:  1:10 p.m.
                    Recess:  6:36 p.m.


HELD AT:        Remote Hearing

B E F O R E:    Mark Gjonaj,
                Chairperson of the Committee on
                Small Business

                Andrew Cohen,
                Chairperson of the Committee on
                Consumer Affairs and Business
                Licensing


COUNCIL MEMBERS:
                Speaker Corey Johnson
                Helen K. Rosenthal
                Justin Brannan
                Carlina Rivera
                Brad Lander
                Karen Koslowitz
                Francisco Moya
                Margaret Chin
                Adrienne Adams
```

A-671

2

COUNCIL MEMBERS (CONT.):

                    Kalman Yeger
                    Steven Matteo
                    Peter Koo
                    Keith Powers

3

A P P E A R A N C E S

Greg Bishop
Commissioner of the New York City Department of
Small Business Services

Lorelei Salas
Commissioner of the Department of Consumer and
Worker Protection

Jackie Mallon
First Deputy Commissioner

Steven Edinony[SP?]
Executive Director

Mike Tiger
Deputy General Counsel

Evan Franca
Merchant Member of the North Flatbush Business
Improvement District

Jessica Lappin
New York City Business Leader

Andrew Riggie
Vice Chair of Community Board 7

Robert Bookman
New York City Hospitality Alliance

Amy Healy
Senior Director Public Affairs of Grubhub

A-673

4

          A P P E A R A N C E S (CONT.)

Josh Gold
Director, Public Affairs for Uber

Max Rettig
Global Head of Public Policy at Door Dash

Vignesh Ganapathy on behalf of Postmates for
Vikrum Dave Aiyer

Lisa Sorin
Head of Bronx Chamber of Commerce

Karen Narefsky
ANHD Senior Organizer for Equitable Economic
Development

Jo-Ann Yoo
Executive Director of the Asian American
Federation

Ahyoung Kim
Small Business Project Manager at the Asian
American Federation

Ryan Monell
Director of City Legislative Affairs for the Real
Estate Board of New York

Steven Choi
Executive Director at the New York Immigration
Coalition

5

              A P P E A R A N C E S  (CONT.)

Mohamad Attia
Executive of the Street Vendor project at the
Urban Justice Center

Michael Brady
Chief Executive Officer of the Third Avenue
Business Improvement District

Pablo Benson Silva
New York City Network of Worker Cooperatives

Jennifer Tausig
Co-Chair of the New York City Bid Association

Matt Newberg
Founder and Author of HNGRY

Antitrust Lawyer
Partner of the New York City Law Firm Frank LLP

Yin Kong
Director of Think Chinatown

Alice Lu
Small Business Owners in Chinatown

Julian Hill
Supervising Attorney at TakeRoot Justice

Brendan Martin
Executive Director of the Working World

Ryan Roy
Small Business Owner in Greenpoint, Brooklyn

6

        A P P E A R A N C E S (CONT.)

Andrew Ding
Owner of the Expat

Carlos Martinez
Member of Sunset Scholars LLC

Rahim Ali
Chelsea Papaya

Mojito Iaba[SP]
Small business owner

Shawday Swift[SP?]
Rebellious Root

Robert S. Altman
Represent the Queens and Bronx Building
Association and the Building Industry
Association of New York City

COMMITTEE ON SMALL BUSINESS JOINTLY WITH COMMITTEE
ON CONSUMER AFFAIRS AND BUSINESS LICENSING        3

1

2      CHAIRPERSON GJONAJ: [Gavel] We want to comply

3   with the full guidelines during the hearing.  First,

4   we ask that cameras be places on viewing mode , so

5   that we are able to identify all parties in

6   attendance.  Second, we ask that your microphones be

7   muted until it's your turn to speak.  Finally, we ask

8   for all background noises to be limited when unmuted

9   including cell phones.

10      If you are unable to filter out noises, we'll ask

11   you to submit your testimony via email to

12   counciltestimony@nyc.gov.  I repeat,

13   counciltestimony@nyc.gov.  Should you choose not to

14   follow these guidelines, the Sergeant at Arms will

15   block your video and possibly remove you from the

16   remote hearing.  Thank you for your kind cooperation

17   in this matter.

18      Mr. Chair?

19      CHAIRPERSON GJONAJ:  Chair Gjonaj.  Thank you all

20   for joining our virtual hearing today on the effects

21   of COVID-19 and the city's small business.

22      First off, I'd like to acknowledge that we've

23   been joined by our Speaker Corey Johnson and to you

24   Speaker, a belated Happy Birthday.  Many more

25   healthy, Happy Birthdays and looking forward to be

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS          8
 2   able to celebrate with you under different
 3   circumstances.
 4      I'd like to also acknowledge my other colleagues
 5   who have joined us so far today.  Council Member
 6   Brannan, Council Member Chin, Council Member Rivera,
 7   Council Member Adams, Council Member Lander, Council
 8   Member Yeger, Council Member Koslowitz.
 9      I'm going to turn it over to the Committee
10   Counsel Stephanie Jones to go over some procedural
11   items.
12      STEPHANIE JONES:  Thank you.  I'm Stephanie
13   Jones, Counsel to the Small Business Committee of the
14   New York City Council.  Before we begin, I want to
15   remind everyone that you will be on mute until you
16   are called on to testify when you will unmuted by the
17   host.
18      I will be calling on panelists to testify.
19   Please listen for your name to be called.  I will be
20   periodically announcing who the next panelist will
21   be.  The first two panels to give testimony will be
22   Greg Bishop Commissioner of the New York City
23   Department of Small Business Services followed by
24   Lorelei Salas Commissioner of the New York City
25
```

A-678

1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
          INTERNATIONAL INTERGROUP RELATIONS          9

2    Department of Consumer and Worker Protection.  I will

3    call you when it is your turn to speak.

4        For the question and answer period only, we will

5    also be joined by First Deputy Commissioner Jackie

6    Mallon from the Department of Small Business

7    Services.  As well as Executive Director Steven

8    Edinony[SP?] and Deputy General Council Mike Tiger

9    from the Department of Consumer and Worker

10   Protection.

11       During the hearing, if Council Members would like

12   to ask a question of the Administration or a specific

13   panelist, please use the Zoom raise hand function and

14   I will call on you in order.  We will be limited

15   Council Member questions to five minutes, which

16   includes the time it takes to answer your questions.

17       Please note, that for ease of this virtual

18   hearing, we will not be allowing a second round of

19   questions for each panelist.

20       Thank you.  I'll now pass to the Speaker to give

21   an opening statement.

22       SPEAKER COREY JOHNSON:  Thank you Stephanie.

23   Thank you Chair's Gjonaj and Cohen for holding this

24   hearing today.  There are a lot of bills on deck, so

25   I will be brief but I wanted to say that as we all

A-679

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1           INTERNATIONAL INTERGROUP RELATIONS        10
  2  know, small businesses make our neighborhoods feel
  3  like home for residents and they show tourists why
  4  we're the greatest city in the world.
  5      So, we have no choice but to make sure they are
  6  able to whether this unbelievably painful storm.  It
  7  is too important for New York City.  I can't imagine
  8  my neighborhood or any neighborhood without our local
  9  small businesses and I'm sure every New Yorker would
 10  agree with that sentiment.  But they're not just a
 11  critical part of making New York special.  Small
 12  businesses employ 26 percent of New Yorkers and if
 13  they close down, hundreds of thousands of workers
 14  will permanently lose their jobs and the city loses
 15  out on billions of dollars in sales tax, property tax
 16  and income tax revenue.  Our economy runs on small
 17  businesses and now they are facing unprecedented
 18  losses.  This could be the worst economic disaster
 19  that New York City has seen since the great
 20  depression.
 21      Many businesses will be forced to shut down for
 22  good if they don't get more help.  That won't just
 23  devastate business owners and their workers, it will
 24  further destabilize our economy, our neighborhoods,
 25  and the lives of so many New Yorkers.
```

A-680

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                INTERNATIONAL INTERGROUP RELATIONS          11
 2          Congress made some improvements to the Paycheck
 3     Protection program but those loans are still too hard
 4     to access in their ensured supply and I'm not
 5     confident that they will end up helping the vast
 6     majority of New York City small businesses.
 7          This is particularly true for the city's
 8     immigrant owned small businesses.  They face
 9     significant obstacles in accessing loans because of
10     language barriers, documentation requirements and
11     eligibility criteria.  We absolutely need more
12     federal support here but there are some things that
13     the city can do.
14          We've got a large package of bills that we're
15     hearing today including bills that would give
16     desperately needed help to restaurants by capping
17     delivery app fees.  I want to give the sponsors time
18     to discuss, so I'll just briefly mention two bills
19     that I'm co-sponsoring.  Introduction 1914, which I
20     co-sponsored with Council Member Adrienne Adams,
21     would make threatening an impacted commercial tenant
22     a form of harassment punishable by a civil penalty of
23     between $10,000 or $50,000.  And Introduction 1932
24     which I co-sponsored with Council Member Rivera,
25     would suspend personal liability clauses, so that
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        12
 2   city business owners don't face the loss of their
 3   businesses and also personal bankruptcy.  I want to
 4   thank everyone who has joined us, I know it is
 5   especially challenging for small business owners to
 6   take time to be here today and I know we can't solve
 7   all of the issues that you are facing but I want you
 8   to know the City Council is committed to doing
 9   everything we can as quickly as we can and I will now
10   turn it back over to the Chairs.
11       Thank you very much.
12       CHAIRPERSON GJONAJ:  Thank you so much Speaker
13   Johnson.  I'd like to acknowledge that we've been
14   joined by colleagues since the start of the hearing
15   and we've been joined by Council Member Matteo and
16   Council Member Moya.
17       Good afternoon.  I'm Council Member Mark Gjonaj,
18   Chair of the Committee on Small Business and I'd like
19   to welcome you to our remote joint hearing today with
20   the Committee on Consumer Affairs and Business
21   Licensing Chaired by my dear friend Council Member
22   Andy Cohen.
23       As Chair of this Committee, I've had the honor of
24   being a voice in the City Council to advocate for and
25   support the over 200,000 small businesses in New York
```

A-682

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                  INTERNATIONAL INTERGROUP RELATIONS          13
 2   City.  The small businesses in the city are the
 3   living environment of what makes New York great.
 4   Nearly half of our small businesses are immigrant
 5   owned and, in some neighborhoods, these immigrant
 6   business owners employ up to 40 percent of the
 7   community.  Our small businesses deliver cultural,
 8   relevant goods that can't be found in larger
 9   businesses or in big box stores.  They beautify our
10   neighborhoods and serve as a meeting place for
11   citizen, city's residents to socialize.
12      Micro businesses with nine employees or fewer
13   capture the more common conception of the mom and pop
14   shop.  They are a symbol of the what hard work and an
15   entrepreneurial spirit can accomplish in our great
16   city.
17      The COVID-19 crisis perhaps presents the greatest
18   threat to our economy and small businesses in modern
19   history.  Our non-essential businesses are currently
20   closed and they must now decide whether they can
21   continue paying their staff rent, debt, real estate
22   taxes, sewer and water charges throughout the
23   duration of this crisis.
24      Our essential businesses may also be struggling
25   with the declined business and sales and now, have
```

A-683

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        14
 2   the added burden of providing personal protective
 3   equipment or PPE to protect their staff and
 4   customers.
 5       I look forward to hearing from Commissioner
 6   Bishop about the SBS's Loan and Grant program and
 7   their success and failures in getting necessary
 8   financial resources into the hands of small business
 9   owners.
10       I believe with the right amount of resources and
11   leeway; you could have done more to save our
12   businesses and you still can.  I have a number of
13   questions for the Commissioner, specifically how SBS
14   engaged without immigrant small business owners.  Why
15   these programs close so quickly and to get a
16   breakdown of which types of businesses and
17   neighborhoods benefited the most from these programs.
18   It is well documented that this virus had a
19   tremendous negative impact on the communities of
20   color.  And I want to make sure that the issuance of
21   financial relief did not disproportionately benefit
22   business owners living in certain areas or working in
23   certain industries or of a certain size.  And while
24   I'm eager to get answers from the Commissioner on the
25   Grant Loan program, I'd like to be honest.  I have
```

A-684

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        15
 2   deep concerns that the Mayor may have taken his eye
 3   off the ball in protecting New York City small and
 4   micro businesses.  While he's out busy playing
 5   national politics, struggling business owners are
 6   left wondering if he would do his job and focus on
 7   protecting them during a crisis.
 8       To say he was MIA, we'd be putting it mildly.
 9   The Mayor needs to realize that he must work with
10   this body to ensure that we can maximize the city's
11   response.  Norkman[SP?] reminds us of when Washington
12   told New York City to go to hell in the 1970's by
13   allocating only $49 million in aid to our small
14   business.  In essence, he has told New York City
15   small businesses they can go to hell and they are not
16   relevant.
17       To put things in perspective, $49 million of the
18   200,000 businesses in New York City, equates to $245
19   per business.  We spend more on parades in New York
20   City.  This Administration spent more on parades.
21   This Administration is a $62.4 million in the FY 2021
22   Budget for Department of Transportation Executive at
23   Administration on other than personal service debt.
24       $172 million in contracts for legal services.
25   $129 million for contracts for security services.
```

A-685

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS          16
 2   $45.6 million for printing contracts and $30 million
 3   for advertising.  I suggest this Administration focus
 4   on the lifeblood of our economy.  Our small
 5   businesses contribute billions annually to our digit.
 6   They deserve more, they are entitled to more.  The
 7   city must be there for them in this time of crisis.
 8   This hearing is also a legislative one.  We will be
 9   hearing a package of bills today and intended to
10   provide immediate relief to our struggling small
11   businesses during this crisis.  We will be hearing
12   eight bills today that relate to third-party delivery
13   platforms.  We've had two oversight hearings on this
14   topic this legislative session and have spent almost
15   a year working on this legislation.  The bills we're
16   hearing today will ensure that the restaurants will
17   be able to weather the storm and reopen for business
18   after this crisis is over.
19       I'm especially proud of my bills, Intro.'s 1895,
20   1896, 1897, 1898, and 1921.  I am also co-sponsor of
21   my colleagues bill Council Member Francisco Moya's
22   bills Intro. 1907 and 1908.  The Committee will also
23   be hearing Into. 1914 and 1932.  I look forward to
24   beginning a dialogue with SBS and our advocates here
25   today on all these bills as they continue the
```

A-686

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1           INTERNATIONAL INTERGROUP RELATIONS        17

  2   legislative process.  The package of bills we're

  3   hearing today will provide small businesses with the

  4   essential relief they need and deserve.

  5       I fear after we open back up this city and life

  6   begins to return to a new normal, we will see our

  7   commercial corridors decimated and empty.  There were

  8   signs of this before this crisis.  We can't even

  9   imagine what our commercial corridors will look like

 10   after this crisis.

 11       We must prevent mass retail vacancies.  We must

 12   save mom and pop shops; we must take advantage and

 13   legislative action to ensure small businesses are

 14   protected.  Now is the time to be proactive.  I

 15   created a petition calling for City Hall in Albany to

 16   wake up and delay business income tax, sales tax,

 17   payroll tax, real estate taxes and water and sewer

 18   charges.  Nearly 20,000 New Yorkers agreed that this

 19   must be done.  With that said, I'd like to thank the

 20   Speaker of the Council for adapting to this new

 21   normal and allowing the Council to resume our work

 22   despite these challenges.

 23       I want to thank my Chief of Staff Regi Johnson,

 24   our Legislative Council Stephanie Jones, our Policy

 25
```

A-687

```
                  COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                      INTERNATIONAL INTERGROUP RELATIONS        18
 2    Analyst Noah Meixler and Financial Analyst Aliya Ali
 3    for their hard work in preparing for this hearing.
 4        I'd like to turn it over to Chair Cohen, who
 5    Chairs the Committee on Consumer Affairs and Business
 6    Licensing to say a few words and give an opening
 7    statement.  Chair Cohen?
 8        CO-CHAIR COHEN:  Mark, it's good to see your
 9    face.
10        CHAIRPERSON GJONAJ:  Same here.
11        CO-CHAIR COHEN:  Alright, good afternoon.  My
12    name is Andrew Cohen and I am the Chair of the
13    Committee on Consumer Affairs and Business Licensing.
14    I'd like to thank everyone who has managed to join us
15    for this remote hearing and thank you Council Member
16    Gjonaj for convening this important hearing together.
17        The scope of today's hearing is extensive and it
18    has been mentioned, it is both an oversight hearing
19    and an opportunity to gather feedback on numerous
20    pieces of legislation.  I look forward to hearing
21    directly from small business owners about the impact
22    that this pandemic on their operations and their
23    experiences navigating government programs meant to
24    assist them.
25
```

A-688

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS          19

 2       Small businesses are the lifeblood of our economy

 3   but we all know that even before this pandemic hit,

 4   maintaining a profitable one in the city was

 5   incredibly difficult.  So, it is hard to comprehend

 6   to tenacious small business owners are making it

 7   happen now.

 8       But many of you still are.  We've heard

 9   incredible stories of ingenuity and innovation in the

10   ways that you have been able to utilize technology to

11   reach your customers.  I hear that there are bodega's

12   in the Bronx that are now taking orders online while

13   others such as restaurants and food trucks are still

14   operating and sending food to our frontline

15   healthcare workers.

16       While it is inspiring to hear about the

17   generosity and resilience of our small business

18   owners, we do not want you to bear this weight alone.

19   Many of you have called for very specific legislation

20   and governmental support to help you navigate this

21   unprecedented crisis.  In response, Chair Gjonaj,

22   myself and my fellow Council Members introduced a

23   package of legislation geared toward reducing the

24   burden on small business to help you maintain your

25   operation and get through this crisis.
```

A-689

```
1      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS        20
2          My bill Intro. 1916 will require the Department

3      of Consumer Affairs to waive and refund all fees

4      related to sidewalk café licenses for the remainder

5      of this year.  Sidewalk café's cost restaurant owners

6      thousands of dollars in fees annually.  There are

7      approximately 1,400 sidewalk café's in the city

8      representing an annual cost to the industry of

9      between $11 and $12 million.  It simply does not make

10     sense for the city to collect these fees when

11     restaurants are one of the hardest hit industries.

12         I look forward to hearing from Commissioner Salas

13     and the Administration regarding this legislation.

14     I'm also proud to be a co-sponsor on several of my

15     colleagues bills including the bills limiting the

16     fees, the commissions that restaurants and grocery

17     stores have to pay third party food delivery

18     companies.

19         In this time of need, these businesses and their

20     workers continuously put themselves on the front line

21     to help New Yorkers acquire basic necessities.  It is

22     distressing to hear that their already slim profit

23     margins are further diminished by exploitatively high

24     commissions and fees.

25
```

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1           INTERNATIONAL INTERGROUP RELATIONS          21

2       Finally, before we begin to hear the testimony, I

3   would like to thank all the City Council staff who

4   helped make this virtual hearing possible.  Specific

5   from Consumer Affairs Balqees Mihirig, Senior Counsel

6   Leah Skrzypiec, I hope I said that right and Policy

7   Analyst Sebastian Bacchi, Senior Finance Analyst as

8   well as my Legislative Director Patty Vandenack and a

9   particular thank you to all the IT people who are

10  really making this miracle of technology take place.

11      These certainly are trying times but I hope New

12  Yorkers find it reassuring to know that the Council

13  can continue its work to serve the people of this

14  city.

15      I believe that Council Member Gjonaj acknowledged

16  all the members of my Committee.  I'm not sure he

17  acknowledged Council Member Koo, who has joined us

18  also.

19      And with that Mark, I'm going to turn it back

20  over to you.

21  CHAIRPERSON GJONAJ:  Thank you Council Member.  I

22  also want to acknowledge that with us, we have public

23  advocate Jumaane Williams and we've been joined by

24  Council Member Powers.  I want to acknowledge Council

25  Members Moya, who is a sponsor of Introduction 1907

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1           INTERNATIONAL INTERGROUP RELATIONS      22

2   and 1908.  Council Member Adams the sponsor of Intro.

3   1914, Council Member Matteo the sponsor of the pre-

4   considered bill, Council Member Rivera the sponsor of

5   Intro. 1932 and the Public Advocate who is the

6   sponsor of the Resolution Number 1049.

7       For ease of this virtual hearing, we will be

8   limiting opening statements to five minutes for each

9   sponsor.  I'd like to turn it over to Council Member

10  Moya for some remarks followed by Council Member

11  Adams.  Council Member Moya?

12      COUNCIL MEMBER MOYA:  Thank you Chair Gjonaj.  I

13  want to start by thanking my colleagues and of course

14  the Speaker of the City Council and Chair Gjonaj for

15  partnering with me on the package of legislation to

16  protect New York City's local restaurants that we are

17  going to be discussing here today.

18      When I introduced these bills back in February,

19  we lived in a much different city.  At the time, we

20  were concerned about family owned restaurants

21  struggling to keep their doors open because

22  commission fees from apps like Grubhub were really

23  causing an issue for them.

24      Now restaurants have no choice but to keep their

25  doors closed.  Many have already closed for good
```

A-692

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
          INTERNATIONAL INTERGROUP RELATIONS          23

1

2   because of the devastating effects of the COVID-19

3   crisis.  With no one sitting down at their

4   restaurants, countless front and back of house staff

5   have been laid off.  Every restaurant felt the

6   pressure to partner with third party food service

7   apps, like seamless before but now, they have no

8   choice.  Some people treated these apps like saviors

9   for restaurants allowing them to reach customers who

10   were staying home and social distancing.

11       In March Grubhub made headlines when it announced

12   it would suspend commission fees as the restaurant

13   struggled to cope with the pandemic.  Good news for

14   restaurants on the brink of failure.  Outlets like

15   CNBC and others reported that Grubhub would and I

16   quote, for go or waive commission fees.  Except it

17   wasn't true.  In fact, there was so much confusion

18   and misrepresentation about what Grubhub was doing

19   that it later had to clarify its statement.

20       No, it wasn't waiving fees, it was just deferring

21   them to a later date.  So, another words, they were

22   telling restaurants, we hope you survive long enough

23   to pay us our money.  How generous of them.

24       Is there anyone who actually believes that these

25   restaurants barely hanging on will be able to pay off

A-693

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                    INTERNATIONAL INTERGROUP RELATIONS        24

 2   the commission fees by some unidentified date?  Of

 3   course not.  It's disingenuous to act otherwise.

 4       Restaurants needed help before COVID-19 epidemic.

 5   They are getting swallowed up by the exorbitant

 6   commission fees that reach as high as 30 percent and

 7   exceed the slim perfect margins most restaurants

 8   operate in.

 9       Now, as they perform the essential functions of

10   feeding New Yorkers, they need this help more than

11   ever.  This is why we've added a section to Intro.

12   1908, which would place a ten percent cap on

13   commission fees from third party food vendor services

14   to specifically address the needs during a crisis

15   like COVID.

16       The new section mandates that in times of

17   declared emergencies, where restaurants are limited

18   to pick up or delivery only, apps could only charge

19   restaurants for actually delivering meals.  When we

20   introduced this package of bills, I already could see

21   a nightmare version of New York that had nothing but

22   chain restaurants on every block because no locally

23   owned place could survive the cost of doing business

24   here.  Without putting in place the protections these

25   bills would create, that nightmare seems almost
```

A-694

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                  INTERNATIONAL INTERGROUP RELATIONS        25

 2   impossible to avoid.  Restaurants and the workers who

 3   keep them running in the community that they serve

 4   are demanding that we do something to give them a

 5   chance at survival.  This was true before the

 6   pandemic; it turned the world upside down but now

 7   more than ever there is a greater urgency to get this

 8   done.

 9       So, I want to take this opportunity again to

10   thank the Speaker, Chair Gjonaj and my colleagues for

11   being a leader on this issue and a champion for New

12   York City small businesses and I urge my colleagues

13   to join us in supporting these bills.  Thank you

14   Chair Gjonaj for the opportunity to speak.

15       CHAIRPERSON GJONAJ:  Thank you Council Member

16   Moya.  I'd like to call on Council Member Adams for

17   some remarks, followed by Council Member Matteo.

18   Council Member Adams.

19       COUNCIL MEMBER ADAMS:  Thank you so much and good

20   afternoon.  I'd like to start by thanking Chair's

21   Gjonaj and Cohen for today's important hearing on the

22   impact of COVID-19 on New York City.  I'm proud to

23   sponsor Introduction 1914 with Speaker Johnson.  This

24   bill would make threatening a commercial tenant based

25   on their status as a COVID-19 impacted business or
```

A-695

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                  INTERNATIONAL INTERGROUP RELATIONS        26
 2    person a form of harassment punishable by a civil
 3    penalty of $10,000 to $50,000.  Our businesses,
 4    especially small businesses are extremely vital to
 5    the pulse of our neighborhoods.  Small businesses are
 6    suffering right now as they are forced to adapt to a
 7    new normal.  We need to act now to protect the
 8    businesses that make our neighborhoods vibrant and
 9    maintain the history and character of our communities
10    across the city.
11        Unfortunately, thousands of businesses in our
12    city are suffering as they've been forced to close
13    due to COVID-19.  As availability of federal loans is
14    limited, many businesses are unable to pay their
15    rent.  This leaves them vulnerable to harassment from
16    landlords in search of ways to collect or in essence
17    force the incumbent tenant to voluntarily abandon the
18    property, so that new tenants willing to pay higher
19    rents can move on in.
20        The threat of harassment will particularly impact
21    the city's small independently owned and immigrant
22    owned businesses, many of which were operating on
23    thin margins and struggling to pay rent even before
24    this crisis.
25
```

```
 1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
           INTERNATIONAL INTERGROUP RELATIONS         27

 2      So, I thank the Speaker for his leadership and

 3    partnership and I certainly thank my colleagues for

 4    considering Intro. 1914 to protect our small

 5    businesses and protect commercial tenants.

 6      Thank you, Chair's.

 7      COUNCIL MEMBER GJONAJ:  Thank you so much Council

 8    Member.  I'd like to call on Council Member Matteo to

 9    give his remarks followed by Council Member Rivera.

10    Council Member Matteo?

11      COUNCIL MEMBER MATTEO:  Thank you Chair's Cohen

12    and Gjonaj for holding today's joint hearing.  Thank

13    you to the staff that has helped make it possible,

14    truly appreciate all your hard work.

15      Every one knows how terrible this pandemic has

16    been.  It has kept families and friends apart; it has

17    taken so many loved ones from us.  The toll on our

18    physical and mental health continues to be felt and

19    the hardship of this place and our small businesses

20    has also been unprecedented.

21      Small businesses are the backbone of our

22    communities and the engine of our economy.  They

23    employ more than half our city's workforce and most

24    of our residents.  They support non-for-profits that

25
```

A-697

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
                INTERNATIONAL INTERGROUP RELATIONS          28

1

2   enhance our neighborhoods quality of life to a level

3   that government can never accomplish on its own.

4       We have to support them to get back on their feet

5   so they can continue to fill that vital role in New

6   York City.  That is why I have introduced this pre-

7   considered Intro.  I appreciate that license and

8   permits have been extended during the duration of

9   these emergency but the agency response to Executive

10  Order 107 of 2020 has been uneven at best.  Some

11  agencies maintain that permits have to be renewed at

12  the expense of small businesses, so we need the Mayor

13  to clarify which permits and licenses have been

14  extended.

15      We also much ensure that our small businesses are

16  not burdened with red tape just as we are starting to

17  allow them to reopen.  That is why no permit or

18  license should have to be renewed for 90 days after

19  this emergency is over.  This will give small

20  businesses, our mom and pop establishments, our local

21  restaurants and others at least some breathing room

22  as they try to restart and to operate without

23  worrying about paper or a fine from the city.

24      I look forward to hearing from the Administration

25  and working with them to make sure that this burden

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1             INTERNATIONAL INTERGROUP RELATIONS        29
2   is lifted from small businesses before it hobbles
3   them in their come back.
4       Thank you, Chair's.
5       COUNCIL MEMBER GJONAJ:  Thank you Council Member
6   Matteo.  I'd like to call on Council Member Rivera
7   for some remarks, followed by Public Advocate
8   Williams.  Council Member Rivera.
9       COUNCIL MEMBER RIVERA:  Thank you.  Good
10  afternoon, I am Council Member Carlina Rivera and I'd
11  like to thank Chair Gjonaj and Chair Cohen and
12  members of the Small Business and Consumer Affairs
13  Committee's for letting me speak briefly at this
14  hearing on my bill, Introduction 1932 which would
15  prohibit the enforcement of personal liability
16  provisions in commercial leases or rental agreements
17  involving a COVID-19 impacted tenant.
18      This pandemic has already left a profound impact
19  on our city.  One that will be felt for years if not
20  decades.  No where will this long term effect be felt
21  more than in our small business community where
22  countless owners are facing the very real possibility
23  that their stores may never return.
24      We must do everything in our power through
25  legislation and advocacy to help these pillars of our
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        30
 2   communities and the thousands of New Yorkers they
 3   employ.  My bill will ensure that business owners,
 4   should they be forced to walk away or temporarily
 5   shutter their stores, through no fault of their own
 6   can do so without facing personal liability, ensuring
 7   that one day they may be able to return and relaunch
 8   or create a new thriving business in our
 9   neighborhoods.
10       Sadly, I am already hearing from small businesses
11   in my district that some landlords who I understand
12   maybe suffering as well are going after small
13   business owners life savings and personal assets
14   during this national pandemic.  These are folks like
15   my constituents Mario, the owner of Follia, an
16   amazing Italian restaurant on 3rd Avenue.  Mario is
17   already getting rent due notices and threats from his
18   landlord that the personal liability clause in his
19   lease will soon be acted upon.  He has no where to
20   turn right now.
21       No matter the need, it is a moral and unethical
22   failure for landlords to seek such restitution for
23   people who have already lost their life's work.  Any
24   small business owners that's taken the right steps in
25   incorporating their business should be protected by
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        31

 2    this bill and I encourage all members of these

 3    committees to please support Intro. 1932.

 4       I also want to recognize that that bill's we are

 5    hearing today wont do enough for every small business

 6    owner and that this crisis has only deepen the

 7    challenges our small businesses have faced for

 8    decades in our city.

 9       We must continue to fight for the assistance we

10    need from Albany and Washington both in the form of

11    rental forgiveness for small business tenants and

12    financial assistance as well.  And as part of any

13    relief package, our nonprofit and small landlords

14    must be taken into account through methods such as

15    property tax relief.

16       So, as long as they are actively working to

17    provide direct relieve to their tenants themselves.

18    When I go out to deliver food or assist folks in my

19    district, I have been both saddened and strengthened

20    by the store owners who while shuttered and stressed

21    continue to support and give back to their community

22    so selflessly.  It's time we stepped up and gave back

23    to them in this time of crisis.

24       Thank you.

25
```

A-701

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS         32
 2      CHAIRPERSON GJONAJ:  Thank you Council Member
 3   Rivera.  I want to call on Public Advocate Williams
 4   for some remarks.  Public Advocate.
 5      PUBLIC ADVOCATE WILLIAMS:  Thank you so much
 6   Chair Gjonaj and Chair Cohen.
 7      CHAIRPERSON GJONAJ:  Can't hear you.
 8      PUBLIC ADVOCATE WILLIAMS:  You can't hear me.
 9   Can you hear me now?  I want to thank Chair Gjonaj
10   and Chair Cohen for this.  I apologize, I have to
11   keep the mask on.  I'm in a crew distribution event
12   in Statin Island, but I'm used to the magic of
13   technology, I can still get my statement in this
14   hearing.  So, I appreciate the opportunity to speak.
15      I do want to thank Speaker as well for working
16   with the Council to get there hearing online and
17   showing leadership for our legislature that act the
18   core of the country that this can be done and I'd
19   also like to say the Speakers quarantine barrier much
20   better in the mind, so I appreciate that as well.
21      And I appreciate the attention for Consumer
22   Affairs and Business Licensing and Small Businesses
23   for holding an oversight hearing on the impact of
24   small businesses in New York City.  I know the
25   Committee is hearing several bills that will support
```

A-702

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        33
 2  our restaurants and delivery workers in our small
 3  businesses.  I support my colleagues efforts and
 4  thank them for introducing these bills.
 5      I'd also like to thank our first responders and
 6  frontline workers for helping our city battle
 7  coronavirus, as well as keep this city moving.  I'm
 8  calling and working with the City Council to make
 9  sure that our essential workers, who very often are
10  pushed out of [INAUDIBLE 31:37] for the rest of the
11  city will get the recourse that they need due to the
12  failures of our city exec, state exec and our federal
13  exec in decisions that were made.
14      To the residents of New York City, I want to
15  stress how important it is that we continue to
16  practice social distancing and stay home as much as
17  possible.
18      With that said, as this crisis continues, the
19  financial pressures on New Yorkers will only
20  increase.  My Resolution, Resolution 1049 aims to
21  address the major root cause of one of the financial
22  issues that many New Yorkers face, confession of
23  judgement in business loans.  A confession of
24  judgment is a written agreement which one signed by
25
```

A-703

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        34

2  the bar of monetary loan relinquishes the borrowers

3  right to dispute legal claims made by length.

4     In other words, a person is giving up their right

5  to due process if the debt is unpaid and there is a

6  dispute.  While confessions of judgement allow

7  lenders to resolve and receive [INAUDIBLE 32:28] in a

8  timely manner, these agreements have also lead to

9  predatory practices.  Lenders can use there

10  agreements to accuse borrowers of defaulting on their

11  loans and seize their assets without proof and prior

12  notification.

13     The Resolution calls on the Congress and New York

14  State to pass legislation to prohibit use of

15  confessions and judgement in business loans.  There

16  have been some points in our federal government, it's

17  a step in the right direction but it does not

18  prohibit confessions of judgement from being filed

19  against an instate debtor which leads many New

20  Yorkers vulnerable to predatory living practices.

21     One group of New Yorkers who have made this

22  vulnerable population, taxi medallion owners.  There

23  are 11,938 taxi medallions in New York City and

24  obtaining a taxi medallion is not a cheap endeavor.

25  With many taking out a business loan and they

1   COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
       INTERNATIONAL INTERGROUP RELATIONS        35

2   couldn't afford it.  Between 2002 and 2014, the price

3   of medallions $200,000 to more than 1 million even

4   though city records show that the taxi driver incomes

5   barely change.

6       Can you still hear me?  Sorry, the following

7   year, the cost of medallions began to fall as the

8   value of the taxi medallions fell, as the value of

9   the taxi medallions fell, lenders denied, borrows

10  appeals to refinance and instead issued confessions

11  of judgment.  Allowing the lender to seize the

12  borrowers assets.  In fact, several banks use

13  confessions of judgement in their lending activity

14  where the borrower has admitted to defaulting on a

15  loan even before borrowing any funds at all.

16      The ripple effect of the predatory lending

17  practices, much of which were based on confessions of

18  judgement have left taxi drivers and others who own

19  medallions and a lot of debt.

20      Incurably a number of medallion holders have

21  taken their lives due to the overwhelming stress from

22  their debt.

23      Now, the city has the opportunity to address this

24  outcome in a number of ways.  The city should look to

25  offer a debt forgiveness course [inaudible 34:25] the

A-705

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS          36
 2  man the Council appointed the panel to uphold the
 3  bill for thousands of drivers and we applaud that.
 4  Although much of our city funds will be decimated to
 5  address the COVID-19 related issues, we need to look
 6  to how to make the promise bailout a reality for the
 7  taxi drivers as well.  Not only are they among the
 8  front line workers who are going outside every day to
 9  make sure people can get around safely, they are also
10  among those who are financially struggling during
11  this pandemic.
12      Small businesses are also at risk of confession
13  of judgments to use against them and probably even
14  more so as we move through this COVID responsive
15  recovery.  Whether a local restaurant or retail
16  store, the reality that small business owners are
17  vulnerable to the predatory practice.  This is the
18  especially true in our current environment as most
19  this is effectively stopping a steady stream of
20  income.  Businesses already have very tough decisions
21  to make, businesses that have signed loans with high
22  interest rates cannot afford to on because of a
23  missed payment.  The situation for these small
24  businesses that empower and strengthen our
25  communities is precarious at best.
```

A-706

```
    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1        INTERNATIONAL INTERGROUP RELATIONS        37
2    MODERATOR:  Time.
3    PUBLIC ADVOCATE WILLIAMS:  Losing and these small
4  businesses will be a catastrophe and we expect it
5  might be more.  But it does not have to be this way
6  and the legislation on a federal level and on the
7  state, it's the best recourse.
8      New Yorkers under stress cannot wait any longer
9  for, as their collectors continue to misuse
10  confessions of judgement.  So, I'm asking my
11  colleagues to join me and this is just a resolution
12  but I think it helps New York City Council to make
13  sure that we are pushing as hard as we can in
14  conjunction with the other bills.  I think we will be
15  moving in the right way in protecting all New Yorkers
16  including all small businesses.
17      Thank you again.  I appreciate it.
18    CHAIRPERSON GJONAJ:  Thank you Public Advocate.
19  Before I turn it over to the moderator, I want to
20  acknowledge that we've been joined by Council Member
21  Rosenthal.
22      Counsel Stephanie Jones?
23    STEPHANIE JONES:  Thank you Chair.  We will now
24  call on members of the Administration to testify.
25  First, Commissioner Greg Bishop of the Department of
```

**A-707**

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1               INTERNATIONAL INTERGROUP RELATIONS        38
2   Small Business Services followed by Commissioner
3   Lorelei Salas of the Department of Consumer and
4   Worker Protection.
5        Before we begin, I will administer the oath.
6   Commissioner Bishop, Commissioner Salas, First Deputy
7   Commissioner Mallon, Executive Director Edinony and
8   Deputy General Counsel Tiger.  I will call on each of
9   you individually for response to the oath.
10       Please raise your right hands.  Do you affirm to
11   tell the truth, the whole truth and nothing but the
12   truth before these Committees and to respond honestly
13   to Council Member questions?
14       Commissioner Bishop?
15       GREG BISHOP:  I do.
16       STEPHANIE JONES:  Thank you.  Commissioner Salas?
17       LORELEI SALAS:  I do.
18       STEPHANIE JONES:  Thank you.  First Deputy
19   Commissioner Mallon?
20       JACQUELINE MALLON:  I do.
21       STEPHANIE JONES:  Thank you.  Executive Director
22   Edinony?
23       STEVEN EDINONY: I do.
24       STEPHANIE JONES:  Thank you.  Deputy General
25   Counsel Tiger?
```

A-708

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1         INTERNATIONAL INTERGROUP RELATIONS        39
 2      MIKE TIGER:  I do.
 3      STEPHANIE JONES:  Thank you.  Commissioner
 4   Bishop, you may begin when ready.
 5      GREG BISHOP:  Thank you.  Good afternoon Mr.
 6   Speaker, Mr. Public Advocate and of course Chair
 7   Gjonaj, Chair Cohen and members of the Committee on
 8   Small Business and the Committee on Consumer Affairs
 9   and Business Licensing.
10      My name is Greg Bishop and I'm the Commissioner
11   of the New York City Department of Small Business
12   Services.  I'm joined by SBS First Deputy
13   Commissioner Jackie Mallon.  First and foremost, this
14   has been such a difficult moment for our city and
15   especially our small business community.  My staff
16   and I are working tirelessly for small businesses
17   through our programs and advocacy for additional
18   support.  I'm so grateful for the Council's
19   enthusiastic partnership and engagement as we
20   continue to reach constituents in your districts that
21   need help and to better understand the involving
22   impacts of COVID-19 on the city's small businesses.
23      New York City small business owners are facing
24   unprecedented challenges.  Our goal is to connect
25   them to the resources they need to preserve through
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        40
```

2   this crisis and come out on the other side stronger.

3   Based on the concerns we heard in January and

4   February, SBS worked quickly to launch two financial

5   assistance programs.  The NYC Employee Retention

6   Grant and the NYC Business Continuity Loan Fund.

7        Through the NYC Employee Retention Grant, SBS has

8   approved financial assistance totaling more than 419

9   million for over 2,600 small businesses.  SBS's New

10  York City and NYC Business Continuity Loan Fund, has

11  also seen an enormous demand.

12       We received thousands of applications and are

13  expecting to award about $20 million in loans.  Thus

14  far over 170 loans have been approved totaling more

15  than $10 million for small businesses.  However, the

16  overwhelming needs of our small business community

17  can only be met by the resources of the federal

18  government.  To help New York City small business

19  owners access their fair share of federal funds from

20  the Care's Act, our agency has shifted our resources

21  to provide technical assistance of business owners

22  who need help applying to the U.S. Small Business

23  Administration's Emergency Response Products

24  including the Paycheck Protection Program.  Which

25

A-710

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS          41
2   reopened to applications earlier this week after
3   initial funding was exhausted.
4      Technical assistance ranges from overview of
5   available funding options to communicating directly
6   with lenders to address questions regarding
7   applications.  SBS is providing this technical
8   assistance through virtual information sessions,
9   small group sessions in a one on one setting.
10     We will provide technical assistance in multiple
11  languages, so that immigrant entrepreneurs are not
12  excluded from these opportunities.  Beyond these
13  initiatives SBS has shifted all our operations to
14  support the most pressing needs of our constituents
15  as we whether this pandemic.
16     Our NYC Business Solution Centers experts are
17  available remotely to connect business owners with
18  services including identify additional financial
19  opportunities through our network of more than 40
20  lenders and local philanthropic partners.  Rent as we
21  heard, has been an enormous challenge for small
22  businesses.  Our commercial lease assistance program
23  is available to support small business owners as they
24  engage with their landlords to discuss changes to
25  their lease obligations, which might include a rent
```

A-711

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        42
 2  deferral, abatement or reduction among other actions.
 3  CLA lawyers can help review leases to determine what
 4  a business rights and obligations are, negotiate a
 5  payment plan for arrears.  And we know that Council
 6  is also committed to providing additional support for
 7  commercial tenants and we look forward to discussing
 8  Intro. 1914 and Intro. 1932 further.
 9     SBS is also providing targeted support for our
10  cities minority and women business enterprises.  In
11  additions to connecting MWBE's with relevant
12  information about SBS and SBA COVID relief
13  opportunities, SBS rapidly transitioned its existing
14  programming workshops.  One on one technical
15  assistance and contractor compliance operations to
16  remote service delivery.  SBS has collaborated with
17  the Mayor's Office of Minority and Women Owned
18  Enterprise and Mayor's Office of Contract Services to
19  identify MWBE firms that supply essential services
20  such as medical staffing, IT goods, childcare
21  services, cleaning services and food services to
22  connect these in demand MWBE firms with emerging
23  contracting opportunities.
24     SBS's Workforce One career center staff are
25  available to provide job seekers with 101 assistance
```

A-712

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        43
 2   regarding job searches and preparation as well as
 3   unemployment insurance.  We are focused on recruiting
 4   for essential services such as healthcare, groceries,
 5   pharmacies, and delivery companies as well as
 6   identifying opportunities that are close to our job
 7   seekers, so that's easier for them to travel to and
 8   from work.
 9     SBS is currently working with approximately 150
10   employees to fill 1,600 positions across the city.
11   We are building on these efforts by working with the
12   foods team to establish a workforce development
13   program that is specifically targeted towards the
14   essential businesses that sustain our food systems
15   including grocers.
16     To support the healthcare industry, SBS is
17   working directly with hospitals and nursing homes to
18   provide support in filling urgent staff needs and
19   develop a home heath aid training to meet the ongoing
20   demand of the home care and long term care facility
21   centers.
22     Since the onset of the pandemic, SBS has worked
23   to ensure that our partners and constituents have
24   access to the information they critically need.  We
25   share information through email correspondence,
```

A-713

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1                INTERNATIONAL INTERGROUP RELATIONS          44
2    social media, advertising campaigns and local and
3    national print, television and radio broadcast media.
4    We have created numerous resource pages with COVID
5    specific guidance for small business owners and job
6    seekers on our website.  These new COVID related
7    patients have seen over 700,000 visits since the
8    beginning of March.
9       We have also activated our community partner
10   network to disseminate information and share details
11   regarding new or ongoing challenges faced by their
12   small business constituents and I have personally
13   held regular conference calls with elected officials
14   and with community partners and through our
15   neighborhood development team.  SBS is in close
16   communication with bids and other community based
17   development organizations.
18      To continue providing critical support to
19   neighborhood commercial corridors across the five
20   boroughs, SBS has worked with all of our Neighborhood
21   360 and Avenue NYC grantees to rescope their efforts
22   to align with our COVID response and recovery
23   strategies.
24      By providing technical assistance and working
25   with our community partners, SBS is working to ensure
```

**A-714**

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS          45

 2  that New York City business owners have greater

 3  access to federal funding opportunities.  No matter

 4  how we are able to improve the access challenges of

 5  New York City small businesses, we must also

 6  recognize and correct the structural problems of the

 7  SBH, PPP, and idle programs.

 8     For most among them, the timeline for loan

 9  forgiveness needs to change to be fair to New York

10  City and businesses.  Congress needs to follow

11  businesses that receive PPP funding to bring their

12  employees back when their city reopens giving them a

13  fighting chance to sustain their business without

14  taking an insurmountable debt.

15     We are advocating for the extension of these

16  federal loan terms as increasing the timeline or

17  repayment would provide companies with the necessary

18  breathing room to emerge from this pandemic

19  financially sound.

20     Furthermore, many business sectors, especially

21  restaurants and our hospitality industry need

22  additional assistance with their fixed costs, like

23  rent, mortgage, and utilities in addition to the

24  expense of employee retention which is the focus of

25  the PPP.
```

A-715

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS           46
 2        And following, the federal government needs to do
 3    more to ensure that our smallest, most vulnerable
 4    businesses have access to the resources they need by
 5    developing financial tools and routing more money to
 6    business owners that have been left out of early
 7    federal funding rounds, including undocumented New
 8    Yorkers, some nonprofits and religious institutions
 9    who desperately need more support.
10        With your help and continued leadership for our
11    congressional delegation, we will continue to
12    identify these gaps in resources and advocate to the
13    federal government to ensure that future stimulus
14    packages capture the unique needs of New York City's
15    small business economy.
16        I applaud the Council's leadership in developing
17    local solutions especially related to third party
18    delivery applications but I do want to ensure we are
19    not putting additional regulatory burdens on small
20    business owners at this time.  I look forward to
21    discussing further and continuing to work together to
22    effectively serve New Yorkers.
23        Thank you and I would be happy to take your
24    questions.
25
```

**A-716**

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1         INTERNATIONAL INTERGROUP RELATIONS        47
 2      STEPHANIE JONES:  Thank you Commissioner.  Next,
 3   we'd like to invite Commissioner Salas of the
 4   Department of Consumer and Worker Protection to
 5   testify.  Commissioner Salas.
 6      LORELEI SALAS:  Thank you.  Good afternoon
 7   Speaker Johnson and Chair's Cohen and Gjonaj and
 8   members of the Committee.  I am Lorelei Salas,
 9   Commissioner for the Department of Consumer and
10   Worker Protection.  First, I'd like to state that I
11   hope that each of you and your loved ones are staying
12   safe and healthy during this crisis.
13      My office has been in regular contact with many
14   of your offices but I look forward to at this hearing
15   officially update you on the work that my agency has
16   been doing.
17      The economic cost of COVID-19 crisis is
18   tremendous, as my colleague Greg Bishop just
19   testified to.  But for the over 200,000 small
20   businesses in New York City, including thousands of
21   DCWP Licensees, revenue streams are strained or
22   nonexistent.
23      Under this Administration, DCWP has been
24   especially attentive to small business needs by
25   promoting a culture of compliance through
```

A-717

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS          48
2   presentations, round table meetings and business.  In
3   fact, just last month at our Preliminary Budget
4   hearing, I testified to yet another consecutive year
5   of decreased fines on businesses.
6       DCWP's mission to protect and enhance the daily
7   economic lives of New Yorkers to create thriving
8   communities is more important than ever before.  This
9   is why DCWP has and will continue to work to provide
10  guidance to small businesses and work in good faith
11  to address unforeseen matters of concern.
12      In compliance with New York State on pause DCWP
13  suspended in person customer visits to the New York
14  City small business support center in Jamaica in our
15  lower Manhattan main office on March 16th.
16      Instead of in person visits, DCWP published
17  guidance advising customers to use a suite of online
18  services and published public facing contacts to
19  further guide customer questions on issues including
20  business compliance, collections and licensing.  This
21  notice remains on our website home page and is
22  available in multiple languages.  Less than three
23  weeks after New York calls to extend that to June
24  30th, upcoming license terms and provided additional
25
```

**A-718**

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1         INTERNATIONAL INTERGROUP RELATIONS        49
 2  grace periods for licensees to submit renewal
 3  applications.
 4      The Mayor has of course also issued Executive
 5  Order 107 which extends license terms for the
 6  duration of the state of emergency and if the state
 7  of emergency extends beyond June 30th, we will extend
 8  our deadlines accordingly.
 9      DCWP has also been responsive to stakeholders.
10  Although prohibited by state statute from extending
11  the license expiration date of employment agencies,
12  we acted where we could and extend that the renewal
13  application grace period deadline to August 28, in
14  response to questions from the industry.  The
15  complete licensing extension guidance is available on
16  our website and in multiple languages as I said.
17      My staff and I have also been in close contact
18  with the City Council through the COVID-19 crisis.
19  Our partnership facilitated a Mayoral Executive order
20  waiving consent fees for sidewalk café's for
21  dependency of the state of emergency.  We are
22  processing refunds as quickly as possible and are on
23  track to complete final steps over the next few
24  weeks.
25
```

**A-719**

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1               INTERNATIONAL INTERGROUP RELATIONS          50

2        In these difficult times for businesses, DCWP's

3   core function and mission to protect workers and

4   consumers must persist.  In order to prevent stores

5   from overcharging New Yorkers, I used my authority on

6   March 5th, to declare our face masks temporarily in

7   short supply.  Subsequently, I expanded the short

8   supply order to cover disinfectant wipes and hand

9   sanitizers.

10       By March 16th, our agency took further steps and

11  issued an emergency rule making price gouging illegal

12  for any service or personal or household good that is

13  needed to prevent or limit the spread of or treatment

14  of COVID-19.  Under the emergency rule, businesses

15  have an opportunity to provide evidence to DCWP if

16  prices were raised in excess of ten percent due to

17  increased costs to supply them.  DCWP has also

18  subpoenaed several suppliers to investigate claims at

19  businesses that they were being gouged.  Thus far,

20  the agency has reached out to several manufacturers

21  of products to request assistance with positive

22  results.

23       Information of flyers for business compliance are

24  available on our website in multiple languages and on

25  March 6th, DCWP physically distributed this flyer in
```

A-720

```
           COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        51
 2   various business districts in New York City.  In late
 3   March, DCWP published updated COVID-19 guidelines for
 4   employers and employees as it relates to city, state
 5   and federal laws that govern New York City private
 6   sector workplaces.  DCWP received appreciation from
 7   stakeholders on updated paid sick leave guidance that
 8   clarified obligations as it related to new emergency
 9   protections passed by the state and congress.
10       I also want to take this opportunity to thank
11   Speaker Johnson for amplifying the regularly updated
12   guidance which is now available in multiple languages
13   on our website.  Both the guidance for workplace laws
14   in price gouging are the subject of ongoing virtual
15   outreach events, stakeholder communications, and
16   daily communication with sister agencies like SBS
17   that further amplify our work.  Today DCWP has
18   participated in 14 outreach events for small business
19   owners since the COVID-19 crisis began.
20       Before I discuss the broader package of bills,
21   I'd like to express the sentiment that my agency and
22   the administration generally, we agree with the
23   issues that the Council is trying to address with
24   these bills.
25
```

A-721

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1             INTERNATIONAL INTERGROUP RELATIONS        52
2        Given the ongoing emergency in this difficult
3   situation, it would be challenging for us to
4   contemplate taking on a broad area of new regulation.
5        With that said, we want to work with the Council
6   to figure out the best pathway forward and what we
7   can do to help small businesses the most that need
8   this help right now.
9        Introductions 1846, 1896, 1897, 1898, 1907 and
10  1908-A; this package of bills aims to regulate third
11  party food delivery services.  We'd like to work
12  together on addressing fees as addressed in Intro.
13  1908-A by Council Members Moya and Gjonaj.  Intro.
14  1908-A would place a cap on the fees charged to
15  restaurants during this crisis.  We are discussing
16  with City Hall to identify the best agency to tackle
17  this pressing matter to protect small businesses and
18  would like to continue the conversations with the
19  Council to find a path forward.
20       Similarly, DCWP supports the intent of Intro.
21  1846 but we have several questions including but not
22  limited to the prudency of only requiring these
23  disclosures to consumers we use a third-party food
24  delivery service and not to those that order directly
25  from restaurants.
```

A-722

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        53
 2       We're interested in working with you on the other
 3   bills as soon as the crisis is behind us.
 4   Introduction 1916 waives all license and consent fees
 5   for sidewalk café's that are due on or after January
 6   1, 2020 until December 31, 2020.  As noted earlier,
 7   DCWP worked successfully with the City Council to
 8   address sidewalk consent fees concerns for the
 9   dependency of the state of emergency by way of
10   Mayoral Executive Order.
11       Circumstances resulting from COVID-19 are
12   impacting the bottom lines of thousands of different
13   types of businesses.  DCWP alone licenses more than
14   75,000 businesses across over 50 business categories
15   and sidewalk café's represent less than 1,000 of
16   those businesses.
17       As a general matter, DCWP will continue to
18   explore ways that we can help businesses tie do
19   dependency of the state of emergency.  And we look
20   forward to working with the Council on this.
21       The pre-considered Introduction requires the
22   Mayor to issue guidance on license renewal deadline
23   extensions.  The legislation also provides that no
24   licenses or permits shall be required to be renewed
25   until 90 days after the COVID-19 emergency ends.
```

A-723

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS         54
 2   This legislation impacts licenses and permits beyond
 3   those under the purview of DCWP.  The Law Department
 4   is currently reviewing the proposal along with the
 5   other bills in this package in its totality.
 6      In conclusion, I would just like to say that
 7   we're very, very grateful for the essential workers
 8   that are taken care of the sick and vulnerable and
 9   for those delivering a variety of services we
10   normally take for granted.
11      We're also grateful for the incredible sacrifices
12   in our communities.  The small businesses that had to
13   close their doors to protect New Yorkers.  The New
14   Yorkers to continue to abide by social distance
15   guidelines and our collective staff who have remained
16   steadfast in working for the greater good of the city
17   and on behalf of millions who are suffering in these
18   trying times.
19      Thank you for the opportunity to testify and I
20   look forward to hearing from you and answering any
21   questions you may have.
22   STEPHANIE JONES:  Thank you Commissioner.  I will
23   now turn it over to questions from Chair Gjonaj and
24   then Chair Cohen.  For these questions, again, we
25   will additionally be joined by First Deputy
```

A-724

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        55
 2   Commissioner Jackie Mallon from SBS and Executive
 3   Director Steven Edinony and Deputy General Counsel
 4   Mike Tiger from DCWP.
 5       Panelists, please stay unmuted if possible,
 6   during this question and answer period.  Thank you,
 7   Chair Gjonaj, please begin.
 8       CHAIRPERSON GJONAJ:  Thank you Stephanie.
 9   Commissioner Bishop, thank you for your testimony.
10   What is the total dollar amount in loans that have
11   been allocated so far that have actually reached our
12   small businesses, whether it be in grants or loans?
13       GREG BISHOP:  So, first of all, it's good to see
14   you Council Member Gjonaj and I'm glad that you are
15   well.  As I had mentioned in my testimony, we have as
16   of today, in terms of our grants, we approved over
17   $19 million.  And as you know, when we make the
18   approval, it is a direct debit into someone's
19   account.  So, depending on their bank, once an
20   approval is done, it could take up to a week for the
21   money to actually get into the individuals bank
22   account.  And on the loan, we've approved over $10
23   million.
24
25
```

A-725

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1            INTERNATIONAL INTERGROUP RELATIONS        56
  2        CHAIRPERSON GJONAJ:  That's $39 million in total.
  3   Is that the total budget that as allocated for loans
  4   and grants?
  5        GREG BISHOP:  So, we actually, for the total
  6   budget was around $50 million and as you know and I
  7   know you talked about the allocation earlier in your
  8   opening statement.  When we created these programs,
  9   we actually, we were on the ground in early February
 10   because we saw a lot of businesses experiencing the
 11   impact of COVID-19 in the city, particularly you're
 12   not trying to talk communities.
 13        So, this program was designed for smaller
 14   businesses that were already experiencing the impact.
 15   When the Mayor made this announcement, the world
 16   changed within five days as you can imagine and were
 17   able to quickly pivot but we knew that the need was
 18   going to be far outweigh the ability for these
 19   programs to meet the need of the entire city.  And we
 20   said, and the Mayor said, that we will need the
 21   federal government to step in.
 22        You know, from when we launched a program, it
 23   took us five days from launching, excepting
 24   applications to making the first disbursement for our
 25
```

A-726

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        57
 2  grant program.  And for our loan program, it took us
 3  less than two weeks.
 4     So, our team moved as quickly as possible and for
 5  anyone that's in finance you know that you know
 6  standing up a program and making disbursements that
 7  quickly, it was task and we worked you know, well
 8  into late hours, weekends to get these programs up
 9  and running as quickly as possible.
10     But I share your concern in terms of the need.
11  We know that the federal government has the resources
12  as we all know, our budget situation we have as a
13  city, we have to have a balanced budget.  The state
14  has to have a balanced budget.  So, we need to depend
15  on the federal government in order to not only help
16  our small businesses but help the city in general.
17  So, we certainly agree with you that more needs to be
18  done.  We've been advocating and I want to thank our
19  New York Congressional Delegation because they have
20  been fighting for the little guys and I can talk a
21  little bit more about the federal programs but I just
22  wanted to let you know that we moved really quickly.
23  Money is out the door, there are companies that have
24  received dollars from our programs.
25
```

A-727

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        58
 2      CHAIRPERSON GJONAJ:  Thank you Commissioner, but
 3   I'm still not clear.  Is it $39 million or $49
 4   million that have been allocated in funds for loans
 5   and grants?
 6      GREG BISHOP:  So, the total number is $49
 7   million.  What you are seeing here is that we had and
 8   I'll ask First Deputy Jackie Mallon to give you the
 9   clarity in the dollars.  When we announced the
10   closure of our grant program, because when we
11   originally went out, there was a smaller number for
12   our grant program.  But instead of shutting the door
13   and saying no, we had a tremendous amount of
14   applications on the last day, I think double the
15   amount that we had throughout the entire program.
16      And remember this grant program was employee
17   retention.  So, when we decided that we were going to
18   pivot to now help our small businesses connect with
19   the federal employee retention program, that is why
20   we decided to sense out the out program.  Because the
21   out program is only for business with one to four
22   employees.  We did open it up to nonprofits and
23   individuals who immigrants could have also
24   participated in this but the federal program had a
25   much large catchment area.
```

A-728

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS         59

 2       So, we had a surge of applications and we are

 3   going through those applications, so that number that

 4   you're seeing, there is dollars that far exceeds the

 5   allocated budget that we're working on right now.

 6   Jackie.

 7       JACKIE MALLON:  Yes, $39 million is allocated for

 8   the grant program.  $10 million for the loan program,

 9   which we're also using private capital in the loan

10   program which is how we get $20 million-ish in loans

11   awarded.  And to date, it's about $19 million in the

12   grant that's been approved and $10 million, so it's

13   not $39 million so far, it's $29 million actually in

14   the loan, Council Member.

15       CHAIRPERSON GJONAJ:  So, how much has been

16   allocated already, $29 million or?

17       JACKIE MALLON:  No, no, awarded, so like, on it's

18   way to the customers is $19 million in the grant

19   program.  $10 million in the loans, that's $29

20   million out of the $49 million that's in the funding.

21       CHAIRPERSON GJONAJ:  Well, thank you Deputy

22   Commissioner but what's the hold up?  I mean, this

23   dollar amount is so small to begin with but only $29

24   million is out the door, that would mean we have

25   another $20 million that we could be allocating to
```

A-729

```
              COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                 INTERNATIONAL INTERGROUP RELATIONS        60
 2   these small businesses that are in dire straits.  So,
 3   I'm not sure who can answer that question.
 4       GREG BISHOP:  So, I started by saying that you
 5   know, we moved very quickly and you know part of the
 6   and when we talk about out the door, we're talking
 7   about there's a financial process right.  So, once we
 8   make the approval, the money needs to move from
 9   different bank accounts and as I talked about,
10   depending on your account, some of these transactions
11   and depending on the dollar value, some of these
12   transactions do take a certain amount of time.
13       We also have for the loan, it is an underwriting
14   process and the underwriting process, our third-
15   party, we are not underwriting the loans, a third
16   party is underwriting the loans.  They have put all
17   the resources that they need to.  They process
18   roughly about 40 applications per day and they are
19   moving as quickly as possible.
20       So, we expect to have all of the dollars
21   disbursed for the grant program within the next week
22   and then of course shortly after for the loan
23   program.  But in the meantime, we're still continuing
24   to help our businesses connect with our federal
25   programs because we know this is just a stop gap, the
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        61
2   city program was just a stop gap.  The federal
3   programs are the programs that our small businesses
4   need and we continue to advocate for changes for
5   those federal programs to make sure that they match
6   the needs of our New York City small businesses.
7       CHAIRPERSON GJONAJ:  Thank you Commissioner.  I'm
8   just going to reiterate that you need to get this
9   money out the door sooner than later and the total
10  dollar amount of $49 million which equates to roughly
11  $204, how many loans and grants were made and what
12  was the total that was requested?
13      So, maybe I can ask this in a different form.
14  One, what was the dollar amount of the total loans
15  and grants that came in in the form of requests and
16  the total dollar amount?  Do you have that answer?
17      GREG BISHOP:  Yeah, so I think, we had over 8,000
18  applications for our loan program, and if you look at
19  how we are doing with the average size loan of like
20  $60,000.  That's about $1.5 to $2 billion in terms of
21  need.  That doesn't mean everyone will get you know,
22  everyone has that average but again, it highlights
23  the fact that you know, the need far outweighs our
24  ability to help on a local level which is why we were
25  so excited when the federal government came as
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        62
 2  quickly as they did.  Because as you know, in the
 3  past, after Hurricane Sandy, the federal government
 4  took some time to bring in the additional resources
 5  that we needed.
 6      So, in terms of our ability to stand up this
 7  program, we knew that it was going to be a program
 8  that would just be a stop gap until the federal
 9  government brought in their programs.
10      In terms of numbers, we do have that information.
11  So, in terms of the rent, Jackie, do you have that
12  readily available?
13      JACKIE MALLON:  Sure, sure, we've received 8,800
14  grant applications and we have awarded 26— a little
15  over 2,600 to date which equate to that nearly $20
16  million that we're talking about.
17      CHAIRPERSON GJONAJ:  So, less than a quarter of
18  the applicants have received any funding?
19      JACKIE MALLON:  The approval rate is about 61
20  percent.  Some people that apply are actually not
21  eligible.  The larger businesses or whatever, a
22  number of different reasons.
23      GREG BISHOP:  Like, we saw some, the grant
24  program was specifically for small businesses.  We
25  wanted to make sure that we had you know, our very
```

A-732

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS          63
 2   microbusinesses.  So, only businesses that have four
 3   or fewer employees were eligible for this program.
 4   But we had a number of applicants that had more than
 5   four employees.  So, what we have done is for those
 6   that were not eligible we've connected them to the
 7   paycheck protection program, meaning we've provided
 8   technical support to help them with the application
 9   process either through their lender or through a
10   lender that's accepting new applications.
11        CHAIRPERSON GJONAJ:  Thank you Commissioner.
12   Again, this is only a fraction of the need that's out
13   there and the total dollar amount of $49 million is
14   less than crumbs when it comes to the needs of our
15   small businesses.  And I broke down the number, the
16   total dollar amount versus business that we have in
17   New York City and that equates to about $245 per
18   business.  How small businesses contribute billions
19   of dollars a year to the city's budget, billions and
20   in their most time of need and crisis, all this
21   Administration could give back to them is a total of
22   $49 million.  And in my opening statement, I outlined
23   that we spend more or this Administration spends more
24   on parades.  They spent more on printing then they
25   gave out in a form of grants.
```

A-733

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
        INTERNATIONAL INTERGROUP RELATIONS        64

1

2    The message is clear from this Administration and

3    although you're going to say there is a stop gap

4    measure that was only temporary, the Mayor has gone

5    on the record quite a few times to say, that the

6    money is not coming in quick enough from Washington

7    to aid our small businesses.  It's time for our

8    Mayor, this Administration to start focusing on this

9    city with the resources that we have.  No matter how

10   limited they are, $49 million doesn't even come close

11   to showing the relevance and the sincerity that is

12   needed to our small businesses.  This is their dreams

13   that have been destroyed.  They see a dim future and

14   this City and Administration has failed to be there

15   for them in this time of crisis.

16       I don't want to take more time on this issue

17   because we have so many that are going to testify on

18   the other issues on the bills that we have.  I'm

19   going to open this up to Chair Cohen if he has any

20   questions for the Administration on the loans and

21   grants and as the Commissioner of Business of

22   Consumer Affairs.

23       CO-CHAIR COHEN:  Thank you Mark.  I will be

24   brief; I'm going to let the bill sponsors I think

25   focus on their bills.  So, I'm just going to say,

A-734

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1          INTERNATIONAL INTERGROUP RELATIONS         65
  2  it's good to see you Commissioner Salas and
  3  Commissioner Bishop.
  4     GREG BISHOP:  Good to see you.
  5     CO-CHAIR COHEN:  And you know, I appreciate the
  6  collaboration.  Consumer Affairs, we've had regular
  7  briefings together and I appreciate the transparency
  8  and us being able to work together.  The one in your
  9  testimony, you don't object to 1916.  I understand
 10  that the agency is taking action on their own but you
 11  don't have any objection to it do you?
 12     LORELEI SALAS:  The question is addressed to me
 13  right, Chair Cohen?
 14     CO-CHAIR COHEN:  Yes, yes.
 15     LORELEI SALAS:  Yes, so I think that what I did
 16  testify to is that the bill implicates you know, many
 17  more agencies than the Department of Consumer Worker
 18  Protection, right.  And so, it is a logical
 19  conversation for the Law Department to really
 20  understand how this would effect the other agencies.
 21  I would say one thing, that operationally, we had
 22  timed our license expiration dates and renewal
 23  expiration dates so that there would be staggered
 24  deadlines, right.
 25
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS          66
 2        As you can imagine, operationally it could be a
 3    challenge to not only have to process 70,000 licenses
 4    at once, which could just add to waiting times for
 5    license applicants or renewal applicants.
 6        CO-CHAIR COHEN:  But as related specifically to a
 7    sidewalk café, you don't have any objection to that
 8    legislation?
 9        LORELEI SALAS:  Oh, I'm sorry.  So, with respect
10    to the consent fees, waiver for the year generate
11    through December 2020.  So, as you know, we work
12    collaboratively to arrive at a waiver of the consent
13    fees for the March installing period.  These consent
14    fees are part of contractual agreements entered into
15    with the city, right.  The agency doesn't have its
16    own discretion to act without involving other
17    stakeholders that are you know, part of or involved
18    in these contracts, right.
19        And I would just say also that obviously this
20    would have an impact on revenue streams, so it's
21    something to just take into consideration.
22        CO-CHAIR COHEN:  Can you tell us what the status
23    is?  Have you refunded everybody who has paid so far
24    or are you still processing?  What percentage of the
25
```

A-736

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1             INTERNATIONAL INTERGROUP RELATIONS      67
2   sidewalk café license holders didn't pay?  Can you
3   just give us a little run down on that?
4     LORELEI SALAS:  I can tell you that we are still
5   processing the refunds, right.  We're in the middle
6   of that.  Our finance division will be sending out
7   checks to those who had already sent their consent
8   fees within the next two to three weeks.
9       As to the percentage, I'm not so clear on that
10  and I'm not sure Steve or Mike have access to that
11  information but if we don't have it right now, I'd be
12  happy to send it to you once we get it from the
13  office.
14    STEVEN EDINONY:  So, Chair Cohen, I appreciate
15  the question.  I think for us, it's a multistep
16  process.  The first of which involves our licensing
17  team identifying those records that need refunds and
18  then once we have that in order, working to have the
19  checks distributed.
20      So, I think our internal analysis is that over
21  the next two to three weeks we will have that
22  completed.
23    CO-CHAIR COHEN:  Did everybody who is entitled to
24  refund will have gotten it in three weeks or less?
25
```

A-737

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
INTERNATIONAL INTERGROUP RELATIONS        68

1

2    STEVEN EDINONY:  That's, right now our analysis

3    is that that will be the case, yes.  We're happy to

4    continue to update you if that timeline changes but

5    that is what we believe.

6    CO-CHAIR COHEN:  I appreciate that and again, do

7    you have any idea of the percentage of people who,

8    licenses actually paid?

9    LORELEI SALAS:  I don't have that right now.  I

10   think that when we take some of the estimates we were

11   talking about, about $300,000 in total fees paid, but

12   I don't know what that represents.  So, we'll have to

13   come back to you with an answer on that.

14   CO-CHAIR COHEN:  That sounds like a relatively

15   small percentage, that's great.  Chair Gjonaj, like I

16   said, I'm going to come back.  I think I'll let our

17   colleagues, the bill sponsors ask questions and then

18   I can come back if I have more.

19   STEPHANIE JONES:  Okay, Chair, did you want to

20   ask any more questions or you want me to call on the

21   Council Members?

22   CHAIRPERSON GJONAJ:  No, thank you Stephanie.

23   Thank you, Chair Cohen.  We have a slew of questions

24   that our colleagues can ask.

25

A-738

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS          69

 2      STEPHANIE JONES:  Okay, thank you.  Okay, so I

 3   will now call on Council Members in the order they

 4   have used the Zoom raise hand function.  If you would

 5   like to ask a question and you have not yet used that

 6   function, please raise it now.  Council Members,

 7   please keep your questions to five minutes.

 8      The Sergeant at Arms will keep a timer and we'll

 9   let you know when the time is up.  You should begin

10   once I have called on you.  Okay, so first, we'll

11   hear from Council Member Rivera followed by Council

12   Member Lander.  Council Member Rivera?

13      MODERATOR:  Time.

14      COUNCIL MEMBER RIVERA:  Thank you so much.  Thank

15   you to the Commissioners, all of you and everyone

16   here.  I just wanted to follow up on a couple of

17   numbers that were kind of discussed.  I guess the

18   first one is, you have some numbers here for the SBS

19   the Business Continuity Loan Fund, Commissioner

20   Bishop and the Employee Retention Grant Program.  You

21   have 8,000 loans, I think you said, 170 have been

22   approved.  How many people actually qualified?  And

23   I'm asking because I heard from some of my

24   constituents that they were turned down, so I'm

25   trying to understand versus how many apply, how many
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1          INTERNATIONAL INTERGROUP RELATIONS          70
2   qualified and then of course the number you included
3   in your testimony which is 170 loans.
4      GREG BISHOP:  Right, so far.  So, we had 8,000
5   applications which represents the demand for a
6   program that, that far weighed the funding for the
7   loan program.  So, it's a two step process.  So, we
8   go through the approval process to make sure that
9   they have all of their documentation etc., and then
10  we send it over to the lender to actually make the
11  loan.  That's the underwriting process and so, the
12  loan is a traditional loan.  So —
13     COUNCIL MEMBER RIVERA:  I'm so sorry, I just
14  don't have a lot of time and I just wonder, do you
15  have the number of how many people qualified or not
16  really?
17     GREG BISHOP:  Yes, yes, we do.  Jackie do you
18  have the —
19     JACKIE MALLON:  So far 174.
20     COUNCIL MEMBER RIVERA:  174 out of 8,000?
21     JACKIE MALLON:  By the lender, that's what you're
22  asking right?  Yeah.
23     COUNCIL MEMBER RIVERA:  Okay, I just want to move
24  on.  How many small business owners have contacted
25  you about inability to pay rent and since the city's
```

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        71
 2  applications are closed, where are you referring them
 3  to?
 4      GREG BISHOP:  So, we can get back to you on the
 5  terms of the number of businesses that we referred to
 6  our legal services.  But Council Member, I was going
 7  to tell you, so [INAUDIBLE 1:16:36] for example can
 8  use our commercial lease assistance to get a free
 9  attorney.  We've been partnering with other law firms
10  who are providing pro bono legal services to help our
11  businesses negotiate with their landlords.
12      COUNCIL MEMBER RIVERA:  Okay.  So, you are
13  referring them where?  Sorry.
14      GREG BISHOP:  To attorney's.  So, right now, if
15  anyone needs assistance with their landlords, we have
16  the commercial lease assistance program, so we are
17  referring them to pro bono legal attorney's.  We'll
18  help them review their lease, help them negotiate
19  with their landlord.  It's helpful to have an
20  attorney during this time, to have that conversation
21  with the landlord.
22      But we're also advising small landlords because a
23  number of the mortgage companies are issuing
24  forbearance.  So, if a small landlord has a mortgage,
25  they too can call their mortgage companies, most
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        72
 2   banks have allowed a 90-day for forbearance, which
 3   that information could actually, that relief can be
 4   passed onto the small business owner.
 5        COUNCIL MEMBER RIVERA:  Okay, have you heard from
 6   business owners regarding personal liability concerns
 7   either prior to or during COVID-19, and if so, how
 8   would you assist them?
 9        GREG BISHOP:  We have not, but again, we would
10   connect them to our attorney network.  That is one of
11   the services that we provide in general for legal
12   assistance, especially around contracts and leases.
13   So, that would be if someone contacted us and they
14   can do so either through 311 or nyc.gov/covid19biz we
15   can connect them to an attorney at no cost.
16        COUNCIL MEMBER RIVERA:  What is your position on
17   our bill Intro. 1932?
18        GREG BISHOP:  So, Intro. 1932, we are, sorry, so
19   1932 is the COVID related, I'm sorry.
20        COUNCIL MEMBER RIVERA:  Yeah, it's on personal
21   liability.
22        GREG BISHOP:  Yeah, so I think we you know, would
23   love to talk to you some more about that.  The Law
24   Department would love to look at some additional
25   details, but in general, anything that we can do to
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        73
 2   provide some relief to small business is things that
 3   we would take a look at.
 4     COUNCIL MEMBER RIVERA:  So, you don't have a
 5   position at this time but your game to engage in
 6   conversation and figure something out?
 7     GREG BISHOP:  Absolutely.  There's some legal
 8   questions around that, so we want to make sure we do
 9   it right in terms of the concept, but the Law
10   Department would love to take some time to review.
11     COUNCIL MEMBER RIVERA:  Okay, and then I just
12   want, in the wake of the city shutting down its loan
13   and grant programs, do you think the city still has
14   a role to financially support businesses,
15   particularly those owned by or employing undocumented
16   New Yorkers and thus cannot apply for federal
17   programs?
18     GREG BISHOP:  So, and I've mentioned this and I
19   mentioned this in my testimony.
20     MODERATOR:  Time expired.
21     GREG BISHOP:  The private sector, we need to work
22   with the private sector but we've done it in the past
23   to help create a philanthropic pathway to get dollars
24   in the private sector that doesn't have the
25   restrictions of either federal dollars or city
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        74
 2  dollars to be able to help on those vulnerable, which
 3  is our undocumented entrepreneurs.  And that is
 4  something that we are very much interested in
 5  pursuing and we're working with you on how we can do
 6  that officially.
 7      COUNCIL MEMBER RIVERA:  Thank you.  I have a
 8  couple more questions but thank you for the time, Mr.
 9  Chair.
10      STEPHANIE JONES:  Thank you Council Member.
11  Next, we'll hear from Council Member Lander followed
12  by Council Member Powers.  Council Member Lander?
13      MODERATOR:  Clock.
14      COUNCIL MEMBER LANDER:  Thanks very much.  I'm
15  going to follow up in the later part of my time on
16  Council Member Rivera's question but I guess I just
17  want to start from like, what we can do on the PPE.
18  Because I spent a bunch of yesterday in advance to
19  this hearing talking to the small business, a bunch
20  of small business owners in my district and not a one
21  has either gotten, but in one case a person got but
22  just can't use the PPP because of the eight week
23  restriction.
24      So, they have zero federal relief, nothing.  They
25  are closed, they got no revenue.  Their employees are
```

A-744

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          75
 2   getting unemployment insurance, but they have
 3   absolutely nothing to cover rent and their own debt
 4   and their supplier leases, nothing.  And so, they're
 5   terrified they are not going to be able to make their
 6   rent payments.  They can't keep leasing the machines
 7   from their suppliers and so, unless we can make the
 8   PPP work and to me, the eight week issue seems like
 9   the one that is most, like, that doesn't even cost
10   the federal government anything to let people have
11   until the end of the year to rehire and use 75
12   percent of the money for payroll and all of these
13   other things are important.  And I'm signing on to
14   all of these bills and I support them all and I thank
15   their sponsors.  But if we can't get federal dollars
16   to cover the loss of revenue, I just don't see what
17   else is going to work to keep there being just mass
18   business shutdowns of perfectly viable businesses.
19        So, do you share that analysis and if so, what
20   are going to do to change that?
21      GREG BISHOP:  Absolutely.  So, there's actually
22   four things.  Three things related to PPP and one
23   I'll jump in really quickly because I see the time is
24   ticking.  But you are absolutely right and I've been
25   working with the New York Federal Delegation.  They
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS          76
 2  share the same concerns that you have and they are
 3  advocating and they are working right now negotiating
 4  in the next stimulus package.  There needs to be a
 5  change in terms of the timing.
 6      Remember when the PPP was launched, no one knew
 7  how long this pandemic that sort of paused, would
 8  occur.  And I think you know, this hurts cities that
 9  have paused business operations.  So, we need to push
10  as delegation and they have been doing it to change
11  that time.  We need to change the percentage.  Only
12  25 percent of the PPP can be used for every other
13  expense and you hit the nail on the head, for New
14  York City business, we think based on the ratio, they
15  can borrow two and a half time at payroll.  It should
16  be a lower percentage that is required for payroll
17  and then they could use the rest for rent.
18      And then three, to make sure, ensure and
19  absolutely ensure that our smallest, most vulnerable
20  businesses have access.  We are also asking for
21  another tweak.  We got the tweak in the second round
22  where banks, small community banks and CDFI's had a
23  $60 billion allocation.  We are now going to advocate
24  that only CDFI's have an allocation that they could
25  work with and they can operate in.  Technical
```

A-746

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        77
 2  assistance is so important and it take about a week
 3  or two to get a small business in terms of the
 4  technical assistance to apply.
 5      And the last thing that I would say that we have
 6  not talked about is our insurance industry.  Our
 7  insurance industry is sitting on about $800 billion
 8  of reserves.  They have hid behind the cloak of, you
 9  know this is not a covered pandemic, but I say that
10  we should allow the congress to come up with a path.
11  Not necessarily bankrupt the industry but have some
12  type of percentage or allocation, so that way the
13  businesses that have business interruption insurance,
14  these are businesses that have been around for 20, 30
15  years that have paid their premiums every month and
16  now in the most needed time, insurance companies are
17  hiding behind the veil.
18      COUNCIL MEMBER LANDER:  It's even worse than
19  that, one of the businesses I talked to yesterday,
20  talked about the fact that they are still getting
21  their insurance bill.  So, like, not only are they
22  not getting their insurance, the are being expected
23  to continue to pay their insurance.  It's really
24  outrageous.  So, I just, you know, to me, it's like,
25  I'm open to other things that could matter at scale
```

A-747

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        78
2   but if we don't change PPP so it could work for our
3   small businesses, I just, I don't know what, all
4   these things we're talking about are good but I don't
5   think they are going to be enough to save a lot of
6   them.
7      I'm a little less worried about the percentages
8   just because of people reopen and then they have
9   revenue coming in, then they could use the PPP to pay
10  the wages of their workers and use the revenue that's
11  coming in to pay back the back rent.  But I hear you,
12  to me, it's really that —
13     GREG BISHOP:  And —
14     COUNCIL MEMBER LANDER:  Let me, just because my
15  time is running out.  I just do want to underline
16  what Council Member Rivera just spoke about because
17  I'm going to work hard and pray that we pass all
18  these bills, we get PPP fixed and at least like a lot
19  of our small businesses can benefit from that.
20  That's a big, big leap of faith but no one is coming
21  to help our immigrant entrepreneurs, our street
22  vendors, like a whole set of people that there's no
23  way they're going to be eligible for PPP.
24     So, we got to build a program at the city level
25  and that might need public debt.  You know, it might
```

A-748

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        79
 2  need other but I don't think we can like hope someone
 3  else will ride to the rescue for those benefits.  No
 4  one else is going to come to their rescue.
 5      MODERATOR:  Time expired.
 6      COUNCIL MEMBER LANDER:  And I just would really
 7  reinforce what Council Member Rivera said about our
 8  need to stand up a program that does that.
 9      GREG BISHOP:  And we agree and we've worked with
10  the private sector before and we will look forward to
11  working with the private sector to address this
12  particular population.  So, thank you very much and
13  I'm happy to work with you and Council Member Rivera
14  to make sure that we get it right.
15      COUNCIL MEMBER LANDER:  Thank you.
16      STEPHANIE JONES:  Thank you.  Chair Cohen?
17      CO-CHAIR COHEN:  I just want to pipe up for one
18  second.  You know to be respectful of the clock, but
19  you don't have to be slavish to it.  I thought
20  Council Member Rivera might have gotten cut off.  So,
21  I'm just asking people to be respectful of the clock,
22  that's all.  Thank you.
23      STEPHANIE JONES:  Thank you Chair.  Next, we'll
24  hear from Council Member Powers, followed by Council
25  Member Yeger.  Council Member Powers?
```

A-749

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        80
 2          COUNCIL MEMBER POWERS:  Thank you and thank you
 3     to the Chair's for allowing us the time here and to
 4     get into questions.  I had a couple of questions,
 5     one, I just have to echo on what Council Member
 6     Lander said, which is that those programs that are
 7     put in place while are really still great programs
 8     that are helping businesses still need so much more
 9     changes to be able to make them actually executable
10     at the city level.  But I know we all agree on that,
11     so I'm going to go to questions.
12          But first I want to add this, for the City
13     programs that were put in place, understandably there
14     was a misunderstanding of how their might be a lack
15     of clarity of how long this would last and so
16     resources were limited but can you give us any data
17     on the types of businesses.  Like, in terms of the
18     loans that went out and the grants that went out.  Do
19     you have a breakdown of what types of businesses
20     receive those?  Meaning what sector or what area
21     receive those grants and loans?
22          GREG BISHOP:  Yeah, so they vary.  So far, a loan
23     program you know, the top recipients of the loans
24     were accommodation in food services, so restaurants
25     etc., and then followed by what we describe in the
```

A-750

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        81
2   mixed codes as professional scientific and technical
3   services but that's like your architects,
4   architectural firm, traffic designers and then
5   followed by beauty salons, dry cleaners etc. and they
6   have retail.  Then it goes down all the way to you
7   know wholesale trade, healthcare, transportation and
8   manufacturing.
9       For our grant program, it skewed a little bit
10  differently simply because of the size standard that
11  we applied.  So, you saw a lot of professional and
12  technical services again, architectural firms and
13  retail, then hair salons, barber shops, nail salons.
14  Then you had your healthcare and then you had arts
15  and entertainment.  Then you had accommodations, so
16  food, restaurants, coffee shops.  So, it's a
17  widespread and I think you know one of the reasons
18  why we wanted to limit the employee count was to make
19  sure that we limited to our very micro businesses.
20  But again, first come first serve for as you said
21  with the federal program, it doesn't really help with
22  our small businesses, which is why the things that I
23  mentioned with Council Member Lander in terms of the
24  fixes for the PPP, I think will address the fact that
25
```

A-751

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        82
 2   our small businesses got left out of the first round
 3   of the PPP.
 4      COUNCIL MEMBER POWERS:  Okay, and if you have any
 5   info you can send to us on that breakdown, it would
 6   be helpful just for us to have an understanding of
 7   it.
 8      GREG BISHOP:  Yeah, we can.
 9      COUNCIL MEMBER POWERS:  On the number of bills
10   that are related to — and this is for SBS or others,
11   so bills that related to commercial tenants and
12   harassment liability, evictions and things like that.
13   Do you have any data related to, one of the concerns
14   is obviously, I've talked to the owners who are
15   holding on to their lives and they are fearful of
16   having to put all their savings into it and
17   conversely I've heard from folks who are you know, we
18   are relying on in terms of tax revenue here in the
19   city.  About their concerns with what impact it may
20   be to the city on property tax and their ability to
21   pay.  Do you have any data on commercial rent
22   payments for the month of March or April at this
23   point?  Basically, in the coronavirus, is there any
24   data available to us about how many, like sort of
25   percent, like, who is paying and how many commercial
```

A-752

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        83
 2   rent tenants are not able to pay the rent at this
 3   point?
 4      GREG BISHOP:  No, we do not have that information
 5   currently.  I know the Brooklyn Chamber did a quick
 6   survey of their members of businesses in Brooklyn and
 7   there seems to be about I think 30 percent were not
 8   able to pay the rent and only about half of them have
 9   been able to work with their landlords.  But what we
10   have, in everything that we have done, we've sent out
11   guidance to so many different businesses.  We've told
12   businesses to be proactive, contact their landlord
13   and use our legal services to have that conversation.
14      So, we can provide you information about how many
15   referrals we've made to our legal services, so you
16   can get an understanding of how many businesses —
17      COUNCIL MEMBER POWERS:  Yeah, well my point here
18   is like I talked to a restaurant owner last night who
19   was wonderful and was talking about his you know, his
20   difficulty right now some concerns of course on
21   liability and being able to pay.  I've heard
22   anecdotally some commercial landlords saying they
23   have collected in the 80, 90 percentile and others
24   are collecting in the 50, maybe even a lower point a
25   concern that legislation would impact that and then
```

A-753

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                  INTERNATIONAL INTERGROUP RELATIONS          84
 2    we would be having an inability to collect on
 3    property taxes for a number of these folks.  So, I am
 4    trying to monitor what impact people to the city's
 5    revenue and also to those owners as well.  And some
 6    are trying to do the right thing by their tenants.
 7    I've heard some that have not even been communicated
 8    or have not had positive communication from their
 9    landlord.
10        I just want to ask one more question since there
11    is so many topics on this.  On the topic of
12    surcharges on restaurants and deliveries and apps and
13    things like that.  I did not hear, I have to admit, I
14    did not hear the exact position of the Administration
15    on those bills but I did want to ask a question of
16    whether they thought those had apply during this
17    period.  Whether there should be a surcharge put on
18    at the moment where restaurants are closed and only
19    open for takeout or were in support of or had
20    thoughts on that beyond that period of time.
21    Meaning, this particular point and time seems unique
22    to the restaurant and hospitality industry relative
23    to the non-coronavirus period of time and whether
24    there was a distinction drawn between those two areas
25    when it comes to those bills.
```

A-754

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        85
 2    GREG BISHOP:  And so, we and you know, we work
 3    closely with the Hospitality Alliance, Ed Drew[SP?],
 4    I saw him in this hearing.  You know the rest of the
 5    industry has already thin margins and so, we're very
 6    supportive of any efforts to limit their expenses.
 7    Especially during this emergency period.
 8       So, we are supportive of that.  I think it
 9    requires a broader conversation after this period but
10    certainly we want to be supportive of anything that
11    can help reduce the cost of our restaurants.
12    Primarily because our restaurants right now, they are
13    operating on just take out.  So, in some cases that
14    might not be enough revenue for them to actually
15    operate but some of them are just operating just to
16    be a resource to the community, so we are very
17    supportive of that.
18    COUNCIL MEMBER POWERS:  Thank you and I think
19    I'll end there.  Thanks, Chair.
20    STEPHANIE JONES:  Thanks Council Member.  Next,
21    we'll hear from Council Member Yeger followed by
22    Council Member Koslowitz.  Council Member Yeger?
23    COUNCIL MEMBER YEGER:  Thank you Mr. Chairman.
24    Thank you very much Mr. Chairman.  Commissioner, it's
25    good to see you again and I'm going to be easy
```

A-755

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1               INTERNATIONAL INTERGROUP RELATIONS         86
2   because I'm not asking any questions.  I'm simply
3   going to make a few statements and you can sit back
4   and relax.
5       I appreciate the work that SBS is doing for small
6   businesses.  I do think that the city can do more,
7   not necessarily from within your department but I'm
8   going to use my free time at the microphone today to
9   make a few points that I've been making over the last
10  days.
11      The city is continuing its standard process of
12  issuing summonses for example to sanitation. So, that
13  hasn't really laid off, sanitation employees are
14  going around writing summonses on businesses, on
15  homeowners.  The city is still doing what it can to
16  suck the life out of New Yorkers and get the cash and
17  I get that because we are facing tough times but I
18  also think that the city can and should do more.
19      For example, last real property tax payments were
20  done on April 1st, so that's going to be July 1st.
21  There are people who have not been able to make the
22  April 1st payment.  They may not be able to make the
23  July 1st and a lot of that particularly when it comes
24  to real property owners that are one and two family
25  owners, relies on rental income.  The city has an
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        87
 2   obligation to help tenants of small businesses to
 3   alleviate their rental burden but at the same time,
 4   it can't be one direction.  The city must use the
 5   resources that it has to alleviate the burdens on
 6   those that have to pay the bills, the landlords who
 7   have to give the money to the city.
 8       If tenants can't pay rent and landlords can't pay
 9   property taxes, the city gets hurt but if the city
10   can figure out a way to alleviate that burden a
11   little bit on landlords and one easy way to do it
12   right now is to give them a little breathing room.
13   For the city to tell them look, you may not have been
14   able to make your April 1st payment, the grace period
15   was 14 days ago, interest is accumulating, we are
16   waiving that.
17       Right now, the Mayor and the City Council can
18   make that announcement, well not me, but the Mayor
19   and the Council can make that announcement that
20   interest payments for interest debt being accrued on
21   payments that were due on April 1st will be waived.
22   Interest payments due on payments that cannot be made
23   by July 1st will be waived and a commitment to New
24   Yorkers that real property taxes will not go up this
25   year when we adopt the budget.  Not that the rate
```

**A-757**

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          88
 2   won't change because that's always the trick we play
 3   with New Yorkers.  We don't change the rate, but
 4   everybody gets a higher bill.  That the property tax
 5   itself will stay, whether that means grieving effect
 6   evaluations are rolling them back down, we have to do
 7   something to release the pressure on those pipes,
 8   otherwise they are going to burst.
 9       The focus on the private sector for relief and
10   the unwillingness of the city to do its part is
11   wrong.  And I think that the city and the Council,
12   the Administration and the Council can make those
13   commitments.  And the reality is, that tenants who
14   can't pay rent today and tenants who can't pay rent
15   on May 1st, may never, ever be able to recover the
16   loss of revenue to come current.  And we need to do
17   things that will fix that.  Which brings me to
18   Introduction 1932.
19       I spoke yesterday about another introduction and
20   seems I'm going to repeat myself in some regard.
21   It's important for us to come up with ways to help
22   tenants, it's necessary.  It's also important for us
23   to do it legally and for us to do it
24   constitutionally.
25
```

```
 1      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
               INTERNATIONAL INTERGROUP RELATIONS        89

 2          Intro. 1932 and I think and without speaking for

 3      the cooperation Council, I think one of the reasons

 4      that the city is not ready to [INAUDIBLE 1:36:24] on

 5      it, is because the city doesn't want to come before

 6      the Council and say this bill as it is written is

 7      unconstitutional.  Except it is.  The violation of

 8      Article 1 Section 10 is constitutional.  The city

 9      cannot retroactively adjust, amend a contract that

10      was entered into by two parties at arm's length.  You

11      can't do it, illegal.  We can think we can do it

12      because we always think we can do things that are

13      illegal and unconstitutional but its not lawful for

14      us to do it.  Emergency or not, and this is the real

15      epitome of an emergency.  There has been no emergency

16      like this, not just in the last 50 year but probably

17      in the last 100 years since the stock market crash of

18      the early 19— nearly 20th century, but we have an

19      obligation to actually be honest with New Yorker.

20      This feels unconstitutional.  We don't have a legal

21      authority to go backwards into a contract that was

22      entered into five, six, seven, three years ago, one

23      year ago, 16 months ago and amended retroactively to

24      remove a provision.  I want to make one more point

25      Mr. Chair.  I know my time is about to wrap up and
```

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS          90
 2   I'm going to try to do it quickly.  To understand the
 3   nature of why personal guarantee exists in lease
 4   abatements.  It's important for that to be part of
 5   this conversation.  It's not simply to suck cash out
 6   of people.  It is because in many respects, a
 7   landlord when deciding to right the seize of property
 8   would not but for that provision rent the property.
 9       If a business doesn't have the access, the income
10   —
11       MODERATOR:  Time expired.
12       COUNCIL MEMBER YEGER:  Of the landlord.  If it's
13   a new business, the landlord may not want to rent the
14   property.  What induces a landlord to do that and
15   what builds the small business enterprises of New
16   York City, including my father's firm.  He would not
17   be able to rent the piece of property if he did not
18   sign a personal guarantee on his lease.  It's
19   necessary for the landlord to induce him to be
20   willing to accept that lease.  When we try to step in
21   and say the landlords wrong, the landlords wrong, the
22   landlords wrong, without recognizing that it's not
23   that the landlord's wrong.  But we are in tough times
24   and everybody is hurting and it can't just be that
25   the tenant is not going to pay rent because the
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        91
2   tenant doesn't have income.  We have to find a way,
3   we in the Council, the Administration on the other
4   side of the building have to find a way to reduce the
5   burden on all New Yorkers that are trying to come out
6   of this.  Thank you, Mr. Chairman for indulging me
7   and Commissioner, you weren't being lectured at but I
8   appreciate you sitting there patiently.  It was just
9   my chance to make these points.  Thank you again.
10      GREG BISHOP:  Thank you.
11      STEPHANIE JONES:  Thank you Council Member.
12  Next, Council Member Koslowitz followed by Council
13  Member Chin.  Council Member Koslowitz?
14      MODERATOR:  Time.
15      COUNCIL MEMBER KOSLOWITZ:  Thank you very much.
16  Good to see everybody.  Today, the Queens delegation
17  had a remote meeting with the Queens Chamber of
18  Commerce and the numbers that they gave us were
19  pretty scary.  Out of six thousand businesses
20  throughout Queens county, they don't expect 3,000
21  businesses to reopen.  That's a very scary number.  I
22  know my district is full of commercial businesses all
23  over.  Wherever you walk, I have all of Queens
24  Boulevard that adds from Elliot Avenue all the way
25  down into Kew Gardens, all businesses, 108th street
```

A-761

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          92
```

2   and that's a very scary number.  I've gotten calls

3   from different businesses doing the same kind of

4   business for instance, hair salons.  One person got a

5   check for $10,000 and the other hair salon got

6   $1,600.  How did they decide who gets what?

7      GREG BISHOP:  So, those two instances, were the

8   SBA's Economic Injury Disaster Loan Program that they

9   applied to.  There was an emergency grant that was

10  attached to that program.  That program, the grant

11  was up to $10,000.  But as you can imagine, there was

12  a number of applications, so I think at a certain

13  point, the SBA changed the guidance to limit the

14  amount of dollars.

15     So, if you were early on, you might have gotten

16  the maximum but later on, they shifted it to just

17  $1,000 per employee.

18     COUNCIL MEMBER KOSLOWITZ:  That's like kind of

19  unfair and the truth of the matter is, that in most

20  hair salons, the employees are self, they work on

21  commission more than salary.  And that's really

22  unfair because the bills are the same.  The rent is

23  the same, you know, whenever they apply, the rent is

24  still the same and their expenses are the same.  And

25  for one to get $1,600 and then the other get $10,000,

A-762

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        93
 2   why didn't they foresee that there were going to be a
 3   lot more people applying and like kind of decide how
 4   much each person would get?
 5      GREG BISHOP:  I think the New York Delegation
 6   sees that and the New York Delegation has been
 7   advocating for additional funding.  As you know, the
 8   New York Delegation is also advocating for funding
 9   for the City of New York itself to help close out
10   budget deficit.  So, I've been in touch with everyone
11   from you know, Congressman Velazquez, Hakeem
12   Jefferies, you know even Gregory Meeks.  You know,
13   everyone in the New York Delegation to let them know
14   about the concerns of our smallest business, our
15   microbusinesses.
16      So, again, I will bring this up in terms of
17   additional funding for the next stimulus package and
18   then I'm happy to have your support there as well.
19      COUNCIL MEMBER KOSLOWITZ:  Okay, I just, I just
20   felt that you know the way you described it, first
21   come first served in this kind of disaster act really
22   to do it that way, not anticipating that there would
23   be a lot of people applying for these loans and kind
24   of you know, lower the amounts so each business
25   applying would get the same amount of money.
```

A-763

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1      INTERNATIONAL INTERGROUP RELATIONS        94

2      GREG BISHOP:  Right, there's also another

3  strategy that we're pursuing.  At the beginning of my

4  testimony I talked about how important CDFI's are to

5  our small businesses.  So, more than likely those

6  nail salons, those small businesses that have fewer

7  than five employees, they have a relationship with a

8  CDFI or a small community bank.

9      CDFI's are restricted in terms of their behavior

10  in the open market to get capital.  There's some

11  restrictions on the SBA side, which is the Federal

12  Small Business Administration and there's

13  restrictions on the federal reserve side and we're

14  advocating to loosen some of that restrictions, so

15  our CDFI's can get capital and therefore they can

16  lend to those small businesses as well.

17      COUNCIL MEMBER KOSLOWITZ:  Okay, thank you very,

18  very much.

19      STEPHANIE JONES:  Thank you.  Next, we'll hear

20  from Council Member Chin followed by Council Member

21  Brannan.  Council Member Chin?

22      MODERATOR:  Clock.

23      COUNCIL MEMBER CHIN:  Thank you.  Thank you to

24  Chair Gjonaj and Chair Cohen and to the panel.

25  Commissioner Bishop, it's great to see you and thank

A-764

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1           INTERNATIONAL INTERGROUP RELATIONS          95
  2   you for your support and concern you know, for our
  3   small businesses especially the small business in my
  4   district in Chinatown, lower east side.  It was
  5   impacted so early as you mentioned.
  6      So, first I wanted to see if you had some
  7   statistic in terms of how many of the small
  8   businesses in Chinatown were able to access the
  9   city's loan program and then also the grant program,
 10   because it took a while for the application to get
 11   off and running.  So, if you can provide some of that
 12   statistic and also, how many were like street vendors
 13   who you know, they work or they have another employee
 14   working with them.  Were they able to get some of the
 15   grants and program under the city?  If you can answer
 16   those two questions.
 17      GREG BISHOP:  Yeah, so we can breakdown and we
 18   are happy to follow up specific on the zip code for
 19   Chinatown because I just have like a global in terms
 20   of the boroughwide breakdown.
 21      So, we'll follow up with you specifically for
 22   Chinatown.  I think for street vendors, you know we
 23   did open up the grant program because it's only for
 24   companies that have one to four employees.  And I you
 25   know, spoke to some of the advocates in the street
```

A-765

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        96
 2  vending community.  That is one of the areas that we
 3  are going to meet folks on in terms of private
 4  philanthropy to figure out how we can help those
 5  businesses that may not have the traditional
 6  documentation that's necessary for these programs.
 7  Because you know, there's some vendors, they may not
 8  even have like a payroll system.  They may not have
 9  even maybe a back account.  And so, we are definitely
10  aware that there are some gaps in both the city's
11  program and the federal program and we would be happy
12  to work with you to continue to figure out how we can
13  solve that particular problem in terms of helping our
14  street vendors and our undocumented immigrants.
15      COUNCIL MEMBER CHIN:  So, you're saying that none
16  of the street vendors got a grant?
17      GREG BISHOP:  So, I don't have the breakdown in
18  terms, I only have sectors, so I can't tell you if
19  like what we categorize as a restaurant was like a
20  food cart.  We would have to look at like who the
21  business was and I don't have that level of details
22  for this hearing but we can go back and give you like
23  just overall businesses in your district.  How many
24  were awarded a grant.
25
```

A-766

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1           INTERNATIONAL INTERGROUP RELATIONS        97
2    COUNCIL MEMBER CHIN:  I think it's also helpful
3  to see if like the food carts and you know, the
4  street vendors were able to access that.  I think
5  that would really help the community that there is a
6  fighting chance that don't just assume you wont have
7  an opportunity.
8    The other thing is that my question is on the
9  loan, now you had a third-party vendor organization
10 that was helped processing the loan.  How come you
11 were not able to reach out to CDFI's and credit
12 unions to help with the city and you had to do the
13 third-party?
14   GREG BISHOP:  The third-party is a CDFI.  So, the
15 way it works is that we use tax dollars to do a loan
16 loss reserve.  We got capital from the private sector
17 and that capital was then deployed to the CDFI and
18 that CDFI —
19   COUNCIL MEMBER CHIN:  Which one was that?
20   GREG BISHOP:  Pursuit.
21   COUNCIL MEMBER CHIN:  Okay.
22   GREG BISHOP:  Yeah, so, but I know we also, I
23 know Renaissance, there's a couple of CDFI's we work
24 closely with.  You know, Pursuit, renaissance, BCNA,
25 we also work closely with True Fund.  There's a
```

A-767

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        98
 2   number of them that we work with that have specific,
 3   Axion[SP?] for example.  We have a network of a lot
 4   of CDFI's but for this particular program, we worked
 5   with them in the past during Hurricane Sandy.  They
 6   had the technology to be able to stand up this
 7   program as quickly as we did it.
 8       So, you know, we are of course working with other
 9   CDFI's because they are the one's that will provide
10   the technical assistance to help —
11       COUNCIL MEMBER CHIN:  In this 3.5 stimulus, sorry
12   to interrupt.  In the 3.5 stimulus, there's $60
13   billion set aside for women and minority owned
14   business but it also did mention from the
15   congressional rep that CDFI, credit union will also
16   be able to help small businesses, is that correct?
17       GREG BISHOP:  That's correct but it's CDFI's and
18   community banks.  So, not to get into the weeds, but
19   community banks have access to the capital markets,
20   so they can borrow, they can money from the feds as
21   quickly as possible, CDFI's don't.  So, there's sort
22   of like a structural disadvantage for CDFI's in terms
23   of liquidity for them to be able to lend as quickly
24   as possible as community banks.  So, what we're
25   seeing in the next stimulus package —
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS      99
 2       MODERATOR:  Time.
 3       GREG BISHOP:  We would like CDFI's to have their
 4   own pool, so their competing against other CDFI'S
 5   nationwide and not necessarily community banks.  It's
 6   a minor clarification but I've been contacting our
 7   New York Delegation and they understand sort of like
 8   the challenges there as well.
 9       COUNCIL MEMBER CHIN:  Thank you.  Thank you.
10       STEPHANIE JONES:  Thank you Council Member.
11   Next, we'll hear from Council Member Brannan followed
12   by Council Member Koo.  Council Member Brannan?
13       COUNCIL MEMBER BRANNAN:  Thank you.  Thank you,
14   Commissioner.  Certainly, you know, echoing what my
15   colleagues are saying today and certainly
16   acknowledging the fact that what we're dealing with
17   right now is larger than what the city can handle on
18   its own.  But I wanted to ask, as far as the SBS
19   Grant and Loan programs, how does SBS decide how much
20   money to put into that pot in relation to the amount
21   of taxes that our small businesses pay?  There seems
22   to be a substantial discrepancy in the money that our
23   small business are funding, putting into the city to
24   keep the lights on versus the money that is now being
25   extended or offered to them or was being extended and
```

Case 20-4238, Document 36, 02/11/2021, 3035040, Page228 of 297

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1             INTERNATIONAL INTERGROUP RELATIONS        100

2   offered to them in the grant loan programs.  How is

3   that decision made and is there any talk about

4   putting more money into those funds?

5       GREG BISHOP:  So, just to make sure we you know

6   understand your landscape, when we designed this

7   program, the world that we're in right now was

8   totally different.  So, we looked at what was

9   happening as the Council Member Chin talked about

10  with businesses that were impacted in January and in

11  February.  We looked at the landscape of our small

12  businesses in terms of our microbusinesses and we

13  focus on the largest amount of help that we can

14  assist.

15      So, businesses with one to four employees, make

16  up about 60 percent of our small businesses in New

17  York City, so we figured that was going to be the

18  maximum reach to help those businesses that were

19  trying to hold on to their employees but still had

20  services for businesses.  They were still operating.

21      Five days later, we got to this point where the

22  entire city needed assistance.  Now, we were able to

23  quickly adapt a program because we heard a lot of

24  businesses saying you're only looking at lost

25  reserves in January and February, so we were able to
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS          101
 2  add March but we publicly said that this is not going
 3  to be enough for everyone, we need federal help and
 4  as soon as we got federal help, we started
 5  transitioning our resources and all our efforts to
 6  make sure our small businesses connect to the federal
 7  programs.
 8     COUNCIL MEMBER BRANNAN:  Okay, so is there any
 9  discussion around now that we're in this new reality,
10  a discussion around putting more money into those
11  programs?
12     GREG BISHOP:  I think you know; it's going to be
13  depending on our resources.  As you know, we have our
14  budget constraints.  We have been advocating on the
15  federal level for more resources and I think I've
16  publicly said, the Mayor has publicly said, we need
17  the federal government to help us here.  And we've
18  been advocating for changes in those federal programs
19  to make sure they are aligned with all the things
20  we're talking about today to New York City businesses
21  and the needs of New York City businesses, to make
22  sure that not only our smaller businesses can get
23  access through CDFI's to these funding.  But then
24  also, our businesses in general if they access the
25  PPP, they have enough time to make a decision on
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        102
 2   hiring.  They have enough time to figure out in terms
 3   of how to repay their employees in terms of the
 4   percentage.
 5       So, there's a number of things that we've been
 6   advocating for, in addition to you know, asking the
 7   banks to do more.  They could create, they don't have
 8   to wait for the federal government to back the loans.
 9   They could create their own loan programs.  So, we're
10   doing a number of things to help our small businesses
11   get the capital that they need.
12       COUNCIL MEMBER BRANNAN:  Okay, I'll finish up but
13   I guess my concern is you know, we're hearing a lot
14   of talk now about donor states right and states that
15   send back more money to DC then we get.  But a lot of
16   small business owners are starting to feel the same
17   way, that they send more money to the city to keep
18   the lights on then they're being offered access to
19   now when they need it most.  And there seems to be a
20   pretty bid discrepancy there with how much money is
21   being taken from the businesses to keep the lights on
22   in the city versus how much of that money is being
23   you know, put aside to be extended to the businesses
24   now when they need it most.
25
```

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1        INTERNATIONAL INTERGROUP RELATIONS        103

2     So, that's going to be a big concern for the

3   Council as we go forward certainly into the budget

4   hearing.

5     Thank you for your time.

6     STEPHANIE JONES:  Thank you Council Member.

7   Next, we have Council Member Koo.  Council Member

8   Koo?

9     MODERATOR:  Time.

10     COUNCIL MEMBER KOO:  Thank you.  Thank you

11   Commissioner Bishop and Chair Gjonaj and Chair Cohen

12   and all our members and also our Administration

13   spending time on this very important meeting.

14     My question is to the Commissioner, the city is

15   only spending $39 million to help small business

16   owners.  It's not enough.  We spend more money on

17   renting hotels for homeless people then $39 million.

18   We spend more money on mental health programs,

19   there's almost a $1 billion there and so, the city

20   has thousands and thousands of small business owners

21   and many or better as you said, they only have four

22   or five employees.  And many owners told me first of

23   all, they don't know how to apply because they have a

24   language problem.  By the time they find somebody who

25   will help them to apply, it's over already.

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        104
 2       So, I think we should do more.  I mean, we have
 3   to find some money to help small business owners
 4   because they are the backbone of this economy.  They
 5   pay taxes, they hire people and it's how a small
 6   business should work.
 7       This is your agency; your priority should be
 8   helping small business owners.  But that's more
 9   business owners, they close the door, they don't have
10   money to pay the rent and their landlords are calling
11   them and they have bills to pay.  The electricity
12   bill, the insurance bills.  Even though they haven't
13   opened the business for three months, those bills are
14   still coming.
15       So, I'm hoping as Commissioner you will portray
16   the Mayor to spend more money to help small business
17   owners.  Because even if you give them like $5,000
18   each, you will help them a lot because this will help
19   them pay past rent or something you know.  Right now,
20   it's tough and if you don't do anything, I will
21   foresee maybe one-third and half of the businesses
22   will file bankruptcy.
23       So, it will be bad for the city if you don't want
24   to spend money to feed these golden goose.  We used
25   to feed the city of tax revenues and we are the
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        105

2   golden goose right, the golden geese.  Now, the geese

3   have nothing to eat, they cannot lay any eggs

4   anymore.  So, the city has to feed the geese, the

5   business owners with some money to help them over

6   this difficult period.

7       That's all I want to say, thank you.

8       STEPHANIE JONES:  Thank you Council Member.

9   Chair Gjonaj, did you have any further questions for

10  our panel?

11      Thank you.  Chair Cohen did you have any further

12  questions?

13      CHAIRPERSON GJONAJ:  I do.  I'll come on.  Thank

14  you, Stephanie.  I think the Commissioner has an

15  update for us on the number of loans that were issued

16  by borough grants or loans.  I'm not sure if you have

17  that now available.

18      GREG BISHOP:  Yeah, so, in terms of the loans by

19  borough and we have talked about the percentage.  So,

20  we can, I can go through the actual.  So, this is as

21  of April 26th.  So, 5 percent of the loans went to

22  Staten Island, 9 percent went to Queens, 66 percent

23  went to Manhattan, 18 percent went to Brooklyn and 1

24  percent went to the Bronx.

25      CHAIRPERSON GJONAJ:  What went to Manhattan?
```

**A-775**

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        106

2      GREG BISHOP:  66 percent.

3      CHAIRPERSON GJONAJ:  And how much went to the

4  Bronx?

5      GREG BISHOP:  1 percent as of 4/26 and we're

6  still processing applications.

7      CHAIRPERSON GJONAJ:  You know what I'm going to

8  say to you.  1 percent of the loan went to the

9  Borough of the Bronx and 66 percent went to

10  Manhattan.  And we know that most of these small

11  businesses exist in the outer boroughs.  So, already

12  we see a huge disparity on how these loans, I mean,

13  does any one even know how many went to minority and

14  women owned businesses, the very group that we're

15  supposed to be fighting for?

16      GREG BISHOP:  Yeah, so we have that and just so

17  you know the Bronx also has, we also have for the

18  loans.

19      CHAIRPERSON GJONAJ:  It's obvious, yeah but I

20  know what we have.

21      GREG BISHOP:  For the loans we have 30 percent of

22  the approvals went to MWBE's and for the grants, when

23  you look at the borough breakdown, we have 3 percent

24  to Staten Island, 60 percent to Queens, 25 percent to

25
```

```
 1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS        107
 2   Brooklyn and 53 Percent to Manhattan and 3 percent to

 3   the Bronx.

 4       I will just let you know that in terms of when

 5   you look at the number of firms that have one to four

 6   employees, the breakdown citywide, 8 percent of those

 7   businesses are in the Bronx, 26 percent are in

 8   Brooklyn, 40 percent are in Manhattan, 23 percent are

 9   in Queens and 4 percent are in Staten Island.  So,

10   there are very small businesses in Manhattan, 40

11   percent of those, so what you're seeing is a ratio

12   that matches just the general landscape of small

13   businesses across the city.

14       CHAIRPERSON GJONAJ:  Commissioner, how many small

15   businesses from the borough of the Bronx applied for

16   those loans and grants?

17       GREG BISHOP:  We can get that number to you.

18       CHAIRPERSON GJONAJ:  That will be very telling of

19   the real story.

20       GREG BISHOP:  Yeah.

21       CHAIRPERSON GJONAJ:  One percent of $39 million

22   which really amounts to —

23       GREG BISHOP:  No, that is not accurate.  That one

24   percent is so far of the $8 million that we have

25
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        108
 2   awarded, not the $39 million, and we're still
 3   awarding businesses on the loan side.
 4       CHAIRPERSON GJONAJ:  So, in essence of the $8
 5   million, $80,000 has gone to the Borough of the
 6   Bronx?
 7       GREG BISHOP:  And we can give you a breakdown in
 8   terms of the number of businesses.  As you may
 9   recall, the loan which was a standard loan is not an
10   emergency loan, required businesses to be in business
11   for two years, there was addition requirements.  For
12   those that did not get the loan through the city's
13   program, we pivoted them over to the Paycheck
14   Protection Program, which had a lot more flexibility.
15       CHAIRPERSON GJONAJ:  Commissioner, I don't want
16   to deflect to the federal government.  This is New
17   York City taking care of its own and if you're
18   telling me that New York City couldn't do more than
19   $39 million, and I'm using your numbers, provide
20   $80,000 to the entire Borough of the Bronx, we have
21   real problems here.
22       We're not going to figure them out today but we
23   need this message to go back to this Administration.
24   Start pumping more mon— give the money back to those
25   small businesses.  You know, we often talk about New
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS          109
 2   York City sending more money out than actually
 3   getting back.  Give that and I'm going to echo, I
 4   think it was Council Member Brannan who said it, give
 5   their money back.  This is the time that they need
 6   it.
 7      $80,000 to the entire borough of the Bronx thus
 8   far is not —
 9      GREG BISHOP:  So, $80,000 for the loan but when
10   you look at the grant program as well, in terms of
11   the dollars to businesses in the Bronx, we have
12   awarded, let me just pull this up.  But it's more
13   than $80,000 Council Member.
14      CHAIRPERSON GJONAJ:  Well, when you get that
15   number, you can get back to us.  I think Chair Cohen
16   may have a question in the meantime, but that would
17   be relevant to today's hearing.  That's a true
18   telling of how this money, this very limited money
19   which doesn't meet the needs of the city and how it's
20   being broken down by borough including the actual
21   dollar amount would be a true telling of what is
22   happening in New York City.  And this Administration,
23   I hope is hearing this loud and clear, this Council
24   is not going to except that.  This Committee is not
25   going to except that.  Council Chair Cohen?
```

A-779

```
             COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                 INTERNATIONAL INTERGROUP RELATIONS        110
 2        CO-CHAIR COHEN:  Thank you Mark.  I just want to
 3   circle back.  I know that there's been a tremendous
 4   focus on SBS but Commissioner Salas, could you just
 5   expand a little bit about the price gouging
 6   activities that your agency has been up to.  I know
 7   there has been a lot of good work done and I think
 8   it's important that we try to get the word out on
 9   some of those activities.
10        LORELEI SALAS:  Sure, thank you Chair Cohen and I
11   wanted to get back to you.  My staff is telling me
12   that it was 47 businesses that had paid consent fees
13   by March 1st, totaling $325,000 and that's the money
14   that we're seeking to refund in the next couple of
15   weeks.
16        CO-CHAIR COHEN:  That's great.
17        LORELEI SALAS:  And so, with the price gouging,
18   just briefly, I would say that yes, we've been
19   overwhelmed with complaints from our neighbors in New
20   York City, over 8,000 complaints.  More than 4,000
21   violations issued and for the most part I would say a
22   lot of the businesses get the message and they stop
23   these practices and that's great.  That's what we
24   want and in cases in which we are seeing repeated
25   price gouging, we have filed lawsuits at the Office
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1           INTERNATIONAL INTERGROUP RELATIONS        111
2   of Administrative Trials and Hearings.  I did mention
3   that businesses do have an opportunity to justify an
4   increase in cost that is higher than 10 percent and
5   we'll take that into account when they had to incur
6   additional costs for labor or just to pay their
7   suppliers to bring those items into their stores,
8   right.
9       We do not want to discourage the retail stores
10  from trying to get those items into our communities.
11  The other thing that I would say is that we're very
12  encouraged by our conversations with manufacturers of
13  these products, who are very much interested in
14  making sure that their products are available to our
15  most, of consumers that most need them without having
16  to pay extra money for that.  And so, they are
17  collaborating with us.  We have served a couple of
18  subpoena's on certain wholesalers to identify whether
19  they are the ones who are overcharging for these
20  items and so, we are keeping a close eye on that
21  situation and obviously encourage you and anyone else
22  in the Council to let us know if they are seeing this
23  activity occurring in their neighborhoods.  We're
24  hoping that it stops and that our New Yorkers are
25
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1         INTERNATIONAL INTERGROUP RELATIONS        112
 2   able to access the items they need to take care of
 3   themselves.
 4      CO-CHAIR COHEN:  Do you know in the 4,000
 5   instances of violations, is that 4,000 individual
 6   businesses or some businesses have multiple
 7   violations?  How many businesses have been caught up
 8   in the practice?
 9      LORELEI SALAS:  Yeah, I don't have the number of
10   businesses that were inspected and assessed fines for
11   but I can tell you that those —
12      MIKE TIGER:  I have those.
13      LORELEI SALAS:  You have them, okay.  So, Mike
14   Tiger can —
15      MIKE TIGER:  Yeah, I believe this is as of
16   yesterday that there have been over 1,200 inspections
17   with 289 summonses issued by our enforcement division
18   that will be heard at OATH, the Office of
19   Administrative Trials and Hearings.  Of those 289
20   summonses, they made up over 4,500 violations.
21      CO-CHAIR COHEN:  Oh, so, when you find somebody
22   who is doing it, they are doing it through a number
23   of different products in their business.
24      MIKE TIGER:  Exactly or a lot of one product.
25
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        113
 2      CO-CHAIR COHEN:  Or a lot of one.  Thank you,
 3   Commissioner, I really appreciate your time here this
 4   afternoon.  Thank you.
 5      LORELEI SALAS:  Thank you Chair Cohen.
 6      CO-CHAIR COHEN:  Thank you Stephanie.
 7      STEPHANIE JONES:  Thank you Chairs.  Alright, so
 8   we will now turn to public testimony.  I'd like to
 9   remind and thank you to the panelists.  If you'd like
10   to leave, you're welcome to do so.
11      I'd like to remind everyone that unlike our
12   typical Council hearings we will be calling
13   individuals one by one to testify.  Each panelist
14   will be given three minutes to speak.  Council
15   Members who have questions for a particular panelist
16   should use the raise hand function in Zoom and I will
17   call on you after the panelist has completed their
18   testimony.
19      For panelists, once your name is called, a member
20   of staff will unmute you.  I would like to now
21   welcome Evan Franca to testify.  After Evan Franca I
22   will be calling on Jessica Lappin and then Andrew
23   Riggie.  Evan?
24      MODERATOR:  Time.
25
```

```
1      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS        114
2      EVAN FRANCA:  Thank you.  First of all, I'd like
3   to thank the Chair Gjonaj and the City Council for
4   allowing me to speak today.
5      My name is Evan Franca and I am the Merchant
6   Member of the North Flatbush Business Improvement
7   District and also the owner of Brooklyn Crepe for the
8   past 12 years in Councilman Lander's district.
9      Right now, many of you noted that New York City
10  hospitality is on life support and with everyday that
11  passes, we're losing the café's, the restaurants and
12  the bars.  They make our neighborhoods so special.
13  I'm actually one of the lucky businesses, we've
14  actually been able to stay open throughout the
15  pandemic for take away and delivery and we've
16  retained seven of our nine staff members.  And we've
17  even provided over 300 meals to four local hospitals.
18     Now, since Governor Cuomo issued a stay at home
19  order, we've seen a big change in our business.  So,
20  pre-COVID, we were receiving about 20 percent of our
21  overall business from these third party delivery
22  services but now that's jumped to almost 80 percent.
23  So, what does that mean?  So, the six main services,
24  Grubhub, Seamless, Uber Eats, Post Mates, Door dash
25  and Caviar all operate slightly differently but
```

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
                INTERNATIONAL INTERGROUP RELATIONS          115

1

2   generally, they take a 25 to 30 percent fee from us

3   for each order that we receive and they deliver for

4   us.

5       So, if we did $1,000 in business before the

6   pandemic and 20 percent of our orders were through

7   these apps, we'd be looking at about $60 in fees and

8   I'd still be left with $940.  I can make a living.

9       Now, today, if I do that same $1,000 in sales, 80

10  percent of that is going to be subject to a 30

11  percent fee and now, $240 go to these companies, I'm

12  only left with $760 which just aren't covering my

13  expenses.  That difference over the course of the

14  year would be over $65,000.

15      This is simply an unsustainable model and it's

16  been an issue for years but this crisis has exposed

17  this broken model and we need immediate government

18  intervention.  Now, the digital economy and third-

19  party delivery is going to continue to grow and there

20  needs to be regulation.

21      I understand that these companies, they have

22  employees and expenses but they also charge our

23  customers fees and shouldn't be allowed to profit off

24  of both side while were drowning in this crisis.  So,

25  what we need to do, is we need an immediate cap on

A-785

```
 1   COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
           INTERNATIONAL INTERGROUP RELATIONS        116
 2   the total fees, restaurants, including the delivery

 3   fees, marketing fees and the credit card processing

 4   fees to no more than 10 percent during this crisis

 5   and that would give us a fighting chance.

 6       In addition, on fees where the customers pick up

 7   orders, we need a smaller fee of maybe just three to

 8   five percent you know, so that we can focus on

 9   surviving these next couple of months.  We also need

10   to have the freedom to charge higher prices with

11   these platforms than our diamond customers.  So, if

12   it cost us 30 more plus packaging cost, we should be

13   able to factor that in and charge more and currently

14   many of these platforms don't allow that.

15       These companies also need to be licensed and be

16   able to lose that license if they engage in poor

17   business practices.  Just like how we can fined and

18   closed down for not running our operation properly,

19   they should have that same oversight.  For example,

20   just by having signed contracts with one of these

21   companies, they increased my fees overnight from 21.5

22   percent to 29 percent, a 7.5 percent jump without my

23   approval, that's not right.

24       And finally, I support more transparency so that

25   the customers know what percentage of their money is
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        117
 2  going to these third party companies and where their
 3  tips are going, not to take anything away from these
 4  hard working delivery drivers that we partner with
 5  but they also need protections and that's a whole
 6  separate issue.  But I think there should be a
 7  mandatory tip line for the restaurant staff that are
 8  preparing the meals as well as the delivery drivers.
 9     Not all the third-party apps are created equal.
10  Caviar and Door Dash have reduced delivery fees and
11  have through the end of May and they've eliminated
12  fees on pickup orders during that time and I will
13  applaud them on that but things are not going to go
14  back to normal in a month and we need more
15  protections.
16     These steps I outlined will give us desperately
17  needed lifeline in this uncertain time and help us
18  feel more confident to hire back staff and reopen our
19  doors but time is running out and if further inaction
20  continues we're going to lose a majority of our
21  independent restaurants that make up the fabric and
22  sole of our city.
23     Thank you again for the opportunity to speak
24  today.
25
```

A-787

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        118
 2      STEPHANIE JONES:  Thank you.  Chair Gjonaj, you
 3   had a question for our panelist?
 4      CHAIRPERSON GJONAJ:  Yeah, thank you Stephanie.
 5   Evan, thank you so much first of all for joining us
 6   today and testifying.  What you're saying hits home
 7   with so many businesses out there that couldn't
 8   participate but can you explain a little bit more
 9   about the B-structure?  You said, 25 to 30 percent,
10   can you give me the extreme breakdown of the charges
11   that you are seeing?
12      EVAN FRANCA:  Well, there is six different
13   companies that we deal with and each one has a
14   slightly different fee structure.  Some charge a just
15   flat fee of 30 percent, others charge a marketing
16   portion of the fee and a delivery portion of the fee
17   but in general, most of the companies range in fees
18   from about 25 to 30 percent and then some of those
19   also add on a credit card processing fee, some of
20   them don't.  So, it's kind of, you'd have to talk to
21   each company individually but generally it breaks
22   down to about 25 to 30 percent.
23      CHAIRPERSON GJONAJ:  So, can I ask you to be
24   transparent, I'll use Grubhub?
25      EVAN FRANCA:  Sure.
```

A-788

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        119
 2      CHAIRPERSON GJONAJ:  What is the fee structure
 3   that they are charging you for delivery, marketing
 4   and credit card?
 5      EVAN FRANCA:  We are charged it's 25 percent for
 6   the delivery and marketing fees and then it's around
 7   a 4 percent processing fee.  So, we pay about 29
 8   percent for delivery orders.  Now, if a customer
 9   comes and picks up the order, we're still charged 15
10   percent, even though they did nothing except for
11   aggregate that order for us.  So, they didn't deliver
12   it.  That's a customer just going on Grubhub saying
13   hey, I want to pick up an order.  We're still being
14   charged 15 percent just for a customer to place the
15   order through there platform.
16      CHAIRPERSON GJONAJ:  Evan, what is your profit
17   margin on your typical sale?
18      EVAN FRANCA:  Typically, you know, in our
19   industry we see around a 10 percent margin on our
20   sales.  Now, when our restaurant is full of people,
21   it's nice to have these extra sales that come in but
22   now that we're not allowed to fill our restaurants in
23   this emergency, we're relying on only these orders
24   and we just simply can't survive on these margins if
25   we're not allowed to have our regular dine in
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        120
 2  customers.  I mean, even the CEO, Matt Maloney of
 3  Grubhub said that this not sustainable.
 4      CHAIRPERSON GJONAJ:  So, Evan, you're telling me
 5  your profit margins are around 10 percent but yet
 6  you're paying up to 30 percent plus the credit card
 7  fee to these food party online apps.  That would mean
 8  on each sale, you have a net loss.
 9      EVAN FRANCA:  Yeah, we are losing money on a lot
10  of these orders now.
11      CHAIRPERSON GJONAJ:  Well, it would be on every
12  order.
13      EVAN FRANCA:  Yeah, yeah.
14      CHAIRPERSON GJONAJ:  Your profit margin is at 10
15  percent but yet you're paying out 30 percent plus
16  credit card fees.  That means each delivery and each
17  order is a net loss, is that accurate?  I don't want
18  to put words in your mouth.
19      EVAN FRANCA:  Yeah, I mean I've been working 12
20  hours a day just to pretty much to get us to break
21  even and I'm not taking any salary or any pay.  So,
22  yeah, basically we are pretty much losing money right
23  now.
24      CHAIRPERSON GJONAJ:  Thank you Evan.  We're going
25  to fight this fight for you and all of our other
```

A-790

```
                 COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                   INTERNATIONAL INTERGROUP RELATIONS        121
 2     small businesses, in particular the restaurant
 3     industry that is being impacted by this crisis and
 4     where they are shut down or if they are open, it's
 5     only delivery and third-party food order apps is the
 6     only way that they are able to stay in business.  But
 7     when your netting a net loss, I don't know what's
 8     better, just shutting the doors or continuing the
 9     slow bleed.
10        EVAN FRANCA:  Yeah, right now I'm just trying to
11     keep my staff employed and keep the lights on until
12     this situation improves.
13        CHAIRPERSON GJONAJ:  Thank you Evan.
14        EVAN FRANCA:  Thank you.
15        STEPHANIE JONES:  I just want to remind public
16     panelists that you do not need to use the Zoom raise
17     hand function.  We have seen you and we will call on
18     you in order.
19        Chair Cohen, did you have any questions for our
20     panelist?
21        CO-CHAIR COHEN:  Sure, I just, have you thought
22     about not using these platforms?  I mean, you know,
23     if Chair Gjonaj's math is correct, you know, you
24     could lose money without giving it to Grubhub.  You
25     don't need their help to lose money.
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        122
 2      EVAN FRANCA:  Yeah, that's a great question and
 3  one that we get a lot.  You know, right now, we just
 4  need every bit of revenue that we can get and
 5  unfortunately that's just not an option as so many
 6  customers use these platforms and are used to using
 7  these platforms, we simply just don't have the time
 8  to create our own systems and many entrepreneurs have
 9  tried to do that.  You know, we're going into these
10  companies that have you know, millions and millions
11  of dollars of resource of marketing of advertising
12  all over the trains and they are being used.  It's
13  like Uber and it's like telling tab companies to oh,
14  just start your own app and just compete with Uber.
15      You know, we would tens of millions in start up
16  capital to be able to build out the technology and
17  compete with these guys realistically.
18      CO-CHAIR COHEN:  Thank you Chair.
19      STEPHANIE JONES:  Thank you.  We'll now turn to
20  questions from other Council Members, I see Council
21  Member Powers has a question for our panelist.
22  Council Member Powers?
23      COUNCIL MEMBER POWERS:  Yeah, thank you.  Thanks
24  to both of the Chairs.  I just want to go at that, am
25  I right saying that according to what the answer was
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        123
 2   that you are losing money on every single, it's kind
 3   of a follow to Council Member Cohen and Council
 4   Member Gjonaj's question but you are losing, is that
 5   possibly true, you're losing revenue on each delivery
 6   that goes through these platform?  Is that how I
 7   heard that?
 8        EVAN FRANCA:  That's correct.
 9        COUNCIL MEMBER POWERS:  But I mean, I guess, my
10   question is kind of with Council Member Cohen's, in
11   what world would a restaurant stay on a platform if
12   they were losing money on every transaction was being
13   done by it?
14        EVAN FRANCA:  Well, for one, it's keeping my
15   staff employed and again, during good times, when our
16   dining rooms are full of people, this is extra
17   income.  Let's say this is our, you know, we can't
18   fit, let's see we only have ten seats, we can only
19   fill those ten seats.  So, if we're able to get some
20   of these orders, then we're not losing money because
21   it's helping us cover those costs.  But now that
22   we're not allowed to have any diners dine in and
23   we're only subject to using these apps, again, it's
24   about 80 percent of our business now and only about
25   20 percent of customers actually coming and ordering
```

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        124

2   at our window, we can't survive on that math and

3   those numbers right now.

4       The numbers need to be you know, we need to have

5   that discussion in the long term to be capped, but

6   right now, we just really need immediate assistance

7   during this crisis when we're not allowed to have

8   diners.

9       COUNCIL MEMBER POWERS:  No, and I understand

10  that, I guess I'm just torn here in terms of,

11  certainly during this period of time, I think all the

12  platforms, I see many of them on here should be doing

13  as much.  I know some of done stuff but to limit,

14  this is just about take out right now and delivery.

15      EVAN FRANCA:  And we're not losing money on the

16  Caviar and Door Dash orders, because those orders are

17  only in the ten to twelve percent range right now,

18  since they've reduced those fees.

19      COUNCIL MEMBER POWERS:  That's where you're

20  making profit is on Door Dash?

21      EVAN FRANCA:  Yeah, we are making money on our

22  Door Dash and Caviar orders.

23      COUNCIL MEMBER POWERS:  Yeah, but I guess my

24  point is, is it is hard to hear or believe that on

25  every single delivery order, one is losing 30

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        125
 2   percent.  I'm not accusing you of anything, it's just
 3   the reality of that seems hard to put together how
 4   you could be losing 30 percent.  If a restaurant
 5   would be losing 30 percent on a transaction or losing
 6   money I should say on a transaction and continue to
 7   do it, the math of that is difficult for me to
 8   understand.
 9     EVAN FRANCA:  Right, we need a certain amount of
10   revenue just to cover our rent, our expenses, our
11   employees and our staff.  So, right now, you know,
12   I'd rather lose a little bit of money and keep my
13   staff that I've had for so many years and you know,
14   keep paying rent and keep the lights on and keep the
15   insurance paid and all those bills paid, then just
16   close down the business completely and you know, lose
17   the 12 years that I've spent building it up in the
18   community.
19     COUNCIL MEMBER POWERS:  Okay, and I appreciate
20   it.  Just two more questions that are related, how
21   much of this is negotiable?  I know some platforms
22   allow you to come in and negotiate.  I don't know, I
23   really honestly don't know how every platform works
24   with the business but how much of this is negotiable,
25   meaning you could sit down and negotiate with the
```

A-795

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1        INTERNATIONAL INTERGROUP RELATIONS         126
2   platform about what the revenue sharing or what the
3   arrangement is and how many platforms allow you to
4   negotiate?  How much of it is negotiable and
5   renegotiable?  And then lastly, how much of those
6   fees are mandatory versus things that you can opt
7   into.  I know on certain platforms you can elevate
8   yourself because you may want to be seen by more
9   folks, but can you explain to me just in terms of how
10  much of that is negotiable and how much of that is
11  option null in terms of how you pay to seeing things
12  like that?
13      EVAN FRANCA:  Sure, so as an independent
14  restaurant, we don't have a lot of negotiability.  I
15  know you know, if you're a McDonalds or you're a big
16  chain and you have a lot of locations, you are going
17  to have some power there in the negotiability of your
18  contracts.  Like I said, we were at a certain rate
19  and you know, Grubhub and Seamless said hey, this is
20  going to be your new rate starting next week and like
21  it or not.  You know you can drop us if you want.
22      I've called other companies to speak about this
23  and they've said, nope, we're not going to move the
24  rates.  The rates are what they are, take it or leave
25  it.  So, I've seen a lot of resistance to negotiating

A-796

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        127
```

2  these rates.  Again, besides Door Dash and Caviar who

3  have voluntarily reduced the rates for all of the

4  restaurants on their platform.  And can you repeat

5  the second questions again?

6     COUNCIL MEMBER POWERS:  The second question was,

7  fees that are optional, meaning you might pay or one

8  restaurant might decide to pay more than another

9  restaurant on their platforms to get themselves

10  priority status.

11     EVAN FRANCA:  They do try to pit restaurants

12  against each other to compete in this marketplace to

13  get better visibility on the website.  And there are

14  also options, if you do deliver the food on your own

15  and have your own delivery staff, the fees are less.

16  But it's not easy for us to hire a brand new you

17  know, staff of and it's also very costly as well to

18  hire more employees and staff to deliver that food.

19  So, these percentages are if they are delivering the

20  food for you, they are a little bit lower.  If you're

21  doing the deliveries yourself but a lot of can't

22  afford to hire those delivery driver's right now, pay

23  the additional insurance and just you know.

24     COUNCIL MEMBER POWERS:  And how many of the

25  platforms of the six that I think you said you were

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        128
 2   on six platforms.  How many of those do you negotiate
 3   a fee with the platform versus those where it's a
 4   take it or leave it.  Figuratively meaning, this is
 5   the fee we charge for the restaurant versus having to
 6   individually negotiate with them.
 7       Like, if I open up a restaurant today, how many
 8   can I go to and I pay the same rate as you by default
 9   versus having individually negotiations?
10       EVAN FRANCA:  Most new restaurants now it's
11   pretty nonnegotiable.  In the beginning when they
12   were first piloting these programs, they were
13   offering better rates to get restaurants to sign up
14   but I've found a lot of residence now in negotiating,
15   at least on my own.  Maybe if we had a large
16   collection of restaurants that were negotiating but
17   then again, we'd have to you know, we'd have to pull
18   out if they didn't and a lot of restaurants rely on
19   this income and every order right now really counts.
20   So, you know, I hope they don't take me off their
21   platforms for saying anything negative about them.
22       COUNCIL MEMBER POWERS:  Alright, I'll leave it
23   right there.  Thank you for taking some time to
24   answer the questions.
25       EVAN FRANCA:  Sure.
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        129
 2     STEPHANIE JONES:  Thank you.  I understand Chair
 3   Gjonaj has a follow up question.
 4     CHAIRPERSON GJONAJ:  Thank you Stephanie.  Evan,
 5   just to piggyback on some of the questions and your
 6   responses to Council Member Powers.  Is this the most
 7   you can get from the platform?  Is there any other
 8   bells and whistles, so the 29 percent is that the
 9   maximum that you can be charged by Grubhub or is
10   there other programs that you can participate in
11   marketing that would increase the fee?  Is this the
12   Rolls Royce that you're enrolled in?
13     EVAN FRANCA:  So, there is another program and
14   it's, I think you've touched on it before in your
15   previous hearings.  It's called virtual restaurants
16   or ghost kitchens.  For those concepts, I've seen
17   rates of up to 34 percent.
18     If you're trying to introduce a secondary concept
19   within your concept, they'll charge up to 34 percent
20   fees on those orders.
21     CHAIRPERSON GJONAJ:  And Evan, the last thing
22   that you brought out that's a little sensitive for me
23   and I want to make sure that everyone hears this.
24   There will be no repercussions for you.  You spoke up
25   and your testimony is important and you've been only
```

```
                  COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                    INTERNATIONAL INTERGROUP RELATIONS        130
 2    honest and frank with us.  I assure you that if there
 3    is any unattended consequences that you get
 4    retaliated against, I want you to reach out to me and
 5    the Council and I promise you that we will be there
 6    for you to support you.  But I don't expect any type
 7    of retaliation Evan.
 8        EVAN FRANCA:  I appreciate that, thank you.
 9        CHAIRPERSON GJONAJ:  Just to put your mind at
10    ease.  Thank you.
11        EVAN FRANCA:  Thank you.
12        STEPHANIE JONES:  Thank you.  Chair Cohen, did
13    you have any follow up questions for our panelist?
14        CO-CHAIR COHEN:  No, I'm good, thank you.
15        STEPHANIE JONES:  Thank you.  I would like to now
16    welcome Jessica Lappin[SP?] to testify.  After
17    Jessica, I will be calling on Andrew Riggie and
18    Robert Bookman.  Jessica?
19        MODERATOR:  Time.
20        JESSICA LAPPIN:  Well, hello, thank you for
21    allowing me to testify and for having this hearing.
22    I thank, like the rest of the city, the coronavirus
23    has really had a devasting impact on lower Manhattan
24    in particular.  You are not down at City Hall or at
25    250 Broadway, so you probably aren't seeing for
```

```
           COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        131
 2    yourself but I can promise you that only a very small
 3    number of our essential businesses are open, have
 4    managed to stay open and provide services for the
 5    hospital workers downtown and others.
 6        And so, well, I'll talk about a couple of the
 7    bills, the one I really wanted to focus on was Intro.
 8    1908.  Our restaurants also operate on razor thin
 9    margins and they are facing this crisis which is
10    really a once in a generation crisis and what they
11    keep saying to us is that even if they are serving
12    take out and delivery, they are likely doing it at a
13    loss.  And I hear that in my own neighborhood as well
14    where I live.  They are just doing it to keep the
15    doors open and they are trying to keep staff on
16    payroll.  And yet, they are being charged these
17    really exorbitant fees by apps like Seamless and
18    Grubhub.
19        And so, I think you know, to your questions, they
20    have become such an integral part of the food scape
21    in New York, that's it's hard to avoid them and yet
22    they are charging these really outsize fees and I
23    think in a crisis like this, they should share in
24    some of the pain and to charge 30 percent is really
25    unconscionable.
```

A-801

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS         132
 2       And so again, while there are other things, I
 3   know you are discussing, like prohibiting the apps
 4   from charging for telephone orders that didn't occur
 5   or requiring the disclosure of commissions to
 6   customers or creating a new licensing and regulatory
 7   system.  Those would all be really helpful but what
 8   we've been hearing again and again the last few
 9   weeks, is that by far and away the single most
10   impactful thing you could do is to limit the amount
11   that these third-party delivery apps can charge.  And
12   so, I'm urging your very swift passage of this.  I
13   can try to answer questions and I would just say
14   proactively you know, again, to sort of follow up on
15   the thread that was just happening.
16       There are restaurants that didn't used to do take
17   out or delivery who are doing that now to survive.
18   So, they can't hire their own delivery staff right
19   now.  So, they're dependent upon this temporary
20   service, so they are kind of screwed that way.  And
21   also, in terms of marketing and communications, if
22   you don't show up on those apps as being open in that
23   neighborhood, then people don't know you exist and I
24   think people feel very beholden for that reason as
25   well.
```

A-802

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        133
 2       So, thank you.
 3       STEPHANIE JONES:  Thank you.  Chair Gjonaj, do
 4   you have any questions for our panelist?
 5       CHAIRPERSON GJONAJ:  None.
 6       STEPHANIE JONES:  Chair Cohen?
 7       CO-CHAIR COHEN:  No, I appreciate it, thank you.
 8       STEPHANIE JONES:  Thank you.  I see Council
 9   Member Powers has a follow up question.  Council
10   Member Powers?
11       COUNCIL MEMBER POWERS:  Thank you.  Nice to see
12   you Council Member Lappin, former Council Member
13   Lappin I guess but still a friend, nice to see you.
14   I want to just reiterate, I do think that we during
15   this crisis for sure be asking those in many of the
16   platforms who are here today to be taking steps to
17   reduce the fees as much as possible, because we are
18   in an emergency crisis and we have to tangle with
19   some of the larger questions as we move forward here.
20       To your point, you mentioned that you, I was
21   asking questions related to you know loss of revenue
22   and things like that.  For folks who are in downtown
23   Manhattan where you represent who have their doors
24   closed, do you know how many restaurants right now,
25   do you have any sort of sense of how many restaurants
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS         134
 2  have completely closed their doors versus those who
 3  are moving to take out and delivery as the option to
 4  stay afloat?
 5     JESSICA LAPPIN:  Well, I would say have roughly
 6  1,200 retailers all in and we're at about 25 percent
 7  that are open.  So, 200 and some odd and you know
 8  again, of the ones that are open, I had a call with
 9  30 of them last week and I mean, they had many things
10  that could be helpful from the state, federal and
11  city level but you know this just seemed to them, you
12  know, it's sort of like insult to injury and they are
13  all trying to adapt as much as they can and like Evan
14  said, you know the principals or the owners are not
15  taken a salary at all.  They are really just trying
16  to kind of keep their people and maintain some
17  presence and I think also we're mindful that it will
18  cost more to start up again and they don't want to
19  have to incur those start up costs.
20     So, if they can kind of eek it out; today we
21  announced a grant program actually at the Alliance,
22  $800,000 for small independently owned businesses to
23  help them pay April or May rent, just for that
24  reason.  Like, let's just, we got to keep the doors
25  open, we got to keep the lights on.  We got to help
```

A-804

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS          135
 2  those who can survive and I think this is such a
 3  common sense easy way to help them and you know,
 4  longer term, we can figure it all out, as Evan said.
 5  But you know, it's nice to see like Caviar and Door
 6  Dash being proactive.  It's not in their best
 7  interest for these restaurants to close, long term.
 8  It's like sort of stupid for their own business
 9  model, quite frankly.
10      COUNCIL MEMBER POWERS:  Thanks.  I hope all your
11  businesses are hanging in there.  Thank you for that
12  announcement today and we are looking I think for
13  ways to continue to help businesses, so any guidance
14  you have in that with the folks you are working with
15  is much appreciated.
16      JESSICA LAPPIN:  Thank you.
17      STEPHANIE JONES:  Thank you Council Member, I see
18  Chair Cohen has a follow up question.
19      CO-CHAIR COHEN:  Stephanie, could you recognize
20  Council Member Koslowitz, she wanted to clarify
21  something she said.
22      STEPHANIE JONES:  Yes, Council Member Koslowitz.
23      COUNCIL MEMBER KOSLOWITZ:  Thank you.  I just
24  want to make a correction.  I said there were 6,000
25  business, no, 6,000 restaurants and an estimated
```

A-805

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        136
 2   3,000 would close.  Not businesses, we have a lot
 3   more businesses, thousands more businesses in Queens.
 4   Thank you.
 5      STEPHANIE JONES:  Hi Karen.  Thank you so much
 6   for your testimony Jessica.
 7      JESSICA LAPPIN:  Thank you.
 8      STEPHANIE JONES:  I would like to now welcome
 9   Andrew Riggie[SP?] to testify.  After Andrew, I will
10   be calling on Robert Bookman and then Amy Healy.
11      MODERATOR:  Time.
12      ANDREW RIGGIE:  Thank you.  Good afternoon.
13   First, I'd like to thank the Speaker, Chair Gjonaj
14   and Cohen, all the members and staff for putting
15   today's hearing together.  Listen, the restaurant
16   industry and nightlife industry is vital to the
17   economic footprint and social fabric of New York City
18   and our city will not recover unless this industry is
19   at the forefront and the core of this recovery.
20      And that's why we are very thankful for many of
21   the bills being introduced today and I have submitted
22   written comments for the record, but I do want to
23   touch on three bills in particular and then I'm happy
24   to answer any questions.
25
```

A-806

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        137
 2      These three bills we support: 1908-A, 1914 and
 3  1932. Per-1908-A, I want to make it very clear that
 4  the third-party delivery platform situation was a
 5  crisis before we were in this crisis. Restaurants
 6  cannot afford to pay 15 to 30 percent per order to
 7  these delivery companies. And what companies like
 8  Grubhub and Seamless are doing is using sophisticated
 9  techniques to basically extract as much money as
10  possible out of businesses pre and during this
11  pandemic. We need to cap delivery fees at no more
12  than 10 percent. I can answer some of the members
13  questions earlier but there is sophisticated works at
14  here at play. Restaurants cannot afford to not be on
15  applications like Grubhub and Seamless when some
16  reports say they own between 60 to 70 percent of the
17  marketplace. They also own ownership of the customer
18  data. So, a restaurant can say, I'm not paying these
19  fees and I'm going to leave because then they're
20  going to lose all of their customers. And there's a
21  lot more at play but when government has used their
22  authority to shut down restaurants, they must use
23  that same authority to cap the fees both during the
24  crisis for the long term recovery and in the future.
25
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        138

2       On 1916, sidewalk cafés are going to be

3   extraordinarily important for the survival of our

4   local restaurants.  Frankly, we are going to have to

5   re-envision how we use public safe streets and public

6   areas to support our local businesses and one thing

7   we can do is waive these fees throughout the

8   remainder of the year.  It will bring much needed

9   support.  It will also help generate sales for these

10  businesses which will then generate sales tax and

11  create activity on our streets which we desperately

12  will need to get back to a sense of whatever the new

13  normal will be.

14      Finally, 1932, businesses are in crisis and they

15  are going to lose their livelihood.  They are also

16  laying off all of their employees.  It would be, it

17  would just be absolutely tragic if now people are not

18  only losing their businesses but then they are losing

19  their own personal assets.  We're not failing because

20  we're not running our business properly, government

21  has required us to shut down.  We never anticipated

22  this when we entered into these lease agreements.  We

23  cannot now take away people's personal livelihoods

24  and their assets because they are unable to pay their

25  rent because of the pandemic, because government is
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        139
 2   shutting us down.  So, I know I'm at time and I'll
 3   leave it there.  As I mentioned, I did submit
 4   comments but we truly, truly appreciate the Council's
 5   support of our small businesses.  Our restaurants are
 6   bars and nightclubs.  These are our small businesses,
 7   the backbone of our community and we need it, not
 8   only for our economy but for New Yorkers and our
 9   visitors to get back to some sense of normalcy and we
10   will not do that if we are not at the core of the
11   recovery.
12       So, I want to thank you all again for your
13   leadership here and I'm happy to answer any
14   questions.
15       STEPHANIE JONES:  Thank you Andrew.  I see
16   Council Member Rivera had a question.  Council Member
17   Rivera?
18       COUNCIL MEMBER RIVERA:  Hi, thank you so much for
19   being here and congrats on your appointment to the
20   Governor's Board.
21       ANDREW RIGGIE:  Thank you.
22       COUNCIL MEMBER RIVERA:  So, thank you for what
23   you said about the bill.  You know, this is not an
24   amendment to a contract, it's a temporary suspension
25   and contract law does allow for broad changes based
```

A-809

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        140
 2   on emergency situations and I think this is certainly
 3   an emergency.  We are in crisis.
 4      So, Andrew, I wanted to ask you and thank you for
 5   your testimony.  How many of your members have been
 6   impacted by personal liability clauses during COVID-
 7   19, more or less?  And how many do you expect to face
 8   this?
 9      ANDREW RIGGIE:  You know, that's a good question.
10   I don't have the data.  I can tell you thousands of
11   restaurant, bars and clubs throughout the city are
12   being impacted.  The challenge is, we don't know when
13   we're going to be able to reopen lawfully.  But then
14   once we can start reopening, if there will be a
15   reduced occupancy and then what consumer purchasing
16   behavior is going to be.  Will we have enough sales
17   to sustain those businesses.  So, immediately, we've
18   heard some stories where there's been great
19   relationships between the small businesses and the
20   landlords.  But we've heard some as I think you
21   mentioned earlier, where there is you know, been some
22   threats or there hasn't been as good of
23   communication.
24      So, the longer that these closures go on and the
25   uncertainty of what the business environment will be
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        141
 2   moving forward, leads me to believe that there will
 3   be more and more businesses or businesspeople whose
 4   personal livelihood and assets are at risk.
 5       So, I don't have an exact number but I have to
 6   imagine with 25,000 eating and drinking
 7   establishments in the five boroughs, we're talking
 8   about numbers in the thousands since the vast
 9   majority of them are not generating any revenue and
10   their unable to pay the rent.
11       COUNCIL MEMBER RIVERA:  So, and just my second
12   question is, do you have any recommendations for what
13   owners should do now to make sure they are ready and
14   prepared in case a landlord attempts to follow
15   through on a personal liability cause?  And then,
16   what else should the city and state be doing to
17   support your members?
18       ANDREW RIGGIE:  Sure, thank you.  So, you know,
19   one, and it's tough to say go hire a lawyer because
20   people don't have money.  So, I know that the
21   Department of Small Business Services and the
22   Commissioner had mentioned some of the resources that
23   they are offering.  I'd highly suggest businesses do
24   reach out to them.  If they can speak with a lawyer,
25   or they can reach out to groups like the New York
```

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        142
 2  City Hospitality Alliance and we could try to provide
 3  some general guidance, but you need to have dialogues
 4  with your landlords.  And like I said, there are some
 5  good landlords that understand because we, as New
 6  Yorkers are all in this together and there's not
 7  going to be another restaurant ready to reopen if a
 8  business you know, just shuts down and that's going
 9  to have great consequences for the City of New York.
10     So, I think one is dialogue, but also make sure
11  to the best of your ability, you have legal counsel
12  guiding you through all of this and again, I
13  understand it's not easy but that's one of the
14  challenges that we're facing here.
15     As far as what can the city and state do, it is
16  going to have to be a comprehensive save restaurant
17  and save nightlife plan.  We are going to have to
18  look at everything from issues like capping fees and
19  waiving sidewalk café or waiving cap and delivery
20  fees and waiving sidewalk café fees.
21     We're going to have to look at utilizing public
22  space like I said to you.  We're also going to have
23  to look at a lot of other policies.  Throughout time,
24  I think there's going to be some immediate needs that
25  may have to come from the federal government,
```

```
              COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                INTERNATIONAL INTERGROUP RELATIONS        143
 2   amending the paycheck protection program which was
 3   mentioned earlier.  How do we get business
 4   interruption insurance claims paid out to businesses
 5   right away.  We've heard from restaurants that want
 6   to be able to add a clearly disclosed charge to menu
 7   prices in a way to help generate additional revenue
 8   to keep their doors open and to keep people employed.
 9      So, I think again, we are going to need to look
10   at every single angle possible and work together to
11   get it done because there's not going to be one
12   policy that's happening, that's going to be a you
13   know, a save all.  But certainly, many of the bills
14   today including yours, the package of many of the
15   delivery related bills, those would take a great step
16   and they'd also be symbolic in showing the local
17   business community that our elected leaders are not
18   just saying we need to support you, but they are
19   taking bold action to do so and doing it quickly.
20   Because every minute we waste, we're losing more
21   businesses and more jobs.
22      COUNCIL MEMBER RIVERA:  Thank you and I did write
23   a letter to the Governor specifically trying to
24   include what I think the language should be for the
25   business interruption clarification, which so many of
```

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                 INTERNATIONAL INTERGROUP RELATIONS          144
 2   you will not qualify for based on what stands right
 3   now.  So, thank you so much for your time and thank
 4   you to the Chair's for the ability to ask questions.
 5       ANDREW RIGGIE:  Thank you Council Member.
 6       STEPHANIE JONES:  Thank you.  I see Chair Cohen
 7   had a follow up question.
 8       CO-CHAIR COHEN:  Thank you Stephanie.  Andrew,
 9   it's good to see you.
10       ANDREW RIGGIE:  You too.
11       CO-CHAIR COHEN:  I had two questions I wanted to
12   ask.  Are you concerned at all about the impact of
13   the availability of credit if the Council you know,
14   I'm referring specifically to the Public Advocates
15   Resolution or Councilman Rivera's legislation.  I'm
16   concerned that I don't want to freeze credit to these
17   businesses and you know if lenders can't use the
18   normal contracting procedure loan agreements.  Are
19   you concerned about that at all?
20       ANDREW RIGGIE:  You know, I think you know, there
21   are complexities in all of this.  I do believe many
22   of these types of loans, not the ones that are just
23   being offered today but the ones that are going to be
24   needed for opening capital for businesses to open,
25   are going to have to be back from the government.
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        145
 2  These are going to be difficult choices to make but
 3  if we are serious about getting businesses you know,
 4  reopened, we are going to have to pass multiple
 5  bills.
 6     So, if for some reason one bill that is passed is
 7  going to then prevent a business from getting a loan,
 8  we need to understand why that's going to happen and
 9  frankly the government may need to step in and
10  provide some sort of back stop.  You know, again, I
11  think everything we do there is going to be
12  additional questions that need to be addressed but
13  these bills are critical for people again.  Not to
14  lose their personal livelihood, not just their
15  professional and if the government is going to have
16  to step up in some ways to support or back these
17  other entities, then that's what needs to be done.
18  You know the situation demands it.
19     CO-CHAIR COHEN:  Well, do you think it might be a
20  better approach to be offering guarantees rather than
21  sort of changing the nature of the agreements?
22     ANDREW RIGGIE:  Well, I think you could suspend
23  it immediately past this legislation and then quickly
24  move to figure out how you can provide those funds or
25  that type of support.  I'd imagine and that's I guess
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS          146
 2   more of your work than mine that that may be a little
 3   bit more complicated, longer term discussion then
 4   immediately prohibiting you know, the enforcement of
 5   the personal liability provisions.
 6       CO-CHAIR COHEN:  And related to the apps, I
 7   again, I'm cautious only about changing the nature of
 8   contractual relationships.  And I guess, I don't know
 9   if it was your testimony or someone else's that there
10   were problems sort of structurally with these apps in
11   the restaurant industry before the COVID crisis.  I'm
12   not sure you know, it's a different constituency.
13   When I have a you know, an individual tenant who
14   comes to me and says that you know, that they are
15   having problems with their landlord, you see the real
16   strong, differential and bargaining power but you
17   know, you have business owners who are you know, I
18   think you know, not the least sophisticated members
19   of our society that you know, it takes a lot to open
20   a business in New York.  How do you think we got here
21   in terms of how these apps got, this situation got so
22   destructive?
23       ANDREW RIGGIE:  Yeah, well, good question.  I'll
24   try to answer as quickly as possible but listen, the
25   world is changing and it's changing fast.  Technology
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        147
 2   has changed the way that we interact and we make
 3   purchases.  Grubhub, Seamless in particular, well
 4   Seamless was the original New York City business.
 5   Was able to capture a lot of the market share early
 6   on.  They were also able to capture a lot of the
 7   corporate business where in the past, you know, an
 8   accounting firm had a house account of 12 different
 9   neighborhood restaurants where their employees could
10   order lunch from or dinner from if they were working
11   late and they'd have to tally them up at the end of
12   the month.
13       You know, Seamless and Grubhub kind of came in
14   and said well, we'll handle all of that and they
15   basically lock in that business.  Consumers are so
16   used to the convenience and paying on their phone
17   that they don't realize when they order through some
18   of these apps, not all of them, I want to be very
19   clear.  Some of them are very good and have done the
20   right thing.  How they are harming the businesses.
21       So, I think part of it was certain companies were
22   able to get in early and capture enormous amount of
23   the market share and then use sophisticated
24   techniques to keep diners on their apps and keep
25   businesses on their apps by controlling the catering
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          148
 2    business.  By purchasing add words and other
 3    sophisticated SEO techniques to ensure that any time
 4    anyone you know, visits, you know, wants to order
 5    from and is you know, bar and grill and they google
 6    it, that somehow their third-party platform is going
 7    to come up before and Andy's Bar and Grill's actual
 8    website.  They have also created phone numbers for
 9    the restaurants, so when a customer thinks that hey,
10    I'm ordering directly from my restaurant.  Guess
11    what, your not.  You are ordering through the Grubhub
12    Seamless one that's been levying bogus fees for years
13    now and has still not appropriately dealt with it.
14       So, much so that we need legislation in the City
15    Council to say, you're prohibited from charging fees
16    for services you did not render.  I mean, this is
17    kind of crazy talk.  You would never think we were
18    having this conversation but we are.
19       So, you know, there's that.  There is also the
20    spending of millions of dollars on TV ads on the
21    subways they take out ads.  So, they are doing
22    everything in their power to redirect consumer
23    purchasing behavior so they can get a fee any way
24    they can.  And even the larger more sophisticated
25    restaurant groups, do not have the resources or the
```

A-818

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        149
 2  bandwidth to be able to compete, especially when all
 3  of their competitors are also listed on those
 4  websites and all of a sudden, you're going to come up
 5  lower in the search results or maybe you'll just
 6  disappear.
 7      I will tell you one last thing on that is, I've
 8  been doing this work for a long time over some really
 9  challenging issues.  Everything from minimum wage to
10  paid sick leave and all these issues where small
11  business owners that are consumer facing would come
12  to public hearings and speak out.  And it's not
13  always a great look but when it comes to this issue
14  with third-party delivery platforms like Grubhub and
15  Seamless, they are scared.  They almost are being
16  silenced as you saw earlier.  The person who just
17  spoke prior to me is concerned about retribution.  I
18  want to thank Council Member Gjonaj for recognizing
19  and for having their back.  This is a real
20  significant issue.  It's very sophisticated and
21  again, when required to close, we need support and
22  when we open back up, we need support.  This is not
23  only about small businesses and jobs, we're also
24  vital to the food supply system of the City of New
25  York and if restaurants close because they can't
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS         150
 2   afford doing third-party delivery, then New Yorkers
 3   aren't going to be able to get their food and I think
 4   we've seen the display of philanthropy and support
 5   our local restaurants [INAUDIBLE 2:49:57-2:50:04] to
 6   providing our [INAUDIBLE 2:50:05].  So, what we are
 7   testing is these were important bills before the
 8   crisis, they are vitally important during and they
 9   will be just as much [INAUDIBLE 2:50:12].
10       MODERATOR:  He's losing his —
11       ANDREW RIGGIE:  Op, I'm sorry, am I here?
12       CO-CHAIR COHEN:  Yeah, you cut out a little bit.
13   We got the just of it.  Thank you very much Andrew,
14   thank you.
15       ANDREW RIGGIE:  Thank you.
16       STEPHANIE JONES:  Thank you.  Chair Gjonaj had a
17   question or some remarks to make.
18       CHAIRPERSON GJONAJ:  Thank you Stephanie and
19   thank you Chair Cohen.  I'm getting messages that we
20   have so many people lined up to ask questions both
21   from the Council Members and so many that have
22   testified that we're going to try to limit now the
23   questions and answer portions to three minutes for
24   members please.
25       Thank you.
```

A-820

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        151
 2        STEPHANIE JONES:  Thank you Chair.  I'd like to
 3    invite Robert Bookman to testify next.  After Robert,
 4    I will be calling Amy Healy[SP?] and then Josh Gold.
 5    Robert?
 6        ROBERT BOOKMAN:  Thank you.
 7        MODERATOR:  Time.
 8        ROBERT BOOKMAN:  Thank you for the opportunity to
 9    testify today in this historic Council hearing.  I
10    want to thank Council staff as well for putting this
11    together so seamlessly.  I'm sure that was not an
12    easy job.
13        It's historic because this is not only the first
14    virtual hearing but because the small business
15    community, especially the Hospitality industry is in
16    historic trouble.  I've been involved as an attorney
17    with small business and testifying before this
18    Council going back 30 plus years since my time in
19    City Government at the Department of Consumer
20    Affairs.
21        Never before have I seen anything like what we
22    are experiencing now.  Not 911, not the recession in
23    the late 1980's, not the great recession.  This is
24    different, this has the real makeup of an
25    unprecedented closing of thousands of neighborhood
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1            INTERNATIONAL INTERGROUP RELATIONS         152
  2  businesses forever.  If we do not act at every level
  3  of government and we can see our commercial strips in
  4  every neighborhood turn into ghost towns.
  5      That is why these bills are so important.  Not
  6  just for the message that the send that this body is
  7  listening and hearing small businesses but that it is
  8  acting, and quick action is desperately needed.
  9  Restaurants were the first to be closed and they will
 10  likely be the last to be reopened, even then we do
 11  not know what reopening will mean or look like for a
 12  long time to come.  50 percent capacity is not
 13  providable but for now, we must keep the food
 14  flowing, especially for the tens of thousands of New
 15  Yorkers that rely on delivery to eat.  To do that, we
 16  must immediately rain in the monopolistic big
 17  businesses that dominate the food delivery ordering
 18  industry.
 19      Let's be clear, all they do in New York City is
 20  transmit an order.  They do not cook the food and
 21  with minor exceptions they do not deliver the food
 22  and for this they grab over 20 percent of every
 23  order.  While these fees were not sustainable when
 24  the restaurant was filled with diners, it is simply
 25  an outrage now that we are empty.  This is why other
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1          INTERNATIONAL INTERGROUP RELATIONS          153
  2   city's like San Francisco, Seattle, Chicago and LA
  3   have either already instituted fee caps on these
  4   companies, some as low as five percent or actively
  5   pursuing it like you are.
  6       Restaurants will not and cannot with this vital
  7   public service if these fees remain in effect.  Food
  8   delivery will simply dry up, forcing elderly and sick
  9   New Yorkers to wait in long lines to get food.  And
 10   New Yorkers have the right to know if these charges,
 11   which the platform contract are forced to be hidden
 12   from them.  Pass these package of bills immediately.
 13       Then there are the personal guarantees on
 14   commercial leases.  Nothing is keeping small business
 15   owners awake at night more than this, what we are
 16   calling the industry good guy guarantees.  Typically,
 17   leases require that the business owner personally
 18   guaranteed the rent as long as the business is in
 19   possession of the premises.
 20       It is designed properly to prevent someone from
 21   operating while not paying the rent.  But no one ever
 22   contemplated this situation where we are technically
 23   in possession but the government says we cannot
 24   operate or only minimally operate.  For a landlord
 25   under these circumstances to file civil action
```

```
             COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        154
 2  against the small business owners personal assets,
 3  their life savings, their house is simply
 4  unconscionable and cannot be allowed to happen.
 5      MODERATOR:  Time.
 6      ROBERT BOOKMAN:  May rent is coming due and
 7  business owners are deciding, should they give the
 8  keys back and permanently go out of business or risk
 9  another month of personal liability.  You must act
10  now.
11      In wrapping up, finally, a simple bill in
12  relation to sidewalk café fees.  Thousands of
13  restaurants owe the city rental fees for sidewalk
14  café space that they cannot legally use.  It is only
15  fair that these fees, some of which were paid already
16  be waived for 2020.  Unlike what the Commissioner
17  said, where there is 70 categories, this is
18  different.  In this category, it's not just a license
19  fee, the city is the landlord.  And if we're asking
20  private landlords to step up, the city needs to step
21  up as the landlord of this commercial space and say,
22  we are forgiving rent on our commercial space for
23  2020.
24      As Andrew said, small businesses are not just the
25  live blood of our neighborhoods, they are not just
```

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1                    INTERNATIONAL INTERGROUP RELATIONS        155
2    employers, their not just the reason why companies
3    come to New York to do business, they are also why
4    artists of all types can make a living here while
5    pursuing their art, their music, their acting and
6    their writing.  There is no recovery for New York
7    City without our restaurants and our small
8    businesses.
9        Thank you.  I'm happy to answer any questions.
10       STEPHANIE JONES:  Thank you for your testimony
11   Robert.  Next up, we will be calling Amy Healy, then
12   Josh Golds and then Max Rettig.  Amy?  Thank you,
13   Robert.
14       AMY HEALY:  Thank you.  Dear Chairman Gjonaj,
15   Chairman Cohen and members of the Committee's.  I'm
16   here today to express Grubhub's strong opposition to
17   the proposed caps on fees paid by restaurants for
18   marketing and delivery services.
19       Any cap on fees, regardless of the duration will
20   result in damaging unintended consequences as we are
21   already seeing for locally owned businesses, delivery
22   workers, diners and the local economy.  In fact, it
23   will result in the exact opposite of what the
24   legislation is designed to accomplish.  And we
25   believe that any cap on fees, nullifying contracts
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS          156
 2   between two businesses represents an overstep by
 3   local officials and will not withstand a legal
 4   challenge.
 5       On the face of it, a cap on fees seems to be an
 6   easy solution to help restaurants that are struggling
 7   due to the coronavirus and there is nothing we want
 8   more then to assure the health of independent
 9   restaurants.  As many have said, we don't have a
10   business without them, but this solution is exactly
11   the wrong thing to do.  In reality, this proposed cap
12   will lower order volume to locally owned restaurants,
13   increase costs and headaches for small business
14   owners and raise costs to consumers.
15       Delivery workers who are currently relying on
16   Grubhub to earn an income including 100 percent of
17   tips from diners would have fewer work opportunities
18   and lower earnings.  In the middle of what is quickly
19   becoming one of the worst economic downturns in a
20   century, Grubhub is ensuring that workers in New York
21   City can continue to provide for themselves and their
22   families.  Grubhub is neither a public utility or nor
23   simply a delivery service.  In the simplest of terms,
24   Grubhub is a marketing engine and an order generation
25
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        157
 2  business connecting diners to great local
 3  restaurants.
 4      The platform is free for any restaurant owner who
 5  choses to join and Grubhub offers a fee for service
 6  model meaning that restaurant owners select the
 7  services they want and only pay Grubhub when we
 8  generate a sale.  Restaurants have many options to
 9  dry businesses other than third-party marketplaces,
10  none of which are seeing their fees regulated.  The
11  arbitrary cap would limit how restaurants and
12  especially small ones can market themselves and
13  therefore limit how many customers and orders we can
14  bring to these restaurants.  Why not cap how much
15  other marketing platforms can charge these
16  restaurants?  Why not cap Google or Facebook ads,
17  Yellow Pages, newspaper, radio, billboards?  These
18  are all marketing options that restaurants have.
19  Restaurants should make their own decisions for where
20  they want to market and how much they want to spend
21  on those channels but they and you cannot expect
22  Grubhub and others to operate at a loss.
23      The cap would raise costs on restaurants by
24  blocking them from taking advantage of Grubhub's
25  economies of scale.  As a restaurant said earlier, a
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        158
 2   local restaurant may not have the order volume to
 3   hire a full time delivery person.  Grubhub
 4   identifies, verifies, conducts background checks,
 5   coordinates delivery teams, operates 24/7 customer
 6   care on behalf of their restaurant.
 7       MODERATOR:  Time expired.
 8       AMY HEALY:  I'm happy to take any questions.
 9       STEPHANIE JONES:  Thank you Amy.  We have a
10   question from Chair Gjonaj and then we'll be calling
11   on Chair Cohen.  Chair Gjonaj?
12       CHAIRPERSON GJONAJ:  I'm going to ask for Ms.
13   Healy to finish her statement if it's okay, because
14   this is such an important issue.  I don't know how
15   much more she has.  Ms. Healy?
16       AMY HEALY:  Not much.  While the largest of
17   national chains can afford these types of expenses,
18   small and independent restaurants cannot, even in the
19   best of times.  They may shut their doors or shift
20   additional costs onto consumers making them even less
21   competitive against other national chain businesses.
22       There is a popular and completely false believe
23   that third-party marketing services would still make
24   a profit, let alone significant profits with their
25   proposed fee caps.  It is not true and these caps may
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        159
 2   force us to exit certain markets or suffer
 3   substantial losses that threaten the sustainability
 4   of our businesses.
 5       Of course, all this is happening at the worst
 6   possible time for customers across your city
 7   including homebound families and seniors that are
 8   dependent on food delivery and Grubhub has provided
 9   with partners tens of thousands of meals to seniors,
10   to frontline workers and others in New York City.  We
11   are committed to working with you and with policy
12   makers because we do share a common goal, to create
13   and maintain a growing, thriving local restaurant
14   community.  We only do well when they do well.
15       Thank you.
16       CHAIRPERSON GJONAJ:  Thank you Ms. Healy.  I'm
17   going to call on Council Member Moya.
18       STEPHANIE JONES:  I believe Chair that Chair
19   Cohen also had some questions.
20       CO-CHAIR COHEN:  I'm happy to defer to Council
21   Member Moya and go after that, that's fine.
22       STEPHANIE JONES:  Thank you.
23       COUNCIL MEMBER MOYA:  Thank you.
24       MODERATOR:  Clock starting.
25
```

A-829

```
1        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS        160
2        COUNCIL MEMBER MOYA:  Yeah, thank you so much.
3    Thank you Chair.  A quick question.  Just given that
4    you deferred fee payments for independent
5    restaurants, what's your plan for collecting these
6    fees and is there a timeline that they will be due or
7    will they be due all at once or will these
8    restaurants be able to pay them off over time or be
9    able to request forgiveness?
10       AMY HEALY:  Thank you.  We deferred fees, which
11   essentially was an interest free loan right at the
12   beginning of this pandemic and we're still working on
13   payback options.  We don't have hard and fast payment
14   options, we're being flexible.
15       So, I can't tell you that there's a date certain
16   because we haven't established one.
17       COUNCIL MEMBER MOYA:  So, well, what will you do
18   for restaurants unable to pay back their fees after
19   this pandemic is over?
20       AMY HEALY:  Well we knew taking that risk of
21   deferring fees that there would be some restaurants
22   that would not be able to pay them back and we were
23   willing to take that risk on.
24       COUNCIL MEMBER MOYA:  So, really quickly because
25   I know I don't have that much time, what is the
```

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        161
 2   lowest percentage and the highest percentage that
 3   you've charged restaurants for listing advertising
 4   fees because like, we'd like to have a sense of the
 5   full range that you've been able to charge.
 6       AMY HEALY:  Sure, and given we have competitors
 7   on the line, you know, I'm sensitive to you know
 8   putting out our pricing in this form.
 9       COUNCIL MEMBER MOYA:  Well, that's my question to
10   all of them, so.
11       AMY HEALY:  Yeah, our average, 10 percent per
12   delivery and we don't charge to be on our platform.
13   There's no annual fee, no sign up fee.  We provide
14   the tablets and all of the onboarding for free and
15   then my understanding is an average commission rate
16   is at 15 percent.
17       COUNCIL MEMBER MOYA:  Okay, thank you very much.
18       STEPHANIE JONES:  Thank you.  Chair Cohen?
19       CO-CHAIR COHEN:  Thank you very much.  Thank you
20   for your testimony.  You know, I guess, I'm just
21   wondering what percentage, do you have any sense of
22   what percentage of the market in New York City
23   Grubhub has penetrated?
24       AMY HEALY:  I should have started my comments
25   that I started Grubhub three months ago, so if I
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS         162
 2   don't have answers to your questions today, I
 3   certainly will get them.  I believe we are the
 4   largest player in the market in New York, especially
 5   with our acquisition of seamless.
 6      CO-CHAIR COHEN:  I mean, I think that there's a
 7   feeling from restaurants that there's like a monopoly
 8   problem; that you have such tremendous unequal
 9   bargaining power between the restaurant and you that
10   you, you know you control the customer and the
11   restaurant needs you.  That there's really a you
12   know, a monopoly problem or an antitrust problem
13   here.
14      AMY HEALY:  You know, we believe that consumers
15   love the service that we provide.  You know, we have,
16   the way the consumers want to buy services.  They
17   don't want to read their credit card number into a
18   crowded restaurant lobby.  I had a credit card
19   written on a to go bag the other day with my name,
20   address and credit card number.  That's not a great
21   customer experience and we know that.  People like
22   that their information is secure.  That their
23   favorite restaurants are saved in one place.  It's
24   convenient, anyone in their family can log in.
25
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1           INTERNATIONAL INTERGROUP RELATIONS        163

2       So, consumers are demanding this type of

3   experience when they order today and that's a

4   fundamental shift as somebody said in the economy.

5   That's just how people want to order especially New

6   Yorkers.  Young New Yorkers want everything at their

7   fingertips in a secure, easy way.  And so, the diners

8   were demanding services like this and it's a very

9   competitive space.  I've got you know friends of mine

10  that are going to talk after me and we're always you

11  know, competing against each other.

12      CO-CHAIR COHEN:  Well, I guess that's really the

13  issue that I think is most germane here.  Is it

14  really competitive?  Does Grubhub control such a

15  large portion of the app market that it's not as

16  competitive as it needs to be in New York and that

17  would be I think a good justification for City

18  government to step in.  If the market is broken,

19  that's an opportunity for — and I am believe me,

20  cautious and reserved in interfering in marketplace

21  transactions and particularly commercial

22  transactions.  But if this market is broken, that's a

23  deep concern to me.

24      AMY HEALY:  Chairman, I think you'll see media

25  reports that say that other companies have surpassed
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        164
 2  Grubhub, so you know, I challenge that that you know,
 3  Grubhub is a monopoly.
 4     CO-CHAIR COHEN:  Thank you Chair.
 5     STEPHANIE JONES:  Thank you.  I see Council
 6  Member Powers has a question.  Council Member Powers?
 7     COUNCIL MEMBER POWERS:  Thank you.  After this,
 8  I'm going to stop talking so much.
 9     MODERATOR:  Clock starting.
10     COUNCIL MEMBER POWERS:  But thank you for more
11  time.  I just wanted to ask a question.  I think the
12  comment here was that by lowering the fees, it would
13  or capping fees rather, it would lower restaurant
14  orders.  Which seems to be counter to what many of us
15  would think or believe when you talk about lowering
16  prices and increasing the ability for people to
17  afford it and then to order it.  Can you explain that
18  to me?
19     AMY HEALY:  Sure, if you cap our fees, price
20  controls lead to shortages.  So, if our prices are
21  fixed, then other parts of the business are going to
22  be squeezed.  So, there may not be as much marketing
23  available to that restaurant.  We drive orders, you
24  know, somebody said you know we're simply a pass
25  through.  You know, we provide a lot of services to
```

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                INTERNATIONAL INTERGROUP RELATIONS        165
 2   showcase a restaurant and if our ability to do that
 3   is limited then you know, we might have to make
 4   business decisions that are going to reduce service.
 5        I mean, if you increase prices, somethings got to
 6   give.
 7        COUNCIL MEMBER POWERS:  Meaning, you're saying
 8   like in a sense that you'll have to change your model
 9   here as a company to be able to help deliver services
10   to restaurants, is that your point?
11        AMY HEALY:  I'm saying if our costs are
12   increased, we will have to make business decisions
13   about how to be sustainable, yes.
14        COUNCIL MEMBER POWERS:  Okay, I understand that.
15   And then can I just, I asked, I might have missed a
16   piece of your testimony but have you made adjustments
17   during COVID-19 to help the restaurants here in New
18   York City who are obviously closed.  I mean, we had
19   to close them as a public health issue.  What has
20   Seamless and Grubhub done in terms of addressing fees
21   or helping their customers?
22        AMY HEALY:  Right, we're doing a multitude of
23   things.  We've again deferred fees right at the
24   beginning which was again an interest free loan.  We
25   have a separate support, $30 million of cash that
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        166
 2   we're just giving to restaurants that chose to
 3   participate in that program.  Our marketing team is
 4   constantly working on other promotions to drive
 5   orders to small businesses.  And the $30 million is
 6   get free $10 on any order over $30, so that drives
 7   100 million in sales.  And again, we've got marketing
 8   support going out for these restaurants all the time.
 9       COUNCIL MEMBER POWERS:  Okay, I just, you know, I
10   think that crisis is called for intervention.  I know
11   that's the part of the intention here from my
12   colleagues here is to intervene at a moment where an
13   industry has been shut down because of public health,
14   not because of bad business decisions or anything
15   like that and I think that's the request here is to
16   ask a major player here.
17       I know you've been here for three months.  I'm
18   not going to ask you to be the spokesperson for the
19   company but certainly to be able to share the burden
20   here and I know that's painful for our company and
21   it's public traded upon company in general but it
22   does, even when you talk to the restaurant owners
23   here in New York City, this is the only way they can
24   make their money right now and it does feel like, it
25   is a moment that calls for an intervention.
```

```
      COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        167

 2      MODERATOR:  Time expired.

 3      COUNCIL MEMBER POWERS:  You don't have to respond

 4  to that.  I'll leave it at that.

 5      Thanks.

 6      STEPHANIE JONES:  Thank you Council Member.  I

 7  believe we have a follow up question from Chair

 8  Gjonaj and then Council Member Brannan.  Chair?

 9      CHAIRPERSON GJONAJ:  Thank you Stephanie and Amy,

10  just to answer your question, according to the

11  information I have, you have 62 percent of all third-

12  party food order apps in the entire city of New York,

13  62 percent of the entire market.

14      The other food order apps share in the 38

15  percent.

16      AMY HEALY:  Okay, thank you.

17      CHAIRPERSON GJONAJ:  Your welcome.  In addition,

18  can you tell me about the deferral program, the

19  duration.  I believe it was for only two weeks, am I

20  correct?

21      AMY HEALY:  I believe it was about two weeks,

22  yes.

23      CHAIRPERSON GJONAJ:  So, you sought to help these

24  small businesses, these restaurants deal with this

25  COVID crisis by allowing a two week deferral.
```

```
1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
            INTERNATIONAL INTERGROUP RELATIONS        168
2        AMY HEALY:  That was the first step Chairman.  We
3    knew that access to capital in cash was hugely
4    important.  The federal government was coming through
5    with unfortunately you know disappointing response at
6    this level which we have encouraged congressional
7    leaders in the White House to do more and after that,
8    we've shifted to other programs to drive revenue, to
9    drive orders to our restaurants.
10       CHAIRPERSON GJONAJ:  So, I think your two week
11   period is up now?
12       AMY HEALY:  Yes, but I don't believe we've
13   started, again, there's no hard collection date.
14   We're not taking any type of retaliatory measures
15   toward restaurants.
16       CHAIRPERSON GJONAJ:  It's not retaliation, I'm
17   just asking, have they started paying back that
18   deferral?  Have you started collecting on the two
19   week deferral?
20       AMY HEALY:  I just pinned somebody to ask that
21   question, hopefully I can get back to you to
22   understand where we are in the collection.
23       CHAIRPERSON GJONAJ:  And the second thing you
24   mentioned is this $10 off on orders.  Can you
25   elaborate a little bit about that?
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        169
 2      AMY HEALY:  Sure, it's $10 to the restaurant, so
 3  that if somebody, to encourage a large order, so if a
 4  customer will buy a $30 order, we'll give the
 5  restaurant $10 to increase the size of that order
 6  because bigger orders is better for the restaurant.
 7  So, that's a $30 million cash injection for the
 8  restaurants, the $10 drives the $30 order.  So, its
 9  called Supper for Support.
10      CHAIRPERSON GJONAJ:  So, the marketing ranges for
11  those that participate in the marketing services part
12  that you offer, they range from what to what on a low
13  level to a high level.
14      AMY HEALY:  I think our average is about 30
15  percent and they range from a low of 15, no fee or
16  cost at all to get onto our platform or to onboard.
17  And then of course restaurants can pay more.
18      CHAIRPERSON GJONAJ:  Right, that's what I'm
19  asking.  The fee structure that you have for
20  marketing, not the delivery, not the 3 percent credit
21  card fee, just the marketing.
22      AMY HEALY:  How high does it go, the range?
23      CHAIRPERSON GJONAJ:  Yeah, from low to high.
24      AMY HEALY:  15, I don't know the highest that a
25  restaurant has chosen to pay but I believe it starts
```