# 20-4238-cv

## United States Court of Appeals

*for the*

## Second Circuit

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC,
LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,
ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

– v. –

CITY OF NEW YORK, a municipal entity, MAYOR BILL DE BLASIO, as
Mayor of the City of New York, COMMISSIONER LOUISE CARROLL,
Commissioner of New York City Department of Housing Preservation &
Development, COMMISSIONER JONNEL DORIS, Commissioner of
New York City Department of Small Business Services,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 5 of 16 (Pages A-1116 to A-1392)

JAMISON DAVIES
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street
New York, New York 10007
(212) 356-2490

CLAUDE G. SZYFER
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Plaintiffs-Appellants*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated July 10, 2020 ................................. A-14

Notice of Motion for Preliminary Injunctive and
Declaratory Relief, dated July 22, 2020 ................ A-78

Declaration of Stephen P. Younger in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated July 22, 2020 ................ A-80

Exhibit 1 to Younger Declaration -
July Reopening Survey Summary ......................... A-107

Exhibit 2 to Younger Declaration -
Partnership for New York City – A Call for
Action and Collaboration....................................... A-109

Exhibit 3 to Younger Declaration -
The New York Times Article: New Threat to New
York City: Commercial Rent Payments Plummet,
dated May 21, 2020 ................................................ A-177

Exhibit 4 to Younger Declaration -
The Real Deal Article: About 25% of NYC
renters didn't pay in May: survey, dated
May 19, 2020 .......................................................... A-183

Exhibit 5 to Younger Declaration -
Complaint in *The Gap, Inc. v. 44-45 Broadway
Leasing Co., LLC*, dated June 23, 2020 ................ A-187

Exhibit 6 to Younger Declaration -
Complaint in *The Gap, Inc. v. 170 Broadway
Retail Owner, LLC*, dated July 2, 2020 .................. A-213

ii

**Page**

Exhibit 7 to Younger Declaration -
Complaint in *Bath & Body Works, LLC v. 304
PAS Owner LLC*, dated June 8, 2020 ..................... A-237

Exhibit 8 to Younger Declaration -
Complaint in *Victoria's Secret Stores, LLC v.
Herald Square Owner LLC*, dated June 8, 2020 .... A-258

Exhibit 9 to Younger Declaration -
The New York Times Article: Tenants' Troubles
Put Stress on Commercial Real Estate, dated
June 5, 2020 ............................................................ A-282

Exhibit 10 to Younger Declaration -
The New York Times Article: 5 Ways the
Coronavirus Has Changed Suburban Real Estate,
dated July 17, 2020 ................................................ A-289

Exhibit 11 to Younger Declaration -
The New York Times Article: Coronavirus
Escape: To the Suburbs, dated May 8, 2020 .......... A-299

Exhibit 12 to Younger Declaration -
Snapshot: IBO's Updated Economic and Revenue
Forecast and Review of the Adopted Budget for
2021, dated July 21, 2020 ...................................... A-310

Exhibit 13 to Younger Declaration -
New York City Independent Budget Office –
Focus on: The Executive Budget, dated
May 2020 ................................................................ A-351

Exhibit 14 to Younger Declaration -
The New York Times Article: N.Y.C. Budget and
a Cut to N.Y.P.D. Funding, Explained, dated
July 1, 2020 ............................................................ A-377

iii

**Page**

Exhibit 15 to Younger Declaration -
Chapter 23 of the New York State Session Laws
of 2020, effective March 3, 2020 ........................... A-385

Exhibit 16 to Younger Declaration -
New York State Assembly Memorandum in
Support of Legislation submitted in Accordance
with Assembly Rule III, Sec 1(f) ........................... A-388

Exhibit 17 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202, dated March 7, 2020 ..................... A-390

Exhibit 18 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.3, dated March 16, 2020 ................ A-394

Exhibit 19 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.6, dated March 18, 2020 ................ A-397

Exhibit 20 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.7, dated March 19, 2020 ................ A-400

Exhibit 21 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.8, dated March 20, 2020 ................ A-403

Exhibit 22 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.16, dated April 12, 2020 ................ A-406

Exhibit 23 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.28, dated May 7, 2020 ................... A-409

Exhibit 24 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.38, dated June 6, 2020 ................... A-413

iv

**Page**

Exhibit 25 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.48, dated July 6, 2020 .................... A-416

Exhibit 26 to Younger Declaration -
Chapter 125 of the New York State Session Laws
of 2020, effective June 17, 2020 ........................... A-420

Exhibit 27 to Younger Declaration -
Chapter 127 of the New York State Session Laws
of 2020, effective June 30, 2020 ........................... A-423

Exhibit 28 to Younger Declaration -
Proposed Int. No. 1914-A ...................................... A-426

Exhibit 29 to Younger Declaration -
Proposed Int. No. 1932-A ...................................... A-430

Exhibit 30 to Younger Declaration -
Proposed Int. No. 1936-A ...................................... A-434

Exhibit 31 to Younger Declaration -
Transcript of Remote Hearing, dated
May 13, 2020 ........................................................ A-438

Exhibit 32 to Younger Declaration -
New York City Council Article: New York City
Council Announces COVID-19 Legislative
Relief Package To Be Introduced on Wednesday,
dated April 21, 2020 .............................................. A-516

Exhibit 33 to Younger Declaration -
Transcript of Remote Hearing, dated
April 28, 2020 ....................................................... A-525

Exhibit 34 to Younger Declaration -
Transcript of Remote Hearing, dated
April 29, 2020 ....................................................... A-669

v

**Page**

Exhibit 35 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure and Government Affairs
Division, dated April 28, 2020 .............................. A-959

Exhibit 36 to Younger Declaration -
The Council of the City of New York Briefing
Paper and Committee Report of the
Governmental Affairs Division, dated
April 29, 2020 ........................................................ A-973

Exhibit 37 to Younger Declaration -
The Council of the City of New York Committee
Report of the Governmental Affairs Division,
dated May 13, 2020 ............................................... A-1052

Exhibit 38 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure Division, dated
May 13, 2020 ........................................................ A-1108

Exhibit 39 to Younger Declaration -
Summary – Brooklyn Chamber of Commerce
Surveys .................................................................. A-1114

Exhibit 40 to Younger Declaration -
MetLife & U.S. Chamber of Commerce Small
Business Coronavirus Impact Poll, dated
June 3, 2020 .......................................................... A-1116

Exhibit 41 to Younger Declaration -
NYC's Nightlife Economy Impact, Assets, and
Opportunities ......................................................... A-1132

Exhibit 42 to Younger Declaration -
Emails, dated June 19, 2020 .................................. A-1213

vi

**Page**

Exhibit 43 to Younger Declaration -
The Stoop NYU Furman Center Blog Article:
Understanding the Potential Magnitude of Rent
Shortfalls in New York Due to COVID, dated
June 4, 2020 ............................................................ A-1216

Exhibit 44 to Younger Declaration -
Small Business First – Better Government
Stronger Businesses ................................................. A-1229

Exhibit 45 to Younger Declaration -
Guaranty, dated October 18, 2018 ......................... A-1278

Declaration of Santo Golino in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 22, 2020 .......................................................... A-1281

Declaration of Ling Yang in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 9, 2020 ............................................................. A-1323

Declaration of Marcia Melendez in Support of
Plaintiffs' Motion for a Preliminary Injunction,
dated July 9, 2020 ................................................... A-1330

Notice of Motion to Dismiss, dated August 12, 2020    A-1336

Declaration of Carlos F. Ugalde Alvarez in Support
of Defendants' Motion to Dismiss and in
Opposition to Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 12, 2020 ...................................................... A-1338

Exhibit A to Alvarez Declaration -
Chapter 23 of the New York State Laws of 2020 ..    A-1366

Exhibit B to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202 dated March 7, 2020 ................................. A-1370

vii

**Page**

Exhibit C to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.3 dated March 16, 2020 ........................... A-1374

Exhibit D to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.5 dated March 18, 2020 ........................... A-1377

Exhibit E to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.6 dated March 18, 2020 ........................... A-1381

Exhibit F to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.7 dated March 19, 2020 ........................... A-1384

Exhibit G to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 ........................... A-1387

Exhibit H to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.9 dated March 21, 2020 ........................... A-1390

Exhibit I to Alvarez Declaration -
New York State Gubernatorial Executive Order
Nos. 202.13, 202.14, 202.18 dated March 29,
2020, April 7, 2020 and April 16, 2020 ................. A-1393

Exhibit J to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.16, dated April 12, 2020........................... A-1404

Exhibit K to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.28, dated May 7, 2020 ............................. A-1407

Exhibit L to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.29, dated May 8, 2020 ............................. A-1411

viii

**Page**

Exhibit M to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.31, dated May 14, 2020 .......................... A-1413

Exhibit N to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.34, dated May 28, 2020 .......................... A-1416

Exhibit O to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.35, dated May 29, 2020 .......................... A-1419

Exhibit P to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.36, dated June 2, 2020 ............................ A-1422

Exhibit Q to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.38, dated June 6, 2020 ............................ A-1425

Exhibit R to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.39, dated June 7, 2020 ............................ A-1428

Exhibit S to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.41, dated June 13, 2020 .......................... A-1431

Exhibit T to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.45, dated June 26, 2020 .......................... A-1434

Exhibit U to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.48, dated July 6, 2020 ............................ A-1437

Exhibit V to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.49, dated July 7, 2020 ............................ A-1441

ix

**Page**

Exhibit W to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.50, dated July 9, 2020 .............................  A-1443

Exhibit X to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.53, dated July 21, 2020 ...........................  A-1445

Exhibit Y to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................  A-1448

Exhibit Z to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 .....................  A-1452

Exhibit AA to Alvarez Declaration -
Administrative Order No. AO/68/20, dated
March 16, 2020........................................................  A-1454

Exhibit BB to Alvarez Declaration -
Administrative Order No. AO/127/20, dated
June 18, 2020 ..........................................................  A-1464

Exhibit CC to Alvarez Declaration -
Administrative Order No. AO/131/20, dated
June 23, 2020 ..........................................................  A-1474

Exhibit DD to Alvarez Declaration -
Administrative Order No. AO/143/20, dated
July 7, 2020..............................................................  A-1480

Exhibit EE to Alvarez Declaration -
Chapter 112 of the New York State Laws of 2020
and Chapter 126 of the New York State Laws of
2020 ........................................................................  A-1482

Exhibit FF to Alvarez Declaration -
Chapter 125 of the New York State Laws of 2020   A-1492

x

**Page**

Exhibit GG to Alvarez Declaration -
Chapter 127 of the New York State Laws of 2020    A-1501

Exhibit HH to Alvarez Declaration -
Introduction No. 1914............................................    A-1504

Exhibit II to Alvarez Declaration -
Introduction No. 1932............................................    A-1508

Exhibit JJ to Alvarez Declaration -
Introduction No. 1936............................................    A-1516

Exhibit KK to Alvarez Declaration -
Transcript of Meeting, dated April 22, 2020..........    A-1520

Exhibit LL to Alvarez Declaration -
Committee Report of the Infrastructure and
Governmental Affairs Divisions, dated
April 28, 2020........................................................    A-1620

Exhibit MM to Alvarez Declaration -
NYU Furman Center Article: What are the
Housing Costs of Households Most Vulnerable to
Job Layoffs? An Initial Analysis, dated
March 30, 2020......................................................    A-1634

Exhibit NN to Alvarez Declaration -
The New York Times Article: 11 Numbers That
Show How the Coronavirus Has Changes N.Y.C.,
dated April 20, 2020 .............................................    A-1643

Exhibit OO to Alvarez Declaration -
Transcript of Hearing, dated April 28, 2020 ..........    A-1654

Exhibit PP to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. No. 1936...........................    A-1798

xi

**Page**

Exhibit QQ to Alvarez Declaration -
Briefing Paper and Committee Report of the
Governmental Affairs Divisions, dated
April 29, 2020........................................................... A-1906

Exhibit RR to Alvarez Declaration -
New York City Comptroller Scott M. Stringer:
City must take immediate action to prepare for
economic impacts of COVID-19 and protect vital
services for most vulnerable New Yorkers, dated
March 16, 2020........................................................ A-1985

Exhibit SS to Alvarez Declaration -
New York State Restaurant Association,
Restaurant industry impact survey: New York
State, dated April 2020 ........................................... A-1991

Exhibit TT to Alvarez Declaration -
National Bureau of Econ. Research Article: How
are small businesses adjusting to COVID-19?
Early evidence from a survey, dated April 2020.... A-1993

Exhibit UU to Alvarez Declaration -
Info. Station Article: How important are small
businesses?, dated January 3, 2017........................ A-2030

Exhibit VV to Alvarez Declaration -
United States Small Business Administration,
Small Businesses generate 44 percent of U.S.
economic activity, dated January 30, 2019............ A-2034

Exhibit WW to Alvarez Declaration -
N.Y.C. Department of Small Business Services,
Comprehensive Guide to Commercial Leasing in
New York City ....................................................... A-2037

xii

**Page**

Exhibit XX to Alvarez Declaration -
Entrepreneur Article: Hayden Field, 5 most
common red flags entrepreneurs should know
before signing a commercial real estate lease in
New York, dated June 6, 2019 ............................... A-2078

Exhibit YY to Alvarez Declaration -
Transcript of Hearing, dated April 29, 2020 .......... A-2091

Exhibit ZZ-1 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2381

Exhibit ZZ-2 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2550

Exhibit ZZ-3 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2745

Exhibit ZZ-4 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2925

Exhibit ZZ-5 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-3128

Exhibit AAA to Alvarez Declaration -
Intro. No. 1914-A ................................................. A-3335

Exhibit BBB to Alvarez Declaration -
Intro. No. 1932-A ................................................. A-3339

Exhibit CCC to Alvarez Declaration -
Intro. No. 1936-A ................................................. A-3344

Exhibit DDD to Alvarez Declaration -
Intro. No. 1914- A's Plain Language Summary ..... A-3348

xiii

**Page**

Exhibit EEE to Alvarez Declaration -
Intro. No. 1932- A's Plain Language Summary ..... A-3350

Exhibit FFF to Alvarez Declaration -
Intro. No. 1936- A's Plain Language Summary ..... A-3352

Exhibit GGG to Alvarez Declaration -
Committee Report of the Infrastructure Division,
dated May 13, 2020 ................................................ A-3354

Exhibit HHH to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3360

Exhibit III to Alvarez Declaration -
Committee Report of the Governmental Affairs
Divisions, dated May 13, 2020 .............................. A-3368

Exhibit JJJ to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3425

Exhibit KKK to Alvarez Declaration -
City Council's Meeting ........................................... A-3438

Exhibit LLL to Alvarez Declaration -
Letter from the City's Office of the Mayor, dated
May 26, 2020 ......................................................... A-3516

Exhibit MMM to Alvarez Declaration -
Commercial Harassment Law, effective
May 26, 2020 ......................................................... A-3519

Exhibit NNN to Alvarez Declaration -
Guaranty Law, effective May 26, 2020 ................. A-3523

Exhibit OOO to Alvarez Declaration -
Residential Harassment Law, effective
May 26, 2020 ......................................................... A-3528

Exhibit PPP to Alvarez Declaration -
Local Law No. 62 of 2020 ..................................... A-3533

xiv

**Page**

Exhibit QQQ to Alvarez Declaration -
Local Law No. 63 of 2020.................................... A-3536

Exhibit RRR to Alvarez Declaration -
Resolution No. 1349 of 2020................................ A-3540

Exhibit SSS to Alvarez Declaration -
Resolution No. 1350 of 2020................................ A-3543

Exhibit TTT to Alvarez Declaration -
Document Produced by Plaintiff Jarican Realty
Inc., dated July 31, 2020......................... A-3546

Exhibit UUU to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC.......................................................... A-3580

Exhibit VVV to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC.......................................................... A-3595

Letter from Arthur Kats to the Honorable Ronnie
Abrams, dated August 13, 2020........................... A-3614

Brief of Amicus Curiae Volunteers of Legal Service
in Opposition to Plaintiffs' Motion for
Preliminary Injunctive and Declaratory Relief,
dated August 13, 2020 ............................. A-3617

Declaration of Arthur Kats in Opposition to
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 13, 2020............ A-3646

Exhibit 1 to Kats Declaration -
The New York Times Article: How Prepared Is
the U.S. for a Coronavirus Outbreak?, dated
February 29, 2020................................. A-3658

xv

**Page**

Exhibit 2 to Kats Declaration -
New York Times U.S. COVID-19 Map and Case
Tracker, last visited August 11, 2020 ..................... A-3669

Exhibit 3 to Kats Declaration -
The New York Times Article: New York City
Region Is Now an Epicenter of the Coronavirus
Pandemic, dated March 22, 2020 ......................... A-3687

Exhibit 4 to Kats Declaration -
New York Times N.Y. Covid-19 Map and Case
Tracker, last visited August 11, 2020 ..................... A-3693

Exhibit 5 to Kats Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-3704

Exhibit 6 to Kats Declaration -
The Wall Street Journal Article: Times Square Is
Eerily Empty During the Pandemic, but
Advocates Are Focused on a Comeback, dated
May 19, 2020 ......................................... A-3707

Exhibit 7 to Kats Declaration -
Report Published by the U.S. Small Business
Administration's Office of Advocacy: Small
Business GDP: 1998-2014 ................................. A-3711

Exhibit 8 to Kats Declaration -
Office of the N.Y. State Comptroller, Small
Business in New York State: An Economic
Snapshot 1, dated 2019 .................................. A-3787

Exhibit 9 to Kats Declaration -
U.S. Small Business Administration's 2019 Small
Business Profile for the State of New York ........... A-3792

xvi

**Page**

Exhibit 10 to Kats Declaration -
The New York Times Article: One-Third of New
York's Small Businesses May Be Gone Forever,
dated August 3, 2020 ............................................. A-3797

Exhibit 11 to Kats Declaration -
The Wall Street Journal Article: Amid
Coronavirus Shutdowns, Landlords Often
Determine Fate of Small Businesses, dated
June 4, 2020 ........................................................... A-3802

Exhibit 12 to Kats Declaration -
Article: For Small Businesses With High Rents,
Coronavirus Aid Falls Short ................................. A-3808

Exhibit 13 to Kats Declaration -
Article: On a Vibrant Street in Brooklyn,
Businesses Are Struggling for Survival ................. A-3814

Exhibit 14 to Kats Declaration -
Brooklyn Chamber of Commerce, July
Reopening Survey Summary, dated July 2020 ...... A-3820

Exhibit 15 to Kats Declaration -
The Wall Street Journal Article: Small Business
Sector Highly Vulnerable to Coronavirus Crisis,
dated April 7, 2020 ................................................ A-3822

Exhibit 16 to Kats Declaration -
U.S. Fed. Reserve Bank of N.Y., 2020 Report on
Employer Firms: Small Business Credit Survey,
dated 2020 ............................................................. A-3825

Exhibit 17 to Kats Declaration -
Fed. Reserve Bank of N.Y., Can Small Firms
Weather the Effects of COVID-19?, dated
April 2020 .............................................................. A-3863

xvii

                                                                    **Page**

Exhibit 18 to Kats Declaration -
Local Law 53 ........................................................... A-3867

Exhibit 19 to Kats Declaration -
Local Law 55 ........................................................... A-3871

Exhibit 20 to Kats Declaration -
Committee Report of the Governmental Affairs
Division on Local Law 53 ..................................... A-3876

Exhibit 21 to Kats Declaration -
Testimony of the Volunteers of Legal Service
Microenterprise Project Int. Nos. 1914 & 1932 .... A-3932

Exhibit 22 to Kats Declaration -
Partnership for New York City: A Call for Action
and Collaboration................................................. A-3936

Letter from Jeffrey Turkel to the Honorable Ronnie
Abrams, dated August 25, 2020............................ A-4004

Reply Declaration of Stephen P. Younger in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 .......................................... A-4030

Exhibit 1 to Younger Declaration -
Rentec Direct's August 2020 Rental Trends
Report ................................................................... A-4043

Exhibit 2 to Younger Declaration -
New York Hospitality Alliance's July 2020 Rent
Report ................................................................... A-4046

Exhibit 3 to Younger Declaration -
Sydney Pereira New Article: Thousands of New
Yorkers at Risk of Eviction as Cuomo's
Moratorium Expires............................................... A-4056

xviii

**Page**

Exhibit 4 to Younger Declaration -
News Article: Retail Chains Abandon Manhattan:
It's Unsustainable.................................................... A-4067

Exhibit 5 to Younger Declaration -
Screenshot of Post from Newman Ferrara LLP's
Website.................................................................. A-4077

Exhibit 6 to Younger Declaration -
Complaint in *The Maramont Corporation v.
Generation Next Realty, Inc.*, dated July 20, 2020   A-4082

Exhibit 7 to Younger Declaration -
Report: Landlords and Renters Struggling to
Make Ends Meet During COVID-19 Uncertainty,
dated August 20, 2020 .......................................... A-4094

Exhibit 8 to Younger Declaration -
Press Release: Small Property Owners of New
York Announces Majority of Owners and
Managers of Small Properties Are Working with
Tenants by Reducing, Forgoing, and Offering
Rent Concessions, dated August 25, 2020.............. A-4111

Exhibit 9 to Younger Declaration -
The New York Post Article: New Yorker's Keep
Moving Out of the City to Suburbs, Other States,
dated August 11, 2020........................................... A-4115

Exhibit 10 to Younger Declaration -
The New York Times Article: Movers in N.Y.C.
Are So Busy They're Turning People Away,
dated August 20, 2020 .......................................... A-4120

Exhibit 11 to Younger Declaration -
CNBC Article: Retail Rents Plummet Across
New York City, as America's Glitzy Shopping
Districts Turn Into Ghost Towns, dated
August 2, 2020...................................................... A-4130

xix

**Page**

Exhibit 12 to Younger Declaration -
The City Article: New York's Rent Drops as
Vacancies Increase. Could Rent Regulation Be
Next Thing to Fall?, dated July 27, 2020 ............... A-4138

Exhibit 13 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ......................... A-4148

Exhibit 14 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ...................... A-4152

Exhibit 15 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.57, dated August 20, 2020 ....................... A-4154

Exhibit 16 to Younger Declaration -
New York City Council Bill Int. No. 2007-2020 ... A-4157

Exhibit 17 to Younger Declaration -
New York State Senate Bill No. S8904 ................. A-4160

Exhibit 18 to Younger Declaration -
August 2020 Resolution ........................................ A-4163

Exhibit 19 to Younger Declaration -
Gotham Gazette Article: Requestions for
Emergency Rent Grants Fell During Pandemic,
But Expected to Skyrocket When Evictions
Resume, dated July 24, 2020 ................................. A-4179

Exhibit 20 to Younger Declaration -
New York State Senate Bill No. S8139 ................. A-4187

Exhibit 21 to Younger Declaration -
New York State Senate Bill No. S8190-A ............. A-4191

Exhibit 22 to Younger Declaration -
New York State Senate Bill No. S8125-A ............. A-4201

xx

**Page**

Exhibit 23 to Younger Declaration -
Screenshot from New York City Department of
Health, dated August 19, 2020 ............................... A-4204

Exhibit 24 to Younger Declaration -
Guidance Published by Centers for Disease
Control and Prevention: COVID-19 Pandemic
Planning Scenarios ................................................ A-4210

Reply Declaration of Santo Golino in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 ........................................... A-4219

Reply Declaration of Marcia Melendez in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 21, 2020 ..................................................... A-4242

Declaration of Elias Bochner in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 25, 2020 ............ A-4245

Reply Declaration of Carlos F. Ugalde Alvarez in
Further Support of Defendants' Motion to
Dismiss, dated September 2, 2020 ........................ A-4250

Amended Complaint, dated September 2, 2020 ........ A-4268

Transcript of Oral Argument, dated
September 11, 2020 ............................................... A-4334

Notice of Appeal, dated December 21, 2020 ............ A-4394

# Exhibit 40

A-1117

**MetLife & U.S. Chamber of Commerce**
**Small Business Coronavirus Impact Poll**
**June 3, 2020**

A-1118

**Index Summary**

### *NEW REPORT SHOWS MANY SMALL BUSINESSES HAVE REOPENED*
*BUT GROWING NUMBER BELIEVE RECOVERY WILL TAKE MORE THAN SIX MONTHS*

American small businesses report they have reopened in some capacity and are showing signs of optimism about the future, even while still dealing with many ongoing challenges related to the pandemic, according to the latest MetLife & U.S. Chamber of Commerce Small Business Coronavirus Impact Poll.[1]

This month, we find that small businesses' level of concern about the impact of COVID-19 has subsided slightly. Overall, 82% of small businesses are concerned about the impact of the pandemic, similar to the last two months of the survey. However, the number of small businesses reporting they are *very* concerned is now 43%, a 10 percentage-point drop from a month ago, and a 15-point drop from two months ago.

Perceptions of cash flow and revenue have also improved. 56% feel comfortable with their company's cash flow situation, up from last month's low of 48% and similar to late March (59%). Also, 50% expect next year's revenues to increase, while 19% expect them to decrease. Last month, 47% expected an increase in revenue and 25% expected a decrease in revenue.

Most small businesses report being at least partially open. 79% of small businesses are either: fully (41%) or partially (38%) open. One in five are closed, either temporarily (19%) or permanently (1%). However, most believe it will take longer for the small business economic climate to return to normal: 55% of small businesses believe it will take six months to a year before the U.S. business climate returns to normal, up from 50% last month and 46% two months ago.

More than eight in ten small businesses report that they are making, or planning to make, adaptations in response to the coronavirus. Nearly half (48%) have either started, or plan to start, more frequent cleaning/disinfecting of surfaces, while 44% are asking, or plan to ask, employees to self-monitor for symptoms and stay home if they feel sick. Four in ten are also making, or planning to make, adaptations around employees wearing protective gear (40%) or requiring six feet of distance (39%) between employees and customers.

---

[1] *The MetLife/U.S. Chamber of Commerce Small Business Coronavirus Impact Poll was conducted via a monthly online survey, in place of the typical phone-based approach. This methodological shift is in response to anticipated lower response rates in dialing business locations as a result of mandated closures related to the COVID-19 outbreak. During Q2, we fielded three waves, each one month apart, with each survey comprised of 500 respondents. Results of the June survey are summarized in this report. While significant changes in data points can largely be attributed to the recent economic environment, switching from a phone to online approach may have also generated a mode effect.*

2

A-1119

Overall, sentiment toward the economy remains similar to last month, but negative sentiments toward the U.S. economy are softening. 53% of businesses believe their business is in good health (50% last month). One in four (24%) rate the U.S. economy as "good," compared to 21% last month. 27% believe their local economy is in good health (last month the finding was 25%). However, the number of small businesses saying the U.S. economy is in "very poor" health has shrunk to 18%, from 29% last month.

A-1120

**Index Highlights**

- **Most businesses are partially open.** Seventy-nine percent of small businesses are either fully (41%) or partially (38%) open. One in five are closed, either temporarily (19%) or permanently (1%). 51% of small businesses in the South report they are fully open.

- **Most say it will take longer for the business climate to return to normal.** Fifty-five percent of small businesses believe it will take six months to a year before the U.S. business climate returns to normal (up from 50% last month and 46% two months ago).

- **More than eight in ten small businesses report that they are making or planning to make adaptations in response to the coronavirus.** Of those doing so, nearly half (48%) of small businesses have either started, or plan to start, more frequent cleaning/disinfecting of surfaces, while 44% are asking, or plan to ask, employees to self-monitor for symptoms and stay home if they feel sick. Four in ten are also making, or planning to make, adaptations around employees wearing protective gear (40%) or requiring six feet of distance between employees and customers (39%).

- **Fewer businesses are *very* concerned about the coronavirus' impact.** The number of small businesses reporting they are *very* concerned about the impact of COVID-19 is now 43%, a 10 percentage-point drop from a month ago and a 15-point drop from two months ago.

- **Most larger small businesses concerned about lawsuits.** Two-thirds (67%) of small businesses with 20-500 employees are concerned about the possibility of lawsuits related to the coronavirus. Those with less than five employees are less concerned at 22%.

- **Negative sentiments toward the economy are softening.** Twenty-four percent of small businesses rate the U.S. economy as "good," (21% last month). However, the number of small businesses saying the U.S. economy is in "very poor" health has shrunk 11 points to 18% (29% last month).

- **Business health steady overall, increases substantially in Northeast.** 53% of small businesses report good overall health (similar to last month's 50%). Retailers continue to report the lowest percentage of those in good health (46%), while small businesses in the Northeast saw an increase in good health since last month: from 41% to 59% this month.

- **Revenue expectations improve.** Now, 50% expect next year's revenues to increase, while 19% expect them to decrease. Last month 47% expected an increase and 25% expected a decrease.

- **Cash flow improves.** Cash flow has been a perennial concern for small businesses during the pandemic. Currently, 56% feel comfortable with their company's cash flow situation, up from last month's low of 48%, and in line with findings in late March (59%).

- **Fewer see poor local economy.** Slightly more believe their local economy is in good health (28%, similar to last month's 24%). This month, fewer perceive their local economy's health to be poor (38% believe it is in poor health vs. 50% last month), and more say it is average (33% vs. 25% last month).

- **Most firms which shed workers anticipate rehiring them.** Seventy-one percent of small businesses say they have the same number of employees as in February before the pandemic began. Among those that report having fewer employees now, more than half

4

A-1121

(55%) anticipate rehiring or bringing back most workers at some point in the next six months.

**Spotlight: The Impact of the Coronavirus on Small Business**

*MOST SMALL BUSINESSES REPORT AT LEAST PARTIAL REOPENING*
Nearly eight in ten small businesses are at least partially open, and most are making—or plan to make—adaptations regarding business operations.

Nearly a quarter (23%) of small businesses report temporarily closing their business entirely since the start of the COVID-19 pandemic. As of right now, however, eight in ten report they are either fully (41%) or partially (38%) open.



Please select the option that best describes your current situation.

My business is permanently closed 1%
Don't know 1%
My business is temporarily closed 19%
My business is fully open 41%
My business is partially open 38%

Retail small businesses are reporting more temporary business closures, and they are the least likely to be fully operational. Currently, 29% of retail businesses report having temporarily closed their business at any point since the COVID-19 pandemic began, and 43% say they are partially open, versus 32% who are fully open.

Current operating status not only varies by sector, but by region and business size. Small businesses in the West region are more likely to be only partially open, while more in the Northeast remain temporarily closed when compared to other regions. Nearly half of the smallest businesses remain fully open and are least likely to say they are temporarily closed.

A-1122

| Please select the option that best fits your current situation. | Total | Region | | | | Employee Size | | | Industry | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | North -east | Mid- west | South | West | Less than 5 | 5-19 | 20+ | Manu- facturing | Services | Retail | Prof. Services |
| My business is fully open | 41 | 37 | 39 | 51 | 31 | 45 | 35 | 33 | 48 | 38 | 32 | 51 |
| My business is partially open | 38 | 37 | 38 | 31 | 49 | 38 | 38 | 41 | 33 | 36 | 43 | 37 |
| My business is temporarily closed | 19 | 25 | 19 | 16 | 19 | 15 | 25 | 26 | 19 | 22 | 24 | 11 |
| My business is permanently closed | 1 | 1 | 1 | 1 | 1 | 0 | 2 | 0 | 0 | 1 | 1 | 0 |
| Don't know | 1 | 0 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 1 |
| *Open* | *79* | *74* | *77* | *82* | *80* | *83* | *73* | *74* | *81* | *75* | *75* | *88* |
| *Closed* | *20* | *26* | *20* | *17* | *20* | *16* | *27* | *26* | *19* | *23* | *25* | *11* |

For small businesses who reported a temporary closure at some point since the start of the COVID-19 pandemic (23%), 43% have reopened. At present, 19% of all small businesses remain temporarily closed, while just 1% have closed permanently. Those who are still temporarily closed are split on if they will open in the next two weeks (49% say it is likely, 47% say unlikely).

Most small businesses[2] are concerned about the financial hardships due to prolonged business closure (71%), and more than half worry about having to permanently close their business (57%). Looking ahead, 66% are concerned about having to stay closed, or closing again, if there is a second wave of COVID-19. More are anxious about this in the West (77%) and Northeast (74%) than in the Midwest (62%) and South (55%).

---

[2] Note: the 1% of businesses that report being permanently closed were not asked this question.

A-1123

*MOST SAY IT WILL TAKE LONGER FOR BUSINESS CLIMATE TO RETURN TO NORMAL*
Currently, 55% of small businesses believe it will take six months to a year before the U.S. business climate returns to normal (with another 6% saying it never will), up from 50% last month and 46% two months ago. Retailers are most optimistic, with 43% predicting normal operations in under six months, followed by manufacturing (37%). 27% and 26% among professional service and services small businesses, respectively, predict normal operations in under six months.

Though small businesses now think it will take longer for the business climate to get back on track, they are more optimistic about their own projections. For small businesses who have not shut down entirely, most believe they can continue to operate without permanent closure for six months or more (52%), up from 44% last month. Interestingly, smaller-sized businesses with less than five employees are most likely to believe they can to operate indefinitely (37%), while mid-sized and larger-sized small businesses are less optimistic (27% with 5-19 employees and 14% with 20-500 employees).

| How long do you believe your business can continue to operate without shutting down permanently? | Total | Less than 5 employees | 5-19 employees | 20+ employees |
|---|---|---|---|---|
| Less than a month | 3 | 4 | 1 | 1 |
| 1-2 months | 12 | 9 | 18 | 18 |
| 3-under 6 months | 21 | 16 | 24 | 39 |
| 6 months-1 year | 21 | 19 | 24 | 25 |
| Indefinitely | 31 | 37 | 27 | 14 |
| Don't know | 11 | 15 | 7 | 3 |
| *Under 6 months* | *36* | *29* | *43* | *58* |
| *6 months or more* | *52* | *56* | *51* | *39* |

*FIRMS WHICH SHED WORKERS ANTICIPATE REHIRING THEM*
71% of small businesses say they have the same number of employees as in February before the pandemic began. Among those that report having fewer employees now, more than half (55%) anticipate rehiring or bringing back most workers at some point in the next six months.

Manufacturers are most likely across sectors to report a change in number of employees compared to before the pandemic, with 14% saying they have more (2-4% across other small business sectors) and 30% saying they have fewer employees (17-26% across other sectors).

Case 20-4238, Document 38, 02/11/2021, 3035076, Page30 of 298

A-1124

## *MOST ARE ADAPTING TO COPE WITH THE PANDEMIC*

More than eight in ten small businesses report that they are making, or planning to make, adaptations in response to the coronavirus. Of those, nearly half (48%)of small businesses have either started, or plan to start, more frequent cleaning/disinfecting of surfaces, while 44% are asking, or plan to ask, employees to self-monitor for symptoms and stay home if they feel sick. Four in ten are also making, or planning to make, adaptations around employees wearing protective gear (40%) or requiring six feet of distance between employees and customers (39%).

The most common response to the outbreak has been shortening hours of operations (30% have done so since the start of the pandemic). One in five (22%) report transitioning some or all of their employees to teleworking, and another 20% have sought capital from other sources—a 15-percentage point increase from last month.

The smallest-sized businesses (fewer than five employees) are least likely to report adjusting employee salaries or hours (17%, versus 39% of businesses with 5-19 employees, and 44% of businesses with 20 or more employees), furloughing employees (7%, versus 14% of mid-sized, and 24% of larger-sized businesses) or laying off employees (10%, versus 26% of mid-sized, and 23% of larger-sized businesses).

Though small businesses are pressing onward, concerns abound. Two-thirds (67%) are anxious about the low business demand due to continued social distancing measures. Sixty-two percent are concerned about the risks COVID-19 poses to their customers and employees. Half (48%) are worried about the lack of guidance on proper reopening procedures.

As small businesses adapt to the new environment, three in ten anticipate needing more guidelines on how to keep customers and employees safe and well. This month, less see a need for more loans and financial assistance (26%, down from 35% last month) over the next few months. Around one in five expect needing more guidance from political leaders on how to respond (21%), more resources for understanding the outbreak (20%), and guidance on healthcare, insurance, or accounting issues (19%).

While few report a need for more legal advice (15%) and liability insurance (13%) over the next few months, a newer concern for some small businesses is the possibility of lawsuits related to the coronavirus. Overall, more than one in three (36%) are concerned, including a majority (51%) of mid-size small businesses and two-thirds (67%) of larger small businesses who are worried by this possibility. The smallest employers (fewer than five employees) are the least concerned with just over one in five (22%) expressing concern about these lawsuits. Manufacturers (43%) and retailers (40%) are most likely to express worry about lawsuits, with less in professional services (33%) and services (30%) sharing the sentiment.

## *AMONG PPP USERS PAYING EMPLOYEES REMAINS TOP PRIORITY*

A-1125

This month, three in ten (29%) of the small business population has applied, or tried to apply, for a Paycheck Protection Program (PPP) loan. This includes those who have applied for a loan but did not receive it (7%), those who tried to apply but were unsuccessful (7%), and those who applied for and received a loan (15%, up from 9% last month).

Eight percent of small businesses report that they are planning on applying for a PPP loan, down five percentage points from last month (13%). As noted in this report above, fewer report a need for loans and financial assistance this month compared to last month.

Paying current employee salaries and benefits remains the top intended use among those who have gone through the PPP application process, or plan to (36%, nearly unchanged from last month), while paying for rent or utilities has fallen six points to 15% from 21% last month.

**KEY FINDINGS**

**SMALL BUSINESS OPERATIONS**

*BUSINESS HEALTH STABILIZES, WHILE CASH FLOW IMPROVES*
This month, small businesses report improving cash flow and stabilizing views of their own business health.

Overall health among small businesses remains statistically unchanged from last month. This month, 53% report good health (compared to 50% last month). This represents a decrease of four percentage points from two months ago and 12 points from Q1 2020.

As seen throughout the second quarter, manufacturing (60%) and professional services (57%) are the most likely to report good health, while those in retail (46%) remain the least likely to do so. By sector, small businesses in the services industry saw the largest increase in optimism regarding business health since last month, a six-point increase to 51%.

Reported small business health has increased significantly in the Northeast to 59%, from 41% last month. The Northeast and South (57%) are now the most likely to report good health, with the Midwest and West trailing behind (both 47%). The smallest businesses remain the least optimistic, by size: only 45% report good health compared to 64% and 71% of mid- (5-19 employees) and large-sized (20+) small businesses, respectively.

This month, pessimism surrounding cash flow has lessened, with 56% of small businesses reporting comfort with their cash flow—closer to what was seen two months ago (59%) from last month's low (48%). This measure still remains dramatically low, after falling from 80% or higher before the start of the pandemic.

While small businesses across all regions feel more optimistic about their cash flow, those in the Northeast report the largest increase (54% now, up 16 percentage points from last month). Additionally, retail (58%) and services (50%) small businesses also experienced spikes in optimism, increasing 17 and 11 points, respectively, but still falling behind the continued optimism felt by professional services (62%). The smallest businesses are still least likely to report comfort with their cash flow (50%, compared to 66% of mid-sized and 64% of large-sized small businesses).

10

A-1127

**KEY FINDINGS**

**SMALL BUSINESS ENVIRONMENT**

*FEWER SEE 'VERY POOR' NATIONAL ECONOMY*

Sentiments toward the national economy are softening slightly from last month, but a majority still perceive it as "poor" (57% vs. 63% last month). While nearly three in ten small businesses (29%) rated the U.S. economy "very poor" last month, just 18% feel the same this month. Across regions, those in the Midwest (22%) and West (27%) are now more likely to perceive the U.S. economy as good when compared to last month (up six and seven points, respectively), and those in the Northeast and South are unchanged.

Slightly more small businesses perceive their local economy as in good health (28%) when compared to the national economy (24%). This month, fewer perceive their local economy's health to be poor (38% believe it is in poor health vs. 50% last month), and more say it is average (33% vs. 25% last month).  Optimism is greatest among large-sized small businesses (20+ employees): 42% believe their local economy is in good health.

A-1128

**KEY FINDINGS**

**SMALL BUSINESS EXPECTATIONS**

*60% OF SMALL BUSINESSES EXPECT TO RETAIN SAME AMOUNT OF STAFF*
Small businesses are slightly more optimistic about future revenues than last month. Half (50%) expect to see an increase (was 47% last month), compared to 19% that expect next year's revenues to decrease (was 25% last month).

Small businesses continue to feel uncertain about their future investments. Currently, 27% report expectations to increase investment, statistically unchanged from last month's 25%. As seen previously, a fair amount (16%) are unsure whether they will increase or decrease investment in the next year.

Despite ongoing closures, retailers are still hopeful about the future. Thirty-four percent anticipate increasing investments in the upcoming year (compared to 27% among manufacturing, 26% among professional services, and 20% among services). With reopening economies, small businesses in the services industry are more likely this month to foresee an increase in investments in the next year (20% vs. 13% last month). Even so, they remain the least optimistic, as we saw last month, with fewer predicting increases in revenue, staffing, or investment than other sectors.

Expectations to hire also remain mostly unchanged from last month. A quarter (23%) anticipate increasing staff (24% last month), while most (60%) plan to retain the same staffing size (55% last month). Like last month, one in 10 plan to reduce staff (13% last month).

*NOTE: The latest Small Business Coronavirus Impact Poll was in the field May 21 – 27, 2020, prior to the civil unrest now gripping cities across our country.*

A-1129

**U.S. Chamber Resources for Small Businesses**
For small business resources on the coronavirus, visit uschamber.com/co.

Step-by-step guidelines on applying for a loan through the Paycheck Protection Program are available at uschamber.com/sbloans.

A guide to the Small Business Administration's expanded Economic Injury Disaster Loan Program (EIDL) program to assist small businesses is available at uschamber.com/report/guide-sbas-economic-injury-disaster-loans.

A guide to CARES Act Relief for independent contractors or those who are self-employed and don't have any employees is available at https://www.uschamber.com/report/independent-contractors-guide-cares-act-relief.

A-1130

## Methodology

*SURVEY METHODOLOGY*
These are the findings of an Ipsos poll conducted between May 21-27, 2020. For this survey, a sample of roughly 500 small business owners and operators age 18+ from the continental U.S. Alaska and Hawaii was interviewed online in English.

The sample for this study was randomly drawn from Ipsos' online panel, partner online panel sources, and "river" sampling and does not rely on a population frame in the traditional sense. Ipsos uses fixed sample targets, unique to the study, in drawing sample. Small businesses are defined in this study as companies with fewer than 500 employees that are not sole proprietorships. Ipsos used fixed sample targets, unique to this study, in drawing sample. This sample calibrates respondent characteristics to be representative of the U.S. small business population using standard procedures such as raking-ratio adjustments. The source of these population targets is U.S. Census 2016 Statistics of U.S. Businesses dataset. The sample drawn for this study reflects fixed sample targets on firmographics. Post-hoc weights were made to the population characteristics on region, industry sector and size of business.

Statistical margins of error are not applicable to online non-probability polls. All sample surveys and polls may be subject to other sources of error, including, but not limited to coverage error and measurement error. Where figures do not sum to 100, this is due to the effects of rounding. The precision of Ipsos online polls is measured using a credibility interval. In this case, the poll has a credibility interval of plus or minus 5.0 percentage points for all respondents. Ipsos calculates a design effect (DEFF) for each study based on the variation of the weights, following the formula of Kish (1965). This study had a credibility interval adjusted for design effect of the following (n=500, DEFF=1.5, adjusted Confidence Interval=+/-6.5 percentage points).

A-1131

Percentage breakdowns for region, employee size, and sector:

| | | | | | |
|---|---|---|---|---|---|
| Manufacturing and Resources | 18% | Employee Size: 1-4 | 61% | Northeast | 20% |
| Services | 25% | Employee Size: 5-19 | 27% | Midwest | 21% |
| Retail | 24% | Employee Size: 20-99 | 9% | South | 34% |
| Professional services | 28% | Employee Size: 100+ | 2% | West | 25% |
| Other | 5% | | | | |

A-1132

# Exhibit 41

A-1133

# NYC's Nightlife Economy
## Impact, Assets, and Opportunities

Commissioned by The Mayor's Office of Media and Entertainment



**About the Mayor's Office of Media and Entertainment**

The Mayor's Office of Media and Entertainment encompasses the key economic and creative sectors of film, TV, theater, music, advertising, publishing, digital content and real estate as it relates to these industries. The office promotes New York City as a thriving center of creativity, issuing permits for productions filming on public property, and facilitating production throughout the five boroughs. In June 2017, Mayor Bill de Blasio announced that the Mayor's Office of Media and Entertainment (MOME), led by Commissioner Julie Menin, would support NYC's diverse nightlife community with a department dedicated to its management. The Office of Nightlife cements New York's position as a leader in this growing global movement that recognizes nightlife's value to cities, and represents the first time a NYC agency has been tasked with promoting an economically and culturally vibrant nightlife industry.

**About the Consulting Team**

The NYC Nightlife Economy report was conducted by a three-firm consulting team: The North Highland Company, Econsult Solutions, Inc. (ESI), and Urbane Development.

**The North Highland Company**

The North Highland Company is a global consulting organization serving multiple industries and functional areas. The Firm's Consumer, Media and Entertainment, Public Sector and Strategy practices contributed to this study.

**Econsult Solutions, Inc.**

Econsult Solutions, Inc. (ESI) provides businesses and public policy makers with economic consulting services in urban economics, real estate economics, transportation, public infrastructure, development, public policy and finance, community and neighborhood development, planning, as well as litigation support.

**Urbane Development**

Urbane Development (Urbane) is a community development venture and certified M/WBE based in New York City. Founded in 2008, Urbane cultivates innovative solutions to build dynamic neighborhoods and positively impact underserved communities.

A-1135

# Executive Summary

Throughout its long history, nightlife has been central to New York City's identity. The "city that never sleeps" is a destination for dreamers and doers and an epicenter of creativity. It boasts something for everyone once the sun sets, including opportunities for dining, dancing, performing, socializing, or building a career. Over many decades, New York nightlife has launched cultural and social movements that resonated far beyond the city's shores: from the social consciousness of beat poetry, folk music, and hip-hop, to the rhythms of jazz, salsa, disco, punk rock, and many more. New York nightlife has inspired artists and entertainers to push boundaries, and provided places for people to come together to find community, all of which contributes to the city's distinctive energy.



New York City nightlife is world-renowned, and has a $35 billion economic impact.

Not surprisingly, nightlife is a major economic, as well as cultural driver for New York City, with more than 25,000 nightlife establishments citywide. In 2016 (the most recent year where standardized data sets were available), the nightlife industry supported 299,000 jobs with $13.1 billion in employee compensation and $35.1 billion in total economic output. This annual economic impact also yielded $697 million in tax revenue for New York City.

The popularity of nightlife is reflected in economic activity that has outpaced New York City's overall economy, driven by a 2 percent annual growth rate in nightlife establishments between 2011 and 2016. The five-year annualized growth rate[1] for jobs in the nightlife industry was 5 percent, compared to the city's overall job growth of 3 percent. Nightlife wages have been rising at double the annual rate for the city, at 8 percent as compared to 4 percent citywide.

## Defining the Nightlife Economy

NYC's nightlife comprises five subsectors, and the economic activity that occurs within those subsectors between the hours of 6PM and 6AM:

**Food Service:** Food Service, a subsector that encompasses full- and partial-service restaurants, cafes, and food trucks, is the backbone of NYC's nightlife industry, with 19,400 establishments across the five boroughs. The Food Service subsector supported a total of 141,000 jobs, $4.2 billion in wages, and $12 billion in direct economic output. Fine dining is a notable contributor to this subsector; NYC is home to 72 Michelin-starred restaurants, more than any other U.S. city.

**Bars:** The Bars subsector, which includes drinking establishments that primarily serve alcoholic beverages, and nightclubs, comprises 2,100 establishments, and boasts a five-year annualized growth rate that outpaced the nightlife industry as a whole. The Bars subsector generated 13,400 jobs, $492 million in wages, and $2 billion in direct economic output.

## EXECUTIVE SUMMARY

**Arts:** The Arts subsector, which includes galleries, museums, live performing arts spaces, movie theaters, and Broadway, has 1,800 establishments. Most of the subsector's jobs and wages—75 percent and 90 percent—are clustered in Manhattan. However, Brooklyn has seen robust job and wage growth in this subsector (10 and 12 percent, respectively). Nightlife in the Arts subsector supported 18,300 jobs, $804 million in wages, and $3.1 billion in direct economic output.

**Venues:** The Venues subsector includes concert and entertainment venues, independent venues, informal cultural and performance spaces—commonly referred to as "do-it-yourself," or DIY venues. As of 2016, there were 2,400 establishments in this subsector throughout NYC. Notably, Queens' venues have grown by 10 percent in the last 5 years, in comparison to citywide growth of 4 percent. Venues operating at night generated 19,900 jobs, $373 million in wages, and $1.2 billion in direct economic output.[2]

**Sports and Recreation:** New York City offers no shortage of family-friendly nightlife, including arcades, amusement venues, billiards, bowling alleys, and spectator and participatory sports. The Sports and Recreation subsector represents the smallest component of NYC's nightlife industry, with 100 total establishments as of 2016. Nightlife's total economic impact in this subsector included 3,900 jobs, $352 million in wages, and $735 million in economic output.

### Nightlife's Economic Impact

In total, the five subsectors that comprise NYC nightlife—**Food Service, Bars, Arts, Venues, and Sports and Recreation**—were responsible for a direct economic impact of 196,000 jobs, $6.2 billion in wages (or $7.4 billion in employee compensation), and $19.1 billion in economic output.

Beyond the economic impact of nightlife businesses themselves, the nightlife sector yields additional benefits for NYC's economy. The goods and services locally purchased by nightlife establishments have an indirect impact in the NYC economy of 25,000 jobs, $1.8 billion in employee compensation, and $5.1 billion in economic output. The induced economic impact of nightlife is the result of spending by those employed directly in the nightlife industry. In 2016, this amounted to more than 29,000 jobs with $1.7 billion in employee compensation and $4.9 billion in economic output.

There is also an ancillary impact on NYC's economy from additional spending on retail, transportation, lodging, and other services that happens only because of people enjoying New York City's nightlife. This ancillary spending supports 48,000 jobs, $2.3 billion in wages and $6.0 billion in economic output.

Finally, the nightlife industry generates a fiscal impact of $1.8 billion in tax revenues to New York City and New York State. This includes taxes from nightlife employees, sales, liquor and hotel taxes, totaling $697 million to the City and $1.1 billion to the State.

**Exhibit 1.1: NYC's Nightlife Economy by Subsector**

| Subsector | Establishments | Jobs | Wages | Output |
|---|---|---|---|---|
| Food Service | 19,400 | 141,000 | $4.2B | $12.0B |
| Bars | 2,100 | 13,400 | $492M | $2.0B |
| Arts | 1,800 | 18,300 | $804M | $3.1B |
| Venues | 2,400 | 19,900 | $373M | $1.2B |
| Sports & Recreation | 100 | 3,900 | $352M | $735M |
| **Total** | **25,800** | **196,000** | **$6.2B** | **$19.1B** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding.*

*Direct economic impact was modeled using direct wages from the Bureau of Labor Statistics. IMPLAN then estimates the employee compensation of these direct wages and calculates the portion of indirect and induced impacts', employee compensation and total output.*

EXECUTIVE SUMMARY

**Exhibit 1.2: Direct, Ancillary, Induced, and Indirect Impact of NYC's Nightlife Economy**



Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)
Columns may not sum due to rounding.

## Nightlife's Citywide Reach

One of New York's many strengths is that every neighborhood has something different to offer, and New Yorkers' nightlife choices reflect this. Nightlife establishments are distributed throughout the city, generating economic activity and providing local jobs in all five boroughs:

*The Bronx* experienced a steady growth in nightlife establishments until 2015, when the growth reversed. As of 2016, there were 1,700 nightlife establishments in the Bronx, and the borough matched the city's overall annual growth rate of 2 percent. There were 7,600 direct nightlife jobs supporting $129 million in wages, with annualized growth rates of 7 and 9 percent, respectively. The Bronx experienced the highest growth in the Venues subsector (3 percent), but a decline in the Bars subsector (-2 percent). This data from the New York State Liquor Authority (SLA) shows an annualized growth rate for liquor licenses of 0.2 percent since 2000.

*Brooklyn* has witnessed the highest growth in nightlife, with 5,500 total establishments as of 2016, growing at an annual rate of 5 percent. There were 31,100 direct nightlife jobs supporting $608 million in wages, with annualized growth rates of 10 and 15 percent, respectively–double the citywide rate. Total liquor licenses have grown at an annualized rate of 4 percent since 2000, with 2,586 active licenses in 2018.

*Manhattan* had 13,000 nightlife establishments as of 2016, the highest across all five boroughs. Manhattan's nightlife establishments have seen modest growth of 2 percent annually, leveling off between 2015 and 2016. Manhattan nightlife supported 128,900 direct jobs with $4.8 billion in wages, with annualized growth of 4 and 7 percent, respectively. Total liquor licenses have grown at an annualized rate of 1.6 percent since 2000, with 6,011 active licenses across the borough as of 2018.

*Queens* had 4,800 nightlife establishments in 2016, and experienced annualized growth of about 3 percent

## EXECUTIVE SUMMARY

since 2011. Queens' venues spaces have grown by 10 percent in the last five years in comparison to NYC's venue growth of 4 percent. There were 24,900 direct nightlife jobs supporting $622 million in wages. The annualized growth rate for jobs and wages were 7 and 9 percent, respectively, outpacing nightlife growth citywide. Until the mid-2000s, Queens had more nightlife establishments and liquor licenses than Brooklyn—making it second to Manhattan. According to 2018 SLA data, the borough has 2,332 active licenses, which represents 1.7 percent annualized growth since 2000.

**Staten Island** had 800 nightlife establishments, down from 815 in 2015—the fewest establishments of any borough. It has experienced a decline in nightlife establishments across all subsectors over the last 5 years. There are 3,900 direct nightlife jobs supporting $64 million in wages, with annualized growth rates of 5 and 6 percent, respectively. SLA data show 404 active liquor licenses in the borough in 2018, an annualized growth of 0.6 percent since 2000.

Two additional historical analyses were completed to contextualize nightlife's economic impact—examining the retention rate of establishments with liquor licenses and the growth of taxi and For-Hire Vehicles (FHV) across NYC.

Data provided by SLA show that NYC had 11,961 active on-premises liquor licenses in 2018, a total that has grown at an annual rate of 2 percent since 2000, despite significant turnover. Tracking liquor

license serial numbers over time demonstrated that 44 percent of licenses were still active after six years, 22 percent were still active after 12 years, and roughly 20 percent were still active after 18 years.

Data from the NYC Taxi and Limousine Commission (TLC) show that approximately 32 percent of all taxi and FHV trips are nightlife related. The rise of FHVs has contributed to increased activity across NYC, with an annualized growth rate for total taxi and FHV pick-ups during prime nightlife hours (12AM to 4AM) of 12 percent each year between 2013 and 2017. The growth of taxi and FHV trips is especially pronounced outside Manhattan:

- Brooklyn has seen an increase in the volume of taxi/FHV activity in Bushwick (92 percent annualized growth in 12AM to 4AM trips) and Williamsburg (33 percent annualized growth).

- In the Bronx, the greatest increase in taxi/FHV pick-ups were in: West Concourse (133 percent annualized growth), East Concourse (175 percent annualized growth), Co-op City (389 percent annualized growth), and Mott Haven (90 percent annualized growth).

- In Queens, neighborhoods with the greatest increase in the volume of taxi and FHV pick-ups include Jackson Heights (68 percent annualized growth in trips) and Astoria (34 percent annualized growth).

#### Exhibit 1.3: NYC's Nightlife Economy by Borough

|  | Establishment | Growth | Jobs | Growth | Wages | Growth |
|---|---|---|---|---|---|---|
| Bronx | 1,700 | 2% | 7,600 | 7% | $129M | 9% |
| Brooklyn | 5,500 | 5% | 31,100 | 10% | $608M | 15% |
| Manhattan | 13,000 | 2% | 128,900 | 4% | $4.8B | 7% |
| Queens | 4,800 | 3% | 24,900 | 7% | $622M | 9% |
| Staten Island | 800 | 1% | 3,900 | 4% | $64M | 6% |
| **Total** | **25,800** | **2%** | **196,000** | **5%** | **$6.2B** | **8%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

*Direct economic impact was modeled using direct wages from the Bureau of Labor Statistics. IMPLAN then estimates the employee compensation of these direct wages and calculates the portion of indirect and induced impacts', employee compensation and total output.*

EXECUTIVE SUMMARY

### Nightlife Stakeholder Perspectives

To complement the economic impact analysis, more than 1,300 nightlife stakeholders—consumers/residents, owners/operators, artists/entertainers, and employees—participated in a survey about their experiences.

**Owners/Operators:** Of the 83 owners and operators surveyed, respondents operated restaurants (69 percent), bars (60 percent), and dance clubs (24 percent), among other types of establishments.

- **Revenue and profits:** Over the last 3 years, respondents reported modest revenue growth, with 35 percent stating that revenues had increased, 31 percent stating that revenues had stayed flat, and 24 percent reporting declining revenues over the last 3 years (the remainder were either unsure or preferred not to answer). Furthermore, 47 percent reported a decrease in profit over the same period, with 17 percent experiencing a decrease that exceeded 10 percent.

- **Outlook:** Sixty percent of respondents believe their businesses will be open in three years. Nearly 40 percent were either unsure or indicated that their businesses would not be open in three years. Thirty-five percent of owners anticipate expanding their business within New York City, while 41 percent plan to expand into other cities.

- **Challenges:** Eighty-seven percent of respondents indicated the rise of commercial rent prices is a challenge to varying degrees. For 68 percent of owners, regulations or red tape were cited as a challenge and 67 percent reported staffing their establishments as challenging.

**Artists/Entertainers:** Among the 187 artists and entertainers surveyed, respondents had an average tenure in their role exceeding 23 years. Over half of nightlife artists and entertainers (60 percent) are employed full-time in their craft; the balance (40 percent) work part-time in other non-related industries. Of artists surveyed, 28 percent reported performing at three to five establishments at the time they took the survey. Another 23 percent were performing at six or more establishments.

**Where they work and live:** A large majority of artists (80 percent) reported that they primarily perform in Manhattan, followed by 18 percent who focus on Brooklyn for their performances. Manhattan and Brooklyn were the most popular boroughs for residence, with 39 percent and 23 percent of artists living in these boroughs, respectively. Of the 22 percent who commute from outside New York City, the overwhelming majority live in New Jersey and other parts of New York.

- **Challenges:** Eighty percent of artists and entertainers cited lack of income stability as a moderate or major challenge. The lack of benefits and low wages were also cited as challenges. Competition for gigs remains a significant hurdle for performers, with 80 percent citing it as a moderate or major challenge. Sixty-eight percent of surveyed artists pointed out that establishment closures and reduced hours adversely impacted them.

- **Outlook:** Despite challenges, over three-fourths of respondents (79 percent) indicated they will still work in the NYC nightlife industry in three years.



*Despite challenges, over three-fourths of artists and entertainers believed they will still work in the NYC nightlife industry in three years.*

## EXECUTIVE SUMMARY

**Nightlife Employees:** Nightlife is a source of employment across many roles: establishment managers, security, chefs and other food preparation roles, bartenders, hosts, service staff, and more. Among 106 survey respondents spanning these roles, the average tenure exceeded 18 years in the nightlife industry. The majority work full-time in their role (77 percent). Forty-two percent of employees surveyed indicated that they worked at one establishment, 23 percent worked in two locations and another 22 percent worked in three to five locations (the remainder indicated that they work in six or more establishments).

- **Where they work and live**: Those surveyed work predominantly in Manhattan (74 percent) and Brooklyn (21 percent). Employees reported living in Manhattan (39 percent) and Brooklyn (34 percent) most frequently. Twelve percent reported residence outside New York City.

- **Challenges:** Fifty-four percent of survey respondents cited the lack of benefits as a moderate or major obstacle of working in the nightlife industry. Close to half of employees surveyed (49 percent) indicated that income volatility is a challenge.

- **Outlook:** Despite challenges, a majority of employee respondents (65 percent) see themselves continuing to work in the nightlife industry within the next three years.

**Consumers/Residents:** Of the 864 nightlife consumers surveyed, 73 percent were NYC residents, while the balance (27 percent) were non-residents (commuters, day-trippers, tourists, business travelers). Most fell between the ages of 21-40 (66 percent), with 32 percent age 41 or older.

- **Where they go:** NYC's nightlife consumers most commonly enjoy restaurants (85 percent), bars and nightclubs (73 percent), and live music and concerts (56 percent).

- **Reasons they go out:** Consumers engage in nightlife to connect with friends/family (77 percent), to relax and unwind (69 percent) and

to experience art and culture (64 percent). Non-residents also have a higher propensity for sightseeing at night (more than 50 percent compared to 22 percent for residents).

- **Influences shaping their choices:** Besides their personal preferences and tastes, the top factors that shape consumers' nightlife decisions are the opportunity to attend a unique experience or event (93 percent), price or affordability (89 percent), minimal wait time (84 percent), and accessibility via public transportation (83 percent).

- **Challenges:** Cost was a top consumer concern, with 66 percent of respondents agreeing that affordability is a challenge to participating in nightlife. For residents living in neighborhoods dense with nightlife establishments, quality of life concerns relating to noise, sanitation, and lack of retail diversity were major challenges cited.

New York City's nightlife is thriving, outpacing growth in the citywide economy, supporting 299,000 jobs and $35 billion in economic activity, and providing spaces for New Yorkers of all stripes to gather. However, the New Yorkers who rely on nightlife for their livelihood do face challenges, as do residents living in neighborhoods dense with nightlife establishments. The City's new Office of Nightlife is uniquely positioned to help mitigate these pressures and to ensure that the City's services and support systems that are available during the day are equally coordinated at night.

As the Office of Nightlife sets its policy agenda, it can improve the nightlife ecosystem by working across City agencies to reduce red tape; increase regulatory transparency; address quality of life concerns; and identify opportunities for investment in economic development and cultural retention, through partnerships with both City and non-City entities. These efforts will help not only those who work in New York City's nightlife, but also the millions of people who venture out, from near and far, to enjoy all the city offers when the sun goes down, as well as those who prefer the comforts of staying in.

A-1141

# CONTENTS

**03** Executive Summary

**10** Introduction

**16** Economic Impact of NYC's Nightlife

**42** NYC's Nightlife Assets

**46** Nightlife Perspectives

**62** Opportunities for the Future

**66** Appendix



# Introduction

10

A-1143

# Introduction

**The City that never sleeps.** New York City's famous nickname recognizes that nightlife is part of NYC's identity and history. NYC's nightlife is known globally for its diversity and innovation, which are a function of its defining characteristics:

- Long immigrant history drawing from cultures across the world;
- Diverse population and economic base;
- Destination for commuters and tourists;
- Epicenter for artists and creatives seeking to develop their craft and be discovered; and
- Cultural appetite that values history alongside the new, innovative, and unusual.

Throughout its long history, NYC's nightlife has incubated cultural and social trends with impact well beyond its five boroughs: beat poetry, pop art, disco, hip-hop, punk rock, jazz—the list goes on. From world-famous venues and concert halls such as Harlem's Apollo Theater, Staten Island's St. George Theater, Broadway theaters and Madison Square Garden, and underground venues at the cutting edge of culture—New York City's nightlife is second to none. New York attracts, and is home to, artists across all genres, who develop their talents and draw inspiration from across NYC's nightlife venues. Experience in New York City nightlife provides musicians, entertainers, and performing artists the chance to hone their craft and build demand for their talent. Throughout its history, New York City nightlife's contributions to economic, artistic, and cultural trends have been fueled by businesses, artists, employees, and nightlife patrons.

Across the globe, many cities have planned primarily for the daytime economy, with nightlife managed in a less formal manner. In recent years, many have now started to take a proactive approach to managing nightlife, including not only its economic effects, but also its social and cultural impacts.[3] These efforts have resulted in reductions in noise complaints, improved quality of life, and stronger nighttime economies. There are many case studies and ideas for proactive management, City agency cooperation, and creative solutions that New York can benefit from.

New York has now joined more than 40 cities around the world with so-called "nightlife leaders," such as Amsterdam, Berlin, London, and Paris as well as in American cities like Orlando, Pittsburgh, and San Francisco. In June 2017, Mayor Bill de Blasio announced that the Mayor's Office of Media and Entertainment (MOME),



NYC Nightlife: Economic Indicators

5% job growth

8% wage growth

11

## INTRODUCTION

led by Commissioner Julie Menin, would support NYC's diverse nightlife community with a department dedicated to its management. In August 2017, the City Council passed Local Law 178, and in September, Mayor de Blasio signed the bill, officially creating New York City's Office of Nightlife.

The Office of Nightlife cements New York's position as a leader in this growing global movement that recognizes nightlife's value to cities, and represents the first time a City agency has been tasked with promoting an economically and culturally vibrant nightlife industry.

To inform the work of the Office of Nightlife, and following the 2017 study *Economic Impact, Trends and Opportunities: Music in New York City,* MOME commissioned this study of the current economic and cultural dynamics of the nightlife industry, to provide recommendations to support and strengthen the nightlife community. The study summarizes its findings in the following sections:

- **Methodology Overview:** The approach, tools, and techniques used to analyze multiple data sources and draw insights from nightlife's many stakeholders;

- **Economic Impact of NYC's Nightlife:** The value of NYC's nightlife to the city's economy based on five categories of impact with summary views for each borough;

- **NYC's Nightlife Assets:** An understanding of NYC's nightlife assets beyond the economic impact numbers;

- **Nightlife Perspectives:** Perspectives of nightlife stakeholders, and the challenges they face, based on more than 1,300 surveys and interviews of consumers (NYC residents and non-residents), owners or operators of nightlife establishments, artists, and employees; and

- **Opportunities for the Future:** Opportunity areas for NYC's local government to address some of the challenges facing nightlife.

### Methodology Overview[4]

This study used the following steps to assess the economic impact of NYC's nightlife:

- Reviewed nightlife trends and studies from cities across the world, as well as literature on NYC's nightlife, past and present.

- Analyzed economic indicators and metrics across relevant subsectors in NYC's five boroughs, including, but not limited to:

    ○ Employment and wages calculated by the Bureau of Labor Statistics;

    ○ Establishments data recorded by the Bureau of Labor Statistics;

    ○ The portion of economic activity attributable to nightlife, focusing on the hours between 6PM and 6AM.

- Quantified the economic impact of nightlife using IMPLAN, an industry-standard input-output economic modeling software.

- Surveyed 864 consumers who patronize NYC nightlife including NYC residents from all five boroughs, commuters, and tourists. The survey was designed to understand their nightlife preferences, economic activities, perceptions, and challenges.

- Surveyed 376 NYC nightlife professionals, including owners and operators of establishments, artists and performers, and employees of nightlife industries.

- Interviewed 65 people including including owners and operators of establishments, artists and performers, consumers (residents, tourists, commuters), public officials, policymakers, developers, activists, academics, and employees of nightlife industries.

INTRODUCTION

## The Nightlife Ecosystem

Urban nightlife ecosystems are complex—there are many moving parts and participants, including people who enjoy the night, who work at night, and who manage nighttime activities. These categories are not mutually exclusive; a student may be a frequent bar patron as well as a hospitality worker, or an emergency services worker may be a taxi passenger returning from an overnight shift managing public safety.

To specifically identify key trends and to examine the impact of the nightlife economy in New York City—defined as activity occurring between the hours of 6PM and 6AM—this study defines the nightlife ecosystem as five key subsectors with several sub-categories.[5]



 *Arts:* Galleries, museums, live performing arts spaces, and movie theaters

 *Bars:* Drinking establishments that primarily serve alcoholic beverages (and not food), as well as nightclubs

 *Food Service:* Full- and partial-service restaurants, cafes, fast food and fast casual restaurants, venue food concessions, food trucks, and other food-related establishments

 *Sports and Recreation:* Spectator sports and other recreational activities such as participatory sports, bowling, billiards, amusement arcades, other recreation

 *Venues:* Music venues as well as independent and DIY spaces

**Exhibit 2.1: Nightlife Economy Sub-Categories**

| Subsector | Industry Sub-Category |
|---|---|
| Arts | Live theatres and motion picture theatres |
| | Art galleries |
| | Other live performing arts |
| Bars | Bars |
| | Nightclubs |
| Food Service | Full-service and partial-service restaurants |
| | Fast food or fast casual restaurants |
| | Concessions and other food establishments |
| Sports & Recreation | Spectator sports |
| | Experiential activities (bowling, arcades, billiards, etc.) |
| Venues | Music venues |
| | Independent spaces |

*Source: Econsult Solutions (2018)*

INTRODUCTION

**Exhibit 2.2: The Nightlife Ecosystem – Any/All Cities (Not Exhaustive)**



*Source: North Highland Nightlife Archives, Research and Analysis*

A-1147



*"Nightlife is indistinguishable from my craft as a DJ. Nightlife is not optional to my long-term profession and not separate from the art itself. Nightlife is the medium."*
*- NYC Nightlife Performer*

A-1148



# The Economic Impact of NYC's Nightlife

# The Economic Impact of NYC's Nightlife

The overall economic impact of New York City's nightlife has five components:

- **Direct Impact:** The jobs and economic output generated by the five nightlife subsectors;
- **Indirect Impact:** The jobs and economic output generated by local businesses that supply goods and services to the five nightlife subsectors;
- **Induced Impact:** The jobs and economic output generated as a result of nightlife employees spending their wages in New York City;
- **Ancillary Impact:** The jobs and economic output generated from spillover spending related to nightlife activities. Examples include taxi and For-Hire Vehicles (FHV) taken to or from a nightlife destination and the non-nightlife spending of tourists visiting NYC specifically for nightlife purposes; and
- **Fiscal Impact**: The tax revenues generated for New York City and New York State from income, sales, and business taxes, as well as additional taxes.
    - **Note:** As a key economic metric, employee compensation is isolated and presented as its own indicator throughout this report

In addition to these types of economic impact, there is another unquantifiable category: nightlife as an economic catalyst. Major cities such as New York City compete for talent and jobs—and nightlife and cultural opportunities are two of the differentiating urban amenities that make NYC globally competitive. In a 21st century economy connected by communications and ease of travel, highly-skilled workers have many choices based on job opportunities and quality of life. The variety and depth of New York City's nightlife continues to drive interest and demand for the city as a place to live, learn, work, and socialize.



**Exhibit 3.1: Types of Economic Impact From New York City Nightlife**

Source: Econsult Solutions (2018)

17

ECONOMIC IMPACT

## Total Economic Impact

The nightlife industry makes a significant contribution to employment and economic growth in New York City. The total economic impact of this industry is the sum of its direct, indirect, and induced economic impacts, as well as the ancillary spending impacts that are adjacent to nightlife activity. In 2016 (the most recent year where standardized datasets were available), the nightlife industry supported **299,000 jobs with $13.1 billion in employee compensation and $35.1 billion in economic output.** This economic impact also yielded $697 million in tax revenue for New York City.

## Direct Economic Impact by Sector

The five subsectors that make up New York City's nightlife industry directly generate economic output through revenues from nightlife consumers, and spending by nightlife establishments on goods and services. **In 2016, the five subsectors directly supported 196,000 jobs, $6.2 billion in wages (or $7.4 billion in employee compensation), and $19.1 billion in economic output.**[6] Throughout the report, wage reported by the Bureau of Labor Statistics is

used to describe the direct impact from the nightlife industry, while employee compensation is used in describing the total economic impact of nightlife on the New York City economy.

The nightlife industry has shown significant growth in jobs and wages over the last five years, outpacing New York City's baseline economic growth. The five-year annualized growth rate (CAGR)[7] for jobs in the nightlife industry was 5 percent, compared to NYC's overall job growth rate of 3 percent. At the same time, nightlife wages rose at an annual rate of 8 percent, compared to the citywide rate of 4 percent.

The average annual wage in the nightlife industry was $32,000, with notable disparities among the five subsectors (explored in the following sections). While the industry overall has shown growth in total wages, the typical nightlife employee's salary may not grow at the same rate as the total.

New York City's nightlife establishment count exceeds 25,000 and has grown at a rate of approximately 2 percent annually between 2011 and 2016. Growth in Brooklyn and Queens over that time period has been notable, at 5 percent and 3 percent, respectively.



**Exhibit 3.2: Direct, Ancillary, Induced, Indirect Impact of NYC's Nightlife Economy**

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)
Columns may not sum due to rounding.

ECONOMIC IMPACT



**Exhibit 3.3: Total Direct Nightlife Jobs and Wage**

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)



**Exhibit 3.4: Total Nightlife Establishments**

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

## ECONOMIC IMPACT

The following subsections examine each subsector and their contributions to NYC's nightlife economy.

### Food Service

Food service—a sector that encompasses full- and partial-service restaurants, cafes, and food trucks—is the backbone of NYC's nightlife industry. Whether going out for a long meal with friends, grabbing a quick bite before a show, or stopping for pizza in the late hours, a night out is nearly guaranteed to touch Food Service in some way. NYC is home to 72 Michelin-starred restaurants (all star tiers), more than any other U.S. city.[8]

**In 2016, Food Service supported 141,000 jobs, $4.2 billion in wages, and $12 billion in direct economic output.** The largest portion of NYC's nightlife economy is captured by the Food Service sector, representing 72 percent of jobs and 67 percent of direct output. With the rising popularity of "dining as entertainment" and changes to eating habits, from fast casual to on-demand delivery service to food trucks, this industry continues to grow. The five-year annual growth rate of this subsector outpaced the nightlife industry as a whole, with 6 percent job growth and 9 percent wage growth as compared to the industry's annualized job growth of 5 percent and wage growth of 8 percent. As of 2016 there were 19,400 food service establishments across NYC.

Job and wage growth were especially significant in Brooklyn and Queens, where Food Service establishments have proliferated in recent years. Queens showed annualized job growth of 8 percent and wage growth of 11 percent between 2011 and 2016. Over the same period, Brooklyn's Food Service establishments grew at an annualized rate of 4 percent; wages grew at an annualized rate of 15 percent.

The average wage was one of the lowest within the nightlife industry at $29,700.[9] While part of that deficit can be explained by underreported wages and the part-time nature of some Food Service jobs, this low average annual salary represents a real challenge for the industry.



Direct Economic Impact of Food Service

141,000 jobs

$12B economic output



Exhibit 3.5: Direct Nightlife Jobs and Wages—Food Service

$4.2B

141,000

Jobs   Wages

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

A-1153

ECONOMIC IMPACT

### Bars

Globally, nightlife is synonymous with drinking establishments such as bars and nightclubs—and NYC is no different. In total, there were 2,100 bars and clubs in NYC in 2016. **The Bars subsector generated 13,400 jobs, $492 million in wages, and $2.0 billion in direct economic output.** The subsector's five-year annual growth rate also outpaced the nightlife industry as a whole with 7 percent growth in jobs and 9 percent growth in wages.

The growth in this subsector has been largely driven by growth in Brooklyn. Between 2011 and 2016, the annualized growth rate for the Bars subsector's jobs and wages in Brooklyn were 16 percent and 21 percent, respectively. The typical employee in the Bars subsector earns on average $36,800, a 24 percent higher wage than employees in the Food Service subsector.



Direct Economic Impact of Bars

13,400 jobs

$2B economic output



Exhibit 3.6 Direct Nightlife Jobs and Wages—Bars

13,400

$492M

Jobs — Wages

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

A-1154

## Understanding Turnover: Analysis of NYC's Liquor Licenses

To contextualize the economic analysis the volume of active on-premises (i.e. not takeout) liquor licenses in NYC was examined, tracking borough and establishment trends. Data were provided by the New York State Liquor Authority (SLA) in six year increments—2000, 2006, 2012, and 2018.[10,11] The City's total liquor license count stands at 11,961, with an annualized growth rate of 2 percent.[12] Exhibit 3.7 shows the distribution of liquor licenses by borough and the annualized rate of growth. Further analysis at a license-by-license level showed interesting trends in turnover over the last two decades. In each six-year period, roughly half of the active licenses are new. Tracking liquor license serial numbers over time revealed an average retention rate of 44 percent for licenses after six years and of 22 percent after 12 years. In 2018, the data show a retention rate of roughly 20 percent for all licenses that were active in 2000.

### Exhibit 3.7: Number of On-Premise Liquor Licenses in NYC

| Borough | 2000 | 2006 | 2012 | 2018 | Annual Growth (2000-2018) |
|---------|------|------|------|------|---------------------------|
| Bronx | 610 | 779 | 660 | 628 | 0.2% |
| Brooklyn | 1,236 | 1,780 | 2,119 | 2,586 | 4.2% |
| Manhattan | 4,498 | 5,205 | 5,621 | 6,011 | 1.6% |
| Queens | 1,707 | 2,137 | 2,150 | 2,332 | 1.8% |
| Staten Island | 361 | 392 | 406 | 404 | 0.6% |
| **Total** | **8,412** | **10,293** | **10,956** | **11,961** | **2.0%** |

*Source: New York State Liquor Authority (2018)*
*This data takes into account openings and closures over time.*



**11,961** liquor licenses in 2018

**2%** annualized growth rate

22

While the dataset does not show the age of the 8,412 active liquor licenses that were active in 2000, it is possible to trace the typical success or closure of establishments (using active liquor licenses as a proxy) for those licenses added to the dataset in 2006 and 2012. Exhibit 3.8 illustrates the turnover of liquor licenses across these time periods, with the following retention rates:

**By 2006**

• 4,341 of the licenses from the 2000 were active, a 52 percent retention rate

• 5,952 new licenses were issued, representing 58 percent of all active licenses in 2006

**By 2012**

• 2,480 of the licenses active in 2000 were active, a 29 percent retention rate

• 2,620 of the licenses new in 2006 were active, a 44 percent retention rate

• 5,856 new licenses were issued since 2006, slightly less than in the previous six year period, representing 53 percent of all new licenses in 2012

**By 2018**

• 1,575 of the licenses active in 2000 were active, a 19 percent retention rate

• 1,312 of the licenses new in 2006 were active, a 22 percent retention rate

• 2,601 of the licenses new in 2012 were still active, a 44 percent retention rate (the same retention rate for licenses in the six-year period from 2006 to 2012)

• 6,473 new licenses were issued since 2012—the most in any of the six-year periods from 2000—representing 54 percent of all licenses active in 2018

For further detail on liquor license data at a borough level, refer to the following subsection on "The Nightlife Economy across New York City."



Exhibit 3.8: NYC Active Liquor Licenses by Year

Licenses Active in 2000    Licenses Active in 2006    Licenses Active in 2012    Licenses Active in 2018

*Source: New York State Liquor Authority (2018), Econsult Solutions (2018)*

23

ECONOMIC IMPACT

### Arts

NYC is a global leader in arts and culture, with numerous art galleries, museums, Broadway theaters, performing arts spaces, and a historic role as a welcoming center for artists and entertainers. Today, many of the city's storied cultural institutions incorporate nightlife into their operations by offering evening programming, hosting live bands or DJs, or providing cocktail and bar services for guests. In total, the Arts subsector had 1,800 establishments throughout NYC in 2016. **This subsector generated 18,300 jobs, $804 million in wages, and $3.1 billion in direct economic output.**

Manhattan's arts-based nightlife activity accounts for 75 percent and 90 percent of the subsector's jobs and wages, respectively. That said, Arts establishments remain an essential component of the nightlife industry across the city, and have grown at a faster rate outside of Manhattan. In Brooklyn, jobs in the Arts account for 15 percent of NYC's total, and have seen an annualized growth rate of approximately 10 percent between 2011 and 2016. Wages in the Brooklyn Arts subsector have seen an annualized growth rate of 12 percent. Queens has also seen significant growth in this subsector with annualized growth rates of 6 percent for jobs and 7 percent for wages.



Direct Economic Impact of Arts

**18,300** jobs     **$3.1B** economic output



Exhibit 3.9: Direct Nightlife Jobs and Wages—Arts

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

### Venues[13]

The vibrancy of New York City's nightlife is fueled by concert and entertainment venues, independent venues, and DIY spaces. As of 2016, there were 2,400 establishments in this subsector throughout NYC. **Venues generated 19,900 jobs, $373 million in employee compensation, and $1.2 billion in direct economic output.[14]**

While this is one of the smallest nightlife subsectors in terms of job volume, the total number of jobs related to Venues has grown at an annualized rate of 3 percent since 2011. While reported wages have grown at a more rapid rate, 9 percent over the same time period, the average annual wage for workers in this subsector is just $18,700. As in the case of Food Service, the low salaries are due (in part) to the part-time nature of several jobs in this sector.

### Sports and Recreation

New York City offers no shortage of family-friendly nightlife, including arcades, amusement venues, billiards, bowling alleys, and spectator and participatory sports. This subsector represents the smallest component of NYC's nightlife industry, with 100 total establishments as of 2016. **Sports and Recreation generated 3,900 jobs, $352 million in wages, and $735 million in direct economic output.**

Sports and Recreation represents the highest average paying jobs within the nightlife sector, averaging $90,000 in wages in 2016.[15] While these jobs represented slightly less than 2 percent of all nightlife jobs in NYC, their wages represent nearly 6 percent of the industry's wage base. Sports and Recreation wages grew at an annual rate of 5 percent between 2011 and 2016, which is a slightly lower rate than the industry (8 percent) but still faster than the citywide average. Queens has the largest share of Sports and Recreation-related nightlife jobs (44 percent) and total wages (50 percent).

New York City is home to some of the best sports teams in the country with world-renowned franchises and stadiums. In addition to major stadiums and



Direct Economic Impact of Venues

**19,900** jobs          **$1.2B** economic output



Exhibit 3.10: Direct Nightlife Jobs and Wages–Venues

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

ECONOMIC IMPACT

arenas such as Yankee Stadium, Madison Square Garden, and Citi Field, NYC is also home to numerous secondary sports venues (e.g. Heritage Field in the Bronx, Staten Island's St. George Stadium, Coney Island's MCU Park) supporting spectator and nighttime play across all types of popular sports. In multiple cases, these sports venues anchor nightlife in the immediate vicinity, including dining, bars, amusement venues, retail, and exhibits that derive income from the crowds attending events.

In addition to traditional recreational activity, electronic sports or eSports are becoming increasingly popular. Several establishments provide playing and viewing amenities for eSports tournaments, such as Community Gaming NYC, Waypoint Café, and Alien Gang NYC. In August 2015, Madison Square Garden was sold out for two straight nights hosting the North American League of Legends Championship Series Finals, the highest level of professional eSports league play. Global demand for eSports is expected to grow in the coming years, with 2018 revenues in the subsector estimated at $345 million across North America and growing at an annual rate of 27 percent over the next 5 years.[16]



**Direct Economic Impact of Sports & Recreation**

**3,900** jobs

**$735M** economic output

### Indirect Impact

The nightlife industry has an indirect economic impact on other industries. The core nightlife subsectors engage with suppliers and contractors from other industries to procure goods and services. As a result, to the extent these transactions happen with local businesses, these transactions generate jobs, wages, and output in NYC for the industries that support nightlife activities. **The indirect impact of New York City's nightlife amounts to 25,000 jobs, $1.8 billion in employee compensation, and $5.1 billion in economic output.** The amount of indirect impact and the top jobs impacted (as shown in Exhibit 3.12) are



Exhibit 3.11: Direct Nightlife Jobs and Wages—Sports and Recreation

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

particular to NYC. The indirect impact on industries highly interconnected with hospitality that have greater leakage outside of NYC, such as wholesale trade (i.e. food distribution) and transportation and logistics, are not analyzed in this study.

### Induced Impact

Induced impact is generated when people employed directly within the five subsectors, or people in industries impacted by nightlife, spend their wages on local vendors in New York City. When direct and indirect nightlife employees spend their wages in NYC, this spending further generates jobs, wages, and output within the five boroughs. **The induced impact of New York City's nightlife amounts to more than 29,000 jobs with $1.7 billion in employee compensation, and $4.9 billion in economic output.** Similar to the indirect nightlife economics,

the calculated induced value and the distribution of jobs (Exhibit 3.13) represent the impact of the nightlife industry specifically on the NYC economy.

### Ancillary Impact

Ancillary impact is derived from additional spending on retail, transportation, lodging, and other expenditures resulting from participation in nightlife activities. This spending then translates into significant revenues for business owners in New York City. The influx of ancillary spending by nightlife consumers has a multiplier effect throughout New York City, **supporting 48,000 jobs with $2.3 billion in employee compensation and $6.0 billion in economic output.**

Exhibit 3.12: Industries Supported by Indirect Spending, by Share of Jobs

| Top Industries | Percentage |
| --- | --- |
| Arts, Entertainment, and Recreation | 27% |
| Administrative and Support Services | 11% |
| Professional, Scientific, and Technical Services | 11% |
| Real Estate and Rental and Leasing | 9% |
| Management of Companies and Enterprises | 7% |
| Other Services (except public administration) | 4% |
| Wholesale Trader | 4% |
| Accommodation and Food Service | 3% |
| Transportation and Warehousing | 3% |
| Information | 3% |
| All other Industries | 17% |

*Source: IMPLAN (2015), Econsult Solutions (2018)*

Exhibit 3.13: Industries Supported by Induced Spending, by Share of Jobs

| Top Industries | Percentage |
| --- | --- |
| Health Care and Social Assistance | 28% |
| Retail Trade | 14% |
| Other Services (Except Public Administration) | 12% |
| Accommodation and Food Service | 12% |
| Educational Services | 5% |
| Finance and Insurance | 5% |
| Administrative and Support Services | 4% |
| Professional, Scientific, and Technical Services | 4% |
| Real Estate and Rental and Leasing | 3% |
| All other Industries | 13% |

*Source: IMPLAN (2015), Econsult Solutions (2018)*

A-1160

## ECONOMIC IMPACT

### Fiscal Impact

The nightlife industry generates substantial tax revenues for New York City and New York State. Nightlife activities increase the local tax base directly by employing workers who pay taxes, and indirectly via spending by nightlife vendors and employees. In addition to these taxes, nightlife contributes a significant portion of other taxes and fees (e.g. liquor and hotel taxes), specifically related to their activities and spending patterns. **In 2016 the total annual fiscal impact of New York City's nightlife summed to nearly $1.8 billion—approximately $697 million for the City and $1.1 billion for New York State.**

**Exhibit 3.15: Fiscal Impact for New York City and New York State**

| Tax Type | New York City ($M) | New York State ($M) |
|---|---|---|
| Income Tax | $268.2 | $741.0 |
| Sales Tax | $198.6 | $232.1 |
| Business Tax | $107.9 | $105.6 |
| Alcohol Tax | $12.8 | - |
| Hotel Tax | $109.8 | - |
| **Total Tax Revenue** | **$697.3** | **$1,078.6** |

*Source: IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding.*



A-1161



"The extended hours of operation in NYC still make it one of the best places to go out."
- NYC Nightlife Consumer

A-1162

## Driving Nightlife: Calculating the Impact of Nightlife Taxi and FHV Trips

The nightlife and transportation sectors have complemented each other's development in recent years. Nightlife is instrumental to this sector's profitability and its ability to attract drivers. For-Hire Vehicles (FHVs, which include Uber, Lyft, and others) have enabled greater access to and within the five boroughs. Therefore, this report includes trips taken via taxi and FHV to travel to or from nightlife destinations as part of NYC's ancillary nightlife. The NYC Taxi and Limousine Commission (TLC) records the time and location of all pick-ups for taxis and FHVs; trips to and from nightlife destinations can be counted by aggregating all trips in a year, subtracting airport trips and evening commutes. Approximately 32 percent of all taxi and FHV trips are nightlife related. The value of those trips was included in the ancillary impact of NYC's nightlife economy.

A comparative analysis of TLC data in 2013 and 2017 shows how concentrations of taxi and FHV pick-up locations at key nightlife times has changed over time.[17] The maps in Exhibit 3.14 show concentrations of increased taxi/FHV activity in areas of Bushwick and Williamsburg in Brooklyn, and Jackson Heights and Astoria in Queens. The proliferation of FHVs has, in part, enabled the above-average nightlife growth in Brooklyn and Queens. Borough-specific trends in taxi and FHV use are discussed in greater detail in *The Nightlife Economy Across New York City* section.

Looking forward, FHV services will continue to shape where future nightlife establishments choose to locate, and consequently the opportunities for nightlife workers and consumers. On the other hand, constraints on FHV services may also limit the potential growth in some areas, particularly those neighborhoods with limited public transportation alternatives.



*Of the 317 million taxi and For-Hire Vehicle rides in New York City in 2017, an estimated 101 million (32 percent) are attributable to nightlife.*

**Exhibit 3.14: TLC Analysis - Changes in Taxi & FHV Pick-Ups  (2013 vs. 2017)**



Source: NYC Taxi and Limousine Commission (2018), Econsult Solutions (2018)

31

ECONOMIC IMPACT

## The Nightlife Economy Across New York City

### The Bronx

The Bronx experienced a steady growth in nightlife establishments until 2015, when that growth reversed. There were 1,700 nightlife establishments in the borough in 2016. The annualized growth rate between 2011 and 2016 was 2 percent, similar to the overall growth of nightlife establishments citywide. The Bronx experienced the highest growth in the Venues subsector at an annualized growth rate of 3 percent, but a decline in the Bars subsector at an annualized rate of -2 percent.

This decline in Bars establishments is reflected in a decline in liquor licenses in the Bronx over the last decade. Analysis of SLA data shows that the Bronx (currently home to 628 active liquor licenses) has an annualized growth rate of 0.2 percent since 2000.

A zip code level analysis shows that 10454 (Mott Haven, with 26 liquor licenses in 2018) and 10475 (Co-Op City, with 12 licenses) have experienced the greatest annualized growth in licenses (4 percent and 3 percent); by contrast, the zip codes 10473 (Castle Hill, with 3 licenses) and 10474 (Hunts Point, with 6 licenses) have each experienced an annualized decrease in active licenses, approximately 3 percent each.



**Exhibit 3.16: Bronx Nightlife Establishments**

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

*"There is an acceptance of unique art in NYC that doesn't exist to the same degree in other places."*
*- NYC Nightlife Entertainer*

ECONOMIC IMPACT

**As of 2016 there were 7,600 total nightlife jobs supporting $129 million in wages in the Bronx's nightlife economy. The annualized growth rate for jobs is 7 percent and the annualized wage growth rate is 9 percent.**

A heat map of the Bronx's nightlife establishments, compiled based on Yelp data, shows establishments scattered throughout the borough, with concentrations in neighborhoods like Woodlawn, Kingsbridge, and Concourse.[18]

Analysis of historic data from the NYC TLC shows that since the introduction of FHVs, the volume of nighttime trips (pick-ups between 12AM and 4AM) in the Bronx grew at an annual rate of 177 percent between 2013 and 2017. The greatest increase in taxi/FHV pick-ups has been in the following neighborhoods: West

Concourse (an increase of 60,000 trips per year, or annualized growth of 133 percent), East Concourse (61,000 more trips, annualized growth of 175 percent), Co-op City (57,000 more trips, annualized growth of 389 percent), and Mott Haven (54,000 more trips, growth of 90 percent annually).



*12% of nightlife jobs in the Bronx are in Arts and Venues*

**Exhibit 3.17: Bronx Nightlife Establishment Density Map**



*Source: Yelp (2016), Econsult Solutions (2018)*

ECONOMIC IMPACT

*Brooklyn*

Of the five boroughs, Brooklyn witnessed the greatest growth in nightlife establishments, with 5,500 total establishments as of 2016, a 5 percent annual growth rate compared to NYC's overall nightlife establishment growth rate of 2 percent.

**In 2016, there were 31,100 total nightlife jobs supporting $608 million in wages in Brooklyn's nightlife economy. The annualized growth rate for jobs is 10 percent and the annualized growth rate for wages is 15 percent.**

Brooklyn's nightlife saw an increase in active liquor licenses in the borough since 2000. SLA data show 2,586 active licenses throughout the borough in 2018,

compared to 1,236 in 2000, an annualized growth rate of 4 percent. A zip code level analysis shows substantial annualized growth in 11249 (Williamsburg along the waterfront had 64 liquor licenses in 2018 and none in 2000), 11238 (Prospect Heights with 17 liquor licenses in 2000 and 139 in 2018, an annualized growth rate of 12 percent), and 11217 (the area along Flatbush Avenue and between Park Slope, Gowanus and Boerum Hill had 28 liquor licenses in 2000 and 140 in 2018, an annualized growth of 9 percent).



**Exhibit 3.18: Brooklyn Nightlife Establishments**

See Inset

Legend: Arts — Bars — Food Service — Sports & Recreation — Venues

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

*"The combination of artistry and nightlife has created a special atmosphere in NYC."*
*- NYC Nightlife Performer*

34

ECONOMIC IMPACT

The liquor license story is not universal across Brooklyn—for example, active liquor licenses have decreased in 11236 (Canarsie, which has 8 liquor licenses and decreased at an annualized rate of 5 percent).

A heat map of Brooklyn's nightlife establishments shows the densest concentration around Williamsburg, moving into Greenpoint to the north and Bushwick to the east. DUMBO, Downtown Brooklyn, and Park Slope are other neighborhoods with significant nightlife concentration.

NYC TLC data from 2013 and 2017 demonstrate that the rise of FHVs in Brooklyn has coincided with an annualized growth rate of 46 percent in the number of taxi or FHV pick-ups between the hours of 12AM and 4AM. The neighborhoods with the greatest increase in trips originating in the borough during this time are Williamsburg (an increase of 442,000 total trips in

a year, or annualized growth of 33 percent), Crown Heights (an increase of 305,000 trips, annualized growth of 117 percent), and Bushwick South and Bushwick North (an increase of 288,000 trips and annualized growth of 28 percent and 271,000 trips and annualized growth of 92 percent, respectively).



**21% of NYC's nightlife establishments are in Brooklyn**

**Exhibit 3.19: Brooklyn Nightlife Establishment Density Map**



*Source: Yelp (2018), Econsult Solutions (2018)*

ECONOMIC IMPACT

## Manhattan

Manhattan is the epicenter of New York City's nightlife. There were 13,000 nightlife establishments in Manhattan in 2016, the highest among all five boroughs. Manhattan's nightlife establishments have seen modest growth of 2 percent from 2011 to 2016, on par with citywide growth. Establishment count, particularly in Food Service (the largest part of the nightlife economy in the largest borough), is showing signs of leveling off with the total volume of Food Service establishments dropping from 2015 to 2016 (8,683 to 8,574). Based on stakeholder interviews, these businesses face oversaturated competition and high operating expenses which could be contributing to this one year decrease.

**In 2016, there were 128,900 total nightlife jobs supporting $4.8 billion in wages in Manhattan's nightlife economy. The annualized growth rate for jobs is 4 percent and the annualized growth rate for wages is 7 percent.**

In Manhattan, total liquor licenses have grown at an annualized rate of 1.6 percent since 2000; SLA data show 6,011 active liquor licenses across the borough as of 2018. Zip codes with the greatest liquor license growth include 10065 (part of the Upper East Side with no active liquor licenses in 2000 and 69 in 2018), 10026 (part of Harlem with 5 liquor licenses in 2000 and 38 liquor licenses in 2018, an annualized growth of 12 percent), and 10002 (the Lower East Side, with 69 liquor licenses in 2000 and 287 in 2018, annualized growth of 8 percent).

A heat map of Manhattan's nightlife establishments shows that nightlife activity is significant throughout the borough. The densest concentrations of nightlife establishments are around Times Square, Chelsea, and Greenwich Village.



Exhibit 3.20: Manhattan Nightlife Establishments

See Inset

Legend: Arts — Bars — Food Service — Sports & Recreation — Venues

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)



*"New York City is the place where the world can find you."*
*- NYC Artist*

ECONOMIC IMPACT

Analysis of the changes in the volume of late-night taxi and FHV pick-ups shows a more nuanced story. While neighborhoods like the East Village and West Village continue to experience large volumes of pick-ups between 12AM and 2AM, they have not experienced the same level of growth as other parts of the borough during this timeframe. These neighborhoods saw a noticeable decrease in the volume of pick-ups between 2AM and 4AM from 2013 to 2017 (a decrease of 29,000 and 83,000 trips, or annualized declines of 1 percent and 3 percent, respectively). Among the neighborhoods in Manhattan with the greatest increase in taxi and FHV pick-ups between 12AM and 4AM were Midtown (366,000 more trips, with annualized growth of 4 percent), Central Harlem (308,000 more trips, annualized growth of 49 percent), and Washington Heights (223,000 more trips, annualized growth of 72 percent), demonstrating the increased transit accessibility that FHVs have created.



*Manhattan's nightlife jobs represent 66% of NYC's industry total*

Exhibit 3.21: Manhattan Nightlife Establishment Density Map



Manhattan Nightlife Establishment Density

35        1,045        3,620
Count Per Square Mile

*Source: Yelp (2018), Econsult Solutions(2018)*

ECONOMIC IMPACT

### Queens

As of 2016, Queens had 4,800 nightlife establishments, and experienced annualized growth of about 3 percent since 2011, slightly higher than NYC's nightlife industry growth rate of 2 percent. The subsector with the greatest rate of growth was Venues. Queens' music venues and entertainment spaces have grown by 10 percent in the last five years in comparison to NYC's Venues growth of 4 percent. Not growing as fast, but comprising a larger base of the borough's nightlife scene, are Food Service establishments (4,200 as of 2016), growing at an annual rate of 3 percent.

**In 2016, there were 24,900 total nightlife jobs supporting $622 million in wages in the Queens nightlife economy. The annualized growth rate for jobs was 7 percent and the annualized growth rate for wages was 9 percent.**

Until the mid-2000s, Queens had more nightlife establishments and liquor licenses than Brooklyn—making it second to Manhattan. According to 2018 SLA data, the borough has 2,332 active licenses, which represents 1.7 percent annualized growth since 2000.



**Exhibit 3.22: Queens Nightlife Establishments**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

*"People are choosing to go out locally in Queens. This is easier to do now, compared to 20 years ago because there are more options."*
*-NYC DJ & Entertainer*

ECONOMIC IMPACT

A zip code level analysis shows that the neighborhoods with the greatest growth in active liquor licenses include 11364 (Oakland Gardens, which had 9 liquor licenses in 2000 and 22 licenses as of 2018, an annualized growth rate of 5 percent) and 11354 (Flushing, which had 82 liquor licenses in 2000 and 176 licenses in 2018, an annualized growth rate of 4 percent).

Queens' nightlife establishments are highly concentrated in Hunter's Point and Astoria, as demonstrated in the heat map.

Based on the comparative analysis of nightlife pick-ups via taxis and FHVs in 2013 and 2017, nighttime rides have increased at an annualized rate of 50 percent between the hours of 12AM and 4AM. The neighborhoods of Astoria, Hunters Point/ Long Island City, and Jackson Heights have seen the greatest increase in annual late-night pick-ups

(219,000, 166,000, and 165,000 more trips each year, respectively in 2017 compared to 2013). The annualized growth rate of taxi and FHV pick-ups in Astoria was 34 percent; in Hunters Point/Long Island City 30 percent; and in Jackson Heights 68 percent.



*Nightlife wages in Queens have grown 9% annually*

Exhibit 3.23: Queens Nightlife Establishment Density Map



*Source: Yelp (2018), Econsult Solutions (2018)*

ECONOMIC IMPACT

### Staten Island

Staten Island has the fewest nightlife establishments of the five boroughs. There were 800 nightlife establishments in 2016 in Staten Island, down from 815 in 2015. The borough experienced a decline in nightlife establishments across all nightlife categories over the last five years.

SLA liquor license data show that there were 404 active licenses in the borough in 2018, an annualized growth of 0.6 percent since 2000. There are some neighborhoods with a greater volume of liquor license activity in Staten Island when analyzed at the zip code level. In 10307 (Tottenville) the annualized growth rate for liquor licenses was 4 percent (totaling 11 in 2000 and 21 in 2018), and in 10308 (Great Kills) the

annualized growth rate was 3 percent (totaling 18 in 2000 and 33 in 2018).

**In 2016, there were 3,900 total nightlife jobs supporting $64 million in wages in Staten Island's nightlife economy. The annualized growth rate for jobs was 4 percent and the annualized growth rate for wages was 6 percent.**

Nightlife establishments in Staten Island are scattered throughout the borough. The Yelp data show concentrations in St. George, in addition to parts of North Shore and South Shore.



Exhibit 3.24: Staten Island Nightlife Establishments

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

*"With population growth throughout the boroughs, areas where nightlife couldn't have been sustained before now can."*
*- NYC Real Estate Professional*

ECONOMIC IMPACT

The expansion of FHV rides between 2013 and 2017 resulted in increased trips throughout Staten Island during nightlife hours—with 280 percent annualized growth—signifying greater accessibility and transportation options for borough residents. Analysis of nightlife establishments and late-night taxi and FHV pick-ups show pockets of increased activity between 12AM and 4AM in the neighborhoods of New Brighton (28,000 more trips throughout the year, or annualized growth of 528 percent), Grymes Hill/Clifton (12,000 more trips, or 297 percent annualized growth) and St. George (11,000 more trips, or 260 percent growth).

With the impending opening of the Empire Outlets in the borough, and the $1.2 billion investment in the St. George Waterfront redevelopment, Staten Island anticipates attracting more of the 2 million tourists that take the Staten Island Ferry to spend additional time in in the area. Due to the new visitors and proximity to the Staten Island Ferry Terminal, there is considerable potential for increased volumes of nightlife activity in the coming years.[19]



82% of Staten Island's nightlife jobs are in Food Service

Exhibit 3.25: Staten Island Nightlife Establishment Density Map

Staten Island Nightlife
Establishment Density

6        14        68
Count Per Square Mile

*Source: Yelp (2018), Econsult Solutions (2018)*

Case 1:20-cv-05801-JGK Document 29-41 Filed 9/7/2020 Page 43 of 80

# NYC's Nightlife Assets



42

Case 20-4238, Document 38, 02/11/2021, 3035076, Page80 of 298

A-1175

# NYC's Nightlife Assets

New York City's nightlife economy benefits from multiple assets and underlying infrastructure, which can be used to understand the drivers of economic growth and advance the development of NYC's nightlife. These include, but are not limited to:

- An identity that incorporates nightlife, appealing to patrons and professionals who constitute nightlife's talent;
- A diverse population that creates demand for nightlife across the five boroughs;
- An extensive 24/7 transportation infrastructure; and
- Historically low crime rates that enable patrons and professionals to engage safely in NYC's nightlife.

## NYC's Nightlife Identity

New York City's nightlife has an identity that resonates among surveyed stakeholders and interviewees (as described in detail in the following section). The brand carries intangible value well beyond the economic impact quantified in this report.

**Consumers:** Among surveyed consumers who live outside the city, over 60 percent indicated that nightlife was a factor in their decision to visit New York City.[20]

**Hospitality Professionals and Artists/Entertainers:** Because of NYC's reputation as an epicenter of nightlife, it is a magnet and training ground for hospitality and entertainment professionals. With dozens of schools and educational programs spanning culinary skills, music, the arts, and hospitality around the tri-state area, NYC has a steady pipeline of professionals pursuing careers in hospitality and entertainment. Interviewees and surveyed professionals described how working in New York City's nightlife industry developed their artistic skills, professional networks, and personal brands, enabling them to find above-average salaries when working outside NYC. Owners and managers operating their establishments in the hyper-competitive NYC environment carry their experience into future ventures within the city and elsewhere. Interviewees across different musical and entertainment genres consistently describe the waves of innovation that New York City has incubated, catalyzed, and accelerated over the decades.



60% of non-residents surveyed noted that nightlife was a factor in their decision to visit NYC

## NIGHTLIFE ASSETS

### Diverse Population

NYC's nightlife variety reflects the diversity of its population—both residents and non-residents who visit the five boroughs.

**Immigrants:** With approximately 40 percent of NYC's population of 8.6 million being foreign-born, and a long history of immigration from across the world, New York City's ethnic diversity is reflected in food service, entertainment and other nightlife offerings.[21]

**Tourists:** As a magnet for tourism with over 62 million visitors in 2017, nightlife patrons visiting NYC create a constant demand for the city's offerings.[22]

**LGBTQ:** With an estimated LGBTQ population exceeding 750,000 (9 percent of the city's population), New York City has the largest LGBTQ population of any U.S. city.[23] Citing NYC nightlife as an industry that has historically been shaped by and welcoming of marginalized groups, interviewees for this study noted the LGBTQ community's contributions in shaping NYC nightlife over many years.

**Students:** Over 600,000 students spanning more than 100 NYC college and university campuses constitute an important sub-segment of the city's population as they provide a stable, if seasonal, population with a high demand for nightlife services.

### Transportation Infrastructure

New York City boasts a 24/7 transportation network offering several options for nightlife patrons and professionals. NYC has a well-established tradition of nighttime transport, in contrast to many other major cities that often struggle with whether and how to operate night service at all. The city's transportation network includes:

- Over 665 miles of mainline subway tracks, nearly 800 bridges and tunnels, along with 6 ferry service lines connecting the five boroughs.[24] These are complemented by the 16 major bridges and tunnels operated by the Metropolitan Transportation Authority (MTA) and Port Authority of New York and New Jersey (PANYNJ) that connect the city to the tri-state area.[25]



44

NIGHTLIFE ASSETS

- More than 3,500 yellow medallion taxis and an estimated 60,000 For-Hire Vehicles (FHV) working across the boroughs and venturing throughout the tri-state area.[26]

- Three major airports (John F. Kennedy, LaGuardia and Newark's Liberty), two of which are in Queens and the third only 30-45 minutes away from downtown Manhattan, in New Jersey. These are supported by multiple secondary airports outside the city's limits, but accessible to NYC in less than an hour. Collectively, these airports served more than 124 million passengers in 2015, and capacity is expected to grow as the airports are upgraded, enabling a growing tourism base in coming years.[27]

### Historically Low Crime Rates

New York City has enjoyed significant improvements in public safety over the last two decades, and crime rates have reached record lows with a steady drop in violent crime. Although the population has grown from 8 million in 2000 to 8.6 million in 2018, crime has declined. Fewer than 300 murders were committed in the city in 2017, the lowest since 1951, and a substantial reduction from 2,245 in 1990.[28] The 96,658 crimes that occurred in the city in 2017, across seven major felony offense categories, were the lowest since the New York Police Department (NYPD) began tracking the data.[29] NYC's nightlife thrives today, in part, because it is relatively safe for patrons and professionals to venture out at night to participate in nightlife.





# Nightlife Perspectives

46

# Nightlife Perspectives

The research conducted across NYC's nightlife stakeholders, including 1,300 sources of input, elaborates what they value in New York City's nightlife scene and their behaviors that drive nightlife economics. This report summarizes findings from stakeholders in three overarching categories:

- 864 completed surveys of NYC nightlife consumers (including members of the community and people who live outside NYC);

- 376 completed surveys of nightlife professionals (including owners or operators of establishments, artists or entertainers, and nightlife employees); and

- 65 interviews with diverse nightlife stakeholders, including owners and operators of establishments, artists and performers, consumers (residents, tourists, commuters), public officials, policymakers, developers, activists, academics, and employees of nightlife industries.



Exhibit 4.1 Frequency of Going Out to Engage in NYC's Nightlife (Days/Week)

1 - 2: 53%
3 - 4: 35%
5 - 7: 7%
Never/Almost Never: 6%

Source: Urbane Development (2018)



47

A-1180

NIGHTLIFE PERSPECTIVES

## Consumers

Of the 864 nightlife consumers asked about their participation in NYC's nightlife, 73 percent were NYC residents while the balance (27 percent) were non-residents (commuters, day-trippers, tourists, or business travelers). Sixty-six percent fell in the age range of 21-40, with 32 percent reporting to be 41 or older. The survey addressed their spending patterns, preferences, and factors that influence their nightlife decisions.

### How do they participate in NYC's nightlife?

- **Types of establishments frequented:** NYC's nightlife consumers most commonly enjoy restaurants (85 percent), bars and clubs (73 percent), and live music and concerts (56 percent). While cited with less frequency by consumers, survey respondents also reported attendance at house parties (37 percent) and underground or pop-up parties (35 percent), indicating that DIY nightlife continues to thrive in NYC.

- **Frequency of going out and typical days:** Surveyed respondents go out most frequently 1-2 times a week (53 percent), followed by 3-4 times a week). Thursday (61 percent), Friday (80 percent) and Saturday (86 percent) are the most common days to go out. Mondays are the least common day to enjoy nightlife, with only 19 percent of survey respondents selecting that day.

- **When they depart and return:** The most common time to depart for nightlife activities is between the hours of 6PM and 8PM (41 percent), with 31 percent departing between 8PM and 10PM. Thirty-two percent of respondents return home between 12AM and 2AM; 38 percent return home after 2AM.

- **Mode of transportation used:** Most nightlife consumers get to their nightlife activities by subway, bus or other public transportation (75 percent). The next most popular modes include taxis and FHV (car service, limo, or Uber/Lyft) (65 percent), and walking (34 percent).



Exhibit 4.2: Types of Establishments Frequented in a Typical Night Out in NYC

*Source: Urbane Development (2018)*

## NIGHTLIFE PERSPECTIVES

*Why do they participate in NYC nightlife?*

- **Why they typically go out:** Overall, nightlife consumers are usually engaging in nightlife to connect with friends or family (77 percent), to relax and unwind (69 percent), and to experience arts and culture (64 percent). Non-residents also have a higher propensity for sightseeing at night (over 50 percent versus 22 percent for residents).

- **Factors influencing their decisions:** Besides their personal preferences and tastes, the top factors that shape consumers' nightlife decisions are the opportunity to attend a unique experience or event (93 percent), price and affordability (89 percent), minimal wait time (84 percent), and accessibility via public transportation (83 percent).[30]





Exhibit 4.3: Reasons Consumers Typically Participate in NYC Nightlife

Connect with friends and family — NYC Residents 80%, NYC Visitors 67%
Relax and unwind — NYC Residents 72%, NYC Visitors 62%
Experience arts and culture — NYC Residents 67%, NYC Visitors 55%
Party — NYC Residents 53%, NYC Visitors 48%
Dance — NYC Residents 48%, NYC Visitors 31%
Meet someone for a date — NYC Residents 33%, NYC Visitors 23%
Connect with colleagues — NYC Residents 28%, NYC Visitors 20%
Sightseeing at night — NYC Residents 22%, NYC Visitors 52%

■ NYC Residents   ■ NYC Visitors

*Source: Urbane Development (2018)*
*Note: Residents surveyed (n=629); visitors surveyed (n=235)*

49

NIGHTLIFE PERSPECTIVES

**How do they contribute to NYC's nightlife economy?**

- **Residents:** When NYC residents go out at night, they tend to spend the most money on drinks (39 percent will spend $30+ per person); however, overall, the majority of New Yorkers spend less than $30 per person on food, drinks, cover charges or tickets, or transportation in a given night (in each category of spend). Among residents, 21 percent spend over $30 per person on cover charges or tickets;  34 percent typically spend more than $30 per person on food. Only 9 percent of residents pay more than $30 for transportation.

- **Non-residents:** In comparison, non-residents of the city generally spend more. More than half of all non-resident respondents spend more than

$30 per person on drinks when enjoying nightlife. Among non-residents, 35 percent pay over $30 per person on cover or tickets on a typical night out; 48 percent of non-residents pay more than $30 per person for food and 18 percent of non-residents pay more than $30 for transportation (twice the frequency of residents).

When asked to characterize New York City's nightlife, the most common adjectives used by consumers related to cost, variety, and enjoyment. Additionally, the most commonly cited areas to frequent included Bushwick, the Lower East Side, the East Village and the West Village.

**Exhibit 4.4: Words Commonly Used by Consumers to Describe NYC's Nightlife**



NIGHTLIFE PERSPECTIVES

**Comparative Nightlife Spending: NYC Residents vs. Non-Residents Based on Survey Responses**

   

**63%** of New Yorkers and **54%** of non-residents spend less than **$15** on transportation on a typical night out

**29%** of New Yorkers and **20%** of non-residents don't pay cover when they engage in nightlife

**40%** of New Yorkers and **51%** of non-residents spend more than **$30** on drinks during a typical night out in NYC

**34%** of New Yorkers and **48%** of non-residents spend more than **$30** on food during a typical night out in NYC

*What challenges do consumers see in NYC's nightlife?*

- **Price and affordability:** The costs of NYC's nightlife was clearly the top issue amongst surveyed consumers; 66 percent of the respondents agreed in varying degrees that affordability is a challenge.

- **Safety concerns:** When highlighting NYC nightlife challenges, 44 percent of survey respondents cited safety concerns. Of those citing safety concerns, half (22 percent) somewhat agreed that safety is a challenge, 14 percent agreed and only 8 percent strongly agreed that it is a challenge. Notably, 54 percent of female respondents agreed that safety is a concern to some degree while only 36 percent of men indicated a concern.

- **Nightlife policing:** Twenty-four percent of survey respondents agreed or strongly agreed that nightlife policing is a challenge, while 18 percent somewhat agreed (total of 42 percent). Noticeable differences existed in survey responses based on race: 34 percent of African American respondents strongly agreed or agreed

that policing is a challenge, compared to 22 percent for white respondents.

- **Transportation accessibility:** Forty-two percent of respondents perceived transportation accessibility to be a challenge.



## NIGHTLIFE PERSPECTIVES

- **Noise:** Forty-one percent indicated that noise is a challenge in NYC's nightlife (5 percent strongly agreed, 11 percent agreed, and 25 percent somewhat agreed). However, 59 percent disagreed that noise is a challenge (15 percent strongly disagreed, 26 percent disagreed, 18 percent somewhat disagreed). Given the spread in this data, as well as comments from survey respondents, this challenge is an impassioned issue for a minority of respondents.

- **Competing for consumer time:** When not going out to participate in NYC's nightlife, consumers participate in other leisure activities. Eighty-nine percent of respondents choose to watch TV/ movies/YouTube; 57 percent read or write; 53 percent cook; and 45 percent work out. Although not overtly identified by consumers as a challenge, these replacement activities represent a broader challenge to the nightlife economy: 83 percent anticipate that these alternative activities will increase (33 percent) or take up the same amount of time (50 percent) in the future.

**Exhibit 4.5: What Challenges Do Consumers See in NYC's Nightlife?**

| Challenges | Percentage |
|---|---|
| Price/Affordability | 66% |
| Safety Concerns | 44% |
| Policing | 42% |
| Accessibility via Public Transportation | 42% |
| Noise | 41% |
| Lack of Variety | 37% |
| Hours of Operation | 31% |

*Source: Urbane Development  (2016)*



*"New York nightlife is a key part of the community and the way New Yorkers and others enjoy the City's culture. We work with the police, fire department and other agencies to make sure it's safe at the same time."*
**- NYC Bar Owner**

NIGHTLIFE PERSPECTIVES

## Nightlife Professionals

NYC has a diverse community of nightlife professionals, which can be divided into 3 sub-groups: owners or operators of establishments, artists and entertainers, and employees.[31] There is notable overlap in employment across these groups as nightlife professionals may work multiple jobs across categories (e.g. entertainers who are also employees) or have transitioned in their careers (e.g. entertainers who have become establishment owners). Respondents were asked to provide their outlook based on their current professional role in NYC's nightlife industry.

## Owners/Operators

Of the 83 survey respondents, the average establishment owner had almost 20 years of experience in the industry, including roles that pre-date their careers as owners. Most operators almost exclusively own and operate establishments in NYC (as opposed to establishments outside the five boroughs).

### How do they contribute to NYC's nightlife economy?

- **Types of establishments:** The top types of establishments owned or operated by survey respondents included: restaurants (69 percent), bars (60 percent), and dance clubs (24 percent).

- **Establishment locations:** The majority of respondents owned or operated at least one establishment in Manhattan (76 percent) with the balance (24 percent) indicating that they owned establishments in the other four boroughs.[32]

- **Patrons served:** The largest portion of establishments served 300+ customers a night (36 percent). The balance was split between establishments serving fewer than 100 customers (33 percent) and 101-300 customers (31 percent).

- **Liquor and live entertainment:** The provision of alcohol is a major element of the nightlife business for surveyed operators, as more than

95 percent of the respondents offer alcoholic beverages.[33] Live entertainment is also a focal point, with 71 percent of respondents providing music and other forms of entertainment: 53 percent of venues offer DJ entertainment, and 49 percent offer live music, making these the most popular forms of entertainment.

- **Number of employees:** Slightly more than half of the businesses (55 percent) employ 50 or fewer people (19 percent indicated 1-10 employees and 36 percent indicated 11-50 employees). Forty-five percent employ more than 50 individuals.[34]

**Exhibit 4.6: What Type of Establishments Do Surveyed Owners/Operators Manage?**

| Establishment Type | Percentage[35] |
|---|---|
| Restaurant (full- and limited-service) | 69% |
| Bars | 60% |
| Dance Club or Other Club | 24% |
| Live Music/Concert Venues | 20% |
| Cabaret/Burlesque | 11% |
| Performance Venue (theater, stage performance) | 9% |
| Comedy Club | 5% |
| Art Gallery or Museum | 4% |
| Underground/Pop-up/DIY | 4% |
| Outdoor Festival | 1% |
| Strip Club | 1% |

*Source: Urbane Development (2018)*

NIGHTLIFE PERSPECTIVES

### How has business been in recent years?

- **Revenues**: Thirty-five percent of surveyed owners reported that revenues had increased over the last 3 years, with 65 percent of those seeing a revenue increase between 5 and 10 percent. Of those whose revenues decreased over the last 3 years (24 percent), 61 percent reported a decrease between 5 and 10 percent. Thirty-one percent indicated that revenues had stayed flat.

- **Profitability:** Almost 50 percent of surveyed owners (47 percent) reported a decrease in profit over the last 3 years. Of these, 36 percent experienced a decrease in profits that exceeded 10 percent and 46 percent saw a profit decrease between 5 and 10 percent. Eighteen percent indicated their profits had increased over this period while 23 percent indicated that profits had stayed flat.

- **Business confidence:** Sixty percent of respondents believe their businesses will be open in 3 years. Over 38 percent were either unsure or indicated that they would not be open in 3 years.

- **Plans to expand:** Thirty-five percent of owners anticipate expanding their business in New York City and 41 percent of operators plan to expand into other cities. Twenty-nine percent are unsure about future expansions and 30 percent reported they will not expand elsewhere.

- **Ideal customer attraction strategies:** Social media and other press publicity is the strategy that most owners and operators (57 percent) would like to use more to promote their establishment. Forty-six percent aim to increase advertising or marketing expenditures, and 42 percent of operators would like to use entertainment such as DJs, live music sets, or shows to attract customers.

- **Organizations/groups important for success:** Regarding organizations or entities helpful to ensure ongoing success, 77 percent of owners/ operators cited an industry association, 64 percent pointed to the NYPD, and 61 percent highlighted their neighbors.

### What is their employment outlook?

- **Employment trends:** Aside from addressing normal employee turnover, 40 percent of respondents indicate they will keep their staffs at the same level within the next 3 years—neither decreasing nor increasing staff count. Thirty-nine percent of surveyed owners intend to decrease their staffing number within the same timeframe.

- **Difficulty staffing and hiring:** Two-thirds (67 percent) of nightlife operators struggle to staff their establishments. The challenges that operators face in finding the right talent vary, but the majority feel that high wages (52 percent), including a high minimum wage (53 percent), are the biggest difficulties. Over half of the respondents (51 percent) feel that finding qualified candidates is also challenging. Close to half of owners/operators (48 percent) reported that competition from other establishments is a major barrier to hiring.

**Exhibit 4.7: What Are Owner/Operators' Major Hiring Challenges in Staffing Their Establishments?**

| Hiring Challenge | Percentage |
|---|---|
| High minimum wage | 53% |
| High wages (overall) | 52% |
| Lack of qualified candidates | 51% |
| Competition for employees with other establishments | 48% |
| High turnover | 36% |
| Healthcare costs | 33% |
| Lack of proper documentation | 17% |
| Other costs of benefits (non-healthcare) | 13% |
| Hours of operation | 10% |
| Physical demands of the job | 7% |
| Language barrier | 6% |
| Other | 5% |
| Location not easily accessible to public transportation | 5% |
| Safety concern of employees | 4% |
| Lack of parking | 4% |

*Source: Urbane Development (2018)*

NIGHTLIFE PERSPECTIVES

*What operating challenges do they face?*

- **Costs of running businesses:** Eighty-seven percent of respondents indicated that the rise of commercial rent prices is a challenge or major challenge.

- **Regulatory red tape:** Sixty-eight percent of owners reported regulations or red tape as a challenge while operating their business in NYC. When asked the degree to which they found red tape challenging (e.g. licensing, inspections, fines, and process uncertainties when opening or modifying an establishment), 50-74 percent of respondents rated them as moderate or major challenges.

- **Consumer challenges:** Beyond the operating difficulties, they also face consumer-related challenges. Sixty-three percent of owners cited fewer people going out to be a challenge, while 61 percent recognized that nightlife's pricing and affordability for consumers are challenges as well.

**Exhibit 4.8: What Operating Challenges Do Owner/Operators Face?**

| Operating Challenge[37] | Percentage |
|---|---|
| Rising commercial rents | 87% |
| Regulatory red tape | 68% |
| Fewer people going out | 63% |
| Price/affordability for customers | 61% |
| Community board processes | 49% |

*Source: Urbane Development (2018)*

**87% of respondents indicated rise of commercial rent is a challenge**

**Exhibit 4.9: Words Commonly Used by Owners/Operators to Describe NYC's Nightlife[36]**



NIGHTLIFE PERSPECTIVES

### Artists/Entertainers[38]

Amongst the 187 surveyed artists and entertainers, their average tenure exceeds 23 years in their role.

*How do they make a living?*

- **Full-time vs. part-time employment:** Over half of nightlife artists and performers (60 percent) are employed full-time in their craft; the balance (40 percent) works part-time in other non-related industries. Artists working full-time in their craft indicated that they perform during the day and night, teach, and assume other roles that use their talent. Part-time artists and entertainers work a wide range of other jobs that do not necessarily take advantage of their skills.[39]

- **Number of performance venues:** Thirty-eight percent of surveyed artists reported working at 3 to 5 establishments at the time they took the survey. Thirty-nine percent performed at 6 or more establishments.

- **Where they work:** A large majority of artists (80 percent) primarily perform in Manhattan, followed by 18 percent who focus on Brooklyn for their performances.

- **Types of establishments:** Sixty-three percent of artists reported performing at live music or concert venues, followed by 55 percent who work

at bars. Over half (52 percent) reported working in performance venues, including theaters, dance halls, or other stage performance centers.

- **Residence:** Manhattan and Brooklyn are the most common boroughs in which artists reside, with 39 percent and 23 percent of artists living in each, respectively. Of the 22 percent who commute from outside New York City, the overwhelming majority live in New Jersey and other parts of New York State.[40] Manhattan remains a large base for residence, but notable shifts have occurred from Manhattan to the outer boroughs, consistent with nightlife's expanding footprint.[41]



**Exhibit 4.10: Number of Venues Surveyed Artists Perform in**

12% — 1
11% — 2
38% — 3 to 5
11% — 6 to 10
28% — 10+

*Source: Urbane Development (2018)*

*"The art and music scene in New York City is more accessible than in other places because of the range of shows."*
*-NYC Performing Artist*

A-1189

## NIGHTLIFE PERSPECTIVES

### *What is their outlook on the future?*

- **Future in nightlife:** Over three-fourths of respondents (79 percent) indicated they will still be working in NYC's nightlife industry in three years, while 16 percent are not sure of their future in the industry.

- **Factors influencing professional decisions:** Over 79 percent of artists choose to work in NYC's nightlife industry because it allows them to develop their talent or craft. Ninety-six percent indicated that they like the type of work they are doing, and that this was a factor in their decision to work in NYC nightlife. Seventy-two percent of surveyed artists reported they enjoy the opportunity to meet and work with different kinds of people. Nearly 70 percent of respondents cite an interest in this industry to make connections to pursue other professional opportunities. This was followed closely by 67 percent of respondents who cited the energy of the nightlife industry as a reason they like working in NYC nightlife.

- **Attracting customers:** Close to half of the surveyed artists (49 percent) indicated that entertainment, such as DJ performances, live music, and stage performances is a major attraction for customers. Forty-seven percent of performers cited that customers seek opportunities to attend unique experiences or events, followed by an interest in going dancing (36 percent).

- **Income instability:** Eighty percent of artists and entertainers cited lack of income stability as a moderate or major challenge of working in NYC's nightlife industry.

- **Competition:** Competition for gigs remains a significant hurdle for performers, with 79 percent of respondents citing competition as a moderate or major challenge.

- **Lack of benefits:** Seventy-three percent of respondents indicated the lack of benefits is an issue for them.

- **Low wages:** Seventy percent of respondents cited low wages as a challenge in their field. Moreover, 60 percent agreed that wage theft or withholding of wages was a moderate or major issue for them in their work.

- **Establishment closures:** Sixty-eight percent of surveyed artists pointed out that establishment closures and reduced hours adversely impacted them in a moderate or major way.

When describing nightlife, artists and entertainers use adjectives and descriptors that underscore their job satisfaction, sense of cultural diversity, and artistic freedom. They did not frequently cite economic motives and compensation in their responses (Exhibit 4.12).

**Exhibit 4.11: What Challenges Do Artists/Entertainers Working in NYC's Nightlife?**

| Artists Challenges | Percentage |
|---|---|
| Lack of stable income | 80% |
| Competition for gigs | 79% |
| Lack of benefits | 73% |
| Low wages | 70% |
| Establishments shutting down | 68% |
| Inequitable payment practices (theft, withholding, pay to play, etc.) | 60% |
| Negotiating contracts with employers | 57% |
| Finding time to practice or develop my craft while working another job | 44% |
| Access to affordable rehearsal space | 43% |
| Access to workplace via public transportation | 35% |

*Source: Urbane Development (2018)*

NIGHTLIFE PERSPECTIVES

Exhibit 4.12: Words Commonly Used by Artists and Entertainers to Describe NYC's Nightlife[42]



## Nightlife Employees

Nightlife is a source of employment across many roles: establishment managers, security, chefs and other food preparation roles, bartenders, hosts, service staff, and more. The 106 survey respondents spanning these roles had an average tenure exceeding 18 years in the nightlife industry, with work experience ranging between 2 and 40 years (average tenure was 23 years).

### How do they make a living?

- **Full-time vs. part-time employment:** Of employee survey respondents, the majority work full-time in their role (77 percent), although their hours may span daytime and nighttime hours.

- **Number of employment establishments:** Forty-two percent of surveyed employees work at one establishment. In cases where respondents work in multiple establishments, 23 percent of them work in 2, and another 22 percent work in 3 to 5 locations.

- **Boroughs in which they work:** When asked about their primary employment locations, employees in the nightlife industry work predominantly in Manhattan (74 percent) and Brooklyn (21 percent).

- **Establishment types:** The highest numbers of respondents reported working in bars (48 percent), full-service restaurants (34 percent), and live music or concert venues (33 percent).

### What is their outlook for the future?

- **Future in nightlife:** A majority of employee respondents (65 percent) see themselves continuing to work in the nightlife industry within the next 3 years.

- **Factors influencing professional decisions:** Most employees report that they enjoy working in the nightlife industry because of the opportunity to meet and work with different kinds of people (71 percent). They also enjoy the NYC nightlife industry's energy (69 percent) and the social aspects of their employment (64 percent).

- **Attracting customers:** Respondents indicated that customers are typically attracted to the establishment in which they work because it provides the opportunity to attend a unique experience/event (54 percent), the entertainment it offers (50 percent), and the variety of its food and beverage options (39 percent).

NIGHTLIFE PERSPECTIVES

### *What challenges do they face as employees in the nightlife industry?*

- **Lack of benefits:** Fifty-four percent of survey respondents cited lack of benefits as a moderate or major obstacle of working in the nightlife industry.

- **Lack of stable income:** Close to half of employees surveyed (49 percent) indicated that income volatility remains a challenge for them in the nightlife sector.

- **Low wages:** Thirty-nine percent of surveyed employees considered low wages to be a moderate or major challenge. While only 12 percent of nightlife workers surveyed found wage theft to be issue, interviews with stakeholders suggested that the population most vulnerable to this type of employer abuse were less represented in the survey.[43] According to the NYC Department of Consumer Affairs, low-wage immigrant workers in NYC are more than twice as likely as other low-wage workers to experience minimum wage violations, are more likely to suffer poor treatment by their employers, and are less willing to confront their employer in abusive situations or reach out to government or legal support services.[44]

When describing nightlife, employees use adjectives and descriptors that fall into two categories. First, they underscore the fun, exciting culture and music that characterize nightlife. Their economic motives tied to work and wage earnings are also evident in the way they describe NYC's nightlife.

**Exhibit 4.13: What Challenges Do Employees Face in the Nightlife Industry?**

| Employee Challenges | Percentage |
|---|---|
| Lack of benefits | 54% |
| Lack of stable income | 49% |
| Low wages | 39% |
| Establishments shutting down | 34% |
| Competition with others for jobs | 18% |
| Safety concern | 14% |
| Wage theft or withholding of wages | 12% |
| Access workplace via public transportation | 10% |

*Source: Urbane Development (2018)*



*"There is more opportunity in NYC because of the diversity—whether that is ethnic, cultural, or socioeconomic."*
*-NYC Nightlife Professional*

**Exhibit 4.14: Different Reasons Employees and Artists Enjoy Nightlife Work**

| Reason They Like Nightlife Work | % Employees (n=106) | % Artists (n=195) | Percentage Difference (Employees-Artists) |
|---|---|---|---|
| Ability to make connections to pursue other professional opportunities | 55% | 70% | -15% |
| Nature/Character of the Employer | 46% | 25% | +21% |
| Opportunity to develop my talent/craft | 46% | 79% | -33% |
| Opportunity to meet/work with people similar to me | 56% | 68% | -12% |

*Source: Urbane Development (2018)*

A-1192

NIGHTLIFE PERSPECTIVES

**Exhibit 4.15: Common Words Used by Employees to Describe NYC's Nightlife**



### Interviewee Themes Across Stakeholders

The survey results summarized above were reinforced by qualitative comments and interviews across stakeholders. Within the diversity of outlooks and opinions, there were common themes that consistently arose. Stakeholders agree that NYC's nightlife community can sustain and grow its economy by addressing the following areas:

- **Affordability:** Mitigating the pressures posed by the operating and personal expenses borne by all nightlife stakeholder groups.

- **Competition:** Enhancing opportunities for nightlife professionals to grow demand for their businesses and services in order to mitigate competitive pressures.

- **Regulations:** Enhancing regulatory transparency and consistency to mitigate the time and cost of compliance.

- **Transportation:** Supporting ongoing efforts for more user-friendly transportation so that nightlife professionals can manage the costs and demands of commuting for their work.

- **Collaboration:** Approaching nightlife collaboratively so that issues of enforcement and quality of life can be managed proactively.



61

# Opportunities For The Future



# Opportunities For The Future

While the nightlife sector is a driver of New York City's economy, it is impacted by broad social trends, norms, and challenges beyond the scope of what local government can address. That being said, New York City government can help to mitigate many challenges facing the small business owners, workers, artists, patrons, and residents who comprise New York's distinctive nightlife ecosystem.

The Office of Nightlife was established in 2017 within the Mayor's Office of Media and Entertainment (MOME) to coordinate existing services and develop new programs to promote safe and vibrant nightlife across New York City. Its toolkit of initiatives may include the following:

- Working across City agencies to improve the operating environment for nightlife establishments;
- Developing workshops and forums for industry professionals, advocates, and workers;
- Compiling new and existing educational resources for use by various stakeholders;
- Coordinating programs and services of other City agencies; and
- Developing economic development tools to support a diverse mix of nightlife offerings.

Based on the surveys and stakeholder interviews conducted for this report, there are three major strategic areas of opportunity for New York City's nightlife management:

## Improve and Streamline the Regulatory Environment

Many nightlife operators have cited difficulty navigating the regulatory processes necessary to open and operate nightlife establishments. By coordinating the efforts of multiple City agencies involved in managing, regulating, and promoting nightlife, and by acting as a clearinghouse for regulatory information, the Office of Nightlife is well-positioned to improve the business environment for existing and prospective operators. These efforts could support a range of nightlife businesses, from food service establishments that comprise most of the nightlife sector, to informal venues and cultural spaces, which often lack resources to achieve full regulatory compliance.

## Address Quality of Life and Public Safety Issues

Neighbors of nightlife establishments cited quality of life concerns related to noise, waste management, and public health and safety, especially in areas with a high concentration of nightlife activity. Other interviewees also raised concerns regarding common issues that affect patron safety and workplace safety. The City should ensure that continuing growth in the nightlife sector is met with corresponding policies and services to mitigate health and safety risks and potential adverse impacts to its workforce, its consumers, and its neighbors.

## Promote Economic Development and Cultural Retention

Interviewees across all stakeholder groups expressed concerns related to costs of living and costs of doing business, which can result in disruptive effects such as establishment closures and out-migration of artists and creative professionals. Policies and services that reduce barriers to entry and operating costs for small and culturally significant nightlife businesses could help to limit displacement and sustain a diverse mix of businesses across all neighborhoods. The City should develop initiatives that promote economic development and support the retention of valued nightlife spaces as well as the people who work and perform in them.

A-1196



## OPPORTUNITIES FOR THE FUTURE

New York City's nightlife continues to evolve, fueling the city's economy and pushing culture forward locally and globally. The establishment of the Office of Nightlife presents an opportunity for the City of New York to manage that growth in a way that supports jobs and social cohesion while also mitigating nightlife's challenges. The nightlife stakeholders surveyed and interviewed for this report have surfaced trends and issues common across this sector that can help inform the Office of Nightlife's initiatives and policy recommendations going forward, toward a safe and vibrant nightlife economy that works for all New Yorkers.



A-1198



# Appendix

# Appendix

## Appendix I: Methodology Details

This report is the result of both primary and secondary data collection and analyses. This engagement was divided into two primary research phases: a literature review of industry reports, white papers, and case studies to identify best practices in the nightlife industries; and an analysis of the size, dynamics, and impacts of the nightlife industry through qualitative and quantitative research methods, including stakeholder interviews and surveys of customer and industry contributors.

### Literature Review

The consulting team conducted a literature review of relevant industry reports, academic papers, newspaper and journal articles, and white papers that seek to situate the nightlife industry within the context of the New York City's social, economic, and political landscape. More than 25 resources were reviewed, which pay special attention to best practices employed by comparable cities locally and nationally; challenges facing the nightlife industry; trends in nightlife vis-à-vis technology, policies, and demographics; public measures to increase access to nightlife venues and experiences, including safety and transportation; and the ways in which minority groups experience nightlife. Special attention was paid to Amsterdam, Austin, London, San Francisco, Seattle, and Sydney to provide a snapshot of initiatives that have successfully impacted the nightlife scene.

### Economic Impact Projections

Economic impact estimates were generated by estimating the initial amount of direct activity occurring within each geographic area of interest and then using input-output models to translate this direct economic activity into the total amount of economic activity that it supports. Expenditures within a given geography give rise to "spillover" impacts when those dollars are recirculated to suppliers and to employees within the local and state economy. In so doing, they also support additional employment and earnings, and generate tax revenue for local and state governments. Econsult Solutions, Inc. (ESI) has constructed an input-output model of the city and state economy using IMPLAN software to estimate the total impact of these expenditures.

### *Defining Nightlife*

The detail that follows explains how the direct economic output was calculated, the mechanics of using input-output modeling to estimate economic and employment impacts, and the fiscal model utilized to estimate tax revenue impacts to local and state government from New York City's nightlife activity.

In order to capture the diversity of what nightlife means to New Yorkers, we began by considering the variety of social activities that occur between 6PM and 6AM. Using the North American Industry Classification System (NAICS), the standard used by the public and private sector to classify business establishments according to sector, the industries that contribute to nightlife were identified. These fall into five subsectors: Food Service, Bars, Arts, Venues, and Sports and Recreation. This method captured the breadth of nightlife and the wide range of industries that contribute to it. While this approach is similar to the 2017 Music Study commissioned by the New York City Mayor's Office of Music and Entertainment (MOME), it is important to note that it is not additive in nature with that study due to of the potential overlap in economic activity between live music and the nightlife economy.

APPENDIX: METHODOLOGY

With the breadth and variety of New York City's nightlife economy, as well as the informal nature of certain aspects of the industry, it is difficult to capture all of the industry's economic activity. However by casting a wide net of industries that are part of the New York City nightlife economy and then taking research-based proportionate cuts to the activity that would not be attributable to nightlife, this study aimed to be representative of the inclusive nature of New York City and its nightlife sector, while still applying a conservative economic modeling approach. Data on jobs, wages, and establishments by NAICS is available from a variety of federal data sources. The Quarterly Census of Employment and Wages (QCEW), published by the Bureau of Labor Statistics, compiles counts of employment and wages as reported by employers covering more than 95 percent of U.S. jobs. To capture self-employed individuals, we utilized the U.S. Census Bureau's Nonemployer Statistics (NES), which covers businesses that have no paid employees (most nonemployers are self-employed individuals operating sole proprietorships). It is important to note that federal datasets used are self-reported. Wages can go un- or under-reported for various reasons, ranging from human error to vulnerable populations working informally. Another challenge of self-reported data is incorrectly identifying the sector in which a place of employment technically falls.

It would be an overestimation to attribute all of the economic activity in each of these industries to nightlife. To varying degrees, each of these industries conducts business outside the hours of 6PM and 6AM. And while it may be the case that heightened nighttime activity brings in the majority of a company's revenue, the purpose of this calculation is to quantify the economic activity that occurs during the nightlife hours. For example, while a restaurant may make most of its revenue after 6PM, effectively subsidizing lunch service, only the nightlife revenues are included in the direct impact calculated in this study. Therefore, for each industry that contributes to nightlife, the analysis captured the portion of economic activity attributable to nightlife. To do this we relied on expert opinions, research, and analysis of available data to understand the proportion of money spent by nightlife patrons at these institutions. We identified the following NAICS categories as having some portion of its economic activity as attributable to nightlife:

- **Food service:** full- and partial-service restaurants, cafes, and food trucks (NAICS codes 722310, 722320, 722330, 722511, 722513, 722514, 722515);

- **Bars:** drinking places and hotel bars (NAICS codes 721110, 722410);

- **Arts:** art dealers, galleries, museums, movie theaters, performing arts companies (NAICS codes 453920, 512131, 7111);

- **Venues:** independent artists and promoters (NAICS codes 7113 ,7115);

- **Sports and recreation:** spectator sports, bowling, arcades, and amusement parks (NAICS codes 7131, 7132, 71395, 7112).



While this methodology is similar to the MOME Music Study completed in 2017, the Venues subsector has been defined in different ways in each study. Specifically, Independent artists are included in nightlife's Venues analysis to account for their work at Venues. The music study has a separate category for the local artist community and only assigns promoters to the Venues subsector. A larger portion of these

APPENDIX: METHODOLOGY

artists' jobs was attributed to nightlife, accounting for non-music artists who participate in the nightlife economy. This definition of venues extends beyond the music industry and results in a higher overall jobs number for this subsector than the music study's methodology. Furthermore, the analysis was conservative in accounting for wages reported by independent artists so as not to overly attribute the wages of highly paid, world famous artists who live in New York but do not work full-time in the NYC nightlife industry specifically. This results in a lower annual wages impact for independent artists compared with to music study's evaluation, which was more inclusive of all music artists.

### *Types of Impact*

The money that nightlife patrons spend at nightlife establishments between the hours of 6PM and 6AM is the direct impact of nightlife in the City. That impact is broken down into two types. First, nightlife establishments procure goods and services from other businesses, and to the extent that those businesses are located in New York City, the money spent with those businesses creates further economic impact that is felt in the City (indirect impact). Additionally, the employees of nightlife establishments and the local businesses from which they procure goods and services earn wages that, when spent locally, create induced impacts.

Input-output modeling, which maps the connections between industries within an economy, is used to quantify how activity in one industry ripples through the economy, creating indirect and induced impacts. The estimates of economic impact of the nightlife industry in this report are generated using IMPLAN, an industry-standard input-output modeling software. IMPLAN translates an initial amount of direct economic activity into the total amount of economic activity that it supports, which includes multiple waves of spillover impacts generated by spending on goods and services and by spending of labor income by employees.

Another category of impact comes from spending that would not have taken place but for patrons enjoying New York City's nightlife. For the purpose of this study we look at two significant sources of ancillary spending, transportation and visitor spending, though these do not represent the only spending driven by nightlife. New York City's taxis and For-Hire Vehicle (FHV) companies are integral to nightlife activity, allowing patrons to move around the city at all hours and to access areas not reliably served by public transit. The high percentage of all rides that occur between the hours of 6PM and 6AM demonstrates the importance of nightlife in supporting the taxi and FHV industries. Millions of people visit New York City each year and enjoy the City's nightlife. Nightlife spending by visitors is captured in the direct economic impact, but in the case of trips to the city where nightlife is the main reason for the visit, the full trip spending can be attributed to nightlife. These two categories of ancillary spending were estimated using the following methodology:



- The NYC Taxi and Limousine Commission collects data on the time and fare of taxi and FHV trips in the city. Using this data, the number of trips that occurred between 6PM and 6AM were estimated. To account for non-nightlife rides that occur during this period, adjustments were made for airport trips and commuters who take taxis or FHVs from their workplace to their home. To estimate the trips that were made by commuters (rather than people going to nightlife destinations), the number of trips during the morning commute, roughly between 6AM and 10AM in the morning, was subtracted from the number of trips in the

APPENDIX: METHODOLOGY

nightlife count. The fare spent on the resulting 100 million annual trips is the direct spending on transportation that occurs as a result of New York City nightlife.

- According to tourism data from NYC + Company studies, New York City has 7.2 million international and 15.8 million domestic overnight leisure visitors each year (23 million altogether). Some of those visitors are drawn to New York specifically for its nightlife offerings. Based on survey results asking visitors their main motivation for their trip, approximately 7.7 million of these visits (2.4 million international and 5.3 million domestic) are fully or partially attributable to New York City nightlife. Therefore their non-nightlife spending can be considered part of the ancillary impact of the nightlife economy. The spending profile of domestic and overseas travelers vary considerably, both in length of trip and spending profiles. With this in mind, we calculated the annual spending of domestic and overseas nightlife travelers, yielding the ancillary spending footprint of these visitors.

Together, the spending on transportation and nightlife travelers constitute the direct ancillary spending that is attributable to New York City's nightlife. In the same manner as the direct nightlife impact, this ancillary spending creates indirect and induced impacts through the city's economy. The direct, indirect, and induced impacts of the ancillary spending are in addition to the direct, indirect, and induced impacts of the spending with nightlife establishments. Together, this total constitutes a holistic accounting of the diversity of the nightlife industry and the impacts it generates throughout the New York City economy.

*Tax Revenue Impact*

The direct, indirect, and induced economic output from nightlife and ancillary activity increases the tax base, which in turn leads to increased tax revenue collections for New York City and the State of New York. To translate these increases in economic activity to additional tax revenue, the analysis used custom fiscal models based on the relationships between various types of economic activity and tax collections. Using these effective tax rates, the analysis estimated the effect of nightlife activity on tax revenue.

In addition to income, sales, and business taxes, certain nightlife activities generate tax revenue directly, including the alcoholic beverages tax and Hotel Room Occupancy Tax. Similar to the process of attributing industry sales to nightlife activity, the impact of alcoholic beverage sales was estimated by attributing a portion of the total revenue collected to nightlife. The Hotel Room Occupancy Tax revenue generated by nightlife visitors was estimated by applying the tax rate to the estimate of nightlife visitors' spending on hotel rooms.

**Stakeholder Interviews**

The consulting team conducted 65 interviews with experts and stakeholders to contextualize quantitative insights. Stakeholders represented the range of industries, professions, and persons involved in New York City's nightlife, including owners and operators of establishments, artists and performers, consumers (residents, tourists, commuters), public officials, policymakers, developers, activists, academics, and employees of nightlife industries. The interviews, which lasted approximately 45-60 minutes each, sought to understand the spectrum of experiences within the nightlife industry, with an eye towards New York City-specific challenges and opportunities. Although interview questions were tailored to fit the individual's expertise, all questions sought to identify what, in their experience, makes New York City's nightlife unique, the challenges it faces, how they envision the sector evolving over the next several years, and their recommendations for the future. All interviews were conducted confidentially, affording interviewees the opportunity to speak freely without reservation or hesitation.

A-1203

## APPENDIX: METHODOLOGY

### Surveys

The consulting team designed, implemented, and analyzed two surveys—a consumer survey and an industry professional survey—to solicit additional insights on perceptions of New York City's nightlife. The survey ultimately reached over 1,240 people between the two survey instruments.

- Consumer Survey: The consumer survey, a combination of in-person and online data collection, collected over 864 responses that cut across the five boroughs. In this short survey, respondents were asked questions about  the kinds of venues and locales frequented; the frequency of outings; transportation preferences; spending habits; challenges they face in participating in the city's nightlife, as well as general demographic questions.

- Industry Professional Survey: The industry professional survey sought insights from 376 owners and operators, artists and performers, and employees of nightlife industries, venues, events, and locales. The respondents cut across venue typologies and occupations and reflect their professional perspectives. Depending on the occupation and industry they identified, respondents were directed to a tailored set of questions relevant to their roles and experience. Analysis of the responses were done in aggregate and the basis of professional groupings: owners/operators, artists/entertainers, and employees.

- Owners and operators were asked how many establishments they operate and where they are located; the kinds of entertainment they offer; trends in business finances; and the challenge and opportunities they face to grow their footprint in New York City.

- Artists and musicians were asked to identify the kinds of establishments at which they perform; the reasons they choose to participate in New York City's nightlife; and the challenges they face.

- Nightlife establishment employees, such as waiters, hosts, chefs, bartenders, and security guards, were asked to identify the kinds of establishments at which they work; the benefits of working in New York City's nightlife; and the challenges they face as employees.



71

APPENDIX: ENDNOTES

## Appendix II: Endnotes

1 Compound annual growth rate (CAGR) is the mean annual growth rate over a specified period of time longer than one year. CAGR is expressed in annual percentage terms. Unless noted otherwise, this study uses growth rates within a five-year period from 2011 to 2016.

2 A portion of the economic activity includes DIY nightlife. Given the diversity of DIY as a venue category, and the use of open spaces and shared economy rentals for DIY nightlife, the venue estimate herein is deemed conservative.

3 "A Guide To Managing Your Night Time Economy," Sound Diplomacy and Andreina Seijas. Panel discussion at the Mayor's Office of Media Entertainment Nightlife Conference, June 8, 2018

4 See Appendix for an in-depth discussion of the methodology of the analyses used in this report.

5 Due to the nature of nightlife, there is a natural overlap in how establishments identify. To avoid double counting, establishments were categorized based on how they are identified by the Bureau of Labor Statistics (BLS). For example, a music venue that primarily presents shows and concerts but also has a bar would likely be categorized as a venue according to BLS data; a bar that occasionally has live music would still be categorized as a bar.

6 While the BLS provides data on employee wages, IMPLAN calculates employee compensation, which includes wage and salary, all benefits (e.g. health, retirement) and payroll taxes. Based on BLS wage data, the nightlife industry supports $6.2 billion in wages, which translates to $7.3 billion of employee compensation (IMPLAN's measure of income estimates gross pay as opposed to strictly wages). Throughout this report, the total employee compensation impact of the nightlife industry is shown, which is inclusive of the direct wages described in the Direct Impact section of this report.

7 Compound annual growth rate (CAGR) is the mean annual growth rate over a specified period of time longer than one year. CAGR is expressed in annual percentage terms. Unless noted otherwise, this study uses growth rates within a five-year period from 2011 to 2016.

8 Sutter, Ryan. "New York City's Michelin Stars Announced for 2018," *Eater* by Ryan Sutton, October 30, 2017

9 Data based on BLS total jobs and total wages in a year. Therefore, average wage is based on reported income for that particular job, and does not include second or third jobs that a food service employee might work.

10 The SLA is a state-run agency responsible for issuing liquor licenses citywide. On premises liquor licenses are broken into multiple categories, including to serve specifically beer or wine and another for liquor. For full liquor license applications (beer, wine and liquor being served) there is a statewide rule that does not allow more than three establishments with full licenses to be within 500-feet of each other. According to the SLA the 500 foot law requires consultation with the community board and a hearing to determine whether the public interest would be served by issuing the license, though the final decision is in the hands of the SLA.

11 The SLA provided data for four points in time: 2000, 2006, 2012, and 2018. Data labeled 2000 has a license expiration data from 2000 to 2005; 2006 has expirations from 2006 to 2011; 2012 has license expirations from 2012 to 2015, and 2018 data has expirations from 2018 onward. Establishments that existed in 2000 and were still in operation would be in each of the four datasets, identified by its license serial number.

12 Because of the data provided, CAGR for liquor licenses was calculated between 2000 and 2018.

13 It is important to note that this subsector represents some of the same economic impact that was quantified in the 2017 Music in New York City study commissioned by the Mayor's Office of Media and Entertainment. Because the economic activity related to local artists' and live performances are a significant dynamic of the New York nightlife experience, this economic activity has been included in this report.

14 This subsector aggregates a portion of the local artist community and the mass music consumption categories calculated in that report and this analysis should be viewed as complementary, rather than additive.

15 Does not include professional athlete salaries. Athlete salaries are not attributable to nightlife and are a function of market and competitive dynamics beyond nighttime economics. However, this subsector's higher than usual average wage is representative of some portion of back of office spectator sports jobs, which pay higher salaries than a typical nightlife-related job.

16 Data provided by NewZoo, a leading e-sports market analytics firm.

## APPENDIX: ENDNOTES

17 While FHVs were first introduced to NYC in 2011, TLC data for trips starts in 2015. Comparing 2017 and 2013 (only taxi data) is purposeful in showing the change in transportation access for less centralized NYC neighborhoods.

18 Data from *Yelp* as of May 18, 2018. Establishments that identified as restaurants, performing arts spaces, music venues, bars, clubs, and sports recreational establishments were compiled to develop a geospatial snapshot of nightlife across New York City.

19 Jones-Gorman, Jessica. "St. George update: Empire Outlets set to open this fall; development of NY Wheel still being finalized." *Staten Island Business Trends*. 10 August 2018.

20 Total survey sample (N=225); In several instances, those surveyed had visited the City during the day, supporting the daytime, as well as the nighttime, economy.

21 New York City Mayor's Office of Immigrant Affairs, 2018.

22 NYC & Company, 2018

23 "New York Still Has More Gay Residents Than Anywhere Else in US," *New York Times* citing Gallup study, March 23, 2015

24 MTA website. Does not include non-revenue tracks typically used for purposes other than rider transport

25 NYC Department of Transportation (2018).

26 "Uber and Lyft cars now outnumber yellow cabs in NYC 4 to 1," *Curbed New York*, January 17, 2017

27 "NYC's Airports Had More Passengers Than Ever in 2015," *Curbed New York*, February 3, 2016. Total passengers – not only those going to NYC or participating in nightlife.

28 Katerasky, Aaron. "New York City records fewest murders, lowest crime rate in decades," *ABC News*, January 5, 2018."

29 New York City Police Department, Citywide Seven Major Felony Offenses 2000-2017.

30 Survey respondents somewhat agree, agree or strongly agree to these factors as being influential, reflecting the top 3 box responses on a 6 point scale.

31 Survey responses: Owner/Operator (n=83), Artists/Entertainers (n=187), Employees (n=106). Partial responses to selective questions may cause response rates to be lower as noted in relevant endnotes

32 Respondents could select "all that apply". Thus, percentages add up to more than 100 percent

33 This distribution reflects the overall establishment breakdown between Manhattan and. the other boroughs

34 N=74 with 9 respondents not answering the question regarding alcohol service.

35 N=69. See the discussion regarding employment for the surveyed breakdown of full-time vs. part-time employees.

36 Percentage of respondents who rated in the top two boxes as being a challenge or a major challenge.

37 Note that word size correlates to frequency of word use as a descriptor

38 N=187. Surveys administered to artists occurred in two waves. The first wave entailed an open, online distribution of the survey.  The average tenure for working in the nightlife industry was 15.6 years for this group.  The second wave was more focused on musicians who play live music, with the support of the Associated Musicians of Greater New York/American Federation of Musicians Local 802, "the largest local union of professional musicians in the world." The average tenure for working in the nightlife industry was 29 years for this group.

39 Of those surveyed, 73 were part-time artists

40 Of those surveyed, 163 were out of town commuters

41 Florida, Richard. "NYC Has More Artists Than Ever," CityLab, July 25, 2017.

42 Note that word size correlates to frequency of word use as a descriptor

43 For multiple reasons including language barriers, low inclination to respond to government-related surveys, partial access to survey tools, etc. To compensate, the study purposefully conducted interviews with people who could knowledgeably address the nightlife experiences of such employees.

44 New York City Department of Consumer Affairs.

APPENDIX: ECONOMIC IMPACT TABLES

## Appendix III: Economic Impact Tables

### Exhibit 6.1: Direct Economic Impact - Jobs

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 71,700 | 81,900 | 105,900 | 141,000 | 5% | 6% | 6% |
| Bars | 7,700 | 8,000 | 9,500 | 13,400 | 4% | 5% | 7% |
| Arts | 13,800 | 13,600 | 14,800 | 18,300 | 2% | 3% | 4% |
| Venues | 13,800 | 16,200 | 17,500 | 19,900 | 3% | 2% | 3% |
| Sports & Recreation | 3,300 | 3,000 | 3,300 | 3,900 | 1% | 3% | 3% |
| **Total** | **110,300** | **122,700** | **151,000** | **196,500** | **4%** | **5%** | **5%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

### Exhibit 6.2: Direct Economic Impact - Wages ($M)

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 1,537.5 | 2,034.2 | 2,783.6 | 4,189.0 | 7% | 7% | 9% |
| Bars | 192.3 | 229.1 | 312.9 | 492.1 | 7% | 8% | 9% |
| Arts | 523.4 | 582.7 | 683.9 | 803.9 | 3% | 3% | 3% |
| Venues | 160.5 | 261.8 | 244.7 | 372.8 | 6% | 4% | 9% |
| Sports & Recreation | 197.1 | 249.4 | 276.9 | 352.1 | 4% | 4% | 5% |
| **Total** | **2,610.8** | **3,357.1** | **4,301.1** | **6,209.9** | **6%** | **6%** | **8%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

### Exhibit 6.3: Direct Economic Impact - Output ($M)

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 4,304.6 | 5,677.4 | 7,754.1 | 11,977.1 | 8% | 8% | 9% |
| Bars | 744.0 | 883.4 | 1,357.0 | 2,019.4 | 7% | 9% | 8% |
| Arts | 2,494.9 | 2,475.2 | 2,942.8 | 3,132.6 | 2% | 2% | 1% |
| Venues | 471.6 | 760.1 | 930.1 | 1,218.9 | 7% | 5% | 6% |
| Sports & Recreation | 411.8 | 515.3 | 572.1 | 734.0 | 4% | 4% | 5% |
| **Total** | **8,426.9** | **10,311.4** | **13,556.2** | **19,082.2** | **6%** | **6%** | **7%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

A-1207

APPENDIX: ECONOMIC IMPACT TABLES

### Exhibit 6.4: Indirect Economic Impact by Direct Category - Jobs

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 6,200 | 7,200 | 8,500 | 11,900 | 5% | 5% | 7% |
| Bars | 800 | 900 | 1,200 | 1,600 | 5% | 6% | 6% |
| Arts | 8,700 | 8,300 | 9,100 | 8,900 | 0% | 1% | 0% |
| Venues | 1,500 | 2,100 | 2,400 | 2,700 | 4% | 3% | 2% |
| Sports & Recreation | 400 | 400 | 400 | 400 | 0% | 0% | 0% |
| Total | 17,600 | 18,900 | 21,600 | 25,500 | 3% | 3% | 3% |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.5: Indirect Economic Impact by Direct Category - Employee Compensation ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $421.2 | $551.2 | $709.7 | $1,072.7 | 7% | 7% | 9% |
| Bars | $57.8 | $67.9 | $101.0 | $145.3 | 7% | 8% | 8% |
| Arts | $281.2 | $292.3 | $347.1 | $371.2 | 2% | 2% | 1% |
| Venues | $75.4 | $114.6 | $141.2 | $175.8 | 6% | 4% | 4% |
| Sports & Recreation | $23.7 | $27.8 | $30.2 | $37.7 | 3% | 3% | 4% |
| Total | $859.4 | $1,053.9 | $1,329.2 | $1,802.6 | 5% | 6% | 6% |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.6: Indirect Economic Impact by Direct Category - Output ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $1,172.9 | $1,564.3 | $2,020.4 | $3,038.7 | 7% | 7% | 9% |
| Bars | $154.8 | $184.4 | $273.1 | $391.5 | 7% | 8% | 7% |
| Arts | $862.9 | $904.2 | $1,067.5 | $1,147.2 | 2% | 2% | 1% |
| Venues | $189.9 | $289.7 | $358.6 | $442.6 | 6% | 4% | 4% |
| Sports & Recreation | $55.7 | $66.4 | $73.57 | $92.1 | 4% | 3% | 5% |
| Total | $2,436.3 | $3,009.1 | $3,793.2 | $5,112.1 | 5% | 5% | 6% |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

A-1208

APPENDIX: ECONOMIC IMPACT TABLES

### Exhibit 6.7: Induced Economic Impact by Direct Category - Jobs

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 8,400 | 9,900 | 12,300 | 17,200 | 5% | 6% | 7% |
| Bars | 1,200 | 1,300 | 1,700 | 2,400 | 5% | 6% | 7% |
| Arts | 4,100 | 4,000 | 4,300 | 4,500 | 1% | 1% | 1% |
| Venues | 1,600 | 2,300 | 2,100 | 2,900 | 4% | 2% | 7% |
| Sports & Recreation | 1,000 | 1,200 | 1,200 | 1,500 | 3% | 2% | 5% |
| **Total** | **16,300** | **18,700** | **21,600** | **28,500** | **4%** | **4%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.8: Induced Economic Impact - Employee Compensation ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $382.0 | $503.9 | $677.4 | $1,029.9 | 7% | 7% | 9% |
| Bars | $56.2 | $66.5 | $92.8 | $144.8 | 7% | 8% | 9% |
| Arts | $184.7 | $201.4 | $238.1 | $268.1 | 3% | 3% | 2% |
| Venues | $70.8 | $116.7 | $117.3 | $174.2 | 7% | 4% | 8% |
| Sports & Recreation | $47.2 | $58.7 | $64.5 | $90.7 | 5% | 4% | 7% |
| **Total** | **$741.0** | **$947.1** | **$1,190.0** | **$1,707.7** | **6%** | **6%** | **7%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.9: Induced Economic Impact - Output ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $1,101.8 | $1,446.2 | $1,951.6 | $2,974.4 | 7% | 7% | 9% |
| Bars | $162.2 | $190.8 | $267.3 | $418.2 | 7% | 8% | 9% |
| Arts | $532.8 | $578.1 | $686.2 | $774.5 | 3% | 3% | 2% |
| Venues | $204.2 | $335.0 | $338.2 | $503.5 | 7% | 4% | 8% |
| Sports & Recreation | $136.1 | $168.4 | $186.0 | $261.9 | 5% | 5% | 7% |
| **Total** | **$2,137.1** | **$2,718.5** | **$3,429.3** | **$4,932.4** | **6%** | **6%** | **8%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

A-1209

APPENDIX: ECONOMIC IMPACT TABLES

### Exhibit 6.10: Indirect Economic Impact by Industry Category- Jobs

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Arts, Entertainment, and Recreation | 6,000 | 6,100 | 6,700 | 6,800 | 1% | 1% | 0% |
| Administrative and Support Services | 1,800 | 2,000 | 2,300 | 2,900 | 3% | 4% | 5% |
| Professional, Scientific, and Technical Services | 1,900 | 2,000 | 2,300 | 2,800 | 3% | 3% | 4% |
| Real Estate and Rental and Leasing | 1,500 | 1,600 | 1,900 | 2,400 | 3% | 4% | 5% |
| Management of Companies and Enterprises | 1,000 | 1,100 | 1,300 | 1,800 | 4% | 5% | 7% |
| Other | 5,400 | 6,100 | 7,100 | 8,800 | 4% | 4% | 4% |
| **Total** | **17,600** | **18,900** | **21,600** | **25,500** | **3%** | **3%** | **3%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2016)*
*Columns may not sum due to rounding*

### Exhibit 6.11: Indirect Economic Impact by Industry Category- Employee Compensation ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Arts, Entertainment, and Recreation | $99.8 | $118.4 | $137.0 | $160.3 | 3% | 3% | 3% |
| Administrative and Support Services | $82.7 | $101.5 | $127.8 | $169.4 | 5% | 5% | 6% |
| Professional, Scientific, and Technical Services | $156.7 | $191.6 | $238.0 | $316.2 | 5% | 5% | 6% |
| Real Estate and Rental and Leasing | $47.9 | $59.1 | $75.1 | $102.3 | 6% | 6% | 6% |
| Management of Companies and Enterprises | $147.5 | $190.5 | $244.1 | $360.1 | 7% | 7% | 8% |
| Other | $324.7 | $392.8 | $507.2 | $694.3 | 6% | 6% | 6% |
| **Total** | **$859.4** | **$1,053.9** | **$1,329.2** | **$1,802.6** | **5%** | **6%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2016)*
*Columns may not sum due to rounding*

A-1210

APPENDIX: ECONOMIC IMPACT TABLES

**Exhibit 6.10: Indirect Economic Impact by Industry Category- Output**

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-16) |
|---|---|---|---|---|---|---|---|
| Arts, Entertainment, and Recreation | $329.1 | $398.2 | $477.7 | $554.8 | 4% | 3% | 3% |
| Administrative and Support Services | $155.3 | $186.6 | $230.1 | $302.4 | 5% | 5% | 6% |
| Professional, Scientific, and Technical Services | $296.0 | $365.8 | $445.0 | $586.9 | 5% | 5% | 6% |
| Real Estate and Rental and Leasing | $445.4 | $551.8 | $683.2 | $947.9 | 6% | 6% | 7% |
| Management of Companies and Enterprises | $211.5 | $307.4 | $410.9 | $582.3 | 8% | 7% | 7% |
| Other | $999.0 | $1,199.3 | $1,546.3 | $2,137.8 | 6% | 6% | 7% |
| **Total** | **$2,436.3** | **$3,009.1** | **$3,793.2** | **$5,112.1** | **5%** | **5%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

## Appendix IV: Sources and Acknowledgements

The following organizations and individuals were instrumental in the completion of this report:

**New York City Mayor's Office of Media and Entertainment (MOME)**

- Julie Menin - Commissioner
- Shira Gans - Senior Executive Director of Policy and Programs

**The Consulting Team**

*The North Highland Company*

**Rob Mann, Vice President, Growth & Innovation Expert,** focuses on Growth and Innovation across consumer industries He has 26 years of consulting experience in the Americas, the Middle East, UK/Europe, the Caribbean, Greater China, and the APAC region. Rob has extensive expertise in growth and innovation, product design/development, CX design, and operating model improvements.

*Econsult Solutions*

**Daniel Miles, Vice President & Associate Principal,** leads financial and strategic analyses for public sector economic and fiscal impact studies. Project areas include commercial corridors, affordable housing, neighborhood change, real estate development, economic development, public finance, economic and fiscal impacts, and financial modeling.

**Gina Lavery, Director,** is a trained city planner with expertise in anchor institutions, spatial and statistical analysis, and commercial real estate. She leads ESI's work to provide market insights and trends for the firm's clients.

**Elizabeth Desmond** is a Senior Analyst with a focus on real estate and urban development. Ms. Desmond applies a strong background in finance, economics, and statistical analysis to a wide range of projects in housing and public policy.

**Jing Liu** is a Senior Analyst with experience with spatial and statistical analysis, city planning, transportation planning, economic analysis, data visualization, graphic design. She works on economic research and modeling, quantitative analysis, and spatial analysis.

*Urbane Development*

**James Johnson-Piett, Principal and CEO,** focuses on strengthening small businesses operating in underserved communities through market intelligence, technical assistance, and access to capital.  He has participated in several consumer-related studies within urban environments leveraging local leaders and communities to drive study results.

**Naim Brown, Director of Place-Based Investment,** provides real estate advisory and development expertise in residential and commercial real estate for a range of clients from small for-profit developers to public housing agencies.

**Sunil Narayan, Senior Consultant,** leads project teams for a diverse array of clients and engagements. His responsibilities include ensuring operational efficiency through prudent fiscal and project management, and provide strategic insights to exceed clients expectations.

**Chiara Passerini, Senior Consultant,** works closely with stakeholders and community groups to develop economic development strategies that catalyze inclusive and sustainable design.









A-1213

# Exhibit 42

A-1214

**Richard Claman**

| | |
|---|---|
| **From:** | Vellucci, Frank S. <frank.vellucci@nortonrosefulbright.com> |
| **Sent:** | Friday, June 19, 2020 2:33 PM |
| **To:** | Richard Claman; Jonathan Rich |
| **Cc:** | Jeremy Bier; Larry Swiger; Michael Eisenberg; Frank Vellucci |
| **Subject:** | RE: 100 Park Avenue - Poke |

Richard and Jonathan,

I disagree with almost every assertion in your notices.  I also note that under recent legislation enacted by the City Council, a landlord is not allowed to harass a tenant who is late on payments due to the Covid crisis (i.e., threatening to or attempting to enforce such a provision would also be considered a form of harassment).  Please note that Sweetcatch's monthly rental payments include all rent and charges, including a portion each month of the arrears of the previous tenant which became part of my monthly rent as per my agreement with SL Green.  In addition, SL Green has not negotiated in good faith to come up with a reasonable compromise and your letters are contradictory to emails and conversations I have had with SL Green on this matter.

Please rescind both letters or I will forward them both to the City Council and NY Bar Association.  Even after recession, I reserve all rights I have under new city council legislation

Best regards,
Frank

Frank S. Vellucci
Owner & CEO
(917) 721-1434
www.sweetcatchpoke.com



**From:** Jonathan Rich [mailto:JRich@sbchlaw.com]
**Sent:** Friday, June 19, 2020 2:39 PM
**To:** Vellucci, Frank S. <frank.vellucci@nortonrosefulbright.com>
**Cc:** Richard Claman <rclaman@sbchlaw.com>
**Subject:** 100 Park Avenue - Poke

Mr. Vellucci:

We are counsel to landlord in the above-referenced matter.

Please see the attached correspondence and notice to cure.

Thanks,

**A-1215**



**STEMPEL BENNETT**
**CLAMAN & HOCHBERG, P.C.**

Jonathan W. Rich, Esq.
STEMPEL BENNETT CLAMAN & HOCHBERG, P.C.
675 THIRD AVENUE
NEW YORK, NEW YORK 10017
TEL: (212) 681-6500 Ext. 244
FAX: (212) 681-4041
EMAIL: jrich@sbchlaw.com
www.sbchlaw.com

CONFIDENTIALITY NOTICE

The information contained in this e-mail message is legally privileged and confidential information intended only for the use of the addressee named above. If the reader of this message is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us at the e-mail above. Thank you.

**CONFIDENTIALITY NOTICE:** This email, including any attachments, is confidential and may be privileged. If you are not the intended recipient please notify the sender immediately, and please delete it; you should not copy it or use it for any purpose or disclose its contents to any other person. Norton Rose Fulbright entities reserve the right to monitor all email communications through their networks.

Norton Rose Fulbright Australia, Norton Rose Fulbright LLP, Norton Rose Fulbright Canada LLP, Norton Rose Fulbright South Africa Inc and Norton Rose Fulbright US LLP are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

A-1216

# Exhibit 43

ABOUT    TEAM    SUPPORT    JOBS    IN THE NEWS    CONTACT



NYU Furman Center

**Celebrating 25 Years**
advancing research and debate
on housing, neighborhoods,
and urban policy

✉ SIGN UP    f    ⟳    in

| THE LATEST | RESEARCH | DEBATES & DISCUSSIONS | SPECIAL PROJECTS | COREDATA.NYC | STATE OF NYC HOUSING & NEIGHBORHOODS |



# The Stoop

## NYU FURMAN CENTER BLOG

News & Events | Data Updates | Research & Policy

### Understanding the Potential Magnitude of Rent Shortfalls in New York Due to COVID

*June 4th 2020*

IN THIS SECTION

News & Events
Data Updates
Research & Policy

SEARCH THE FURMAN CENTER

Enter search terms    SEARCH



⏱ LATEST          📢 TRENDING

Housing Justice in the Pandemic Age:
Recommendations for Safe and Effective
Courts During COVID-19
Publications | July 6th 2020

Policy Minute: Housing Stability and
COVID-19 Recovery
The Stoop | June 24th 2020

REPORT: Eviction Filings Continued
Dramatic Decline Through 2019
The Stoop | June 16th 2020

New York City Eviction Filings Decline
Dramatically Through 2019
Press Releases | June 16th 2020

How Can Historic Preservation Be More
Inclusive?
The Stoop | June 8th 2020



*We would like to help cities or counties with populations under 500,000 replicate this analysis. If you work in or for a city or county that does not have the resources to duplicate this analysis, but are interested in seeing how your community is similarly affected, please reach out to our Executive Director* **matthew.murph@n u.edu** *to discuss how we can help.*

*All* <u>*code and data for our analysis of rental assistance need are available on GitHub.*</u>

### <u>Understanding the Potential Magnitude of Rent Shortfalls in New York State and New York Cit  Due to COVID-19</u>

Job losses from the economic fallout of the COVID-19 pandemic are unprecedented, and unemployment filings have reached historic levels. In <u>a previous analysis</u>, we showed that job losses were likely to impact Black and Hispanic* households disproportionately, noting they were over-represented among households earning income from occupations highly vulnerable to pandemic-related income loss. Policymakers, advocates, and property owners have grown increasingly concerned that mounting job losses are affecting the ability of households to pay their rent. In response, many have put forth proposals for providing short-term rental assistance during the COVID-19 crisis, but the magnitude of the rental shortfall remains unclear.

In this post we estimate the likely magnitude of need for rental assistance in New York State and New York City. First, we examine the temporary CARES Act benefits made available to New York State residents and show the variation in the degree to which they are helping different types of renter households. Next, we use New York State Unemployment Insurance Assistance (UI) claims data to learn which industries have actually suffered the most job losses. With this information, we narrow in on the magnitude of rental assistance needed after taking into account CARES Act benefits. More importantly, we project need in August, the period when the most beneficial CARES Act provision for UI claiming households wears off, assuming little or no job recovery.

Case 20-4238, Document 38, 02/11/2021, 3035076, Page125 of 298

A-1219

Consistent with the CARES Act s goal of covering lost income for workers affected by COVID-19, we find that rent burdens will remain manageable for renters who experienced job loss through the end of July and who are eligible for benefits. These benefits are vital for this period of time, and may explain, in part, why rent collection has not <u>dropped as dramatically</u> as <u>many expected</u> when the pandemic started. That said, the CARES Act assistance is not reaching all workers that experience job loss. A portion of households are not eligible for UI, and other workers are seeing hours cut without necessarily losing their jobs. Further, assuming unemployment continues at its current high rate going into August, renter households will face significant shortfalls without further government support.

**Unemplo ment Insurance:**
**Background and Examples of Renter Households that Use the Program**

In response to the COVID-19 pandemic and the unprecedented job losses it has created, the federal CARES Act dramatically expanded the UI system. First, the CARES Act expanded eligibility for UI. Households that ordinarily would not have been eligible, such as gig workers and freelancers, or those unable to travel to their workplaces for public health reasons, were granted access to UI benefits. The CARES Act also extended the length of time that base UI benefits are available by an additional 13 weeks (in New York, from 26 to 39 weeks). At the same time, the CARES Act temporarily made UI benefits substantially more generous by adding a flat weekly supplement of $600 (Enhanced Benefits) to base UI benefits. Enhanced Benefits are set to expire on July 31, 2020.

However, there are gaps in the UI system. Some households are <u>not receiving UI</u> because they are ineligible, while others are not receiving it (or face lengthy delays in accessing their benefits) due to administrative hurdles. Still others continue to face economic hardship even after receiving UI benefits. There is also <u>variation across states</u> in the generosity of overall weekly benefits (the maximum weekly benefit ranges from a low of $235 in Mississippi to $1,192 in Massachusetts), the length of time a person can receive benefits, and the ease of accessing benefits. As a result, many households continue to face significant financial challenges, and in particular, difficulty paying their rents.

To illustrate the importance of UI benefits towards mitigating rent burden, as well as the range of ways UI benefits assist different types of households, this section estimates the post-COVID rent burdens of six prototypical New York households who were paying 35 percent of their (pre-COVID) income in rent, and were therefore moderately rent-burdened.  In general, we find that rent burden would jump for a number of households that do not recover their wages by the time Enhanced Benefits wear off.

In calculating weekly UI benefit rates, we assume that each household s gross income is earned evenly across quarters. Each household in the first four scenarios has a total income of $40,000; the last two scenarios depict households earning $60,000. In each case, we assume that the UI claimants will remain unemployed into August. In this section,  we do not account for one-time stimulus assistance the CARES Act provided income eligible households in April/May.

**Household One: Single Earner, Formerl  Earning $40K, Full UI Benefits**

**Rent Burden (percentage of income towards rent) through Jul :** 28%
**Rent Burden from August onward:** 71%

To simply illustrate a household receiving full unemployment benefits, we consider a household earning $40,000 a year, with a single earner who was laid off due to COVID-19. That household was previously moderately rent burdened, paying a monthly rent of 35 percent of its income, or $1,167 per month.

If the recent earner in that household is eligible for unemployment benefits, she is receiving a weekly benefit of $984 through July 31: $384 in base UI benefits, plus the $600

supplemental payment. Thereafter, she will receive the weekly $384 benefit, for a total of 39 weeks.

Because of the CARES Act s supplemental UI payment, this household will not be rent burdened through July. Assuming 4.3 weekly payments per month, the single earner will have a monthly income of $4,231 through July, making the household s rent 27.5 percent of their income.

After July, however, this household will lose the supplemental UI payment and revert to the base UI rate. The household s monthly income will drop to $1,651, and they will become severely rent burdened, paying 71 percent of their income towards rent.

**Household Two: Single Earner, Formerl  Earning $40K, Lost 60% of Hours, Receiving Partial Unemplo  ment**

**Rent burden through Jul  :** 25%
**Rent burden from August onward:** 54%

In New York, unemployment insurance is also available to some workers who have lost hours but remain employed part-time. In this scenario, we look at a household identical to that in Scenario One (a single-earner household, earning $40,000, and paying 35 percent of its income toward rent). Here, however, we assume that the working member s employment was cut from five days a week to two, while earning the same hourly wage. In other words, the household s weekly income was cut from $769 to $308.

Based on New York State s formula for partial unemployment benefits, this worker will receive $192 each week in UI (half as much as the worker in scenario #1). She will also receive the $600 supplement through July, for a total weekly household income of $1,100.

Through July, this household will not be rent burdened. The household will have a monthly income of $4,730, meaning that they will pay 25 percent of their monthly income towards rent. After July, however, this household s income will drop to $2,150. The household will be paying 54 percent of its monthly income to rent, making the household severely rent burdened.

**Household Three: Single Earner, Formerl  Earning $40K, Lost 20% of Hours, Receiving No Benefits**

**Rent burden through Jul  :** 44%
**Rent burden from August onward:** 44%

Not all workers who lose their jobs will be able to access UI benefits. Some will be deterred by any number of administrative obstacles. Others, including immigrants working without legal authorization, will not be eligible. Some job losses, including those where "essential workers" fear returning to their workplace, may not trigger UI eligibility.

Even a relatively small reduction in income can greatly exacerbate a household s rent burden. Consider if the same household supported by a single worker earning $40,000 saw the worker s hours cut by 20 percent, from five days to four days per week. This is not an amount sufficient to trigger any partial UI payment in New York. That earner s wages would fall to $615 per week, or $2,667 per month. The household would then be paying 44 percent of their income in rent, compared with 35 percent before the reduction in hours.

Workers facing income losses greater than 20 percent who cannot access UI—because of immigration status, employment history, or difficulties applying—would of course face larger rent burdens.

**Household Four: Two Earners, Formerl  Earning $20K Each, One Eligible for UI**

**Rent burden through Jul :** 34%
**Rent burden from August onward:** > 100%

This scenario imagines a household with the same rent and the same total income, but split among two working members. We assume both earners have lost their jobs and previously earned $20,000 each, and that only one is eligible for UI.

The worker who was eligible for UI would receive a base UI benefit of $192 per week, along with the $600 supplemental payment through July. The other member of the household would not receive any UI compensation. Through July, this household s income would be $3,406, and it would be paying 34 percent of its income towards rent—leaving it at roughly the same level of rent burden as before. After July, the household s monthly income would drop to $826. Their monthly rent would be greater than their income.

By comparison with Household One, this household is far more reliant on the $600 supplemental payment, which as a flat rate, is larger relative to their former wages and base UI benefits. Once it expires (and assuming no new income), this household will not be able to pay their rent.

**Household Five: Single Earner, Formerl  Earning $60,000, Full UI Benefits**

**Rent burden through Jul :** 37%
**Rent burden from August onward:** 80%

While the scenarios above all examined households earning $40,000, the interplay between UI and rental assistance is somewhat different at higher incomes. (The same is true at lower incomes, but at lower incomes, additional government benefits may be available). This scenario looks at a household that, prior to its single earner being laid off, had earnings of $60,000 per year—around the median income for New York City households. Like the households above, they were paying 35 percent of their income to rent, for a monthly rent of $1,750.

Relative to workers earning $20,000 or $40,000, this worker will receive a lower percentage of her former earnings: with full UI benefits, she will receive $504 per week, (the maximum base UI allowed in New York State). She will also receive the $600 supplemental payment through July.

This will give her a monthly income of $4,747 through July. During this time, she will pay roughly 37 percent of her income to rent, a slight increase in rent burden from before she was laid off. After July, her monthly income will fall to $2,167. She will be paying 80 percent of her income to rent.

As compared with a lower-wage worker, this household receives proportionally smaller (though larger in absolute terms) benefits from the UI system. Both while receiving the federally-supplemented UI benefit and while receiving the state baseline, this household will be more rent burdened than the household earning $40,000.

**Household Six: Two Earners, Each Formerl  Earning $30,000, Full UI Benefits**

**Rent burden through Jul :** 23%
**Rent burden from August onward:** 70%

This scenario considers the impact of dividing a higher-earning household s wages between two workers, rather than one. It again imagines a pre-layoff household income of $60,000, split equally among two workers, and a pre-layoff rent of $1,750.

In this scenario, each earner will receive a base UI payment of $288, along with the temporary $600 federal supplement. Through July, this will total to a monthly household income of $7,637. It will not be rent-burdened, as it will be paying 23 percent of its income to

rent. After July, the household s monthly income will fall to $2,477.  It will become severely rent burdened, paying 70 percent of its income to rent.

This scenario shows the importance of the federal supplement s fixed nature, as well as the cap on base UI earnings. Compared to the household in Scenario Five, which has the same total income and pays the same rent, this two-earner household receives more UI benefits both through July and after, and experiences lower rent burdens.

**Summar** .

| Household earnings pre-COVID | Rent burden pre-COVID | COVID emplo ment effects | Benefits | Rent burden through Jul 31, 2020 | Rent burden August 2020 onward |
|---|---|---|---|---|---|
| Single earner, $40k | 35% | Unemplo ed | Full UI benefits (39 weeks) + Pandemic Unemplo ment Assistance (PUA) through Jul  2020 | 28% | 71% |
| Single earner, $40k | 35% | Lost 60% of hours | Partial UI benefits, + PUA through Jul 2020 | 25% | 54% |
| Single earner, $40k | 35% | Lost 20% of hours | No benefits | 44% | 44% |
| Two earners, $20k each | 35% | Both unemplo ed | One member receives full UI benefits, + PUA through Jul 2020 Other member ineligible for UI | 34% | > 100% (rent is greater than monthl income) |
| Single earner, $60k | 35% | Unemplo ed | Full UI benefits (maximum base UI rate), + PUA through Jul  2020 | 37% | 80% |
| Two earners, $30k each | 35% | Both unemplo ed | For both, full UI Benefits + PUA through Jul  2020 | 23% | 70% |

**Estimating the need for rental assistance in New York State and New York Cit** _ **when incorporating New York State UI Data**

In a prior blog post we estimated that over 1 million renter households in New York City had at least one member who worked in an occupation at risk due to the economic fallout of the coronavirus. This analysis assumed 100 percent job loss in all industries we identified as particularly vulnerable to job loss. Now three months into the pandemic, we see, as expected, that job loss has varied greatly by industry.

To update and expand this analysis across New York State, we used publicly available data on New York State UI claims, and compared those claims to the number of jobs in each industry prior to the pandemic. This provides a sense of the proportion of jobs that have actually been lost in each industry. In New York State, we find that the industries with the highest

proportion of claims relative to total jobs are: Accommodation and Food Services; Administrative and Support Services; Wholesale Trade; Construction/Utilities; Arts, Entertainment, and Recreation; Retail Trade; and Other Services (which includes working in jobs like dry cleaning, nail salon specialist, etc.). Using UI claim data alone as an estimate of actual job loss misses households unable to use UI. To gain an understanding of these households, we rely on an analysis by James Parrott and Andrew Stettner of the households that do not receive UI, and estimate that 67 percent of New York State households that experience job loss claim UI benefits. After accounting for this 67 percent take-up, we use job loss proportion by industry to simulate job loss using American Community Survey household level data. For this, we net out the 2019 claims in order to focus on COVID-related job loss that is in excess of typical monthly claims. We run this as a simulation because we do not have household level data on both job loss and housing characteristics.

Below we estimate the magnitude of scale and need for New York State and New York City renter households. In an effort to narrow down the analysis to renter households least likely to have savings or access to credit to help stem the tide during the pandemic, we limit most of our analysis to renter households with incomes at or below 80 percent of the local Area Median Income (AMI) prior to COVID-related job loss (lower income households). Because we do not know the incomes and location of those that make claims, we simulated job loss across the households that work in each industry at the proportion of job loss. You can find the code for all renters in New York State and New York City here.

**Estimates of Affected Households in New York State and New York City** .

**Using New York State UI Claim data to date, we estimate that 829,600 New York State renter households have at least one household member who filed a UI claim due to COVID-19. We estimate that an additional 327,200 households have at least one member who lost their job due to COVID-19, but do not claim UI Benefits.**

Using available UI claim data, we estimate that 1,156,800 renter households in New York State have at least one member who has lost their job due to COVID-19. Aggregate wages lost per month for this group total about $4.9 billion. We estimate that monthly UI benefits (base UI and Enhanced Benefits) together provide about $3.6 billion per month to make up lost wages for households who qualify. In addition, we estimate that the one-time April/May Stimulus provided about $2.4 billion in total assistance to the 829,600 households who have claimed UI.

However, of the 1.1 million households, we estimate that 327,200 households have members who have experienced job loss but do not receive UI benefits. The aggregate lost wages for these 327,200 households is $793 million per month, with no UI benefits to make up for lost wages. We also assume that these 327,200 households did not receive one-time stimulus assistance either, as we have no basis for estimating what portion of these households would have received one-time stimulus assistance.

**When limiting just to New York City renters, we estimate that 526,200 renter households have at least one household member who filed UI claims due to COVID-19 job loss. We estimate that an additional 208,700 New York City renter households have at least one member who lost their job due to COVID-19, but do not claim UI Benefits.**

We apply the same method to estimate the scale of job loss for New York City renters. We estimate that 734,900 renter households** in New York City have at least one member that has lost employment due to COVID-19, representing about one third of rental households in New York City. In aggregate, the amount of wages lost per month for this population is about $3.5 billion, with $2.3 billion in monthly UI benefits (base UI and Enhanced Benefits) helping to make up for this loss.  In addition, we estimate that the one-time April/May Stimulus provided about $1.4 billion in total assistance to the 526,200 households who have claimed UI.

However, of the 734,900 households, we estimate that 208,700 households have members who have experienced job loss but do not receive UI benefits. The aggregate lost wages for these 208,700 households is $622 million per month, with no UI benefits to make up for lost wages. We also assume that these 208,700 households did not receive one-time stimulus assistance either, as we have no basis for estimating what portion of these households would have received one-time stimulus assistance.

**Of all New York State renter households with at least one member who we estimate filed a UI claim due to COVID-19 job loss, 451,300 are lower income (pre-COVID earnings below 80 percent of Area Median Income). We estimate that an additional 176,900 lower income renter households have at least one member lost their job due to COVID-19, but do not claim UI benefits.**

We next limit our analysis to lower income households. We estimate that 451,300 New York State renter households with annual incomes below 80 percent of their local Area Median Income (AMI) have experienced job loss due to COVID-19, and filed a UI claim. We estimate an additional 176,900 households have at least one member that do not claim UI benefits, but experienced job loss.

Because of Enhanced Benefits, lower income renters who receive UI benefits may now temporarily receive more income than they did pre-COVID. In aggregate, we estimate that lost wages for lower income New York State renters are $1.3 billion per month. We estimate that $1.2 billion in Enhanced Benefits and $526 million in base UI make up for wage losses for lower income renters who qualify for benefits.

Again, not all households that lose income will use UI (as such, any aggregate estimates may be deceiving, as aggregate estimates may mask this issue). We estimate that the 176,900 households that will not be able to claim UI are losing $155 million in wages per month, with no UI benefits to help cover this lost income.

**Of all New York Cit  renter households with at least one member who we estimate filed UI claims due to COVID-19 job loss, 279,400 are lower income (pre-COVID earnings below 80 percent of Area Median Income). We estimate that an additional 111,500 lower income New York Cit  renter households have at least one member that lost their job due to COVID-19 but did not claim UI benefits.**

We estimate that 279,400 New York City renter households with annual incomes below 80 percent of the New York City AMI have experienced job loss due to COVID-19, and filed a UI claim. We estimate an additional 111,500 households have at least one member that do not claim UI benefits, but experienced job loss.

Because of the Enhanced Benefits, eligible lower income renters who receive UI benefits may temporarily receive more income than they earned prior to COVID. We estimate that lost wages for the 279,400 lower income New York City renters are $898m per month. These lost wages are made up for with $746 in Enhanced Benefits, and $339 million in base UI.

However, we estimate that the additional 111,500 lower income New York City households who do not claim UI benefits are losing $125 million in wages per month, with no UI to cover for this lost income.

**Lower income New York State households that have lost wages due to COVID-19 pa  a total of $796 million in rent per month. $538 million of that rent is owed in New York Cit  .**

Lower income New York State households affected by job loss pay an average of $1,267 per month in rent – in New York City, the average monthly rent for lower income renters affected by job loss is $1,376. For context, about $4.7 billlion in gross residential rent is incurred in

New York State monthly. The amount of monthly rent owed by lower income renters who have lost wages due to COVID-19 is about 17 percent of all rent across the state.

**When Enhanced Benefits wear off in Jul  2020, without job recover  or rent reductions, the effects for lower-income renter households in New York State and New York Cit  will be devastating. The most at-risk households ma  be the estimated 227,000 New York State households, 142,000 of which are in New York Cit , that were severel  rent-burdened before the pandemic and lost their job due to COVID-19.**

As noted throughout this post, Enhanced Benefits expire in July of 2020, creating a cliff for the most valuable benefits. We estimate that base UI benefits are providing about $526m per month to lower income UI claimants in New York State, but the CARES Act Enhanced Benefits are providing another $1.2 billion per month to those eligible renter households. In New York City, we estimate that base UI Benefits are providing $339 million to lower income renters per month, and another $746 million is coming from Enhanced Benefits per month.

Workers in households that are not re-employed will be solely reliant on base UI benefits in August. As this date comes closer, affected households may feel more pressure to conserve cash, and be less likely to pay rent compared to rent payment rates in April, May, and June. If the economy has not recovered by then, or the Federal government does not provide more assistance, this pressure will likely spread further across the rental market when Enhanced Benefits wear off on July 31, 2020. It is important to note that we find that 227,000 households across New York State (142,000 of which are in New York City) who lost their job due to COVID-19 and made a UI claim were severely rent-burdened. These households may be at the greatest risk of housing instability when Enhanced  Benefits expire.

**<u>Valuing Rental Assistance Need</u>**

Next, we estimate the need for rental assistance after accounting for both CARES Act benefits and households not likely to be receiving those benefits. To estimate this total need, we target the amount of money that would be required to bring lower income households to their target rent burden (the higher of 30 percent of their income towards rent, or their previous rent burden). We focus on returning households to their previous rent burden in order to ensure household stability, but assisting all affected households to the point where they are paying 30 percent of income towards rent would greatly increase the cost estimates that follow.

For additional context, nearly half (46.3 percent) of New York State households are renters, and even before the pandemic, many tenants struggled to pay rent. In 2018, 26 percent of New York renter households were severely rent burdened, paying more than half of their income to pay their monthly rent. New York State is home to 3.4 million renter households, and statewide, renters pay an average gross monthly rent of $1,370. If every New York State renter household did not pay their rent for a month, the maximum possible non-payment amount would be about $4.7 billion each month. This scale of non-payment would be extremely unlikely, but this number is a useful bound for estimates.

**<u>Rental Assistance Need for Lower Income Renters During Period of Enhanced Benefits</u>**

We first examine the monthly rental assistance need for lower income New York State renters during the period that Enhanced Benefits are in place. We estimate that $108 million per month would be needed to cover households that have experienced COVID-related job loss, with $95 million of that amount covering households that do not receive any UI benefits. New York City households comprise $83 million of the estimated need, with $73 million covering households that do not receive any UI benefits. Assuming these monthly costs stay constant for March, April, May, June, and July, it is reasonable to assume an upward bound estimate of total need across the state would be about $540 million (five months of need), and about $415 million in New York City.

An often overlooked benefit is the one-time stimulus assistance provided in April and May for income eligible households. As mentioned earlier, we do not know what portion of households that do not receive UI benefits received one-time stimulus funds. But for lower income households that have claimed UI, we estimate that the one-time stimulus provided about $1.3 billion in assistance to lower income households across the state. The impact of this one-time assistance depended on household size. When spreading this total assistance out for five months (March-July), we find that the one-time Stimulus provides about $268 million in assistance per month. This assistance undoubtedly has helped to contribute to eligible renters ability to pay rent. If we assume that all households that have claimed UI also received one-time stimulus assistance, and that households that have not claimed UI did not receive stimulus payments, then our estimate of need for New York State drops to a cumulative total of $475 million over five months to cover the households that did not receive UI or stimulus ($95 million per month).

### Rental Assistance Need for Lower Income Renters when Enhanced Benefits Expire

Of greater concern is how the need for rental assistance increases when Enhanced Benefits wear off. In this section, we show how the need changes when assuming that 25 percent of jobs lost during the pandemic return by August, and the need if no jobs return by August. We estimate that the monthly need for lower income New York State households will increase from $85 to $391 million in August. In New York City, the monthly rental assistance need will grow from $65 to $267 million.

The graph below compares how the monthly rental assistance need changes when Enhanced Benefits wear off, assuming a 25 percent job recovery. The graph also shows the potential monthly rental assistance need for all households in both New York State and New York City, as well as the need for just lower income households earning 80 percent of AMI, which has been our primary focus.



Assuming that none of the jobs lost return by August, the monthly rental assistance need would increase to $516 million across the state ($352 million in New York City). These figures take into account base UI benefits replacing lost wages, which stay in place for a total of 39 weeks for eligible households.



It is important to note that other factors are likely to mitigate this total need. The first is that some households might be able to negotiate lower rents upon lease renewal. Building owners may agree to reduced rents in order to retain tenants as housing demand falls, and uncertainty about the future remains. In addition, it may be the case as well that any housing assistance made available does not fully compensate for the rent owed, covering instead only a portion of it. The second is that while there is likely to be some job recovery by July, as evidenced by many parts of New York State opening this week, it is not clear to what degree jobs that are lost will return. As shown in this section, the rental assistance need varies greatly depending on actual job recovery.

## Conclusion

Our analysis suggests that the CARES Act is currently protecting most renters who lost income due to COVID-19 and claim UI from elevated rent burdens. Without Enhanced Benefits, however, the scale of monthly rental assistance needed to help lower income households may reach up to between $391 and $516 million per month starting in August, depending on job recovery rates. Additionally, a subset of households who are left out of CARES Act assistance programs may have a cumulative rent need of about $475 million between March and July. A disproportionate share of the workers at risk of housing instability and nonpayment are Black and Hispanic, as evidenced by their over-representation in occupations that have faced higher rates of job loss.

It is important to note that throughout our analysis, we did not assume that rents would either increase or fall. It may be the case that rents do drop, or that building owners negotiate with tenants to reduce rents at lease renewal. If this occurs, this would decrease the rental assistance need estimates overall. Our method highlights the need to tie real-time monitoring of actual UI claims to housing status. Because UI is such an important benefit during the pandemic, it is critical to understand the intersection between the labor market and the rental market. Additionally, it would be beneficial to understand how other labor market conditions affect housing status, including the effect of reduced hours, which we did not build into our analysis; what the actual UI claim rate has been in comparison to actual job loss; and the actual job recovery rate. Finally, our analysis also underscores the need for real-time information on non-payment in New York City s rental stock in order to understand which housing portfolios are most affected by non-payment. We look forward to forthcoming national estimates using a similar methodology from our research partners at the Urban Institute and the Joint Center for Housing Studies.

Whether assistance is provided directly to tenants, or directly to landlords to cover rents for tenants in exchange for not displacing tenants, the amount budgeted must match the scale of the issue, and administratively needs to be set up in the next 45 days to mitigate against a large, expected cliff starting in August 2020.

*We use the term Hispanic because of the way American Community Survey data are described by the US Census. You can <u>find out more about the reason we use the term Hispanic here</u>.

**Our <u>earlier blog post</u> estimated an upward bound of just over 1 million potential jobs at risk in New York City. This represents a revision of that estimate, but UI claims may still increase, at which point our 734,900 estimate would need to be revised.

We are grateful to Santander Bank, whose support made this blog post possible. Santander Bank is also the Premier Sponsor of our 2019 State of New York City's Housing and Neighborhoods. Our special focus this year is on the State of Eviction in New York City.

<u>« Previous</u>    |    <u>The Stoop</u>    |    <u>Next »</u>

All content © 2005 – 2020 Furman Center for Real Estate and Urban Policy | <u>Top of page</u> | <u>Contact Us</u>

NYU WAGNER     NYU LAW

A-1229

# Exhibit 44

Case 1:20-cv-05301-RA   Document 29-44   Filed 08/22/20   Page 2 of 49






# Small
# Business
# First

Better Government. Stronger Businesses.



A-1231

Case 1:20-cv-05301-RA   Document 29-44   Filed 07/22/20   Page 3 of 49

# EXECUTIVE SUMMARY

A-1232

Small businesses strengthen New York City's economy, anchor communities, create jobs, and add to the vibrancy of the City's neighborhoods. Of the more than 200,000 businesses located in New York City, 98 percent are small (fewer than 100 employees) and 89 percent are very small (fewer than 20 employees). These small businesses employ more than half of New York City's private sector workforce, and often provide a first chance for economic self-determination and a path to the middle class for their owners.

Every day, however, small businesses face a variety of challenges, including multiple levels of government regulation. Steps have been taken over the years to improve New York City's regulatory environment, but the complexity and number of requirements weigh heavily on small businesses that often have fewer resources to navigate government.

In July 2014, Mayor de Blasio launched Small Business First, an inter-agency initiative led by the Mayor's Office of Operations and the Department of Small Business Services to make government more effective and efficient in helping businesses start, operate, and expand. The result is 30 recommendations to greatly improve the City's regulatory environment for small businesses and save business owners time, money, and hassle, as well as increase satisfaction with City services.

To build the recommendations included in Small Business First, the City worked closely with small business owners, advocates, neighborhood and community leaders, and elected officials, to solicit ideas about how best to help small businesses. More than 600 unique comments and ideas were received detailing the specific needs of small businesses across the five boroughs. This report outlines 30 initiatives aimed at supporting small businesses in the ways the small business community says it needs most.

## Recommendations include:

### Provide Clear Information with Coordinated Services and Support

1. Create a Comprehensive Online Business Portal
2. Provide an Easy-to-Find Location for Businesses on Each Regulatory Agency Website
3. Engage Entrepreneurs in Developing Online Services for Businesses
4. Create a New One-Stop Business Center
5. Provide Individual Support to Business Owners with Client Managers
6. Promote the Use of Handheld Devices for Inspections
7. Ensure Agencies Have Plain Language Guides
8. Create Informational Guides for Inter-Agency Processes

### Help Businesses Understand and Comply with City Regulations

9. Deploy Small Business Compliance Advisors to Help Businesses Follow the Rule
10. Provide Proactive Support to Businesses Needing Education
11. Provide Better Customer Service
12. Create One-Stop Hearing Centers for Business Regulatory Issues
13. Provide a More Flexible Adjudication Process by Expanding Alternative Hearing Options

A-1233

### Reduce the Burden Imposed by Complex Regulations and Fines

14. Create an Advisory Board to Provide Feedback and Review City Laws

15. Eliminate and Consolidate Licenses and Permits

16. Repeal or Modify Unnecessarily Complex or Obsolete Rules

17. Make it Easier for Gyms and Health Clubs to Open in New York City

18. Improve Coordination Between the Department of Buildings and the Fire Department

19. Streamline Fire Suppression Plan Review by Removing Department of Buildings' Review

20. Allow Licensed Fire Suppression Contractors to Submit Plans for Commercial Kitchen (Rangehood) Fire Suppression Systems

21. Streamline Department of Buildings' Process for Determinations

22. Streamline and Standardize the Process for Obtaining a Department of Buildings' Letter of No Objection

23. Standardize Department of Buildings' Plan Objections

24. Create a Sidewalk Shed Notification System at Department of Transportation

25. Expand the Department of Transportation's Online Permitting System to Include All Permit Types

### Ensure Equal Access for All Business Owners

26. Train Community Groups to Assist Local Businesses

27. Support Businesses by Providing Educational Events in Communities

28. Help Small Business Owners by Connecting Them to Personal Financial Counseling

29. Simplify Critical Materials for Small Business Owners

30. Make Key Materials and Services Available in More Languages

We will begin implementing these recommendations immediately, holding ourselves accountable by tracking progress against specific and ambitious goals. We will ensure that we are saving business owners time, money, and hassle, as well as increasing their satisfaction with City services. For example, the City will reduce the time required for a business to open or work with the City by 50 percent and reduce the incidence of repeat violations by 10 percent in neighborhoods targeted for outreach, training, and support.

Through Small Business First, the de Blasio Administration is pursuing a multi-faceted and expansive strategy to ensure City government works better for small businesses. In doing so, the City will lift up entrepreneurs who create jobs, strengthen neighborhoods, and grow the economy.

A-1234

Case 1:20-cv-05301-RA   Document 29-44   Filed 07/22/20   Page 6 of 49

A-1235

# TABLE OF CONTENTS

**08** INTRODUCTION

**14** PROVIDE CLEAR INFORMATION WITH COORDINATED SERVICES AND SUPPORT

    **15** Improve Information and Services for Businesses Online

    **17** Improve Information and Services for Businesses in Person

    **18** Improve Informational Materials for Businesses

**20** HELP BUSINESSES UNDERSTAND AND COMPLY WITH CITY REGULATIONS

    **21** Help Small Businesses Learn to Comply

    **23** Provide Better Customer Service

    **23** Make the Adjudication Process Easier

**26** REDUCE THE BURDEN IMPOSED BY COMPLEX REGULATIONS AND FINES

    **27** Update and Simplify City Law

    **28** Streamline City Processes

**32** ENSURE EQUAL ACCESS FOR ALL BUSINESS OWNERS

    **33** Decrease the Distance between Small Businesses and City Agencies

    **34** Help All New Yorkers Understand How to Comply With the Law

**36** ACCOMPLISHING OUR GOALS

**42** MEASURING OUR SUCCESS

**44** NOTES

**46** ACKNOWLEDGMENTS

# INTRODUCTION

### A City of Small Businesses

Every day in New York City, entrepreneurs open and operate small businesses. These small business owners take tremendous financial risk to transform their dreams into reality and in doing so, they provide the foundation for our city's unique and diverse neighborhoods. For many New Yorkers, small business ownership also offers a first chance for economic self-determination and a path to the middle class. As we strive to create a fairer economy and reduce inequality in our city, supporting those who pursue business ownership is vitally important.

**CHANGE IN NUMBER OF NYC ESTABLISHMENTS BY ESTABLISHMENT SIZE, 2001-2012**



Source: U.S. Census Bureau, County Business Patterns

New York City is a city of small businesses. Of the approximately 220,000 businesses located in the City, 98 percent are small (fewer than 100 employees) and 89 percent are very small (fewer than 20 employees). These businesses already employ nearly half of the City's workforce and they are growing. Very small businesses were responsible for nearly a quarter of the new hires in the City between 2007 and 2012. Similarly, businesses with fewer than 100 employees gained jobs at a rate of five percent compared with a 0.7 percent loss for businesses with 500 to 1,000 employees. Given the importance of small businesses to our economy, it is critical to New York's global competitiveness that we create an environment where it is easy for small businesses to open, operate, and grow.



**CHANGE IN NYC EMPLOYMENT BY ESTABLISHMENT SIZE, Q1 2007- Q1 2012**

Source: NYSDOL,Quarterly Census of Employment and Wages

## The Challenge of Starting, Operating, and Growing in New York City

Government regulation at all levels has consistently been cited by small businesses as one of the primary hurdles. The City's small business owners have repeatedly voiced their concerns about the overwhelming maze of requirements and processes that they must navigate to open, operate, and grow. These concerns are very real. New York City has a complex regulatory environment, with over 6,000 rules and regulations and around 250 business-related licenses and permits as well as many processes created to ensure compliance with the law. For example, a restaurant opening in New York City may have to file applications, make payments, undergo reviews, obtain approvals, get inspections, and receive licenses and permits from up to eight City agencies before it even opens its doors for business. The complexity of this process brings with it many possibilities for confusion and delays from both the business and the City, adding significant costs and hindering business development. Once the business opens it may receive violations from inspections that can be, in some cases, more punitive than educational.

Regulatory requirements weigh heavily on businesses that are small. These businesses are typically subject to a large proportion of the City's laws and, in terms of resources, their owners are the least capable of navigating the bureaucracy. Of all of the industries that are regulated by the City, the most heavily regulated are the accommodation and food services, retail, and other services (includes beauty salons, nail salons, laundry, and dry cleaning) industries. These industries are almost exclusively comprised of small businesses. Unlike some larger businesses, small businesses do not have staff dedicated to managing their interactions with government and may have less knowledge of and experience with City processes and rules. In addition, many small business owners are further inhibited by language, cultural barriers, or other impediments that make this process more difficult. As a result, in the majority of cases, owners are forced to allocate their limited resources to the hiring of consultants or expeditors to help them. Leveling the City's regulatory playing field for small businesses is necessary to create a fairer economy in New York City.

**Some of the groups we met with include:**

- American Institute of Architects
- Association for a Better New York
- Bronx Chamber of Commerce
- Bronx Overall EDC
- Brooklyn Chamber
- Con Edison
- El Museo del Barrio
- Make the Road NY
- Manhattan Chamber
- Mano a Mano
- New York City Hospitality Alliance
- New York Fire Alarm Association
- New York State Restaurant Association
- NY Fire Sprinkler Contractors Association
- NYC BID Association
- Partnership for New York City
- Queens Chamber of Commerce
- Queens EDC
- Real Estate Board of New York
- SAPNA NYC
- Staten Island Chamber
- Staten Island Economic Development Corp

**Some of the elected officials that we met with include:**

- Bronx Borough President
- Brooklyn Borough President
- Manhattan Borough President
- Queens Borough President
- Staten Island Borough President

## The Vision of Small Business First

Efforts have been made over the past few years to improve the small business regulatory climate with some success. For example, the collaborative work of the Mayor's Office, the Department of Consumer Affairs (DCA), and the City Council resulted in significant improvements to the licensing process for sidewalk cafés including a reduction in the time for obtaining and renewing licenses from 465 days to less than 150 days. We will build on these achievements and focus on Mayor de Blasio's goals to reach and support small businesses and underserved New Yorkers across all five boroughs; promote education and compliance, instead of simply punitive enforcement; and focus on inter-agency collaboration. Mayor de Blasio acted on these priorities in his first budget by reducing the revenue estimates from fines for fiscal year 2015 by 21 percent for DCA and 44 percent for the Department of Health and Mental Hygiene (DOHMH) as compared to 2012. In addition, DCA has implemented a Small Business Relief package that includes numerous initiatives such as a reduction in the number of violations that would be cited for an incident and reduced amounts for violation settlements.

Despite these improvements, however, we know that there is more to be done. With that in mind, in July 2014, Mayor de Blasio launched Small Business First, an initiative led by the Mayor's Office of Operations (Operations) and the Department of Small Business Services (SBS) in conjunction with numerous City agencies that seeks to dramatically improve the regulatory climate for businesses in New York City. The Mayor directed Operations and SBS to work with the public and with City agencies to develop recommendations to achieve this goal. The results are described in this report.

## Listening to Business Owners

As a first step, Small Business First focused on understanding the needs and priorities of business owners and those who work with them. We engaged in an extensive outreach effort to gather ideas and hear concerns from a wide variety of stakeholders across the City. To that end, we held meetings with business owners, community-based organizations, Chambers of Commerce, local economic development corporations, and Business Improvement Districts. We reached out to immigrant entrepreneurs through organizations and the media. We sought detailed feedback on technical processes from various industries and the professionals who work with them including food service and real estate as well as contractors, architects, and engineers. We also discussed the issues facing business owners and communities with elected officials including City Council members and the Borough Presidents.

We also solicited feedback from business owners and the public directly using various online tools. An online form on the SBS website, available in English and Spanish, allowed anyone to submit an idea to improve the City's regulatory environment. The form was publicized through email blasts from City agencies and many of our partners to more than 90,000 businesses and groups, with a specific focus on working with organizations in immigrant communities to ensure that we communicated with harder-to-reach populations. In addition, blog posts, tweets, and press coverage provided additional encouragement to submit suggestions.

A-1241



**OUTREACH COMMENTS BY BOROUGH**

## Listening to Agencies

Operations and SBS also sought feedback and ideas from our agency partners. In particular, we engaged in substantial dialogue with:

- Board of Standards and Appeals
- Department of Buildings
- Department of Citywide Administrative Services
- Department of City Planning
- Department of Consumer Affairs
- Department of Environmental Protection
- Department of Finance
- Department of Health and Mental Hygiene
- Department of Housing Preservation and Development
- Department of Information, Technology and Telecommunications
- Department of Sanitation
- Department of Transportation
- Fire Department
- Law Department
- Mayor's Office for People with Disabilities
- Mayor's Office of Immigrant Affairs
- Office of Labor Relations
- Office of Management and Budget
- Office of Administrative Trials and Hearings
- Taxi and Limousine Commission

A-1242

## What We Learned

We heard consistent messages from the meetings, conversations, web submissions, and other dialogue. Small businesses need the City government to:

1. **Provide clear information with coordinated services and support.**
   Business owners need straightforward directions, and easy-to-access services as well as sources for answers to their questions.

2. **Help businesses understand and comply with City regulations.**
   City agency staff must work with business owners to provide compliance support and education, rather than focusing on punitive measures.

3. **Reduce the burden imposed by complex regulations and fines.**
   The City needs to provide a system of laws and rules that is as simple as possible to understand. Business owners must be able to operate within requirements and City agencies must be able to consistently enforce the law.

4. **Ensure equal access for all business owners.**
   All entrepreneurs and business owners should have access to City services, no matter where they are located or what language they speak.

### PUBLIC OUTREACH RESULTS



We have translated the feedback we received into regulatory and process changes to help small businesses where they need it most. Small Business First strives to deliver improvements for small businesses while ensuring compliance with City regulations – which keep New Yorkers safe, healthy, and protected.

A-1243

# PROVIDE CLEAR INFORMATION WITH COORDINATED SERVICES AND SUPPORT

A-1244


Case 1:20-cv-05201-RA   Document 29-44   Filed 07/22/20   Page 15 of 49

"A centralized location and transparent website would be helpful. This way businesspeople and potential entrepreneurs do not have to seek and filter scattered information."

–Business Owner, Brooklyn, NY

With 15 City agencies that may be involved in the process of starting and running a small business, business owners are often confused about where to seek information and services. This can lead to misunderstandings, mistakes, and loss of time and money. In addition, businesses may not learn about or receive needed benefits or services that the City makes available.

Communicating clearly and providing ample information in a central location is necessary to help the City better meet the needs of small businesses. Because small businesses are diverse, materials and services must be made available and be distributed to businesses in a variety of ways. We must use different media, including online and in print, and multiple locations, including City sites and community organizations. Providing better information in a variety of ways is critical to ensuring that all small businesses understand how to comply with City rules and processes, know where to go if they need help, and are aware of all of the City resources that are available.

### Improve Information and Services for Businesses Online

#### 1. Create a Comprehensive Online Business Portal

Small Business First will build on the City's existing online resources for businesses to create a new, state-of-the-art Online Business Portal that provides the central resource that businesses need. Centralizing online City services and resources for businesses will alleviate some of the administrative burden small business owners currently face in having to seek and filter scattered information.  Through the portal, businesses will be able to access information and conduct transactions at convenient times and locations.

The City's current website for businesses, NYC Business (www.nyc.gov/Business), allows potential entrepreneurs to find information on how to start a business by business type. Currently, business owners can find resources as well as check the status of permits, licenses, and violations from certain agencies. The site also links to a wizard tool that helps entrepreneurs learn what permits, licenses, and regulations are required to start and operate a business. However, there is a lot that can be improved.

Building on NYC Business, the City will create a powerful and innovative Online Business Portal that will allow a business owner to create an account that provides access from any computer or mobile device to personalized information from City records about a business including licenses, permits, certifications, inspections, and violations. The account will also allow a business owner to conduct all available online transactions with City agencies including applying for or renewing licenses and permits, making payments, and checking the status of applications. In addition, the business owner will be able to receive information distributed by City agencies such as updates on the law and renewal notices.

Other features for potential inclusion in the new Online Business Portal include a database of inspection checklists searchable by sector and business type and translated into top languages as well as information for business owners on how to pass inspections including video examples. The Portal will contain a comprehensive list of regulations searchable by category, keyword, business type, and industry. Specific regulations will be matched to relevant plain language guides that explain the regulations in easy-to-understand English and will list top violations to alert small businesses to common mistakes. The Portal will allow for submission of questions, should a business need additional assistance.

To help ensure the Online Business Portal meets the needs of users, we will continually seek feedback from business owners as we develop new features. The portal will be publicized in many ways including a link in the Business Owner's Bill of Rights, which is distributed during most agency inspections.

| Online Business Portal Features | Current State | Future State |
|---|---|---|
| Informational resources for businesses | ✓ | ✓ |
| Searchable database of inspection checklists | | ✓ |
| Searchable database of regulation with plain language guides | | ✓ |
| Send personalized information to business owner | | ✓ |
| Personalized business account | | ✓ |
| Ability to conduct transactions (applications, payments) | Limited | ✓ |
| Ability to check status of permits/licenses/violations | Limited | ✓ |

### 2. Provide an Easy-to-Find Location for Businesses on Each Regulatory Agency Website

In addition to creating a centralized, primary resource for business owners through the Online Business Portal, we will also improve the information available on each regulatory agency website. Each agency site will be updated to include a uniform "Business" tab that contains all information relevant to a business as well as a link to the Online Business Portal. Agencies will also seek to improve the information and features available for businesses on their websites. For example, the Department of Sanitation (DSNY) will soon provide the ability for a business to input its address into the agency website and be given a list of the businesses' routing times. This will help businesses understand when they can expect sanitation agents to be in their area checking for compliance with City rules, making it easier for businesses to comply and avoid violations.

### 3. Engage Entrepreneurs in Developing Online Services for Businesses

The City will seek to leverage innovation from the private sector through events such as a hackathon where participants will be provided with opportunities to work with the City to improve the City's online services, including components of the Online Business Portal. A hackathon is an event typically lasting between a day and a week. During that time participants compete by developing products that are geared towards specific goals such as the creation of an easy-to-use mobile application to help businesses navigate City requirements.

## Improve Information and Services for Businesses in Person

### 4. Create a New One-Stop Business Center

Small Business First will work to provide new and expanded resources online so that businesses have one source to consult for all their City needs. We understand, however, that many business owners may not have access to technology or may prefer to interact with the City in person, and that various City requirements necessitate a visit to an agency office (e.g., fingerprinting). We will create a One-Stop Business Center to provide an in-person option for business owners. This concept may be expanded depending on the success of the initial location.

The One-Stop Business Center will provide a clear resource for a potential entrepreneur or a small business owner to get information, receive support services, and transact with the City. In particular, the Center will house DCA and DOHMH resources, and intake functions including payment and filings. The One-Stop Business Center will also have client managers available to support businesses through the City's regulatory requirements. These client managers will be made available to businesses at the Center as well as at regulatory agencies that interact with small businesses. In addition, the Center will house many of the business support services currently provided by SBS. To help business owners access online City resources and provide efficient services, the Center will also include public kiosks.

A-1247

### 5. Provide Individual Support to Business Owners with Client Managers

The One-Stop Business Center will be a place where business owners can receive individual support. Currently, owners of food, industrial and retail industry businesses can access client management services from the Division of Business Acceleration at SBS. Building on this model, Small Business First will make client managers available at the One-Stop Business Center to provide services to any small business upon request. The client manager will serve as the business owner's point person for navigating government and can help to facilitate all interactions with City agencies including providing advice on sequencing of services, scheduling and coordinating inspections, understanding and resolving violations, and providing information and assistance on recovering from a disaster or emergency.

---

**AGENCY HIGHLIGHT** | **NYC DEPARTMENT OF FINANCE**
**TAXPAYER ADVOCATE OFFICE**

The new Taxpayer Advocate Office at the Department of Finance will be an independent voice within the agency and serve as a "last resort" option for taxpayers, including small businesses. The Office will be a resource for businesses to bring complaints and address disputes and issues concerning City tax administration and policy.

---

### 6. Promote the Use of Handheld Devices for Inspections

To improve the clarity and flow of information between City agencies and business owners, we will promote the use of handheld devices for inspections at each agency. Some City agencies, including the Department of Environmental Protection (DEP), DOHMH, Department of Transportation (DOT), and the Taxi and Limousine Commission (TLC), already use handhelds during inspections to provide business owners with more accurate information more quickly and, in some cases, electronically. We will work with other agencies to implement this technology and prioritize adoption.

---

**AGENCY HIGHLIGHT** | **NYC DEPARTMENT OF TRANSPORTATION**
**STREET WORKS MANUAL**

The Department of Transportation is currently revising its Street Works Manual, including placing all of the material in an easy-to-access format online accessible on any device. The Manual is a comprehensive resource guide on policies and procedures relating to work on city streets. It provides contractors and business owners directions for notice, approval, and execution of street work.

---

## Improve Informational Materials for Businesses

### 7. Ensure Agencies Have Plain Language Guides

All agencies have created informational materials to help clarify rules and regulations and provide guidance on required processes. We will ensure that each agency has a guide on its top three functions (e.g., licenses, violations). For example, the Department of Finance (DOF) plans to publish information for small businesses on the tax auditing process, and the Mayor's Office for People with Disabilities will draft a guide for businesses explaining how to comply with accessibility requirements and how to properly apply for an accessibility waiver.

A-1248

**AGENCY HIGHLIGHT** | **NYC DEPARTMENT OF CONSUMER AFFAIRS INSPECTION CHECKLISTS**

The Department of Consumer Affairs makes available to business owners all 41 of the easy-to-read checklists that its inspectors use to conduct inspections. The checklists are posted online so that businesses can learn what inspectors look for during inspections. The 10 most common checklists are translated into multiple languages including Spanish, Chinese, French-Creole, Korean, Russian, Bengali, and Arabic. All others will be translated into Spanish.

### 8. Create Informational Guides for Inter-Agency Processes

To prevent business owners from having to comb through multiple City agency sources in order to understand City requirements, we are creating new informational guides for inter-agency processes. The guides will be subject-matter specific and will cover topics such as things a business should know before leasing a space and how to obtain a newsstand permit. Business owners will be able to find these guides in numerous locations including the Online Business Portal and the One-Stop Business Center.

A-1249

# HELP BUSINESSES UNDERSTAND AND COMPLY WITH CITY REGULATIONS

A-1250

Creating a supportive environment for small businesses is key to ensuring business growth in New York City. A supportive environment ensures that small business owners are not being unnecessarily burdened with violations, and helps small businesses focus on their core mission – to earn profits and expand operations.

To improve the way the City interacts with small businesses, we will promote compliance through education rather than primarily through punitive measures, and we will ensure that City agencies and employees provide the best possible customer service. In addition, we will institute more flexibility and clarity in the adjudication process to alleviate some of the burden currently felt by small businesses.

**AGENCY HIGHLIGHT**

## NYC DEPARTMENT OF HEALTH AND MENTAL HYGIENE PERFORMANCE IMPROVEMENT INITIATIVE FOR CHILD CARE

The Department of Health and Mental Hygiene recently announced the launch of a Performance Improvement Initiative for child care services. The initiative represents a unique approach to addressing under-performing child care services permitted and regulated by New York City. Through data analysis and set performance indicators, the Department will identify child care centers that have a history of chronic non-compliance with the regulatory requirements of the City's Health Code. Child care centers identified as needing assistance will receive intensive technical assistance and oversight to improve their performance. These efforts will provide a useful service to small child care businesses that need support in complying with DOHMH's rules.

### Help Small Businesses Learn to Comply

#### 9. Deploy Small Business Compliance Advisors to Help Businesses Follow the Rules

The City's agencies have already taken steps to help small businesses avoid violations by helping them comply with the City's rules. For example, DOHMH recently launched a new consultative inspection program where a business can pay a fee to receive a review of its current operating practices along with an inspection, all without the risk of receiving a violation. The purpose of the program is to help businesses understand how to comply with the rules before an inspection occurs and fines are issued. Similarly, inspectors from various agencies including DOHMH and the New York City Fire Department (FDNY) visit sites or provide consultative inspections as part of the Division of Business Acceleration at SBS.

This concept will be expanded through the creation of the new role of Small Business Compliance Advisors. Based at SBS, Small Business Compliance Advisors will be trained in the requirements of multiple agencies and will be available to visit businesses and provide an on-site walkthrough designed to help a new or existing business understand how to comply with the City's regulatory requirements. Up to 10 Small Business Compliance Advisors will be trained on specific, compatible topics by City regulatory agencies in order to maximize efficiency for business owners and help businesses avoid violations.

A-1251



### 10. Provide Proactive Support to Businesses Needing Education

In order to provide all small businesses with the information they need to comply with the City's requirements, the City will also promote small business compliance through on-going and proactive educational support. This initiative is modeled on similar educational efforts provided by other agencies, such as DCA's "Business Education Days" where inspectors visit businesses to provide information and answer questions and DOT's outreach related to new commercial bicyclist laws. By providing interactive sessions business owners will better understand the regulations and agency staff will better understand the challenges faced by businesses.

Small Business First will build on those programs by working with the Mayor's Office of Data Analytics to compile and analyze data, including violations, from a variety of sources in order to identify neighborhoods with significant incidence of non-compliance that might benefit from additional education and outreach. Data will be analyzed regularly and used by City agencies, particularly SBS, to target those areas for support including direct, one-on-one engagement with business owners, local informational events, and informational guides – all with the goal of helping small businesses better understand City regulations in order to reduce the future incidence of violations.

A-1252

**AGENCY HIGHLIGHT** | NYC SMALL BUSINESS SERVICES
NYC BUSINESS ACCELERATION

Business Acceleration, a unit within Small Business Services, assists individuals and groups opening or operating a food and beverage, industrial, or retail business as well as pre-kindergarten programs. The program is designed to help these businesses open or expand more easily and faster, operate more smoothly and with fewer challenges, and recover from emergencies. Specifically, Business Acceleration provides free client management, plan reviews, consultations with inspectors, and inspections from City agencies including Buildings, Fire, Health and Mental Hygiene, and Environmental Protection.

### 11. Provide Better Customer Service

The City will also better support businesses by making sure that the City's employees are properly trained and well-equipped to interact with the public – whether in person, over the phone, or online. Specifically, the City will improve the way its employees work with business owners by ensuring that all agency personnel who have significant interaction with the public, including inspectors and intake staff, receive extensive customer service training. Not only will agency personnel be trained, but they will also be evaluated on their provision of customer service. This will encourage more constructive interactions between small business owners and agency personnel.

**AGENCY HIGHLIGHT** | NYC DEPARTMENT OF
ENVIRONMENTAL PROTECTION
NOISE CODE OUTREACH

The Department of Environmental Protection has taken a number of steps to help small business owners understand and comply with the City's noise requirements. DEP holds Noise Compliance Workshops, informational seminars to walk business owners through the steps they must take to comply with the noise code in order to keep New York City an economically vibrant and desirable place to live. DEP has also developed an educational video about commercial music requirements that it distributes to bars, clubs, and restaurants.

### Make the Adjudication Process Easier

### 12. Create One-Stop Hearing Centers for Business Regulatory Issues

After previous consolidation efforts in 2008 and in 2011, the Office of Administrative Trials and Hearings (OATH), the City's independent adjudicative body, now oversees the OATH Tribunal, the Environmental Control Board, the Health Tribunal, and the TLC Tribunal. As a result, OATH manages the adjudication of violations for all business-related violations, except for violations of the DCA rules.

Each of the City's tribunals has jurisdiction over different types of cases and hears violations from different agencies. The various tribunals have different rules, procedures, forms, and office locations. Requirements for responding to summonses may vary depending on the tribunal hearing the summonses, on the type of case, and on the agency that issued the summonses. The result is an inconvenient and confusing process for small businesses who receive violations.

A-1253

"[The adjudication process] is way too time-consuming and degrading to the business. Many businesses hire someone to handle the summons, but that costs the small business more money."

–BID, Brooklyn, NY

To make the adjudication process easier to navigate, the City will create One-Stop Hearing Centers across the five boroughs. OATH locations will be transformed into hearing offices that can handle any type of case from any agency all in one site. The One-Stop Hearing Centers will provide individuals and small businesses with the opportunity to deal with summonses and violations issued by any City agency before an independent and impartial tribunal with one uniform procedure.

### 13. Provide a More Flexible Adjudication Process by Expanding Alternative Hearing Options

Receiving a violation is often a stressful and confusing time for a business owner. This is due, in part, to the time-consuming nature of correcting a violation. As a result, a business owner may be required to take time off from running her or his business in order to participate in a hearing at one of the City's administrative tribunals.

With the permission of the various regulatory agencies whose rules it enforces, OATH has already taken steps to mitigate this problem. OATH currently provides alternative methods of adjudication for many violations issued by City agencies such as DOHMH, DOT, and DSNY. A business owner can choose to have a hearing for many types of violations via telephone, online, or mail. For instance, most restaurant violations can be contested by any of these methods.

However, not all violations can be adjudicated remotely. In order to make this process more convenient for small businesses we will expand the violation categories available for alternative hearings. By using these alternative methods, a business owner will no longer have to take as much time away from running their business.

A-1254

A-1255

# REDUCE THE BURDEN IMPOSED BY COMPLEX REGULATIONS AND FINES

Small businesses consistently ask that we make the rules easier to understand and follow. They express frustration with the fact that the processes to comply are time-consuming and can overlap or be duplicative. To address these issues, we will not only provide businesses with more information and support, but we will also build on previous efforts by the City to make changes to the regulations and processes that create New York City's complex regulatory environment. In partnership with business owners, the City Council, and City agencies, we will update and simplify laws and rules to better meet small business needs. In addition, we will promote coordination among agencies and streamlining of agency processes to ensure faster and more efficient services.

## Update and Simplify City Law

### 14. Create an Advisory Board to Provide Feedback and Review City Laws

In order to receive public feedback on upcoming City regulatory and process changes that impact businesses, we will create a Small Business Advisory Board. The Advisory Board will have five core functions:

1. Provide feedback on plans to implement Small Business First.

2. Act as a sounding board for potential new initiatives.

3. Raise issues that the community is facing in their interactions with the City, so that Small Business First can find ways to improve processes.

4. Select a topic (e.g., signage, dry cleaning industry) for an annual focused review of regulations; and

5. Ensure that the potential impact of legislation on business owners is a formal consideration in the legislative process by reviewing legislation introduced in the City Council.

By institutionalizing a public feedback channel as well as a review of City laws and rules, we will establish a mechanism for the regulatory system to continuously improve.

### 15. Eliminate and Consolidate Licenses and Permits

In order to make the regulatory system easier to understand, we will eliminate outdated or unnecessary licenses and permits, and consolidate overlapping or duplicative licenses and permits from the City Administrative Code and Rules. These efforts will begin with a variety of DCA's licenses and permits. Once consolidated and eliminated, these licenses and permits are estimated to save businesses hundreds of thousands of dollars per year in fees paid to the City. DCA's efforts will be replicated in other agencies, where applicable.

### 16. Repeal or Modify Unnecessarily Complex or Obsolete Rules

As part of a larger review being led by Operations, we will also clean up and simplify the City's laws by repealing or modifying rules and regulations that are not consistent with modern business practices, are overly complex, or are obsolete. This will include, as part of our work with the Advisory Board, conducting a review of regulations focused on a particular topic.

### 17. Make it Easier for Gyms and Health Clubs to Open in New York City

Based on a regulation enacted in the 1970s, physical culture establishments (facilities such as exercise gyms, martial arts studios, and spas) are not automatically allowed to open anywhere in the City "as-of-right." Each facility must obtain a special permit from the



Case 1:20-cv-05301-RA   Document 29-44   Filed 07/22/20   Page 29 of 49

City's Board of Standards and Appeals. The process for obtaining such a permit is extensive and lengthy – potentially adding approximately six months and $50,000 in costs for the opening of a gym. Considering that health clubs are a valued service in New York City, the Department of City Planning will study the Physical Culture or Health Establishments special permit to determine a more appropriate framework for regulating these facilities.

## Streamline City Processes

### 18. Improve Coordination between the Department of Buildings and the Fire Department

A business seeking to modify its property or perform certain activities within its space must receive a variety of approvals from both DOB and FDNY. Both agencies provide plan review, permitting, and inspections in relation to facilities. They have overlapping or interdependent responsibilities in many areas, including fire alarm, fire suppression, and place of assembly.

Efforts have already been made to streamline some of these dual-agency processes to save time and money for customers. For example, although an applicant must still file and receive permits from DOB for fire alarm, plan review only occurs at FDNY. In addition, the City recently changed the process for renewing Place of Assembly Certificate of Operation by removing DOB's role and making the entire renewal process the responsibility of FDNY. These changes are still being implemented, but will eventually reduce the number of steps and the renewal time for businesses.

Notwithstanding these previous efforts, we know that we must do more. The overlapping requirements between DOB and FDNY result in inefficiencies that waste time and money for businesses. Small Business First will engage in a detailed operational review to

streamline processes at DOB and FDNY related to small business regulation. This review will include, at minimum, the processes for fire alarm, emergency action/fire prevention plan review, equipment use permits, fire suppression, and place of assembly. It will identify specific opportunities to make these efforts more efficient and enhance coordination. We will consider a variety of options to improve the City's ability to serve businesses including eliminating duplicative steps, responsibilities, and functions between agencies as well as reshaping processes.

> "My general comment is for the city to stop creating more and more layers of compliances and fees and consolidate the process."
>
> –Owner, Architecture Office, New York, NY

**AGENCY HIGHLIGHT** | NYC DEPARTMENT OF BUILDINGS
THE DEVELOPMENT HUB

The Department of Buildings operates the NYC Development Hub, a center designed to expedite the approval process. The Hub coordinates electronic filing at DOB and allows applicants to have their plans electronically reviewed with input from multiple City agencies in a virtual environment. In 2015, DOB plans to launch a new online scheduling system, Hub Inspection Ready, where users will be able to schedule nearly all inspections.

### 19. Streamline Fire Suppression Plan Review by Removing Department of Buildings' Review

Currently, a business that needs to install a fire suppression system for a restaurant kitchen or certain other types of facilities (e.g., gas station) has to have the plan for the fire suppression system approved by both DOB and FDNY. This process involves multiple steps at each agency. Two separate plan review processes create the potential for unnecessary conflict that can result in added costs, paperwork, time, and effort for small businesses. We will streamline this process by designating FDNY as the sole agency reviewing fire suppression plans. Businesses will no longer need to seek separate DOB review and approval of their fire suppression plans. Additionally, businesses installing a commercial kitchen fire suppression system will no longer need to go to DOB to file or receive a permit. These changes will save businesses an estimated $1.6 million and decrease the amount of time and complexity for a small business to have a fire suppression plan reviewed and, ultimately, installed so that it can open for business.

### 20. Allow Licensed Fire Suppression Contractors to Submit Plans for Commercial Kitchen (Rangehood) Fire Suppression Systems

In order for a food business to open in New York City, it must obtain approval for the installation of a rangehood fire suppression system for the kitchen. This requires the submission and review of plans for approval. Under the current system where a small business has to get approvals from both DOB and FDNY, the plans must be submitted by a licensed architect or engineer, as required by DOB. Rangehood system designs are pre-approved and pre-engineered. Thus, professional architects and engineers add little value – but substantial cost – to the applications. Transferring the responsibility for rangehood plan review to FDNY, as discussed above, will allow licensed master fire suppression contractors, instead of architects or engineers, to submit applications for rangehood plans since this is allowed by FDNY.

A-1259

### 21. Streamline the Department of Buildings' Process for Determinations

An architect or engineer working on behalf of a business owner may request a Construction Code Determination or Zoning Resolution Determination (Determination) on an objection made by a DOB plan examiner. The Determination must be made in order to obtain plan approval, get permits, and begin construction.

In order to streamline the Determination process, DOB will leverage technology solutions to improve the speed of determinations, such as facilitating electronic submission of requests and communication of decisions.

### 22. Streamline and Standardize the Process for Obtaining a Department of Buildings' Letter of No Objection

A Letter of No Objection is used where there is no Certificate of Occupancy or the "use" of a location needs to be confirmed (e.g., to meet City agency requirements for day camps). Oftentimes, when the "use" of a location is unclear on the Certificate of Occupancy, a business owner has to request a Letter of No Objection issued by DOB to confirm the "use." However, the process of having a Letter of No Objection issued can take a significant amount of time and may delay the opening of the business.

The City will streamline this process. Starting with food and beverage businesses, DOB will work to clarify the accepted "use" listed on Certificates of Occupancy. This should result in fewer businesses requesting Letters of No Objections, which will, in turn, create a faster and more efficient process.

### 23. Standardize Department of Buildings' Plan Objections

Similar plan objections by DOB's plan examiners may take different forms due to variations in plan examiners' styles and methods of description. This may cause difficulty for the licensed professionals working on behalf of small business owners in interpreting and resolving these objections, ultimately prolonging the time it takes to get a business opened.

The City will improve the plan review process by ensuring that plan examiners use standard language to describe plan objections. One way this goal will be achieved is by providing plan examiners with lists of standardized objection language that they can select from – the plan examiner would be able to add or edit the standardized language as necessary to fit unique situations. This will provide added clarity to the licensed professional and improve a business owner's ability to understand and participate in the process.

### 24. Create a Sidewalk Shed Notification System at Department of Transportation

Sidewalk sheds are erected to protect pedestrians from debris caused by construction. Small businesses responsible for erecting sidewalk sheds complain that, despite receiving a permit for construction of a sidewalk shed from DOB, they receive fines from DOT for blocking the street and sidewalk while they are erecting or taking down the shed.

A-1260

In response, the City will create a sidewalk shed notification system at DOT to increase coordination with DOB and reduce violations for businesses. A notification system will allow a scaffolding business to avoid DOT violations by notifying DOT that the business will be erecting or taking down a sidewalk shed that has been permitted by DOB.

### 25. Expand the Department of Transportation's Online Permitting System to Include All Permit Types

In order to save business owners time, the City is working to expand DOT's online permitting system to include all of its permit types. This will allow business owners more flexibility, and will save them time by allowing them to submit permit applications online rather than in person.

DOT's NYCStreets Permit Management System currently allows applicants to obtain permits for street openings, sidewalk reconstructions, building operations, commercial refuse containers, emergencies, and utilities. DOT will add the following permit types to its online permitting capabilities: canopies, vaults, and sidewalk sheds. These additions will result in nearly all of DOT's permits being accessible online.

A-1261

# ENSURE EQUAL ACCESS FOR ALL BUSINESS OWNERS



A large number of small businesses in New York City are immigrant-owned. In fact, 52 percent of self-employed New Yorkers are foreign-born. In addition, many small businesses in New York City are located far from City agencies. These factors, among others, add layers of complexity to navigating an already-complicated regulatory system.

Small Business First seeks to provide information and services to all small business owners in all five boroughs, by overcoming hurdles such as distance from City resources, language, and cultural barriers. To achieve this goal we will provide information in multiple languages, simplify documents by removing jargon and overly technical terms, and ensure resources are available to businesses in all neighborhoods throughout the City.

### Decrease the Distance between Small Businesses and City Agencies

#### 26. Train Community Groups to Assist Local Businesses

Community-based organizations and other groups are often trusted resources for local business owners, because they are located in their neighborhoods and speak their language. We will "train the trainer" by providing neighborhood organizations with tools to assist small business owners, especially immigrants, in finding City information and services. In doing this, we will further our reach into communities through newly formed partnerships with community groups that will help business owners throughout the City receive the information and services they need.

A-1263

### 27. Support Businesses by Providing Educational Events in Communities

City agencies will hold educational events in neighborhoods where business owners can get their questions answered directly from regulatory and business support agency staff. Many agencies already engage in outreach efforts either on an ongoing basis or around specific initiatives. We will expand this City concept by holding events where multiple City agencies come together at convenient times in neighborhood locations (e.g., community centers) that are easily accessible to potential and existing entrepreneurs. These events will feature staff from relevant regulatory and business support agencies that will be available to provide information, answer questions, and link business owners to needed resources.

DOB will also welcome small businesses to its Homeowner's Night. This program includes weekly sessions in each borough where non-professionals have the opportunity to meet with Department representatives. Business owners will now have direct access to have their questions answered from DOB personnel.

### 28. Help Small Business Owners by Connecting Them to Personal Financial Counseling

DCA's Office of Financial Empowerment will increase its efforts to provide financial services to business owners. We will develop connections between the Office of Financial Empowerment and regulatory agencies that work with small business owners so that valuable financial counseling services reach the business owners who need it. For example, we will place a Financial Empowerment counselor on-site at a regulatory agency customer service site so that business owners can easily learn about and access services.

## Help All New Yorkers Understand How to Comply With the Law

### 29. Simplify Critical Materials for Small Business Owners

Business owners often have a hard time understanding City regulations and how to comply with them. Some of this confusion stems from written communication from City agencies that is overly complicated or too technical. Thus, City agencies will provide more information to business owners and their representatives in an easy-to-understand language and format. In order to achieve this, we will provide plain language training to agency staff responsible for creating written messages for the public. Training these staff members to write more clearly and less technically will ensure that business owners are provided with notices and resource materials that are more straightforward.

**AGENCY HIGHLIGHT** | NYC TAXI AND LIMOUSINE COMMISSION PLAIN LANGUAGE RULES

The Taxi and Limousine Commission simplified all of its rules to make it easier for businesses to understand the agency's requirements. This included re-organizing them to make it easier to find the right rule, converting all of the agency's rules to plain language, and ensuring that all potential penalties are clearly defined and easy to identify.

A-1264

### 30. Make Key Materials and Services Available in More Languages

Increasing translations of critical materials needed by businesses and informational guides from agencies is necessary in a city where half of the population speaks a language other than English at home. Each agency will translate informational materials about, at a minimum, its top three functions (e.g., licenses, violations). Added translations will help limited English proficient business owners have the information they need to comply with the laws.

Similar to translations, the need for interpretation in the field by inspectors is also important – non-English speaking business owners and managers need to be able to understand what is required of them in order to comply with City regulations and laws. That is why it is imperative that City personnel use interpreters as often as possible to communicate with non-English speakers. Small Business First will promote the use of telephone interpretation services during inspections to communicate with non-English speakers. Agencies will provide the contact information for an interpretation service to inspectors and will train inspectors on the use of this service.

**AGENCY HIGHLIGHT** | NYC OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS
DOCUMENT TRANSLATION SERVICES

The Office of Administrative Trials and Hearings is the City's central independent adjudicative body. OATH provides free professional language interpretation services for all languages at trials and hearings. Recently, OATH began allowing individuals responding to violations to submit any form or application to OATH in the language of their choice. OATH will then translate the submission into English at no cost to the respondent. Since implementing this program at the beginning of 2014, there has been a more than 1,500 percent increase in the number of forms received in foreign languages and being translated by OATH.

A-1265

# ACCOMPLISHING OUR GOALS

Through Small Business First, we will prioritize the needs of small businesses. Over the coming weeks, months, and years we will transform the regulatory environment and provide the solutions that business owners have long sought. We will improve the way information is provided to businesses through investments in technology, educational resources, and infrastructure. We will also change the way the City works with businesses by promoting an environment where a real partnership can develop through more supportive services. In addition, we will simplify rules and processes to make the overall regulatory system less complex and make it easier for small businesses to start and operate, and we will ensure that the system is accessible to all small businesses regardless of language ability or location.

These changes will not be easy. They will require tremendous support from City agencies and may require legislative action. Small Business First will rely on the Agency Liaisons, created by Local Law 34 of 2013 to work with the regulated communities of each regulatory agency, to help ensure the successful implementation of our initiatives. These changes will take time and will require an enormous shift in the way our city operates.

Case 1:20-cv-05301-RA    Document 29-44    Filed 07/22/20    Page 38 of 49

## Provide Clear Information with Coordinated Services and Support

| Recommendation | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|
| **1** | **Create a Comprehensive Online Business Portal** | • Add links to Business Owners' Bill of Rights.<br>• Begin construction of portal features<br>• Complete portal | | | |
| **2** | **Provide an Easy-to-Find Location for Businesses on Each Regulatory Agency Website** | • Begin installation on agency websites<br>• Complete installation | | | |
| **3** | **Engage Entrepreneurs in Developing Online Services for Businesses** | | | | |
| **4** | **Create a New One-Stop Business Center** | • Build Center<br>• Roll out additional centers, as appropriate | | | |
| **5** | **Provide Individual Support to Business Owners with Client Managers** | | | | |
| **6** | **Promote the Use of Handheld Devices for Inspections** | | | | |
| **7** | **Ensure Agencies have Plain Language Guides** | • Begin developing new guides<br>• Complete all guides | | | |
| **8** | **Create Informational Guides for Inter-Agency Processes** | | | | |

 INCREASED COST SAVINGS

 INCREASED TIME SAVINGS

 INCREASED CUSTOMER SATISFACTION

 INCREASED PROCESS STEPS SAVED

 INCREASED GOVERNMENT EFFICIENCY

A-1267

## Help Businesses Understand and Comply with City Regulations

| Recommendation | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|
| **9** | **Deploy Small Business Compliance Advisors to Help Businesses Follow the Rules** | • Determine appropriate topics for cross-training<br>• Hire and cross-train advisors | | | |
| **10** | **Provide Proactive Support to Businesses Needing Education** | • Analyze data and train staff<br>• Use data to provide regular support to businesses | | | |
| **11** | **Provide Better Customer Service at All Levels** | • Include customer service measures in staff evaluations<br>• Provide customer service training to agency staff who have significant interaction with the public | | | |
| **12** | **Create One-Stop Hearing Centers for Business Regulatory Issues** | | | | |
| **13** | **Provide a More Flexible Adjudication Process by Expanding Alternative Hearing Options** | | | | |

## Reduce the Burden Imposed by Complex Regulations and Fines

| Recommendation | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|
| **14** Create an Advisory Board to Provide Feedback and Review City Laws | | | | | |
| **15** Eliminate and Consolidate Licenses and Permits | • Update first group of licenses and permits | | | | |
| | • Identify and modify additional licenses and permits | | | | |
| **16** Repeal or Modify Unnecessarily Complex or Obsolete Rules | • Update first group of rules | | | | |
| | • Identify and modify additional rules | | | | |
| **17** Make it Easier for Gyms and Health Clubs to Open in New York City | • Determine the appropriate framework for regulating health clubs | | | | |
| | • Implement new framework for regulating gyms and health clubs | | | | |
| **18** Improve Coordination Between the Department of Buildings and the Fire Department | • Conduct a review to assess the best methods to improve coordination | | | | |
| | • Implement improved coordination | | | | |
| **19** Streamline Fire Suppression Plan Review by Removing Department of Buildings' Review | | | | | |
| **20** Allow Licensed Fire Suppression Contractors to Submit Plans for Commercial Kitchen (Rangehood) Fire Suppression Systems | | | | | |

A-1269

| 21 | **Streamline Department of Buildings' Process for Determinations** | • Evaluate current processes for Department of Buildings' Determinations and design a template for a new database<br><br>• Streamline Department of Buildings' process for Determinations | | |
| 22 | **Streamline and Standardize the Process for Obtaining a Department of Buildings' Letter of No Objection** | | | |
| 23 | **Standardize Department of Buildings' Plan Objections** | • Establish the list of objections that can be standardized<br><br>• Standardize the Department of Buildings' plan objections | | |
| 24 | **Create a Sidewalk Shed Notification System at the Department of Transportation** | | | |
| 25 | **Expand the Department of Transportation's Online Permitting System to Include All Permit Types** | | | |

A-1270

### Ensure Equal Access for All Business Owners

| Recommendation | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|
| **26** **Train Community Groups to Assist Local Businesses** | | ████████████ | | | ☑ 📈 |
| **27** **Support Businesses by Providing Educational Events in Communities** | • Expand the Department of Buildings' Homeowner's Night to include small businesses<br><br>• Hold educational events in local neighborhoods where business owners can interact with agency staff | ▬▬ ▬▬ | | | ☑ |
| **28** **Help Small Business Owners by Connecting Them to Personal Financial Counseling** | | ██████████ | | | ☑ |
| **29** **Simplify Critical Materials for Small Business Owners** | | ▬▬ | | | ☑ |
| **30** **Make Key Materials and Services Available in More Languages** | | ▬▬ | | | ☑ |

A-1271

# MEASURING OUR SUCCESS

As we move forward with implementing the various initiatives outlined in this report, we know that it is critical for us to measure our progress so that we can hold ourselves accountable to the businesses of New York City. Each City agency will track its progress toward accomplishing each initiative. In addition, Small Business First will monitor overall improvement in the ability of small businesses to open, operate, and expand in New York City. Specifically, we will focus on time savings, cost savings, and regulatory steps saved for businesses. We will also ensure that we are improving business owners' satisfaction with City services.

## Establishing a Baseline for City Performance

Individual agencies assess metrics such as processing times for applications, compliance levels, and violations issued. The City, however, does not currently have a system to combine these metrics across agencies to track the experience for businesses. Since opening and operating most small businesses involves interactions with multiple agencies, developing and calculating these aggregate metrics is critical to improving the regulatory system.

To address this, Small Business First will consult with the Mayor's Office of Operations, especially the Mayor's Office of Data Analytics, to establish baselines for key overall metrics such as:

- Median time to open a business by sector/business type;

- Median time from application submission to issuance, by application type; and

- Business owner satisfaction with City services, as measured by an annual customer satisfaction survey that will commence in 2015.

A-1272

In addition to establishing a baseline measure and tracking the aggregate measures described above, we will aggressively pursue target goals related to the each Small Business First area:

### Provide Clear Information with Coordinated Services and Support

- Number and growth rate of Online Business Portal accounts;

- Available business-related applications and status updates, with the goal of having 95 percent of all business applications be able to be submitted online, and the top 20 most-commonly used applications have online status updates; and

- Number of simple guides available in plain language, with the goal of having more than 50 percent of the most common small business violation areas covered.

### Help Businesses Understand and Comply with City Regulations

- Number of new businesses assisted each month through business acceleration services, including businesses in the retail, industrial, and food service sectors, with a target minimum of 400 businesses assisted;

- Monthly and annual utilization rate of Small Business Compliance Advisor services;

- Number of businesses receiving repeat violations, with the goal of reducing the incidence of repeat violations by 10 percent in neighborhoods targeted for outreach, training, and support; and

- Availability and use rates of alternative hearing mechanisms (phone, email, mail).

### Reduce the Burden Imposed by Complex Regulations and Fines



For example, we estimate that removing the Department of Buildings from the rangehood fire suppression plan review process could save businesses 50 percent of the time currently required for this process.

- Update regulations or processes, with the goal of ensuring that 10 outdated or overly complex regulations and/or processes are updated initially, and working with the Advisory Group to identify additional regulations for review;

- Savings to businesses of at least $50 million per year by reducing time and resources spent on City processes, and avoiding fines and penalties;

- Steps and time involved in the top 10 inter-agency processes for businesses, with the goal of reducing each by at least 50 percent; and

- Time required for a business to open or work with the City on an annual basis; with the goal of saving businesses at least 50 percent.

### Ensure Equal Access for All Business Owners

- Number of training workshops held with community groups, with a target of 50 community groups being trained in the first full year of operation;

- Plain language guides (described above) are available in six languages other than English; and

- Availability of interpretive services at each agency, with the goal of increasing the agencies' utilization rate of such services.

Goals for other elements of the program will be defined as implementation progresses.

There is a lot of work ahead of us. Regardless of the challenges we face – we will continuously work to improve our services to small businesses. These changes are only the beginning. They are this Administration's first steps towards a New York City that is more supportive of small businesses than ever before.

A-1273

# NOTES

## Executive Summary
Pg. 3
Small business employment figures are based on 2012 County Business Patterns.

## Introduction
Pg. 10
Small business data is based on 2012 County Business Patterns.

Pg. 10
For details on data, see 2012 Quarterly Workforce Indicators.

Pg. 10
Employment data is based on 2012 Quarterly Workforce Indicators.

Pg. 10
For details on small business survey and data, see http://www.nfib.com/surveys/small-business-economic-trends/.

Pg. 10
Ninety-nine percent of the businesses in the accommodation and food services and retail industries have fewer than 100 employees. Businesses in the Other Services category are 98 percent small. See County Business Patterns (2012).

## Help Businesses Understand and Comply with City Regulations
Pg. 21
Although the Department of Health and Mental Hygiene inspector will not typically issue a violation during a consultative inspection, "any public health hazard will have to be corrected before the end of the inspection, or the Department may have to order the restaurant to close temporarily until the condition is corrected." http://www.nyc.gov/html/doh/downloads/pdf/permit/consultative-inspections.pdf.

## Ensure Equal Access for all Business Owners
Pg. 33
The total number of self-employed in incorporated and unincorporated businesses is 362K.  This number is based on 2013 American Community Survey (1 Year Estimates).

Pg. 35
For details on data, see http://www.nyc.gov/html/dcp/html/census/pop_facts.shtml.

A-1274

# ACKNOWLEDGMENTS

Small Business First was made possible by the hard work and contribution of numerous individuals from multiple City agencies. We would especially like to thank the following:

## Office of the Mayor

**Anthony Shorris,** First Deputy Mayor

**Alicia Glen,** Deputy Mayor for Housing and Economic Development

**Dominic Williams,** Chief of Staff, Office of the First Deputy Mayor

**Benjamin Furnas,** Senior Policy Analyst, Office of the First Deputy Mayor

**James Patchett,** Chief of Staff, Office of the Deputy Mayor for Housing and Economic Development

**Peter Wertheim,** Senior Advisor, Office of the Deputy Mayor for Housing and Economic Development

**Kate Blumm,** Communications Advisor, Office of the Deputy Mayor for Housing and Economic Development

**Minerva Tantoco,** Chief Technology Officer

**Mindy Tarlow,** Director, Mayor's Office of Operations

**Amen Ra Mashariki,** Chief Analytics Officer, Mayor's Office of Data Analytics

**Michael DeLoach,** Mayor's Office of City Legislative Affairs

**Saba Debesu,** Deputy Director, Mayor's Office of City Legislative Affairs

A-1276

## Agency Leaders

**Nisha Agarwal,** Commissioner, Mayor's Office of Immigrant Affairs

**Dr. Mary Bassett,** Commissioner, Department of Health and Mental Hygiene

**Vicki Been,** Commissioner, Department of Housing Preservation and Development

**Victor Calise,** Commissioner, Mayor's Office of People with Disabilities

**Zachary Carter,** Corporation Counsel, Law Department

**Rick Chandler,** Commissioner, Department of Buildings

**Stacey Cumberbatch,** Commissioner, Department of Citywide Administrative Services

**Fidel F. Del Valle,** Commissioner, Office of Administrative Trials and Hearings

**Dean Fuleihan,** Director, Office of Management and Budget

**Kathryn Garcia,** Commissioner, Department of Sanitation

**Jacques Jiha,** Commissioner, Department of Finance

**Meera Joshi,** Commissioner, Taxi and Limousine Commission

**Robert W. Linn,** Commissioner, Office of Labor Relations

**Emily Lloyd,** Commissioner, Department of Environmental Protection

**Julie Menin,** Commissioner, Department of Consumer Affairs

**Daniel Nigro,** Commissioner, New York City Fire Department

**Anne Roest,** Commissioner, Department of Information Technology and Telecommunications

**Ryan Singer,** Executive Director, Board of Standards and Appeals

**Maria Torres-Springer,** Commissioner, Department of Small Business Services

**Polly Trottenberg,** Commissioner, Department of Transportation

**Carl Weisbrod,** Commissioner, Department of City Planning

## The exceptionally hardworking staff at the following City agencies:

Department of Buildings, Department of City Planning, Department of Citywide Administrative Services, Department of Consumer Affairs, Department of Environmental Protection, Department of Health and Mental Hygiene, Department of Finance, Department of Information Technology and Telecommunications, Department of Sanitation, Department of Small Business Services, Department of Transportation, Fire Department, Law Department, Mayor's Office of Immigrant Affairs, Mayor's Office of Operations, Mayor's Office of People with Disabilities, Office of Administrative Tribunals and Hearings, Office of Labor Relations, Office of Management and Budget, Taxi Limousine Commission; and a special thanks to:

Amit Bagga, Steve Banks, Dominic Berg, Steve Bezman, Tara Boirard, Francesco Brindisi, Alex Camarda, Barbara Carnival, Tina Chiu, Georgia Davidson, Barry Dinerstein, Thomas Dolan, Teresa Egelhof, Sabrina Fong, Brian Geller, Maurice Goldstein, Kanda Gordon, Robinson Hernandez, Nicholas Kaminski, Daniel Kass, Laura Kavanagh, Kleo King, David Klahr, Natalie Kotkin, Albert Kramer, Sarah Krauss, Steven Lawitts, Sonia Lin, Vincent Maniscalco, John Martin, Angelina Martinez-Rubio, Dawn Miller, Lindsay Mollineaux, Nina Ong, Antonia Pereira, Emma Pfohman, Alba Pico, Anthony Pompeo, Yvonne Quintian, Robert Richardson, Carmine Rivetti, Euan Robertson, Kristine Ryan, Marisa Senigo, Adira Siman, Lydon Sleeper, Geraldine Sweeney, Megan Taub, Felisha Torres, Logan Werschky, Edward Wilton, and Betty Woo.

A-1277

A-1278

# Exhibit 45

A-1279

EXHIBIT A

GUARANTY

A.    As an inducement to GAMOTO ENTERPRISES LLC, ("Landlord"), to enter into a lease dated _OCT 18_ , 2018 (the "Lease") with RIVERA'S CATERING CORP. (the "Tenant") for the Third Floor located at 40-06 Astoria Blvd. S, Astoria, New York, (the "demised premises"), the undersigned, _TOMAS ESPINOZA_ residing at ▮▮▮▮▮▮▮▮▮▮▮▮ (hereinafter the "Guarantor") absolutely, unconditionally and irrevocably guarantees to Landlord all Base Annual Rent and Additional Rent and other charges payable by Tenant under the Lease (hereinafter collectively referred to as "Accrued Rent"). However, Guarantor's obligations under this Guaranty shall be limited beginning with the third anniversary of the lease's commencement so that the Guarantor absolutely, unconditionally and irrevocably guarantees to Landlord all Accrued Rent, up to the "Surrender Date" as defined below.

        The "Surrender Date" means the date that Tenant shall have performed all of the following: (a) at anytime after the third anniversary of the lease commencement, provides Landlord with ninety (90) days prior notice of Tenant's intention to vacate and surrender the demises premises to Landlord, (b) vacated and surrendered the demised premises to Landlord (or its managing agent) free of all subleases or licensees and in broom clean condition, and Tenant has so notified Landlord or such agent in writing, (c) delivered the keys to the doors to the demised premises to Landlord (or its managing agent), and (d) paid all amounts due and payable under the Lease as Base Annual Rent or Additional Rent or other such charges to Landlord up until the date of (a), (b) and (c) above.

B.    Guarantor shall not be liable under this Guaranty for any Base Annual Rent, Additional Rent or other charges or payments accruing under the Lease after the Surrender Date. Any security deposit under the Lease shall not be credited against amounts payable by Tenant, or by Guarantor under the terms of this Guaranty.  The acceptance by Landlord of payments under this Guaranty or the acceptance of a surrender of the demised premises shall not be deemed a release or waiver by Landlord of any obligation of the Tenant under the Lease, and Tenant's obligations shall survive such acceptance and surrender.

C.    Notwithstanding any payments made by Guarantor hereunder, the Guarantor shall not be subrogated to any of the rights of Landlord against Tenant for any payment, nor shall the Guarantor seek any reimbursement from Tenant in respect of payments made by such Guarantor hereunder until all of the amounts due or becoming due to Landlord under the Lease have been paid.

D.    This Guaranty is absolute and unconditional and is a guaranty of payment and performance, not of collection.  This Guaranty may be enforced without the necessity of resorting to or exhausting any other security or remedy and without the necessity at any time of having recourse to Tenant. The validity of this Guaranty shall not be affected or impaired by reason of the assertion by Landlord against Tenant of the rights or remedies reserved to Landlord under the Lease.  Guarantor agrees that this Guaranty shall remain in force and effect as to any assignment, transfer, renewal, modification or extension of the Lease whether or not Guarantor shall have received any notice of or consented to such renewal, modification, extension, assignment or transfer.

E.    The granting of any extension of time or the forbearance or failure of Landlord to insist upon strict performance or observance of any of the terms of the Lease, or otherwise to exercise any right therein contained, shall not be construed as a waiver as against Tenant or Guarantor of any such term or right and the same shall continue and remain in full force and effect.  Receipt by Landlord of Rent with knowledge of the breach of any provision of the Lease shall not be deemed a waiver of such breach. The Guarantor waives notice of any and all defaults by Tenant in the payment of Base Annual Rent, Additional Rent, or other charges, and waives notice of any and all defaults by Tenant in the performance of any of the terms, of the Lease on Tenant's part to be performed.  Further, Guarantor waives any and all defenses available to tenant under the Lease.

F.    Guarantor further agrees that if Tenant becomes insolvent or shall be adjudicated a bankrupt or shall file for reorganization or similar relief or if such petition is filed by creditors of Tenant, under any present or future Federal or State law, Guarantor's obligations hereunder may

24



A-1280

nevertheless be enforced against the Guarantor.  The termination of the Lease pursuant to the exercise of any rights of a trustee or receiver in any of the foregoing proceedings shall not affect Guarantor's obligation hereunder or create in Guarantor any setoff against such obligation.  Neither Guarantor's obligation under this Guaranty nor any remedy for enforcement thereof, shall be impaired, modified or limited in any manner whatsoever by any impairment, modification, waiver or discharge resulting from the operation of any present or future provision under the National Bankruptcy Act or any other statute or decision of any court.  Guarantor further agrees that its liability under this Guaranty shall be primary and that in any right of action which may accrue to Landlord under the Lease, Landlord may, at its option, proceed against Guarantor or Tenant without having commenced any action against or having obtained any judgment against Tenant or Guarantor.

G.      Guarantor will pay attorneys' fees, court costs and other expenses incurred by Landlord in enforcing or attempting to enforce this Guaranty.

H.      This Guaranty is made and delivered in New York, New York and shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of New York, without regard to the conflicts of laws principles thereof.  Guarantor hereby waives any right to trial by jury in any action or proceeding arising out of this Guaranty.

I.      All terms and provisions herein shall inure to the benefit of the assigns and successors of Landlord and shall be binding upon the assigns and successors of Guarantor.

**IN WITNESS WHEREOF**, the Guarantor has signed this Guaranty on the _18_ day of _OCTOBER_ , 2018.

_____ , Guarantor
TOMAS ESPINOZA
Social Sec. # ███████
Home Address: ███████████████

State of New York           )

County of _QUEENS_          ) ss.:

On the _18_ day of _OCT._ in the year 2018 before me, the undersigned, personally appeared _TOMAS ESPINOZA_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Nick Tsoromokos
Notary Public, State of New York
No. 02TS6096335
Qualified in Queens County
Commission Expires on July 28, 2019

25

| Landlord | Tenant |
|---|---|
| OP | JRR |

A-1281

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, | Civ. No. 20-cv-05301 (RA) |

*Plaintiffs,*

*v.*

The City of New York, *a municipal entity,* Bill de Blasio, *as Mayor of the City of New York,* Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development,* and Jonnel Doris, *Commissioner of New York City Department of Small Business Services,*

*Defendants.*

## DECLARATION OF SANTO GOLINO IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.    INTRODUCTION

### A.    Qualifications and Professional Experience

1.    I am the founder and managing member of the Golino Law Group, PLLC. I earned my Bachelor's degree from St. John's University in 1981 and my Juris Doctorate from St. John's University School of Law in May 1987. I was admitted to practice in New York in January 1988. I was admitted to practice before the United States District and Bankruptcy Courts for the Southern and Eastern Districts in 1995. I make this declaration based on my personal knowledge of and experience with practices and procedures involving real estate in New York City.

2.    For 32 years, my law practice has concentrated almost exclusively in the area of landlord-tenant law and related real-estate law. I represent both landlords and tenants in

11866127

all aspects of commercial and residential real-estate litigation involving landlord-tenant disputes, including but not limited to summary proceedings (including trials, motion practice, and hearings), *Yellowstone* injunctions, and other forms of equitable relief, depositions, settlements, and conferences.

3.       I regularly appear before the New York State Supreme Court in counties within New York City, the New York City Civil Court's Commercial Part, the New York City Housing Court, and the New York State Surrogate's Court, and Westchester and Nassau counties (in addition to practicing before local courts in Westchester and Nassau counties). My work also includes appellate practice before New York's Appellate Divisions and the Appellate Terms of the New York State Supreme Court.

4.       In addition, my practice includes administrative proceedings before the Division of Housing and Community Renewal ("DHCR") involving rent stabilization and rent control issues, the New York City Department of Buildings, the New York City Loft Board, the New York City Department of Housing Preservation and Development ("HPD"), and related Article 78 Proceedings in New York State Supreme Court. Moreover, I have practiced before the United States District Court and Bankruptcy Court in the Southern and Eastern Districts of New York in proceedings related to landlord-tenant matters.

5.       Finally, my practice has included real-estate transactions, including commercial and residential leasing, guaranties, and purchases and sales of real property.

6.       In February 1988, I began my career as an associate attorney at the firm of Kucker, Kraus & Bruh, LLP,[1] a firm concentrating in landlord-tenant law and rent regulation. In 1993, I became a litigation partner at the firm, until I left in November of 2000 to form my own

---

[1] Subsequently known as Kucker & Bruh, LLP, and currently known as Kucker, Marino, Winiarsky & Bittens LLP.

2

firm.  In November 2000, I founded the Law Offices of Santo Golino, where I continued my

practice representing landlords and tenants in most aspects of landlord-tenant law and

regulations.  In 2016, we became known as the Golino Law Group, PLLC.

       7.      Prior to attending law school, I was employed by the New York City

Conciliation and Appeals Board ("CAB"), a quasi-judicial agency.  The CAB was exclusively

responsible for administering and enforcing the Rent Stabilization Law of 1969 ("RSL"), as

amended, the Emergency Tenant Protection Act of 1974 ("ETPA"), as amended, and the Rent

Stabilization Code ("RSC"), for over one million rent-stabilized apartments in New York City.

       8.      From November 1981 until March 31, 1984, I was a Senior Paralegal at

the CAB.  In that position, I was responsible for processing cases and disputes between landlords

and tenants in the areas of rent overcharges, lease renewals and required services, conducting

legal research, and drafting quasi-judicial opinions for Board issuance.  My duties at CAB also

involved administration and management of the Board's Emergency Heat Program from 1981

through 1984.  While at CAB, I regularly advised tenants and owners of their rights and

obligations under the RSL and RSC.

       9.      Pursuant to the Omnibus Housing Act of 1983 (Law of 1983, Chap. 403),

the Legislature merged the CAB and the New York City Office of Rent Control into the DHCR,

effective April 1, 1984.  After the merger with DHCR, I became a Rent Examiner I (civil service

title), continuing much of the same work as I had at CAB, except with an emphasis on required

services under the RSL and RSC, as well as responsibilities for rent controlled tenants under the

N.Y.C. Rent and Eviction Regulations ("Rent Control Law").

10.     In the past, I have published and I often lecture in the fields of landlord-tenant proceedings and DHCR rent-overcharge proceedings. Nevertheless, I do not have any publications in the last ten years that are subject to disclosure.

11.     I serve on the Judiciary Committee of the Association of the Bar of the City of New York, and previously served on its Civil Court Committee and Housing Court Committee. I am a member of the New York County Lawyers Association's Committee on Real Property, the New York County Landlord-Tenant Bar Association, and the New York State Bar Association's Real Property Section.

12.     A copy of my *curriculum vitae* is set forth in Exhibit A to this declaration.

13.     I have not testified as an expert in any cases in the last four years.

14.     I am being compensated at an hourly rate of $525.00 per hour for time spent on this matter. My compensation is not contingent on the nature of my findings or time spent on this matter.

**B.      Assignment and Methodology**

15.     I have been asked by Patterson Belknap Webb & Tyler LLP, counsel for the Plaintiffs in this action, to provide my opinions on the following topics: a) landlord-tenant relationships in New York; b) the statutory context for those relationships in New York; c) the practice of obtaining guaranties for commercial leases, including what are known as "good guy" guaranties; d) the laws and mechanisms in place in New York for property owners to enforce lease terms when tenants fail to meet their obligations; e) practices and procedures in the courts of the State of New York that apply in the event of lease defaults; f) recent New York State and New York City laws enacted following the onset of the COVID-19 pandemic ("the Pandemic"), together with certain Executive Orders issued by Governor Andrew M. Cuomo, as they apply to

4

A-1285

the real estate industry; and g) the impact that those new City laws are likely to have on property owners in New York City.

**C.    Summary of Opinions**

16.    Based on my examination of the recent New York State laws and New York City legislative enactments regarding commercial and residential harassment and personal guaranties, together with my experience in this area (as described above), my opinions, all of which are held to a reasonable degree of certainty in my capacity as an experienced real-estate lawyer are:

   a.  New York City Local Law 53 of 2020 ("the Commercial Harassment Law") and New York City Local Law 56 of 2020 ("the Residential Harassment Law") (collectively "the Harassment Laws") significantly impair the ability of property owners to enforce the terms of their lease agreements, and do so for the benefit of tenants without any substantial injury requirement.

   b.  The Harassment Laws are likely to create significant confusion for many property owners who wish to enforce lease terms and collect back rent during an already complicated time.

   c.  New York City Local Law 55 of 2020 ("the Guaranty Law") encourages judgment-proof tenants to default on their leases, yet retain possession of their leased premises, thereby making it difficult for property owners to meet their own obligations to the City of New York for the payment of real estate taxes and to their own banks and lenders for the payment of mortgage interest and principal.

17.    My opinions and the bases for my opinions are contained in the remainder of this declaration.  A list of the materials that I have considered in connection with this assignment is set forth in Exhibit B attached to this declaration.

**II.    STATUTORY BACKGROUND REGARDING NEW YORK STATE AND CITY LAWS AFFECTING LANDLORD-TENANT RELATIONSHIPS**

18.    Landlord-tenant relations in New York are governed by a patchwork of

5

local, state, and federal legislation.[1]  The principal statutes underlying these relationships are found in Article 7 of the New York Real Property Actions and Proceedings Law ("RPAPL"), the New York Real Property Law ("RPL"), the General Obligations Law ("GOL"), the Rent Stabilization Law of 1969, the Rent Control Law, the Rent Stabilization Code, the New York City Administrative Code, and the Loft Law.

19.    One law that underlies this patchwork of State and City laws and regulations is the Urstadt Law.  In 1971, the New York State Legislature enacted N.Y. Unconsol. Law § 8605, commonly known as the Urstadt Law.  It was part of a package of laws enacted to limit and control the number of vacancies, abandonment, and general disinvestment of rent-controlled housing in New York City because of rent-stabilization laws that had gone into effect years prior.  The Urstadt Law provides as follows:

> No housing accommodations presently subject to regulation and control pursuant to local laws or ordinances adopted or amended under authority of this subdivision shall hereafter be by local law or ordinance or by rule or regulation which has not been theretofore approved by the state commissioner of housing and community renewal subjected to *more stringent or restrictive provisions of regulation and control than those presently in effect.*

*Id.* (emphasis added).

20.    The Appellate Division, First Department has ruled that the Urstadt Law is not limited to Rent Stabilization or Rent Control, and that the Urstadt Law's prohibitions on "expanding control . . . go beyond the issue of rent regulation, and encompass attempts by the local municipality to expand its control over housing units unless approved by the state." *See Alston v. Starrett City, Inc.*, 74 N.Y.S.3d 211, 214 (1st Dep't 2018).

---

[1] I am not presently aware of any federal statutory laws or regulations that are relevant to my opinions on this matter, although I note that the Plaintiffs are asserting claims under the United States Constitution that arise out of the matters on which I am opining.

A-1287

## III.    REAL PROPERTY LEASES

21.    In New York, leases may be in writing or may be entered into orally (for up to one year), allowing the tenant to take possession of the landlord's real property, or part thereof, for a specific term and for a specified rent. There are two main types of leases for real property in New York:  commercial leases and residential leases.

### A.    Commercial Lease

22.    Commercial real-estate leases involve leases for non-residential premises used by commercial and other business operations.  These premises include office spaces, retail stores, restaurants, parking lots, and service establishments, such as hair or nail salons, grocery stores, and bakeries.

23.    In addition to a specified monthly rent, commercial leases almost uniformly require a commercial tenant to pay a portion of the landlord's operating costs – most typically, the tenant's proportionate share of increases in the building's real-estate taxes over a base year (which is tied to lease commencement).  These other charges are usually defined in the commercial lease as "additional rent."

24.    As discussed below, landlords frequently insist on some form of personal or parent-company guaranty as a condition to entering into lease agreements with commercial tenants.

### B.    Residential Leases

25.    Residential leases are for dwellings or premises that are used for human habitation.  These premises can range from private, single-family units to multi-unit apartment buildings.  In New York City, all residential tenancies are subject to some form of statutory or administrative regulation, ranging from Rent Controlled and Rent Stabilized apartments to free-market dwellings.  *See generally* RPL Article 7 *et seq.*; N.Y. Multiple Dwelling Law § 280 *et*

7

*seq.*; the N.Y.C. Housing Maintenance Code, N.Y.C. Administrative Code, Title 27, Chap. 2; GOL §§ 7-101-7-109.

26.    Depending on the type of housing involved, these statutes and regulations may limit the rents that a landlord may charge in a residential lease; prohibit or make unenforceable certain clauses in residential leases; provide tenants with defenses to the obligation to pay rent; or, impose certain maintenance obligations on landlords or minimum standards of living that a landlord must provide in leased-dwelling units.

### C.    Guaranty Agreements in Commercial Leases

27.    Depending on the credit-worthiness of the tenant, a common practice in commercial leasing – retail and office alike – is for landlords to require some form of a personal guaranty to secure performance under the lease.  These guaranties of commercial leases form a central and material aspect of the economic rights of the parties to the lease, and provide critical remedies in the event of a lease default.  In addition, these guaranties enable tenants to lease space which they would otherwise be precluded from leasing because of a property owner's need or desire to place a more creditworthy tenant on the lease, as more fully described below.[2]

28.    In New York commercial leases, guaranty agreements provide additional security where the tenant named on the lease is a corporation, LLC, or other entity, such that the entity's officers or members would be protected from personal liability for the entity's debts. Often, the guarantor is an owner or other principal of the business entity who agrees to be personally liable for the obligations of the tenant.

---

[2] Although lease agreements create relationships between the landlord and tenant, "often times the landlord requires a personal or corporate guaranty, which is a separate agreement executed simultaneously with the lease, making the guarantor liable for the tenant's defaults." 4E N.Y. Prac., Comm. Litig. in New York State Courts § 120:17 (4th ed.).

**A-1289**

29.    Such guaranties can take various forms.  For example, the agreement may constitute a "full" guaranty, where the guarantor guarantees payment of the tenant's obligations through the end of the lease, irrespective of whether the lease is terminated early or not. Alternatively, it may be a limited guaranty, such as a guaranty of a guarantor's obligations through the date when the tenant surrenders possession of the premises to the landlord – which is known as a "good guy guaranty."

30.    Guaranty agreements benefit both owners and tenants.  They encourage property owners to lease property to commercial tenants who may not be as creditworthy (for example, small-business start-ups) by providing a third-party backstop to ensure that the tenant's lease obligations can be fulfilled.  Additionally, guaranties, and particularly good guy guaranties, can discourage tenant holdovers.  Good guy guaranties are generally designed to incentivize tenants to voluntarily surrender a leased property at the end of its term, without the landlord having to resort to an eviction proceeding – the cost of which the tenant may be required to pay. At the same time, these guaranties give the property owner continued security in the event that rent remains unpaid while the tenant is still in possession of the premises.

31.    Good guy guaranties help prevent the worst-case-scenario – which, for a landlord, is when a tenant continues to occupy its premises during and beyond the lease term without paying rent.  Given the length of time needed to complete a typical eviction proceeding, a tenant without a good guy guaranty may be incentivized to continue occupying the leased property, despite the existence of a default, and courts often will not require any interim rent payments from the defaulting tenant during the holdover period.  The terms of such guaranties discourage tenants from obstructing property owners' business following a lease default.

32.    Generally, but not always, guaranty agreements are distinct documents

9

A-1290

from lease agreements with independent obligations.  Guaranty agreements and leases are often "separate undertakings, and the latter are enforceable without qualification or reservation." *Royal Equities Operating, LLC v. Rubin*, 62 N.Y.S.3d 337, 338 (1st Dep't 2017).

## IV.   PROCEDURES IN NEW YORK FOR PROPERTY OWNERS TO INVOKE ENFORCEMENT MECHANISMS TO PURSUE NON-PAYMENT OF RENT AND REPOSSESSION OF PROPERTY

### A.   Background on Summary Proceedings in New York

33.    A summary proceeding is a special proceeding that a landlord can bring in the New York courts to seek "dispossession for the tenant's non-payment of rent or for the tenant's holding over after the expiration of the lease term.  It also serves as the rent-collecting device when the tenant is in default." *See* David Siegel, N.Y. Prac., The RPAPL and the Summary Proceeding; a Perspective § 571 (6th ed.).  Summary proceedings were "designed to provide landlords with a simple, quick, and inexpensive means of recovering possession of real property."[3]  The Legislature attempted to accomplish this goal by "severely limiting the parties" procedural rights and remedies.[4]

34.    Although named "summary proceedings," in New York City, the practice and procedures for handling landlord-tenant disputes have evolved such that they now take significant time to resolve – contrary to what was originally envisioned when the RPAPL was enacted.  As Chief Judge McMahon recently noted in *Elmsford Apartment Associates, LLC, v. Cuomo*, No. 20-CV-4062, 2020 WL 3498456, at *4 (S.D.N.Y. June 29, 2020),

> Evicting a tenant especially a residential tenant – in New York is a slow, cumbersome and extremely tenant-favorable process, especially when compared to analogous procedures in other states. . . . [T]enants in New York City enjoy even more generous protections . . . The way the process actually plays out belies the

---

[3] Daniel Finkelstein & Lucas A. Ferrara, History and background—Summary remedy, G N.Y. Prac, Landlord and Tenant Practice in New York § 15:3 (2019-2020 ed.)
[4] *Id.*

10

term "summary proceeding" that is statutorily authorized to
recover real property from a non-paying tenant.

35.     The summary proceeding process is lengthy and highly regulated, and
generally entails the following: a) service of a notice of default or non-payment to the tenant;
b) after such notice is served, the landlord must file a petition in the appropriate court, which also
must be served on the tenant; c) once the petition is filed, a court hearing is set to determine the
schedule for the summary proceeding; d) following submissions by the parties and, potentially, a
trial on disputed factual issues, the court issues its judgment on the petition; e) a judgment in
favor of a landlord may be for an amount certain awarding back rent owed or may lead to a
warrant of eviction or writ of execution for possession; f) a tenant may request a stay of the
warrant or writ or seek an appeal of the judgment; and g) if a warrant or writ of execution is
issued, possession of the property is returned to the landlord by enforcement of the warrant or
writ.

36.     The most common type of summary proceeding is based on the tenant's
failure to pay rent, commonly referred to as a "non-payment" proceeding.  In most New York
City leases, rent is due on the first of the month.  Therefore, on the second day of the month, the
tenant is technically in default.  In my experience, it is rare for a landlord to commence non-
payment proceedings when a tenant is behind for just one month of rent.  In addition, property
owners will typically hold a security deposit covering at least one month's rent – and sometimes
more for commercial tenants – to protect them in these circumstances.

37.     As a result, New York City landlords will typically wait at least two
months, and sometimes even three, before commencing a non-payment action, and such court
filings are usually preceded by multiple letters demanding payment of the back rent.

**B.      Processes and Timelines for Summary Proceedings Prior to the Housing**

11

**Stability and Tenant Protection Act**

38.     Three types of proceedings are common in New York's landlord-tenant courts:  a) non-payment proceedings; b) holdover proceedings; and c) Housing Part proceedings.[5] Non-payment proceedings make up the overwhelming majority of landlord-tenant cases in New York, and will be the focus of the following discussion.

### 1.   Non-payment Proceedings

39.     Until June 14, 2019 and the passage of the Housing Stability and Tenant Protection Act (which modified such procedures for residential tenants), RPAPL § 711(2) provided that before commencing a non-payment action against either a residential or a commercial tenant, rent had to be demanded either orally or by written demand ("rent demand"), at least three days before commencing the action; this demand needed to be served in the same manner as the Notice of Petition, which starts a summary proceeding.  Such service of the rent demand required at least two attempts at personal service at the premises sought to be recovered – once during business hours, and once during non-business hours on different days.  This meant that a process server needed at least three days to complete service of a rent demand.  The practical effect of this requirement was that a rent demand given to the process server as early as the second day of the month, most likely, would not be served until the fourth or fifth day of the month.  In reality, rent demands were typically given to process servers a day or two later than the second day of the month.

40.     Under RPAPL § 711(2), once service of the rent demand was completed, no action could be taken until the passage of three more calendar days.  Typically, this meant

---

[5] Housing Part proceedings are brought by tenants seeking building repairs or to seek redress for other building code violations.  Such proceedings are beyond the scope of this opinion.  In certain circumstances, *Yellowstone* injunctions may also be available to stay a potential lease default and allow the tenant time to cure.

that the papers commencing the summary proceeding (*i.e.,* a Notice of Petition and Petition) would not be prepared until a week after the tenant was two or three months in arrears on their rent.  The Notice of Petition and Petition must first be filed in N.Y.C. Civil Court, and an index number assigned by the court before it can be served, and it must be served in the same manner as the rent demand.[6]  Therefore, in a best-case scenario, service will not be complete until at least two or three days after the court issues an index number for the case.

41.     Before June 14, 2019, the tenant was statutorily afforded five days (under former RPAPL § 732) to answer the papers by appearing at the Clerk's office of the Civil Court to file an answer.  However, even if the tenant failed to appear until seven to ten days after service was complete, no default would ordinarily have been recorded.  Instead, the practice of the Court was (and is) that the Clerk would typically accept the late answer, assign a court date – usually at least a week after the tenant had appeared in the case – and send a copy of the tenant's answer to the landlord's attorneys with notice of the assigned court date.  The Court would regularly accept late answers almost until an eviction warrant had actually been issued.  For this reason, most landlords' attorneys would usually not submit a request for a default and warrant of eviction until at least five days after the tenant's time to answer had expired, in case an answer arrived in the mail, which would make preparation of the default request a waste of time and resources.

42.     If the tenant failed to appear in response to the Petition, then, in order to obtain a default judgment, the landlord's attorneys would have to prepare a request for a final

---

[6] The Civil Court's the monetary jurisdictional limit of $25,000 does not apply to non-payment summary proceedings.  *See* N.Y.C. Civ. Ct. Act § 204; *Eastrich No. 80 Corp. v. Patrolmen's Benev. Ass'n of N.Y.C. Transit Police Dep't*, 688 N.Y.S.2d 409, 410 (1st Dept. 1999) ("It is of course true that a judgment for rent may be rendered in a summary proceeding without regard to amount." (internal citations omitted)).

judgment and issuance of a warrant of eviction, and then forward these papers to a duly

authorized N.Y.C. Marshal.  The Marshal would then have to prepare their own paperwork and

file the request for the judgment and warrant with the Clerk of the Court.  Given that the Court

will usually accept late answers until the warrant is actually issued, most attorneys do not submit

the warrant request until at least five days after the tenant's time to answer expires.  Once the

warrant request is submitted, at a minimum, it typically takes at least three weeks for a default

warrant to be issued.

       43.    If the tenant was personally served with the Notice of Petition and Petition

commencing the special proceeding, or if substituted service was utilized, then the requested

judgment would have sought re-possession of the premises and recovery of the amount of rent

stated in the Petition.  Because of the time lag affecting the Court's issuance of default warrants,

by the time the default judgment and warrant issue, another month of rent could accrue, but that

rent would not be included in the judgment entered by the court.  Where no personal or

substituted service was effected, and the papers were served by posting them to the door of the

premises and mailing them to the tenant (commonly referred to as "nail and mail" service), then

the default judgment would be for possession only, but not for recovery of money.  In such

circumstances, the landlord would be relegated to a separate plenary action, usually brought after

an eviction occurred,[7] in order to obtain a money judgment for back rent.

       44.    Where the tenant does answer the Petition and a court date is set, the

typical practice would be for the landlord's attorney to try to resolve the matter with the tenant

---

[7]A tenant who is served with a Marshal's notice of eviction after a default usually applies to the Court for an order to show cause to stay the eviction.  If there are no grounds to vacate the tenant's lease default, but if the tenant has the available funds or is otherwise able to make the rent payments, typically, the court's practice is to condition the stay of eviction on the tenant paying the rent arrears.  It is for this reason that landlords ordinarily do not immediately commence separate plenary actions for the monetary judgment.

on the court date.[8]  If no resolution was reached, the case will be adjourned to the court's "first

available" date.  Prior to June 2019, these adjournments were typically for around three weeks,

depending on the calendar of the Part to which the case is assigned. Usually, these adjournments

would allow the tenant time to try to engage counsel, or so that there could be further efforts to

resolve the dispute.

45.     If the tenant failed to appear on the first court date, or at a subsequent

adjourned date, the court typically marked the case as a "default," and the landlord's attorney

had to submit to the Marshal the same request for judgment and warrant as noted above.

46.     In the scenario where the tenant answered in a reasonable time after

service of the Petition was complete, the first court date would likely be at least 25 to 30 days

after the court process had been commenced.  In the typical case, by this point, the rent arrears

would be about three months.  If the case were adjourned, the tenant would then be close to four

months behind in rent.

47.     Where the tenant defaulted entirely, by the time the default was entered

and the warrant issued (because eviction warrants are only issued for execution to a City

Marshal), no eviction could be scheduled until the Marshal informed the landlord or their

attorney that the Marshal had a warrant in his possession.  Once the Marshal received the warrant

and was instructed to proceed with the eviction, the Marshal was required to serve a six business

---

[8] Data from a City report indicates that between 2011 and 2015, 50 percent of eviction petitions were resolved
without the Court's participation.  *See* N.Y.C. Office of Civil Justice, 2016 Annual Report 20 (hereinafter "2016
OCJ Report"),
https://www1.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ%202016%20Annual%20Report.pdf.
However, in August 2017 New York City enacted the Universal Access law, aimed at providing legal services
available to tenants facing eviction.  As a result of this law and the provision of counsel, "tenants were allowed to
remain in their homes in 84% of cases citywide" between July 1, 2018 and June 30, 2019.  *See* Office of Civil
Justice, Universal Access to Legal Services:  A Report on Year Two of Implementation in New York City 23
(2019), *available at*
https://www1.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2019.pdf.

A-1296

days' notice of eviction.  As a result, an eviction notice served on a Monday, for example could result in an eviction on the following Tuesday.  This meant that by the time the eviction was scheduled, the tenant would typically be close to four months in arrears in paying their rent.

48.     Finally, if a tenant appeared in the case and the case could not be resolved following several adjournments, the case would be sent to the Clerk of the Court's trial part for assignment to a trial judge.  Depending on the availability of trial judges, and due to the sheer volume of cases pending in the Court, typically, a trial could be held three or four weeks after being sent to the trial part's Clerk.  After trial, if the Court ruled from the bench, the landlord would have to file the same warrant request through the Marshal.  And, after trial, warrants would be issued, usually, around two to three weeks after the warrant request was filed.

49.     In the usual case, a tenant served with a Marshal's notice of eviction would file an Order to Show Cause requesting:  a) to be relieved of their default, or b) additional time to pay the rent arrears, or c) additional time to move out of the premises.  It is rare for a judge to decline the first Order to Show Cause requested by the tenant.  Based on my years of experience, the average non-payment case would have at least three to four Orders to Show Cause signed by the judge, although there are no legal limitations on the amount of such orders that can be issued by the Court; and in my practice, I have seen many cases where the number of Orders to Show Cause signed by the Court was in the double digits.[9]  Prior to June 2019, Orders to Show Cause were typically returnable a week to ten days after they were signed, and would usually result in the tenant being granted 10 to 30 days to pay the arrears, depending on the circumstances of the case.

---

[9] Courts have rejected the adoption of a "hard and fast rule" in determining what circumstances judges should issue Orders to Show Cause. *See Parkchester Apartments Co. v. Heim*, 607 N.Y.S.2d 212, 213 (1st Dep't 1993).

50.     Therefore, until June 2019, on average, it would typically take four to six

months after a case was commenced for a landlord to obtain a judgment awarding back rent,[10]

but these cases may also "span calendar years." *See* 2016 OCJ Report at 20, fn. 21.

**2.  Holdover Proceedings**

51.     Holdover proceedings, generally, are initiated by landlords against tenants

for lease violations arising from issues other than non-payment, including pet violations, creating

nuisances, or remaining in a unit beyond the expiration of the lease's terms.

52.     Before the passage of the Housing Stability and Tenant Protection Act,

property owners had to serve tenants with holdover petitions at least five days before the first

court appearance, and they could demand an answer three days before the initial court date if the

Petition was served at least eight days before the trial date.  Many of these provisions were

amended by the Housing Stability and Tenant Protection Act.

**C.     THE HOUSING STABILITY AND PROTECTION ACT OF 2019**

53.     On June 14, 2019, the Governor signed into law the Housing Stability and

Tenant Protection Act of 2019 (the "HSTPA").  This Act made fundamental changes to how

summary proceedings are handled for residential tenants, and made permanent several

protections for commercial and residential tenants throughout the State of New York.

54.     Prior to the HSTPA, as discussed, in order for a property owner to initiate

a non-payment proceeding, the owner had to first demand the rent orally or provide three-days'

written demand notice before filing a summary proceeding.  The HSTPA eliminated the oral

rent-demand option, and instead requires a written demand, and for landlords to separately send

---

[10] *See, e.g.*, N.R. Kleinfield, "Unsheltered – Where Brooklyn Tenants Plead the Case for Keeping Their Homes",
N.Y. Times (May 20, 2018), https://nyti.ms/2TUeCUm.
Even with the entry of a judgment for back rent, it could take still longer to recover the amount awarded in such a
judgment.

tenants, *by certified mail,* notices informing the tenant that rent was not received within five days

past the due date.  Under RPL § 235-e (d), the failure to send such a notice constitutes an

affirmative defense to the non-payment proceeding.  *See Lawler v. Carfield*, 114 N.Y.S.3d 621,

626 (N.Y. City Ct. 2019).

55.     The Act also expanded to 14 days the jurisdictional notice period between

service of a rent-demand notice on a tenant and the subsequent commencement of a proceeding

for non-payment. *See* RPAPL § 711; Gerald Lebovits et al., NY's Housing Stability and Tenant

Protection Act of 2019 Part III – What Lawyers Must Know, N.Y. State Bar Association (Dec. 1,

2019), *available at* https://nysba.org/nys-housing-stability-and-tenant-protection-act-of-2019-

part-iii-what-lawyers-must-know/#. When the time for service is included, a period of at least 17

days, and usually more, will now pass before the landlord can take the next step of filing a

summary proceeding.

56.     The HSTPA also extends the answer period.  The HSTPA now gives

tenants ten days to answer a non-payment petition – up from five days under the old law.

RPAPL § 732.  When coupled with the time for service of the rent demand, it typically takes

about 30 days – after the tenant is already two to three months in arrears – before the landlord

can apply for a default judgment, and closer to 40 days before the parties will appear before a

judge. Moreover, the HSTPA codifies the requirement that a tenant's payment of rent prior to the

commencement of non-payment proceedings must be accepted by the landlord, thereby requiring

the dismissal of eviction proceedings if such late payments are received.  *Id.* § 731 (4).

57.     In addition, the HSTPA amended RPAPL § 745(1) to require that

adjournments of such court proceedings be for a minimum of 14 days.  The practical effect of

this new rule is that court calendars have become even more backed up.  As a result, prior to the

onset of the Pandemic, in most non-payment cases, adjournments were typically for four to six weeks.

58.     With respect to deregulated residential tenancies, before the adoption of the HSTPA, when a lease ended, the tenant had to vacate the premises.  If the tenant failed to do so, the landlord could bring a holdover proceeding, with no notice required.  The HSTPA now requires a landlord to give: a) a tenant of less than one year, a 30-day notice of non-renewal of their lease; b) a tenant of at least one year but less than two years, a 60-day notice of non-renewal; and c) for a tenancy of at least two years, a 90-day notice of non-renewal.  Failure to provide the requisite timely notice will extend the tenancy until the end of the applicable time period, measured from when the landlord gives the notice.

59.     Similar to non-payment proceedings, courts may issue stays of warrant executions for up to one year.  However, when a holdover proceeding is brought because a tenant has breached a provision of the lease, under the HSTPA, courts are required to issue a 30-day stay of execution in order to allow a tenant to cure the breach.  RPAPL § 753.  Prior to the HSTPA, the automatic-stay period was ten days.

60.     The HSTPA also allows a judge to stay a warrant of eviction for one year, up from six months under prior law. *Id.* Even without the issuance of a stay of a warrant for eviction, several months can pass before a property owner can repossess its premises from a holdover tenant. As the First Department has noted, "[a] period of approximately five months for the owner to recover possession of commercial realty . . . is not an unreasonable amount of time. *Duane Reade, Inc. v. Reade Broadway Associates*, 710 N.Y.S.2d 566 (1st Dep't 2000).

61.     As a result of the new requirements imposed by the HSTPA, the former four to six weeks' period to obtain an award of rent through the judicial process had been

increased by around two or three months during the period prior to the Pandemic.

## V.  RECENT LIMITATIONS ON REMEDIES AVAILABLE TO LANDLORDS AS A RESULT OF NEW YORK STATE LAWS AND EXECUTIVE ORDERS ADOPTED IN LIGHT OF COVID-19

62.     In response to the Pandemic, a combination of recent legislative and executive actions in the real estate field have severely constrained landlords' abilities to regain possession of their property from defaulting tenants.  Those actions have included: a) laws passed by the New York State Legislature ("the Legislature), and b) executive orders issued by New York's Governor, Andrew M. Cuomo, under authority granted by the Legislature.

### A.   Governor Cuomo's Executive Orders

63.     In March 2020, the Legislature expanded Governor Cuomo's emergency powers by passing an amendment to Section 29-a of the New York State Executive Law, so as to allow the Governor to "issue any directive during a state disaster emergency declared" in an "epidemic[] [or] disease outbreak . . . ." and to "provide for procedures reasonably necessary to enforce such directives." This amendment currently expires on April 30, 2021.

64.     Exercising these expanded powers, on March 20, 2020, Governor Cuomo issued Executive Order 202.8, instituting a temporary moratorium on commercial and residential evictions for a period of 90 days.

65.     On May 7, 2020, the Governor extended that moratorium through another Executive Order. That Order prohibited landlords and building owners from commencing summary proceedings for an additional period of 60 days from June 20, 2020, but only if the tenant had experienced "financial hardship due to the COVID-19 pandemic" or was eligible for state or federal benefits, including unemployment insurance.  This directive extended the eviction moratorium until at least August 19, 2020, but only for tenants who had suffered a direct injury from the Pandemic.  Importantly, on July 6, 2020, Governor Cuomo rescinded this

moratorium with respect to residential tenants, given that the protections afforded to residential

tenants had been superseded by the Tenant Safe Harbor Act (discussed below) that was passed

by the Legislature; at the same time, the Governor continued these protections for commercial

tenants. *See* Exec. Order 202.48.

66.     Executive Order 202.28 also allows landlords and tenants or licensees of

residential properties, at the consent of the tenant or licensee, to enter into written agreements

through which the tenant's security deposit, and any accrued interest, can be used to pay back or

future rent. This Order prohibits landlords form harassing or threatening tenants to enter into

such agreements. If the amount of the security deposit is less than a full month's rent, the consent

of the tenant or licensee does not constitute a waiver of the remaining rent that is due for that

month.

67.     Significantly, the tenants or licensees of residential properties who qualify

for this relief under this Order are limited to those who:  a) are eligible for unemployment

insurance or benefits under state or federal law; or b) are otherwise facing hardship due to the

Pandemic.  Landlords must provide this relief to tenants or licensees who request it, provided

that they meet the specified eligibility requirements.  Tenants are obligated to replenish their

security deposits with monthly payments, beginning 90 days after the security deposit is used as

rent.

68.     This Order suspends the operation of Sections 7-103, 7-107 and 7-108 of

New York's General Obligations Law.

69.     Executive Order 202.28 further suspends the operation of Section 238-a(2)

of the RPL so as to prohibit landlords, lessors, sub-lessors or grantors from demanding any

payment, fees, or charges for late rent payments against residential tenants during the period March 20, 2020 through August 20, 2020.

**B.    The Emergency Rent Relief Act**

70.    In response to the Pandemic, the Legislature also passed legislation regarding the relationship between property owners and their tenants, and in particular, impacting the collection of rent.

71.    On June 17, 2020, the Governor signed into law the Emergency Rent Relief Act of 2020 ("the ERRA").  That Act directs $100 million in federal monies from the CARES Act to a fund that subsidizes rent payments for residential tenants in financial distress due to the Pandemic.

72.    Under the ERRA, property owners can receive rental-assistance vouchers on behalf of tenants who have experienced an increase in their rent burden during the period April 1, 2020 through July 31, 2020 due to a loss in income resulting from the Pandemic. Critically, the ERRA limits this rent relief to eligible tenants whose: a) rent exceeds more than 30% of their household income, and b) household incomes are 80% of their area median income, measured prior to March 7, 2020.  The voucher subsidy covers the gap between the tenant's pre-COVID-19 rent burden and their new rent burden, and up to 125% of their fair market rent.

73.    This rent relief program is being administered by the New York State DHCR, a State agency that is responsible for supervising, maintaining and developing affordable housing across the State.

**C.    Tenant Safe Harbor Act**

74.    On June 30, 2020, Governor Cuomo also signed into law the Tenant Safe Harbor Act ("the TSHA").  The TSHA prevents a court from issuing a warrant of eviction for

residential tenants or occupants who can establish that they have experienced a "financial hardship" during a specified "COVID-19 period."

75.     The TSHA defines the COVID-19 period as the time between March 7, 2020 and a to-be-determined date on which Governor Cuomo's COVID-19 related restrictions on non-essential gatherings expire.  The Act bars courts from evicting certain residential tenants who have experienced financial hardship based on non-payment of rent during that time period. In determining if a tenant has experienced a financial hardship during the COVID-19 period, a court is to consider: a) the tenant's income both before and during the COVID-19 period, b) the tenant's liquid assets, and c) the tenant's eligibility for disability, unemployment insurance, or other benefits under state or federal law, including cash assistance, supplemental nutrition assistance program, supplemental security income, and the home energy assistance program. The Act expressly allows landlords to commence summary proceedings, and courts are not prohibited from awarding judgments for back rent due through such proceedings.

## VI.     THE CITY COUNCIL'S RECENT ACTIONS AFFECTING ENFORCEMENT OF LEASE OBLIGATIONS

### A.     The Harassment Laws

76.     On May 26, 2020, Mayor de Blasio signed into law the City's new Harassment Laws.  These Laws were passed as part of the City's response to the Pandemic.

77.     The Harassment Laws amend the N.Y.C. Administrative Code so as to substantially broaden the scope of prohibited tenant harassment.

78.     Based on my practice, these two recently enacted Harassment Laws have created confusion for many property owners who wish to enforce lease terms and collect back rent during an already complicated time.  Previously, for commercial tenancies, N.Y.C. Administrative Code § 22-902 set forth 13 acts and omissions which, if taken by or on behalf of

23

a property owner, would constitute harassment should such act or omission "reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property . . . ."

79.     Through the Commercial Harassment Law, the City extended the harassment protections of Section 22-902 of the N.Y.C. Administrative Code so as to prohibit landlords from "threatening" a commercial tenant based on either: a) the "tenant's status as a person or business impacted by COVID-19"; or b) the "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period." This second trigger for harassment penalizes landlords who extend forbearances of back rent and hinders them from ever collecting this unpaid rent. Violations of this new Law may be punished by civil penalties of $10,000 to $50,000. Notably, these new Harassment Laws contain no definition of the prohibited term "threatening."

80.     This new Commercial Harassment Law broadly defines the term "impacted by COVID-19" for both businesses and individuals. A person "impacted by COVID-19" is defined as:

    a.    a person diagnosed with COVID-19 or experiencing COVID-19 symptoms and seeking a medical diagnosis;

    b.    a person who has a member of their household who was diagnosed with COVID-19;

    c.    a person providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

    d.    a person with primary caregiving responsibility for a member of their household who was unable to attend school or another facility that was closed due to the COVID-19 State disaster emergency, and such school or facility care was required in order for the person to work;

    e.    a person who could not reach their place of business because of a quarantine imposed as a result of the COVID-19 State disaster emergency,

or because the person had been advised by a health care provider to self-quarantine due to COVID-19 concerns;

f.    a person who became primarily responsible for financial support for their household because the prior household head died as a result of COVID-19; and

g.    a person whose business was closed as a direct result due to the COVID-19 State disaster emergency.

81.    These triggers are phrased so expansively that, in my opinion, and, based on my experience litigating issues of landlord-tenant relations, they could be invoked by extremely broad classes of New Yorkers who seek to avoid paying rent – regardless of whether they have suffered a direct and substantial injury due to COVID-19.

82.    Under the Commercial Harassment Law, a business "impacted by COVID-19" is defined in similarly sweeping terms as a business that: a) had to shut down for the COVID-19 period because it was subject to certain executive orders of the Governor or Mayor; and b) its revenues during any three-month period were less than half of its revenues for the same three-month period in 2019, or less than half of its aggregate revenues for the month of December 2019, January 2020, and February 2020, and such revenue loss was the direct result of the COVID-19 State disaster emergency.

83.    Significantly, the Commercial Harassment Law's definition of "impacted by COVID-19" for businesses or persons fails to include any substantial injury requirement that would impact the tenant's ability to pay rent. Although this Law contains a short-term revenue threshold for businesses, that trigger does not link to either the tenant's profits from the business, or the capital which backs up its finances. As a result, businesses that qualify for the protections of the Commercial Harassment Law would necessarily include entities and individuals that do not actually merit financial assistance.

25

84.     The Commercial Harassment Law defines the "COVID-19 period" as

follows: "March 7, 2020 through the later of: (i) the end of the first month that commences after

the expiration of the moratorium on enforcement of evictions of any tenant, residential or

commercial, set forth in executive order number 202.8, as issued by the governor on March 20,

2020 and extended thereafter, (ii) the end of the first month that commences after the expiration

of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid,

relief, and economic security, or CARES, act and any subsequent amendments to such section or

(iii) September 30, 2020, inclusive."

85.     As outlined above, before an eviction proceeding can go forward, an

owner must make a written demand for rent. The Commercial Harassment Law and the

Residential Harassment Law's language is both broad and unclear as to the type of

communications by landlords that are now prohibited. Both Harassment Laws make it difficult

for property owners to determine what may constitute prohibited "harassment," as opposed to

what may be permissible demands for unpaid rent. Pursuant to N.Y.C. Administrative Code §

22-903(a), if a court finds that a landlord has engaged in harassment, a court "shall impose a civil

penalty in an amount not less than ten thousand dollars and not more than fifty thousand dollars"

and may award compensatory damages, punitive damages and reasonable attorneys' fees and

court costs.

86.     The confusion brought on by these laws serves as a substantial advantage

in my own practice representing tenants. For several tenants of these clients, procedural delays

are used to slow down the judicial process, thereby allowing them time to cure defaults or

bargain for concessions from property owners. These Harassment Laws, as written, may permit

tenants to claim "harassment" if they are dissatisfied with the bargaining positions once negotiations have broken down.

87.     Recent case law on this issue compounds the burden on property owners of these new Local Laws.  In April of this year, a decision issued by the Civil Court held that commercial harassment under the existing Administrative Code provisions was not judged by "the landlord's intent . . . . Rather, it is the effect on the small business tenant that becomes the focus on the determination of harassment . . . [and] whether or not landlord's conduct would reasonably cause the small business tenant to vacate leasehold premises or to surrender or waive any rights under the lease or other rental agreement." *One Wythe LLC v. Elevations Urban Landscape Design Inc.*, 67 Misc. 3d 1207(A), 2020 WL 1917760, at *8 (N.Y. Civ. Ct. Kings Cty. April 17, 2020).  The Court closely considered the statutory language and ruled that prohibited harassment was based on the impact on the tenant – regardless of the intentions of the property owner.

88.     Moreover, the new Harassment Laws fail to take into account the number of property owner representatives who are often involved – ranging from property managers to paralegals and lawyers – any of whom could trigger liability when communicating with a tenant in an effort to resolve rent disputes.  The informal communications between these representatives that often lead to an amicable resolution may now open up property owners to needless litigation, that will, inevitably, burden the judicial the system due to the sheer volume of cases.

89.     The savings clause of Section 22-902(b), which provides that a property owner's "lawful termination of a tenancy, lawful refusal to renew or extend a lease or other rental agreement, or lawful reentry and repossession of the covered property shall not constitute commercial tenant harassment" does not ameliorate the problematic issues discussed above. In

my view, this language fails to clarify whether making simple rent demands, either by phone, email or letter, or following up with a legal demand, is statutorily prohibited. And given the manner in which summary proceedings are handled, this type of savings clause language can often be disregarded by the judge presiding over a case.

90.     In addition, in the context of non-payment and holdover proceedings, pursuant to RPAPL § 743, a commercial tenant may interpose "any . . . counterclaim." Such a counterclaim can be for violation of Section 22-902 of the Administrative Code. Under Section 22-903(a)(3), the court is empowered to award to the tenant compensatory and punitive damages, costs, and attorney's fees, as outlined above, and under Section 22-903(b), any amounts awarded would be offset against the back rent that the tenant owes.

91.     Similarly, the Residential Harassment Law amends Section 27-2004(a)(48) of the N.Y.C. Administrative Code to prohibit landlords from "threatening" a residential tenant who has:  a) "actual or perceived status as an essential employee"; b) "status as a person impacted by COVID-19"; or c) received "a rent concession or forbearance for any rent owed during the COVID-19 period. . . ."

92.     The Residential Harassment Law suffers from many of the same defects as discussed above regarding the Commercial Harassment Law.  The term "threatening" is similarly undefined, and what it means to be "impacted by COVID-19" is framed in terms that are quite sweeping in their reach in that this new Law contains no substantial injury requirement. Violations of this provision are punishable by a civil penalty of $2,000 to $10,000 and also subject to punitive damage awards and legal fees.

**B.     The Guaranty Law**

93.     On the same day as he signed the Harassment Laws, Mayor de Blasio signed in to law the Guaranty Law.  The Guaranty Law amends the N.Y.C. Administrative Code,

adding new Section 22-1005, and shields natural persons who have agreed to personal liability as a guaranty for commercial leases. This new Guaranty Law forever prohibits the enforcement of personal liability provisions in commercial leases or rental agreements of certain businesses for defaults arising during a defined period of time.

94.     This new City Law bars property owners from holding personal guarantors of certain commercial tenants responsible for unpaid rent if the following conditions specified in Governor Cuomo's executive orders are met:  a) the tenant had to stop serving patrons food or beverage on premises, or had to discontinue operations under Executive Order 202.3; b) the tenant was a non-essential retail business owner, and was subject to in-person limitations under Executive Order 202.6; or c) the tenant had to close its business to the public under Executive Order 202.7 (such as barbers or cosmetologists).  If any of those conditions are met, and there is a lease guaranty holding one or more persons, other than the tenant, liable for the tenant's default, the property owner is forever barred from enforcing that guaranty in order to collect unpaid rent, utilities, fees, building maintenance charges, or taxes owed by the tenant for defaults arising between March 7, 2020 and September 30, 2020.

95.     The Guaranty Law also amends N.Y.C. Administrative Code § 22-902(a) so as to define prohibited "harassment" to include any attempt to enforce a personal guaranty that is covered by this new Law.

96.      By rendering these critical guaranties permanently unenforceable for defaults during the defined period, the City's Guaranty Law has deprived property owners of a critical remedy that is key to their original economic bargain as memorialized in their lease.  In my experience, most landlords would typically be unwilling to enter into commercial leases without guaranty agreements of this nature.  By depriving landlords of their contractual rights to

enforce these guaranties, and effectively eliminating vital terms of the lease, the City has essentially destroyed the economic value of these leases during the period covered by the Guaranty Law.

97.     Given this new Law's failure to include any substantial injury requirement, by its terms, it lets guarantors off the hook for rent defaults, regardless of whether they have the capital to withstand the impacts of the Pandemic. Nothing in the terms of the Guaranty Law limits its evisceration of these guaranties to businesses that have suffered any sort of financial or other injury due to the crisis.  Nor does this Law consider the assets that may be available to back a particular business's finances. As a result, in my view, this Law will be available to be invoked by, and result in the permanent cancellation of guaranties that could be used to enforce the defined rent defaults for, a wide range of businesses – even if they have access to other financial support to make it through the current difficult times.  In my opinion, the result of this Law is to shift onto property owners – who have their own bills to pay (*e.g.*, for property taxes, mortgage financing costs, and maintenance expenses) – the economic burden of these rent defaults.

98.     Since the start of the Pandemic, most landlords with whom I have interacted have engaged in discussions with commercial tenants regarding rent deferments. In my experience, they have done so given the current market conditions; few landlords desire to have empty commercial space that may be difficult to re-let during the Pandemic.  Among other reasons, my experience is that tenants have sought these sorts of rent deferral arrangements in order to avoid potential personal liabilities that would arise on the part of guarantors under these personal guaranties.  More importantly, tenants have typically sought to utilize every available avenue to attempt to salvage their businesses. In my view, both landlords and tenants have

30

A-1311

tended to acknowledge the difficult financial circumstances brought on by the Pandemic, but have instead chosen to figure out ways for tenants to salvage their businesses — and in many cases, their life's work. This has been done in the hope that New York City's economy, particularly for small and mid-sized businesses, will eventually return to normal operations.

99.     However, since the enactment of this Guaranty Law forever insulating personal guarantors from liability for tenant rent arrears during the defined period, I have seen more commercial tenants seeking to surrendering their tenancies so they can walk away from their premises.  In my estimation, this has been done in order to avoid potential personal liability under guaranty agreements.  This is particularly the case with good guy guaranties, where a required surrender notice period under the guaranty would end before the September 30, 2020 expiration date these new legal protections for guarantors. These types of guaranties have thus incentivized businesses to walk away from leases quickly in order to take advantage of the Law's guaranty cancellation provisions before the Law's covered period expires.

100.     This phenomenon has left property owners with little or no recourse to enforce their commercial leases, and in my opinion, has created perverse incentives that are harmful to struggling property owners, to small businesses, and to the City's and State's economies. Many in the real-estate market anticipate that by Fall of 2020, there will be a glut of vacant storefront commercial space in New York City which will be difficult to rent, or will rent below former market values.[8] This will make it difficult for landlords to meet their real-estate tax obligations, mortgage financing costs, and other operating expenses. It will also likely increase the number of vacant storefronts in the City.

---

[8] *See* Josh Barro, Here's What the Trouble in Commercial Real Estate Means for You, N.Y. Mag. (July 8, 2020), *available at* https://nymag.com/intelligencer/2020/07/coronavirus-possible-permanent-effect-on-retail-real-estate.html.

101.    Accordingly, the City's new Guaranty Law will forever destroy the value of critical guaranties that landlords relied on in entering into commercial lease agreements, and thereby damage property owners, tenants, and the City alike.

## CONCLUSION

102.    As discussed above, though well intentioned, the Harassment and Guaranty Laws, respectively, impose more confusion on property owners seeking to collect rent, inhibit and delay the ability collect lawfully owed rent, and create perverse incentives for tenants who once had guarantors who could be held accountable for any potential lease defaults.

A-1313

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 22, 2020.

Santo Golino
NY Registration No. 2158806
E-mail: s.golino@golinolaw.com
46 Trinity Place, 3rd Floor
New York, New York 10006
Telephone:  (212) 344-9300
Fax:  (212) 363-9444

A-1314

# Exhibit A

A-1315

# GOLINO LAW GROUP, PLLC

46 Trinity Place
New York, N.Y.  10006
(212) 344-9300
Fax: (212) 363-9444

SANTO GOLINO*‡
BRIAN W. SHAW **
───────
LOUIS MARINOS †
LORRAINE GOLINO*

*Member of N.Y. and  CT. Bars
† Member of N.Y. and N.J. Bars
‡ Member of S.D.N.Y. and E.D.N.Y.
**Member of S.D.N.Y.

OF COUNSEL

HOLLIS B. VANDAMME
───────
LEGAL ASSISTANTS

LAURA SANCHEZ
MARY A. FALES

## CURRICULUM VITAE

### Golino Law Group PLLC (formally Law Offices of Santo Golino) (est. Nov. 2000)

The firm was founded as a solo practice by Santo Golino in November 2000 under the name of Law Offices of Santo Golino, after having practiced for 12 years at the firm of Kucker & Bruh, LLP (formally Kucker, Kraus & Bruh, LLP) where he was a litigation partner for seven (7) years.

Since 1988, Santo Golino's practice has concentrated on all aspects of commercial and residential real estate litigation involving landlord-tenant disputes, including appellate practice at the Appellate Term and Appellate Division, as well as administrative proceedings involving Rent Stabilization, Rent Control, the Dept. of Buildings, the Loft Board, the Dept. of Housing Preservation and Development and other aspects of tenant protection regulations,  as well as real estate transactions and practice in the Federal Courts on related landlord-tenant matters.

In 2016, Brian W. Shaw was made a partner, at which time the firm name changed.

### Kucker & Bruh, LLP (formally Kucker Kraus & Bruh, LLP) (1988-2000)

**Litigation Partner, November 1, 1993 to November 9, 2000;**
**Associate Attorney,  February 1988 through October 1993**

Conducted all aspects of  general, commercial and residential real estate and landlord-tenant litigation in Housing Court, Civil Court,  Supreme Court and Federal Court, as well as before administrative agencies, including but not limited to,  jury trials, bench trials, appeals to the Appellate Term and Appellate Division, motion practice,  hearings, depositions, settlements and conferences; supervision of litigation staff of (7) associate attorneys, as well as support staff; conducted real estate transactions including closings and drafting and preparation of commercial and residential leases and riders.

-1-

## N.Y.S. DIVISION OF HOUSING AND COMMUNITY RENEWAL (*formally NYC Conciliation and Appeals Boara*) (1981-1988)

**Counsel to the Rent Administrator, June, 1987 to February 1988.**

Duties included advising the Administrator on all aspects of housing regulations; deciding the merits of requests for reconsideration of the Administrator's orders; recommending policy and procedures; addressing inquiries of legislators, attorneys and the general public; legal research; consulting with Deputy Counsel.

**Supervisor of Services Unit, November, 1984 to June, 1987.**
Immediate and direct supervision of a large unit of rent examiners, clerical and secretarial staff; review proposed orders prepared by rent examiners; train and instruct rent examiners law; process complex cases, train new personnel; administrative duties in daily management of the section.

**Lecturer** at Executive Management Training Seminar on Implementation and Application of New Rent Stabilization Code, May, 1987.

**Rent Examiner I, April, 1984 to November, 1984.**
Pursuant to State take over of the N.Y.C. Conciliation and Appeals Board duties remained substantially the same.

## N.Y.C. Conciliation and Appeals Board, (November, 1981 to April, 1984 merger with DHCR)

**Senior Para Legal**
Processed cases involving disputes between tenants and owners in the areas of rent overcharges, lease renewals and required services; legal research; writing final quasi-judicial opinions for Board issuance; responsible for administration and management of the Board's Emergency Heat Program from 1981 through 1984; advising tenants and owners of their rights and duties under the Rent Stabilization Law and Code.

## EDUCATION:

**St. John's University School of Law**, Juris Doctor Degree awarded June 1987
**St. John's University**, Bachelor of Science Degree awarded June, 1981

## ADMISSIONS:

Admitted to New York Bar January, 1988;
Admitted to Connecticut Bar December, 1987,
Admitted to Federal U.S. Southern and Eastern Districts May, 1995

**Member of the NYC Bar Association**
    **Present Member of the Judiciary Committee**
    **Past member of the Civil Court Committee and the Housing Court Committee;**

A-1317

**Member of the NY County Lawyers Association**
  **Committee on Real Property;**
**Member of the NY County Landlord-Tenant Bar Association**
**Member NYS Bar Association;**
**Member American Bar Association**

<u>**PUBLICATIONS:**</u>

  **Discovery in Summary Landlord-Tenant Proceedings,** NYLJ March 20, 2000, p. S3;
  **Should Rent Deposits Be Required for Tenants,** NYLJ Sept. 18, 1997, p. S3, col.1;
  **Mandatory Rent Deposits? Tenants Use Delaying Tactic to Gain Edge in Current**
  **System**, NYLJ March 11, 1996, p. S3, col. 1;
  **Rent Overcharge Claims by New York City Tenants**, NYLJ Sept. 25, 1995, p. S3. col. 1.

<u>**CLE SPEAKER**</u>

  **Feb. 2017  NYSBA, Real Property Law Section, "The Tenant Protection Unit: A**
  **Practitioner's View";**
  **Nov. 2010  Queens County Bar Association , "Landlord & Tenant Update 2010";**
  **Nov. 2008 Queens County Bar Association , "Landlord & Tenant Update 2008"**

A-1318

# Exhibit B

A-1319

## List of Materials and Sources

### Cases

*Alston v. Starrett City, Inc.*, 74 N.Y.S.3d 211, 214 (1st Dep't 2018)

*Eastrich No. 80 Corp. v. Patrolmen's Benevolent Ass'n of the N.Y.C. Transit Police Dep't*, 688 N.Y.S.2d 409, (1st Dep't 1999)

*Elmsford Apartment Assocs. L.L.C. v. Cuomo*, No. 20-CV-4062, 2020 WL 3498456 (S.D.N.Y June 29, 2020)

*Lawler v. Carfield*, 114 N.Y.S.3d 621(2019)

*Melendez v. City of New York*, Case 1:20-cv-5301, Complaint (July 10, 2020)

*One Wythe LLC v. Elevations Urban Landscape Design, Inc.,* 66 Misc.3d 1223(A), 2020 WL 1917760, at *8 (N.Y. Civ. Ct. April 17, 2020)

*Royal Equities Operating, L.L.C. v. Rubin*, 67 N.Y.S.3d 337, 338 (1st Dep't 2017)

*Duane Reade, Inc. v. Reade Broadway Associates*, 710 N.Y.S.2d 566 (1st Dep't 2000)

*Parkchester Apartments Co. v. Heim*, 607 N.Y.S.2d 212, 213 (1st Dep't 1993)

### Declarations

Declaration Of Ling Yang In Support Of Plaintiffs' Motion For A Preliminary Injunction (July 9, 2020)

Declaration Of Marcia Melendez In Support Of Plaintiffs' Motion For A Preliminary Injunction (July 9, 2020)

### Codes, Statutes, Reports

N.Y.C. Administrative Code §22-902

N.Y.C. Administrative Code §22-903

N.Y.C. Administrative Code §22-1005

N.Y.C. Administrative Code §27-2004

The New York City Council Legislation - Int. No. 1914-A, New York City Local Law 53 of 2020 ("the Commercial Harassment Law")

The New York City Council Legislation - Int. No. 1932-A, New York City Local Law 55 of 2020 (2020) ("the Guaranty Law")

The New York City Council Legislation - Int. No. 1936-A, New York City Local Law 56 of 2020 ("the Residential Harassment Law")

Rent Stabilization Law of 1969 ("RSL")

1

A-1320

Emergency Tenant Protection Act of 1974 ("ETPA")

Emergency Rent Relief Act of 2020 ("the ERRA")

Tenant Safe Harbor Act ("the TSHA")

Rent Stabilization Code ("RSC")

Loft Law – Multiple Dwelling Law Article 7

Omnibus Housing Act of 1983 (Law of 1983, Chap. 403)

N.Y. Practice Series §15:3, Landlord and Tenant Practice in New York

4E N.Y. Practice Series §120:17, Commercial Litigation in New York State Courts (4th ed.)

Housing Stability and Tenant Protection Act of 2019 (the "HSTPA"), State of N.Y., Bill A08281 (June 11, 2019)

RPL § 226, et seq.

RPL § 227, et seq.

RPL § 228

RPL § 229

RPL § 232, et seq.

RPL § 233, et seq.

RPL § 235, et seq.

RPL § 238, et seq.

RPAPL § 711

RPAPL § 731

RPAPL § 732

RPAPL § 735

RPAPL § 743

RPAPL § 745

RPAPL § 749

RPAPL § 753

N.Y. Real Property Actions and Proceedings Law, Art. 7, Summary Proceeding to Recover Possession of Real Property.

N.Y. Real Property Law, Article 7, Landlord and Tenant

N.Y. Unconsol. Law § 8605 (Urstadt Law)

McKinney's N.Y. City Civ. Ct. Act § 204., §204 Summary Proceedings

McKinney's General Obligations Law § 701, Article 7 Summary Proceeding
§701. Jurisdiction; Courts; Venue, NY RP ACT & PRO §701

McKinney's General Obligations Law § 7-101. Money deposited or advanced for use or rental of
personal property; waiver void

McKinney's General Obligations Law § 7-109. Commencement of a proceeding or action by the
attorney general to compel compliance

N.Y.C. Housing Maintenance Code (N.Y.C. Administrative Code, Title 27, Chap 2)

N.Y. General Obligations Law, Article 7 Obligations Relating to Property Received as Security

N.Y. Executive Order 202, as Amended including 202.3, 202.6, 202. 7, 202.8, 202.28 and 202.48

N.Y. State Dept. of Economic Development d/b/a Empire State Development, Guidance on
Executive Order 202.6

Administrative Orders of the Chief Administrative Judge of the Courts, AO 78-2020, et seq.
(March 22, 2020)

State of N.Y., S8192b (Tenant Safe Harbor Act) April 13, 2020

State of N.Y., S8419 (Emergency Rent Relief Act of 2020) May 25, 2020

NYC Office of Civil Justice (OCJ) 2016 Annual Report

NYC Office of Civil Justice (OCJ) Universal Access to Legal Services: A Report on Year Two
of Implementation in New York City 23 (2019)

**Article, Books, Websites**

Gerald Lebovits et al., NY's Housing Stability and Tenant Protection Act of 2019 Part III – What
Lawyers Must Know, N.Y. State Bar Association (Dec. 1, 2019), https://nysba.org/nys-housing-
stability-and-tenant-protection-act-of-2019-part-iii-what-lawyers-must-know/#.

"Unsheltered – Where Brooklyn Tenants Plead the Case for Keeping Their Homes", by N.R.
Kleinfield in The New York Times, May 20, 2018

"Here's What the Trouble in Commercial Real Estate Means For You", by Josh Barro in The
Top Line, July 8, 2020, *available at* https://nymag.com/intelligencer/2020/07/coronavirus-
possible-permanent-effect-on-retail-real-estate.html.

N.Y.C. Civil Court and Housing Court, Legal & Procedural Information,
http://www.courts.state.ny.us/courts/nyc/housing/procedural.shtml and
http://www.courts.state.ny.us/courts/nyc/civil/commercial.shtml

Georgia Kromrei, Attorney Find Ways to "Eject" Tenants Without Housing Court, Real Deal
(May 26, 2020), https://therealdeal.com/2020/05/26/landlord-attorneys-find-ways-to-eject-
tenants-without-housing-court/

A-1322

Dolan, <u>Rasch's Landlord & Tenant including Summary Proceedings,</u> Fifth Edition

Finkelstein & Ferrara, <u>Landlord and Tenant Practice in New York,</u> 2019-2020 Edition

Rasch, <u>New York Law and Practice of Real Property</u>, Second Edition

David Siegel, N.Y. Prac., The RPAPL and the Summary Proceeding; a Perspective, § 571 (6th ed.).

A-1323

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Marcia Melendez, Jarican Realty Inc.,
1025 Pacific LLC, Ling Yang, Top East
Realty LLC, and Haight Trade LLC,

*Plaintiffs,*

v.

The City of New York, *a municipal entity,*
Bill de Blasio, *as Mayor of the City of New York,*
and Louise Carroll, *Commissioner of New York
City Department of Housing Preservation &
Development,* Jonnel Doris, *Commissioner of
New York City Department of Small Business
Services,*

*Defendants.*

Civ. No. <u>20-cv-5301 (RA)</u>

## DECLARATION OF LING YANG
## IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LING YANG pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.     My name is Ling Yang.  I am a resident of Queens in the City of New

York (the "City").

2.     I make this declaration on my own behalf and on behalf of Plaintiffs

Haight Trade LLC and Top East Realty LLC (together, the "LLCs").

3.     My son and I are co-shareholders of Haight Trade LLC and Top East

Realty LLC.

4.     Haight Trade LLC is a limited liability company that I established under

the laws of the State of New York in 2011.

5.     Top East Realty LLC is a limited liability company that I established

under the laws of the State of New York in 2014.

6.      Haight Trade LLC owns the property located at 4118 Haight St., Flushing, NY, which has one commercial space and six residential units. Top East Realty LLC owns the three commercial spaces located at 4059 College Point Blvd., Flushing, NY.

7.      I was born in the People's Republic of China in 1957.

8.      In China, I observed the events of the Cultural Revolution, and the Chinese government's actions that caused the ruination of individual businesses. The Chinese government would frequently confiscate people's money and businesses for distribution to others. As such, although I was a successful businesswoman in China, I decided to move to the United States for the promise of economic and personal freedom.

9.      In 1994, I immigrated to the United States from China.

10.      I arrived in the United States, unable to speak, read or write English and with very little money.

11.      From 1994 until 2002, I worked hard to support myself and my family by working as a housekeeper, as a nanny, in restaurants, at a clothing factory, and, at times, by delivering food.

12.      In 2002, after 8 years of working, I started a small retail store in Manhattan, which I operated for approximately five years. I used the savings I accumulated through my jobs, and the assets from my former life in China to start this business.

13.      In 2010, I started working in a small transport company in which I own a small percentage in another partner's share. The company operated for approximately six years.

14.      In 2019, I started a cabinet business, which I currently operate from the commercial space in 4118 Haight St., Flushing, NY. The retail store and transport company are no longer in operation. I also participate in service activities in my community.

2

15.     In 2012, through my LLC, we bought the building located at 4118 Haight St., Flushing, NY.  I work as the superintendent for this building.  My responsibilities include cleaning the premises on a daily basis and performing small repairs.

16.     Several years later, through my LLC, we purchased the property located at 4059 College Point Blvd., Flushing, NY.  The down payment of this purchase was borrowed from Home Equity Loan, and the loan is guaranteed by 4118 Haight St, Flushing NY.

17.     I invested in these buildings with money from selling all my assets in China, and my life savings from the businesses I worked in.

18.     My family has never received government benefits.  My son, who is a co-shareholder of the LLCs, served in the United States Army and lives with a disability connected to his military service.  Regardless, we have strived to provide for ourselves and have not received governmental assistance.  My plan is to use the buildings to support myself and my family after I reach retirement.

19.     Currently, all of the rent payments from the commercial and residential tenants are used to pay for the tax and mortgage obligations on the properties, and maintenance related expenses.

20.     The tax and mortgage obligations for 4059 College Point Blvd., Flushing, NY total approximately $20,000 a month.  The tax and mortgage obligations for 4118 Haight St. Flushing, NY total approximately $12,000 a month.

21.     We also pay a common charge for the property located at 4059 College Point Blvd., Flushing, NY for the maintenance of that property.  The amount of the common charge depends on the monthly maintenance needs.  Last month, the common charge was approximately $1,800.

3

A-1326

22.     The maintenance expenses for the property located at 4118 Haight St., Flushing, NY total approximately $2,000 a month.

23.     Although the LLCs are not yet profitable because all of the rent payments need to be used to meet these various obligations and expenses, my hope and plan is that they will become profitable once we satisfy more of the mortgage obligations on the properties so that I can support myself and my family after my retirement.

24.     Due to the COVID-19 pandemic, however, we have not been able to collect rent payments from most of our tenants for the period of March 2020 to June 2020.  We also expect that we may not be able to collect full rent payments for a long time.  Accordingly, my companies have been placed in great financial jeopardy.

25.     As a direct result of the outbreak of COVID-19, and Governor Cuomo's Executive Order 202.8 requiring non-essential businesses to shut down, our commercial tenants have had to close their businesses, and many of our residential tenants' workplaces closed starting in March 2020.

26.     One of our commercial tenants, Home Décor Expo, is now open part-time, and has not paid any rent for the period of March 2020 to July 2020.  The tenant argues it is not obligated to pay rent before August 20th, 2020.

27.     Of the six residential units located at 4118 Haight St., Flushing, NY, only four units are currently occupied, and only one has paid the rent obligations for the period March 2020 to June 2020.

28.     During this difficult time, the City's newly passed laws have made rent collection more challenging for us, if not impossible.

4

29.     Under the newly enacted law, Int. No. 1932-A (known as the "Guaranty Law"), I understand that we are prohibited from enforcing any personal guaranties if the underlying lease payments arose between March 20, 2020 and September 30, 2020.

30.     In the lease agreement with our delinquent commercial tenant, Home Décor Expo, the principal of the business gave us a personal guaranty.  The guaranty states in relevant part that the principal guarantees "the full performance and observance of all the agreements to be performed and observed by Tenant."

31.     We require personal guaranties for all of our commercial tenants in the regular course of our business.  As a practical matter, for a small business with little to none of its own assets, a landlord can only enforce the lease if there is a personal guaranty to back it up. Personal guaranties help avoid the worst-case scenario in which a small business tenant with little to no assets tries to avoid paying rent due under their lease agreement.  Absent a personal guaranty, the risk of having a small business as a tenant would be so great as to be prohibitive. We would not have entered into any lease agreements with small businesses if not for the personal guaranties given by the principals of the businesses.  Personal guaranties are thus critical to our commercial lease agreements.

32.     Because of the Guaranty Law, however, we have no practical means under the commercial lease agreement with Home Décor Expo to collect unpaid rent and regain possession of our property without going to court.  Essentially, this law would render our commercial lease with Home Décor Expo virtually valueless for the period March 20, 2020 to September 30, 2020.

33.     Furthermore, under the City's newly enacted law, Int. No. 1936-A (known as the "Residential Harassment Law"), I understand that a tenant may argue that our discussions

5

about the consequences of their failure to pay rent owed could be considered a prohibited threat against a commercial tenant affected by COVID-19. I understand that a tenant could argue that there has been harassment even if the tenant is able to pay the rent owed.

34.     Before the outbreak of COVID-19, as was our normal business practice, we sent notices of late rent and sought to recover unpaid rent in Housing Court. We never threatened physical violence or any other illegal consequences from the tenant's failure to pay rent.

35.     Since we learned of the Residential Harassment Law, however, we have stopped even mentioning to the residential tenants the consequences of their continued failures to pay rent due to our fear that such statements could be considered "harassment" under the City's law.

36.     From March 2020 to July 2020, we lost almost $100,000 in income due to our tenants' failures to pay their rent. That money would have been used to make our mortgage payment and satisfy operational costs of our properties.

37.     If our rental income decreases any further, one or both of my LLCs might not have sufficient assets to continue as a going concern while meeting the tax and mortgage obligations, and maintenance obligations.

38.     Indeed, although the bank has agreed to a three-month deferral of our mortgage payments, they have indicated that they will seek to collect on the mortgages if we seek any additional deferrals. The bank has further charged me an additional $16,500 in interest for the deferred three months. If the bank cancels our mortgage, we will not be able to obtain any further loans from any other banks as my personal credit has already been severely impacted. I also fear that all my properties would be foreclosed upon.

A-1329

39.    I understand that COVID-19 has had a substantial impact on the City and its residents, but the Guaranty Law and the Residential Harassment Law substantially hinder our ability to collect rent from our tenants and enforce our reasonable our lease agreements as we understood them. I believe that the City should not act to the detriment of one group of tenants in favor of another group of property owners. This situation has caused me great financial and mental distress. Indeed, I decided to immigrate from China to the United States to avoid these types of situations.

40.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  July 9, 2020

_____
Ling Yang

7

A-1330

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, and Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development*, Jonnel Doris, *Commissioner of New York City Department of Small Business Services*, <br><br> *Defendants*. | Civ. No. <u>20-cv-5301 (RA)</u> |

**DECLARATION OF MARCIA MELENDEZ**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

MARCIA MELENDEZ, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      My name is Marcia Melendez.  I am a resident of Brooklyn in the City of New York (the "City").

2.      I make this declaration on my own behalf and on behalf of Plaintiffs Jarican Realty Inc. and 1025 Pacific LLC.

3.      Jarican Realty Inc. is a corporation incorporated under the laws of the State of New York.  Jarican was established in 2004 by my husband and I.  I serve as the Chairman of Jarican Realty Inc.

4.      1025 Pacific LLC is a limited liability company established under the laws of the State of New York by my husband and I in 2011.

A-1331

5.      Jarican Realty Inc. is the record owner for the property located at 547 Nostrand Ave., Brooklyn, NY; and 1025 Pacific LLC is the record owner for the property located at 283 East 55th St., Brooklyn, NY.

6.      These two properties were purchased using loans and personal funds of myself and my husband, which we saved from starting, owning, and operating small businesses.

7.      I was born in Jamaica in 1951.  When I was a child, my family immigrated to England, and subsequently to the United States when I was 17 years old.

8.      Once in the United States, I earned my Bachelor of Arts and Master of Arts at Brooklyn College.  After graduation, I held jobs in both the private and public sectors.

9.      In 1983, I decided to start my own businesses.  I first owned a flower shop, and later extended into the landscaping business with my husband.

10.     In 2000, we decided to purchase the property located at 547 Nostrand Ave., Brooklyn, New York.  I had to scrape together the funds for the down payment on the property.

11.     At the time, that property was in need of substantial repairs.  As such, we had to borrow money to renovate the property.  My husband and I renovated the premises ourselves, and moved our flower shop to the commercial space on the ground floor in that building.

12.     In 2016, we purchased the property located at 283 East 55th St. in Brooklyn.  In 2017, my husband and I retired.

13.     My husband and I rely on the rent payments from the two properties for our retirement.  We do not have pensions or a 401(k) retirement account.  As such, rent payments from the buildings, as well as social security benefits, are our only reliable sources of income.

2

14.     To supplement my retirement income, I also work part-time as a real estate broker.

15.     Each of the two properties relies on rent payments to pay for their various obligations and expenses.

16.     Both properties have property tax obligations to the City.  Property taxes are due in January and July of every year.  For the time period January 1, 2020 to June 30, 2020, the total tax obligations for both of the properties are in excess of $20,500.  A property tax payment for that period was due on July 1, 2020.  Based on my past experience, I anticipate another property tax payment in substantially the same amount of money will be due in or around January, 2021.

17.     The property located at 547 Nostrand Ave., Brooklyn, NY, also has mortgage obligations.  The mortgage obligation is approximately $4,058 a month.

18.     Through the above companies, we contract with various independent contractors to assist in maintaining these properties.  These independent contractors include plumbers and electricians.  The contractor fees for all of the properties total thousands of dollars on a monthly basis.

19.     We have had difficulty collecting rent payments from our commercial and residential tenants of the two properties starting from prior to the outbreak of COVID-19.  Accordingly, we have struggled to satisfy the various obligations and expenses for the properties.

20.     The property located at 283 East 55th St. in Brooklyn is a four-family building with three residential tenants.  Starting in November 2019, one of our residential tenants failed to make timely rent payments.

3

21.     Prior to the outbreak of COVID-19, in accordance with our normal business practices, we sent that delinquent residential tenant notices of late rent and sought to recover unpaid rent in Housing Court.  We never threatened physical violence or any other unlawful repercussions for the tenant's failure to pay rent.  In Housing Court, however, the residential tenant stated that we were "harassing" her simply by asking for rent payments.  The residential tenant has since paid rent for November 2019 and for December 2019 through March 2020.

22.     Prior to the eviction moratorium, which Governor Cuomo's Executive Order No. 202.8 ordered on March 20, 2020, we were seeking to evict the delinquent residential tenant.  We were not able to evict the tenant due to the eviction mortarium, and thus, the tenant remains on the premises.  Currently, the residential tenant has failed to pay any rent for April, May, June, or July of 2020.

23.     We have also been unable to recover rent from our commercial tenant in the property located at 547 Nostrand Ave. in Brooklyn.  This property has one commercial space, whose rent makes up more than half of the rent roll for the entire property.  The commercial tenant operates a coffee shop called Furman's Coffee.  As coffee shops are deemed essential businesses under Governor Cuomo's Executive Order 202.8, the coffee shop has remained open throughout the last four months.

24.     Nevertheless, the coffee shop has not paid any rent payments since February 2020.

25.     On April 27, 2020, we sent the coffee shop a dispossess notice through an attorney, in accordance with our normal business practices.

4

26.     In May 2020, approximately one month ago, I learned of Prop. Int. No. 1914-A (the "Commercial Harassment Law") and Prop. Int. No. 1936-A (the "Residential Harassment Law").

27.     As I understand the provisions of the Commercial Harassment Law and the Residential Harassment Law, a tenant may argue that discussions of the potential consequences of a tenants' failure to meet their full rent obligations could constitute a prohibited threat against a tenant affected by COVID-19 — regardless of the reason for the tenant's failures to meet the rent obligations and the financial ability of the tenant to pay their rent.  It is also my understanding that attempts on our part to enforce our contractual rights to payment could be considered to be a form of "harassment" under the laws.

28.     Based on our knowledge of the Commercial Harassment Law and Residential Harassment Law, in late May 2020, we stopped sending demands and other correspondence to collect overdue rent.

29.     If the Commercial Harassment Law and the Residential Harassment Law were not in effect, we would have already served additional notices on the delinquent residential tenant and the coffee shop to recover all delinquent rent payments.  Upon learning of the two laws, however, we have refrained from issuing any further notices for fear of being accused of engaging in "harassment" under these laws.  Particularly given the residential tenant's prior accusation that simply asking for late rent payments through demand notices was harassment, we have refrained from any such conduct in light of these two new laws.

30.     From March 2020 to June 2020, we have incurred losses of thousands of dollars as a direct consequence of the tenants' failure to meet their rent obligations.  If our rental income decreases further, one or both of our companies will not have sufficient assets to

5

A-1335

continue as a going concern while meeting mortgage, tax, and maintenance obligations. Indeed, as a direct result of the lack of rent payments, we have been unable to meet the full tax obligations for 2019, or on July 1, 2020, for these properties.

31.     I understand that COVID-19 has had a substantial impact on the City and all of its residents. Nonetheless, the Commercial Harassment Law and the Residential Harassment Law significantly impact our ability to collect rent from our tenants and enforce our reasonable contractual expectations under our binding lease agreements.

32.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  July 9, 2020

Marcia Melendez

6

A-1336

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, | **NOTICE OF MOTION TO DISMISS** |
| *Plaintiffs,* | 20 CV 05301 (RA) |
| *v.* | **Oral Argument Requested** |
| The City of New York, a municipal entity, Bill de Blasio, as Mayor of the City of New York, Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, and Jonnel Doris, Commissioner of New York City Department of Small Business Services, | |
| *Defendants.* | |

**PLEASE TAKE NOTICE** that upon the annexed Declaration of Carlos Fernando Ugalde Alvarez dated August 12, 2020, together with the exhibits annexed thereto, the accompanying memorandum of law, and all of the papers and proceedings had herein, Defendants will move this Court, before the Honorable Ronnie Abrams, at the United States Courthouse for the Southern District of New York, located at 40 Foley Square, New York, New York, on a date and at a time to be designated by the Court, for an order and judgment dismissing the Complaint in the above-captioned action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, together with such other and further relief as the Court may deem just and proper.

A-1337

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's Order dated July 31, 2020, Plaintiffs shall serve opposition to the instant motion on or before August 26, 2020, and Defendants shall serve any reply in support of the instant motion on or before September 2, 2020.

Defendants hereby request oral argument on this motion.

Dated:      New York, New York
            August 12, 2020

                          **JAMES E. JOHNSON**
                          Corporation Counsel of the City of New York
                          Attorney for Defendants


                          By:_____/s/_____
                              Pamela A. Koplik
                              Carlos Fernando Ugalde Alvarez
                              100 Church Street, 4th Floor
                              New York, New York  10007
                              E-mails: pkoplik@law.nyc.gov
                                       cugalde@law.nyc.gov


TO:    Counsel of Record (via ECF)

2

A-1338

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, | **DECLARATION OF CARLOS F. UGALDE ALVAREZ IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF** |
| *Plaintiffs,* | |
| v. | |
| The City of New York, a municipal entity, Bill de Blasio, as Mayor of the City of New York, Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, and Jonnel Doris, Commissioner of New York City Department of Small Business Services, | 20 CV 05301 (RA) |
| *Defendants.* | |

**CARLOS FERNANDO UGALDE ALVAREZ** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

1.     I am an Assistant Corporation Counsel in the office of James E. Johnson, Corporation Counsel of the City of New York, attorney for Defendants in the instant action.

2.     I respectfully submit this declaration in support of Defendants' motion for an order and judgment dismissing the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and in opposition to Plaintiffs' motion for preliminary injunctive and declaratory relief.

3.     This declaration is intended principally to put before the Court various pieces of publicly-available information which bear on Plaintiffs' and Defendants' motions.

**A-1339**

**Chapter 23 of the New York State Laws of 2020**

        4.      Attached as Exhibit "A" is a true and correct copy of Chapter 23 of the New York State Laws of 2020 ("Chapter 23"). Chapter 23 appropriated $40,000,000.00 for services and expenses related to the outbreak of coronavirus disease 2019 ("COVID-19"), and amended sections 20(2)(a) and 29-a of the New York Executive Law. The amendment to N.Y. Executive Law § 29-a enabled the Governor to "issue any directive during a state disaster emergency" involving, among other things, an epidemic or disease outbreak so long as such directive is "necessary to cope with the disaster," and expanded the Governor's existing authority to temporarily suspend laws, rules or orders during such emergencies. The amendment to N.Y. Executive Law § 29-a took effect on March 3, 2020 and is set to expire on April 30, 2021.

**Relevant Gubernatorial Executive Orders**

        5.      Attached as Exhibit "B" is a true and correct copy of New York State Gubernatorial Executive Order ("EO") No. 202 dated March 7, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf. By virtue of EO No. 202, the Governor, *inter alia*, declared, pursuant to N.Y. Executive Law § 28, a state disaster emergency, effective March 7, 2020, until September 7, 2020. EO No. 202 further states, in relevant part, as follows:

    a.    "on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern";

    b.    "on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19";

    c.    "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue";

    d.    "New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors."

Case 20-4238, Document 38, 02/11/2021, 3035076, Page246 of 298

A-1340

Notably, by virtue of EO No. 202, the Governor "authorize[d] all necessary State agencies to take appropriate action to *assist local governments* and individuals in containing, preparing for, responding to and recovering from this state disaster emergency . . . ." (emphasis added).

6.      Attached as Exhibit "C" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.3 dated March 16, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.3.pdf.  By virtue of EO No. 202.3, the Governor, *inter alia*, directed that, no later than March 16, 2020 at 8:00 p.m., (i) "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises,"[1] and (ii) "[a]ny gym, fitness centers or classes, and movie theaters shall also cease operation."  Notably, EO No. 202.3 also states that "[n]o local government or political subdivision shall issue any local emergency order or declaration of emergency or disaster inconsistent with, conflicting with or superseding the foregoing directives, or any other executive order issued under Section 24 of the Executive Law and any local emergency order or any local administrative codes, charters, laws, rules or regulations, are hereby suspended with respect to any such order issued under such authority different or in conflict with Executive directives."

7.      Attached as Exhibit "D" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.5 dated March 18, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_5.pdf. By virtue of EO No. 202.5, the Governor, *inter alia*, directed that, "[e]ffective at 8 p.m. March 19, 2020, all indoor common portions of retail shopping malls with in excess of 100,000 square feet of retail space available for lease shall close and cease access to the public," except for "stores located within shopping malls, which have their own external entrances open to the public,

---

[1] They were still permitted to serve food or beverage for off-premises consumption.  *See* EO No. 202.3.

A-1341

separate from the general mall entrance," so long as they comply with "the requirements of [EO No.] 202.3 that any restaurant shall limit itself to take out or delivery food services, and that any interior entrances to common areas of the mall remain closed and locked."

        8.    Attached as Exhibit "E" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.6 dated March 18, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.6.pdf.  By virtue of EO No. 202.6, the Governor, *inter alia*, directed that, no later than March 20, 2020 at 8:00 p.m., "[a]ll businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize," and that "[e]ach employer shall reduce the in-person workforce at any work locations by 50%," except that these directives do not apply to "[a]ny essential business or entity providing essential services or functions," which include "essential retail including grocery stores and pharmacies."[2]

        9.    Attached as Exhibit "F" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.7 dated March 19, 2020, which is also publicly available at  https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO%20202.7.pdf.    By virtue of EO No. 202.7, the Governor, *inter alia*, (i) ordered the closure of all barbershops, hair salons, tattoo or piercing parlors and related personal care services, including nail technicians, cosmetologists and estheticians, and the provision of electrolysis, laser hair removal services, by

---

[2] According to EO No. 202.6, essential businesses or entities include: "essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media;  banks and related financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses;  vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public."

A-1342

March 21, 2020 at 8:00 p.m., and (ii) modified "[t]he provisions of [EO No.] 202.6 requiring in-person work environment restrictions" so that, no later than March 21, 2020 at 8:00 p.m., non-essential businesses or entities "reduce the in-person workforce at any work locations by 75%."

10.     Attached as Exhibit "G" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.8 dated March 20, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf.  By virtue of EO No. 202.8, the Governor, *inter alia*, (i) modified the provisions of EO No. 202.6 so that, no later than March 22, 2020 at 8:00 p.m., non-essential businesses or entities "reduce the in-person workforce at any work locations by 100%," and (ii) prohibited the "enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days."

11.     Attached as Exhibit "H" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.9 dated March 21, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.9.pdf.  By virtue of EO No. 202.9, the Governor, *inter alia*, temporarily modified N.Y. Banking Law § 39(2) "to provide that it shall be deemed an unsafe and unsound business practice, if in response to the COVID-19 pandemic, any bank which is subject to the jurisdiction of the Department shall not grant a forbearance to any person or business who has a financial hardship as a result of the COVID-19 pandemic for a period of ninety days."

12.     Attached collectively as Exhibit "I" are true and correct copies of New York State Gubernatorial Executive Order Nos. 202.13, 202.14 and 202.18 dated, respectively, March 29, 2020, April 7, 2020, and April 16, 2020, which are also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.13.pdf,

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.14_final.pdf,    and

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.18.pdf.    By virtue

of EO Nos. 202.13, 202.14 and 202.18, the Governor, *inter alia*, continued the in-person

business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7

and 202.8 until 11:59 p.m. on May 15, 2020, unless further extended by executive order.

      13.    Attached as Exhibit "J" is a true and correct copy of New York State

Gubernatorial Executive Order No. 202.16 dated April 12, 2020, which is also publicly available

at    https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.16_final.pdf.

By virtue of EO No. 202.16, the Governor, *inter alia*, temporarily suspended or modified N.Y.

Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple

Dwelling Law § 4(8)-(9), and any other law or regulation "to the extent that such laws would

otherwise create a landlord tenant relationship between any individual assisting with the response

to COVID-19 or any individual that has been displaced due to COVID-19, and any individual or

entity, including but not limited to any hotel owner, hospital, not-for-profit housing provider,

hospital, or any other temporary housing provider who provides temporary housing for a period

of thirty days or more solely for purposes of assisting in the response to COVD-19."

      14.    Attached as Exhibit "K" is a true and correct copy of New York State

Gubernatorial Executive Order No. 202.28 dated May 7, 2020, which is also publicly available at

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.28.pdf.    By virtue of

EO No. 202.28, the Governor, *inter alia*, (i) "continued the suspensions and modifications of

law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202 and

each successor [EO] up to and including [EO No.] 202.14," with certain modifications, until June

6, 2020, and (ii) ordered:

A-1344

a.  The temporary suspension or modification of N.Y. General Obligations Law §§ 7-103, 7-107 and 7-108, to, *inter alia*, (i) permit landlords and tenants to enter into written agreements for the application of security deposit funds to rental payment obligations, and (ii) require landlords to provide such relief to tenants that are eligible for unemployment insurance or benefits or are facing financial hardship due to the COVID-19 pandemic;

b.  The temporary suspension or modification of Real Property Law § 238-a(2) "to provide that no landlord, lessor, sub-lessor or grantor shall demand or be entitled to any payment, fee or charge for late payment of rent occurring during the time period from March 20, 2020, through August 20, 2020"; and

c.  That "[t]here shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020."

15.    Attached as Exhibit "L" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.29 dated May 8, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.29.pdf.  By virtue of EO No. 202.29, the Governor, *inter alia*, "continue[d] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] . . . 202.16 . . . until June 7, 2020."

16.    Attached as Exhibit "M" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.31 dated May 14, 2020, which is also publicly available at   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.31.pdf.    By virtue of EO No. 202.31, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 until 11:59 p.m. on May 28, 2020, unless further extended by executive order, except that, as of 12:01 a.m. on May 15, 2020, such reductions and restrictions "no longer appl[ied] to Phase One

industries," which include retail (limited to curbside or in-store pickup or drop off), manufacturing and wholesale trade, in regions authorized for "Phase One" reopening.[3]

17.    Attached as Exhibit "N" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.34 dated May 28, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.34.pdf.  By virtue of EO No. 202.34, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through June 27, 2020, unless further extended by executive order, except that, as of the date of EO No. 202.34, such reductions and restrictions no longer applied to business or entities eligible for "Phase One" reopening in regions authorized for "Phase One" reopening.

18.    Attached as Exhibit "O" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.35 dated May 29, 2020, which is also publicly available at  https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_35.pdf.    By virtue of EO No. 202.35, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through June 28, 2020, unless further extended by executive order, except that, as of 1:00 p.m. on May 29, 2020, "the reductions and restrictions on the in-person workforce at non-essential businesses or other entities [] no longer appl[ied] to Phase Two industries," which include retail in-store shopping, rental, repair and cleaning businesses, and barbershops and hair salons (for limited services), in regions authorized for "Phase Two" reopening.[4]

---

[3]    New York City entered "Phase One" reopening on June 8, 2020.    *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5JI_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

[4]    New York City entered "Phase Two" reopening on June 22, 2020.    *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5JI_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

19.     Attached as Exhibit "P" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.36 dated June 2, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.36.pdf.   By virtue of EO No. 202.36, the Governor, *inter alia*, modified EO No. 202.7 "to allow for the opening of barbershops and hairs salons" in regions authorized for "Phase Two" reopening.

20.     Attached as Exhibit "Q" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.38 dated June 6, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO-202.38-final.pdf.     By virtue of EO No. 202.38, the Governor, *inter alia*, (i) "continued the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202 and each successor [EO] up to and including [EO No.] 202.14," until July 6, 2020, and (ii) modified the directive contained in EO No. 202.3 "to allow a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space."

21.     Attached as Exhibit "R" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.39 dated June 7, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_39.pdf.   By virtue of EO No. 202.39, the Governor, *inter alia*, (i) modified the directive contained in EO No. 202.38 "that allowed a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space . . . to explicitly limit such activity to those regions that are in Phase 2 of the re-opening," and (ii) "continue[d] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202.15, through 202.21, and including 202.29, as contained in Executive Order 202.29 until July 7, 2020."

22.     Attached as Exhibit "S" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.41 dated June 13, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.41_.pdf.     By virtue of EO No. 202.41, the Governor, *inter alia*, (i) modified EO No. 202.7 "to allow for the opening of such personal care services, and only to the extent and in regions consistent with Department of Health guidance promulgated for Phase Three reopening," and (ii) continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through July 13, 2020, unless further extended by executive order, except that, as of June 12, 2020, "the reductions and restrictions on the in-person workforce at non-essential businesses or other entities [] no longer appl[ied] to Phase Three industries," which include restaurants, food services, and personal care businesses, in regions authorized for "Phase Three" reopening.[5]

23.     Attached as Exhibit "T" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.45 dated June 26, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.45.pdf.  By virtue of EO No. 202.45, the Governor, *inter alia*, continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through July 26, 2020, except that, as of June 26, 2020, "the reductions and restrictions on the in-person workforce at non-essential businesses or other entities [] no longer appl[ied] to Phase Four

---

[5]   New York City entered "Phase Three" reopening on July 6, 2020.  *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5JI_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

10

industries," which include film and music production and low-risk indoor and outdoor arts and entertainment, in regions authorized for "Phase Four" reopening.[6]

24.     Attached as Exhibit "U" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.48 dated July 6, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.48.pdf.   By virtue of EO No. 202.48, the Governor, *inter alia*, (i) modified "[t]he directive contained in [EO No.] 202.41, that discontinued the reductions and restrictions on in-person workforce at non-essential businesses or other entities in Phase Three industries or entities . . . in eligible regions, . . . only to the extent that indoor food services and dining continue to be prohibited in New York City, and (ii) "continued the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by [EO No.] 202 and each successor [EO] up to and including [EO No.] 202.14," through August 5, 2020, except for:

   a.     EO No. 202.9's directives and temporary modification of N.Y. Banking Law § 39(2), which were superseded by Chapters 112 and 126 of the New York State Laws of 2020;

   b.     EO No. 202.28's directive prohibiting the initiation of a proceeding or enforcement of either an eviction of any residential tenant, for nonpayment of rent or a foreclosure of any" residential mortgage, for nonpayment of such mortgage, which was superseded by Chapters 112, 126, and 127 of the New York State Laws of 2020.

25.     Attached as Exhibit "V" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.49 dated July 7, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.49.pdf.   EO No. 202.49 did not further extend EO No. 202.16's temporary suspension or modifications of N.Y.

---

[6]   New York City entered "Phase Four" reopening on July 20, 2020.   *See* https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page?fbclid=IwAR1a5YKbVTvP5JI_yUjIP40K1DcwuopYcsBbJbQ5KgBriekj5AYxcg0CKUU.

A-1349

Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple Dwelling Law § 4(8)-(9), which was effective until July 7, 2020 pursuant to EO No. 202.39.

26.     Attached as Exhibit "W" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.50 dated July 9, 2020, which is also publicly available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.50.pdf.   By virtue of EO No. 202.50, the Governor, *inter alia*, modified EO No. 202.5's directive "that required closure to the public of all indoor common portions of retail shopping malls, as extended, and as continued and modified in [EO No.] 202.48, . . . to allow such malls to open in regions of the state that are in Phase Four of the state's reopening, so long as such malls adhere to Department of Health issued guidance, effective 12:01am on Friday, July 10, 2020."

27.     Attached as Exhibit "X" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.53 dated July 21, 2020, which is also publicly available at   https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202_53.pdf.     By virtue of EO No. 202.53, the Governor, *inter alia*, (i) continued the in-person business and workplace restrictions or reductions set forth in EO Nos. 202.3, 202.5, 202.6, 202.7 and 202.8 through August 20, 2020, except that, as of July 20, 2020, the indoor common portions of retail shopping malls and places of low-risk indoor arts and entertainment continue to be closed in New York City, and (ii) modified EO No. 202.50's directive "that allowed indoor common portions of retail shopping malls to open in regions that have met the public health and safety metrics to enter Phase Four of the State's reopening, . . . to provide that indoor common portions of shopping malls continue to be closed in the New York City region."

28.     Attached as Exhibit "Y" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.55 dated August 5, 2020, which is also publicly

A-1350

available at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.55.pdf. By virtue of EO No. 202.55, the Governor, *inter alia*, (i) "continue[d] the directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.21, and Executive Order 202.27, 202.28, 202.29, 202.30, 202.38, 202.39, and 202.40, as continued and contained in Executive Order 202.48, 202.49, and 202.50 for another thirty days through September 4, 2020," and (ii) temporarily suspended or modified N.Y. Real Property and Proceedings Law § 711, N.Y. Real Property Law § 232-a, and N.Y. Multiple Dwelling Law § 4(8)-(9), and any other law or regulation in the same manner as EO No. 202.16 until September 4, 2020.

29.     Attached as Exhibit "Z" is a true and correct copy of New York State Gubernatorial Executive Order No. 202.55.1 dated August 6, 2020, which is also publicly available                                                                                        at https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.55.1.pdf.   By virtue of EO No. 202.55.1, the Governor, *inter alia*, modified EO No. 202.55 "to include all suspensions and modifications, not superseded by a suspension or modification in a subsequent Executive Order for the Executive Orders listed in 202.55; and provided further, Executive Orders 202.48, 202.49, and 202.50 are continued in their entirety, through September 4, 2020."

**Relevant Orders of the Chief Administrative Judge of the N.Y. State Unified Court System**

30.     Attached as Exhibit "AA" is a true and correct copy of Administrative Order No. AO/68/20 dated March 16, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-68-20.pdf.   By virtue of AO/68/20, the Chief Administrative Judge of the Courts promulgated procedures and protocols in response to the pandemic and, with respect to "Housing matters," ordered that: (i) "[a]ll eviction proceedings and pending eviction orders shall be suspended statewide, and court-ordered auctions of property

A-1351

shall be postponed, until further notice"; (ii) "[a]ll residential foreclosure proceedings shall be suspended statewide until further notice"; and (iii) "effective March 13, 2020, residential evictions in New York City have been stayed, and the New York City Housing Court has been directed not to issue new eviction warrants when a party has not appeared in court."

31.      Attached as Exhibit "BB" is a true and correct copy of Administrative Order No. AO/127/20 dated June 18, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-127-20.pdf.  AO/127/20 states that it took effect on June 20, 2020 and that it will continue "in effect for such time as state and federal emergency measures addressing the COVID-19 pandemic amend or suspend statutory provisions governing eviction proceedings, or until further order."  By virtue of AO/127/20, the Chief Administrative Judge of the Courts ordered, *inter alia*, as follows:

> Consistent with prior and current gubernatorial Executive Orders (EO/202.8, EO/202.14, EO/202.28, EO/202.39) and Administrative Order AO/68/20, RPAPL eviction matters commenced on or before March 16, 2020 shall continue to be suspended until further order; eviction proceedings filed after March 16, 2020 shall, upon the filing of a petition (if no answer is filed thereafter) or the filing of an answer, be suspended until further order.  Notwithstanding the foregoing, eviction matters in which all parties are represented by counsel shall be eligible for calendaring for virtual settlement conferences.

32.      Attached as Exhibit "CC" is a true and correct copy of Administrative Order No. AO/131/20 dated June 23, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-131-20.pdf.  AO/127/20 states that it took effect on June 24, 2020 and that it will continue "in effect for such time as state and federal emergency measures addressing the COVID-19 pandemic amend or suspend statutory provisions governing eviction proceedings, or until further order."  By virtue of AO/131/20, the Chief Administrative Judge of the Courts ordered, *inter alia*, as follows:

> Consistent with prior and current gubernatorial Executive Orders (EO/202.8, EO/202.14, EO/202.28, EO/202.39) and Administrative Order AO/68/20,

foreclosure matters commenced on or before March 16, 2020 shall continue to be suspended until further order; foreclosure proceedings filed after March 16, 2020 shall, upon the filing of a petition (if no answer is filed thereafter) or the filing of an answer, be suspended until further order; initial mandatory settlement conferences in residential foreclosure pursuant to CPLR 3408 shall not be scheduled; and foreclosure auctions shall continue to be suspended until further order.  Notwithstanding the foregoing, foreclosure matters in which all parties are represented by counsel shall be eligible for calendaring for both initial and follow-up virtual settlement conferences; lenders may move for a judgment of foreclosure and sale on the ground that a property is vacant and abandoned; and lenders may move to discontinue a pending case.

33.     Attached as Exhibit "DD" is a true and correct copy of Administrative Order No. AO/143/20 dated July 7, 2020, which is also publicly available at https://www.nycourts.gov/whatsnew/pdf/AO-143-20.pdf.  AO/143/20 states that it took effect on July 7, 2020 and that it will "remain in effect until further order."  By virtue of AO/143/20, the Chief Administrative Judge of the Courts stated, *inter alia*, that the directives set forth in AO/127/20 and AO/131/20 "continue in full force and effect."

**Chapter 112 and 126 of the New York State Laws of 2020**

34.     Attached collectively as Exhibit "EE" are true and correct copies of Chapter 112 of the New York State Laws of 2020 ("Chapter 112") and Chapter 126 of the New York State Laws of 2020 ("Chapter 126").  Chapter 112 amended the N.Y. Banking Law by adding a new section "9-x," relating to the forbearance of residential mortgage payments. Chapter 126 further amended the provisions of N.Y. Banking Law § 9-x.  Both chapters were enacted and went into effect on June 17, 2020.

35.     N.Y. Banking Law § 9-x requires, *inter alia*, New York regulated banks, trust companies, private bankers, savings banks, safe deposit companies, savings and loan associations, credit unions, investment companies, and mortgage servicer entity subject to supervision by the New York State Department of Financial Services (defined as "regulated institutions") to "grant [a] forbearance of all monthly payments due with respect to [a] mortgage

secured by [a] qualified mortgagor's[7] primary residence in New York for a period of up to one

hundred eighty days to any such qualified mortgagor, with the option to extend the forbearance

of such monthly payments for up to an additional one hundred eighty days provided that this

extension is subject to the mortgagor demonstrating continued financial hardship."[8]

36.     Notwithstanding, the obligation to grant forbearance is limited in certain

respects.  For example, a regulated institution is not required to grant a forbearance if it has

insufficient "capital and liquidity to meet its obligations and to operate in a safe and sound

manner."  N.Y. Banking Law § 9-x(6).  Also, there is no such obligation if the mortgage was

"made, insured, purchased or securitized by any agency or instrumentality of the United States,

any government sponsored enterprise, or a federal home loan bank, or a corporate governmental

agency of the state constituted as a political subdivision and public benefit corporation, or the

rights and obligations of any lender, issuer, servicer or trustee of such obligations, including

servicers for the Government National Mortgage Association."  *Id.* § 9-x(5).

37.     Notably, N.Y. Banking Law § 9-x(4) states that adherence to the

provisions of N.Y. Banking Law § 9-x "shall be a condition precedent to commencing a

foreclosure action stemming from missed payments."

**Chapter 125 of the New York State Laws of 2020**

---

[7] The term "qualified mortgagor" is defined by N.Y. Banking Law § 9-x(1).  In order to qualify as such, a
mortgagor must, *inter alia*, demonstrate financial hardship as a result of COVID-19 during the "covered
period," which is defined as "March 7, 2020 until the date on which none of the provisions that closed or
otherwise restricted public or private businesses or places of public accommodation, or required
postponement or cancellation of all non-essential gatherings of individuals of any size for any reason . . .
continue to apply in the county of the qualified mortgagor's residence."  *Id.* § 9-x(1).

[8] "If any qualified mortgagor has already received a forbearance pursuant to [EO No.] 202.9 of two
thousand twenty, the time of such forbearance shall be considered as part of the requirement of this
section to provide a forbearance of up to one hundred eighty days, and any extension thereof pursuant to
this section."  N.Y. Banking Law § 9-x(2)(b).

38.     Attached as Exhibit "FF" is a true and correct copy of Chapter 125 of the New York State Laws of 2020 ("Chapter 125"), which is known as the "Emergency Rent Relief Act of 2020."   Chapter 125 was enacted and went into effect on June 17, 2020, and is set to expire on July 31, 2021.   Among other things, Chapter 125 directs the New York State Commissioner of Housing and Community Renewal "to establish and implement an interim residential rent relief program to support households impacted by the COVID-19 pandemic." Under such program, "[a] rental subsidy shall be provided in the form of a voucher . . . directly to the owner of the dwelling unit for applicants determined to be eligible households during the coverage period in an amount equal to the difference between the applicant's rent burden on March 1, 2020 and their rent burden during the month or months assistance is requested for."

**Chapter 127 of the New York State Laws of 2020**

39.     Attached as Exhibit "GG" is a true and correct copy of Chapter 127 of the New York State Laws of 2020 ("Chapter 127"), which was enacted and went into effect on June 30, 2020.   Chapter 127 provides, *inter alia*, that "[n]o court shall issue a warrant of eviction or judgment of possession against a residential tenant or other lawful occupant that has suffered a financial hardship during the COVID-19 covered period[9] for the non-payment of rent that accrues or becomes due during the COVID-19 covered period."   Ex. GG, § 2(1). Notwithstanding, Chapter 127 does "not prohibit any court from awarding a judgment for the rent due and owing to a successful petitioner in a summary proceeding under article 7 of the real property actions and proceedings law."  *Id.* § 2(3).

---

[9] Chapter 127 defines "COVID-19 covered period" as "March 7, 2020 until the date on which none of the provisions that closed or otherwise restricted public or private businesses or places of public accommodation, or required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason . . . continue to apply in the county of the tenant's or lawful occupant's residence." Ex. GG, § 1.

**The Challenged Local Laws & Their Relevant Legislative History**

        40.     On April 22, 2020, during its stated meeting, the New York City Council ("City Council") introduced the following three bills that, as amended, became Local Law No. 53 of 2020 (the "Commercial Harassment Law"),[10] Local Law No. 55 of 2020 (the "Guaranty Harassment Law"),[11] and Local Law No. 56 of 2020 (the "Residential Harassment Law")[12]: (a) Introduction ("Intro.") No. 1914 (a true and correct copy of which is attached as Exhibit "HH"); (b) Intro. No. 1932 (a true and correct copy of which is attached as Exhibit "II"); and (c) Intro. No. 1936 (a true and correct copy of which is attached as Exhibit "JJ").  A true and correct copy of the transcript of the April 22, 2020 stated meeting is attached as Exhibit "KK."

        41.     Attached as Exhibit "LL" is a true and correct copy of the "Committee Report of the Infrastructure and Governmental Affairs Divisions" dated April 28, 2020, which was prepared in advance of the April 28, 2020 hearing before the City Council's Committees on Housing and Buildings and on Consumer Affairs and Business Licensing on Intro. No. 1936. The committee report states, in relevant part, as follows:

        a.     "The outbreak of the novel coronavirus, COVID-19, in the City of New York has resulted in a myriad of concerns for many New Yorkers, including loss of income, food insecurity and housing instability," Ex. LL at 3;

---

[10]  The legislative history for the Commercial Harassment Law, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4424937&GUID=EA82E496-2E94-43A6-8C1D-4D279AE425FD&Options=ID%7cText%7c&Search.

[11]  The legislative history for the Guaranty Law, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4424954&GUID=C2A4AC16-7409-465E-B5A4-A84F6E7989FB&Options=ID|Text|&Search.

[12]  The legislative history for the Residential Harassment Law, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4425102&GUID=4A05D415-0BF2-4980-98A9-C0EABB57E397&Options=ID|Text|&Search.

A-1356

b.    "In an effort to manage the spread of the virus, Governor Andrew Cuomo issued an executive order, and subsequent continuing executive orders, to bring the State to a 'PAUSE,' which ordered the closing of all businesses deemed 'nonessential,'" Ex. LL at 3;

c.    "In an analysis of the potential economic impacts of the pandemic on NYC households, the New York University Furman Center 'estimate[s] that about 1,405,000 (or 34 percent) of the city's wage earners may be at risk of income loss' as a result of mass layoffs or workplace closures, and that there are nearly 1,032,000 New York City households with at least one wage earner in an occupation more vulnerable to income loss," Ex. LL at 3 (citing *What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial Analysis*, NYU FURMAN CENTER (Mar. 30, 2020), *available at* https://furmancenter.org/thestoop/entry/what-are-the-housing-costs-of-households-most-vulnerable-to-job-layoffs-an, a printout copy of which is annexed as Exhibit "MM");

d.    "Additionally, the number of unemployment claims filed with the State has skyrocketed since the 'PAUSE': approximately 144,000 claims were filed in New York City the week of March 22, 2020, up 2,637% from the same period in 2019," Ex. LL at 3-4 (citing Corina Knoll, Azi Paybarah, Jacob Mensche and Elaine Chen, *11 Numbers That Show How the Coronavirus Has Changes N.Y.C.*, THE N.Y. TIMES, (Apr. 20, 2020), *available at* https://www.nytimes.com/2020/04/20/nyregion/coronavirus-nyc-numbers-unemployment.html, a printout copy of which is annexed as Exhibit "NN");

e.    "Although the eviction moratoriums serve as temporary stopgaps to allow tenants to remain in their apartments, they do not provide any kind of relief to tenants for rent owed during the moratoriums. Further, they do not guarantee that tenants unable to pay rent will be able to stay in their apartments once the moratoriums are lifted, or that tenants will be safe from landlord harassment on the basis of having been impacted by the virus," Ex. LL at 4.

42.    Attached as Exhibit "OO" is a true and correct copy of the transcript of the April 28, 2020 hearing held by the City Council's Committees on Housing and Buildings and on Consumer Affairs and Business Licensing on Intro. No. 1936. During this hearing, oral testimony was submitted by representatives from the New York City Commission on Human Rights, the New York City Department of Housing Preservation and Development ("HPD") and the Real Estate Board of New York ("REBNY"), housing advocates, and non-profit organizations.

43.     Attached as Exhibit "PP" is a true and correct copy of the written testimony, which consists of a total of 107 pages, received by the City Council's Committees on Housing and Buildings and on Consumer Affairs and Business Licensing in connection with their April 28, 2020 hearing on Intro. No. 1936.  The written testimony on Intro. 1936 includes testimony from the Deputy Commissioner of Policy and Intergovernmental Affairs of the New York City Commission on Human Rights, REBNY, the New York City Community Housing Improvement Program ("CHIP"), and The Legal Aid Society.

44.     Attached as Exhibit QQ" is a true and correct copy of the "Briefing Paper and Committee Report of the Governmental Affairs Divisions" dated April 29, 2020, which was prepared in advance of the April 29, 2020 hearing (entitled "OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City") before the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing held a hearing on Intro Nos. 1914 and 1932.  The committee report discusses the impact of COVID-19 on small businesses, as well as the need for legislation to address such impact.  It states, in relevant part, as follows:

a.      "In New York, Governor Andrew Cuomo issued an executive order – New York State on PAUSE (PAUSE) – that closed all on-site, non-essential businesses, effective March 22, 2020, to help stop the spread of SARS-CoV-2," Ex. QQ at 8;

b.      "Although this list covers a range of industries that are permitted to operate during PAUSE, a large proportion of New York's small (and large) businesses have still had to severely reduce their capacities," Ex. QQ at 9;

c.      "According to an analysis by the NYC Comptroller, the City's hotels are projected to only maintain an occupancy rate of 20 percent, while restaurant sales are expected to drop by a staggering 80 percent. Real estate and retail sales are both expected to decline by 20 percent," Ex. QQ at 9-10 (citing New York City Comptroller Scott M. Stringer, *Comptroller Stringer: City must take immediate action to prepare for economic impacts of COVID-19 and protect vital services for most vulnerable New Yorkers* (March 16, 2020), available at https://comptroller.nyc.gov/newsroom/comptroller-stringer-city-must-take-immediate-action-to-prepare-for-economic-impacts-of-covid-19-and-protect-vital-services-for-most-vulnerable-new-yorkers/, a printout copy of which is attached as Exhibit "RR");

20

d.      "These figures for the restaurant industry reflect the results of a recent survey by the New York State Restaurant Association. According to their findings, sales have declined by 79 percent, and New York State restaurants are expected to lose $3.6 billion in sales revenue, in April alone. Just over half (51 percent) of all restaurants have been able to move their operations online, and unemployment rates in this sector have skyrocketed, as 80 percent of restaurant workers have lost their jobs," Ex. QQ at. 10 (citing New York State Restaurant Association, *Restaurant industry impact survey: New York State* (April 2020), available at https://www.nysra.org/uploads/1/2/1/3/121352550/restaurant_industry_impact_survey___new_york_state__2_.pdf, a copy of which is attached as Exhibit "SS");

e.      "In their survey of small businesses (under 500 employees), the National Bureau of Economic Research found that 43 percent of businesses had closed due to COVID-19 and that they had reduced their staff by about 40 percent since January 2020. The results were more severe in the Mid-Atlantic region, which includes New York, where 57 percent of businesses were closed, and staff employment decreased by 47 percent. According to the survey's conclusion, about 20 percent of the nation's employees work in 'retail trade, leisure and hospitality and these sectors are particularly vulnerable to the current pandemic,' Ex. QQ at 10-11 (citing Alexander W. Bartik et al., *How are small businesses adjusting to Covid-19? Early evidence from a survey*, NAT'L BUREAU OF ECON. RESEARCH (April 2020), available at https://www.nber.org/papers/w26989.pdf, a copy of which is attached as Exhibit "TT");

f.      "The nation's economy is dependent on its small businesses. There are approximately 27 million of these businesses across the country and they are responsible for employing 57 million workers. When including the owners of these businesses, in addition to employees, that total comes to an estimated 85 million people," Ex. QQ at 11 (citing *How important are small businesses?*, INFO. STATION (Jan. 3, 2017), available at https://informationstation.org/video/how-important-are-small-businesses/?utm_source=google&utm_medium=cpk&gclid=EAIaIQobChMI-Ymy3df86AIVGozICh0QRQPrEAAYASAAEgI7ivD_BwE, a printout copy of which is attached as Exhibit "UU");

g.      "According to the Small Business Administration, small businesses are responsible for creating two-thirds of the Country's new jobs," Ex. QQ at 11 (citing United States Small Business Administration, *Small Businesses generate 44 percent of U.S. economic activity* (Jan. 30, 2019), available at https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/, a printout copy of which is attached as Exhibit "VV");

h.      "Given their vital role, it is crucial that they are either given alternative means to operate, in as lucrative a manner as possible, throughout the COVID-19 crisis, and/or are provided the necessary support to restart their operations once social distancing measures have been lifted," Ex. QQ at 11;

i.      "The various governmental approaches to support small businesses during this crisis have provided some measure of relief for small business owners and their employees; however, there are [a] range of outstanding issues that continue to make operating a business during the pandemic particularly difficult, " Ex. QQ at 28;

j.      "Businesses who experience a drop in revenue due to COVID-19 may face added legal pressure to meet financial obligations.  Commercial leases may contain provisions imposing personal liability on the tenant for non-payment of rent. These personal guarantees can make the business, which may otherwise shield the owner from liability due to its corporate structure, answerable in a court of law for any unpaid debts or damages," Ex. QQ at 28-29 (citing N.Y.C. Dep't of Small Business Services, *Comprehensive Guide to Commercial Leasing in New York City*, available at https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/commercial-lease-guide-accessible.pdf, a printout copy of which is attached as Exhibit "WW"; Hayden Field, *5 most common red flags entrepreneurs should know before signing a commercial real estate lease in New York*, ENTREPRENEUR (June 6, 2019), available at https://www.entrepreneur.com/article/334848, a printout copy of which is attached as Exhibit "XX");

k.      "Without recourse, landlords and debt servicers may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19," Ex. QQ at 29.

45.     Attached as Exhibit "YY" is a true and correct copy of the transcript of the April 29, 2020 hearing held by the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing on Intro Nos. 1914 and 1932.  During this hearing, oral testimony was submitted by representatives from the New York City Department of Small Business Services ("SBS"), REBNY, small business advocates, chambers of commerce and non-profit organizations.

46.     Attached collectively as Exhibit "ZZ-1," "ZZ-2," "ZZ-3," "ZZ-4," and "ZZ-5" are a true and correct copies of the written testimony, which together consists of a total of 949 pages, received by the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing in connection with their April 29, 2020 hearing on Intro Nos. 1914 and 1932.  The written testimony on Intro Nos. 1914 and 1932 includes testimony from

SBS, REBNY, United for Small Businesses NYC, Volunteers of Legal Service (VOLS), CHIP, and The Legal Aid Society.

47.    On May 13, 2020, the City Council amended: (a) Intro. No. 1914 as Intro. No. 1914-A (a true and correct copy of which is attached as Exhibit "AAA"); (b) Intro. No. 1932 as Intro. No. 1932-A (a true and correct copy of which is attached as Exhibit "BBB"); and (c) Intro. No. 1936 as Intro. No. 1936-A (a true and correct copy of which is attached as Exhibit "CCC").

48.    Attached as Exhibit "DDD" is a true and correct copy of Intro. No. 1914-A's "Plain Language Summary" document that is prepared by the City Council, which states, in relevant part, that Intro. No. 1914-A "would make threatening a commercial tenant based on their status as a COVID-19 impacted business or person a form of harassment punishable by a civil penalty of $10,000 to $50,000."

49.    Attached as Exhibit "EEE" is a true and correct copy of Intro. No. 1932-A's "Plain Language Summary" document that is prepared by the City Council, which states, in relevant part, that Intro. No. 1932-A would:

   a.    "temporarily prohibit the enforcement of personal liability provisions in commercial leases or rental agreements involving a COVID-19 impacted tenant";

   b.    "apply to businesses that were impacted by mandated closures and service limitations in the Governor's Executive Orders"; and

   c.    "cover[] (1) businesses that were required to stop serving food or beverages on-premises (restaurants and bars); (2) businesses that were required to cease operations altogether (gyms, fitness centers, movie theaters); (3) retail businesses that were required to close and/or subject to in-person restrictions; and (4) businesses that were required to close to the public (barbershops, hair salons, tattoo or piercing parlors and related personal care services)."

50.    Attached as Exhibit "FFF" is a true and correct copy of Intro. No. 1936-A's "Plain Language Summary" document that is prepared by the City Council, which states, in

A-1361

relevant part, that Intro. No. 1936-A "would amend the definition of harassment in the Housing Maintenance Code to include threats against an individual based on their status as a COVID-19 impacted person, their status as an essential employee, or their receipt of a rental concession or forbearance."

51.     Attached as Exhibit "GGG" is a true and correct copy of the "Committee Report of the Infrastructure Division" dated May 13, 2020, which was prepared in advance of the May 13, 2020 hearing to be held before the City Council's Committee on Housing and Buildings on Intro. No. 1936-A.  It states, in relevant part, that "Proposed Int. No. 1936-A would expand the definition of tenant harassment to protect individuals who may be harassed due to their status as an essential employee or a person impacted by COVID-19, or whether they received a rent concession or forbearance for any rent owed during the COVID-19 crisis."  Ex. GGG at 2.

52.     Attached as Exhibit "HHH" is a true and correct copy of the transcript of the May 13, 2020 hearing held by the City Council's Committee on Housing and Buildings on Intro. No. 1936-A.  During the hearing, the Committee on Housing and Buildings approved Intro No. 1936-A by a vote of 9 to 1.

53.     Attached as Exhibit "III" is a true and correct copy of the "Committee Report of the Governmental Affairs Divisions" dated May 13, 2020, which was prepared in advance of the May 13, 2020 hearing to be held before the City Council's Committee on Small Business on Intro Nos. 1914-A and 1932-A.  This committee report, which largely incorporates language from the April 29, 2020 committee report, states, in relevant part, that "[n]othing in this [Intro. No. 1914-A] is intended to limit any of the rights or obligations of landlords or commercial tenants under the existing harassment law as set forth in chapter 9 of title 22 of the Administrative Code, including but not limited to (1) the right of a landlord to terminate a

24

tenancy, refuse to renew or extend a lease or other rental agreement, or reenter and repossess property under section 22-902(b) and (2) the obligation of a commercial tenant to continue paying rent owed under section 22-903(b)." Ex. DDD at 35.

54.     Attached as Exhibit "JJJ" is a true and correct copy of the transcript of the May 13, 2020 hearing held by the City Council's Committee on Small Business on Intro. Nos. 1914-A and 1932-A.  During the hearing, the Committee on Small Business approved Intro Nos. 1914-A and 1932-A each by a vote of 5 to 0.

55.     Attached as Exhibit "KKK" is a true and correct copy of the City Council's stated meeting, where Intro. Nos. 1914-A, 1932-A, and 1936-A were passed as local laws by votes of 47-3, 44-6 and 47-3, respectively.

56.     Attached as Exhibit "LLL" is a true and correct copy of a letter from the City's Office of the Mayor dated May 26, 2020, indicating that the Mayor signed Intro. Nos. 1914-A, 1932-A, and 1936-A.

57.     Attached as Exhibit "MMM" is a true and correct copy of the Commercial Harassment Law, which took effect on May 26, 2020.

58.     Attached as Exhibit "NNN" is a true and correct copy of the Guaranty Law, which took effect on May 26, 2020.

59.     Attached as Exhibit "OOO" is a true and correct copy of the Residential Harassment Law, which took effect on May 26, 2020.

**City Council's Laws and Resolutions to Reduce Interest Rates for Nonpayment of Taxes on Certain Real Property by Property Owners Who Were Adversely Affected by COVID-19**

60.     On June 25, 2020, the City Council passed Local Law No. 62 of 2020 (a true and correct copy of which is attached as Exhibit "PPP") and Local Law No. 63 of 2020 (a

true and correct copy of which is attached as Exhibit "QQQ"). Although signed by the Mayor on July 7, 2020, these local laws took effect on June 25, 2020.

61.     On June 25, 2020, the City Council also passed Resolution No. 1349 of 2020 (a true and correct copy of which is attached as Exhibit "RRR"), which adopted "an interest rate of 7.5 percent . . . for a portion of Fiscal Year 2021 for the non-payment of taxes on real property with an assessed value over $250,000 for property owners adversely affected by COVID-19 as authorized by" Local Law No. 62 of 2020.[13]

62.     On June 25, 2020, the City Council also passed Resolution No. 1350 of 2020 (a true and correct copy of which is attached as Exhibit "SSS"). By virtue of Resolution No. 1350 of 2020, the City Council adopted "an interest rate of zero percent . . . for a portion of Fiscal Year 2021 for the non-payment of taxes on real property with an assessed value of $250,000 or less for property owners adversely affected by COVID-19 as authorized by" Local Law No. 63 of 2020.[14]

**Contracts Produced by Plaintiffs Jarican Realty Inc. and Top East Realty LLC**

63.     In response to "Defendants' Limited Requests for the Production of Documents in Advance of Responding to Plaintiffs' Complaint and Motion for Preliminary Injunctive and Declaratory Relief" dated July 28, 2020, on July 31, 2020, Plaintiff Jarican Realty Inc. produced a document Bates stamped as MELENDEZ00000001 through

---

[13] The interest rate for the non-payment of taxes on properties with an assessed value of over $250,000, or over $250,000 per residential unit for cooperative apartments, was established at 18% per annum for Fiscal Year 2021 by the City Council by virtue of Resolution No. 1347 of 2020. *See* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4579027&GUID=73EBBADD-E91C-488B-8A7E-3E87E9A302F4&Options=ID|Text|&Search=1347.

[14] The interest rate for the non-payment of taxes on properties with an assessed value of not more than $250,000, or not more than $250,000 per residential unit for cooperative apartments, was established at 3.25% for the first quarter of Fiscal Year 2021 and 5% for the remainder of Fiscal Year 2021 by the City Council by virtue of Resolution No. 1348 of 2020. *See* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4579030&GUID=BB48C27C-F1F9-4556-ADFA-8D6E340911BD&Options=ID|Text|&Search=1348.

MELENDEZ00000033 (a true and correct copy of which is attached hereto as Exhibit "TTT"), and Plaintiff Top East Realty LLC produced two documents, respectively, Bates stamped as YANG00000001 through YANG00000014 (a true and correct copy of which is attached hereto as Exhibit "UUU") and YANG00000015 through YANG00000032 (a true and correct copy of which is attached hereto as Exhibit "VVV").[15]

64.     The document Bates stamped as MELENDEZ00000001 through MELENDEZ00000033 consists of (i) an "Agreement of Lease (Net Lease)" dated February 1, 2017, entered into between Plaintiff Jarican Realty Inc. (as landlord) and Furman's Lab LLC (as tenant), in connection with the property located at 547 Nostrand Avenue, Brooklyn, NY 11216 (*see* Ex. TTT at MELENDEZ00000001-29), and (ii) a "Good Guy Guaranty" signed by principals of the tenant (*see* Ex. TTT at MELENDEZ00000030-33).

65.     The document Bates stamped as YANG00000001 through YANG00000014 consists of (i) an "Agreement of Lease" in connection with the property located at 40-59 College Point Blvd., 2nd Floor, Flushing, Queens, NY, which is not executed by the parties (*see* Ex. UUU at YANG00000001-5), (ii) a "Guaranty," which is unsigned (*see* Ex. UUU at YANG00000006), and a signed "Rider to Lease Agreement" (*see* Ex. UUU at YANG00000007-14).

66.     The document Bates stamped as YANG00000015 through YANG00000032 consists of (i) an "Agreement of Lease" dated September 1, 2015, executed between Plaintiff Top East Realty LLC (as "OWNER") and "Home Decor Expo" and "Khalid Yehia" (as "TENANTS") in connection with the property located at 40-59 College Point Blvd., Flushing, Queens, NY, which expires on August 31, 2020 (*see* Ex. VVV at YANG000000015-

---

[15] These documents have been duly redacted in accordance with the Court's applicable rules, including Federal Rule of Civil Procedure 5.2.

A-1365

19), (ii) a "Guaranty," which is signed by tenant Khalid Yehia (*see* Ex. VVV at YANG00000020), and a signed "Rider to Lease" (*see* Ex. VVV at YANG00000021-32).

**WHEREFORE**, for the reasons stated in Defendants' papers, Defendants respectfully request that this Court grant Defendants' motion to dismiss the Complaint and deny Plaintiffs' motion for preliminary injunctive and declaratory relief.

Dated:      New York, New York
            August 12, 2020


                              /s/ Carlos Fernando Ugalde Alvarez
                              **CARLOS FERNANDO UGALDE ALVAREZ**

28

A-1366

# EXHIBIT A

**A09953 Actions:**

```
BILL NO    A09953

03/02/2020  referred to ways and means
03/02/2020  reported referred to rules
03/02/2020  reported
03/02/2020  rules report cal.12
03/02/2020  ordered to third reading rules cal.12
03/02/2020  motion to amend lost
03/02/2020  substituted by s7919
            S07919 AMEND= STEWART-COUSINS
            03/02/2020  REFERRED TO RULES
            03/02/2020  ORDERED TO THIRD READING CAL.524
            03/02/2020  MESSAGE OF NECESSITY - APPROPRIATION
            03/02/2020  MESSAGE OF NECESSITY - 3 DAY MESSAGE
            03/02/2020  PASSED SENATE
            03/02/2020  DELIVERED TO ASSEMBLY
            03/02/2020  referred to ways and means
            03/02/2020  substituted for a9953
            03/02/2020  ordered to third reading rules cal.12
            03/02/2020  message of necessity - appropriation
            03/02/2020  message of necessity - 3 day message
            03/02/2020  passed assembly
            03/02/2020  returned to senate
            03/03/2020  DELIVERED TO GOVERNOR
            03/03/2020  SIGNED CHAP.23
```

Case 20-4238, Document 38, 02/11/2021, 3035076, Page274 of 298

A-1368

8/3/2020                    Case 1:20-cv-05301-RA  Document 38-1  Filed 08/12/20  Page 3 of 4
                                          New York State Assembly | Bill Search and Legislative Information

A09953 Text:

# STATE OF NEW YORK

9953

# IN ASSEMBLY

March 2, 2020

Introduced by M. of A. ORTIZ -- (at request of the Governor) -- read
once and referred to the Committee on Ways and Means

AN ACT to amend the executive law, in relation to issuing by the gover-
nor of any directive necessary to respond to a state disaster emergen-
cy; making an appropriation therefor; and providing for the repeal of
certain provisions upon expiration thereof

The People of the State of New York, represented in Senate and Assem-
bly, do enact as follows:

```
 1    Section 1. Paragraph a of subdivision 2 of section 20 of the executive
 2  law, as amended by section 1 of part B of chapter 56 of the laws of
 3  2010, is amended to read follows:
 4    a. "disaster" means occurrence or imminent, impending or urgent threat
 5  of wide spread or severe damage, injury, or loss of life or property
 6  resulting from any natural or man-made causes, including, but not limit-
 7  ed to, fire, flood, earthquake, hurricane, tornado, high water, land-
 8  slide, mudslide, wind, storm, wave action, volcanic activity, epidemic,
 9  disease outbreak, air contamination, terrorism, cyber event, blight,
10  drought, infestation, explosion, radiological accident, nuclear, chemi-
11  cal, biological, or bacteriological release, water contamination, bridge
12  failure or bridge collapse.
13    § 2. Section 29-a of the executive law, as added by chapter 640 of the
14  laws of 1978, subdivision 1 as amended by section 7 of part G of chapter
15  55 of the laws of 2012, is amended to read as follows:
16    § 29-a. Suspension of other laws. 1. Subject to the state constitu-
17  tion, the federal constitution and federal statutes and regulations, the
18  governor may by executive order temporarily suspend [specific provisions
19  of] any statute, local law, ordinance, or orders, rules or regulations,
20  or parts thereof, of any agency during a state disaster emergency, if
21  compliance with such provisions would prevent, hinder, or delay action
22  necessary to cope with the disaster or if necessary to assist or aid in
23  coping with such disaster. The governor, by executive order, may issue
24  any directive during a state disaster emergency declared in the follow-
25  ing instances: fire, flood, earthquake, hurricane, tornado, high water,
26  landslide, mudslide, wind, storm, wave action, volcanic activity,
```

EXPLANATION--Matter in italics (underscored) is new; matter in brackets
                      [-] is old law to be omitted.
                                                        LBD12048-08-0

Case 20-4238, Document 38, 02/11/2021, 3035076, Page275 of 298

A-1369

1  **epidemic, disease outbreak, air contamination, terrorism, cyber event,**
2  **blight, drought, infestation, explosion, radiological accident, nuclear,**
3  **chemical, biological, or bacteriological release, water contamination,**
4  **bridge failure or bridge collapse. Any such directive must be necessary**
5  **to cope with the disaster and may provide for procedures reasonably**
6  **necessary to enforce such directive.**
7     2. Suspensions pursuant to subdivision one of this section shall be
8  subject to the following standards and limits, **which shall apply to any**
9  **directive where specifically indicated**:
10    a. no suspension **or directive** shall be made for a period in excess of
11 thirty days, provided, however, that upon reconsideration of all of the
12 relevant facts and circumstances, the governor may extend the suspension
13 for additional periods not to exceed thirty days each;
14    b. no suspension **or directive** shall be made which [~~does not safeguard~~
15 ~~the~~] **is not in the interest of the** health [~~and~~] **or** welfare of the public
16 and which is not reasonably necessary to **aid** the disaster effort;
17    c. any such suspension order shall specify the statute, local law,
18 ordinance, order, rule or regulation or part thereof to be suspended and
19 the terms and conditions of the suspension;
20    d. the order may provide for such suspension only under particular
21 circumstances, and may provide for the alteration or modification of the
22 requirements of such statute, local law, ordinance, order, rule or regu-
23 lation suspended, and may include other terms and conditions;
24    e. any such suspension order **or directive** shall provide for the mini-
25 mum deviation from the requirements of the statute, local law, ordi-
26 nance, order, rule or regulation suspended consistent with the **goals of**
27 **the** disaster action deemed necessary; and
28    f. when practicable, specialists shall be assigned to assist with the
29 related emergency actions to avoid needless adverse effects resulting
30 from such suspension.
31    3. Such suspensions **or directives** shall be effective from the time and
32 in the manner prescribed in such orders and shall be published as soon
33 as practicable in the state bulletin.
34    4. The legislature may terminate by concurrent resolution executive
35 orders issued under this section at any time.
36    § 3. The sum of forty million dollars ($40,000,000) is hereby appro-
37 priated for transfer by the governor to the general, special revenue,
38 capital projects, proprietary or fiduciary funds of any agency, depart-
39 ment, or authority for services and expenses related to the outbreak of
40 coronavirus disease 2019 (COVID-19). Such funds shall be used for
41 purposes including, but not limited to, additional personnel, equipment
42 and supplies, travel costs, and trainings. A portion of these funds may
43 be made available as state aid to municipalities for services and
44 expenses related to the outbreak of coronavirus disease 2019 (COVID-19).
45 Such funds shall be available for payment of financial assistance here-
46 tofore accrued or hereafter to accrue. Any disbursements from this
47 appropriation shall be distributed pursuant to a plan approved by the
48 director of the budget.
49    § 4. This act shall take effect immediately and sections one and two
50 of this act shall expire and be deemed repealed April 30, 2021.

A-1370

# EXHIBIT B

A-1371



**State of New York**

**Executive Chamber**

No. 202

E X E C U T I V E  O R D E R

**Declaring a Disaster Emergency in the State of New York**

**WHEREAS**, on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern;

**WHEREAS**, on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19;

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue; and

**WHEREAS**, New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors.

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, hereby find, pursuant to Section 28 of Article 2-B of the Executive Law, that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately, and I do hereby declare a State disaster emergency for the entire State of New York. This Executive Order shall be in effect until September 7, 2020; and

**IN ADDITION**, this declaration satisfies the requirements of 49 C.F.R. 390.23(a)(l)(A), which provides relief from Parts 390 through 399 of the Federal Motor Carrier Safety Regulations (FMCSR). Such relief from the FMCSR is necessary to ensure that crews are available as needed.

**FURTHER**, pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 6, 2020 the following:

Section 112 of the State Finance Law, to the extent consistent with Article V, Section 1 of the State Constitution, and to the extent necessary to add additional work, sites, and time to State contracts or to award emergency contracts, including but not limited to emergency contracts or leases for relocation and support of State operations under Section 3 of the Public Buildings Law; or emergency contracts under Section 9 of the Public Buildings Law; or emergency contracts for professional services under Section 136-a of the State Finance Law; or emergency contracts for commodities, services, and technology under Section 163 of the State Finance Law; or design-build or best value contracts under and Part F of Chapter 60 of the Laws of 2015 and Part RRR of Chapter 59 of the Laws of 2017; or emergency contracts for purchases of commodities, services, and technology through any federal GSA schedules, federal 1122 programs, or other state, regional, local, multi-jurisdictional, or cooperative contract vehicles;

Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, to the extent necessary to allow the purchase of necessary commodities, services, technology, and materials without following the standard notice and procurement processes;

Section 97-G of the State Finance Law, to the extent necessary to purchase food, supplies, services, and equipment or furnish or provide various centralized services, including but not limited to, building design and construction services to assist affected local governments, individuals, and other non-State entities in responding to and recovering from the disaster emergency;

Section 359-a, Section 2879, and 2879-a of the Public Authorities Law to the extent necessary to purchase necessary goods and services without following the standard procurement processes;

Sections 375, 385 and 401 of the Vehicle and Traffic Law to the extent that exemption for vehicles validly registered in other jurisdictions from vehicle registration, equipment and dimension requirements is necessary to assist in preparedness and response to the COVID-19 outbreak;

Sections 6521 and 6902 of the Education Law, to the extent necessary to permit unlicensed individuals, upon completion of training deemed adequate by the Commissioner of Health, to collect throat or nasopharyngeal swab specimens from individuals suspected of being infected by COVID-19, for purposes of testing; and to the extent necessary to permit non-nursing staff, upon completion of training deemed adequate by the Commissioner of Health, to perform tasks, under the supervision of a nurse, otherwise limited to the scope of practice of a licensed or registered nurse;

Subdivision 6 of section 2510 and section 2511 of the Public Health Law, to the extent necessary to waive or revise eligibility criteria, documentation requirements, or premium contributions; modify covered health care services or the scope and level of such services set forth in contracts; increase subsidy payments to approved organizations, including the maximum dollar amount set forth in contracts; or provide extensions for required reports due by approved organizations in accordance with contracts;

Section 224-b and subdivision 4 of section 225 of the Public Health Law, to the extent necessary to permit the Commissioner of Health to promulgate emergency regulations and to amend the State Sanitary Code;

Subdivision 2 of section 2803 of the Public Health Law, to the extent necessary to permit the Commissioner to promulgate emergency regulations concerning the facilities licensed pursuant to Article 28 of the Public Health Law, including but not limited to the operation of general hospitals;

Subdivision 3 of section 273 of the Public Health Law and subdivisions 25 and 25-a of section 364-j of the Social Services Law, to the extent necessary to allow patients to receive prescribed drugs without delay;

Section 400.9 and paragraph 7 of subdivision f of section 405.9 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals and nursing homes licensed pursuant to Article 28 of the Public Health Law ("Article 28 facilities") that are treating patients during the disaster emergency to rapidly discharge, transfer, or receive such patients, as authorized by the Commissioner of Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices, and to comply with the Emergency Medical Treatment and Active Labor Act (42 U.S.C. section 1395dd) and any associated regulations;

Section 400.11 of Title 10 of the NYCRR, to the extent necessary to permit Article 28 facilities receiving patients as a result of the disaster emergency to complete patient review instruments as soon as practicable;

Section 405 of Title 10 of the NYCRR, to the extent necessary to maintain the public health with respect to treatment or containment of individuals with or suspected to have COVID-19;

Subdivision d and u of section 800.3 of Title 10 of the NYCRR, to the extent necessary to permit emergency medical service personnel to provide community paramedicine, transportation to destinations other than hospitals or health care facilities, telemedicine to facilitate treatment of patients in place, and such other services as may be approved by the Commissioner of Health;

Paragraph 3 of subdivision f of section 505.14 of Title 18 of the NYCRR, to the extent necessary to permit nursing supervision visits for personal care services provided to individuals affected by the disaster emergency be made as soon as practicable;

Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals who meet the federal requirements for high complexity testing to perform testing for the detection of SARS-CoV-2 in specimens collected from individuals suspected of suffering from a COVID-19 infection;

Subdivision 4 of section 6909 of the Public Health Law, subdivision 6 of section 6527 of the Education Law, and section 64.7 of Title 8 of the NYCRR, to the extent necessary to permit physicians and certified nurse practitioners to issue a non-patient specific regimen to nurses or any such other persons authorized by law or by this executive order to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing, or to perform such other tasks as may be necessary to provide care for individuals diagnosed or suspected of suffering from a COVID-19 infection;

Section 596 of Title 14 of the NYCRR to the extent necessary to allow for rapid approval of the use of the telemental health services, including the requirements for in-person initial assessment prior to the delivery of telemental health services, limitations on who can deliver telemental health services, requirements for who must be present while telemental health services are delivered, and a recipient's right to refuse telemental health services;

Section 409-i of the Education Law, section 163-b of the State Finance Law with associated OGS guidance, and Executive Order No. 2 are suspended to the extent necessary to allow elementary and secondary schools to procure and use cleaning and maintenance products in schools; and sections 103 and 104-b of the General Municipal Law are suspended to the extent necessary to allow schools to do so without the usual advertising for bids and offers and compliance with existing procurement policies and procedures;

Article 7 of the Public Officers Law, section 41 of the General Construction Law, and section 3002 of the Public Health Law, to the extent necessary to permit the Public Health and Health Planning Council and the State Emergency Medical Services Council to meet and take such actions as authorized by law, as may be necessary to respond to the COVID-19 outbreak, without meeting quorum requirements or permitting the public in-person access to meetings, provided that any such meetings must be webcast and means for effective public comment must be made available; and

**FURTHER,** I hereby temporarily modify, for the period from the date of this Executive Order through April 6, 2020, the following laws:

Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law; Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations, to the extent necessary to provide the Governor with the authority to regulate traffic and the movement of vehicles on roads, highways, and streets.

G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

seventh day of March in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1374

# EXHIBIT C

A-1375



No. 202.3

E X E C U T I V E  O R D E R

**CONTINUING TEMPORARY SUSPENSION AND MODIFICATION OF LAWS RELATING TO
THE DISASTER EMERGENCY**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

WHEREAS, one state acting alone cannot control the continued spread of this disease and it requires coordination and cooperation amongst the states; and

NOW, THEREFORE, I, Governor Andrew M. Cuomo, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, or to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives and suspensions and modifications for the period from the date of this Executive Order 202.3 through April 15, 2020:

- The directive requiring large gatherings and events to be cancelled or postponed if they had anticipated attendance in excess of 500 people by virtue of Executive Order 202.1 dated March 12, 2020, is hereby amended and modified to require that any large gathering or event (concert, conference, worship service, performance before a large audience, etc.) shall be cancelled or postponed if more than fifty persons are expected in attendance, at any location in New York State until further notice.

- Any restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises effective at 8 pm on March 16, 2020, and until further notice shall only serve food or beverage for off-premises consumption. Notwithstanding any provision of the alcohol and beverage control law, a retail on-premises licensee shall be authorized for the duration of this Executive Order to sell alcohol for off-premises consumption, which shall include either take-out or delivery, subject to reasonable limitations set by the State Liquor Authority.

- Any facility authorized to conduct video lottery gaming, or casino gaming shall cease operation effective at 8 pm on March 16, 2020, and until further notice. For a Class III

Tribal Gaming enterprise or Class II Tribal Gaming enterprise, any facility should also close to the public until further notice.

- Any gym, fitness centers or classes, and movie theaters shall also cease operation effective at 8 pm on March 16, 2020 until further notice.

- No local government or political subdivision shall issue any local emergency order or declaration of emergency or disaster inconsistent with, conflicting with or superseding the foregoing directives, or any other executive order issued under Section 24 of the Executive Law and any local emergency order or any local administrative codes, charters, laws, rules or regulations, are hereby suspended with respect to any such order issued under such authority different or in conflict with Executive directives.



GIVEN under my hand and the Privy Seal of the State in the City of Albany this sixteenth day of March in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1377

# EXHIBIT D



State of New York

Executive Chamber

No. 202.5

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS,** in order to facilitate the most timely and effective response to the COVID 19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 17, 2020 the following:

- Sections 6512 through 6516, and 6524 of the Education Law and Part 60 of Title 8 of the NYCRR, to the extent necessary to allow physicians licensed and in current good standing in any state in the United States to practice medicine in New York State without civil or criminal penalty related to lack of licensure;

- Section 6502 of the Education Law and Part 59.8 of Title 8 of the NYCRR, to the extent necessary to allow physicians licensed and in current good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

- Sections 6512 through 6516, and 6905, 6906 and 6910 of the Education Law and Part 64 of Title 8 of the NYCRR, to the extent necessary to allow registered nurses, licensed practical nurses, and nurse practitioners licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

- Sections 6512 through 6516, and 6541 of the Education Law and Part 60.8 of Title 8 of the NYCRR 8 NYCRR, to the extent necessary to allow physician assistants licensed and in current good standing in any state in the United States to practice in New York State without civil or criminal penalty related to lack of licensure;

- Section 400.12 of Title 10 of the NYCRR, to the extent necessary to allow patients affected by the disaster emergency to be transferred to receiving Article 28 facilities as authorized by the Commissioner of Health;

- Section 415.11 of Title 10 of the NYCRR, to the extent necessary to permit nursing homes receiving individuals affected by the disaster emergency to perform comprehensive assessments of those residents temporarily evacuated to such nursing homes as soon as practicable following admission or to forego such assessments for individuals returned to facilities from which they were evacuated;

- Subdivision b of section 415.15 of Title 10 of the NYCRR, to the extent necessary to permit nursing homes receiving individuals affected by the disaster emergency to obtain physician approvals for admission as soon as practicable following admission or to forego such approval for individuals returned to facilities from which they were evacuated;

- Subdivision i of section 415.26 of Title 10 of the NYCRR, to the extent necessary to permit nursing homes receiving individuals affected by the disaster emergency to comply with admission procedures as soon as practicable following admission or to forego such procedures for individuals returned to facilities from which they were evacuated;

- Paragraph 2 of subdivision g of section 763.4; paragraphs 7 and 8 of subdivision h of section 763.4; paragraph 2 of subdivision a of section 766.5; and paragraph 1 of subdivision d of section 766.5 of Title 10 of the NYCRR, to the extent necessary to permit certified home health agencies, long term home health care programs, AIDS home care programs, and licensed home care services agencies serving individuals affected by the disaster emergency to conduct in-home supervision of home health aides and personal care aides as soon as practicable after the initial service visit, or to permit in-person and in-home supervision to be conducted through indirect means, including by telephone or video communication;

- Subdivision a of section 763.5 of Title 10 of the NYCRR, to the extent necessary to permit initial patient visits for certified home health agencies, long term home health care programs and AIDS home care programs serving individuals affected by the disaster emergency to be made within 48 hours of receipt and acceptance of a community referral or return home from institutional placement;

- Sections 403.3 and 403.5 if Title 10 of the NYCRR, to extend the time in which home care services entities must submit information to the Home Care Worker Registry;

- Sections 358-4.3, 358-5.12 and 358-5.13 of Title 18 of the NYCRR, to the extent necessary to allow or require appearance by any parties to a fair hearing by written, telephonic, video or other electronic means;

- Sections 2999-h and 2999-j of the Public Health Law, to the extent necessary to provide reimbursement to Medical Indemnity Fund enrollees, in primary residences where a resident has had COVID-19 or was exposed to COVID-19, for costs related to cleaning and disinfection of such primary residences, at the discretion of the Commissioner of Health;

- Section 2805-k of the Public Health Law and sections 405.4, 405.5, 405.9, 405.14, 405.19, and 405.22 of Title 10 of the NYCRR, to the extent necessary to allow staff with the necessary professional competency and who are privileged and credentialed to work in a facility in compliance with such section of the Public Health Law and such sections of the NYCRR, or who are privileged and credentialed to work in a facility in another state in compliance with the applicable laws and regulations of that other state, to practice in a facility in New York State;

- Part 405 of Title 10 of the NYCRR, to the extent necessary to adopt existing policies and procedures in a general hospital at a new, temporary facility created for the purpose of treating patients during the COVID-19 outbreak;

- Any code related to construction, energy conservation, or other building code, and all state and local laws, ordinances, and regulations relating to administration and enforcement of the foregoing, to the extent necessary to allow, upon approval by the Commissioner of Health or the Commissioner of OPWDD, as applicable, the temporary changes to physical plant, bed capacities, and services provided; the construction of temporary hospital locations and extensions; the increase in and/or exceeding of certified capacity limits; and the establishment of temporary hospital locations and extensions;

- Part 425 of Title 10 of the NYCRR and section 461-k of the Social Services Law, to the extent necessary to prevent transportation to and attendance at adult day care programs, until authorized by the Commissioner of Health;

- Section 16.17 of the Mental Hygiene Law to the extent necessary to permit the Office of People with Developmental Disabilities to take emergency action to suspend or limit a provider's operating certificate;

- Sections 633.12 and 636-1 of Title 14 of the NYCRR, to the extent necessary to temporarily deviate from an individual's service plan, which would otherwise outline participation in day programming and other community based served, and to the extent necessary to temporarily relocate individuals, in order to maintain the health and safety of that individual during this emergency period and to the extent necessary;

- Sections 33.02 and 33.05 of the Mental Hygiene law and sections 633.4, 636-1.4 and 633.16 of Title 14 of the NYCRR, to the extent necessary to restrict visitors to facilities certified pursuant Article 16 of the Mental Hygiene law and to permit restrictions on community outings for residents of such facilities to reduce the spread of COVID-19;

- Sections 633.8 and 633.14 of Title 14 of the NYCRR to the extent necessary to permit abbreviated training of direct support professionals employed in programs and facilities certified pursuant to Article 16 of the Mental Hygiene Law that are experiencing staff shortages;

- Section 633.17 of Title 14 of the NYCRR, to the extent necessary to permit abbreviated medication administration training of direct support professionals employed in programs or facilities certified pursuant to Article 16 of the Mental Hygiene Law;

- Section 390-b of the Social Services Law and regulations at sections 413.4 and 415.15 of Title 18 of the NYCRR insofar as that statute and those regulations establish background check requirements for child day care;

- Section 390 of the Social Services Law insofar as that section of law exempts school age child care programs operated by a school or entity with experience providing child care and located in a school providing elementary or secondary education from having to comply with the regulations of the office of children and family services;

- Subdivision 7 of section 590 and subdivision 2 of section 607 of the Labor Law, so far as they relate to waiting periods for unemployment insurance claimants whose claims for unemployment insurance arise due to closure of an employer for a reason related to COVID-19 or due to a mandatory order of a government entity duly authorized to issue such order to close such employer, as of March 12, 2020;

- Subdivision b of section 708 of the Business Corporation Law to the extent necessary to permit business corporations to take any action otherwise permitted under that section with the electronic consent of the members of the board or committee, when such consent is submitted via electronic mail along with information from which it can reasonably be determined that the transmission was authorized by such member;

- Sections 65(13)(b) and 66(12)(f) of the Public Service Law to the extent of having in-person public hearings, provided that such hearings are held by conference call or similar electronic means, which are recorded and later transcribed;

- Section 165(1) of the Public Service Law ("PSL") to the extent of holding public statement hearings, provided that the public may file written comments in any case subject to PSL Article 10 until issuance of a final order; and

- Section 123(1) of the Public Service Law ("PSL") to the extent of holding a public hearing, provided that the public may file written comments in any case subject to PSL Article VII until issuance of a final order.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 17, 2020:

- Any village election set to be held March 18, 2020 shall be postponed and any elected official holding such position shall remain in office until such time as a new election is held.

- Effective at 8 p.m. March 19, 2020, all indoor common portions of retail shopping malls with in excess of 100,000 square feet of retail space available for lease shall close and cease access to the public. Any stores located within shopping malls, which have their own external entrances open to the public, separate from the general mall entrance, may remain open, subject to the requirements of Executive Order 202.3 that any restaurant shall limit itself to take out or delivery food services, and that any interior entrances to common areas of the mall remain closed and locked.

- Additionally, all places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, arcades, fairs, children's play centers, funplexes, theme parks, bowling alleys, family and children's attractions shall likewise be closed to the public at 8 p.m. on March 19. This directive shall not apply to public parks and open recreation areas.

- Notwithstanding section 24 of the Executive Law, no locality or political subdivision shall issue any local emergency order or executive order with respect to response of COVID-19 without the approval of the State Department of Health.

G I V E N   under my hand and the Privy Seal of the State

in the City of Albany the eighteenth day of

March in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1381

# EXHIBIT E

A-1382



**State of New York**

**Executive Chamber**

No. 202.6

E X E C U T I V E   O R D E R

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS,** in order to facilitate the most timely and effective response to the COVID 19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 17, 2020 the following:

- Section three of the Public Officer's Law shall not apply to an individual who is deemed necessary to hire or to engage in a volunteer capacity to provide for an effective and efficient emergency response, for the duration of such emergency;

- Subparagraph (i) of subdivision l of section 73 of the Public Officers Law Section shall not apply to any person who is hired, retained, appointed, or who volunteers in any way to assist New York State in its response to the declared emergency;

- Subparagraph 5 of section 73 of the Public Officers Law Section shall not apply to a state officer or employee, or a volunteer who is facilitating contributions or donations to assist New York State in its response to the declared emergency;

- Subparagraph 8 of section 73 of the Public Officers Law Section 73(8) and section 74 of the Public Officer's Law shall not apply to volunteers or contractors who assist New York State in its response, provided that any recusals shall be adhered to if determined necessary by the appointing entity;

- Legislative Law Section 1-M is suspended to the extent that any agency may receive a donation in kind or otherwise, in any amount from any source, provided such donation is made to the State and is administered by a state agency in furtherance of the response effort;

- State Finance Law Section 11, to the extent necessary to facilitate an efficient and effective New York State emergency disaster response, shall not apply to any state agency efforts to further the response to the declared emergency;

A-1383

**NOW, THEREFORE,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 17, 2020:

- Effective on March 20 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 50% no later than March 20 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. This includes essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media; banks and related financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses;  vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public;

- Any other business may be deemed essential after requesting an opinion from the Empire State Development Corporation, which shall review and grant such request, should it determine that it is in the best interest of the state to have the workforce continue at full capacity in order to properly respond to this disaster. No later than 5 p.m. on March 19, 2020, Empire State Development Corporation shall issue guidance as to which businesses are determined to be essential.

G I V E N  under my hand and the Privy Seal of the State in the City of Albany this eighteenth day of March in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1384

# EXHIBIT F



**State of New York**

**Executive Chamber**

No. 202.7

E X E C U T I V E   O R D E R

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS**, in order to facilitate the most timely and effective response to the COVID 19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 18, 2020 the following:

- The suspensions made to the Public Officer's Law, including provisions of Section 73 and Section 74, by Executive Order 202.6 are hereby modified to require that such suspensions and modifications shall only be valid with respect to a person hired for a nominal or no salary or in a volunteer capacity.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 18, 2020:

- Any notarial act that is required under New York State law is authorized to be performed utilizing audio-video technology provided that the following conditions are met:
    - The person seeking the Notary's services, if not personally known to the Notary, must present valid photo ID to the Notary during the video conference, not merely transmit it prior to or after;
    - The video conference must allow for direct interaction between the person and the Notary (e.g. no pre-recorded videos of the person signing);
    - The person must affirmatively represent that he or she is physically situated in the State of New York;
    - The person must transmit by fax or electronic means a legible copy of the signed document directly to the Notary on the same date it was signed;
    - The Notary may notarize the transmitted copy of the document and transmit the same back to the person; and

     ○  The Notary may repeat the notarization of the original signed document as of the date of execution provided the Notary receives such original signed document together with the electronically notarized copy within thirty days after the date of execution.

- Effective March 21, 2020 at 8 p.m. and until further notice, all barbershops, hair salons, tattoo or piercing parlors and related personal care services will be closed to members of the public. This shall also include nail technicians, cosmetologists and estheticians, and the provision of electrolysis, laser hair removal services, as these services cannot be provided while maintaining social distance.

- The provisions of Executive Order 202.6 requiring in-person work environment restrictions are modified as follows: Effective March 21, 2020 at 8 p.m. and until further notice all businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 75% no later than March 21 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions.



G I V E N   under my hand and the Privy Seal of the State

in the City of Albany the nineteenth day of

March in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1387

# EXHIBIT G



**State of New York**

**Executive Chamber**

No. 202.8

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws**
**Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS,** in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 19, 2020 the following:

- In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis,  any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020;
- Subdivision 1 of Section 503 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a driver's license, in order to extend for the duration of this executive order the validity of driver's licenses that expire on or after March 1, 2020;
- Subdivision 1 of Section 491 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a non-driver identification card, in order to extend for the duration of this executive order the validity of non-driver identification cards that expire on or after March 1, 2020;
- Sections 401, 410, 2222, 2251, 2261, and 2282(4) of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a registration certificate or number plate for a motor vehicle or trailer, a motorcycle, a snowmobile, a vessel, a limited use vehicle, and an all-terrain vehicle, respectively, in order to extend for the duration of this executive order the validity of such registration certificate or number plate that expires on or after March 1, 2020;
- Section 420-a of the vehicle and traffic law to the extent that it provides an expiration for temporary registration documents issued by auto dealers to extend the validity of such during the duration of this executive order.
- Subsection (a) of Section 602 and subsections (a) and (b) of Section 605 of the Business Corporation Law, to the extent they require meetings of shareholders to be noticed and held at a physical location.

A-1389

NOW, THEREFORE, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 19, 2020:

- The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.
- There shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days.
- Effective at 8 p.m. March 20, any appointment that is in-person at any state or county department of motor vehicles is cancelled, and until further notice, only on-line transactions will be permitted.
- The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to also authorize abatement of interest, for a period of 60 days for a taxpayers who are required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twentieth day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1390

# EXHIBIT H



No. 202.9

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS**, in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 20, 2020 the following:

- Subdivision two of Section 39 of the Banking Law is hereby modified to provide that it shall be deemed an unsafe and unsound business practice if, in response to the COVID-19 pandemic, any bank which is subject to the jurisdiction of the Department shall not grant a forbearance to any person or business who has a financial hardship as a result of the COVID-19 pandemic for a period of ninety days.

**NOW, THEREFORE**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 20, 2020:

- The Superintendent of the Department of Financial Services shall ensure under reasonable and prudent circumstances that any licensed or regulated entities provide to any consumer in the State of New York an opportunity for a forbearance of payments for a mortgage for any person or entity facing a financial hardship due to the COVID-19 pandemic. The Superintendent shall promulgate emergency regulations to require that the application for such forbearance be made widely available for consumers, and such application shall be granted in all reasonable and prudent circumstances solely for the period of such emergency.

A-1392

- Further, the Superintendent shall be empowered to promulgate emergency regulations to direct that, solely for the period of this emergency, fees for the use of automated teller machines (ATMs), overdraft fees and credit card late fees, may be restricted or modified in accordance with the Superintendent's regulation of licensed or regulated entities taking into account the financial impact on the New York consumer, the safety and soundness of the licensed or regulated entity, and any applicable federal requirements.



GIVEN  under my hand and the Privy Seal of the

State in the City of Albany this

twenty-first day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor