# 20-4238-cv

## United States Court of Appeals

*for the*

## Second Circuit

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC,
LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,
ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

– v. –

CITY OF NEW YORK, a municipal entity, MAYOR BILL DE BLASIO, as
Mayor of the City of New York, COMMISSIONER LOUISE CARROLL,
Commissioner of New York City Department of Housing Preservation &
Development, COMMISSIONER JONNEL DORIS, Commissioner of
New York City Department of Small Business Services,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 6 of 16 (Pages A-1393 to A-1642)

JAMISON DAVIES
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street
New York, New York 10007
(212) 356-2490

CLAUDE G. SZYFER
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Plaintiffs-Appellants*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

i

## TABLE OF CONTENTS

| | Page |
|---|---|
| District Court Docket Entries .................................... | A-1 |
| Complaint, dated July 10, 2020 ................................ | A-14 |
| Notice of Motion for Preliminary Injunctive and Declaratory Relief, dated July 22, 2020 ............... | A-78 |
| Declaration of Stephen P. Younger in Support of Plaintiffs' Motion for Preliminary Injunctive and Declaratory Relief, dated July 22, 2020 ............... | A-80 |
| Exhibit 1 to Younger Declaration - July Reopening Survey Summary ........................ | A-107 |
| Exhibit 2 to Younger Declaration - Partnership for New York City – A Call for Action and Collaboration........................................ | A-109 |
| Exhibit 3 to Younger Declaration - The New York Times Article: New Threat to New York City: Commercial Rent Payments Plummet, dated May 21, 2020 ................................................. | A-177 |
| Exhibit 4 to Younger Declaration - The Real Deal Article: About 25% of NYC renters didn't pay in May: survey, dated May 19, 2020 ........................................................... | A-183 |
| Exhibit 5 to Younger Declaration - Complaint in *The Gap, Inc. v. 44-45 Broadway Leasing Co., LLC*, dated June 23, 2020 ................. | A-187 |
| Exhibit 6 to Younger Declaration - Complaint in *The Gap, Inc. v. 170 Broadway Retail Owner, LLC*, dated July 2, 2020 .................. | A-213 |

ii

**Page**

Exhibit 7 to Younger Declaration -
Complaint in *Bath & Body Works, LLC v. 304
PAS Owner LLC*, dated June 8, 2020 ..................... A-237

Exhibit 8 to Younger Declaration -
Complaint in *Victoria's Secret Stores, LLC v.
Herald Square Owner LLC*, dated June 8, 2020 .... A-258

Exhibit 9 to Younger Declaration -
The New York Times Article: Tenants' Troubles
Put Stress on Commercial Real Estate, dated
June 5, 2020 ............................................................ A-282

Exhibit 10 to Younger Declaration -
The New York Times Article: 5 Ways the
Coronavirus Has Changed Suburban Real Estate,
dated July 17, 2020 ................................................ A-289

Exhibit 11 to Younger Declaration -
The New York Times Article: Coronavirus
Escape: To the Suburbs, dated May 8, 2020 .......... A-299

Exhibit 12 to Younger Declaration -
Snapshot: IBO's Updated Economic and Revenue
Forecast and Review of the Adopted Budget for
2021, dated July 21, 2020 ...................................... A-310

Exhibit 13 to Younger Declaration -
New York City Independent Budget Office –
Focus on: The Executive Budget, dated
May 2020 ................................................................ A-351

Exhibit 14 to Younger Declaration -
The New York Times Article: N.Y.C. Budget and
a Cut to N.Y.P.D. Funding, Explained, dated
July 1, 2020 ............................................................ A-377

iii

**Page**

Exhibit 15 to Younger Declaration -
Chapter 23 of the New York State Session Laws
of 2020, effective March 3, 2020 .......................... A-385

Exhibit 16 to Younger Declaration -
New York State Assembly Memorandum in
Support of Legislation submitted in Accordance
with Assembly Rule III, Sec 1(f) .......................... A-388

Exhibit 17 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202, dated March 7, 2020 .................... A-390

Exhibit 18 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.3, dated March 16, 2020 ................ A-394

Exhibit 19 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.6, dated March 18, 2020 ................ A-397

Exhibit 20 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.7, dated March 19, 2020 ................ A-400

Exhibit 21 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.8, dated March 20, 2020 ................ A-403

Exhibit 22 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.16, dated April 12, 2020 ................ A-406

Exhibit 23 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.28, dated May 7, 2020 ................... A-409

Exhibit 24 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.38, dated June 6, 2020 ................... A-413

iv

**Page**

Exhibit 25 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.48, dated July 6, 2020 .................... A-416

Exhibit 26 to Younger Declaration -
Chapter 125 of the New York State Session Laws
of 2020, effective June 17, 2020 ........................... A-420

Exhibit 27 to Younger Declaration -
Chapter 127 of the New York State Session Laws
of 2020, effective June 30, 2020 ........................... A-423

Exhibit 28 to Younger Declaration -
Proposed Int. No. 1914-A ...................................... A-426

Exhibit 29 to Younger Declaration -
Proposed Int. No. 1932-A ...................................... A-430

Exhibit 30 to Younger Declaration -
Proposed Int. No. 1936-A ...................................... A-434

Exhibit 31 to Younger Declaration -
Transcript of Remote Hearing, dated
May 13, 2020 ......................................................... A-438

Exhibit 32 to Younger Declaration -
New York City Council Article: New York City
Council Announces COVID-19 Legislative
Relief Package To Be Introduced on Wednesday,
dated April 21, 2020 .............................................. A-516

Exhibit 33 to Younger Declaration -
Transcript of Remote Hearing, dated
April 28, 2020 ........................................................ A-525

Exhibit 34 to Younger Declaration -
Transcript of Remote Hearing, dated
April 29, 2020 ........................................................ A-669

v

**Page**

Exhibit 35 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure and Government Affairs
Division, dated April 28, 2020............................... A-959

Exhibit 36 to Younger Declaration -
The Council of the City of New York Briefing
Paper and Committee Report of the
Governmental Affairs Division, dated
April 29, 2020........................................................ A-973

Exhibit 37 to Younger Declaration -
The Council of the City of New York Committee
Report of the Governmental Affairs Division,
dated May 13, 2020 ................................................ A-1052

Exhibit 38 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure Division, dated
May 13, 2020......................................................... A-1108

Exhibit 39 to Younger Declaration -
Summary – Brooklyn Chamber of Commerce
Surveys ................................................................... A-1114

Exhibit 40 to Younger Declaration -
MetLife & U.S. Chamber of Commerce Small
Business Coronavirus Impact Poll, dated
June 3, 2020 ........................................................... A-1116

Exhibit 41 to Younger Declaration -
NYC's Nightlife Economy Impact, Assets, and
Opportunities ......................................................... A-1132

Exhibit 42 to Younger Declaration -
Emails, dated June 19, 2020 .................................. A-1213

vi

**Page**

Exhibit 43 to Younger Declaration -
The Stoop NYU Furman Center Blog Article:
Understanding the Potential Magnitude of Rent
Shortfalls in New York Due to COVID, dated
June 4, 2020 ............................................................ A-1216

Exhibit 44 to Younger Declaration -
Small Business First – Better Government
Stronger Businesses ................................................ A-1229

Exhibit 45 to Younger Declaration -
Guaranty, dated October 18, 2018 ......................... A-1278

Declaration of Santo Golino in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 22, 2020 .......................................................... A-1281

Declaration of Ling Yang in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 9, 2020 ............................................................ A-1323

Declaration of Marcia Melendez in Support of
Plaintiffs' Motion for a Preliminary Injunction,
dated July 9, 2020 .................................................. A-1330

Notice of Motion to Dismiss, dated August 12, 2020 A-1336

Declaration of Carlos F. Ugalde Alvarez in Support
of Defendants' Motion to Dismiss and in
Opposition to Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 12, 2020 ..................................................... A-1338

Exhibit A to Alvarez Declaration -
Chapter 23 of the New York State Laws of 2020 .. A-1366

Exhibit B to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202 dated March 7, 2020 ................................. A-1370

vii

**Page**

Exhibit C to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.3 dated March 16, 2020 .......................... A-1374

Exhibit D to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.5 dated March 18, 2020 .......................... A-1377

Exhibit E to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.6 dated March 18, 2020 .......................... A-1381

Exhibit F to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.7 dated March 19, 2020 .......................... A-1384

Exhibit G to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-1387

Exhibit H to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.9 dated March 21, 2020 .......................... A-1390

Exhibit I to Alvarez Declaration -
New York State Gubernatorial Executive Order
Nos. 202.13, 202.14, 202.18 dated March 29,
2020, April 7, 2020 and April 16, 2020 ................. A-1393

Exhibit J to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.16, dated April 12, 2020.......................... A-1404

Exhibit K to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.28, dated May 7, 2020 ............................ A-1407

Exhibit L to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.29, dated May 8, 2020 ............................ A-1411

viii

**Page**

Exhibit M to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.31, dated May 14, 2020 .......................... A-1413

Exhibit N to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.34, dated May 28, 2020 .......................... A-1416

Exhibit O to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.35, dated May 29, 2020 .......................... A-1419

Exhibit P to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.36, dated June 2, 2020 ........................... A-1422

Exhibit Q to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.38, dated June 6, 2020 ........................... A-1425

Exhibit R to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.39, dated June 7, 2020 ........................... A-1428

Exhibit S to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.41, dated June 13, 2020 .......................... A-1431

Exhibit T to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.45, dated June 26, 2020 .......................... A-1434

Exhibit U to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.48, dated July 6, 2020 ........................... A-1437

Exhibit V to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.49, dated July 7, 2020 ........................... A-1441

ix

**Page**

Exhibit W to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.50, dated July 9, 2020 .............................. A-1443

Exhibit X to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.53, dated July 21, 2020 ........................... A-1445

Exhibit Y to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................ A-1448

Exhibit Z to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ...................... A-1452

Exhibit AA to Alvarez Declaration -
Administrative Order No. AO/68/20, dated
March 16, 2020........................................................ A-1454

Exhibit BB to Alvarez Declaration -
Administrative Order No. AO/127/20, dated
June 18, 2020 .......................................................... A-1464

Exhibit CC to Alvarez Declaration -
Administrative Order No. AO/131/20, dated
June 23, 2020 .......................................................... A-1474

Exhibit DD to Alvarez Declaration -
Administrative Order No. AO/143/20, dated
July 7, 2020............................................................. A-1480

Exhibit EE to Alvarez Declaration -
Chapter 112 of the New York State Laws of 2020
and Chapter 126 of the New York State Laws of
2020 ........................................................................ A-1482

Exhibit FF to Alvarez Declaration -
Chapter 125 of the New York State Laws of 2020    A-1492

x

**Page**

Exhibit GG to Alvarez Declaration -
Chapter 127 of the New York State Laws of 2020    A-1501

Exhibit HH to Alvarez Declaration -
Introduction No. 1914............................................    A-1504

Exhibit II to Alvarez Declaration -
Introduction No. 1932............................................    A-1508

Exhibit JJ to Alvarez Declaration -
Introduction No. 1936............................................    A-1516

Exhibit KK to Alvarez Declaration -
Transcript of Meeting, dated April 22, 2020..........    A-1520

Exhibit LL to Alvarez Declaration -
Committee Report of the Infrastructure and
Governmental Affairs Divisions, dated
April 28, 2020........................................................    A-1620

Exhibit MM to Alvarez Declaration -
NYU Furman Center Article: What are the
Housing Costs of Households Most Vulnerable to
Job Layoffs? An Initial Analysis, dated
March 30, 2020......................................................    A-1634

Exhibit NN to Alvarez Declaration -
The New York Times Article: 11 Numbers That
Show How the Coronavirus Has Changes N.Y.C.,
dated April 20, 2020 .............................................    A-1643

Exhibit OO to Alvarez Declaration -
Transcript of Hearing, dated April 28, 2020 ..........    A-1654

Exhibit PP to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. No. 1936...........................    A-1798

xi

**Page**

Exhibit QQ to Alvarez Declaration -
Briefing Paper and Committee Report of the
Governmental Affairs Divisions, dated
April 29, 2020 ........................................................ A-1906

Exhibit RR to Alvarez Declaration -
New York City Comptroller Scott M. Stringer:
City must take immediate action to prepare for
economic impacts of COVID-19 and protect vital
services for most vulnerable New Yorkers, dated
March 16, 2020 ...................................................... A-1985

Exhibit SS to Alvarez Declaration -
New York State Restaurant Association,
Restaurant industry impact survey: New York
State, dated April 2020 .......................................... A-1991

Exhibit TT to Alvarez Declaration -
National Bureau of Econ. Research Article: How
are small businesses adjusting to COVID-19?
Early evidence from a survey, dated April 2020 .... A-1993

Exhibit UU to Alvarez Declaration -
Info. Station Article: How important are small
businesses?, dated January 3, 2017 ........................ A-2030

Exhibit VV to Alvarez Declaration -
United States Small Business Administration,
Small Businesses generate 44 percent of U.S.
economic activity, dated January 30, 2019 ............ A-2034

Exhibit WW to Alvarez Declaration -
N.Y.C. Department of Small Business Services,
Comprehensive Guide to Commercial Leasing in
New York City ....................................................... A-2037

xii

**Page**

Exhibit XX to Alvarez Declaration -
Entrepreneur Article: Hayden Field, 5 most
common red flags entrepreneurs should know
before signing a commercial real estate lease in
New York, dated June 6, 2019 ............................... A-2078

Exhibit YY to Alvarez Declaration -
Transcript of Hearing, dated April 29, 2020 .......... A-2091

Exhibit ZZ-1 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2381

Exhibit ZZ-2 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2550

Exhibit ZZ-3 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2745

Exhibit ZZ-4 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2925

Exhibit ZZ-5 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-3128

Exhibit AAA to Alvarez Declaration -
Intro. No. 1914-A ................................................. A-3335

Exhibit BBB to Alvarez Declaration -
Intro. No. 1932-A ................................................. A-3339

Exhibit CCC to Alvarez Declaration -
Intro. No. 1936-A ................................................. A-3344

Exhibit DDD to Alvarez Declaration -
Intro. No. 1914- A's Plain Language Summary ..... A-3348

xiii

**Page**

Exhibit EEE to Alvarez Declaration -
Intro. No. 1932- A's Plain Language Summary .....   A-3350

Exhibit FFF to Alvarez Declaration -
Intro. No. 1936- A's Plain Language Summary .....   A-3352

Exhibit GGG to Alvarez Declaration -
Committee Report of the Infrastructure Division,
dated May 13, 2020 ...............................   A-3354

Exhibit HHH to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ...........   A-3360

Exhibit III to Alvarez Declaration -
Committee Report of the Governmental Affairs
Divisions, dated May 13, 2020 ..........................   A-3368

Exhibit JJJ to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ...........   A-3425

Exhibit KKK to Alvarez Declaration -
City Council's Meeting ...........................   A-3438

Exhibit LLL to Alvarez Declaration -
Letter from the City's Office of the Mayor, dated
May 26, 2020 ....................................   A-3516

Exhibit MMM to Alvarez Declaration -
Commercial Harassment Law, effective
May 26, 2020 ....................................   A-3519

Exhibit NNN to Alvarez Declaration -
Guaranty Law, effective May 26, 2020 .................   A-3523

Exhibit OOO to Alvarez Declaration -
Residential Harassment Law, effective
May 26, 2020 ....................................   A-3528

Exhibit PPP to Alvarez Declaration -
Local Law No. 62 of 2020 ....................................   A-3533

xiv

Page

Exhibit QQQ to Alvarez Declaration -
Local Law No. 63 of 2020 .................................... A-3536

Exhibit RRR to Alvarez Declaration -
Resolution No. 1349 of 2020 ................................ A-3540

Exhibit SSS to Alvarez Declaration -
Resolution No. 1350 of 2020 ................................ A-3543

Exhibit TTT to Alvarez Declaration -
Document Produced by Plaintiff Jarican Realty
Inc., dated July 31, 2020 ......................................... A-3546

Exhibit UUU to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC ........................................................................ A-3580

Exhibit VVV to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC ........................................................................ A-3595

Letter from Arthur Kats to the Honorable Ronnie
Abrams, dated August 13, 2020 ........................... A-3614

Brief of Amicus Curiae Volunteers of Legal Service
in Opposition to Plaintiffs' Motion for
Preliminary Injunctive and Declaratory Relief,
dated August 13, 2020 ........................................... A-3617

Declaration of Arthur Kats in Opposition to
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 13, 2020 ............ A-3646

Exhibit 1 to Kats Declaration -
The New York Times Article: How Prepared Is
the U.S. for a Coronavirus Outbreak?, dated
February 29, 2020 .................................................. A-3658

xv

**Page**

Exhibit 2 to Kats Declaration -
New York Times U.S. COVID-19 Map and Case
Tracker, last visited August 11, 2020 .................... A-3669

Exhibit 3 to Kats Declaration -
The New York Times Article: New York City
Region Is Now an Epicenter of the Coronavirus
Pandemic, dated March 22, 2020 ......................... A-3687

Exhibit 4 to Kats Declaration -
New York Times N.Y. Covid-19 Map and Case
Tracker, last visited August 11, 2020 .................... A-3693

Exhibit 5 to Kats Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-3704

Exhibit 6 to Kats Declaration -
The Wall Street Journal Article: Times Square Is
Eerily Empty During the Pandemic, but
Advocates Are Focused on a Comeback, dated
May 19, 2020 ......................................................... A-3707

Exhibit 7 to Kats Declaration -
Report Published by the U.S. Small Business
Administration's Office of Advocacy: Small
Business GDP: 1998-2014 ..................................... A-3711

Exhibit 8 to Kats Declaration -
Office of the N.Y. State Comptroller, Small
Business in New York State: An Economic
Snapshot 1, dated 2019 ......................................... A-3787

Exhibit 9 to Kats Declaration -
U.S. Small Business Administration's 2019 Small
Business Profile for the State of New York ........... A-3792

xvi

**Page**

Exhibit 10 to Kats Declaration -
The New York Times Article: One-Third of New
York's Small Businesses May Be Gone Forever,
dated August 3, 2020 ............................................  A-3797

Exhibit 11 to Kats Declaration -
The Wall Street Journal Article: Amid
Coronavirus Shutdowns, Landlords Often
Determine Fate of Small Businesses, dated
June 4, 2020 ...........................................................  A-3802

Exhibit 12 to Kats Declaration -
Article: For Small Businesses With High Rents,
Coronavirus Aid Falls Short ..................................  A-3808

Exhibit 13 to Kats Declaration -
Article: On a Vibrant Street in Brooklyn,
Businesses Are Struggling for Survival ................  A-3814

Exhibit 14 to Kats Declaration -
Brooklyn Chamber of Commerce, July
Reopening Survey Summary, dated July 2020 ......  A-3820

Exhibit 15 to Kats Declaration -
The Wall Street Journal Article: Small Business
Sector Highly Vulnerable to Coronavirus Crisis,
dated April 7, 2020 ................................................  A-3822

Exhibit 16 to Kats Declaration -
U.S. Fed. Reserve Bank of N.Y., 2020 Report on
Employer Firms: Small Business Credit Survey,
dated 2020 ..............................................................  A-3825

Exhibit 17 to Kats Declaration -
Fed. Reserve Bank of N.Y., Can Small Firms
Weather the Effects of COVID-19?, dated
April 2020 ..............................................................  A-3863

xvii

Page

Exhibit 18 to Kats Declaration -
Local Law 53 ......................................................... A-3867

Exhibit 19 to Kats Declaration -
Local Law 55 ......................................................... A-3871

Exhibit 20 to Kats Declaration -
Committee Report of the Governmental Affairs
Division on Local Law 53 ..................................... A-3876

Exhibit 21 to Kats Declaration -
Testimony of the Volunteers of Legal Service
Microenterprise Project Int. Nos. 1914 & 1932 .... A-3932

Exhibit 22 to Kats Declaration -
Partnership for New York City: A Call for Action
and Collaboration................................................. A-3936

Letter from Jeffrey Turkel to the Honorable Ronnie
Abrams, dated August 25, 2020............................ A-4004

Reply Declaration of Stephen P. Younger in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 .......................................... A-4030

Exhibit 1 to Younger Declaration -
Rentec Direct's August 2020 Rental Trends
Report ................................................................... A-4043

Exhibit 2 to Younger Declaration -
New York Hospitality Alliance's July 2020 Rent
Report ................................................................... A-4046

Exhibit 3 to Younger Declaration -
Sydney Pereira New Article: Thousands of New
Yorkers at Risk of Eviction as Cuomo's
Moratorium Expires............................................... A-4056

**xviii**

Page

Exhibit 4 to Younger Declaration -
News Article: Retail Chains Abandon Manhattan:
It's Unsustainable.................................................... A-4067

Exhibit 5 to Younger Declaration -
Screenshot of Post from Newman Ferrara LLP's
Website................................................................... A-4077

Exhibit 6 to Younger Declaration -
Complaint in *The Maramont Corporation v.
Generation Next Realty, Inc.*, dated July 20, 2020   A-4082

Exhibit 7 to Younger Declaration -
Report: Landlords and Renters Struggling to
Make Ends Meet During COVID-19 Uncertainty,
dated August 20, 2020 .......................................... A-4094

Exhibit 8 to Younger Declaration -
Press Release: Small Property Owners of New
York Announces Majority of Owners and
Managers of Small Properties Are Working with
Tenants by Reducing, Forgoing, and Offering
Rent Concessions, dated August 25, 2020 ............. A-4111

Exhibit 9 to Younger Declaration -
The New York Post Article: New Yorker's Keep
Moving Out of the City to Suburbs, Other States,
dated August 11, 2020 ........................................... A-4115

Exhibit 10 to Younger Declaration -
The New York Times Article: Movers in N.Y.C.
Are So Busy They're Turning People Away,
dated August 20, 2020 ........................................... A-4120

Exhibit 11 to Younger Declaration -
CNBC Article: Retail Rents Plummet Across
New York City, as America's Glitzy Shopping
Districts Turn Into Ghost Towns, dated
August 2, 2020..................................................... A-4130

xix

**Page**

Exhibit 12 to Younger Declaration -
The City Article: New York's Rent Drops as
Vacancies Increase. Could Rent Regulation Be
Next Thing to Fall?, dated July 27, 2020............... A-4138

Exhibit 13 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................ A-4148

Exhibit 14 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ...................... A-4152

Exhibit 15 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.57, dated August 20, 2020 ....................... A-4154

Exhibit 16 to Younger Declaration -
New York City Council Bill Int. No. 2007-2020 ... A-4157

Exhibit 17 to Younger Declaration -
New York State Senate Bill No. S8904 ................. A-4160

Exhibit 18 to Younger Declaration -
August 2020 Resolution ........................................ A-4163

Exhibit 19 to Younger Declaration -
Gotham Gazette Article: Requestions for
Emergency Rent Grants Fell During Pandemic,
But Expected to Skyrocket When Evictions
Resume, dated July 24, 2020 ................................ A-4179

Exhibit 20 to Younger Declaration -
New York State Senate Bill No. S8139 ................. A-4187

Exhibit 21 to Younger Declaration -
New York State Senate Bill No. S8190-A ............. A-4191

Exhibit 22 to Younger Declaration -
New York State Senate Bill No. S8125-A ............. A-4201

xx

**Page**

Exhibit 23 to Younger Declaration -
Screenshot from New York City Department of
Health, dated August 19, 2020 ............................... A-4204

Exhibit 24 to Younger Declaration -
Guidance Published by Centers for Disease
Control and Prevention: COVID-19 Pandemic
Planning Scenarios ................................................. A-4210

Reply Declaration of Santo Golino in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 ........................................... A-4219

Reply Declaration of Marcia Melendez in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 21, 2020 ..................................................... A-4242

Declaration of Elias Bochner in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 25, 2020 ............ A-4245

Reply Declaration of Carlos F. Ugalde Alvarez in
Further Support of Defendants' Motion to
Dismiss, dated September 2, 2020 ........................ A-4250

Amended Complaint, dated September 2, 2020 ........ A-4268

Transcript of Oral Argument, dated
September 11, 2020 ............................................... A-4334

Notice of Appeal, dated  December 21, 2020 ............ A-4394

A-1393

# EXHIBIT I



No. 202.13

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 28, 2020 the following:

- Sections 16.03 and 16.05 of the Mental Hygiene Law and Part 619 of Title 14 of the NYCRR to the extent that they limit the provision of certain services to certified settings provided, however, that use of such settings shall require the approval of the commissioner of OPWDD;

- Sections 16.33, 16.34, 31.35 and 19.20 of the Mental Hygiene law; sections 378-a, 424-a and 495 of the Social Services law; sections 550, 633.5, 633.24 and 805 of Title 14 of the NYCRR;  Article 3, sections 442.18, 447.2, 448.3, 449.4, 450.9, 451.6 of Title 18 of the NYCRR ; and sections 166-1.2, 180-1.5, 180-3.4, 182-1.5, 182-1.9, 182-1.11, 182-2.5, -182-2.9 and 6051.1 of Title 9 of the NYCRR, to the extent necessary to allow current employees of OPWDD or OPWDD approved providers, OCFS licensed or certified programs, OASAS certified, funded or authorized programs, OMH or OMH licensed, funded or approved programs who have previously undergone such background checks to be employed by a different OPWDD approved provider and/or OCFS licensed or certified program and/or OASAS certified, funded or authorized program and/or OMH licensed, funded or approved program without undergoing new background checks.  These provisions are also waived to the extent necessary to allow providers the discretion to permit already qualified individuals and who are not listed on the Staff Exclusion List to work unsupervised while an updated background check is completed;

- Sections 3203 and 4510 of the Insurance Law are modified to extend the grace period for the payment of premiums and fees to 90 days for any life insurance policyholder or fraternal benefit society certificate holder, as those terms are used in such sections, facing a financial hardship as a result of the COVID-19 pandemic;

- Sections 3203, 3219, and 3220 of the Insurance Law are modified to provide a life insurance policyholder or annuity contract holder or a certificate holder, as those terms are used in such sections, under a group policy or contract with 90 days to exercise rights or benefits under the applicable life insurance policy or annuity contract for any policyholder or contract holder or certificate holder under the group policy or contract who is unable timely to exercise rights or benefits as a result of the COVID-19 pandemic;

- Section 1116 and Articles 34, 53, 54, and 55 of the Insurance Law and Sections 54 and 226 of the Workers' Compensation Law are modified to impose a moratorium on an insurer cancelling, non-renewing, or conditionally renewing any insurance policy issued to an individual or small business, or, in the case of a group insurance policy, insuring certificate holders that are individuals or small businesses, for a period of 60 days, for any policyholder, or in the case of a group insurance policy, group policyholder or certificate holder, facing financial hardship as a result of the COVID-19 pandemic. The foregoing relief shall also apply to the kinds of insurance set forth in paragraphs (16), (17), (20), (21), (24), (26), and (30) of Section 1113(a) of the Insurance Law. For purposes of this Executive Order, a small business shall mean any business that is resident in this State, is independently owned and operated, and employs one hundred or fewer individuals;

- Section 576 of the Banking Law is modified to grant the Superintendent of Financial Services the authority to promulgate an emergency regulation to apply the provisions of the Executive Order relevant to policy cancellations, to premium finance agencies (as defined in Article XII-B of the Banking Law), subject to the safety and soundness considerations of the premium finance agencies;

- Subdivisions three and four of section 42 of the Public Officer's Law to the extent that it requires that a proclamation be separately issued by the Governor for an election to fill a vacancy; and

- Subdivision (i) of section 414 of the Education Law to the extent necessary to allow the school districts to pay for the cost of such child care services.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through April 28, 2020:

- All instruments that are signed and delivered to the superintendent under the New York Banking Law (the "Banking Law"), and are required to be verified or acknowledged under the Banking Law, may be verified or acknowledged by including standard verification or acknowledgement language in the instrument and transmitting a legible copy of the signed instrument by fax or electronic means.

- The special election in the City of New York to fill the vacancy in the Office of Borough President of Queens is rescheduled for June 23, 2020. Only candidates who were eligible to appear on the ballot for the March 24, 2020 special election shall appear on the ballot for the June 23, 2020 special election.

- Any special election which was previously scheduled to occur on April 28, 2020 and rescheduled for June 23, 2020 by virtue of Executive Order 202.12 shall only contain the names of those individuals who had previously been qualified to appear on the ballot on April 28, 2020.

- Circulation, filing, and collection of any designating petitions, or independent nominating petitions for any office that would otherwise be circulated or filed pursuant to the Election Law, Education Law or any other consolidated law for any office commencing March 31, 2020 are hereby postponed.

- Any school board, library board, or village election scheduled to take place in April or May of 2020 is hereby postponed until at least June 1, 2020, and subject to further directive as to the timing, location or manner of voting for such elections.

- Any worker who is employed by the state of New York, shall, if deemed non-essential by their agency shall work from home or shall be able to stay home without charging their accruals until April 16, 2020.

- Executive Order 202.6 is hereby modified to clarify that construction which was an essential service not subject to the in-person work restrictions is modified to provide only certain construction is considered exempt from the in-person restrictions as of March 28, 2020. Further, on and after March 27, 2020, Empire State Development Corporation is hereby authorized to determine which construction projects shall be essential and thereby exempt from the in-person workforce prohibition, contained in EO 202.6 and subsequent Executive Orders which further reduced the workforce requirements. All continuing construction projects shall utilize best practices to avoid transmission of COVID-19.

- By virtue of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11 which closed or otherwise restricted public or private businesses or places of public accommodation, all such Executive Orders shall be continued, provided that the expiration dates of such Executive Orders shall be aligned, such that all in-person business restrictions will be effective until 11:59 p.m. on April 15, 2020, unless later extended by future Executive Orders.

A-1396

- The directive of Executive Order 202.12 requiring a support person for a patient giving birth is modified insofar as to cover labor, delivery as well as the immediate postpartum period.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twenty-ninth day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor



No. 202.14

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order to 202, for thirty days until May 7, 2020, except as limited below.

IN ADDITION, I hereby temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, for the period from the date of this Executive Order through May 7, 2020, the following:

- Section 6524 of the Education Law, section 60.7 of title 8 of NYRR and section paragraph (1) of subdivision (g) 405.4 of title 10 of the NYCRR to the extent necessary to allow any physician who will graduate in 2020 from an academic medical program accredited by a medical education accrediting agency for medical education by the Liaison Committee on Medical Education or the American Osteopathic Association, and has been accepted by an Accreditation Council for Graduate Medical Education accredited residency program within or outside of New York State to practice at any institution under the supervision of a licensed physician;

- Subdivisions one, two, four, five, eight and nine of Section 1726 of the Surrogate's Court Procedure Act are hereby modified to provide that any parent, a legal guardian, a legal custodian, or primary caretaker who works or volunteers in a health care facility or who reasonably believes that they may otherwise be exposed to COVID-19, may designate a standby guardian by means of a written designation, in accordance with the process set forth in such subdivisions; and such designation shall become effective also in accordance with the process set forth in such subdivisions; and

- Sections 3216(d)(1)(C) and 4306(g) of the Insurance Law, subject to consideration by the Superintendent of Financial Services of the liquidity and solvency of the applicable insurer, corporation subject to Article 43 of the Insurance Law, or health maintenance organization certified pursuant to Article 44 of the Public Health Law, to:

A-1398

    o  Extend the period for the payment of premiums to the later of the expiration of the applicable contractual grace period and 11:59 p.m. on June 1, 2020, for any comprehensive health insurance policyholder or contract holder under an individual policy or contract, as those terms are used in such sections, who is facing a financial hardship as a result of the COVID-19 pandemic; and

    o  Require that the applicable insurer, corporation subject to Article 43 of the Insurance Law, or health maintenance organization certified pursuant to Article 44 of the Public Health Law shall be responsible for the payment of claims during such period and shall not retroactively terminate the insurance policy or contract for non-payment of premium during such period.

**FURTHER,** I hereby issue the following directives for the period from the date of this Executive Order through May 7, 2020:

- Any medical equipment (personal protective equipment (PPE), ventilators, respirators, bi-pap, anesthesia, or other necessary equipment or supplies as determined by the Commissioner of Health) that is held in inventory by any entity in the state, or otherwise located in the state shall be reported to DOH. DOH may shift any such items not currently needed, or needed in the short term future by a health care facility, to be transferred to a facility in urgent need of such inventory, for purposes of ensuring New York hospitals, facilities and health care workers have the resources necessary to respond to the COVID-19 pandemic, and distribute them where there is an immediate need. The DOH shall either return the inventory as soon as no longer urgently needed and/or, in consultation with the Division of the Budget, ensure compensation is paid for any goods or materials acquired at the rates prevailing in the market at the time of acquisition, and shall promulgate guidance for businesses and individuals seeking payment.

- By virtue of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, and 202.13 which closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), all such Executive Orders shall be continued, provided that the expiration dates of such Executive Orders shall be aligned, such that all in-person business restrictions and workplace restrictions will be effective until 11:59 p.m. on April 29, 2020, unless later extended by a future Executive Order.

- The enforcement of any violation of the foregoing directives on and after April 7, 2020, in addition to any other enforcement mechanism stated in any prior executive orders, shall be a violation punishable as a violation of public health law section 12-b(2) and the Commissioner of Health is directed and authorized to issue emergency regulations. The fine for such violation by an individual who is participating in any gathering which violates the terms of the orders or is failing to abide by social distancing restrictions in effect in any place which is not their home shall not exceed $1,000.

- The directive contained in Executive Order 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide shall hereafter be modified to provide that all schools shall remain closed through April 29, 2020, at which time the continued closure shall be re-evaluated. No school shall be subject to a diminution in school aid due to failure to meet the 180 day in session requirement as a result of the COVID-19 outbreak, provided their closure does not extend beyond the term set forth herein. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers, and continue to first use any vacation or snow days remaining.

- Superintendent of Financial Services shall have the authority to promulgate an emergency regulation, subject to consideration by the Superintendent of Financial Services of the liquidity and solvency of the applicable insurer, corporation subject to Article 43 of the Insurance Law, health maintenance organization certified pursuant to Article 44 of the Public Health Law, or student health plan certified pursuant to Insurance Law § 1124, to:

    o  extend the period for the payment of premiums to the later of the expiration of the applicable contractual grace period and 11:59 p.m. on June 1, 2020 for any small group or student blanket comprehensive health insurance policy or contract, or any child health insurance plan policy or contract where the policyholder or contract holder pays the entire premium, as those terms are used in the Insurance Law, for any policyholder or contract holder who is facing financial hardship as a result of the COVID-19 pandemic; and

- o require that the applicable insurer, corporation subject to Article 43 of the Insurance Law, health maintenance organization certified pursuant to Article 44 of the Public Health Law, or student health plan certified pursuant to Insurance Law § 1124, shall be responsible for the payment of claims during such period and shall not retroactively terminate the insurance policy or contract for non-payment of premium during such period.

- • Superintendent of Financial Services shall have the authority to promulgate emergency regulations necessary to implement this Executive Order, including regulations regarding: (1) the waiver of late fees; and (2) the prohibition on reporting negative data to credit bureaus.

- • For the purposes of Estates Powers and Trusts Law (EPTL) 3-2.1(a)(2), EPTL 3-2.1(a)(4), Public Health Law 2981(2)(a), Public Health Law 4201(3), Article 9 of the Real Property Law, General Obligations Law 5-1514(9)(b), and EPTL 7-1.17, the act of witnessing that is required under the aforementioned New York State laws is authorized to be performed utilizing audio-video technology provided that the following conditions are met:

  - o The person requesting that their signature be witnessed, if not personally known to the witness(es), must present valid photo ID to the witness(es) during the video conference, not merely transmit it prior to or after;

  - o The video conference must allow for direct interaction between the person and the witness(es), and the supervising attorney, if applicable (e.g. no pre-recorded videos of the person signing);

  - o The witnesses must receive a legible copy of the signature page(s), which may be transmitted via fax or electronic means, on the same date that the pages are signed by the person;

  - o The witness(es) may sign the transmitted copy of the signature page(s) and transmit the same back to the person; and

  - o The witness(es) may repeat the witnessing of the original signature page(s) as of the date of execution provided the witness(es) receive such original signature pages together with the electronically witnessed copies within thirty days after the date of execution.

G I V E N  under my hand and the Privy Seal of the State in the City of Albany this seventh day of April in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor



State of New York

Executive Chamber

No. 202.18

EXECUTIVE ORDER

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**NOW, THEREFORE, I,** Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 16, 2020 the following:

- Sections 6512 through 6516, and 6905, 6906 and 6910 of the Education Law and Part 64 of Title 8 of the NYCRR, to the extent necessary to allow registered nurses, licensed practical nurses, and nurse practitioners or a substantially similar title licensed and in current good standing in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

- Sections 6512 through 6516, and 6524 of the Education Law and Part 60 of Title 8 of the NYCRR, to the extent necessary to allow physicians licensed and in current good standing in any province or territory of Canada, to practice medicine in New York State without civil or criminal penalty related to lack of licensure;

- Sections 6512 through 6516, and 6541 of the Education Law and Part 60.8 of Title 8 of the NYCRR 8 NYCRR, to the extent necessary to allow physician assistants or a substantially similar title licensed and in current good standing in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

- Sections 3502 and 3505 of the Public Health Law and Part 89 of Title 10 of the NYCRR to the extent necessary to permit radiologic technologists or a substantially similar title licensed and in current good standing in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

- Sections 6512 through 6516, 6548 and 6911 of the Education Law and sections 60.11 and 64.8 Title 8 of the NYCRR, to the extent necessary to allow clinical nurse specialists, specialist assistants, and substantially similar titles certified and in current good standing in any state in the United States, or any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of certification;

- Sections 6512 through 6516, and 7704 of the Education Law and Part 74 of Title 8 of the NYCRR, to the extent necessary to allow licensed master social workers, licensed clinical social workers, and substantially similar titles licensed and in current good standing in any state in the

United States, or in any province or territory of Canada, to practice in New York State without civil or criminal penalty related to lack of licensure;

- Section 6502 of the Education Law and 8 NYCRR 59.8, to the extent necessary to allow specialist assistants, respiratory therapists, respiratory therapist technicians, pharmacists, clinical nurse specialists, dentists, dental hygienists, registered dental assistants, midwives, perfusionists, clinical laboratory technologists, cytotechnologists, certified clinical laboratory technicians, certified histological technicians, licensed clinical social workers, licensed master social workers, podiatrists, physical therapists, physical therapist assistants, mental health counselors, marriage and family therapists, creative arts therapists, psychoanalysts and psychologists who have an unencumbered license and are currently in good standing in New York State but not registered in New York State to practice in New York State without civil or criminal penalty related to lack of registration;

- Section 6908 of the Education Law and associated regulations, to the extent necessary to permit graduates of State Education Department registered, licensure qualifying nurse practitioner education programs to be employed to practice nursing in a hospital or nursing home for 180 days immediately following successful completion of a New York State Registered licensure qualifying education program, provided that the graduate files with the State Education Department an application for certification as a nurse practitioner;

- Section 8609 of the Education Law and associated regulations, to the extent necessary to permit graduates of State Education Department registered, licensure qualifying clinical laboratory technology and clinical laboratory technician education programs to be employed to practice for 180 days immediately following successful completion of a New York State Registered licensure qualifying education program, in a clinical laboratory with a valid New York State permit, provided that the graduate files an application for a New York State clinical laboratory practitioner license and limited permit;

- Section 6808 of the Education Law and 8 NYCRR 63.6 and 63.8, to the extent necessary to extend the triennial registrations of pharmacy establishments who are currently registered and whose registration is set to expire on or after March 31, 2020. An application for re-registration of such registrations shall be submitted no later than 30 days after expiration of Executive Order 202;

- Sections 1514 and 1531 of the Business Corporation Law and Section 121-1500(g) of the Partnership Law, to the extent necessary to extend the statements of domestic or foreign professional service corporations, design professional service corporations, registered professional limited liability partnerships, New York registered foreign professional limited liability partnerships whose statements are set to expire on or after March 31, 2020. Such statements shall be filed no later than 30 days after the expiration of Executive Order 202;

- Section 7210 of the Education Law, to the extent necessary to extend the triennial renewal of certificates of authorizations of domestic or foreign professional service corporations, design professional service corporations, professional service limited liability companies, foreign professional service limited liability companies, registered professional limited liability partnerships, New York registered professional foreign limited liability partnerships, partnerships and joint enterprises specified in Education Law §7209(4) authorized to provide professional engineering, land surveying or professional geology services whose certificates of authorizations are set to expire on or after March 31, 2020. The application for the renewal of such certificates of authorization shall be submitted no later than 30 days after the expiration of Executive Order 202;

- Section 6503-b of the Education Law and 8 NYCRR 59.15, to the extent necessary to extend the waivers for certain special education schools and early intervention programs providing certain professional services whose waivers are set to expire on or after March 31, 2020. An application for renewal of such waivers shall be submitted no later than 30 days after expiration of Executive Order 202;

- Sections 6802, 6808, and 6841 of the Education Law and Parts 29.7 (10) and 63.6 of Title 8 of the NYCRR, to the extent necessary to permit pharmacy technicians and pharmacists to practice at an alternative location, including their home, as long as there is adequate security to prevent any Personal Health Information from being compromised;

- Section 603(b) of the Not-for-Profit Corporations Law to the extent necessary to permit annual meetings of members to be held remotely or by electronic means;

- Sub-clauses (1), (2), and (3) of clause (a) of subparagraph (ii) of paragraph (3) of subdivision (a) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, to the extent

necessary to make home-delivered meals available to persons age 60 or older who do not meet these listed eligibility requirements;

- Paragraph (4) of subdivision (a) and subparagraph (ii) of paragraph (14) of subdivision (b) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, insofar as it requires meals served to provide minimum percentages of the dietary reference intake;

- Paragraph (6) of subdivision (a) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations to the extent that it requires menus to be reviewed and approved by a registered dietitian;

- Paragraph (5) of subdivision (a) and paragraph (6) of subdivision (b) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, insofar as it requires menus to follow a minimum of a four-week cycle;

- Clause (a) of subparagraph (i) of paragraph (3) of subdivision (a) and subparagraph (ii) of paragraph (2) of subdivision (b) of section 6654.10 of Title 9 of the New York Code of Rules and Regulations, insofar as it requires that home-delivered meals be provided 5 or more days per week;

- Paragraph (2) of subdivision (s) of section 6654.17 of Title 9 of the New York Code of Rules and Regulations to the extent that it requires an in-home supervisory visit within 5 days of the first time services are provided to a client;

- Section 6654.6 of Title 9 of the New York Code of Rules and Regulations to the extent necessary to allow for all new clients to be provided services under the Expanded In-Home Services for the Elderly Program without the requirement that any such clients pay cost-sharing until such time as an assessment is conducted and a cost share amount can be determined;

- Subdivision (r) of section 6654.16 of Title 9 of the New York Code of Rules and Regulations to the extent that it requires client contacts be conducted in-home or in-person and to allow for all required client contacts to be conducted by telephone or otherwise remotely;

- Section 352-eeee(2)(a) of the General Business Law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires that an offering statement or prospectus become effective within fifteen months from filing or from the date of issue of the letter of the attorney general stating that the offering statement or prospectus has been accepted for filing, and any such fifteen month period, shall be tolled during the duration of this executive order;

- Section 352-e(7)(a) of the General Business law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires certain filing fees be made at the time of submission and filing of each offering statement or prospectus, shall be exempted during the duration of this executive order, it being understood that such filing fees shall be remitted in full to the department of law within 90 days from the expiration of this executive order;

- 13 NYCRR §§ 18.3(g)(1), 20.3(h)(1), 23.3(h)(1), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to set forth a budget for the first year of condominium operation, the requirements with respect to any such projected first year of condominium operation are hereby tolled for the duration of this executive order. Sponsor must update the first year of operation, as necessary, within 30 days from the expiration of this executive order and shall not be required to offer rescission, to the extent such budget for the first year of operation does not increase by 25 percent or more during the pendency of the state of disaster emergency;

- 13 NYCRR § 20.3(o)(12), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to offer rescission if the first closing of a unit does not occur within the first year of operation projected in schedule B, is hereby tolled for the duration of the executive order. Sponsor must update the first year of operation, as necessary, within 30 days from the expiration of this executive order;

- Article 165 of the Education Law and section 58-1.3 of Title 10 of the NYCRR, to the extent necessary to allow clinical laboratory practitioners to perform testing in a clinical laboratory under remote supervision, provided a supervisor is on-site at least eight hours per week;

- Subdivision (a) of section 70 and subdivision (a) of section 370 of the retirement and social security law, to the extent necessary to waive the 15 day waiting period in which a service retirement application must be on file before it becomes effective, which suspension shall be deemed to have been in effect on and after the issuance of executive order 202, and shall enable any member who has died due to COVID-19 after March 7, 2020 while an application was on

A-1403

file, but not yet effective, shall be entitled to retirement benefits due to them pursuant to this suspension;

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 16, 2020:

- Any skilled nursing facility, nursing home, or adult care facility licensed and regulated by the Commissioner of Health shall notify family members or next of kin if any resident tests positive for COVID-19, or if any resident suffers a COVID-19 related death, within 24 hours of such positive test result or death.

- Any person utilizing public or private transportation carriers or other for-hire vehicles, who is over age two and able to medically tolerate a face covering, shall wear a mask or face covering over the nose and mouth during any such trip; any person who is operating such public or private transport, shall likewise wear a face covering or mask which covers the nose and mouth while there are any passengers in such vehicle. This directive shall take effect in the same manner as Executive Order 202.17, at 8 p.m. on Friday, April 17, 2020.

- Executive Order 202.14, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, and 202.13 which each closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), is hereby continued, provided that the expiration date of such provisions of such Executive Orders shall be aligned, such that all in-person business restrictions and workplace restrictions will be effective until 11:59 p.m. on May 15, 2020, unless later extended by a future Executive Order. All enforcement mechanisms by state or local governments shall continue to be in full force an effect until May 15, 2020 unless later extended by a future Executive Order.

- Executive Order 202.14, which extended the directive contained in Executive Order 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide is hereby continued to provide that all schools shall remain closed through May 15, 2020, at which time the continued closure shall be re-evaluated. No school shall be subject to a diminution in school aid due to failure to meet the 180 day in session requirement as a result of the COVID-19 outbreak, provided their closure does not extend beyond the term set forth herein. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers, and continue to first use any vacation or snow days remaining.

G I V E N   under my hand and the Privy Seal of the State in the City of Albany this sixteenth day of April in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1404

# EXHIBIT J



State of New York

Executive Chamber

No. 202.16

EXECUTIVE ORDER

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through May 12, 2020 the following:

- Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals to perform testing for the detection of SARS-CoV-2, or its antibodies, in specimens collected from individuals suspected of suffering from a COVID-19 infection; individuals performing testing must meet the federal requirements for testing personnel appropriate to the assay or device authorized by the FDA or the New York State Department of Health;

- Section 711 of the Real Property and Proceedings Law, Section 232-a of the Real Property Law, and subdivisions 8 and 9 of section 4 of the Multiple Dwelling Law, and any other law or regulation are suspended and modified to the extent that such laws would otherwise create a landlord tenant relationship between any individual assisting with the response to COVID-19 or any individual that has been displaced due to COVID-19, and any individual or entity, including but not limited to any hotel owner, hospital, not-for-profit housing provider, hospital, or any other temporary housing provider who provides temporary housing for a period of thirty days or more solely for purposes of assisting in the response to COVD-19;

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 12, 2020:

- The New York City Department of Law shall issue no-action or no-filing letters received during the duration of this executive order within 45 days from submission of such no-action or no-filing application made to the department of law for essential projects involving affordable housing and homeless shelters. For each application granted by the department of law which permits the applicant to solicit public interest or public funds preliminary to the filing of an offering statement or for the issuance of a "no-filing required" letter. The New York City Department of Finance shall process and record condominium declarations for essential projects involving hospitals or health care facilities, affordable housing, and homeless shelters within 30 days of receipt of such filing.

- Any political party, political party authority or political party official, which, by virtue of any law has a caucus scheduled or otherwise required to take place in April or May of 2020, shall be postponed until June 1, 2020, without prejudice, however such caucus may continue if the caucus is able to be held remotely, through use of telephone conference, video conference, and/or other similar service, and provided that notice for any party caucus to be held remotely shall be deemed satisfied if such notice includes specific information on remote participation and has been filed with the clerk and board of elections at least five days preceding the day of the caucus and published either by newspaper publication thereof once within the village, or on the party's website, or through electronic mail to any previous caucus participant for which the party has an electronic mail address.

- For all essential businesses or entities, any employees who are present in the workplace shall be provided and shall wear face coverings when in direct contact with customers or members of the public. Businesses must provide, at their expense, such face coverings for their employees. This provision may be enforced by local governments or local law enforcement as if it were an order pursuant to section 12 or 12-b of the Public Health Law. This requirement shall be effective Wednesday, April 15 at 8 p.m.



G I V E N  under my hand and the Privy Seal of the

State in the City of Albany this

twelfth day of April in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1407

# EXHIBIT K

**A-1408**



No. 202.28

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, for thirty days until June 6, 2020, except as modified below:

- The suspension or modification of the following statutes and regulations are not continued, and such statutes, codes and regulations are in full force and effect as of May 8, 2020:

  - 10 NYCRR 405.9, except to the limited extent that it would allow a practitioner to practice in a facility where they are not credentialed or have privileges, which shall continue to be suspended; 10 NYCRR 400.9; 10 NYCRR 400.11, 10 NYCRR 405; 10 NYCRR 403.3; 10 NYCRR 403.5; 10 NYCRR 800.3, except to the extent that subparagraphs (d) and (u) could otherwise limit the scope of care by paramedics to prohibit the provision of medical service or extended service to COVID-19 or suspected COVID-19 patients; 10 NYCRR 400.12; 10 NYCRR 415.11; 10 NYCRR 415.15; 10 NYCRR 415.26; 14 NYCRR 620; 14 NYCRR 633.12; 14 NYCRR 636-1; 14 NYCRR 686.3; and 14 NYCRR 517;
  - Mental Hygiene Law Sections 41.34; 29.11; and 29.15;
  - Public Health Law Sections 3002, 3002-a, 3003, and 3004-a to the extent it would have allowed the Commissioner to make determination without approval by a regional or state EMS board;
  - Subdivision (2) of section 6527, Section 6545, and Subdivision (1) of Section 6909 of the Education Law; as well as subdivision 32 of Section 6530 of the Education Law, paragraph (3) of Subdivision (a) of Section 29.2 of Title 8 of the NYCRR, and sections 58-1.11, 405.10, and 415.22 of Title 10 of the NYCRR;
  - All codes related to construction, energy conservation, or other building code, and all state and local laws, ordinances, and regulations which would have otherwise been superseded, upon approval by the Commissioner of OPWDD, as applicable only for temporary changes to physical plant, bed capacities, and services provided; for facilities under the Commissioners jurisdiction.

**IN ADDITION**, I hereby temporarily suspend or modify the following if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, for the period from the date of this Executive Order through June 6, 2020:

- Sections 7-103, 7-107 and 7-108 of the General Obligations Law to the extent necessary to provide that:

  o Landlords and tenants or licensees of residential properties may, upon the consent of the tenant or licensee, enter into a written agreement by which the security deposit and any interest accrued thereof, shall be used to pay rent that is in arrears or will become due. If the amount of the deposit represents less than a full month rent payment, this consent does not constitute a waiver of the remaining rent due and owing for that month. Execution in counterpart by email will constitute sufficient execution for consent;

  o Landlords shall provide such relief to tenants or licensees who so request it that are eligible for unemployment insurance or benefits under state or federal law or are otherwise facing financial hardship due to the COVID-19 pandemic;

  o It shall be at the tenant or licensee's option to enter into such an agreement and landlords shall not harass, threaten or engage in any harmful act to compel such agreement;

  o Any security deposit used as a payment of rent shall be replenished by the tenant or licensee, to be paid at the rate of 1/12 the amount used as rent per month. The payments to replenish the security deposit shall become due and owing no less than 90 days from the date of the usage of the security deposit as rent. The tenant or licensee may, at their sole option, retain insurance that provides relief for the landlord in lieu of the monthly security deposit replenishment, which the landlord, must accept such insurance as replenishment.

- Subdivision 2 of section 238-a of the Real Property Law to provide that no landlord, lessor, sub-lessor or grantor shall demand or be entitled to any payment, fee or charge for late payment of rent occurring during the time period from March 20, 2020, through August 20, 2020; and

- Section 8-400 of the Election Law is modified to the extent necessary to require that to the any absentee application mailed by a board of elections due to a temporary illness based on the COVID-19 public health emergency may be drafted and printed in such a way to limit the selection of elections to which the absentee ballot application is only applicable to any primary or special election occurring on June 23, 2020, provided further that for all absentee ballot applications already mailed or completed that purported to select a ballot for the general election or to request a permanent absentee ballot shall in all cases only be valid to provide an absentee ballot for any primary or special election occurring on June 23, 2020. All Boards of Elections must provide instructions to voters and post prominently on the website, instructions for completing the application in conformity with this directive.

- The suspension of the provisions of any time limitations contained in the Criminal Procedure Law contained in Executive Order 202.8 is modified as follows:

  o Section 182.30 of the Criminal Procedure Law, to the extent that it would prohibit the use of electronic appearances for certain pleas;

  o Section 180.60 of the Criminal Procedure Law to provide that (i) all parties' appearances at the hearing, including that of the defendant, may be by means of an electronic appearance; (ii) the Court may, for good cause shown, withhold the identity, obscure or withhold the image of, and/or disguise the voice of any witness testifying at the hearing pursuant to a motion under Section 245.70 of the Criminal Procedure law—provided that the Court is afforded a means to judge the demeanor of a witness;

  o Section 180.80 of the Criminal Procedure Law, to the extent that a court must satisfy itself that good cause has been shown within one hundred and forty-four hours from May 8, 2020 that a defendant should continue to be held on a felony complaint due to the inability to empanel a grand jury due to COVID-19, which may constitute such good cause pursuant to subdivision three of such section; and

  o Section 190.80 of the Criminal Procedure Law, to the extent that to the extent that a court must satisfy itself that good cause has been shown that a defendant should continue to be held on a felony complaint beyond forty-five days due to the inability to empanel a grand jury due to COVID-19, which may constitute such good cause pursuant to subdivision b of such section provided that such defendant has been provided a preliminary hearing as provided in section 180.80.

**IN ADDITION,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through June 6, 2020:

- There shall be no initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned or rented by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020.

- Executive Order 202.18, which extended the directive contained in Executive Orders 202.14 and 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide, is hereby continued to provide that all schools shall remain closed through the remainder of the school year. School districts must continue plans for alternative instructional options, distribution and availability of meals, and child care, with an emphasis on serving children of essential workers.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

seventh of May in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1411

# EXHIBIT L



No. 202.29

## EXECUTIVE ORDER

### Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.15, 202.16, 202.17, 202.18, 202.19, 202.20, and 202.21, for thirty days until June 7, 2020; and

**IN ADDITION**, I hereby temporarily modify, beginning on the date of this Executive Order, the following:

- Section 214-g of the Civil Practice Law and Rules, to the extent it allows an action to be commenced not later than one year and six months after the effective date of such section, is hereby modified to allow an action commenced pursuant to such section to be commenced not later than one year and eleven months after the effective date of such section.



G I V E N  under my hand and the Privy Seal of the

State in the City of Albany this eighth

day of May in the year two thousand

twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1413

# EXHIBIT M



No. 202.31

<u>EXECUTIVE ORDER</u>

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through June 13, 2020 the following:

- Subdivisions (1), (2), and (3) of Section 594 of the Labor Law are suspended to the extent necessary to prevent forfeiture of effective benefit days to provide claimants with temporary relief from serving forfeit day penalties during the COVID-19 disaster emergency; and

- Section 240.35 of the penal law, to the extent it is inconsistent with any directive requiring an individual wear a face covering in public or otherwise.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through the date so designated below:

- Executive Order 202.28, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, and 202.14 which each closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), which together constitute New York On PAUSE, is hereby continued until 11:59 p.m. on May 28, 2020, unless later amended or extended by a future Executive Order;
  - Provided, however, that effective at 12:01 a.m. on May 15, 2020 that the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase One industries
    - Construction, Agriculture, Forestry, Fishing and Hunting, Retail - (Limited to curbside or in-store pickup or drop off); Manufacturing and Wholesale Trade;
  - Such businesses or entities must be operated subject to the guidance promulgated by the Department of Health;
  - Only those businesses or entities in a region that meets the prescribed public health and safety metrics, as determined by the Department of Health, will be eligible for reopening;

- ○ As of May 14, 2020 the regions are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier and the North Country regions comprising the counties of: Genesee, Livingston, Monroe, Ontario, Orleans, Seneca, Wayne, Wyoming, Yates Cayuga, Cortland, Madison, Onondaga, Oswego, Fulton, Herkimer, Montgomery, Oneida, Otsego, Schoharie, Broome, Chemung, Chenango, Delaware, Schuyler, Steuben, Tioga, Tompkins Clinton, Essex, Franklin, Hamilton, Jefferson, Lewis, and St. Lawrence. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open phase one industries, subject to the same terms and conditions.
  - ○ All enforcement mechanisms by state or local governments shall continue to be in full force an effect until June 13, 2020 unless later extended or amended by a future Executive Order.

- • The directive contained in Executive Order 202.15 authorizing the Department of Taxation and Finance to accept digital signatures in lieu of handwritten signatures on documents related to the determination or collection of tax liability, is hereby modified to authorize such acceptance for the duration of the disaster emergency.

- • The directive contained in Executive Order 202.3 which closed movie theaters until further notice and was later extended by Executive Order 202.14 and EO 202.28, is hereby modified to provide that a drive-in movie theater, shall not be required to close, but shall be treated as any other business per Executive Order 202.6, which designated certain businesses as essential or non-essential and subjected such businesses to in-person presence restrictions in the workplace.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

fourteenth day of May in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1416

# EXHIBIT N



No. 202.34

E X E C U T I V E   O R D E R

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through June 27, 2020:

- Business operators and building owners, and those authorized on their behalf shall have the discretion to ensure compliance with the directive in Executive Order 202.17 (requiring any individual over age two, and able to medically tolerate a face-covering, be required to cover their nose and mouth with a mask or cloth face-covering when in a public place), including the discretion to deny admittance to individuals who fail to comply with the directive in Executive Order 202.17 or to require or compel their removal if they fail to adhere to such directive, and such owner or operator shall not be subject to a claim of violation of the covenant of quiet enjoyment, or frustration of purpose, solely due to their enforcement of such directive. Nothing in this directive shall prohibit or limit the right of State and local enforcement authorities from imposing fines or other penalties for any violation of the directive in Executive Order 202.17. This directive shall be applied in a manner consistent with the American with Disabilities Act or any provision of either New York State or New York City Human Rights Law, or any other provision of law.

- Executive Order 202.31, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.32 as modified by Executive Order 202.33 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:
  - As soon as a region meets the prescribed public health and safety metrics, as determined by the Department of Health, they will be eligible for Phase One reopening.
  - Businesses or entities open pursuant to Department of Health guidance must be operated subject to the guidance promulgated by the Department of Health.
  - As of May 28, 2020 the regions meeting the prescribed public health and safety metrics required for Phase One reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, North Country, Western New York, Capital Region, Mid-Hudson, and Long Island. Such regions include the counties of Genesee, Livingston, Monroe, Ontario, Orleans, Seneca, Wayne, Wyoming, Yates, Cayuga, Cortland, Madison, Onondaga, Oswego, Fulton,

Herkimer, Montgomery, Oneida, Otsego, Schoharie, Broome, Chemung, Chenango, Delaware, Schuyler, Steuben, Tioga, Tompkins, Clinton, Essex, Franklin, Hamilton, Jefferson, Lewis, St. Lawrence, Allegany, Cattaraugus, Chautauqua, Erie, Niagara, Albany, Columbia, Greene, Saratoga, Schenectady, Rensselaer, Warren, Washington, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, Westchester, Nassau, and Suffolk. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase One industries, subject to the same terms and conditions.

GIVEN under my hand and the Privy Seal of the State in the City of Albany this twenty-eighth day of May in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1419

# EXHIBIT O

A-1420



No. 202.35

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through June 28, 2020:

- Executive Order 202.34, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, and 202.31 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.32 as modified by Executive Order 202.33 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

  o   That effective at 1:00 p.m. on May 29, 2020 that the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Two industries:

    ▪ Professional Services, Administrative Support, Information Technology,
    ▪ Real estate services, Building and Property Management, Leasing, Rental, and Sales Services,
    ▪ Retail In-store Shopping, Rental, Repair, and Cleaning,
    ▪ Barbershops and Hair Salon (limited services), and
    ▪ Motor Vehicle Leasing, Rental, and Sales.

  o   Businesses or entities in industries open in Phase Two must be operated subject to the guidance promulgated by the Department of Health.

A-1421

o   As of May 29, 2020 the regions meeting the prescribed public health and safety metrics
    required for Phase Two reopening are: Finger Lakes, Central New York, Mohawk Valley,
    Southern Tier, and the North Country. Any additional regions which meet the criteria after
    such date will be deemed to be incorporated into this Executive Order without further
    revision and will be permitted to re-open Phase two industries, subject to the same terms and
    conditions.

G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twenty-ninth day of May in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1422

# EXHIBIT P

---



State of New York
Executive Chamber

No. 202.36

E X E C U T I V E   O R D E R

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Angola, Erie County; Village of Babylon, Suffolk County; Village of Bellport, Suffolk County; Village of Brockport, Monroe County; Village of Brookville, Nassau County; Village of Buchanan, Westchester County; Village of Clayton, Jefferson County; Village of Depew, Erie County; Village of East Hills, Nassau County; Village of Endicott, Broome County; Village of Farmingdale, Nassau County; Village of Fayetteville, Onondaga County; Village of Greenport, Suffolk County; Village of Groton, Tompkins County; Village of Hempstead, Nassau County; Village of Homer, Cortland County; Village of Hudson Falls, Washington County; Village of Island Park, Nassau County; Village of Kensington, Nassau County; Village of Laurel Hollow, Nassau County; Village of Monroe, Orange County; Village of Munsey Park, Nassau County; Village of Nyack, Rockland County; Village of Ocean Beach, Suffolk County; Village of Otisville, Orange County; Village of Patchogue; Suffolk County; City of Peekskill, Westchester County; Village of Red Hook, Dutchess County; Village of Rhinebeck, Dutchess County; City of Saratoga Springs, Saratoga County; Village of Scarsdale, Westchester County; Village of South Floral Park, Nassau County; Village of Stamford, Delaware County; Village of Stewart Manor, Nassau County; Village of Sylvan Beach, Oneida County; Village of Watkins Glen, Schuyler County; Village of Wellsville, Allegany County; and

IN ADDITION, by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law, I do hereby retroactively extend by twenty-one days the period for paying without interest or penalty the property taxes that were due by April 1, 2020, in the Village of Thomaston, Nassau County.

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 2, 2020 the following:

- Section 6530 of the Education Law, or any section of the Public Health Law, to the extent necessary to allow a questionnaire administered through an asynchronous electronic interface or

electronic mail that is approved by a physician licensed in the State of New York to be sufficient to establish a practitioner-patient relationship for purposes of ordering a clinical laboratory test.

**IN ADDITION,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 2, 2020:

- The directive contained in Executive Order 202.7, as extended, requiring all barbershops, hair salons, tattoo or piercing parlors and related personal care services to be closed to members of the public is hereby modified to allow for the opening of barbershops and hair salons, only to the extent and in regions consistent with Department of Health guidance promulgated for Phase Two industries reopening.
- The directive contained in Executive Order 202.32 allowing any licensee or franchisee of a racetrack to operate such racetrack is hereby modified and extended until July 2, 2020, to allow any operator of an auto racetrack to operate beginning June 3, 2020, pursuant to Department of Health guidance for such operation, and provided such auto racetrack allows only essential personnel or participants to be on site, and does not permit any visitor or spectator into the facility or on premise.
- Executive Order 202.35, which amended prior Executive Orders with respect to New York on Pause, is here by modified as follows:
  - Any region that meets the prescribed public health and safety metrics as determined by the Department of Health for Phase One reopening may allow outdoor, low-risk recreational activities and businesses providing such activities, as determined by Empire State Development Corporation, to be permitted to operate, in accordance with Department of Health guidance.

G I V E N   under my hand and the Privy Seal of the State in the City of Albany this second day of June in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1425

# EXHIBIT Q



No. 202.38

E X E C U T I V E   O R D E R

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, as continued as contained in Executive Order 202.27 and 202.28 until July 6, 2020; and

IN ADDITION, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 6, 2020:

- Consistent with Center for Disease Controls and Prevention and New York State Department of Health Guidance, commercial building owners, retail store owners and those authorized on their behalf to manage public places within their buildings and businesses (collectively "Operators") shall have the discretion to require individuals to undergo temperature checks prior to being allowed admittance. Further, Operators shall have the discretion to deny admittance to (i) any individual who refuses to undergo such a temperature check and (ii) any individual whose temperature is above that proscribed by New York State Department of Health Guidelines. No Operator shall be subject to a claim of violation of the covenant of quiet enjoyment, or frustration of purpose, solely due to their enforcement of this directive. This directive shall be applied in a manner consistent with the American with Disabilities Act and any provision of either New York State or New York City Human Rights Law.

- The directive contained in Executive Order 202.3, as extended, that required any restaurant or bar to cease serving patrons food or beverage on-premises, is hereby modified to the extent necessary to allow a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity.

- Executive Order 202.35 which continued the directive of Executive Order 202.33 is hereby modified to permit any non-essential gatherings for houses of worship at no greater than 25% of the indoor capacity of such location, provided it is in a geographic area in Phase 2 of re-opening, and further provided that social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to.

- Upon the resumption of on-premises outdoor service of food and beverages at the licensed premises of restaurants and bars, to facilitate compliance with social distancing requirements in connection with such service, notwithstanding any provision of the Alcoholic Beverage Control law, restaurants or bars in the state of New York shall be permitted to expand the premises licensed by the State Liquor Authority to use (a) contiguous public space (for example, sidewalks or closed streets) and/or (b) otherwise unlicensed contiguous private space under the control of such restaurant or bar, subject to reasonable limitations and procedures set by the Chairman of the State Liquor Authority and, with respect to (a) the use of public space, subject to the reasonable approval of the local municipality, and all subject to the guidance promulgated by the Department of Health.



G I V E N  under my hand and the Privy Seal of the
State in the City of Albany this sixth
day of June in the year two thousand
twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1428

# EXHIBIT R

A-1429



No. 202.39

### EXECUTIVE ORDER

#### Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.15, through 202.21, and including 202.29, as contained in Executive Order 202.29 until July 7, 2020, and further, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 7, 2020 the following:

- Sections 2018-a and 2018-b of the Education Law, to the extent necessary to allow any absentee ballot for an election held on June 9, 2020 and received by mail in the office of the clerk of the school district or designee of the trustees or school board not later than June 16, 2020 to be canvassed for such election.  No ballots for such election shall be accepted by the clerk of the school district or designee of the trustees or school board after 5 p.m. on June 9, 2020 except those received by mail in accordance with this provision. Any receptacle used for hand delivery of absentee ballots in such election shall be closed and removed at 5 p.m. on June 9, 2020; The ballots therein shall remain unopened pending delivery of mailed ballots, and shall be removed and canvassed after 5 p.m. on June 16, 2020;

- Section 3012(d) of the Education Law and Subpart 30-3 of Title 8 of the NYCRR, to the extent necessary to exempt school districts from completing annual professional performance reviews of classroom teachers and building principals during the 2019-20 school year without withholding any apportionment of funds for the general support of public schools for which a school district is otherwise entitled; and

- Sections §§2509, 2573, 3012 and 3014 of the Education Law, to the extent necessary to allow a board of education or the trustees of a common school district, only upon specific agreement, to appoint on tenure those classroom teachers and building principals recommended by the superintendent of schools who are in the final year of the probationary period, have received the previous requisite annual professional performance review ratings pursuant to §3012-d of the education law and would have been in their discretion qualified for appointment on tenure based upon past performance, notwithstanding that their annual professional performance review had not been completed and they had not received the necessary effectiveness rating for the 2019-20 school

A-1430

year, or to allow such board of education or trustees of a common school district to extend such determination for an additional year.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through July 7, 2020:

- The directive contained in Executive Order 202.38, that allowed a restaurant or bar to serve patrons food or beverage on-premises only in outdoor space, provided such restaurant or bar is in compliance with Department of Health guidance promulgated for such activity, is modified to explicitly limit such activity to those regions that are in Phase 2 of the re-opening. .

- The directive contained in Executive Order 202.4, as extended, that required local governments to allow non-essential personnel to be able to work from home or take leave without charging accruals, and required such number of non-essential personnel to total no less than 50% of the total number of employees across the entire workforce of such local government or political subdivision, is hereby modified to apply only to local governments that have not met the prescribed public health and safety metrics to be eligible for Phase Two reopening, provided such local governments in Phase Two regions may bring non-essential employees back to work beginning two weeks after such region meets the metrics to reopen Phase Two.

G I V E N  under my hand and the Privy Seal of the

State in the City of Albany this

seventh day of June in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1431

# EXHIBIT S

A-1432



No. 202.41

EXECUTIVE ORDER

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, **THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, and to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby continue the directives contained in Executive Order 202.31, unless superseded by a subsequent directive; and

IN ADDITION, I hereby temporarily suspend or modify the following and issue the following directives for the period from the date of this Executive Order through July 13, 2020:

- The directive contained in Executive Order 202.7, as extended and as amended by Executive Order 202.36, requiring all salons, tattoo parlors, piercing parlors, and related personal care services to be closed to members of the public is hereby again modified to the extent necessary to allow for the opening of such personal care services, and only to the extent and in regions consistent with Department of Health guidance promulgated for Phase Three reopening.

- Executive Order 202.35, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, and 202.31 and 202.34 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.38 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

  o That effective on June 12, 2020, the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Three industries, as determined by the Department of Health, in eligible regions, including:
    ▪ Restaurants / Food Services; and
    ▪ Personal Care.
  o Businesses or entities in industries open in Phase Three must be operated subject to the guidance promulgated by the Department of Health.
  o As of June 12, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Three reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further

A-1433

revision and will be permitted to re-open Phase Three industries, subject to the same terms and conditions.

GIVEN under my hand and the Privy Seal of the State in the City of Albany this thirteenth day of June in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1434

# EXHIBIT T

A-1435



No. 202.45

EXECUTIVE ORDER

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby extend any directive contained in Executive Order 202.34 and 202.35, provided such directive has not been superseded by a subsequent directive, and further, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through July 26, 2020 the following:

- Paragraph (e) of subdivision 1 of Section 581 of the Labor Law, to the extent necessary to authorize the Commissioner of Labor to issue a finding related to experience rating charges as permitted by the Families First Coronavirus Response Act and incurred beginning with the benefit week starting March 9, 2020;

- Subdivision 4 of section 1 of chapter 25 of the laws of 2020 is modified to the extent necessary to provide that in addition to any travel to a country for which the Centers for Disease Control and Prevention has a level two or three travel health notice, an employee shall not be eligible for paid sick leave benefits or any other paid benefits pursuant to this chapter if such employee voluntarily travels which commences after June 25, 2020 to a state with a positive test rate higher than 10 per 100,000 residents, or higher than a 10% test positivity rate, over a seven day rolling average, and which the commissioner of the department of health has designated as meeting these conditions as outlined in the advisory issued pursuant to Executive Order 205, and the travel was not taken as part of the employee's employment or at the direction of the employee's employer;

- Section 28-66 of the Charter of the City of Buffalo, to the extent necessary to allow the Mayor to waive the additions prescribed therein on unpaid 2019-2020 city taxes for the months of April, May and June of 2020, and to require payments of 2019-2020 city taxes that are made after June 30, 2020 to be made without additions for the months of April, May and June of 2020;

**IN ADDITION,** by virtue of the authority vested in me by Section 925-a of the Real Property Tax Law to extend during a State disaster emergency the period for paying property taxes without interest or penalties upon request of the chief executive officer of an affected county, city, town, village or school district, I do hereby extend by twenty-one days the period for paying, without interest or penalty, property taxes that are due in the following localities that have requested such an extension: Village of Ossining, Westchester County; Village of Pomona, Rockland County;

**IN ADDITION,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through July 26, 2020:

- The directive contained in Executive Order 202.35, as extended and as amended by Executive Order 202.38 and Executive Order 202.42, which amended the directive in Executive Order 202.10 that limited all non-essential gatherings, is hereby further modified to allow gatherings of fifty (50) or fewer individuals for any lawful purpose or reason, so long as any such gatherings occurring indoors do not exceed 50% of the maximum occupancy for a particular indoor area, and provided that the location of the gathering is in a region that has reached Phase 4 of the State's reopening, and provided further that social distancing, face covering, and cleaning and disinfection protocols required by the Department of Health are adhered to.

- Executive Order 202.41, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, 202.31, 202.34, and 202.35 which each closed or otherwise restricted public or private businesses or places of public accommodation, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

  o  That effective on June 26, 2020, the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Four industries, as determined by the Department of Health, in eligible regions, including:
     - Higher Education;
     - Film and Music Production;
     - Low-risk indoor arts and entertainment;
     - Low-risk outdoor arts and entertainment; and
     - Professional Sports without fans.
  o  Businesses or entities in industries open in Phase Four must be operated in compliance with the guidance promulgated by the Department of Health.
  o  As of June 26, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Four reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase Four industries, subject to the same terms and conditions.
  o  Any previous directive that restricted operation of any industry, business, or facility that is permitted to open in Phase One, Phase Two, Phase Three, or Phase Four is hereby superseded, only insofar as it is inconsistent with any Executive Order allowing businesses, industries, and facilities to reopen.

- The directive contained in Executive Order 202.44 regarding elective surgeries is hereby amended to provide that the directive contained in Executive Order 202.10 authorizing the Commissioner of Health to direct all general hospitals, ambulatory surgery centers, office-based surgery practices and diagnostic and treatment centers to increase the number of beds available to patients, including by cancelling all elective surgeries and procedures, is hereby modified to authorize general hospitals to perform elective surgeries and procedures so long as the established criteria are met currently, whether or not such criteria were met on the dates set forth in such directive, and as modified by the June 14th Department of Health guidance.

- Executive Order 202.34, which extended the directive contained in Executive Orders 202.28, 202.18, 202.14 and 202.4 as amended by Executive Order 202.11 related to the closure of schools statewide, is hereby continued to provide that all schools shall remain closed to in-person instruction except for the purpose of provision of special education services. School districts must ensure the availability of meals, and child care, with an emphasis on serving children of essential workers. Meals may be provided by an alternative entity, provided that the school district shall be responsible for ensuring that all children have access to free meals. Should the students not have access through an alternative entity, the school district must provide the meals.

G I V E N   under my hand and the Privy Seal of the State in the City of Albany this twenty-sixth day of June in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1437

# EXHIBIT U



No. 202.48

### E X E C U T I V E   O R D E R

**CONTINUING TEMPORARY SUSPENSION AND MODIFICATION OF LAWS
RELATING TO THE DISASTER EMERGENCY**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, as continued and contained in Executive Order 202.27, 202.28, , and 202.38, for another thirty days through August 5, 2020, except the following:

- The suspension or modification of the following statutes and regulations, and the following directives, are not continued, and such statutes, codes, and regulations are in full force and effect as of July 7, 2020:

  o The suspension of Education law section 3604(7), and any associated directives, which allowed for the Commissioner of Education to reduce instructional days, as such suspensions and directives have been superseded by statute, contained in Chapter 107 of the Laws of 2020;

  o The suspension of Section 33.17 of the Mental Hygiene Law and associated regulations to the extent necessary to permit providers to utilize staff members transport individuals receiving services from the Office of Mental Health or a program or provider under the jurisdiction of the Office of Mental Health during the emergency;

  o The suspensions of sections 2800(1)(a) and (2)(a); 2801(1) and (2); 2802(1) and (2); and 2824(2) of the Public Authorities Law, to the extent consistent and necessary to allow the director of the Authorities Budget Office to disregard such deadlines due to a failure by a state or local authority to meet the requirements proscribed within these sections during the period when a properly executed declaration of a state of emergency has been issued, are continued only insofar as they allow a state or local authority a sixty day extension from the original statutory due date for such reports;

  o Section 390-b of the Social Services Law and regulations at sections 413.4 and 415.15 of Title 18 of the NYCRR;

  o Subdivision 8 of section 8-407 of the Election Law;

o The suspension of Criminal Procedure Law to the extent it requires a personal appearance of the defendant, and there is consent, in any jurisdiction where the Court has been authorized to commence in-person appearances by the Chief Administrative Judge; provided further that the suspension or modification of the following provisions of law are continued:

- Section 150.40 of the Criminal Procedure Law, is hereby modified to provide that the 20-day timeframe for the return date for a desk appearance ticket is extended to 90 days from receiving the appearance ticket;

- Section 190.80 of the Criminal Procedure Law, is hereby modified to provide that the 45-day time limit to present a matter to the grand jury following a preliminary hearing or waiver continues to be suspended and is tolled for an additional 30 days;

- Section 30.30 of the Criminal Procedure Law, is hereby modified to require that speedy trial time limitations remain suspended until such time as petit criminal juries are reconvened or thirty days, whichever is later;

- Article 195 of the Criminal Procedure Law, is hereby suspended to the extent that it would prohibit the use of electronic appearances for certain pleas, provided that the court make a full and explicit inquiry into the waiver and voluntariness thereof;

- Sections 190.45 and 190.50 of the Criminal Procedure Law, are hereby modified to the extent necessary to allow an incarcerated defendant to appear virtually with his or her counsel before the grand jury to waive immunity and testify in his or her own defense, provided the defendant elects to do so;

- The suspension of Section 180.80 and 190.80 of the Criminal Procedure Law, as modified by Executive Order 202.28, is hereby continued for a period not to exceed thirty days in any jurisdiction where there is not a grand jury empaneled; and when a new grand jury is empaneled to hear criminal cases, then 180.80 and 190.80 of the criminal procedure law shall no longer be suspended beginning one week after such grand jury is empaneled;

- The suspension of Sections 180.60 and 245.70 of the Criminal Procedure Law, as modified by Executive Order 202.28, which allowed protective orders to be utilized at preliminary hearings, is hereby continued for a period of thirty days; and

- The suspension of Sections 182.20, in addition to the modification contained in Executive Order 202.28 of section 182.30 of the Criminal Procedure Law is hereby extended for a period of thirty days, to the extent that it would prohibit the use of electronic appearances for felony pleas, or electronic appearances for preliminary hearings or sentencing;

o Business Corporation law sections 602, 605, and 708, as such suspensions have been superseded by statute, as contained in Chapter 122 of the Laws of 2020;

o Banking Law Section 39 (2), as such suspension has been superseded by statute, as contained in Chapters 112 and 126 of the Laws of 2020, as well as the directives contained in Executive Order 202.9;

o Insurance Law and Banking Law provisions suspended by virtue of Executive Order 202.13, which coincide with the expiration of the Superintendent's emergency regulations;

o Subdivision (28) of Section 171 of the Tax Law, to the extent that the Commissioner has extended any filing deadline;

o Sections 3216(d)(1)(c) and 4306 (g) of the Insurance Law, and any associated regulatory authority provided by directive in Executive Order 202.14, as the associated emergency regulations are no longer in effect;

o The directive contained in Executive Order 202.28, as extended, that prohibited initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for nonpayment of rent or a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, is continued only insofar as it applies to a commercial tenant or commercial mortgagor, as it has been superseded by legislation for a residential tenant, and residential mortgagor, in Chapters 112, 126, and 127 of the Laws of 2020; and

o The directive contained in Executive Order 202.10 related to restrictions, as amended by Executive Order 202.11, related dispensing hydroxychloroquine or chloroquine, as recent findings and the U.S. Food & Drug Administration's revocation of the emergency use authorization has alleviated supply shortages for permitted FDA uses of these medications.

• The directives contained in Executive Order 202.3, that closed video lottery gaming or casino gaming, gym, fitness center or classes, and movie theaters, and the directives contained in Executive Order 202.5 that closed the indoor common portions of retail shopping malls, and all places of public amusement, whether indoors or outdoors, as amended, are hereby modified to provide that such directives remain in effect only until such time as a future Executive Order opening them is issued.

**IN ADDITION,** I hereby suspend or modify for thirty days through August 5, 2020:

- the provisions of Articles 11-A and 11-B of the State Finance Law, and any regulations authorized thereunder, to the extent necessary to respond to the direct and indirect economic, financial, and social effects of the COVID-19 pandemic.

**IN ADDITION,** by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I do hereby issue the following directives for the period from the date of this Executive Order through August 5, 2020:

- The directive contained in Executive Order 202.41, that discontinued the reductions and restrictions on in-person workforce at non-essential businesses or other entities in Phase Three industries or entities, as determined by the Department of Health, in eligible regions, is hereby modified only to the extent that indoor food services and dining continue to be prohibited in New York City.



G I V E N   under my hand and the Privy Seal of the
State in the City of Albany this sixth
day of July in the year two thousand
twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1441

# EXHIBIT V



No. 202.49

E X E C U T I V E   O R D E R

CONTINUING TEMPORARY SUSPENSION AND MODIFICATION OF LAWS
RELATING TO THE DISASTER EMERGENCY

WHEREAS, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

WHEREAS, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.15 and each successor Executive Order up to and including Executive Order 202.21, and Executive Order 202.29, as continued and contained in Executive Order 202.39, for another thirty days through August 6, 2020, except the following:

- The suspension or modification of the following statutes and regulations are not continued, and such statutes, codes, and regulations are in full force and effect as of July 8, 2020:
  - 10 NYCRR 5-6.12(a)(4);
  - Religious Corporations Law §§ 43, 45, as such suspensions have been superseded by Chapter 122 of the Laws of 2020;
  - Environmental Conservation Law Articles 3, 8, 9, 13, 15, 17, 19, 23, 24, 25, 27, 33, 34, 35, 37, and 75, and 6, and NYCRR Parts 552, 550, 601, and 609 to the extent they were suspended to allow the Department of Environmental Conservation to suspend hearings if public comments were accepted electronically or by mail;
  - Real Property and Proceedings Law § 711, Real Property Law § 232-a, and Multiple Dwelling Law § 4(8) and (9);
  - Not for Profit Corporation Law § 1517; 19 NYCRR 203.3, 203.6, 203.13; 10 NYCRR 77.7(a)(1);
  - Not for Profit Corporation Law § 1517; 19 NYCRR 203.3, 203.6, 203.13; 10 NYCRR 77.7(a)(4); and
  - Public Health Law §§ 4140; 4144; Not for Profit Corporation Law § 1502, 1517, 19 NYCRR 203.1, 203.4, 203.8, 203.13; 10 NYCRR 13.1.

G I V E N  under my hand and the Privy Seal of the State in

the City of Albany this seventh day of July

in the year two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1443

# EXHIBIT W



State of New York

Executive Chamber

No. 202.50

E X E C U T I V E   O R D E R

Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, and further, I do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.30 and Executive Order 202.40, which amended the directives contained in Executive Order 202.30, for thirty days until August 8, 2020.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through August 8, 2020:

- The directive contained in Executive Order 202.5, that required closure to the public of all indoor common portions of retail shopping malls, as extended, and as continued and modified in Executive Order 202.48, is hereby amended to allow such malls to open in regions of the state that are in Phase Four of the state's reopening, so long as such malls adhere to Department of Health issued guidance, effective 12:01am on Friday, July 10, 2020.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this ninth

day of July in the year two thousand

twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1445

# EXHIBIT X



No. 202.53

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws**
**Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202.22, through 202.26, and including 202.32, except for the provision authorizing the extension of payment of sales and use taxes without penalty by the Commissioner of Tax and Finance, 202.33, 202.34, and 202.35 as contained in Executive Order 202.44 and Executive Order 202.45 until August 20, 2020.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through August 20, 2020:

- The directive contained in Executive Order 202.45, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, 202.31, 202.34, 202.35 and 202.41 which each closed or otherwise restricted public or private businesses or places of public accommodation, and allowed regions to enter Phase Four of the State's reopening so long as the prescribed public health and safety metrics set by the Department of Health have been met, is hereby continued until and unless later amended or extended by a future Executive Order, provided that as of July 20, 2020 the New York City region is deemed to have met the prescribed public health and safety metrics required for Phase Four industries to reopen, further provided, however, that indoor common portions of retail shopping malls and places of low-risk indoor arts and entertainment continue to be closed in such region.

**A-1447**

- In addition, the directive contained in Executive Order 202.50, that allowed indoor common portions of retail shopping malls to open in regions that have met the public health and safety metrics to enter Phase Four of the State's reopening, is hereby amended to provide that indoor common portions of shopping malls continue to be closed in the New York City region.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twenty-first of July in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1448

# EXHIBIT Y



No. 202.55

E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby continue the directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.21, and Executive Order 202.27, 202.28, 202.29, 202.30, 202.38, 202.39, and 202.40, as continued and contained in Executive Order 202.48, 202.49, and 202.50 for another thirty days through September 4, 2020, and I hereby suspend or modify for thirty days through September 4, 2020:

- Sections 5-11.0(a), 5-16.0(a) 5-18.0(1) and 6-22.0 of the Nassau County Administrative Code, to the extent necessary to authorize the Nassau County Executive to:
    - change the deadline for the County Assessor to complete the extension of taxes for 2020-2021 school district purposes (and file the certificate associated therewith), from September 18, 2020 to October 16, 2020;
    - change the deadline for the County Legislature to levy such taxes from September 18, 2020 to October 16, 2020;
    - change the deadline for the County to deliver to the town tax receivers the 2020-2021 school district assessment roll and warrants from September 28, 2020 to October 26, 2020;
    - change the deadline that first half 2020-2021 school district taxes shall be due and payable from October 1, 2020 to November 1, 2020; and
    - change the deadline by which the first half 2020-2021 school district taxes may be paid without interest or penalties from November 10, 2020 to December 10, 2020, with payments made after such date to be subject to interest and penalties beginning on December 11, 2020.

- Section 730(3) of the Real Property Tax Law, to the extent necessary to extend the deadline for filing a 2020 small claims assessment review petition in relation to property located in Nassau County to September 4, 2020; provided that such deadline shall not be further extended unless expressly provided otherwise by an Executive Order issued hereafter;

- Section 711 of the Real Property and Proceedings Law, Section 232-a of the Real Property Law, and subdivisions 8 and 9 of section 4 of the Multiple Dwelling Law, and any other law or regulation are suspended and modified to the extent that such laws would otherwise create a landlord tenant relationship between any individual assisting with the response to COVID-19 or any individual that

has been displaced due to COVID-19, and any individual or entity, including but not limited to any hotel owner, hospital, not-for-profit housing provider, hospital, or any other temporary housing provider who provides temporary housing for a period of thirty days or more solely for purposes of assisting in the response to COVID-19;

- Sections 352-eeee(2)-(2)(a) of the General Business Law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires that an offering statement or prospectus filed with the Department of Law must be declared effective within fifteen months from filing or from the date of issuance of the letter of the attorney general stating that the offering statement or prospectus has been accepted for filing (the "Fifteen Month Period"), and any such Fifteen Month Period, shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days (the "Tolling Period"). In addition, any deadlines contained within paragraphs 352-eeee(1)(f), 352-eeee(1)(g), 352-eeee(2)(c)(vi), 352-eeee(2)(c)(vii), and 352-eeee(2)(d)(ix) shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days. Sponsor must treat all tenants in occupancy as non-purchasing tenants as defined by GBL 352-eeee(1)(e) for the duration of the Tolling Period, and must provide all such tenants in occupancy with all protections accorded to non-purchasing tenants under GBL 352-eeee for the duration of the Tolling Period. Sponsor must submit an amendment to the offering plan to the Department of Law updating the date by which sponsor must declare the offering plan effective, as necessary, within 45 days from the expiration of this Executive Order or within such other longer timeframe as may be specified by the Department of Law;

- Sections 352-eee(2)-(2)(a) of the General Business Law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires that an offering statement or prospectus filed with the Department of Law must be declared effective within twelve months from filing or from the date of issuance of the letter of the attorney general stating that the offering statement or prospectus has been accepted for filing (the "Twelve Month Period"), and any such Twelve Month Period, shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days ("the Tolling Period"). In addition, any deadlines contained within paragraphs 352-eee(1)(f), 352-eee(1)(g), 352-eee(2)(d)(vi), and 352-eee(2)(d)(ix) shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days. Sponsor must treat all tenants in occupancy as non-purchasing tenants as defined by GBL 352-eee(1)(e) for the duration of the Tolling Period, and must provide all such tenants in occupancy with all protections accorded to non-purchasing tenants under GBL 352-eee for the duration of the Tolling Period. Sponsor must submit an amendment to the offering plan to the Department of Law updating the date by which sponsor must declare the offering plan effective, as necessary, within 45 days from the expiration of this Executive Order or within such other longer timeframe as may be specified by the Department of Law;

- 13 NYCRR § 20.3(o)(12), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to offer rescission if the first closing of a unit does not occur within a period of twelve months after the projected date for such closing (corresponding to the projected first year of operation) as set forth in the offering plan, and any such twelve month period, shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days. Sponsor must submit an amendment to the offering plan to the Department of Law updating the first year of operation and projected date of first closing, as necessary, within 45 days from the expiration of this Executive Order or within such other longer timeframe as may be specified by the Department of Law. The Department of Law shall not deem the tolling provided under this Executive Order and Executive Order 202.18 of any such twelve month period to be a material and/or adverse event or change under terms of the offering plan or any order, rule, or regulation applicable thereto, or otherwise;

- 13 NYCRR § 22.3(k)(10), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to offer rescission if the first closing of a home or lot does not occur within a period of twelve months after the projected date for such closing (corresponding to the projected first year of operation) as set forth in the offering plan, and any such twelve month period, shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days. Sponsor must submit an amendment to the offering plan to the Department of Law updating the first year of operation and projected date of first closing, as necessary, within 45 days from the expiration of this Executive Order or within such other longer timeframe as may be specified by the Department of Law. The Department of Law shall not deem the tolling provided under this Executive Order and Executive Order 202.18 of any such twelve month period to be a material and/or adverse event or change under terms of the offering plan or any order, rule, or regulation applicable thereto, or otherwise;

- 13 NYCRR § 25.3(l)(12), and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to offer rescission if the units are not ready for occupancy within a period of twelve months after the projected date for such closing (corresponding to the

projected first year of operation) as set forth in the offering plan, and any such twelve month period, shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days. Sponsor must submit an amendment to the offering plan to the Department of Law updating the first year of operation and projected date of first closing, as necessary, within 45 days from the expiration of this Executive Order or within such other longer timeframe as may be specified by the Department of Law. The Department of Law shall not deem the tolling provided under this Executive Order and Executive Order 202.18 of any such twelve month period to be a material and/or adverse event or change under terms of the offering plan or any order, rule, or regulation applicable thereto, or otherwise;

- 13 NYCRR §§ 18.3(g)(1), 20.3(h)(1), 21.3(g), 22.3(g)(1), 23.3(h)(1), 24.3(j)(1), and 25.3(h)(1) and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it requires sponsor to set forth a budget for the first year of operation, the requirements with respect to any such budget for the projected first year of operation shall be tolled and extended for a period equal to, in the aggregate, the duration of this Executive Order plus an additional period of 120 days. Sponsor must submit an amendment to the offering plan to the Department of Law updating the first year of operation, as necessary, within 45 days from the expiration of this Executive Order or within such other longer timeframe as may be specified by the Department of Law, and shall not be required to offer rescission unless such budget for the first year of operation increases by 25 percent or more during the pendency of this Executive Order (or rescission otherwise is required under terms of the offering plan or any order, rule, or regulation applicable thereto, or otherwise). The Department of Law shall not deem the tolling provided under this Executive Order and Executive Order 202.18 of sponsor's requirements with respect to the budget for the first year of operation to be a material and/or adverse event or change under terms of the offering plan or any order, rule, or regulation applicable thereto, or otherwise;

- Section 339-ee(2) of the Real Property Law, and any order, rule, or regulation in furtherance of the requirements thereof, to the extent it provides that as each unit in a condominium is first conveyed "there shall be allowed a credit against the mortgage recording taxes (except the special additional mortgage recording tax imposed by subdivision one-a of section two hundred fifty-three of the tax law) that would otherwise be payable on a purchase money mortgage," in respect of a portion of certain mortgage taxes previously paid, provided certain two-year time periods (as specified therein) have not elapsed before the recordation of the declaration of condominium or the first condominium unit is sold, as the case may be, the running of any such two-year period(s) is hereby suspended for the duration of this Executive Order, and any such two-year period is hereby extended for a period equal to the duration of this Executive Order plus an additional period of 120 days.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this fifth

of August in the year two thousand

twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1452

# EXHIBIT Z

A-1453



*State of New York*

*Executive Chamber*

No. 202.55.1

## EXECUTIVE ORDER

### Continuing Temporary Suspension and Modification of Laws
### Relating to the Disaster Emergency

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, do hereby amend Executive Order 202.55 to include all suspensions and modifications, not superseded by a suspension or modification in a subsequent Executive Order for the Executive Orders listed in 202.55; and provided further, Executive Orders 202.48, 202.49, and 202.50 are continued in their entirety, through September 4, 2020.

G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this sixth

of August in the year two thousand

twenty.

BY THE GOVERNOR

Secretary to the Governor

A-1454

# EXHIBIT AA

A-1455

ADMINISTRATIVE ORDER OF THE
CHIEF ADMINISTRATIVE JUDGE OF THE COURTS

Pursuant to the authority vested in me, and at the direction of the Chief Judge, I hereby

promulgate the following procedures and protocols, effective as set forth below, to mitigate the

effects of the COVID-19 outbreak upon the users, visitors, staff, and judicial officers of the

Unified Court System:

- Effective 5 p.m. on Monday, March 16, all non-essential functions of the courts will be postponed until further notice.   All essential court functions will continue, as described below.

- Jury Proceedings and Jury Trials:   Effective March 16, civil jury trials in which opening statements have not commenced shall be postponed until further notice.   Civil jury trials already commenced shall continue to conclusion.   Criminal jury trials shall continue where jeopardy has attached; no new criminal jury trials shall be commenced. The jury selection process in civil and criminal trial matters shall be suspended until further notice.   Existing grand juries will continue, upon consultation of the appropriate district attorney and empaneling judge.   No new grand juries shall be empaneled absent exceptional circumstances.

- Motion practice:   Effective March 16, unless otherwise directed by the court in exceptional circumstances, all motions in civil matters shall be taken on submission. When permitted, argument should be conducted by Skype or other remote means whenever possible.

- Special Parts:   Effective March 17, outside of New York City, special court parts will be established in individual jurisdictions (at the courthouses listed in Attachment A) where essential matters will be consolidated; inside New York City, courthouses will remain open to handle essential matters as follows:

| | |
|---|---|
| Supreme Court: | Essential applications as the court may allow, e.g., Mental Hygiene Law applications, civil commitments, and guardianships. |
| Civil matters in courts other than Supreme Court: | |
| | Essential applications as the court may allow. |

1

A-1456

| | |
|---|---|
| Housing matters: | Essential applications as the court may allow, e.g., landlord lockouts, serious housing code violations, and repair orders. |
| | All eviction proceedings and pending eviction orders shall be suspended statewide, and court-ordered auctions of property shall be postponed, until further notice. |
| | All residential foreclosure proceedings shall be suspended statewide until further notice. |
| | I confirm that, effective March 13, 2020, residential evictions in New York City have been stayed, and the New York City Housing Court has been directed not to issue new eviction warrants when a party has not appeared in court. |
| Criminal (superior court) matters: | Essential applications as the court may allow. |
| | Felony matters wherein the defendant is not in custody shall be administratively adjourned until further notice. Felony matters in which defendants are in custody will either be administratively adjourned or be conducted remotely by video in New York City and in jurisdictions outside of New York City that have technology available to do so. |
| Criminal (lower court): | Arraignments, and essential applications as the court may allow, e.g., applications for orders of protection. |
| | Arraignments shall be conducted through video remote appearances in New York City and to the fullest extent possible elsewhere in the State. |
| | In New York City, the Red Hook Community Court and the Midtown Community Court are designated as arraignment sites where persons believed to be at medical risk related to the coronavirus will appear remotely by video. |
| | Effective Monday, March 16, misdemeanors and lesser offenses wherein the defendant is not in custody shall be administratively adjourned until further notice. Misdemeanors and lesser offenses in which defendants are |

2

in custody will either be administratively adjourned or be
conducted remotely by video in New York City and in
jurisdictions outside of New York City that have
technology available to do so.

Family Court:              Essential matters as the court may allow, e.g., issues related
                           to child protection proceedings, juvenile delinquency
                           proceedings. family offenses, and support orders.

Surrogate's Court:         Essential applications as the court may allow.

Court of Claims:           Essential applications as the court may allow.

Activities in all other court parts shall be deferred to a later date to the fullest extent
possible until further notice, unless expressly permitted by the appropriate administrative judge.

In addressing essential applications, judges will exercise judicial discretion in a manner
designed to minimize court appearance and traffic in the courts.

• Court Access, Cleaning, and Reporting Protocols:  The court access, cleaning,
and reporting protocols set forth in the memo of the Chief Administrative Judge dated March 13,
2020 shall continue until further order.

_____
Chief Administrative Judge of the Courts

Dated: March 16, 2020

AO/68/20

3

A-1458

ATTACHMENT A

**Courts Outside NYC**
(As of 3/16/20; 11:00 a.m.)

| County/City | Designated Court/Location for Emergency Proceedings |
|---|---|

**3rd District**

| Albany County Courthouse & Judicial Center | Albany County Judicial Center, 6 Lodge Street, Albany, NY 12207 |
| Albany County Family Court | Albany County Judicial Center, 6 Lodge Street, Albany, NY 12207 |
| Albany City Court | Albany County Judicial Center, 6 Lodge Street, Albany, NY 12207 |
| Cohoes City Court | Albany County Judicial Center, 6 Lodge Street, Albany, NY 12207 |
| Watervliet City Court | Albany County Judicial Center, 6 Lodge Street, Albany, NY 12207 |

| Columbia County | Columbia County Courthouse, 401 Union Street, Hudson |
| Hudson City Court | Columbia County Courthouse, 401 Union Street, Hudson |

| Greene County | Greene County Courthouse, 320 Main Street, Catskill |

| Rensselaer County Courthouse | Rensselaer County Courthouse, 80 Second Street, Troy |
| Rensselaer County Family Court | Rensselaer County Courthouse, 80 Second Street, Troy |
| Rensselaer City | Rensselaer County Courthouse, 80 Second Street, Troy |
| Troy City | Rensselaer County Courthouse, 80 Second Street, Troy |

| Schoharie County | Schoharie County Courthouse, 290 Main Street, Schoharie |

| Sullivan County Courthouse | Sullivan County Courthouse, 414 Broadway, Monticello |
| Sullivan County Family Court | Sullivan County Courthouse, 414 Broadway, Monticello |

| Ulster County Courthouse | Ulster County Courthouse, 285 Wall Street, Kingston |
| Ulster County Family | Ulster County Courthouse, 285 Wall Street, Kingston |
| Kingston City Court | Ulster County Courthouse, 285 Wall Street, Kingston |

**4th District**

| Clinton Co. Supreme/County/Family/Surrogate | Clinton County Courthouse, Clinton County Office Building, 137 Margaret Street, Plattsburgh |
| Plattsburgh City Court | Clinton County Courthouse, Clinton County Office Building, 137 Margaret Street, Plattsburgh |

| Essex Co. Supreme/County/Family/Surrogate | Essex County Courthouse, 7559 Court Street, Elizabethtown |

| Franklin Co. Supreme/County/Family/Surrogate | Franklin County Courthouse, 355 West Main Street, Malone |

| Fulton Co. Family Court | Fulton County Courthouse - Family Court Building, 223 West Main Street, Johnstown |
| Fulton Co. Supreme/County/Surrogate | Fulton County Courthouse - Family Court Building, 223 West Main Street, Johnstown |
| Gloversville City Court | Fulton County Courthouse - Family Court Building, 223 West Main Street, Johnstown |
| Johnstown City Court | Fulton County Courthouse - Family Court Building, 223 West Main Street, Johnstown |

| Hamilton County Courthouse | Hamilton County Courthouse, 102 County View Drive, Lake Pleasant |
| Indian Lake Court Offices | Hamilton County Courthouse, 102 County View Drive, Lake Pleasant |

| | |
|---|---|
| Montgomery Co. Supreme/County/Family/Surrogate<br>Amsterdam City Court | Montgomery County Courthouse, 58 Broadway, Fonda<br>Montgomery County Courthouse, 58 Broadway, Fonda |
| Saratoga Co. Family Court - Building #2<br>Saratoga Co. Supreme/County/Surrogate - Bldg. #3<br>Mechanicville City Court<br>Saratoga Springs City Court | Saratoga County Courthouse, Building #2, 30 McMaster Street, Ballston Spa<br>Saratoga County Courthouse, Building #2, 30 McMaster Street, Ballston Spa<br>Saratoga County Courthouse, Building #2, 30 McMaster Street, Ballston Spa<br>Saratoga County Courthouse, Building #2, 30 McMaster Street, Ballston Spa |
| St. Lawrence Co. Supreme/County/Family/Surrogate<br>Ogdensburg City Court | St. Lawrence County Courthouse, 48 Court Street, Canton<br>St. Lawrence County Courthouse, 48 Court Street, Canton |
| Schenectady Supreme/County/Surrogate - 612 State<br>Schenectady Co. Family Court - 620 State<br>Shaffer Heights Supreme Court Annex - Nott Terrace<br>Schenectady City Court - Civil and Traffic (Jay St.)<br>Schenectady City Criminal (Liberty St - police station) | Schenectady County Family Court - 620 State St., Schenectady<br>Schenectady County Family Court - 620 State St., Schenectady<br>Schenectady County Family Court - 620 State St., Schenectady<br>Schenectady County Family Court - 620 State St., Schenectady<br>Schenectady County Family Court - 620 State St., Schenectady |
| Warren Co. Supreme/County/Family/Surrogate<br>Glens Falls City Court<br>Warren Co. Centralized Arraignment Part (CAP) | Warren County Courthouse - Family Court wing, 1340 State Route 9, Lake George<br>Warren County Courthouse - Family Court wing, 1340 State Route 9, Lake George<br>CAP will remain open |
| Washington Co. Supreme/County/Family/Surrogate<br>Washington Co. Centralized Arraignment Part (CAP) | Washington County Courthouse, 383 Broadway, Fort Edward<br>CAP will remain open |

**5th District**

| | |
|---|---|
| Herkimer County<br>Little Falls City Court | Herkimer County Court - 301 N. Washington St. Herkimer, NY 13350<br>Herkimer County Court - 301 N. Washington St. Herkimer, NY 13350 |
| Jefferson County<br>Watertown City Court | Jefferson County Court - 163 Arsenal St. Watertown, NY 13601<br>Jefferson County Court - 163 Arsenal St. Watertown, NY 13601 |
| Lewis County | Lewis Multi-Bench - 7660 N. State St. Lowville, NY 13367 |
| Oneida County<br>Utica City Court<br>Rome City Court<br>Sherrill City Court | Oneida Family Court - 200 Elizabeth St. Utica, NY 13501<br>Oneida Family Court - 200 Elizabeth St. Utica, NY 13501<br>Oneida Family Court - 200 Elizabeth St. Utica, NY 13501<br>Oneida Family Court - 200 Elizabeth St. Utica, NY 13501 |
| Onondaga County<br>Syracuse City Court | Onondaga Family Court - 401 Montgomery St. Syracuse, NY 13202<br>Onondaga Family Court - 401 Montgomery St. Syracuse, NY 13202 |
| Oswego County<br>Fulton City Court<br>Oswego City Court | Public Safety Center, 39 Churchill Road, Oswego, NY 13126<br>Public Safety Center, 39 Churchill Road, Oswego, NY 13126<br>Public Safety Center, 39 Churchill Road, Oswego, NY 13126 |

## 6th District

| | |
|---|---|
| **Broome County** | |
| Binghamton City Court (City Hall) | Broome County Annex County and Family Court Building, Binghamton |
| | Broome County Annex County and Family Court Building, Binghamton |
| **Chemung County** | |
| Elmira City Court (City Hall) | Justice Building, Elmira |
| | Justice Building, Elmira |
| **Chenango County** | |
| Norwich City Court (City Court Building) | Eaton Center, Norwich |
| | Eaton Center, Norwich |
| **Cortland County** | |
| Cortland County Supreme Court (Cortland County Courthouse) | Cortland County Courthouse, 46 Greenbush Street, Cortland |
| Cortland City Court (City Hall | Cortland County Courthouse, 46 Greenbush Street, Cortland |
| **Delaware County** | Delaware County Courthouse, 3 Court Street, Delhi |
| **Madison County** | Madison County Courthouse, 138 North Court Street, Wampsville |
| Oneida City Court (Justice Center) | Madison County Courthouse, 138 North Court Street, Wampsville |
| **Otsego County** | Otsego County Office Building, 197 Main Street, Cooperstown |
| Oneonta City Court (Public Safety building) | Otsego County Office Building, 197 Main Street, Cooperstown |
| **Schuyler County** | Schuyler County Courthouse, Watkins Glen |
| **Tioga County** | Tioga County Annex Building, Owego |
| **Tompkins County** | Tompkins County Courthouse, 320 North Main Street, Ithaca |
| Ithaca City Court (City Court Building) | Tompkins County Courthouse, 320 North Main Street, Ithaca |

## 7th District

| | |
|---|---|
| **Cayuga County** | Cayuga Historic Old Post Office, Auburn |
| Auburn City Court | See Courthouse Above |
| | Cayuga CAP Jail Visitation (Town and Village) |
| **Livingston County** | Livingston County Courthouse, Geneseo |
| | Livingston CAP (Town and Village) |
| **Monroe County** | Monroe County Courthouse, Hall of Justice, Rochester |
| Rochester City Court | Monroe County Courthouse, Hall of Justice, Rochester |
| **Ontario County** | Ontario County Courthouse, Canandaigua |
| | Ontario CAP Jail Lobby (Town and Village) |
| | Ontario County Courthouse, Canandaigua |
| Canandaigua City Court | Ontario CAP Jail (Town and Village) |
| | Ontario County Courthouse, Canandaigua |
| Geneva City Court | Ontario CAP Jail (Town and Village) |

Seneca County
Seneca County Courthouse, Waterloo
Seneca CAP Jail Lobby (Town and Village)

Steuben County
Steuben County Courthouse, Bath
Steuben CAP Jail Visitation Area (Town and Village)
Steuben County Courthouse, Bath

Corning City Court
Steuben CAP Jail Visitation Area (Town and Village)
Steuben County Courthouse, Bath

Hornell City Court
Steuben CAP Jail Visitation Area (Town and Village)

Wayne County
Wayne County Courthouse, Lyons
Wayne CAP Jail Visitation (Town and Village)

Yates County
Yates County Courthouse, Penn Yan
Yates CAP Jail Lobby (Town and Village)

**8th District**

Allegany County
Allegany County Courthouse, Belmont

Cattaraugus County
Cattaraugus County Courthouse, Little Valley

Olean City Court
Cattaraugus County Courthouse, Little Valley

Salamanca City Court
Cattaraugus County Courthouse, Little Valley

Chautauqua County
Chautauqua County Courthouse, Mayville

Dunkirk City Court
Chautauqua County Courthouse, Mayville

Jamestown City Court
Chautauqua County Courthouse, Mayville

Erie County
Erie County Courthouse, Buffalo

Buffalo City Court
Erie County Courthouse, Buffalo

Lackawana City Court
Erie County Courthouse, Buffalo

Tonawanda City Court
Erie County Courthouse, Buffalo

Genesee County
Genesee County Court Facility, Batavia

Batavia City Court
Genesee County Court Facility, Batavia

Niagara County
Niagara County Courthouse, Lockport

Lockport City Court
Niagara County Courthouse, Lockport

Niagara Falls City Court
Niagara County Courthouse, Lockport

North Tonawanda City Court
Niagara County Courthouse, Lockport

Orleans County
Orleans County Courthouse, Albion

Wyoming County
Wyoming County Courthouse, Warsaw

A-1463

**9th District**

Dutchess County          Dutchess Family Court, 50 Market Street, Poughkeepsie, NY
Beacon City Court        Dutchess Family Court, 50 Market Street, Poughkeepsie, NY
Poughkeepsie City Court  Dutchess Family Court, 50 Market Street, Poughkeepsie, NY

Orange County            Orange County Courthouse, 285 Main Street, Goshen, NY
Middletown City Court    Orange County Courthouse, 285 Main Street, Goshen, NY
Newburgh City Court      Orange County Courthouse, 285 Main Street, Goshen, NY
Port Jervis City Court   Orange County Courthouse, 285 Main Street, Goshen, NY

Putnam County            County Courthouse, 20 County Center, Carmel NY

Rockland County          Rockland County Courthouse, New City

Westchester County       Supreme Court - 111 Dr. Martin Luther King Jr. Blvd., White Plains
Mount Vernon City Court  Supreme Court - 111 Dr. Martin Luther King, Jr. Blvd., White Plains
New Rochelle City Court  Supreme Court - 111 Dr. Martin Luther King, Jr. Blvd., White Plains
Peekskill City Court     Supreme Court - 111 Dr. Martin Luther King, Jr. Blvd., White Plains
Rye City Court           Supreme Court - 111 Dr. Martin Luther King, Jr. Blvd., White Plains
White Plains City Court  Supreme Court - 111 Dr. Martin Luther King, Jr. Blvd., White Plains
Yonkers City Court       Supreme Court - 111 Dr. Martin Luther King, Jr. Blvd., White Plains

**Nassau County**

Nassau County - All Courts   Nassau County Court, 262 Old Country Road, Mineola

**Suffolk County**

Suffolk County - All Courts   Cohalen Court Complex, 400 Carleton Avenue, Central Islip, NY 11722

**Court of Claims**

Albany                   Robert Abrams Building for Law and Justice, Capitol Station, Albany

A-1464

# EXHIBIT BB

A-1465

## ADMINISTRATIVE ORDER OF THE
## CHIEF ADMINISTRATIVE JUDGE OF THE COURTS

Pursuant to the authority vested in me, I hereby order and direct that, effective June 20, 2020, petitions in eviction proceedings involving residential or commercial property pursuant to Article 7 of the Real Property Actions and Proceedings Law (RPAPL), whether brought on the ground that the respondent has defaulted in the payment of rent or on some other ground, shall require the inclusion of (1)(a) an attorney affirmation in the form attached as Exh. 1a, in cases where the petitioner is represented by counsel, or (1)(b) a petitioner's affidavit in the form attached as Exh. 1b, in cases where the petitioner is self-represented; and (2) a Notice to Respondent Tenant in the form attached as Exh. 2a (if filing within the City of New York) or Exh. 2b (if filing outside the City of New York).

Consistent with prior and current gubernatorial Executive Orders (EO/202.8, EO/202.14, EO/202.28, EO/202.38) and Administrative Order AO/68/20, RPAPL eviction matters commenced on or before March 16, 2020 shall continue to be suspended until further order; eviction proceedings filed after March 16, 2020 shall, upon the filing of a petition (if no answer is filed thereafter) or the filing of an answer, be suspended until further order. Notwithstanding the foregoing, eviction matters in which all parties are represented by counsel shall be eligible for calendaring for virtual settlement conferences.

This order shall take effect on June 20, 2020, and shall remain in effect for such time as state and federal emergency measures addressing the COVID-19 pandemic amend or suspend statutory provisions governing eviction proceedings, or until further order.


_____
Chief Administrative Judge of the Courts

Dated: June 18, 2020

AO/127/20

A-1466

**Exh. 1a**

[Court]
COUNTY OF _____

_____

                    Petitioner (Landlord)         Index No.  L&T _____

                                       **AFFIRMATION**

v.

                    Respondent (Tenant)

                    Address:

_____

*Please note: As a result of the COVID-19 pandemic, the commencement and prosecution of eviction proceedings were stayed under various provisions of law, including but not limited to Governor Cuomo's Executive Order 202.8 and Executive Order 202.28, Chief Administrative Judge Marks's Administrative Orders AO/68/20, AO/121/20, and AO/127/20, and the federal Coronavirus Aid, Relief, and Economic Security Act of 2020 (Public Law 116-136).  This affirmation is designed to advance the purpose of these federal and state directives, and to avoid unnecessary in-person appearances of parties and others in courthouses.*

                              **\*\*\***

      [ _____ ] , Esq., pursuant to CPLR §2106 and under the penalties of perjury, affirms as follows:

      1.  I am an attorney at law duly licensed to practice in the state of New York and am affiliated with the law firm of _____, attorneys for Petitioner in the above-captioned eviction proceeding pursuant to RPAPL §732.  As such, I am fully aware of the underlying action, as well as the proceedings had herein.

      2.  I am aware that, as a result of the COVID-19 pandemic, various state and federal authorities have issued statutes and executive orders regulating the time and manner of commencement and prosecution of eviction proceedings.  These include (without limitation), gubernatorial Executive Orders EO-202.8 (March 20, 2020), EO-202.14 (April 7, 2020), EO-202.28 (May 7, 2020), and EO 202.38 (June 6, 2020); Chief Administrative Judge Administrative Orders AO/68/20 (March 16, 2020), AO/121/20 (June 9, 2020), and AO/127/20

A-1467

(June 18, 2020), and federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act, enacted on March 27, 2020).

3.  I have reviewed these authorities, have consulted with my client, and affirm that, to the best of my knowledge, information, and belief, the petition and other papers filed or submitted to the Court in this matter comport with the requirements of those state and federal directives -- including the directive, set forth in Executive Order 202.28, that "[t]here shall be no initiation of a proceeding or enforcement of ... an eviction of any residential or commercial tenant, for nonpayment of rent  ... by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020."

4.  I am aware of my obligations under New York Rules of Professional Conduct (22 NYCRR Part 1200) and 22 NYCRR Part 130.


DATED:


_____


*Please note: Counsel may augment this affirmation to provide explanatory details, and may file supplemental affirmations or affidavits for the same purpose.*

A-1468

**Exh. 1b**

[Court]
COUNTY OF _____

_____

                    Petitioner (Landlord)                    Index No.  L&T _____

v.                                                           **PETITIONER'S AFFIDAVIT**

                    Respondent (Tenant)

                    Address:

_____

*Please note: As a result of the COVID-19 pandemic, the commencement and prosecution of eviction proceedings were stayed under various provisions of law, including but not limited to Governor Cuomo's Executive Order 202.8 and Executive Order 202.28, Chief Administrative Judge Marks's Administrative Orders AO/68/20, AO/121/20, and AO/127/20, and the federal Coronavirus Aid, Relief, and Economic Security Act of 2020 (Public Law 116-136).  This affidavit, to be filed by petitioners who are self-represented in eviction matters, is designed to advance the purpose of these federal and state directives, and to avoid unnecessary in-person appearances of parties and others in courthouses.*

\*\*\*

STATE OF NEW YORK      )
                       )ss.
COUNTY OF _____  )


_____, being duly sworn, says:

     1.  I am the petitioner in this eviction proceeding, and am not represented by counsel.  I have personal knowledge of the facts stated in the petition.

     2.  I am aware that, as a result of the COVID-19 pandemic, various state and federal authorities have issued statutes and orders regulating the bringing of eviction proceedings.  These include (without limitation), Governor Cuomo's Executive Orders EO-202.8 (March 20, 2020), EO-202.14 (April 7, 2020), EO-202.28 (May 7, 2020), and EO 202.38 (June 6, 2020) (https://www.governor.ny.gov/executiveorders); Chief Administrative Judge Administrative

A-1469

Orders AO/68/20 (March 16, 2020), AO/121/20 (June 9, 2020), and AO/127/20 (June 18, 2020) (https://www.nycourts.gov/latest-AO.shtml), and section 4024 of the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act, enacted on March 27, 2020) (see, e.g. https://crsreports.congress.gov/product/pdf/IN/IN11320).

      3.  I have reviewed these authorities, and declare that, to the best of my knowledge, information, and belief, the petition and other papers filed in this matter meet the requirements of those state and federal directives -- including the requirement contained in Executive Order 202.28, that "[t]here shall be no initiation of a proceeding or enforcement of ... an eviction of any residential or commercial tenant, for nonpayment of rent  ... by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020."

 

_____

                    Petitioner's Full Name

Sworn to before me this
\_\_\_\_\_ day of \_\_\_\_\_, 20\_\_\_

 

_____

Public Notary

A-1470

**Exh. 2a**

NOTICE TO RESPONDENT TENANT

DURING THE CORONAVIRUS EMERGENCY, YOU MIGHT BE ENTITLED BY LAW TO TAKE ADDITIONAL DAYS OR WEEKS TO FILE AN ANSWER TO THIS PETITION.

PLEASE CONTACT YOUR ATTORNEY FOR MORE INFORMATION.

IF YOU DON'T HAVE AN ATTORNEY, PLEASE CALL

**718-557-1379**

OR VISIT

**www.nycourts.gov/evictions/nyc/**

A-1471

AVISO A INQUILINO DEMANDADO

DURANTE LA EMERGENCIA DEL CORONAVIRUS,
ES POSIBLE QUE USTED TENGA DERECHO POR LEY
A TOMAR DÍAS O SEMANAS ADICIONALES
PARA PRESENTAR UNA RESPUESTA
A ESTA PETICIÓN

POR FAVOR CONTACTE A SU ABOGADO PARA MAS
INFORMACIÓN.

SI USTED NO TIENE UN ABOGADO, LLAME AL
**718-557-1379**
O VISITE
**www.nycourts.gov/evictions/nyc/**

A-1472

**Exh. 2b**

NOTICE TO RESPONDENT TENANT

DURING THE CORONAVIRUS EMERGENCY, YOU
MIGHT BE ENTITLED BY LAW TO TAKE ADDITIONAL
DAYS OR WEEKS TO FILE AN ANSWER TO THIS
PETITION.

PLEASE CONTACT YOUR ATTORNEY FOR MORE
INFORMATION.

IF YOU DON'T HAVE AN ATTORNEY, PLEASE

VISIT

**www.nycourts.gov/evictions/outside-nyc/**

FOR MORE INFORMATION.

**A-1473**

AVISO A INQUILINO DEMANDADO

DURANTE LA EMERGENCIA DEL CORONAVIRUS,
ES POSIBLE QUE USTED TENGA DERECHO POR LEY
A TOMAR DÍAS O SEMANAS ADICIONALES
PARA PRESENTAR UNA RESPUESTA
A ESTA PETICIÓN

POR FAVOR CONTACTE A SU ABOGADO PARA MAS
INFORMACIÓN.

SI USTED NO TIENE UN ABOGADO, VISITE
**www.nycourts.gov/evictions/outside-nyc/**

A-1474

# EXHIBIT CC

A-1475

## ADMINISTRATIVE ORDER OF THE
## CHIEF ADMINISTRATIVE JUDGE OF THE COURTS

Pursuant to the authority vested in me, I hereby order and direct that, effective June 24, 2020, commencement papers in foreclosure proceedings involving residential or commercial property shall require the inclusion of (1) an attorney affirmation in the form attached as Exh. 1 and (2) a Notice to Respondent, in English and Spanish, in the form attached as Exhs. 2 and 3.

Consistent with prior and current gubernatorial Executive Orders (EO/202.8, EO/202.14, EO/202.28, EO/202.38) and Administrative Order AO/68/20, foreclosure matters commenced on or before March 16, 2020 shall continue to be suspended until further order; foreclosure proceedings filed after March 16, 2020 shall, upon the filing of a complaint (if no answer is filed thereafter) or the filing of an answer, be suspended until further order; initial mandatory settlement conferences in residential foreclosures pursuant to CPLR 3408 shall not be scheduled; and foreclosure auctions shall continue to be suspended until further order.  Notwithstanding the foregoing, foreclosure matters in which all parties are represented by counsel shall be eligible for calendaring for both initial and follow-up virtual settlement conferences; lenders may move for a judgment of foreclosure and sale on the ground that a property is vacant and abandoned; and lenders may move to discontinue a pending case.

This order shall take effect on June 24, 2020, and shall remain in effect for such time as state and federal emergency measures addressing the COVID-19 pandemic amend or suspend statutory provisions governing foreclosure proceedings, or until further order.


_____
Chief Administrative Judge of the Courts

Dated: June 23, 2020

AO/131/20

A-1476

**Exh. 1**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF _____

_____

                             Index No. _____

          Petitioner

                             **AFFIRMATION**

v.

          Defendant

          Mortgaged Premises:

_____

*Please note: As a result of the COVID-19 pandemic, the commencement and prosecution of foreclosure proceedings were stayed under various provisions of law, including but not limited to Governor Cuomo's Executive Order 202.8 and Executive Order 202.28, Chief Administrative Judge Marks's Administrative Orders AO/68/20, AO/121/20, and AO/127/20, and the federal Coronavirus Aid, Relief, and Economic Security Act of 2020 (Public Law 116-136). This affirmation is designed to advance the purpose of these federal and state directives, and to avoid unnecessary in-person appearances of parties and others in courthouses.*

                                  \*\*\*

      [ _____ ] , Esq., pursuant to CPLR §2106 and under the penalties of perjury, affirms as follows:

      1.  I am an attorney at law duly licensed to practice in the state of New York and am affiliated with the law firm of _____, attorneys for Plaintiff(s) in the above-captioned foreclosure proceeding. As such, I am fully aware of the underlying action, as well as the proceedings had herein.

      2.  I am aware that, as a result of the COVID-19 pandemic, various state and federal authorities have issued statutes and executive orders regulating the time and manner of commencement and prosecution of foreclosure proceedings. These include (without limitation), gubernatorial Executive Orders 202.8 (March 20, 2020), 202.14 (April 7, 2020), 202.28 (May 7, 2020), and 202.38 (June 6, 2020); Chief Administrative Judge Administrative Orders AO/68/20

A-1477

(March 16, 2020), AO/121/20 (June 9, 2020), and AO/127/20 (June 18, 2020); and federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act, enacted on March 27, 2020), Department of Veterans Affairs Circular 26-20-22 (June 17, 2020), and Department of Housing and Urban Development Mortgagee Letter 2020-19 (June 17, 2020).

3. I have reviewed these authorities, have consulted with my client, and affirm that, to the best of my knowledge, information, and belief, the petition and other papers filed or submitted to the Court in this matter comport with the requirements of those state and federal directives -- including the directive, set forth in Executive Order 202.28, that "[t]here shall be no initiation of a proceeding or enforcement of ... a foreclosure of any residential or commercial mortgage, for nonpayment of such mortgage, owned ... by someone that is eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic for a period of sixty days beginning on June 20, 2020."

4. I am aware of my obligations under New York Rules of Professional Conduct (22 NYCRR Part 1200) and 22 NYCRR Part 130.

DATED:

_____

*Please note: Counsel may augment this affirmation to provide explanatory details, and may file supplemental affirmations or affidavits for the same purpose.*

A-1478

**Exh. 2**

NOTICE TO DEFENDANT


DURING THE CORONAVIRUS EMERGENCY, YOU MIGHT BE ENTITLED BY LAW TO TAKE ADDITIONAL DAYS OR WEEKS TO FILE AN ANSWER TO THIS COMPLAINT.


PLEASE CONTACT YOUR ATTORNEY FOR MORE INFORMATION.

IF YOU DON'T HAVE AN ATTORNEY,

PLEASE VISIT


**http://ww2.nycourts.gov/admin/OPP/foreclosures.shtml**

**OR**

**https://www.nycourts.gov/courthelp/Homes/foreclosures.shtml**

A-1479

**Exh. 3**

AVISO A DEMANDADO


DURANTE LA EMERGENCIA DEL CORONAVIRUS,

ES POSIBLE QUE USTED TENGA DERECHO POR LEY

A TOMAR DÍAS O SEMANAS ADICIONALES

PARA PRESENTAR UNA RESPUESTA

A ESTA PETICIÓN


POR FAVOR CONTACTE A SU ABOGADO PARA MAS

INFORMACIÓN.


SI USTED NO TIENE UN ABOGADO,

VISITE

**http://ww2.nycourts.gov/admin/OPP/foreclosures.shtml**

O

**https://www.nycourts.gov/courthelp/Homes/foreclosures.shtml**

A-1480

# EXHIBIT DD

A-1481

ADMINISTRATIVE ORDER OF THE
CHIEF ADMINISTRATIVE JUDGE OF THE COURTS

Pursuant to the authority vested in me, I hereby order and direct that petitions in eviction proceedings involving property pursuant to Article 7 of the Real Property Actions and Proceedings Law (RPAPL) and in foreclosure proceedings shall no longer require an accompanying attorney affirmation or petitioner's affidavit, as previously required pursuant to Administrative Orders AO/127/20 and AO/131/20. AO/127/20 and AO/131/20 are modified to this extent only, and shall otherwise continue in full force and effect, including but not limited to the continued requirement of service of a Notice to Respondent Tenant or Notice to Respondent as described in those orders.

This order shall take effect immediately, and shall remain in effect until further order.

_____
Chief Administrative Judge of the Courts

Dated: July 7, 2020

AO/143/20

A-1482

# EXHIBIT EE

LAWS OF NEW YORK, 2020

CHAPTER 112

AN ACT to amend the banking law, in relation to the forbearance of resi-
    dential mortgage payments

    Became a law June 17, 2020, with the approval of the Governor.
        Passed by a majority vote, three-fifths being present.

    The People of the State of New York, represented in Senate and Assem-
bly, do enact as follows:

    Section 1. The banking law is amended by adding a new section 9-x to
read as follows:
        § 9-x. Mortgage forbearance. 1. As used in this section, the following
terms shall have the following meanings:
        (a) "Covered period" means March 7, 2020 until the date on which none
of the provisions that closed or otherwise restricted public or private
businesses or places of public accommodation, or required postponement
or cancellation of all non-essential gatherings of individuals of any
size for any reason in Executive Orders 202.3, 202.4, 202.5, 202.6,
202.7, 202.8, 202.10, 202.11, 202.13 or 202.14, as extended by Executive
Orders 202.28 and 202.31 and as further extended by any future Executive
Order, issued in response to the COVID-19 pandemic continue to apply in
the county of the qualified mortgagor's residence;
        (b) "qualified mortgagor" means an individual who resides in New York
whose principal dwelling is encumbered by a home loan pursuant to para-
graph (a) of subdivision six of section thirteen hundred four of the
real property actions and proceedings law or whose principal dwelling is
a co-operative unit whose shares are encumbered by any loan otherwise
meeting the requirements of a home loan under paragraph (a) of subdivi-
sion six of section thirteen hundred four of the real property actions
and proceedings law, from or serviced by a regulated institution;
        (c) "regulated institution" means any New York regulated banking
organization as defined in this chapter and any New York regulated mort-
gage servicer entity subject to supervision by the department; and
        (d) "trial period plan" means an agreement whereby the mortgagor is
required to make trial payments in full and on-time in order to be
considered for a permanent loan modification.
        2. Notwithstanding any other provision of law, New York regulated
institutions shall:
        (a) make applications for forbearance of any payment due on a residen-
tial mortgage of a property located in New York widely available to any
qualified mortgagor who, during the covered period, is in arrears or on
a trial period plan, or who has applied for loss mitigation and demon-
strates financial hardship during the covered period; and
        (b) grant such forbearance for a period of one hundred eighty days to
any such qualified mortgagor who is in arrears or on a trial period
plan, or who has applied for loss mitigation and demonstrates financial
hardship, with the option to extend an additional one hundred eighty
days.

EXPLANATION--Matter in _italics_ is new; matter in brackets [—] is old law
                    to be omitted.

A-1484

CHAP. 112                                         2

(c) Such forbearance may be backdated to March seventh, two thousand twenty.

3. Notwithstanding any other provision of law, any mortgage forbearance granted by a regulated institution pursuant to executive order number 202.9 of two thousand twenty, this section, or any other law, rule or regulation to the qualified mortgagor as a result of financial hardship during the covered period shall be subject to the following provisions:

(a) the mortgagor shall have the option to extend the term of the loan for the length of the period of forbearance. The regulated institution shall waive interest on the principal for the term of the forbearance and waive any late fees accumulated as a result of the forbearance; or

(b) the mortgagor shall have the option to have the arrears accumulated during the forbearance period payable on a monthly basis for the remaining term of the loan without being subject to penalties or late fees incurred as a result of the forbearance; or

(c) if the mortgagor is unable to make mortgage payments due to mortgagors' demonstrated hardship and the mortgagor and regulated institution cannot agree on a mutually acceptable loan modification, the mortgagor shall have the option to defer arrears accumulated during the forbearance period as a non-interest bearing balloon payment payable at the maturity of the loan consistent with the safety and soundness of such regulated institution, or at the time the loan is satisfied through a refinance or sale of the property. Any late fees accumulated as a result of the forbearance shall be waived.

(d) The exercising of options provided for in paragraph (a), (b) or (c) of this subdivision by a qualified mortgagor shall not be reported negatively to any credit bureau by any regulated institution.

4. Notwithstanding any other provision of law, adherence with this section shall be a condition precedent to commencing a foreclosure action stemming from missed payments which would have otherwise been subject to this section. A defendant may raise the violation of this section as a defense to a foreclosure action commenced on the defendant's property when such action is based on missed payments that would have otherwise been subject to this section.

5. Notwithstanding anything to the contrary in this section, this section shall not apply to, and does not affect any mortgage loans made, insured, or securitized by any agency or instrumentality of the United States, any government sponsored enterprise, or a federal home loan bank, or the rights and obligations of any lender, issuer, servicer or trustee of such obligations, including servicers for the Government National Mortgage Association.

§ 2. This act shall take effect immediately.

The Legislature of the STATE OF NEW YORK ss:
    Pursuant to the authority vested in us by section 70-b of the Public Officers Law, we hereby jointly certify that this slip copy of this session law was printed under our direction and, in accordance with such section, is entitled to be read into evidence.

    ANDREA STEWART-COUSINS                    CARL E. HEASTIE
Temporary President of the Senate        Speaker of the Assembly

A-1485

LAWS OF NEW YORK, 2020

CHAPTER 126

AN ACT to amend a chapter of the laws of 2020 amending the local finance law relating to bond anticipation notes issued in calendar years 2015 through 2021, as proposed in legislative bills numbers S. 8417 and A. 10492, in relation to expenditures and temporary transfer of reserve funds for expenses related to state disaster emergency declared pursuant to executive order 202 of 2020 and authorizing the extension of repayment of inter-fund advances made for expenses related to state disaster emergency declared pursuant to executive order 202 of 2020 (Part A); to amend the public service law, in relation to issuing a moratorium on utility termination of services during periods of pandemics and/or state of emergencies; and to amend a chapter of the laws of 2020 amending the public service law, relating to issuing a moratorium on utility termination of services during periods of pandemics and/or state of emergencies, as proposed in legislative bills numbers S.8113-A and A.10521, in relation to the effectiveness thereof (Part B); to amend the banking law, in relation to the forbearance of residential mortgage payments (Part C); and to amend the criminal procedure law, in relation to hearings conducted on a felony complaint during a state disaster emergency (Part D)

Became a law June 17, 2020, with the approval of the Governor. Passed on message of necessity pursuant to Article III, section 14 of the Constitution by a majority vote, three-fifths being present.

   **The People of the State of New York, represented in Senate and Assembly, do enact as follows:**

   Section 1. This act enacts into law legislation providing for important provisions relating to a state disaster emergency. Each component is wholly contained within a Part identified as Parts A through D. The effective date for each particular provision contained within such Part is set forth in the last section of such Part. Any provision in any section contained within a Part, including the effective date of the Part, which makes reference to a section "of this act", when used in connection with that particular component, shall be deemed to mean and refer to the corresponding section of the Part in which it is found. Section three of this act sets forth the general effective date of this act.

PART A

   Section 1. The title of a chapter of the laws of 2020 amending the local finance law relating to bond anticipation notes issued in calendar years 2015 through 2021, as proposed in legislative bills number S. 8417 and A. 10492, is amended to read as follows:
   to amend the local finance law, in relation to bond anticipation notes issued in calendar years 2015 through 2021; to authorize the expenditure and temporary transfer of reserve funds for expenses related to [COVID-19] the state disaster emergency declared pursuant to executive order

EXPLANATION--Matter in _italics_ is new; matter in brackets [—] is old law
to be omitted.

Case 20-4238, Document 39, 02/11/2021, 3035088, Page115 of 271

A-1486

CHAP. 126                              2

202 of 2020; and to authorize the extension of repayment  of  inter-fund
advances  made  for  expenses  related  to [COVID-19] the state disaster
emergency declared pursuant to executive order 202 of 2020

§ 2.  Section  2  of a chapter of the laws of 2020 amending the local
finance law relating to bond anticipation notes issued in calendar years
2015 through 2021, as proposed in legislative bills numbers S. 8417  and
A. 10492, is amended to read as follows:

§ 2.  Notwithstanding  any  provision  of  sections 6-c or 6-g of the
general municipal law or section  3651  of  the  education  law  to  the
contrary,  the  governing  board  of a town, village, county, city, water
improvement district,  sewer  improvement  district,  fire  district  or
school  district,  by resolution which shall not be subject to referendum
requirements, may authorize expenditures from capital reserve funds  for
capital  costs  attributable  to  the [COVID-19 pandemic] state disaster
emergency declared pursuant to executive order 202 of 2020.

§ 3. Section 3 of a chapter of the laws of 2020  amending  the  local
finance law relating to bond anticipation notes issued in calendar years
2015  through 2021, as proposed in legislative bills numbers S. 8417 and
A. 10492, is amended to read as follows:

§ 3. Notwithstanding any provision of the general municipal  law,  the
town  law or the education law to the contrary, the governing board of a
town, village, county, city, water improvement district, sewer  improve-
ment  district,  fire  district  or school district, by resolution which
shall not be subject to referendum requirements, if any, may  authorize
the  temporary  transfer of moneys from reserve funds to pay for operating
costs  attributable to the state disaster emergency declared pursuant to
executive order 202 of 2020 or other costs attributable to the [COVID-19
pandemic] state disaster emergency declared pursuant to executive  order
202  of  2020, provided, that the reserve fund from which the funds were
temporarily transferred shall be reimbursed from the fund to  which  the
transfer  was  made  over  a  period of not more than five fiscal years,
starting with the fiscal year following the transfer.  At  least  twenty
percent  of  the moneys temporarily transferred shall be reimbursed each
fiscal year. Such reimbursement  shall  include  an  additional  amount
reasonably  estimated to be the amount that would have been earned on the
investment of the transferred moneys had they been retained in the capi-
tal reserve fund.

§ 4.  Section  4  of a chapter of the laws of 2020 amending the local
finance law relating to bond anticipation notes issued in calendar years
2015 through 2021, as proposed in legislative bills numbers S. 8417  and
A. 10492, is amended to read as follows:

§ 4. Notwithstanding the provisions of subdivision 3 of section 9-a of
the  general municipal law, for inter-fund advances made pursuant to such
subdivision  for  costs  attributable  to  the [COVID-19 pandemic] state
disaster emergency declared pursuant to executive  order  202  of  2020,
repayment  of  moneys to the fund from which they were advanced shall be
made by close of the fiscal year next  succeeding  the  fiscal  year  in
which such advance was made.

§ 5.  This  act  shall  take  effect on the same date and in the same
manner as a chapter of the laws of 2020 amending the local  finance  law
relating  to  bond  anticipation  notes  issued  in  calendar years 2015
through 2021, as proposed in legislative bills numbers S.  8417  and  A.
10492, takes effect.

PART B

Section 1. Subdivisions 9, 10 and 12 of section 91 of the public service law, as added by a chapter of the laws of 2020 amending the public service law, relating to issuing a moratorium on utility termination of services during periods of pandemics and/or state of emergencies, as proposed in legislative bills numbers S.8113-A and A.10521, are amended to read as follows:

9. No telephone corporation shall terminate or disconnect a residential service customer for the non-payment of an overdue charge for the duration of the state disaster emergency declared pursuant to executive order two hundred two of two thousand twenty (hereinafter "the COVID-19 state of emergency"). Telephone corporations shall have a duty to restore service, to the extent not already required under this chapter, [~~to~~] at the request of any residential customer within forty-eight hours if such service has been terminated during the pendency of the COVID-19 state of emergency and disconnection of such service was due to non-payment of an overdue charge.

10. [~~After~~] For a period of one hundred eighty days after the COVID-19 state of emergency is lifted or expires, no telephone corporation shall terminate or disconnect the service of a residential customer account because of defaulted deferred payment agreements or arrears then owed to the telephone corporation when such customer has experienced a change in financial circumstances due to the COVID-19 state of emergency, as defined by the department. The telephone corporation shall provide such residential customer with the right to enter into, or restructure, a deferred payment agreement without the requirement of a down payment, late fees, or penalties[~~, as such is provided for in article two of this chapter~~].

12. Implementation of the provisions of this section shall not prohibit a telephone corporation from recovering lost or deferred revenues after the lifting or expiration of the COVID-19 state of emergency, pursuant to such means for recovery as are provided for in this chapter, and by means not inconsistent with any of the provisions of this article. Nothing in this section shall prohibit a telephone corporation from disconnecting service at the request of a customer. Nothing in this section shall prohibit a telephone corporation from disconnecting service when it is necessary to protect the health and safety of customers and the public.

§ 2. Section 5 of a chapter of the laws of 2020 amending the public service law, relating to issuing a moratorium on utility termination of services during periods of pandemics and/or state of emergencies, as proposed in legislative bills numbers S.8113-A and A.10521, is amended to read as follows:

§ 5. This act shall take effect immediately and shall expire March 31, 2021 when upon such date the provisions of this act shall be deemed repealed.

§ 3. This act shall take effect on the same date and in the same manner as a chapter of the laws of 2020 amending the public service law, relating to issuing a moratorium on utility termination of services during periods of pandemics and/or state of emergencies, as proposed in legislative bills numbers S.8113-A and A.10521, takes effect; provided however, that the amendments to subdivisions 9, 10 and 12 of section 91 of the public service law made by section one of this act shall not affect the repeal of such subdivisions and shall be deemed to be repealed therewith.

PART C

Section 1. Section 9-x of the banking law, as added by  a  chapter  of the  laws  of 2020, amending the banking law relating to the forbearance of residential mortgage payments,  as  proposed  in  legislative  bills numbers S. 8243-C and A. 10351-B, is amended to read as follows:

§ 9-x. Mortgage forbearance. 1. As used in this section, the following terms shall have the following meanings:

(a)  "Covered period" means March 7, 2020 until the date on which none of the provisions that closed or otherwise restricted public or  private businesses  or  places of public accommodation, or required postponement or cancellation of all non-essential gatherings of  individuals  of  any size  for  any  reason  in  Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13 or 202.14, as extended by Executive Orders 202.28 and 202.31 and as further extended by any future Executive Order, issued in response to the COVID-19 pandemic continue to apply  in the county of the qualified mortgagor's residence;

(b)  "qualified  mortgagor"  means  an  individual [who resides in New York] (i) whose [principal dwelling] primary residence is located in New York and is encumbered by a home  loan  pursuant  to  paragraph  (a)  of subdivision  six  of  section thirteen hundred four of the real property actions and proceedings law or whose [principal dwelling] primary  residence is located in New York and is a co-operative unit whose shares are encumbered by any loan otherwise meeting the requirements of a home loan under  paragraph (a) of subdivision six of section thirteen hundred four of the real property actions and proceedings law, from or serviced by  a regulated institution; and (ii) who demonstrates financial hardship as a result of COVID-19 during the covered period;

(c)  "regulated institution"  means  any  New  York regulated banking organization as defined in this chapter and any New York regulated mortgage servicer entity subject to supervision by the department; and

(d) "trial period plan" means an agreement whereby  the  mortgagor  is required  to  make  trial  payments  in  full and on-time in order to be considered for a permanent loan modification.

2. Notwithstanding any other provision  of  law,  New  York  regulated institutions shall:

(a)  make applications for forbearance of any payment due on a residential  mortgage of a property located in New York widely available to any qualified mortgagor who, during the covered period, is in arrears or  on a  trial period plan, or who has applied for loss mitigation [and demonstrates financial hardship during the covered period]; and

(b) grant such forbearance of all monthly payments due with respect to the mortgage secured by the qualified mortgagor's primary  residence  in New York for a period of up to one hundred eighty days to any such qualified mortgagor [who is in arrears or on a trial period plan, or who has applied  for  loss mitigation and demonstrates financial hardship], with the option to extend the forbearance of such monthly payments for up  to an  additional  one  hundred eighty days provided that this extension is subject to the mortgagor demonstrating continued financial hardship.  If any qualified mortgagor has already received a forbearance  pursuant  to executive  order 202.9 of two thousand twenty, the time of such forbearance shall be considered as part of the requirement of this  section  to provide  a  forbearance of up to one hundred eighty days, and any extension thereof pursuant to this section.

(c) Such forbearance may be backdated to March seventh,  two  thousand twenty,  provided  that  the maximum length of the forbearance may be no longer than one hundred eighty days and any extension  thereof  pursuant to this section.

5                                                          CHAP. 126

3. Notwithstanding any other provision of law, any mortgage forbear-
ance granted by a regulated institution pursuant to executive order
number 202.9 of two thousand twenty, this section, or [~~any other law,
rule or regulation to the~~] 3 NYCRR Part 119 to a qualified mortgagor as
a result of financial hardship [~~during the covered period~~] shall be
subject to the following provisions:

(a) the mortgagor shall have the option to extend the term of the loan
for the length of the period of forbearance. The regulated institution
shall [~~waive interest on the principal for the term of the forbearance
and waive any late fees accumulated as a result of the forbearance~~] not
charge additional interest or any late fees or penalties on the forborne
payment; or

(b) the mortgagor shall have the option to have the arrears accumu-
lated during the forbearance period payable on a monthly basis for the
remaining term of the loan without being subject to penalties or late
fees incurred as a result of the forbearance; or

(c) the mortgagor shall have the option to negotiate a loan modifica-
tion or any other option that meets the changed circumstances of the
qualified mortgagor; or

(d) if [~~the mortgagor is unable to make mortgage payments due to mort-
gagors' demonstrated hardship and~~] the mortgagor and regulated institu-
tion cannot reasonably agree on a mutually acceptable loan modification,
the [~~mortgagor~~] regulated institution shall [~~have the option~~] offer to
defer arrears accumulated during the forbearance period as a non-inter-
est bearing balloon [~~payment~~] loan payable at the maturity of the loan
[~~consistent with the safety and soundness of such regulated institu-
tion~~], or at the time the loan is satisfied through a refinance or sale
of the property. Any late fees accumulated as a result of the forbear-
ance shall be waived.

[~~(d)~~] (e) The exercising of options provided for in paragraph (a), (b)
[~~or~~], (c) or (d) of this subdivision by a qualified mortgagor shall not
be reported negatively to any credit bureau by any regulated institu-
tion.

4. Notwithstanding any other provision of law, adherence with this
section shall be a condition precedent to commencing a foreclosure
action stemming from missed payments which would have otherwise been
subject to this section. A defendant may raise the violation of this
section as a defense to a foreclosure action commenced on the defend-
ant's property when such action is based on missed payments that would
have otherwise been subject to this section.

5. Notwithstanding anything to the contrary in this section, this
section shall not apply to, and does not affect any mortgage loans made,
insured, purchased or securitized by any agency or instrumentality of
the United States, any government sponsored enterprise, or a federal
home loan bank, or a corporate governmental agency of the state consti-
tuted as a political subdivision and public benefit corporation, or the
rights and obligations of any lender, issuer, servicer or trustee of
such obligations, including servicers for the Government National Mort-
gage Association.

6. Notwithstanding any other provision of law or of this section, the
obligation to grant the forbearance relief required by this section
shall be subject to the regulated institution having sufficient capital
and liquidity to meet its obligations and to operate in a safe and sound
manner. Any regulated institution that determines that it is not able to
offer relief pursuant to this section to any qualified mortgagor must
notify the department within five business days of making such determi-

nation. Any such notice filed with the department shall include informa-
tion about the qualified mortgagor, the reason the regulated institution
determined that it was unable to offer any relief pursuant to this
section, information about the regulated institution's financial condi-
tion supporting the regulated institution's determination, and any other
information required by the department. At the same time that the regu-
lated institution provides notice to the department, it shall advise the
qualified mortgagor that the application for relief was denied and
provide a statement that the applicant may file a complaint with the New
York state department of financial services at 1-800-342-3736 or
http://www.dfs.ny.gov if the applicant believes the application was
wrongly denied.
  § 2. This act shall take effect on the same date and in the same
manner as a chapter of the laws of 2020, amending the banking law relat-
ing to the forbearance of residential mortgage payments, as proposed in
legislative bills numbers S. 8243-C and A. 10351-B, takes effect.


                                 PART D

  Section 1. Section 180.65 of the criminal procedure law, as added by a
chapter of the laws of 2020, amending the criminal procedure law relat-
ing to conducting hearings on a felony complaint during a state disaster
emergency, as proposed in legislative bills numbers S. 8414 and A.
10493, is amended to read as follows:
  § 180.65 Hearing upon felony complaint; emergency provision during
           disaster emergency.
  During the period of the COVID-19 state disaster emergency, as
declared pursuant to executive order number two hundred two of two thou-
sand twenty and extensions thereof and article two-B of the executive
law, the following additional provisions shall apply to the conduct of a
hearing on a felony complaint pursuant to this article:
  1. The appearance of any party and any witness at such hearing may be
by electronic appearance through an independent audio-visual system, as
such terms are defined in section 182.10 of this title, where the court
finds upon its own motion after hearing from the parties and any such
witness, either in person or by electronic appearance, that due to the
person's circumstances and such disaster emergency a personal appearance
by such party or witness would be an unreasonable hardship to such
person or witness or create an unreasonable health risk to the public,
court staff or anyone else involved in the proceeding.
  2. At any such hearing on the felony complaint, the judge must be able
to hear and see the image of each witness clearly [though] through the
independent audio-visual system and such sound and visual image shall be
similar to the sound and image the judge would hear and see if the
witness were present together with the judge testifying in the court-
room. Documents, photographs and the like offered at the hearing may be
exchanged among the parties by electronic means. A stenographic tran-
scription or appropriate audio recording of the proceedings shall be
maintained, and the live testimony received by electronic appearance,
and other electronic appearances where practicable, shall be video
recorded by the court, and a copy provided to the people and the
defense.
  3. The authority for an electronic appearance pursuant to this section
shall be considered sufficient means to enable the court to conduct a
hearing on a felony complaint within the meaning of section 180.80 of
this article.

7                          CHAP. 126

§ 2. This act shall take effect on the same date and in the same manner as a chapter of the laws of 2020, amending the criminal procedure law relating to conducting hearings on a felony complaint during a state disaster emergency, as proposed in legislative bills numbers S. 8414 and A. 10493, takes effect, provided, however, that the amendments made to section 180.65 of the criminal procedure law made by section one of this act shall not affect the repeal of such section and shall be deemed repealed therewith.

§ 2. Severability clause. If any clause, sentence, paragraph, subdivision, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgment shall have been rendered. It is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions had not been included herein.

§ 3. This act shall take effect immediately provided, however, that the applicable effective date of Parts A through D of this act shall be as specifically set forth in the last section of such Parts.

The Legislature of the STATE OF NEW YORK ss:

Pursuant to the authority vested in us by section 70-b of the Public Officers Law, we hereby jointly certify that this slip copy of this session law was printed under our direction and, in accordance with such section, is entitled to be read into evidence.

ANDREA STEWART-COUSINS                 CARL E. HEASTIE
Temporary President of the Senate      Speaker of the Assembly

A-1492

# EXHIBIT FF

**S 8419**  KAVANAGH   Same as A 10522  Rules (Cymbrowitz)
ON FILE: 05/25/20 Housing
TITLE....Enacts the "emergency rent relief act of 2020" to establish an interim residential rent relief program

| 05/25/20 | REFERRED TO HOUSING, CONSTRUCTION AND COMMUNITY DEVELOPMENT |
| 05/26/20 | REPORTED AND COMMITTED TO FINANCE |
| 05/26/20 | REPORTED AND COMMITTED TO RULES |
| 05/27/20 | ORDERED TO THIRD READING CAL.670 |
| 05/28/20 | PASSED SENATE |
| 05/28/20 | DELIVERED TO ASSEMBLY |
| 05/28/20 | referred to ways and means |
| 05/28/20 | substituted for a10522 |
| 05/28/20 | ordered to third reading rules cal.58 |
| 05/28/20 | passed assembly |
| 05/28/20 | returned to senate |
| 06/05/20 | DELIVERED TO GOVERNOR |
| 06/17/20 | SIGNED CHAP.125 |

**A10522** Rules (Cymbrowitz)   Same as S 8419  KAVANAGH
Housing
TITLE....Enacts the "emergency rent relief act of 2020" to establish an interim residential rent relief program

| 05/25/20 | referred to housing |
| 05/28/20 | reference changed to ways and means |
| 05/28/20 | reported referred to rules |
| 05/28/20 | reported |
| 05/28/20 | rules report cal.58 |
| 05/28/20 | ordered to third reading rules cal.58 |
| 05/28/20 | ruling of chair on point of order |
| 05/28/20 | substituted by s8419 |
| **S08419** | **KAVANAGH** |
| 05/25/20 | REFERRED TO HOUSING, CONSTRUCTION AND COMMUNITY DEVELOPMENT |
| 05/26/20 | REPORTED AND COMMITTED TO FINANCE |
| 05/26/20 | REPORTED AND COMMITTED TO RULES |
| 05/27/20 | ORDERED TO THIRD READING CAL.670 |
| 05/28/20 | PASSED SENATE |
| 05/28/20 | DELIVERED TO ASSEMBLY |
| 05/28/20 | referred to ways and means |
| 05/28/20 | substituted for a10522 |
| 05/28/20 | ordered to third reading rules cal.58 |
| 05/28/20 | passed assembly |
| 05/28/20 | returned to senate |
| 06/05/20 | DELIVERED TO GOVERNOR |
| 06/17/20 | SIGNED CHAP.125 |

KAVANAGH, COMRIE, HOYLMAN, KAPLAN, MONTGOMERY, RIVERA
Enacts the "emergency rent relief act of 2020" to establish an interim residential rent relief program.
EFF. DATE 06/17/2020 (SEE TABLE)

**Same-As History:**

| Bill Version | Same-As Bill |
|---|---|
| S 8419 | A 10522 |
| **Current Same-As** | |
| S 8419 | A10522 |

05/28/20  S8419  Assembly Vote  Yes: 133  No : 10

05/28/20  S8419  Senate Vote  Aye: 61  Nay: 0

Go to Top of Page

**Floor Votes:**

05/28/20  S8419   Assembly Vote  Yes: 133  No : 10

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Yes | Abbate | Yes | Abinanti | ER | Arroyo | Yes | Ashby |
| Yes | Aubry | Yes | Barclay | Yes | Barnwell | Yes | Barrett |
| No | Barron | Yes | Benedetto | Yes | Bichotte | Yes | Blake |
| Yes | Blankenbush | Yes | Brabenec | Yes | Braunstein | Yes | Bronson |
| Yes | Buchwald | Yes | Burke | Yes | Buttenschon | Yes | Byrne |
| Yes | Byrnes | Yes | Cahill | Yes | Carroll | Yes | Colton |
| Yes | Cook | Yes | Crespo | Yes | Crouch | Yes | Cruz |
| Yes | Cusick | Yes | Cymbrowitz | Yes | Darling | Yes | Davila |
| No | De La Rosa | Yes | DenDekker | Yes | DeStefano | Yes | Dickens |
| Yes | Dilan | Yes | Dinowitz | No | DiPietro | Yes | D'Urso |
| Yes | Eichenstein | Yes | Englebright | No | Epstein | Yes | Fahy |
| Yes | Fall | Yes | Fernandez | ER | Finch | Yes | Fitzpatrick |
| Yes | Friend | Yes | Frontus | Yes | Galef | ER | Gantt |
| Yes | Garbarino | Yes | Giglio | Yes | Glick | Yes | Goodell |
| Yes | Gottfried | Yes | Griffin | Yes | Gunther A | Yes | Hawley |
| Yes | Hevesi | Yes | Hunter | Yes | Hyndman | Yes | Jacobson |
| Yes | Jaffee | Yes | Jean-Pierre | Yes | Johns | Yes | Jones |
| Yes | Joyner | No | Kim | Yes | Kolb | Yes | Lalor |
| Yes | Lavine | Yes | Lawrence | No | Lentol | Yes | Lifton |
| Yes | LiPetri | Yes | Lupardo | Yes | Magnarelli | Yes | Malliotakis |
| Yes | Manktelow | Yes | McDonald | Yes | McDonough | Yes | McMahon |
| Yes | Mikulin | Yes | Miller B | Yes | Miller MG | Yes | Miller ML |
| Yes | Montesano | Yes | Morinello | Yes | Mosley | No | Niou |
| Yes | Nolan | Yes | Norris | Yes | O'Donnell | Yes | Ortiz |
| Yes | Otis | Yes | Palmesano | Yes | Palumbo | Yes | Paulin |
| Yes | Peoples-Stokes | Yes | Perry | Yes | Pheffer Amato | Yes | Pichardo |
| Yes | Pretlow | Yes | Quart | Yes | Ra | Yes | Ramos |
| Yes | Reilly | No | Reyes | Yes | Richardson | Yes | Rivera |
| Yes | Rodriguez | Yes | Rosenthal D | No | Rosenthal L | Yes | Rozic |
| Yes | Ryan | Yes | Salka | Yes | Santabarbara | Yes | Sayegh |
| ER | Schimminger | Yes | Schmitt | Yes | Seawright | Yes | Simon |
| No | Simotas | Yes | Smith | Yes | Smullen | Yes | Solages |
| Yes | Stec | Yes | Steck | Yes | Stern | Yes | Stirpe |
| Yes | Tague | Yes | Taylor | Yes | Thiele | Yes | Vanel |
| Yes | Walczyk | Yes | Walker | Yes | Wallace | Yes | Walsh |
| Yes | Weinstein | Yes | Weprin | Yes | Williams | Yes | Woerner |
| Yes | Wright | Yes | Zebrowski K | Yes | Mr. Speaker | | |

Go to Top of Page

**Floor Votes:**

05/28/20  S8419   Senate Vote  Aye: 61  Nay: 0

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Aye | Addabbo | Aye | Akshar | Aye | Amedore | Aye | Bailey |

A-1495

| Aye | Benjamin | Aye | Biaggi | Aye | Borrello | Aye | Boyle |
|---|---|---|---|---|---|---|---|
| Aye | Breslin | Aye | Brooks | Aye | Carlucci | Aye | Comrie |
| Aye | Felder | Aye | Flanagan | Aye | Funke | Aye | Gallivan |
| Aye | Gaughran | Aye | Gianaris | Aye | Gounardes | Aye | Griffo |
| Aye | Harckham | Aye | Helming | Aye | Hoylman | Aye | Jackson |
| Aye | Jacobs | Aye | Jordan | Aye | Kaminsky | Aye | Kaplan |
| Aye | Kavanagh | Aye | Kennedy | Aye | Krueger | Aye | Lanza |
| Aye | LaValle | Aye | Little | Aye | Liu | Aye | Martinez |
| Aye | May | Aye | Mayer | Aye | Metzger | Aye | Montgomery |
| Aye | Myrie | Aye | O'Mara | Aye | Ortt | Aye | Parker |
| Aye | Persaud | Aye | Ramos | Aye | Ranzenhofer | Exc | Ritchie |
| Aye | Rivera | Aye | Robach | Aye | Salazar | Aye | Sanders |
| Aye | Savino | Aye | Sepulveda | Aye | Serino | Aye | Serrano |
| Aye | Seward | Aye | Skoufis | Aye | Stavisky | Aye | Stewart-Cousins |
| Aye | Tedisco | Aye | Thomas | | | | |



**2019 - 2020 Bill Add/Edit**                              Add Alert

| Bill No. | S08419 | Query | Save | Delete | Clear | Next | Prev |
|---|---|---|---|---|---|---|---|

**Sponsor**    KAVANAGH
**Title**    Enacts the "emergency rent relief act of 2020" to establish an interim residential rent relief program
**Last Action**    06/17/20 SIGNED CHAP.125

Choose A File/Drawer To Add This Bill    ☑ Add/Edit Same as A10522    ☐ Hide from Reports

**NO DATA QUALIFIED**

Position

No Position

Priority    Extra Field 1    Extra Field 2    Staff

Comment

Notes    ⬇ DATE STAMP

3/8

LAWS OF NEW YORK, 2020

CHAPTER 125

AN ACT in relation to enacting the "emergency rent relief act of 2020"
   to establish an interim residential rent relief program; and to
   provide for the repeal of such provisions upon expiration thereof

      Became a law June 17, 2020, with the approval of the Governor.
            Passed by a majority vote, three-fifths being present.

   The People of the State of New York, represented in Senate and Assem-
bly, do enact as follows:

   Section 1. Short title. This act shall be known and may be cited as
the "emergency rent relief act of 2020".
   § 2. 1. For the purposes of this act:
   a. "Coverage period" shall mean April 1, 2020 through July 31, 2020.
   b. "Eligible household" shall mean a household (i) with an income
below 80 percent of the area median income, as adjusted for family size,
both prior to March 7, 2020 and at the time of application; (ii) with a
rent burden both prior to March 7, 2020 and at the time of application;
and (iii) has lost income during the coverage period.
   c. "Income" shall mean income from all sources of each member of the
household, including all wages, tips, overtime, salary, recurring gifts,
returns on investments, welfare assistance, social security payments,
child support payments, unemployment benefits, any benefit, payment or
cash grant whose purpose is to assist with rental payments, any payments
whose purpose is to replace lost income, and any other government bene-
fit or cash grant. The term "income" shall not include:  employment
income from children under eighteen years of age, employment income from
children eighteen years of age or older who are full-time students,
foster care payments, sporadic gifts, groceries provided by persons not
living in the household, supplemental nutrition assistance program bene-
fits, earned income disallowance, or the earned income tax credit.
   d. "Fair market rent" shall mean the fair market rent for each rental
area as promulgated annually by the United States department of housing
and urban development's office of policy development and research pursu-
ant to 42 USC 1437f.
   e. "Rent burden" shall mean the amount of a contract monthly rent
which is more than 30 percent of the household income.
   2. The commissioner of housing and community renewal is hereby author-
ized and directed to establish and implement an interim residential rent
relief program to support households impacted by the COVID-19 pandemic.
   3. Such program shall be provided up to $100,000,000 of monies that
have been allocated to the state of New York by the federal Coronavirus
Aid, Relief, and Economic Security (CARES) Act of 2020 (P.L. 116-136)
that have not otherwise been obligated, to provide rental assistance to
eligible households for their primary residence in the state of New
York.
   4. A rental subsidy shall be provided in the form of a voucher to be
provided directly to the owner of the dwelling unit for applicants
determined to be eligible households during the coverage period in an

EXPLANATION--Matter in _italics_ is new; matter in brackets [-] is old law
                  to be omitted.

Case 20-4238, Document 39, 02/11/2021, 3035088, Page126 of 271

A-1497

CHAP. 125                                    2

amount equal to the difference between the applicant's  rent  burden  on
March  1,  2020 and their rent burden during the month or months assist-
ance is requested for.  Such subsidy shall be limited to 125 percent  of
the fair market rent.

  5.  Applicants  shall not be expected or required to repay any assist-
ance granted through this program  unless  otherwise  required  by  law.
Assistance  shall  not be considered income for purposes of public bene-
fits or other public assistance. There shall be no requirement on appli-
cants  to  seek  assistance  from  other  sources,  including  charitable
contributions, for eligibility.

  6.  The commissioner of housing and community renewal may delegate the
administration of portions of this program to any state,  county,  city,
town,  or public housing agency or any non-profit organization as neces-
sary to implement such program.

  7. The commissioner of housing and  community renewal  shall  establish
preferences  prioritizing  households  with  the  greatest  economic  and
social need in processing applications for this  program.  Such  prefer-
ences shall account for, at a minimum:

  a.  the historical income level of the household as it relates to area
median income;

  b. the rent burden of the household;

  c. the percentage income lost for the household; and

  d. the risk of homelessness or eviction.

  8.  The commissioner of housing and  community  renewal  shall,  on  or
before, October thirty-first two thousand twenty submit and make public-
ly  available  a  report to the governor, the temporary president of the
senate, the speaker of the assembly, and on its website, on the  monthly
expenditures  made  pursuant to this act including recipient demographic
data, regional data, and details on subsidy values.

  § 3. This act shall take effect immediately and shall expire July  31,
2021,  when  upon  such  date the provisions of this act shall be deemed
repealed.


The Legislature of the STATE OF NEW YORK ss:

  Pursuant to the authority vested in us by section 70-b of  the  Public
Officers  Law,  we  hereby  jointly  certify that this slip copy of this
session law was printed under our direction and, in accordance with such
section, is entitled to be read into evidence.


    ANDREA STEWART-COUSINS                      CARL E. HEASTIE
Temporary President of the Senate          Speaker of the Assembly

Case 20-4238, Document 39, 02/11/2021, 3035088, Page127 of 271

A-1498

**NEW YORK STATE SENATE**
**INTRODUCER'S MEMORANDUM IN SUPPORT**
**submitted in accordance with Senate Rule VI. Sec 1**

**BILL NUMBER:** S8419

**SPONSOR:** KAVANAGH

**TITLE OF BILL**:

An act in relation to enacting the "emergency rent relief act of 2020" to establish an interim residential rent relief program; and to provide for the repeal of such provisions upon expiration thereof

**PURPOSE**:

To provide emergency rent relief to tenants who experienced an increase in rent burden because of a loss of income as a result of the COVOD-19 pandemic

**SUMMARY OF PROVISIONS**:

The Emergency Rent Relief Act of 2020 would provide rental assistance vouchers to landlords on behalf of tenants who experienced an increase in rent burden because of a loss of income as a result of the COVOD-19 pandemic through Homes and Community Renewal.  The spending cap is up to $100,000,000 for this program. The coverage period would be April 1 through July 31. A tenant has a rent burden if their rent is more than 30% of the household income.  Households would be eligible if they make up to 80% Area Median Income (AMI) prior to March 7 and at the time of application; have a rent burden both prior to March 7 and at the time of application, and they have lost income during the covered period.  The subsidy would be a voucher paid to the landlords for the gap between their pre-COVID rent burden and their new rent burden, up to 125% Fair Market Rent (FMR).

The commissioner is required to establish preferences prioritizing households with the greatest economic and social need and must, at mini-mum, account for historic income levels, the rent burden of the house-hold, the percentage of income lost, and the risk of homelessness or eviction.  The commissioner must also publicly report the monthly expenditures made under the program including demographic and regional data by October 31, 2020.

**EXISTING LAW**:

N/A

**JUSTIFICATION**:

The economic impact of the COVID-19 pandemic has left many tenants across the state with severe rent burdens. Tenants need help staying afloat and paying their rent immediately. This bill is necessary to provide some of that relief.

**LEGISLATIVE HISTORY**:

A-1499

new bill

**FISCAL IMPLICATIONS**:

$100,000,000

**LOCAL FISCAL IMPLICATIONS**:
n/a

**EFFECTIVE DATE**:
Immediately.

Unformatted text option not available for Chapter numbers

A-1501

# EXHIBIT GG

A-1502

LAWS OF NEW YORK, 2020

CHAPTER 127

AN ACT in relation to prohibiting the eviction of residential tenants who have suffered financial hardship during the COVID-19 covered period

Became a law June 30, 2020, with the approval of the Governor. Passed by a majority vote, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. For the purposes of this act, "COVID-19 covered period" means March 7, 2020 until the date on which none of the provisions that closed or otherwise restricted public or private businesses or places of public accommodation, or required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason in Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13 or 202.14, as extended by Executive Orders 202.28 and 202.31 and as further extended by any future Executive Order, issued in response to the COVID-19 pandemic continue to apply in the county of the tenant's or lawful occupant's residence.

§ 2. Notwithstanding any provision of law to the contrary:

1. No court shall issue a warrant of eviction or judgment of possession against a residential tenant or other lawful occupant that has suffered a financial hardship during the COVID-19 covered period for the non-payment of rent that accrues or becomes due during the COVID-19 covered period.

2. (a) A tenant or lawful occupant may raise financial hardship during the COVID-19 covered period as a defense in a summary proceeding under article 7 of the real property actions and proceedings law.

(b) In determining whether a tenant or lawful occupant suffered a financial hardship during the COVID-19 covered period, the court shall consider, among other relevant factors:

(i) the tenant's or lawful occupant's income prior to the COVID-19 covered period;

(ii) the tenant's or lawful occupant's income during the COVID-19 covered period;

(iii) the tenant's or lawful occupant's liquid assets; and

(iv) the tenant's or lawful occupant's eligibility for and receipt of cash assistance, supplemental nutrition assistance program, supplemental security income, the New York State disability program, the home energy assistance program, or unemployment insurance or benefits under state or federal law.

3. This act shall not prohibit any court from awarding a judgment for the rent due and owing to a successful petitioner in a summary proceeding under article 7 of the real property actions and proceedings law.

§ 3. This act shall take effect immediately.


EXPLANATION--Matter in *italics* is new; matter in brackets [-] is old law to be omitted.

Case 20-4238, Document 39, 02/11/2021, 3035088, Page132 of 271

A-1503

CHAP. 127                                    2

The Legislature of the STATE OF NEW YORK <u>ss:</u>
  Pursuant to the authority vested in us by section 70-b of  the  Public
Officers  Law,  we  hereby  jointly  certify that this slip copy of this
session law was printed under our direction and, in accordance with such
section, is entitled to be read into evidence.

     ANDREA STEWART-COUSINS                      CARL E. HEASTIE
<u>Temporary</u> <u>President</u> <u>of</u> <u>the</u> <u>Senate</u>          <u>Speaker</u> <u>of</u> <u>the</u> <u>Assembly</u>

A-1504

# EXHIBIT HH

A-1505

Int. No. 1914

By Council Members Adams, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Louis, Ayala, Levin, Lander and Koslowitz

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Paragraph 11 of subdivision a of section 22-902 of the administrative code of the city of New York, as added by local law number 185 for the year 2019, is amended to read as follows:

11. threatening a commercial tenant based on (i) such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence[,] or status as a victim of sex offenses or stalking, or (ii) the commercial tenant's status as a person or business impacted by COVID-19, or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

1

A-1506

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach their place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major supporter for a household because the head of the household died as a direct result of COVID-19;

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency; and

2

A-1507

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019 and February 2020;

§ 2. This local law takes effect immediately.

LS # 14764
4/20/20 4:37PM

3

A-1508

# EXHIBIT II

A-1509

Int. No. 1932

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin, Ayala, Levin, Lander and Koslowitz

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1004 to read as follows:

§ 22-1004. Personal liability provisions in commercial leases. a. Definitions. For the purposes of this section, the following terms have the following meanings:

COVID-19. The term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV.

COVID-19 period. The term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive.

COVID-19 state disaster emergency. The term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020.

Impacted by COVID-19. The term "impacted by COVID-19" means:

1

1. With respect to an individual, that the individual experienced one or more of the following situations:

(a) the individual was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

(b) a member of the individual's household was diagnosed with COVID-19;

(c) the individual was providing care for a family member or a member of the individual's household who was diagnosed with COVID-19;

(d) a member of the individual's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work;

(e) the individual was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(f) the individual was unable to reach their place of business because of the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(g) the individual became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(h) the individual's business closed as a direct result of the COVID-19 state disaster emergency.

2. With respect to a business, that (i) the business was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) the revenues of the business during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in

2

Case 20-4238, Document 39, 02/11/2021, 3035088, Page140 of 271

2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020.

Personal liability provision. The term "personal liability provision" means, with respect to a commercial lease or other rental agreement involving real property and to which a business is a party as tenant, a term that provides for an individual to become wholly or partially personally liable for an obligation of such business arising under such lease or agreement upon the occurrence of a default or other event.

b. No personal liability provision of a commercial lease or other rental agreement involving real property and to which a business impacted by COVID-19 is a party as tenant may be enforced against an individual where the default or other event allowing for such enforcement occurs during the COVID-19 period.

§ 2. Subdivision a of section 22-902 of the administrative code of the city of New York, as amended by local law number 185 for the year 2019, is amended to read as follows:

a. A landlord shall not engage in commercial tenant harassment. Except as provided in subdivision b of this section, commercial tenant harassment is any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following:

1. using force against or making express or implied threats that force will be used against a commercial tenant or such tenant's invitee;

2. causing repeated interruptions or discontinuances of one or more essential services;

3

3. causing an interruption or discontinuance of an essential service for an extended period of time;

4. causing an interruption or discontinuance of an essential service where such interruption or discontinuance substantially interferes with a commercial tenant's business;

5. repeatedly commencing frivolous court proceedings against a commercial tenant;

6. removing from a covered property any personal property belonging to a commercial tenant or such tenant's invitee;

7. removing the door at the entrance to a covered property occupied by a commercial tenant; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the commercial tenant occupying the covered property;

8. preventing a commercial tenant or such tenant's invitee from entering a covered property occupied by such tenant;

9. substantially interfering with a commercial tenant's business by commencing unnecessary construction or repairs on or near covered property; [or]

10. engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business;

11. threatening a commercial tenant based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking;

4

12. requesting identifying documentation that would disclose the citizenship status of a commercial tenant, an invitee of a commercial tenant or any person seeking entry to the covered property in order to patronize such commercial tenant; [or]

13. unreasonably refusing to cooperate with a tenant's permitted repairs or construction activities[.]; or

14. threatening to or implementing a personal liability provision that is not enforceable pursuant to section 22-1004 of the code; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

5

Case 20-4238, Document 39, 02/11/2021, 3035088, Page143 of 271

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach the person's place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach the person's place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency;

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020; and

(d) the term "personal liability provision" has the meaning set forth in section 22-1004 of the code;

§ 3. This local law takes effect immediately.

6

A-1515

LS # 14817
4/20/20 4:31PM

A-1516

# EXHIBIT JJ

A-1517

Int. No. 1936

By Council Member Torres and the Speaker (Council Member Johnson)

A Local Law to amend the administrative code of the city of New York, in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Subparagraph f-5 of paragraph 48 of subdivision a of section 27-2004 of the administrative code of the city of New York, as added by local law number 48 for the year 2018, is amended to read as follows:

f-5. threatening any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking, lawful source of income, status as an essential employee, status as a person impacted by COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-19 period or because children are, may be or would be residing in such dwelling unit, as such terms are defined in sections 8-102 and 8-107.1 of the code; provided that for the purposes of this subparagraph:

(1) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in

1

A-1518

section 4024 of the federal coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(2) the term "essential employee" means a person employed by or permitted to work at or for a business classified as an essential business by the New York state department of economic development in accordance with executive order number 202.6 as issued by the governor on March 18, 2020 and extended thereafter; and

(3) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(i) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(ii) a member of the person's household was diagnosed with COVID-19;

(iii) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

(iv) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(v) the person was unable to reach the person's place of employment because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

2

A-1519

(vi) the person was unable to reach the person's place of employment because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(vii) the person was scheduled to commence employment and did not have a job or was unable to reach the job as a direct result of the COVID-19 state disaster emergency;

(viii) the person became the breadwinner or major supporter for a household because the head of the household died as a direct result of COVID-19;

(ix) the person quit a job as a direct result of COVID-19; or

(x) the person's place of employment is closed as a direct result of the COVID-19 state disaster emergency;

§ 2. This local law takes effect immediately.

LS 14513
4/20/20 1:52AM

3

A-1520

# EXHIBIT KK

A-1521

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

             of the

STATED MEETING

------------------------ X

                         April 22, 2020
                         Start:  1:40 p.m.
                         Recess: 4:45 p.m.


HELD AT:        REMOTE HEARING

B E F O R E:    Corey Johnson
                Speaker


COUNCIL MEMBERS: Adrienne E. Adams
                 Alicka Ampry-Samuel
                 Diana Ayala
                 Inez D. Barron
                 Joseph C. Borelli
                 Justin Brannan
                 Fernando Cabrera
                 Margaret S. Chin
                 Costa Constantinides
                 Robert E. Cornegy, Jr.
                 Laurie A. Cumbo
                 Chaim M. Deutsch
                 Ruben Diaz, Sr.
                 Daniel Dromm
                 Rafael L. Espinal, Jr.
                 Mathieu Eugene
                 Vanessa L. Gibson
                 Mark Gjonaj
                 Barry Grodenchik
                 Robert Holden

Ben Kallos
Andy King
Peter Koo
Karen Koslowitz
Rory I. Lancman
Brad Lander
Stephen T. Levin
Mark Levine
Farah Louis
Alan N. Maisel
Steven Matteo
Carlos Menchaca
I. Daneek Miller
Francisco Moya
Bill Perkins
Keith Powers
Antonio Reynoso
Donovan J. Richards
Carlina Rivera
Ydanis Rodriguez
Deborah Rose
Helen K. Rosenthal
Rafael Salamanca, Jr.
Ritchie J. Torres
Mark Treyger
Eric A. Ulrich
Paul Vallone
Jimmy Van Bramer
Kalman Yeger

A-1523

3

A P P E A R A N C E S (CONTINUED)

```
STATED MEETING                                    4
```

1

2          MAJORITY LEADER CUMBO:  Good afternoon

3  and welcome back to the Stated Meeting of April 22,

4  2020.  We will now have the adoption of minutes by

5  Council Member Powers.

6          COUNCIL MEMBER POWERS:  Thank you.  I

7  now, thank you, Majority Leader, I now move the

8  minutes of the Stated Meeting of February 11, 2020,

9  and February 27.

10          LANCE POLIVY: Council Member Powers.

11          COUNCIL MEMBER POWERS:  Yes?

12          LANCE POLIVY: Can you please pause?

13          COUNCIL MEMBER POWERS:  Yes.

14          LANCE POLIVY: Madam Majority Leader.

15          MAJORITY LEADER CUMBO:  Yes?

16          LANCE POLIVY: I ask that you please state

17  that meeting will stand at ease.

18          MAJORITY LEADER CUMBO:  The meeting will

19  stand at ease at this time.

20          SPEAKER JOHNSON:  I believe we're having

21  some technical issues with the feed, which is why

22  we're standing at ease.  We want to just make sure

23  that all council members have access as well as that

24  it is live streaming appropriately.  So that is what

25

**A-1525**

```
 1  STATED MEETING                              5

 2  the staff is working on right now.  That is why we

 3  are standing at ease.

 4           LANCE POLIVY: Mr. Parliamentarian?  Madam

 5  Majority Leader?

 6           MAJORITY LEADER CUMBO:  Yes?

 7           LANCE POLIVY: The technical issues are

 8  resolved.  You can now recognize Council Member

 9  Powers.

10           MAJORITY LEADER CUMBO:  We will now have

11  the adoption of minutes by Council Member Powers.

12           COUNCIL MEMBER POWERS:  Right, second

13  time.  I now move the Stated Meetings of February 11,

14  2020, and February 27, 2020, be adopted as printed.

15           MAJORITY LEADER CUMBO:  Thank you.

16  Messages and papers from the mayor.

17           COMMITTEE CLERK:  Communication from the

18  mayor, M230 through M236, mayor's executive budget,

19  expense, capital, and CD budgets with supporting

20  schedules.

21           SPEAKER JOHNSON:  Finance.

22           COMMITTEE CLERK:  M237, city debt and

23  reserves.

24           SPEAKER JOHNSON:  Received, ordered,

25  printed, and filed.
```

A-1526

```
1    STATED MEETING                                   6

2              COMMITTEE CLERK:  M238, withdrawing the

3    name Amisha K. Butler for appointment to the New York

4    City Tax Commission.

5              SPEAKER JOHNSON:  Received, ordered,

6    printed, and filed.

7              MAJORITY LEADER CUMBO:  Communication

8    from city, county, and borough offices.

9              COMMITTEE CLERK:  M239, communication

10   from the chancellor submitting the proposed amendment

11   to the fiscal year 2020 to 2024, five-year capital

12   plan.

13             SPEAKER JOHNSON:  Referred to Finance.

14             MAJORITY LEADER CUMBO:  Petitions and

15   communications.

16             SPEAKER JOHNSON:  None.

17             MAJORITY LEADER CUMBO:  Land use call-

18   ups.

19             SPEAKER JOHNSON:  M240.  I will now ask

20   the clerk to call the role for today's land use call-

21   up.  This is just a vote on the land use call-up

22   calendar right now.

23             COMMITTEE CLERK:  Adams.

24             COUNCIL MEMBER ADAMS:  Aye.

25             COMMITTEE CLERK:  Ampry-Samuel.
```

```
 1   STATED MEETING                                    7

 2             COUNCIL MEMBER AMPRY-SAMUEL:  Aye.

 3             COMMITTEE CLERK:  Ayala.

 4             COUNCIL MEMBER AYALA:  Aye.

 5             COMMITTEE CLERK:  Barron.

 6             COUNCIL MEMBER BARRON:  I vote aye.

 7             COMMITTEE CLERK:  Borelli.

 8             COUNCIL MEMBER BORELLI:  Aye.

 9             COMMITTEE CLERK:  Brannan.

10             COUNCIL MEMBER BRANNAN:  Aye.

11             COMMITTEE CLERK:  Cabrera.

12             COUNCIL MEMBER CABRERA:  Aye.

13             COMMITTEE CLERK:  Chin.

14             COUNCIL MEMBER CHIN:  Aye.

15             COMMITTEE CLERK:  Cohen.

16             COUNCIL MEMBER COHEN:  I vote aye.

17             COMMITTEE CLERK:  Constantinides.

18             COUNCIL MEMBER CONSTANTINIDES:  I vote

19   aye.

20             COMMITTEE CLERK:  Cornegy.

21             COUNCIL MEMBER CORNEGY:  Aye.

22             COMMITTEE CLERK:  Deutsch.

23             COUNCIL MEMBER DEUTSCH:  Aye.

24             COMMITTEE CLERK:  Diaz.

25             COUNCIL MEMBER DIAZ:  Aye.
```

STATED MEETING                                           8

1

2               COMMITTEE CLERK:  Dromm.

3               COUNCIL MEMBER DROMM:  Aye.

4               COMMITTEE CLERK:  Eugene.

5               COUNCIL MEMBER EUGENE:  Aye.

6               COMMITTEE CLERK:  Gibson.

7               COUNCIL MEMBER GIBSON:  I vote aye.

8               COMMITTEE CLERK:  Gjonaj.

9               COUNCIL MEMBER GJONAJ:  Aye.

10              COMMITTEE CLERK:  Grodenchik.

11              COUNCIL MEMBER GRODENCHIK:  Aye.

12              COMMITTEE CLERK:  Holden.

13              COUNCIL MEMBER HOLDEN:  Aye.

14              COMMITTEE CLERK:  Kallos.

15              COUNCIL MEMBER KALLOS:  Aye.

16              COMMITTEE CLERK:  King.

17              COUNCIL MEMBER KING:  Aye.

18              COMMITTEE CLERK:  Koo.

19              COUNCIL MEMBER KOO:  Aye.

20              COMMITTEE CLERK:  Koslowitz.

21              COUNCIL MEMBER KOSLOWITZ:  Aye.

22              COMMITTEE CLERK:  Lancman.

23              COUNCIL MEMBER LANCMAN:  Aye.

24              COMMITTEE CLERK:  Lander.

25              COUNCIL MEMBER LANDER:  Aye.

```
 1  STATED MEETING                                     9

 2            COMMITTEE CLERK:  Levin.

 3            COUNCIL MEMBER LEVIN:  Aye.

 4            COMMITTEE CLERK:  Levine.

 5            COUNCIL MEMBER LEVIN:  I vote aye.

 6            COMMITTEE CLERK:  Louis.

 7            COUNCIL MEMBER LOUIS:  Aye.

 8            COMMITTEE CLERK:  Maisel.

 9            COUNCIL MEMBER MAISEL:  Yes.

10            COMMITTEE CLERK:  Menchaca.

11            COUNCIL MEMBER MENCHACA:  Aye.

12            COMMITTEE CLERK:  Miller.

13            COUNCIL MEMBER MILLER:  Aye.

14            COMMITTEE CLERK:  Moya.

15            COUNCIL MEMBER MOYA:  Aye.

16            COMMITTEE CLERK:  Perkins.

17            COUNCIL MEMBER PERKINS:  Aye.

18            COMMITTEE CLERK:  Powers.

19            COUNCIL MEMBER POWERS:  Aye.

20            COMMITTEE CLERK:  Reynoso.

21            COUNCIL MEMBER REYNOSO:  Aye.

22            COMMITTEE CLERK:  Richards.

23            COUNCIL MEMBER RICHARDS:  Aye.

24            COMMITTEE CLERK:  Rivera.

25            COUNCIL MEMBER RIVERA:  Aye.
```

```
 1  STATED MEETING                              10

 2           COMMITTEE CLERK:  Rodriguez.

 3           COUNCIL MEMBER RODRIGUEZ:  Aye.

 4           COMMITTEE CLERK:  Rose.

 5           COUNCIL MEMBER ROSE:  Aye.

 6           COMMITTEE CLERK: Rosenthal.

 7           COUNCIL MEMBER ROSENTHAL:  Aye.

 8           COMMITTEE CLERK:  Salamanca.

 9           COUNCIL MEMBER SALAMANCA:  Aye.

10           COMMITTEE CLERK:  Torres.

11           COUNCIL MEMBER TORRES:  Aye.

12           COMMITTEE CLERK:  Treyger.

13           COUNCIL MEMBER TREYGER:  Aye.

14           COMMITTEE CLERK:  Ulrich.

15           COUNCIL MEMBER ULRICH:  I vote aye.

16           COMMITTEE CLERK:  Vallone.

17           COUNCIL MEMBER VALLONE:  Aye.

18           COMMITTEE CLERK:  Van Bramer.

19           COUNCIL MEMBER VAN BRAMER:  I vote aye.

20           COMMITTEE CLERK:  Yeger.

21           COUNCIL MEMBER YEGER:  I vote aye.

22           COMMITTEE CLERK:  Mattel.

23           MINORITY LEADER MATTEO:  Aye.

24           COMMITTEE CLERK:  Cumbo.

25           MAJORITY LEADER CUMBO:  I vote aye.
```

A-1531

```
 1   STATED MEETING                                    11

 2             COMMITTEE CLERK:  Speaker Johnson.

 3             SPEAKER JOHNSON:  I vote aye.

 4             COMMITTEE CLERK:  Today's land use call-

 5   ups vote is 50 in the affirmative and zero in the

 6   negative.

 7             MAJORITY LEADER CUMBO:  Today's land use

 8   call-up is adopted.  We will now have communication

 9   from Speaker Corey Johnson, and I would like to thank

10   him for his incredible work in keeping this body

11   together and organizing this unprecedented meeting

12   today.  Speaker Corey Johnson.

13             SPEAKER JOHNSON:  Thank you, Madam

14   Majority Leader.  Good afternoon, everyone.  I am so

15   proud of the work that we are doing together despite

16   these physical challenges that we are facing right

17   now, and I want to thank each council staff member

18   who has put in countless hours to make this happen.

19   This is an extraordinary Stated Meeting because it

20   shows the council's commitment to public service.  We

21   were elected to serve our constituents in all 51

22   council districts, and our mission is to come

23   together to create and pass legislation to help all

24   New Yorkers in our diverse city, and that is needed

25   now more than ever.  This crisis has exposed so many
```

```
1    STATED MEETING                                    12

2    of the structural racial and income inequities that

3    plague New York City, inequities in our healthcare

4    system, in our governance, and in our schools.  And

5    it is my sincerest hope that through this tragedy we

6    will find opportunities to address these long-

7    standing inequities to build a better New York City.

8    This is what we owe to more than 14,000 New Yorkers

9    who have died from this terrible virus, and that work

10   begins with this Stated Meeting today.  I mentioned

11   earlier the enormous losses of life that we have

12   suffered as a city in the last money or so and I'd

13   like to take a moment to acknowledge two former

14   council members who we lost in this pandemic.  Arlene

15   Stringer Cuevas, who represented Washington Heights

16   and is the mother of City Comptroller Scott Stringer,

17   and Noach Dear, who represented Midwood, Borough

18   Park, and Bensonhurst.  We extend our condolences to

19   their families.  I also want to express condolences

20   on the passing of Council Member Salamanca's father.

21   Rafael Salamanca Sr. died of coronavirus on April 3,

22   and we are sending you, Rafael, and your family our

23   love.  In addition, I want to acknowledge that

24   Council Members Torres, Barron, Levin,

25   Constantinides, Vallone, and Grodenchik, and I
```

```
 1   STATED MEETING                                    13

 2   believe Ayala, have all been sickened by COVID-19.  I

 3   am grateful that they are with us today and back to

 4   serving their constituents.  As we do during each

 5   stated, I would also like to acknowledge those who

 6   have died from 9/11-related illnesses since our last

 7   meeting.  Retired FDNY firefight Steve Brickman died

 8   on April 12 of 9/11-related illnesses.  He was 57

 9   years old.  Sergeant Sean Cameron, a retired member

10   of the department, recently lost his battle with

11   9/11-related cancer on April 8.  He was 52 years old.

12   I want to take a moment of silence for former Council

13   Member Arlene Stringer Cuevas, Council Member Noach

14   Dear, Rafael Salamanca Sr., Firefighter Brickman,

15   Sergeant Sean Cameron, as well as all of those who we

16   have lost in our city and state and all over the

17   world who have succumbed to this terrible virus.  May

18   we please now have a moment of silence.  [moment of

19   silence]  Thank you.  Today is Earth Day and it marks

20   the 50th anniversary of the celebration of our planet

21   and the fight for environmental protections.  We are

22   experiencing a terrible public health crisis right

23   now, but we can't forget about the other work, the

24   other important work we have to do to protect our

25   plant and New York City has some of the strongest
```

```
1    STATED MEETING                                    14

2    policies in the country to protect the environment

3    and the council will continue to push for bold change

4    in this area in order to make sure our city and

5    planet are strong for decades to come.  This Friday

6    we usher in the holy month of Ramadan.  I want to

7    wish all of those celebrating a very generous

8    Ramadan.  New York City's Muslim community has

9    contributed so much to our cultural fabric.  So let

10   us all take this month to remember the contributions

11   of Muslim New Yorkers who weren't able to meet, but I

12   hope everyone had a good Passover and a nice Easter

13   during this really important time in our city.  And

14   my last item before we get to our legislative agenda,

15   I said it before, but I want to wish a happy birthday

16   to Council Member Ruben Diaz, Sr.  OK, let's dive

17   into our legislative agenda.  As New York City's

18   affordable housing crisis deepens urgent action must

19   be taken.  The council is voting on a number of items

20   that will preserve and establish affordable housing.

21   I detailed most of those items just a few moments ago

22   during the Committee of the Whole Meeting.  So in the

23   interest of time I will not repeat those descriptions

24   now.  But in addition to voting to those items as a

25   full council we will also vote on several other
```

A-1535

```
 1   STATED MEETING                              15

 2   measures and they are as follows - a rezoning at 271

 3   Seabreeze Avenue to allow commercial use, in Council

 4   Member Deutsch's district; a rezoning at 8118 13th

 5   Avenue, in Council Member Brannan's district to

 6   legalize an existing office; the Queens Boulevard MIH

 7   text amendment in Council Members Holden's and Van

 8   Bramer's districts to facilitate two new residential

 9   developments, including mandatory inclusionary

10   housing; a Health and Hospitals lease at the Seaview

11   campus for a residential substance program in

12   Minority Leader Steven Matteo's district; a

13   rescission of a landmark in Chair Salamanca's

14   district; and the landmark designations of Tin Pan

15   Alley buildings at 47 through 55 West 28th Street in

16   the district that I represent.  Also, an amendment to

17   a previously approved tax exemption at Cooper Square

18   MHA for property in Council Member Rivera's district

19   to allow community facility use for 327 affordable

20   cooperative units in a community land trust.  With

21   that, I turn it back over to you, Madam Majority

22   Leader.

23             MAJORITY LEADER CUMBO:  Thank you,

24   Speaker Johnson.  We will now move into discussion of

25   general orders.  We will first recognize council
```

A-1536

1   STATED MEETING                                    16

2   members who signed up by email, and then recognize

3   members who wish to speak by using the raise hand

4   function in Zoom.  I just want to remind all members

5   to raise your hand and please wait for remarks for

6   our Sergeant at Arms to announce he has begun the

7   countdown clock.  The Sergeant at Arms will alert you

8   when your time has expired.

9             SPEAKER JOHNSON:  And just to remind

10  folks, this is to speak on the items that we are

11  voting on today.

12            LANCE POLIVY: Madam Majority Leader.

13            MAJORITY LEADER CUMBO:  Yes.

14            LANCE POLIVY: Council members Rodriguez,

15  Ampry-Samuel, and Van Bramer are the first to sign

16  up.

17            MAJORITY LEADER CUMBO:  We will begin in

18  the order that was just spoken of.

19            SERGEANT AT ARMS:  Council Member

20  Rodriguez, your time is starting now.

21            COUNCIL MEMBER RODRIGUEZ:

22  Yes,[inaudible] lead by Speaker Johnson and Council

23  Member Carlina Rivera on the 75 mile history that we

24  should be dedicated more for, to pedestrian and

25  cyclist.  I would like for all, all of us to join

A-1537

```
 1  STATED MEETING                              17

 2  into that effort.  Other city had done it.  New York

 3  City should do it, too.  This is the opportunity that

 4  as we are celebrating Earth Day we should show our

 5  commitment to dedicate more streets to pedestrian and

 6  cyclist.  Second, I would like to also say thank you

 7  to Council Member Constantinides for allowing me to

 8  be a co-prime in the resolution that we are calling

 9  to support Council Member, I mean, Senator Gennaro

10  and Senator Gustavo Rivera, who are looking to get

11  the state legislature to pass a bill and for the

12  governor to sign that will provide free rents for

13  three months to tenants and, and tenants and small

14  business owner.  Eh [speaking in Spanish]...

15              SERGEANT AT ARMS:  30 seconds.

16              COUNCIL MEMBER RIVERA: [speaking in

17  Spanish] Thank you.

18              SPEAKER JOHNSON:  Madam Majority Leader,

19  I just want to, thank you, Council Member Rodriguez,

20  I just want to remind members we are discussing now,

21  this is a, a discussion of the things that we are

22  voting on, ah, today.  For other items of bills that

23  are being introduced if folks can hold that until

24  general discussion at the end of the meeting, as we

25  always do, ah, at the Stated Meeting of the Council,
```

A-1538

```
1   STATED MEETING                            18

2   that would be the best time to discuss bills that are

3   being introduced or other items.  I turn it back to

4   you, Madam Majority Leader.

5                 MAJORITY LEADER CUMBO:  Thank you, and

6   our next Council Member that was identified to speak.

7                 COUNCIL MEMBER AMPRY-SAMUEL:  Thank you,

8   everyone.

9                 SERGEANT AT ARMS:  Council Member...

10                COUNCIL MEMBER AMPRY-SAMUEL:  Thank you,

11  everyone.

12                SERGEANT AT ARMS:  Council Member, your

13  time is starting now.

14                COUNCIL MEMBER AMPRY-SAMUEL: Um, in the

15  interest of time I posted my statement to social

16  media and it was in reference to the vote that we

17  just took during the Committee of the Whole.  Thank

18  you, everyone.

19                MAJORITY LEADER CUMBO:  Thank you.  Next.

20                SERGEANT AT ARMS:  Council Member, your

21  time is starting now.

22                COUNCIL MEMBER VAN BRAMER:  Thank you.

23  Ah, first I want to say that on this Earth Day there

24  are a few things that we can do as important as

25  ending car culture as we know it.  So I wanted to
```

A-1539

```
1    STATED MEETING                                    19

2    particularly praise, ah, Speaker Johnson and Council

3    Member Rivera for their, ah, bill, ah, and for their,

4    ah, legislation calling for 75 miles of car-free

5    roads in it city during the crisis.  But I also want

6    to say that we should begin by closing the south

7    outer roadway of the Queensboro Bridge, which has

8    been an immediate crisis affecting so may people.  We

9    can do that and we should do that, ah, already if

10   before that.  Ah, and I just also want to say I am

11   calling in from the great borough of Queens, which

12   might be one of the hardest-hit places in the world,

13   but there's no place I'd rather be than in this

14   borough with the greatest people on the face of the

15   earth as we fight through this crisis in Queens, ah,

16   and, and lastly, before I joined call I joined a Zoom

17   funeral for Mayer Gomoras who was someone who helped

18   raise me.  Ah, the first Zoom funeral I have ever had

19   to attend.  Um, and he was my constituent, but he

20   also helped raise me, ah, the, the father of...

21              SERGEANT AT ARMS:  30 seconds.

22              COUNCIL MEMBER VAN BRAMER: ...my

23   childhood best friend.  So, ah, he's being buried as

24   we speak, so I want to say on behalf of Mayer Gomoras

25   and all of those that we've lost, ah, you're in my
```

A-1540

```
1    STATED MEETING                              20

2    heart forever and I am forever grateful for the role

3    that you played in my life.  Thank you [inaudible].

4              SPEAKER JOHNSON:  Thank you, Jimmy.

5              LANCE POLIVY: Madam Majority Leader.  The

6    next three speakers are Council Members Miller,

7    Cabrera, and Menchaca.

8              MAJORITY LEADER CUMBO:  Thank you.

9              SERGEANT AT ARMS:  Council Member Miller,

10   your time is starting now.

11             SPEAKER JOHNSON:  Did we unmute Council

12   Member Miller?

13             SERGEANT AT ARMS:  I have restarted the

14   clock.  Whenever you're ready, Mr. Council Member

15   Miller.

16             SPEAKER JOHNSON:  Ah, hold on one second.

17   I don't see, Council Member Miller, are you there?

18   Let's go to the next Council Member and then we can

19   get back to Council Member Miller.

20             LANCE POLIVY: Council Member Cabrera,

21   followed by Menchaca, followed by Miller.

22             SERGEANT AT ARMS:  Council Member

23   Menchaca, Council Member Cabrera, your time is

24   starting now.

25
```

A-1541

```
1   STATED MEETING                              21

2              COUNCIL MEMBER CABRERA:  Yes, for the

3   interest of time, ah, I'm gonna do a pass.  Thank you

4   so much.

5              SPEAKER JOHNSON:  Thank you, Council

6   Member.

7              MAJORITY LEADER CUMBO:  Council Member

8   Menchaca.

9              SERGEANT AT ARMS:  Council Member

10  Menchaca, your time is starting now.

11             COUNCIL MEMBER MENCHACA:  Thank you all

12  and, ah, I want to just go a little bit further in my

13  statements around the land use items.  Ah, there are

14  16 land use actions.  Ah, I was able to connect with

15  some of you about what those actions are doing in the

16  districts that you represent and really just offer

17  support.  I think what's really important here that

18  the work that happened before each of these land use

19  actions were in pre-COVID times and, and I just want

20  to continue to ask that question, ah, community

21  boards made decisions in pre-COVID times and COVID

22  has transformed everything, and so I want to just

23  keep mindful of that.  Um, the work that our

24  neighborhoods do every day to support that work, um,

25  at the neighborhood level is just so important, and
```

```
1   STATED MEETING                                22

2   our work to connect to that is great and important as

3   well.  Um, so you all know that ULURP is not my

4   favorite thing in the world.  I think I have a lot of

5   issues with it in general.  Um, so I would prefer

6   that we really spend time thinking about it, and want

7   to think about it with you on the ground.  And so

8   with that, um, ah, I vote aye.

9            MAJORITY LEADER CUMBO:  Thank you,

10  Council Member Menchaca.  Do we now have Council

11  Member Miller available?

12           SERGEANT AT ARMS:  He's not available

13  yet.

14           SPEAKER JOHNSON:  OK, who's next?

15           LANCE POLIVY: No other members have

16  signed up for discussion of general orders.

17           SPEAKER JOHNSON:  If Council Member

18  Miller comes back he can of course, ah, make his

19  statement when it is the time to vote during his

20  voting time.  Ah, thank you.

21           MAJORITY LEADER CUMBO:  Thank you, and so

22  we will allow Council Member Miller to speak, um, at

23  a later time.  We will now move on to the report of

24  special committees.

25           SPEAKER JOHNSON:  None.
```

A-1543

```
 1  STATED MEETING                              23

 2            MAJORITY LEADER CUMBO:  Reports of

 3  standing committees.

 4            COMMITTEE CLERK:  Report of the Committee

 5  on Land Use, LU 617 and Reso 1290, Seaview Campus.

 6            SPEAKER JOHNSON:  Coupled on general

 7  orders.

 8            COMMITTEE CLERK:  LUs 618 through 622 and

 9  accompanying Resos, Tin Pan Alley.

10            SPEAKER JOHNSON:  Coupled on general

11  orders.

12            COMMITTEE CLERK:  LUs 623 and Reso 1296,

13  landmark designation rescission, PS-31.

14            SPEAKER JOHNSON:  Coupled on general

15  orders.

16            COMMITTEE CLERK:  LUs 627, 271, Seabreeze

17  Avenue.

18            SPEAKER JOHNSON:  Approved with

19  modifications and referred to the City Planning

20  Commission pursuant to Section 197-D of the New York

21  City Charter.

22            COMMITTEE CLERK:  LUs 630 and Reso 1297,

23  13th Avenue rezoning.

24            SPEAKER JOHNSON:  Coupled on general

25  orders.
```

A-1544

```
1    STATED MEETING                           24

2              COMMITTEE CLERK:  LU 631, Queens

3    Boulevard text amendment.

4              SPEAKER JOHNSON:  Approved with

5    modifications and referred to the City Planning

6    Commission pursuant to Section 197-D of the New York

7    City Charter.

8              COMMITTEE CLERK:  LU 640 and Reso 1298,

9    Cooper Square.

10             SPEAKER JOHNSON:  Coupled on general

11   orders.

12             COMMITTEE CLERK:  Report of the Committee

13   of the Whole, Intro 1854, downtown Flushing Transit

14   Hub bid.

15             SPEAKER JOHNSON:  Coupled on general

16   orders.

17             COMMITTEE CLERK:  Preconsidered LU 646

18   and Reso 1299, 1898 Harrison Avenue.

19             SPEAKER JOHNSON:  Coupled on general

20   orders.

21             COMMITTEE CLERK:  Preconsidered LU 647

22   and Reso 1300, Grace Senior Housing.

23             SPEAKER JOHNSON:  Coupled on general

24   orders.

25
```

A-1545

```
 1   STATED MEETING                              25

 2              COMMITTEE CLERK:  Preconsidered LU 648

 3   and Reso 1301, HP Morningside Heights.

 4              SPEAKER JOHNSON:  Coupled on general

 5   orders.

 6              COMMITTEE CLERK:  Preconsidered LU 649

 7   and Reso 1302, Turn House.

 8              SPEAKER JOHNSON:  Coupled on general

 9   orders.

10              COMMITTEE CLERK:  Preconsidered LU 650

11   and Reso 1303, Schreiber.

12              SPEAKER JOHNSON:  Coupled on general

13   orders.

14              COMMITTEE CLERK:  Preconsidered LU 651

15   and Reso 1304, East 169th Street.

16              SPEAKER JOHNSON:  Coupled on general

17   orders.

18              COMMITTEE CLERK:  Preconsidered LU 652

19   and Reso 1305, Amron House.

20              SPEAKER JOHNSON:  Coupled on general

21   orders.

22              COMMITTEE CLERK:  Preconsidered LU 653

23   and Reso 1306, Belmont [inaudible].

24              SPEAKER JOHNSON:  Coupled on general

25   orders.
```

A-1546

1    STATED MEETING                              26

2              COMMITTEE CLERK:  Preconsidered LU 654

3    and Reso 1307, Manhattan Avenue Apartments.

4              SPEAKER JOHNSON:  Coupled on general

5    orders.

6              COMMITTEE CLERK:  LU 616 and Reso 1308,

7    East Seventh Street.

8              SPEAKER JOHNSON:  Coupled on general

9    orders.

10             COMMITTEE CLERK:  LU 626 and Reso 1309,

11   Gansevoort Street.

12             SPEAKER JOHNSON:  Coupled on general

13   orders.

14             COMMITTEE CLERK:  LU 628 through 629,

15   Grant Avenue and Pacific Street rezoning.

16             SPEAKER JOHNSON:  Approved with

17   modifications and referred to the City Planning

18   Commission pursuant to Section 197-D of the New York

19   City Charter.

20             COMMITTEE CLERK:  LUs 637 through 639,

21   and accompanying Resos, Rochester [inaudible].

22             SPEAKER JOHNSON:  Coupled on general

23   orders.

24             COMMITTEE CLERK:  LUs 641 through 642,

25   52nd Street rezoning.

A-1547

```
1   STATED MEETING                            27

2            SPEAKER JOHNSON:  Approved with

3   modifications and referred to the City Planning

4   Commission pursuant to Section 197-D of the New York

5   City Charter.

6            COMMITTEE CLERK:  LUs 643 through 644 and

7   accompanying Resos, 90 Sand Street rezoning.

8            SPEAKER JOHNSON:  Coupled on general

9   orders.

10           COMMITTEE CLERK:   Preconsidered LU 655

11  and Reso 1315, the 364 Avenue of the Americas

12  rezoning.

13           SPEAKER JOHNSON:  Coupled on general

14  orders.

15           COMMITTEE CLERK:  Preconsidered LU 656

16  and Reso 1316, River Crossing.

17           SPEAKER JOHNSON:  Coupled on general

18  orders.

19           COMMITTEE CLERK:  Preconsidered LU 657

20  and Reso 1317, 461 Alabama Avenue.

21           SPEAKER JOHNSON:  Coupled on general

22  orders, on the general order calendar.

23           COMMITTEE CLERK:  LU 627 and Reso 1318,

24  Seabreeze Avenue.

25
```

```
1    STATED MEETING                              28

2            SPEAKER JOHNSON:  Coupled on general

3    orders.

4            COMMITTEE CLERK:  LU 631 and Reso 1319,

5    Queens Boulevard.

6            SPEAKER JOHNSON:  Coupled on general

7    orders.  And at this time I'm asking the clerk to

8    please have a roll call vote on all of the items

9    coupled on the general order calendar, all the items

10   that we just went through.  Mr. Clerk, I'm requesting

11   a roll call vote on all of those items.

12           LANCE POLIVY: Mr. Speaker.

13           COMMITTEE CLERK:  Adams.  Excuse me.

14           SPEAKER JOHNSON:  Yes, Mr.

15   Parliamentarian.

16           LANCE POLIVY: Before we begin our role

17   call vote I believe Council Member Miller is now back

18   on the line.  We may want to give him an opportunity

19   to speak before voting.

20           SPEAKER JOHNSON:  Yes.  Yes, before we

21   vote I would like to recognize Council Member Daneek

22   Miller to speak.

23           SERGEANT AT ARMS:  Council Member Miller,

24   your time is starting now.

25
```

A-1549

STATED MEETING                                    29

1

2          COUNCIL MEMBER MILLER:  Um, I'm sorry,

3   ah, could we, could we, ah, ah, put that to general

4   discussion?

5          SPEAKER JOHNSON:  Yes, sir.

6          COUNCIL MEMBER MILLER:  I would greatly

7   appreciate it.

8          SPEAKER JOHNSON:  Yep.

9          COUNCIL MEMBER MILLER:  Thank you so very

10  much.

11         SPEAKER JOHNSON:  Thank you, Council

12  Member.  I request a role call vote on all the items

13  on today's general order calendar, Mr. Clerk.

14         COMMITTEE CLERK:  Council Member Adams.

15         COUNCIL MEMBER ADAMS:  Aye on all.

16         COMMITTEE CLERK:  Ampry-Samuel.

17         COUNCIL MEMBER AMPRY-SAMUEL:  Aye on all.

18         COMMITTEE CLERK:  Ayala.

19         COUNCIL MEMBER AYALA:  Aye on all.

20         COMMITTEE CLERK:  Barron.

21         COUNCIL MEMBER BARRON:  I vote aye on all

22  and I do request to be added to the general

23  discussion list.  Thank you.

24         COMMITTEE CLERK:  Borelli.

25

A-1550

1    STATED MEETING                              30

2              COUNCIL MEMBER BORELLI:  I vote aye on

3    all.

4              COMMITTEE CLERK:  Brannan.

5              COUNCIL MEMBER BRANNAN:  Aye on all.

6              COMMITTEE CLERK:  Cabrera.

7              SERGEANT AT ARMS:  Can we please put your

8    phones to vibrate, please.

9              COUNCIL MEMBER CABRERA:  Aye, aye on all,

10   and please add me to the discussion list.  Thank you.

11             COMMITTEE CLERK:  Chin.

12             COUNCIL MEMBER CHIN:  Aye on all.

13             COMMITTEE CLERK:  Cohen.

14             COUNCIL MEMBER COHEN:  Aye.

15             COMMITTEE CLERK:  Constantinides.

16             COUNCIL MEMBER CONSTANTINIDES:  Aye on

17   all, and please add me to the discussion list.

18             COMMITTEE CLERK:  Cornegy.

19             COUNCIL MEMBER CORNEGY:  Aye.

20             COMMITTEE CLERK:  Deutsch.

21             COUNCIL MEMBER DEUTSCH:  Aye on all.

22             COMMITTEE CLERK:  Diaz.

23             COUNCIL MEMBER DIAZ:  Aye on all.

24             COMMITTEE CLERK:  Dromm.

25             COUNCIL MEMBER DROMM:  Aye.

```
 1  STATED MEETING                              31
 2            COMMITTEE CLERK:  Eugene.
 3            COUNCIL MEMBER EUGENE:  Aye.
 4            COMMITTEE CLERK:  Gibson.
 5            COUNCIL MEMBER GIBSON:  I vote aye.
 6            COMMITTEE CLERK:  Gjonaj.
 7            COUNCIL MEMBER GJONAJ:  Aye on all.
 8            COMMITTEE CLERK:  Grodenchik.
 9            COUNCIL MEMBER GRODENCHIK:  Aye on all.
10  I responded for the discussion list, so if I'm on it
11  good, if I'm not please add me to it.  Thank you.
12            COMMITTEE CLERK:  Holden.
13            COUNCIL MEMBER HOLDEN:  Aye on all.
14            COMMITTEE CLERK:  Kallos.
15            COUNCIL MEMBER KALLOS:  Aye on all.
16            COMMITTEE CLERK:  King.
17            COUNCIL MEMBER KING:  Aye on all.
18            COMMITTEE CLERK:  Koo.
19            COUNCIL MEMBER KOO:  Aye on all.
20            COMMITTEE CLERK:  Koslowitz.
21            COUNCIL MEMBER KOSLOWITZ:  Aye on all.
22            COMMITTEE CLERK:  Lancman.
23            COUNCIL MEMBER LANCMAN:  Aye.
24            COMMITTEE CLERK:  Lander.
25            COUNCIL MEMBER LANDER:  Aye on all.
```

A-1552

```
 1   STATED MEETING                                  32

 2             COMMITTEE CLERK:  Levin.

 3             COUNCIL MEMBER LEVIN:  Aye on all.

 4             COMMITTEE CLERK:  Levine.

 5             COUNCIL MEMBER LEVINE:  I vote aye on

 6   all.

 7             COMMITTEE CLERK:  Louis.

 8             COUNCIL MEMBER LOUIS:  Aye on all.

 9             COMMITTEE CLERK:  Maisel.

10             COUNCIL MEMBER MAISEL:  Yes.

11             COMMITTEE CLERK:  Menchaca.

12             COUNCIL MEMBER MENCHACA:  Aye on all.

13             COMMITTEE CLERK:  Miller.

14             COUNCIL MEMBER MILLER:  Aye.

15             COMMITTEE CLERK:  Moya.

16             COUNCIL MEMBER MOYA:  Aye.

17             LANCE POLIVY: Bill?

18             COUNCIL MEMBER PERKINS:  Yeah.

19             COMMITTEE CLERK:  Perkins.

20             COUNCIL MEMBER PERKINS:  Somebody call

21   me?

22             SPEAKER JOHNSON:  Council Member Perkins,

23   how do you vote?

24             COUNCIL MEMBER PERKINS:  I vote aye on

25   all.
```

A-1553

```
1   STATED MEETING                              33
2              COMMITTEE CLERK:  Powers.
3              COUNCIL MEMBER POWERS:  Aye on all, and
4   Steven Levin, your child is adorable.
5              COMMITTEE CLERK:  Reynoso.
6              COUNCIL MEMBER REYNOSO:  I vote aye on
7   all.
8              COMMITTEE CLERK:  Richards. Council
9   Member Richards.
10             COUNCIL MEMBER RICHARDS:  I vote aye.
11             COMMITTEE CLERK:  Thank you.  Rivera.
12             COUNCIL MEMBER RIVERA:  Aye.
13             COMMITTEE CLERK:  Rodriguez.
14             COUNCIL MEMBER RODRIGUEZ:  Aye.
15             COMMITTEE CLERK:  Rose.
16             COUNCIL MEMBER ROSE:  Aye on all.
17             COMMITTEE CLERK:  Rosenthal.
18             COUNCIL MEMBER ROSENTHAL:  Aye on all,
19   and Council Member Levin, your child is wonderfully
20   distracting.  Thank you.
21             COMMITTEE CLERK:  Salamanca.
22             COUNCIL MEMBER SALAMANCA:  Aye on all.
23             COMMITTEE CLERK:  Torres.
24             SPEAKER JOHNSON:  Call Council Member
25   Torres again.
```

A-1554

```
1   STATED MEETING                              34

2            COUNCIL MEMBER TORRES:  I vote aye.

3            COMMITTEE CLERK:  Council Member Torres,

4   thank you.

5            SPEAKER JOHNSON:  We got [inaudible].

6            COMMITTEE CLERK:  Treyger.

7            COUNCIL MEMBER TREYGER:  I vote aye, and

8   please add me to general orders.

9            COMMITTEE CLERK:  Ulrich.

10           COUNCIL MEMBER ULRICH:  I vote aye, and I

11  hope everybody stays safe and healthy.

12           SPEAKER JOHNSON:  Thanks, Eric.

13           COMMITTEE CLERK:  Vallone.

14           COUNCIL MEMBER VALLONE:  Aye on all.

15           COMMITTEE CLERK:  Van Bramer.

16           COUNCIL MEMBER VAN BRAMER:  Aye on all.

17           COMMITTEE CLERK:  Yeger.

18           COUNCIL MEMBER YEGER:  I vote aye on all,

19  with the exception of Intro 1854 on which I abstain,

20  and I vote no on land use items 618 through and

21  inclusive of 622, consistent with my position that I

22  stated before in the council that landmarkings

23  without the owner's consent constitute an

24  unconstitutional taking under the Fifth Amendment.

25  Thank you.
```

A-1555

```
1   STATED MEETING                                   35
2               COMMITTEE CLERK:  Matteo.
3               MINORITY LEADER MATTEO:  I vote aye.
4               COMMITTEE CLERK:  Cumbo.
5               MAJORITY LEADER CUMBO:  I vote aye.
6               COMMITTEE CLERK:  Speaker Johnson.
7               SPEAKER JOHNSON:  I vote aye on all.  And
8   I ask the clerk to read the results on today's votes
9   on the items on the general order calendar.
10              COMMITTEE CLERK:  The vote on all items
11  for today's general order calendar is 15 in the
12  affirmative, zero in the negative, and no
13  abstentions, with the exception of Introduction 1854,
14  with a vote of 49 in the affirmative, zero in the
15  negative, one abstention, and land use items 618
16  through 622 and their accompanying resolutions with a
17  vote of 49 in the affirmative, one in the negative,
18  and no abstentions.  Land use call-ups remain
19  unchanged.
20              MAJORITY LEADER CUMBO:  Thank you.  The
21  items on today's general orders calendar are adopted.
22  Introduction and reading of bills.
23              SPEAKER JOHNSON:  All bills have been
24  referred to committees as indicated on today's
25  agenda.
```

```
1    STATED MEETING                              36

2              MAJORITY LEADER CUMBO:  Thank you,

3    Speaker Johnson.  There are no resolutions on today's

4    calender.  So we will now move into general

5    discussion.  As a reminder, please wait until the

6    Sergeant at Arms begins the countdown clock before

7    you begin your remarks.

8              LANCE POLIVY: Madam Majority Leader.

9              MAJORITY LEADER CUMBO:  Yes.

10             LANCE POLIVY: Council Members Miller,

11   Adams, and Chin are the first to have signed up.

12             MAJORITY LEADER CUMBO:  OK, we will begin

13   with Council Member Miller.

14             SERGEANT AT ARMS:  Council Member Miller,

15   your time is starting now.

16             COUNCIL MEMBER MILLER:  Thank you,

17   Majority Leader, and it is so great to see all my

18   colleagues out here and, and out in the struggle

19   continuing to work.  As we know, COVID-19 has taken

20   an awful toll, an unmeasurable, ah, a toll on our

21   city, state, and our country.  Yet despite this

22   devastation and disarray that we have suffered the

23   one constant throughout this ordeal has been how

24   cities' work force, how municipal and essential

25   workers have once again stepped up.  As I often say,
```

```
1    STATED MEETING                           37

2    ah, as the Chair of Civil Service and Labor, it is

3    the men and women of our work force, city's work

4    force, that give the city value.  It is the reason

5    why 65 million tourists, Amazon, Google, and so many

6    others want to come to New York City.  These brave,

7    ah, public and, and private employers, employees,

8    have braved this disease with remarkable courage to

9    preserve our health, safety, and our way of life, and

10   have done so with great prowess and costs, personal

11   costs of their own.  Whether in times of prosperity

12   or crisis the inherent value of these workers has

13   always been defined, has always defined our city's

14   greatness.  The majority of them are, ah, among the

15   five million men and women of color who represent the

16   council's, New York City's Committee on Civil Service

17   and Labor and the committee, ah, the, the council's

18   Black, Latino and Asian Caucus.  The sad commentary

19   is that for all that they have given to our city that

20   we have received far less in return.  And our, and

21   continue to, they continue to bear the brunt of the

22   COVID-19.

23              SERGEANT AT ARMS:  30 seconds.

24              COUNCIL MEMBER MILLER:  So once again we

25   emerge from under the, once, once we emerge from this
```

A-1558

```
 1   STATED MEETING                              38

 2   side of the pandemic we must commit to addressing and

 3   resolving these racial and social economic

 4   disparities in the health care, transportation,

 5   finance, and education infrastructures within the

 6   communities of color, which are not reflections of

 7   inner city poverty or generational and structural

 8   racism that persist and government neglect...

 9              SERGEANT AT ARMS:  Time.

10              COUNCIL MEMBER MILLER:  And so I'd like

11   to, everyone thank you and, ah, Ramadan Mubarak.

12              MAJORITY LEADER CUMBO:  Thank you,

13   Council Member Miller.  Next speaker.

14              COUNCIL MEMBER ADAMS:  Thank you, Madam

15   Majority Leader.

16              SERGEANT AT ARMS:  Council Member Adams,

17   your time will start now.

18              COUNCIL MEMBER ADAMS:  Thank you so much.

19   Thank you, Madam Majority Leader.  And hello to all

20   of my colleagues.  I miss being in the same room with

21   all of you.  I am so pleased to introduce today, ah,

22   and be a part of the package that encompasses, ah,

23   small business COVID-19 bill, which I encourage my

24   colleagues to sign on to.  This bill would make

25   threatening a commercial tenant based on their status
```

```
1    STATED MEETING                                39

2    as a COVID-19 impacted business or person a form of

3    harassment, punishable by a civil penalty of $10,000

4    to $50,000.  Unfortunately, thousands of businesses

5    in our city are suffering as they have been forced to

6    close due to COVID-19.  As availability of federal

7    loans is limited, many businesses are unable to pay

8    their rent and this leaves them vulnerable to

9    harassment from landlords looking to find ways to

10   collect or get the tenant to voluntarily abandon the

11   property so they can find tenants willing and able to

12   pay higher rents.  The threat of harassment will

13   particularly impact the city's small, independently

14   owned, and immigrant-owned businesses, many of which

15   were operating on thin margins and struggling to pay

16   rent even before this crisis.  Today also along with

17   Council Member Cornegy we're introducing a deed fraud

18   bill, which would require reporting on complaints

19   received and investigations regarding reported

20   document fraud.  Home ownership is a part of the

21   American dream, but in times of financial uncertainty

22   home owners can become targets for deed fraud.

23   Unfortunately, state law prevents us from doing more

24   rigorous checks before a deed is...

25                SERGEANT AT ARMS:  30 seconds.
```

A-1560

1    STATED MEETING                                40

2              COUNCIL MEMBER ADAMS: Until there is a

3    shift of the state law the City Council must demand

4    updates in accountability from the Office of the

5    Sheriff, on the outcomes and strategies of their

6    investigations.  I ask my colleagues to support both

7    of these very important pieces of legislation.  Thank

8    you so much, Madam Majority Leader.

9              MAJORITY LEADER CUMBO:  Thank you,

10   Council Member Adams.  Next speaker.

11             SERGEANT AT ARMS: Council Member Chin,

12   your time will start now.

13             COUNCIL MEMBER CHIN:  Thank you.  Ah,

14   thank you, Majority Leader, and glad to see all my

15   colleagues.  Um, I want to take this opportunity to

16   thank you, Speaker, ah, to Jason, all the central

17   staff, and all my colleague join, ah, for your

18   support during this pandemic, and also to my team for

19   all their hard work in serving our constituents.  And

20   to all of the frontline workers, ah, the healthcare

21   workers, the first responder, all the essential

22   workers, delivery workers, grocery workers.  They're

23   working so hard, um, to keep us healthy and strong.

24   And that's why as City Council we have to do more to

25   protect them, protect their family, and make sure

A-1561

```
1    STATED MEETING                                    41

2    they come out of this crisis also healthier and

3    stronger.  And finally I wanted to give a big thank

4    you to all the service provider, all the volunteers

5    and donors who have stepped up during this crisis to

6    deliver food and supplies, um, to our healthcare

7    workers, to our seniors, and to our families in need.

8    And I pray that all of us will come out of this

9    pandemic more united and stronger together.  Thank

10   you.

11            MAJORITY LEADER CUMBO:  Thank you,

12   Council Member.  The next three speakers will be.

13            LANCE POLIVY: The next three speakers are

14   Council Members Gibson, Vallone, followed by Louis.

15            SERGEANT AT ARMS:  Council Member Gibson,

16   your time is starting now.

17            COUNCIL MEMBER GIBSON:  Thank you so

18   much, and good afternoon to all of my colleagues.

19   Thank you, Speaker, thank you, Majority Leader, and

20   every one of you.  Um, I join with all of you and

21   first and foremost expressing our thoughts and

22   prayers and condolences to everyone across our city

23   who has lost a loved one, a relative, a family

24   member, a neighbor, to this COVID-19 pandemic.  Those

25   that remain in the hospital that are struggling to
```

```
 1   STATED MEETING                                    42

 2   survive we pray for healing.  Um, I am reminded that

 3   this, too, shall pass and we are New Yorkers, we're

 4   tough, we're resilient, and I know we will get

 5   through this.  We will survive.  We will thrive, and

 6   we will be stronger than ever.  It has been

 7   overwhelming, emotionally draining for all of us as

 8   we continue to do this work.  We take care of our

 9   families, our children.  We serve our districts.

10   There's so much going on.  There's a lot of

11   information that's being shared for coordination of

12   services.  But I join with all of you in saluting

13   every first responder, essential worker, frontline

14   worker, all of our public servants, men and women,

15   that go to work every day to serve the public and

16   risk their lives to protect us and save New Yorkers.

17   I'm reminded that many of our public servants are

18   hardworking men and women of color, predominantly

19   women in women of color and we salute you every day

20   for everything you're doing.  The cafeteria workers

21   in our schools, the crossing guards, small

22   businesses, grocery workers, everyone, we thank you.

23   I think as we move forward and we learn about some of

24   the deficiencies and gaps in services...

25             SERGEANT AT ARMS:  30 seconds.
```

A-1563

```
1   STATED MEETING                              43

2           COUNCIL MEMBER GIBSON:  And challenges

3   that we face I am reminded that a borough like mine

4   of the Bronx has had a higher rate of hospitalization

5   and deaths because of underlying health disparities,

6   so I look forward to working with all of you, my

7   colleagues, as we not only address a COVID post world

8   but also some of the challenges we faced prior to

9   COVID.  Again, my prayers to everyone.  I thank you,

10  colleagues, for introducing a comprehensive package

11  today and I look forward to our continued work.  God

12  bless us all.

13          SERGEANT AT ARMS:  Time.

14          COUNCIL MEMBER GIBSON:  Thank you, Madam

15  Majority Leader.

16          MAJORITY LEADER CUMBO:  Thank you,

17  Council Member Gibson.  We will now move to Council

18  Member Vallone.

19          SERGEANT AT ARMS:  Council Member

20  Vallone, your time is starting now.

21          COUNCIL MEMBER VALLONE:  First off I want

22  to thank our speaker, Corey Johnson, and his staff

23  for really putting this unprecedented hearing

24  together and giving us a chance to see our fellow

25  colleagues.  Thank you, Corey, for all of that and
```

A-1564

```
1   STATED MEETING                              44

2   being our rock for all of us, to myself and the

3   fellow council members who have been struck with this

4   unbelievable disease.  Ah, the rest of you have

5   really given us the, the prayers and the health and

6   the love that we needed for our families to get

7   through this very scary times, and it really

8   humanized what every person had to do during this

9   crisis from the moment you decided you needed to get

10  help, where to get help, and the realization of how

11  dependent we were and are on our first-line workers,

12  our responders, our healthcare workers, our delivery

13  workers.  My life is completely dependent on everyone

14  who has helped us.  So I wanted to say thank you from

15  my family and for everyone who has really just from

16  dropping things to the door, to send us messages.

17  Um, my heart is to everyone who is suffering and has

18  lost someone.  Um, today there is so much, ah, that

19  we need to thank and I just wanted to congratulate

20  our fellow members for all the pieces of legislation

21  [inaudible] today and those who signed on to our

22  resolution calling on the federal government to not

23  continue to forget our co-ops and condos.  It's

24  really our last passage of affordable housing and

25  it's not in any of the relief packings or the PPP
```

A-1565

```
 1  STATED MEETING                              45

 2  loans or the CARE Act.  So we're asking, um, fellow

 3  council members to join in on it.  Almost half of you

 4  are now.

 5            SERGEANT AT ARMS:  30 seconds.

 6            COUNCIL MEMBER VALLONE:  [inaudible]

 7  financing will include co-ops and condos.  That's the

 8  reso that's on today.  And my only caveat for the day

 9  would be that we tread lightly when we're talking

10  about so many miles of our streets.  Um, yes,

11  Manhattan is different than the rest of the boroughs

12  and we need to have some space.  But what we do we do

13  temporarily and that we look to full hearings to talk

14  about impacts from everyone if we were to do anything

15  beyond, ah, temporary emergency acts, because we are

16  dependent on those very streets, all of us, not just

17  certain routes.

18            SERGEANT AT ARMS:  Time.

19            COUNCIL MEMBER VALLONE:  Thank you, God

20  bless everyone.

21            MAJORITY LEADER CUMBO:  Thank you so

22  much, and so glad to see you in good health.

23            COUNCIL MEMBER VALLONE:  Thank you.

24            MAJORITY LEADER CUMBO:  Council Member

25  Louis.
```

A-1566

```
 1  STATED MEETING                                    46

 2           SERGEANT AT ARMS:  Council Member Louis,

 3  your time will start now.

 4           COUNCIL MEMBER LOUIS:  Good afternoon,

 5  everyone.  I'm very, very grateful to see everyone,

 6  um, and to see everyone well, happy, and healthy.

 7  Ah, I want to thank all of our first responders and

 8  everyone that's just been doing a great work on the

 9  grounds, um, in all of our districts and all of our

10  communities.  I want to thank you, Speaker Corey

11  Johnson, for your leadership, and I want to thank the

12  legislative division for helping me push these two

13  pieces of legislation forward.  Um, in the interest

14  of time I'll be really quick.  Um, today I'll be

15  introducing two pieces, ah, Intro 1929, which would

16  create a public alert system to be used in missing

17  persons cases, where the person is believed to be in

18  imminent danger, and Intro 1928, which would require

19  the NYPD to compile, send, and post a yearly missing

20  persons report disaggregated by race, age, gender,

21  police precinct, person, ah, sorry, percent of cases

22  solved and proportion of which cases involved of

23  human trafficking.  Um, I urge my colleagues to sign

24  onto 1928 and 1929.  These two public safety bills

25  can help increase awareness and save more lives.  And
```

1   STATED MEETING                                    47

2   I also want to thank Council Member Gjonaj for

3   allowing me to co-prime on 1921.  I don't know if he

4   is speaking about it today, but it is a very good

5   bill and I want to encourage everyone to sign on.

6   And thank you so much, Majority Leader.

7              LANCE POLIVY: Madam Majority Leader, the

8   next three members who have signed up are Grodenchik,

9   Rivera, and Powers.

10             SERGEANT AT ARMS:  Council Member

11   Grodenchik, your time will start now.

12             COUNCIL MEMBER GRODENCHIK:  Thank you

13   very much.  Um, I want to thank everybody for, ah,

14   their personal concern for myself and my family.  Um,

15   this disease is nothing to be trifled with as many of

16   us have found out.  So thank you.  I want to thank

17   the Speaker and the entire council time for putting

18   this together today.  Um, it's critical that

19   government function in New York City and we have

20   shown that that is possible, ah, despite what we're

21   going through.  I want to thank my own team, led by

22   my chief of staff, Ari Gershman, ah, for keeping up

23   and, ah, helping out, ah, many, many people in my

24   district and elsewhere, um, when I was flat on my

25   back.  Um, I want to thank our first responders and

1  STATED MEETING                                    48

2  everybody, ah, who is fighting this terrible

3  disaster.  I know that we have lost over 10,000 New

4  Yorkers, many of them city workers who have given

5  their lives in performance of their duty, and our

6  thoughts and our prayers are with them and their

7  families at this time.  I want to echo the concerns

8  of my colleague and my dear friend, Paul Vallone, and

9  we must remember that New York City spreads out over

10  300 square miles.  Ah, traveling in my district is

11  very difficult by mass transit, even more so these

12  days.  Ah, I delivered food today on behalf of Common

13  Point in eastern Queens.  None of the people that I

14  delivered today would be able to get around without a

15  car.  Some of them lived almost a mile from the

16  nearest grocery store.  So, ah, it's a very large

17  city, ah...

18            SERGEANT AT ARMS:  30 seconds.

19            COUNCIL MEMBER GRODENCHIK:  Thank you.

20  In sum, ah, growing up when I was a little boy we

21  used to drive along the Cross Bronx Expressway

22  visiting family and vast stretches of our city were

23  burned out in the early '70s.  New York City came

24  back because we worked hard and we were smart, and we

25  will get over this, I assure you.  Ah, New York City

A-1569

```
 1  STATED MEETING                              49

 2  is always going to be a place where people are going

 3  to want to come to live, to work, to raise their

 4  families, and to retire as well.  So let's stay...

 5               SERGEANT AT ARMS:  Time.

 6               COUNCIL MEMBER GRODENCHIK:  Keep your

 7  foot on the accelerator.  Thank you very much.

 8               LANCE POLIVY: Madam Majority Leader,

 9  Council Members Rivera, Powers, and Levine.

10               MAJORITY LEADER CUMBO:  Council Member

11  Rivera.

12               SERGEANT AT ARMS:  Council Member Rivera,

13  your time will start now.

14               COUNCIL MEMBER RIVERA:  Thank you so

15  much.  Thank you, Mr. Speaker.  Thank you to everyone

16  out there who made this happen, especially the staff

17  and to all the first responders and, and workers who

18  are keeping us safe, healthy, and comfortable.  I

19  want to just highlight two bills I'm introducing

20  today.  First, legislation that would temporarily

21  require the city to open approximately 75 miles of

22  city streets to pedestrians and cyclists during the

23  COVID-19 pandemic in order to provide New Yorkers

24  with more room for social distancing.  Cities across

25  the country from Boston to Oakland have taken similar
```

A-1570

```
1   STATED MEETING                              50

2   measures, but if passed we would be the first

3   legislative body to pursue an innovative program such

4   as this.  We have seen just this week in reports from

5   urban planners that almost all of our city sidewalks

6   are not safe for social distancing.  Our Open Streets

7   bill will increase space for essential workers to

8   commute safely.  It will supplement our already

9   crowded parks, which will only become more cramped

10  this summer, and it will bring equity to communities

11  of color that for decades have lacked the open spaces

12  that we are fortunate to have in other neighborhoods.

13  As the chair of the Committee on Hospitals I

14  encourage all of you, my colleagues in the council,

15  to support the passage of this bill as quickly as

16  possible in order to prevent further infections and

17  further strain on our heroic hospitals and their

18  staff.  An open streets program just like washing

19  hands and face coverings will save lives, plain and

20  simple.  The Speaker and I are also introducing

21  legislation as part of the council's coronavirus

22  relief package, which will temporarily suspend

23  personal liability [inaudible] ...

24            SERGEANT AT ARMS:  30 seconds.

25
```

A-1571

```
1   STATED MEETING                           51

2              COUNCIL MEMBER RIVERA: ...and related

3   rental agreements of businesses impacted by COVID-19.

4   This will ensure city business owners don't face the

5   loss of their businesses and personal financial ruin

6   or bankruptcy as a result of this state of emergency.

7   These businesses are closing and losing weeks of

8   income through no fault of their own and allowing

9   small business owners to keep their spaces will be

10  integral to the city's ability to recovery after the

11  virus.  I hope you will join us in cosponsoring the

12  bills and its coronavirus relief package before us

13  today.

14             SERGEANT AT ARMS:  Time.

15             COUNCIL MEMBER RIVERA:  Thank you so

16  much.

17             MAJORITY LEADER CUMBO:  Thank you so

18  much, Council Member Rivera.  Now we'll hear from

19  Council Member Powers.

20             COUNCIL MEMBER POWERS:  Thank you, thank

21  you.

22             SERGEANT AT ARMS:  Council Member Powers,

23  your time will start now.

24             COUNCIL MEMBER POWERS:  OK, thank you for

25  the opportunity, and it's good to see everybody
```

A-1572

```
 1  STATED MEETING                                     52

 2  again, even in a virtual setting.  I have missed

 3  everybody here and thank you for all the good work

 4  you're all doing.  And I wanted to offer some

 5  condolences and some prayers today for those who

 6  unfortunately we have lost along the way in this

 7  difficult moment, and I wanted to offer my deepest

 8  condolences to our colleague, Rafael Salamanca, for

 9  the passing of his father, ah, as well to Comptroller

10  Scott Stringer for the passing of his mother, and

11  also remember the lives of many who couldn't be here,

12  including Council Member Noach Dear who I know passed

13  last week.  Many members of the NYPD, many members of

14  the Corrections Department, ah, and two folks in city

15  custody who passed away, and countless many more.

16  Um, they've been devastating to our city and, of

17  course, to their families as well.  And I also wanted

18  to send my thoughts and prayers to the family of NYPD

19  Transportation Chair, Transportation Chief, rather,

20  William Morris, who I know his family is struggling

21  and he is struggling as well today.  We have so much

22  work to do ahead of us to honor the lives of those

23  who have been lost, but also to save lives and to

24  protect New Yorkers' health and prosperity going

25  forward, and health is our top priority, we all must,
```

Case 1:20-cv-05301-RA   Document 38-37   Filed 08/12/20   Page 54 of 100

```
1    STATED MEETING                                    53

2    ah, follow official guidance.  But as we think past

3    the stages, ah, past this stage of the COVID crisis

4    that means making tough decisions in our city budget.

5    It means making tough decisions about what our

6    priorities will be and, but it means being proactive

7    in helping those.  Um, for me that's meant helping...

8              SERGEANT AT ARMS:  30 seconds.

9              COUNCIL MEMBER POWERS:  Yep.  Helping

10   renters immediately, providing rental assistance,

11   finding creative ways to help people be able to pay

12   the next month's rent.  It means that we have to have

13   a [inaudible] for our small businesses who really

14   need our help, particularly those in the hospitality

15   industry right now, who are being hit the hardest,

16   and it means we need [inaudible] in our city jails

17   where there have been the highest rate of infections.

18   We've lost officers and, ah, people that are

19   incarcerated.  So I know we have a lot of work to do.

20   I'll stop, I see my time is up, and I want to thank

21   everybody for their continued leadership here and I

22   know that we'll be working together in the weeks

23   ahead to make sure New York [inaudible] very

24   difficult time.  Thank you.

25
```

```
1   STATED MEETING                           54

2            MAJORITY LEADER CUMBO:  Thank you so

3   much.  We'll hear now from Council Member Levine.

4            COUNCIL MEMBER LEVINE:  Thank you, Madam

5   Majority Leader.

6            SERGEANT AT ARMS:  Council Member Levine,

7   your time is starting now.

8            COUNCIL MEMBER LEVINE:  Thank you, Madam

9   Majority Leader.  Ah, thank you, Mr. Speaker, for

10  your leadership, which has been outstanding

11  throughout this crisis.  Thanks to all, my

12  colleagues, for what you're doing in your district

13  and all around the, all around the city.  It's really

14  quite inspiring.  As all of you know, we are about to

15  build an entirely new public health system to prepare

16  us for the next phase of this virus and our fight

17  against it.  We are gonna have to build a system of

18  mass testing and contact tracing, quarantining,

19  hoteling, isolating, transporting patients,

20  telemedicine, IT, it's almost the equivalent of

21  starting an entirely new city agency, um, as big as

22  ACS, maybe FDNY.  We've never done anything like this

23  in city history.  Thousands of employees.  Um, it's

24  going to be an extraordinarily challenging

25  undertaking, but it's what we need to do to restart
```

A-1575

```
 1  STATED MEETING                                    55

 2  our economy and to get back to something remotely

 3  like normal.  This is gonna touch every one of our

 4  districts, especially communities of color, which

 5  have been disproportionately hard hit in this crisis,

 6  and every one of us needs to have a role in shaping

 7  this and delivering it.  Our communities need to be

 8  engaged in, engaged in designing this, this new

 9  public health system.  Ah, CBOs need to be engaged in

10  delivering these services.  Ah, so my call to all of

11  you is let's work together on this to make sure that

12  the failures of the early stage in this crisis

13  nationally are not repeated here in New York City

14  when we have one more...

15              SERGEANT AT ARMS:  30 seconds.

16              COUNCIL MEMBER LEVINE: ...shot at

17  containing this horrible virus.  Thank you very much.

18              MAJORITY LEADER CUMBO:  Thank you so

19  much, Council Member Levine.  I'm so glad to see you

20  as well as your family doing better.  Next three

21  speakers.

22              LANCE POLIVY: Madam Majority Leader, the

23  next three speakers are Council Members Menchaca,

24  King, and Eugene.

25
```

A-1576

1  STATED MEETING                                    56

2          MAJORITY LEADER CUMBO:  Council Member

3  Menchaca.

4          SERGEANT AT ARMS:  Council Member

5  Menchaca, your time will start now.

6          COUNCIL MEMBER MENCHACA:  Hi colleagues,

7  and hi again.  Um, the coronavirus continues to be,

8  ah, incredibly impactful, widespread across the

9  economic.  We just heard about the health stuff, um,

10  from, ah, Council Member Levine, and immigrant New

11  Yorkers, particularly those who are undocumented,

12  they have incredible vulnerability in this

13  conversation, and yet these undocumented workers and

14  immigrant families are largely excluded from state

15  programs like unemployment insurance and the federal

16  relief cash payments that are and were supposed to

17  help workers who lost their jobs or got their hours

18  cut.  And so my question to us here and to everyone

19  at home, what will the state and the city do to help

20  our immigrant friends and families and neighbors and

21  colleagues?  And so the governor and the mayor have

22  already said that they're not interested in using

23  government funding for this.  Um, but I'm sure that

24  they know that the undocumented immigrant communities

25  contribute 40 billion dollars a year to New York

A-1577

```
1   STATED MEETING                              57

2   State's gross domestic product.  That's according to

3   the Fiscal Policy Institute report.  And, further,

4   they pay more than a billion dollars a year in state

5   and local taxes.  So, again, I gotta ask, what are we

6   gonna do?  And where are we, what are we gonna do as

7   a council?  Meanwhile, the ICE is, ICE is still, ah,

8   terrorizing our communities.  They're holding people,

9   including pregnant women, in detention facilities, as

10  we, um, ah, told to stay at home...

11             SERGEANT AT ARMS:  30 seconds.

12             COUNCIL MEMBER MENCHACA:  And, and

13  practice social distancing.  So with all this I just

14  want to keep asking ourselves what are we gonna do,

15  um, and let us not, um, forget that democracy, ah,

16  cannot assume democracy, even in this time, and that,

17  that democracy is about participation and I'm hoping

18  that everyone stays engaged, re-engages, whether

19  you're a community board member, a student, an

20  immigrant, a day laborer, no matter what language you

21  speak or sexual indication or gender expression,

22  whatever, we need your help...

23             SERGEANT AT ARMS:  Time's up.

24             COUNCIL MEMBER MENCHACA:  ...to maintain

25  this, the democracy.  Thank you again.
```

A-1578

```
1   STATED MEETING                              58
2            MAJORITY LEADER CUMBO:  Thank you so
3   much, Council Member Menchaca.  Now we will hear from
4   Council Member King.
5            COUNCIL MEMBER KING:  Thank you, Majority
6   Leader.
7            SERGEANT AT ARMS:  Council Member King,
8   your time is starting now.
9            COUNCIL MEMBER KING:  Thank you, Majority
10  Leader and Speaker.  Thank you for leading today's
11  conversation and your leadership through all this
12  craziness that we're trying to manage.  I just want
13  to offer prayers to all the families who are
14  suffering from this pandemic.  More importantly, to
15  all of my colleagues, all of us here, who are dealing
16  with this in our neighborhoods and in our hearts and
17  in our households and outside of our households, and
18  praying for strength and, and health for everyone.
19  Um, I just want to add my voice to Peter Vallone, I
20  mean Paul Vallone.  I want to thank you for allowing
21  me to, ah, be a co-prime with you and with the
22  resolution making sure that our condos and our co-ops
23  are not forgotten in this, all these fiscal
24  stimuluses that are coming down and making sure that
25  we take care of those residents.  Co-op City, which
```

A-1579

```
1    STATED MEETING                                    59

2    is the largest [inaudible] in this country, they're

3    suffering right now.  So even as we're talking about

4    a COVID package that will make sure essential workers

5    get raises, they're gonna have challenges meeting

6    those financial burdens.  So I want us to continue to

7    have these conversations and make sure that we can

8    protect everybody, small businesses, big businesses,

9    housing, and so forth.  But I also want to lend my

10   voice.  Debbie Rosen, our Council Member [inaudible]

11   well the challenge of making sure that summer youth

12   this summer have something to do.  Um, we know that

13   the Speaker, as you mentioned, the conversation has

14   been about ending it.  I'm asking us maybe we can

15   call on the federal government to do a summer youth

16   stimulus package and making sure children are funded

17   and they're doing something during summer, whether

18   it's a school project or something to keep them

19   engaged because of the fiscal responsibilities they

20   have to their own.  I'm asking if we can look at

21   something like that and continue that conversation

22   with our youth.  And finally I want to talk about

23   small businesses.  Not only just small businesses,

24   but...

25                    SERGEANT AT ARMS:  30 seconds.
```

A-1580

```
1   STATED MEETING                                60

2           COUNCIL MEMBER KING:  But our black and

3   brown small businesses for some reason sometimes get

4   left out of the pot, pot when it comes to giving that

5   funding to our neighborhood, whether it's capacity or

6   figuring out the rules, how to be streamlined that

7   this, this big [inaudible] come down, hits our

8   neighborhoods and hits them, hits them in real time.

9   So with that [inaudible] I want to wish everyone a

10  happy Ramadan.  Council Member [inaudible] happy

11  birthday.  And blessings and peace to everybody.

12  Thank you again for your leadership.  God bless us

13  all.

14          MAJORITY LEADER CUMBO:  Thank you so

15  much, Council Member King.  Followed by Council

16  Member Eugene.

17          COUNCIL MEMBER EUGENE:  Thank you very

18  much, Madam Majority Leader.

19          SERGEANT AT ARMS:  Council Member Eugene,

20  your time will start now.

21          COUNCIL MEMBER EUGENE:  Thank you, ah,

22  Madam Majority Leader.  Ah, we all know that we are

23  facing as a community, as a society, we are facing

24  the ongoing tragedy, the COVID-19 pandemic that has

25  claimed the life of so many people, it has caused so
```

A-1581

```
 1   STATED MEETING                           61

 2   many pain and suffering in our society.  And also

 3   that has shut down our economy, our school, our

 4   churches, and, you know, that have affected us in so

 5   many part of our life.  But we can see that part of

 6   the devastation is because we were not ready for this

 7   type of viruses, these type of crisis, even after

 8   such virus epidemic in 2002, and MERS in 2012.  We

 9   were still not ready.  And we put so much stress and

10   challenges on our medical staff, doctors and nurses,

11   and what happened?  The people who have been

12   suffering from critical disease before they couldn't

13   even receive the critical care that they need.

14   That's the reason why I have introduced two pieces of

15   resolution, two pieces of legislation, resolution 637

16   and 638, asking that the city and [inaudible]

17   government create [inaudible] medical centers and

18   hospital to [inaudible] crisis...

19              SERGEANT AT ARMS:  30 seconds.

20              COUNCIL MEMBER EUGENE: ...[inaudible]

21   infectious disease impediment, impediment, and to

22   create also a permanent commission to study the

23   effect of the previous crisis, health crisis, on the

24   society in order for us to be prepared.  And this

25   commission will be staffed by medical staff, elected
```

```
1    STATED MEETING                              62

2    official, and expert in medicine and virology to do

3    research on the impact of the previous medical

4    training.

5              SERGEANT AT ARMS:  Time's up.

6              COUNCIL MEMBER EUGENE:  And [inaudible]

7    people who are infected by a virus like COVID-19, so

8    pathogenic, we are going to expose the medical staff,

9    doctors, nurses, in the previous [inaudible].

10             MAJORITY LEADER CUMBO:  [inaudible]

11             COUNCIL MEMBER EUGENE:  I'm asking all my

12   colleagues to support this, ah, ah, two legislation.

13   Thank you.

14             MAJORITY LEADER CUMBO:  Thank you, and

15   thank you for your important work.  I'd like to have

16   the next three speakers.

17             LANCE POLIVY: Madam Majority Leader, with

18   your permission I'll read the full list.  There have

19   been a number of council members who have been

20   raising their hand.

21             MAJORITY LEADER CUMBO:  OK.

22             LANCE POLIVY: And this way they'll know

23   that they have been recognized.  The remaining list

24   is Council Members Rodriguez, Kallos, Barron,

25   Borelli, Constantinides, Treyger, Lander, Reynoso,
```

A-1583

```
 1   STATED MEETING                                63

 2   Van Bramer, Yeger, Levin, and Cabrera.  The next

 3   three up are Rodriguez, Kallos, and Barron.

 4              MAJORITY LEADER CUMBO:  Thank you.

 5   Council Member Rodriguez.

 6              SERGEANT AT ARMS:  Council Member

 7   Rodriguez, your time will start now.

 8              COUNCIL MEMBER RODRIGUEZ:  Thank you.

 9   Eh, I think that most of you guys know, you know what

10   I gonna say.  But for all New Yorkers it's sad to be

11   in 2020, you know, showing the face of the City of

12   New York that we have reclaiming that we had the best

13   [inaudible] system in the whole nation, and yes when

14   we see the [inaudible] where people have access to

15   the base health services, at those [inaudible] of the

16   wealthy New Yorkers, where you look at the numbers

17   and the faces of people dying, you know, that

18   [inaudible] is the same system [inaudible] poverty

19   that we have in the poorest area.  You can call it in

20   any elected official [inaudible].  But I can tell you

21   like Congressman Sarano district and Sarano is like

22   the first one poorest in the nation, Congressman

23   [inaudible] district is the eleven one poorest in the

24   nation, and you look at the faces of the Latinos and

25   the black and the Asian and yes coronavirus doesn't
```

A-1584

```
 1  STATED MEETING                              64

 2  discriminate, anyone can get it, and we feel, you

 3  know, we really have our prayer for anyone, the 8.6

 4  million New Yorkers.  But they're faces of the

 5  poorest one and the question is what can we do.  We

 6  have failed.  The city has failed.  We have been the

 7  city of the poor...

 8            SERGEANT AT ARMS:  30 seconds.

 9            COUNCIL MEMBER RODRIGUEZ:  ...and the

10  rich.  And until we address that situation we will be

11  in the same place 10, 20 year from now.  [speaking in

12  Spanish] and I call on progressive New Yorkers stand

13  up.  We need to do better.  We can do better.  We can

14  save life.  And lastly I would like to show all our

15  support to the responders who they are putting their

16  life to save other people life.

17            SERGEANT AT ARMS:  Time's up.

18            LANCE POLIVY: And Majority Leader,

19  Council Members Kallos, Barron, and Borelli.

20            COUNCIL MEMBER KALLOS:  I'm waiting for

21  the Sergeant at Arms.

22            SERGEANT AT ARMS:  You have to be

23  recognized by the Majority Leader.

24            SPEAKER JOHNSON:  Council Member Kallos,

25  you're recognized to begin.
```

A-1585

```
1    STATED MEETING                              65

2              SERGEANT AT ARMS:  Time will start now.

3              COUNCIL MEMBER KALLOS:  I'm proud of the

4    work that the council continues to do as the

5    legislative body in responding to the COVID-19

6    pandemic.  Today I'm introducing two bills, one to

7    help essential workers now and one looking ahead in

8    hopes of bringing systemic change, improving access

9    to underrepresented communities to our city's best

10   schools and you may hear my daughter in the

11   background, as all of us adjust to the new normal.

12   My first introduction, 1923, that I authored with

13   Speaker Corey Johnson and Council Member Lander to

14   provide [inaudible] protections to all essential

15   workers, from those in healthcare to those in our

16   grocery markets or making deliveries, as we continue

17   to thank and praise all these workers, including

18   cheering them nightly.  Many have faced retaliation

19   for speaking out against unsafe conditions and

20   demanding protective equipment to keep them safe in

21   order to better keep us safe.  Under this

22   legislation, essential workers would be protected

23   from retaliation or termination without just cause.

24   Second introduction, 1924, that I authored with

25   Public Advocate Williams and Council Members Brannan
```

A-1586

```
1   STATED MEETING                              66

2   and Cornegy, aims to increase access to specialized

3   high schools in our city where black and Latino

4   students have lost seats over the last two decades.

5   The legislation would finally seat every student with

6   a specialized high school, ah, admissions testing,

7   [inaudible] SAT unless they opted out.  Universal

8   test preparation would also be available.  The

9   Education Equity Campaign provided a free seven-week

10  course to nearly 200 students of color.  The results

11  have proved this intervention, combined with seating

12  every student, would improve access.  If you're

13  watching online...

14          SERGEANT AT ARMS:  30 seconds.

15          COUNCIL MEMBER KALLOS:  And you need help

16  during this pandemic please reach out and we will be

17  there for you to help.  I want to thank the council

18  staff for working even harder from home, my staff,

19  Jeff Baker, Risau Chowdry, Malcolm Buterhorn, and

20  countless others.  Thank you.

21          SPEAKER JOHNSON:  Thank you.  I believe

22  we lost the Majority Leader.  Lance, who's next?

23          LANCE POLIVY: Council Members Barron,

24  Borelli, and Constantinides.

25          SPEAKER JOHNSON:  Council Member Barron.
```

A-1587

```
 1   STATED MEETING                               67

 2               SERGEANT AT ARMS:  Council Member Barron,

 3   your time will start now.

 4               COUNCIL MEMBER BARRON:  Thank you.  It's

 5   good to see all of my colleagues.  You're looking

 6   well.  Glad to see you.  I want to thank the Speaker

 7   and all of those who worked to make this a reality.

 8   This is my first big Zoom conference and I'm so glad

 9   that we're doing something that's so significant.  I

10   also want to add my prayers and condolences to all

11   who have been impacted by this, whether you were

12   diagnosed with it or you had someone else was

13   diagnosed.  As you may know, Charles and I did have

14   it.  We have recovered, although we have not been in

15   the house in about 45 days.  We're still staying in.

16   And we want to thank all of who have been supportive

17   of is.  Um, I also want to mention Minister Abdul

18   Hafice Mohammed who passed and Father Lawrence Lupus

19   who passed also.  Ah, this COVID is colorblind, yes.

20   But the systems that operate in this city and this

21   nation are not colorblind.  And the inherent racial

22   inequities that are manifested in our health

23   disparities, in our underfunding through the

24   educational system, through the low family wealth

25   that exists through the businesses that are so
```

A-1588

```
1   STATED MEETING                              68

2   greatly impact, and through the digital divide that

3   we see are a result of the systemic historic racism

4   on which this country has been founded.  And we hear

5   people talking about that and we want to make sure

6   that when we come through this we don't have a worse

7   situation in the aftermath, such as what we saw in

8   Katrina.

9             SERGEANT AT ARMS:  30 seconds.

10            COUNCIL MEMBER BARRON:  So I encourage

11  everyone to be able to be mindful of making sure that

12  we come out at the other end we're at a more

13  equitable place, and I want to encourage you to

14  support the Higher Education Committee as we appeal

15  for CUNY to freeze tuition and to maintain the ASAP

16  program, which is nationally recognized, and to

17  implement the food program which the speaker had so

18  graciously started, and to continue...

19            SERGEANT AT ARMS:  Time's up.

20            COUNCIL MEMBER BARRON:  ...the Link

21  program 'cause are children are going to be

22  devastated when they come back to school in

23  September.  Thank you.

24            SPEAKER JOHNSON:  Thank you, Inez.  I'm

25  glad you and Charles are better.
```

A-1589

```
 1  STATED MEETING                                    69
 2            COUNCIL MEMBER BARRON:  Yes, we're
 3  better, thank you.
 4            MAJORITY LEADER CUMBO:  Thank you.
 5            SPEAKER JOHNSON:  Council Member Borelli.
 6  Oh, sorry, the Majority Leader is back.
 7            MAJORITY LEADER CUMBO:  Thank you.
 8  Council Member Borelli.
 9            SERGEANT AT ARMS:  Council Member
10  Borelli, your time will start now.
11            COUNCIL MEMBER BORELLI:  Thank you.  I
12  think there was a misunderstanding.  I didn't put
13  myself in to speak.  But while I have the conch I
14  just want to say, ah, that I hope the council
15  continues to take a very direct and deliberate action
16  in supporting line of duty death benefits for all
17  essential workers, um, whom we had asked to go to
18  work during this crisis.  The MTA took a very
19  positive step in being the first sort of organization
20  to guarantee these for their members.  Ah, but there
21  are a lot of, um, you know, correction employees,
22  teachers, nurses, ah, ah, and all sorts of people.
23  EMTs, there were two more EMTs that died in the last
24  24 hours.  So please let's take some definitive steps
25  towards easing the mental burden, ah, that, that
```

A-1590

```
 1  STATED MEETING                                70

 2  potentially leaving one's family destitute must be,

 3  ah, on the shoulders of some of our essential

 4  workers.  Thank you.

 5             SPEAKER JOHNSON:  I agree, Joe.  Thank

 6  you.

 7             MAJORITY LEADER CUMBO:  Thank you.

 8  Council Member Costa Constantinides.

 9             SERGEANT AT ARMS:  Council Member

10  Constantinides, your time starts now.

11             COUNCIL MEMBER CONSTANTINIDES:  First I

12  want to thank all of my colleagues for all the good

13  wishes, my family and, ah, to really thank all of the

14  frontline workers, essential workers, healthcare

15  workers.  They have been doing an amazing job under

16  unbelievable circumstances every single day.  Ah, you

17  know, this is Earth Day today, as the Speaker talked

18  about, and, you know, last year we passed some very

19  big legislation.  And it wasn't about the goals.  It

20  was about what those goals mean.  We're seeing the

21  impacts of environmental racism and pollution in our

22  environmental justice communities every single day,

23  exasperated.  The asthma rates are the breeding

24  ground for COVID and we're losing lives in those

25  communities.  We need to act more boldly.  We need to
```

A-1591

```
1   STATED MEETING                              71

2   continue to move our agenda forward.  We need to move

3   our city forward in a way that protects our

4   environmental justice communities in the long haul

5   because it is literally life and death.  Those

6   communities are the ones that are the most impacted.

7   They are the ones that have been bearing the brunt of

8   COVID and we must continue to do more.  So I, I agree

9   with the Speaker as he talked about in his opening

10  about needing to double down on our efforts around

11  environmental justice, around environmental work, and

12  ensuring the health...

13           SERGEANT AT ARMS:  30 seconds.

14           COUNCIL MEMBER CONSTANTINIDES: ...of New

15  Yorkers in the long term.  And lastly I'm glad to

16  work with Council Member Rodriguez in introducing the

17  resolution in support of Senator Gennaro's bill to

18  cancel rent in this critical time.  We need to make

19  sure that with all of this that's going on that no

20  one is losing their homes, no one is being put into

21  debt, and we need to protect all of our New Yorkers,

22  ah, from the consequences of what is going on.  Thank

23  you.

24

25
```

A-1592

```
1   STATED MEETING                              72
2               MAJORITY LEADER CUMBO:  Thank you so
3   much.  I'm so glad to see you doing better.  Council
4   Member Treyger.
5               SERGEANT AT ARMS:  Council Member
6   Treyger, your time will start now.
7               COUNCIL MEMBER TREYGER:  Thank you,
8   Majority Leader.  Thank you to the Speaker, ah, to
9   the staff, to all my colleagues.  Ah, I extended best
10  wishes and speedy recoveries to all of us, ah, and
11  all of our communities that have been greatly
12  impacted.  And thank you to our staff, both central
13  and all of our member office staff, who have
14  literally signed thousands of seniors up for
15  deliveries, meals, ah, for helping with unemployment
16  insurance.  Ah, our staff is doing amazing work.  I
17  want to thank them all and thank you to [inaudible]
18  staff are keeping democracy going in this crisis.  Of
19  course, I want to extend our heartfelt appreciation
20  and thanks to our healthcare heroes, our emergency
21  first responders.  I want to note for the record that
22  there are hospital executives, ah, hiding out in
23  mansions in Florida or in the Hamptons while EMTs in
24  New York City who are dying from their lives on the
25  line still making $35,000 a year, seeing great pay
```

A-1593

1    STATED MEETING                              73

2    disparity.  We must address that once and for all.

3    And I want to just clarify something for the record.

4    We keep hearing city, state, federal leaders keep

5    referring to schools as being closed.  I want to

6    clarify that the work of our educators continue.  I

7    speak not just as the education chair, but as a

8    former public school teacher who speaks to my

9    colleagues.  It would take me a long time to map

10   curriculum for the year ahead.  The work of our

11   educators has been nothing short of extraordinary.

12   To those educators who have lost colleagues, who are

13   grieving...

14            SERGEANT AT ARMS:  30 seconds.

15            COUNCIL MEMBER TREYGER:  ...and their

16   families and their school communities, we see you.

17   The fact that our educators have put together

18   curriculum maps online in this new era of remote

19   learning in under a week or two weeks, we see you.

20   The fact that you're still teaching and educating

21   while taking care of your families and grieving

22   losses, we see you.  The fact you're doing wellness

23   calls to your students, checking in on them, their

24   wellness at home.  We see you.  The fact that

25

A-1594

```
1   STATED MEETING                                74

2   educators are raising money from their own pockets to

3   feed their kids...

4              SERGEANT AT ARMS:  Time's up.

5              COUNCIL MEMBER TREYGER: ...to feed their

6   students, and to buy them clothes, we see you, and I

7   hope my colleagues will see them and we hear them in

8   the budget process.  Thank you, Mr. Speaker, for your

9   time.

10             MAJORITY LEADER CUMBO:  Thank you,

11  Council Member Treyger, and thank you for your

12  passion and your persistence.  I'd now like to call

13  on Council Member Lander, followed by Council Member

14  Van Bramer.

15             SERGEANT AT ARMS:  Council Member Lander,

16  your time is starting now.

17             COUNCIL MEMBER LANDER:  Thank you,

18  Majority Leader, and thank you, Speaker Johnson, and

19  a big thanks to the staff who made this possible.

20  And I also want to echo to my own staff, who are just

21  working extraordinarily hard.  Colleagues, it is

22  unbelievably powerful to be with you right now.

23  These are some of the darkest times that we will live

24  through, some of the darkest times of any generation

25  and we're seeing extraordinary pain and anguish in
```

```
 1    STATED MEETING                            75

 2    the families who are suffering, in the workers who

 3    have to be out there, and people who have lost their

 4    jobs, are afraid of losing their homes, but we are

 5    also seeing some incredible courage, some of the most

 6    courageous action we've ever seen, obviously in our

 7    emergencies and in our hospitals, but by so many of

 8    our essential workers as well.  And I'm glad that we

 9    are back in business today trying to do our part,

10    inspired by those workers to honor it and to make

11    sure we live up to what we're saying.  So I know that

12    many of you, like me, love going out at 7:00 p.m.

13    every night and banging pots and pans and screaming

14    as loudly as we can to say thank you to the people

15    who are stocking the shelves in our grocery stores,

16    delivering food and supplies, driving people to work

17    and appointments, and caring for sick New Yorkers in

18    our hospitals and our nursing homes.  But let's

19    remember so many of those people are low-income New

20    Yorkers, they're working in low-wage jobs.  They're

21    women.  They're people of color.  And we might be

22    banging pots and pans but we haven't done enough to

23    make sure that they've got the pay and the sick leave

24    and the workplace protections and the dignity that

25    they so deeply deserve.
```

A-1596

```
 1  STATED MEETING                                    76

 2              SERGEANT AT ARMS:  30 seconds.

 3              COUNCIL MEMBER LANDER:  So I'm proud

 4  today along with the Speaker, Council Member Kallos,

 5  and Council Member Cumbo to be introducing the New

 6  York City Essential Worker Bill of Rights, which will

 7  go beyond cheering to make sure that our [inaudible]

 8  workers have paid sick leave, that workers can't be

 9  fired for speaking about health and safety

10  conditions, and making sure people get some extra pay

11  if they are working for large companies and having

12  the courage to go out and work in this period of

13  time.  It's a powerful piece of legislation, ah, a

14  package of legislation.  I really hope people join

15  us.

16              SERGEANT AT ARMS:  Your time's up.

17              COUNCIL MEMBER LANDER:  Thank you very

18  much.

19              MAJORITY LEADER CUMBO:  Thank you so

20  much, Council Member Lander, and I stand corrected.

21  We have Council Member Reynoso followed by Council

22  Member Van Bramer, and then followed by Council

23  Member Cabrera.

24              SERGEANT AT ARMS:  Council Member

25  Reynoso, your time starts now.
```

A-1597

```
1   STATED MEETING                              77

2            COUNCIL MEMBER REYNOSO:  Thank you.  I

3   also want to make sure that I thank the Sergeant at

4   Arms for all the work they're doing and participating

5   and keeping everything in order.  To Lance, um, we're

6   big process geeks so love the parliamentarian role.

7   Um, and again, to all the staff, including my staff,

8   that is working hard during this, ah, this pandemic.

9   Um, I want to make sure that I state, um, while this

10  virus, ah, sees us all the same, the inequities in

11  our communities, um, have made it very clear that

12  there are certain types of groups of people, um, and

13  folks of socioeconomic status that are being treated,

14  um, unfairly or inequitably in our system.  And I

15  think, ah, it's going to be extremely important

16  moving forward that business is not done as usual.

17  We are able to start righting the ship of inequality

18  after this crisis and I hope that, ah, many of our

19  colleagues start, ah, drawing a line as to how

20  exactly we're going to do that.  It is very clear.

21  There are neighborhoods in South Bronx, North

22  Brooklyn, and Southeast Queens have the highest rates

23  of asthma in all of the city and it is no, ah,

24  because of that it is why they're dying at a higher

25  rate than anywhere else in the city.  Um, so I think
```

A-1598

```
 1  STATED MEETING                                78

 2  it's very important that we start having these

 3  conversations and not concede or compromise in making

 4  sure we drive ourselves out of this equitable, ah,

 5  this inequity.  Ah, I also note that the budget is

 6  something we're talking about right now.  There are

 7  some agencies...

 8            SERGEANT AT ARMS:  30 seconds.

 9            COUNCIL MEMBER REYNOSO:  ...like NYPD

10  that has not taken the same steps as, as other

11  agencies, like the Department of Education, when it

12  comes to cuts that need to happen so that we can

13  start talking about equity again.  And then we also

14  have, um, initiatives like Thrive that don't

15  necessarily do the job that we thought they should be

16  doing that have also not taken enough cuts.  So we

17  should really have a conversation about where these

18  cuts are coming from and stop, ah, [inaudible] for

19  the initiatives that are supposed to bring about

20  equity, um, to continue to get [inaudible].

21            SERGEANT AT ARMS:  Time's up.

22            COUNCIL MEMBER REYNOSO:  Thank you.

23            MAJORITY LEADER CUMBO:  Thank you.

24  Council Member Van Bramer.

25
```

A-1599

```
 1  STATED MEETING                              79
 2           COUNCIL MEMBER VAN BRAMER:  Thank you
 3  very much.
 4           SERGEANT AT ARMS:  Council Member Van
 5  Bramer, your time will start now.
 6           COUNCIL MEMBER VAN BRAMER:  Thank you.  I
 7  want to thank the Speaker and the entire staff for
 8  making this possible.  Ah, I, too, want to begin by
 9  thanking the members of my staff who have been
10  working nonstop at home since this all begin.  I also
11  want to recognize the public housing residents, ah,
12  the good folks of Queensbridge, Ravenswood, Woodside
13  Houses, Astoria Houses, um, ah, just now we're
14  hearing all of these plans from the governor and the
15  mayor to talk about how we're going to help people in
16  public housing, but that's about eight weeks later
17  than we should have had a plan to talk about how we
18  were going to help folks in public housing, um, get
19  through this crisis.  Um, I also want to talk about
20  the fact that, ah, when we talk about essential
21  workers and I'm proud of the work this council is
22  doing in expanding the definition, but, ah, I was
23  raised by a woman who worked in a supermarket, ah,
24  and my stepfather was a janitor who cleaned, ah, the
25  floors and the bathrooms at Junior High School 10 in
```

A-1600

```
1   STATED MEETING                                    80

2   Astoria.  Ah, grocery store workers and janitors are

3   essential workers and so many of them have put their

4   lives on the line during this crisis.  Ah, every time

5   I go to a supermarket, ah, I thank profusely, ah, the

6   men and women who are working there, risking their

7   lives so that other people can eat.  Um, and I just

8   want to say, again, thank you to all of the first

9   responders, all of the people who gather together...

10              SERGEANT AT ARMS:  30 seconds.

11              COUNCIL MEMBER VAN BRAMER: ...and I'm

12  wearing this tie, as you can see.  I mentioned Mayer

13  Gomoras, ah, who helped raise me, who was a huge Met

14  fan, and this tie, I wore it in his honor.  It is a

15  red and blue tie.  It is the colors of the Mets.  And

16  finally I want to recognize because we will rename

17  the street [inaudible] who was a great Irish LGBT

18  activist who died of COVID-19 and I want to recognize

19  him.  There will be plenty of more time to talk about

20  his legacy going forward.  But thank you to him as

21  well.

22              SERGEANT AT ARMS:  Time's up.

23              COUNCIL MEMBER VAN BRAMER:  Thank you so

24  much.

25
```

```
1   STATED MEETING                                  81

2              MAJORITY LEADER CUMBO:  Thank you.  We

3   will now hear from Council Members, and I'm also

4   making a correction, Yeger, Levin, and then Cabrera.

5              SERGEANT AT ARMS:  Council Member, your

6   time will start now.

7              COUNCIL MEMBER YEGER:  Thank you, Madam

8   President.  Um, I, I also want to add my thanks, as

9   has been mentioned before on this floor, ah, to, ah,

10  the members of the staff of the City Council,

11  particularly Jason, members of the general counsel

12  team, and the folks who worked very hard to, ah, get

13  this meeting off and to get our operations complete.

14  I also want to thank my own staff, who have been

15  working incredibly hard to keep our office

16  operational, um, and to, ah, ah, keep serving the

17  people who, that needs us at the City Council.  Um,

18  I, I think I would be remiss if I don't take a few

19  seconds at least to honor, um, in more time, ah, than

20  I have available he deserves, my predecessor,

21  Councilman Noach Dear, justice of the Supreme Court,

22  um, who was taken at the prime of his life, somebody

23  who had given so much to his community, ah, somebody

24  who was a friend of mine, um, and a friend of so

25  many, and who was leader in our body for 18 years,
```

A-1602

```
1    STATED MEETING                                    82

2    was elected to the City Council when I was still in

3    my single digits and I have known him practically my

4    entire life, and it was a shocking and tremendous

5    loss.  Um, and this is not to belittle the losses

6    that all communities in this city have seen.  Ah, we

7    have all lost so many.  Ah, my grandmother passed

8    away last week, Monday.  Ah, the [inaudible] who is,

9    was a giant in Torah Jewry who gave so much of his

10   life to help build our community here in America, was

11   taken from us prior to his time in a tragic way.

12            SERGEANT AT ARMS:  30 seconds.

13            COUNCIL MEMBER YEGER:  Ah, my own

14   rashishiva of [inaudible] and of course this needs to

15   be mentioned, ah, the dozens and dozens of names that

16   I know, ah, people who were able to escape the

17   brutality of Hitler and the Nazis, and who were

18   survivors of the Holocaust, and whose numbers I

19   touched on their arms who have lost their lives in

20   the last several days at least, and I honor their

21   memory, and I will continue doing that.  Thank you,

22   Madam President.

23            MAJORITY LEADER CUMBO:  Thank you,

24   Council Member Yeger.  And we will now hear from

25   Council Member Levin and then Cabrera.
```

A-1603

```
 1   STATED MEETING                              83

 2              COUNCIL MEMBER LEVIN:  Thank you, Madam.

 3              SERGEANT AT ARMS:  Council Member Levin,

 4   your time will start now.

 5              COUNCIL MEMBER LEVIN:  Thank you, Madam

 6   Majority Leader.  Um, I just want to echo my

 7   colleagues' sentiments.  I am extending our

 8   condolences to everybody that has lost a loved one,

 9   um, everybody who has, um, ah, who has gone through,

10   um, a painful illness, um, this has been, um, one of

11   the darkest hours that our city has ever known and,

12   ah, it is devastating and heartbreaking, ah, for all

13   of us and we extend our love to, to everybody in New

14   York City who is suffering today.  We want to

15   acknowledge all of the tremendous work that our

16   healthcare workers, our first responders, everybody

17   that's going to work in every essential capacity,

18   grocery stores, pharmacies, delivery workers, ah,

19   people at, working at an auto body shop or, um, tire

20   changing place, ah, everybody that's doing a

21   tremendous amount of, putting themselves out on the

22   line, um, in the service of your fellow New Yorker,

23   um, we express our gratitude.  Um, colleagues, I, I'm

24   introducing...

25              SERGEANT AT ARMS:  30 seconds.
```

A-1604

```
1   STATED MEETING                                    84

2            COUNCIL MEMBER LEVIN: ...a piece of

3   legislation today as well, Intro 1927, which would

4   extend to individuals in shelter, in a congregate

5   setting, or in, ah, unsheltered environment, um, the

6   right to a hotel room during this crisis.  The fact

7   of the matter is there are still thousands upon

8   thousands of New Yorkers who are in congregate

9   shelters, um, is a very dangerous and risky place to

10  be, um, and we owe it to them...

11           SERGEANT AT ARMS:  Time's up.

12           COUNCIL MEMBER LEVIN: ...to be able to

13  put them, um, in appropriate setting so that we can

14  avoid an outbreak, um, on our watch in our shelter

15  system.  So I ask my colleagues to sign onto Intro

16  1927.  Thank you.

17           MAJORITY LEADER CUMBO:  Thank you, and

18  Council Member Cabrera.

19           COUNCIL MEMBER CABRERA:  Thank you so

20  much.

21           SERGEANT AT ARMS:  Council Member

22  Cabrera, your time will start now.

23           COUNCIL MEMBER CABRERA:  Thank you so

24  much, and I can see the time clock, so, ah, no need

25  for the reminder at 30 seconds.  But I want to take,
```

A-1605

```
1    STATED MEETING                              85
2    I give a, ah, take a moment to thank the Speaker, ah,
3    to all my colleagues, ah, very early one, as you
4    know, my son came down with coronavirus, um, I was
5    probably the first elected official to have a family
6    member go through this.  I had all kinds of, ah,
7    feelings.  I was scared.  I was, ah, upset.  I was,
8    um, I think I felt all the feelings that a father
9    could feel.  And then my daughter came down with it,
10   their spouses, their, my grandchildren, and, ah, the
11   reason I'm mentioning, ah, this right now, I don't
12   want us to go through what we could have done before.
13   We could have done the quarantine before.  We, we
14   should have done the testing, the appropriate testing
15   and we were not prepared.  And so we're talking about
16   inequities, ah, inequities right now.  Let me just
17   say that I'm hopeful that we're not waiting until
18   this is over, ah, for the inequities to be taken care
19   of.  We need to address them now.  Now that we're
20   going to have antibody tests.  They're already
21   starting.  This should be in our, in the deepest,
22   hardest hit, ah, area should be taking place and
23   areas that was most affected, the help needs to come
24   now.  This recession is gonna last.  Ah, it's not
25   gonna be gone in a year.  It's gonna take years for
```

1    STATED MEETING                                    86

2    us to recover.  So we need to be wise.  We need to,

3    ah, appropriate all the funding that we need, and we

4    need to do it now as we go through this budget and to

5    be able to, ah, stand proud in June to make sure that

6    we have, ah, a good budget for all.  Thank you so

7    much.

8               MAJORITY LEADER CUMBO:  Thank you, and

9    Council Member Rose.

10              SERGEANT AT ARMS:  Council Member Rose,

11   your time will start now.

12              COUNCIL MEMBER ROSE:  Thank you.  Um,

13   like all of my colleagues I want to say thank you to

14   the speaker, our colleagues in government, for all of

15   their efforts on behalf of, of the citizens of New

16   York City.  But I want to thank more especially the

17   first responders and the essential workers for all

18   that they have done and their selfless efforts to

19   keep all of us safe and healthy.  Um, you know, there

20   were some inequities in terms of treatment, um,

21   within the categories of first responders and

22   essential workers, and I hope that we are going to

23   make sure that that doesn't happen, that the workers

24   who are working in the nursing homes and the group

25   homes, um, and in the shelters are equally as

A-1607

```
1   STATED MEETING                              87

2   protected as the workers in, um, in other areas that,

3   you know, none of our civil servants should have to

4   put their lives in jeopardy.  So I, I want us to

5   continue the fight for them.  And I want to say to,

6   um, Teens in Charge take charge, that of course we're

7   gonna fight for SYEP and, um, that my colleagues are,

8   are behind us and we're going to make sure that there

9   is some kind of programming for young people this

10  summer.  So you don't have to waste your efforts on

11  us, go talk to the administration about saving, um,

12  SYEP.  Thank you.

13            MAJORITY LEADER CUMBO:  Thank you so

14  much, Council Member Rose, and thank you so much for

15  your leadership and your fight for our young people.

16  Now Council Member Holden.

17            COUNCIL MEMBER HOLDEN:  Hi, thank you

18  everyone, and certainly...

19            SERGEANT AT ARMS:  Council Member Holden,

20  your time will start now.

21            COUNCIL MEMBER HOLDEN:  Thank you again.

22  Ah, I want to thank Corey Johnson, Speaker, done a

23  great job during the pandemic, along with Jason

24  Goldman, to set up this historic, um, meeting, which

25  is, ah, I love being part of the City Council, but
```

A-1608

```
 1   STATED MEETING                              88

 2   doing this is such a, a task, I can imagine, and I

 3   want to thank him again.  I want to thank my great

 4   staff who are working really hard during this

 5   pandemic and it puts, it's a lot of stress on

 6   everyone.  But also I want to just mention about the

 7   people who have lost loved notes and right now, I

 8   have a lot of cemeteries in my district, and we're

 9   seeing a lot of funerals.  But the cemeteries have

10   cut back, ah, on their burials because of the lack of

11   staff.  So they need help.  I wrote to the mayor,

12   wrote to the governor a number of times, tried to get

13   the out-of-work construction workers to help out, ah,

14   in, in the cemeteries, and get paid for it.  Um,

15   because we're waiting now, families are calling me,

16   they're waiting two and three weeks for funerals.

17   And it, and it really puts more stress on them,

18   obviously.  So we really need to step up as a city

19   and help out the cemeteries.  So thank you again,

20   everyone, and really stay safe.  Thank you.

21              SPEAKER JOHNSON:  Thanks, Bob, to you and

22   Amy and your kids and grandkids.

23              COUNCIL MEMBER HOLDEN:  Thanks so much.

24

25
```

```
1   STATED MEETING                                    89

2            MAJORITY LEADER CUMBO:  Thank you.  Are

3   there any other members who are on the list to speak,

4   Parliamentarian?

5            LANCE POLIVY: No, Madam Majority Leader.

6   There are no other members.

7            MAJORITY LEADER CUMBO:  I just want to

8   close out by thanking again Speaker Corey Johnson and

9   all my colleagues here today.  Um, this is historic

10  and it's unprecedented, and there's nothing harder, I

11  would say, that all of us has experienced as being

12  leaders to have to lead from inside.  We naturally

13  want to be up front.  We naturally want to be at the

14  forefront, and for me as a mom of a 2-year-old with

15  two parents that are both over the age of 80 it has

16  been the hardest thing as a leader to have to stay

17  indoors and to have to lead my community at the same

18  time.  But I want to thank this council because you

19  all have led the efforts from everything from

20  fighting to close our schools, to alternate side of

21  the street parking suspensions, to closing our

22  playgrounds, for the fight for our small businesses,

23  for the fight for PPE.  Because we know that we sent

24  many people, many black and brown people, many women

25  of color, onto the frontlines without protective
```

A-1610

```
 1   STATED MEETING                                    90

 2   gear.  And it's a tragedy that they were sent out in

 3   that way.  And we're going to do everything that we

 4   can in our council to fight for them, to make sure

 5   that we right these wrongs and that we continue to

 6   fight for them.  Because they have made it so that

 7   many of us could lead from inside. So I want to thank

 8   everybody, especially on the council, for what we

 9   did, to get emergency food aid to many of our shut-

10   ins, for many of our seniors who could not go out and

11   get food, who could not go out and get the packages

12   of food from the food pantries and the deliveries

13   that have been made.  I want to lift up Mutual Aid in

14   one community in my district who have been working

15   with our NYCHA tenant leaders, many of them who are

16   senior citizens, who are out on the frontlines

17   getting the food for the seniors, and they themselves

18   can't be out there.  And should not be out there.

19   And I, I just want to thank my staff.  It's so hard

20   to call staff to give them an assignment and you find

21   out that they're on their way to the hospital, or

22   they have to get tested, or their kids are sick, or

23   their parents are sick.  This has been really a very

24   challenging time.  And I just want to lift up while

25   there have been so many passings in my district, I
```

A-1611

```
1   STATED MEETING                              91

2   want to lift up Dr. Roy Hastick who is the founder of

3   the Chamber of the, the Caribbean American Chamber of

4   Commerce, who is a king of Brooklyn, who has done so

5   much to advance local businesses in the Caribbean

6   community, as well as Pastor Gwen Dingle who has been

7   a fighter and a champion on the front lines of the

8   HIV movement.  She is a powerful leader and we are so

9   sorry that we have lost her as well.  And, and we're

10  gonna continue to look forward and, and to continue

11  to lead, and thank you so much, and I beg of you,

12  please stay home.  This is not over.  While the

13  numbers are leveling this is far from over, and we

14  have to continue to stay at home, practice social

15  distancing, to wear our masks, and to take this very

16  seriously.  So with that, Speaker Corey Johnson, I

17  turn it over to you to close out this meeting.  Thank

18  you for your leadership.  Thank you for bringing this

19  body together, and thank you for hosting this

20  unprecedent meeting that has kept us all at home

21  today and is a thankful wish to Earth Day that we

22  were not out there and gave the earth a break.  Thank

23  you so much.

24            SPEAKER JOHNSON:  Thank you, Madam

25  Majority Leader, for those incredibly moving, ah,
```

A-1612

```
1   STATED MEETING                              92

2   closing remarks.  I'm really grateful for your

3   leadership and I just want to wrap up by thanking all

4   of you, all of the members of this body who have been

5   working around the clock to serve your constituents

6   and to look out for the future of New York City.  I

7   want to echo and reiterate some of the, I think, very

8   poignant and, ah, smart and helpful remarks that the

9   Majority Leader just gave, especially as it relates

10  to how we are all in this together.  Ah, we need to

11  continue to practice social distancing.  You know,

12  three weeks ago we were losing 900 New Yorkers a day.

13  Now the number is down to about 450, half of the

14  that.  But that is still an astounding number of

15  people who are dying every single day of COVID-19 in

16  New York City.  And as painful and difficult as it is

17  for New Yorkers to be social distanced right now and

18  physically isolated, it is so important for us to do

19  that because we need to relieve and keep that

20  pressure off of our healthcare system.  We need to

21  think about these healthcare heroes, making their

22  jobs easier.  These folks that are scared every

23  single day leaving their homes, leaving their loved

24  ones and their children, going into work to save

25  other people.  We need to think about these grocery
```

```
 1   STATED MEETING                              93

 2   store workers who are getting on the subway, every

 3   single day, leaving their homes that New Yorkers can

 4   still get food.  We have to think about the NYPD

 5   officers and the firefighters and the correction

 6   officers, the subway conductors and the bus drivers,

 7   the postal workers and the pharmacists.  All of these

 8   workers that are keeping our city going right now.

 9   They are our heroes and we are immensely, immensely

10   grateful for what they have done during this time.

11   We need to lift them up by making sure they are

12   protected and paid better, but also to keep them safe

13   by continuing the social distancing that's in place.

14   We're gonna have to start to have the conversation

15   about what mass testing looks like, about what

16   contact tracing looks like, about what surveillance

17   looks like, so that we can actually go at this virus

18   and take it, ah, and do our best to make sure that we

19   are able to safely at some point reopen and do it in

20   the right way, not in a rushed way or a rash way, but

21   in a smart way, by looking at what other cities and

22   countries around the world have been doing.  This

23   City Council I want New Yorkers to know, all of the

24   members have been working every single day to serve

25   their communities and to look at these broader issues
```

A-1614

```
1    STATED MEETING                                    94

2    that are affecting our great city.  I think it's

3    important to level with New Yorkers about how

4    difficult this is and how the days ahead are gonna be

5    difficult, but also talk about the hope that I have.

6    It's gonna be difficult because there's going to be a

7    shared sacrifice involved.  A shared sacrifice as it

8    relates to making painful budget decisions we would

9    never want to contemplate.  Ah, difficult because

10   we're gonna have to continue, even when we start to

11   try to, ah, reopen in a small way with mandatory mask

12   wearing and social distancing and the things that are

13   going to be required of us.  These things are gonna

14   change our way of life.  But I am hopeful.  And I am

15   hopeful because our city is the greatest city in the

16   world, and it's greatest city in the world not

17   because of our geography, but because of the 8.6

18   million New Yorkers who live here.  They are the

19   beating heart of New York City.  They are the soul of

20   New York City.  We are the most diverse city in the

21   United States of America.  Queens County is the most

22   diverse county in the United States of America.  And

23   we have seen incredible sacrifice and solidarity

24   during the last five to six weeks.  We have seen

25   neighbors take care of neighbors.  We have seen
```

```
1  STATED MEETING                                    95

2  people do food deliveries.  We have seen these

3  essential workers put their lives on the line.  We

4  have seen young people delivering groceries to older

5  people.  We have seen all of this in one of the most

6  painful moments in our history.  And I have hope that

7  we can get through this.  We will be a changed city.

8  Our city will not be the same.  But we can still come

9  back if we remain united, if we are compassionate and

10 kind and strategic and thoughtful about how to get

11 through this.  And that is going to require us

12 looking at some of the hard and glaring truths that

13 exist, the truths on disparities, the truths on, ah,

14 structural racism that exist in our society.  And I

15 hope that we can take this moment as a transformation

16 point.  In the 1940s after the war the UK decided to

17 set up the NHS, their national healthcare service,

18 knowing they needed to do something transformational.

19 It is my hope that we'll be able to do something

20 transformational here.  Healthcare needs to be a

21 basic civil right, not tied to employment and not

22 tied to profit.  We need to make sure that all New

23 Yorkers are being protected and you have seen these

24 frontline workers, most of them black and brown

25 people, most of them black and brown women, who have
```

```
 1   STATED MEETING                                 96
 2   continued to step up day after day.  We need to
 3   recognize that.  We need to honor them and protect
 4   them and make decisions that are going to help them
 5   and their families moving forward.  That is the best
 6   way to actually honor the lives of all the New
 7   Yorkers that we have lost.  Our north star in this
 8   budget process and moving forward is to take care and
 9   protect the most vulnerable, to ensure that we are
10   doing right by all these families that have lost
11   loved ones and the families that continue to
12   sacrifice every single day.  These glaring holes in
13   our social safety net, when it comes to housing and
14   food and healthcare and wages are more glaring than
15   ever right now in the midst of this pandemic.  But if
16   we stay united, if we stay one New York, just like we
17   got through the fiscal crisis of the 1970s, just like
18   we got through 9/11 together, just like we got
19   through the Great Recession together, and just like
20   we got Thursday Hurricane Sandy together.  We can get
21   through this.  But we need to look out for our young
22   people and our seniors and our public housing
23   residents and our healthcare works and our essential
24   workers and all of these folks that are counting on
25   us.  That needs to be our north star.  So I am
```

```
 1  STATED MEETING                                97

 2  incredibly grateful for the staff that made today

 3  possible.  I'm grateful to all of you for being part

 4  of this historic meeting today.  We have committee

 5  hearings coming up tomorrow and Friday and next week,

 6  and I want to thank you all for your solidarity and

 7  for your continued support and working together to

 8  help our city get out of one of the biggest crises

 9  that we've ever faced.  So I want to thank you, Madam

10  Majority Leader, for doing a wonderful job today and

11  being the presiding officer of this meeting.  I want

12  to thank Lance Polivy for being our parliamentarian

13  and doing a great job.  I want to thank all of the

14  sergeants who have been on the call, led by Carl

15  D'Alba, our director of security.  I want to Jason

16  Goldman, my chief of staff, and all of the, ah, all

17  of the, ah, central staff members of the council and

18  district office members who have been working

19  remotely, serving constituents, getting us up and

20  going, drafting bills, working on the city's budget.

21  We have been working around the clock and we will

22  continue to do that.  So with that, Madam Majority

23  Leader, I want to sign off and tell New York City I

24  love you.  We love this great city and we will get

25  through this together.  So with that, the Stated
```

A-1618

1   STATED MEETING                                    98

2   Meeting of April 22, 2020, is now adjourned.

3   Godspeed.  Be safe, New York City.  We're here for

4   you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

World Wide Dictation certifies that the

foreging transcript is a true and accurate

record of the proceedings. We further certify that

there is no relation to any of the parties to

this action by blood or marriage, and that there

is interest in the outcome of this matter.



Date _____ April 24, 2020 _____

A-1620

# EXHIBIT LL

A-1621

Staff: <u>Committee on Housing & Buildings</u>
Austen Brandford, Senior Counsel
Audrey Son, Counsel
Genan Zilkha, Counsel
Jose Conde, Senior Policy Analyst
Charles Kim, Policy Analyst
Sarah Gastelum, Principal Financial Analyst
Luke Zangerle, Financial Analyst

Staff: <u>Committee on Consumer Affairs and</u>
<u>Business Licensing</u>
Balqees Mihirig, Senior Counsel
Leah Skrzypiec, Policy Analyst
Sebastian Bacchi, Senior Financial Analyst



### THE NEW YORK CITY COUNCIL
Jeffrey Baker, Legislative Director

### COMMITTEE REPORT OF THE INFRASTRUCTURE AND GOVERNMENTAL AFFAIRS DIVISIONS
Terzah Nasser, Deputy Director, Infrastructure Division
Rachel Cordero, Deputy Director, Governmental Affairs Division

### COMMITTEE ON HOUSING AND BUILDINGS
Hon. Robert E. Cornegy, Jr., Chair

### COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING
Hon. Andrew Cohen, Chair

**April 28, 2020**

<u>INT. NO. 1912:</u>                    By the Speaker (Council Member Johnson) and
                                       Council Members Kallos, Van Bramer, Lander and
                                       Chin

1

A-1622

| | |
|---|---|
| **TITLE:** | A Local Law in relation to ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19 |
| **ADMINISTRATIVE CODE:** | N/A |
| **INT. NO. 1936:** | By Council Members Torres, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin and Powers |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York, in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19 |
| **ADMINISTRATIVE CODE:** | Amends section 27-2004 |

## INTRODUCTION

On April 28, 2020, the Committee on Housing and Buildings, chaired by Council Member Robert Cornegy, Jr., and the Committee on Consumer Affairs, chaired by Council Member Andrew Cohen, will hold a hearing on two bills: Int. No. 1912, in relation to ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19, and Int. No. 1936, in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19. The Committees expect to receive testimony from the New York City ("NYC" or the "City") Department of Housing Preservation and Development ("HPD"), the NYC Department of Consumer and Worker Protection ("DCWP"), the NYC Commission on Human Rights ("CCHR"), tenants, building owners, as well as other interested members of the public.

2

A-1623

## BACKGROUND

### TENANTS AND COVID-19

The outbreak of the novel coronavirus, COVID-19, in the City of New York has resulted in a myriad of concerns for many New Yorkers, including loss of income, food insecurity and housing instability. In an effort to manage the spread of the virus, Governor Andrew Cuomo issued an executive order,[1] and subsequent continuing executive orders, to bring the State to a "PAUSE," which ordered the closing of all businesses deemed "nonessential."[2] The initial "PAUSE" order was issued on March 7, 2020, and businesses began to close or were required to reduce the number of in-person employees commencing on that date.[3] The closure of "nonessential" businesses eventually became applicable to 100% of employees at all nonessential businesses at 8:00 p.m. on March 22, 2020.[4]

In an analysis of the potential economic impacts of the pandemic on NYC households, the New York University Furman Center "estimate[s] that about 1,405,000 (or 34 percent) of the city's wage earners may be at risk of income loss"[5] as a result of mass layoffs or workplace closures, and that there are nearly 1,032,000 New York City households with at least one wage earner in an occupation more vulnerable to income loss.[6] Additionally, the number of unemployment claims filed with the State has skyrocketed since the "PAUSE": approximately 144,000 claims were filed in New York City the week of March 22, 2020, up 2,637% from the

---

[1] N.Y. Exec. Order No. 202 (Mar. 7, 2020) https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf.
[2] *Id.*
[3] *Id.*
[4] N.Y. Exec. Order No. 202.8 (Mar. 20, 2020) https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf.
[5] *What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial Analysis*, NYU Furman Center (Mar. 30, 2020) *available at* https://furmancenter.org/thestoop/entry/what-are-the-housing-costs-of-households-most-vulnerable-to-job-layoffs-an.
[6] *Id.*

same period in 2019.[7] With this sudden loss of income, many tenants in the City have been left wondering how they would make their rent payments.

In an effort to provide some relief to tenants, the State and Federal governments have each enacted measures to halt evictions for a period of time. Under Executive Order 202,[8] New York State has implemented a moratorium on evictions, meaning no evictions will be enforced against residential or commercial tenants. The moratorium is to remain in effect at least through June 20, 2020, although it remains unclear whether it will be extended after that date. Likewise, the Federal Coronavirus Aid, Relief, and Economic Security Act, otherwise known as the CARES Act, imposes a moratorium on evictions for all federally subsidized housing, applying to all new eviction actions for nonpayment of rent.[9] The New York State Attorney General has also issued guidance to tenants[10] that provides information about their rights, including information about harassment by landlords.

Although the eviction moratoriums serve as temporary stopgaps to allow tenants to remain in their apartments, they do not provide any kind of relief to tenants for rent owed during the moratoriums. Further, they do not guarantee that tenants unable to pay rent will be able to stay in their apartments once the moratoriums are lifted, or that tenants will be safe from landlord harassment on the basis of having been impacted by the virus. Indeed, housing advocates have reported that tenants are confused and uncertain as to what will happen once the moratoriums are lifted, including whether landlords will suddenly flood the housing courts with eviction actions

---

[7] Corina Knoll, Azi Paybarah, Jacob Mensche and Elaine Chen, *11 Numbers That Show How the Coronavirus Has Changes N.Y.C.*, The New York Times, (Apr. 20, 2020) *available at* https://www.nytimes.com/2020/04/20/nyregion/coronavirus-nyc-numbers-unemployment.html .
[8] *Supra*, note 2.
[9] Coronavirus Aid, Relief, and Economic Security Act, § 4024 (Mar. 27, 2020) https://www.congress.gov/116/bills/hr748/BILLS-116hr748eas.pdf.
[10] *Guidance on Coronavirus Resources and Warnings Against Consumer Scams: Housing Rights*, N.Y. Attorney General available at https://ag.ny.gov/coronavirus#housingrights (last accessed Apr. 24, 2020).

A-1625

against all tenants who were unable to make rent during the moratoriums.[11] In this hearing, the Committees hope to learn more about tenant concerns arising from this crisis, and whether any additional legislative measures can help rent-burdened tenants as the City prepares for the long-term economic effects of the virus.

## LEGISLATION

Below is a brief summary of the legislation being heard by the Committees at this hearing. These summaries are intended for informational purposes only and do not substitute for legal counsel. For more detailed information, you should review the full text of the bills, which are attached below.

**Int. No. 1912, a local law in relation to ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19**

This bill would prevent the City Sheriff and Marshals from taking certain actions with respect to the taking and restitution of property or the execution of money judgments for specified timeframes beyond the duration of state and federal eviction moratoriums.

This legislation would take effect immediately.

**Int. No. 1936, A Local Law to amend the New York city charter and the New York city building code in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19**

---

[11] *See, e.g.*, Caroline Splvack, *New York lawmakers seek to prevent 'tidal wave' of evictions*, Curbed New York (Apr. 7, 2020, 3:22 p.m.) *available at* https://ny.curbed.com/2020/4/7/21212353/new-york-coronavirus-rent-eviction-bill-covid-19.

A-1626

This bill would expand the definition of tenant harassment to protect individuals who may be harassed due to their status as an essential employee or a person impacted by COVID-19, or whether they received a rent concession or forbearance for any rent owed during the COVID-19 crisis.

This legislation would take effect immediately.

A-1627

Int. No. 1912

By the Speaker (Council Member Johnson) and Council Members Kallos, Van Bramer, Lander and Chin

A Local Law in relation to ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19

Be it enacted by the Council as follows:

1    Section 1. As used in this local law, the following terms have the following meanings:

2    COVID-19. The term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV.

3    COVID-19 state disaster emergency. The term "COVID-19 state disaster emergency"

4  means the state disaster emergency declared by the governor in executive order number 202

5  issued on March 7, 2020.

6    Federal eviction moratorium. The term "federal eviction moratorium" means the

7  moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief,

8  and economic security, or CARES, act and any subsequent amendments to such section.

9    First suspension date. The term "first suspension date" means the later of (i) the end of

10  the first month that commences after the expiration of the state eviction moratorium, (ii) the end

11  of the first month that commences after the expiration of the federal eviction moratorium, or (iii)

12  September 30, 2020.

13    Second suspension date. The term "second suspension date" means the later of (i) the end

14  of the seventh month that commences after the expiration of the state eviction moratorium, (ii)

15  the end of the seventh month that commences after the expiration of the federal eviction

16  moratorium, or (iii) April 1, 2021.

A-1628

1    State eviction moratorium. The term "state eviction moratorium" means the moratorium

2  on enforcement of evictions of residential and commercial tenants set forth in executive order

3  number 202.8, as issued by the governor on March 20, 2020 and thereafter extended.

4    § 2. Until the first suspension date, the city sheriff and, pursuant to section 1609 of the

5  New York city civil court act, the marshals shall take no action with respect to the taking and

6  restitution of property or the execution of money judgments unless:

7    1. such action or type of action has been ordered by the governor or mayor pursuant to

8  article 2-B of the executive law or is necessary in order to carry out an order issued by the

9  governor or mayor pursuant to such article; or

10    2. such action or type of action is in connection with a matter under the jurisdiction of the

11  family court.

12    § 3. a. Until the second suspension date, the city sheriff and, pursuant to section 1609 of

13  the New York city civil court act, the marshals shall take no action with respect to the taking and

14  restitution of property or the execution of money judgments unless:

15    1. such action or type of action has been ordered by the governor or mayor pursuant to

16  article 2-B of the executive law or is necessary in order to carry out an order issued by the

17  governor or mayor pursuant to such article;

18    2. such action or type of action is in connection with a matter under the jurisdiction of the

19  family court; or

20    3. the party against whom such taking and restitution or such execution is sought has

21  been provided a reasonable opportunity to show the court having jurisdiction over the matter that

22  such party suffered a substantial loss of income because of COVID-19 and such court has found

23  that such party has not suffered such a loss or has effectively waived such opportunity.

8

A-1629

1    b. For the purposes of subdivision a of this section, a party has suffered a substantial loss

2  of income because of COVID-19 in the following instances:

3    1. The party is a natural person and between March 7, 2020 and the first suspension date,

4  inclusive, experienced two or more weeks in which (i) the person claimed federal or state

5  unemployment insurance benefits in connection with a claim that was filed on or after March 7,

6  2020 or (ii) the person worked fewer than three days and earned less than $504 because of one or

7  more of the following situations:

8    (a) the person was diagnosed with COVID-19 or was experiencing symptoms of COVID-

9  19 and seeking a medical diagnosis;

10    (b) a member of the person's household was diagnosed with COVID-19;

11    (c) the person was providing care for a family member or a member of the person's

12  household who was diagnosed with COVID-19;

13    (d) a member of the person's household for whom the person had primary caregiving

14  responsibility was unable to attend school or another facility that was closed as a direct result of

15  the COVID-19 state disaster emergency and such school or facility care was required for the

16  person to work;

17    (e) the person was unable to reach the person's place of employment because of a

18  quarantine imposed as a direct result of the COVID-19 state disaster emergency;

19    (f) the person was unable to reach the person's place of employment because the person

20  had been advised by a health care provider to self-quarantine due to concerns related to COVID-

21  19;

22    (g) the person was scheduled to commence employment and did not have a job or was

23  unable to reach the job as a direct result of the COVID-19 state disaster emergency;

9

A-1630

1    (h) the person became the breadwinner or major supporter for a household because the

2  head of the household died as a direct result of COVID-19;

3    (i) the person quit a job as a direct result of COVID-19; or

4    (j) the person's place of employment is closed as a direct result of the COVID-19 state

5  disaster emergency;

6    2. The party is a business and (i) it was subject to seating, occupancy or on-premises

7  service limitations pursuant to an executive order issued by the governor or mayor during the

8  COVID-19 period or (ii) its revenues for any three-month period between March 7, 2020 and the

9  first suspension date, inclusive, were less than 50 percent of its revenues for the same period in

10  2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January

11  2020, and February 2020; or

12    3. The party is a natural person who is being held liable for a debt or other obligation of a

13  business that satisfies the requirements of paragraph 2 of this subdivision.

14    § 4. This local law takes effect immediately.

LS 14763
4/20/20 4:39PM

A-1631

Int. No. 1936

By Council Member Torres, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin and Powers

A Local Law to amend the administrative code of the city of New York, in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19

Be it enacted by the Council as follows:

1    Section 1. Subparagraph f-5 of paragraph 48 of subdivision a of section 27-2004 of the

2    administrative code of the city of New York, as added by local law number 48 for the year 2018,

3    is amended to read as follows:

4    f-5. threatening any person lawfully entitled to occupancy of such dwelling unit based on

5    such person's actual or perceived age, race, creed, color, national origin, gender, disability,

6    marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage

7    or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or

8    stalking, lawful source of income, status as an essential employee, status as a person impacted by

9    COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-

10   19 period or because children are, may be or would be residing in such dwelling unit, as such

11   terms are defined in sections 8-102 and 8-107.1 of the code; provided that for the purposes of

12   this subparagraph:

13   (1) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of

14   the first month that commences after the expiration of the moratorium on enforcement of

15   evictions of residential and commercial tenants set forth in executive order number 202.8, as

16   issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month

17   that commences after the expiration of the moratorium on certain residential evictions set forth in

11

A-1632

1    section 4024 of the federal coronavirus aid, relief, and economic security, or CARES, act and

2    any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

3    (2) the term "essential employee" means a person employed by or permitted to work at or

4    for a business classified as an essential business by the New York state department of economic

5    development in accordance with executive order number 202.6 as issued by the governor on

6    March 18, 2020 and extended thereafter; and

7    (3) a person is "impacted by COVID-19" if such person experienced one or more of the

8    following situations:

9    (i) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19

10    and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term

11    "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

12    (ii) a member of the person's household was diagnosed with COVID-19;

13    (iii) the person was providing care for a family member or a member of the person's

14    household who was diagnosed with COVID-19;

15    (iv) a member of the person's household for whom the person had primary caregiving

16    responsibility was unable to attend school or another facility that was closed as a direct result of

17    the COVID-19 state disaster emergency and such school or facility care was required for the

18    person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state

19    disaster emergency" means the state disaster emergency declared by the governor in executive

20    order number 202 issued on March 7, 2020;

21    (v) the person was unable to reach the person's place of employment because of a

22    quarantine imposed as a direct result of the COVID-19 state disaster emergency;

A-1633

1          (vi) the person was unable to reach the person's place of employment because the person

2     had been advised by a health care provider to self-quarantine due to concerns related to COVID-

3     19;

4          (vii) the person was scheduled to commence employment and did not have a job or was

5     unable to reach the job as a direct result of the COVID-19 state disaster emergency;

6          (viii) the person became the breadwinner or major supporter for a household because the

7     head of the household died as a direct result of COVID-19;

8          (ix) the person quit a job as a direct result of COVID-19; or

9          (x) the person's place of employment is closed as a direct result of the COVID-19 state

10    disaster emergency;

11          § 2. This local law takes effect immediately.

LS 14513
4/20/20 1:52AM

13

A-1634

# EXHIBIT MM

Case 20-4238, Document 39, 02/11/2021, 3035088, Page264 of 271

A-1635

What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial A... Page 1 of 8
Case 1:20-cv-05301-RA    Document 38-39    Filed 08/12/20    Page 2 of 9



**NYU Furman Center**

**Celebrating 25 Years**
advancing research and debate
on housing, neighborhoods,
and urban policy

ABOUT    TEAM    SUPPORT    JOBS    IN THE NEWS    CONTACT

✉ SIGN UP    f    🐦    in

THE LATEST    RESEARCH    DEBATES & DISCUSSIONS    SPECIAL PROJECTS    COREDATA.NYC    STATE OF NYC HOUSING & NEIGHBORHOODS

# The Stoop

NYU FURMAN CENTER BLOG

News & Events    Data Updates    Research & Policy    🔲

## What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial Analysis

*Data Updates* | *March 30th 2020*



**IN THIS SECTION**

News & Events
Data Updates
Research & Policy

**SEARCH THE FURMAN CENTER**

Enter search terms

SEARCH

🕒 LATEST    📊 TRENDING

Allocation of the Limited Subsidies for Public Housing
The Stoop | August 12th 2020

Allocation of the Limited Subsidies for Public Housing
Publications | July 27th 2020

Housing Justice in the Pandemic Age
The Stoop | July 27th 2020

Case 20-4238, Document 39, 02/11/2021, 3035088, Page265 of 271

A-1636

What are the Housing Costs of Households Most Vulnerable to Job Layoffs?  An Initial A...  Page 2 of 8
Case 1:20-cv-05301-RA    Document 38-39    Filed 08/12/20    Page 3 of 9



As the COVID-19 public health crisis grows in New York City and across the United States, there is significant concern about the economic effect the crisis will have on workers in occupations susceptible to mass layoffs. Workers in a number of sectors face significant income loss due to closures, reduced hours, and cancellations. While a $2.2 trillion stimulus bill that expands unemployment benefits was signed into law last Friday, not all affected workers will have access to the expanded aid. In an effort to understand the scale of the issue and disparities when examining potential impacts by race, we reviewed pre-crisis incomes and housing costs of New York City residents who work in occupations that are more vulnerable to income loss ("vulnerable occupations").

We invite constructive criticism and a dialogue over the methodology we use. To conduct this analysis, we used 2018 ACS Microdata on households in New York City. We separated occupations into two categories: those with the highest risk of mass layoffs and workplace closures due to the pandemic; and those likely to be more protected from widespread disruption. Our categorization draws on work by others (including the Brookings Institution, Moody's, and the U.S. Private Sector Job Quality Index Team) in identifying the industries and occupations most vulnerable to job loss due to the pandemic. Other kinds of analyses focus on the susceptibility of certain workers to contracting the virus, due to the essential nature of the job and the inability of these workers to work from home. While these workers aren't necessarily in industries facing mass layoffs, some may likely still face loss in wages associated with their inability to continue working. Additionally, our numbers assume that all workers in a vulnerable occupation group are prone to layoffs, when it is likely that a percentage of each category are able to maintain their incomes. Because this proportion is unknown, we err on the side of considering all workers in a category at risk. In total, we estimate that about 1,405,000 (or 34 percent) of the city's wage earners may be at risk of income loss.

You can find our occupation categorization here, and all of the data and code for this analysis are available on our GitHub. Again, we invite your advice and feedback.

Virtual Launch Event: State of Eviction Filings in New York City's Neighborhoods
The Stoop | July 20th 2020

Housing Justice in the Pandemic Age: Recommendations for Safe and Effective Courts During COVID-19
Publications | July 6th 2020

A-1637

Based on these assumptions, which we subject to further refinement, we find that:

- In 2018, lower income households were more likely to work in occupations prone to COVID-related job loss.

- Out of almost 3.2 million households in New York City, almost 1,032,000 (totaling nearly 3.5 million people) had at least one household member that worked in a vulnerable occupation, and that person earned about 67 percent of the total income for the household.

- In about 549,000 households, all earners worked in vulnerable occupations, making these households hyper-susceptible to income loss.

- For households that earned less than $150,000 and had at least one worker in a vulnerable occupation in 2018, the median household monthly income was about $4,580 and the median rent was about $1,430.

- Hispanic workers in particular disproportionately worked in vulnerable occupations in 2018. The potential negative impact for low-income people of color, who are predominantly renters, could be at a scale equivalent to the effects of the foreclosure crisis.

**Lower income workers are significantly more likely to rely on employment income from jobs that are prone to job loss.**

More than 60 percent of households that earned between $15,000 and $30,000 had at least one household member employed in a vulnerable occupation, compared to 28 percent of households that earned more than $150,000. Households are dependent on this income: workers in vulnerable occupations earned about 67 percent of the total income for their household. Finally, the scale of affected households is quite large. About 1,032,000 New York City households (out of almost 3.2 million) had at least one household member that worked in a vulnerable occupation.

Case 20-4238, Document 39, 02/11/2021, 3035088, Page267 of 271

A-1638

What are the Housing Costs of Households Most Vulnerable to Job Layoffs?  An Initial A...  Page 4 of 8
Case 1:20-cv-05301-RA    Document 38-39    Filed 08/12/20    Page 5 of 9

**Share of households with at least one member employed
in a more vulnerable occupation by household income**

New York City, 2018



Notes: Error bars represent 90% confidence intervals, and value labels
reflect point estimates

Sources: American Community Survey (2018); IPUMS USA; NYU Furman Center

**Households with at least one member employed in
a more vulnerable occupation by household income**

New York City, 2018



Notes: Error bars represent 90% confidence intervals, and value labels
reflect point estimates

Sources: American Community Survey (2018); IPUMS USA; NYU Furman Center

**The majority of households with at least one member
working in a vulnerable occupation and income under
$150,000 were renters.**

Case 20-4238, Document 39, 02/11/2021, 3035088, Page268 of 271

A-1639

The high proportion of vulnerable households that rent elevates concerns about the potential for rent payments to accrue during the COVID-19 crisis, placing a strain on both renters and building owners. Among households with at least one member in a vulnerable occupation, more than 85 percent of households with income below $50,000 rented their home. Nearly 90 percent of households with income below $30,000 rented their home.



**Renter share of households with at least one member employed in a more vulnerable occupation by household income**

New York City, 2018

*Notes: Error bars represent 90% confidence intervals, and value labels reflect point estimates*

*Sources: American Community Survey (2018), IPUMS USA, NYU Furman Center*

**Households with incomes between $15,000 and $50,000 were more likely to rely entirely on employment income from vulnerable occupations. These households may be hyper-vulnerable to the negative effects of job loss.**

About 548,700 New York City households relied entirely on earners that worked in vulnerable occupations in 2018. This group includes households that have only one vulnerable wage earner, such as a single parent, as well as households that have multiple earners in vulnerable occupations. The median monthly household income for households that exclusively relied on workers in vulnerable occupations was $3,433.

Over half of households that had income below $30,000 had all employed household members in a vulnerable occupation. For example, about 55 percent of households with incomes between $15,000 and $30,000 had all earners in vulnerable occupations.

Case 20-4238, Document 39, 02/11/2021, 3035088, Page269 of 271

A-1640

What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial A... Page 6 of 8
Case 1:20-cv-05301-RA    Document 38-39    Filed 08/12/20    Page 7 of 9



Share of households with all employed members in
more vulnerable occupations by household income

New York City, 2018

Notes: Error bars represent 90% confidence intervals, and value labels
reflect point estimates

Sources: American Community Survey (2018), IPUMS USA, NYU Furman Center



Households with all employed members in
more vulnerable occupations by household income

New York City, 2018

Notes: Error bars represent 90% confidence intervals, and value labels
reflect point estimates

Sources: American Community Survey (2018), IPUMS USA, NYU Furman Center

**Households with at least one worker in a vulnerable
occupation and income under $150,000 had a median rent
of $1,430 and a median household monthly income of**

Case 20-4238, Document 39, 02/11/2021, 3035088, Page270 of 271

A-1641

What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial A... Page 7 of 8
Case 1:20-cv-05301-RA    Document 38-39    Filed 08/12/20    Page 8 of 9

**$4,583.**
As policymakers weigh pathways to support renters in the midst of
COVID-19, a key question has been the cost of rent for the most
vulnerable households. If renters do not have emergency savings and
are unable to pay their rent due to COVID-19 related shutdowns,
they may emerge from the crisis in debt and/or at risk of eviction.

The median gross rent across all households with income below
$150,000 and at least one vulnerable worker was $1,430. In
contrast, the median gross rent for all households with income below
$150,000 and without a worker in a vulnerable occupation was
$1,580. Median monthly household income among households with
at least one earner in a vulnerable occupation was $4,583 in 2018,
compared to median monthly income of $6,250 for households
without a vulnerable worker.



Median rent for households with at least one member employed
in a more vulnerable occupation by household income

New York City, 2018

Notes: Error bars represent 90% confidence intervals, and value levels
reflect point estimates

Sources: American Community Survey (2018), IPUMS USA, NYU Furman Center

**The pandemic may widen existing racial and ethnic income
gaps, especially for Hispanic households, who
disproportionately worked in vulnerable occupations in
2018.**
Close to 511,000 Hispanic earners worked in vulnerable occupations
in 2018, more than any other racial group. About 48 percent of
Hispanic wage earners were in vulnerable occupations in 2018, as

Case 20-4238, Document 39, 02/11/2021, 3035088, Page271 of 271

A-1642

What are the Housing Costs of Households Most Vulnerable to Job Layoffs? An Initial A... Page 8 of 8

Case 1:20-cv-05301-RA    Document 38-39    Filed 08/12/20    Page 9 of 9

were 38 percent of non-Hispanic black workers, and 35 percent of non-Hispanic Asian or Pacific Islander workers.

In contrast, non-Hispanic white earners worked disproportionately in less vulnerable occupations in 2018; 23 percent of non-Hispanic white workers were in vulnerable occupations.



**Share of wage earners employed in more vulnerable occupations by race/ethnicity**

New York City, 2018

Notes: Error bars represent 90% confidence intervals, and value labels reflect point estimates

Sources: American Community Survey (2018), IPUMS USA, NYU Furman Center



« Previous    |    The Stoop    |    Next »

All content © 2005 – 2020 Furman Center for Real Estate and Urban Policy | Top of page | Contact Us

