# 20-4238-cv

## United States Court of Appeals

*for the*

## Second Circuit

―――――♦―――――

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC,
LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,
ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

― v. ―

CITY OF NEW YORK, a municipal entity, MAYOR BILL DE BLASIO, as
Mayor of the City of New York, COMMISSIONER LOUISE CARROLL,
Commissioner of New York City Department of Housing Preservation &
Development, COMMISSIONER JONNEL DORIS, Commissioner of
New York City Department of Small Business Services,

*Defendants-Appellees.*

―――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 7 of 16 (Pages A-1643 to A-1905)

JAMISON DAVIES
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street
New York, New York 10007
(212) 356-2490

CLAUDE G. SZYFER
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Plaintiffs-Appellants*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated July 10, 2020 ................................. A-14

Notice of Motion for Preliminary Injunctive and
    Declaratory Relief, dated July 22, 2020 ............... A-78

Declaration of Stephen P. Younger in Support of
    Plaintiffs' Motion for Preliminary Injunctive and
    Declaratory Relief, dated July 22, 2020 ............... A-80

Exhibit 1 to Younger Declaration -
July Reopening Survey Summary ........................ A-107

Exhibit 2 to Younger Declaration -
Partnership for New York City – A Call for
Action and Collaboration....................................... A-109

Exhibit 3 to Younger Declaration -
The New York Times Article: New Threat to New
York City: Commercial Rent Payments Plummet,
dated May 21, 2020 ............................................... A-177

Exhibit 4 to Younger Declaration -
The Real Deal Article: About 25% of NYC
renters didn't pay in May: survey, dated
May 19, 2020 .......................................................... A-183

Exhibit 5 to Younger Declaration -
Complaint in *The Gap, Inc. v. 44-45 Broadway
Leasing Co., LLC*, dated June 23, 2020 ................. A-187

Exhibit 6 to Younger Declaration -
Complaint in *The Gap, Inc. v. 170 Broadway
Retail Owner, LLC*, dated July 2, 2020 .................. A-213

ii

**Page**

Exhibit 7 to Younger Declaration -
Complaint in *Bath & Body Works, LLC v. 304
PAS Owner LLC*, dated June 8, 2020 .................... A-237

Exhibit 8 to Younger Declaration -
Complaint in *Victoria's Secret Stores, LLC v.
Herald Square Owner LLC*, dated June 8, 2020 .... A-258

Exhibit 9 to Younger Declaration -
The New York Times Article: Tenants' Troubles
Put Stress on Commercial Real Estate, dated
June 5, 2020 ............................................................ A-282

Exhibit 10 to Younger Declaration -
The New York Times Article: 5 Ways the
Coronavirus Has Changed Suburban Real Estate,
dated July 17, 2020 ................................................ A-289

Exhibit 11 to Younger Declaration -
The New York Times Article: Coronavirus
Escape: To the Suburbs, dated May 8, 2020 .......... A-299

Exhibit 12 to Younger Declaration -
Snapshot: IBO's Updated Economic and Revenue
Forecast and Review of the Adopted Budget for
2021, dated July 21, 2020 ...................................... A-310

Exhibit 13 to Younger Declaration -
New York City Independent Budget Office –
Focus on: The Executive Budget, dated
May 2020 ................................................................ A-351

Exhibit 14 to Younger Declaration -
The New York Times Article: N.Y.C. Budget and
a Cut to N.Y.P.D. Funding, Explained, dated
July 1, 2020 ............................................................ A-377

iii

**Page**

Exhibit 15 to Younger Declaration -
Chapter 23 of the New York State Session Laws
of 2020, effective March 3, 2020 .......................... A-385

Exhibit 16 to Younger Declaration -
New York State Assembly Memorandum in
Support of Legislation submitted in Accordance
with Assembly Rule III, Sec 1(f) ........................... A-388

Exhibit 17 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202, dated March 7, 2020 ..................... A-390

Exhibit 18 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.3, dated March 16, 2020 ................ A-394

Exhibit 19 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.6, dated March 18, 2020 ................ A-397

Exhibit 20 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.7, dated March 19, 2020 ................ A-400

Exhibit 21 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.8, dated March 20, 2020 ................ A-403

Exhibit 22 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.16, dated April 12, 2020 ................ A-406

Exhibit 23 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.28, dated May 7, 2020 ................... A-409

Exhibit 24 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.38, dated June 6, 2020 ................... A-413

iv

**Page**

Exhibit 25 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.48, dated July 6, 2020 ................... A-416

Exhibit 26 to Younger Declaration -
Chapter 125 of the New York State Session Laws
of 2020, effective June 17, 2020 .......................... A-420

Exhibit 27 to Younger Declaration -
Chapter 127 of the New York State Session Laws
of 2020, effective June 30, 2020 .......................... A-423

Exhibit 28 to Younger Declaration -
Proposed Int. No. 1914-A ...................................... A-426

Exhibit 29 to Younger Declaration -
Proposed Int. No. 1932-A ...................................... A-430

Exhibit 30 to Younger Declaration -
Proposed Int. No. 1936-A ...................................... A-434

Exhibit 31 to Younger Declaration -
Transcript of Remote Hearing, dated
May 13, 2020 ......................................................... A-438

Exhibit 32 to Younger Declaration -
New York City Council Article: New York City
Council Announces COVID-19 Legislative
Relief Package To Be Introduced on Wednesday,
dated April 21, 2020 .............................................. A-516

Exhibit 33 to Younger Declaration -
Transcript of Remote Hearing, dated
April 28, 2020 ......................................................... A-525

Exhibit 34 to Younger Declaration -
Transcript of Remote Hearing, dated
April 29, 2020 ......................................................... A-669

v

**Page**

Exhibit 35 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure and Government Affairs
Division, dated April 28, 2020................................ A-959

Exhibit 36 to Younger Declaration -
The Council of the City of New York Briefing
Paper and Committee Report of the
Governmental Affairs Division, dated
April 29, 2020.......................................................... A-973

Exhibit 37 to Younger Declaration -
The Council of the City of New York Committee
Report of the Governmental Affairs Division,
dated May 13, 2020 ................................................ A-1052

Exhibit 38 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure Division, dated
May 13, 2020.......................................................... A-1108

Exhibit 39 to Younger Declaration -
Summary – Brooklyn Chamber of Commerce
Surveys ................................................................... A-1114

Exhibit 40 to Younger Declaration -
MetLife & U.S. Chamber of Commerce Small
Business Coronavirus Impact Poll, dated
June 3, 2020 ........................................................... A-1116

Exhibit 41 to Younger Declaration -
NYC's Nightlife Economy Impact, Assets, and
Opportunities ......................................................... A-1132

Exhibit 42 to Younger Declaration -
Emails, dated June 19, 2020 .................................. A-1213

vi

**Page**

Exhibit 43 to Younger Declaration -
The Stoop NYU Furman Center Blog Article:
Understanding the Potential Magnitude of Rent
Shortfalls in New York Due to COVID, dated
June 4, 2020 ............................................................ A-1216

Exhibit 44 to Younger Declaration -
Small Business First – Better Government
Stronger Businesses ................................................. A-1229

Exhibit 45 to Younger Declaration -
Guaranty, dated October 18, 2018 ......................... A-1278

Declaration of Santo Golino in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 22, 2020 .......................................................... A-1281

Declaration of Ling Yang in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 9, 2020 ............................................................ A-1323

Declaration of Marcia Melendez in Support of
Plaintiffs' Motion for a Preliminary Injunction,
dated July 9, 2020 .................................................. A-1330

Notice of Motion to Dismiss, dated August 12, 2020   A-1336

Declaration of Carlos F. Ugalde Alvarez in Support
of Defendants' Motion to Dismiss and in
Opposition to Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 12, 2020 ..................................................... A-1338

Exhibit A to Alvarez Declaration -
Chapter 23 of the New York State Laws of 2020 .. A-1366

Exhibit B to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202 dated March 7, 2020 ................................ A-1370

vii

**Page**

Exhibit C to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.3 dated March 16, 2020 ........................... A-1374

Exhibit D to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.5 dated March 18, 2020 ........................... A-1377

Exhibit E to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.6 dated March 18, 2020 ........................... A-1381

Exhibit F to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.7 dated March 19, 2020 ........................... A-1384

Exhibit G to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 ........................... A-1387

Exhibit H to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.9 dated March 21, 2020 ........................... A-1390

Exhibit I to Alvarez Declaration -
New York State Gubernatorial Executive Order
Nos. 202.13, 202.14, 202.18 dated March 29,
2020, April 7, 2020 and April 16, 2020 ................. A-1393

Exhibit J to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.16, dated April 12, 2020.......................... A-1404

Exhibit K to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.28, dated May 7, 2020 ............................ A-1407

Exhibit L to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.29, dated May 8, 2020 ............................ A-1411

viii

**Page**

Exhibit M to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.31, dated May 14, 2020 .......................... A-1413

Exhibit N to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.34, dated May 28, 2020 .......................... A-1416

Exhibit O to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.35, dated May 29, 2020 .......................... A-1419

Exhibit P to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.36, dated June 2, 2020 ............................ A-1422

Exhibit Q to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.38, dated June 6, 2020 ............................ A-1425

Exhibit R to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.39, dated June 7, 2020 ............................ A-1428

Exhibit S to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.41, dated June 13, 2020 .......................... A-1431

Exhibit T to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.45, dated June 26, 2020 .......................... A-1434

Exhibit U to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.48, dated July 6, 2020 ............................ A-1437

Exhibit V to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.49, dated July 7, 2020 ............................ A-1441

ix

**Page**

Exhibit W to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.50, dated July 9, 2020 ............................. A-1443

Exhibit X to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.53, dated July 21, 2020 ........................... A-1445

Exhibit Y to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................ A-1448

Exhibit Z to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ..................... A-1452

Exhibit AA to Alvarez Declaration -
Administrative Order No. AO/68/20, dated
March 16, 2020 ....................................................... A-1454

Exhibit BB to Alvarez Declaration -
Administrative Order No. AO/127/20, dated
June 18, 2020 .......................................................... A-1464

Exhibit CC to Alvarez Declaration -
Administrative Order No. AO/131/20, dated
June 23, 2020 .......................................................... A-1474

Exhibit DD to Alvarez Declaration -
Administrative Order No. AO/143/20, dated
July 7, 2020 ............................................................ A-1480

Exhibit EE to Alvarez Declaration -
Chapter 112 of the New York State Laws of 2020
and Chapter 126 of the New York State Laws of
2020 ......................................................................... A-1482

Exhibit FF to Alvarez Declaration -
Chapter 125 of the New York State Laws of 2020   A-1492

x

**Page**

Exhibit GG to Alvarez Declaration -
Chapter 127 of the New York State Laws of 2020    A-1501

Exhibit HH to Alvarez Declaration -
Introduction No. 1914............................................    A-1504

Exhibit II to Alvarez Declaration -
Introduction No. 1932............................................    A-1508

Exhibit JJ to Alvarez Declaration -
Introduction No. 1936............................................    A-1516

Exhibit KK to Alvarez Declaration -
Transcript of Meeting, dated April 22, 2020..........    A-1520

Exhibit LL to Alvarez Declaration -
Committee Report of the Infrastructure and
Governmental Affairs Divisions, dated
April 28, 2020.......................................................    A-1620

Exhibit MM to Alvarez Declaration -
NYU Furman Center Article: What are the
Housing Costs of Households Most Vulnerable to
Job Layoffs? An Initial Analysis, dated
March 30, 2020.....................................................    A-1634

Exhibit NN to Alvarez Declaration -
The New York Times Article: 11 Numbers That
Show How the Coronavirus Has Changes N.Y.C.,
dated April 20, 2020 .............................................    A-1643

Exhibit OO to Alvarez Declaration -
Transcript of Hearing, dated April 28, 2020 ..........    A-1654

Exhibit PP to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. No. 1936...........................    A-1798

xi

**Page**

Exhibit QQ to Alvarez Declaration -
Briefing Paper and Committee Report of the
Governmental Affairs Divisions, dated
April 29, 2020 ........................................................ A-1906

Exhibit RR to Alvarez Declaration -
New York City Comptroller Scott M. Stringer:
City must take immediate action to prepare for
economic impacts of COVID-19 and protect vital
services for most vulnerable New Yorkers, dated
March 16, 2020 ...................................................... A-1985

Exhibit SS to Alvarez Declaration -
New York State Restaurant Association,
Restaurant industry impact survey: New York
State, dated April 2020 .......................................... A-1991

Exhibit TT to Alvarez Declaration -
National Bureau of Econ. Research Article: How
are small businesses adjusting to COVID-19?
Early evidence from a survey, dated April 2020 .... A-1993

Exhibit UU to Alvarez Declaration -
Info. Station Article: How important are small
businesses?, dated January 3, 2017 ....................... A-2030

Exhibit VV to Alvarez Declaration -
United States Small Business Administration,
Small Businesses generate 44 percent of U.S.
economic activity, dated January 30, 2019 ............ A-2034

Exhibit WW to Alvarez Declaration -
N.Y.C. Department of Small Business Services,
Comprehensive Guide to Commercial Leasing in
New York City ....................................................... A-2037

xii

**Page**

Exhibit XX to Alvarez Declaration -
Entrepreneur Article: Hayden Field, 5 most
common red flags entrepreneurs should know
before signing a commercial real estate lease in
New York, dated June 6, 2019 .............................. A-2078

Exhibit YY to Alvarez Declaration -
Transcript of Hearing, dated April 29, 2020 .......... A-2091

Exhibit ZZ-1 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2381

Exhibit ZZ-2 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2550

Exhibit ZZ-3 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2745

Exhibit ZZ-4 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2925

Exhibit ZZ-5 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-3128

Exhibit AAA to Alvarez Declaration -
Intro. No. 1914-A ................................................ A-3335

Exhibit BBB to Alvarez Declaration -
Intro. No. 1932-A ................................................ A-3339

Exhibit CCC to Alvarez Declaration -
Intro. No. 1936-A ................................................ A-3344

Exhibit DDD to Alvarez Declaration -
Intro. No. 1914- A's Plain Language Summary ..... A-3348

**xiii**

**Page**

Exhibit EEE to Alvarez Declaration -
Intro. No. 1932- A's Plain Language Summary ..... A-3350

Exhibit FFF to Alvarez Declaration -
Intro. No. 1936- A's Plain Language Summary ..... A-3352

Exhibit GGG to Alvarez Declaration -
Committee Report of the Infrastructure Division,
dated May 13, 2020 ............................................... A-3354

Exhibit HHH to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3360

Exhibit III to Alvarez Declaration -
Committee Report of the Governmental Affairs
Divisions, dated May 13, 2020 ............................. A-3368

Exhibit JJJ to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3425

Exhibit KKK to Alvarez Declaration -
City Council's Meeting ......................................... A-3438

Exhibit LLL to Alvarez Declaration -
Letter from the City's Office of the Mayor, dated
May 26, 2020 ...................................................... A-3516

Exhibit MMM to Alvarez Declaration -
Commercial Harassment Law, effective
May 26, 2020 ...................................................... A-3519

Exhibit NNN to Alvarez Declaration -
Guaranty Law, effective May 26, 2020 ................. A-3523

Exhibit OOO to Alvarez Declaration -
Residential Harassment Law, effective
May 26, 2020 ...................................................... A-3528

Exhibit PPP to Alvarez Declaration -
Local Law No. 62 of 2020 ................................... A-3533

xiv

                                                              **Page**

Exhibit QQQ to Alvarez Declaration -
Local Law No. 63 of 2020 ..................................... A-3536

Exhibit RRR to Alvarez Declaration -
Resolution No. 1349 of 2020 ................................. A-3540

Exhibit SSS to Alvarez Declaration -
Resolution No. 1350 of 2020 ................................. A-3543

Exhibit TTT to Alvarez Declaration -
Document Produced by Plaintiff Jarican Realty
Inc., dated July 31, 2020 ......................................... A-3546

Exhibit UUU to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC .......................................................................... A-3580

Exhibit VVV to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC .......................................................................... A-3595

Letter from Arthur Kats to the Honorable Ronnie
Abrams, dated August 13, 2020 ............................ A-3614

Brief of Amicus Curiae Volunteers of Legal Service
in Opposition to Plaintiffs' Motion for
Preliminary Injunctive and Declaratory Relief,
dated August 13, 2020 ........................................... A-3617

Declaration of Arthur Kats in Opposition to
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 13, 2020 ............ A-3646

Exhibit 1 to Kats Declaration -
The New York Times Article: How Prepared Is
the U.S. for a Coronavirus Outbreak?, dated
February 29, 2020 .................................................. A-3658

xv

**Page**

Exhibit 2 to Kats Declaration -
New York Times U.S. COVID-19 Map and Case
Tracker, last visited August 11, 2020 .................... A-3669

Exhibit 3 to Kats Declaration -
The New York Times Article: New York City
Region Is Now an Epicenter of the Coronavirus
Pandemic, dated March 22, 2020 ......................... A-3687

Exhibit 4 to Kats Declaration -
New York Times N.Y. Covid-19 Map and Case
Tracker, last visited August 11, 2020 .................... A-3693

Exhibit 5 to Kats Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-3704

Exhibit 6 to Kats Declaration -
The Wall Street Journal Article: Times Square Is
Eerily Empty During the Pandemic, but
Advocates Are Focused on a Comeback, dated
May 19, 2020 ......................................... A-3707

Exhibit 7 to Kats Declaration -
Report Published by the U.S. Small Business
Administration's Office of Advocacy: Small
Business GDP: 1998-2014 .................................. A-3711

Exhibit 8 to Kats Declaration -
Office of the N.Y. State Comptroller, Small
Business in New York State: An Economic
Snapshot 1, dated 2019 ......................... A-3787

Exhibit 9 to Kats Declaration -
U.S. Small Business Administration's 2019 Small
Business Profile for the State of New York ........... A-3792

xvi

**Page**

Exhibit 10 to Kats Declaration -
The New York Times Article: One-Third of New
York's Small Businesses May Be Gone Forever,
dated August 3, 2020 ............................................. A-3797

Exhibit 11 to Kats Declaration -
The Wall Street Journal Article: Amid
Coronavirus Shutdowns, Landlords Often
Determine Fate of Small Businesses, dated
June 4, 2020 ........................................................... A-3802

Exhibit 12 to Kats Declaration -
Article: For Small Businesses With High Rents,
Coronavirus Aid Falls Short .................................. A-3808

Exhibit 13 to Kats Declaration -
Article: On a Vibrant Street in Brooklyn,
Businesses Are Struggling for Survival ................. A-3814

Exhibit 14 to Kats Declaration -
Brooklyn Chamber of Commerce, July
Reopening Survey Summary, dated July 2020 ...... A-3820

Exhibit 15 to Kats Declaration -
The Wall Street Journal Article: Small Business
Sector Highly Vulnerable to Coronavirus Crisis,
dated April 7, 2020 ................................................ A-3822

Exhibit 16 to Kats Declaration -
U.S. Fed. Reserve Bank of N.Y., 2020 Report on
Employer Firms: Small Business Credit Survey,
dated 2020 .............................................................. A-3825

Exhibit 17 to Kats Declaration -
Fed. Reserve Bank of N.Y., Can Small Firms
Weather the Effects of COVID-19?, dated
April 2020 .............................................................. A-3863

xvii

**Page**

Exhibit 18 to Kats Declaration -
Local Law 53 .......................................................... A-3867

Exhibit 19 to Kats Declaration -
Local Law 55 .......................................................... A-3871

Exhibit 20 to Kats Declaration -
Committee Report of the Governmental Affairs
Division on Local Law 53 .................................... A-3876

Exhibit 21 to Kats Declaration -
Testimony of the Volunteers of Legal Service
Microenterprise Project Int. Nos. 1914 & 1932 .... A-3932

Exhibit 22 to Kats Declaration -
Partnership for New York City: A Call for Action
and Collaboration.................................................. A-3936

Letter from Jeffrey Turkel to the Honorable Ronnie
Abrams, dated August 25, 2020............................ A-4004

Reply Declaration of Stephen P. Younger in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 .......................................... A-4030

Exhibit 1 to Younger Declaration -
Rentec Direct's August 2020 Rental Trends
Report ................................................................... A-4043

Exhibit 2 to Younger Declaration -
New York Hospitality Alliance's July 2020 Rent
Report ................................................................... A-4046

Exhibit 3 to Younger Declaration -
Sydney Pereira New Article: Thousands of New
Yorkers at Risk of Eviction as Cuomo's
Moratorium Expires............................................... A-4056

xviii

**Page**

Exhibit 4 to Younger Declaration -
News Article: Retail Chains Abandon Manhattan:
It's Unsustainable...................................................... A-4067

Exhibit 5 to Younger Declaration -
Screenshot of Post from Newman Ferrara LLP's
Website................................................................... A-4077

Exhibit 6 to Younger Declaration -
Complaint in *The Maramont Corporation v.
Generation Next Realty, Inc.*, dated July 20, 2020  A-4082

Exhibit 7 to Younger Declaration -
Report: Landlords and Renters Struggling to
Make Ends Meet During COVID-19 Uncertainty,
dated August 20, 2020 .......................................... A-4094

Exhibit 8 to Younger Declaration -
Press Release: Small Property Owners of New
York Announces Majority of Owners and
Managers of Small Properties Are Working with
Tenants by Reducing, Forgoing, and Offering
Rent Concessions, dated August 25, 2020............. A-4111

Exhibit 9 to Younger Declaration -
The New York Post Article: New Yorker's Keep
Moving Out of the City to Suburbs, Other States,
dated August 11, 2020........................................... A-4115

Exhibit 10 to Younger Declaration -
The New York Times Article: Movers in N.Y.C.
Are So Busy They're Turning People Away,
dated August 20, 2020 .......................................... A-4120

Exhibit 11 to Younger Declaration -
CNBC Article: Retail Rents Plummet Across
New York City, as America's Glitzy Shopping
Districts Turn Into Ghost Towns, dated
August 2, 2020...................................................... A-4130

xix

**Page**

Exhibit 12 to Younger Declaration -
The City Article: New York's Rent Drops as
Vacancies Increase. Could Rent Regulation Be
Next Thing to Fall?, dated July 27, 2020.............. A-4138

Exhibit 13 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................ A-4148

Exhibit 14 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ...................... A-4152

Exhibit 15 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.57, dated August 20, 2020 ...................... A-4154

Exhibit 16 to Younger Declaration -
New York City Council Bill Int. No. 2007-2020... A-4157

Exhibit 17 to Younger Declaration -
New York State Senate Bill No. S8904 ................. A-4160

Exhibit 18 to Younger Declaration -
August 2020 Resolution ........................................ A-4163

Exhibit 19 to Younger Declaration -
Gotham Gazette Article: Requestions for
Emergency Rent Grants Fell During Pandemic,
But Expected to Skyrocket When Evictions
Resume, dated July 24, 2020 ................................. A-4179

Exhibit 20 to Younger Declaration -
New York State Senate Bill No. S8139 ................. A-4187

Exhibit 21 to Younger Declaration -
New York State Senate Bill No. S8190-A ............. A-4191

Exhibit 22 to Younger Declaration -
New York State Senate Bill No. S8125-A ............. A-4201

xx

**Page**

Exhibit 23 to Younger Declaration -
Screenshot from New York City Department of
Health, dated August 19, 2020 ............................... A-4204

Exhibit 24 to Younger Declaration -
Guidance Published by Centers for Disease
Control and Prevention: COVID-19 Pandemic
Planning Scenarios ................................................ A-4210

Reply Declaration of Santo Golino in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 ........................................... A-4219

Reply Declaration of Marcia Melendez in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 21, 2020 ..................................................... A-4242

Declaration of Elias Bochner in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 25, 2020 ............ A-4245

Reply Declaration of Carlos F. Ugalde Alvarez in
Further Support of Defendants' Motion to
Dismiss, dated September 2, 2020 ........................ A-4250

Amended Complaint, dated September 2, 2020 ........ A-4268

Transcript of Oral Argument, dated
September 11, 2020 ............................................... A-4334

Notice of Appeal, dated December 21, 2020 ............ A-4394

A-1643

# EXHIBIT NN

**The New York Times** | https://nyti.ms/3eDvM18

# 11 Numbers That Show How the Coronavirus Has Changed N.Y.C.

Unemployment has skyrocketed, but so has the size of the city's volunteer pool and the number of people fostering animals. One month into the shutdown, the city is as complex as it ever was.

By Corina Knoll, Azi Paybarah, Jacob Meschke and Elaine Chen

April 20, 2020

New York City has never looked so unlike itself. Deserted streets and vacant stores. Essential workers taking to lonely subways. Mandatory face coverings.

But beyond the changes we can see outright are other lifestyle shifts that reflect the struggles and needs that have emerged within the last month.

Unemployment, of course, is up, and the number is staggering. With the state's shutdown extended until at least May 15, it is a desperate time for many.

But some of the data shows glimmers of hope. While hundreds of food banks were forced to close, the city's volunteer pool vastly expanded. Air pollution is down. Applications to foster abandoned animals skyrocketed.

Our altered city, by the numbers, is just as complex as the one we remember.

## 2,637%

**Increase in unemployment claims**

Case 20-4238, Document 40, 02/11/2021, 3035097, Page24 of 284

A-1645

11 Numbers That Show How the Coronavirus Has Changed N.Y.C. - The New York Times  Page 2 of 10
Case 1:20-cv-05301-RA    Document 38-40    Filed 08/12/20    Page 3 of 11



A commercial district in the Bronx.  Desiree Rios for The New York Times

During the week of March 22, nearly 144,000 unemployment claims were made in New York City. That constituted a 2,637 percent increase from last year, when the same time frame yielded about 5,300 claims.

And there's still many who have yet to file as the state's system was overwhelmed.

7%

**Decrease in trash collection in Manhattan**

Case 20-4238, Document 40, 02/11/2021, 3035097, Page25 of 284

A-1646

Case 1:20-cv-05301-RA   Document 38-40   Filed 08/12/20   Page 4 of 11

Sanitation workers in Brooklyn.  Demetrius Freeman for The New York Times

March data from the city's Department of Sanitation shows the amount of refuse collected from Manhattan residences shrank by nearly 7 percent compared to the borough average for that month over the last five years.

The decrease is most likely a reflection of New Yorkers who had the means to relocate.

Greenwich Village, the Upper West Side and the Upper East Side, neighborhoods with some of the highest median incomes in the city, led the way with 11, 10 and 8 percent declines.

The rest of the city saw little change, although Staten Island logged the biggest increase, producing over 7 percent more refuse than usual.

# 3,000

**Number of applications to Foster Dogs**

The Union Square farmers market in Manhattan.  James Sprankle for The New York Times

Interest in fostering pets has surged in the city, as many New Yorkers find themselves looking for companionship and having more time at home to care for a pet.

---

**Latest Updates: The Coronavirus Outbreak** ›

Updated 2020-08-12T10:58:18.105Z

- Scores of restaurants in the U.S. have had to temporarily close after outbreaks.

- Britain's lockdown recession is the deepest in Europe and North America.

- Crisis in the nation, crickets on Capitol Hill.

More live coverage: **Markets**

---

Foster Dogs, a nonprofit that works with about 30 shelters and rescue organizations in the New York City area, fielded more than 3,000 applications for fostering in March. Traffic to its website increased 250 percent.

In comparison, Foster Dogs received an average of 140 applications a month in 2019.

"It was more interest than we've ever seen before," said Sarah Brasky, who founded the organization.

In March, Muddy Paws Rescue, a New York nonprofit, received seven times the number of applications for dog fostering than it had just two months earlier.

# 18%

**Decrease in morning electricity usage**

A-1648

Overlooking the Cypress Hills neighborhood of Brooklyn.  Sarah Blesener for The New York Times

The dip began as workplaces and schools started closing, then accelerated through the rest of March.

By the end of the month, the city's energy use was down by more than 10 percent, according to the New York Independent System Operator, the agency responsible for managing the state's electric grid.

The change was most pronounced on weekday mornings, when usage would normally spike as people started their days and businesses opened. With nonessential workers ordered to stay home, it appeared that many were awakening later than usual.

## 42%

**Increase in complaints about loud televisions**

New Yorkers' patience with noisy neighbors has run thin, particularly when it comes to blaring televisions, which prompted a 42 percent increase in 311 complaints in March compared to last year, according to NYC Open Data.

Complaints of loud talking and music increased by 12 and 30 percent across the city.

Similarly, residential noise complaints, a broad category that's also one of the most common, rose significantly in every borough, peaking with a 33 percent increase in Staten Island. New Yorkers are especially irritated with helicopter noise; grievances about helicopters have tripled across the city.

## 90%

**Decrease in subway ridership**

A-1649

An elevated subway platform in the East New York neighborhood of Brooklyn. Juan Arredondo for The New York Times

The Metropolitan Transportation Authority has struggled the last three years to improve a crumbling system, even as ridership numbers had been higher than ever. Last year, during one week in mid-April, 34 million swipes were recorded at M.T.A. stations.

That number was whittled down to just 2.5 million rides during the week ending April 11. The steepest declines were in Manhattan, while the Bronx, which has the highest poverty rate of any of the boroughs, saw ridership drop the least.

The M.T.A., which oversees the subways, buses and two commuter rails, has suffered crew shortages as thousands fall sick. So far, the agency has reduced bus service and temporarily eliminated some subway lines. Already deep in debt and heavily reliant on revenue from fares, New York City's transit faces a tough future.

## 19.9%

**Decrease in overall crime as the city shut down**

A-1650

Police officers in the SoHo neighborhood of Manhattan.  Diana Zeyneb Alhindawi for The New York Times

March began with an uptick in major crimes, such as murder and burglary, but there was soon a sharp decline in overall crime in every borough.

From March 12 through March 31, murders decreased by 25 percent when compared with the same period last year, according to the Police Department. Complaints of rape and grand larceny both went down as well.

Reports of domestic violence fell nearly 15 percent. That drop, however, could mean victims have been less able to report abuse.

The virus has put a strain on the department: It must enforce the new restrictive rules while dealing with a diminished force. One out of every six New York City police officers is out sick or in quarantine.

## 60%

**Decrease in traffic at the busiest bridges and tunnels**

The Belt Parkway in the Bay Ridge neighborhood of Brooklyn.  Stephen Speranza for The New York Times

On the first Monday in March, more than 850,000 vehicles traveled across the M.T.A.'s nine city crossings, including the Queens-Midtown Tunnel and the Verrazzano-Narrows Bridge. Three weeks later, that number had plummeted to about 351,000.

Case 20-4238, Document 40, 02/11/2021, 3035097, Page30 of 284

A-1651

11 Numbers That Show How the Coronavirus Has Changed N.Y.C. - The New York Times Page 8 of 10
Case 1:20-cv-05301-RA    Document 38-40    Filed 08/12/20    Page 9 of 11

The less congested roads gave drivers a newfound sense of freedom. The city's automated speed cameras issued nearly 25,000 speeding tickets in a single day at the end of March, double the number from the previous month, according to city data.

Still, the roads have appeared safer. Traffic accidents overall dropped nearly 60 percent, with just over 1,000 motor vehicle collisions reported during the last week in March, according to an analysis of police data by a nonprofit watchdog group.

# 288%

**More people signed up to volunteer**

A storefront in the West Harlem neighborhood of Manhattan.  Brittainy Newman/The New York Times

Many New Yorkers volunteer each year, but March alone had an increase of almost three times the number of volunteer applications, with 6,500 compared with around 2,400 last year, based on data from New York Cares, an expansive volunteer network, which partnered with the city to coordinate coronavirus relief efforts.

The large spike in those eager to assist their communities was often directed toward food programs and social support for older adults, the primary areas of need across the city.

"There's a huge surge in need for virtual volunteering, to have a friend or neighbor to talk to," said Anusha Venkataraman, the city's chief service officer.

A-1652

New York Cares reported that its volunteers distributed more than 130,000 meals in March — 55,000 more than the previous month.

# 37%

**Of food banks have closed**

The food pantry at New Covenant Dominion Cathedral in the Morrisania neighborhood of the Bronx.  Desiree Rios for The New York Times

Despite the increased interest in volunteering, the heightened danger from coronavirus to those over 65 years of age has forced some food bank sites to close, particularly those run by volunteers who are older and retired.

City Harvest and Food Bank for New York City, the two largest food charities in the city, have seen a reduction in the number of soup kitchens and pantries they serve. Nearly 40 percent of Food Bank's 800 delivery sites have closed while City Harvest reported that one-third of the 284 sites it serves have closed.

# 25%

**Decrease in air pollution across the city**

A-1653

Overlooking the Williamsburg, Manhattan and Brooklyn Bridges.  Ryan Christopher Jones for The New York Times

In a twist, the stay-at-home efforts have made it safer to breathe outside.

Air quality has vastly improved, with an average 25 percent decrease in pollution across the city, based on data by state environmental monitors of the levels of particulate matter, a pollutant tied to asthma and lung cancer.

Staten Island showed the most dramatic drop at 35 percent. The borough has long had a reputation for noxious skies from heavy traffic and ferries and barges in New York Harbor.

Reporting was contributed by Winnie Hu, Nikita Stewart, Lindsey Rogers Cook and Ashley Southall.

A-1654

# EXHIBIT OO

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                       1

 2      CITY COUNCIL
        CITY OF NEW YORK
 3
        ------------------------ X
 4
        TRANSCRIPT OF THE MINUTES
 5
                    Of the
 6
        COMMITTEE ON HOUSING AND BUILDINGS
 7      JOINTLY WITH THE COMMITTEE ON
        CONSUMER AFFAIRS AND BUSINESS
 8      LICENSING

 9      ------------------------ X

10                      April 28, 2020
                        Start:  1:15 p.m.
11                      Recess:  4:00 p.m.

12
        HELD AT:        Remote Hearing
13
        B E F O R E :   Robert E. Cornegy, Jr.,
14                      Chairperson of the Committee on
                        Housing and Buildings
15
                        Andrew Cohen,
16                      Chairperson of the Committee on
                        Consumer Affairs and Business
17                      Licensing

18
        COUNCIL MEMBERS:
19                      Speaker Corey Johnson
                        Margaret Chin
20                      Karen Koslowitz
                        Brad Lander
21                      Justin Brannan
                        Kalman Yeger
22                      Ritchie Torres
                        Farah N. Louis
23                      Fernando Cabrera
24                      Carlina Rivera

25
```

A-1656

```
                                                        2
 1    COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING
 2    COUNCIL MEMBERS (CONT.):

 3                    Barry Grodenchik
                      Mark Gjonaj
 4                    Keith Powers
                      Helen Rosenthal
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A-1657

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                        3
   2                A P P E A R A N C E S

   3      Michael McKee
   4      Treasurer of the Tenants Political Action
          Committee
   5
          Barika Williams
   6      Executive Director at Association for
   7      Neighborhood and Housing Development

   8      Caryn Schreiber
          Legal Aid Society
   9
          Andy Morrison
  10      Campaigns Director at New Economy Project
  11
          Oksana Mironova
  12      Housing Policy Analyst
  13
          Dana Sussman
  14      Commission on Human Rights
  15      Sheriff Joseph Fucito
          Department of Finance
  16
          AnnMarie Santiago
  17      Department Housing Preservation and Development
  18
          Ava Farkas
  19      Met Council
  20
          Julia Duranti-Martinez
  21      Campaign Coordinator at New Economy Project
  22
          Joseph Condon
  23      Community Housing Improvement Program, CHIP
  24      David Chemtob
          Renaissance Realty
  25
```

```
 1   COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                      4
 2              A P P E A R A N C E S (CONT.)

 3      Kenneth Litwack
        Marshals Association of the City of New York
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                       5
 2        UNIDENTIFIED:  Okay, Dane, we can begin.
 3        CHAIRPERSON CORNEGY: Are you ready for me to
 4        gavel in?
 5        UNIDENTIFIED:  Dane, we cannot hear you.
 6        CHAIRPERSON CORNEGY:  Ralph, start it.
 7        UNIDENTIFIED:  Good afternoon ladies and
 8     gentleman and welcome to today's New York City
 9     hearing.  At this time, we ask that everyone to
10     silence all electronic devices.  We need everyone to
11     turn their cameras at the beginning of the hearing on
12     for proper identification.  Please mute your
13     microphones on Zoom.  Microphones will be unmuted for
14     you when it is your turn to speak.  Silence all
15     electronic devices, so as to eliminate any
16     disturbances during your testimony.  Any members of
17     the public wishing to testify can email their
18     statements to testimony@council.nyc.gov.  Again, you
19     can email your testimony to
20     testimony@council.nyc.gov.  We are ready to begin
21     today's hearing.
22        CHAIRPERSON CORNEGY: [Gavel]  Welcome to today's
23     hearing held by Committee on Housing and Buildings
24     chaired by myself and the Committee on Consumer
25     Affairs and Business Licensing chaired by Council
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                         6
 2   Member Andrew Cohen.  We are also joined today by

 3   Speaker Corey Johnson who would like to share some

 4   opening remarks.

 5     SPEAKER JOHNSON:  Thank you Chairs Cornegy and

 6   Cohen for holding this hearing today.  Nice to see

 7   everyone, I hope everyone is safe and healthy and I

 8   want to just remember all of the hero's out there.

 9   Our healthcare workers and all of the city workers

10   that we have lost, so many of them during this hard

11   time.

12     This crisis has us fighting on two fronts;

13   against the virus and against an unprecedented

14   economic crisis.  We can't forget that the suffering

15   and anxiety in New York City right now isn't just

16   about health.  It's also about peoples economic

17   circumstances.

18     When you are being hounded by creditors because

19   you are behind on bills.  When your landlord maybe

20   harassing you for your rent or you're worried about

21   whether you can afford to feed your family, that fear

22   can become overwhelming.  New York City was in a

23   housing emergency even before this epidemic.  Almost

24   a third of New Yorkers were late on their rent.  20

25   percent had the utilities shut off and 19 percent
```

A-1661

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                      7
 2   were doubled up in apartments, 15 percent were facing

 3   eviction.  Almost half of New Yorkers are at or near

 4   the poverty line and now, over half a million workers

 5   are probably out of a job.

 6       The ripple effects here are devastating.

 7   Unemployment benefits will help but it's not that

 8   simple.  Not everyone is eligible and payments have

 9   been very slow to arrive.  If you were struggling

10   before and had to pay your bills with credit cards

11   over money, back payments aren't going to make you

12   whole.  That means that many tenants won't be able to

13   pay rent.  But keeping renters in their homes has to

14   be our number one priority.  Not just during this

15   crisis but after the emergency orders are lifted.  We

16   have to give New Yorkers impacted by this crisis a

17   fighting chance to get back on their feet.

18       So, today we are hearing two bills that will help

19   give New Yorkers some piece of mind to let them know

20   that the City Council is going to do everything we

21   can to make sure New Yorkers aren't going to suffer

22   harms that we can't fix later.  We can't compound the

23   tragedies we're already seeing by letting New Yorkers

24   become homeless or have creditors go after them

25   because of no fault of their own.
```

A-1662

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                    8
 2       Introduction 1936 which I'm co-sponsoring with
 3    Council Member Torres, would protect tenants impacted
 4    by COVID-19 from landlords who may retaliate against
 5    them.  And Intro. 1912, which I've sponsored would
 6    protect the hundreds of thousands of vulnerable New
 7    Yorkers and struggling business owners.
 8       While many mortgage holders have been offered
 9    more concrete relief, renters and business owners are
10    left to worry of what will happen when temporary
11    eviction moratoriums are lifted.  And those with
12    debts like medical bills or credit cards are left to
13    hope that their lenders will do the right thing.
14       We're going to need rent cancelation and
15    reductions but while we work to make that happen, we
16    need to put a backstop in place.
17       Introduction 1912 will prevent Marshals and City
18    Sheriffs from taking property or executing money
19    judgements.  This means that evictions and debt
20    collection would be paused.  It also means tenants
21    would have time to repay their rent.  This would
22    apply to actions against all New Yorkers through
23    September or longer if the state of emergency
24    continues into the fall.
25
```

A-1663

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                      9
 2       If you were impacted by COVID-19, Marshals and

 3    Sheriff's will be banned from collecting debts and

 4    performing evictions until April of 2021.  We have a

 5    lot more work here but I believe these bills will put

 6    us on the right track.

 7       I want to thank all the advocates, the

 8    stakeholders and the members of the Administration

 9    who are here today.  I look forward to hearing from

10    you all and I now turn it back over to Chair Cornegy.

11    Chair Cornegy?  Did we lose the Chair?  I'll turn it

12    over to Chair Cohen.

13       CO-CHAIR COHEN:  Alright, are we still looking

14    for Rob?

15       SPEAKER JOHNSON:  I don't see him on here, so

16    you may want to go in.

17       CO-CHAIR COHEN:  Alright, now, I'm gone.

18       SPEAKER JOHNSON:  No, you are here.

19       CO-CHAIR COHEN:  I don't know why my screen is

20    going.

21       SPEAKER JOHNSON:  You're on.

22       CO-CHAIR COHEN:  I appreciate that, except that

23    my screen unfortunately for some reason has gone

24    black and it's going to be hard to read my opening.

25       SPEAKER JOHNSON:  Okay.
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                     10
 2      CO-CHAIR COHEN:  I don't know what's going on.

 3      SPEAKER JOHNSON:  Take your time.  Thank you to

 4    everyone for your patience.  We are doing this

 5    remotely, it isn't easy, so I appreciate everyone

 6    bearing with us.

 7      If the Sergeants or Carl if you are there if you

 8    could reach out to Chair Cornegy.

 9      UNIDENTIFIED:  In the process of doing that now.

10      SPEAKER JOHNSON:  Thank you.

11      CO-CHAIR COHEN:  I am happy to give my opening,

12    so.

13      SPEAKER JOHNSON:  Okay, go ahead.

14      CO-CHAIR COHEN:  I don't want to freelance but

15    I'm going to start by wising my Speaker a happy

16    birthday today.

17      SPEAKER JOHNSON:  Thank you.

18      CO-CHAIR COHEN:  And then I'm going to say good

19    afternoon to everybody.  I am Andrew Cohen and I am

20    the Chair of the Committee on Consumer Affairs and

21    Business Licensing.

22      I want to thank everyone who has managed to join

23    us for this remote hearing.  I want to thank Council

24    Member Cornegy, although he can't hear me right at

25    this second.  He is the driving force behind this
```

A-1665

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                    11
 2   hearing.  As it will be mentioned at today's hearing,

 3   we're seeking feedback on two pieces of legislation.

 4   I am looking forward to hearing from a broad spectrum

 5   of stakeholders including tenants, property owners,

 6   the Marshals, Sheriff's, the advocates, and the

 7   public, so that the Council can get a better

 8   perspective on both sides of the issue.

 9      With these bills, the Council hopes to mitigate

10   tenant harassment during the COVID-19 crisis and help

11   keep as many folks as possible in their homes and

12   business properties.

13      In addition, the Council recognizes many

14   landlords are facing financial pressures and need to

15   weigh in on these issues during these challenging

16   times.  Intro. 1912 which has been introduced by the

17   Speaker, would limit the actions of City Sheriff's

18   and Marshals would limit the action City Marshals and

19   Sheriffs could take during both the pandemic and post

20   crisis recovery.

21      The COVID emergency is disrupting people's lives

22   in the most horrific of ways.  So, the last thing

23   that they should have to worry about is having their

24   money or property seized.  I am very supportive of

25   the various addition moratoria by both the state and
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                          12
 2  federal governments and as the Chair of Consumer

 3  Affairs and Business Licensing Committee, I am very

 4  happy to see that we are trying to do what we can on

 5  the local level.

 6     I commend the Speaker on his leadership on this

 7  issue.  I look forward to gathering feedback from our

 8  witnesses today, so that we can ensure that this

 9  legislation successfully achieves its aims.  Before

10  we begin the testimony, I would like to thank the

11  central staff for the hours and hours and hours of

12  work it took to get media prepared and to get this

13  hearing up and running.  I would also like to

14  acknowledge the Committee Members who have joined us.

15  I think we have Council Members Chin, Koslowitz,

16  Lander, Brannan, Koo, Yeger.

17     And with that, I don't know if Robert is back,

18  but I will —

19     UNIDENTIFIED:  He's back.

20     CO-CHAIR COHEN:  Turn it back over to Rob.  Thank

21  you, Rob.

22     CHAIRPERSON CORNEGY:  Sorry about that, I don't

23  know we lost my feed a little bit but thank you for

24  jumping right in Chair Cohen, as you always do and

25  saving the day.
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                         13

1

2      I want to thank Speaker Johnson and also wish him

3   a very happy birthday.  Unfortunately, you have to

4   celebrate it with us in this way but you are always

5   willing to stand up and be there for us, so I

6   appreciate you Speaker Johnson.

7      As we all know the impacts of the novel

8   coronavirus have been devastating and vast.  At this

9   hearing, the Committees hope to gain a better

10  understanding of the economic implications of the

11  virus.  With special attention paid to the struggles

12  of tenants as residents citywide face unprecedented

13  financial strain.

14     To that end, we'll also be hearing two pieces of

15  legislation aimed at protecting tenants as the City

16  works to recover from this crisis.  In an effort

17  curtail the spread of the virus, the state has been

18  on pause since March which has been a critical tool

19  to facilitate social distancing and save lives.  An

20  unfortunate but necessary component of this pause is

21  the closure of nonessential businesses effectively

22  stalling much of the city's economy.  The result has

23  been a loss of employments for hundreds of thousands

24  of New Yorkers and the numbers continue to grow.

25

A-1668

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    14
 2         Now, in a city where a disproportionate share of

 3      the population was rent burdened even prior to the

 4      pandemic, more and more residents are not sure how

 5      they will make rent.  In an effort to mitigate some

 6      of the renters concerns, the state and federal

 7      government have each enacted measures to halt

 8      evictions for a period of time.

 9         While this allows tenants to remain in their

10      apartments for now, it does not guarantee the tenants

11      unable to pay rent will be able to stay in their

12      apartment once eviction actions resume.  Or that

13      tenants will be safe from the landlord harassment on

14      the basis of having been impacted by the virus.

15         Today, we will be hearing two bills that seek to

16      provide additional long term protections to tenants

17      effected by the crisis.  The first is Intro. 1912,

18      which is sponsored by the Speaker.  This bill would

19      prohibit the City Sheriff and Marshals from taking

20      certain actions related to eviction and debt

21      collection until the end of the first month after the

22      state of emergency of September 30, 2020, whichever

23      is later.

24         For New Yorkers impacted by COVID-19, the effects

25      of the bill would be to extend until the end of the
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      15
2    seventh month after the state of emergency or April

3    1, 2021, whichever is later.

4       Second, is Intro. 1936 which is sponsored by

5    Council Member Ritchie Torres and the Speaker.  This

6    bill would make it illegal for a landlord to harass a

7    tenant based on their status as a person impacted by

8    COVID-19.  Including whether they are an essential

9    worker or because they were laid off or because they

10   received a rental concession or forbearance where the

11   eviction moratoria were in effect.

12      We look forward to hearing from the Department of

13   Housing Preservation and Development, the Department

14   of Finance and the Commissioner on Human Rights as

15   well as from interested members of the public about

16   these bills.  We will now hear an opening statement

17   from Chair Cohen, well actually, you already heard

18   that statement from Chair Cohen.  Thank you so much

19   and I do want to add before we go into testimony that

20   we've also been joined by Justin Brannan, Ritchie

21   Torres, and Farah Louis.

22      At this point, I'll hand it over to Austen.

23      AUSTEN BRANDFORD:  Yeah, great, thank you.  I am

24   Austen Brandford, I'm Counsel for the City Council of

25   Committee on Housing and Buildings and before we
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                      16
 2   start, I want to remind everyone that you will be on

 3   mute until you are called on to testify.  I'd like to

 4   point you will be unmuted by the host.  I will be

 5   calling on panelists to testify.  Please listen for

 6   your name to be called as I will be periodically

 7   announcing who the next panelist will be.  During the

 8   hearing, if Council Members have questions, please

 9   use the Zoom raise hand function and I will call you

10   in order.

11       When called upon, please be sure to let us know

12   to whom your questions are directed, so they can be

13   unmuted to.  We will be limiting Council Member

14   questions for four minutes including responses.  Our

15   first panelist will be Mike McKee, Barika Williams,

16   Caryn Schreiber and Andy Morrison.  I will call you

17   when it's your turn to speak and your testimony will

18   be limited to three minutes.  A Sergeant at Arms will

19   keep a timer and let you know when you begin and when

20   your time is up.  This panel will be followed by

21   Council Member questions.  You will then hear

22   testimony from the Administration which will followed

23   by additional Council Member questions.

24       Finally, we will hear public testimony.

25
```

A-1671

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                      17
 2        We will now start with our fist panelist Mike

 3    McKee who will be followed by Barika Williams.

 4        MICHAEL MCKEE:  Good Afternoon.

 5        SERGEANT AT ARMS:  Mike, your clock will begin

 6    when you start your testimony.

 7        MICHAEL MCKEE:  Sorry.  Good afternoon, my name

 8    is Michael McKee, I'm a Treasurer of the Tenants

 9    Political Action Committee.  I want to make it clear

10    that I'm testifying only on behalf of myself and

11    tenants not on behalf of any other organization.

12        We are very much in support of these two pieces

13    of legislation.  They are important pieces of the

14    puzzle but I want to parenthetically which Corey a

15    happy birthday.  I also want to thank the Council for

16    getting back to work and showing how it can be done

17    and are very much hoping that this legislation will

18    follow your lead.  And just as somebody who has been

19    cooped up for seven weeks, I'm going thank the

20    Council for taking the leadership on opening our city

21    streets to pedestrians.

22        Intro. 1912 and Intro. 1936 are important pieces

23    of what is needed to protect tenants but it's not

24    everything that we need as many of you know and as we

25    have discussed.  The ultimate thing we need is some
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
   1    LICENSING                                    18
   2    kind of cancelation or forgiveness of rent.  We are

   3    now facing a situation where literally hundreds of

   4    thousands of tenants all across New York State and

   5    across the country simply cannot pay rent through no

   6    fault of their own because they've lost their income.

   7        When the courts reopen and when eviction

   8    moratoria are lifted, we're going to be in a

   9    situation where a lot of these people are going to be

  10    facing eviction and displacement and that's why it's

  11    important that we get rent cancellation in addition

  12    to these other measures.  They are very glad to see

  13    that for people effected by COVID-19, that protection

  14    against eviction will continue into next spring and

  15    we commend you for that.

  16        I want to emphasize that we are talking about

  17    cancelling rents, cancelling mortgage payments, and

  18    cancelling utilities.  And we do believe that mom and

  19    pop landlords need relief as well as tenants.  We

  20    think the big landlords like Black Zone can take a

  21    haircut.  They can certainly absorb this situation

  22    for several months.

  23        I am a volunteer on a hotline sponsored by the

  24    MET Council on Housing and until two or three months

  25    ago, almost all of the calls were how do I get
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                          19
  2    repairs done?  How do I force my landlord to fix

  3    something?  Things like that.  The last six weeks the

  4    calls have all been about I can't pay the rent.  I'm

  5    out of a job.  I've lost hours.  My income has been

  6    reduced.  My income has been eliminated.  What do I

  7    do?

  8        We've also had a lot of calls from tenants who

  9    want to break their lease because they can't afford

 10    to pay the rent anymore and of course one thing we

 11    know is that New York State law on breaking lease is

 12    very bad.  We're hoping to get some relief once the

 13    state legislature goes back into business.

 14        SERGEANT AT ARMS:  Time expired.

 15        MICHAEL MCKEE:  Thank you very much.

 16        AUSTEN BRANDFORD:  Thank you Mike.  We will now

 17    here from Baricka Williams who will be followed by

 18    Caryn Schreiber.

 19        CHAIRPERSON CORNEGY:  One second, I just want to

 20    acknowledge the presence of Fernando Cabrera and

 21    Carlina Rivera.

 22        SERGEANT AT ARMS:  And Barika, your time will

 23    start when you begin your testimony.

 24        BARIKA WILLIAMS:  Good afternoon.  Thank you,

 25    Speaker Johnson, and happy birthday I should also
```

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1       LICENSING                                    20
 2   add.  Thank you to Chair Cornegy, to Chair Cohen.

 3   It's nice to see all of you back in my new roll as ED

 4   at ANHD and I'm sorry that we haven't gotten to

 5   interact except for remotely.

 6       You all know, many of you all know ANHD and our

 7   work on behalf of 80 plus nonprofits, tenants groups

 8   and CDC's across the city.  We've fought for decades

 9   against harassment of tenants, many of which are

10   things that we've accomplished in partnership with

11   the City Council and specifically with many of the

12   people on this Zoom call.  And ensuring that all

13   tenants are protected against harassment especially

14   during these challenging times.  It is incredibly

15   important.  We cannot stress how much the stress of

16   the pandemic of living through this, of losing

17   people, of losing family members, of struggling

18   through health is only made more complicated when the

19   tenants are facing harassment and displacement.  And

20   facing harassment and displacement in a moment where

21   that really compromises your safety and the safety of

22   your family.

23       So, we fully support expanding the definition of

24   harassment to include threats based on persons having

25   been impacted by COVID, the Intro. of 1936 2020.
```

A-1675

1   COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                      21
2   Absolutely looking forward to and happy to continue

3   to work with the City Council to pass this

4   legislation and to expand these protections.  We

5   really appreciate the intention behind 1912 and

6   really applaud the city using its authority over

7   Sheriffs and Marshals to prevent evictions in this

8   time and during this current moratorium.

9       We do have a few concerns with the bill as

10  currently drafted and that's because many of ANHD's

11  members are nonprofits, are CDC's who have been their

12  community caretakers, been on the frontlines

13  throughout all of this.  And while tenants in these

14  buildings are often struggling, they absolutely need

15  relief.  We have a lot of concerns about pushing and

16  extending the loss of rental income onto the very

17  nonprofits who are trying to support their

18  communities throughout this.

19      We know that statewide, two-thirds of the folks

20  who filed for unemployment earned $40,000 or less, so

21  that is really the tenants that mainly reside in our

22  buildings and in communities and we really just don't

23  want to end up in a place where the extension of

24  anything means that there is a loss of services or

25  that that burden falls back on our nonprofits that

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1     LICENSING                                    22
  2   we're going to need because we're desperately going
  3   to need the affordable housing coming out of this
  4   into the long, the very long term work of recovery.
  5       So, to piggyback on some of what Mike McKee said,
  6   we can't substitute meaningful rent relief.
  7       SERGEANT AT ARMS:  Time is expired.
  8       BARIKA WILLIAMS:  Okay, but just to say we want
  9   to absolutely make this a priority for all levels of
 10   government.  Thank you.
 11       CHAIRPERSON CORNEGY:  Thank you, very good.
 12   Before we go to the next panelist, I'd also like to
 13   acknowledge that there are at least four or five of
 14   my colleagues who have been here since the beginning
 15   of the hearing.  I neglected to go to my second
 16   screen to see that they were there.  Barry
 17   Grodenchik, Mark Gjonaj, Keith Powers and Helen
 18   Rosenthal have been here from the beginning.  I just
 19   neglected to go to the second screen and see them,
 20   welcome.
 21       AUSTEN BRANDFORD:  Thank you.  We will now here
 22   from Caryn Schreiber who will be followed by Andy
 23   Morrison.  Karen?
 24       SERGEANT AT ARMS:  Karen, your time will start
 25   when you begin your testimony.
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                        23
  2      CARYN SCHREIBER:  Thank you.  Good afternoon,

  3   thank you Chairpersons Cornegy and Cohen and members

  4   of the Committees for the opportunity to testify on

  5   behalf of the Legal Aid Society.  The nation's oldest

  6   and largest not-for-profit legal services

  7   organization.

  8      We welcome this opportunity to endorse and share

  9   our view on this legislation and we commend the

 10   committees for holding today's hearings on both bills

 11   which will provide relief to numerous New Yorkers who

 12   are currently on the edge of homelessness and

 13   financial distress.

 14      We strongly support the passage of the bills and

 15   have some suggested recommendations to strengthen the

 16   legislation.  We strongly support the passage of

 17   Intro. 1912, which will temporarily help in taking

 18   restitution of property and the execution of money

 19   judgments.  As you are aware, the COVID-19 pandemic

 20   is causing devastating and lasting economic hardship

 21   that disproportionately impacts low and moderate

 22   income New Yorkers and communities of color.  This

 23   has caused numbers low and moderate income New

 24   Yorkers to default or fall behind on financial

 25   obligation.
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                    24
 2         The COVID-19 pandemic has amplified New York

 3     City's ongoing housing crisis in ways that are

 4     impossible to ignore.  Housing insecurity is a brutal

 5     fact of life for many New Yorkers.  44 percent of New

 6     York City renters are rent burdened and four out of

 7     ten low income people in New York are either homeless

 8     or severely rent burdened.

 9         A budget overwhelmed by housing costs increase

10     the families risk of food insecurity, lack of access

11     to proper medical care and addiction and with little

12     room for savings, a reduction in work hours or an

13     unexpected expense may cause turmoil and ultimately

14     displacement.  And similar to the COVID-19 pandemic,

15     involuntary displacement is not born equally in New

16     York City where low income, Black and Latinx

17     households are most impacted by eviction

18     homelessness.

19         Housing and security now impacts a far broader

20     range of households than it did earlier this year.

21     For low and moderate income renters on the precipice

22     rent burdened and without savings, they have now

23     fallen off of a financial cliff.  While New Yorkers

24     are right now protected from eviction by Governor

25     Cuomo's 90-day statewide eviction moratorium, the
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                        25
 2   economic landscape is unlikely to be dramatically

 3   altered by the end of the state moratorium on June

 4   20ᵗʰ.

 5      By June 20ᵗʰ, renters will owe months of rent

 6   arrears and fees.  Many will promptly face eviction

 7   proceedings seeking thousands of dollars of debt and

 8   disposition.  Far from solving up the crisis, the end

 9   of this short term moratorium will be catastrophic

10   for renters.

11      The eviction of any one household is a tragedy

12   and the eviction of thousands of renter households is

13   a humanitarian crisis.  The consequences of eviction

14   are vast and have devastating long term negative

15   impacts.  Similarly, New Yorkers face financial

16   challenges beyond eviction and the hardships imposed

17   by money judgments are equally as devastating for

18   individual judgment debtors and communities at large.

19      An increasing number of judgment debtors have

20   contacted the Legal Aid Society in the last few weeks

21   seeking assistance due to frozen bank accounts and

22   garnished wages.

23      So, we suggest, well we support the legislation,

24   we have a few suggestions that will further reduce

25   the harm including clarifying —
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                    26
  2      SERGEANT AT ARMS:  Time is expired.

  3      CARYN SCHREIBER:  Thank you.

  4      AUSTEN BRANDFORD:  Thank you Caryn.  We'll now

  5   here from Andy Morrison and open up for Council

  6   Member questions.  Andy?

  7      SERGEANT AT ARMS:  Andy, your time will begin

  8   when you start your testimony.

  9      ANDY MORRISON:  Thank you Chairs Cohen and

 10   Corney and members of the Committees for the

 11   opportunity to testify today.  My name is Andy

 12   Morrison and I'm Campaigns Director at New Economy

 13   Project and many of you know us and our work.  We are

 14   an economic justice organization that works with

 15   community groups and low income New Yorkers

 16   throughout New York City.

 17      We strongly support Intro. 1912.  We urge the

 18   Committee to take swift action to move the bill

 19   forward, so that the full body can pass it into law

 20   as soon as possible and we commend Speaker Johnson

 21   and other sponsors of this emergency legislation for

 22   their leadership.

 23      We have calling for several weeks now for a

 24   statewide emergency moratorium on predatory debt

 25   collection and we're very pleased that in the absence
```

```
              COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
    1         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
              LICENSING                                      27
    2    of state level action, members of the Council are

    3    taking this crucial step to protect New Yorkers.  At

    4    New Economy Project, we run a free legal hotline for

    5    low income New Yorkers and we've heard over the years

    6    from thousands of New Yorkers who have been harmed by

    7    discriminatory and abusive debt collection.  And

    8    since COVID-19 gripped our city, we've been flooded

    9    with a new spade of calls from low income New Yorkers

   10    who are being hounded by debt collectors.  It should

   11    just go without saying that no New Yorker should be

   12    having his or her bank accounts frozen or wages

   13    garnished and as debt collectors continue to siphon

   14    wealth from New Yorkers and from communities, the

   15    predatory debt collection is morphed into a public

   16    health crisis and so, we really need this action to

   17    further and ensure economic and racial justice and

   18    community equity.

   19        A lot of the New Yorkers we've heard from have

   20    been speaking out and sharing their stories and I

   21    just want to read one testimonial from a Brooklyn

   22    resident named Veronica and refer you to our written

   23    testimony where we have included several others.

   24        "I just found out that my paycheck was garnished.

   25    I don't know what it's for.  I can't afford to have
```

A-1682

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                      28
 2   any money taken away right now.  My two daughter and

 3   two grandchildren live with me.  I'm trying to

 4   support my family but everything is uncertain.  My

 5   job has cut the number of days that I go into work

 6   for safety reasons.  One of my daughters lost her job

 7   because of coronavirus.  That money was taken from

 8   me, could have gone toward a lot of other things that

 9   I am worried about right now, like food, disinfecting

10   supplies, and other things I need to keep my family

11   healthy.

12       Stories like this underscore the need for bold

13   action and as we address this issue in the immediate

14   term, we also want to underscore the need to be

15   thinking about the structural inequities that underly

16   this crisis from lack of healthcare to housing

17   insecurity and discrimination built into our

18   financial system.  So, in addition to addressing this

19   issue in the immediate term, which we urge the

20   Council to do right away, we also want to encourage

21   the Council to be thinking about broader measures

22   including debt cancellation and other more structural

23   solutions to our unequal economy.

24       SERGEANT AT ARMS:  Time is expired.

25
```

A-1683

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    29
 2     AUSTEN BRANDFORD:  Thank you Andy.  We will now

 3   open it up to the questions from Speaker Johnson,

 4   Chair Cornegy and Chair Cohen before moving to

 5   general council member questions.

 6     SPEAKER JOHNSON:  Thank you Austen, it's good to

 7   see you.  I hope you are safe and healthy.  Let me,

 8   give me one moment.  So, I wanted to start off for

 9   anyone on the panel and I want to thank you for the

10   work that you're doing.  You've really been at the

11   forefront on these issues and even though two-thirds

12   of New Yorkers are renters, they certainly aren't

13   getting two-thirds of the help.

14     We've seen a lot more support be announced for

15   landlords and mortgage holders and we have to make

16   sure as this hearing is about that we're not leaving

17   tenants behind.  It's governments job to solve this

18   problem.  There have been devastating personal

19   impacts for many New Yorkers but this crisis also

20   threatens the city's budget.  If people aren't able

21   to pay their rent, we will see a drop in property tax

22   revenue and if people can't afford to pay their

23   bills, we will see less spending and that means less

24   money in sales tax revenue.  All of that means less

25
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              30

1

2    money for the social safety net, which we need more

3    than ever right now.

4        So, the Council is doing what we can but we're

5    going to need more help.  I've been advocating for a

6    lot more money from the federal government and we

7    need the state to cancel rent as we've seen in these

8    bills but they're calling for money from the feds as

9    well.

10       So, I want everyone watching to understand how

11   serious this is.  Can each one of you talk about what

12   you think will happen if we don't figure this out?

13   If New Yorkers who need help with rent don't get it.

14   And maybe we can start with Mike McKee.

15       MICHAEL MCKEE:  Thank you Mr. Speaker.  I think

16   we're facing, I forgot which witness it was that said

17   this is a humanitarian crisis.  I mean, that's

18   exactly what this is going to be.  There is going to

19   come a point when the courts reopen and when these

20   moratoria on eviction are lifted where literally tens

21   of thousands, hundreds of thousands if you look at it

22   statewide or nationwide, of tenants who just can't

23   pay the rent are going to be facing displacement.

24   And another issue is that the courts are simply going

25   to be overwhelmed with eviction cases.  Right now,

A-1685

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              31

1
2   landlords cannot file new eviction cases but at some

3   point, they will be allowed to do that.  This is all

4   going to pile up, so there has to be money from the

5   federal government targeted specifically to housing

6   and rent relief.  There has to be a cancellation of

7   rent.

8       It's my view that at some point Andrew Cuomo is

9   going to end his stonewalling on this issue and

10  recognize that something must be done.  And that, if

11  you don't just cancel the rent and then figure out

12  how to take care of mom and pop landlords while

13  you're doing that.  And as Barika pointed out,

14  nonprofit landlords have special needs to and they

15  don't gouge their tenants.  So, they are really

16  running at a very low margin if any.

17      This all has to be done and it is governments job

18  to do it and if it isn't done, it's going to be a

19  disaster and I don't think ultimately government or

20  the courts are doing to sit by and let that happen.

21  I cannot imagine most Judges presiding over eviction

22  after eviction after eviction, human nature being

23  what it is and Judges being who they are, I would

24  suspect they are going to be pressuring landlords and

25  tenants to come to some kind of settlement possibly

A-1686

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                           32

1

2    where tenants pay some of the rent if they can.  I

3    don't know, maybe some kind of fund to help make this

4    up, but I think it's a very dangerous and serious

5    situation that we just can't ignore and I think that

6    by not talking about it now and by basically

7    stonewalling on it, the governor is creating a lot of

8    fear and anxiety.  And I think it's time that

9    everyone in state government, our friends in the

10   state legislature and the governor recognize that

11   this is a serious issue that has to be addressed.

12   The city can only do so much and I think it's

13   commendable that you're doing what you're doing but

14   if we don't have federal and state government

15   weighing in on this, we're not going to be able to

16   deal with this.  There's not going to be a solution

17   that's going to keep people in their homes.

18       SPEAKER JONNSON:  I'm not going to let; I have

19   other questions and I want to get through them

20   quickly because we have a lot of Council Members on.

21   I want to go to ANHD.  You all have been ringing the

22   alarm for weeks.  Your analysis has shown this crisis

23   is hitting Black and Brown working class

24   neighborhoods the hardest.  I know you are certainly

25   seeing this when it comes to tenants loss of income

A-1687

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      33
 2    and the inability to pay rent.  What are you all

 3    seeing on the ground with respect to small

 4    businesses, vendors, particularly immigrant owned

 5    businesses?

 6      BARIKA WILLIAMS:  Thank you for that Speaker

 7    Johnson.  I mean, as we've seen for so many people,

 8    we've seen our immigrant and Black and Brown

 9    businesses are the hardest hit.  Many of them were

10    unbanked or underbanked before and so, there has been

11    a lot of conversation, a lot of work at the federal

12    level because many of these small businesses have

13    been entirely shut out, if not by process shut out of

14    the federal aid.

15      But it also feeds into the side of things that as

16    residential tenants and the broader community

17    supports, because often times these are businesses

18    that are tied to some of our residential buildings.

19    They are the businesses that are supporting people's

20    incomes.  Obviously the longer they stay shut and

21    impacted, the more we're impacting peoples earnings

22    and so, this all ultimately gets tied together.

23      One of the things we're hearing on the ground

24    from many of our members is really, to put the human

25    side on it as Mike McKee was talking about, really
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                       34
```

2    being confronted with the challenges of because their

3    government is not stepping in.  Because at the city,

4    at the state, at the federal and I know you all are

5    limited in how much you can do and what you are able

6    to do in this but there hasn't been a clear approach

7    and relief package for residential tenants.  And so,

8    what these landlords are being confronted with is

9    going to tenants that they know have lost their jobs,

10   know that their businesses aren't open because they

11   are around the corner.  Know that they are not able

12   to help them get a loan with the bank that they have

13   a relationship with and then also, being faced with

14   having to knock on their door and ask them, what can

15   we do about rent?

16       And our groups really don't want to be put in

17   that position, right.  At the end of this down the

18   line, what we're looking at is if we do not figure

19   out a rent relief package, in some way shape or form,

20   we are looking at an explosion of our homeless

21   population and explosion in our Human Services needs.

22   Because we've got tons of people going to food banks

23   now but where will we be then and what little

24   intergenerational wealth that we have built for

25   immigrant communities and Black and Brown communities

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                        35
2   will be absolutely wiped out.  And as we kick this

3   down the road, as we go from four months' worth of

4   rent out a $1,400 rent, is like $5,600.  Most

5   families don't have more than $400 or $700 in

6   savings.

7       So, there is no possibility and that savings,

8   they are already burning through.  So, the likelihood

9   that they are able to take and pay that back, even

10  over a one year timeline is just incredibly slim.

11      So, what we're really talking about is creating

12  like a long term debt burden for people that they

13  know they will never get out of.

14      SPEAKER JOHNSON:  Thank you.  Thank you Barika.

15  I want to go Legal Aid for a quick question.  This

16  crisis is deepening the inequalities that you just

17  heard about that we had even before coronavirus hit

18  our city.  Low income communities of color are taking

19  the brunt of the health impacts and if we don't do

20  more to help with debt and rent, we're going to see

21  the irreversible economic impacts that Barika just

22  spoke about.  Can you talk about what you are seeing

23  on the ground?  What are your clients facing in terms

24  of economic hardships?  How important is taking care

25
```

A-1690

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              36

1

2   of the rent issue, in terms of helping New Yorkers

3   out?

4       CARYN SCHREIBER:  Thank you for that question

5   Speaker Johnson.  It is helping renters in this city

6   is of the upmost importance right now as the other

7   witnesses have said, people are struggling and they

8   will be struggling even further come June, come this

9   fall.  The rent continues to accrue and people are

10  terrified.  That's what we are seeing.

11      We are seeing people, hearing from clients who

12  don't know how they will pay their rent in May, don't

13  know how they will pay their rent in June and going

14  forward.  They are preparing for and resigning

15  themselves to having to leave their homes, which has

16  as I mentioned before very dramatic negative effects

17  on employment outcomes, school performance and

18  physical and mental health.

19      We appreciate the City Council's recognition of

20  this tremendous need and we hope that the state and

21  federal governments will do more here because we are

22  faced with a reckoning and come June, we will see

23  tenants brought to Housing Court on a tremendous

24  scale and scale that the courts will not be able to

25

A-1691

```
          COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
          LICENSING                                      37
 2   handle and that the city's infrastructure will not be

 3   able to handle.

 4      SPEAKER JOHNSON:  And Caryn on that point, I just

 5   want to hear Legal Aids thought on this.  There are

 6   two temporary eviction moratoriums that could apply

 7   to New Yorkers right now.  There's the states 90-day

 8   moratorium and then there is the 120-day federal

 9   moratorium that applies to properties with a

10   federally backed mortgage.  Does it seem like tenants

11   and even landlords understand what protections apply

12   to them or their tenants?

13      CARYN SCHREIBER:  Unfortunately, I think no they

14   don't.  We are hearing from our partners around the

15   country to that.  The federal moratorium is causing a

16   lot of confusion or well, confusion I guess, for

17   landlords who don't realize that people cannot be

18   evicted for nonpayment if they reside in a property

19   that has a, as you said Mr. Speaker, a federally

20   subsidized mortgage or has another subsidy attached.

21      That federal moratorium covers a certain portion

22   of tenants and other renters from again, eviction for

23   nonpayment through the end of July but it doesn't go

24   far enough.  It seems to relate again only to

25   nonpayment proceedings, leaving open other types of
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                         38
 2   proceedings where nonpayment could be an issue but is

 3   not explicitly stated.

 4      And further, it's only I believe less or a little

 5   bit more than 30-days longer than the current state

 6   moratorium.  So, even if more than half of New York

 7   City's renters are covered by the federal moratorium,

 8   come the end of July, we will see the same thing that

 9   we will see at the end of June likely.

10      SPEAKER JOHNSON:  Thank you.  I have more

11   questions but I want to go back to the Chairs, so

12   they can get through some of their questions and then

13   we'll go to the Council Members.  I can come back

14   later to ask the rest of my questions for this panel.

15      So, I turn it back to either Chair Cornegy or

16   Chair Cohen.

17      CHAIRPERSON CORNEGY:  Thank you Speaker Johnson.

18   Both Barika and Mike have alluded to this fine line

19   that has to be drawn and the governor has to be

20   involved while protecting you know, tenants, small

21   homeowners as well not burdening them and it's a

22   delicate balance.  As the Chair of the Committee, I

23   am also faced with doing that and I'm acutely aware

24   that the input of the state and federal government in

25   doing that is essential.  I just wanted to ask
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    39
  2   statistically, do you know the ratio between big

  3   buildings and big building owners as landlords as

  4   compared to small homeowners?  I had heard that there

  5   is a statistic that there actually maybe more small

  6   homeowners responsible for the makeup of tenancy,

  7   that it actually is big buildings.  I just wanted to

  8   know, I know you probably, the two of you I know you

  9   probably know.  I'm just curious as to what that is.

 10      MICHAEL MCKEE:  Barika, you want to go first.

 11      BARIKA WILLIAMS:  I mean, I actually don't know

 12   that number off the top of my head but I could

 13   probably get it for you in about two minutes.  So, if

 14   you give me a second Council Member, I can pull that

 15   but I also would say one thing that's a little bit

 16   challenging here is that sometimes it's not a clean

 17   break between the size of the building.  It's really

 18   about the type of owner, right.  We've seen big

 19   investment firms and specifically hedge firm

 20   companies buy up a series of buildings across an

 21   entire neighborhood but these are one to four family

 22   homes, so Bushwick is one of the places that's been

 23   rampant for this.  We want to treat them who have

 24   investors and backers and reserves very differently

 25   than the understanding of a first time homebuyer who
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                    40

2   is likely being supported by some of the groups that

3   you will hear from today; Impact, Chhaya, right,

4   CNYCN, some of these groups that are really trying to

5   build new homeownership across the city.  And part of

6   their ability to pay for the mortgage is that first

7   time homeowner collecting rent or in one or two units

8   of somebody that they know and they have a

9   relationship with and they are trying to support

10  their tenant.  Those are two very different things

11  and the hard thing is that by slicing it just by

12  stock, they kind of get blurred together.

13       CHAIRPERSON CORNEGY:  So, Mike, before you try —

14       MICHAEL MCKEE:  Well, I don't have exact numbers

15  for you but we can certainly dig that up.  The data

16  show very clearly that the majority of rent

17  stabilized apartments in New York City are owned by

18  large landlords.  There is no question about that but

19  it's also true that a majority of owners are small

20  landlords who own one or two buildings.  And as

21  Barika pointed out, there are small landlords and

22  there are small landlords and in fact, one of the

23  thing predatory investors have done in the aftermath

24  of the 2008 economic crisis is they went around the

25  country and bought up mobile home parks and they

A-1695

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                      41
```

2   bought up even single family homes that have been

3   foreclosed and turned them into rental properties

4   where they are gouging and evicting people.

5       So, the mere size of the building is not what you

6   need to look at.  You need some kind of system where

7   you can actually ascertain who people are.  Just for

8   example, there is a very famous landlord from

9   Brooklyn who comes to the Rent Guidelines Board every

10  year and testifies that he is a small landlord.

11  Well, when he started out doing this back in the

12  1980's, he owned one 20-unit building.  He now owns

13  nine 20-unit buildings.  All rent stabilized, of

14  course, now he has some deregulator departments

15  thanks to Peter Vallone and thanks to George Pataki

16  but you know, he's done very well under rent

17  stabilization.  He owns 180, 9 times 20, 180

18  apartments and he bought these new building while he

19  was running his original stabilized building.

20      So, it's not cut and dried and you can't simply

21  go by the size of the building.  You have to go by

22  pattern of ownership and other factors but we can

23  certainly prepare numbers for you that will help you

24  understand who owns what.

25

A-1696

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
   1    LICENSING                                         42
   2       CHAIRPERSON CORNEGY:  Well, I appreciate that but
   3    I also know that it is very difficult to do that
   4    because as you mentioned, you have these hedge funds
   5    who are operating as individual LLC's to some degree.
   6    So, trying to get the cumulative affect of their
   7    buying power sometimes is difficult.  We've tried to
   8    look into, but you know, LLC's federally are
   9    protected from who their owners are.  So, we know
  10    that that is happening as well.
  11       I just want to be mindful because there are some
  12    small homeowners who while their tenants will be
  13    getting some help and some relief, they still, are
  14    subject to rising energy costs and things like that
  15    that kind of make it difficult.  So, I'm just, I'm in
  16    precarious position, I'm screaming at the governor
  17    just like you guys are because we need help.  We need
  18    to be able to disseminate you know, who is who.
  19    That's going to be very important to do and we don't
  20    have a whole bunch of time to do it.  So, I look
  21    forward to working with the entire first panel to
  22    make sure that we continue some of this apart and
  23    target those that we need to target and support and
  24    help those that we need to help in terms of
  25    homeowners and/or landlords.
```

A-1697

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                      43
 2       So, we got to walk and chew gum at the same time.
 3    Andy?
 4       CO-CHAIR COHEN:  Thank you very much Rob.  I'll
 5    be very brief.  Mike, in your testimony, you talked
 6    about calls that you are taking now as a volunteer.
 7    What do you tell tenants who call now who can't pay
 8    the rent?  Is Mike able to hear me?
 9       MICHAEL MCKEE:  I'm sorry, my internet is
10    apparently unstable.  I keep getting this prompt
11    saying your internet connection is unstable.
12       So, I heard part of what you said Council Member.
13       CO-CHAIR COHEN:  What I was wondering is you said
14    that you are volunteering and taking calls from
15    tenants.  I'm just curious, what are telling tenants
16    today who call and say they can't pay their rent?
17       MICHAEL MCKEE:  Well, you have to deal with it
18    first as a matter of common sense.  It's a question
19    between feeding your family and paying the landlord.
20    There is no choice, you have to feed your family.
21       I do tell people that if you can put aside some
22    of the rent, you should do that because down the
23    road, just the ability to pay partial rent might be
24    useful in terms of individual negotiations in a
25    landlord/tenant proceeding.  But of course, there are
```

A-1698

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          44

1

2    people that can't do even that and it's you know, we

3    refer people to local community groups, we refer

4    people to lawyers when they need a lawyer.  There is

5    not a lot you can tell people except that you know,

6    hunker down, and get through this and stay safe.

7        You can't tell people to save money when they

8    don't have an income but it all depends on the

9    individual situation when you talk to the tenant who

10   is calling in.  We also have resources that we refer

11   people to —

12       CO-CHAIR COHEN:  I think we lost Mike again.

13       MICHAEL MCKEE:  I think there are even more who

14   won't be able to pay on May 1st and there are other

15   tenants who can pay but who are going to withhold

16   rent out of solidarity which I have no problems with

17   if they want to do that but ultimately this has to be

18   a government solution.

19       CO-CHAIR COHEN:  Briefly, Caryn Schreiber from

20   Legal Aid, in your testimony also, you said that you

21   had some suggestions on possibly improving the bill.

22   I don't know if you submitted written testimony in

23   which those suggestions were made otherwise, I'm

24   interested in them.

25       Can we unmute Legal Aid?  You are unmuted.

A-1699

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                    45
 2       CARYN SCHREIBER:  Yes, thank you for that
 3     question.  We did submit written testimony that
 4     outlines some our recommendations.  I was out of time
 5     and was unable to get to them.
 6       CO-CHAIR COHEN:  If you have them for the record,
 7     that's fine.
 8       CARYN SCHREIBER:  Okay, thank you very much Mr.
 9     Chair.
10       CO-CHAIR COHEN:  Thank you Rob.  Austen, I'm
11     done.
12       AUSTEN BRANDFORD:  Great, any more questions from
13     Speaker Johnson?
14       SPEAKER JOHNSON:  No, we can go to the other
15     members, I can come back after them.  I don't want to
16     hold up the other members who are waiting.
17       AUSTEN BRANDFORD:  Okay, sounds good.  So, I will
18     now call on Council Members to ask questions in the
19     order they have used in the Zoom raise hand function.
20     I'd like to also note that Council Members Torres,
21     Yeger and Powers have already raised their hands to
22     ask questions of the Administration after their
23     testimony.
24       Council Members, please keep your questions to
25     four minutes including responses.  If there is a
```

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1       LICENSING                                    46
 2   second round of questions Council Members questions
 3   will be limited to two minutes.  A Sergeant at Arms
 4   will keep a timer and let you know when your time is
 5   up.  Our first question will come from Council Member
 6   Yeger followed by Council Member Cabrera.
 7       SERGEANT AT ARMS:  And Council Member Yeger, your
 8   clock will start when you begin your testimony.
 9       COUNCIL MEMBER YEGER:  I'm not testifying, I'm a
10   member of the Council.  How are you, thank you.
11       First of all, I'd like to echo Mr. Speaker, I
12   agree with a portion of his opening statement that we
13   do need rent cancellations, we do need reductions.  I
14   also believe as Mr. McKee said, and Mike McKee has
15   been a leader in tenant advocacy, so this is an
16   important point from him that that has to go hand and
17   hand with relief for landlords.  So, particularly
18   small landlords, I'm not worried about the very large
19   landlords, I am worried about the small landlords.
20   Excuse me, I have some background noise, but my
21   question more importantly is to Ms. Schreiber and
22   since you are the only lawyer on the panel, I wanted
23   to ask you this question.  With regard to your
24   Introduction 1912, my understanding and you can
25   correct me if I'm wrong is that the authority of a
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              47

1

2    Sheriff or a Marshal to execute a judgement comes

3    from state law.  And state law particularly the CTLR

4    with respect to execution is what a Sheriff perceives

5    it contained the word shall.

6        Do you believe that the City Council has the

7    authority to supersede state law and to replace the

8    word shall when a Sheriff receives a lawfully

9    received an executed and commit execution or money

10   judgement execution or a warrant.

11       CARYN SCHREIBER:  So, thank you very much for

12   that question Council Member Yeger.  We believe, well

13   with regard to City Marshals specifically, that the

14   Mayor has the authority to direct City Marshals to

15   stop enforcement of judgements and that the City

16   Council has the power to legislate here as a result.

17       COUNCIL MEMBER YEGER:  Okay, and that the City

18   Council, not withstanding the fact that if a judge or

19   clerk of the court or an officer of the court signed

20   an execution that says at the top, the people of the

21   State of New York to any Sheriff or Marshal and gives

22   it to a Sheriff, the Sheriff can put it aside because

23   we passed a law that says so?

24       CARYN SCHREIBER:  I think that the Sheriff would

25   not be placing the judgement aside indefinitely.  It

```
          COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
          COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1        LICENSING                                      48
 2   could be exe— it will be executed let's say, not
 3   could.  It will be executed when the moratorium is
 4   lifted and it would not be flying in the face of
 5   state law to say that that judgement is going to be
 6   paused for lack of a better word for now.  Until such
 7   time has passed that it makes sense for the community
 8   at large for judgements to resume being enforced.
 9        COUNCIL MEMBER YEGER:  I appreciate that very
10   much.  Well, the Sheriff is going to come on and
11   testify in a little while and I'm interested in
12   hearing his opinion on this topic.  But I appreciate
13   all of the advocates who came today and the important
14   work that you do.  Of the lawyers who are on the
15   front line and Mike McKee who is a legend in tenants
16   rights and tenants offenses and I'm a tenant too and
17   you know, I can pay my rent, so I'm going to and I
18   will.  But there are a lot of people who are
19   suffering right now and can't.  And I'm going to use
20   the remaining clock that the Sergeant has at 40
21   seconds to say that I do believe there are things
22   that the City Council can do to relieve the burden on
23   the owners in addition to the tenants because it
24   can't just be that tenants stop paying rent simply
25
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                       49
  2   because we say so and not withstanding that they are

  3   not able to afford it.

  4       Tenants who don't pay rent and can't afford it

  5   will never be able to make that up and that's going

  6   to leave a hole.  And we have to do it on both ends,

  7   we have to help the tenants and freeze their rent and

  8   we also have to help the landlords and we can do it

  9   on taxation.

 10       We can do something to relieve the tax burden by

 11   stopping the interest payments on late payments.

 12       SERGEANT AT ARMS:  Time expired.

 13       COUNCIL MEMBER YEGER:  Okay Serg.  We can stop

 14   the interest on late payments and allow the owners to

 15   have a little bit of float so that they don't have

 16   the proverbial gun to their head on making payments

 17   at the same time that they are not receiving an

 18   income.

 19       So, that's why your advocacy on this Mike is so

 20   important because you are recognizing that it does

 21   come from both ends.  We can't just stop it on one

 22   end, we do also have to help those people who have

 23   those 20 unit buildings before they get the other 8

 24   20-unit buildings.

 25
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    50
 2      And so, I want to thank you all.  Thank you very

 3   much Mr. Chair and I yield back.

 4      AUSTEN BRANDFORD:  Thank you.  We will now hear

 5   from Council Member Cabrera followed by Council

 6   Member Powers.

 7      SERGEANT AT ARMS:  And your clock will start now.

 8      COUNCIL MEMBER CABRERA:  Thank you so much.

 9   First, I want to wish our Speaker a super happy

10   birthday and the lord bless you and give you many,

11   many more years.

12      SPEAKER JOHNSON:  Thank you.

13      COUNCIL MEMBER CABRERA:  And also, I want to

14   thank the Speaker, the Chairs for being so

15   parsimonious with your questions to get to the rest

16   of us.  I know I can speak on behalf of my

17   colleagues; we really truly appreciate it.

18      My question is in regards — I have a couple of

19   questions real quick.  Does it make more sense to

20   have to state and the city come up with a fund that

21   pays for those who are struggling with the rent?  For

22   those who were unemployed, we know the full list.

23   There are people who are employed.  There are people

24   who actually make more money than ever.  But we have

25   a big segment that is in a tremendous need.  Doesn't
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                      51
 2   it make more sense to have the state and the city

 3   come up with a fund to pay for those rent, just like

 4   Delaware.  This is not unprecedented.  The State of

 5   Delaware pay for the rent for all the renters?

 6       My second question because I'm going to run out

 7   of time is that if the nonprofits organizations are

 8   excluded, wouldn't it make also sense to include

 9   those landlords, they have the same business plan,

10   they have the same agreements with HPD when it comes

11   to, you know, many of them they have Title 11.  There

12   were agreements in place to be able to have low rent.

13   And also, the last thing is Assemblywoman Inez

14   Dickens; I was in a meeting the other day and she was

15   very much afraid of landlords or minority owned

16   landlords that could essentially be wiped out if they

17   are not able to collect rent and we could see pretty

18   much the end of a generation of minorities who own

19   property.

20       So, here trying to find that balance, which I

21   know is very difficult.  So, I'll turn it over to the

22   panel for some wisdom.

23       BARIKA WILLIAMS:  So, I think — this is Barika.

24   I think I can pick up on the minority landlords and

25   CDC's.  I think we see those as being interrelated.
```

A-1706

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              52

1

2    We do have some large landlords who are minority

3    owned but by and large that's rarer in the city.

4        I was able to pull those numbers and just so

5    folks know, I think it's about 13 percent of

6    landlords own one building or less in New York City

7    as compared to 27 percent that own 61 buildings or

8    more.  So, that's sort of the spread that we're

9    talking about.  There is relatively few buildings

10   that are owned by small landlords.  But in both cases

11   when it comes to CDC's, when it comes to some of our

12   community controlled, like CLT'S or our limited

13   equity co-ops and then also our MWBE developers.

14   They face slightly different challenges.  Our

15   affordable housing have so many regulations that are

16   put on them by HPD but also at the federal level that

17   dictate their contracts, what they can collect in

18   rents but also what they can charge, how much they

19   can have in reserves.

20       And so, they don't have the ability to sort of

21   pull in from other buildings and other locations.

22   Likewise, though there are concerns similarly for our

23   minority developers and landlords sometimes because

24   we do know that they are underbanked and often

25   underserved.

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        53

1

2       SERGEANT AT ARMS:  Time is expired.

3       BARIKA WILLIAMS:  On loans and they get higher

4    rates.

5       COUNCIL MEMBER CABRERA:  Thank you.

6       AUSTEN BRANDFORD:  Thanks Council Member.  The

7    next person is going to be Council Member Powers

8    followed by Council Member Koo, but first I want to

9    remind everyone to identify to whom your questions

10   are directed, so they can be unmuted to.  Council

11   Member Powers.

12      SERGEANT AT ARMS:  And your clock will start now.

13      COUNCIL MEMBER POWERS:  Great, thank you.  Happy

14   birthday Mr. Speaker.  I hope you are enjoying it and

15   thanks to everybody for your testimony and everybody

16   viewing at home.  I hope everybody is safe and

17   healthy.

18      This is directed to any members of the panel, I

19   guess I can start with Mike McKee, but other folks

20   are obviously helpful to join in.  I wanted to echo

21   some of the comments that were made earlier.  I do

22   think that it's important that we, at the state and

23   local level, you know, ensure that folks are not

24   being evicted at this point and time based on loss of

25   income or inability to move out of an apartment.

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
         LICENSING                                      54
2    There is just so many reasons why we need to make

3    sure that people have some housing stability but

4    particularly right now.

5        I am concerned that we also should be providing

6    people with the ability and a better ability to pay

7    their rent in the meantime which is good for all

8    stakeholders that we're talking about here.  And you

9    know, we put out some proposals and suggest some

10   things like flexibility in terms of using the

11   security deposit to be able to pay the next months

12   rent.  Obviously, that only covers one month but you

13   know to give you a bridge in the time period that

14   we're talking about.

15       My landlord has offered rent deferral programs to

16   be able to pay part of your rent or just to be able

17   to push a months rent back and pay later, which I

18   also have some concerns.  But enhance rent programs,

19   things around SCRIE to enhance the SCRIE program for

20   people in need.

21       For me, it's really important that we also make

22   sure people can find ways and creative ways to make

23   sure that people have the ability to pay rent and I

24   wanted to hear ideas or thoughts on in addition to

25   just an eviction moratorium, other ways that the city
```

A-1709

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                      55
 2   or state can be interceding to help people be able to
 3   pay the rent and what creative measures you might be
 4   able to employ right now to not just shift the
 5   onerous over to those who own property some are mom
 6   and pop, some are large but to actually assist with
 7   the tenants ability to pay right now.
 8       MICHAEL MCKEE:  Well, that's a mouth full.
 9       COUNCIL MEMBER POWERS:  That's a mouth full, I'm
10   sorry.
11       MICHAEL MCKEE:  I'm not sure which part of the
12   question —
13       COUNCIL MEMBER POWERS:  Well, just other ideas.
14       MICHAEL MCKEE:  If I could back just a little bit
15   Council Member.  I think we all need to acknowledge
16   that during the 25 years that we had vacancy
17   decontrol in effect and other deregulation
18   amendments, and I want to remind you that it was not
19   the republicans in Albany who first stuck us with
20   permanent vacancy decontrol.  It was the democrats in
21   the New York City Council in 1994 under the
22   leadership of Speaker Peter Vallone.
23       But during that 25 years that we had vacancy
24   decontrol and other weakening amendments in effect,
25   most of which were repealed last year, thank God.
```

A-1710

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                        56

2    There was a huge hit on affordability to housing, not

3    just rent regulated housing but housing in general in

4    the downstate region.  And we are still living with

5    the effects of that hit on affordability.  Rents are

6    much less affordable now than they were 25 years ago.

7    25 years ago, no one thought that $2,000 a month

8    would be a normal rent in Brooklyn or Queens.  In

9    fact, Council Member after Council Member that we

10   were trying to convince to vote against Peter Vallone

11   Decontrol bill from Brooklyn, Queens, and the Bronx

12   all said, "I don't have any apartments in my district

13   renting for $2,000 a month."  And we said, just pass

14   this bill and wait ten years and you will and who was

15   right?  Were we right or were they right?  I rest my

16   case.

17       But there are a whole bunch of things that could

18   be done.  We won a lot of things last year but we did

19   not get everything we need.  There was no rent

20   rollback.

21       SERGEANT AT ARMS:  Time expired.

22       MICHAEL MCKEE:  The apartments that were

23   deregulated were not reregulated and we did not get

24   good cause eviction passed for small buildings.

25   Those are things that need to be done.

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      57
  2       COUNCIL MEMBER POWERS:  Mike and amen and I

  3     certainly don't have any apartments at [INAUDIBLE

  4     1:04:26] I think at this point in my district, but

  5     I'm just wondering if there are things right now you

  6     think that or Legal Aid or ANHD or others that we

  7     should be doing in addition to extending an eviction

  8     moratorium, just as a flexibility.

  9       So, I see others raising their hand, I think

 10     Barika had her hand up to, so.

 11       BARIKA WILLIAM:  No, Council Member Powers and

 12     we're happy to have those conversations and work with

 13     you on some of those ideas.  There's been

 14     conversations around things like waiving security

 15     deposits and allowing tenants to use them around

 16     accessing the reserves.  Around letting tenants

 17     amortize their rent over the following year to break

 18     a current lease early without a penalty.  But some of

 19     what Mike is talking about but I think sort of our

 20     larger point and push and this is why it's important

 21     for Council Member Cabrera's earlier question.  It's

 22     important for everybody to understand the scale and

 23     volume.

 24       So, if we were talking, there's almost 3.5

 25     million rental units in just the city, assuming that
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1     LICENSING                                        58
  2     they rent at just $1,000 a piece which is a low ball

  3     number.  So, you know, I'm rounding this down and

  4     assuming that people can't pay for three months,

  5     that's over a half, that's a half a billion dollar

  6     price tag right there, right.

  7         So, I think it's key for us to all sort of

  8     understand what volume we're expecting and that's

  9     with just five percent of people not being able to

 10     pay their rent for three months.

 11         COUNCIL MEMBER POWERS:  Thank you.  I'll give my

 12     time back, thanks.

 13         AUSTEN BRANDFORD:  Thank you.  Next, we'll hear

 14     from Council Member Koo who will be followed by

 15     Council Member Torres.  Council Member Koo?

 16         SERGEANT AT ARMS:  Council Member Koo, your clock

 17     will start now.

 18         COUNCIL MEMBER KOO:  Thank you.  Happy birthday

 19     Speaker and I want to thank everyone who come in to

 20     testify today.  And I support the spirit of the

 21     intent of Intro. 1912 and 1926 but I have a few

 22     questions for the first panel.  You mentioned people

 23     have no jobs and they have no money to pay for the

 24     rent.  But I thought we have this unemployment

 25     insurance.  Everyone has money coming from the state
```

A-1713

```
                COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1             COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
                LICENSING                                    59
  2    and on top of that the federal government is giving

  3    $600 per week to adults who collect unemployment.

  4        So, just a rough estimate, an average worker,

  5    even though they are not working, they collect

  6    unemployment, they will get like $3,000 a month.

  7        So, I mean, some of them might have other

  8    circumstances but I think many of them are able to

  9    pay their rent.  If they are not able to pay the

 10    rent, where did the money go?  If you have $3,000 a

 11    month, per month from the government and you buy food

 12    and you pay bills, and unemployment wages, everyone

 13    don't pay rent.  All the landlords are going to go

 14    bankrupt.

 15        So, how do we help all these landlords,

 16    especially the small ones?  Many landlords have their

 17    own obligations.  They have to pay mortgage,

 18    utilities and property tax and don't forget property

 19    tax is one third of the city revenues.  If the

 20    landlords don't pay tax, the city will go bankrupt

 21    immediately.

 22        So, we all have to understand there are good

 23    intentions but then there are unintended

 24    consequences.  We don't want those things to happen

 25    to adults.  They are paying property tax to the city
```

A-1714

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                     60
2     and if they don't pay tax the city will get broke in

3     a minute.  So, can any one of you answer these

4     questions?

5         MICHAEL MCKEE:  I'll take a stab at it Council

6     Member.  First of all, just let me point out that

7     most people who have filed for unemployment have yet

8     to receive any benefits at all.  In fact, there was a

9     study that was released yesterday Pew Search outfit

10    that found that 29 percent of Americans; this was a

11    national survey who filed unemployment claims in

12    March have actually received unemployment benefits

13    and that means 71 percent have not.  Plus $1,200 a

14    month that the federal government has graciously

15    granted to individuals, I mean, that's a joke.

16        So, I don't really have any response to your

17    larger questions about what are we going to do to

18    keep the housing market from collapsing but

19    obviously, this has to be a government solution and

20    it's going to involve money.

21        COUNCIL MEMBER KOO:  I thought if they were

22    approved, they can get unemployment retroactively.

23        MICHAEL MCKEE:  Well, look, yeah but they don't

24    have it now.

25
```

A-1715

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                       61
 2       COUNCIL MEMBER KOO:  Well, they are soon to have

 3     a bunch of money coming.

 4       MICHAEL MCKEE:  I have a friend who have been

 5     trying to apply for unemployment for three weeks and

 6     she can't get through.

 7       BARIKA WILLIAMS:  Mike, the other thing that I

 8     would add into this is that it's very clear that

 9     there are huge parts of New York City's population

10     who are ineligible to even quality for unemployment,

11     because of their documentation status, because they

12     operated in a cash economy, because they were out of

13     employment too long prior to this.

14       So, there's also a huge set of people who have

15     been shut out, which is heavily our immigrant

16     population and our Black and Brown populations which

17     is the same set of populations that, and especially

18     for our Asian population who have suffered from this

19     crisis almost a full month before almost every body

20     else in the city, right.

21       So, I think there are some key things that we

22     know and we've heard are huge gaps in even that one

23     time stimulus check or the $600 bump consistently.

24

25
```

A-1716

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                       62
 2        I know there are some others; I think I saw

 3      Caryn.  There are some others who can speak to this

 4      later.

 5        COUNCIL MEMBER KOO:  Alright, thank you.

 6        AUSTEN BRANDFORD:  Next, we'll hear from Council

 7      Member Torres followed by Council Member Lander.

 8      Again, a reminder to choose who you are directing

 9      your questions to so we can unmute them to.

10        SERGEANT AT ARMS:  And your clock will start now.

11        COUNCIL MEMBER TORRES:  Thank you.  I want to

12      wish the Speaker a happy birthday.  I have a question

13      about harassment, I'm curious to know from any of the

14      advocates, what cases of COVID-19 harassment have you

15      seen on the ground and do you think Intro. 1936 is

16      sufficiently brought to capture those cases?  And I'd

17      be curious to know what suggestive revisions you have

18      the bill.

19        CARYN SCHREIBER:  Mike, do you want to go ahead?

20        MICHAEL MCKEE:  Caryn, I think maybe that's a

21      better question for you.

22        CARYN SCHREIBER:  Sure, thank you for that

23      question Council Member Torres.  So, in terms of what

24      we would recommend, it's just a suggestion that the

25
```

```
           COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
           COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1         LICENSING                                      63
 2    bill could include an additional definition of a

 3    person impacted by COVID-19.

 4       We proposed including a catch all provision for a

 5    person who may be impacted for the purposes of the

 6    legislation but doesn't fall into one of the

 7    categories listed.

 8       In terms of what we are seeing on the ground, we

 9    are hearing about harassment based on a perception of

10    lost income or following a renters attempts to

11    discuss with the landlord that they have lost income

12    and would like to set up some sort of payment plan

13    and in a particularly insidious turn because of the

14    eviction moratorium that's currently in place, we

15    believe that this harassment is going on to get

16    tenants to in some way voluntarily involuntarily

17    move.

18       A way of a work around, around the current

19    moratorium and we expect that this behavior will only

20    escalate and get worse as the months go by and folks

21    continue to be unable to pay some or all of the rent.

22       COUNCIL MEMBER TORRES:  And I'll just make one

23    general comment here, where as a city we're facing a

24    humanitarian crisis, a nightmare that poses a

25    systemic risk to working families, to small property
```

A-1718

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                        64
 2   owners, to even the city which disproportionately

 3   depends on property taxes.

 4       And as has been pointed out, you know, there is

 5   risk in freezing evictions without cancelling rent.

 6   And there is risk in cancelling rent without

 7   subsidizing it and as far as I can tell, there is no

 8   means of subsidizing without federal intervention and

 9   I'm pessimistic about the prospects for federal

10   support.

11       So, in the absence of federal support, what's the

12   exit strategy from this nightmare?  For me, there's a

13   real quandary about how to move forward.

14       MICHAEL MCKEE:  I think your question is well

15   taken and I don't think any of us has an answer.  I

16   mean, state and federal government have got to step

17   up and it's going to involve money and you know, as

18   Barika pointed out, we have thousands and thousands

19   of people who don't qualify under any of these

20   programs and they are going to be left out on the

21   cold which is why we are calling for universal rent

22   forgiveness or cancellation, not means tested.

23   Because if you have a means test, his or hers and

24   undocumented tenants, they are going to be excluded

25   and that's not right.
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                          65
 2     COUNCIL MEMBER TORRES:  And it's worth pointing
 3   out that many working families have been slow to
 4   receive their stimulus checks because of under
 5   banking.  Not everyone has a bank account that allows
 6   for direct deposit.
 7     MICHAEL MCKEE:  Right.
 8     COUNCIL MEMBER TORRES:  There is just infinite
 9   ways in which COVID-19 has brought to light deeper
10   inequalities in America but I thank you all for your
11   testimony.
12     AUSTEN BRANDFORD:  Okay.  Next, we will be
13   hearing from Council Member Lander followed by
14   Council Member Louis.
15     SERGEANT AT ARMS:  Council Member Lander, your
16   clock will start now.
17     COUNCIL MEMBER LANDER:  Thank you very much to
18   the Chairs and I'll join in the birthday wishes to
19   the Speaker.
20     I'm going to follow up on both of Council Member
21   Torres's questions and I guess, first Ms. Williams,
22   first of all, welcome to the Council of sorts and
23   your role.
24     You know, I think you said that you would provide
25   a little data to the Council and I think after this
```

A-1720

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                      66
 2   dialogue about how many New Yorkers and especially
 3   what percent of tenants roughly will not be eligible
 4   for unemployment insurance and federal stimulus,
 5   would be really helpful here.  Because it is true
 6   that part of the idea of unemployment insurance is to
 7   enable people to have the resources that they need to
 8   pay their bill.  So, it's taking too long, a lot of
 9   people won't get what they need but as people start
10   to get those and it is income replacement, you know
11   that for people in something of a position to cover
12   their expenses but as  you point out, there's a very
13   high percentage of New Yorkers who will not be
14   receiving any relief because of the callus
15   xenophobic.  We just shouldn't let that sit as though
16   that's like reasonable.  What we have are a set of
17   xenophobes running the senate and the White House and
18   as a result, a whole set of hard working New York
19   families who just as much as everyone of us on this
20   call need a place to live and food to eat are going
21   to have no relief.
22      So, I think it would be helpful if you could just
23   help us document what percent of New York tenants are
24   being left out in the cold because that is a piece of
25   why New York City and New York State have an extra
```

A-1721

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                        67
2  responsibility to step up and do something here.  So,

3  is that something that you could help with?

4      BARIKA WILLIAMS:  Yeah, absolutely.

5      COUNCIL MEMBER TORRES:  And then I guess, I do

6  want to just ask a little, I understand you know,

7  Michael you're right that we need federal

8  intervention here but I do think it's worth like

9  going a little further on how we think about that

10 because if what we're saying is, some version of

11 those of us that are lucky enough to still you know,

12 have our income and you know, pay rent and pay

13 mortgage but there's a whole lot of people who can

14 you know, pay rent and pay mortgage but there's a

15 whole lot of people who can't and how that's going to

16 work its way through the system.

17     It's not that hard to imagine that the federal

18 reserve or a set of banking institutions in

19 partnership with the federal government could

20 actually imagine some reasonable guidelines.  So,

21 that you know, where tenants can't pay and therefore

22 were multifamily building owners with tenants who

23 can't pay their mortgage, they can expect to relate

24 to their lending institutions in a way that says,

25 yes, we're like all in a shared crisis.  Here is some
```

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1       LICENSING                                    68
 2   set of provisions for how to deal with it in ways
 3   that don't put people on the streets and we haven't
 4   heard anything about that at the national level.  I
 5   know that's not your job or the job of today's
 6   hearing but I wonder, Barika, this is something that
 7   you, you know, the housing market and its
 8   interconnectedness pretty well.  Like can you just do
 9   a little more thinking with us assuming we start the
10   ball rolling with this legislation and we push it up
11   to the state with the rent and mortgage moratorium
12   legislation.
13       What do we expect at the level above that to kind
14   of hold our system together for the next year, not
15   put people on the street but then still leave us the
16   housing economy as we move forward beyond that?
17       BARIKA WILLIAMS:  So, I mean, I think what this
18   bill and this legislation seem like they are doing is
19   creating sort of a bubble around the New York City
20   housing stock, so that when we get to what in
21   vernacular, we're all calling the 91st day.  Which
22   could be at 91 or could be at 120 or right whatever
23   day that that is.
24       So, when we get to that 91st day, how are we not
25   in a place where to Caryn's point, we don't have you
```

**A-1723**

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                          69
 2   know, thousands of people run in and file evictions,

 3   right.  That creates an enormous strain right there.

 4   So, we want to prevent that but what we also need to

 5   ensure is that we're not delaying that a year out, so

 6   that we're looking at having that same exact

 7   circumstance, just maybe trickled out over a longer

 8   period of time or delayed a longer period of time.

 9   And I think that's where it goes to okay then, what

10   is the state going to be stepping —

11       SERGEANT AT ARMS:  Time is expired.

12       BARIKA WILLIAMS:  In to do in the interim and

13   then what is the federal government going to be

14   stepping in to do and those solutions might not be

15   the same for everybody or they might not be the same

16   depending on what point and time you're in.  Whether

17   it's you know, one year out or it's six months out or

18   two years out.

19       COUNCIL MEMBER TORRES:  Thank you very much and

20   I'm pleased to sign onto both pieces of the

21   legislation being heard today with thanks to their

22   sponsors.

23       AUSTEN BRANDFORD: Okay, next we'll have Council

24   Member Louis followed by Council Member Chin.

25
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                       70
 2       SERGEANT AT ARM:  Council Member Louis, your time
 3     will start now.
 4       COUNCIL MEMBER LOUIS:  Good afternoon everyone.
 5     I want to wish Speaker Johnson a very happy birthday
 6     and thank you Chair's Cornegy and Cohen for hosting
 7     this hearing.  I'm getting a lot of emails from
 8     different small businesses in regards to this bill,
 9     so I am assuming this question could go to Caryn or
10     anyone on the first panel.  But the question is, for
11     big businesses like Kings Plaza, City Point, those
12     locations are in Brooklyn.  If they were to commence
13     an action for eviction before the New York enforced
14     policy, are City Marshals still prohibited from
15     evicting?  And if so, how does 1912 help or hurt
16     small businesses?  Thank you.
17       CARYN SCHREIBER:  Thank you Council Member.  Just
18     so I can make sure I understand your question.  Will
19     City Marshals be able to evict currently or if, or
20     while the state moratorium is in effect or if the
21     1912 moratorium was in effect or all three?
22       Oh, Council Member, I think you are muted.
23       COUNCIL MEMBER LOUIS:  Can you hear me now?
24       CARYN SCHREIBER:  Yes, I can thank you.
25
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              71

1

2       COUNCIL MEMBER LOUIS:  Perfect.  Currently or

3   during the New York on pause, were they able to evict

4   after.  Will they still be able to evict if they

5   already had come into action before hand and how does

6   1912 help or hurt the small businesses in the bigger

7   conglomerate?  I don't know if you are familiar with

8   Brooklyn or Kings Plaza more or City Point, if there

9   was a smaller business within and they were about to

10  get evicted, before New York on pause, how does this

11  bill help or hurt them?  Thank you.

12      CARYN SCHREIBER:  So, it's my understanding that

13  after the moratorium ends, any notices of eviction

14  which are legally required before a Marshal can

15  execute a warrant of eviction, must be reserved.

16      So, if an eviction was scheduled for let's say

17  March 20 or maybe like March 21st, and that eviction

18  did not happen, the warrant wasn't executed.  The

19  notice of eviction will need to be reserved again

20  either when you know, when they are able to, when

21  this current moratorium ends and/or when the Marshals

22  begin serving notices of evictions again in order to

23  execute them.

24      And this I mean, having notice served again is

25  extremely important whether for residential tenants

```
          COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
          COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1        LICENSING                                  72
 2   at risk of eviction or commercial tenants at risk of

 3   eviction, so that the tenant is on notice and is

 4   aware that the eviction can be scheduled and is

 5   coming up.

 6      And in terms of how a moratorium would benefit

 7   small businesses that may have been at risk of

 8   eviction prior to it going into effect this will

 9   hopefully allow those small businesses along with

10   other renters an opportunity to devise a plan,

11   hopefully with the assistance of government funding

12   to stave off that eviction.  And delaying that

13   eviction will provide some opportunity for them to do

14   that whereas right now, they don't have a chance of

15   preventing that eviction from going forward.

16      COUNCIL MEMBER LOUIS:  Alright, thank you.

17      CARYN SCHREIBER:  Thank you.

18      AUSTEN BRANDFORD:  Now, I'll turn to Council

19   Member Chin who will be followed by Council Member

20   Grodenchik.

21      SERGEANT AT ARMS:  Council Member Chin, your

22   clock will start now.

23      COUNCIL MEMBER CHIN:  Thank you.  Thank you to

24   the panel, thank you to the Chair and happy birthday

25   to our Speaker.  What I wanted to raise is that in my
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                          73
2    district particularly, I do have a lot of small

3    property owner that are legacy owners.  That are

4    owned by you know, families for generation.  They all

5    wanted to build things or family association based on

6    last name or the part of China that the immigrated

7    from.  And they are working with their tenant and

8    trying to work with them.  They are not evicting them

9    because they can't pay rent but what they are asking

10   the city for is, you know, help them out with the

11   property tax issue.

12       What about you know, deferring a portion of the

13   property tax or delaying payment, so that they can

14   also meet their needs?  And that's something that

15   they are asking the city.  At the same time,  you

16   know, the water charge are going up.  You know,  a

17   lot of people are home, they use more water and water

18   bills are coming due.

19       So, they are really asking for deferral of these

20   payments you know, hopefully after the crisis is

21   over.  So, that's something that we have to look at

22   what we can do as a city for some of these good

23   property owners who are supporting their tenant.

24       At the same time, we still have some really bad

25   property owners who are using these times to raise

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                          74

2    rent.  They are issuing new leases to residents and

3    they are asking for a huge rent increase or that they

4    are trying to evict them and not allow them to have

5    secession rights, that they have to fight for it.  I

6    mean those are the cases that we're still getting and

7    also some landlords not providing heat and hot water.

8        So, I think what the bill in terms of the

9    harassment, I wanted to ask Caryn from the Legal Aid

10   Society, in terms of and maybe Mike.  Is there other

11   tenant harassment issues?  Are they also coming into

12   your office and to the hotline and how are we helping

13   these tenants because right now, the courts are

14   closed.  But they need to prepare to fight the

15   harassment or fight the evictions.  Thank you.

16       CARYN SCHREIBER:  I can start Mike if that's okay

17   with you.  So, in terms of certainly we are hearing

18   from tenants about landlords not maintaining

19   essential services like hot water or heat during the

20   night or even during the day when it's still cold.

21   And the housing courts remain open for those types of

22   emergency housing part proceedings related to

23   repairs.  The housing courts are also open for

24   illegal evictions or lockout cases because any

25   eviction right now is an illegal eviction and

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                      75
 2    unfortunately, those types of cases are still being
 3    filed.  People are being unlawfully locked out of
 4    their homes and certainly, we are also hearing about
 5    tenants who are being made to feel that they need to
 6    leave their homes because of the impact that COVID-19
 7    has had on them, either as people who are potentially
 8    exposed or are sick with COVID-19 or those who have
 9    lost income as a result of the pandemic and the
10    shutdown.
11        COUNCIL MEMBER CHIN:  Thank you.
12        AUSTEN BRANDFORD:  We'll now turn to Council
13    Member Grodenchik who will be followed by Council
14    Member Rosenthal.
15        SERGEANT AT ARMS:  Council Member Grodenchik,
16    your time is starting now.
17        COUNCIL MEMBER GRODENCHIK:  Thank you very much.
18    Thank you Chairs, happy birthday Speaker.  Ms.
19    Williams, do we have an estimate or Mr. McKee or
20    anybody, do we have an estimate on how many people
21    you feel are going to be in danger of not being able
22    to pay their rent on a long term basis in the City of
23    New York?  How many units?  Are we talking 10,000
24    units, are we talking 100,000?  Because that is
25    really a big part of this issue here.  You know if
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                   76
  2     it's 100,000, it's a big, big, big issue.  If it's

  3     10,000, much more manageable.

  4        I think Ms. Williams is talking but —

  5        BARIKA WILLIAMS:  There we go.  I think the best

  6     way that we've had to look at the numbers, so some

  7     people are looking at the numbers based on

  8     unemployment.  The other side and the other way that

  9     we've looked at these numbers is based on the loss of

 10     —

 11        COUNCIL MEMBER GRODENCHIK:  I don't have much

 12     time; do you have an estimate?

 13        BARIKA WILLIAMS:  We think currently in the first

 14     month and a half, it's about 30 percent loss of rent

 15     role for many of our members.

 16        COUNCIL MEMBER GRODENCHIK:  And how many people

 17     would that be with 30 percent of what?

 18        BARIKA WILLIAMS:  If we were looking across the

 19     entire city's rental population, that would be one

 20     million.

 21        COUNCIL MEMBER GRODENCHIK:  How many units are

 22     there of rental housing in this city?

 23        BARIKA WILLIAMS:  About 3.5 million.

 24        COUNCIL MEMBER GRODENCHIK:  Okay, so that is

 25     almost —
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    77
  2       MICHAEL MCKEE:  Roughly 2 million rental units.

  3       BARIKA WILLIAMS:  Oh, sorry, yeah, 2 million

  4     rental, 1.5 homeowner.

  5       COUNCIL MEMBER GRODENCHIK:  Okay, well, I do

  6     think you know, I was involved in the early 90's

  7     because I'm old in the co-op and condo crisis when

  8     you were able to take a building that had 15 percent

  9     you know join and then you know, people were in

 10     danger of losing everything.  We were able to put

 11     together in the Queens Borough Presidents Office

 12     under the great leadership of Claire Shulman, we were

 13     able to save the units of 20,000 homeowners in Queens

 14     and it also helped of course the renters as well

 15     because they weren't dispossessed either.  And I

 16     really think Brad Lander hit at it, but I think that

 17     we are going to need a holistic solution where the

 18     banks who made these loans are willing to step

 19     forward and everybody, I think is going to have to

 20     eat something here.

 21       I'm not sure that a blanket noneviction procedure

 22     will be the answer but I think we definitely need to

 23     have an answer to this and I want to thank the Chairs

 24     for leading this discussion today on these important

 25     pieces of legislation.  But I really think that we
```

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1       LICENSING                                    78
 2   are going to need really everybody kicking in and I
 3   think my colleague Margaret Chin was also quite
 4   correct in saying that property taxes are something
 5   we're going to have to look at.  They are out of
 6   control in the City of New York.  We could put liens
 7   on property taxes, put a lien on an apartment
 8   building until it's sold, so the city wouldn't be
 9   losing out.  But I think really from where I'm
10   looking at here, this is going to take a very, very
11   large solution.
12       And I thank you, I thank the panel for being here
13   today and helping me to clear my head so to speak and
14   start to think about this issue a little more
15   clearly.
16       With that I waive the balance of my time.  Thank
17   you very much.
18       AUSTEN BRANDFORD:  Thank you.  Next, we'll turn
19   to Council Member Rosenthal and follow back to our
20   Chair's and Speaker Johnson for any final questions.
21       SERGEANT AT ARMS:  Council Member Rosenthal,
22   your time will start now.
23       COUNCIL MEMBER ROSENTHAL:  Thank you very much.
24   Thank you all for your testimony.  I would like to
25   also try to get to some numbers and think about for
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              79

1

2    the purpose of helping the city bring this to the

3    attention of the federal government because I really

4    do think at the end of the day, the city is not going

5    to be able to bail out you know, renters or small

6    property owners.  And of course, we all want to

7    prevent some sort of venture capitalist from coming

8    in and swooping everything up and making it ten times

9    worse.

10       And I'm listening to each of you go back and

11   forth on the numbers and just having a hard time

12   trying to fine tune it.  You know, if you say we have

13   2 million renters, how many people in New York City

14   are on unemployment, a half a million now?  Not quite

15   sure.  And then add on that, everyone who can't even

16   get unemployment insurance.  Can we start to quantify

17   the magnitude of it that way?

18       BARIKA WILLIAMS:  So, I would say, I think one of

19   the, I'm hearing a lot about the numbers.  I think

20   one of the challenges here is that these are moving

21   numbers.  We're pulling things from different

22   resources.  They are not disaggregated and we can't

23   line them up.

24       So, we've got a set of population primarily

25   focused in our Asian communities that were impacted,

A-1734

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            80

1

2    had a rent loss, really largely before any of this

3    tracking started.  So, put them on a months impact

4    ahead of everybody else.  Then we start from

5    tracking, if we use unemployment, we're skipping some

6    of the other populations highlighted before, right.

7    If we're looking strictly at the loss of rent roles,

8    that doesn't necessarily speak to people who have

9    lost well, sorry, unemployment also doesn't speak to

10   the fact that people might be taking unemployment but

11   still trying to pay their rent or still paying a

12   portion of their rent, right.

13       So, that doesn't necessarily fully line up with

14   the ability to pay or not pay your rent although we

15   expect and fully anticipate that that's a core part

16   of the population that isn't able to pay.  And then,

17   we've got another set of the population that isn't

18   tied to unemployment at all, it's sort of separate

19   from this.  Maybe is still employed, has had huge

20   reductions in their incomes, they are working part

21   time and they are also struggling to pay rent.  They

22   might be paying half, they might be paying a quarter,

23   they might be paying zero.  And so, all of those

24   numbers, right and then each two weeks, we probably

25   scale that number up proportionally because there is

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                       81
 2   more and more people impacted.  So, that's one of the

 3   struggles right now for anybody being able to track

 4   this.

 5      COUNCIL MEMBER ROSENTHAL:  And I would add to

 6   that, how do we expect people to ever be able to make

 7   up the rent?  It's not going to happen.

 8      BARIKA WILLIAMS:  Right.

 9      MICHAEL MCKEE:  A lot of these jobs, they are

10   gone.  They are not coming back plus there are people

11   leaving the city because of lost of income, loss of

12   employment and how you calculate this, I mean, good

13   luck with it but as Barika points out, it's a moving

14   target.  It's going to be big; it's going to big;

15   it's going to be a lot.

16      COUNCIL MEMBER ROSENTHAL:  Yeah, I agree with you

17   on that.  I just think you know we got low —

18      SERGEANT AT ARMS:  Time expired.

19      COUNCIL MEMBER ROSENTHAL:  Okay, thank you for

20   keeping me on the clock, but thank you to the

21   panelists for all your hard work, everything you are

22   doing to keep our tenants safe.  There is no question

23   the federal government is going to have to come in

24   and there is no question but that banks are going to

25   have to step up.  That's who was bailed out last time
```

```
    COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1  COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                      82
 2  around and this time they need to bail out everyone

 3  else.

 4     Thank you.

 5     AUSTEN BRANDFORD:  Thank you.  Just circling back

 6  to Speaker Johnson for any final questions and moving

 7  on to Administration testimony.

 8     SPEAKER JOHNSON:  Thank you Austen.  I just want

 9  to quickly go back and ask, is the new economy

10  project on?

11     MICHAEL MCKEE:  Yes.

12     SPEAKER JOHNSON:  Okay, I wanted to ask you guys,

13  you guys have been fighting for a broad set of

14  emergency measures to protect New Yorkers health,

15  safety and financial security including advocating

16  for a moratorium on debt collections in New York

17  State.  Can you talk about the short and long term

18  harmful impacts of money judgements and other debt

19  collection measures on New York City's low income

20  communities and communities of color?

21     ANDY MORRISON:  Absolutely, so, already debt

22  collection, predatory debt collection is a scourge in

23  low income communities and communities of color and

24  what we've seen over the years particularly through

25  our financial justice hotline is debt collectors
```

A-1737

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                         83
 2   using and abusing our courts to get judgements

 3   against New Yorkers violating their due process using

 4   all kinds of shady tactics to get judgment and then

 5   enforce those judgements against New Yorkers to

 6   siphon massive amounts of wealth from communities.

 7       So, it's an issue that exacerbates and

 8   perpetuates racial and economic inequality in our

 9   city and again, to underscore, these are the same

10   communities that have been particularly harmed by

11   COVID-19 and are subject to all kinds of racial and

12   economic inequities.

13       And so, in the short term, the moratorium is

14   needed as our other immediate remedies to some of the

15   issues that we've seen New Yorkers facing.  In the

16   long term, what we're hearing from a lot of our

17   community partners and organizations that we've

18   worked with is that, while we need to really stretch

19   the bounds of the city's authority and our creativity

20   to address the immediate issues people are facing and

21   while we need to pressure the state and the federal

22   government to do more, we also need to be thinking

23   about building alternative institutions.  And New

24   York City is fortunate in one way that it has laid a

25   lot of critical groundwork for worker cooperatives,
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                    84
 2    community land trusts.  There's an exciting movement

 3    for a public bank, which would over the long term

 4    address a lot of the issues that have been surfacing

 5    throughout this hearing from the banks not serving

 6    communities equitably, to landlords harassing and

 7    exploiting their tenants and the list goes on and on.

 8        And so, there's a lot of excitement and

 9    enthusiasm for building new institutions and economic

10    models that would create and build resiliency and

11    build institutions that are rooted economic and

12    racial justice and equity.  And so, we really

13    strongly encourage the Council to be thinking about

14    that as we move into this economic recovery phase.

15    To be thinking about the types of initiatives the

16    city can adopt to really recreate an economy that

17    works for everybody.

18        SPEAKER JOHNSON:  Thank you Andy and do we have

19    someone from the Community Service Society CSS on?

20    No, no one from CSS or do they need to be unmuted?

21        BARIKA WILLIAMS:  I think Sergeant it's Oksana.

22        MICHAEL MCKEE:  Oksana is here, online.

23        BARIKA WILLIAMS:  Yeah, she's here.

24        SPEAKER JOHNSON:  Okay, hold on a second.

25    Oksana.
```

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
         COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1      LICENSING                                        85
  2        OKSANA MIRONOVA:  Thank you.  Thanks, Barika.
  3        SPEAKER JOHNSON:  Hi Oksana, so, first before I
  4      ask my question, I just want to really extend my
  5      condolences to you and to the entire CCS family in
  6      New York City lost a legend and you lost a colleague
  7      in Tom Waters who such a giant in the housing
  8      community and fighting against poverty in New York
  9      City for decades and we know that COVID-19 took his
 10      life and we're sending our condolences to you all at
 11      CSS and the Broader Tenant Movement is mourning Tom's
 12      loss as well.  We really appreciate CSS's continued
 13      dedication to fighting for the most vulnerable during
 14      this time where your mourning Tom's loss, so thank
 15      you for being here.
 16        You all done a lot of work to show that many New
 17      Yorkers were in crisis even before COVID.  That 30
 18      percent of New Yorkers were falling behind on rent
 19      before the virus hit.  I wanted to ask, what percent
 20      of New Yorkers do you think are falling behind rent
 21      right now as a result of this crisis and what are the
 22      risks that those tenants are going to face and what
 23      risk does the city face if we don't step up to
 24      protect them now?
 25
```

A-1740

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                        86

1

2      OKSANA MIRONOVA:  Absolutely.  Thank  you and

3  thank you so much and thank you for listening to our

4  testimony and yeah, I really appreciate the statement

5  about Tom, it's difficult to believe that he's gone.

6      So, we know that from the data that was available

7  from the CUNY public health research; they've been

8  doing a survey every single week about the number of

9  people who are effected by COVID-19.  And from our

10  own research about the number of people who have less

11  than $1,000 in savings which is 70 percent of low

12  income people have less than $1,000 in savings.

13      At the end of March, there was probably about

14  126,000 people who were I don't want to say were

15  likely to fall behind on rent but who lost most of

16  their income and also didn't have enough money in the

17  bank to make a months' worth of rent.

18      So, that's 126,000 renters, specifically in the

19  private market, so that's excluding everyone who gets

20  Section 8.  Excluding everyone who lives in public

21  housing because we're making the assumption with the

22  Cares Act that their rent is going to be covered at

23  least for the next couple of months.

24      There is no guarantees beyond that but for the

25  foreseeable future.  So, that's 126,000 people in

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              87

1

2   late March.  We don't have figures for April, we

3   don't know what's going to happen in May but the

4   harsher social distancing rules went into effect I

5   think on March 16th.  So, and lots of people lost

6   jobs after that, so that number is much larger by

7   now.

8       SPEAKER JOHNSON:  Thank you.  Thanks, Oxsana.  I

9   just want to, yeah Barika, go ahead you are unmuted.

10      BARIKA WILLIAMS:  I just, since we've gotten a

11  lot of questions about specific data, I think Oxsana

12  can probably chime in on this and tell me if she

13  disagrees, but I think one thing you all could do and

14  especially you Speaker, could maybe help us with one

15  thing we know would aid a lot of our analysis is

16  being able to get the unemployment data disaggregated

17  at something other than the citywide or county level.

18      So, when we just get that big number, it's really

19  hard to do anything with.  That translates into very

20  different rents, very different numbers of people in

21  different places.  One thing that we've been trying

22  to figure out with New York State DOL, I'm not sure

23  where they are but if we could get that number at

24  some sort of smaller geography and with more

25  frequency, I think that would be hugely helpful.

A-1742

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                            88

1

2      SPEAKER JOHNSON:  Thank you.  I appreciate you

3   all testifying today under these trying

4   circumstances.  I want to thank all the Council

5   Members who I have been listening to all their

6   questions, very thoughtful questions, I appreciate

7   it.  And I just want to say you know, the Council is

8   doing the best that we can.  We are trying here to

9   give some level of protection to renters, to tenants,

10  to New Yorkers who we know are vulnerable and

11  suffering but again, I think it's just important for

12  the public to understand and realize that with one of

13  the worst economic situations the city has ever been

14  in, with a $2.5 billion budget shortfall in the

15  current fiscal year that we're in, not even talking

16  about next fiscal year which begins on July 1st.  We

17  estimate that that number is upwards of another $5

18  billion, so we're somewhere near $8 billion in the

19  hole and that number could grow.  The city doesn't

20  have the resources and money to be doing many of the

21  things that we all know is the right thing to do,

22  which is why we need federal help and federal

23  intervention to help us here.

24      There was a bill I know that was put forward by

25  some Assembly Members and Senators calling for a $10

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        89
 2   billion program from the federal government to

 3   actually compensate landlords for tenants who can't

 4   pay their rent.  So, landlords could still pay their

 5   property taxes and real estate taxes which then

 6   wouldn't undermine the city's budget.

 7       We know there is another bill that would cancel

 8   rent but by Senator Gianaris but we want to do

 9   anything we can but ultimately when you've seen these

10   really outrageous statements by the Senate Majority

11   Leader Mitch McConnell, saying that states and local

12   governments should just declare bankruptcy, the human

13   impact, the toll that that would have on New York

14   City is beyond comprehension.  And so, his comments

15   softened just a little bit yesterday but we know how

16   he really feels.  We really need in this next

17   stimulus bill a significant amount of money for New

18   York City to protect the social safety net.

19       Our north star in this process is to protect

20   people that are vulnerable.  To protect New Yorkers

21   that were struggling and vulnerable before this

22   crisis hit to protect children and seniors and

23   tenants in low income communities and communities of

24   color and immigrant communities, people that we knew

25
```

A-1744

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1     LICENSING                                          90

  2     were struggling before COVID-19 slammed into our

  3     city.

  4        So, throughout this budget process and through

  5     our advocacy to both the state and our federal

  6     representatives, we are going to continue to push for

  7     money and programs that will help New Yorkers that

  8     need it most right now.

  9        I really appreciate all of you and your

 10     organizations joining us today for this important

 11     call.  It's a nice way to spend my 38$^{th}$ birthday on

 12     this Zoom conference and I just wanted to thank you

 13     all for being here today and I'm happy to either turn

 14     it back to Chair Cohen or Chair Cornegy or to the

 15     Committee Counsel so that we can hear from our next

 16     witness.

 17        AUSTEN BRANDFORD:  I can now call on members of

 18     the Administration to testify.

 19        So, today we will be hearing testimony from Dana

 20     Sussman of the Commission on Human Rights and Sheriff

 21     Joseph Fucito of the Department of Finance.  AnnMarie

 22     Santiago Department Housing Preservation and

 23     Development will also be available for questions.

 24

 25
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                        91
 2        Can the three of you please raise your right

 3    hands.  We will administer the oaths once; we will

 4    unmute you to affirm individually at the end.

 5        Do you affirm to tell the truth, the whole truth

 6    and nothing but the truth before this Committee and

 7    to respond honestly to Council Member questions?

 8        PANEL:  Yes.

 9        AUSTEN BRANDFORD:  Dana Sussman?

10        DANA SUSSMAN:  Yes.

11        AUSTEN BRANDFORD:  Sheriff Fucito?  Sheriff?

12        JOSEPH FUCITO:  Yes.

13        AUSTEN BRANDFORD:  Great.  AnnMarie Santiago?

14    AnnMarie?

15        ANNMARIE SANTIAGO:  Yes.

16        AUSTEN BRANDFORD:  Great, wonderful.  You may

17    begin when you are ready.

18        DANA SUSSMAN:  Alright, I think I am starting.

19    Good afternoon Speaker Johnson, Committee Chairs

20    Cornegy and Cohen and the members of the Committees.

21    I am Dana Sussman, Deputy Commissioner for Policy

22    Intergovernmental Affairs at the New York City

23    Commission on Human Rights.  Thank you for convening

24    today's hearing to address the critical needs of New

25    Yorkers during the COVID-19 pandemic.  We know that
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                        92
 2    many of us are now struggling and may be mourning a

 3    loss of friends and family and co-workers and I want

 4    to take a moment to acknowledge that during this

 5    incredibly difficult time.

 6        As you likely know, the Commission is the local

 7    law enforcement agency of Civil Rights Law

 8    Enforcement Agency that enforces the New York City

 9    Human Rights Law, one of the broadest and most

10    protective anti-discrimination and anti-harassment

11    laws in the country, now totaling 26 protected

12    categories across nearly all aspects of city living:

13    housing, employment and public accommodations, in

14    addition to discriminatory harassment and bias-based

15    profiling by law enforcement.  By statute, the

16    Commission has two main functions.  First, the

17    Commission's Law Enforcement Bureau enforces the City

18    Human Rights Law by investigating complaints of

19    discrimination from the public, initiating its own

20    investigations on behalf of the City, and utilizing

21    its in house testing program to help identify

22    entities breaking the law.

23        Second, the Community Relations Bureau, which is

24    comprised of Community Service Centers in each of the

25    City's five boroughs, provides free workshops on
```

A-1747

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              93

1

2   individuals right and businesses, employers and

3   housing providers obligations under the City Human

4   Rights Law and creates engaging programming on human

5   rights and civil rights issues.

6        Before turning to Intro. 1936, I'd like to

7   highlight some of the important work that the

8   Commission is doing to address discrimination and

9   harassment that we have seen emerging in the midst of

10  the current public health crisis posed by COVID-19.

11  In the context of the COVID-19 pandemic, we have seen

12  a multitude of ways in which the City Human Rights

13  Law intersects with the rapidly changing needs of New

14  Yorkers in crisis.  Starting in January, the

15  Commission began to monitor and increase in anti-

16  Asian discrimination and harassment, including

17  scapegoating, fearmongering, and the spread of

18  misinformation, as news about COVID-19 started to

19  emerge.

20       In February, the Commission started to receive

21  its first reports of New York City-based incidents of

22  discrimination and harassment targeting Asian New

23  Yorkers.  At the same time, the Commission's East

24  Asian Communities Liaison Flora Ferng and other

25  members of the community outreach team were working

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                    94
```

2   regularly with community leaders of Asian and Pacific

3   Islander or API communities throughout New York City

4   to provide information and resources about the

5   Commission's work.

6       From February through mid-April, the agency

7   recorded 284 reports of harassment and discrimination

8   related to COVID-19, over 40 percent of which or 115

9   identify incidents of anti-Asian harassment or

10  discrimination.  And I'd just like to note that we

11  released numbers last week.  The numbers I'm

12  reporting out today are updated as of earlier this

13  week, so the numbers are slightly higher.

14      By comparison, during this same time period in

15  2019, the Commission had received just five reports

16  of anti-Asian discrimination.  This influx in reports

17  and cases resulted in the Commission's April

18  announcement of the formation of a COVID-19 Response

19  Team to handle reports of harassment and

20  discrimination related to the outbreak.  The Response

21  Team is comprised of staff from the Law Enforcement

22  Bureau and the Community Relations Bureau working in

23  coordination to quickly and efficiently track and

24  respond to the sharp increases in reports of

25  harassment and discrimination connected to the

**A-1749**

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                    95
 2    pandemic.  The COVID-19 Response Team has now taken

 3    action in 176 of those reports, including, for

 4    example, conducting early or emergency intervention,

 5    providing know your rights information about how to

 6    request a reasonable accommodation, referring the

 7    individual to another service or agency, or

 8    commencing an investigation.

 9        In addition, the Commission has opened active

10    investigations into 26 matters spanning

11    discrimination in housing, public accommodations, and

12    employment on the basis of race, national origin,

13    disability, and lawful source of income.

14    Additionally, the Response Team has now successfully

15    resolved and closed ten matters of COVID-19 related

16    harassment and discrimination so far.

17        The Commission's Community Relations Bureau or

18    CRB has also held bystander intervention trainings

19    with the Center for Anti-Violence Education, which

20    provide techniques to safety de-escalate a bias

21    incident in real time and just earlier this week or

22    late last week, were recently piloted in Mandarin.

23        In early March, CRB co-sponsored community forums

24    in Sunset Park Brooklyn and Manhattan's Chinatown

25    educating Asian communities of their rights and
```

A-1750

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                      96
 2  protections under the law.  The Commission has held
 3  virtual town halls, in partnership with sister
 4  agencies, elected officials and community based
 5  organizations highlighting workplace rights related
 6  to COVID-19, reporting discrimination and harassment
 7  related to COVID-19 and responding to hate and bias
 8  with restorative justice measures among other topics.
 9      The Commission continues to produce and promote
10  content to provide key information to impacted
11  communities on their rights in several language
12  including many of those spoken by Asian New Yorkers
13  facing heightened harassment and discrimination
14  including Cantonese, Fujianese, Korean, Mandarin and
15  Tagalog with additional language forthcoming.  The
16  Commission staff currently speak over 30 languages.
17      Shortly after the outbreak began, the Commission
18  launched an online resource page outlining New
19  yorker's rights and protections around COVID-19
20  related harassment and discrimination in housing,
21  employment and public accommodations which is
22  regularly updated.  The page is available at
23  nyc.gov/stopcovidhate.  The commission also currently
24  has a paid campaign running on social media platforms
25
```

A-1751

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                         97

2    directing people to our resources on their rights as

3    they relate to COVID-19.

4       Turning now to Intro. 1936, most cases of housing

5    discrimination against a person with suspected or

6    confirmed COVID-19, or against a person carrying for

7    someone with a suspected or confirmed case, are

8    protected under the City Human Rights Law's broad

9    protections based on actual or perceived disability

10   or a person's association with someone with a

11   disability.

12      In addition, essential workers who may face

13   housing discrimination because they are at risk of

14   exposure to COVID-19 are protected by the City Human

15   Rights Law's protections based on lawful occupation.

16      The Commission's Law Enforcement Bureau has

17   directly received 228 COVID-19 related inquiries, 44

18   of which are in the housing context.  The Commission

19   has provided tenants and co-op residents with

20   information regarding the City Human Rights Law and

21   in some cases, contacted management companies or co-

22   op boards to advise them of their responsibilities

23   under the law.  For example, where restrictions on

24   residents to reduce the spread of COVID-19 did not

25   allow for accommodations for residents with

A-1752

1   COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                      98

2   disabilities.  For example, in situations in which

3   buildings are not permitting or facilitating

4   deliveries to the door of individuals with

5   disabilities unable to exit their apartment due to

6   their limitations or immunocompromise conditions,

7   COVID-19 self-quarantine, or because they are unable

8   to lift or otherwise carry packages due to a

9   disability.  The Commission's Law Enforcement Bureau

10  is able to intervene and provide inquirers with

11  information about their rights to request a

12  reasonable accommodation.

13      While Intro. 1936 does not amend the City Human

14  Rights Law, it does amend or seek to amend the

15  Housing Maintenance code's language on protected

16  categories with respect to tenant harassment which

17  was modeled after language in the City Human Rights

18  Law to protect against harassment based on a person's

19  protected status.

20      That 2017 addition of those protected categories

21  with respect to tenant harassment and housing code,

22  allows tenants to choose whether to file a

23  discrimination claim with the Commission or can take

24  a case to housing court.  Because of the substantial

25  overlap between existing protections in the City

```
   COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
   LICENSING                                      99
```

1

2    Human Rights Law and the Housing Maintenance Code,

3    several of the protections contemplated in 1936

4    already exist to protect tenants against harassment

5    in housing.

6        As I said before, this is true for cases of both

7    confirmed or suspected COVID-19, or when an

8    individual has a relationship or association with

9    someone with an actual or suspected case of COVID-19,

10   including for example, family members who reside in

11   the unit.

12       It is important to note that if a tenant chooses

13   to prevent claim under this provision in housing

14   court, they typically will be precluded from bringing

15   the same claim at the Commission.  Currently,

16   remedies in housing court are usually limited to

17   civil penalties ranging from $1,000 to $10,000

18   compared to remedies at the Commission, which include

19   uncapped compensatory damages to the victim, civil

20   penalties of up to $250,000 and other affirmative

21   relief.  Because the remedies in housing court are

22   more limited than at the Commission, it is vital that

23   tenants understand the options available to them and

24   are able to make an informed decision regarding the

25   venue they choose.  To the extent that New Yorkers

A-1754

```
                COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
            1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
                LICENSING                                      100
            2   experience discrimination or harassment with respect

            3   to any of the protected categories articulated in the

            4   City Human Rights Law, we always encourage them to

            5   contact the Commission.

            6       The Commission recognizes that people who have

            7   COVID-19 are at risk of contracting the virus and/or

            8   are essential workers must be able to live safely and

            9   securely and should never, under any circumstance,

           10   have to contend with discrimination harassment.  We

           11   are committed to working with the Council to ensure

           12   that he devastating impacts of this public health

           13   crisis are not unnecessarily compounded and that new

           14   Yorkers can live peacefully in their homes, free from

           15   harassment.  We are acutely aware of the

           16   vulnerabilities of New Yorkers right now and the

           17   Commission is ever more committed to defending the

           18   human rights of all New Yorkers, especially those

           19   impacted by COVID-19.

           20       Thank you for convening today's hearing and I

           21   look forward to your questions.

           22       AUSTEN BRANDFORD:  Thank you.  A quick reminder

           23   that if you mute yourself, you cannot unmute

           24   yourself.

           25       Sheriff Joseph Fucito?
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1   LICENSING                                      101

2       JOSEPH FUCITO:  Good afternoon members of the

3   Committee on Consumer Affairs and Business Licensing

4   and Committee on Housing and Buildings.  I am Sheriff

5   Joe Fucito and I am here today to discuss proposed

6   Intro. 1912.

7       Before I do, I want to take the time to thank the

8   City Council for its efforts to tackle the many

9   hardships facing New Yorkers during the COVID-19

10  pandemic and beyond.  We have all been touched by

11  this crisis, my office included, with the loss of

12  loved ones.  Sheriff's Public Safety Officer Serge

13  Paul passed away last week after a brave struggle

14  against COVID-19.  He was a dedicated law enforcement

15  officer, husband, and father and I would be remiss if

16  I did not publicly acknowledge his dedicated service

17  and sacrifice.

18      The Sheriff's Office fully appreciates what we

19  believe is the Council's intention to provide relief

20  to New Yorkers from debilitating seizures of property

21  and monetary assets.  However, Intro. 1912, while

22  well intended, raises significant legal concerns for

23  my office.  The work of our Office is integrally

24  related to the work of the judicial system and

25  governed by State Law.

A-1756

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
   1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      102
   2       May I take a moment to provide a quick

   3    explanation about judgement enforcement matters.  A

   4    judgement is the final outcome of a court case.  A

   5    judgment resolves the contested issues and terminates

   6    a lawsuit, since it is regarded as the court's

   7    official pronouncement of the law on the action that

   8    was pending before it.  The judgment states who has

   9    won the case and what remedies are awarded to that

  10    prevailing party.  Remedies may include monetary

  11    damages, injunctive relief,

  12        or both.

  13        Judgements are enforced by writs of execution,

  14    which can be addressed to the Sheriff or in New York

  15    City to the Marshal, commanding them to give the

  16    plaintiff possession of land; or to enforce the

  17    delivery of personal property which was the subject

  18    of an action, or to collect the amount of the

  19    judgment, depending on the relief sought in the

  20    underlying case.

  21        As I've described, judgment and execution

  22    enforcement are mandates that come from the court.

  23    They are under the governance of the State court

  24    system and implemented through the State Civil

  25    Practice Law and Rules.  Indeed, they represent the
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1    LICENSING                                              103
2    core function of the judiciary branch and the

3    ultimate expression of its independent decision

4    making authority.  We believe that Intro. 1912 would

5    require actions that interfere with this well

6    established structure.

7        The bill assigns duties to the Sheriff that

8    presupposes the Sheriff has control over the judgment

9    and execution process.  However, that is not the

10   case.  The Sheriff is an officer of the court and

11   wholly guided by the exacting statutory steps set

12   forth in the CPLR which preclude the Sheriff's

13   personal judgment or outside review.

14       Courts have repeatedly held that a Sheriff cannot

15   look behind the court mandates or review them for

16   error and can be penalized for doing so.  For these

17   reasons, it is our view that the Sheriff could not

18   comply with the directives of Intro. 1912 without

19   violating the panoply of State laws that govern the

20   Sheriff's role as the civil enforcement official of

21   the courts.

22       In my role as Sheriff, I am not a heartless bill

23   collector, but rather an officer of the court who has

24   the duty to enforce the laws enacted for the

25   protection of the lives, persons, property, and

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          104

1

2    health of our citizens.  I hope that my testimony

3    today has conveyed my passion for following the law

4    and having the Office of the Sheriff working

5    productively and cooperatively for the betterment of

6    all New Yorkers.

7        Thank you for your time and I will now take any

8    questions.

9        AUSTEN BRANDFORD:  Thank you.  We will now open

10   it up for questions from Speaker Johnson and the

11   Chair's.

12       SPEAKER JOHNSON:  Thank you very much.  I really

13   appreciate your patience.  I know you guys waited for

14   a while to testify.  So, Sheriff, I want to thank you

15   for your patience and I want to give you our

16   condolences on the loss of someone in your office,

17   I'm really sorry.  As you said, this is touching all

18   of our lives and we want to remember all of the folks

19   that have been serving New York City, especially the

20   city workers.  So, thank you for acknowledging this

21   wonderful person who served the City of New York.

22       I wanted to ask you Sheriff; do you have any

23   policies that guide how you decide to prioritize your

24   enforcement actions?  Are you trying to avoid

25   targeting low income New Yorkers right now?

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              105

1

2      JOSEPH FUCITO:  Part of our protocols during this

3   COVID-19 emergency is we're looking at emergency type

4   orders and orders that affect public safety.

5      So, right now, orders of protection are still

6   being enforced, mental hygiene warrants are still

7   being enforced.  Things that involve public safety,

8   we are enforcing.

9      Things that require the types of court process

10   that require the seizure of money and property, we're

11   looking at very carefully.  There are certain

12   protections in place that are only available when the

13   court system is open and fully functioning.  So,

14   those are items that we take a careful look at

15   because whenever we seize money or property, those

16   remedies should be available to the person.  They

17   should be able to be able to go to court and look to

18   have protection granted by the court.

19      So, right now we're not conducting any property

20   seizures but that's simply because the court system

21   is not fully open and those remedies are not

22   available to them except for very limited

23   circumstances.  So, the types of orders we are

24   carrying out you would be considering emergency type

25   orders.

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                      106
 2      SPEAKER JOHNSON:  Sorry about that.  Is it safe

 3   to say Sheriff and so, I assume it is because of the

 4   answer to the question you just gave.  Is it safe to

 5   say that you are enforcing judgments during this

 6   crisis?

 7      JOSEPH FUCITO:  Yes.

 8      SPEAKER JOHNSON:  And what if you go and the

 9   person says they have COVID-19?

10      JOSEPH FUCITO:  Well, the idea of enforcement

11   doesn't necessarily work that way.  If we have to

12   serve an order of protection on somebody and they

13   have COVID-19, the Deputy Sheriff has to serve that

14   person.  So, our officers have to wear protective

15   gear.  We try to have as limited contact as possible

16   the person within the confines of the order.

17      So, whatever the order tells us to do, we still

18   have to carry out even though COVID-19 is going on

19   but we can take obvious safety precautions for our

20   officers.

21      SPEAKER JOHNSON:  Thank you and if the state

22   moratorium lapses, are you going to rely on the

23   courts to determine whether someone is protected by

24   the federal moratorium?

25
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                        107
 2      JOSEPH FUCITO:  We have to.  Unfortunately, in my

 3    role as Sheriff, while I have personal opinion and

 4    like said, my personal feeling is I think that these

 5    concepts are very good to explore.  In my role as

 6    Sheriff, I have to be somewhat agnostic and stand

 7    offish, neutral.  I can't really weigh in on these

 8    positions and I have to rely on the court to be the

 9    best guide for what the Sheriff is supposed to do.

10      SPEAKER JOHNSON:  Thank you Sheriff and thank you

11    to the members of the Administration.  I turn it back

12    to the Committee Counsel.

13      AUSTEN BRANDFORD:  Thank you Speaker.  Any

14    questions from the Chair's?

15      CO-CHAIR COHEN:  Austen, I'm going to defer.  I'm

16    going to let the Committee Members ask and then I'll

17    come back.

18      AUSTEN BRANDFORD:  Okay, great.  I will now call

19    on Council Members in the order they have used the

20    Zoom raise hand function with a quick reminder that

21    Council Members Torres, Yeger and Powers raised their

22    hand previously to ask questions at this time.

23      Council Members, please keep your questions to

24    four minutes including responses.  If there's a

25    second round of questioning, Council Member questions
```

```
    COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1  COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
    LICENSING                                      108
 2  will be limited to two minutes.  The Sergeant at Arms

 3  will keep a timer and let you know when to start and

 4  when your time is up.  We will begin with Council

 5  Member Torres followed by Council Member Yeger.

 6      SERGEANT AT ARMS:  And your clock will start now.

 7      COUNCIL MEMBER TORRES:  Thank you.  I have a

 8  question for the Sheriff.  Sheriff, imagine for a

 9  moment the Council were to go forward with Intro.

10  1912, so it's the law of the city and then a judge

11  were to issue an eviction warrant.  In the event of a

12  conflict between the local law and a judicial order,

13  how would the Sheriff's respond and I'm curious to

14  know how the Marshal's respond.  I know DOI is not

15  present at the moment but what would you do in the

16  event of a conflict between a judicial order and the

17  local law?

18      JOSEPH FUCITO:  The law is very clear on it.

19  That the Sheriff can't look behind a judgement.  In

20  fact, most of the case law in New York involving a

21  Sheriff questioning an order happened here in New

22  York City and it's a very well settled law that if

23  the Sheriff is ordered to do something, he can't look

24  behind the reasoning of the court and he must carry

25  out the mandate according to its command.  That was
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              109

1

2     the whole principle by having a Sheriff be the

3     ministerial officer for the court and for the Sheriff

4     carrying out those duties, the Sheriff is granted

5     quasi-judicial immunity.  Meaning that even if that

6     action were to disobey a current law, a Sheriff would

7     be immunized for carrying it out.  That is the

8     protection that is granted the Sheriff because he is

9     carrying out the will of the court.

10         COUNCIL MEMBER TORRES:  So, even if we were to

11    enact the law, you would not enforce it over a

12    judicial order, is that—

13         JOSEPH FUCITO:  If the Sheriff fails to act, he

14    can be held in contempt.  There are two types of

15    contempt in New York State.  There is a criminal

16    contempt which is punitive and there's a civil

17    contempt which is coercive.  The court could apply a

18    criminal contempt to me which would jail me for 30-

19    days and a civil contempt which could jail me

20    indefinitely until I perform the act.

21         An example was recently you had a county clerk

22    who refused to take marriage licenses.  That's a

23    ministerial act and if a Sheriff is required to carry

24    out a ministerial act and he refuses; he faces

25

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                           110
 2   probably the most severe punishment available under

 3   the law for an officer.

 4      So, I face both a personal liability, criminal

 5   and civil but if I carry out the order, I am fully

 6   immunized and I have the full backing of the court to

 7   do so.

 8      COUNCIL MEMBER TORRES:  So, since you're an agent

 9   of the state court, neither a federal and/or a local

10   moratorium is viable without the buy in of the court,

11   is that what you are saying?

12      JOSEPH FUCITO:  Yes.  Unfortunately, the court in

13   the court room, the courts process really controls

14   what the Sheriff does and since the Sheriff has no

15   ability to look behind the courts order, then

16   whatever the court tells the Sheriff to do, the

17   Sheriff must do.  The Sheriff leaves these issues for

18   the litigation in court.  That's why a lot of civil

19   process has a notice requirement.  The Sheriff give

20   notice before he does something and that gives the

21   person the opportunity to go to court to make these

22   claims.

23      Many of these issues that you are bringing

24   forward are claims that would be appropriately made

25   in court not to the Sheriff.
```

A-1765

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1     LICENSING                                    111
  2       COUNCIL MEMBER TORRES:  This might be a question

  3   for HPD but suppose in the absence of a moratorium,

  4   is there anything that the city could do, the Council

  5   could do to address egregious case of rent gouging in

  6   an attempt to exploit the COVID-19 crisis?

  7       DANA SUSSMAN:  So, I don't know that we are

  8   prepared to comment on that.  I haven't heard that as

  9   a suggestion at this point Council Member but we can

 10   certainly take that back to see if there has been any

 11   discussion around that particular issue.

 12       COUNCIL MEMBER TORRES:  Thank you.  I see my time

 13   is about to expire, so thank you for affording me the

 14   opportunity.

 15       AUSTEN BRANDFORD:  Thank you.  Now, we'll hear

 16   from Council Member Yeger followed by Council Member

 17   Powers.

 18       SERGEANT AT ARMS:  And your clock will start now.

 19       COUNCIL MEMBER YEGER:  Thank you very much.

 20   Sheriff, thank you for being here.  First, I just

 21   want to echo Mr. Speaker's comments anytime somebody

 22   in our greater family of New York City employees is

 23   taken, it's a shock not just for the greater system

 24   but obviously to the employees who are close with

 25   that person and your office being the small office
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                        112
```

2   that it is, I'm sure, I have no doubt that it's

3   hitting you folks at the Department of Finance pretty

4   hard and I want to express my condolences.

5        Sheriff, in your opening testimony and in

6   Councilman Torre's questions, you really did allude

7   to many of the items that I wanted to talk to you

8   about today and some of which I discussed with the

9   earlier panel.  But I just, I want to get some more

10  information a little bit, just so that we can have

11  some clarity.

12       So, if I may, when did you start working at the

13  Sheriff's office?

14       JOSEPH FUCITO:  1988.

15       COUNCIL MEMBER YEGER:  Okay, so I'm going to say

16  at least for myself, as for a good number of my

17  colleagues in the Council.  I would think it's fair

18  to say you probably have a greater understanding of

19  your powers and authorities than I do.  I just want

20  to focus I think on some of the remedies.  Since it's

21  so clear to me that this law cannot be enforced.

22  Introduction 1912.  If it were to be enacted, you

23  would not be legally allowed to follow it under any

24  circumstances.

25

A-1767

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                        113
 2      I don't doubt for one second that the Mayor would

 3   not fire you for not following an unlawful act of

 4   this Council.  I know for sure that the Mayor values

 5   his oath.  I know you value your oath.  I value my

 6   oath as a member of the Council but I also value my

 7   oath as an officer of the court and a Sheriff is an

 8   officer of the court, an arm of the judicial system.

 9      So, I want to focus on some of the remedies that

10   can be done instead.  My understanding obviously is

11   that your powers come from the CPLR and from state

12   law but clearly, if the Chief Judge of the State of

13   New York were tomorrow to issue an order directing

14   judges in the state that they may not issue

15   execution, is it fair to say that you would not

16   receive executions because judges would stop issuing

17   them?

18      JOSEPH FUCITO:  Yes, if the court directed us, we

19   would do it.

20      COUNCIL MEMBER YEGER:  Alright, so you know the

21   obvious solutions to these problems don't come from

22   the well intentioned efforts here in the Council, but

23   the notion that there are places in this state that

24   govern your activity and you do not have the ability

25   to decide to refuse to execute on an execution that
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    114

2    you receive but more to the point that you stated

3    earlier, there are remedies should you receive an

4    execution.

5        Number one, is there are notice provisions,

6    correct?

7        JOSEPH FUCITO:  Correct.

8        COUNCIL MEMBER YEGER:  Okay, and number two is

9    when you actually seize property, you don't

10   immediately that day or the next morning turn it

11   over.  You actually hold it for quite a while to

12   allow for within the confines of the Sheriff, so that

13   the debtor can actually collaterally attack the

14   execution and the underlying judgment if necessary,

15   is that correct?

16       JOSEPH FUCITO:  Correct.

17       COUNCIL MEMBER YEGER:  Well, there are remedies

18   as we know.  My concern of course is as I've said

19   Sheriff and you may not necessarily be aware of this

20   but I say this for the greater public, I have in my

21   time in the Council been, I believe, very protective

22   of the authorities of the Council.  I believe that

23   the council has authorities as it is stated in our

24   Charter and under state law but it is limited and

25   when it is limited, we should not try to cross that

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                          115
  2   line.  We should respect the authority of the law.

  3   In this case the state is the place that needs to

  4   make these instructions to you and I would suggest to

  5   my colleagues that is a better way to go with respect

  6   to the good intentions of this law and with that I

  7   yield back my time, thank you.

  8       AUSTEN BRANDFORD:  Thank you.  Next, we will be

  9   hearing from Council Member Powers followed by

 10   Council Member Cabrera.

 11       COUNCIL MEMBER POWERS:  Mr. Sheriff, how are you

 12   doing?

 13       JOSEPH FUCITO:  How are you sir?  Nice to see

 14   you.

 15       COUNCIL MEMBER POWERS:  Nice to see you again.  I

 16   hope you are hanging in there.  I'm very sorry to

 17   hear about your employee or your colleague that

 18   passed away and wishing all of you the best.  And

 19   thank you to everybody else as well from HPD and

 20   Human Rights.

 21       Just two very quick questions, just as I'm

 22   looking at this, the 1912, we were told by tenants

 23   today and I actually have a legislation around

 24   security deposits in the City Council and I'm

 25   wondering if on the other side of this equation,
```

A-1770

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
1       LICENSING                                      116
2    would your ability to do money judgments, I'm just

3    looking at the bills.  Would you ability to do money

4    judgements here affect a tenant who is suing the

5    landlord to get their security deposit returned to

6    them and would you be able to take action in that

7    case?

8        JOSEPH FUCITO:  Well, supposing that there was a

9    ban and as I said earlier, we don't think we would be

10   able to carry through on it.  The ban would work both

11   ways.  In fact, it would probably impact; the state

12   has a tribunal community and housing renewal.  They

13   actually have a tribunal where they award triple

14   damages to a tenant who has been rent overcharged.

15       So, the workings of the justice system on both

16   sides would be impacted by this type of legislation.

17       COUNCIL MEMBER POWERS:  Meaning that If there was

18   a rent overcharge or I guess a security deposit

19   issue, you would and you were meant to on behalf of

20   the tenant help them out or restore their money or

21   damages that you would — at least for this period of

22   time be able to do that?

23       JOSEPH FUCITO:  Correct, the Sheriff is

24   everyone's Sheriff.  We carry out the mandates of the

25
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              117

1

2   court and everybody is entitled to have their

3   judgement enforced impartial.

4      COUNCIL MEMBER POWERS:  Understood and you would

5   be able to then do it after this period ended?  You

6   know, I understand there is a constitutional question

7   here that you are raising but let's just say we were

8   able to figure that issue out, you would be able to

9   do it but it would be at the end of that period and

10  time.

11     JOSEPH FUCITO:  I don't want to speak to what the

12  legislation would look like.  I could only speak to

13  if the appropriate remedies were available to stop

14  the Sheriff, the Sheriff would be stopped and we'd

15  follow the directions that we're authorize to follow.

16     COUNCIL MEMBER POWERS:  Okay, and I applaud this

17  because I don't always know the exact intersection of

18  where you hand over to the Marshals but I know the

19  Marshals have some jurisdiction over things like

20  parking tickets and I think other tickets that are

21  unpaid in the city.

22     JOSEPH FUCITO:  A quick reference.  The Sheriff

23  is a law enforcement agency.  We are like a small

24  police agency that handles the enforcement of court

25  orders.  The courts that we handle are all the courts

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                         118

1

2    in New York City.  So, all the courts in the city and

3    the state.  The Sheriff is the enforcement officer.

4    The Marshal is the enforcement officer for the civil

5    court of the City of New York.

6        They work in a similar fashion but I don't want

7    to speak for them.

8        COUNCIL MEMBER POWERS:  Okay, and I think I am

9    confident that they will be you know, probably

10   testifying later today.  But just my question that

11   is, maybe you can speak on this issue and then I'll,

12   if the Marshals do testify, I'll ask this question.

13       For things like red light camera tickets,

14   speeding tickets, I guess parking tickets too.  Is

15   that impacted by this legislation if we are looking

16   to — I guess it takes some action related to things

17   that many issues we talk about like speeding and red

18   light cameras and things like that.

19       JOSEPH FUCITO:  Yes.

20       COUNCIL MEMBER POWERS:  How is that impacted?

21       JOSEPH FUCITO:  Most of these public safety

22   judgment enforcement in the city relies on judgement.

23   So, like, building code violations, fire code

24   violation, speeding violations, all of those

25

A-1773

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              119

1

2   ultimately culminate into a decision that's docketed

3   with the New York City Civil Court as a judgement.

4       COUNCIL MEMBER POWERS:  And that would be put on

5   pause for the time period.

6       JOSEPH FUCITO:  Yes, the legislation has that

7   view.

8       COUNCIL MEMBER POWERS:  Okay, great, thank you.

9   Thanks for answering my questions, but my times up

10  anyway.  Thanks.

11      AUSTEN BRANDFORD:  Thank you.  We'll now here

12  from Council Member Cabrera followed by Council

13  Member Chin.

14      SERGEANT AT ARMS:  And your clock will start now.

15      COUNCIL MEMBER CABRERA:  I'm going to use a very

16  short amount of time because my questioned was

17  answered by the questions that were asked by my

18  colleagues.

19      Thank you so much, I'll pass.

20      AUSTEN BRANDFORD:  Council Member Chin?

21      SERGEANT AT ARMS:  Your clock will start now.

22      COUNCIL MEMBER CHIN:  Yes, thank you.  Thank you

23  to the panel.  I first wanted to really thank the

24  Deputy Commissioner Sussman from Human Rights

25  Commission for working with our community, in

```
                COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
            1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
                LICENSING                                    120
```

1    

2    fighting xenophobia and hate crime and we got to do

3    more to educate.  I think the bystander training are

4    great.  My staff is all taking it and we want to urge

5    more people to report the hate crime that is

6    happening unfortunately.

7        My question is, two things, I don't if someone

8    from Department of Finance is here.  One of the

9    things that I talked about earlier was you know,

10   support for property owners, small property owners

11   who are providing affordable housing, rent regulated

12   housing and they need relief and I talked about

13   property tax deferral but we know the city needs

14   money and the only way we can get out of this mess is

15   we get the federal dollars.  But in our City Council

16   response to the Mayor that I think there was

17   precedent set I guess back in the economic crisis in

18   the 70's that large property owner, commercial

19   property owner that could afford to pay property tax

20   up front, that we should encourage them to do that so

21   that we can give a deferral program to the smaller

22   property owner who are providing affordable housing

23   in our district.

24

25

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          121

1

2     I don't know if anybody can answer that.  If

3  there is anybody from Department of Finance.  If not,

4  we'll bring it back to the Administration.

5     And the other question is to Deputy Commissioner

6  Santiago in HPD.  You know, during this time, as I

7  said, we still have predatory landlords, bad

8  landlords who are still doing tenant harassment.  So,

9  I'm just interested to see like, how many cases have

10  HPD been working on?  The Commissioners HIPAA rights

11  gave us some really good statistics in terms of

12  complaints and so, if you can address that issue,

13  that would be great.

14     ANNMARIE SANTIAGO:  So, as you know the Mayor has

15  supported us greatly in tenant harassment initiatives

16  and HPD had started and has an anti-harassment unit,

17  which tenants can contact and we have continued to

18  receive complaints during this period.

19     Most are around heat, hot water.  We are still

20  responding with inspections to those conditions and

21  we're taking information from tenants to follow up

22  once we're in a better state to do full building

23  inspections because that is what mostly what the

24  anti-harassment unit does.

25

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    122
 2     So, we've received about 60 complaints during

 3   this period and we're continuing to reach out to all

 4   of those tenants who contact us to make sure that

 5   once we can continue with our anti-harassment

 6   inspections, do inspections for violations,

 7   conditions in the buildings, we will be ready to

 8   continue that.

 9     COUNCIL MEMBER CHIN:  Do you know if all those

10   complaints came in through HPD or are some of them

11   from referrals, from elected officials office or

12   could maybe base —

13     ANNMARIE SANTIAGO:  The vast majority have been

14   through 311 who refers them to HPD.

15     COUNCIL MEMBER CHIN:  Okay, alright.  Thank you.

16     ANNMARIE SANTIAGO:  Your welcome.

17     AUSTEN BRANDFORD:  Thank you.  We will now circle

18   back to our Chair's and Speaker for any final

19   questions for the Administration before moving to

20   public testimony.  Chair's?

21     CO-CHAIR COHEN:  I appreciate that.  I did want

22   to say thank you to the Administration for your

23   patience.  I know the hearing has been long, so I

24   want to say thank you for that.

25
```

A-1777

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1    COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                     123
  2        To HPD, I wonder if I really, maybe I should have
  3    asked this at the last panel but I'm of some thought
  4    that perhaps you know, eviction is a legal proceeding
  5    in the state of New York.  Housing court is uniquely
  6    set up to deal with those and we've talked about you
  7    know, tenants and landlords and property owners all
  8    differently situated.  Maybe housing court isn't
  9    really the best place to try to sort this out as the
 10    time, when the time comes, as opposed to looking, I
 11    mean it would be great to find some macro policy that
 12    just solved everyone's problem in one great piece of
 13    legislation but I wonder if HPD has any thoughts on
 14    you know, maybe the individualized approach at
 15    housing court might be the way to go, or if you have
 16    thoughts one way or the other.
 17        ANNMARIE SANTIAGO:  I think as some of the
 18    advocates said, housing court would be totally
 19    overwhelmed if and when we ever got to a position
 20    where all of these cases and all of these people,
 21    that they are talking about at risk, wound up in
 22    eviction proceedings or wound up in some other
 23    proceedings in housing court.
 24        I think the Mayor you know, is continuing to look
 25    and has advocated for a lot of the initiatives that
```

A-1778

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1   LICENSING                                    124
```

 2   have been talked about today.  Again, we continue to

 3   look to our federal and state partners for financial

 4   support.  You know, getting ahead of this before it

 5   has to come before housing court or any other type

 6   of, I think judicial or administrative body on an

 7   individual case by case basis, is really how this

 8   would have to be addressed.

 9       So, I know that there are many people working on

10   this issue looking for guidance, looking for support

11   from outside the city and I think that that would be

12   the way that we all should continue to push.

13       CO-CHAIR COHEN:  I certainly agree that obviously

14   that we need federal support.  I know that you know,

15   the Speaker has been a very loud voice on that.  I've

16   spoke to my congressional representative about the

17   city's needs.  I know that we all will.

18       Thank you very much.  Austen, do we have

19   everybody?

20       CHAIRPERSON CORNEGY:  I just wanted to ask one

21   point question.

22       CO-CHAIR COHEN:  Oh, please Rob.

23       CHAIRPERSON CORNEGY:  Sorry.  I'm pretty sure

24   that with this esteemed group of Council Members this

25   may have been asked, but I'm just curious whether or

A-1779

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1     LICENSING                                    125
 2   not there's a belief that there is enough resources

 3   to actually effectively and efficiently look at

 4   tenant harassment cases.

 5       So, I don't know if someone asked.  I don't know

 6   if there is a complaint being made by HPD about the

 7   staff size and the requirements now that have

 8   expanded their duties but I'm just curious as to

 9   whether or not there is an opinion that the necessary

10   resources are already in existence or are there more

11   resources needed to do this job?  Especially the job

12   of investigating these cases effectively.

13       ANNMARIE SANTIAGO:  So, I think there are a

14   couple of different issues on the table here Council

15   Member.  So, you know that the Mayor is in full

16   support of anti-tenant harassment measures and I

17   think between HPD, DOB, HRA, a number of agencies who

18   deal with tenant harassment generally a lot of

19   resources have been put forth.

20       If you are speaking specifically about the COVID

21   related cases that we are talking about today, I

22   don't want to speak on behalf of the commission who

23   testified about their resources and what they've been

24   doing.  So, I would defer to them, specifically in

25   that area.
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
  1    LICENSING                                      126
  2      CHAIRPERSON CORNEGY:  Well, I won't hold up

  3    moving forward because again, I believe that my

  4    colleagues who I am very proud of, of being a member

  5    of this body, have probably asked questions that are

  6    relevant to the questions that I was going to ask.

  7    So, thank you though for appearing today.

  8        ANNMARIE SANTIAGO:  Your welcome, thank you.

  9        AUSTEN BRANDFORD:  Great, with no further

 10    questions from Chair's, we'll be turning to public

 11    testimony.  Thank you all for waiting.

 12      I'd like to remind everyone that unlike our

 13    typical Council hearings, we'll be calling

 14    individuals one by one to testify.  Once your name is

 15    called, a member of our staff will unmute you and the

 16    Sergeant at Arms will give you the go ahead to begin.

 17      Your testimony will be limited to two minutes and

 18    a Sergeant at Arms will let you know when to begin

 19    and when your time is up.

 20      Please wait for the Sergeant at Arms to announce

 21    you can begin before delivering your testimony.  I

 22    would now like to welcome Ava Farkas to testify.

 23        SERGEANT AT ARM:  Ava, your clock will start when

 24    you begin your testimony.

 25
```

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    127
 2     AVA FARKAS:  Sorry, I just heard my name, can you

 3   give me one second.

 4     Okay, thank you very much, thank you.  I just

 5   wanted to thank Speaker Johnson and the Committee on

 6   Housings and Buildings and the Committee on Consumer

 7   Affairs and Business Licensing for having this

 8   hearing.

 9     My name is Ava Farkas and I am here to testify in

10   strong support of Intro.'s 1912 and Intro. 1936.  Met

11   Council's mission is to fight for housing as a human

12   right.  The fact that it is not a human right has

13   exacerbated this current COVID-19 crisis and its

14   health impacts.

15     92,000 New York State residents are homeless and

16   cannot shelter in place and if we do not have a plan,

17   post eviction moratorium then millions more will find

18   themselves in the same predicament.

19     I want to thank members of the City Council for

20   supporting one of the critical services that Met

21   Council provides which is our tenant rights hotline,

22   which is now more important than ever for New

23   Yorkers.

24     Our hotline calls are confirming what everyone

25   knows that tenants who were barely able to afford
```

A-1782

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1       COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
         LICENSING                                        128
 2    their rent before the pandemic are completely unable

 3    to now.  Our hotline calls have gone from questions

 4    about getting repairs to questions almost exclusively

 5    about inability to pay the rent, either due to

 6    layoff, reduction in hours or a roommates layoff or

 7    reduction in hours.  We have also gotten at least one

 8    call from a healthcare worker whose roommate and

 9    primary tenant has been harassing her into leaving

10    the apartment before her sublease is up.  So, Intro.

11    1936 is critically important.

12         In addition, we conducted a survey with our base,

13    556 people responded, so this is a self-selecting

14    survey but I want to share the data with all of you.

15    Of the 556 people who took our survey about how

16    COVID-19 is impacting their ability to pay rent, 80

17    percent —

18         SERGEANT AT ARMS:  Time is expired.

19         AVA FARKAS:  Sorry.  My time up?

20         AUSTEN BRANDFORD:  If you have additional

21    testimony, we will review all written testimony

22    submitted.

23         AVA FARKAS:  Okay.

24

25
```

Case 20-4238, Document 40, 02/11/2021, 3035097, Page162 of 284

```
     COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
     LICENSING                                    129
 2     AUSTEN BRANDFORD:  We will make sure we look at

 3   it.  Alright, next, I would like to welcome Julia

 4   Duranti-Martinez to testify.

 5     SERGEANT AT ARMS: And Julia, your clock will

 6   start when you begin your testimony.

 7     JULIA DURANTI-MARTINEZ:  Hi, good afternoon

 8   Chair's Cohen and Corneqy and Committee Members and

 9   thank you for the opportunity to testify.

10     My name is Julia Duranti-Martinez and I'm a

11   Campaign Coordinator at New Economy Project.  As my

12   colleague Andy Morrison noted on the first panel, in

13   addition we are also working to expand community land

14   trust in New York City, including through a citywide

15   community land trust discretionary funding

16   initiative.

17     We welcome the steps the Council has taken to

18   combat housing discrimination and displacement during

19   the COVID-19 crisis through Intro.'s 1912 and 1936.

20   In addition to protecting New Yorkers from harassment

21   and evictions, it is critical that Council support

22   community led institutions like Community Land Trust

23   to ensure a just recovery in New York City's

24   communities of color and to the communities interest

25
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1   COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
      LICENSING                                    130
```

 2   and lease use of the land for permanently affordable

 3   housing and other local needs.

 4       As community governed organizations, CLT'S have

 5   the relationships and trust to address rapid response

 6   needs during times of crisis and more than a dozen

 7   emerging CLT's citywide are engaged in COVID-19

 8   mobilization efforts from conducting wellness check

 9   calls to residents and connecting tenants to legal

10   assistance to distributing food and supplies to

11   elderly and homebound community residents.

12   Nationally, CLT's also have a track record of

13   stabilizing housing for low income families in

14   communities, including preventing park closures in

15   the wake of the 2008 financial crash and aiding in

16   recovery efforts after the hurricanes in Puerto Rico.

17       Now more than ever, New York City has to invest

18   in proven community led solutions like CLT'S to

19   strengthen and stabilize neighborhoods that have long

20   born the brunt of housing in public health crisis.

21       We urge City Council to sustain and expand its

22   support for CLT's and community led cooperative

23   economic development.  We are calling for renewed

24   fiscal year 2021 discretionary funding which will

25   directly support the hardest hit neighborhoods and

```
         COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
         LICENSING                                      131
  2    build institutions that will be crucial to prevent

  3    evictions, foreclosures, and speculation in the wake

  4    of economic devastation brought by COVID-19.

  5        SERGEANT AT ARMS:  Time expired.

  6        AUSTEN BRANDFORD:  Thank you.  We would now like

  7    to welcome Joseph Condon to testify.

  8        SERGEANT AT ARMS:  Joseph, your clock will begin

  9    when you begin your testimony.

 10        JOSEPH CONDON:  Good afternoon and thank you for

 11    the opportunity to provide testimony.  Thank you,

 12    Committee Chairs, thank you Speaker Johnson.  My name

 13    is Joseph Condon and I am providing this testimony on

 14    behalf of the Community Housing Improvement Program,

 15    also known as CHIP.

 16        CHIP is an organization made up primarily of

 17    small and medium sized owners and operators of rent

 18    stabilized housing in New York City.  Our members run

 19    hands on small businesses by managing their own

 20    buildings and becoming long term fixtures in their

 21    communities.

 22        During the COVID-19 pandemic, these members and

 23    their staff are on the frontlines making sure people

 24    have safe, clean properly functioning apartment

 25
```

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                          132

1

2    buildings to live in while the shelter in place order

3    is in effect.

4        Because our members are community oriented, they

5    are extremely sympathetic to the painful financial

6    circumstances that COVID-19 has created.  According

7    to a survey of our members, more than 50 percent of

8    them have already entered into payment agreements

9    with tenants who have been impacted by COVID-19.

10   Another 25 percent of our members who responded said

11   that they expect to offer some relief on a case by

12   case basis moving forward and almost all of our

13   members have provided information on employment

14   benefits and other benefits to their tenants.

15       Now, we understand that not everyone who has lost

16   income will be eligible for those benefits, nor will

17   those benefits make up all of the lost income for

18   those who are eligible.  But CHIP members and other

19   property owners are working with these tenants to

20   figure things out.  Property owners and managers are

21   in the best position to deal with a variety of

22   circumstances tenants are facing.  But if everyone

23   else who can pay rent just stops paying, the ability

24   of an owner to provide relief to those who can't get

25   it anywhere else is significantly diminished.

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
        COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1      LICENSING                                        133
 2   Despite this being a time where we need to put

 3   politics aside and work together, many tenant

 4   activists are using the COVID-19 crisis as an

 5   opportunity to push a political agenda.  Cancelling

 6   rent without also providing relief for the expenses

 7   of small property owners is not a workable option and

 8   should not be realistically considered by these

 9   committees, unless there is some commencement relief

10   on the expense side.

11        SERGEANT AT ARMS:  Time up.

12        JOSEPH CONDON:  Relief in the area of property

13   taxes is an excellent compliment to any moratorium.

14   Between 30 and 40 percent of a tenants rent payment

15   goes to the city in the form of property taxes but

16   only focusing on one side of the equation, these

17   proposals add fuel to the political fire of anti-

18   housing activists who are calling for a rent strike

19   for all.  This is one of the main reasons CHIP

20   opposes 1912.

21        CO-CHAIR COHEN:  Thank you for your testimony.

22        JOSEPH CONDON:  Thank you.

23        AUSTEN BRANDFORD:  Thank you.  We'd now like to

24   welcome David Chemtob to testify.

25
```

```
          COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
          COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
   1      LICENSING                                        134
   2         SERGEANT AT ARMS:  David, your clock will begin

   3    when you start your testimony.

   4         DAVID CHEMTOB:  Can everyone see me?  Can you

   5    hear me?

   6         CO-CHAIR COHEN:  Yes.

   7         DAVID CHEMTOB:  Okay, dear honorable members of

   8    the New York City Council.  Thank you for hearing my

   9    testimony today.  Now that you are considering new

  10    legislation in the wake of this COVID-19 pandemic to

  11    allow tenants not to pay rent.  I would like to ask

  12    the Council Members who are in favor of this a few

  13    questions.  Landlords are currently providing crucial

  14    and essential services to their tenants.  Those

  15    essential services could only continue if landlords

  16    could continue to collect their rent.  Specifically,

  17    how are landlords expected to pay for heat and hot

  18    water if tenants are not going to be paying rent?

  19    How do you expect landlords to pay for water and

  20    sewage that allows tenants to take showers and to go

  21    to the bathroom?

  22         Landlords are paying supers and porters to put

  23    the garbage that tenants are generating today.  How

  24    will landlords continuing to clean up and mop public

  25    spaces without the critical cash flow that comes from
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                    135
 2   rent collections?  How does City Council expect

 3   landlords to pay property taxes without rent?

 4   Property taxes have skyrocketed in the last three

 5   years to a level as equal to 35 percent of our rental

 6   income.  Why is the landlord trying to collect termed

 7   as harassment?  Is a landlord not entitled to collect

 8   rent for providing shelter, heat, hot water, and

 9   cleaning services and etc., to their tenants?

10       Why are we even using the term harassment?  All

11   we want to do is just collect the rent on an

12   apartment so we can continue paying our property

13   taxes, paying our supers, paying the oil company

14   that's going to deliver oil tomorrow.

15       We got to pay ConEdison to keep the elevators

16   rolling.  Why is government considering to throwing

17   the burden of this pandemic completely on the

18   landlords?  Why is City Council not considering a

19   bill to allow people to walk into a local

20   supermarket, pick up some groceries and walk out

21   without paying?

22       SERGEANT AT ARMS:  Time expired.

23       DAVID CHEMTOB:  Thank you and good luck.

24       AUSTEN BRANDFORD:  Thank you.  We would now like

25   to welcome Kenneth Litwack to testify.
```

```
   COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1 COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
   LICENSING                                      136
 2    SERGEANT AT ARMS:  Kenneth, your clock will begin

 3 as you start your testimony.

 4    KENNETH LITWACK:  Good afternoon Chairman

 5 Cornegy, Cohen and Speaker Johnson and the members of

 6 the Committee.  I want to thank you for this

 7 opportunity to testify before you today on behalf of

 8 the Marshals Association of the City of New York.  I

 9 am going to speak in opposition to Intro. 1912.

10    Since 1979, when I was first appointed as Council

11 in the Inspector General to the New York City

12 Sheriff, I've been involved in this aspect of the

13 law.  I became Director for the Marshals Bureau for

14 the New York City Department of Investigation after

15 serving for the Sheriff and that is the unit that is

16 responsible for regulating New York City Marshals

17 pursuant to state law.  I'd like to point out to you

18 that Marshals employ approximately 250 people or New

19 Yorkers whose lives would be deeply impacted by the

20 long term disruptions to their operations.

21    Our first objection to Intro. 1912 is that the

22 City Council does not have the jurisdiction or legal

23 authority to enact such a measure.  There is no

24 statutory basis that would permit the City Council to

25 restrain a Marshal or a Sheriff's functions.
```

```
       COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
       LICENSING                                     137
 2    Marshals act pursuant to court orders which command

 3    them to act and are part of a complex system where it

 4    is the duty of judges to determine the special

 5    circumstances of a particular case.

 6        Section 16092 of the New York City Civil Court

 7    Act specifies that it is the [INAUDIBLE 2:38:46]

 8    which has the regulatory authority over Marshals.

 9    Marshal is an independent officer whose position was

10    created by the state legislature and his powers and

11    duties are prescribed by state statute.  In addition

12    to the civil court act Marshals yet their powers,

13    which are defined by the New York State CPLR.

14        Our next objection is that while we understand

15    the intent of this legislation is to help those in

16    need, which have been negatively impacted by COVID-

17    19, we believe the proposal —

18        SERGEANT AT ARMS:  Time expired.

19        CO-CHAIR COHEN:  Austen, can we give the Marshal

20    a little more time.  I think this testimony is

21    particular germane, I just want to let him finish,

22    alright.

23        KENNETH LITWACK:  Thank you.

24        SERGEANT AT ARMS:  I will restart the clock at

25    two minutes.
```

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                        138
 2        CO-CHAIR COHEN:  Thank you.

 3        KENNETH LITWACK:  If the proposed legislation

 4    were enacted as written, it would negatively impact

 5    small claims court and a needy plaintiffs ability to

 6    enforce a money judgement.  As a result of this

 7    legislation, plaintiffs would have no way of

 8    recovering money they are legally entitled to which

 9    adds insult to injury during these trying times.

10        New York City Marshals enforce approximately

11    2,000  to 2,500 money judgments in small claims court

12    each year.  It is imperative that the Council

13    consider the budgetary implications of this bill.  We

14    are a key part of an approximate $80 million in

15    revenue that the city collects in judgements every

16    year on parking, speed, red light violations, camera

17    violations, as low as environment control board

18    violations.

19        This is a significant source of annual revenue

20    for the City of New York and is needed more than ever

21    as the city's budget deficit continues to expand.

22    Furthermore, the money judgments Marshals execute in

23    these categories serve as a deterrent to this type of

24    behavior and further the goals of the city's safety

25    programs like Vision Zero.
```

A-1793

COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
LICENSING                                              139

1

2      I'd also like to point out that putting aside

3  these objections, in the past Marshals have

4  cooperated with the city in for example during 911

5  and during Hurricane Sandy, in cutting back on

6  evictions through the city and working with the city.

7  I'm very sensitive to these issues.  We look forward

8  to working with the Council on this issue and I am

9  happy to answer any question you may have.

10      CO-CHAIR COHEN:  Thank you very much.

11      AUSTEN BRANDFORD:  We will now turn for any

12  questions from the Chairs.  We have a question from

13  Council Member Yeger.

14      COUNCIL MEMBER YEGER:  Thank you Mr. Chairman.

15  Mr. Lipblack, I'm glad you are here to testify

16  because you are adding clarity to a place where the

17  Sheriff was not able to opine.  He limited his

18  opinions to his own powers of authority but it's very

19  clear from what you are saying that should the

20  Council, and this goes to a very similar question

21  that I asked earlier.  Should the Council pass this

22  law and the law says that you are to ignore a

23  lawfully delivered execution.  You would not be

24  empowered to abide by the Council law, you would have

25  to abide by your powers as stipulated by Section 1609

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
 1      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                      140
```

2     of a civil court act and Article 52 of the PPLR, is

3     that correct?

4        KENNETH LITWACK:  That is absolutely correct.  If

5     would be improper and illegal for a Marshal to refuse

6     a command of the court.

7        COUNCIL MEMBER YEGER:  Okay, I have nothing

8     further.  Thank you, Mr. Chairman, I yield back.

9        AUSTEN BRANDFORD:  Alright, with no more

10    questions, this concludes the public testimony.  So,

11    if inadvertently forgotten to call on someone who

12    registered to speak, that person can raise their hand

13    using the Zoom raise hand function in the next minute

14    or so, we'll try to hear from you now.  We will wait

15    for a minute.

16       Seeing none it looks like we can turn this back

17    to the Chair's here for some closing remarks.

18       CHAIRPERSON CORNEGY:  So, Andy, I don't know if

19    you want to go first.  You kind of held this down.

20       CO-CHAIR COHEN:  I'll be very brief.  I really

21    just want to say thank you to everybody who

22    testified.  I think I mentioned this in my opening

23    but it took an enormous amount of work on part of the

24    staff to bring this hearing off and a tremendous

25    amount of prep you know from our committee, my

```
        COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
  1     COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
        LICENSING                                       141
  2     Legislative Director Patty, like, it was enormous

  3     amount of work and I don't want to hurt my arm

  4     patting us on the back here but I thought this went

  5     very, very well and I want to say, thank you for

  6     everybody participating and I want to say thank you

  7     for your partnership Rob, I think you did a good job.

  8         CHAIRPERSON CORNEGY:  Thank you.  I'd like to say

  9     for those who are watching an essential function of

 10     the council is to meet and to advocate through

 11     legislation and policy on behalf of the voice of the

 12     city.  I think this was a balanced effort at looking

 13     at what we're facing as it relates to tenant

 14     displacement during COVID.  But I think what we heard

 15     was testimony that you know, that applicates on

 16     behalf of small landlords as well, which demonstrates

 17     the need to get this right and to make sure that you

 18     know that we don't have a singular focus and as a

 19     Council, we have a duty to hear these things and this

 20     is unique environment to do it in.  I have to say

 21     that I've never been prouder of the Council to honor

 22     its commitment to act on behalf of its citizens even

 23     in this unique way.

 24         I want to thank all the staff that was involved

 25     because what people don't know is you see this couple
```

```
      COMMITTEE ON HOUSING AND BUILDINGS JOINTLY WITH
      COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS
 1    LICENSING                                      142
 2  of hours of hearing and of testimony but there were

 3  countless hours put in prior to and in countless

 4  hours that will be put in in debriefing and making

 5  sure we have all of the information.  So, I want to

 6  personally thank all the staff involved, including

 7  the Security staff who make sure that those who are

 8  supposed to be here are here and those who are not

 9  are not allowed to disrupt this.  So, thank you again

10  and I think this is the part Austen where I gavel

11  out.  With my favorite drum sticks by the way.  So,

12  [GAVEL], this conclude the hearing of Housing and

13  Buildings and with my partnership with Andy Cohen.

14  Thanks Andy.

15      CO-CHAIR COHEN:  Great job Rob, thank you.

16      CHAIRPERSON CORNEGY:  Thanks Mike.

17

18

19

20

21

22

23

24

25
```

A-1797

C E R T I F I C A T E

World Wide Dictation certifies that the
foregoing transcript is a true and accurate
record of the proceedings. We further certify that
there is no relation to any of the parties to
this action by blood or marriage, and that there
is interest in the outcome of this matter.



Date _____ April 1, 2018 _____

A-1798

# EXHIBIT PP

Testimony of Dana Sussman
Deputy Commissioner, Policy and Intergovernmental Affairs
New York City Commission on Human Rights
Before the Committee on Housing and Buildings and Committee on Consumer Affairs and
Business Licensing on Int. 1936
April 28, 2020

Good afternoon Speaker Johnson, Committee Chairs Cornegy and Cohen, and Members of the
Housing and Buildings and Consumer Affairs and Business Licensing Committees. I am Dana
Sussman, Deputy Commissioner, Policy and Intergovernmental Affairs, at the New York City
Commission on Human Rights. Thank you for convening today's hearing to address the critical
needs of New Yorkers during the COVID-19 pandemic. We know that many of us are struggling
and may be mourning the loss of family, friends, and co-workers, and I want to take a moment to
acknowledge that.

As you likely know, the Commission is the local civil rights enforcement agency that enforces
the New York City Human Rights Law, one of the broadest and most protective anti-
discrimination and anti-harassment laws in the country, now totaling 26 protected categories
across nearly all aspects of city living: housing, employment, and public accommodations, in
addition to discriminatory harassment and bias-based profiling by law enforcement. By statute,
the Commission has two main functions. First, the Commission's Law Enforcement Bureau
enforces the City Human Rights Law, by investigating complaints of discrimination from the
public, initiating its own investigations on behalf of the City, and utilizing its in-house testing
program to help identify entities breaking the law. Second, through the Community Relations
Bureau which is comprised of Community Service Centers in each of the City's five boroughs,
the Commission provides free workshops on individuals' rights and businesses, employers' and
housing providers' obligations under the City Human Rights Law and creates engaging
programming on human rights and civil rights issues.

Before turning to Int. 1936, I'd like to highlight some of the important work that the Commission
is doing to address discrimination and harassment that we have seen emerging in the midst of the
current public health crisis posed by COVID-19. In the context of the COVID-19 pandemic, we
have seen a multitude of ways in which the City Human Rights Law intersects with rapidly
changing needs of New Yorkers in crisis. Starting in January, the Commission began to monitor
an increase in anti-Asian discrimination and harassment, including scapegoating, fearmongering,
and the spread of misinformation, as news about COVID-19 started to emerge. In February, the
Commission started to receive its first reports of New York City-based incidents of
discrimination and harassment targeting Asian New Yorkers. At the same time, the
Commission's East Asian Communities Liaison Flora Ferng and other members of the
community outreach team were working regularly with community leaders of Asian and Pacific
Islander (API) communities throughout New York City to provide information and resources
about the Commission's work.

From February through mid-April, the agency recorded 284 reports of harassment and
discrimination related to COVID-19, over 40% (115) of which identify incidents of anti-Asian
harassment or discrimination. By comparison, during this same time period in 2019, the

A-1800

Commission received just five reports of anti-Asian discrimination. This influx in reports and cases resulted in the Commission's April 19 announcement of the formation of a COVID-19 Response Team to handle reports of harassment and discrimination related to the outbreak. The Response Team is comprised of staff from the Law Enforcement Bureau and the Community Relations Bureau working in coordination to quickly and efficiently track and respond to the sharp increase in reports of harassment and discrimination connected to the pandemic. The COVID-19 Response Team has taken action in 176 of those reports, including, for example, conducting early or emergency intervention, providing information on how to request a reasonable accommodation, referring the individual to another service or agency, or commencing an investigation. In addition, the Commission has opened active investigations into 26 matters spanning discrimination in housing, public accommodations, and employment on the basis of race, national origin, disability, and lawful source of income. Additionally, the Response Team has successfully resolved 10 matters of COVID-19-related harassment and discrimination so far.

The Commission's Community Relations Bureau (CRB) has also held bystander intervention trainings with the Center for Anti-Violence Education. The trainings provide techniques to safely de-escalate a bias incident in real time, and were recently piloted in Mandarin. In early March, CRB co-sponsored community forums in Sunset Park, Brooklyn and Manhattan's Chinatown educating Asian communities of their rights and protections under the law. The Commission also held virtual town halls, in partnership with sister agencies, elected officials, and community-based organizatoins highlighting workplace rights related to COVID-19, reporting discrimination and harassment related to COVID-19, and responding to hate and bias with restorative justice measures, among other topics. The Commission continues to produce and promote content to provide key information to impacted communities on their rights in several languages, including those spoken by Asian New Yorkers facing heightened harassment and discrimination due to COVID-19 stigma (Cantonese, Fujianese, Korean, Mandarin, and Tagalog). Commission staff currently speak over 30 languages. Shortly after the outbreak began, the Commission also launched an online resource page outlining New Yorkers' rights and protections from COVID-19 related discrimination in housing, employment, and public accommodations which is regularly updated. The page is available at nyc.gov/stopcovidhate. The Commission also currently has a paid campaign running on social media platforms directing people to our resources on their rights as they relate to COVID-19.

Turning now to Int. 1936: most cases of housing discrimination against a person with suspected or confirmed COVID-19, or against a person caring for someone with a suspected or confirmed case, are protected under the City Human Rights Law's broad protections based on actual or perceived disability and a person's association with someone with a disability. In addition, essential workers who may face housing discrimination because they are at risk of exposure to COVID-19 are covered by the City Human Rights Law's protections based on occupation. The Commission's Law Enforcement Bureau has directly received 228 COVID-19 related inquiries, 44 of which are in the housing context. The Commission has provided tenants and coop residents with information regarding the City's Human Rights law and, in some cases, contacted management companies or cooperative boards to advise them of their responsibilities under the law, where restrictions on residents to reduce the spread of COVID-19 did not allow for accommodations for residents with disabilities. For example, in situations in which buildings are not permitting or facilitating deliveries to the door of individuals with disabilities unable to exit

2

their apartment due to immunocompromised conditions, COVID-19 self-quarantine, or are unable to lift or otherwise carry packages or deliveries due to a disability, the Commission's Law Enforcement Bureau was able to intervened and provided inquirers with information about their rights to request a reasonable accommodation.

While Int. 1936 does not amend the City Human Rights Law, it does amend the Housing Maintenance Code's language on tenant harassment, which was modeled after language in the City Human Rights Law to protect against harassment based on a person's protected status. The addition of tenant harassment in the housing code in 2017 allows tenants to choose whether to file a discrimination claim with the Commission or to take a case to housing court. Because of the substantial overlap between existing protections in the City Human Rights Law and the Housing Maintenance Code, several of the protections contemplated in Int. 1936 already exist to protect tenants against harassment in housing. This is true for cases of both confirmed or suspected COVID-19, or when an individual has a relationship or association with someone with an actual or suspected case of COVID-19.

It is important to note that if a tenant chooses to bring a claim under this provision in housing court, they typically will be precluded from bringing the same claim at the Commission. Currently, remedies in housing court are limited to civil penalties ranging from $1,000 to $10,000, compared to remedies at the Commission which include uncapped compensatory damages to the victim, civil penalties of up to $250,000, and other affirmative relief. Because the remedies in housing court are more limited than at the Commission, it is vital that tenants understand the options available to them and are able to make an informed decision regarding the venue they choose. To the extent that New Yorkers experience discrimination or harassment with respect to any of the protected categories articulated in the City Human Rights, we encourage them to contact the Commission.

The Commission recognizes that people who have COVID-19, are at risk of contracting the virus, or are essential workers must be able to live safely and securely and should never, under any circumstances, have to contend with discrimination and harassment. We are committed to working with the Council to ensure that the devastating impacts of this public health crisis are not unnecessarily compounded, and that New Yorkers can live peacefully in their homes, free from harassment. We are acutely aware of the vulnerabilities of New Yorkers right now, and the Commission is ever more committed to defending the human rights of all New Yorkers, especially those impacted by COVID-19.

3

A-1802



## Committee on Consumer Affairs and Business Licensing and

## Committee on Housing and Buildings

Intro 1912: A Local Law in relation to ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19

Testimony of Joseph Fucito,
Sheriff of the City of New York
New York City Department of Finance

April 28, 2020

A-1803

Good afternoon members of the Committee on Consumer Affairs and Business Licensing and Committee on Housing and Buildings. I am Sheriff Joe Fucito, and I am here today to discuss proposed Intro-1912. Before I do, I want to take the time to thank the City Council for its efforts to tackle the many hardships facing New Yorkers during the COVID-19 pandemic and beyond. We have all been touched by this crisis, my office included, with the loss of loved ones. Sheriff's Public Safety Officer Serge Paul passed away last week after a brave struggle against COVID-19. He was a dedicated law enforcement officer, husband, and father, and I would be remiss if I did not publicly acknowledge his dedicated service and sacrifice.

The Sheriff's Office fully appreciates what we believe is the Council's intention to help provide relief to New Yorkers from debilitating seizures of property and monetary assets.  However, Intro 1912 -- while well intentioned – raises significant legal concerns for my office.  The work of our Office is integrally related to the work of the judicial system and governed by State law.

May I take a moment to provide a quick explanation about judgment enforcement matters. A "judgment" is the final outcome of a court case. A judgment resolves the contested issues and terminates a lawsuit, since it is regarded as the court's official pronouncement of the law on the action that was pending before it. The judgment states who has won the case and what remedies

A-1804

are awarded to that prevailing party. Remedies may include money damages, injunctive relief, or both.

Judgments are enforced by "writs of execution" which can be addressed to the Sheriff or in New York City to the Marshal, commanding them to give the plaintiff possession of land; or to enforce the delivery of personal property which was the subject of the action; or to collect the amount of the judgment, depending on the relief sought in the underlying case.

As I've described, judgment and execution enforcement are mandates that come from the court. They are under the governance of the State court system and implemented through the State Civil Practice Law and Rules. Indeed, they represent the core function of the judiciary branch and the ultimate expression of its independent decision-making authority. We believe that Intro 1912 would require actions that interfere with this well-established structure.

The bill assigns duties to the Sheriff that presupposes the Sheriff has control over the judgment and execution process. However that is not the case. The Sheriff is an officer of the court and wholly guided by the exacting statutory steps set forth in the CPLR which preclude the Sheriff's personal judgment or outside review.

Courts have repeatedly held that a Sheriff cannot look behind court mandates or review them for error, and can be penalized for doing so. For these

2

A-1805

reasons, it is our view that the Sheriff could not comply with the directives of Intro 1912 without violating the panoply of State laws that govern the Sheriff's role as the civil enforcement official of the courts.

In my role as Sheriff I am not a heartless bill collector, but rather an officer of the court who has the duty to enforce the laws enacted for the protection of the lives, persons, property, and health of our citizens. I hope that my testimony today has conveyed my passion for following the law and having the Office of the Sheriff working productively and cooperatively for the betterment of all New Yorkers.

Thank you for your time.  I will now take questions.

A-1806



# TESTIMONY OF THE REAL ESTATE BOARD OF NEW YORK TO THE COMMITTEE ON HOUSING & BUILDINGS AND THE COMMITTEE ON CONSUMER AFFAIRS & BUSINESS LICENSING OF THE NEW YORK CITY COUNCIL ON INTRO NO. 1912 AND INTRO NO. 1936, AS PART OF THE COVID-19 PACKAGE

April 28, 2020

The Real Estate Board of New York (REBNY) is the City's leading real estate trade association representing commercial, residential, and institutional property owners, builders, managers, investors, brokers, salespeople, and other organizations and individuals active in New York City real estate. REBNY strongly supports policies that expand the local economy, grow and improve the City's housing stock, and create greater opportunities for all New Yorkers. Thank you to the City Council for the opportunity to provide REBNY's perspective regarding COVID-19 related legislation.

New York is facing an unprecedented crisis. New Yorkers are worried about their health and safety, and too many are worrying about how they will provide for themselves and their families.

REBNY and its members are committed to ensuring our fellow New Yorkers withstand this crisis safely in their homes. That is why before government or the courts acted, REBNY members representing over 150,000 rental units voluntarily pledged to not execute warrants of eviction for three months. With so much physical, emotional, and financial suffering going on now, no one should have to worry about losing their place to live during this crisis.

During this time of crisis, property owners are doing all they can to meet their responsibility of providing quality and safe housing for their tenants. However, as is the case with most businesses in this crisis, it has become increasingly difficult financially to find ways to cover the costs for utilities and maintenance, COVID-19 related cleaning and safety precautions, and the other already burdensome financial obligations they have including property taxes.

Very few industries or sectors have been shielded from the economic downtown brought by COVID-19, and the real estate industry is no exception. As we look for ways to encourage a robust but safe economic recovery, it is critical that policymakers recognize that one well-intentioned bill can have harmful consequences on other actors in ways that will hinder our ability to recover. Unfortunately, it does not appear that the bills being proposed in the package takes that into account.

Below please find more detailed comments on the bills under consideration today.

**BILL:** Intro No. 1912-2020

**SUBJECT:** Ceasing the taking and restitution of property and the execution of money judgments by the city sheriff and marshals due to the impacts of COVID-19.

**SPONSORS:** Speaker Johnson and Council Members Kallos, Van Bramer, Lander, Chin and Ayala



Intro 1912 prohibits the marshals and the City's sheriffs from the taking and restitution of property or the execution of money judgments until the later of the end of the state of emergency or September. For New Yorkers impacted by COVID-19, marshals and sheriffs would be barred from the taking and restitution of property or the execution of money judgments.

REBNY is opposed to Intro 1912 for numerous policy, practical, and legal reasons. REBNY understands the Council's concern for eviction proceedings and shares its pursuit for fairness and justice in the process, notably during the COVID-19 pandemic. It is why REBNY was the first group to announce that its members voluntarily instituted a 90-day eviction moratorium for their tenants to provide relief. Additionally, as the pandemic has continued, REBNY members have been proactive with their tenants to best address their specific needs as we weather this crisis together.

The powers and duties of marshals and sheriffs are embedded within New York State law, not local law.  The Council attempts to limit these duties through a local law.  It is misguided and conceivably, unlawful basis by the Council to usurp State authority.

Notwithstanding the above, from a practical perspective, property owners rely on the ability to collect rent to meet their expenses. According to data collected by the City of New York, nearly 30% of a tenant's rent goes to property taxes. In the past year, Class 2 properties experienced a 7.6% increase in property tax levy, a faster pace than that of the City as a whole, as the Rent Guidelines Board PIOC Report notes. Additionally, assessments rose 7.8% and the Class 2 levy share increased 0.4%. Rent also pays for utilities, insurance, maintenance, and other operating costs. As a result, not all property owners are able to forgo rental payments and simultaneously operate their properties at the same level for the next year.

Noticeably since Intro 1912 provides no contingency regarding a time period, an eviction moratorium could last indefinitely. There should be widespread concern on the impression that this legislation gives to tenants, particularly those who have the means to pay rent and will choose not to do so. The economic consequences of this misimpression could lead to widespread mortgage default, decreased property tax collection, and a subsequent decline in necessary city services for quality of life for tenants across the city.

Additionally, while this bill does allow for actions to be taken in connection with a matter under the jurisdiction of the family court, at a minimum, the bill also needs to allow for marshal action if an action is in connection with a matter under the jurisdiction of criminal court. For example, Safe Horizon, New York City's domestic violence hotline, has received a surge of 3,000 calls in April, after a decline in March. The family court system does not deal with the issuance of permanent and temporary orders of protection, often granted in criminal matters, which require the removal of an individual. We need sensible legislation that allows owners to maintain the warranty of habitability that protects the welfare of their tenants.

**BILL:** Intro No. 1936-2020

**SUBJECT:** Amending the definition of harassment to include threats based on a person having been impacted by COVID-19.

**SPONSORS:** Council Members Torres, Kallos, Van Bramer, Chin, Powers and Speaker Johnson



Intro 1936 amends the definition of harassment in the Housing Maintenance Code to include threats against an individual based on their status as a COVID-19 impacted person, their status as an essential employee, or their receipt of a rental concession or forbearance. Harassment would be punishable by a civil penalty of $2,000 to $10,000.

REBNY agrees wholeheartedly with the Council that protecting tenants from harassment of bad actors, notably during the COVID-19 crisis, should be a priority. However, it is important to clearly define what harassment means when most of the normal ways our society interacts with each other has changed.

With that said, REBNY has concerns surrounding how Intro 1936 will affect the conversations that are already happening between tenants and owners that could lead to solutions on rent relief. Notably, if either side of those conversations are now fearful that such conversations could be misconstrued as harassment, needed relief for tenants could be lost. Is one knock on the door to ask if the building notices have been received, which have been emailed at some points daily to alert tenants to changing executive orders, CDC guidance, and protocols on elevator usage, considered harassment? What about reminders to pick up packages?

Additionally, REBNY has concerns that surround the idea of creating a temporary protected class, and how a building owner understands what constitutes a protected class. As written, there does not seem to be a contingency on for how long a tenant could claim protected status relative to the COVID-19 disaster declaration, theoretically allowing for the protected class to be claimed well after the end of the current pandemic.

Additionally, extending the protected class to also cover individuals who have received a rent concession or forbearance for any rent owed also raises questions and concerns. As written, there is no clarity on what would occur if a tenant who has claimed protected status, for example, does not pay rent on a future unit under a different lease.

Finally, in our social distancing society, REBNY has concerns on if the bill addresses what could be misconstrued as harassment. For example, limitations on elevator usage are important but certainly will provide inconveniences for tenants. We encourage the Council to take these scenarios into consideration to best provide more clarity for building owners and tenants alike.


*CONCLUSION*

As we work to address reopening our economy while prioritizing the health and safety of all New Yorkers, we need to support proposals and actions that embrace collaboration. Additionally, we need to understand the reality that most small businesses and industries across our City need real and immediate relief.

Unfortunately, many of the proposals fall short on understanding that reality. REBNY is ready and willing to work with the Council and appropriate City agencies to find solutions that balances relief for both small businesses and workers, the obligations of owners, and the needs of tenants.

A-1809



Thank you for the time and consideration of these points.

CONTACT:
Ryan Monell
Government Affairs, Director of City Legislative Affairs
Real Estate Board of New York (REBNY)
(937) 269-6889
rmonell@rebny.com

**Subject: The proposed Council Bill would be a destructive hit to Landlords**

Hi Laurie,

It was very nice to speak with you today.  I appreciate the time you spent listening to my concerns.

As I mentioned on our call, I am the owner of a small commercial building in the garment center, 230 West 39th Street, which has 16 stories and 60,000 sq. ft.  I have 24 tenants and only four of them have paid a portion of April's rent; the rest I have deferred for three months.  If the economic and pandemic situation, however, does not improve, I think they will need to defer their rent for a longer term.

While there may be some press reports of large commercial and office tenants continuing to pay rent, judging from the landlords I know, I doubt such reporting would be accurate.  Instead, I think it is more likely that NYC landlords, almost all if whom carry debt on their properties, would prefer not to broadcast to their lenders that they may have an issue collecting rents and therefore may not be able to service their debt.

Whether or not landlords are receiving their rental income, we still have to pay debt service, taxes, utility charges, insurance premiums and payroll to keep the lights on.  Generally, commercial and residential landlords have not been allowed to benefit from any of the emergency financing that SBA has made available to businesses and individuals across the country to alleviate the financial burdens caused by the pandemic.  Also, most banks are prohibiting borrowers from placing additional debt on their properties, even loans from the SBA, and even if the SBA debt would be subordinate to the bank loan.

In short, landlords rely on tenants to pay rent so they can pay their business expenses and keep their businesses operational for both their other tenants and to keep paying their employees.  Without rental income, a landlord can't keep the lights on.  If a landlord can't service the debt on the building, the bank will foreclose on the asset.  If many landlords end up in this predicament, the banks will not be able to keep up with foreclosures.  The snowball effect of allowing tenants to remain in their units for a year, without paying rent, without being subject to eviction or personal liability, will collapse the rental real estate market in NYC.

The aspects of the COVID-19 Legislative Relief Package that pertain to real estate (Int 1912-2020, Res 1277-2020, Int 1932-2020, Int1936-2020) if enacted, would destroy the rental real estate market in NYC and have disastrous, long reaching consequences. The only people who will enjoy a long term benefit from such legislation are extremely wealthy investors, sitting on massive reserves of cash.  When the destruction sowed by this legislation blankets the City, they will swoop in to cherry pick otherwise decent assets.   In fact, it was reported on by Costar today that Blackstone has set aside a mountain of cash to buy distressed real estate.

If this were to happen, the small businesses I have nurtured as an independent landlord will vanish as will the jobs of my union employees who manage my building.  I will lose my building

that I have invested in for 3 decades and my living as well. The proposed legislation is tantamount to a taking of private property and my right and my employees rights to earn a living.

I would also like to take this opportunity to point out the unique obstacles that face both landlords and tenants in the Garment Center. Unlike other commercial buildings located in business areas throughout the City where you will find diverse businesses, commercial buildings in the garment center primarily have garment related tenants. Therefore, when the garment industry suffers, the landlords who house that sector will also suffer. Forcing the landlords to cary the burdens of the distressed garment sector is fundamentally unjust.

NYC garment businesses were already having trouble in 2019-2020 because of the Trump tariffs on imports. When the pandemic hit in March, all the U.S. stores cancelled their orders. The goods were ordered, paid for and manufactured by the tenant garment companies, however, when stores/buyers cancelled orders there was no place to ship those orders. Then the "factors" (garment industry lenders) refused to pay the garment companies because there would be no outlet for the sales. As a result, garment tenants are out all the funds they fronted to produce goods for the season they cannot sell.

Only the largest companies might be able to carry this kind of loss. No one is buying product, not even the outlet sellers (TJ Maxx, Century 21, Walmart, etc). Many garment companies will not be able to pay rent. When most tenants in a building are garment tenants, landlords in these buildings, especially smaller buildings with smaller sized businesses, will not have income. The proposed legislation would mean I have to keep my building open, my lights on, for tenants who are not paying me, all for a sustained period of time. During this time, your proposal offers me no tax relief and no debt relief. What funds am I supposed to use to carry my tenants, my employees, my taxes and my mortgage for a year?

Kindly take the ramifications I have described of the proposed legislation into account before proceeding further on this path. I am a small landlord who has worked hand in hand with my small tenants to help them grow. I proudly take risks on new companies. Where tenants don't have a track record and creditworthiness, they can provide good guy guaranties to secure their lease. How else do you think these new "mom and pop" garment start-ups can get a literal foothold, a space of their own? Your proposed legislation might help some struggling commercial endeavors muddle through a year of COVID downturn but it will also destroy the marketplace for small landlords who take chances on small start-up businesses.

I would appreciate a reply to this correspondence.

Sincerely yours,

Charles Hoppenstein
[choppenstein@gmail.com]

Personal Guarantee Release

Speaker Johnson - Thank you for all of your efforts in supporting small businesses in NYC during these unprecedented times.  Your proposed law that would release commercial tenants from personal guarantee would be life changing for me and many other small business owners.

3 years ago, when I took my life savings to open up a 20 seat, 6 employee restaurant in the West Village, the only way I could secure a lease was to provide a personal guarantee.  That guarantee entitles my landlord to 6 months rent (at $18,000 per month) ,other fees and my security deposit (3 months rent) should I request to vacate the premises prior to the end of the 10 year lease.  In the current situation i cannot afford to pay rent and i can not afford to give notice.  I will quickly run out of money either way.  I applied early on for the PPP and 2 other SBA loans, but I was not approved before the funds dried up.  I have filed loss of income claims with my insurance company to no avail. I am out of options.

If the personal guarantees stay in place I and many others will not only lose our business, our livelihoods and our investments in the business, but also spend every other dollar we have on commercial rent on a space that is unusable.  We will then be forced into bankruptcy to liquidate whatever little else we might have, to pay commercial rent on a location that has been forced to close.

I beg you to please help us.  Please step in and give us an opportunity to survive this disaster by getting rid of the personal guarantees.  I have accepted that my business will not survive this, but  I am hopeful with your help I and many small business owners will not be personally ruined as well.

Thank you and stay safe,

Joseph Conti
Owner - Shuraku Restaurant

A-1813



**Testimony Submitted to the New York City Council Committee on Housing and Buildings, Jointly with the Committee on Consumer Affairs and Business Licensing**
**Re: Int. 1912**
April 28, 2020

On behalf of the New York State Association for Affordable Housing (NYSAFAH), we would like to thank Chair Cornegy and Chair Cohen for the opportunity to submit comments on the bills being heard at today's remote hearing.

NYSAFAH is the trade association for New York's affordable housing industry, with nearly 400 members, including developers, lenders, investors, attorneys, contractors, architects and others active in the financing, construction, and operation of affordable housing.

**Int. 1912**
The Covid-19 pandemic has created a crisis in the City's rental housing for tenants who have experienced an unexpected loss in income and for the owners trying to keep buildings afloat. On both fronts, these challenges are worse in our affordable housing stock. Our members are reporting higher degrees of rent non-payment than has been reported Citywide and the margins in affordable housing are much thinner than in their market rate counterparts.

This crisis requires a multifaceted solution and will certainly necessitate federal relief, which NYSAFAH has been advocating for with nonprofit and government partners nationwide. Int. 1912 is not a solution that benefits affordable housing in New York City.

Without question, there will be large swaths of tenants who are newly unable to pay all or part of their rent as a result of the ongoing emergency. NYSAFAH's members are communicating with their tenants regularly, encouraging them to discuss their situation so that payment agreements can be reached, concessions can be made, or voucher administrating agencies can be contacted if adjustments to subsidy vouchers are necessary.

Continuing to receive rent from tenants who are able pay the rent, because they are still working or because the enhanced unemployment benefits and stimulus funding allows

A-1814

them to, is critical. Payments continue to be required on the mortgage, insurance, utilities, taxes, payroll and, vitally important, the building service workers necessary to keep the buildings clean and maintained.

Unfortunately, statewide calls for rent strikes, including of tenants who are able to pay the rent, have been persistent and largely unchallenged. Those who voluntarily do not pay rent make it more difficult for building owners to assist and meet halfway those who have no choice. They make it more difficult to keep building staff paid.

Against this backdrop, Int. 1912 bars City sheriffs from restitution of property or money judgments until September for all, and April 2021 for those impacted by Covid-19, broadly and loosely defined. It is the serious concern of the affordable housing industry that this bill with further disincentive rent payment in an already extremely vulnerable part of the housing stock.

Many tenants are in an extremely vulnerable position, as well. This cannot be denied. There must be a solution that involves flexibility on the part of government housing agencies with respect to reserves and cash flow payments, leniency and openness by banks and lenders, and massive federal relief in the form of tenant vouchers and larger direct stimulus payments. All of these must work in concert. However, we fear that Int. 1912 will instead incentivize tenants to make the rational decision to wait things out until September 2020 or April 2021 and press their luck. The bill kicks the can down the road, but it is affordable housing and those that reside in it and maintain it that disproportionally suffer in the meantime.

Int. 1912 does not require showing rent burden, or that the enhanced Unemployment Insurance received was insufficient to pay the rent. NYSAFAH supported the State's eviction moratorium, calling for it prior to its enactment. Evictions are not the goal; they are massively traumatic for families. But moratoriums during the height of the crisis must eventually be matched by the relief that allows tenants to stay in homes and buildings to stay operational, safe, clean and staffed. Int. 1912 is not that solution.

**A-1815**

**Testimony of Kenneth Litwack**

*On Behalf of*

**The Marshals Association of the City of New York**

*Before the*

**New York City Council**
**Committees on Consumer Affairs and Business Licensing & Housing and Buildings**
**April 28, 2020**

*Regarding*

**Int. 1912-2020: Temporary Prohibition on Evictions and Money Judgments**


Good afternoon Chairmen Cornegy and Cohen and the rest of the committee members. I want to thank you for the opportunity to testify before you today.

My name is Kenneth Litwack and I serve as Special Counsel to the Marshals Association of the City of New York. I am here today to testify on behalf of the Association in opposition to Int. 1912.

In 1979, I was appointed Counsel and Inspector General to the New York City Sheriff after which, I became Director of the Marshals Bureau for the New York City Department of Investigation (DOI). This unit is responsible for regulating New York City Marshals pursuant to state law. Upon going into private practice, I became Counsel to the Marshals Association.

I want to state at the outset that Marshal's offices collectively employ 250 New Yorkers whose lives would be deeply impacted by long-term disruptions to their operations.

Our first objection to Int. 1912 is that the City Council does not have the jurisdiction or legal authority to enact such a measure. There is no statutory basis that would permit the City Council to terminate or restrain a Marshal or Sheriff's official functions. Marshals act pursuant to court orders which command them to act and are one part of a complex system where it is the duty of Judges to determine the special circumstances of a particular case.

Section 1609 (2) of the New York City Civil Court Act specifies that it is the Appellate Division, First and Second Departments which has the regulatory authority over Marshals. *See also Iorio v. City of New York, 96 Misc. 955, 410 NYS 2d 195 (1978).* A Marshal is an independent officer whose position was created by the State Legislature and whose powers and duties are prescribed by state statute. In addition to the Civil Court Act, Marshals and their powers are defined and regulated under section 105(s-1) of the New York State Civil Practice Law and Rules (CPLR), which also governs the enforcement of money judgements under Art. 52 and was extended in the recently-enacted state budget.

Furthermore, we believe that in addition to the state law that governs and regulates the Marshal's official duties, the issuance of Executive Order 202.8 by Governor Cuomo last month, clearly preempts any municipal ordinance regarding evictions as this type of action would indicate an intent by the City Council to occupy this field. Given the language and effect of Int. 1912 to restrict evictions and the execution of money judgments, we believe the proposed legislation is preempted by state law. I'll also

A-1816

point out that Executive Order 202.8 only prohibited eviction and eviction proceedings but was silent on the execution of money judgments.

Our next objection is that while we understand the intent of this legislation is to help those in need who have been negatively impacted by COVID-19, we believe the proposed legislation actually hurts this constituency. If the proposed legislation were enacted as written it would negatively impact Small Claims Court and a needy plaintiff's ability to enforce a money judgment. As a result of this legislation, plaintiffs would have no way of recovering money they are legally entitled to which adds insult to injury during these trying times. New York City Marshals enforce approximately 2,000 – 2,500 money judgments in Small Claims Court per year.

It is also imperative that the Council considers the budget implications of this bill. We are a key part of an approximate $80 million in revenue that the City collects in judgments every year on parking, speed and red light camera violations as well as Environmental Control Board (ECB) violations. This is a significant source of annual revenue for the City of New York and is needed more than ever as the city's budget deficit continues to expand. Furthermore, the money judgments Marshals execute in these categories serve as a deterrent to this type of behavior and furthers the goals of the City's safety programs like Vision Zero.

Putting aside the objections I have laid out in my testimony, I'd like to conclude by providing the Council with some history of how evictions have been halted during previous crisis in New York City. For example, after the terrorist attacks on 9/11, we worked closely with the City to halt evictions, particularly in Lower Manhattan, for an extended period of time. After the devasting damage done by Hurricane Sandy, Marshals halted evictions in various parts of the city including the Rockaways. The court-ordered judgments and evictions are complex and any disruption will have a myriad of consequences. We need to be measured and thoughtful on how to approach these subjects during the COVID-19 crisis just as we have done in the past.

We look forward to working with the Council on this issue and I am happy to answer any questions you may have.

A-1817

**Testimony of New Economy Project**
**Before the NYC Council's Committee on Consumer Affairs and Business Licensing**
Delivered by Andy Morrison, Campaigns Director
April 28, 2020

Thank you, Committee Chair Cohen and members of the Committee, for the opportunity to testify today. My name is Andy Morrison and I am the Campaigns Director at New Economy Project, an economic justice organization that works with community groups and low-income New Yorkers throughout New York City. New Economy Project's mission is to build a just economy, based on cooperation, racial, economic, and gender justice, and ecological sustainability.

Since our organization's founding in 1995, we have worked with hundreds of grassroots groups to challenge Wall Street banks and other corporations that harm New Yorkers and perpetuate poverty, inequality, and segregation. We also work with groups to build democratically-structured and community-controlled initiatives, including community land trusts and mutual housing, worker and financial co-ops, public banks, and more.

New Economy Project strongly supports Int. 1912 and we urge the Committee to bring the bill before the full body of the NYC Council, for the swiftest possible passage into law. We commend Speaker Johnson and other sponsors of this emergency legislation for their strong leadership. New Economy Project, along with thousands of New Yorkers and more than 60 groups statewide, has been pressing Governor Cuomo to institute an emergency statewide moratorium on predatory debt collection during the COVID-19 crisis. We are pleased that in the absence of state-level action, members of the NYC Council are taking this critical step to protect New Yorkers.

For the past 15 years, New Economy Project has run a free legal hotline for low-income New Yorkers. We have heard from thousands of New Yorkers harmed by discriminatory and abusive debt collection lawsuits. Since COVID-19 gripped New York City last month, our hotline has been flooded with a new spate of calls from low-income New Yorkers who are being hounded by debt collectors using judgments to freeze people's bank accounts and garnish their wages.

As has been well-documented, the debt collection industry is rife with bottom-feeding companies in the business of buying old, alleged debts on the cheap, then using our courts to pry away as much money as they can from low-income New Yorkers. The rapacious debt buyers that file these lawsuits are notorious for using deceptive and fraudulent practices to obtain automatic, or "default," judgments against thousands of New Yorkers, which they then use to freeze people's bank accounts or garnish their wages.

A-1818

Amid the COVID-19 pandemic, predatory debt collection, which siphons wealth from and destabilizes so many low-income communities and communities of color throughout the City, has morphed into an urgent public health crisis. We must be clear: No New Yorker should find themselves blocked from their funds, unable to buy food, medicine or other necessities, because of a debt collection judgment.

New Economy Project urges the NYC Council to pass Int. 1912 immediately. We would recommend that the NYC Council follow up with a bill that strengthens the second part of Int. 1912, which would extend the moratorium until the second suspension date. Specifically, this follow-up legislation should:

- Require the NYC sheriff and marshals to:
  - Provide written notice to New Yorkers, at least 30 days in advance of any judgment enforcement, of their right to show that they qualify for this extended moratorium and the steps they should take to make such a showing; and
  - Provide this notice to New Yorkers at an address verified as a valid address by the person's bank or employer or other third party not acting as an agent of the judgment creditor;
- Empower the NYC Department of Consumer and Worker Protection to adopt emergency implementing regulations, in order to ensure compliance with these provisions;
- Explicitly allow New Yorkers to make the showing of proof required by section 3(a)(3) via a sworn detailed affidavit, without more; and
- Add a catch-all "other" provision that allows New Yorkers to offer their own explanation as to why they qualify for the extended moratorium.

Predatory debt collection is a vivid example of the profound racial and economic inequities that underlie the urgent public health and safety concerns we are now dealing with. Department of Health and Mental Hygiene data show a disproportionate concentration of COVID-19 cases in neighborhoods of color, home to so many frontline workers who are putting themselves at risk to keep our city running. These neighborhoods already face severe health and economic disparities. They are also the communities from which debt buyers systematically extract wealth, where calls from abusive debt collectors are part of everyday life.

New York City needs to take this action to ensure economic and racial justice, and community equity. As debt collectors continue callously to take people's money during COVID-19, they are further endangering low-wage service workers, elderly and disabled New Yorkers, and others who are at higher risk of severe illness from COVID-19.

Many of these New Yorkers are speaking out and sharing their stories, underscoring the need for bold actions to stop debt collection in New York City:

*"I just found out that my paycheck was garnished. I don't know what it's for. I can't afford to have any money taken away right now. My two daughters and two grandchildren live with me. I'm trying to support my family, but everything is uncertain. My job has cut the number of days that I go into work for safety reasons. One of my daughters lost her job because of coronavirus. This money that was taken from me could have gone toward a lot of other things that I'm worried about right now, like food, disinfecting supplies, and other things I need to keep my family healthy. I am overwhelmed trying to work and make sure my family is safe."* - Veronica, Brooklyn

*"I used to be homeless. Now I work as a home health aide and live in affordable housing I got through a lottery. A marshal started garnishing my paycheck in January. I found out it's for a really old judgment, but I never got court papers. I'm also a victim of identity theft, so I don't think this is even my debt. I went to court to try to stop the wage garnishment, but the court postponed my court date to March, and then again to June, because of coronavirus. The whole time the marshal kept garnishing my wages. I'm worried I'll have to go back to a shelter because of all this."* - Migdalia, Brooklyn

*"I work for the city finding emergency housing for fire victims. I just found out that 10% of my paycheck was garnished. Now I don't know if I'll be able to stock up on the insulin my son needs. He has Type 1 diabetes. I've also been delivering groceries to my mother, who lives close by. About a month ago I got a marshal's notice saying my wages would be garnished. I was about to go to court to try to stop it, but with COVID-19 hitting the city so hard, I decided I should stay at home for the sake of my family's health. I already live paycheck to paycheck, so if this garnishment goes on, taking care of my family during this crisis will be incredibly hard."* -Grace, Queens

*"I was laid off because of COVID-19. Then my family tried to get groceries and I found out my debit card wouldn't work. I checked my bank account and it was thousands of dollars overdrawn. I thought I'd been scammed. I spent hours on the phone with my bank trying to find out what happened. Finally they told me there was a judgment against me for a credit card from a few years ago. That's when my husband, who's disabled, was going through severe health issues. I have zero funds. I have no money. I'm at the breaking point."* - Veronica, The Bronx

*"I'm a single mother. I have three kids. My bank accounts were frozen in March. I found out it's for an old judgment that the city got against me. I never got court papers and I have no idea what the judgment is for. I found out that the city's lawyers don't even have my correct address. I had no money to pay my bills or prepare my family for this crisis,*

*but the lawyers said they wouldn't release my bank accounts unless I signed something saying I owe the debt."* - Jilliann, The Bronx

*"I went to buy toilet paper and other supplies early in the morning, when the supermarket was just open for seniors, but my debit card wouldn't work. Then I found out my account was frozen because of a credit card judgment. That account is where I get my Social Security disability benefits. I'm 61 and I have congenital heart failure, so I've been trying to stay home. I also live with my mom, who's 81, and I'm afraid of her getting sick. But I had to go to the post office to send a letter to the debt collectors. They just called me, and they didn't seem to care that I only get Social Security. They just kept asking how I'm going to pay."* - G.W., Manhattan

*"In March I found out a debt collector had frozen my bank accounts. I've never even heard of this debt collector. This is all the money I have in the world as I'm currently out of work due to the pandemic. I'm a substitute teacher, and with schools likely closed until the fall, I won't have any income for the next few months. Now I don't have enough money for rent. I also worry that my stimulus check will be directly deposited into my frozen accounts and not accessible. I need that money for urgent necessities like rent, food, and supplies for my family. I tried to find out how the direct deposit could be switched to paper check via mail but I couldn't locate that info, and the IRS website says do not call. This situation has put a terrible pressure on me and on my family. On top of all this, last week I was laid low with coronavirus-like symptoms, so I'm trying to rest and isolate myself."* - Robert, Queens

*"About six years ago I developed multiple autoimmune disorders which began to worsen. I had to stop working and have been forced to rely on family support. In March I received court papers for a credit card I had to stop paying six years ago. Battling three autoimmune disorders and multiple immune conditions puts me at very high risk for COVID-19. Going to court would put me in grave danger, but I'm panicked that the credit card company will get a judgment against me if I don't make the trip to court."* - L.H., Manhattan

*"I am a healthcare worker. I commute over two hours each way from my home in the Bronx to a clinic in Brooklyn, where I work 10-hour shifts. I am a single mother and the sole provider for my family. In the middle of March I got court papers in the mail saying I was being sued for a credit card I had been trying to pay off. I'm stressed out wondering if I'm supposed to miss work to go to court to answer this lawsuit right now. With this crisis, I need to prioritize caring for people at my clinic and making sure my family stays healthy. I'm worried that the court will say I owe this money if I don't fight*

A-1821

*back, but I'm also worried about risking my health and the health of my loved ones."* - Olga, The Bronx

These are just a few examples that underscore the pressing need for action to halt debt collection in New York City. We urge the Committee to move Int. 1912 forward so that the Council can pass this desperately-needed bill into law right away.

Thank you.

A-1822



### THE BUILDING OWNERS AND MANAGERS ASSOCIATION OF GREATER NEW YORK'S TESTIMONY ON INT. NO. 1912, A LOCAL LAW IN RELATION TO CEASING THE TAKING AND RESTITUTION OF PROPERTY AND THE EXECUTION OF MONEY JUDGMENTS BY THE CITY SHERIFF AND MARSHALS DUE TO THE IMPACTS OF COVID-19

The Building Owners and Managers Association of Greater New York (BOMA New York) appreciates this opportunity to submit the below comments for the record. BOMA New York represents more than 750 property owners, managers, and building professionals who own or manage 400 million square feet of commercial space in New York City. We are an association within BOMA International, a federation of 90 US associations and 19 international affiliates that own and operate approximately 10.5 billion square feet of office space in the United States.

This bill is part of a packet of potential legislation that purports to add various protections for different groups who have or will be impacted by COVID-19 and the pandemic it has created. Although we appreciate the City Council's desires to help the City mend when this health crisis is mitigated or over, we feel that this and the other bills was rushed out without proper consultation with various stakeholders, including the commercial real estate community, and will undoubtedly cause significant obstacles to recovery.

Commercial real estate has been devastated by the COVID-19 outbreak. In the face of these challenges, our critical employees have worked diligently to keep buildings up and operational and open, even if most tenants have elected or been told to stay away. With spaces empty and with many tenants suffering unprecedented losses, commercial real estate has not been spared. The cost of keeping buildings open is significant, and those costs will only escalate as our tenants return in the new COVID-19 world, where a wide range of public health safety practices will need to be implemented in buildings that will impact budgetary bottom lines as well as create significant operational challenges.

Given never-before-seen nature of the impacts of this virus on New York City and its economy, it's critical that we find the right responses that help everyone get back up and running, and that do not create barriers and unforeseen consequences that hinder recovery. This bill, which would grant virtual immunity from eviction and other penalties to almost all tenants for up to (and possibly beyond) a year, is not the right solution.

At a time when the economy is disrupted and there is virtually no new lease signing, it is in no one's interest to evict, or have evicted, existing tenants in commercial buildings. That is why

A-1823

building owners and managers are negotiating and working with tenants to find practical solutions to short-term financial issues to make sure tenants can stay. This bill would likely take many tenants out of those negotiations, as they could rely on blanket immunity to protect them. A year of no rent would destroy the real estate industry and take away their important tax revenues from the City. It would also lead to workers in commercial buildings losing their jobs.

Furthermore, many of the tenants we are negotiating with are large and sophisticated retail companies, law firms, hedge funds, and other such companies that do not need the protections this bill would offer to a very wide range of tenants. Again, the City intervening here will only raise obstacles to finding solutions that will cost everyone time and money.

One Penn Plaza, Suite 2205 . New York, New York 10119 . Phone: (212) 239-3662 . EFax: (646) 706-0503 . Website: www.bomany.org

A-1824

77 Sands Street
Brooklyn, NY 11201
randolphbeer.com
@randolphbeer



April 26th, 2020

**<u>VIA ELECTORNIC DELIVERY</u>**

NYC Council Speaker Corey Johnson
City Hall Office
New York, NY 10007

**RE:** Proposed COVID-19 Relief Bill, Protecting NYC Small Businesses

Dear Speaker Johnson,

First, I want to thank you and the rest of the Council, on behalf of my company and myself personally, for the COVID-19 relief bill being proposed. While the purpose of this letter is to emphasize the importance of a specific small business protective measure under consideration, as a 20-year New Yorker I could not be more enthusiastically in support of what the Council is proposing in all aspects.

I am currently raising a family in Brooklyn, where I have lived for the past 10 years after spending 10 prior in Manhattan. My parents were from the Bronx and Queens and I am here for the long haul. My partners and I started our restaurant business on Broome Street over 15 years ago with 4 employees and a small bar/cafe. Today we have 3 full-service restaurants (2 with small breweries) and 80 employees (pre-crisis) who are all NYC residents. We have been an owner-operated, DIY company since the beginning and we have survived throughout the years by catering to locals. 2020 was set up to be our biggest year ever in hiring and growth as we just signed a new lease for a 4th location in January, which at this point is untenable and a tremendous stress unfortunately. While our future is uncertain in this moment, we are reassured by the fact that our local government understands what we are dealing with and has the courage and resolve to act in support of businesses like ours.

Regarding the small business protective measures under consideration, the suspension of commercial lease guaranties in COVID-19 impacted situations is, by far, the one that gives me the most comfort as I lie awake every night thinking about how my company and family will survive the crisis. I believe this measure is a profoundly fair solution to a problem in which both tenants and landlords equally share no fault yet also equally cannot escape. In support of this proposal, I want to share with you how this measure would mean the difference between survival and bankruptcy for my small business specifically, a tried and true NYC restaurant company.

We guarantee leases through a holding company, owned by founders and employees, whose assets include 100% of our restaurant businesses and which also serves as our company's centralized employer. In the case of our most recent lease, for which the project has not yet started, the depletion funds to cover COVID-19 losses has made moving forward a guaranteed path to insolvency. We informed the landlord about this and attempted to negotiate, explaining that both parties are better off if we remain solvent. The landlord prefers to simply wait since our holding company has guaranteed the lease (full 15-year term), and therefore all of our existing restaurants are on the hook indirectly. Should we secure financial relief or start to recoup losses after we can open, this landlord's recovery potential and leverage will grow. We are paralyzed and forced to consider starting a project we cannot fund and spending ourselves into insolvency as a preferable strategic option to waiting for the landlord to force us into bankruptcy as we begin to recover from the crisis.

A-1825

77 Sands Street
Brooklyn, NY 11201
randolphbeer.com
@randolphbeer



Landlords and tenants, and everyone else, knows that economic circumstances have changed in a dramatic fashion, and at a speed, never before seen in our lifetime.  Small business owners have had no choice but to accept these circumstances in real time, reset their expectations and either throw the towel in or begin to make the sacrifices necessary to survive.  We now desperately need our landlords to acknowledge these same circumstances and either negotiate with us accordingly or allow us to accept a calculable loss and move on.  Suspending guarantees is the only way to force this fair and earnest negation, based on the market conditions of today.  It is absolutely essential to the survival of small businesses in our city.

Finally, I am reminded, as many have been, about hurricane Sandy and the fears we faced then.  Compared to COVID-19 Sandy somehow feels small, but it was still devastating.  We were a smaller and younger company with just one restaurant during Sandy.  We were shut down, broke and unsure when, or if, we'd be able to re-open.  We made the decision to drive upstate and borrow a family member's gas-powered generator and charcoal grill.  We opened our downtown restaurant for the community and offered free food, coffee and beer.  We used plug-in, string lights and candles and cooked with a grill on the sidewalk.  We became the only place open for blocks and drew our neighbors to us.  Our make-shift operation lasted for about 2 days before we ran out of gas for the generator.  Despite offering everything for free, our neighbors insisted that we accept payment.  The whole experience became our company's most defining moment.  We went from a new and unknown spot to a neighborhood institution.  Our significance in the community was instantly solidified and we built friendships and loyalties that we still enjoy today.  We're not yet exactly sure how, but we think this crisis presents the same type of defining opportunity for our company, and our industry.  What the Council is currently proposing will help us all get form where we are now to that moment and for that we are beyond grateful.

If there is anything we can do to assist in this matter, please do not hesitate to contact me.

Sincerely,

Dave Plate
CEO, Randolph Beer
dave@randolphbeer.com
646-242-3496

A-1826

77 Sands Street
Brooklyn, NY 11201
randolphbeer.com
@randolphbeer











A-1827

# Virus relief package... NO

Good morning.  I am a resident of Chelsea and a small business owner.  I am reading about the proposed virus relief package, and when I read it I think that the council is out of touch with the reality of nyc life.  I live in a small coop building that has retail stores.

## The tenant protections in the legislation would bar marshals and sheriffs from collecting debts or performing evictions for residential or commercial tenants affected by the virus until next April and give renters more time to repay their rent

Our coop is made up of 10 families, and we rely on the rent from the commercial stores that we have.  We are obviously willing to share the burden of this virus with them, but we cannot possibly go until next April before collecting any rent.  All you would be doing is transferring the loss from them to us.  Who helps us out?  Maybe you should work to have NYC lower the property taxes of every building that forgives rent.

Everyone thinks that all landlords are these cash rich corporate entities, but that is certainly not the case in NYC.  As I mentioned, I am a small business owner who has been severely impacted by this.  On top of that, you want me to bail out other businesses?

John J. Kennedy, CDMM®

JK Daily Money Management LLC

646-924-5605

johnk@jkmoneymgmt.com

www.jkmoneymgmt.com



A-1828



A-1829

In support of your COVID-19 bill for commercial tenant relief

Dear Speaker Johnson,

I'm a small business owner in your district (I opened a new food hall called The Deco Food + Drink at 231 W. 39th St. in the Garment District in December 2019), and I'm writing to express my strong support for the bill that you recently introduced to the City Council to nullify personal liability provisions in commercial leases like mine (including in the good guy guaranty, which I have in my lease) where the commercial tenant was impacted by COVID-19.

In my case, we shut down the food hall on March 17, 2020 in response to NYS and NYC government orders. I very much hope to re-open the food hall when the COVID dust settles, but uncertainty about my rent obligations is a huge barrier to my business's ability to survive. If passed, your bill would have a significant positive effect on leveling the playing field between commercial tenants and our landlords when the time comes to renegotiate our leases (which will absolutely need to happen in the majority of cases for hospitality business owners -- otherwise, a large swath of us will go out of business for sure).

Thank you for what you're doing to persuade your fellow council members of the critical importance of this bill. I very much hope that the council votes to enact your proposal.

Sincerely,

Doris

--

Doris Huang

Owner, The Deco Food + Drink

doris@thedeconewyork.com

650-283-8884

A-1830

Covid19 Legislative Relief Package / I am a friend and Nieghbor of Stefan Campbell

Dear Mr. Johnson,

I SUPPORT THIS PACKAGE.

You are doing a fantastic job for us hard working citizens. As a restaurateur this is more important than EVER.

Thank you for all that you do.

Good luck Wednesday and be well,
Judi Wong


cafecluny.com
theodeonrestaurant.com
cafeluxembourg.com

A-1831

As a small landlord with a family owned building I am shocked to see some of the proposals being used to "protect" rights of certain groups.   As our governor has said many times, we are ALL in this together and this is no time to politicize the issue.   As the mayor and many council members seek to use this pandemic as a means to solidify their base and secure "favors" from the electorate in order to get elected, they are using very short sited plans to do this.   Putting in place programs that allow tenants to withhold and potentially walk away for rents for 12 months does nothing to help the city's situation.   Small landlords do not have unlimited supply of working capital to keep buildings running up to the City's high standards.   Compliance with all the regulations that were in effect prior the pandemic plus requirement to continue operating without any income to provide necessary updates will cause major defaults/bankruptcies.   If the City's plan is to have landlords walk away from their buildings so that the city can take over and resell at a later date for a profit , then go ahead and pass the bills.   Otherwise the city itself will reap the pain of the bills it passes today as a "landlord" for all these buildings.   It simply provides you with a city full of people who will make the same demands of you that they make of us. And without the rents , the City will not be able to make any improvements and we will have 5 boroughs of "NYCHA" apartments-no heat, no service, etc.

Landlords want to be part of the solution and there has to be a middle ground where we can work with those tenants that can't pay and those that can.   We are not the bad guys here.


guillermo garcia

tgcllc@yahoo.com

A-1832

Proposed regulations

I wanted to reach out in support of several of the city councils' proposed new policies aimed at supporting small businesses in New York City.

I am a small business owner and operator in the West Village, with a casual cafe called Village Den. Although a successful eatery, our margins are thin as are all restaurants, especially with New York commercial rents.

I stand strongly in favor of your proposed bill to provide relief to commercial renters in the form of pausing evictions and debt collections for both residential and commercial properties until April 2021.

I also strongly stand in favor of your proposed bill that will suspend personal liability provisions in commercial leases.

I lastly appreciate your proposal to waive annual sidewalk fees.

Please let me know if my voice can be of any help in this moving forward.

Best Regards,

Lisle Richards
Owner
Village Den
[lisle@themetric.com]

A-1833

Tax Relief along with eviction moratorium!

Dear Council Speaker Corey Johnson,

I am writing about the proposed new eviction law  that the New York City Council is currently considering- a new local law that will declare a moratorium on evictions until April 2021, a move instigated by the pandemic.

While this addresses a problem that is real and for which this law represents a humanitarian solution it will set into motion a humanitarian disaster for building owners who will be destroyed by not being able to pay their real estate taxes if a tenant is paying no rent and no tax relief for the building owner is forthcoming.

Those of us building owners paying dizzying real estate taxes will be out of our homes in desperation. For example: the many coops in Soho who rely on our ground floor tenant's rent to pay our taxes. I am the president of just such a building. Our tenants simply cannot cover the taxes by a long stretch given how high those taxes are currently with no rental income for many months under this law <u>as it is written</u>.

Our commercial tenant is part of an ecosystem that includes us as well.  Tenants and building owners both need relief if the humanitarian aim of this law will work.

Please rewrite the proposed eviction law to include a tax freeze for building owners.

Sincerely,
Sarah Walker
Board President
138 Prince Street
NY, NY 10012
917-270-5775

A-1834

COVID-19 Relief Package

David McGoldrick
Partner and Manager
Marjen & Family LLC and Marmelade LLC
124 East 72nd Street
New York, NY 10021

Dear Council Members,

First, I hope that you are doing well and staying healthy. Obviously, these are very trying times and the safety of our families and communities is of paramount importance.

I am writing to express my concern over proposals that are being considered by the City Council to protect New York City tenants during this crisis. Let me say that my family and I have been landlords in New York since the 1940s, and I think a survey of our tenants would confirm that we have always been diligent and responsive to them and their needs, but now I AM WORRIED ABOUT LOSING OUR BUILDINGS!

Obviously, there's so much trouble going around right now that there is plenty to share, and we are willing to do our part to keep our city safe and successful, but I do not think that the proposals being considered by the City Council will achieve that objective. In fact, they will, by virtue of human nature, do just the opposite. Both residential and commercial tenants are practically being encouraged to withhold their rents and eventually to walk away from their leases when grace periods expire. It simply cannot be so one-sided. The City Council must take into account the health and financial well-being of both landlords and tenants in crafting legislation. As it is now, it seems as if landlords are slated to be the city's safety net, with no discussion of how landlords are supposed to keep up with taxes, insurance, utilities, maintenance and so on, to provide the services that keep tenants safe and secure.

If this sort of legislation passes, building owners will essentially have no way to enforce the collection of rent from anyone claiming, without any evidence, to have been negatively impacted by the COVID-19 crisis. While it is understandable that there is concern for tenants, this sort of sweeping mandate will be devastating for owners. Any relief and protection for tenants must be coupled with the same for landlords, whether that entails measures to abate or delay collection of property taxes or many of the other bills that owners must pay, and to make it incumbent on tenants to show that they are unable to pay their rent due to COVID-19, and to make arrangements for them to catch up when the economic situation improves. If owners aren't extended commensurate relief then the outlook for the residential housing stock will be bleak indeed: tax defaults, mortgage defaults, reduced or non-existent maintenance, and the exposure of landlords to predatory lenders and buyers; people and entities who do not have the same devotion to fair play and the responsibilities that tenants and landlords must share.

A-1835

I know it's not easy to come up with a comprehensive plan, but you must not implement a shoot from the hip solution that ignores the complexity of the existing system and instead imposes a draconian and unsustainable burden on just one group of stakeholders.

Thank you for your time. Be well.

Sincerely,

David McGoldrick
david@1919films.com

A-1836

Case 1:20-cv-05301-RA    Document 38-42    Filed 08/12/20    Page 39 of 108

Stop trying to punish business and property owners. These stories are insane and reflect how out of touch leftists and leftist politicians are with reality. I'm convinced you're all traitors trying to destroy the city and country as a whole. Also shutting down evictions and making it seem it's ok to not pat rent is also insane and irresponsible. You're turning this city into a cesspool.

https://therealdeal.com/2020/04/24/grocers-well-shut-down-if-city-council-mandates-rona-bonus/

https://ny.eater.com/2020/4/22/21231018/nyc-restaurant-coronavirus-city-council-legislation

*Sent from phone*

David Brotsky
212.863.9665
https://davidbrotsky.com
Location and Production Services
Licensed Real Estate Professional

virus relier package

To Whom It May Concern,

I, like most of my colleagues in the bar and restaurant industry, are obviously watching the proceedings of the City Council with bated breath. I'd like to offer an individual case for your consideration - mine - hoping it might shed just a little more light on the situation. My tavern, The Ginger Man, opened in 1996 and has been a midtown Manhattan (36th Street) favorite since then, especially with the craft beer movement community. We have run fundraisers for environmental causes, disaster relief efforts, and have worked closely with our neighborhood and local police department. For our employees, hundreds since we opened, we make sure that their workplace is friendly, fair, and safe. No employee, or vendor, or government agency has had invoices go unpaid, or even had to wait for payment, in our near quarter of a century of doing business. Seems unlikely, I know, but this is a matter of record. After 20 years of wonderful New York business and experiences our lease expired 5 years ago and we found ourselves, coincidentally, with a new owner of our space. This new landlord, only occasionally in New York, rewarded us for our efforts with a doubling of our rent - far in excess of what our neighbors were paying, and when I complained he responded by putting the condo common charges *on top of* the 100% increase. *Our* business life changed overnight, and what was a pleasure for all became difficult, but we pressed on. However, he wasn't done with us - he demanded a personal guarantee, defined and qualified by a Good Guy Guarantee. This guarantee, as you know, came into being in NYC to add some measure of sanity to PG's - LL's could have their guarantee, and tenants could have a way out; standard clauses have a 3 month notice of intent to close, forfeit of all security deposits, and a handover of the keys. If the tenant was current in rent, he could walk away. Not so with my LL - he devised a milestone formula - I could only give notice, with *six* months notice, only every two years. He gave me no choice but to sign on to these terms. Regarding the PG formula, I thought the likelihood of major catastrophe happening exactly when when one of those 2 year opportunities passed was was far fetched, and that I wouldn't have to worry about it. The last window was this past January. So, with my nearly $55,000 rent I am looking at financial ruin if he were successful in enforcing the PG for another 2 years. Aside from being patently unfair and bad for business in the city, the logic is lacking - if the space in question (11 E36th St) was rentable at $55,000 a month, why would any LL need to have more than 5 months security to do so (my 2 month's security deposit + the 3 months of notice)? In this scenario, he is demanding 2 years.
I hope the City Council moves to remove these onerous PG's, and also to provide necessary rent relief for our industry.

Thank you.

Sincerely,

Robert Precious
bptgm1@gmail.com

A-1838

Ümit Yolcu

Good afternoon Mr. speaker, I'm pleased to see you and the council taking a much needed initiative in providing assistance to essential workers, as many of us across the city have had our hours cut in response to the ongoing situation. I feel it would be very beneficial to a lot of struggling individuals and families working through this pandemic to keep our great city running as best we can, and the added bonuses would mean a world of difference in providing financially for our loved ones. Im sure the great members of our council will get this passed without delay, and im writing to you today to request that upon passage it also be applied to all essential workers retroactively, dating back to the beginning of the shutdown, when we all as a city began to feel the impacts of COVID across many areas of life. I appreciate you taking the time to read this and will look forward to seeing you all take the needed steps to protect our essential employees in these times of uncertainty.

Best regards,

Ümit Yolcu

A-1839

Commercial rents

On commercial leases for stores that the store owner gave personal guarantees. All small business owners make their dream their small business , they'll do most anything to go into business including giving their personal guarantee putting themselves and their family into catastrophic ruin.

Please outlaw any such practice,  especially in this time of virus.
Also taxi medallion owners whose medallion has collapsed,  have lost everything, they also should be treated equally.

MICHAEL SIMON <nycmls@aol.com>

A-1840

Commercial rent help for small business

My family has a small business.  The measures you have proposed with regard to tenants having large commercial rents would be very helpful to us and may have the effect of saving our business.

Thank you.  I hope you are successful in this effort.

Margie Katz

<margie.katz@icloud.com>

## Small business owner in FiDi received notice of default

I am writing to you to pass along information that is pertinent to the proposed new legislation.  I have owned and operated a small business in NYC for 20 years and am currently located in the financial district.  I have been at that location for over 5 years and have a 10 year lease.

We have struggled to stay afloat but have managed to remain current with all of our vendors and our landlord through March of this year. We are in the entertainment business on the production side and have no way to produce revenue during this health crisis.

I received a "Default Notice" on Monday, April 20 with a 5 day cure.  There is no $ to pay the balance of my April rent.

It certainly seems extreme to receive a "Default Notice" already especially since I was current through March, but our landlord, Moinian, is obviously taking a very aggressive stance.

I felt you should have this information from another small business owner.

Sincerely,

**David Baker**
**ENDEAVOR** studios
endeavorstudios.com
212-645-2641
90 John Street
Suite 301
NYC 10038
Fulton St. Subway Station
**2,3,**4,5**,A,C,J,Z** Trains



A-1842

Hello Mr. Reynoso and Mr. Johnson
As a resident of Greenpoint, I am writing to you in support of several options being discussed at today's meeting. They include the following:

Pushing for Open Streets- the proposed 75 miles is a bare minimum for a city of 8.5 million and over 6000 miles of roads- I urge you to push for many times that number- perhaps 10% of roads could be closed, at 600 miles, giving millions of New Yorkers safe space to breath and be outside- as well as creating safe zones for essential workers to move about the city and avoid and heavily overcrowded subways. This could work to open up bike lanes, as well as bus only lanes- again reducing subway use.

Rent/eviction freeze- Please support the rent/eviction freeze, as New Yorkers need to be able to continue living in their homes safely and without the worry of becoming homeless- particularly in a crisis. We already have tens of thousands of homeless, each of whom should be given a guaranteed apartment- there are thousands if not tens of thousands of empty apartments across the city-USE YOU MASSIVE AUTHORITY as the City Council to force these apartments to be rented out to those who need them. You have the power- USE IT.

Essential worker benefits- as the first city in the US to offer full medical coverage, you must make this process instantaneous and paperwork free- while also heavily promoting it to all New Yorkers. All workers, not just essential workers, need a job and payment guarantee, with special attention paid to those keeping us all alive- food workers, hospital staff, etc. We must make it as safe as possible for them to continue supporting all of us- see the above comments as well.

The above are a good starting point. As the wealthiest city in the US, and one of the wealthiest in the world, I expect to see you support ALL New Yorkers through this crisis and beyond, guaranteeing us a decent quality of life no matter what.

Thank you, and I look forward to watching what you do,
Cameron Shore
--
Cameron Shore
*M.Arch, CCNY 2017*
<cameronbshore@gmail.com>



Advancing research and debate
on housing, neighborhoods,
and urban policy

School of Law
Wagner School of Public Service

**Written Testimony of Matthew Murphy, Executive Director, NYU Furman Center
to the New York City Council**

**Joint Hearing of the Committee on Housing and Buildings and
Committee on Consumer Affairs and Business Licensing**

April 28, 2020

On behalf of the NYU Furman Center, thank you for the opportunity to submit testimony on
**Int. No. 1912 - Ceasing the taking and restitution of property and the execution of money
judgments by the city sheriff and marshals due to the impacts of COVID-19.** My name is
Matthew Murphy and I am the Executive Director of the NYU Furman Center. We appreciate
today's hearing on COVID-19 Relief, and the Council's consideration of the significant housing
challenges faced by New Yorkers as a result of the pandemic's economic impacts.

The NYU Furman Center advances research and debate on housing, neighborhoods, and urban
policy. This includes preparing essential data and analysis that helps policymakers, community
organizations, and many others to examine pressing policy issues. The New York City Council
funds the NYU Furman Center to provide data for the real estate and affordable housing
community in New York City. As a provider of information on housing issues, we submit some
of our recent data on eviction filings trends to assist in understanding and quantifying issues
related to today's hearing.

We recently completed extensive data analysis of eviction filing trends from 2010-2019. The
complete findings will be released in June with our annual *State of New York City's Housing and
Neighborhoods* report. Given the critical timing of today's hearing topic, however, we would like
to highlight a few findings for the Council. We hope that this information can assist the
Council's deliberations by establishing a baseline for eviction filing trends prior to the pandemic,
highlighting disparities in eviction filings between communities, and shedding light on the
demographics of areas with the highest eviction filing rates.

Using administrative data from the New York State Office of Court Administration, we analyzed
all private eviction filings in New York City housing courts from 2010 to the present. In addition
to analyzing summary statistics, we were able to examine filing patterns and demographic
correlations at the ZIP Code level. To help inform Council, we provide some key findings on the
scale of eviction filings in New York City:

- In 2019, there were 139,615 filings, down almost 17% from 2018. Citywide, the number
  of eviction filings initiated decreased between 2010 and 2019.
- The risk of eviction is not equally distributed across communities. Areas of the city with
  lower incomes and larger Black and Hispanic populations had some of the highest
  eviction filing rates.

**NYU Furman Center**

Advancing research and debate
on housing, neighborhoods,
and urban policy

School of Law
Wagner School of Public Service

- The vast majority of eviction cases are related to non-payment of rent. The median amount sought in non-payment cases for 2020 (prior to the moratorium) was around $3,000.
- Based on the previous 4-year average, we estimate that there would typically have been around 27,000 eviction filings in March and April 2020, and another 13,000 filings in May.

While this analysis cannot nor does not predict future filing trends, it is our hope that it helps contextualize the issues you will discuss and debate.

Additionally, we would also like to provide findings from an analysis that we completed in March 2020 that examined the professions most vulnerable to job loss during the COVID-19 pandemic. We conducted this analysis to help inform understanding about the workers who may be at risk for non-payment of rent. We found the following:

- Out of almost 3.2 million households in New York City, almost 1,032,000 (totaling nearly 3.5 million people) had at least one household member that worked in an occupation vulnerable to job loss, and that person earned about 67 percent of the total income for the household.
- Lower income workers are significantly more likely to rely on employment income from jobs that are prone to job loss.
- The majority of households with at least one member working in a vulnerable occupation and income under $150,000 were renters.

Thank you again for the opportunity to submit this testimony and the attached appendix. We hope that this information is helpful and would be happy to provide any additional housing data or analysis to the Council.

A-1845

**Appendix 1**

**NYU Furman Center Written Testimony to the New York City Council**
**April 28, 2020**



Sources: New York State Office of Court Administration's Universal Case Management
System, NYU Furman Center

A-1846

**Appendix 1**

**NYU Furman Center Written Testimony to the New York City Council April 28, 2020**



Sources: New York State Office of Court Administration's Universal Case Management System, NYU Furman Center

A-1847

Pending legislation on tenant protections

Speaker Johnson,

Some tenants are concerned about landlords tacking on fines for late payment of rents which may be written into lease riders. When considering legislation to protect renters who are unable to pay rents now, I suggest that a ban be explicitly included to prevent this from happening. Thanks.

Rosalie Grossman
151 W. 16th St.
mailto:rggrossmandsw@gmail.com

A-1848



April 28, 2020

Dear Chair Cohen and Members of the Committee on Consumer Affairs & Business Licensing:

United for Small Business NYC ("USBnyc") is a coalition of community organizations across New York City fighting to protect small businesses and non-residential tenants from the threat of displacement, with a focus on owner-operated, minority-run businesses that serve low-income and minority communities. The threat of displacement to New York City's small businesses and non-profits has been exacerbated by the COVID-19 crisis.

Our members and clients (small businesses, sole proprietorships, cooperatives, street vendors, and non-profits who provide goods and services to the public) are seeing a catastrophic drop in income, up to 100 percent. Because of this, we need swift action to protect small businesses and non-residential tenants from displacement and closure. We applaud the relief package introduced by Speaker Corey Johnson and Members of the Council, including one bill before this committee: Intro 1912-2020.

The extensions proposed by Intro 1912 of the current eviction moratorium address a growing concern of small businesses regarding their ability to continue occupying their commercial spaces due to the economic devastation caused by the coronavirus pandemic. While this policy offers some relief for small businesses attempting to survive through this crisis, the relief is only temporary. Without further legislation or government action, once the moratorium is over, small businesses will be liable for back rent owed during the periods they were closed due to the virus with no projection that their revenues will be restored to pre-pandemic levels, let alone increase beyond those levels to cover this additional debt. The legislature should not presume that property owners will, at their own discretion, agree to suspend or reduce payments of rent.

We would like to highlight three concerns we hope the Council will take into consideration as this bill proceeds through the legislative process, in order to strengthen the effect of this bill and include all small businesses it intends to protect.

First, many small businesses in the City rent workspaces under license agreements which tend to include provisions allowing licensors to terminate agreements after one late payment and enter the space to take possession of the business' belongings, essentially conducting an eviction that would otherwise be illegal if the business was a residential tenant. Unfortunately, if a property owner or licensor of commercial space decides to exercise their contractual right to re-enter and take possession when a licensee defaults, Intro 1912 would not apply as there is no court-ordered warrant of eviction in this situation.

Secondly, the protected party under this bill should more clearly include commercial tenants who are named personally on a lease or rental agreement. Sometimes small business owners do not name their business as the tenant on a commercial lease (typically because they had not formed a legal entity by the time the lease was executed, they could not afford to form a legal entity, or the property owner preferred to name the business owner personally as the tenant). As a result, if the property owner files an eviction proceeding against the small business tenant, the named respondent is a natural person. Under this bill, if the protected party is not a named business, it must fall within the definitions under § 3(b)(1). To prevent any confusion for commercial tenants named personally under their lease agreements, language should be added to ensure this bill applies to such tenants.

USB NYC
United for Small Business NYC

Finally, pursuant to § 3(a) of the bill, the second moratorium extension would not apply to a tenant who has "effectively waived" its opportunity to show the court that it has suffered substantial loss of income due to the coronavirus. This exception can be an issue (and lead to more litigation) for commercial tenants who were improperly served, corporate tenants who were unable to get representation in court, or tenants who otherwise were unable to appear in court.

Our coalition supports Intro 1912 and the Council's intent to provide some relief to the City's most vulnerable small business owners and their employees. However, the small business community should not be expected to continue paying rent without income in a city where commerce has come to a halt. We urge the Council to take additional measures of rent relief are necessary to ensure small businesses are as prepared for the long-term economic effects of the virus as possible.  The City should exercise its power under the State Home Rule Law to do so[1].

Sincerely,
United for Small Business NYC
- Association for Neighborhood & Housing Development
- Brooklyn Legal Services Corporation A
- Chhaya CDC
- Cooper Square Committee
- Municipal Arts Society of New York
- NYC Artist Coalition
- NYC Network of Worker Cooperatives
- Street Vendor Project, Urban Justice Center
- TakeRoot Justice
- Volunteers of Legal Service
- Women's Housing and Economic Development Corporation

---

[1] *See* New York State Constitution, Article IX. The powers of local governments to act in their own jurisdiction are meant to be construed broadly by the courts. N.Y. Mun. Home Rule L. § 51 (providing that home rule powers "shall be liberally construed"); N.Y. Stat. Local Gov. § 20(5) (same). Article IX authorizes local governments to adopt local laws in a wide range of fields including the government, protection, order, conduct, safety, health and well-being of persons or property within the locality. N.Y. Const. art. IX, § 2(c)(ii)(10); Municipal Home Rule Law § 10(1)(ii)(a)(12); N.Y. City Charter § 28(a).
In addition to the Home Rule powers enumerated above and granted by the Constitution and specific State statutes, municipalities have police powers.
Legislation which has for its object the promotion of the public welfare and safety, falls within the scope of the police power and must be submitted to even though it imposes restraints and burdens on the individual.
*People v. Ortiz*, 479 NYS2d 613, 620 (2nd Dept 1984). The police power has been defined generally as the power to regulate persons and property for the purpose of securing the public health, safety, welfare, comfort, peace and prosperity of the municipality and its inhabitants. *Village of Carthage v. Frederick*, 122 N.Y. 268 (1890) (affirming local law imposing responsibilities on owners of real property in its limits). In New York State, it is as old as cities themselves. Further, it is "a proper exercise of the City's police power to regulate … businesses in the public interest," *Short Stop Industrial Catering*, 127 Misc.2d 363, 366 (Sup. Ct. N.Y. Co 1985), and there is no exclusion for the regulation of real estate businesses.

**IN OPPOSITION to Int. 1912-2020 - Joint Hearing of the Committee on Housing & Buildings and the Committee on Consumer Affairs and Business Licensing**

I work for a small landlord - a mom and pop shop who operate on thin margins. Landlords, like the place I work for, account for 60% of rent-stabilized units throughout the city. These 60% own less than 50 units each.

Many of these hardworking people, like the ones I work for, are out in their buildings personally cleaning and disinfecting door handles, rails, elevator buttons etc. – risking contracting COVID-19 in order to keep their tenants safe. These same people are on-call 24/7 for their tenants and buildings. Yet these same people are being demonized by the likes of State Senators Michael Gianaris, Julia Salazar, and Mayor DeBlasio and thrown under the bus when the city and state advocate that tenants should stop paying rent altogether.

Not only should tenants stop paying rent but now the city wants to rob landlords of, not only their income, but their only restitution for their hard-earned revenue.

While Michael Gianaris, Julia Salazar, and DeBlasio are pushing for rent strikes – who will bear the burden when these 60% cannot afford their July 1st tax bills because no income is being received; and no tax forgiveness or even deferment is being extended by the city or state? And yet the city charges interest to late payers of 7 – 18% COMPOUNDED DAILY.

Meanwhile the SBA and NYC's dismal "attempts" to provide loans to small business has fallen flat on its face. No small-time landlord I know of has been the beneficiary of one of these much-needed loans. Instead the money is shelled out to large corporations and corporate landlords leaving that 60% of small-time landlords to rely heavily on a few tenants who are able to pay their rents.

Taxes have been deferred federally; individuals are receiving stimulus checks of $1,200.00 (households $3,400.00). Unemployment claims have been provided with an additional $600.00 weekly – making it more lucrative for some to stay on unemployment rather than go back to work (I managed one such tenant who has been asked to return to work but has declined as she is making more on unemployment). This has been done so that people CAN pay their rent and meet their obligations. And yet this proposed bill and rhetoric spewed by our city and state "representatives" tell people otherwise.

This rent, that the city and state are telling people not to pay, is the very same rental income that property owners need to pay their property taxes, water and sewer, utilities, mortgage payments, fuel costs, payroll for superintendents and janitors to maintain and operate their buildings. Not to mention money to pay to contractors for repairs and improvements to the buildings where these same tenants reside. This harkens back memories to the abyss of NYC in the 1970s and 80s where similar actions lead us down this path once before.

As Landlords are the biggest taxpayers in NYC, we should take an socioeconomic view of this proposal:

A-1851

- Less income yields less tax payments collected by the city and state (and less money to maintain buildings and hire employees);
- devalued properties because of less income and more deterioration (higher unemployment for supers, janitors and contractors, more people out of work; apartment & building conditions deteriorate without money for renovations),
- which in turn yield less demand (people were fleeing NYC & NYS for the last decade which has ramped up exponentially now!!) lower rents and empty apartments yield still lower income (no recourse to collect delinquent rents)
  - People living rent free during the moratorium while landlords are expected to maintain services and are issued copious violations if this is not done.
- less taxes billed on decreased assessed values = still lower tax revenue for NYC & NYS

No other sector has been asked to bear such a burden as what the city and state are asking of the real estate industry.  Something you are asking of your biggest taxpayers and biggest source of revenue that allows the city and state to operate.  Those who provide shelter to millions of New Yorkers, whom many have personal relationships with the landlords, who are working with their tenants during this time to ensure that their financial obligations are not overwhelming to their families.

Tenants are being told not to pay their rent, but no one is telling tenants how their living conditions can deteriorate if there is no money to repair buildings, maintain staff and cover other costs.  And if these buildings deteriorate, and those 60% of mom and pop landlords lose their buildings because of the financial burden created by the city – who will run those buildings and care for those tenants?  Will the city take over the buildings?  Need I remind you that the New York City Housing Authority is in fact New York City's very own "worst landlord".

And to these 60% of mom and pop landlords who have no pensions, whose entire families' livelihoods rely on these buildings, what will be done with them when they lose everything?  They will be forced on to food stamps and rental assistance programs – creating a further burden on the system.  Will they also be told not to pay their rent when it comes time?

Consider the disastrous outcome of what is being proposed here.  You are proposing to kill the backbone of New York City – meanwhile states and corporations alike are bailed out and provided a safety net.

Free things never made anyone richer.  In fact, it promulgates the cycle of poverty, but also seemingly creates a dependent voter base.  The politization of this pandemic at the expense of people's livelihoods has been sickening to watch.  It needs to stop here and now.

.



**TOPAZ**
REALTY MANAGEMENT, LLC

52 E. 13TH STREET, SUITE 3A
NEW YORK, N.Y. 10003
E-MAIL : OFFICE@TOPAZ.MGMT.COM
TEL: 212-278-0061
FAX: 212-398-9068

April 28, 2020

New York City Council
Committee on Housing and Buildings

Dear Chairperson,

We are writing to submit testimony that the City Council's proposed new rules will impose an unreasonable burden on property owners and managers.

First, Intro. 1912 gives tenants no incentives to pay their rent on time or cooperate with landlords to come to a mutual agreement on payment plans. It also provides no recourse for landlords if tenants decide to leave without paying their rent and break their leases, as is currently happening. It in essence gives tenants 1 year period of not having to pay rent without compensating landlords for any loss revenue. Landlords still have to pay their mortgages, real estate taxes, water/sewer bills and all the other operating expenses on top of that. This is an unreasonable burden to impose of landlords at a time of national crisis and dwindling revenues as we negotiate with tenants to reduce their monthly payments.

Second, Intro. 1936 is a vaguely written law that imposes a blanket restriction from talking to tenants about their rental payments. NYC already has one of the nation's toughest, if not toughest, anti-harassment laws for tenants. Imposing a new vaguely worded law would serve no purpose other than to score political points while people are dying, losing their jobs and otherwise suffering. The City Council would better serve the whole of the population by finding ways to help tenants get financial assistance and lobbying Albany to address both sides of the rental equation by also getting landlords assistance by reducing their tax burden, their water burden and their mortgage burden. The last one can be addressed by making sure any landlord or consumer taking mortgage forbearance will not be penalized for doing so by making sure banks don't blacklist consumers or landlords for taking mortgage forbearance during a national crisis.

Thank you for your time and consideration.

Ameet Sachdev
Member

A-1853



**Testimony**
**New York City Council**
**Committee on Housing and Buildings**
**Jointly with the Committee on Consumer Affairs and Business Licensing**

**Tuesday, April 28, 2020**

The Brooklyn Chamber of Commerce is among the largest and most influential business advocacy organizations in New York, having spent the last hundred years developing and promoting policies that drive economic development and advance its members' interests. The Brooklyn Chamber is the voice of Brooklyn's business community, offering the promotion, support and advocacy businesses need to continue creating jobs and opportunities in their communities.

We submit testimony today regarding Introduction 1912 of 2020 regarding the moratorium on evictions through April 21, 2021 or 7 months after the state or federal moratoriums on evictions expire. We understand that the purpose of this bill is to protect commercial and residential tenants. Here at the Brooklyn Chamber of Commerce we have been working around the clock to help our small businesses weather the COVID-19 crisis and offer them the support, tools, and resources that they need to survive. We have seen firsthand how difficult it is for them cover basic expenses such as salaries and rent at a time when many have been mandated to close and others have been forced to pivot to a completely new business model that does not offer them the same amount as revenue.

Nonetheless, we believe Intro. 1912 will not help our businesses where it matters most – by offering them resources and support to keep their enterprises alive. It does not provide them financial relief from taxes or other payments owed to city government. In addition, it is unclear whether New York City government has the authority to revise the authorizing state law that permits marshals and sheriffs to enforce evictions and other civil judgments. Furthermore, eviction proceedings should be tied to state mandates regarding moratoriums on evictions. When the state re-authorizes evictions, every eviction still must go through a due process in civil court. Because of this process, we do not understand why the city would prevent eviction actions from taking place for 7 months or more past the time when the state has authorized evictions to take place.

Thank you for your consideration and for your support of New York City's small businesses.

Respectfully submitted:
Randy Peers, President & CEO

# TAKEROOT JUSTICE

**Testimony of Priya Sreenivasan before the New York City Council Committee on Housing and Buildings**

*April 28, 2020*

Thank you for allowing me the opportunity to provide testimony. My name is
Priya Sreenivasan and I am a legal intern with the Housing Rights Practice at TakeRoot Justice.
We write today to comment on Intro 1936, which would amend the definition of harassment
to include threats based on an individual's status as a person impacted by COVID-19.

TakeRoot Justice, formerly the Community Development Project at the Urban Justice
Center, has a long history of providing legal services and support on housing issues in New York
City's low-income neighborhoods, particularly within immigrant communities and communities
of color. Through working in partnership with tenant associations, community-based
organizations, and city- and state-wide coalitions, we advocate with tenants for policies to stop
predatory landlords and to fight for safe housing. As a member of Stabilizing NYC - a coalition
of eighteen grassroots organizations, a citywide housing advocacy organization,
and TakeRoot Justice, we collectively work to combat tenant harassment and preserve affordable
housing.

As the COVID-19 pandemic has unfolded, our practice has adapted to ensure that our work is
responsive to the needs of the communities we serve. We have launched a dedicated COVID-
19 hotline for our partner organizations across the boroughs, are providing legal research support
to coalitions, and have developed materials for virtual Know Your Rights training for
tenants. We also have been making hundreds of phone calls to pre-existing clients to check-in
and monitor their landlords' behavior.

In our work, we have already started to see landlords retaliate against their tenants for their
inability to pay rent as a result of being impacted by COVID-19. We recently worked in a
building with tenants who were unable to afford their rent as a result of loss of income because
during COVID-19, there has been reduced demand for their freelancing services. The tenants
asked their neighbors to withhold rent in solidarity, and in response, the landlord accused the
tenants of committing tortious interference. Tenants in the building received a letter from
attorneys at Belkin Burden Goldman that threatened to sue tenant leaders in New York Supreme
Court if anyone in the building withheld rent a result of their organizing efforts. We anticipate
that other landlords may similarly harass tenants who are not able to pay rent due to the

A-1855

impact COVID-19, and we support the proposed amendment to the harassment definition insofar as it offers some of these tenants potential legal recourse.

However, we are concerned about the exclusion of a vast number of tenants from the definition of people "impacted by COVID-19". As written, the definition leaves out a critical mass of tenants who have been able to keep their jobs but still lost income as a result of reduced hours, rates, or commissions. In 2019, the New York City Mayor's Office of Media and Entertainment partnered with the Freelancers Union and Upwork to release a report that estimated one in three New York City workers (approximately 1.3 million) engaged in freelance work in the previous 12 months.[1] Many of these individuals, along with tenants with jobs not counted in this report, have had their incomes diminished as a result of COVID-19, yet would not be entitled to protection from harassment under this bill.

From our work, it is clear this is not an abstract concern; rather, it is the reality we see. The tenants who received the letter from Belkin Burden mentioned above are an example of tenants who would be excluded from this bill. We hope that this legislation will be a starting point for offering tenants affected by COVID-19 a mechanism to protect themselves against harassment, and that it will be expanded to provide protection to all tenants who need it.

Thank you for your time.

Priya Sreenivasan
Legal Intern
TakeRoot Justice

---

[1] Freelancers Union, New York City Mayor's Off. in Media & Ent., & Upwork. *Freelancing in New York City 2019.* https://www1.nyc.gov/assets/mome/pdf/freelancing-ny-report-09062019.pdf.

123 William St., 16th floor
New York, NY 10038
T: 212-810-6744
F: 212-619-0653

Law, research, and
policy for organizing

**TAKEROOTJUSTICE.ORG**

2



A-1856

1



April 28, 2020

**Testimony of Community Housing Improvement Program
at a Joint Hearing of the Committee on Housing and Buildings and
the Committee on Consumer Affairs and Business Licensing
Re: Intros. 1912 and 1936 of 2020**

Good afternoon and thank you for the opportunity to provide testimony to the Committees on Housing and Buildings and Consumer Affairs and Business Licensing. My name is Joseph Condon and I am providing this testimony on behalf of the Community Housing Improvement Program, also known as CHIP. CHIP is an organization made up primarily of small- and medium-sized owners and operators of rent-stabilized housing in NYC. We have about 4,000 members who own and operate about 400,000 units of rental housing. Our members run hands-on small businesses by managing their own buildings and becoming long-term fixtures in their communities. More than 50% of CHIP members have owned their property for 20 or more years. They know their buildings; they know their employees; they know their tenants. Many of our members also sit on local clubs or civic associations, some on their community boards. During the COVID-19 pandemic, our members and their businesses are on the front lines, making sure people have a safe, clean, properly functioning apartment building to live in while we shelter in place. Many CHIP members go beyond this minimum standard.

Because our members are long-term owners with community ties, they are extremely sympathetic to the painful financial circumstances that COVID-19 has created. In fact, many of our members have worked with their tenants who are currently experiencing temporary financial difficulties. According to an internal survey of CHIP members conducted earlier this month, more than 50% of owners who responded have either worked out payment plans or are currently doing so with tenants whose financial circumstances have been impacted by COVID-19. Another 25% of our members who responded stated that they expected to offer discounts, forbearances, or payment plans on a case-by-case basis moving forward. Almost all of our members have provided information on available governmental benefits to their tenants.

But some of our members are also experiencing financial strain. And the rest are nervous for what May and June will be. For CHIP members, the utmost concern is their ability to provide safe, clean, and quality housing to the residents of this city. And just like any other small business, without paying customers, it cannot survive. According to a recent survey of CHIP members, more than 40% of owners who responded said they would not be able to pay all their monthly operating expenses (e.g., salaries, utilities, property taxes, or mortgages) if they could not collect any rent for one month. After collecting no rent for two months, the number grew to 75%. And it is worth noting that small multifamily building owners were not eligible for the Paycheck Protection Program that was part of the federal government's stimulus package to help small businesses.

Unfortunately, despite this being a time where we need to put politics aside, many so-called tenant activists are using the COVID-19 crisis as an opportunity to push a political agenda rather than addressing the real needs of people during this time.  Calling for city-wide rent strikes without concern for the negative impacts of putting small- and medium-sized property owners out of business is irresponsible.  Canceling rent without also providing relief for the expenses of small property owners is not a workable option and should not be realistically considered by these committees without providing commensurate relief on the expense side for property owners.  Relief in the area of property taxes is a necessary complement to any moratorium.  The ripple effects of not doing so will be felt most by building employees, management staff, maintenance contractors such as carpenters, plumbers, and exterminators, just to name a few.

Property taxes are the biggest single operating expense for rent-stabilized building owners.  Between 30 and 40% of a tenant's rent payment goes to the City in the form of property taxes and other charges and fees.  In some ways, the City is just as reliant on those rent payments as the property owner.  As someone once said, "even the people you pay rent to have to pay rent."  We think it is unfair to CHIP members for this Council to propose moratoriums that effectively prohibit rent collection for a certain period of time without also providing complimentary relief for owners who must still pay operational expenses during that time.  By only focusing on one side of the equation, these proposals add fuel to the political fire of the anti-housing activists who are calling for a rent strike for all.  This is one of the main reasons CHIP opposes Int. 1912-2020.

Further, assuming that no one can pay rent ignores the significant benefits already disbursed—and yet to be disbursed—by the state and federal governments to those who have lost income during these difficult times.  We understand that not everyone who has lost income will be eligible for those benefits, and that the benefits may not completely make up for lost income for those who are eligible.  CHIP members are working with these tenants to figure things out.  Indeed, property owners and managers are in the best position to deal with the variety of circumstances tenants are facing.  But if everyone else who can pay rent just stops, the ability of an owner to provide relief to those who can't get it anywhere else is significantly diminished.

Another specific concern regarding Int. 1912-2020 is lack of distinction between tenants in arrears as a result of COVID-19 and its secondary effects, and tenants who were in arrears long before the pandemic arrived.  As currently drafted, the moratorium would cover these pre-existing arrears.

Int. 1912-2020 would also prevent evictions based on nuisance activity; criminal conduct; illegal subletting, profiteering, and subdivision; or other misuses of an apartment that endanger other tenants in the building, or at the very least impair their quality of life.  While a building owner is likely to be able to work out something with a tenant who is experiencing genuine financial difficulties because of COVID-19, should the tenant who was four months in arrears before the pandemic struck receive the same immunity from legal process?  Should a person who is profiteering from their rent-stabilized apartment by using it as an illegal hotel be protected because their income was reduced, giving them a license from the government to refuse to pay rent?

In sum, Int. 1912-2020 sends a strong signal from the Council that tenants do not have to pay rent because owners cannot even attempt to collect those arrears for almost one year.  While the Council continues to recite kumbaya rhetoric of everyone working together in this time of crisis, its actions belie its words.  Where is the relief to property owners who will be forgoing the rent while their expenses continue to accrue?  Where is the seven-month extension on property taxes due to the City?  CHIP members are doing what they can to provide relief to their tenants, but they cannot do it alone. We are asking the Council for help.

Aside from the practical concerns over the bill Int. 1912-2020 also suffers from multiple legal infirmities that make a legal challenge inevitable, and an injunction against its enactment and/or enforcement more likely than normal.

First, Int. 1912-2020 is expressly pre-empted by §1(5) of the Local Emergency Housing Rent Control Act of 1962 ("The Urstadt Law") which, in relevant part, precludes the New York City government from enacting any "local law… subject[ing any housing  accommodations] to more stringent or restrictive provisions of regulation and control [of residential rents or eviction] than those presently in effect."  By forbidding NYC marshals and the NYC Sheriff from executing any warrants of eviction during "suspension periods" of its own determination, Int. 1912-2020 would subject all housing accommodations in the City of New York that are named in warrants of eviction to more stringent and restrictive regulation of eviction than those presently in effect, under existing statutes as supplemented by the governor's Executive Order No. 202.8 (90-day statewide eviction moratorium).  Therefore, Int. 1912-2020 is facially invalid and unenforceable.  See Mayer v. City Rent Agency, 46 N.Y.2d 139 (1978) (striking down NYC local law pre-empted by Urstadt).

Second, Int. 1912-2020 vastly oversteps the boundaries of the City of New York's local legislative powers under the home-rule provisions of the New York State Constitution and the Municipal Home Rule Law.  "The home rule provisions of the Constitution and the legislation implementing it list several subjects about which local governments are given the power to legislate." Council of City of New York v. Bloomberg, 6 N.Y.3d 380, 392 (2006).  The enforceability of judgments issued by the New York City Housing Court and other New York State courts is **not** among these enumerated subjects.  NY Const., art. 9, §2(c)(ii)(1)-(10); Municipal Home Rule Law §10(1)(ii)(a)(1)-(14). Therefore, should Int. 1912-2020 be enacted, it will not be able to withstand a challenge on home-rule grounds in the New York State courts. See Bloomberg (striking down NYC local law based on pre-emption by Municipal Home Rule Law, among other grounds).

CHIP has equally grave constitutional concerns with regard to Int. 1936-2020, which would expand the definition of residential tenant harassment (intent rebuttably presumed) to include "threatening any person lawfully entitled to occupancy of a dwelling unit based on such person's actual or perceived... status" as the member of a new protected class for purposes of tenant harassment: "an essential employee, status as a person impacted by COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," defined in the same way as the "first suspension period" under Int. 1912-2020 above, that is, from March 7, 2020 through, at the earliest, September 30, 2020.

While it is certainly a laudable goal to attempt to deter anyone from "threatening" tenants based on the current pandemic's direct or indirect effect on them, we argue that the lack of any definition at all of "threatening" or "based on" in this bill—or anywhere else in the Housing Maintenance Code, for that matter—makes Int. 1936-2020 void for vagueness under the New York City Charter (Chap. 45, §1046(c)(1)), the New York State Constitution (Art. I, §6), and the United States Constitution (14th Amendment).  In the absence of any such definition, the City Council puts property owners on unconstitutionally deficient notice of what it is that gives rise to the devastating rebuttable presumption of intent to harass tenants.  Does "threatening… based on" include warning a tenant via a late rent notice and then by a notice to sure—as the law mandates—that the failure to pay arrears by a date certain will result in eviction proceedings once the COVID-19 moratorium expires?  What exactly is the modicum of evidence required to prove discriminatory intent?  The tenant's hearsay account of a past request for payment?  Or even a third party's account of a past event, allegedly demonstrating the owner's intent to discriminate against that particular tenant, or any tenant suffering from the primary or secondary effects of the pandemic?  Unless the Council will add language to Int. 1936-2020 that puts all the foregoing questions to rest, CHIP respectfully urges that this bill be rejected by these committees, and by the full Council if it gets that far.

A-1859

4

      In fine, CHIP urges these committees, and the City Council as a whole, to either radically amend or reject both Int. 1912-2020 and Int. 1936-2020, based upon the decimation of small building owners that the former bill would cause; and based upon the legal infirmities of both bills, which are so grievous that they are likely to be tied up in the courts long after the COVID-19 pandemic has subsided.

A-1860

*City Council Committee on Housing & Buildings and the Committee on Consumer Affairs*
*Remote Hearing - April 28, 2020*
*Oksana Mironova, Housing Policy Analyst, Community Service Society of New York*

My name is Oksana Mironova and I am a housing policy analyst with the Community Service Society of New York. Thank you for the opportunity to present comments on the COVID-19 Relief Package, as it pertains to tenants.

The pandemic has intensified the city's ongoing housing crisis, already a daily reality for four in ten low-income New Yorkers who are homeless or housing insecure. Before March 2020, many low-income New Yorkers were spending a substantial portion of their earnings on rent. For example, our research has shown that the median rent to income ratio for low-income rent stabilized households bypassed the severe rent burden threshold, increasing from 40 percent in 2002 to 52 percent in 2017.



After decades of climbing housing costs, low-income renters were already experiencing high rates of housing hardships. In 2019, 30 percent fell behind on rent, 20 percent had utilities shut off, 19 percent had to move in with other people, and 15 percent were threatened with an eviction.

It is therefore unsurprising that many renters have been unable to save money. The vast majority of low-income renters–70 percent–had less than $1000 in savings for an emergency, like an unexpected loss of income or a hospitalization. Further, there are major disparities in savings by race among renters across all incomes. Sixty three percent of black renters and 60 percent of Latinx renters report having less than $1,000 in savings, as compared to 43



*City Council Committee on Housing & Buildings and the Committee on Consumer Affairs*
*Remote Hearing - April 28, 2020*
*Oksana Mironova, Housing Policy Analyst, Community Service Society of New York*

percent of Asian renters and 41 percent of white renters. This is in line with national research, which points to a broadening racial wealth gap across all socioeconomic levels. Most black and Latinx renters, and the vast majority of low-income renters do not have one months' worth of rent in savings. And, the sudden onset of the pandemic has disproportionately impacted these communities.

The pandemic not only created an impossible situation for New Yorkers who were already homeless or housing insecure, but is now bringing many others closer to the edge. Our research has showed that more than 126,000 low- and moderate-income renters in the private market have minimal savings and have lost much or all of their income as of late March. This number will increase dramatically in May.

Expanded unemployment insurance—covering more workers, with higher weekly benefits–will help some, but will leave out important segments of the New York City workforce, like undocumented workers. The stimulus check will offer some reprieve as well, but is a one-time payment that also excludes undocumented New Yorkers. In the short term, delays in unemployment insurance claims processing have been a huge problem, because many renters lack savings to get by, even for even a few weeks.

New York State has a 90-day eviction moratorium in place, set to expire in mid-June. First, we need to extend the moratorium, because we know that the economic effects of the pandemic will be with us for a long time. We support Intro 1912, which would pause evictions until September 2020 for all tenants, and until April 2021 for those directly impacted by the pandemic. We also support Intro 1936, which would amend the definition of harassment in the Housing Maintenance Code to include COVID-19 status – no one should be discriminated against because they got sick.

Second, we need some sort of rent relief that is universally available and easily accessible to anyone impacted by COVID-19, especially undocumented New Yorkers. Without it, we are going to see a major spike in evictions whenever the moratorium is lifted.

Looking toward the long term, we need to expand right to counsel to give more tenants a fighting chance in housing court. Further, we need to develop programs that allow mission-driven nonprofit developers, or tenants themselves, to acquire properties that will come up for sale, or go into foreclosure in the wake of the pandemic. This could include laws that give tenants, nonprofits, or the city the right of first refusal, paired with targeted funding to support acquisition.

Thank you for the opportunity to provide comments on the COVID-19 Relief Package. If you have any questions, you can reach me at omironova@cssny.org.

4/28/20

Dear Honorable Members of the NYC Council,

I know that you are considering passing a new legislation in the wake of this Covid-19 Pandemic, to allow tenants to not pay rent.
I would like to ask Council members who are in favor of this a legislation, few questions.

### Landlords are currently providing crucial and essential services to tenants. Those essential services can only continue if landlords could collect rent.

Specifically
1. How are landlords expected to pay for heat and hot water if tenants are not going to pay rent.
2. How do you expect a landlord to pay for the water and sewage that allows tenants to take showers and go to the bathroom.
3. Landlords are paying supers and porters to put out the garbage, and to clean/mop public spaces. How do landlords provide this without the critical cash flow that comes from rent collection.
4. How does City Council expect a landlord to pay property taxes without rent?
   - Property taxes have skyrocketed in the last 3 years to a level that is equal to 35% of rental income. We are in essence collecting taxes on behalf of the city.
5. Why is landlord trying to collect rent, termed as "Harassment". Is a landlord not entitled to collect rent for proving shelter, heat, hot water, cleaning services etc.?

   Why are we even using the term "Harrasment"? All we want to do is collect rent on an apartment so we could pay our 1) property taxes 2) Super 3) the oil company for delivering oil 4) ConEdison for the running elevator

6. Why is the Government throwing all the burden of this pandemic on the landlords only?
   Why is the city council not considering a bill to allow people to walk into the local supermarket pick up some groceries and walk out without paying.

Thank you,

-   David Chemtob
    917-681-5401

To the esteem members of the City Council:

As someone who's been managing NYC rent regulated property for over 30 years, but who is not a landlord, I've come to appreciate all arguments from both sides of the aisle in the on-going, now more than ever, contentious issue of housing.  Notwithstanding my professional occupation I am also a father of two millennials who themselves are dealing with the high cost of housing here in the City.   So I'm both an employee of the landlord/tenant industry and someone who needs to help subsidize his two children in the landlord/tenant world.

With respects to the current proposed legislation before you, may I ask rhetorically, why are you looking to create solutions to problems that don't exist, especially during a crisis of such global proportions?  This is a society threatening pandemic we're all dealing with.  Everyone person I know is going out of their way to talk to their tenants to find workable solutions to something that for many of us we've never seen the likes of before.  I cannot imagine that some landlord is out there making threatening overtures to tenants at this time.  Forgive me for wearing blinders, but I just don't see it happening.

We manage over a 1000 units between 28 properties and I have to say the conversations we're having with tenants these days are some of the most sincere and genuinely human conversations we've ever had.  We hear the anxiety and concerns in their voices; for some we hear fear.  But I can assure you our reactions aren't to disregard the epic proportions this crisis is having on all people.  If anything I see people in this industry rising to the top with their hands held out for anyone who needs it.

We hear how appreciative our tenants are to see our maintenance people out there on the front lines *every single day* doing what they can to keep buildings as clean as we can.  They appreciate us being here.  There's a new found sense of appreciation that I think we're all feeling for everyone who is helping each and every one of us to get through this.  I think some people are even taking comfort in just talking to people in our office as it's a form of distraction from their own thoughts while they remain home.

Now more than ever, please, I beg you, do not widen the divide that separates us, but do what you can to bring us together. If you are truly – *truly* – interested in helping your constituents during this extremely difficult time, set aside your feelings of animosity and revenge for property owners and use the occasion instead to let your humanity be the example.  Help us to help them.

Please be well and stay safe.

Steven J. Lavelle, CPM CMCA AMS
Director of Operations
Ventura Land Corp.

A-1864



# Council of New York Cooperatives & Condominiums

**TESTIMONY TO THE COMMITTEE ON HOUSING & BUILDINGS AND COMMITTEE ON CONSUMER AFFAIRS**

**Regarding Int. 1912 and Int. 1936**

**April 28, 2020**

The Council of New York Cooperatives & Condominiums is a membership organization providing information, education and advocacy for housing cooperatives and condominiums located throughout the five boroughs of New York City and beyond. More than 170,000 New York families make their homes in CNYC member buildings, which span the full economic spectrum from very modest, income-restricted housing to solid middle class apartment complexes to upscale dwellings. The common thread is that these buildings are owed by their residents and operate as self-governing representative democracies.

Today our City, State, and Nation face an unparalleled health and economic crisis. New Yorkers are suffering greatly and it is understandable that the City Council is looking for solutions. However, we write today to raise concerns about the cumulative impact of the legislation being considered today and at upcoming hearings which is meant to help commercial tenants but may hurt homeowners.

There are around 100,000 households throughout the five boroughs in co-op buildings that have commercial space and may be lucky enough to have commercial tenants during this difficult time. The owners and shareholders in these buildings are not large real estate companies – they are average citizens and families. These citizens and families rely on the rental income from commercial tenants to offset their monthly maintenance and other carrying-costs.

Many co-ops and condos are working collaboratively with their commercial tenants to establish payment plans and other ways to weather this crisis together. It is almost always of mutual interest to find a way forward that prevents commercial tenants from needing to end a lease or vacate a site, especially during these hard economic times when finding another tenant would be extremely difficult. However, the legislation being considered today could mean that a co-op or condo might be forced to wait until April 2021 to see any rent payments from a commercial tenant. We are deeply concerned about the impact this might have on the operations of our members who are already facing rising operating costs across the board.

CNYC shares a desire to find relief for those New Yorkers who need it most. However, we must caution against any broad legislation which could have major negative consequences for our City's homeowners. We look forward to working with the City Council to address these issues and countless others during this difficult time for all.

A-1865



April 28, 2020

New York City Council
Committee on Housing and Buildings

RE: Intro. 1912

To Whom It May Concern:

J & L Holding Corporation is a family owned and operated property management company and I am writing to express my concern about the proposed Intro. 1912.

While I understand the desire to protect tenants under the circumstances before us with the Covid-19 pandemic, but the general idea of this proposal blatantly ignores the economic reality owners face in the name of political pandering.

How are we supposed to pay our property taxes in July and January if you are, in essence, allowing tenants to not pay rent during a time period when two real estate tax payments are due?

How can you explain shifting the financial burden to one group as you have proposed?

With the logic proposed, why are you not going after every other business?  Why is it that we are being vilified?

The proposal puts the financial burden solely on the backs of property owners.  The proposal is one sided, short sighted and a politically motivated attempt at a "solution". It is simple solution to a complicated problem that does not solve any problems, it only makes things worse.

I urge you to look at the bigger picture when considering the approval of Intro.  1912.

Yours truly

JP Rutigliano

1140 Bronx River Avenue – Bronx, NY  10472 – 718.620.2200 – Fax 718.620.1870

TESTIMONY OF THE QUEENS & BRONX BUILDING ASSOCIATION

April 28 and 29, 2020

My name is Robert Altman, representing the Queens & Bronx Building Asociation, and I am submitting this testimony on Int. Nos. 1912, 1914, 1932 and 1936.  But in general, let me express the Association's general concern that the Council be very careful about inadvertently using the COVID-19 pandemic situation as a means to protect populations who before the current pandemic had already been delinquent in their obligations.  We understand the Council's desire to minimize the damage from the pandemic, but COVID-19 should not be used as a sword by already problematic individuals.  Some of the overly broad legislation will frankly protect bad actors without the need to do so.

For example, in Intro. No. 1912, what if the protected person had, in fact, become delinquent in his or her responsibilities before COVID-19, but because of COVID-19 now fits in the law.  Moreover, what if a person is not tested for COVID-19 but now uses the generalities of this law to seek protection.  Theoretically, with tele-medicine consultations, it is quite easy to know what the law allows for and seek a consultation without even really having ANY symptoms!  It is not like a doctor can provide a full examination through tele-medicine and determine if a patient is faking symptoms or a situation is real.  At least a person should test positive for the virus or as part of a defense in a court of law, show that he or she had contracted the virus either though a positive test, or at least, showing signs of the antibodies after the fact.  (And that should also be true for any relatives the person is claiming they needed to care for.)

But even worse causation issues exist in Int. No. 1914.  Here a person is assumed to be impacted if another member of the household had COVID-19.  But what if that person was not the primary caregiver?  In the law, mere partial caregiving is sufficient (and when part it must be is not defined).  What if the person continued to live as if everything was normal?  COVID-19 must at least be the cause of the hardship, not an incidental situation.

And these same issues exist in Int. No. 1932 and 1936 because it basically uses the same definitions and thus has the same flaws.  Moreover, Intro. No. 1932 changes the dynamic of liability.  If the business is ruined, the guarantor now has no reason to leave quickly (under a personal good guy guaranty, the guarantor will want to leave early to limit liability) and the landlord then must institute proceedings, proceedings which the Council is seeking to stymie.  It leaves the Landlord in a ridiculous situation.  And again, what if the issues of the entity are pre and post-COVID-19.

And I gather because the Landlord is getting no revenue because the Council is not really allowing it, the Council is willing to (i) forego all property taxes due to COVID impacts defined in the legislation, (ii) forego all water bills due to the COVID impacts defined in the legislation, (iii) pay a landlord's heating, cooling, electric, mortgage and operating payments which may not be impacted by an executive order because

many loans are not of the type that are delayed (and mind you, must still be paid). The Council must make provisions for this as not every landlord is a deep pocket.  And I gather if a small landlord is using the money for its obligations, such as retirement, the Council is willing to subsidize such small landlords.  And for larger landlords, I gather the Council is ready to provide funds so the Landlord can pay its employees.

Finally, all of the legislation ignores basic economics.  No rationale landlord wants to use the pandemic as an excuse to harm a tenant or collect against good people.  Recent rent law changes basically make it difficult to do so, and in the coming recession, harming good tenants who should be good again is bad economics.  In the last recession, Landlords worked with good tenants who came upon tough times.  But the Council seems to forget that.  Trying to re-let vacant space in a bad economy, only means a landlord will face months of no rent and then the market rent will probably be much less anyway.  The Council's legislation ultimately fails to understand basic economics.  And it fails on basic fairness because it allows that those who are not impacted by the pandemic to take advantage of it without showing a need for assistance.  Such blanket legislation is a boondoggle of the highest degree.

A-1868

**For Submission to the New York City Council Committee on Housing and Buildings**

Thank you for this opportunity to submit my testimony during these trying times.  I am an owner of rent stabilized apartments in the borough of Brooklyn and would like to testify to the following:

- The Housing Stability Act of 2019 passed by the NYS Legislature last year severely impacted my financial situation by decreasing revenue in the form of what I can charge my tenants in rent, increase in expenses, specifically in legal fees due to the extended time it takes to now evict a tenant, and removal of any growth rate in rents due to the removal of IAI's and the vacancy bonus when tenants vacate an apartment.
- Covid-19 has further exasperated my financial situation with an increase in tenants not paying rent and a current rent strike being promoted by various legislators for political purposes.
- By extending Gov. Cuomo's freeze on evictions from the current 90 days to an additional 360 days will drive me to foreclosure.  I will not be able to evict non- paying tenants and without that rent, I will not be able to pay my mortgage.
- My bank in turn pays real estate property taxes and water and sewer taxes through my monthly payments which will mean the City of New York will be severely impacted as well.
- Housing Court rarely results in evictions, even before the Housing Stability Act passed in 2019. However, it is the most effective way for Landlords to collect rent arrears.
- By extending the eviction moratorium (which will be immediately challenged in court for lack of authority since only New York State has the authority to do so) will only exasperate a difficult situation for all parties involved, including tenants, landlords, and the City of New York.
- 

This is not an exaggeration, but current reality.


*/s/ Rosario Parlanti*

A-1869

As a small landlord with a family owned building I am shocked to see some of the proposals being used to "protect" rights of certain groups.   As our governor has said many times, we are ALL in this together and this is no time to politicize the issue.  As the mayor and many council members seek to use this pandemic as a means to solidify their base and secure "favors" from the electorate in order to get elected, they are using very short sited plans to do this.  Putting in place programs that allow tenants to withhold and potentially walk away for rents for 12 months does nothing to help the city's situation. Small landlords do not have unlimited supply of working capital to keep buildings running up to the City's high standards.  Compliance with all the regulations that were in effect prior the pandemic plus requirement to continue operating without any income to provide necessary updates will cause major defaults/bankruptcies.  If the City's plan is to have landlords walk away from their buildings so that the city can take over and resell at a later date for a profit , then go ahead and pass the bills.  Otherwise the city itself will reap the pain of the bills it passes today as a "landlord" for all these buildings.   It simply provides you with a city full of people who will make the same demands of you that they make of us. And without the rents , the City will not be able to make any improvements and we will have 5 boroughs of "NYCHA" apartments-no heat, no service, etc.

Landlords want to be part of the solution and there has to be a middle ground where we can work with those tenants that can't pay and those that can.  We are not the bad guys here.

**IN OPPOSITION to Int. 1912-2020 - Joint Hearing of the Committee on Housing & Buildings and the Committee on Consumer Affairs and Business Licensing**

I work for a small landlord - a mom and pop shop who operate on thin margins. Landlords, like the place I work for, account for 60% of rent-stabilized units throughout the city. These 60% own less than 50 units each.

Many of these hardworking people, like the ones I work for, are out in their buildings personally cleaning and disinfecting door handles, rails, elevator buttons etc. – risking contracting COVID-19 in order to keep their tenants safe. These same people are on-call 24/7 for their tenants and buildings. Yet these same people are being demonized by the likes of State Senators Michael Gianaris, Julia Salazar, and Mayor DeBlasio and thrown under the bus when the city and state advocate that tenants should stop paying rent altogether.

Not only should tenants stop paying rent but now the city wants to rob landlords of, not only their income, but their only restitution for their hard-earned revenue.

While Michael Gianaris, Julia Salazar, and DeBlasio are pushing for rent strikes – who will bear the burden when these 60% cannot afford their July 1st tax bills because no income is being received; and no tax forgiveness or even deferment is being extended by the city or state? And yet the city charges interest to late payers of 7 – 18% COMPOUNDED DAILY.

Meanwhile the SBA and NYC's dismal "attempts" to provide loans to small business has fallen flat on its face. No small-time landlord I know of has been the beneficiary of one of these much-needed loans. Instead the money is shelled out to large corporations and corporate landlords leaving that 60% of small-time landlords to rely heavily on a few tenants who are able to pay their rents.

Taxes have been deferred federally; individuals are receiving stimulus checks of $1,200.00 (households $3,400.00). Unemployment claims have been provided with an additional $600.00 weekly – making it more lucrative for some to stay on unemployment rather than go back to work (I managed one such tenant who has been asked to return to work but has declined as she is making more on unemployment). This has been done so that people CAN pay their rent and meet their obligations. And yet this proposed bill and rhetoric spewed by our city and state "representatives" tell people otherwise.

This rent, that the city and state are telling people not to pay, is the very same rental income that property owners need to pay their property taxes, water and sewer, utilities, mortgage payments, fuel costs, payroll for superintendents and janitors to maintain and operate their buildings. Not to mention money to pay to contractors for repairs and improvements to the buildings where these same tenants reside. This harkens back memories to the abyss of NYC in the 1970s and 80s where similar actions lead us down this path once before.

As Landlords are the biggest taxpayers in NYC, we should take an socioeconomic view of this proposal:

- Less income yields less tax payments collected by the city and state (and less money to maintain buildings and hire employees);
- devalued properties because of less income and more deterioration (higher unemployment for supers, janitors and contractors, more people out of work; apartment & building conditions deteriorate without money for renovations),
- which in turn yield less demand (people were fleeing NYC & NYS for the last decade which has ramped up exponentially now!!) lower rents and empty apartments yield still lower income (no recourse to collect delinquent rents)
  - People living rent free during the moratorium while landlords are expected to maintain services and are issued copious violations if this is not done.
- less taxes billed on decreased assessed values = still lower tax revenue for NYC & NYS

No other sector has been asked to bear such a burden as what the city and state are asking of the real estate industry. Something you are asking of your biggest taxpayers and biggest source of revenue that allows the city and state to operate. Those who provide shelter to millions of New Yorkers, whom many have personal relationships with the landlords, who are working with their tenants during this time to ensure that their financial obligations are not overwhelming to their families.

Tenants are being told not to pay their rent, but no one is telling tenants how their living conditions can deteriorate if there is no money to repair buildings, maintain staff and cover other costs. And if these buildings deteriorate, and those 60% of mom and pop landlords lose their buildings because of the financial burden created by the city – who will run those buildings and care for those tenants? Will the city take over the buildings? Need I remind you that the New York City Housing Authority is in fact New York City's very own "worst landlord".

And to these 60% of mom and pop landlords who have no pensions, whose entire families' livelihoods rely on these buildings, what will be done with them when they lose everything? They will be forced on to food stamps and rental assistance programs – creating a further burden on the system. Will they also be told not to pay their rent when it comes time?

Consider the disastrous outcome of what is being proposed here. You are proposing to kill the backbone of New York City – meanwhile states and corporations alike are bailed out and provided a safety net.

Free things never made anyone richer. In fact, it promulgates the cycle of poverty, but also seemingly creates a dependent voter base. The politization of this pandemic at the expense of people's livelihoods has been sickening to watch. It needs to stop here and now.

.

A-1872

**Rhumbline Realty Management Company**
73 E. Merrick Road
Freeport, NY 11520
631.757.2758
rhumblinemanagement@gmail.com

April 28, 2020

RE: The New York City Council Committee on Housing and Buildings
Intro: 1912 & 1936

Last month when Governor Cuomo announced the shut down of the state due to Covid-19 he also ordered the suspension and prohibition of eviction cases for 90 days.  That order effectively announced to tenants that they didn't have to pay their rent for three months if they didn't want to.

At about the same time a group of state senators and representatives proposed a bill that would have allowed tenants to not pay rent at all. Fortunately that bill was not approved.  I reached out to Senator Hoylman, who was a sponsor of this bill, and explained to him that it was absurd to place the weight of the Covid pandemic squarely on the shoulders of the apartment building owners.

It is unfortunate that my retail tenants have all been closed by the Governor's order so they are unable to pay their rent.  They have no reserves and I already have to bear the burden of that lost income.

It is absurd for the government, city or state, to legislate a rent suspension for residential tenants.  Fortunately, the majority of my tenants are either still employed or are now receiving unemployment benefits or had cash reserves and are able to continue paying their rent.  Some have asked if I am waiving the rent and I tell them no but pay what you can.  I tell them that if they are able then they should pay their rent.  Unfortunately, some of my tenants think that they should not have to pay their rent because of the current situation whether or not they do have the ability to pay.

The retail market was already in a sorry state prior to the Covid outbreak. Many retail businesses will not survive and many property owners will not survive without their rents.  I have applied for EIDL assistance loans in the event that I do not have the resources to continue to pay my bills but I have not received any response from the SBA with regard to those applications.

A-1873

One of my stores was vacant for all of 2019 because of the already weak retail market. I gave my new tenant three months free rent to build out his store and he was supposed to open at the beginning of April. He is prohibited from opening and has no ability to pay his rent. The situation is already dire enough, we don't need politicians that are looking for votes to make matters worse. It is one thing for an owner to manage his finances with a store that he cannot rent but it is a totally different matter for the government to step in and tell an owner that he loses all of his rights and is prohibited from collecting rent or pursuing his legal rights.

Intro 1912 seeks to delay the enforcement of monetary judgements and warrants of eviction until April 2021. That effectively tells tenants that they don't have to pay their rent for a year if they don't want to. Is the city going to take over all of the buildings that owners cannot afford to keep because of the effects of this legislation? The city cannot now manage the buildings it has. I would be thrown in jail if I ran my properties the way the city does. What about tenants that were already in default prior to the Covid outbreak? If they were unable to pay before now they are being told that they don't have to pay and there is nothing that the owner can do. This is starting to sound like communism.

Intro 1936 seeks to increase the potential for harassment claims if an owner tries to negotiate a payment plan with a tenant that has not paid their rent. In my experience, owners always want to negotiate with tenants whether that occurs before a case in court or once a case has started. We never want to leave money decisions up to the courts because we know that the courts will always decide in favor of the tenants.

We do not need the government taking over our properties and businesses any more than they already have. Property values have already dropped more than 20% since the revision of the housing laws that went into effect last year. The city and state should stop trying to make housing affordable on the backs of private property owners. I suggest that the city and state utilize existing programs like SCRIE and DRIE to help tenants keep their rents affordable. The burden should not be placed on private property owners when the government fails to come up with a plan to assist tenants.


Cordially,

Paul Kampa

A-1874

Intro 1912 will make it impossible for us to pay our property taxes and water bills in the foreseeable future. We have several eviction proceedings already in the courts, measures that we were forced to take as a last resort after several attempts to work with the tenants.

Obviously, these eviction proceedings have been paused because of the pandemic. The situation is detrimental to our rent-paying tenants and our building because the last rent payment received from these delinquent tenants was in 2018.

If Intro 1912 passes, we would be facing 30-plus months of no rent revenue from multiple tenants, in addition to those tenants now facing hardship due to COVID-19.

Lincoln Eccles

Case 1:20-cv-05301-RA   Document 38-42   Filed 08/12/20   Page 78 of 108

**RIS NYC LLC**
56-23 55th Avenue, Maspeth, NY 11378
646.588.8393
www.risnyc.com



April 27, 2020

## Testimony by Mike Gordon on Council Intro 1912

My name is Mike Gordon and I am speaking on behalf of RIS NYC LLC - Republic Immobilization Services. Our company is partnered with New York City to manage and enforce the traffic violation program with the overall goal of keeping our streets safe and accessible. Thank you for the opportunity to submit testimony with regard to Council Introduction 1912.

RIS and its 56 employees work closely with the NYC Sheriff and the NYC Marshals to help manage the balancing of traffic flow, last-block delivery of consumer goods and accessibility for urgent care services within and around the City.

Ultimately, our service ensures vehicles which should not be on City streets are removed and scofflaw offenders, which have accumulated numerous violations, honor them. By enforcing violations, which include multiple ignored parking tickets, red light camera violations, unresolved speed zone violations, fictitious and invalid plates, and improperly parked vehicles blocking fire/life/safety access, we are opening accessibility to residential, commercial, and public safety needs.

In addition to assisting with traffic management our services generate $60 million in annual revenue for the city; revenue which would likely not otherwise be captured.

While we all know that accessibility and revenue are important, the reality is that the real value of the work we do is the service we provide to help ensure the City can achieve its ambitious Vision Zero goals. The City Council and the DeBlasio Administration have led the nation on a program to create safer streets for both pedestrians and motorists. This enforcement measure would also be in line with the City's recently announced initiative to close 40 miles of streets to cars, so that pedestrians have more room to stay socially distant. The work we do, again in partnership with City Officials, is crucial to making those goals a reality. We know too well that vehicle owners who ignore summonses are the same ones who block hydrants, stall efforts to clean city streets, run red lights and don't carry insurance.

Intro 1912 would suspend the enforcement of monetary judgements for vehicle violations by both the City Sheriff and City Marshals. While we understand the good intentions behind this legislation, we submit to the Committee that with regard to the booting and towing program we manage, it will have the unintended consequence of making our streets less safe. At a time when our focus should be better management of the public streets for the safety of pedestrians and motorists, this bill takes the City in the wrong direction.

Our company is committed to working with the Council to make our streets safer and we urge you to reject any initiative that would result in allowing the "car culture" to exploit a crisis.

Thank you for your consideration.

A-1876

I am Willy Chavarria owner of Palmer Trading Company Corp. tax ID # 27-3607950 located at 67 West Street Brooklyn, New York 11222.  We are a mens fashion label and web store business operating out of the studio space. We have been open for over 10 years. I have been struggling to keep my employees and pay rent for our studio space for the business during the government shut down. The building owner has not offered forgiveness of any rent during the period of the shutdown. I am requesting that City Council of New York request rent forgiveness for months when our business must be closed.

I have applied for all available assistance including PPP and Disaster Releif Loan but have not yet received any support. Of course if I do receive a loan it will be used entirey for rent and payroll, but it will be impossible for my small business to recover from the months of needed back paid rent. It must be

We are unable shut down and move out for several reasons one of them including reasons also associated with the shutdown.
We have  contacted local Law enforcement several weeks ago and we were informed that we should not be congregating or moving until the stay home order has ended. This would be a risk to our health and others, and could result in court summons.
In addition necessary services and business' are closed which makes moving out even more unrealistic.

City and state governments have ordered us to stay home, so as tenants we really have no other option.

We can not follow the local laws for safety and health as well if we are to follow the guidance of the building management to either pay the rent or move out.

Thank you for considering this request.

Sincerely,

Willy Chavarria

A-1877

### What can the City Council do to provide real housing solutions for both Tenants and Home Providers?

I and many other home owners I speak to are very distressed by the recent package of legislation proposed by the City Council as a response to the COVID-19 pandemic.

This legislation will be incredibly detrimental to housing providers across my community and New York City.

Throughout this crisis, property owners have gone above and beyond to make sure our residents are safe.  They work around the clock to source enough protective equipment for building workers. They regularly disinfecting common areas, managing deliveries, and making regular and emergency repairs to apartment units. Sadly, at least 19 building workers have succumbed to the virus across the city - we honor them and their heroic service while continuing to work under challenging conditions. Many other property owners are also working to accommodate tenants who have been financially impacted, instituting payment plans and other relief where needed.

Rental payments go to taxes, wages for building staff, and ongoing maintenance - it is not pure profit. Not all property owners are able to forgo rental payments and simultaneously operate their properties for the next year.

Additionally, many home providers supported the initial 90-day eviction moratorium so all New Yorkers would have a home where they could shelter in place while officials evaluated the potential impact of the virus. We should be focused on rental subsidies, vouchers, and the revival of FEMA's mortgage and rental assistance program that saved many New York families after 9-11. These are proven solutions that help tenants and property owners, while ensuring New York City can continue to collect tax revenue.

However, if home providers don't receive rental payments until April 2021, then they are unable to pay property taxes, insurance costs, fuel, electricity, management costs, concierges, or mortgage payments. If these buildings can't meet basic financial obligations, they risk defaulting on mortgages and an inability to provide property taxes - which hurts their ability to provide quality and safe housing for New Yorkers when they need it the most.

As we work to address reopening our economy while prioritizing the health and safety of all New Yorkers, we need to support proposals and actions that embrace collaboration. Additionally, we need to understand the reality that most small businesses and industries across our City need real and immediate relief. We want you to advocate for realistic, balanced, and legal policy solutions that help renters at their time of need while ensuring buildings can continue to operate during this time of crisis.

Thank you for your time and service.

Sincerely,

Jimmy Santis

4/28/20

Dear Honorable Members of the NYC Council,

I know that you are considering passing a new legislation in the wake of this Covid-19 Pandemic, to allow tenants to not pay rent.
I would like to ask Council members who are in favor of this a legislation, few questions.

### Landlords are currently providing crucial and essential services to tenants. Those essential services can only continue if landlords could collect rent.

Specifically
1. How are landlords expected to pay for heat and hot water if tenants are not going to pay rent.
2. How do you expect a landlord to pay for the water and sewage that allows tenants to take showers and go to the bathroom.
3. Landlords are paying supers and porters to put out the garbage, and to clean/mop public spaces. How do landlords provide this without the critical cash flow that comes from rent collection.
4. How does City Council expect a landlord to pay property taxes without rent?
   - Property taxes have skyrocketed in the last 3 years to a level that is equal to 35% of rental income. We are in essence collecting taxes on behalf of the city.
5. Why is landlord trying to collect rent, termed as "Harassment". Is a landlord not entitled to collect rent for proving shelter, heat, hot water, cleaning services etc.?

   Why are we even using the term "Harrasment"? All we want to do is collect rent on an apartment so we could pay our 1) property taxes 2) Super 3) the oil company for delivering oil 4) ConEdison for the running elevator

6. Why is the Government throwing all the burden of this pandemic on the landlords only?
   Why is the city council not considering a bill to allow people to walk into the local supermarket pick up some groceries and walk out without paying.

Thank you,

-   David Chemtob
    917-681-5401

A-1879

### Testimonial against intro 1912 and 1936

*Prohibit City Marshals and the City's Sheriffs from the taking and restitution of property or the execution of money judgments until the later of the end of the COVID-19 crisis, or September. For residential and commercial tenants impacted by COVID-19, Marshals and Sheriffs would be barred from enforcing warrants of eviction or monetary judgments until April 2021.*

We have legal action against 3 tenants who have not paid rent since 2018. They have been taking advantage of me and living for free for over 2 years. Intro 1912 will allow this to continue for another year. I cannot afford to house these tenants who do not contribute to paying for building operations. For example, water/sewer, garbage removal, taxes, payroll, etc.. Moreover, now that people are home all day due to public safety issues of COVID19, tenants are using more water/sewer and making more garbage. The pandemic is causing operating expenses to dramatically increase. To keep buildings clean, we have spent 200% more this month on cleaning labor and supplies compared to the same period last year.

Intro 1912 was written to help tenants but it will end up hurting more tenants instead. If landlords are incurring a loss every month, it will lead to maintenance issues and an overall lower quality of living for tenants.



April 27, 2020

The New York City Council's Committees on Consumer Affairs and Business Licensing and Housing and Buildings

Re:  Testimony regarding Intro 1912-2020

Dear Councilmembers:

Thank you for this opportunity to testify regarding Intro 1912-2020 which would bar marshals and city sheriffs from executing money judgments or seizing property during the current COVID-19 crisis.

Manhattan Legal Services is part of Legal Services NYC (LSNYC), the largest civil legal services provider in the country, with offices in the Bronx, Brooklyn, Queens, Staten Island and Manhattan.  LSNYC fights poverty and seeks racial, social and economic justice for low-income New Yorkers.  For over fifty years, LSNYC has challenged systemic injustices and ensured the well-being of communities across the city. This work includes preventing evictions and preserving housing; demanding access to high-quality education, health care, and economic security; ensuring safety and stability for survivors of domestic violence and immigrants; and fighting for the dignity and respect of all New Yorkers.

LSNYC provides full representation to low-income New Yorkers in the areas of consumer law, including, but not limited to, representing consumers who are defending debt collection lawsuits, as well as advocating for those whose bank accounts have been restrained, or whose wages are being garnished, and filing affirmative cases against debt collectors for violations of the Fair Debt Collection Practices Act.

### THE IMPACT OF INTRO 1912-2020 ON CONSUMERS

Many of our clients find out for the first time that a debt collector has obtained a judgment against them when their bank account is restrained, or their paycheck is garnished.  Many of these judgments were obtained years ago through sewer service, where the court papers were never served on our clients, or were served, but sent to an out of date address.  In our experience, the vast majority of our clients have meritorious defenses to these judgments, but never had the opportunity to present them to a court because they were unaware that they had been sued.

A majority of our clients are low-income people of color, who have been disproportionately impacted by the COVID-19 crisis, both in terms of job loss and in terms of having higher rates of infection. Although Intro 1912-2020 aims to prevent those already struggling economically as a

**Manhattan Legal Services** | 1 West 125th Street, 2nd Floor, New York, NY 10027
Phone: 646-442-3100 | Fax: 212-348-4093 | www.LegalServicesNYC.org
**Peggy Earisman**, Project Director



result of COVID-19 from further economic loss by suspending the enforcement and seizure of assets, the bill does not completely address how this would be accomplished. This lack of detail could lead to a different result than that intended by the City Council.

As an initial observation, the bill as written does not prevent a debt collector's attorney from restraining a bank account, which requires no intervention from a sheriff or a marshal. Under existing law, a restraint placed on an account will "freeze" the account for a year. In our experience, this is the most common action taken by debt collectors when attempting to collect a debt. As a result, if the bill is passed in its current form, debt collectors could employ an attorney to place a restraint that will prevent the consumer from accessing desperately needed money in their bank account.

As to sheriffs and marshals, the bill states that no execution will be permitted until the party against whom it is sought has been given a "a reasonable opportunity to show the court having jurisdiction over the matter that such party suffered a substantial loss of income because of COVID-19 and such court has found that such party has not suffered such a loss or has effectively waived such opportunity." However, the bill does not explain when or how the hearing will be provided. The bill also does not include any requirement about how consumers will be notified of their right to show the court that they have suffered a substantial loss of income due to COVID-19.

Because of COVID-19, court operations are severely limited and a consumer's only current option when faced with a restraint or levy is to file an order to show cause with the appropriate court. In order to file an order to show cause, many of our clients would need to physically go to the court. Many of our clients have limited access to computers or other technology that would allow them to file an order to show cause without going to court, and at this point, the courts' approach to remote applications for stays is not uniform.

Most of our consumer clients are elderly and/or disabled, and of these, many are limited English proficient. They struggle to file orders to show cause during normal times, when they can visit a legal services office or take advantage of the court's access to justice programs such as CLARO and Volunteer Lawyers for the Day. During this crisis, consumers are at a loss to know what to do or where to turn to when they receive notice of a garnishment or restraint. Since many of these judgments were obtained by default, the consumer may not even know which court entered the judgment.

If the City Council's intention is to ensure due process to consumers, the mechanism for triggering that due process should be defined. There are procedures that are already used in other legal contexts that could be implemented to address these concerns.

For example, before taking action to enforce a money judgment, the debt collector could be required to send a notice to the consumer notifying him or her of the existence of the judgment (including the court caption and index number) and informing the consumer of the types of income that are protected from collection under the New York State Exempt Income Protection Act ("EIPA"). Under EIPA, consumers receive an exemption form they can complete and return

to the creditor to explain why their income is exempt. A similar form could be adopted for Intro 1912, informing the consumer of the temporary suspension of enforcement of judgments with a check list where the consumer could indicate their eligibility for the suspension.

Notices could also be sent to consumers to inform them of their due process rights under Intro 1912, similar to the notices included on summonses in consumer credit transactions, which inform the consumer of the risk to their assets and advise them of their right to consult with an attorney. To ensure that limited English proficient consumers are protected, the notices should be sent out in the consumer's first language.

If debt collectors are required to send notices prior to enforcement, we would caution that the process should also include a requirement that the debt collector verify the address to make sure it is a valid. Many default judgments are obtained after the debt collector served court papers to an out-of-date address and often debt collectors seek to enforcement money judgments years after the judgments are obtained, meaning that consumers have since moved.

Given the broad economic impact of COVID-19, it appears that most consumers would be eligible for the suspension of the enforcement of judgments. In the interests of efficiency and taking into account the court's reduced capacity, a r possible approach would be to create a presumption that the consumer is entitled to the protection and the debt collector has the burden to establish otherwise. This would be similar to requirements that prior to filing a housing court case, the landlord has an affirmative duty to establish that a tenant is not in the military or dependent on someone in the military by making an investigation and submitting a sworn affidavit to the court.

Intro 1912 protects consumers who have experienced substantial harm as a result of the coronavirus. The definition of substantial harm included in the act largely tracks the definition contained in the CARES Act relating to establishing eligibility for Pandemic Unemployment Assistance ("PUA"), but does not contain a similar catchall provision in the list of harms, or specifically provide for self-certification of eligibility. Without this language, consumers may have more difficulty in taking advantage of the protections of Intro 1912-2020.

If self-certification is not provided for, a court might ask consumers to present evidence of substantial harm at a hearing or as a condition of having an order to show cause signed. Because many low-income consumers have lost work at businesses that may not reopen, including small businesses that do not maintain extensive records, they could have difficulty obtaining documentation relating to their loss of employment. Similarly, if they lacked medical coverage, there may have been barriers to their making formal attempts to seek a medical diagnosis. In our experience, judges have declined to sign orders to show cause filed by consumers seeking to stop debt collection when they have submitted a sworn affidavit without written documentation, even when no documentation was required by law. Specifically providing that self-certification is sufficient to establish substantial harm would obviate this concern.

In addition, the impact consumers have experienced may not fit in to any of the listed categories. Creating a catchall category and allowing consumers to submit alternative proof, such as letters from a community-based organization could address this concern. For example, Real Property

A-1883

Law 227-c was recently amended to broaden the categories of documentation a domestic violence victim can submit to establish his or her domestic violence status in order to take advantage of the protections afforded by that provision.

We believe that ensuring clarity and transparency of the consumer's due process rights will benefit both the consumer and the debt collector by eliminating unnecessary litigation.

Please do not hesitate to contact me at 646-442-3143 for further information.

Respectfully submitted,

Mary McCune
Senior Staff Attorney
Consumer Law Specialist

A-1884

# TAKEROOT JUSTICE

**New York City Council**
**Committee on Housing and Buildings Jointly with the**
**Committee on Consumer Affairs and Business Licensing**

**Written Testimony of TakeRoot Justice in Support of Int. No. 1912**
**By: Cheryl Walker, Stephanie Storke, and Tedmund Wan**

*April 28, 2020*

<u>Introduction</u>

TakeRoot Justice thanks the New York City Council for the opportunity to submit this written testimony in support of Int. No. 1912.

Following 18 years of impact as the Community Development Project of the Urban Justice Center, TakeRoot Justice launched as an independent organization in July 2019. The mission of TakeRoot Justice is to provide legal, participatory research and policy support to strengthen the work of grassroots and community-based groups in New York City to dismantle racial, economic and social oppression. We do this by partnering with grassroots and community-based groups, who take the lead in determining the priorities and goals for our work, as we believe that community organizing should be at the center of any effort to create sustainable, systemic change. Our office represents residential and commercial tenants, as well as consumers.

On behalf of TakeRoot Justice, we would first like to thank the City Council and Mayor for taking steps to protect tenants, small businesses, essential workers and the homeless, who are at the epicenter of the unprecedented global COVID-19 pandemic.

<u>Impacts of Unprecedented Circumstances</u>

COVID-19 has laid bare our city's underlying housing crisis and lack of social safety net. As in any crisis, New York's most vulnerable citizens face the greatest consequences. Millions in our city have lost their jobs or fallen ill. They, and many more, face a grim choice between paying rent and buying basic necessities. So many New Yorkers lived paycheck to paycheck, and therefore lacked sufficient savings to withstand the fact their paycheck is now gone. This economic situation is particularly dire for communities of color, who have also disproportionately suffered health-wise from the pandemic.

Clearly, the pandemic will exact an enormous financial, emotional, and physical toll on many throughout New York City. But, the City can blunt this toll by passing Int. No. 1912,

Case 20-4238, Document 40, 02/11/2021, 3035097, Page264 of 284

which bars marshals and sheriffs from evicting all residential or commercial tenants or collecting debts until at least September 2020, and from evicting or collecting from those most-directly affected by COVID-19 until at least April 2021.

<u>Residential Tenants</u>

First, the residential tenant protections of Int. No. 1912 would avert a looming crisis in evictions and homelessness.

Housing has become the front-line defense against the COVID-19 pandemic. The ability to retain access to housing and remain in it is a life or death situation. Once the Governor's eviction moratorium ends on June 20, 2020 renters who have been unable to pay their rent will be left unprotected. Housing courts will swell with new cases, and many people will be evicted and become homeless.

This wave of evictions will not only have a brutal social impact but will also pose a threat to public health and safety, and will overwhelm the City's emergency housing providers. Overcrowded shelters will present a nightmare for public health officials attempting to stop the spread of this pandemic, unless the Council passes Int. No. 1912.

Keeping people safe in their homes—and not homeless—is one of the most effective ways to protect the health and economic well-being of our neighbors. We are in a massive public health crisis, and nobody should be put out onto the street or be forced into an apartment right now. Extending the eviction moratorium will allow the most vulnerable New Yorkers to weather the crisis, get healthy, and get back on their feet by resuming their jobs, education, and lives after the outbreak has ended.

<u>Consumer Protections</u>

In addition to suspending evictions, Int. No. 1912 temporarily bars city marshals and sheriffs from executing on money judgments against New Yorkers. Low-income New Yorkers have always been harmed by wage garnishment and bank freezes (the two most common forms of enforcing judgments). Now, though, these New Yorkers would be especially harmed, as they face lost wages and no easy way to return to work. This harm would be most pronounced in communities of color, where consumer debt is highest and where the effects of COVID-19 have been the worst.

The state and federal governments have failed to protect New York's consumers from such ill-timed debt collection. It falls to the City Council to remediate this harm.

At any given time, there are tens of thousands of unsatisfied money judgments against the consumers and citizens of New York City. Often, these judgments are unsatisfied because the consumer never even knew that they had been sued and unwittingly defaulted. Many more are unsatisfied because an individual simply does not have the income necessary to both satisfy the judgment and pay their family's living expenses. When one or more income earners in a family loses their employment due to the COVID-19 crisis, the damage caused by enforcing money judgments will only be exacerbated. This is especially troubling when many families' budgets were already stretched to the limit before the current pandemic.

A-1886

Although Attorney General James issued a guidance to prevent banks and debt collectors from satisfying money judgment with CARES Act stimulus funds, such guidance is not legally binding and does not go far enough to protect New Yorkers' other hard-earned resources from garnishment. Similarly, although the state and federal governments provided myriad forms of relief to homeowners, student loan borrowers, and even large businesses, neither government does enough to protect low-income communities that are often saddled with large consumer debt loads.

Moreover, without clear legal directive to stop all garnishments, many families with funds that are legally exempt from judgment execution will inevitably still have their funds improperly garnished by banks. While the Exempt Income Protection Act has been in effect for more than a decade, bank personnel who are ill-informed continue to illegally freeze exempt funds. Affected consumers frequently require lengthy legal services interventions to access their exempt funds. An unequivocal stay on all garnishments and levies contemplated in Int. No. 1912 will leave no room for bank employees' confusion, and no excuses for banks to fail to observe legal mandates to leave exempt income exempt.

Further, the failure to stop money judgment enforcement is not only a financial scourge on low-income families, it is also a threat to public health and safety. When banks freeze a consumer's account, the consumer often must go to a bank branch several times to even discover the reason for the freeze, let alone unfreeze the account. This is true even when the funds were erroneously levied. Similarly, to vacate an improperly obtained default judgment, a consumer must personally go to the courthouse and file papers, go to a post office to mail the papers, then appear in court on a later date to challenge the judgment. These trips--to banks, to courts, to post offices—inevitably increase the chance that consumers, or court and bank employees who have been deemed essential, will be exposed to the COVID-19 disease. Neither judgment debtors nor essential workers should be subjected to such risks and contradict public health policy just so a debt collector can garnish funds that a family may need to put food on the table.

Lastly, in addition to residential tenants and consumers, Int. No. 1912 protects commercial tenants, by creating an eviction moratorium for these tenants as well. From our office's work with the Commercial Leases Assistance Program, we know that small business tenants face many of the same problems that residential tenants do. In particular, they also face dire economic consequences from COVID-19 that are exacerbated by underlying inequalities.

Small Businesses

In the best of times, the small business tenants we represent often experience landlord harassment and have severely limited rights under their written leases—if they are lucky to have a written lease at all. Many of our clients are sole proprietors, dependent on the income from their businesses to earn a livelihood for their families. Often, even if their businesses are incorporated, landlords require small business tenants to execute personal guarantees, making a tenant personally liable under a commercial lease.

New York's small business tenants now face unprecedented challenges and we must act to protect them. To ensure this moratorium will provide the most protection possible, we recommend that the moratorium remain in effect, even where a tenant has "effectively waived"

A-1887

the opportunity to demonstrate substantial loss of income due to COVID in a court of law. The waiver will disproportionately affect business owners and tenants who may be unable to represent themselves in court due to illness, corporate clients who are unable to afford or secure legal representation because they cannot represent themselves, and tenants who may be improperly served. Additionally, we recommend that a party who has suffered a substantial loss of income include a commercial tenant or guarantor who is personally liable under a commercial lease agreement.

<u>Closing</u>

While the protections afforded under Int. No. 1912, are important, we believe they are insufficient in and of themselves to address the needs of the most vulnerable New Yorkers. Our clients and partners desperately need rent relief. Otherwise, the least protected New Yorkers will be forced to shoulder the enormous economic cost of this pandemic. Residents and small business owners who find themselves without any source of income are facing grim realities. While we understand that the City may not have the legal authority to legislate on residential rents, it can take action to protect commercial tenants. We hope that the City will act swiftly to support such efforts at all levels of government.

On behalf of TakeRoot Justice, we thank you for standing up for New York City residents, consumers, and small business owners in this time of crisis. We ask that the Council seize this opportunity to pass Int. No. 1912 to fashion a more just society as we emerge from the COVID-19 crisis.


On behalf of TakeRoot Justice,

**Cheryl Walker**
Staff Attorney, Capacity Building

**Stephanie Storke**
Staff Attorney, Housing Justice

**Tedmund Wan**
Staff Attorney, Consumer Justice

123 Williams St., 16th floor
New York, NY 10038
T: 212-810-6744
F: 212-619-0653

Law, research, and
policy for organizing

**TAKEROOTJUSTICE.ORG**

A-1888

City Council Legislation

To whom it may concern;

Hope this email finds you well and safe!
In these devastating times when everyone is going through so many hardships,
we have been apprised that the city wants to pass legislation regarding mostly
stopping evictions till April 2021.  This will immediately result in lots of tenants
not paying the rent because there's no consequence they can get from the owner.
And they know that the owners hands are tied.
Such a situation will result in terrible hardships for the owners.
How will a building owner be able to pay his tax bill if his revenues are
tremendously cut?!
How will a owner pay for maintenance if there's no revenue to cover his
expenses???!!!
Does the city council want to see tenants in rotten apartments because the owner
can't afford repairs?!?!
How is a building owner supposed to survive these times if only the tenants
hardships are taken into account?!
Something needs to be done that's fair for everyone involved.
We urge the city council to consider property owners facing hardships in these
times just like tenants; and do what's fair to everyone!

Thanking in advance!
Stay safe!

---
*Chany Friedman*
*Five Star Management*
52 Bakertown RD.
Monroe, NY 10950
646-238-9669
chanymgmt@gmail.com

A-1889

Do Not Kill NYC Housing

To whom it may concern,

I hope this letter finds everybody healthy and safe,

I'm writing to you today as an owner from buildings in Manhattan, Brooklyn and Bronx.
we are all suffering at this time with so many people are sick and so many people are dying we are all in deep pain.

But NYC Landlords are already in deep pain way before this pandemic started. The cost to keep a building running NY City went up tremendously the city increased the Texas with big numbers the same with the water.

in additional the insurance cost double the last few years but the New York City let as increase in the last five years only with a few percent combined.

In the last year since USA have a trade war with China the price of material when up between 30 and 50%

The minimum wage is going up yearly with a big percentage.

The past summer the Legislature passed new laws, which is a real recipe for bankruptcy for all owners!

In addition to that, we were notified about laws proposed to stop eviction for the coming months or even longer.

It is very difficult for us to continue, when the tenants don't feel obligated to pay, and subconsciously they know that nothing can be done from the management side.

Realize, that it is a cause and effect situation. If we don't receive their monthly payments, we are unable to provide them with repairs, maintenance etc. and I believe you don't want to see them live in neglected apartments.

A-1890

The way the New York legislator is dealing with the landlords we going to go back to the 1960s and 70s which everybody threw away their buildings, New York looked like a slum for many years.

please don't trash so much hard-working people their work-their money- and effort.

In 2-5 years from now the people in New York will not forgive you.

Therefore I'm asking the legislature, Please! Please! do not pass through that law and do what is fair for everyone.

Sincerely,

Barry Weiss
Apple Estates LLC.
51 Forest Road Suite 316-17
Monroe, NY 10950
845-782-3337 Ext. 101
barrymgmt@gmail.com

A-1891

Do Not Stop Eviction

To whom it may concern,

Hope you're doing well in these unusual times!

NYC housing laws has drastically changed in the past years. Resulting plenty of difficulties for the building owners.

For instance, I had a tenant living in an apartment close to 30 years, the tenant's monthly rent was $800. When the tenant moved out, I had to renovate the apartment and put in at least $40,000. I was confident with my decision knowing that with a 20% increase, plus the Vacancy longevity bonus I'll have the money throughout the years. During the renovations the new laws passed, not allowing the landlord to take any raise.

The $800 every month, is far from paying off the expenses, which leads me to a monthly deficit!! The $40,000 I invested, is challenging me to pay the essential expenses, and puts me in a risk of losing the building.

Another tenant ours, just left her apartment. We can't afford even a simple paint job!!! In such neglected apartments you want to find the NYC residents living???

Furthermore, the law that was now introduced; **"A landlord cannot evict a tenant even after crisis is over"** this will really bring all building owners and tenants in big trouble.

I really beg to you, please do the maximum you can to prevent this law, and give the opportunity for the building owners to earn their money as it should be.

Thank you!!


**Bryan Bragg**
**Greenlake Estates LLC**
**Bronx, New York**
NYC Realty
<nycrealty9669@gmail.com>

A-1892

Testimony to the City Council Committee on Housing & Buildings and the Committee on
Consumer Affairs and Business Licensing

April 28, 2020

Ava Farkas
Executive Director, Met Council on Housing

Thank you Speaker Johnson and the Committee on Housing & Buildings and the Committee on
Consumer Affairs and Business Licensing

I'm pleased to testify in strong support of Intros 1912 which and Intro 1936.

Met Council's mission is to fight for Housing as a human right. The fact that it is **not** a human
right has exacerbated this current COVID-19 Crisis and its health impacts. 92,000 are homeless
and cannot shelter in place, and if we do not have a plan post eviction-moratorium then millions
more will find themselves in the same predicament.

I want to thank the City Council for supporting one of the critical services that Met Council
provides which is our tenant rights hotline and is now more important than ever. Our hotline
calls are confirming what everyone knows, that tenants who were barely able to afford their
rents before the pandemic are completely unable to now. Our hotline calls have gone from
questions about getting repairs to questions almost exclusively about inability to pay the rent
either due to layoff, reduction in hours, or roommates' layoff or reduction in hours.

We also have gotten at least one call from a health care worker whose roommate and primary
tenant have been harassing her into leaving the apartment before her sublease is up (and also
trying to force her to find her replacement) so Intro 1936 is critically important.

We also conducted a survey of our base with 556 people responding and found the following
information:
- 80% of people said that they will have problems paying the rent due to COVID-19
- 58% were not able to pay in April and an additional 28% will not be able to pay in May
- 60% were already paying over 30% of their income in rent

Both of these bills will provide a critical stop-gap measure and are an important first step to hold
things in place and give the Governor time to do his job of protecting the 5 million tenants in
NYS by Canceling Rent. Without relief from Albany we are just kicking the crisis down the road.

A-1893

## WRITTEN TESTIMONY IN SUPPORT OF INTRO 1912-2020:

Ceasing the taking and restitution of property and the execution of money
judgments by the city sheriff and marshals due to the impacts of COVID-19

## PRESENTED TO:

The New York City Council's Committees on Consumer Affairs and Business
Licensing and Housing and Buildings

## ON BEHALF OF:

Bromberg Law Office, P.C.

Brooklyn Bar Association Volunteer Lawyers Project

Law Office of Ahmad Keshavarz

The Legal Aid Society

Lincoln Square Legal Services, Inc. at Fordham Law School

Mobilization for Justice

National Center for Law and Economic Justice

New York Legal Assistance Group

Queens County Bar Association Volunteer Lawyers Project

TakeRoot Justice

Teamsters Local 237 City Employees Union

## HEARING DATE: APRIL 28, 2020

This written testimony is submitted by consumer advocates, who work on behalf of consumers, in support of Intro 1912 ("the Proposal"), which would require New York City marshals and sheriffs to cease the taking of property and the execution of money judgments during the current public health crisis until sufficient time has passed. We work on behalf of consumers, many of whom are low-wage workers, are immigrants, have limited English proficiency, or are financially insecure. Through our work on behalf of these consumers, we are uniquely positioned to understand the unique harm caused by the execution of money judgments, particularly during these unprecedented times of the COVID-19 crisis. We fully support the cessation of the execution of money judgments, and applaud the Council for taking this vital step to protect vulnerable New Yorkers during this difficult time.

**The Need for Intro 1912**

Many New Yorkers have already experienced job loss at unprecedented rates, and more and more are facing the prospect of crippling financial insecurity. Enforcement of judgments through bank account restraints, levies, and/or wage garnishment presents an emergency situation for New Yorkers. During the current COVID-19 crisis, and in the months and years to come, enforcement of money judgments will loom large and inflict severe consequences on a substantial number of New Yorkers. Even before the crisis, debt collection lawsuits inundated New York City courts. Hundreds of thousands of judgments (many by default, without proper notice to the consumer) have been entered in consumer credit transactions in New York City Civil Court over the past decade alone.  The economic havoc the crisis has inflicted on so many will cause many New Yorkers to rely on credit and incur additional debt, which will mean an increase in debt collection litigation and the entry of more money judgments.

Because of improper service, many consumers only find out for the first time that they were sued when they receive a wage garnishment or their bank account is restrained. Without a cessation of judgment enforcement, these New Yorkers will face the choice of asserting their rights in court, and possibly risking the health and safety of themselves and others, or suffer through this unprecedented time without access to much-needed funds.

The New Yorkers who are most vulnerable to judgment enforcement are those who have the most to lose: the working poor, whose income is subject to garnishment, and/or who may have scraped together enough savings in a bank account to pass the threshold for automatic bank restraints. One example of a working poor New Yorker is D.C., age 37, is a Hispanic domestic violence survivor and single mother of two children who lives in Queens. After she fled her abuser, she lived on credit and tried to start her own business, which ultimately failed.  She then joined the gig economy and started working as for-hire vehicle driver to make ends meet.  Like tens of thousands of other people in New York City, she was sued by a debt collector, who

obtained a judgment against her, and then used that judgment to start garnishing her meager ride-share earnings. D.C.'s story is like so many other New Yorkers who are currently facing and who face the fearful prospect of judgment enforcement, and who would benefit from Intro. 1912.

By requiring marshals and sheriffs to halt executions and takings, the Council is acting to protect the financial security of the most vulnerable New Yorkers during an unprecedented crisis, and at a time when our state and federal governments are not taking action in this important area.

**Concerns with the Proposal and Suggested Changes**

While we fully support the goal of the Proposal: to reduce the risk of income execution and bank levies, we have some concerns about certain provisions in the Proposal and respectfully suggest that certain elements of the bill be clarified to better protect New Yorkers. As explained in more detail below, our comments pertain to Section 3 of the Proposal, which applies to judgment execution during the period between the first and second suspension dates, defined in Section 2. **Because Section 3 does not go into effect until after the first suspension date expires, which is at the earliest, September 30, 2020, we urge the City Council to implement the remainder of the Proposal and immediately prohibit execution of money judgments while it considers the following suggestions.**

The Proposal requires marshals and sheriffs to provide the party against whom they are executing "a reasonable opportunity to show the court having jurisdiction over the matter that such party suffered a substantial loss of income because of COVID-19." (Intro. 1912 § 3(a)(3).) The Proposal is silent as to the nature, format, or frequency of this notice.  We suggest that the Proposal require a clear and easily understandable notice of the process be given to consumers as a pre-condition to enforcement.

We also have concerns about the address that might be relied on for any notice.  In our experience, many of the judgments that debt collectors seek to enforce were obtained on default, and notice of the court action was served at an outdated address. Therefore, the Proposal should require the marshal or sheriff to verify with a third party the current address of the party against whom they are executing to ensure that any notices sent to the consumer will actually be received. Any notice should also be easily readable and available in languages other than English.

As currently drafted, the Proposal requires the consumer to demonstrate to a court that they have "suffered a substantial loss of income because of COVID-19." (Intro. 1912 § 3(a)(3).) We have concerns about the fairness of placing the burden of proof on vulnerable consumers who, to be able to invoke the protections of this Proposal, necessarily have to have been adversely affected by COVID-19.

3

A-1896

We also have questions about the procedure itself, and what evidence will constitute proof, as well as the quantity and quality of such proof. We urge the Council to clarify the procedure by which consumers would show that they have suffered a substantial loss of income due to COVID-19: for example, the Proposal should clarify whether consumers will have to appear in person and testify at a hearing. Any procedure and proof requirement also must take into account the obstacles consumers faced in seeking medical diagnosis or treatment, the likely lack of written documentation to establish they have sought medical help, the fact that many business establishments that employed consumers are closed and may not re-open, and the fact that consumers may no longer have access to proof of events that occurred months before the collection is attempted. Any proof a consumer is able to obtain may also be of questionable evidentiary value, through no fault of their own.

The Proposal allows a sheriff or marshal to enforce a judgment against someone who has suffered substantial loss of income because of COVID-19 if a court finds the consumer "has not suffered such a loss or has effectively waived such opportunity." (Intro. 1912 § 3(a)(3).) The Proposal does not specify what would inform a court's finding or the basis for determining that a consumer has waived their opportunity to make a COVID-19-related assertion. No consumer should waive such "opportunity" to show they have been adversely affected by COVID-19 because, for example, they default on a hearing, or do not understand the procedure.

The Proposal includes several specific examples of proof that consumers may use to show they have suffered a substantial loss of income because of COVID-19. (Intro. 1912 § 3(b)(1)(a)-(j).) We recommend that the Council add a catchall provision under which consumers can assert reasons not included in the list to establish they should not be subject to judgment enforcement because of a COVID-19-related reason.

In conclusion, thank you for the opportunity to submit this testimony and offer comments on the Council's Proposal to protect tenants and consumers during the COVID-19 crisis. We respectfully request that the Council immediately enact Sections 1, 2, and 4 of the Proposal, and take into consideration the above requests for clarifications regarding Section 3. We remain willing and available to discuss these concerns in more detail and to provide model language if doing so would be helpful.

*Please contact Carolyn Coffey at Mobilization for Justice (ccoffey@mfjlegal.org), Tashi Lhewa at The Legal Aid Society (tlhewa@gmail.com), or Sarah Rosenthal at New York Legal Assistance Group (srosenthal@nylag.org) for any questions about this testimony.*

4

# THE LEGAL AID SOCIETY

**The Legal Aid Society**
**199 Water Street, 3rd Floor**
**New York, NY 10038**
**(212) 577 3300**

**Testimony of The Legal Aid Society Before The New York City Council Committee on Housing and Buildings and Committee on Consumer Affairs and Business Licensing on Int. 1912-2020 and 1936 -2020.**

**April 28, 2020**

## Introduction

Thank you Chairpersons Cornegy and Cohen, and members of the Committees on Housing and Buildings, and Consumer Affairs and Business Licensing, for the opportunity to testify on behalf of The Legal Aid Society ("the Society"), the nation's oldest and largest not-for-profit legal services organization. We welcome this opportunity to endorse and share our view on legislation that would temporarily halt the seizure of property and execution of money judgments by city sheriff and marshals, as well as, expand the definition of harassment to include threats based on a person having been impacted by COVID-19.

Through a network of borough, neighborhood, and courthouse-based offices in 26 locations in New York City, and more than 2,000 attorneys, paralegals, social workers, investigators and support staff, along with volunteer help coordinated by the Society's Pro Bono program, we provide comprehensive legal services to fulfill our mission that no New Yorker

1

should be denied access to justice because of poverty. Through three major practices – Civil, Criminal, and Juvenile Rights – the Society handles approximately 300,000 cases a year in city, state, and federal courts. This includes over 50,000 individual civil matters and law reform cases which benefit over 2 million low-income families and individuals. The Society acts as one of New York City's first responders, protecting and enforcing the legal rights of families and individuals through long-term advocacy for the right to counsel in criminal defense or juvenile justice issues, and by directly addressing emergent and systemic issues our client communities face.

The Society's Civil Practice improves the lives of low-income New Yorkers who struggle daily to buy food, pay rent, achieve or maintain self-sufficiency, and keep their families healthy and safe. Through sixteen neighborhood and courthouse-based offices in all five boroughs and 23 city-wide and special projects, the Society's Civil Practice provides direct legal assistance to low income individuals. In addition to individual assistance, the Society represents clients in law reform litigation, advocacy and neighborhood initiatives, and provides extensive back up support and technical assistance to community organizations.

The Society commends the Committees for holding today's hearings on both bills which will provide relief to numerous New Yorker who are currently on the edge of homelessness and financial distress. We strongly support the passage of the bills and have some suggested recommendations to strengthen the legislation.

**Intro. 1912-2020**

We strongly support the passage of Intro. 1912-2020, which will temporarily halt the taking and restitution of property and execution of money judgments by city sheriffs and

marshals. As you are aware, the COVID-19 pandemic is causing devastating and lasting economic hardship that disproportionately impacts low- and moderate-income New Yorkers and communities of color. This has caused numerous low- and moderate-income New Yorkers to default or fall behind on financial obligations, including medical bills, credit card payments, auto loans, student loans and rent.

The COVID-19 pandemic has amplified New York City's ongoing housing crisis in ways that are impossible to ignore. Housing insecurity is a brutal fact of life for many New Yorkers. Forty-four percent of New York City renters are rent burdened, and four out of ten low-income people in New York are either homeless or severely rent burdened.[1] Even in a strong economy, a budget overwhelmed by housing costs increases a family's risk of food insecurity, lack of access to proper medical care and eviction. With little room for savings, a reduction in work hours or an unexpected expense may cause turmoil and ultimately, displacement. Similar to the COVID-19 pandemic, involuntary displacement is not born equally in New York City, where low-income black and Latinx households are most impacted by eviction and homelessness.[2]

Housing insecurity now impacts a far broader range of households than it did earlier this year. Reeling from a sudden loss of income, low- and moderate-income renters on the precipice, rent burdened and without savings, have now fallen off of a financial cliff. Stay-at-home orders triggered mass layoffs and shuttered businesses and entire industries. A weekly survey, conducted by public health experts over the course of the pandemic, found that one in three New

---

[1] Center for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet*, (Dec. 10, 2019), *available at:* https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY.
[2] Oksana Mironova, Community Service Society, *Where Have All the Affordable Rentals Gone?* (May 2019), *available at*: https://www.cssny.org/publications/entry/where-have-all-the-affordable-rentals-gone; NYU Furman Center, *COVID-19 Cases in New York City, a Neighborhood-Level Analysis*, (Apr. 10, 2020), *available at*: https://furmancenter.org/thestoop/entry/covid-19-cases-in-new-york-city-a-neighborhood-level-analysis.

3

Yorkers did not pay their rent or mortgage in April.[3] Sixty-two percent of those who were unable to pay their rent stated that they feared eviction.

While New Yorkers are now protected from eviction by Governor Andrew Cuomo's 90-day eviction moratorium, the economic landscape is unlikely to be dramatically altered by the end of the state moratorium on June 20.[4] By June 20, renters will owe months of rental arrears and fees; many will promptly face eviction proceedings seeking thousands of dollars of debt and dispossession. Far from solving the crisis, the end of this short-term moratorium will be catastrophic for renters who have not received a paycheck in months.

The eviction of any one household is a tragedy; eviction of thousands of rental households is a humanitarian crisis. The loss of a home is not the only consequence of eviction, which it can have devastating, long-term negative effects on employment outcomes, school performance and physical and mental health.[5] Mass displacement will undermine recovery efforts for the foreseeable future and traumatize entire communities. Because truly affordable housing is in limited supply in New York City, many renters will have no choice but to double-up with friends or family or enter a shelter system already strained by an intractable homelessness crisis. It is likely that among those evicted will be people sick with COVID-19 or asymptomatically and unknowingly carrying the virus.

---

[3] *CUNY New York City COVID-19 Survey Week 5 (April 10-12)*, CUNY Graduate School of Public Health & Health Policy, *available at* https://sph.cuny.edu/research/covid-19-tracking-survey/week-5/.
[4] See, N.Y. Executive Order 202.8, (March 20, 2020), *available at*:
https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.8.pdf
[5] See, e.g., Matthew Desmond and Carl Gershenson, *Housing and Employment Insecurity Among the Working Poor*, (2016), *available at*:
https://scholar.harvard.edu/files/mdesmond/files/desmondgershenson.sp2016.pdf?m=1452638824.

4

Other jurisdictions have recognized that an effective response to this impending eviction crisis includes an eviction moratorium that extends passed the state of emergency.[6] New York should be leading this issue, and we strongly support the passage of legislation that will allow our communities a chance to remain intact as we recover from the global pandemic.

New Yorkers face financial challenges beyond eviction. The hardship imposed by money judgments include a nine percent post-judgment statutory interest rate; systemic and systematic improper service of process, and failure to apply existing laws when vacatur of judgments are sought; and abusive debt collection practices in connection with financial services and products, such as credit cards, auto loans and leases, rental arrears, student loans, and medical debt.

Enforcement of judgments through bank account restraint, levies, and wage garnishment presents a dire situation for the hundreds of thousands of New Yorkers who have been impacted by the economic devastation in the wake of the pandemic. At a time when almost half of all New Yorkers do not have even $400 in cash to pay for emergency expenses, consumers across the state are now confronted with loss of income due to illness and workplace closures related to the pandemic.[7] Many other jurisdictions and some agencies have temporarily suspended enforcement of judgments, but there remains a tremendous need to cease enforcement for the vast majority of the remaining judgment debtors.[8] It is critical that this bill pass to provide temporary relief to New Yorkers facing limited income and savings from execution of money judgments.

---

[6] *Covid-19 Housing Policy Scorecard*, The Eviction Lab, *available at*: https://evictionlab.org/covid-policy-scorecard/.

[7] Cargill, C., Maury, M., & Wimer, C. (June 2019), *Spotlight on Emergency Expenses*, *available at* https://robinhoodorg-production.s3.amazonaws.com/uploads/2019/06/EMERGENCY-EXPENSE-REPORT_6_19_FINAL.pdf.

[8] *Governor Cuomo and Attorney General James Temporarily Suspend State Debt Collection in Response to Coronavirus.* (March 17, 2020), *available at* https://www.governor.ny.gov/news/governor-cuomo-and-attorney-general-james-temporarily-suspend-state-debt-collection-response; U.S. Department of Education. *Secretary DeVos Directs FSA to Stop Wage Garnishment, Collections Actions for Student Loan Borrowers, Will Refund More Than $1.8 Billion to Students, Families,* (March 25, 2020), *available* at https://content.govdelivery.com/accounts/USED/bulletins/28317e2.

5

An increasing number of judgement debtors have approached the Society in the last few weeks seeking assistance due to frozen bank accounts and garnished wages. For example, a client who was working from home last week discovered that her debit card was not working due to a restraint on her bank account by Capital One Bank. The client was the sole wage earner in her family, until she was let go on March 20, 2020 as a result of her employer's inability to pay employees due to the current pandemic. The bank account contained her last paycheck and retirement funds that her disabled husband cashed, to pay for back due rent. Without access to her bank account she was unable to pay for food, medication, and rent for her family. There are numerous other similarly situated New Yorkers facing ongoing debt collection, and we expect a drastic increase in the immediate aftermath of this crisis.

The Society suggests the following supportive amendments, which will further the bill's goal of reducing the harm of judgment enforcement during the current pandemic. We suggest the bill clarify what constitutes a "reasonable opportunity to show the court having jurisdiction over the matter that such party suffered a substantial loss of income because of COVID-19." There must be clarity about the procedure by which one would show they "suffered a substantial loss of income." It is critical that the process be easily understandable and accessible by the many judgment debtors and renters who will need to prepare for and make this showing without the assistance of an attorney. Over 95 percent of consumers are unrepresented in debt collection cases, and *pro se* legal assistance programs for consumer debtors, such as the Civil Legal Advice and Resource Office (CLARO) and Volunteer Lawyer for the Day (VLFD), have temporarily closed due to the ongoing public health emergency.[9] In housing court, while the majority of landlords are represented by attorneys, most tenants appear *pro se*.[10]

---

[9] The New York State courts estimated in 2014 that 98% of consumers were unrepresented in debt collection cases. *See* N.Y. State Chief Judge Jonathan Lippman, *Law Day Remarks: Consumer Credit Reforms* 1 (transcript) (Apr. 30, 2014). That percentage has slightly decreased to 96% of consumers in 2017 following an increase in civil legal

6

Similarly, a 'reasonable opportunity' to make such a showing must ensure address verification, as numerous default judgments that are being enforced were obtained by service of process on incorrect addresses.[11] Last, in listing the circumstances under which a judgment debtor or renter would be considered to have "suffered a substantial loss of income" due to COVID-19, it is important that there be a catchall provision for those who faced loss of income due to COVID-19 but are not enumerated in the listed situations.

### Intro. 1936-2020

We support and urge the passage of Intro 1936-2020, which amends the definition of harassment in the Housing Maintenance Code to include threats against an individual based on their status as a COVID-19 impacted person, their status as an essential employee, or their receipt of a rental concession or forbearance for any rent owed during the COVID-19 period. Access to safe and stable housing is critically important for New Yorkers at a time when landlords increasingly look to force tenants to leave their homes or otherwise give up their rights under law. Lack of housing would force thousands of tenants to survive on the streets and face increased risks for both contracting COVID-19 and experiencing serious complications from the virus. Homeless New Yorkers cannot isolate at home or practice social distancing in congregate shelters. Those who contract COVID-19 are at a high-risk of serious complications due to high rates of underlying health conditions such as diabetes, heart disease, asthma, and COPD.

The Society is concerned about reports of tenants facing increasing harassment related to COVID-19, especially senior tenants. Our experience with harassment includes baseless eviction

---

services funding; According to 2018 data from the New York City Civil Court, out of a total of 100,186 consumer credit filings, attorney answers were filed in only 3,892 actions -- which is a rate of representation of only 3.88%.
[10] New York City Office of Civil Justice, *Universal Access to Legal Services: A Report on Year One of Implementation in New York City*, (2018).
[11] Creditors obtained more than approximately 700,000 default judgments in consumer credit actions filed between 2008 and 2016.

cases, illegal rent demands, vague nuisance allegations, withholding of repairs and maintenance, and repeated buyout offers. With the eviction moratorium issued by Governor Cuomo and other legislative measures to temporarily halt evictions,[12] we have seen landlords resort to harassment to remove tenants facing financial challenges due to the pandemic. The bill provides necessary relief to tenants facing "self-help evictions" and other forms of harassment during a public health emergency.

We recommend that the bill include an additional definition of "a person impacted by COVID-19." We propose including a catchall provision for a person who may have been impacted by COVID-19 for purposes of the legislation but does not fall into the listed categories.

## Conclusion

We applaud the Committees for holding today's hearing on these critically important bills. They will go a long way to protect low income and vulnerable New Yorkers trying to survive while facing unemployment and financial distress.  Thank you for your leadership on these issues and for the opportunity to testify. We look forward to working with the Committees and the City Council in the coming months.


Respectfully submitted,


Adriene Holder, Attorney-in-Charge, Civil Practice
Judith Goldiner, Attorney-in-Charge, Civil Law Reform Unit

---

[12] See, e.g., N.Y.S. Assembly Bill A10290/N.Y.S. Senate S08192, "Tenant Safe Harbor Act" (prohibits landlords from evicting tenants for non-payment of rent that accrued during the current state of emergency and for six months after its eventual end.) *available at*: https://nyassembly.gov/leg/?bn=A10290&term=2019; N.Y.S. Assembly Bill A10224/N.Y.S. Senate Bill S8125A (suspends rent payment for 90 days for those who lost their jobs or had to close their businesses because of COVID-19.) *available at*:  https://www.nysenate.gov/legislation/bills/2019/s8125

A-1905

Tashi Lhewa, Of Counsel
Caryn Schreiber, Of Counsel
The Legal Aid Society
199 Water Street
New York, New York 10038
(212) 577-3557

9