# 20-4238-cv

## United States Court of Appeals

*for the*

## Second Circuit

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC,
LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,
ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

– v. –

CITY OF NEW YORK, a municipal entity, MAYOR BILL DE BLASIO, as
Mayor of the City of New York, COMMISSIONER LOUISE CARROLL,
Commissioner of New York City Department of Housing Preservation &
Development, COMMISSIONER JONNEL DORIS, Commissioner of
New York City Department of Small Business Services,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 8 of 16 (Pages A-1906 to A-2180)

JAMISON DAVIES
NEW YORK CITY LAW DEPARTMENT
*Attorneys for Defendants-Appellees*
100 Church Street
New York, New York 10007
(212) 356-2490

CLAUDE G. SZYFER
STROOCK & STROOCK & LAVAN LLP
*Attorneys for Plaintiffs-Appellants*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, dated July 10, 2020 ................................. A-14

Notice of Motion for Preliminary Injunctive and
    Declaratory Relief, dated July 22, 2020 ............... A-78

Declaration of Stephen P. Younger in Support of
    Plaintiffs' Motion for Preliminary Injunctive and
    Declaratory Relief, dated July 22, 2020 ............... A-80

Exhibit 1 to Younger Declaration -
July Reopening Survey Summary ........................ A-107

Exhibit 2 to Younger Declaration -
Partnership for New York City – A Call for
Action and Collaboration ....................................... A-109

Exhibit 3 to Younger Declaration -
The New York Times Article: New Threat to New
York City: Commercial Rent Payments Plummet,
dated May 21, 2020 ................................................. A-177

Exhibit 4 to Younger Declaration -
The Real Deal Article: About 25% of NYC
renters didn't pay in May: survey, dated
May 19, 2020 ........................................................... A-183

Exhibit 5 to Younger Declaration -
Complaint in *The Gap, Inc. v. 44-45 Broadway
Leasing Co., LLC*, dated June 23, 2020 ................. A-187

Exhibit 6 to Younger Declaration -
Complaint in *The Gap, Inc. v. 170 Broadway
Retail Owner, LLC*, dated July 2, 2020 .................. A-213

ii

**Page**

Exhibit 7 to Younger Declaration -
Complaint in *Bath & Body Works, LLC v. 304
PAS Owner LLC*, dated June 8, 2020 .................... A-237

Exhibit 8 to Younger Declaration -
Complaint in *Victoria's Secret Stores, LLC v.
Herald Square Owner LLC*, dated June 8, 2020 .... A-258

Exhibit 9 to Younger Declaration -
The New York Times Article: Tenants' Troubles
Put Stress on Commercial Real Estate, dated
June 5, 2020 ............................................................ A-282

Exhibit 10 to Younger Declaration -
The New York Times Article: 5 Ways the
Coronavirus Has Changed Suburban Real Estate,
dated July 17, 2020 ................................................. A-289

Exhibit 11 to Younger Declaration -
The New York Times Article: Coronavirus
Escape: To the Suburbs, dated May 8, 2020 .......... A-299

Exhibit 12 to Younger Declaration -
Snapshot: IBO's Updated Economic and Revenue
Forecast and Review of the Adopted Budget for
2021, dated July 21, 2020 ...................................... A-310

Exhibit 13 to Younger Declaration -
New York City Independent Budget Office –
Focus on: The Executive Budget, dated
May 2020 ................................................................ A-351

Exhibit 14 to Younger Declaration -
The New York Times Article: N.Y.C. Budget and
a Cut to N.Y.P.D. Funding, Explained, dated
July 1, 2020 ............................................................ A-377

iii

**Page**

Exhibit 15 to Younger Declaration -
Chapter 23 of the New York State Session Laws
of 2020, effective March 3, 2020 .......................... A-385

Exhibit 16 to Younger Declaration -
New York State Assembly Memorandum in
Support of Legislation submitted in Accordance
with Assembly Rule III, Sec 1(f) .......................... A-388

Exhibit 17 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202, dated March 7, 2020 .................... A-390

Exhibit 18 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.3, dated March 16, 2020 ................ A-394

Exhibit 19 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.6, dated March 18, 2020 ................ A-397

Exhibit 20 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.7, dated March 19, 2020 ................ A-400

Exhibit 21 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.8, dated March 20, 2020 ................ A-403

Exhibit 22 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.16, dated April 12, 2020 ................ A-406

Exhibit 23 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.28, dated May 7, 2020 ................... A-409

Exhibit 24 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.38, dated June 6, 2020 ................... A-413

iv

**Page**

Exhibit 25 to Younger Declaration -
State of New York Executive Chamber Executive
Order No. 202.48, dated July 6, 2020 .................... A-416

Exhibit 26 to Younger Declaration -
Chapter 125 of the New York State Session Laws
of 2020, effective June 17, 2020 ........................... A-420

Exhibit 27 to Younger Declaration -
Chapter 127 of the New York State Session Laws
of 2020, effective June 30, 2020 ........................... A-423

Exhibit 28 to Younger Declaration -
Proposed Int. No. 1914-A ...................................... A-426

Exhibit 29 to Younger Declaration -
Proposed Int. No. 1932-A ...................................... A-430

Exhibit 30 to Younger Declaration -
Proposed Int. No. 1936-A ...................................... A-434

Exhibit 31 to Younger Declaration -
Transcript of Remote Hearing, dated
May 13, 2020 .......................................................... A-438

Exhibit 32 to Younger Declaration -
New York City Council Article: New York City
Council Announces COVID-19 Legislative
Relief Package To Be Introduced on Wednesday,
dated April 21, 2020 .............................................. A-516

Exhibit 33 to Younger Declaration -
Transcript of Remote Hearing, dated
April 28, 2020 ......................................................... A-525

Exhibit 34 to Younger Declaration -
Transcript of Remote Hearing, dated
April 29, 2020 ........................................................ A-669

v

**Page**

Exhibit 35 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure and Government Affairs
Division, dated April 28, 2020 .............................. A-959

Exhibit 36 to Younger Declaration -
The Council of the City of New York Briefing
Paper and Committee Report of the
Governmental Affairs Division, dated
April 29, 2020 ........................................................ A-973

Exhibit 37 to Younger Declaration -
The Council of the City of New York Committee
Report of the Governmental Affairs Division,
dated May 13, 2020 ................................................ A-1052

Exhibit 38 to Younger Declaration -
The New York City Council Committee Report
of the Infrastructure Division, dated
May 13, 2020 ........................................................ A-1108

Exhibit 39 to Younger Declaration -
Summary – Brooklyn Chamber of Commerce
Surveys .................................................................... A-1114

Exhibit 40 to Younger Declaration -
MetLife & U.S. Chamber of Commerce Small
Business Coronavirus Impact Poll, dated
June 3, 2020 ............................................................ A-1116

Exhibit 41 to Younger Declaration -
NYC's Nightlife Economy Impact, Assets, and
Opportunities .......................................................... A-1132

Exhibit 42 to Younger Declaration -
Emails, dated June 19, 2020 .................................. A-1213

vi

**Page**

Exhibit 43 to Younger Declaration -
The Stoop NYU Furman Center Blog Article:
Understanding the Potential Magnitude of Rent
Shortfalls in New York Due to COVID, dated
June 4, 2020 ............................................................ A-1216

Exhibit 44 to Younger Declaration -
Small Business First – Better Government
Stronger Businesses ................................................ A-1229

Exhibit 45 to Younger Declaration -
Guaranty, dated October 18, 2018 ......................... A-1278

Declaration of Santo Golino in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 22, 2020 .......................................................... A-1281

Declaration of Ling Yang in Support of Plaintiffs'
Motion for a Preliminary Injunction, dated
July 9, 2020 ............................................................ A-1323

Declaration of Marcia Melendez in Support of
Plaintiffs' Motion for a Preliminary Injunction,
dated July 9, 2020 .................................................. A-1330

Notice of Motion to Dismiss, dated August 12, 2020 A-1336

Declaration of Carlos F. Ugalde Alvarez in Support
of Defendants' Motion to Dismiss and in
Opposition to Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 12, 2020 ..................................................... A-1338

Exhibit A to Alvarez Declaration -
Chapter 23 of the New York State Laws of 2020 .. A-1366

Exhibit B to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202 dated March 7, 2020 ................................ A-1370

vii

**Page**

Exhibit C to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.3 dated March 16, 2020 .......................... A-1374

Exhibit D to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.5 dated March 18, 2020 .......................... A-1377

Exhibit E to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.6 dated March 18, 2020 .......................... A-1381

Exhibit F to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.7 dated March 19, 2020 .......................... A-1384

Exhibit G to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-1387

Exhibit H to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.9 dated March 21, 2020 .......................... A-1390

Exhibit I to Alvarez Declaration -
New York State Gubernatorial Executive Order
Nos. 202.13, 202.14, 202.18 dated March 29,
2020, April 7, 2020 and April 16, 2020 ................. A-1393

Exhibit J to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.16, dated April 12, 2020.......................... A-1404

Exhibit K to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.28, dated May 7, 2020 ............................ A-1407

Exhibit L to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.29, dated May 8, 2020 ............................ A-1411

viii

**Page**

Exhibit M to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.31, dated May 14, 2020 .......................... A-1413

Exhibit N to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.34, dated May 28, 2020 .......................... A-1416

Exhibit O to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.35, dated May 29, 2020 ......................... A-1419

Exhibit P to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.36, dated June 2, 2020 ............................ A-1422

Exhibit Q to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.38, dated June 6, 2020 ............................ A-1425

Exhibit R to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.39, dated June 7, 2020 ............................ A-1428

Exhibit S to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.41, dated June 13, 2020 .......................... A-1431

Exhibit T to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.45, dated June 26, 2020 .......................... A-1434

Exhibit U to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.48, dated July 6, 2020 ............................ A-1437

Exhibit V to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.49, dated July 7, 2020 ............................ A-1441

ix

**Page**

Exhibit W to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.50, dated July 9, 2020 .............................  A-1443

Exhibit X to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.53, dated July 21, 2020 ...........................  A-1445

Exhibit Y to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ........................  A-1448

Exhibit Z to Alvarez Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 .....................  A-1452

Exhibit AA to Alvarez Declaration -
Administrative Order No. AO/68/20, dated
March 16, 2020........................................................  A-1454

Exhibit BB to Alvarez Declaration -
Administrative Order No. AO/127/20, dated
June 18, 2020 ..........................................................  A-1464

Exhibit CC to Alvarez Declaration -
Administrative Order No. AO/131/20, dated
June 23, 2020 ..........................................................  A-1474

Exhibit DD to Alvarez Declaration -
Administrative Order No. AO/143/20, dated
July 7, 2020.............................................................  A-1480

Exhibit EE to Alvarez Declaration -
Chapter 112 of the New York State Laws of 2020
and Chapter 126 of the New York State Laws of
2020 .......................................................................  A-1482

Exhibit FF to Alvarez Declaration -
Chapter 125 of the New York State Laws of 2020   A-1492

**x**

                                                                    **Page**

Exhibit GG to Alvarez Declaration -
Chapter 127 of the New York State Laws of 2020    A-1501

Exhibit HH to Alvarez Declaration -
Introduction No. 1914............................................    A-1504

Exhibit II to Alvarez Declaration -
Introduction No. 1932............................................    A-1508

Exhibit JJ to Alvarez Declaration -
Introduction No. 1936............................................    A-1516

Exhibit KK to Alvarez Declaration -
Transcript of Meeting, dated April 22, 2020..........    A-1520

Exhibit LL to Alvarez Declaration -
Committee Report of the Infrastructure and
Governmental Affairs Divisions, dated
April 28, 2020.......................................................    A-1620

Exhibit MM to Alvarez Declaration -
NYU Furman Center Article: What are the
Housing Costs of Households Most Vulnerable to
Job Layoffs? An Initial Analysis, dated
March 30, 2020.....................................................    A-1634

Exhibit NN to Alvarez Declaration -
The New York Times Article: 11 Numbers That
Show How the Coronavirus Has Changes N.Y.C.,
dated April 20, 2020 .............................................    A-1643

Exhibit OO to Alvarez Declaration -
Transcript of Hearing, dated April 28, 2020 ..........    A-1654

Exhibit PP to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. No. 1936...........................    A-1798

xi

**Page**

Exhibit QQ to Alvarez Declaration -
Briefing Paper and Committee Report of the
Governmental Affairs Divisions, dated
April 29, 2020........................................................ A-1906

Exhibit RR to Alvarez Declaration -
New York City Comptroller Scott M. Stringer:
City must take immediate action to prepare for
economic impacts of COVID-19 and protect vital
services for most vulnerable New Yorkers, dated
March 16, 2020...................................................... A-1985

Exhibit SS to Alvarez Declaration -
New York State Restaurant Association,
Restaurant industry impact survey: New York
State, dated April 2020 .......................................... A-1991

Exhibit TT to Alvarez Declaration -
National Bureau of Econ. Research Article: How
are small businesses adjusting to COVID-19?
Early evidence from a survey, dated April 2020.... A-1993

Exhibit UU to Alvarez Declaration -
Info. Station Article: How important are small
businesses?, dated January 3, 2017....................... A-2030

Exhibit VV to Alvarez Declaration -
United States Small Business Administration,
Small Businesses generate 44 percent of U.S.
economic activity, dated January 30, 2019............ A-2034

Exhibit WW to Alvarez Declaration -
N.Y.C. Department of Small Business Services,
Comprehensive Guide to Commercial Leasing in
New York City ....................................................... A-2037

xii

**Page**

Exhibit XX to Alvarez Declaration -
Entrepreneur Article: Hayden Field, 5 most
common red flags entrepreneurs should know
before signing a commercial real estate lease in
New York, dated June 6, 2019 ............................... A-2078

Exhibit YY to Alvarez Declaration -
Transcript of Hearing, dated April 29, 2020 .......... A-2091

Exhibit ZZ-1 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2381

Exhibit ZZ-2 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2550

Exhibit ZZ-3 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2745

Exhibit ZZ-4 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-2925

Exhibit ZZ-5 to Alvarez Declaration -
Written Testimony in Connection with April 28,
2020 Hearing on Intro. Nos. 1914 and 1932 ......... A-3128

Exhibit AAA to Alvarez Declaration -
Intro. No. 1914-A ................................................. A-3335

Exhibit BBB to Alvarez Declaration -
Intro. No. 1932-A ................................................. A-3339

Exhibit CCC to Alvarez Declaration -
Intro. No. 1936-A ................................................. A-3344

Exhibit DDD to Alvarez Declaration -
Intro. No. 1914- A's Plain Language Summary ..... A-3348

xiii

**Page**

Exhibit EEE to Alvarez Declaration -
Intro. No. 1932- A's Plain Language Summary ..... A-3350

Exhibit FFF to Alvarez Declaration -
Intro. No. 1936- A's Plain Language Summary ..... A-3352

Exhibit GGG to Alvarez Declaration -
Committee Report of the Infrastructure Division,
dated May 13, 2020 ................................................ A-3354

Exhibit HHH to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3360

Exhibit III to Alvarez Declaration -
Committee Report of the Governmental Affairs
Divisions, dated May 13, 2020 ............................. A-3368

Exhibit JJJ to Alvarez Declaration -
Transcript of Hearing, dated May 13, 2020 ........... A-3425

Exhibit KKK to Alvarez Declaration -
City Council's Meeting .......................................... A-3438

Exhibit LLL to Alvarez Declaration -
Letter from the City's Office of the Mayor, dated
May 26, 2020 ........................................................ A-3516

Exhibit MMM to Alvarez Declaration -
Commercial Harassment Law, effective
May 26, 2020 ........................................................ A-3519

Exhibit NNN to Alvarez Declaration -
Guaranty Law, effective May 26, 2020 ................. A-3523

Exhibit OOO to Alvarez Declaration -
Residential Harassment Law, effective
May 26, 2020 ........................................................ A-3528

Exhibit PPP to Alvarez Declaration -
Local Law No. 62 of 2020 .................................... A-3533

xiv

**Page**

Exhibit QQQ to Alvarez Declaration -
Local Law No. 63 of 2020 .................................... A-3536

Exhibit RRR to Alvarez Declaration -
Resolution No. 1349 of 2020 ................................ A-3540

Exhibit SSS to Alvarez Declaration -
Resolution No. 1350 of 2020 ................................ A-3543

Exhibit TTT to Alvarez Declaration -
Document Produced by Plaintiff Jarican Realty
Inc., dated July 31, 2020 ......................................... A-3546

Exhibit UUU to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC .......................................................................... A-3580

Exhibit VVV to Alvarez Declaration -
Document Produced by Plaintiff Top East Realty
LLC .......................................................................... A-3595

Letter from Arthur Kats to the Honorable Ronnie
Abrams, dated August 13, 2020 ............................. A-3614

Brief of Amicus Curiae Volunteers of Legal Service
in Opposition to Plaintiffs' Motion for
Preliminary Injunctive and Declaratory Relief,
dated August 13, 2020 ............................................ A-3617

Declaration of Arthur Kats in Opposition to
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 13, 2020 ............ A-3646

Exhibit 1 to Kats Declaration -
The New York Times Article: How Prepared Is
the U.S. for a Coronavirus Outbreak?, dated
February 29, 2020 .................................................. A-3658

xv

**Page**

Exhibit 2 to Kats Declaration -
New York Times U.S. COVID-19 Map and Case
Tracker, last visited August 11, 2020 .................... A-3669

Exhibit 3 to Kats Declaration -
The New York Times Article: New York City
Region Is Now an Epicenter of the Coronavirus
Pandemic, dated March 22, 2020 ......................... A-3687

Exhibit 4 to Kats Declaration -
New York Times N.Y. Covid-19 Map and Case
Tracker, last visited August 11, 2020 .................... A-3693

Exhibit 5 to Kats Declaration -
New York State Gubernatorial Executive Order
No. 202.8 dated March 20, 2020 .......................... A-3704

Exhibit 6 to Kats Declaration -
The Wall Street Journal Article: Times Square Is
Eerily Empty During the Pandemic, but
Advocates Are Focused on a Comeback, dated
May 19, 2020 ........................................... A-3707

Exhibit 7 to Kats Declaration -
Report Published by the U.S. Small Business
Administration's Office of Advocacy: Small
Business GDP: 1998-2014 .................................. A-3711

Exhibit 8 to Kats Declaration -
Office of the N.Y. State Comptroller, Small
Business in New York State: An Economic
Snapshot 1, dated 2019 .................................. A-3787

Exhibit 9 to Kats Declaration -
U.S. Small Business Administration's 2019 Small
Business Profile for the State of New York ........... A-3792

xvi

**Page**

Exhibit 10 to Kats Declaration -
The New York Times Article: One-Third of New
York's Small Businesses May Be Gone Forever,
dated August 3, 2020 .............................................. A-3797

Exhibit 11 to Kats Declaration -
The Wall Street Journal Article: Amid
Coronavirus Shutdowns, Landlords Often
Determine Fate of Small Businesses, dated
June 4, 2020 ............................................................ A-3802

Exhibit 12 to Kats Declaration -
Article: For Small Businesses With High Rents,
Coronavirus Aid Falls Short .................................. A-3808

Exhibit 13 to Kats Declaration -
Article: On a Vibrant Street in Brooklyn,
Businesses Are Struggling for Survival ................. A-3814

Exhibit 14 to Kats Declaration -
Brooklyn Chamber of Commerce, July
Reopening Survey Summary, dated July 2020 ...... A-3820

Exhibit 15 to Kats Declaration -
The Wall Street Journal Article: Small Business
Sector Highly Vulnerable to Coronavirus Crisis,
dated April 7, 2020 ................................................ A-3822

Exhibit 16 to Kats Declaration -
U.S. Fed. Reserve Bank of N.Y., 2020 Report on
Employer Firms: Small Business Credit Survey,
dated 2020 .............................................................. A-3825

Exhibit 17 to Kats Declaration -
Fed. Reserve Bank of N.Y., Can Small Firms
Weather the Effects of COVID-19?, dated
April 2020 .............................................................. A-3863

xvii

**Page**

Exhibit 18 to Kats Declaration -
Local Law 53 ......................................................... A-3867

Exhibit 19 to Kats Declaration -
Local Law 55 ......................................................... A-3871

Exhibit 20 to Kats Declaration -
Committee Report of the Governmental Affairs
Division on Local Law 53 ..................................... A-3876

Exhibit 21 to Kats Declaration -
Testimony of the Volunteers of Legal Service
Microenterprise Project Int. Nos. 1914 & 1932 .... A-3932

Exhibit 22 to Kats Declaration -
Partnership for New York City: A Call for Action
and Collaboration.................................................. A-3936

Letter from Jeffrey Turkel to the Honorable Ronnie
Abrams, dated August 25, 2020............................. A-4004

Reply Declaration of Stephen P. Younger in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 ........................................... A-4030

Exhibit 1 to Younger Declaration -
Rentec Direct's August 2020 Rental Trends
Report .................................................................... A-4043

Exhibit 2 to Younger Declaration -
New York Hospitality Alliance's July 2020 Rent
Report .................................................................... A-4046

Exhibit 3 to Younger Declaration -
Sydney Pereira New Article: Thousands of New
Yorkers at Risk of Eviction as Cuomo's
Moratorium Expires............................................... A-4056

xviii

**Page**

Exhibit 4 to Younger Declaration -
News Article: Retail Chains Abandon Manhattan:
It's Unsustainable..................................................... A-4067

Exhibit 5 to Younger Declaration -
Screenshot of Post from Newman Ferrara LLP's
Website................................................................... A-4077

Exhibit 6 to Younger Declaration -
Complaint in *The Maramont Corporation v.
Generation Next Realty, Inc.*, dated July 20, 2020   A-4082

Exhibit 7 to Younger Declaration -
Report: Landlords and Renters Struggling to
Make Ends Meet During COVID-19 Uncertainty,
dated August 20, 2020 ........................................... A-4094

Exhibit 8 to Younger Declaration -
Press Release: Small Property Owners of New
York Announces Majority of Owners and
Managers of Small Properties Are Working with
Tenants by Reducing, Forgoing, and Offering
Rent Concessions, dated August 25, 2020............. A-4111

Exhibit 9 to Younger Declaration -
The New York Post Article: New Yorker's Keep
Moving Out of the City to Suburbs, Other States,
dated August 11, 2020............................................ A-4115

Exhibit 10 to Younger Declaration -
The New York Times Article: Movers in N.Y.C.
Are So Busy They're Turning People Away,
dated August 20, 2020 ........................................... A-4120

Exhibit 11 to Younger Declaration -
CNBC Article: Retail Rents Plummet Across
New York City, as America's Glitzy Shopping
Districts Turn Into Ghost Towns, dated
August 2, 2020....................................................... A-4130

xix

**Page**

Exhibit 12 to Younger Declaration -
The City Article: New York's Rent Drops as
Vacancies Increase. Could Rent Regulation Be
Next Thing to Fall?, dated July 27, 2020............... A-4138

Exhibit 13 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55, dated August 5, 2020 ......................... A-4148

Exhibit 14 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.55.1, dated August 6, 2020 ...................... A-4152

Exhibit 15 to Younger Declaration -
New York State Gubernatorial Executive Order
No. 202.57, dated August 20, 2020 ....................... A-4154

Exhibit 16 to Younger Declaration -
New York City Council Bill Int. No. 2007-2020 ... A-4157

Exhibit 17 to Younger Declaration -
New York State Senate Bill No. S8904 ................. A-4160

Exhibit 18 to Younger Declaration -
August 2020 Resolution ........................................ A-4163

Exhibit 19 to Younger Declaration -
Gotham Gazette Article: Requestions for
Emergency Rent Grants Fell During Pandemic,
But Expected to Skyrocket When Evictions
Resume, dated July 24, 2020 ................................. A-4179

Exhibit 20 to Younger Declaration -
New York State Senate Bill No. S8139 ................. A-4187

Exhibit 21 to Younger Declaration -
New York State Senate Bill No. S8190-A ............. A-4191

Exhibit 22 to Younger Declaration -
New York State Senate Bill No. S8125-A ............. A-4201

xx

**Page**

Exhibit 23 to Younger Declaration -
Screenshot from New York City Department of
Health, dated August 19, 2020 ............................... A-4204

Exhibit 24 to Younger Declaration -
Guidance Published by Centers for Disease
Control and Prevention: COVID-19 Pandemic
Planning Scenarios ................................................. A-4210

Reply Declaration of Santo Golino in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief and in
Opposition to Defendants' Motion to Dismiss,
dated August 26, 2020 ........................................... A-4219

Reply Declaration of Marcia Melendez in Further
Support of Plaintiffs' Motion for Preliminary
Injunctive and Declaratory Relief, dated
August 21, 2020 ..................................................... A-4242

Declaration of Elias Bochner in Support of
Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, dated August 25, 2020 ............ A-4245

Reply Declaration of Carlos F. Ugalde Alvarez in
Further Support of Defendants' Motion to
Dismiss, dated September 2, 2020 ......................... A-4250

Amended Complaint, dated September 2, 2020 ........ A-4268

Transcript of Oral Argument, dated
September 11, 2020 ................................................ A-4334

Notice of Appeal, dated December 21, 2020 ............ A-4394

A-1906

# EXHIBIT QQ

A-1907

<u>Small Business Committee Staff:</u>
Stephanie Jones, Counsel
Noah Meixler, Policy Analyst
Aliya Ali, Principal Finance Analyst

<u>Consumer Affairs and Business Licensing Committee Staff:</u>
Balqees Mihirig, Senior Counsel
Leah Skrzypiec, Policy Analyst
Sebastian Bacchi, Senior Finance Analyst



## THE COUNCIL OF THE CITY OF NEW YORK

BRIEFING PAPER AND COMMITTEE REPORT OF THE GOVERNMENTAL AFFAIRS
DIVISION
Jeffrey Baker, Legislative Director
Rachel Cordero, Deputy Director for Governmental Affairs

### COMMITTEE ON SMALL BUSINESS
Hon. Mark Gjonaj, Chair

### COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING
Hon. Andrew Cohen, Chair

**April 29, 2020**

### <u>OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City</u>

| | |
|---|---|
| <u>INT. NO. 1846:</u> | By Council Members Torres and Chin |
| <u>TITLE:</u> | A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of gratuity policies for delivery workers |

1

A-1908

**INT. NO. 1895:**                By Council Members Gjonaj, Kallos, Constantinides, and Brannan

TITLE:                          A Local Law to amend the administrative code of the city of New York, in relation to food service establishments' packaging of food for delivery

**INT. NO. 1896:**                By Council Members Gjonaj, Kallos, Constantinides, Brannan, and Gibson

TITLE:                          A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of commissions charged by third-party food delivery services

**INT. NO. 1897:**                By Council Members Gjonaj, Constantinides, Brannan, and Gibson

TITLE:                          A Local Law to amend the administrative code of the city of New York, in relation to the licensing of third-party food delivery services

**INT. NO. 1898:**                By Council Members Gjonaj, Moya, Constantinides, Brannan, Rosenthal and Gibson

TITLE:                          A Local Law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services

**INT. NO. 1907:**                By Council Members Moya, Gjonaj, Brannan, Rosenthal and Gibson

TITLE:                          A Local Law to amend the administrative code of the city of New York, in relation to prohibiting third-party food delivery services from limiting the purchase prices covered

-2-

A-1909

|  |  |
|---|---|
|  | establishments may charge on food and beverage orders |
| **PROPOSED INT. NO. 1908-A:** | By Council Members Moya, Gjonaj, Kallos, Brannan, Rosenthal, Gibson, Ayala, Van Bramer, Rivera and Cohen |
| TITLE: | A Local Law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services |
| **INT. NO. 1914:** | By Council Member Adams and the Speaker (Council Member Johnson) |
| TITLE: | A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19 |
| **INT. NO. 1916:** | By Council Member Cohen |
| TITLE: | A Local Law in relation to requiring the department of consumer affairs to waive and refund all fees related to sidewalk cafe licenses that are due on or after January 1, 2020 until December 31, 2020, and providing for the repeal of such provision upon the expiration thereof |
| **INT. NO. 1921:** | By Council Members Gjonaj and Louis |
| TITLE: | A Local Law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services and food service establishments to display sanitary inspection letter grades online |
| **INT. NO. 1932:** | By Council Member Rivera and the Speaker (Council Member Johnson) |

-3-

A-1910

TITLE:

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

**PRECONSIDERED INT. NO.   :**

By Council Member Matteo

TITLE:

A Local Law in relation to requiring the mayor to issue a guidance on license and permit renewal deadline extensions, and requiring that no such licenses or permits be required to be renewed within 90 days after the COVID-19 emergency has ended, and providing for the repeal of such provision upon the expiration thereof

**RES. NO. 1049:**

By the Public Advocate (Mr. Williams) and Council Members Levin and Cabrera

TITLE:

A Resolution calling upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans

A-1911

## I.   **INTRODUCTION**

On April 29, 2020, the Committee on Small Business, chaired by Council Member Mark Gjonaj, and the Committee on Consumer Affairs and Business Licensing, chaired by Council Member Andrew Cohen, will hold a remote oversight hearing on "The Impact of COVID-19 on Small Businesses in New York City." The Committees will also hear a package of thirteen pieces of legislation designed to help small businesses in the City weather the negative impacts of the COVID-19 outbreak. Those invited to testify include representatives from the New York City Department of Small Business Services (SBS), representatives from the Department of Consumer and Worker Protection (DCWP) (formerly the Department of Consumer Affairs), representatives from the Office of Nightlife at the Mayor's Office of Media and Entertainment, representatives from third-party delivery platforms, small business advocates, chambers of commerce, Business Improvement Districts (BIDs), and other community-based non-profit organizations.

The package of legislation includes the following bills: (1)  Int. No. 1846 by Council Member Torres, a local law to amend the administrative code of the city of New York, in relation to the disclosure of gratuity policies for delivery workers; (2)  Int. No. 1895 by Council Member Gjonaj, a local law to amend the administrative code of the city of New York, in relation to food service establishments' packaging of food for delivery; (3) Int. No. 1896 by Council Member Gjonaj, a local law to amend the administrative code of the city of New York, in relation to the disclosure of commissions charged by third-party food delivery services; (4) Int. No. 1897 by Council Member Gjonaj, a local law to amend the administrative code of the city of New York, in relation to the licensing of third-party food delivery services; (5) Int. No.

Case 20-4238, Document 41, 02/11/2021, 3035102, Page28 of 296

A-1912

1898 by Council Members Gjonaj and Moya, a local law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services; (6) Int. No. 1907 by Council Members Moya and Gjonaj, a local law to amend the administrative code of the city of New York, in relation to prohibiting third-party food delivery services from limiting the purchase prices covered establishments may charge on food and beverage orders; (7) Proposed Int. No. 1908-A by Council Members Moya and Gjonaj, a local law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services; (8) Int. No. 1914 by Council Member Adams and the Speaker (Council Member Johnson), a local law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19; (9) Int. No. 1916 by Council Member Cohen, a local law in relation to requiring the department of consumer affairs to waive and refund all fees related to sidewalk cafe licenses that are due on or after January 1, 2020 until December 31, 2020, and providing for the repeal of such provision upon the expiration thereof; (10) Int. No. 1921 by Council Members Gjonaj and Louis, a local law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services and food service establishments to display sanitary inspection letter grades online; (11) Int. No. 1932 by Council Member Rivera and the Speaker (Council Member Johnson), a local law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19; (12) Preconsidered Int. No.__ by Council Member Matteo, in relation to requiring the mayor to issue a guidance on license and permit renewal deadline extensions, and requiring that no such licenses or permits be required to be renewed within 90 days after the COVID-19 emergency has ended, and providing for the repeal of such provision upon the expiration thereof; and (13) Res.

-6-

A-1913

No. 1049 by The Public Advocate (Mr. Williams), a resolution calling upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans.

## II.    BACKGROUND

In late December of 2019, a new virus, SARS-CoV-2, was detected in Wuhan, China and by January 30, 2020, the World Health Organization (WHO) declared that COVID-19, the disease caused by the SARS-CoV-2 virus, was now a Public Health Emergency of International Concern (PHEIC).[1] SARS-CoV-2 is not the first virus to pose a serious threat to modern civilization in recent decades. In 2003, the severe acute respiratory syndrome (SARS) was labelled the "first pandemic of the 21st century", because it spread quickly across continents, infected more than 8,000 people and killed nearly 800.[2] By comparison, COVID-19 has infected 2.5 million people across 210 countries, and has killed nearly 800,000 people as of April 22, 2020.[3]

The ease with which the virus spreads has caused governments across the globe to shut-down businesses, schools, religious and cultural institutions, and mandate various levels of social isolation. While this has helped to limit the spread of the virus, stay-at-home orders have had a catastrophic impact on economic markets and particularly small businesses.

### 1.    The Impact on Small Businesses Amid the COVID-19 Crisis

---

[1] World Health Organization "Rolling updates on coronavirus disease (COVID-19)", last updated April 18, 2020, available at: https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen.

[2] James W. DeLuc and M. Anita Barry "SARS, the first pandemic of the 21st century", *Emerging Infectious Diseases*, November 2004, vol. 10(11), e26, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3329048/.

[3] Worldometer "Countries where COVID-19 has spread", April 22, 2020, available at: https://www.worldometers.info/coronavirus/countries-where-coronavirus-has-spread/.

A-1914

In New York, Governor Andrew Cuomo issued an executive order – New York State on PAUSE (PAUSE) – that closed all on-site, non-essential businesses, effective March 22, 2020, to help stop the spread of SARS-CoV-2.[4] The list of essential businesses that are still permitted to operate, to some degree, include:

- Health care operations – such as hospitals, medical labs, walk-in clinics, home healthcare, elder care, veterinaries, nursing homes, licensed mental health providers, and medical billing support personnel.

- Infrastructure – such as airports, public utilities, hotels, commercial shipping ports, and telecommunications.

- Manufacturing – such as food processing, pharmaceuticals, automobiles, household paper products, and chemicals.

- Retail – such as grocery stores, pharmacies, framer's markets, gas stations, restaurants (for take-out and delivery only), and convenience, hardware and pet food stores.

- Services – such as laundromats, postal services, trash and recycling collection, bicycle and automotive repair, funeral homes, and animal shelters.

- Financial Institutions – such as banks and lending institutions, insurance companies, and accounting firms.

---

[4] Governor Andrew Cuomo "Governor Cuomo signs the 'New York State on PAUSE' executive order", March 20, 2020, available at: https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

A-1915

- Human Services Providers – such as food banks, homeless shelters and community care programs.

- Construction – insofar that it supports affordable housing, hospitals, roads, transit facilities, homeless shelters or schools.

- Public Health and Safety – such as law enforcement, fire and emergency services, building cleaners or janitors, and residential moving services.

- Logistical, Technological and Child Care Services – such as technology support for online services, child care programs, government owned or leased buildings and essential government services.

- Recreation – such as parks and open spaces (not including playgrounds), and boatyards and marinas.

- Professional Services – such as lawyers and real estate services.

- News Media; and

- Defense.[5]

Although this list covers a range of industries that are permitted to operate during PAUSE, a large proportion of New York's small (and large) businesses have still had to severely reduce their capacities. According to an analysis by the NYC Comptroller, the City's hotels are projected to only maintain an occupancy rate of 20 percent, while restaurant sales are expected to

---

[5] Empire State Development "Guidance for determining whether a business enterprise is subject to a workforce reduction under recent executive orders", April 19, 2020, available at: https://esd.ny.gov/guidance-executive-order-2026, last accessed April 22, 2020.

drop by a staggering 80 percent. Real estate and retail sales are both expected to decline by 20 percent.[6]

These figures for the restaurant industry reflect the results of a recent survey by the New York State Restaurant Association. According to their findings, sales have declined by 79 percent, and New York State restaurants are expected to lose $3.6 billion in sales revenue, in April alone.[7] Just over half (51 percent) of all restaurants have been able to move their operations online, and unemployment rates in this sector have skyrocketed, as 80 percent of restaurant workers have lost their jobs.[8]

Restrictions similar to PAUSE have been implemented across the country, which has caused a massive reduction in the number of small businesses operating. In their survey of small businesses (under 500 employees), the National Bureau of Economic Research found that 43 percent of businesses had closed due to COVID-19 and that they had reduced their staff by about 40 percent since January 2020.[9] The results were more severe in the Mid-Atlantic region, which includes New York, where 57 percent of businesses were closed, and staff employment decreased by 47 percent.[10] According to the survey's conclusion, about 20 percent of the nation's

---

[6] New York City Comptroller Scott M. Stringer "Comptroller Stringer: City must take immediate action to prepare for economic impacts of COVID-19 and protect vital services for most vulnerable New Yorkers", March 16, 2020, available at: https://comptroller.nyc.gov/newsroom/comptroller-stringer-city-must-take-immediate-action-to-prepare-for-economic-impacts-of-covid-19-and-protect-vital-services-for-most-vulnerable-new-yorkers/.
[7] New York State Restaurant Association "Restaurant industry impact survey: New York State", April, 2020, available at: https://www.nysra.org/uploads/1/2/1/3/121352550/restaurant_industry_impact_survey__new_york_state__2_.pdf.
[8] Id.
[9] Alexander W. Bartik et al. "How are small businesses adjusting to Covid-19? Early evidence from a survey", *National Bureau of Economic Research*, April 2020, available at: https://www.nber.org/papers/w26989.pdf.
[10] https://www.nber.org/papers/w26989.pdf.

employees work in "retail trade, leisure and hospitality and these sectors are particularly vulnerable to the current pandemic."[11]

### 2. <u>Federal, State and Local Government Response to Help Small Businesses</u>

The nation's economy is dependent on its small businesses. There are approximately 27 million of these businesses across the country and they are responsible for employing 57 million workers.[12] When including the owners of these businesses, in addition to employees, that total comes to an estimated 85 million people.[13] According to the Small Business Administration, small businesses are responsible for creating two-thirds of the Country's new jobs.[14] Given their vital role, it is crucial that they are either given alternative means to operate, in as lucrative a manner as possible, throughout the COVID-19 crisis, and/or are provided the necessary support to restart their operations once social distancing measures have been lifted.

a. <u>Federal Government Assistance</u>

During this crisis, small businesses in New York City may apply for various assistance programs including funding distributed by the federal government through its Small Business Administration (SBA). These programs include the Paycheck Protection Program (PPP),[15] the Economic Injury Disaster Loan and Advance (EIDL) and the SBA Express Bridge Loans and

---

[11] Id.
[12] Information Station "How important are small businesses?", January 3, 2017, available at: https://informationstation.org/video/how-important-are-small-businesses/?utm_source=google&utm_medium=cpk&gclid=EAIaIQobChMI-Ymy3df86AIVGozIQh0QRQPrEAAYASAAEgI7ivD_BwE.
[13] Id.
[14] United States Small Business Administration "Small Businesses generate 44 percent of U.S. economic activity", January 30, 2019", available at: https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/.
[15] United States Small Business Administration "Paycheck Protection Program", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program-ppp (last visited on April 9, 2020).

Debt Relief programs. The federal government has also temporarily increased the unemployment insurance stipend that laid-off or furloughed workers may receive, which may have implications for the workforce of some small businesses.

*Paycheck Protection Program*

The Coronavirus, Aid, Relief, and Economic Security Act (CARES ACT) originally allocated about $349 billion in federal funds for PPP, with an additional $322 billion authorized by Congress in late April.[16] The program provides various types of employers, including small businesses, nonprofits, self-employed individuals and independent contractors, access to loans to cover payroll costs of up to $100,000 per employee, rent and mortgage interest prior to February 15, 2020, and utilities. Loans are calculated per employer or per location, and may be as high as 2.5 times the average monthly payroll for the one-year period before the loan application is submitted, to a cap of $10 million. Loans are calculated differently for seasonal and new employers. Employers of fewer than 500 workers may apply for these loans through a network of banks ranging from large to smaller banks.[17] Banks may not require applicants to supply collateral or personal guarantees, and applicants may only apply for one PPP loan.

PPP loans can be forgiven up to the value of eight weeks of payroll costs of up to $100,000 per employee, rent and mortgage interest prior to February 15, 2020, and utilities. To qualify for loan forgiveness, however, 75 percent of the amount loaned must be used for payroll

---

[16] Emily Cochrane and Jim Tankersley "Senate approves aid for small-business loan program, hospitals and testing", April 21, 2020, *New York Times*, available at: https://www.nytimes.com/2020/04/21/us/politics/congress-business-relief-ppp.html.

[17] In the recent funding allocation, $60 billion was set aside for lenders with less than $50 billion in assets. *See* Aaron Gregg and Renae Merle "How to get a small-business loan under the new $484 billion coronavirus aid package", April 23, 2020, *The Washington Post*, available at: https://www.washingtonpost.com/business/2020/04/22/small-business-loan-faq.

**A-1919**

costs, and employee and salary levels must be maintained, or else the forgiven amount will be reduced. If not forgiven, PPP loans accrue at a one percent interest rate and must be paid back within two years, with an optional deferral of up to six months. There are no loan fees or prepayment penalties.

*Economic Injury Disaster Loan and Advance[18]*

Small businesses may apply for the SBA's existing Economic Injury Disaster Loan program (EIDL), which the CARES Act expanded upon. The existing program provides economic relief for small businesses of fewer than 500 employees or otherwise meets SBA size standards, self-employed persons, independent contractors and nonprofits in the form of loans of up to $2 million. To be eligible, entities must also demonstrate the ability to repay the loan. Interest rates are low (3.75 percent for small businesses and 2.75 percent for nonprofits) and feature long-term repayment plans of up to 30 years.

The CARES Act expanded upon this program to provide a loan advance. Eligible entities that can show a temporary loss of revenue can receive an advance of up to $10,000 upon successful application for an EIDL loan. That advance may be forgiven by the federal government.

*SBA Express Bridge Loans[19] and Debt Relief[20]*

---

[18] United States Small Business Administration "Economic injury disaster loan emergency advance", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/economic-injury-disaster-loan-emergency-advance (last visited on April 9, 2020).

[19] United States Small Business Administration "SBA Express Bridge Loans", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/sba-express-bridge-loans (last visited on April 9, 2020).

[20] United States Small Business Administration "SBA debt relief", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/sba-debt-relief (lasted visited on April 9, 2020).

The CARES Act allocated funds for SBA's Express Bridge Loan program and their Debt Relief program. The Express Bridge Loan program quickly provides funds of up to $25,000 for businesses eligible for SBA's 7(a) loans to overcome a temporary loss of revenue. SBA's Debt Relief program allows businesses that are eligible for SBA's 7(a), 504 and microloans to receive limited payment of principal, interest and fees on these loans. The 7(a), 504 and microloans are SBA's standard small business loan programs, which were established before the onset of COVID-19. The 7(a) loans are available for general business purposes, such as working capital, equipment, furniture, and land and building.[21] They are provided through a lender.[22] The 504 loans are issued by Certified Development Companies for long-term, fixed-asset financing for small businesses, such as the purchase and improvement of land and buildings.[23] Microloans are temporary, short-term loans of up to $50,000 to small businesses for general business purposes, and are offered by nonprofits.[24]

The federal government's PPP program, although heavily utilized, has raised some concerns. As of April 13, 2020, the program had issued about 1,661,367 loans totaling over $342 billion, with over 4,975 lenders participating.[25] However, a recent ranking of businesses receiving loans as a percentage of each state's eligible payroll revealed that New York State placed second to last, with only 23.1 percent of eligible businesses receiving a loan.[26] By

---

[21] United States Small Business Administration Office of Financial Assistance: Resources, 7(a) Loans", available at: https://www.sba.gov/offices/headquarters/ofa/resources/11428 (last visited on April 9, 2020).

[22] Id.

[23] United States Small Business Administration "Office of Financial Assistance: Resources, 504 Loans", available at: https://www.sba.gov/offices/headquarters/ofa/resources/4049 (last visited on April 9, 2020).

[24] See 13 CFR § 120.2 for the definition of this and other, traditional SBA loan programs.

[25] United States Small Business Administration "Paycheck Protection Program (PPP) Report: Approvals through 4/16/20", available at: https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.

[26] Zachary Mider and Cedric Sam "Small-business rescue shows not all states are created equal", updated April 20, 2020, Bloomberg, available at: https://www.bloomberg.com/graphics/2020-sba-paycheck-protection-program/.

contrast, Nebraska and North Dakota reached 74.7 percent and 71.5 percent respectively.[27] Further, some industries fared better than others, with the construction industry receiving the highest percentage of loans (13 percent) and restaurants receiving less than nine percent,[28] despite representing about 14 percent of companies employing under 500 people.[29] Of the restaurants who received loans, some reports allege that too many have gone to large chains, and a handful of these companies have received blowback for accepting loans. A Reuters article claimed that 25 percent of the initial $350 billion allocated to SBA loan programs went to fewer than two percent of the firms that got relief, with some of these being large, publicly-traded companies with "thousands of employees and hundreds of millions of dollars in annual sales."[30] Among these companies is the Ruth's Hospitality Group (owns 150 Ruth's Chris Steak Houses), Potbelly ($409.7 million in sales and 6,000 employees) and Shake Shack (8,000 employees). Both Ruth's Hospitality Group[31] and Shake Shack have agreed to return their loans, the latter of which citing an ability to raise the funds through other means.[32] Similarly, dozens of large companies with financial or legal problems have reportedly received significant loans through the program, according to an analysis of 200 publicly-traded companies that reported receiving a

---

[27] Id.

[28] United States Small Business Administration "Paycheck Protection Program (PPP) Report: Approvals through 4/16/20", available at: https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf.

[29] Andy Sullivan, Howard Schneider and Ann Saphir "Main street bailout rewards U.S. restaurant chains, firms in rural states", April 17, 2020, *Reuters*, available at: https://www.reuters.com/article/us-health-coronavirus-usa-lending-analys/main-street-bailout-rewards-us-restaurant-chains-firms-in-rural-states-idUSKBN21Z3FL.

[30] Id.

[31] Peter Rudegeair, Heather Haddon and Ruth Simon "Ruth's Chris to repay loan amid outcry over rescue program", updated April 23, 2020, *The Wall Street Journal*, available at: https://www.wsj.com/articles/public-companies-have-to-repay-small-business-rescue-loans-11587670442.

[32] Luisa Beltran "Restaurant chains received many of the biggest PPP loans, updated April 23, 2020, *Barron's*, available at: https://www.barrons.com/articles/restaurant-chains-received-many-of-the-biggest-ppp-loans-51587573556.

total of $750 million through PPP.[33] Since it became known that large companies had been benefitting from PPP, the SBA published additional guidance emphasizing that businesses may only apply for the loan if, in good faith, they can certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant," and that public companies with "substantial market value" are unlikely to be able to make such a certification.[34] Companies who received the loan before this guidance and repay it before May 7, 2020 will be deemed to have certified in good faith.[35]

The manner in which PPP was offered to the public and the complexity of its terms and conditions may have contributed to a lack of success for many small business owners. Although the program began accepting applications on Friday, April 3, 2020, some large banks refused to participate at first, citing a lack of guidance from the federal government.[36] When more banks did begin to accept applications, there was confusion regarding what conditions the banks could apply. SBA authorized a last-minute raise from half a percent to a one percent interest rate, reportedly to address concerns from banks about being unable to service the loans at an interest rate of only half a percent.[37] Further, some large banks attached unexpected conditions to their

---

[33] Jessica Silver-Greenberg, David Enrich, Jesse Drucker and Stacy Cowley "Large, troubled companies got bailout money in small-business loan program", April 26, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/26/business/coronavirus-small-business-loans-large-companies.html.
[34] United States Small Business Administration "Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)" updated April 23, 2020, https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf.
[35] Id.
[36] Brian Thompson "No small-business relief yet: False start on Paycheck Protection Program loans", April 3, 2020, *Forbes*, available at: https://www.forbes.com/sites/brianthompson1/2020/04/03/no-small-business-relief-yet-false-start-on-paycheck-protection-program-loans/#163172d034c4.
[37] "SBA increases rate, clarifies terms on Paycheck Protection Program loans", *ABA Banking Journal*, April 2, 2020, https://bankingjournal.aba.com/2020/04/treasury-sba-to-increase-rate-on-paycheck-protection-program-loans/; Michela Moscufo "How to get, and give, Paycheck Protection Program loans through the SBA", April 3, 2020, *Forbes*, available at: https://www.forbes.com/sites/michelamoscufo/2020/04/03/how-to-get-and-give-paycheck-protection-program-loans-through-the-sba/#3f766faa27e8.

applications, like having a previous banking relationship with them before February 15, 2020.[38] A few weeks after the lending program began, it ran out of funds,[39] seemingly validating concerns from some experts that the program was not sufficiently well-funded, or disbursing funds quickly enough.[40]

The federal government's EIDL program quickly experienced funding shortages as well. For many applicants, a cap of $2 million per borrower was significantly reduced to $15,000.[41] Furthermore, although the program was touted as featuring a quick turnaround on payments, many applicants waited weeks for approval and found that the amount disbursed to them was much less than the initial approval amount.[42] In a survey of 885 small business owners conducted by the National Federation of Independent Business the day after the SBA's EIDL and PPP programs ran out of funds, 80 percent were still waiting to hear about their loan applications.[43]

Immigrant communities in NYC may have had even more difficulty applying to and obtaining federal funds, which would considerably impact the City's economy. Immigrant

---

[38] *See e.g.* Bank of America "Small Business Administration Paycheck Protection Program application" available at: https://about.bankofamerica.com/promo/assistance/latest-updates-from-bank-of-america-coronavirus/small-business-assistance, (last visited April 8, 2020); JPMorgan Chase & Co "Paycheck Protection Programs FAQs & useful tips", available at: https://recovery.chase.com/cares1/ppp-faqs#accordion-1586386467723-1-panel, (last visited April 8, 2020); and Wells Fargo "Small Business Administration Paycheck Protection Program", available at: https://update.wf.com/coronavirus/paycheckprotectionprogram/, (last visited April 8, 2020).

[39] Stephen Gandel "Paycheck Protection Program out of money: Thousands of small businesses shut out", *CBS News*, April 16, 2020, available at: https://www.cbsnews.com/news/paycheck-protection-program-out-of-money-small-businesses-shut-out.

[40] Jim Tankersley "Virus throws millions out of work, and Washington struggles to keep pace", April 9, 2020 *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/coronavirus-unemployment-washington.html?action=click&module=Top%20Stories&pgtype=Homepage.

[41] Stacy Cowley "Small Businesses Wait for Cash as Disaster Loan Program Unravels", April 9, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/smallbusiness/small-business-disaster-loans-coronavirus.html.

[42] *Id.*

[43] National Federation of Independent Business "80% of PPP applicants are still urgently waiting for financial assistance" April 20, 2020, available at: https://www.nfib.com/content/press-release/economy/80-of-ppp-applicants-are-still-urgently-waiting-for-financial-assistance.

workers make up 45 percent of the city's workforce[44] and own one-half of New York City's businesses.[45] In some neighborhoods, immigrant-owned businesses employ up to 42 percent of the neighborhood population.[46] Yet, there have been questions surrounding whether undocumented immigrants can be eligible for the PPP program, since it requires an Employee Identification Number or Social Security Number on its program application.[47] The application originally required business owners to be U.S. citizens or permanent residents.[48] In the past, SBA placed additional restrictions and requirements on access to loans for non-citizens.[49]

In addition, certain features of the federal government's PPP program may disproportionately disadvantage minority business owners from obtaining loans. A loophole allowing bank servicers to prefer businesses with a previous lending relationship may lead to the exclusion of many minority businesses.[50] Many microbusinesses in New York City may have not previously applied for loans or lines of credit, and therefore may not have relationships with local banks.[51] The Congressional Black Caucus has recognized the "history and legacy" of racial inequality in the banking system, and as banks default to lending to businesses to which they

---

[44] Mayor's Office of Immigrant Affairs "State of Our Immigrant City: Annual Report", March 15, 2018, available at: https://www1.nyc.gov/assets/immigrants/downloads/pdf/annual-report-2018.pdf.

[45] Id.

[46] Lena Afridi "The Displacement Crisis of Immigrant-Owned Small Businesses", February 15, 2018, *Shelter Force,* available at: https://shelterforce.org/2018/02/15/displacement-crisis-immigrant-owned-small-businesses/.

[47] United States Small Business Administration "Paycheck Protection Program: Borrower application form", effective April 3, 2020, available at: https://www.sba.gov/sites/default/files/2020-04/PPP-Borrower-Application-Form-Fillable.pdf.

[48] See Emily Guerin "Massive Federal Loan Program for Small Businesses Off to Rocky Start", April 3, 2020, *LAist*, https://laist.com/2020/04/03/small_business_ppp_paycheck_protection_program_loans_stimulus_coronavirus.php.

[49] *See* United States Small Business Administration "SBA Eligibility Questionnaire, for Standard 7(a) Guaranty", available at: https://www.sba.gov/sites/default/files/bank_eligibility_questionnaire_0.pdf; and Kimberly Rotter and Dawn Papandrea "What Are SBA Loan Requirements?", February 28, 2020, *U.S. News & World Report*, available at: https://loans.usnews.com/complete-list-of-sba-loan-requirements.

[50] Mary Alice Parks "Minority-owned small businesses face unique, steep hurdles amid coronavirus cash crunch", April 8, 2019, *ABC News*, available at: https://abcnews.go.com/Health/minority-owned-small-businesses-face-unique-steep-hurdles/story?id=70011898.

[51] Id.

A-1925

have lent money before, minority-owned businesses could be disproportionately denied and excluded.[52]

For those with access to COVID-19 funding programs, there are drawbacks to consider. Although the federal government's PPP program offers loan forgiveness, there are significant conditions to satisfy. Seventy-five percent of the PPP loan's forgiven amount must be spent on payroll costs, a condition that appears to have taken shape late in the process.[53] If 75 percent of the forgiven amount must be spent on payroll costs, that may leave less for businesses to spend on obligations such as rent and utilities, which may be disproportionately higher in our City.[54] Some businesses may decide, and some have decided, that the program is too risky, or that it is more valuable to their employees to lay them off, so that employees may collect a higher salary through the federal government's expanded unemployment insurance program.[55] If a business does not qualify for full forgiveness of the loan, PPP requires the small business owner to pay off the loan within two years, after a six-month deferral.[56] Small businesses in the City may be concerned about being able to pay back these loans, and about being burdened with more debt.

For many small businesses in the City, dealing with an unpredictable and contagious virus that has already significantly disrupted the ability of many to earn revenue makes

---

[52] Id.

[53] United States Small Business Administration "Interim Final Rule: Business Loan Program Temporary Changes; Paycheck Protection Program", Issued April 2, 2020, available at: https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf.

[54] Greg Iacurci "Your Forgivable Loan May Be Undercut by This Provision of the Paycheck Protection Program", updated April 9, 2020, *CNBC*, available at: https://www.cnbc.com/2020/04/07/this-part-of-paycheck-protection-program-could-reduce-forgivable-loans.html.

[55] Jim Tankersley "Virus Throws Millions Out of Work, and Washington Struggles to Keep Pace", April 9, 2020, *The New York Times*, available at: https://www.nytimes.com/2020/04/09/business/coronavirus-unemployment-washington.html?action=click&module=Top%20Stories&pgtype=Homepage.

[56] United States Small Business Administration "Paycheck Protection Program", available at: https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program.

borrowing money a risky endeavor. With the exception of SBS's Employee Retention Grant Program, which was only available for the smallest of City businesses (1-4 employees), almost all the funding available to businesses have taken the form of loans. There are concerns about whether the City's economy will strengthen quickly enough to satisfy the terms of these loans, and businesses might struggle to pay off additional debt (even at low or no interest rates) after this sustained period of closure and reduced income. A 2019 survey conducted by the Federal Reserve found that as many as 70 percent of small businesses have outstanding debt.[57] Similarly, a 2016 JPMorgan study concluded that most small businesses did not have enough cash reserves to carry them through a significant economic downturn, with the median independent restaurant having only enough extra cash to last them 16 days.[58]

b.  <u>New York State Assistance</u>

In addition to closing 100 percent of non-essential businesses statewide, the PAUSE executive order provides a 90-day moratorium on residential and commercial evictions.[59] Since commercial rent is typically the largest cost and greatest concern for business owners,[60] the 90-day moratorium provides short-term relief to businesses. The Governor's moratorium on

---

[57] Federal Reserve Banks "Small Business Credit Survey: 2019 Report on Employer Firms", available at: https://www.fedsmallbusiness.org/medialibrary/fedsmallbusiness/files/2019/sbcs-employer-firms-report.pdf. Also *see* Bridget Bartolini "City's Small Businesses Need Rent Stabilization to Survive COVID-19, Advocates Say", April 6, 2020, *City Limits*, available at: https://citylimits.org/2020/04/06/citys-small-businesses-need-rent-stabilization-to-survive-covid-19-advocates-say.
[58] *See* Bridget Bartolini, id.
[59] Governor Andrew M. Cuomo "Video, Audio, Photos & Rush Transcript: Governor Cuomo Signs the "New York State on Pause" Executive Order", March 20, 2020, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-signs-new-york-state-pause-executive-order.
[60] Association for Neighborhood & Housing Development "The Forgotten Tenants: New York City's Immigrant Small Business Owners", March, 2019), available at: https://anhd.org/report/forgotten-tenants-new-york-citys-immigrant-small-business-owners.

A-1927

commercial rent is only for a 90-day period, however, and there is currently little guidance over whether evictions will resume after the 90 days is over.

Beyond the Governor's Executive Order pausing commercial evictions, New York State is not currently administering any specific programs to provide relief to small businesses. NYS's Empire State Development (ESD) has information on its website about the SBA's COVID-19 loan programs, including resources on how businesses can apply for relief.[61] ESD's website directs businesses to other existing relief efforts as well, such as a pro bono legal advice service for small businesses applying for the Paycheck Protection Program.[62]

c.  New York City Assistance

Support for New York City's small businesses from local government has been provided in numerous ways. Financial aid, through loans and grants programs, has been offered through the Department for Small Business Services (SBS). Meanwhile, the Department of Consumer and Worker Protection (DCWP) has also provided assistance by reducing regulatory burdens through pausing some of the fees that it administers and extending deadlines for various renewals.

*Small Business Services*

On March 8th, Mayor de Blasio announced that SBS would create two financial relief programs, the Employee Retention Grant Program and Small Business Continuity Loan Fund, to

---

[61] Empire State Development "Apply for Small Business Administration (SBA) COVID-19 Loans", available at: https://esd.ny.gov/small-business-administration-sba-covid-19-loans.
[62] Id.

-21-

provide financial relief to small businesses during the crisis.[63] To qualify for either program, businesses were required to provide documentation proving that over a two-month period in 2020 their revenues decreased by 25 percent due to COVID-19.[64] Businesses with fewer than five employees were eligible for the Employee Retention Grant Program, which provided a grant covering up to 40 percent of a business's payroll for two months, with a maximum amount of $27,000.[65] On April 3rd, SBS stopped accepting applications to the grant program.[66] The Small Business Continuity Loan Fund provided a zero-interest loan to businesses with fewer than 100 employees for up to $75,000.[67] As of April 8th, SBS paused application intake for the loan fund due to an overwhelming number of applications. Accordingly, small businesses in NYC can now only apply to the SBA programs to receive necessary financial relief.[68]

According to SBS, the NYC Employee Retention grant program provided assistance to 1,200 small businesses. SBS allocated $10 million to the program, and small businesses received an average amount of $7,800.[69] SBS is expecting to give out $20 million in loans through the Small Business Continuity Loan Fund. Before the fund closed online applications on

---

[63] Office of the Mayor "Mayor de Blasio Provides Updates on New York City's COVID-19 Response", March 8, 2020, available at: https://www1.nyc.gov/office-of-the-mayor/news/124-20/mayor-de-blasio-provides-on-new-york-city-s-covid-19-response.
[64] Id.
[65] NYC Department of Small Business Services "NYC Employee Retention Grant Program", (as of April 2, 2020), available at: https://www1.nyc.gov/nycbusiness/article/nyc-employee-retention-grant-program. Program information is still available at: https://www.paulweiss.com/media/3979874/nyc2-employee-retention-grant-program-summary_4-6.pdf.
[66] Id.
[67] NYC Department of Small Business Services "NYC Small Business Continuity Loan Program", (as of April 7, 2020) available at: https://www1.nyc.gov/nycbusiness/article/nyc-small-business-continuity-loan-program. Program Information still available at: https://www.natlawreview.com/article/nyc-financial-assistance-businesses-impacted-covid-19
[68] Id.
[69] Sophia Chang, "Funds Are Coming For Small Businesses, But Some Will Have To Wait", April 1, 2020, *Gothamist*, available at: https://gothamist.com/news/funds-are-coming-small-businesses-some-will-have-wait.

April 5th, over 15,000 businesses initially applied, and 8,500 businesses completed applications.[70]

However, some city advocates have raised concerns about access to these funds. SBS was swift to offer their grant and loan programs, acting quickly to bridge an important funding gap before the federal government established their own, but the rollout was flawed. The program initially required business owners to supply documentation demonstrating a drop in revenue in the two consecutive months of 2020, when the full effects of COVID-19 were not yet felt by many businesses.[71] The program eventually allowed business owners to supply information for March 2020, which may have allowed many more business to be eligible.[72] It was also unclear whether non-profit organizations were eligible for SBS's programs, until the website reflected that non-profits were eligible for the Employee Retention Grant Program, but not the Small Business Continuity Loan Fund.[73] While applications were quickly accepted for the Employee Retention Grant Program, the Fund was not available for weeks afterward, and the website confusingly displayed a "Pre-Application" form that did not actually register anyone for consideration to receive funds.[74] Some users felt that SBS had not provided clear information on

---

[70] Id.

[71] Moshe Schulman, Alexis Percival and Patrick Cournot "The Paycheck Protection Program Is Failing: Small Businesses Such as Ours Won't Survive without a Lot More Help", April 16, 2020, *The Atlantic*, available at: https://www.theatlantic.com/ideas/archive/2020/04/relief-small-business/610066/, ("Last month, de Blasio announced a $75,000 interest-free loan available to local businesses that could prove a 25 percent decrease in sales over a two-month period in comparison with sales in the same two months in 2019. Only recently did we meet the threshold, since our drop-off was so sudden, starting in the second week of March, unlike restaurants in Chinatown, for instance, that closed in February. As of last week, applications were closed. Our attorneys think they can push ours through since they created an account in time, but the money is presumed to have dried up.")

[72] *See* NYC Department of Small Business Services "Participation Affidavit", available at: https://www1.nyc.gov/html/sbs/downloads/pdf/COVID19_SBCL_participation_affidavit_form.pdf.

[73] *See* NYC Department of Small Business Services "Assistance & Guidance for Businesses Impacted Due to Novel Coronavirus", available at: https://www1.nyc.gov/site/sbs/businesses/covid19-business-financial-assistance.page (last viewed on April 24, 2020). Page has since been updated to reflect the fact that the programs are no longer being offered.

[74] *See* id.

-23-

the terms of their programs, and that the online application process contained many technical glitches.[75] One user claimed to have lost her application entirely after the SBS website crashed.[76]

Small business owners who are not conversant in English may have had difficulty understanding the terms and conditions, and how to apply to the programs, without materials available in other languages. SBS took weeks to translate application materials on their website, and even then only translated certain materials, with text on the website being translated by browser tools.[77] Further, it is unknown how much outreach was done to immigrant communities through representative organizations or otherwise.

Some critics felt that the requirements for the Employee Retention Grant Program were not inclusive enough. Eligibility was limited, with only the very smallest businesses employing 1-4 people able to receive a grant.[78] This may have excluded many restaurants, since they may typically employ more than four personnel, such as a manager, servers, bus staff, cooks and hosts.

---

[75] Sophia Chang, "Funds Are Coming For Small Businesses, But Some Will Have To Wait", April 1, 2020, *Gothamist*, available at: https://gothamist.com/news/funds-are-coming-small-businesses-some-will-have-wait.

[76] Id.

[77] *See* NYC Department of Small Business Services "Assistance & Guidance for Businesses Impacted Due to Novel Coronavirus", available at: https://www1.nyc.gov/site/sbs/businesses/covid19-business-financial-assistance.page (last viewed on April 24, 2020). Page has since been updated to reflect the fact that the programs are no longer being offered, but materials had not been translated as of March 20, 2020. See also a tweet publicizing an SBS guide in languages other than English from NYC Mayor's Office of Immigrant Affairs, March 24, 2020, available at: https://twitter.com/NYCImmigrants/status/1242484476057354240. Re-tweeted by NYC Department of Small Business Services on March 24, 2020, available at: https://twitter.com/nyc_sbs.

[78] NYC Department of Small Business Services "NYC Employee Retention Grant Program", (as of April 2, 2020), available at: https://www1.nyc.gov/nycbusiness/article/nyc-employee-retention-grant-program. Program information is still available at: https://www.paulweiss.com/media/3979874/nyc2-employee-retention-grant-program-summary_4-6.pdf.

A-1931

In the midst of struggles and confusion regarding SBS's grant and loan programs, the programs abruptly ended without much notice.[79] This may have closed the door on many small businesses who had intended to apply for the programs, but did not have a chance to do so, or were not yet able to gather the necessary documentation materials. Some users claimed that SBS failed to communicate the most basic aspect of the programs: that funds were limited and that time was of the essence.[80] One user termed it a "lottery" and expressed frustration that business decisions were made based upon the programs' promises.[81] According to one SBS loan processer, the programs may have had as much as half a billion dollars in loan requests, and only $20 million in funds to provide.[82] Despite getting at least 600 applications for the SBS loan program, the funding may have only been enough to provide loans for 250 to 400 businesses.[83] Council Speaker Corey Johnson has called for an expansion of the program from a maximum of $75,000 per business to $250,000 per business.[84]

*Department of Consumer and Worker Protection*

In addition to financial assistance through loans and grants, City support for small businesses has also come through DCWP. DCWP licenses more than 75,000 businesses in more than 50 industries and enforces key consumer protection, licensing, and workplace laws that

---

[79] Rachel Holliday Smith "Half a Billion Dollars' Needed from $20M City Small Business Loan Pool", April 16, 2020, *The City*, available at: https://thecity.nyc/2020/04/de-blasios-usd20m-nyc-small-business-loan-program-falls-short.html.
[80] Id.
[81] Id.
[82] Id.
[83] Id.
[84] New York City Council "New York City Council Speaker Corey Johnson Proposes $12 Billion Relief Plan to Help Workers and Businesses Impacted by COVID-19", March 19, 2020, available at: https://council.nyc.gov/press/2020/03/19/1888/.

apply to countless more. DCWP regularly plays a key role in city initiatives involving small businesses.

As the COVID-19 crisis continues to unfold, DCWP has announced several measures to assist small businesses by alleviating various regulatory burdens. In March 2020, DCWP ceased collecting sidewalk café consent fees that were due and, shortly thereafter, commenced refunds for restaurants that had already paid their fees.[85] Though sidewalk café consent fees vary depending on the size, location, and whether it is enclosed or unenclosed, they typically cost restaurants thousands of dollars.[86] There are approximately 1,400 sidewalk cafes in the City, representing an annual revenue of between $11 million to $12 million. Most restaurants pay these fees in a four-part installment plan over a one-year period at a monthly interest rate of 1.5 percent.[87] Three installments remain for the year, and restaurants could still be required to pay the remaining installments if the state of emergency is lifted. Given the significant losses many restaurants have suffered; some restaurants may not have the ability to cover any remaining payments that come due.

DCWP also extended renewal deadlines for most licenses that expire during the pendency of the state of the emergency.[88] The Mayor subsequently issued an emergency executive order

---

[85] Mayor's Executive Emergency Order No. 105, April 4, 2020, available at:
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-105.pdf.
[86] See NYC Department of Consumer Affairs "2018 consent fees for street space: For unenclosed and small unenclosed sidewalk café", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Sidewalk-Cafe-Consent-Fees.pdf.
[87] R.C.N.Y. §2-45.
[88] NYC Department of Consumer Affairs "Does your consumer affairs license expire February through June 2020?", available at:  https://www1.nyc.gov/assets/dca/downloads/pdf/businesses/Does-Your-Consumer-Affairs-License-Expire-February-through-June-2020.pdf.

extending deadlines for all city licenses and permits.[89] However, some city agencies still appear to be requiring businesses to renew their permits, creating some confusion in certain industries.[90]

The declaration of the state of emergency has also led to an uptick of businesses and workers alike reaching out to DCWP for assistance with regard to the City's worker protection laws, including the Fair Workweek Law, Paid Safe and Sick Leave Law, and the Temporary Schedule Change Law. In response, DCWP published guidance specific to addressing employer obligations during the COVID-19 state of emergency. The guidance also included information on state and federal employment laws.[91] However, some industries have criticized the Mayor for not suspending enforcement of the Fair Workweek and Temporary Schedule Change Laws entirely. The National Restaurant Association argued that businesses cannot afford premium pay for last minute schedule changes, which are necessary in light of employees falling ill and sudden decreased staffing needs.[92]

On March 17, 2020, DCWP promulgated an emergency Rule under the City's Consumer Protection Law that makes price gouging illegal for any personal or household good or any service that is needed to prevent or limit the spread of or treat COVID-19.[93] Leading up to the state of emergency, the agency received almost 1,000 complaints of price gouging on items such

---

[89] Mayor's Emergency Executive Order No. 107, § 4, April 14, 2020, available at: https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-107.pdf.

[90] See e.g. Department of Buildings, "COVID-19 Response: Administrative Enforcement (AEU) and Licensing Units Updates," available at: https://www1.nyc.gov/assets/buildings/pdf/covid19_aeu-licensing_response_sn.pdf.

[91] NYC Department of Consumer and Worker Protection "Update about Workplace Laws as NYC Seeks to Stop the Spread of the New Coronavirus (COVID-19)", available at: https://www1.nyc.gov/assets/dca/downloads/pdf/workers/Complying-with-NYC-Workplace-Laws-During-COVID-19.pdf.

[92] Letter from Keith Stephenson, National Restaurant Association, to Mayor de Blasio (March 20, 2020), on file.

[93] NYC Department of Consumer Affairs "Department of Consumer and Worker Protection issues emergency rule that makes price gouging illegal for any item or service needed to limit the ppread of Coronavirus", March 17, 2020, available at: https://www1.nyc.gov/site/dca/media/pr031720-DCWP-Emergency-Rule-Price-Gouging-Illegal.page.

as hand sanitizer and masks. By April 8th, the Department had received more than 7,200 complaints and had issued 2,700 violations.[94] While many of these violations have been issued to egregious offenders,[95] some businesses have raised concerns that DCWP is failing to address price gouging in the supply chain by wholesalers.[96]

### 3. Industry Challenges During COVID-19

The various governmental approaches to support small businesses during this crisis have provided some measure of relief for small business owners and their employees; however, there are range of outstanding issues that continue to make operating a business during the pandemic particularly difficult. The vast array of departments and agencies have made it difficult for businesses to navigate and, as discussed, there have been numerous limitations to the government programs that are further compounded by the technological and language barriers that some small business owners also face. This comes on top of the other issues that small businesses have to navigate during this crisis range from trying to make rent and payroll, finding suppliers and moving retail online, to negotiating insurance claims, delivery commissions, and bank loans.

### a. Debt Collection

Businesses who experience a drop in revenue due to COVID-19 may face added legal pressure to meet financial obligations. Commercial leases may contain provisions imposing

---

[94] Priscilla DeGregory "NYC files law suits against stores for coronavirus price gouging", April 8, 2020, *New York Post,* available at: https://nypost.com/2020/04/08/nyc-files-lawsuits-against-stores-for-coronavirus-price-gouging/.
[95] Andrew Denney " Coronavirus in NY: UES pharmacy fines for drastically marking up face masks", March 25, 2020, available at: https://nypost.com/2020/03/25/coronavirus-in-ny-ues-pharmacy-fined-for-drastically-marking-up-face-masks/.
[96] Priscilla DeGregory "NYC files law suits against stores for coronavirus price gouging", April 8, 2020, New York Post, available at: https://nypost.com/2020/04/08/nyc-files-lawsuits-against-stores-for-coronavirus-price-gouging/.

personal liability on the tenant for non-payment of rent. These personal guarantees can make the business, which may otherwise shield the owner from liability due to its corporate structure, answerable in a court of law for any unpaid debts or damages.[97] Similarly, businesses who have signed confessions of judgment in exchange for cash advances may be on the hook for unpaid debts. In these documents, businesses sign away their legal right to contest claims against them for non-payment, and these documents may be used to effectuate a judgment against them.[98] Although the dangers of this practice were brought to light last year during an examination of taxi medallion loans,[99] and New York State subsequently banned the practice for out-of-state debtors,[100] the issue remains  for New York City businesses.[101] Without recourse, landlords and debt servicers may resort to threats, which continues to make protecting businesses from harassment an important issue as the City grapples with the effects of COVID-19.

b.  Third-Party Delivery Platforms

Before the spread of COVID-19, online food delivery services were becoming an increasingly popular way for consumers to dine. Online restaurant orders have grown 23 percent

---

[97] *See* NYC Department of Small Business Services "Comprehensive Guide to Commercial Leasing in New York City" available at: https://www1.nyc.gov/assets/sbs/downloads/pdf/about/reports/commercial-lease-guide-accessible.pdf,  p. 22; and Hayden Field  "5 most common red flags entrepreneurs should know before signing a commercial real estate lease in New York", June 6, 2019, *Entrepreneur*, available at: https://www.entrepreneur.com/article/334848.
[98] *See* Rachel Holliday Smith, Christine Chung, Gabriel Sandoval and Josefa Velasquez "New York businesses struggle with debts after reform left them out", February 25, 2020, *The City*, available at: https://thecity.nyc/2020/02/ny-businesses-struggle-with-debts-after-reform-shut-them-out.html.
[99] Brian M. Rosenthal "'They were conned': How reckless loans devastated a generation of taxi drivers", May 19, 2019, *The New York Times*, available at: https://www.nytimes.com/2019/05/19/nyregion/nyc-taxis-medallions-suicides.html.
[100] *See* N.Y. CPLR § 3218; Dan M. Clark "NY Gov. Cuomo Signs Measure to Curb Creditors' Abuse of Confessions of Judgment", August 30, 2019, *Law.com*, available at:  https://www.law.com/newyorklawjournal/2019/08/30/ny-gov-cuomo-signs-measure-to-curb-creditors-abuse-of-confessions-of-judgment/.
[101] Rachel Holliday Smith, Christine Chung, Gabriel Sandoval and Josefa Velasquez "New York businesses struggle with debts after reform left them out", February 25, 2020, *The City*, available at:  https://thecity.nyc/2020/02/ny-businesses-struggle-with-debts-after-reform-shut-them-out.html.

A-1936

annually from 2013 to 2017,[102] and UBS predicts that by 2030, the global online food ordering market could grow to $365 billion, up from $35 billion in 2018.[103] A 2019 survey conducted by the National Restaurant Association found that 60 percent of consumers ordering takeout used a third-party delivery service.[104]

The four major third-party delivery platforms utilize different commission models to remain profitable in this overcrowded and competitive marketplace. Grubhub is the largest platform operating in New York City, accounting for over 60 percent of meal delivery sales.[105] Grubhub charges restaurants a 10 percent fee for all orders delivered by a Grubhub courier,[106] and charges restaurants higher commissions in exchange for increased visibility on their platform.[107] Uber Eats and DoorDash account for around 17 percent of City meal delivery sales.[108] Uber Eats charges restaurants a 30 percent fee for orders delivered by Uber couriers,[109] and a 15 percent fee for orders that are made on the Uber Eats website but delivered by a

---

[102] The NPD Group "Feeding the growing appetite for restaurant apps, https://www.npd.com/wps/portal/npd/us/news/infographics/2018/feeding-the-growing-appetite-for-restaurant-apps/.
[103] USB Investment Bank "Is The Kitchen Dead?", June 18, 2018, available at: https://www.ubs.com/global/en/investment-bank/in-focus/2018/dead-kitchen.html
[104] Hudson Riehle and Melissa Wilson "Harnessing Technology to Drive Off-Premises Sales", 2019, National Restaurant Association, available at: https://www.restaurant.org/Downloads/PDFs/Research/research_offpremises_201910.
[105] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/
[106] Grubhub "Grubub Pricing", available at: https://learn.grubhub.com/wp-content/uploads/2018/08/Grubhub_One-Pager_Pricing-Overview_Final.pdf
[107] David Yaffe-Bellany, "New York vs. Grubhub", September 30, 2019, *The New York Times*, available at: https://www.nytimes.com/2019/09/30/business/grubhub-seamless-restaurants-delivery-apps-fees.html
[108] Kathryn Roethel Rieck, "Which company is winning the food delivery war?", April 21, 2020, *Second Measure*, available at: https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/.
[109] Julie Littman "Delivery by the numbers: How top third-party platforms compare", October 3, 2019, *Restaurant Dive*, available at: https://www.restaurantdive.com/news/delivery-by-the-numbers-how-top-third-party-platforms-compare/564279/.

restaurant's delivery worker.[110] Doordash charges restaurants promotion fees, marketing fees, and subscription fees.[111] Similar to Grubhub, DoorDash charges restaurants a commission fee "in exchange for promoting and featuring the Merchant...on the DoorDash Platform," and for all orders delivered by DoorDash couriers (know as "Dashers").[112] Postmates accounts for just under five percent of delivery sales in the City.[113] Under the Postmates model, restaurants do not pay a fee for using Postmates couriers, but pay a standard commission fee "based on the contract signed" by the restaurant upon joining the platform.[114]

   While third-party delivery platforms provide restaurants a unique marketing and delivery service, small businesses have accused these platforms of acting in a predatory manner. In 2018, a class action lawsuit was filed in the United States District Court for the Eastern District of Philadelphia against Grubhub. According to the plaintiff, an owner of a local Indian restaurant chain, Grubhub had committed wrongful conduct, including, but not limited to, "withholding commissions for sham telephone food orders, depriving more than 80,000 restaurants of revenues and profits that rightfully belong to them."[115] Another class action lawsuit was filed in the United States District Court for the Southern District of New York in April 2020 against all four third-party delivery platforms.[116] The lawsuit alleges that all third-party delivery platforms have violated U.S. antitrust law by requiring restaurants to charge delivery customers and dine-in

---

[110] Uber "How do fees work on Uber Eats", available at: https://help.uber.com/ubereats/article/how-do-fees-work-on-uber-eats?nodeId=65d229e2-a2b4-4fa0-b10f-b36c9546cf55
[111] DoorDash "Terms of Service - United States DoorDash Merchants", available at: https://help.doordash.com/merchants/s/terms-of-service-us?language=en_US#payment-fees-and-taxes
[112] Id.
[113] Id.
[114] Postmates "Payment FAQ", available at: https://support.postmates.com/merchant/articles/226618648-article-Payment-FAQ
[115] *TIFFIN EPS, LLC v. GrubHub, Inc*, 2:18-cv-05630-PD, Complaint, p. 2l.5., available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/16288289/Grubhub_lawsuit.pdf.
[116] The four platforms are Grubhub Inc. (which also does business as Seamless), DoorDash Inc., Postmates Inc., and Uber Technologies, Inc., which is the parent company of Uber Eats.

customers the same price for each menu items, while imposing "exorbitant" fees of 10 percent to 40 percent of revenue to process delivery orders.[117] The City Council has conducted two oversight hearings this legislative session on the rise of third-party delivery platforms in the City.[118] During these hearings, small businesses and advocates have highlighted issues they experienced from using these platforms, including high commission fees, restrictions on menu pricing, and erroneous fees they are forced to pay from consumer phone calls that do not result in orders.[119]

Due to the stay-at-home orders issued across the country and the inability for customers to dine-in at restaurants, third-party delivery services are likely to further increase their profits during the COVID-19 pandemic. Governor Cuomo's Executive Order 202.6 limited restaurants to take-out and delivery only,[120] leading restaurants to join third-party delivery platforms to maintain business. The administration issued an updated COVID-19 related guidance sheet for business owners on March 16th, advising restaurants and food services to join food delivery platforms.[121] The issues restaurants typically experience while operating on a third-party delivery platform are likely to become more common as restaurants shift their businesses to this model.

---

[117] Jonathan Stempel, "Grubhub, DoorDash, Postmates, Uber Eats are sued over restaurant prices amid pandemic" April 13ᵗ, 2020, *Reuters*, available at: https://www.reuters.com/article/us-health-coronavirus-food-delivery-laws-idUSKCN21V2C1.

[118] New York City Council "Oversight – The Changing Market for Food Delivery", June 6, 2019, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=705634&GUID=0BC09A92-5DB4-496B-90EE-BF75DF712131&Options=info|&Search=; and New York City Council "Oversight: 'Ghost Kitchens' 'Virtual Restaurants' and the Future of the Restaurant Industry", February 6, 2020, available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=759804&GUID=B42220FE-417A-484C-B7CF-51725F784A71&Options=info|&Search=

[119] Id.

[120] Empire State Development "Guidance for determining whether a business enterprise is subject to a workforce reduction under recent executive orders," available at: https://esd.ny.gov/guidance-executive-order-2026

[121] Flatiron District "Guidance for business owners – Updated March 16, 2020: Tips for addressing changes in customer behavior due to the Novel (New) Coronavirus (COVID19)",  available at:

-32-

Third-party platforms have acknowledged that high commission fees are unsustainable for restaurants during COVID-19. During an interview with MarketWatch, Grubhub CEO Matt Maloney was asked whether restaurants could survive on deliveries alone during the pandemic. Maloney responded, "Not in the long-term. The industry isn't large enough for all restaurants to survive just on delivery, but they can survive for a matter of weeks potentially. It's definitely not a long-term solution to bridge across restaurants."[122] Maloney meanwhile acknowledged that the pandemic has led Grubhub to expand their business: "We've received 10 to 15 times our usual new restaurant leads. This interest has led to four to five times more new restaurant go-lives compared to our previous record-breaking day."[123]

While third-party delivery platforms may profit from the global health pandemic, they have implemented COVID-19 related programs to help benefit local businesses. Grubhub announced a program deferring commission fees for impacted independent restaurants to increase restaurants' cash flow.[124] Uber Eats has waived the delivery fee on all orders for over 100,000 independent restaurants.[125] Doordash is reducing commission fees by 50 percent for over 150,000 restaurants in the U.S., Canada and Australia,[126] and offering new restaurants the

---

https://www.flatirondistrict.nyc/uploaded/files/COVID-19/COVID-19%20Guidance%20for%20Business%20Owners%20-%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.pdf

[122] Elisabeth Buchwald, "Restaurants can't survive on delivery alone, says Grubhub CEO Matt Maloney", March 23, 2020, *MarketWatch*, available at: https://www.marketwatch.com/story/restaurants-wont-be-able-to-survive-on-delivery-only-says-grubhub-ceo-matt-maloney-2020-03-21

[123] Id.

[124] Grubhub "COVID-19 Impact, Delivery Safety and Supporting Local Restaurants", March 18, 2020, available at: https://blog.grubhub.com/health-and-safety

[125] Uber "A company that moves people is asking you not to move", available at: https://www.uber.com/au/en/coronavirus/?_ga=2.191168042.1434603565.1587677057-1914018361.1587677057

[126] DoorDash "The latest on Coronavirus (COVID-19)", available at: https://get.doordash.com/covid-updates#businesses

ability to join their platform and pay zero commissions for 30 days.[127] Postmates is temporarily waiving commission fees for businesses in the San Francisco Bay Area, LA, Sacramento and Detroit.[128]

While each platform has developed programs to aid restaurants during the pandemic, it remains unclear whether these campaigns are providing restaurants relief. Grubhub announced a program in early April, Supper for Support, offering customers $10 off on orders over $30 every day from 5:00-9:00 pm.[129] However, Grubhub continued to charge restaurants during this promotion "on the non-discounted product rather than the amount paid by the customer."[130]

To ensure restaurants can remain profitable throughout the pandemic while operating on these platforms, municipalities sought to cap the fees third-party delivery platforms charge restaurants. Chicago City Council Member Scott Waguespack introduced an ordinance making it unlawful for a third-party food delivery service to charge a covered establishment a fee that totals more than five percent of per online order.[131] Mayor London Breed of San Francisco similarly issued a mayoral declaration making it unlawful for a third-party delivery service to charge restaurants "a fee per online order for the use of its service that totals more than 15 percent of the purchase price of such online order."[132] The Mayor's cap will remain in effect

---

[127] DoorDash "COVID-19 merchant financial assistance", available at:
https://help.doordash.com/merchants/s/article/COVID-19-Merchant-Financial-Assistance?language=en_US
[128] Postmates "Postmates Coronavirus (COVID-19) Response", March 16 2020, available at:
https://blog.postmates.com/postmates-coronavirus-covid-19-response-94eef5b1bbc2
[129] Grubhub "Supper for support", April 3, 2020, available at: https://blog.grubhub.com/support-local-restaurants
[130] Grubhub "Grubhub for restaurants", available at: https://lp.grubhub.com/supper-for-support-terms-conditions-4-15-f/
[131] City of Chicago Office of the City Clerk "Ordinance", April 22, 2020, available at:
https://files.constantcontact.com/58ea69d3101/e58501f0-4a68-4625-b689-f14570f4cde6.pdf
[132] Office of the Mayor San Francisco, London N. Breed "Ninth Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency Dated February 25, 2020", available at:
https://sfmayor.org/sites/default/files/NinthMayoralSupplement.pdf

through the remainder of the local emergency, or until businesses are permitted to reopen for dine-in services, whichever comes first.[133] The Hospitality Alliance has similarly been calling for New York City to cap commission fees on third-party delivery platforms to 10 percent per order.[134]

## III.    CONCLUSION

While many of SBS and DCWP's COVID-19 initiatives are positive steps serving the interests of consumers, workers and small businesses, this hearing represents an opportunity for both departments and industry representatives alike to address concerns and potential areas for improvement. The Council seeks to gain a better understanding of the issues City small business owners are experiencing as a consequence of COVID-19, and how effective the Administration has been in offering support. The Council is also interested in learning about what the future small business landscape may look like in the City after social restrictions are lifted, and what types of relief will be necessary to ensure this sector of the City's economy remains vibrant.

## IV.    BILL ANALYSIS

### Int. No. 1846

Int. 1846 requires food service establishments, retail stores and other commercial businesses that deliver goods, to disclose to consumers such establishments' gratuity policies for delivery personnel. Section one of this bill adds a new Subchapter 7 to Title 20 of Administrative Code titled "Delivery Workers." New section 20-1271 sets out the definitions. New section 20-

---

[133] Eve Batey "San Francisco Emergency Order says delivery apps must cap restaurant fees at 15 percent", April 10, 2020, *Eater San Francisco*, available at: https://sf.eater.com/2020/4/10/21216546/san-francisco-delivery-cap-doordash-grubhub-uber-eats-postmates-caviar.
[134] *See* NYC Hospitality Alliance "Restaurant rescue & save nightlife plan", available at: https://thenycalliance.org/information/updated-9-point-mitigation-and-support-plan (last viewed on April 27, 2020).

A-1942

1272 requires food, retail and commercial establishments to disclose the following information in relation to delivery worker gratuities prior to the consumer placing an order:

1.    The proportion or fixed amount of each gratuity that is distributed to the worker who delivered the goods purchased, including whether such gratuity is required to be shared with other workers;

2.    How gratuities are distributed to delivery workers, whether immediately or otherwise, and in what form of payment, whether cash or otherwise; and

3.    The amount of each gratuity that is used to compose each delivery worker's base wage.

Where an establishment employs the services of a third-party delivery company, they are required to provide the abovementioned information to such company to ensure compliance with the gratuity disclosure requirements of this bill. New section 20-1273 prohibits establishments and third-party delivery companies from providing inaccurate information in gratuity disclosures. To prove accuracy and compliance, subdivision b of this section requires establishments and third-party delivery companies to maintain records demonstrating the gratuity disclosure was provided to the customer and the content of such disclosure. Such records must be maintained for three years for each customer transaction. The civil penalties for any violations of this bill are between $250 and $1,000 for each violation. Each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one customer. Civil penalties are recoverable at the Office of

A-1943

Administrative Trials and Hearings. If enacted, this local law would take effect 180 days after it becomes law.

### Int. No. 1895

This bill would require DOHMH to establish rules requiring restaurants to package food destined for delivery in tamper-evident packaging to decrease the risk that food is tampered with before reaching the customer. Violations would be punishable by a civil penalty of up to $100 for each violation.

### Int. No. 1896

This bill would require that third-party delivery services, entities that provide restaurants with online order and delivery services, disclose to consumers any commission, fees, or other monetary payments imposed on participating restaurants, except that restaurants may decline the disclosure of such information. Violations would be punishable by a civil penalty of not less than $250 nor more than $1000 for each violation, which would accrue daily.

### Int. No. 1897

This bill would require third-party delivery services, entities that provide restaurants with online order and delivery services, to obtain a license in order to provide their service to restaurants in the City. Application terms and fees would be determined by DCWP. The department could refuse to issue or renew a license, or suspend or revoke a license, if the third-party food delivery services violates the conditions of the license, including engaging in misleading advertising or deceptive trade practices. Third-party delivery services who violate license conditions may also be subject to penalties determined by the department.

### Int. No. 1898

The bill would prohibit third-party delivery services, entities that provide restaurants with online order and delivery services, from charging restaurants for telephone orders with customers that did not actually occur. Violations would be punishable by a civil penalty of not less than $250 and not more than $1,000 for each prohibited action that affects a restaurant.

### Int. No. 1907

This bill would prohibit third-party delivery services, entities that provide restaurants with online order and delivery services, from limiting the menu prices restaurants may charge on food and beverage orders. Violations of this prohibition would result in civil penalties of not less than $1,000 per violation. Civil penalties would accrue for each day in violation.

### Proposed Int. No. 1908-A

This bill would prohibit third-party food delivery services, entities that provide restaurants with online order and delivery services, from charging restaurants more than a 10% fee per order for the use of their service. During a declared emergency, when a state of emergency is in effect in the city and restaurants are prohibited from offering food for consumption on-premises, third-party food delivery services would be limited to charging restaurants delivery fees only, up to a total of 10% per order. All other types of fees, such as advertising or processing fees, would be prohibited. Violations of these prohibitions would be subject to civil penalties of not less than $1,000 per violation, with the amount determined by the Commissioner of DCWP. Civil penalties would accrue for each day and for each restaurant charged a fee in violation of a prohibition.

### Int. No. 1914

**A-1945**

This bill provides additional commercial tenant protections in the law by making threatening a commercial tenant based on their status as a COVID-19 impacted business or person a form of harassment punishable by a civil penalty of $10,000 to $50,000.

### Int. No. 1916

Int. 1916 requires the Department of Consumer Affairs to waive all sidewalk café fees, including consent fees, that are due on or after January 1, 2020 until December 31, 2020. If fees were already paid, the Department is required to issue a full refund. If enacted, this bill takes effect immediately and is retroactive to January 1, 2020.

### Int. No. 1921

Int. 1921 creates a new subchapter 22 in chapter 5 of the Administrative Code titled "THIRD-PARTY FOOD DELIVERY SERVICES." This bill requires food service establishments and third-party food delivery services to display online the sanitary inspection letter grades assigned by the Department of Health and Mental Hygiene. New section 20-845 sets out the relevant definitions. New section 20-846 requires third-party delivery services to display sanitary inspection letter grades whenever a food service establishment appears in a list of results from which a consumer may select. The letter grades are also required to be displayed whenever a food service establishment's menu or menu items are displayed to a consumer. Food service establishments that operate their own websites, mobile applications or other internet-based services that offer online ordering capabilities are also required to display their sanitary inspection grades. New section 20-847 creates a penalty of $100 per violation. Each failure to display a letter grade assigned to a food service establishment in violation of this subchapter shall be considered a separate violation. If enacted, this bill takes effect one year after it becomes law.

A-1946

**Int. No. 1932**

This bill would prohibit the enforcement of personal liability provisions in commercial leases or rental agreements involving a COVID-19 impacted tenant where the default or other trigger event happened during the COVID-19 state of emergency. Threatening to or attempting to enforce such a provision would also be considered a form of harassment.

**Preconsidered Int. No.**

This bill requires the Mayor to publish guidance online listing all City licenses and permits covered by section four of his Emergency Executive Order Number 107 issued on April 14, 2020. Such guidance would confirm exactly which licenses are not required to be renewed during the COVID-19 state of emergency. This bill also requires the Mayor to publish guidance on renewal dates and procedures for such licenses and permits no later than 14 days before the state of emergency ends, with no renewal deadlines until 90 days after the emergency has ended.

**Res. No. 1049**

This resolution calls upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans. Confessions of judgment, which are documents some businesses sign as a condition of receiving a business loan, can be used by a lender to obtain a judgement against a borrower for any unpaid debts without any further notification. Although New York State has recently prohibited the use of confessions of judgment for out-of-state businesses, they may still be used for New York businesses, and confessions of judgment have been filed in New York courts since the onset of the COVD-19 outbreak, when some businesses have been unable to make loan payments due to closures or decreases in revenue.

-40-

A-1947

Int. No. 1846

By Council Members Torres, Chin and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of gratuity policies for delivery workers

Be it enacted by the Council as follows:

Section 1. Chapter 12 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 7 to read as follows:

Subchapter 7

Delivery Workers

§ 20-1271 Definitions. As used in this subchapter, the following terms have the following meanings:

Base wage. The term "base wage" means money paid, whether by the hour or otherwise, to a delivery worker by an employer in exchange for work performed, not including gratuities, bonuses, allowances, shift differentials or other monetary payments that may contribute to such worker's total compensation.

Covered establishment. The term "covered establishment" means any food service establishment, retail store or other commercial business that offers, in a single commercial transaction over the internet, whether directly or through a third-party application, the sale and same-day delivery of goods to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" means any establishment inspected pursuant to the restaurant grading program established pursuant to subdivision a of section 81.51 of the health code of the city of New York.

-41-

Goods. The term "goods" means any merchandise, product or ware offered for sale, including but not limited to food products, groceries, meals and non-food products.

Gratuity. The term "gratuity" means a sum of money, paid voluntarily by a customer, when or after ordering goods for delivery from a covered establishment, in addition to the price of such goods and other mandatory charges such as taxes and fees, where such voluntary sum is paid through a third-party application that allows the customer to choose the amount of the voluntary sum and that refers to the sum as a gratuity or tip, or by another, similar name that would suggest to a reasonable person that the sum, or a substantial portion thereof, would be received by the worker delivering the order in addition to the worker's base wage.

Third-party application. The term "third-party application" means a person who provides a website, mobile application or other internet service that allows a customer to order goods from a covered establishment and arranges for the delivery of those goods to such customer.

§ 20-1272 Disclosure. a. Before or at the same time as a gratuity is solicited from a customer in connection with the purchase and delivery of a good from a covered establishment through a third-party application, such third-party application shall disclose the following information, in plain and simple language and in a conspicuous manner, to such customer about its policies and the policies of such covered establishment regarding gratuities for delivery workers in connection with the delivery of purchased goods:

1. The proportion or fixed amount of each gratuity that is distributed to the worker who delivered the goods purchased, including whether such gratuity is required to be shared with other workers;

2. How gratuities are distributed to delivery workers, whether immediately or otherwise,

-42-

and in what form of payment, whether cash or otherwise; and

3. The amount of each gratuity that is used to compose each delivery worker's base wage.

b. Each covered establishment shall provide such disclosure to each third-party application through which such goods are being offered for delivery to customers to allow compliance with subdivision a.

§ 20-1273 Accuracy of representations; recordkeeping. a. No covered establishment or third-party application may misstate or misrepresent any information in the disclosure required by section 20-1272.

b. Such covered establishments and third-party applications shall maintain records demonstrating the provision of such disclosure to customers, and substantiating all the information therein, for three years from the date of each customer's transaction.

§ 20-1274 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is liable for a civil penalty of not less than $250 nor more than $1,000 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one customer.

§ 2. This local law takes effect 180 days after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

SJ

-43-

A-1950

LS #10612
6/20/19

A-1951

Int. No. 1895

By Council Members Gjonaj, Kallos, Constantinides, Brannan, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to food service establishments' packaging of food for delivery

Be it enacted by the Council as follows:

Section 1. Chapter 15 of title 17 of the administrative code of the city of New York is amended by adding a new section 17-1508 to read as follows:

§ 17-1508 Packaging food for delivery. a. For purposes of this section, the term "tamper-evident packaging" means a package having one or more indicators or barriers to entry which, if breached or missing, can reasonably be expected to provide visible evidence to consumers that tampering has occurred.

b. The department shall by rule establish standards and procedures to decrease the risk that food packaged by food service establishments for delivery is tampered with in transit. Such procedures may include, but need not be limited to, requiring food service establishments to use tamper-evident packaging when packaging food for delivery.

c. The department shall by rule establish civil penalties for any food service establishment that does not meet the standards established pursuant to this section and the rules promulgated hereunder. Such penalties shall not exceed $100 for each violation.

§ 2. This local law takes effect 120 days after it becomes law, except that the department shall take such measures as are necessary for implementation of section 17-1508 of the administrative code of the city of New York, as added by section one of this local law, including the promulgation of rules, before such date.

SG

-45-

A-1952

LS # 13268
1/14/20

A-1953

Int. No. 1896

By Council Members Gjonaj, Kallos, Constantinides, Brannan, Gibson Perkins and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to the disclosure of commissions charged by third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third Party Food Delivery Services

§ 20-845 Definitions. As used in this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party application, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Commission disclosure. a. When a final price is disclosed to a customer, and before a transaction occurs, for the purchase and delivery food from a covered establishment

-47-

A-1954

through a third-party delivery service, such third-party delivery service shall disclose to such customer, in plain and simple language and in a conspicuous manner, any commission, fee, or any other monetary payment imposed by the third-party delivery service on such covered establishment as a term of a contract or agreement between the parties in connection with the covered establishment utilizing the third-party delivery service.

b. Any covered establishment may decline to disclose to customers the commission charged by a third-party delivery service. If a covered establishment has declined to have such a commission disclosed to customers, the requirement of subdivision a of this section shall not apply with respect to such covered establishment.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is liable for a civil penalty of not less than $250 nor more than $1,000 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one customer.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

A-1955

JK
LS #11768
2/21/2020

-49-

A-1956

Int. No. 1897

By Council Members Gjonaj, Constantinides, Brannan, Gibson, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to the licensing of third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 2 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 36 to read as follows:

Subchapter 36

Third-Party Food Delivery Services

§ 20-565 Definitions. As used in this subchapter, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-565.1 License required. It shall be unlawful for any person to operate a third-party food delivery service without first having obtained a license thereof issued pursuant to this subchapter.

§ 20-565.2 Application and fees. a. An application for any license required under this subchapter or for any renewal thereof shall be made to the commissioner in such form or manner as the commissioner shall prescribe by rule.

A-1957

b. There shall be a biennial fee for a license to operate a third-party food delivery service. Such fee shall be no less than $500, as determined by the commissioner.

§ 20-565.3 Issuance of license. A license to operate a third-party food delivery service shall be granted in accordance with the provisions of this subchapter and any rules promulgated by the commissioner thereunder. The commissioner may refuse to issue to an applicant any license required under this subchapter based upon a determination made after due notice and opportunity to be heard that such applicant has engaged in conduct which would constitute a basis for license suspension or revocation as set forth in section 20-565.4 of this subchapter.

§ 20-565.4 Renewal, suspension and revocation of license. In addition to any powers of the commissioner and not in limitation thereof, the commissioner may, after due notice and opportunity to be heard, refuse to renew any license required under this subchapter and may suspend or revoke such license if the person holding such license, or, where applicable, any of its officers, principals, directors, members, managers, employees, or stockholders owning more than ten percent of the outstanding stock of the corporation, has been found to have:

a. Repeated violation of any provision of this subchapter or any rules promulgated thereunder; or

b. Made a material false statement or concealed a material fact in connection with the filing of any application pursuant to this subchapter or have been found to have committed fraud or misrepresentation upon a customer; or

c. Engaged in untrue, misleading or deceptive advertising, or deceptive or unconscionable trade practices as described in chapter five of title twenty of this code and any rules promulgated thereunder; or

A-1958

d. Not paid, within the time permitted by law, any civil penalty or judgment duly imposed pursuant to the provisions of this subchapter or any rule promulgated thereunder.

§ 20-565.5 Penalties and enforcement. a. Any person who violates, or causes another person to violate, a provision of this subchapter or any rule promulgated pursuant to such subchapter, shall be guilty of an offense punishable by fines and civil penalties imposed by the commissioner.

b. A proceeding to recover any civil penalty pursuant to this section shall be commenced by the service of a summons or notice of violation which shall be returnable to the office of administrative trials and hearings.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

SJ
LS #13018
2/21/20

A-1959

Int. No. 1898

By Council Members Gjonaj, Moya, Constantinides, Brannan, Rosenthal, Gibson, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to telephone order charges by third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third Party Food Delivery Services

§ 20-845 Definitions. As used in this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party application, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Telephone orders. No third-party delivery service may charge a commission from a covered establishment for a telephone order that does not result in an actual transaction

A-1960

between the covered establishment and a customer during such telephone call, or that exceeds the established commission rate between the third-party delivery service and covered establishment.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is liable for a civil penalty of not less than $250 nor more than $1,000 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section each instance in which a prohibited action affects a covered establishment shall constitute a separate violation.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

JK
LS #12594
2/21/2020

A-1961

Int. No. 1907

By Council Members Moya, Gjonaj, Brannan, Rosenthal, Gibson, Perkins, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to prohibiting third-party food delivery services from limiting the purchase prices covered establishments may charge on food and beverage orders

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third-Party Food Delivery Services

§ 20-845 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Online order. The term "online order" means an order placed by a customer through a platform provided by a third-party food delivery service.

Purchase price. The term "purchase price" means the menu price of a food order from a covered establishment. Such term therefore excludes taxes, gratuities and any other fees that may make up the total cost to the customer of a food order.

A-1962

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Prohibited limits on purchase prices. It shall be unlawful for third-party food delivery services to, by contract or any other means, impose on covered establishments any requirement regarding the purchase prices that covered establishments may charge for food or beverages ordered through such application or through any other means.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty of not less than $1,000 per violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each calendar day during which a person is found to have violated this subchapter shall be considered a separate violation, even if such violation affects more than one covered establishment.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

SJ

A-1963

LS #9163
2/21/20

A-1964

Proposed Int. No. 1908-A

By Council Members Moya, Gjonaj, Kallos, Brannan, Rosenthal, Gibson, Ayala, Van Bramer, Rivera, Cohen, Perkins and Louis

A Local Law to amend the administrative code of the city of New York, in relation to fees charged by third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

Third-Party Food Delivery Services

§ 20-845 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Covered establishment. The term "covered establishment" means any food service establishment that offers, in a single commercial transaction over the internet, whether directly or through a third-party food delivery service, the sale and same-day delivery of food to customers from one or more retail locations within the city.

Declared emergency. The term "declared emergency" means any time during which a state of emergency has been declared by the president of the United States, the governor of the state of New York or the mayor of the city, and is in effect in the city, and during which all food service establishments in the city are prohibited from providing food for consumption on-premises.

Delivery fee. The term "delivery fee" means a fee charged by a third-party food delivery service to cover the cost of providing a covered establishment with a service that delivers food from such establishment to customers. The term does not include any other fee that may be

-58-

charged by a third-party food delivery service to a covered establishment, such as fees for listing or advertising the covered establishment on the third-party food delivery service platform or fees related to processing the online order.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Online order. The term "online order" means an order placed by a customer through a platform provided by a third-party food delivery service.

Purchase price. The term "purchase price" means the menu price of an online order. Such term does not include taxes, gratuities and any other fees that may make up the total cost to the customer of an online order.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Service fees. a. It shall be unlawful for a third-party food delivery service to charge a covered establishment a fee for the use of their service that totals more than 10% of the purchase price of each online order.

b. Subdivision a of this section notwithstanding, during a declared emergency it shall be unlawful for any third-party food delivery service to charge a covered establishment a delivery fee that totals more than 10% of the purchase price of each online order, and it shall be unlawful during such declared emergency for a third-party food delivery service to charge a covered establishment any fee for the use of their services other than a delivery fee.

A-1966

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty of not less than $1,000 per violation, with the exact amount determined by a rule promulgated by the commissioner of consumer affairs. Violations shall accrue on a daily basis for each day and for each covered establishment charged a fee in violation of this subchapter or any rule promulgated pursuant to this subchapter. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings.

§ 20-848 Injunctive relief. In addition to any other relief available by law, the commissioner may seek any relief available under article 63 of the civil practice law and rules in a proceeding against any person alleged to be in violation of any provision of this subchapter.

§ 2. This local law takes effect immediately.

SJ
LS #9163
4/20/20 10:30 AM

-60-

A-1967

Int. No. 1914

By Council Members Adams, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Louis and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Paragraph 11 of subdivision a of section 22-902 of the administrative code of the city of New York, as added by local law number 185 for the year 2019, is amended to read as follows:

11. threatening a commercial tenant based on (i) such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence[,] or status as a victim of sex offenses or stalking, or (ii) the commercial tenant's status as a person or business impacted by COVID-19, or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

A-1968

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach their place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major supporter for a household because the head of the household died as a direct result of COVID-19;

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency; and

A-1969

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019 and February 2020;

§ 2. This local law takes effect immediately.

LS # 14764
4/20/20 4:37PM

A-1970

Int. No. 1916

By Council Members Cohen, Chin, Powers, Yeger, Louis and Ayala

A Local Law in relation to requiring the department of consumer affairs to waive and refund all fees related to sidewalk cafe licenses that are due on or after January 1, 2020 until December 31, 2020, and providing for the repeal of such provision upon the expiration thereof

Be it enacted by the Council as follows:

Section 1. Emergency waiver of sidewalk cafe fees. a. Notwithstanding any inconsistent provision of law or rule, the department of consumer affairs shall waive all fees related to sidewalk cafe licenses issued pursuant to subchapter 6 of chapter 2 of title 20 of the administrative code, including, but not limited to, revocable consent fees, for which the payment due date falls on or after January 1, 2020 until December 31, 2020. The department shall issue refunds for all sidewalk cafe license fees paid by licensees on or after January 1, 2020 until December 31, 2020.

b. This section does not apply to new sidewalk cafe license applications filed with the department of consumer affairs on or after March 30, 2020.

c. The department shall have the authority to promulgate any rules necessary to administer the provisions of this section.

§ 2. This local law takes effect immediately and is retroactive to and deemed to have been in effect as of January 1, 2020.

§ 3. This local law expires and is deemed repealed on January 1, 2021.

BAM
LS #14484
3/31/2020 6:08 p.m.

-64-

A-1971

Int. No. 1921

By Council Members Gjonaj, Louis, Powers, Cohen and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services and food service establishments to display sanitary inspection letter grades online

Be it enacted by the Council as follows:

Section 1. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 22 to read as follows:

Subchapter 22

THIRD-PARTY FOOD DELIVERY SERVICES

§ 20-845 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Letter grade. The term "letter grade" means the sanitary inspection grade issued by the department of health and mental hygiene pursuant to section 81.51 of the health code of the city of New York.

Menu. The term "menu" means a written list of the names or images of a food item or items and the prices of such items, that is the primary writing of a food service establishment from which a person makes an order selection.

Menu item. The term "menu item" means any food item that a customer may select for purchase from a food service establishment.

Online order. The term "online order" means an order placed by a customer through a platform provided by a third-party food delivery service or a food service establishment.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

§ 20-846 Display of letter grades required. a. Every third-party food delivery service shall display the letter grade assigned to each food service establishment in a conspicuous manner to persons using such service. Such letter grade shall be displayed adjacent to the name of each food service establishment whenever such name appears on a list of food service establishments that can be selected by a person to make an online order. Such letter grade shall also be displayed conspicuously whenever the menu or menu items of a food service establishment are displayed for selection by persons using such service.

b. Every food service establishment that operates a website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from such food service establishment, shall conspicuously and prominently post its letter grade on such website, mobile application or other internet service.

c. The department may establish by rule additional requirements relating to the display of such letter grades.

§ 20-847 Penalties. Any person that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter shall be subject to a civil penalty of not less than $100

A-1973

per violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings. For the purposes of this section, each failure to display a letter grade assigned to a food service establishment in violation of this subchapter shall be considered a separate violation.

§ 2. This local law takes effect 1 year after it becomes law, except that the commissioner of consumer affairs shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

BAM
LS #13959
2/28/20

A-1974

Int. No. 1932

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin and Ayala

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1004 to read as follows:

§ 22-1004. Personal liability provisions in commercial leases. a. Definitions. For the purposes of this section, the following terms have the following meanings:

COVID-19. The term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV.

COVID-19 period. The term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive.

COVID-19 state disaster emergency. The term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020.

Impacted by COVID-19. The term "impacted by COVID-19" means:

-68-

A-1975

1. With respect to an individual, that the individual experienced one or more of the following situations:

(a) the individual was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

(b) a member of the individual's household was diagnosed with COVID-19;

(c) the individual was providing care for a family member or a member of the individual's household who was diagnosed with COVID-19;

(d) a member of the individual's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work;

(e) the individual was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(f) the individual was unable to reach their place of business because of the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(g) the individual became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(h) the individual's business closed as a direct result of the COVID-19 state disaster emergency.

2. With respect to a business, that (i) the business was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) the revenues of the business during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in

A-1976

2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020.

Personal liability provision. The term "personal liability provision" means, with respect to a commercial lease or other rental agreement involving real property and to which a business is a party as tenant, a term that provides for an individual to become wholly or partially personally liable for an obligation of such business arising under such lease or agreement upon the occurrence of a default or other event.

b. No personal liability provision of a commercial lease or other rental agreement involving real property and to which a business impacted by COVID-19 is a party as tenant may be enforced against an individual where the default or other event allowing for such enforcement occurs during the COVID-19 period.

§ 2. Subdivision a of section 22-902 of the administrative code of the city of New York, as amended by local law number 185 for the year 2019, is amended to read as follows:

a. A landlord shall not engage in commercial tenant harassment. Except as provided in subdivision b of this section, commercial tenant harassment is any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following:

1. using force against or making express or implied threats that force will be used against a commercial tenant or such tenant's invitee;

2. causing repeated interruptions or discontinuances of one or more essential services;

A-1977

3. causing an interruption or discontinuance of an essential service for an extended period of time;

4. causing an interruption or discontinuance of an essential service where such interruption or discontinuance substantially interferes with a commercial tenant's business;

5. repeatedly commencing frivolous court proceedings against a commercial tenant;

6. removing from a covered property any personal property belonging to a commercial tenant or such tenant's invitee;

7. removing the door at the entrance to a covered property occupied by a commercial tenant; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the commercial tenant occupying the covered property;

8. preventing a commercial tenant or such tenant's invitee from entering a covered property occupied by such tenant;

9. substantially interfering with a commercial tenant's business by commencing unnecessary construction or repairs on or near covered property; [or]

10. engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business;

11. threatening a commercial tenant based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking;

A-1978

12. requesting identifying documentation that would disclose the citizenship status of a commercial tenant, an invitee of a commercial tenant or any person seeking entry to the covered property in order to patronize such commercial tenant; [or]

13. unreasonably refusing to cooperate with a tenant's permitted repairs or construction activities[.]; or

14. threatening to or implementing a personal liability provision that is not enforceable pursuant to section 22-1004 of the code; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

A-1979

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach the person's place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach the person's place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency;

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020; and

(d) the term "personal liability provision" has the meaning set forth in section 22-1004 of the code;

§ 3. This local law takes effect immediately.

-13-

A-1980

LS # 14817
4/20/20 4:31PM

A-1981

Preconsidered Int. No.

By Council Member Matteo

A Local Law in relation to requiring the mayor to issue a guidance on license and permit renewal deadline extensions, and requiring that no such licenses or permits be required to be renewed within 90 days after the COVID-19 emergency has ended, and providing for the repeal of such provision upon the expiration thereof

Be it enacted by the Council as follows:

Section 1. Emergency extension of renewal deadlines for licenses and permits due to COVID-19. a. The mayor or his designee shall publish guidance that includes a list of all city licenses and permits covered by section 4 of the mayor's emergency executive order number 107 for the year 2020. Such guidance shall be published online no later than 14 days after the enactment of this local law.

b. The mayor or his designee shall update the guidance published pursuant to subdivision a to include information about renewal procedures and deadlines for such licenses and permits and shall publish such updated guidance online no later than 14 days prior to the end of the emergency declared by the mayor's executive order number 98 for the year 2020, as such order may be extended. A failure to publish such guidance shall not limit the mayor's authority to end the emergency declared by the mayor's executive order number 98 for the year 2020, as such order may be extended.

c. No city license or permit covered by section 4 of the mayor's emergency executive order number 107 for the year 2020 shall be required to be renewed during the COVID-19 state of emergency and for a period of 90 days after such emergency has ended.

d. For the purposes of this local law, the term "COVID-19 state of emergency" means the period of time from the effective date of this local law until the state of emergency declared

-75-

pursuant to the governor's executive order number 202 for the year 2020, as such order may be extended, and the mayor's executive order number 98 for the year 2020, as such order may be extended, have both expired with respect to the city of New York.

§ 2. This local law takes effect immediately and expires and is deemed repealed 100 days after the COVID-19 state of emergency has ended.

BAM
LS #14873
4/23/2020 12:00 p.m.

A-1983

Res. No. 1049

Resolution calling upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans.

By the Public Advocate (Mr. Williams) and Council Members Levin, Cabrera and Louis

Whereas, There are currently 11,938 active taxicab medallions operating in New York City; and

Whereas, Many medallions owners take out business loans to finance the purchase of their vehicles; and

Whereas, Some of the business loans that medallion owners take out include a document known as a "confession of judgment," where the borrower waives the right to due process if the debt is unpaid and there is a dispute; and

Whereas, Once signed, a "confession of judgment" can be used by the lender to obtain a judgment against the borrower without any further notification; and

Whereas, The Federal government currently has prohibitions on the use of confessions of judgment in consumer loans, but not for business loans; and

Whereas, The United States Federal Trade Commission has recently called for the elimination of confessions of judgment in small business lending contracts; and

Whereas, Many states have also banned confessions of judgment practices for business loans, but New York State does not prohibit them; and

Whereas, A recent New York Times expose revealed that "confession of judgment" documents may have been used by lenders to influence some borrowers applying for taxi medallion loans; and

-77-

A-1984

Whereas, According to the New York Times, some of the documents they reviewed show that some medallion borrowers admitted to defaulting on their loans even before the loan was approved; and

Whereas, A "confession of judgment" can be used by banks and other lending institutions as a document in predatory lending practices, a loophole that should be closed; now, therefore, be it

Resolved, That the Council of the City of New York calls upon the United States Congress and the New York State Legislature to pass legislation to prohibit the use of a confession of judgment in business loans.

LS 9151, 9153, 11030, 11060
RA
7/18/2019

A-1985

# EXHIBIT RR

Join Mailing List

🐦 (https://twitter.com/NYCComptroller)   f (https://www.facebook.com/scottstringernyc/)

📷 (https://www.instagram.com/NYCComptroller/)   ▶️ (https://www.youtube.com/user/ComptrollersOffice)

Newsroom (https://comptroller.nyc.gov/newsroom/) / Press Releases & Statements
(https://comptroller.nyc.gov/newsroom/press-releases/) /
Comptroller Stringer: City Must Take Immediate Action to Prepare For...

# Comptroller Stringer: City Must Take Immediate Action to Prepare For Economic Impacts of COVID-19 and Protect Vital Services for Most Vulnerable New Yorkers

**MARCH 16, 2020**

Stringer Calls for City to Identify $1.4 Billion in Potential Savings to Protect the Social Safety Net and Ensure Non-Interruption of Vital Services

Comptroller's Analysis Estimates $3.2 Billion in Lost Tax Revenues before Q2 FY 2021

Proposes Additional City, State and Federal Measures To Assist Businesses Most Impacted

**(New York, NY)** — Today, New York City Comptroller Scott M. Stringer released a new analysis of the economic impact of COVID-19 on New York City, including significant projected losses in the entertainment, hotel, restaurant, travel, and tourism sectors.

A-1987

The Comptroller's analysis estimates that downturns in these key, revenue-generating sectors could conservatively cost the City $3.2 billion in lost tax revenues over the next six months. To preserve the social safety net and protect vital services for our most vulnerable New Yorkers, Comptroller Stringer is calling for the City to immediately identify potential savings, suggesting a target of 4 percent of City tax levy-funded agency spending with exceptions for social service agencies, DOHMH, and NYC H+H — adding up to approximately $1.4 billion. The savings should be included in the Mayor's Executive Budget due later next month if economic conditions continue to warrant action. Comptroller Stringer also proposed additional City, State and Federal measures to assist businesses most impacted by the loss of economic activity.

"As we brace for the economic fallout of the COVID-19 pandemic, we must protect our children, our seniors, our small businesses, and the arts and cultural organizations that are core to our economy and our identity as a city," said Comptroller Stringer. "We're facing the possibility of a prolonged recession — we need to save now, before it's too late, if we're going to weather the downturn ahead. Once again, I'm urging the City to immediately instruct all City agencies to identify savings in their City tax levy-funded budgets, with certain exceptions for vital public health and social services, to be included in the Mayor's Executive Budget.The vital services for our most vulnerable populations and institutions during lean times will depend on prudent, responsible budgeting today, as will the level of relief we as a City can help to deliver to the hotel, restaurant, entertainment, social service and retail workers who are bearing the brunt of this crisis. I stand ready to facilitate and assist our City's response to this emergency with any powers within my authority."

**Overview of COVID-19 Economic Impact**
The forecast of tax revenue losses is based on the following assumptions:

- Hotels are projected at 20 percent occupancy for the rest of this Fiscal Year (June 30th), with gradual recovery through the first quarter of FY 2021.

- Restaurant sales are projected to decline by 80 percent; real estate sales by 20 percent; and retail sales by 20 percent.

- The Comptroller's analysis estimates that downturns in these key, revenue-generating sectors will cost the City $3.2 billion in lost tax revenues before Q2 FY 2021.                                                                      ⬆

Most private economic forecasters believe the possibility of a recession is growing daily and currently stands at a 50 percent likelihood. The Office of the Comptroller will continue to monitor economic activity and tax receipts daily and revise our forecasts as circumstances dictate.

**The City Must Manage the Budget More Aggressively to Address the Growing Risks**

The Comptroller is recommending that:

- City agencies should immediately identify savings equivalent to 4 percent of City tax levy-funded spending as of the FY 2021 Preliminary Budget. Social services agencies, including the Human Resources Administration, the Department of Homeless Services, and the Administration for Children's Services, should be subject to a 2 percent savings target.

- The Department of Health and Mental Hygiene and NYC Health + Hospitals should be exempted due to their role in the COVID-19 relief efforts.

- These potential savings, which add up to an estimated $1.43 billion on an annual basis, should be included in the Executive Budget next month.

**Additional City, State and Federal Measures To Assist Businesses Most Impacted By the Loss of Economic Activity:**

- The State should defer sales tax payments due March 20th for hotels, restaurants, and small storefront retail.

- The City Department of Small Business Services (SBS) should extend the assistance program announced last week to non-profits, particularly in the arts and culture sectors.

- SBS may need to expand the scope and scale of the assistance if the evolving economic situation warrants it.

- The City should waive all small business fines and fees starting immediately.

- The Federal government should include an emergency small business grant program like that created after 9/11 for Lower Manhattan in the next emergency legislative package.

Case 20-4238, Document 41, 02/11/2021, 3035102, Page105 of 296

A-1989

Comptroller Stringer: City Must Take Immediate Action to Prepare For Economic Impact...   Page 4 of 5
Case 1:20-cv-05301-RA    Document 38-44    Filed 08/12/20    Page 5 of 6

- Other measures, such as deferring other tax payments, should be reviewed and implemented as justified by developments.

On March 15th, Comptroller Stringer also called on the City to provide contractual relief to social services providers and non-profit organizations experiencing depressed client participation rates and decreased attendance due to COVID-19, experiencing difficulty paying their staff, rent, and utility bills, and realizing they will not meet the unit of service requirements established in their contracts with the City.

To stabilize the sector and ensure non-profits will remain able to serve New Yorkers through this crisis, Comptroller Stringer urged the Administration to hold providers harmless for missed contract deliverables that are directly attributable to COVID-19.

To read Comptroller Stringer's letter to the Administration on supporting non-profit organizations, click here (https://comptroller.nyc.gov/wp-content/uploads/2020/03/Ltr-to-Fuleihan-3.15.20.pdf).

### 

**PRESS CONTACT**
**Hazel Crampton-Hays**
(917) 594-2318 hcrampt@comptroller.nyc.gov,

**Josiel Estrella**
(212) 669-4177 jestrel@comptroller.nyc.gov

**SHARE THIS**



Case 20-4238, Document 41, 02/11/2021, 3035102, Page106 of 296

A-1990

Comptroller Stringer: City Must Take Immediate Action to Prepare For Economic Impact...  Page 5 of 5
Case 1:20-cv-05301-RA    Document 38-44    Filed 08/12/20    Page 6 of 6

## The Office

One Centre Street
New York, NY 10007
(212) 669-3916

**Suspect Wasteful Spending?**
Call (212) NO-WASTE

## Follow Us

🐦 @NYCComptroller
(https://twitter.com/NYCComptroller)
**f** @scottstringernyc
(https://www.facebook.com/scottstringernyc/)
📷 NYCComptroller
(https://www.instagram.com/NYCComptroller/)
▶ ComptrollersOffice
(https://www.youtube.com/user/ComptrollersOffice)

## Navigate

About (/about/)
Services (/services/)
Reports (/reports/)
Newsroom (/newsroom/)
Employment (/jobs/)
Contact Us (/about/contact-our-office/)

## Join Mailing List

Get the latest news in your inbox.

Sign Up

© 2020 Copyright, Office of the New York City Comptroller  •  Sitemap (/sitemap/)  •  Disclaimer (/disclaimer/)  •
Privacy Policy (/privacy-policy/)  •  Language Disclaimer (/language-disclaimer/)  •  Text Size  •  Supported Browsers



A-1991

# EXHIBIT SS

A-1992

# RESTAURANT INDUSTRY IMPACT SURVEY

## NEW YORK STATE

To assess the economic impact of the coronavirus to date, the National Restaurant Association conducted a survey of more than 6,500 restaurant operators nationwide, April 10-16. Here are the results for New York State:

## 527K+ RESTAURANT EMPLOYEES

have already been **laid off or furloughed** since the beginning of the coronavirus outbreak



## 79%
### Decline in sales*.
*April 1-10 compared to the same period in 2019


CLOSED

**53%** of operators have **temporarily closed** since beginning of outbreak.

The **restaurant and foodservice industry will lose** an estimated

## $3.6 BILLION+
↓↓↓↓↓↓ in sales by the end of April.


**51%** of operators **moved to takeout/delivery** only since coronavirus outbreak.

**80%** of **Restaurant Employees have lost their jobs.**

**61%** of operators nationwide say existing federal relief will NOT prevent more restaurant layoffs.


NEW YORK STATE RESTAURANT ASSOCIATION

A-1993

# EXHIBIT TT

A-1994

NBER WORKING PAPER SERIES

HOW ARE SMALL BUSINESSES ADJUSTING TO COVID-19?
EARLY EVIDENCE FROM A SURVEY

Alexander W. Bartik
Marianne Bertrand
Zoë B. Cullen
Edward L. Glaeser
Michael Luca
Christopher T. Stanton

Working Paper 26989
http://www.nber.org/papers/w26989

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
April 2020

We thank Karen Mills for connecting us to the leaders at Alignable and to Eric Groves, Venkat Krishnamurthy, and Geoff Cramer for help in facilitating survey distribution. Dylan Balla-Elliott, Manal Saleh, and Pratyush Tiwari provided excellent research assistance. We received no external funding for this research. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

At least one co-author has disclosed a financial relationship of potential relevance for this research. Further information is available online at http://www.nber.org/papers/w26989.ack

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2020 by Alexander W. Bartik, Marianne Bertrand, Zoë B. Cullen, Edward L. Glaeser, Michael Luca, and Christopher T. Stanton. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

How Are Small Businesses Adjusting to COVID-19? Early Evidence from a Survey
Alexander W. Bartik, Marianne Bertrand, Zoë B. Cullen, Edward L. Glaeser, Michael Luca,
and Christopher T. Stanton
NBER Working Paper No. 26989
April 2020
JEL No. E65,I12020,L20

## ABSTRACT

In addition to its impact on public health, COVID-19 has had a major impact on the economy. To
shed light on how COVID-19 is affecting small businesses – and on the likely impact of the
recent stimulus bill, we conducted a survey of more than 5,800 small businesses. Several main
themes emerge from the results. First, mass layoffs and closures have already occurred. In our
sample, 43 percent of businesses are temporarily closed, and businesses have – on average –
reduced their employee counts by 40 percent relative to January. Second, consistent with previous
literature, we find that many small businesses are financially fragile. For example, the median
business has more than $10,000 in monthly expenses and less than one month of cash on hand.
Third, businesses have widely varying beliefs about the likely duration of COVID related
disruptions. Fourth, the majority of businesses planned to seek funding through the CARES act.
However, many anticipated problems with accessing the aid, such as bureaucratic hassles and
difficulties establishing eligibility.

Alexander W. Bartik
University of Illinois
1407 W. Gregory Road
214 David Kinley Hall
Urbana, IL 61821
abartik@illinois.edu

Marianne Bertrand
Booth School of Business University
of Chicago
5807 South Woodlawn Avenue
Chicago, IL  60637
and NBER
marianne.bertrand@chicagobooth.edu

Zoë B. Cullen
Rock Center 210
Harvard Business School
60 N. Harvard
Boston, MA 02163
zcullen@hbs.edu

Edward L. Glaeser
Department of Economics
315A Littauer Center
Harvard University
Cambridge, MA 02138
and NBER
eglaeser@harvard.edu

Michael Luca
Harvard Business School
Soldiers Field
Boston, MA 02163
and NBER
mluca@hbs.edu

Christopher T. Stanton
210 Rock Center
Harvard University
Harvard Business School
Boston, MA 02163
and NBER
christopher.t.stanton@gmail.com

A-1996

## 1. Introduction

How are America's small businesses navigating the economic disruptions resulting from COVID-19, and how will the CARES Act affect their decisions and future prospects? To explore these questions, we conducted a survey of more than 5,800 small businesses that were members of the Alignable business network. The survey focused on assessing (1) the current level of financial fragility among small businesses, (2) the extent to which small businesses have already temporarily closed and laid off employees, (3) expectations about how long the crisis will last - and how this is affecting business decisions, and (4) decisions about whether to seek funding through the CARES Act, and how this will impact layoff and closure decisions. In this short note, we present the survey results and themes that emerge.

Overall, our results suggest that the pandemic has already caused massive dislocation among small businesses. While businesses' beliefs about the duration of the crisis vary widely, the median business owner expects the dislocation to last well into mid-summer. Businesses are adjusting in a variety of ways, and over seventy percent of respondents anticipate taking advantage of aid when asked about a program that resembles the Paycheck Protection Program (PPP) that is part of the CARES act. Moreover, they expect this funding to influence other business decisions – including layoff decisions and staying in business altogether. At the same time, many businesses were reluctant to apply for funding through the CARES Act because of concerns about administrative complexity and eligibility.

This note proceeds as follows. Section 2 discusses the survey design. Section 3 discusses the characteristics of the firms that responded to the survey and their representativeness. Our survey was conducted through Alignable, a network of 4.6 million small businesses, and was included as a link in a March 26, 2020 email to their members. We received 7,511 responses during the first week, which represents approximately one-tenth of Alignable's members who responded to a quick reaction one or two question survey distributed around the same time. After restricting to firm owners located in the United States, we are left with 5,819 responses. The size distribution of the firms in our sample roughly matches the size distribution of firms in the 2017 Census of US Businesses with fewer than 500 employees. The geographic spread looks similar to the spread across the United States, although California is somewhat over represented. Our sample is likely to be disproportionately technology savvy because it is drawn from the ranks of

members of a digital business network. The voluntary nature of the survey may also have attracted businesses that experienced a greater impact of COVID-19.

In Section 4, we explore the current and expected impacts of COVID-19 on these businesses. Three themes emerge in this section. First, our results suggest disruptions have already been extreme. Across the sample as a whole, 43 percent of businesses have temporarily closed and nearly all of these closures are due to COVID. This response seems far more extreme than the economic effects of the 1918 inluenza epidemic found by Barro, Ursua and Weng (2020) and Garrett (2007, 2008). Respondents that have closed temporarily largely point to reductions in demand and employee health concerns. Disruptions in the supply chain have been less of a concern so far. On average, the businesses report having reduced their employees by 40 percent since January. The decline is particularly sharp in the Mid-Atlantic region (which includes New York City), where 54 percent of firms are closed and employment is down by 47 percent. Impacts also vary across industries, with retail, arts and entertainment, personal services, food services, and hospitality businesses all reporting employment declines exceeding 50 percent.  Finance, professional services, and real estate related businesses have seen less disruption.

Second, our results suggest that many businesses are financially fragile. The median firm with expenses over $10,000 per month has only enough cash on hand to last for two weeks. Three-quarters of respondents state that they only have enough cash on hand to cover two months of expenses or less. Parsa et al. (2005) also note the fragility of small restaurants.  Firms with more cash on hand are relatively more optimistic that they will remain open at the end of the year.  Third, beliefs about the likely duration of the crisis vary widely. Fifty percent of respondents believe that the crisis will last at least until the middle of June, suggesting that many businesses expect this to extend well beyond their current cash.

In Section 5, we present results from a module of the survey that experimentally varies policy proposals, allowing us to explore responses to policies such as the recently passed CARES Act. The firms' limited cash on hand suggests that there will be robust demand for Federally-subsidized aid or business loans. Indeed, more than seventy percent of the respondents expressed interest in a hypothetical program with features resembling the PPP aid. Yet a large number of respondents also anticipated problems with accessing the aid, citing issues such as bureaucratic hassles and difficulties establishing eligibility. Part of this module also allows a

3

counterfactual evaluation of a straight loan policy, which is a stylized representation of traditional SBA disaster relief programs. While the more generous CARES Act does improve take-up and business outcomes, traditional loans with speedy delivery and sufficient liquidity are also found to meaningfully shift business owners' expectations about survival even in the face of lower take-up rates.

Section 6 considers survival rate differences across industries, and how this depends on the duration of the crisis. In-person industries like personal services or retail report much lower prospects for riding out the pandemic than professional services or other sectors with minimal need for face-to-face contact. Unsurprisingly, the longer the crisis last, the lower the probability that firms ascribe to their reopening after the crisis. If the crisis lasts 4 months instead of 1 month, only 47% of businesses expect to be open in December compared to 72% under the shorter duration.

Section 7 concludes. The COVID-19 crisis represents a once-in-a-generation crisis for America's small businesses, especially those that specialize in face-to-face service. One fifth of America's workers labor in retail trade, leisure and hospitality and these sectors are particularly vulnerable to the current pandemic.

There is little precedent for the ongoing economic disruptions resulting from the COVID-19 crisis. Our survey documents the enormous disruption that is already occurring and the limited financial resources that small businesses have to weather this storm. Our results suggest that the implementation details of the CARES Act loans are likely to play an important role in ensuring the medium-term solvency of small businesses. The impact of the CARES Act is also likely to depend on the extent to which lenders prioritize simplicity of the sign-up process, transparency of eligibility and repayment rules, and speed of accessing cash.

## 2. Survey Design and Details

Our survey was sent out in partnership with Alignable, which is a network-based platform focused on the small business ecosystem. Alignable enables businesses to share knowledge and interact with one another, and currently has a network of 4.6 million small businesses across North America. Much of the network growth has been organic, with little outside marketing.

4

Alignable also regularly sends out polls (which they call "pulse surveys") to users. At the end of a regular pulse-survey, participants who took that poll received an email inviting them to participate in a more comprehensive survey being conducted by researchers at Harvard Business School. Appendix 1 shows the message seen by respondents who clicked on the link. Participants were shown a disclosure statement and consent protocol.  No payments were offered; participation was completely voluntary.

We received 7,511 responses within the first week. 5,819 of these can be traced back to U.S. based businesses, which is the relevant sample for understanding policy. While the 7,511 responses represents a small fraction (.017 percent) of Alignable's total membership, it represents a much larger share of Alignable's membership that has engaged with their weekly pulse surveys on COVID-19.  Alignable estimates that 50,000-70,000 members are taking these pulse surveys weekly, which suggests a 10 - 15 percent conversion rate relative to these more active respondents.

 Our sample, therefore, is selected in three ways: (1) they are firms that have chosen to join Alignable, (2) they are Alignable firms that have chosen to stay actively engaged taking surveys, and (3) they are the set of firms that are active within Alignable that chose to answer our survey.   Consequently, there are many reasons to be cautious when extrapolating to the entire universe of America's small businesses. We will discuss their representativeness based on observable attributes in the next section of this report.

The survey included a total of 43 questions, with basic information about firm characteristics (including firm-size and industry), questions about the current response to the COVID-19 crisis, and beliefs about the future course of the crisis.  Some questions were only displayed based on skip logic, so most participants responded to fewer questions.  The survey also includes an experimental module that randomized between respondents to understand how different federal policies might impact these firms' behavior and survival as the crisis unfolds.  Specifically, we experimentally varied some of the descriptions of potential policies across the sample to shed light on the potential impact of different policies. We will discuss that module more thoroughly in Section V.  A further experimental module included between-respondent randomization exploring decisions under different hypothetical durations of the crisis.

**3.  Firm Characteristics and Representativeness**

5

The survey contains three baseline questions which enable us to assess the representativeness of the sample along observable dimensions: number of employees, typical expenses (as of January 31, 2020), and share of expenses that go towards payroll. We are also able to get rough information about geolocation to asses representativeness by state.

We compare our data with data on businesses from the 2017 Census of US Businesses, using the publicly available statistics published by the US Census Bureau. The underlying data is drawn from the County Business Patterns sampling frame and covers establishments with paid employees, including sole-proprietorships. The Census data captures large and small businesses alike, but for our comparisons, we will look only at businesses with fewer than 500 employees.

The Alignable network allows users to share customer leads, which could potentially skew our sample towards retail and service businesses that interact directly with consumers. As retail businesses are particularly vulnerable to COVID-19 disruptions, that could lead our sample to overstate the aggregate dislocation created by the crisis. However, as we discuss later, our data on industry mix suggests that the sample does represent a wide swath of America's smaller businesses. Naturally, industries dominated by large firms, such as manufacturing, are under-represented.

Figure 1 shows the size distribution of our sample and the size distribution of businesses with fewer than 500 employees in the Economic Census. The match of employment sizes is reassuring. About 64 percent of the businesses in our sample have fewer than five employees, while about 60 percent of the firms in the Economic Census are that small. About 18 percent of businesses in both samples have between 5 and 9 employees.  The survey becomes less well matched to the Census among the larger employment groupings, and we believe that our survey will capture the experience of larger employers with less accuracy.

While our survey does not allow for an apples-to-apples comparison of payroll expenses with Census data, we constructed a rough comparison by approximating payroll expenses for the Alignable firms from categorical questions about monthly expenses and the share of these expenses going toward payroll. The Census provides annual payroll expenses for W2 employees. To get a sense of the match, we compared our estimated monthly payroll expenses in our sample with one-twelfth of annual expenses in the U.S. Census. To facilitate comparison, we divide by

an estimate of total employment.[2] Figure 2 shows the size distribution of monthly estimated payroll expenses in our sample and a comparable breakdown for the Census using a per-capita adjustment. The match is imperfect, especially for larger firms. The discrepancy might reflect the under-representation of manufacturing or professional services firms in our sample, which are among the highest paying of all 2 digit NAICS sectors in the Census data.  Appendix Table 1 provides further detail on the industry match to the Census.

Figure 3 shows the geographic scope of our sample. The Alignable sample draws particularly from California, the New York region, Florida, and Texas. The sample is notably sparse in America's western heartland. That distribution is qualitatively similar to the distribution of smaller businesses in the Economic Census.

Figure 4 shows the share of our sample coming the 10 most populous states.  The figure also includes the share of small establishments in the Economic Census that are within each state. For example, California has 14.4 percent of our Alignable survey sample, 12.5 percent of small businesses in the Census data and 11.52 percent of total U.S. population. Our sample does overrepresent the coasts and underrepresents Illinois.

Overall, while the sample captured by the survey has limitations and may not be an imperfect snapshot for certain pockets of America's small businesses, the sample allows for important insight into the overall small business ecosystem. The sample is large and includes firms from most major industry groups, states, and firm-size categories.

## 4.   Responses to the COVID-19 Pandemic and Lockdown

We now turn to our main results, which we group into three categories. First, we describe the current impact of COVID-19 on business operations and employment. Second, we report our results on the financial fragility of those businesses, as captured by their cash on hand and ongoing expenses. Third, we turn to their expectations about the duration of the crisis and their own economic survival.

*Temporary Closings and Employment*

We begin by asking owners whether their business is currently operational.  We allowed owners to respond that the business was operational, temporarily closed, or permanently closed.

---

[2] This comparison is very likely to include different "headcount" as we do not disambiguate between W2 and 1099 employment in the survey.

7

We also allowed them to report whether the business was closed because of COVID-19 or because of some other reason.[3]

Across the sample, 41.4 percent of businesses reported that they were temporarily closed because of COVID-19.  A far smaller number – 1.8 percent – reported that they were permanently closed because of the pandemic. By contrast, only 1.3 percent reported that they were temporarily closed for other reasons.  55.4 percent report that they were still operational.

We also asked the businesses owners to fill in a matrix that contained the number of both full time and part time employees that were employed by the firm now and as of January 31, 2020. Over the entire sample, the number of full-time employees had fallen by 32 percent.  The number of part-time employees was 56 percent lower than it had been at the end of January. These results include businesses that have temporarily closed. If we look only at businesses that are still operating, we find that the number of total fulltime employees has fallen by 17.5 percent. The number of part-time employees has declined by 36 percent. Overall employment has declined significantly, totaling only 60% of January headcount.

Table 1 shows our results across the eleven Census Division and displays the share of businesses that had temporarily closed because of COVID-19 and the reduction in total employment between January 31 and today. The results are not meaningfully different if we separate out full time or part time employees. While there is regional heterogeneity, the picture is fairly bleak almost everywhere.

The Mid-Atlantic division has the sharpest decreases in employment and the largest share of firms that have temporarily suspended operations. Fifty-four percent of firms in that region are now closed, and employment has fallen by an average of 47 percent. The Mountain region is the least effected, but even there 39 percent of firms have temporarily closed and employment has declined by 32 percent.

Tables 2 and 3 display the same breakdown by firm size and industry.  Smaller firms with fewer than 20 employees in January are more likely to be closed. Firms with between 6 and 19 January employees have the largest employment reductions. Across industries, in-person retail

---

[3] We did not attempt to assess the quality of firm management, as in Bloom et al. (2013).  We hope that future surveys will test when quality of management helps protect firms against closure during this crisis.  This crisis also presents an opportunity to understanding managerial decision-making under stress, as discussed by Bazerman and Moore (1994).

and services businesses have declined precipitously. Although hard hit, the impact is not as extreme for professional services firms, banking and finance, real estate, or construction.

Table 4 shows the problems that firms are facing by their current operational status.   We asked owners to rate on a 1 to 100 scale the problems that they are having with employee illness, supply chains and customer demand. The scale had both numerical values, and also a text label that went from "Not a concern" at one end to "Extremely disruptive" at the other end.  We differentiate between firms that are open, temporarily closed and permanently closed, and we show the share of firms in each category that indicate significant difficulties in each of these areas.

On average, firms rated the disruptions resulting from supply chain challenges to be 35 out of the 100-point scale (which is in the "slightly disruptive" part of the scale). Concerns about employee health were more prominent of a concern, with firms rating it as 57 out of 100 in terms of importance (which maps to "somewhat disruptive"). Reductions in demand were even more disruptive, with firms rating the importance of this to be 78 out of 100 (extremely disruptive). While closed firms noted worse disruptions due to demand, the basic ranking of the problem areas was consistent across types of firms. This suggests that supply chain problems have thus far been less pronounced, relative to disruptions resulting from demand shocks and concerns about employee health.

Altogether, these results suggest that a vast number of enterprises have temporarily shut down and laid off workers. We now ask whether these firms have the resources to weather the crisis over the months ahead.

*Financial Fragility*

To measure financial fragility, we asked the respondents "roughly how much cash (e.g. in savings, checking) do you have access to without seeking further loans or money from family or friends to pay for your business?" We then divided this amount by their January 31 monthly expenses to understand how long they could maintain operations without seeking extra credit.[4]

---

[4] We did not collect information about access to lines of credit or outside borrowing, but given the severity of the contraction in demand those credit facilities may be unlikely to remain accessible without a government guarantee.

Figure 5 shows a histogram of cash available as a multiple of January 31, 2020 monthly expenses. Approximately one-fourth of firms have cash on hand totaling less than one month's worth of expenses. About one-half of firms have enough cash on hand to cover between one and two months of expenses.

Figure 6 sorts firms by January 31, 2020 monthly expenses and then tabulates the mean and median cash on hand relative to pre-crisis expenses. The median firm with under $10,000 in monthly expenses has one month of cash on hand. For all higher spending level, the median firm typically has less than 15 days of cash based on their pre-crisis expense levels. These firms just do not have cash on hand to meet their regular expenses.

These limited levels of cash on hand readily explain why layoffs and shutdowns have been so prevalent. Absent these actions, it is hard to understand how these firms could have met payroll. Moreover, it is hard to imagine how the firms that are still open are going to survive without laying off their existing workers, at least without an infusion of more credit.

*Predicting the Path of the Crisis*

Finally, we ask the firms to predict how long the COVID-19 crisis will last and whether they will be open again at the end of 2020. To predict the end of the crisis, we asked the survey respondents what was "the most likely date" when the crisis would be over. We also asked them their confidence about this data on a one to ten scale.

Figure 7 shows the distribution of expected end dates. The figure shows that roughly one-fifth of respondents believe that the crisis will be over by the end of May. Another thirty percent of respondents believe that the crisis will end between the end of May and the start of July. Almost one half of the firms answered that they thought that the crisis would still be going at the start of the July.

However, the firms were not particularly confident about their answers. 50 percent of respondents reported their confidence level as five or less on the one to ten scale. Sixteen percent gave their confidence a two or less. Their uncertainty seems appropriate given the uncertainty that is present throughout the world.

Figure 8 shows the histogram of responses about whether they will be open on December 31, 2020. Overall, more than ninety percent thought it is at least somewhat likely that they would be open. More than 64 percent reported that it is very or extremely likely that they would

be open—which we later use as a measure of the probability of being open. A growing literature has found entrepreneurs to be overoptimistic about their prospects (see, for example, Bazerman and Moore 1994). This suggests that true survival rates may be even lower.

The firms with more cash on hand were more confident about their future, as evidenced by the split based on whether the firm has more or less cash on hand (relative to usual monthly expenses) than the median in our sample. Forty-nine percent of those firms with more than the median cash on hand thought that it was extremely like that they would be open at the end of the year. Thirty-two percent of firms with less cash on hand than the median thought that they would be open. One interpretation of these fact is that liquidity generates confidence in the ability to survive this crisis. Among firms at least 20 employees, 70% expressed that they were very or extremely likely to survive, which may indicate greater access to outside resources despite having a higher expense base.

Figure 9 shows the share of firms that think that they are "very likely" or "extremely likely" to be open varies based on their belief about the duration of the crisis. The firms that think that the crisis will be short also believe that they are more likely to survive. Those who believe in a longer crisis are more pessimistic.

## 5. Anticipated Responses to CARES Act Programs

In this section, we discuss the survey's questions about take-up of the CARES Act Paycheck Protection Program (PPP) loans and their expected impact on employment. One important aspect of the CARES program is that "loans that will be fully forgiven when used for payroll costs, interest on mortgages, rent, and utilities," as long as 75 percent of the forgiven amount is spent on payroll and the employer either maintains or quickly rehires workers and maintains salary levels (https://home.treasury.gov/system/files/136/PPP%20--%20Overview.pdf). Consequently, a significant portion of the "loans" can be seen as a grant rather than traditional debt.

The high level of loan forgiveness means that this represents a large potential transfer to small businesses, and we tried to assess the importance of the grant component of the CARES loans relative to a pure (and far less expensive) loan program. One-third of the survey respondents were randomly asked about their interest in a CARES-like program, which was describe as a loan program which "will be forgiven by the amount spent on payroll, lease, rent,

11

mortgage, and utility payments in the 8 weeks after origination." One-third of the respondents were randomly asked about their interest in a loan program that was otherwise identical but without prompting any possibility of forgiveness.[5] As part of the display, the amount of liquidity was varied, with the caveat to respondents that these policies may not be the actual policies currently available to them. This was designed to measure how program generosity affects take-up and perceived business resilience.

Figure 10 shows the expected take-up of the two programs (and the exact details of the question wording). Seventy-two percent of respondents who were told about the loans with forgiveness said that they would like to take them up. Fifty-nine percent of respondents were interested in taking up the loan program without forgiveness. While there is substantial interest in the credit on its own, there was significantly more interest in the loans with forgiveness.

A primary reason to forgives loans is that such a subsidy might do more to maintain employment and keep businesses open. We therefore re-asked businesses to project their likelihood of being open and their expectations about employment after we told them about the loan programs. Figures 11 and 12 also show the expected probability of being open and the expected employment (relative to January 2020 employment) for the two groups of respondents.

Before they were told about the policies, both groups expected that their employment would be 40 percent lower in December 2020 than it had been in January 2020. After the respondents were told about the CARES-like loans, they projected that their employment would decline by only six percent. The respondents who were told about loans without forgiveness predicted that their employment levels would fall by fourteen percent. We are unable to distinguish precisely whether it is the conditional nature of the PPP program or the more favorable credit terms that drive these differences.

The results when we ask firms about their expectations of remaining in business next December are similar. Before being told about the loans, the businesses thought that they had a

---

[5] Because there was significant policy uncertainty at the time of the survey, one third of respondents were also asked about a potential policy that focused on aid that could only be used for payroll. This policy became less relevant after the details of the CARES act emerged.

62-63 percent chance of being open in December.  The probability rose to 81 percent among those who were told about the standard loans.  The projected chance of survival increased to 85 percent for the businesses who were informed about the PPP loans that came with forgiveness. Again, the flow of credit seems important, but forgiveness did have a statistically significant impact on the expectation of staying in business.

Why would businesses not take the aid that comes with such generous forgiveness terms? Figure 13 asks the 28 percent of firms that said that they would not take a CARES-like loan why they would turn down such a generous offer.    The most common response, given by 35 percent of refusers, is that they did not need the cash, which suggests that one-tenth of our sample truly feels confident with their financial security.[6]

A significant number of those who said that they wouldn't take the CARES assistance cited other concerns.  Thirty percent of these respondents said that they didn't think that they would qualify.  Nearly twenty percent said that they didn't trust the government to forgive the debt.  Over one-tenth thought that it would be too much of a hassle. These results suggest that clarity about the program and a streamlined process will be crucial if the governments wants to ensure a high take-up rate.

We also randomly informed survey recipients about the changes in unemployment insurance under the CARES act.   We found that informing employers about the increased generosity of unemployment insurance was associated with lower employment projection in December 2020, among those businesses that were told about the CARES-like loans. Information about unemployment insurance had no impact on the expected probability of remaining open.  More work is needed to understand how interactions between programs may influence economic outcomes.

**6.**  Industry Differences in Response to Crisis Duration

COVID-19 disruptions do not affect all businesses equally.  Some are deemed essential and remain open, while others have been forcibly shut.  Some businesses are able to reduce

---

[6] Those who report their intention not to take-up the program due to having sufficient cash have a median of 3.5 months of cash on hand.  Those who express other reasons for lack of take-up have a median of 1 month of cash.

contagion among employees through a shift to remote work while other businesses prove ill-equipped for the transition.  For a variety of reasons related to both the underlying nature of the business and management capacity, COVID-19 poses an existential threat to some and not others.

Disparities between businesses appear most stark when we measure their resilience to extended durations of the pandemic.   In our survey, we ask the following hypothetical: "We want to understand how the duration of the COVID-19 disruptions might change your answers.  Suppose that most COVID-19 disruptions continue for X months, what is the likelihood of your business remaining operational by Dec. 31, 2020?  Please provide your best guess."  We randomize the duration to be 1 month, 4 months or 6 months, and offer respondents a 5-point scale ranging from extremely unlikely to extremely likely.   As before, we transform this answer into a binary outcome of likely or unlikely to remain open for ease of exposition.

In Table 5 we display the responses to this question by industry.   When firms are told to expect a one-month crisis, the expectation of remaining open by the end of the year hovers around 70 percent across all industries with the exception of Arts and Entertainment, and Personal Services.  In those industries, the expectation of remaining open drops to 65 and 57 percent respectively.

When firms are told to expect a six-month crisis, the average expectation of remaining open falls to 38 percent, and there is significant heterogeneity between sectors.  The expected survival probability for firms in Arts and Entertainment drops precipitously to 45 percent if the crisis lasts 4 months, and 35 percent if the crisis lasts 6 months.  The expected probability of being open for Personal Services firms fall to 22 percent if the crisis lasts six months.

The restaurant industry seems particularly vulnerable to a long crisis.  Restaurateurs believe that they have a 72 percent chance of survival if the crisis lasts one month, but if the crisis lasts four months, then they give themselves only a 30 percent chance of survival.  If the crisis lasts for six months, then they expect to survive with only a 15 percent probability.  Likewise, the chance of survival for firms in tourism and lodging drops to 27 percent by the 6-month mark.  Meanwhile, Banking and Finance, Real Estate and Professional Services say that they will be able to weather extended disruptions far better than these more exposed sectors.

These results suggest that the damage to our economy and its network of small businesses will be far larger if the crisis lasts for many months.   This suggests large economic benefits for policies that can safely lead to reopening the economy quickly.

## 7. Conclusion

Small businesses employ almost fifty percent of American workers. Yet, our results underscore the financial fragility of many small businesses, and how deeply affected they are by the current crisis. In our sample, which is skewed toward retail sales, we found that 43 percent of businesses were temporarily closed and that employment has fallen by 40 percent. This represents a shock to America's small firms that has little parallel since the 1930s. Our results suggest that many of these firms have little cash on hand, which means that they will either have to dramatically cut expenses, take on additional debt, or declare bankruptcy.  This highlights the ways in which the immediacy of new funding might impact medium term outcomes.

Small businesses' responses to our survey suggest that many are likely to fail absent assistance. As of the last week in March 2020, 38 of businesses viewed it as unlikely or only somewhat likely that they would be open as of the end of 2020. While optimism increased when they were informed about the CARES loan program, it is unclear whether the CARES act will enable most of America's small businesses to survive – or whether beliefs about its impact are overly optimistic.

The results also highlight the importance of well-designed and sustained economic and public health policy measures. Three policy-relevant results of our survey stand out. First, more than 13 percent of respondents say that they do not expect to take out CARES Act PPP loans because of the application hassle, distrust that the federal government will forgive the loans, or worry about complicated eligibility rules. Streamlining the application process and clarifying the eligibility criterion and loan forgiveness rules might, therefore, increase the take-up right for loans. Second, firms in particularly exposed industries - such as restaurants, tourism, and personal services - project that they will find it extremely difficult to stay in business if the crisis lasts for longer than four months. These suggest large economic benefits from any policies that can safely shorten the economic shutdown (e.g. through stronger short-term containment policies). Third, if we extrapolate the 72 percent of businesses who indicate they would take up the CARES PPP loans to all US small businesses and assume that all businesses take out the

maximum loan size (2.5 months of expenses), the total volume of loans would be approximately $410 billion, somewhat beyond the $349 billion allocated in the CARES act right now.[7]

## References

Barro, R. J., J. F. Ursúa, and J. Weng (2020, March). The coronavirus and the great influenza pandemic: Lessons from the "Spanish flu" for the coronavirus's potential effects on mortality and economic activity. Working Paper 26866, National Bureau of Economic Research.

Bazerman, Max and Donald Moore (1994). "Judgment in Managerial Decision Making" Wiley Publishing.

Bloom, N., Eifert, B., Mahajan, A., McKenzie, D., & Roberts, J. (2013). Does management matter? Evidence from India. The Quarterly Journal of Economics, 128(1), 1-51.

Garrett, T. A. (2007). Economic Effects of the 1918 Influenza Pandemic: Implications for a Modern-Day Pandemic. Federal Reserve Bank of St. Louis.

Garrett, T. A. (2008). Pandemic economics: the 1918 influenza and its modern-day implications. Review 90(Mar), 74–94.

Parsa, H. G., Self, J. T., Njite D., and King, T. (2005) Why restaurants fail. Cornell Hotel and Restaurant Administration Quarterly, 46(3), 304-322.

Appendix

Appendix 1: Initial message shown to respondents

Thank you in advance for your participation in our survey!

Academics from Harvard University and the University of Chicago are looking to better understand the impact the coronavirus is having on the local business ecosystem – and what can be done to help local businesses. We hope that it will help to communicate your current needs to policymakers.

Please share your truthful and considered views. Your individual answers will be completely confidential.

Sincerely,
Zoe Cullen and Chris Stanton
Professors of Business Administration
Harvard Business School

---

[7] Monthly payroll in the 2017 Census data for businesses under 500 employees totaled 226 billion dollars.

A-2011

## Tables and Figures



Sample size is 4865 and does not include 954 responses with missing employment data.

Figure 1: FIRM SIZE IN THE SURVEY AND CENSUS

This figure plots the share of firms in each employment category for the 2017 Census of US Businesses and the survey respondents.

A-2012



Sample size is 4865 and does not include 954 responses with missing employment data.

Figure 2: Average Per Capita Payroll (§ 1000s) in the Survey and Census

This figure plots per-employee payroll in thousands of dollars by firm size for the 2017 Census of US Businesses aggregates and the survey respondents. The Census data only reports annual payroll for W2 workers and the number of firms in a cell. To calculate payroll for the survey firms, we take the midpoint of categorical answers for monthly expenses, multiply by the fraction of expenses going toward payroll and divided by total employees (we cannot distinguish between W2 employees and contractors).

A-2013

Case 1:20-cv-05301-RA   Document 38-46   Filed 08/12/20   Page 21 of 37

Proportion of Firms by State



Figure 3: COVERAGE BY STATE

This figure plots shares of survey responses across different states.

A-2014



Omits responses with missing location data.

Figure 4: Firm Size in the Survey and Census

This figure plots the share of firms in each state for the 2017 Census of US Businesses and the survey respondents.

A-2015



Figure 5: MONTHS OF CASH

This figure plots firms' months of cash available as a multiple of January 2020 expenses. We compute this measure by taking the midpoint of categorical responses for the amount of cash on hand and divide by the midpoint of the categorical response for typical monthly expenses prior to the crisis.



Figure 6: MEAN AND MEDIAN MONTHS OF CASH SPLIT BY MONTHLY EXPENSES $000s

This figure plots means and medians of the months of cash available measure across the distribution of typical monthly expenses.

A-2017



Figure 7: CDF of Expected COVID End Date

This figure plots the distribution function across respondents for the expected end date of COVID related disruptions .

A-2018



Figure 8: Likelihood of Remaining Open or Re-Opening by December

This figure displays the frequency of answers to a question about the likelihood of being open in December, 2020. Responses are split by whether firms have above median cash on hand relative to typical expenses..



Figure 9: Likelihood of Remaining Open or Re-Opening by December, 2020 as a Function of Beliefs about COVID End Date

This figure plots the likelihood of being open in December, 2020 as a function of respondents' expected COVID end date. Averages are plotted and the shaded region is the confidence interval. The opening likelihood is computed as the share of respondents who answered "Extremely likely" or "Very likely."

25



Sample size is 2621 and pooled t-stat on difference between policies is 6.99.

Figure 10: DIFFERENCES IN POLICY TAKE-UP ACROSS LOANS VERSUS CARES ACT PPP PRO-GRAM SPLIT BY HYPOTHETICAL LIMITS ON BORROWING AMOUNT

This figure displays policy take-up rates for loans versus the stylized Paycheck Protection Program policy using a between subjects design. The borrowing base was also randomized between subjects as a multiple of typical monthly expenses prior to the crisis. The text displayed for the PPP program was: "Imagine a policy where the government allows you to borrow up to [borrowing base] times your typical monthly expenses without posting any collateral. You could use this money to cover any of your business expenses. The loan will be forgiven by the amount spent on payroll, lease, rent, mortgage, and utility payments in the 8 weeks after origination (you can consider this amount to be a grant). The remainder of the loan (that is not spent on these items) will have deferred payments for 1 year. After that, the loan would have an annual interest rate of 4% (deferred for 1 year) and you would have up to 10 years to repay the loan. For example, if you borrow $50,000 and you have no qualifying expenses to offset the loan, the required monthly payment starting 1 year from today would be $506 per month for 10 years. If you borrow $50,000 and spend $40,000 to pay your employees during the first 8 weeks, you will have 10 years to pay the remaining $10,000 with monthly payments of $102." Subjects in the loan condition saw the text: "Imagine the government offers a loan allowing you to borrow up to [borrowing base] times your typical monthly expenses without posting any collateral. You could use this money to cover any of your business expenses. The loan would have an annual interest rate equivalent of 4% and principal and interest payments would be deferred for 1 year. You would have up to 10 years to repay the loan. For example, if you borrow $50,000, the required monthly payment starting 1 year from today would be $506 per month for 10 years." Pooled means for the loan and CARES act are 0.59 and 0.72, respectively.

26



Sample size is 2561 and pooled t-stat on difference between policies is 2.86.

Figure 11: DIFFERENCES IN POLICY EFFECTS ON THE PROPENSITY TO REMAIN OPEN IN DE-
CEMBER OF 2020, SPLIT BY HYPOTHETICAL LIMITS ON BORROWING AMOUNT

This figure plots differences in the propensity to remain open under different policies. The measure is
computed using a follow-up question after policy information displayed, using the fraction that chose "Very
likely" or "Extremely likely" to be open in December of 2020. See notes for Figure 10 for additional detail
about the policy display. Pooled means for the loan and CARES act are 0.805 and 0.848, respectively.



Sample size is 2350 and pooled t-stat on difference between policies is 2.43.

Figure 12: DIFFERENCES IN POLICY EFFECTS ON RELATIVE EMPLOYMENT BETWEEN DECEMBER AND JANUARY

This figure plots differences in the ratio of relative employment between December 2020 and January 2020 under different policies. The December 2020 employment measure is computed using a follow-up question after policy information displayed. See notes for Figure 10 for additional detail about the policy display. Pooled means for the loan and CARES act are 0.86 and 0.94, respectively.

28



N = 382. Respondents could select more than one option; percentages need not sum to 100.
50% of respondents selected an additional reason not displayed or filled in the free text entry for *other*

Figure 13: REASONS FOR NOT USING THE RESOURCES IN THE SENATE BILL

This figure contains the frequency of responses for reasons that respondents would not take-up aid under the CARES Act policy condition. 383 respondents indicated they would not use the policy and 382 answered this question.

Table 1: Summary Measures Across Regions

|  | Currently Closed | | Exp Closed December | | Weeks COVID Will Last | | Current v Jan Employment | |
|---|---|---|---|---|---|---|---|---|
|  | Mean | SD | Mean | SD | Mean | SD | Mean | SD |
| East North Central | .449 | .498 | .353 | .478 | 14.7 | 10.2 | .68 | .38 |
| East South Central | .414 | .494 | .368 | .484 | 16.1 | 11.4 | .57 | .49 |
| Mid Atlantic | .541 | .499 | .372 | .484 | 14.6 | 10.03 | .53 | .45 |
| Mountain | .388 | .488 | .348 | .477 | 16 | 11.34 | .68 | .38 |
| New England | .473 | .5 | .325 | .469 | 16.6 | 10.19 | .55 | .49 |
| South Atlantic | .455 | .498 | .371 | .483 | 15.4 | 10.7 | .55 | .48 |
| Pacific | .413 | .493 | .378 | .485 | 15.5 | 10.33 | .63 | .45 |
| West North Central | .43 | .496 | .349 | .478 | 15.7 | 10.84 | .66 | .41 |
| West South Central | .404 | .491 | .389 | .488 | 15.1 | 11.06 | .68 | .43 |
| Total | .446 | .497 | .366 | .482 | 15.38 | 10.57 | .6 | .45 |
| Populated Obs. | 4969 | . | 4069 | . | 4170 | . | 4362 | . |

*Notes.* This table reports breakdowns by regions. There are 16 observations with unknown region. Note that the Currently Closed column includes both temporary and permanent closures. The measure Exp Closed December comes from a question asking about the likelihood of being open in December and closure is based off a binary indicator for those marking "Extremely Unlikely," "Somewhat Unlikely," or "Somewhat Likely." The current versus January employment ratios are weighted by January employment.

30

Table 2: SUMMARY MEASURES BY FIRM SIZE

|  | Currently Closed | | Exp Closed December | | Weeks COVID Will Last | | Current v Jan Employment | |
|---|---|---|---|---|---|---|---|---|
|  | Mean | SD | Mean | SD | Mean | SD | Mean | SD |
| Under 5 | .459 | .498 | .356 | .479 | 15.8 | 10.86 | .66 | .49 |
| 5-9 | .47 | .499 | .393 | .489 | 14.7 | 10.2 | .52 | .45 |
| 10-19 | .41 | .492 | .414 | .493 | 14.7 | 10.05 | .55 | .47 |
| 20-99 | .364 | .482 | .302 | .46 | 14.1 | 9.48 | .58 | .42 |
| 100-499 | .261 | .444 | .222 | .424 | 16.2 | 10.8 | .72 | .44 |
| Unknown | .413 | .495 | .494 | .503 | 16.7 | 10.41 | . | . |
| Total | .446 | .497 | .366 | .482 | 15.38 | 10.57 | .6 | .45 |
| N | 4969 | . | 4069 | . | 4170 | . | 4362 | . |

*Notes.* This table reports breakdowns by firm size. Note that the Currently Closed column includes both temporary and permanent closures. The measure Exp Closed December comes from a question asking about the likelihood of being open in December and closure is based off a binary indicator for those marking "Extremely Unlikely," "Somewhat Unlikely," or "Somewhat Likely." The current versus January employment ratios are weighted by January employment.

Table 3: Summary Measures by Industry

| | Currently Closed | | Exp Closed December | | Weeks COVID Will Last | | Current v Jan Employment | |
|---|---|---|---|---|---|---|---|---|
| | Mean | SD | Mean | SD | Mean | SD | Mean | SD |
| All Retailers, except Grocery | .522 | .5 | .441 | .497 | 14.1 | 9.59 | .5 | .42 |
| Arts and entertainment | .713 | .453 | .423 | .495 | 17.3 | 11.12 | .4 | .46 |
| Banking/finance | .192 | .395 | .25 | .434 | 16 | 10.88 | .79 | .35 |
| Construction and related | .324 | .468 | .383 | .487 | 14.3 | 10.23 | .66 | .4 |
| Health care and related | .445 | .498 | .29 | .454 | 15 | 10.4 | .69 | .37 |
| Other | .397 | .489 | .349 | .477 | 16.6 | 11.16 | .7 | .41 |
| Personal Services | .86 | .348 | .387 | .488 | 11.7 | 8.24 | .35 | .4 |
| Professional Services | .218 | .413 | .292 | .456 | 15.7 | 10.55 | .79 | .41 |
| Real Estate | .381 | .487 | .302 | .461 | 15.6 | 11.31 | .68 | .42 |
| Restaurants and related | .543 | .5 | .536 | .5 | 13.3 | 9.03 | .25 | .37 |
| Tourism/Lodging | .615 | .488 | .442 | .498 | 16 | 9.83 | .3 | .34 |
| Total | .446 | .497 | .366 | .482 | 15.38 | 10.57 | .6 | .45 |
| N | 4969 | . | 4069 | . | 4170 | . | 4362 | . |

*Notes.* This table reports breakdowns by industry. There are 16 observations with unknown region. Note that the Currently Closed column includes both temporary and permanent closures. The measure Exp Closed December comes from a question asking about the likelihood of being open in December and closure is based off a binary indicator for those marking "Extremely Unlikely," "Somewhat Unlikely," or "Somewhat Likely." The current versus January employment ratios are weighted by January employment.

Table 4: Breakdown of Issues Affecting Businesses

| Business status | N total | N answering | Supply Chain | Employee Health | Demand/Orders |
|---|---|---|---|---|---|
| Currently open | 2,752 | 2,198 | 30.29 | 49.82 | 66.16 |
| Temp. closed | 2,117 | 1,783 | 35.58 | 59.83 | 83.31 |
| Perm. closed | 100 | 85 | 37.87 | 60.85 | 86.13 |
| Total | 4,969 | 4,066 | 34.58 | 56.83 | 78.53 |

*Notes.* This table reports respondents' reactions to the importance of issues affecting their business, broken down by the status of the business at the time of taking the survey.

Table 5: REPORTED LIKELIHOOD OF REMAINING OPEN BY INDUSTRY AND HYPOTHETICAL CRISIS DURATION

| Industry | N | 1 Month | 4 Months | 6 Months |
|---|---|---|---|---|
| All Retailers, except Grocery | 598 | 0.69 | 0.35 | 0.33 |
| Arts and entertainment | 314 | 0.65 | 0.45 | 0.35 |
| Banking/finance | 177 | 0.78 | 0.63 | 0.59 |
| Construction | 448 | 0.72 | 0.43 | 0.45 |
| Health care | 449 | 0.79 | 0.47 | 0.35 |
| Other | 1,462 | 0.76 | 0.48 | 0.38 |
| Personal Services | 214 | 0.57 | 0.40 | 0.22 |
| Professional Services | 271 | 0.79 | 0.63 | 0.54 |
| Real Estate | 147 | 0.74 | 0.56 | 0.56 |
| Restaurant/Bar/Catering | 173 | 0.72 | 0.30 | 0.15 |
| Tourism/Lodging | 174 | 0.66 | 0.48 | 0.27 |
| Total | 4,427 | 0.72 | 0.47 | 0.38 |

*Notes.* This table reports results across industries of expectations of remaining open in December based on different hypothetical durations of the COVID crisis. This question was asked at the end of the survey, after policy questions were conducted. The randomization is between subject.

34

Table A1: Census Industry versus Survey Industry Breakdown

| Industry | Census Percentage | Survey Percentage |
|---|---|---|
| Agriculture, Forestry, Fishing and Hunting | 0.4 | 1.3 |
| Mining, Quarrying, and Oil and Gas Extraction | 0.3 | 0 |
| Utilities | 0.1 | 0 |
| Construction | 11.7 | 13.2 |
| Manufacturing | 4.1 | 3.1 |
| Wholesale and Retail Trade | 15.7 | 18.5 |
| Transportation and Warehousing | 3.1 | 2.7 |
| Information | 1.3 | 2.8 |
| Finance and Insurance | 4 | 5.2 |
| Real Estate and Rental and Leasing | 5.2 | 4.2 |
| Professional, Scientific, and Technical Services | 13.5 | 7.7 |
| Management of Companies and Enterprises | 0.3 | 0 |
| Administrative and Support and Waste Remediation Svcs | 5.8 | 1.4 |
| Educational Services | 1.5 | 2.3 |
| Health Care and Social Assistance | 10.9 | 13.3 |
| Arts, Entertainment, and Recreation | 2.2 | 9 |
| Accommodation and Food Services | 9 | 8.3 |
| Other Services (except Public Administration) | 11.6 | 7.1 |

*Notes.* This table reports results of Census and Survey shares by industry for firms with fewer than 500 employees. Survey response shares are conditional on being able to classify industries, with unavailable or "Other" industry classifications omitted from the denominator. We combine wholesale and retail trade due to the difficulty in separating these out in the survey.

A-2030

# EXHIBIT UU

A-2031

A project of the Job Creators Network Foundation
(https://www.jcnf.org/)

**VIDEOS (HTTPS://INFORMATIONSTATION.ORG/VIDEO/)**

# How Important Are Small Businesses?

**JANUARY 3, 2017   | GOVERNMENT OVERREACH (HTTPS://INFORMATIONSTATION.ORG/CATEGORY/GOVERNMENT-OVERREACH/), TAXES (HTTPS://INFORMATIONSTATION.ORG/CATEGORY/TAXES/)**

 **FACEBOOK**      **TWITTER**      **GOOGLE+**



## 71,736 VIEWS

We hear a lot about large companies in the news, but small business is the engine of the U.S. economy.

America is home to more than **28 million small businesses (https://www.forbes.com/sites/jasonnazar/2013/09/09/16-surprising-statistics-about-small-businesses/#2f17aeb23078)** that employ 57 million

Case 20-4238, Document 41, 02/11/2021, 3035102, Page148 of 296

A-2032

Case 1:20-cv-05301-RA    Document 38-47    Filed 08/12/20    Page 3 of 4

workers. And when you add owners and employees together, that's a community of roughly 85 million hardworking Americans dependent on the success of small business—most of the private-sector workforce.

Small business owners are America's most important job creators: U.S. small businesses accounted for almost **two-thirds of the net new jobs (https://www.sba.gov/sites/default/files/FAQ_Sept_2012.pdf)** created between **1993 and 2013 (https://www.forbes.com/sites/nicoleleinbachreyhle/2014/09/02/why-you-need-to-support-small-businesses/#7db2e9cb147a)**—a grand total of 11.8 million new career opportunities. In 2012, small businesses created more than 2.1 million net new jobs.

Small businesses are the country's main job creators because they are often growing and looking for new markets to expand. To do so, they need additional employees along the way. Large businesses, on the other hand, generally stay the same size, hiring new employees to replace departing ones.

Unfortunately, high taxes and recent government regulations in health care, finance, and labor disproportionately hurt small businesses and prevent them from growing and adding new jobs to the economy. Big business with big profits can afford to comply with red tape in a way that small businesses just starting out cannot.

As a result, small businesses still haven't recovered completely from the Great Recession—and it shows by the chronically weak labor market. More than 94 million Americans are **not working or actively looking for jobs (http://www.cnsnews.com/news/article/susan-jones/94333000-not-labor-force-labor-force-participation-628)**. The labor force participation rate—which measures the percentage of employees and job-seekers in the U.S.—is less than 63 percent, the lowest figure since the late 1970s.

To bring small businesses back, and strengthen the job market, job-killing taxes and regulations must be rolled back. Job creators should be encouraged to hire more employees, not forced to reduce career opportunities. With 85 million people depending on the success of small business, it's easy to see why small business is too big to fail.

Case 20-4238, Document 41, 02/11/2021, 3035102, Page149 of 296

A-2033

Case 1:20-cv-05301-RA    Document 38-47    Filed 08/12/20    Page 4 of 4

*For more information about small businesses, visit* **InformationStation.org (https://informationstation.org/)**.

Privacy Policy (https://informationstation.org/privacy-policy/)
© 2020 Job Creators Network Foundation, all rights reserved

A-2034

# EXHIBIT VV

Home  >  Press Releases  >

PRESS RELEASES

# Small Businesses Generate 44 Percent Of U.S. Economic Activity

Release No. 19-1 ADV

 By **Office Of Advocacy**    On **Jan 30, 2019**

**WASHINGTON, D.C. –** Small businesses are the lifeblood of the U.S. economy: they create two-thirds of net new jobs and drive U.S. innovation and competitiveness. A new report shows that they account for 44 percent of U.S. economic activity. This is a significant contribution, however this overall share has declined gradually.

U.S. gross domestic product (GDP) is the market value of the goods and services produced by labor and property located in the United States. Across the 16 years from 1998 to 2014, the small business share of GDP has fallen from 48.0 percent to 43.5 percent. Over the same period, the amount of small business GDP has grown by about 25 percent in real terms, or 1.4 percent annually. However, real GDP for large businesses has grown faster, at 2.5 percent annually.

"This useful benchmark shows us that small businesses continue to be big contributors to the U.S. economy," Acting Chief Counsel for Advocacy Major L. Clark said. "While their contribution has grown at a slower rate than that of large businesses, small businesses continue to be at the forefront of driving innovation, jobs and economic growth."

Nominal small business GDP measured $5.9 trillion in 2014, the most recent year for which small business GDP data are available. The three largest small business sectors contributing to it were (1) the real estate and rental and leasing industry; (2) wholesale and retail trade; and (3) the manufacturing and mining sector.

The 2008 recession played a small part in the lower small business share, but structural changes may have played a part as well. These factors include long run declines in business dynamism, the rise of big-box stores, the changing regulatory environment and the critical role of credit availability.

A-2036

The full report, "Small Business GDP, 1998-2014," and a summary of the research, are available on Advocacy's website. Advocacy has sponsored research on small businesses' contribution to GDP since 1980.

**Contact Info:**

Jason Doré

jason.dore@sba.gov

202-205-6934



### Office Of Advocacy

Created by Congress in 1976, the Office of Advocacy of the U.S. Small Business Administration (SBA) is an independent voice for small business within the federal government.

Comments are closed.

U.S. Small Business Administration, Office of Advocacy.

409 3rd Street SW, Washington, D.C. 20416

A-2037

# EXHIBIT WW



# ABOUT
# THIS GUIDE

This guide provides basic information to consider before you enter into a commercial lease in New York City. Topics include location selection, evaluating space needs, space construction, working with professionals, reviewing key lease terms, and limiting business and personal risk.

Links to resources are highlighted in **blue**. **Additional resources** are at the end of each section, and a list of all resources are at the end of the guide.

**Definitions** are located on sidebars and are highlighted in purple.

This guide is provided by NYC Department of Small Business Services (SBS). SBS offers free services to help businesses start, operate, and grow in New York City. Resources include:

» Commercial lease education courses. To find a course near you, visit:
  » Link: nyc.gov/businesscourses
» Assistance with pro bono (free) legal advice, business development, finance, navigating government, licensing, permits, and inspections needed to open your business:
  » Link: nyc.gov/businesssolutions
  » Select Operate & Grow, then select Contact us for more information
  » Or Call: 311

The NYC Department of Small Business Services (SBS) helps unlock economic potential and create economic security for all New Yorkers by connecting New Yorkers to good jobs, creating stronger businesses, and building thriving neighborhoods across the five boroughs.

The law firm of Goulston & Storrs PC and Volunteers of Legal Service's Microenterprise Project (VOLS) created content for this guide. This guide is not a substitute for legal or other professional advice. Consult an attorney and other professional advisors before you sign a commercial lease.



A-2040

# CONTENTS

**3**
**Planning**
4 The Location
7 The Space

**9**
**Team of Professionals**
Real Estate Broker or Tenant Representative 10
Architect
Engineer 11
Contractor
Lawyer

**12**
**Lease Basics**
13 Lease Process
Request for Proposals
Letter of Intent or Term Sheet
14 The Lease
Assignment & Subleasing

**15**
**Terms of the Lease**
Base Rent 16
Additional Rent 17
Lease Term
Renewal Options 18
Permitted Use
Utilities & Services 19
Security Deposit 20

**21**
**Limiting Business & Personal Risk**
22 Tenant Entity
Guaranty
23 Insurance
Indemnification Provisions
Contingency Termination Provisions

**24**
**Altering the Space**
Initial Alterations 25
Rent Abatement 26
Permits & Licenses
Building Codes
Alterations During the Term
Returning the Space to the Landlord 27

**28**
**End of Lease**
29 Lease Renewal
Default on the Lease

**30**
**Summary & Takeaways**
Commercial Leasing Do's and Don'ts 31
Sample Timeline
Checklist & Additional Resources 33
Glossary of Legal Terms 36

A-2041



PLANNING

A-2042

Signing a commercial lease can be one of the most significant and expensive choices that you can make as a business owner. Investing the time to create a plan will give your business an advantage. This section presents some important considerations when developing your plan.

## THE LOCATION

Selecting the right location is an important decision that can affect the success or failure of your business. Below are questions to consider when looking for the location that best suits your business. These questions can apply to office, retail, or industrial businesses.

### Who are my customers? Where do they live, work or shop?

Identify who your customers are, and research where they are located. Select a business location near people who will buy your products or services.

### Is location important to my employees?

Consider if a location is convenient and accessible for employees.

### Do my customers or employees need easy access to public transportation or parking?

Not all customers and employees will be within walking distance of your location. Locating your business near public transportation or parking facilities can help attract customers.

### How close do I need to be to my suppliers? Will delivery trucks need easy access to my business?

If you need frequent deliveries, your business may need to be located near suppliers. Easy access to loading and unloading areas may also be important.

### Do I need to be on a busy street where many potential customers will pass by my business? Or will my customers seek out and visit my business?

If you expect customers to buy your products without planning in advance, you may want to locate your business where a large number of people will pass by. If customers will seek you out, you can be in a less travelled location. Spend time around the space and its neighborhood on different days of the week to observe the amount of traffic.

| Examples of businesses that need street traffic | Examples of destination businesses |
|---|---|
| Convenience store | Specialty store (such as a bridal shop) |
| Grocery store | Doctor's office |
| Restaurant | |
| Nail salon | |

Planning

4

A-2043

**Would other businesses nearby attract customers to my business? If so, what type of businesses?**

Locating near similar businesses can attract customers who are already visiting other nearby businesses. If you want to attract a specific group of customers, you may want a location near other businesses that target and appeal to the same group. *For example, if you want to sell specialty foods imported from Latin America, you may want to locate near businesses that sell different items also imported from that region.*

**Is the area growing or declining in population and businesses?**

It can be an advantage to locate in neighborhoods experiencing population and businesses growth. If commercial activity is decreasing, you may have difficulty building a sufficient customer base.

**Is a desired area too expensive for my business?**

Even if a location seems perfect, the rent may be higher than your business can afford. Before you decide on a location, create a budget for your business, and determine what you can afford.

**Is my business permitted in the desired area?**

New York City laws may prohibit your type of business from operating in a specific area or building. Every property has its own zoning designation. This can mean that your planned use of a space may not be allowed. If you find a space like this, you can seek a zoning variance that will allow for that use. However, the process to acquire one requires significant money and time. To learn if you can get a variance, contact the NYC Board of Standards and Appeals by going to nyc.gov/bsa.

To view the zoning restrictions for a property, visit **NYCityMap**:
» Link: nyc.gov/citymap
» Enter address at top
» Zoning information is on right panel under Building & Property Information

**Who can help you answer these questions?**
» People who operate a business in a similar industry
» Businesses in the neighborhood you would like to move into
» Trade associations
» Local development organizations
  (such as Business Improvement Districts (BIDs) throughout the city)
» Merchants Associations

Search online for organizations in your neighborhood. It is important to consult with experienced professionals (see page 10). They can provide answers to questions and guide you through the leasing process.

---

**Zoning Designation:** New York City limits the uses of areas through numerous "zoning districts" throughout the city. The most common zoning districts the City designates are residential, commercial, and manufacturing. Zoning designation can also limit building features in a district, such as its height and signage.

**Zoning Variance:** the City can give permission for owners or tenants to use a property for a purpose outside the zoning laws.

---

**Business Improvement District:** A geographical area where local stakeholders oversee and fund the maintenance, improvement, and promotion of their commercial district.

**Merchant Association:** A group of business owners working together to support and promote businesses in a particular commercial area.

A-2044

 **EXERCISE: LOCATION NEEDS AND PRIORITIES**

Make a list of your business needs for a location. Assign a number based on its importance.
Since you may not find a location that suits all of your needs, prioritizing your needs is important.

| To succeed my business needs: | Priority (1, 2, 3) |
| --- | --- |
|  |  |
|  |  |
|  |  |

**ADDITIONAL RESOURCES**

For an interactive map with data from New York City agencies, visit **NYCityMap**:
View information about the neighborhood:
» Link: nyc.gov/citymap
» Enter address at top
» View information on right panel under Searched Locations

View neighborhood demographics (population, ages, etc.):
» Select Other Map Themes (upper right)
» Select NYC Census FactFinder

View nearby transportation, parks, schools, senior centers, etc.:
» Select Show Additional Data on Map (right panel)

View building, landlord name, building violations, inspections, and zoning:
» View information on right panel under Searched Locations

For additional zoning information, visit **Department of City Planning (DCP)**:
» Link: nyc.gov/planning
» Select Zoning

For a list of **Business Improvement Districts (BIDs)**:
» Link: nyc.gov/biddirectory



# THE SPACE

Once you select a location, you can determine your space requirements. Consider these questions:

## How much space do you need?

Different types of businesses need different amounts of space. You want only enough space to meet the needs of customers and to manage your operations. Unused or unnecessary space means unnecessary costs.

## Is the layout important?

Some businesses or offices may need a large open area. Other businesses may need multiple offices or separate rooms. *For example, if you plan to open a clothing store, a space with a large open area can help customers see and navigate your entire selection. If your employees need privacy for phone calls or meetings, you may need a space with separate offices or the ability to add cubicles.*

## Do I need lots of windows?

Spaces with few or no windows, or windows that do not face the street, are usually less expensive.

## Do I need to be on the ground floor?

If you want customers to find and visit your business by seeing it on the street, a ground floor spaces with windows may be a good choice, even though they are usually more expensive. Second floor spaces are better for businesses whose customers are more likely to seek the business out. *For example, if your business is an office or expects customers to make appointments, a second floor location may be the better choice.*

## Do I need space for storage?

Using commercial space for storage can be expensive. Basements can be a less expensive place for storage. Off-site storage facilities can also be a cheaper option than using commercial space for storage, but will take time and money to move items to and from the storage facility.

## Do I need the ability to add space in the future?

It is not easy to predict how well your business will do. You may want to start with a smaller space with the option to expand in the future if your business grows. You may wish to negotiate an option in your lease to rent space next to yours if it becomes available.

## Do I want a space already set up for my type of business? Or am I willing to change it to my specifications?

Construction takes time and can be expensive. This is especially true if the space will need structural changes, such as building or removing walls. If you find a space that fits your needs and does not need much work, you will save time and money.

## What utilities does my business need?

Make sure the location has access to enough electricity, natural gas, water, and internet access to run all of your equipment.

## Does my business need special equipment?

*For example, a restaurant may need refrigerators, ovens, and grease traps.* Some spaces, such as a previous restaurant location, may already have the equipment you need. This will save you the cost of buying new equipment and connecting the equipment to building systems.

---

**Did you know?**
Businesses located in New York City are eligible for a wide variety of incentive programs, including tax benefits, energy incentives, and wage benefits.

SBS offers one-on-one consultations to help small business owners identify City, State, and Federal incentives. To learn more, visit nyc.gov/incentives.

**Building Systems:** These may include electrical, plumbing, gas, or air conditioning (HVAC) systems.

A-2046

**Is the building structurally sound with no leaks?**
Inspect the space for any signs of problems such as large cracks or water damages. If you see a reason for concern, ask a professional, such as an architect, contractor, or engineer, to inspect the space.

**Will I need to remove asbestos, mold or other hazardous materials before I can occupy the space?**
Renting a space with hazardous materials that must be removed will increase the cost of preparing the space. Older spaces may contain asbestos, a fire-proofing material that is a health hazard. The law requires asbestos to be removed in a specific way that can increase the cost of renovation. Speak to a licensed professional to find out if the space has hazardous materials.

**Can I lease an occupied space and wait for the current tenant to leave? Or do I need the space immediately?**
A landlord will want to lease a space to a new tenant before the current tenant moves out, which ensures a steady income for the landlord. It is possible, however, that the current tenant may not leave when its lease term ends. The landlord can bring a lawsuit against the holdover tenant, but it may be weeks or months before the space is available. If you already signed the lease, you are required to take the space and start making rent payments once the space is available. To protect yourself, include a lease provision that allows you to cancel the lease if the space is not available by a certain date.

**Holdover Tenant:** A tenant that does not leave the property after its lease ends.

**Do I want a direct lease with the landlord? Or will I accept a sublease from an existing tenant?**
In some cases, commercial tenants can choose to lease their space to a secondary tenant through a sublease. These "primary tenants" act as "sublandlords." If you sign a sublease, be aware that any violations by your sublandlord can lead to the landlord terminating your sublease. If you are paying rent to the sublandlord but the sublandlord fails to pay rent to the landlord, the landlord can evict you.

**Sublease:** An agreement in which tenant leases property from another tenant (or "sublandlord") instead of from the landlord directly.

Whichever option you choose, be sure you know whether you are leasing directly from the landlord or from a tenant. You can check the identity of the landlord on the NYCityMap.

**Does the Certificate of Occupancy (CO) for the building allow my use?**
How you use the space must comply with the legal uses allowed by the building's CO. *For example, if you rent a space for a yoga studio and the CO says the space can only be used as an office, your use is not permitted. For your use to be legal, you will need to change the CO. Some landlords may not allow you to change the CO, and making changes can be expensive.*

**Certificates of Occupancy (CO):** Issued by NYC Department of Buildings (DOB), which states a building's legal use and/or type of permitted occupancy. It is illegal to occupy a building before the DOB issues a CO or Temporary CO.

Buildings built before 1938 may not have a CO. If this is the case, it is important to speak with a lawyer about your options.



## ADDITIONAL RESOURCES

To view a building's Certificate of Occupancy, visit NYCityMap:
» Link: nyc.gov/citymap
» Enter address at top
» View information on right panel under Searched Locations
» Under Building and Property Information, select Building Profile

A-2047



# TEAM OF
# PROFESSIONALS

A-2048

If possible, consult with professionals from the start because they can help answer many questions and help negotiate a lease that protects your interests. It means more costs at the beginning, but will save money in the future. You can find professionals to help you at no or low cost. For each specialty, be sure to interview several professionals and hire the one who best suits your needs. Below are types of professionals you may want on your team.



## REAL ESTATE BROKER OR TENANT REPRESENTATIVE

**Purpose:** Brokers and tenant representatives will show you potential spaces based on your desired location and space. They can offer information about the space's surrounding neighborhood, provide expertise on what parts of the lease the landlord may negotiate, and insight on how the landlord operates.

**Timing:** Look for a broker or tenant representative when you know your desired neighborhood(s) and are ready to look at potential spaces.

**Where to find:** Ask for recommendations from other business owners, trade associations, and local real estate broker association.

To check whether a real estate broker is licensed:
» Link: dos.ny.gov/licensing
» Select Search Licensees, then select Real Estate Industry

**Cost (Broker):** The broker is only paid if the tenant signs the lease. The landlord usually pays a commission to the broker that is a percentage of the annual rent or equal to a number of months' rent. The amount depends on the length of the lease, the location, and the broker. The percentage usually varies over the course of the lease (e.g. for a five-year lease, the broker could be paid 5% of the first year's base rent, and 4% for the second through fifth years).

**Cost (Tenant Representative):** A tenant representative only represents your interests and not the landlord's interests. You pay a flat fee whether or not you sign a lease.



## ARCHITECT

**Purpose:** An architect can help determine the space and layout your business needs, create a plan for the space, and make sure your space complies with building codes and other requirements. The architect can also supervise construction to ensure it is done according to the plans.

**Timing:** If you need to renovate the space, look for an architect before you sign the lease.

**Where to find:** Other business owners, broker or tenant representative.

**Cost:** Typically, the architect is paid a fixed fee.

Team of Professionals

A-2049



## ENGINEER

**Purpose:** An engineer helps determine whether the space has the technical requirements your business needs. This is necessary if your business requires alterations to the building systems or structure. *For example, some businesses may need special air conditioning or electrical systems.*

**Timing:** If your business requires alterations to the building systems or structure, you should work with an engineer before you sign the lease.

**Where to find:** Your architect, broker, or tenant representative.

**Cost:** Typically, the engineer is paid a fixed fee.



## CONTRACTOR

**Purpose:** The contractor will construct your space according to the building plans created by your architect and/or engineer. They can make cosmetic repairs and alterations such as painting, repairing minor electric and plumbing problems, installing new floors, and building countertops.

The landlord often requires a licensed contractor to make alterations to electrical, gas, and plumbing systems. Most licenses are issued by the NYC Department of Buildings.

To confirm whether a contractor is licensed, visit: nyc.gov/buildings
» Select Business, then select Business Resources (on right)
» Select Licensing Information (on left), then online search tool

**Timing:** If construction will change the building's structure or utility systems, you may need to hire a contractor after the architect develops plans. If the alterations are mainly cosmetic, you may not need an architect and can hire a contractor after you sign the lease.

**Where to find:** Your broker, tenant representative, architect, engineer, or landlord.

**Cost:** Contractors are typically paid either by a fixed fee or a percentage of the cost of the work.



## LAWYER

**Purpose:** The lawyer is your legal representative and is critical to protecting your rights. A lawyer reviews the lease to determine your responsibilities and liabilities under the lease. They can negotiate contracts with both the landlord and other professionals.

**Timing:** It is important to engage a lawyer early in the process, especially before you sign the lease. Even if your broker or tenant representative is negotiating the basic terms of the lease, a lawyer has additional expertise that can make the lease negotiation easier and faster.

**Where to find:** SBS staff can assess your lease needs and connect you to a pro bono lawyer for free legal consultation and lease review.
» Link: nyc.gov/LegalAssistance

Team of Professionals

A-2050



LEASE BASICS

A-2051

A lease is an agreement between a landlord and a tenant that allows a tenant to occupy a space for a certain amount of time. **Commercial leases and residential leases have important differences.**



### Residential Leases

» Residential tenants have **protections under the law.**
*Example: The landlord is required to make repairs and provide heat.*

» If an apartment is regulated, landlords are limited by how much they can increase rent.

» If an apartment is regulated, landlords must offer to renew the lease.

**VS.**



### Commercial Leases

» A tenant's rights are almost all **governed by the lease.**
*Example: Unless it is required by the lease, the landlord is not required to make repairs or provide heat*

» When the lease ends, the law does not limit how much the landlord can increase the rent.

» The landlord is not obligated by law to renew the lease.

---

## LEASE PROCESS

This section gives an overview of each step towards signing a commercial lease. Depending on the size of the space, the length of the lease, and how the landlord usually handles leases, you may not follow each of these steps.

## REQUEST FOR PROPOSALS

Your broker or tenant representative will help you identify a desired location and the type of space you need. The broker will then gather information or proposals from multiple landlords for you to compare. Proposals usually include basic terms, including length of the lease, base rent, any additional rent, utilities, security deposit, and possibly other items discussed in detail below.

## LETTER OF INTENT OR TERM SHEET

**Letter of Intent:** A letter between the tenant and the landlord that states the basic terms of the lease (ex. length, amount, construction) and that the tenant and landlord intend to enter into a lease together.

After gathering proposals, consulting with professionals, and discussions with landlords, decide which space you want. The next step is often to prepare a letter of intent, also called a term sheet, with the landlord. The letter of intent contains basic terms of the lease, such as rent amount, length of the lease, and security deposit that you and the landlord agreed to. The letter of intent is generally not a contract. Do not make payments to the landlord or start alterations before the lease is signed. Many important terms are on the lease itself. Once the term sheet is agreed upon, the landlord will usually have its lawyer prepare the lease.

Consult with your broker and lawyer before signing a letter of intent. It is important to include terms that are important to you because the landlord may not renegotiate those terms during lease negotiations. If the landlord will not agree to terms you need to operate your business, the space may not be a good fit for your business. Knowing this will save time and money negotiating a lease you won't sign.

For small spaces or short-term leases, the landlord may choose to skip a letter of intent and move right to the lease negotiation.

A-2052

## THE LEASE

The landlord will usually propose the first version or draft of the lease. Many commercial landlords use a template or form lease. The lease can be difficult to understand because of the way it is written, the length, and the small print. **This version will usually heavily favor the landlord.**

The lease should include the terms included in the term sheet but will contain many other important provisions. Carefully review the lease with a lawyer so they can explain your rights and obligations and help negotiate favorable terms for you.

You can negotiate changes to the landlord's offered lease terms. Write changes on the lease or add them in a separate document, called a "**rider**." The rider is attached to the lease and contains terms that add, clarify, or replace terms in the form lease.

You may only be able to negotiate a few changes to the landlord's offered terms. If your lease is for a small space, the landlord may be reluctant to make many changes to its lease. It is critical that professionals explain what these terms mean for your business.

The written lease will govern your relationship with the landlord. **Do not depend on oral statements from the landlord.** Everything you agree to with the landlord should be **written** in the lease. If a term is not included in the lease, it has no effect.

## ASSIGNMENT & SUBLEASING

Even with careful planning, you may decide it is best for your business to move to a different space, maybe larger or smaller, or in another location, before the lease ends. Or you may decide you need to share the space with another tenant to help you pay the rent. You may also choose to close your business during the lease term.

To reduce personal and business liability, you may want another business to take over your lease by assigning or subleasing the space to them. You can negotiate and include in the lease to have the right to assign the lease or sublet the space. Most landlords will only permit an assignment or sublet with its prior written consent. You can, however, negotiate a provision in the lease that requires the landlord to be reasonable in giving its consent.

Whether you assign the lease or sublet the space, you still have obligations and liabilities under the lease. If the new tenant fails to pay rent, you, the original tenant, will be responsible for the unpaid rent. The same is true if a subtenant does not pay rent.

Landlords will sometimes allow assignments or subleases to companies that are affiliated with the original tenant. *For example, if you sell your business to a new owner who continues to operate the business with no substantial changes.*

**Assignment of a Lease:** An arrangement in which the rights and obligations of the original tenant are transferred to the new tenant. The new tenant pays rent to the landlord.

**Sublease:** An arrangement in which the tenant rents its space to a subtenant. The subtenant pays rent to the tenant. The original tenant remains the tenant under the lease and pays rent to the landlord.



Lease Basics

A-2053



# TERMS OF THE LEASE

The basic financial terms of the lease may have a significant effect on your business's success. These terms include the base rent, additional rent, length of the lease, permitted uses, and utilities.

# BASE RENT

Rent is often divided into separate categories. Base rent is the minimum rent that the tenant owes the landlord each month for occupying the space.

Base rent is usually calculated as an annual amount. The amount is determined by multiplying the size of the space by a dollar amount. This is what "rent per square foot" means. The rent per square foot is generally determined by the market. The landlord will charge what other landlords are charging for similar space in similar areas. The size of the space is usually the square footage of the space plus a portion of common areas, such as common hallways or bathrooms. The addition of this common space turns the "usable" area of the space into the "rentable" area. The rentable area is then multiplied by the dollar amount per square foot to determine the base rent.

**Usable vs. Rentable Area:** The usable area is the space that you control. Rentable area includes the usable area plus a portion of the common areas.

**Usable Area:**

| | Entrance | |
|---|---|---|
| **Your Space** | **Common Hallway** | **Other Tenant** |

**Rentable Area:**

| | Entrance | |
|---|---|---|
| **Your Space** | **Common Hallway** | **Other Tenant** |



**TIP:** Measure the space yourself (or ask your architect) so you know the exact amount of usable area. To determine the rentable area, ask the broker or landlord which spaces are common areas, their square footage, and the percentage you will need to pay.

 **EXERCISE: CALCULATING BASE RENT**



Square footage of usable area
**+**
Your portion of square footage of common area
**×**
Price Per Square Foot
**=**
**Base Rent**

| Example Rent Calculation |
|---|

An office space has **1,000 square feet (sq. ft.)** of usable area. The rent is **$50** per square foot. The tenant is also responsible for **10%** of **1,000** square feet of common space.

**1. Calculate your share of the common area:**

| Square footage of common area | | Your portion of the common area | | Your share of common area |
|---|---|---|---|---|
| **1,000** sq. ft | × | **0.10** (10% of common area) | = | **100** sq. ft. |

**2. Calculate the rentable area:**

| Square footage of useable area | | Your sq. ft. portion of the common area | | Rentable area |
|---|---|---|---|---|
| **1,000** sq. ft. | + | **100** sq. ft. | = | **1,100** sq. ft. |

**3. Calculate the total yearly rent:**

| Rentable area | | Price per square foot | | Total yearly rent |
|---|---|---|---|---|
| **1,100** sq. ft. | × | **$50** sq. ft. | = | **$55,000** |

The yearly base rent is **$55,000**. The monthly rent is **$4,583.33**.

## ADDITIONAL RENT

**Operating Expenses:** A landlord spends a certain amount of money per year operating a building. This includes maintaining and insuring the building. The landlord looks to tenants to recover these costs.

**Real Estate Taxes:** Property taxes that the landlord owes to New York City.

The landlord will likely require you to pay costs in addition to the base rent. This is because the landlord's own expenses, such as the property's operating expenses and real estate taxes, will likely increase over time, and landlords generally prefer for tenants to cover a part of these expenses.

The additional rent takes various forms. Your lease may make you responsible for paying one or a combination of the following:

1. A share of the increase in operating expenses;

2. A share of the increase in real estate taxes;

3. A fixed annual percentage increase of the base rent (e.g. 3% each year); or

4. An additional rent increase based on some other measure (e.g. increased wages for building staff).

To plan for these expenses, ask the landlord or broker for an estimate of additional costs.

To find past real estate tax assessments, visit **NYCityMap**:
» Link: nyc.gov/citymap
» Enter address at top
» On right panel under Building & Property Information, select Tax & Property Records

## LEASE TERM

The lease term is the period of time you are allowed to occupy the space. There are several factors to consider when deciding on a lease term.

| Short-Term vs. Long Term-Leases | |
|---|---|
| **Short-Term**<br>(5 years or less) | **Long-Term**<br>(more than 5 years, often 10+ years) |
| **Advantages**<br>» Limits the length of your obligation if the business does not succeed or you decide to move. | **Advantages**<br>» Provides the stability of knowing that your business will have a space, and your base rent will not increase for a long period of time. |
| **Disadvantages**<br>» No guarantee that the landlord will renew the lease.<br>» If you will pay a substantial amount to alter the space, you may not want a short term lease in case the landlord chooses not to renew the lease. | **Disadvantages**<br>» You are responsible for the rent for a longer period of time even if your business fails or you want to move to another location. |
| **Takeaway**<br>A short-term lease may be a good option for a new business or a business that is less certain whether they will be successful. | **Takeaway**<br>A long-term lease may be a good option for an established business that has a history of success and believes it will operate for many years. |



Terms of Lease

A-2056

# RENEWAL OPTIONS

Commercial landlords are not required to renew your lease. Once your lease ends, the landlord is also permitted to ask for any amount of rent.

Protect yourself against a high increase by negotiating for an option to renew in your lease. Options for how to determine the increased rent include a **fixed rent** increase or a "market" base rent, also called **fair market rent**.

**Fixed rent** is a fixed amount your rent will increase each year. Typically the increase is 2-3% each year.

**Fair market rent** is determined by looking at similar prices to rent in the same area. Consider asking the landlord to set a limit to the increase. The limit could be a fixed amount or a percentage of fair market rent (e.g. 90% or 95%). If you and the landlord cannot agree on the fair market rent, it is typical to designate a neutral broker or appraiser to determine the market rate.

If your lease does not have an option to renew and you want to stay in your space, contact your landlord well before your term will end to request that they renew the lease. If you are a good tenant, the landlord may be motivated to extend the term at a reasonable rent.

**Option to Renew:** Tenant has the option to renew at the end of the lease. The most common commercial lease term is 10 years with an option to renew for another 5 years.

## How can I be a good commercial tenant?

✓ Pay your rent on time each month

✓ Do not violate the lease

✓ Be respectful of neighbors, especially regarding noise

✓ Quickly contact the landlord when building systems need repair, such as a leaking roof or burst pipe

# PERMITTED USE

The lease describes how your business can use the space. It is important that the lease has a clear statement of which type(s) of business(es) may operate in the space. This is called the "permitted use."

For a retail business, the lease should permit your specific use, but the landlord should allow a reasonable expansion of the use. *For example, if you operate a pizza parlor, you may want the option to expand into a full service restaurant with the right to sell alcoholic beverages. In this case, the permitted use provision should say "restaurant" and not specifically "pizza parlor." For an office business, the lease can allow for any office use.*

Sometimes retail businesses will include "exclusives" in the lease. These "exclusives" prohibit the landlord from renting another space in the building to a similar type of business. For example, in a shopping center or mall where landlords want a variety of businesses, the landlord may be more restrictive about the types of businesses. Most landlords, however, will resist giving a tenant an exclusive unless it is a large tenant.

**Permitted Use:** The part of the lease that describes the types of uses permitted in the space.

Terms of Lease

18

A-2057

# UTILITY CHARGES & SERVICES

When comparing and deciding among spaces, the method of paying for utilities is an important cost factor.

**Electricity:** The primary utility expense is electricity. You will typically pay for electricity as a separate and additional charge from the rent. There are two different ways you, the tenant, can pay for electricity:

**Direct Meter:** A main (master) meter installed by the utility company that measures the tenant's usage.

**Submeter:** A secondary meter that the landlord uses to measure and bill the tenant for their usage.

1. **Direct meter** – You obtain electricity directly from the utility company. This is usually the least expensive option and is called "direct meter."

2. **Submeter –** The landlord charges you based on your actual usage, as measured by a "submeter." The landlord reads the meter and directly bills you. The cost is based upon utility company charges the landlord plus an additional administrative charge. If a submeter is installed, the lease should state who is responsible for the cost of installation.

**Other Utilities:** Water, sewage, heat, and gas are less costly and are usually charged by a fixed amount or by meter. If usage is low, such as normal bathroom usage, the landlord may cover that cost in the base rent or will determine a fixed charge. If usage is high, the landlord may not want to take the risk of a fixed charge, so will measure and charge you for actual usage.

A landlord is only responsible for providing utilities and services agreed to in the lease. Your lease should provide electricity, water, heating, air conditioning, passenger and freight elevator service (unless you are on the ground floor), and potentially gas, cleaning, and directory listings.

## Costs



The landlord usually provides heating and air conditioning either through a building system or a unit only for your space. The landlord is only required to operate the building-wide heating and air conditioning systems during hours stated in the lease. If you require these systems to operate after those hours, you need to notify the landlord, who will usually charge an overtime charge.

If heating and air conditioning is provided through a unit that only serves your space, you will usually control the hours you use the unit. However, you will likely be required to repair, maintain, and replace the unit.

## Interruptions



The lease can also address how quickly a landlord must respond to utility interruptions they cause. If the leased space is small, most landlords will not agree to a specific time period. In a large space lease, you may be able to negotiate a time period that the landlord must respond to the interruption. Three (3) to ten (10) days is typical. You can negotiate a reduction in rent payment until the problem is fixed if the landlord does not fix the issue within the time period.

In some cases, you may also be able to negotiate for the right to terminate the lease if the interruption continues for a much longer period, typically 30 days. The landlord will usually limit these rights to interruptions that are the fault of the landlord and not the utility company.



Terms of Lease

A-2058

## SECURITY DEPOSIT

The landlord will generally require you to pay a security deposit when you sign the lease. Discuss the security deposit if you have the option at the term sheet stage. The security deposit protects the landlord if you fail to pay rent or violate the lease. The security deposit is refundable, but the landlord will hold the deposit on your behalf during the term of the lease. The landlord may deposit the money in a bank account that earns interest. In such case, you may receive the interest when the landlord returns the security deposit.

The amount of the security deposit is based upon several factors:

1. Amount of the base rent

2. Your business's financial condition. If your business has little or no financial history, or have limited access to cash or credit, the security deposit may be quite large. In this case, the landlord may be willing to negotiate returning part of the security deposit after a few years if your business is successful.

3. Whether you provided a guaranty (discussed on next page).

The security deposit is usually equal to a number of months' rent. The number of months is commonly two, but it depends on factors listed above. The landlord may also require a letter of credit from an acceptable bank as the security deposit instead of or in addition to cash.

At the end of the lease term, the landlord should refund the security deposit if you leave the space in the condition required by the lease, and do not owe the landlord any money under the lease. The landlord will usually refund the security deposit 30 to 45 days after you vacate the space.

**Letter of credit:** A document through which the bank guarantees they will pay the security deposit if the tenant is unable. The bank charges a fee and may require collateral, such as a mortgage on your home.



Terms of Lease



# LIMITING BUSINESS & PERSONAL RISK

This section includes the most important ways to limit your business and personal risk in regards to a commercial lease. A combination of these will likely be necessary to adequately protect you and your business. The landlord will also try to limit its risk around the points below, so careful negotiation of each is important.

## TENANT ENTITY

If you have a business entity, such as a corporation or a limited liability company (LLC), you can sign the lease as the business to avoid personal liability. The business, not you, is the tenant and is called a tenant entity. Ideally, the tenant entity would be separate from your main business entity, and its sole purpose would be to sign the lease.

> **Tenant Entity:** An entity you create that will be the tenant under the lease.

The advantage of a tenant entity is that claims by the landlord or a third party against the tenant are generally limited to that entity. The disadvantage is that entities can be expensive to set up and maintain. A tenant entity with low financial worth will require a significant security deposit. It can also require a personal guaranty, which will place personal liability on you.

> **Financial Worth:** Calculated by adding the value of business assets and property and subtracting liabilities and debts.

## GUARANTY

Even if the business entity is the tenant according to the lease, a landlord may require you, the business owner, to provide a personal guaranty. This means you agree to be **personally** responsible for obligations under the lease. A guaranty of **all** of obligations of the tenant is considered a "full guaranty." A "good guy guaranty" is a "partial guaranty."

> **Good Guy Guaranty:** The guarantor is personally responsible while the business is operating in the space. Once the space is vacated, they are no longer personally liable.

Whether the landlord will require a guaranty depends on these factors:

1. The financial condition of the tenant entity. If the business is new and has no history or financial worth, the landlord will likely require a guaranty. If the business has high financial worth, the landlord may not require a guaranty.

2. The amount of the security deposit. If you are able to provide a large security deposit, the landlord may not require a guaranty.

If a full guaranty is not required, the landlord may still require a "good guy guaranty." If the tenant entity (e.g. the business) defaults under the lease and vacates the space, the guarantor (e.g. the business owner) is not personally responsible for the rent for the time after you vacate. The tenant entity that signed the lease, however, can still be responsible for the remaining rent.

> **Default:** A violation of your responsibilities under the lease.

If any of the following provisions are in a lease, it does not have a true "good guy guaranty." **Avoid provisions that would require you to:**

1. Pay the entire balance of unpaid rent under the lease ("accelerated rent");

2. Make extra repairs or improvements ("performance obligations"); or

3. Repay the landlord for any tenant improvement allowance, rent abatement/free rent, or real estate broker's commission.

# INSURANCE

**Commercial General Liability Insurance:** Protects your business from lawsuits for physical injuries.

**Property insurance:** Covers damage to personal property and to the space when caused by fire, theft, vandalism, or some natural weather events.

Insurance limits your risk by protecting your business against claims for personal injury or property loss. Your landlord will likely require you to maintain insurance. At a minimum, you will usually need commercial general liability insurance and personal property insurance. If your business is in a flood zone, you may also need to purchase flood insurance. Speak to a licensed insurance broker about the types of insurance to best protect your business.

Your landlord may require you to name additional insured parties on your policy including the landlord, property manager, and mortgage lender of the landlord. This protects additional insured parties if a claim against them is your fault as the tenant.

Additionally, obtain business interruption insurance to cover lost income if your business is closed temporarily because of damage to your space. Such insurance may only cover damages that result from some accidents and not others. Review provisions thoroughly before making a decision.

# INDEMNIFICATION PROVISIONS

**Indemnification:** Agreement by a person or entity to be responsible for loss or damage.

Leases contain indemnification provisions which determine who is responsible when there is an incident in your space and on the property. Generally, these are incidents that result in injury or damage.

The landlord does not want to be responsible for anything that occurs inside your space. You do not want to be responsible for anything that occurs on the property outside your space. To address these concerns, leases should contain indemnification provisions.

The landlord should agree to protect you against claims from incidents that occur in areas of the property it controls. Exceptions are those incidents that are your fault. *For example, if you spill water in a shared elevator and someone slips and falls, you will be liable for the personal injury claim.*

As the tenant, you protect the landlord against claims from incidents that occur inside your space. Exceptions are those incidents that are the landlord's fault. *For example, if the landlord makes a negligent repair in your space and someone is injured, the landlord will be responsible.*

# CONTINGENCY TERMINATION PROVISIONS

If your business requires a certain license or permit, consider including a contingency provision. This is the right to end the lease early if you are not able to get the license or permit despite reasonable efforts. *Examples include liquor licenses, day care licenses, and certificates of occupancy.*

The landlord will likely require you to show proof of reasonable efforts to obtain the license or permit. This may mean working with a professional to apply for the permit or license, submitting an application to the appropriate agency, and tracking your communications with the agency.

 ADDITIONAL RESOURCES

SBS staff can help you find a lawyer to help you with creating a business entity. To learn more, visit: nyc.gov/LegalAssistance

To check an insurance broker's license, visit: dfs.ny.gov
» Select Consumers then Insurance Products
» Select Producer/Licensee Search (at bottom)

Limiting Business & Personal Risk



# ALTERING
# THE SPACE

A-2063

It is rare for a space to meet all of your needs without some alterations. During the term of the lease, you may also want the ability to further alter the space.

## INITIAL ALTERATIONS: WHO PERFORMS AND WHO PAYS?

When evaluating a space, consider how much time and money alterations will require and when you can begin operating. Here are some questions to consider:

» What is the estimated cost of the alterations?

» When would I *like* to start using the space? When do I *need* to start using the space?

» How long will it take the architect and engineer to prepare alteration plans?

» How long will it take the landlord to review plans?

» What governmental permits and approvals are needed before beginning construction? How long will it take to get all required permits and approvals?

» Are there any special approvals I must obtain that could extend the approval process?

» Will I need approval from the Landmarks Preservation Commission, co-op board, or condominium association?

» When will the space be available to begin construction?

» How long will it take to build out the space?

» Do I need to get any approvals from governmental agencies upon completion of the work, but before occupying the space?

» What will happen if there are construction delays and I am unable to open on time?

» Once construction in the space is complete, how long will it take to prepare the space to operate my business? Do I need to factor in time to stock the space?

In many leases, a landlord will only perform minimal alterations to the space before the tenant moves in. *Examples include putting up walls if a large space is split into smaller units or repairs to building systems.* You will usually be responsible for other desired alterations such as floor and wall coverings. If you need extensive alterations, negotiate these terms at the term sheet stage.

**Tenant Improvement Allowance:** Amount the landlord is willing to pay for initial alterations.

If substantial alterations to the space are needed, decide whether you or the landlord will perform the work and who will pay. A common option is the landlord makes the alterations and you pay part of the expense. If you make the alterations, the landlord may provide a tenant improvement allowance to cover some or all of the costs.

If the landlord makes substantial alterations, you can negotiate the right to review and approve the plans. If you make the alterations, the landlord will want to review and approve the plans. The landlord may charge a fee to review construction plans or supervise work. You can negotiate a limit to how much the landlord can charge and require the landlord to review the plans in a reasonable time period.

Altering Space

A-2064

# RENT ABATEMENT

If you need time to make alterations, the landlord will often agree to a rent abatement. A rent abatement applies to a period of time at the beginning of the lease when no rent is due. Rent abatements are common and best discussed with the landlord during the term sheet stage.

# PERMITS & LICENSES

Before beginning significant alterations, you may need to obtain permits and approvals from governmental agencies. Your licensed professionals will determine which permits are necessary for the work and will prepare and submit the applications for permits and approvals on your behalf.

SBS can help facilitate licensing, permitting, and inspections needed to open your business. To make an appointment, call 311 or visit nyc.gov/businesssolutions.

To learn more about permits and approvals, visit: nyc.gov/NavigatingGov.

# BUILDING CODES

Require the landlord to deliver the space in compliance with all applicable laws. Certain governmental agencies may not permit alterations to start until the space complies. Any time you make alterations to the space, the landlord will require the alterations to comply with the law.

If your space is open to the public, you will likely need to comply with Americans with Disabilities Act. An architect can help you understand these requirements.

**Americans with Disabilities Act (ADA):** The ADA is a law that prohibits discrimination against people with disabilities, making sure spaces open to the public are accessible to the disabled.

Some types of businesses may have additional building code requirements. *For example, day care centers must follow specific rules about the number and height of toilets and sinks.* The NYC Department of Buildings, your architect, engineer, or code consultant can help determine these requirements.

# ALTERATIONS DURING THE TERM

Most landlords will allow you to make cosmetic or decorative alterations to the space without its approval. There will often be a limit to the cost and type of alterations you can make. While painting and installing wall or floor coverings are unlikely to require landlords' approval, most others will. This should be written in the lease. The landlord will always require review and approval of alterations that require a permit or affect any building systems.



Altering Space

A-2065

## RETURNING THE SPACE TO THE LANDLORD

Most leases require the space to be left in good condition, free of personal property, swept with a broom ("broom-clean"), and with certain tenant alterations removed. Avoid any agreement to restore the space to its original condition. Your lease should allow for reasonable wear and tear.

The lease may require you to remove certain "specialty alterations" (such as kitchens, staircases, and showers) at the end of the lease. A landlord will often agree that you should only remove an alteration if it was required when the alteration was approved. You will usually be required to repair any damage caused by the removal of your property and alterations.

Unless otherwise written in the lease, you must remove all furniture at the end of the lease. Usually a landlord will require you to leave all fixtures, but generally trade fixtures remain your property. This should be written in the lease. Any furniture or personal items left at the end of the term become the property of your landlord, or the landlord may charge you to remove them.

**Fixture:** Anything you attach to the property that is fixed in place and would damage the property if removed (ex. counter).

**Trade Fixture:** Personal property used for a business purpose and detachable from the space (ex. soda machine).



## ADDITIONAL RESOURCES

To see whether a building is landmarked, visit: nyc.gov/landmarks
» Enter the building address under Landmark Search

For information on permits and buildings codes, visit: nyc.gov/buildings
» Select Codes

Altering Space



A-2066



END OF LEASE

It is equally important to review the lease when you end it as when you sign it. Know what your obligations are when returning the space to the landlord, including any alterations that need to be removed or repairs needed.

## LEASE RENEWAL

Landlords are not required by law to renew a lease or engage in renewal negotiations unless it is specified in the lease. New York also does not have commercial rent regulation, which means landlords can raise the rent however much they want in the renewal offer, unless there are specific renewal provisions in the lease.

## DEFAULT ON THE LEASE

A default occurs when a landlord or tenant violates the lease. *Examples of default include failure to pay rent or utilities, placement of a lien on the property, or cases when the tenant abandons the space.*

**Lien:** Claim against a property for an unpaid debt. *For example, a construction company may place a lien against the property during a payment dispute.*

You can negotiate a provision in the lease that requires the landlord to provide written notice of any default. This can include the opportunity to cure, or fix, the default. Landlords are less likely to agree to provide notice of defaults on rent payments since you know when the rent is due and whether you paid. Landlords are more likely to agree to provide notice of failure to make a required repair. Depending on the type of repair, they usually give you 15 to 30 days to complete the repair.

A court will not extend a commercial lease after it is terminated. You may, however, have some legal protections that will allow you to delay a termination and cure (fix) the default. If you receive notice of default, consult an attorney immediately because options are time-sensitive.



### ADDITIONAL RESOURCES

For information on finding an attorney, visit: nyc.gov/LegalAssistance



End of Lease

29

A-2068

# SUMMARY & TAKEAWAYS

A-2069

Careful planning with a team of professionals when choosing a space and signing a lease is critical to a business's success. Once you are ready to negotiate the term sheet and lease, you must understand all of the terms, including your responsibilities and the landlord's. When preparing your negotiation, determine the most important concerns for your business and consider what you can and cannot accept in a lease.



## COMMERCIAL LEASING DO'S AND DON'TS

| ✔ Do | ✘ Don't |
|---|---|
| ✔ Identify what your business needs in a space and what you can afford before you sign a lease. | ✘ Rely on oral agreements or a letter of intent. |
| ✔ Work with professionals (brokers and tenant representatives, lawyers, architects, and engineers). | ✘ Sign a "standard lease" without understanding your responsibilities. |
| ✔ Consider the complexity and timing of build-out when deciding the start date of a lease term. | ✘ Sign a lease without trying to negotiate terms more favorable to you. |
| ✔ Determine whether your business will need special licenses or permits to operate. | ✘ Sign the lease in your own name without conditions. |
| ✔ Negotiate a lease term that guarantees the option to renew. | ✘ Trust the landlord knows the space's permitted uses and restrictions. |
| ✔ Figure out how much additional rent you will need to pay. | ✘ Assume the landlord is required to make repairs or provide heat, water, electric, or other utilities free of charge. |
| ✔ Consider negotiating a "good guy guaranty" to reduce your liability. | |
| ✔ Be clear who is responsible for expenses and liabilities. | |
| ✔ Buy insurance. | |

A-2070



## SAMPLE TIMELINE

Timing of the commercial lease process will depend on factors discussed in this guide. Factors include the type and size of space, extent of alterations, and types of permits needed. Below is a sample timeline of the process from start to finish.

Note this is a *sample*:

» Your process may be longer or shorter.

» You may not need each step.

» You may not need to complete each step in this order.

» Some steps can be completed at the same time.

The right column of the timeline is blank for you to estimate how long each step may take.

| Steps toward opening your business | Time estimate |
|---|---|
| Consider and research what your business will need from a location and space | |
| Interview and decide on a real estate broker and/or tenant representative | |
| Look at potential spaces and choose ones that meet most of your needs | |
| Ask broker for proposed basic lease terms | |
| Hire an architect and/or engineer | |
| Consult with the architect/engineer about whether the space will work for you | |
| Interview and hire a lawyer | |
| Draft a term sheet with the landlord | |
| Architect draws up plans for the space | |
| Research insurance options and costs | |
| Negotiate and sign the lease | |
| Review architect plans and submit them to the landlord for review | |
| If you need a government permit to make the alterations, hire a code consultant | |
| Submit plans to NYC Department of Buildings | |
| After approval, interview and hire a contractor | |
| Construction (*this will vary significantly*) | |
| If necessary, schedule inspections | |
| Minor and decorative alterations, move-in furniture | |



Summary & Takeaways

A-2071



## CHECKLIST & ADDITIONAL RESOURCES

SBS help businesses start, operate, and grow by:

» Connecting entrepreneurs to free resources ranging from business courses to legal services

» Explaining government rules and regulations

» Helping entrepreneurs apply for funding to launch or grow a business

### GETTING STARTED

☐ Learn about free resources and classes for small business owners in NYC.
   **NYC Department of Small Business Services (SBS)**
   » Link: nyc.gov/sbs

☐ Find a commercial lease education course:
   » Link: nyc.gov/businesscourses

☐ For assistance with pro bono legal consultations for commercial leases, contracts, business development, finance, navigating government, licensing, permits, and inspections contact SBS:
   » Link: nyc.gov/businesssolutions
   » Select Operate & Grow, then select Contact us for more information
   » Or Call: 311

☐ Learn about licenses, permits, certifications, and regulations:
   » Link: nyc.gov/business
   » Select Start a Business

☐ Find out if you qualify for City, State, or Federal Government incentives:
   » Link: nyc.gov/incentives

### LEASING COMMERCIAL SPACE

☐ Research the neighborhood:
   **NYC Business Atlas**
   » Link: maps.nyc.gov/businessatlas

   **NYCityMap**
   » Link: nyc.gov/citymap

☐ Engage a real estate broker, and verify they are licensed:
   **NYS Department of State Division of Licensing Services**
   » Link: dos.ny.gov/licensing
   » Select Search Licensees, then select Real Estate Industry

☐ Check the Certificate of Occupancy, including the building's legal use and/or type of permitted occupancy:
   **NYC Buildings**
   » Link: nyc.gov/buildings

   **NYCityMap**
   » Link: nyc.gov/citymap
   » Enter address at top
   » View information on right panel under Searched Locations
   » Under Building and Property Information, select Building Profile

☐ Determine the zoning designation of the property you want to lease and verify applicable zoning restrictions:
**NYC Buildings**
  » Link: nyc.gov/buildings

**NYCityMap**
  » Link: nyc.gov/citymap
  » Enter address at top
  » Zoning information is on right panel under Building & Property Information

☐ Check landlord identity and building and property information:
**NYCityMap**
  » Link: nyc.gov/citymap
  » Enter address at top

☐ Determine if property tax is due on the building:
**NYC Finance**
  » Link: nyc.gov/finance
  » Select Property Records

**NYCityMap**
  » Link: nyc.gov/citymap
  » Enter address at top
  » Select Tax and Property Records (right bottom)

☐ Have the lease reviewed by an attorney. SBS staff can connect you to a pro bono attorney for free assistance with the lease:
**NYC Department of Small Business Services (SBS)**
  » Link: nyc.gov/LegalAssistance

☐ Consider creating an entity that will be the tenant on the lease:
**NYS Department of State**
  » Link: dos.ny.gov/corps

SBS staff can connect you to a pro bono attorney for free assistance with entity formation:
**NYC Department of Small Business Services (SBS)**
  » Link: nyc.gov/LegalAssistance

☐ Check a insurance broker's license before purchasing commercial general liability insurance and property insurance:
**NYS Financial Services**
  » Link: dfs.ny.gov
  » Select Consumers, then select Insurance Products
  » Select Producer/Licensee Search (at bottom)

## CONSTRUCTION

☐ Identify and engage professional assistance from architect, contractor, and/or engineer.
See pages 10–11.

☐ Check if a contractor is licensed:
**NYC Department of Buildings**
  » Link: nyc.gov/buildings
  » Select Business, then select Business Resources (on right)
  » Select Licensing Information (on left)
  » Select Online Search Tool

☐ Have a professional review the lease to ensure construction plans are permitted. See pages 10–11.

☐ Have a professional submit construction plans to landlord if required by the lease.

☐ Have a professional submit applications to relevant government agencies.

## OTHER HELPFUL LINKS

☐ Consider business incubators and co-working spaces if you seek temporary, low-cost space and networking opportunities:
**NYC Economic Development Corporation**
  » Link: nycedc.com/service/incubators-workspace-resources

☐ Review potential equity, financing, and incentives programs available for your business. Search online for a local economic development corporation or small business development centers:
**NYC Economic Development Corporation**
  » Link: nycedc.com

☐ Review rules for liquor licenses and apply for one if you wish to serve liquor at a food and/or drinking services establishment. Consider consulting an attorney who specializes in procuring liquor licenses because of the process's length and complexity:
**NYS Liquor Authority**
  » Link: sla.ny.gov

Summary & Takeaways

35

A-2074

 ## GLOSSARY OF TERMS

**Accelerated Rent:** Lease provision giving the landlord the right to demand the entire balance of unpaid rent

**Additional Rent:** Any costs for a tenant in addition to the base rent (most often a share of the operating expenses) due to the landlord

**As-is:** A term used to describe the state of the space upon landlord's delivery, and tenant's acceptance of the space, in its present, unaltered, or improved condition

**Assignment:** When the tenant vacates a property and turns over the remainder of the lease to another party through a contract

**Base Rent:** The minimum fixed rent due to the landlord under the terms of a lease agreement

**Broker:** A guide to the local real estate market and neighborhood

**Brokerage Commission:** Money that the landlord pays to the broker for finding a tenant for the property

**Business Interruption:** Insurance in case of a disaster and a disaster-related closing (ex. extended power outages). A policy usually will cover lost profits and operating expenses still being incurred

**Casualty and Liability Coverage:** Casualty insurance covers injuries and crimes that occur on the premise. Liability insurance covers injuries caused by an owner or employee or injuries caused by your product

**Certificate of Insurance:** A document from the insurance company verifying your insurance coverage

**Certificate of Occupancy:** NYC Department of Buildings (DOB) issues Certificates of Occupancy (CO) which state a building's legal use and/or type of permitted occupancy. No one may legally occupy a building until the DOB issues a CO or Temporary CO

**Commencement Date:** The date on which the lease term begins. This date is often the day that the tenant takes possession of the leased space

**Commercial General Liability Insurance:** Protects your business from lawsuits for physical injuries

**Default:** A failure to perform a contractual obligation

**Escalations:** Increases in rent above the base year. This can include a fixed amount each year, a percentage increase each year, or an increase based on the landlord's actual increase in expenses such as real estate taxes

**Exclusivity Provision:** An exclusivity provision prohibits the landlord from renting space in the building to a competing business

**Fair Market Rent:** An estimate of what a reasonable tenant would be willing to pay a reasonable landlord for a given space



**Form Lease:** A template lease landlords use as the first draft of the lease. It will usually heavily favor the landlord's interests

**Fixtures:** Anything you attach to the property that is fixed in place and would damage the property if removed (e.g. window treatments, built-in furniture and some appliances like washing machines in a laundromat)

**Free Rent:** A period during which the tenant does not have to pay rent, typically during the build-out. It is also known as rent abatement

**Good Guy Guaranty:** A lease provision that holds the space's guarantor (e.g. the business owner) personally responsible for its obligations only while the business operates there. Once the business vacates the space, the guarantor is no longer personally liable. (See also Personal Guaranty)

**Holdover:** The previous tenant continues to occupy the premises after its lease term has ended

**Indemnification:** A promise to repay another party for future losses or damages

**Landmarked Buildings:** Property that you may not be able to make interior or exterior changes to without an approval process by the City

**Lease Term:** The period of time in which the landlord grants the tenant the right to possess and use the space

**Letter of Credit:** A letter from a bank or financial institution that can be a substitute to a cash security deposit. The letter guarantees that the bank will pay the security deposit if the tenant is unable to do so. The bank requires a fee and may require collateral such as a mortgage on your home

**Letter of Intent:** A written agreement between the tenant and the landlord stating the intention of both parties to sign a lease and the essential terms of the lease (ex. length, costs, construction)

**Lien:** Claim against a property for an unpaid debt. *For example, a construction company may place a lien against the property during a payment dispute*

**Operating Expenses:** The costs of operating a building, including maintaining and insuring the building A tenant may pay a share of these costs, known as the Additional Rent (See above definition)

**Permitted Use:** Lease provision describing how the space may be used

**Personal Guaranty:** The promise by a business owner, or guarantor, to pay on a loan or contract in the case the business cannot

**Performance Obligation:** Contractual obligation to deliver services such as repairs or improvements to a space

**Premises:** The space that a landlord leases to a tenant

**Property Insurance:** A policy that repays a property owner for loss of or damages to personal property. Examples of loss and damages include fire, theft, vandalism, and natural weather events

Summary & Takeaways

Case 20-4238, Document 41, 02/11/2021, 3035102, Page192 of 296

A-2076

**Property Manager:** A company hired by the landlord to manage the property. They handle tasks including the leasing process, collecting rent, and making repairs

**Rider:** Attachment to the lease that adds, clarifies, or replaces lease terms in the "form" lease

**Security Deposit:** A deposit of cash or non-cash alternative (See Letter of Credit) the tenant gives to landlord to secure performance of a lease throughout the lease term

**Sublet:** When a tenant leases part or all of a space to another party for a period of time during the lease term

**Submeter:** A system for measuring utility usage, such as electricity, by a tenant in a building with multiple tenants

**Tenant Improvement Allowance:** Amount the landlord will pay for the tenant to renovate or alter the space

**Tenant Representative:** Professional hired by the potential tenant to represent only the tenant's interests when negotiating with a landlord

**Trade Fixture:** Removable personal property that a tenant attaches to a space for business purposes. *Examples include a display counter or kitchen equipment*

**Termination Right:** A provision that allows the tenant to terminate the lease when a certain condition is met. *For example, if a restaurant is unable to secure a liquor license*

**Zoning Restriction:** Limits to how property owners and tenants can use space. They are generally residential, commercial, and manufacturing



Summary & Takeaways

A-2077



**nyc.gov/sbs**

  



Content provided by:

 

A-2078

# EXHIBIT XX

**REAL ESTATE**

# 5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial Real Estate Lease in New York

*It's exciting to find a home for your business, but here's what experts say you should know before you sign that commercial real estate lease.*



NEXT ARTICLE

Case 20-4238, Document 41, 02/11/2021, 3035102, Page196 of 296

A-2080

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial R... Page 2 of 12
Case 1:20-cv-05301-RA   Document 38-50   Filed 08/12/20   Page 3 of 13





**Hayden Field**
*Associate Editor*

June 6, 2019     9 min read

"If I can make it there, I'll make it anywhere. It's up to you, New York, New York."

When Frank Sinatra first sang those words in 1978, we can surmise he was envisioning the city's iconic skyline, not the nitty-gritty details of commercial tenant contracts. But decades later, the lyrics are true for small business owners renting space in the very buildings that make up that view.

New York is shadow-governed by some of the most powerful real estate conglomerates in the country -- Vornado Realty Trust, Blackstone Group and Brookfield Asset Management, among others. The existence of these "mega-landlords," as well as high expenses across the board, often means

**Grow Your Business, Not Your Inbox**

Stay informed and join our daily newsletter now!

| Email | Submit |

Will be used in accordance with our Privacy Policy

Case 20-4238, Document 41, 02/11/2021, 3035102, Page197 of 296

A-2081

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial R... Page 3 of 12
Case 1:20-cv-05301-RA    Document 38-50    Filed 08/12/20    Page 4 of 13

the odds are stacked against commercial tenants. For one, many lenders prefer to rent to larger chains with extensive credit histories rather than small business owners. There's also the matter of renovation costs: In New York, some commercial spaces can cost between $200,000 and $400,000 to upgrade a commercial space to be move-in ready. And then there's average retail lease length in New York City: about 10 years, compared to half that nationwide, according to the CBRE. That's a big commitment for an entrepreneur in a frequently topsy-turvy market.

**Related: If Business Is Booming, Why Is Main Street America Still Full of Empty Storefronts?**

"In New York, there is very little statutory protection [or laws ensuring certain rights] for commercial tenants," said Kevin McConnell, attorney and partner at Himmelstein, McConnell, Gribben, Donoghue and Joseph, LLP.

What's a small business owner in the Big Apple to do? Fortunately, there are resources available to help you come out ahead on your next lease contract. LegalZoom offers consultation calls and contract reviews with an attorney, starting at $216 total for a six-month subscription. The New York City Bar Association offers 30-minute phone consultations with attorneys that are either free or cost $35, depending on the type of case. The New York City Department of Small Business Services (SBS) offers a Commercial Lease Assistance Program for qualifying business owners, free of charge. And the tables may be turning via City Hall, as well.

Case 20-4238, Document 41, 02/11/2021, 3035102, Page198 of 296

A-2082

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial R... Page 4 of 12
Case 1:20-cv-05301-RA    Document 38-50    Filed 08/12/20    Page 5 of 13

"There's a proposal in the City Council -- there is a bill pending -- whereby commercial tenants do have the right to negotiate with their landlord when their lease expires and the landlord must act in good faith, but there's nothing on the books yet," said McConnell.

Fear not: No matter which neighborhood you've set up shop in, *Entrepreneur* compiled five of the most common landlord-tenant issues you may face as a commercial renter -- plus what to know before you sign that contract.

## Watch out for: A lapse in your commercial real estate lease

When meeting with a small business owner as part of the SBS Commercial Lease Assistance Program, the first question an attorney usually asks is: Do you have a lease, and can I see it? That's according to Gregg Bishop, Commissioner of the NYC Department of SBS. In his experience, landlord-tenant issues often arise after a lease has expired and the landlord continues to accept the rent without providing new lease terms. "The lease is the most important instrument in terms of protecting you for future potential issues that you'll have with your landlord," said Bishop. "It spells out how each party will respond."

The SBS program recently introduced its free legal help for commercial leases, and so far, its attorneys have helped negotiate contracts -- new or renewed -- to procure fairer terms for about 400 enrollees. New York City business owners (excluding franchisees) can apply here, and after submitting the required form, an attorney should reach out within three business days.

## Watch out for: The tax escalation provision

Most commercial leases have a potentially sneaky section called the tax escalation provision, which stipulates the tenant will pay a percentage of

Case 20-4238, Document 41, 02/11/2021, 3035102, Page199 of 296

A-2083

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial R... Page 5 of 12
Case 1:20-cv-05301-RA    Document 38-50    Filed 08/12/20    Page 6 of 13

additional rent according to changes in the building's tax rate. It's largely determined by a "base year" laid out in the contract, said McConnell. Let's say you rent a space for $150 a square foot, and the contract's tax escalation provision has a base year of 2019. You might think $150 a square foot is a great deal and sign right away, but eight years into your lease, you could be paying much more per square foot because of increases in the building's taxes -- a percentage of which you're already locked into paying.

McConnell's solution? Try to have the base year moved forward if possible -- say, 2020 instead of 2019 -- and ensure the percentage of the tax increase you've agreed to pay is proportionate to the amount of space you're renting in the building. For example, if it's a four-story building and you're renting the entire ground floor, the tax escalation provision should stipulate no more than 25 percent.

## Watch out for: A strict personal guarantee

If you're the owner of a limited liability company (LLC), renting a commercial space often requires a personal guarantee. That means that even though your LLC is the named renter, you are essentially a "guarantor" for your own company, said McConnell -- in other words, you're promising to personally take on financial responsibilities for the space if the LLC ends up falling short. If you do agree to a personal guarantee, make sure the contract includes a "good guy clause." It's an agreement stating that if you're having trouble paying rent and need to vacate the premises, you can hand over the keys to the landlord with a certain amount of notice to be released from the lease.

"Most landlords will give that kind of a 'good guy clause' -- if they don't, then tenants shouldn't sign the lease," said McConnell. "Most entrepreneurs... don't see themselves failing in six months." Something else

Case 20-4238, Document 41, 02/11/2021, 3035102, Page200 of 296

A-2084

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial R... Page 6 of 12
Case 1:20-cv-05301-RA    Document 38-50    Filed 08/12/20    Page 7 of 13

to look out for: Make sure the amount of notice stipulated in the clause is no more than two months (or 60 days). McConnell said he's seen leases under which the tenant has exercised the right to vacate but isn't released from their personal guarantee until six months later.

## Watch out for: Unclear terms for what happens if your building changes ownership

Received a letter in the mail -- or taped to your door -- that your building is changing ownership? It's time to take a close look at your contract. Depending on the terms, it's possible that the new owner could void your lease once their purchase goes through, said Bishop. There's a potential for the new owner to take that "escape clause," void all the leases and then offer to re-issue them with new terms (and higher monthly rents).

"You can protect yourself as an entrepreneur by ensuring that if ownership changes, the lease terms do not change," said Bishop. Before you sign a lease, carefully read any provisions about ownership changes for the building. If there aren't any protections for your current lease terms, alert the landlord of your concerns. After consulting an attorney, you could even propose your own addendum.

## Watch out for: Commercial tenant harassment

Maybe the heat stopped working. The refrigerator broke. Water service is constantly interrupted during normal business hours. There are copious amounts of creepy crawlers afoot. Whatever the issue, standard commercial contracts usually attribute responsibility for regular repairs to the landlord, plus dictate that they be completed in a timely manner. If your landlord is making it difficult for your business to operate, there's a chance they could be attempting to push you out of the space. That likely falls under

Case 20-4238, Document 41, 02/11/2021, 3035102, Page201 of 296

A-2085

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial R... Page 7 of 12
Case 1:20-cv-05301-RA    Document 38-50    Filed 08/12/20    Page 8 of 13

commercial tenant harassment, said Bishop -- it's similar to breach of contract but with financial penalties attached.

Before September 2016, tenants looking to litigate with their landlords had no recourse. But that's changed thanks to the "Non-Residential Tenant Harassment" law, which spells out behaviors that qualify as commercial tenant harassment. Take a look at your contract and make sure that clauses on timely repairs are included. Alert your landlord that you're aware of the contract's requirements, and if you still don't hear back, it may be time to consult a commercial tenant attorney. They can reach out to the landlord to let them know they're in danger of breach of contract, plus potentially negotiate new terms for the next lease. You can have an attorney prepare a "cease and desist" letter for your landlord, and if you end up vacating the space because of unworkable conditions, that counts as a "constructive eviction," said McConnell -- meaning that since you've essentially been denied use of the space, you are entitled to leave with no obligation to continue paying rent.

One more thing to note: An attorney will likely never advise you to withhold rent because doing so could strip you of your power in the situation, said Bishop. Failing to pay rent automatically puts you in violation of your lease, and the idea here is to prove the opposite -- that the landlord is the one who's violating terms. It's a good idea to speak with an attorney first; they can send an official notice to the landlord, including a deadline by which they must remedy the situation -- plus the actions you'll take if they fail to deliver.

## More From Entrepreneur



Get heaping discounts to books you love delivered straight to your inbox. We'll feature a different book each week and share exclusive deals you won't find anywhere else.

Sign Up Now





Jumpstart Your Business. Entrepreneur Insider is your all-access pass to the skills, experts, and network you need to get your business off the ground—or take it to the next level.

Join Now



Are you paying too much for business insurance? Do you have critical gaps in your coverage? Trust Entrepreneur to help you find out.

Get Your Quote Now

Case 20-4238, Document 41, 02/11/2021, 3035102, Page204 of 296

A-2088

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial...   Page 10 of 12
Case 1:20-cv-05301-RA   Document 38-50   Filed 08/12/20   Page 11 of 13

# Related Books



**The New Employee Manual**

Buy From



**Entrepreneur Voices on Careers**

Buy From



**Entrepreneur Voices on Emotional Intelligence**

Buy From



**Unstoppable**

Buy From



**Driven**

Buy From

Case 20-4238, Document 41, 02/11/2021, 3035102, Page205 of 296

A-2089

5 Most Common Red Flags Entrepreneurs Should Know Before Signing a Commercial...    Page 11 of 12
Case 1:20-cv-05301-RA    Document 38-50    Filed 08/12/20    Page 12 of 13



**Breakthrough**

Buy From

# Latest On Entrepreneur

| COMPANY | PRODUCTS | EDITIONS |
|---|---|---|
| Advertise | Women Entrepreneur | United States |
| Brand Licensing | Green Entrepreneur | India |
| Contact Us | Ask An Expert | Asia Pacific |
| Staff | Entrepreneur Insurance | Middle East |
| Contribute | Franchise | Europe |
| Reprints & Licensing | Webinars | Español |
| | Publish Your Book | Georgia |
| | Shop | South Africa |

GET THE MAGAZINE



Subscribe

JOIN OUR NEWSLETTER

| Email... | Submit |

Terms of Use  |  Privacy Policy  |  Cookies Policy  |  Site Map

Copyright © 2020 Entrepreneur Media, Inc. All rights reserved.

A-2091

# EXHIBIT YY

1

CITY COUNCIL
CITY OF NEW YORK

----------------------- X

TRANSCRIPT OF THE MINUTES

          Of the

COMMITTEE ON SMALL BUSINESS JOINTLY
WITH THE COMMITTEE ON CONSUMER
AFFAIRS AND BUSINESS LICENSING

----------------------- X

                    April 29, 2020
                    Start:  1:10 p.m.
                    Recess:  6:36 p.m.


HELD AT:          Remote Hearing

B E F O R E:      Mark Gjonaj,
                  Chairperson of the Committee on
                  Small Business

                  Andrew Cohen,
                  Chairperson of the Committee on
                  Consumer Affairs and Business
                  Licensing


COUNCIL MEMBERS:
                  Speaker Corey Johnson
                  Helen K. Rosenthal
                  Justin Brannan
                  Carlina Rivera
                  Brad Lander
                  Karen Koslowitz
                  Francisco Moya
                  Margaret Chin
                  Adrienne Adams

2

COUNCIL MEMBERS (CONT.):

                    Kalman Yeger
                    Steven Matteo
                    Peter Koo
                    Keith Powers

3

A P P E A R A N C E S

Greg Bishop
Commissioner of the New York City Department of
Small Business Services

Lorelei Salas
Commissioner of the Department of Consumer and
Worker Protection

Jackie Mallon
First Deputy Commissioner

Steven Edinony[SP?]
Executive Director

Mike Tiger
Deputy General Counsel

Evan Franca
Merchant Member of the North Flatbush Business
Improvement District

Jessica Lappin
New York City Business Leader

Andrew Riggie
Vice Chair of Community Board 7

Robert Bookman
New York City Hospitality Alliance

Amy Healy
Senior Director Public Affairs of Grubhub

A-2095

4

A P P E A R A N C E S (CONT.)

Josh Gold
Director, Public Affairs for Uber

Max Rettig
Global Head of Public Policy at Door Dash

Vignesh Ganapathy on behalf of Postmates for
Vikrum Dave Aiyer

Lisa Sorin
Head of Bronx Chamber of Commerce

Karen Narefsky
ANHD Senior Organizer for Equitable Economic
Development

Jo-Ann Yoo
Executive Director of the Asian American
Federation

Ahyoung Kim
Small Business Project Manager at the Asian
American Federation

Ryan Monell
Director of City Legislative Affairs for the Real
Estate Board of New York

Steven Choi
Executive Director at the New York Immigration
Coalition

5

         A P P E A R A N C E S  (CONT.)

Mohamad Attia
Executive of the Street Vendor project at the
Urban Justice Center

Michael Brady
Chief Executive Officer of the Third Avenue
Business Improvement District

Pablo Benson Silva
New York City Network of Worker Cooperatives

Jennifer Tausig
Co-Chair of the New York City Bid Association

Matt Newberg
Founder and Author of HNGRY

Antitrust Lawyer
Partner of the New York City Law Firm Frank LLP

Yin Kong
Director of Think Chinatown

Alice Lu
Small Business Owners in Chinatown

Julian Hill
Supervising Attorney at TakeRoot Justice

Brendan Martin
Executive Director of the Working World

Ryan Roy
Small Business Owner in Greenpoint, Brooklyn

6

A P P E A R A N C E S  (CONT.)

Andrew Ding
Owner of the Expat

Carlos Martinez
Member of Sunset Scholars LLC

Rahim Ali
Chelsea Papaya

Mojito Iaba[SP]
Small business owner

Shawday Swift[SP?]
Rebellious Root

Robert S. Altman
Represent the Queens and Bronx Building
Association and the Building Industry
Association of New York City

A-2098

COMMITTEE ON SMALL BUSINESS JOINTLY WITH COMMITTEE
ON CONSUMER AFFAIRS AND BUSINESS LICENSING      3

1

2      CHAIRPERSON GJONAJ: [Gavel] We want to comply

3  with the full guidelines during the hearing.  First,

4  we ask that cameras be places on viewing mode , so

5  that we are able to identify all parties in

6  attendance.  Second, we ask that your microphones be

7  muted until it's your turn to speak.  Finally, we ask

8  for all background noises to be limited when unmuted

9  including cell phones.

10      If you are unable to filter out noises, we'll ask

11  you to submit your testimony via email to

12  counciltestimony@nyc.gov.  I repeat,

13  counciltestimony@nyc.gov.  Should you choose not to

14  follow these guidelines, the Sergeant at Arms will

15  block your video and possibly remove you from the

16  remote hearing.  Thank you for your kind cooperation

17  in this matter.

18      Mr. Chair?

19      CHAIRPERSON GJONAJ:  Chair Gjonaj.  Thank you all

20  for joining our virtual hearing today on the effects

21  of COVID-19 and the city's small business.

22      First off, I'd like to acknowledge that we've

23  been joined by our Speaker Corey Johnson and to you

24  Speaker, a belated Happy Birthday.  Many more

25  healthy, Happy Birthdays and looking forward to be

A-2099

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
            INTERNATIONAL INTERGROUP RELATIONS            8

1

2    able to celebrate with you under different

3    circumstances.

4        I'd like to also acknowledge my other colleagues

5    who have joined us so far today.  Council Member

6    Brannan, Council Member Chin, Council Member Rivera,

7    Council Member Adams, Council Member Lander, Council

8    Member Yeger, Council Member Koslowitz.

9        I'm going to turn it over to the Committee

10   Counsel Stephanie Jones to go over some procedural

11   items.

12       STEPHANIE JONES:  Thank you.  I'm Stephanie

13   Jones, Counsel to the Small Business Committee of the

14   New York City Council.  Before we begin, I want to

15   remind everyone that you will be on mute until you

16   are called on to testify when you will unmuted by the

17   host.

18       I will be calling on panelists to testify.

19   Please listen for your name to be called.  I will be

20   periodically announcing who the next panelist will

21   be.  The first two panels to give testimony will be

22   Greg Bishop Commissioner of the New York City

23   Department of Small Business Services followed by

24   Lorelei Salas Commissioner of the New York City

25

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS          9
 2   Department of Consumer and Worker Protection.  I will
 3   call you when it is your turn to speak.
 4        For the question and answer period only, we will
 5   also be joined by First Deputy Commissioner Jackie
 6   Mallon from the Department of Small Business
 7   Services.  As well as Executive Director Steven
 8   Edinony[SP?] and Deputy General Council Mike Tiger
 9   from the Department of Consumer and Worker
10   Protection.
11        During the hearing, if Council Members would like
12   to ask a question of the Administration or a specific
13   panelist, please use the Zoom raise hand function and
14   I will call on you in order.  We will be limited
15   Council Member questions to five minutes, which
16   includes the time it takes to answer your questions.
17        Please note, that for ease of this virtual
18   hearing, we will not be allowing a second round of
19   questions for each panelist.
20        Thank you.  I'll now pass to the Speaker to give
21   an opening statement.
22        SPEAKER COREY JOHNSON:  Thank you Stephanie.
23   Thank you Chair's Gjonaj and Cohen for holding this
24   hearing today.  There are a lot of bills on deck, so
25   I will be brief but I wanted to say that as we all
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          10
 2   know, small businesses make our neighborhoods feel
 3   like home for residents and they show tourists why
 4   we're the greatest city in the world.
 5       So, we have no choice but to make sure they are
 6   able to whether this unbelievably painful storm.  It
 7   is too important for New York City.  I can't imagine
 8   my neighborhood or any neighborhood without our local
 9   small businesses and I'm sure every New Yorker would
10   agree with that sentiment.  But they're not just a
11   critical part of making New York special.  Small
12   businesses employ 26 percent of New Yorkers and if
13   they close down, hundreds of thousands of workers
14   will permanently lose their jobs and the city loses
15   out on billions of dollars in sales tax, property tax
16   and income tax revenue.  Our economy runs on small
17   businesses and now they are facing unprecedented
18   losses.  This could be the worst economic disaster
19   that New York City has seen since the great
20   depression.
21       Many businesses will be forced to shut down for
22   good if they don't get more help.  That won't just
23   devastate business owners and their workers, it will
24   further destabilize our economy, our neighborhoods,
25   and the lives of so many New Yorkers.
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        11

 2       Congress made some improvements to the Paycheck

 3   Protection program but those loans are still too hard

 4   to access in their ensured supply and I'm not

 5   confident that they will end up helping the vast

 6   majority of New York City small businesses.

 7       This is particularly true for the city's

 8   immigrant owned small businesses.  They face

 9   significant obstacles in accessing loans because of

10   language barriers, documentation requirements and

11   eligibility criteria.  We absolutely need more

12   federal support here but there are some things that

13   the city can do.

14       We've got a large package of bills that we're

15   hearing today including bills that would give

16   desperately needed help to restaurants by capping

17   delivery app fees.  I want to give the sponsors time

18   to discuss, so I'll just briefly mention two bills

19   that I'm co-sponsoring.  Introduction 1914, which I

20   co-sponsored with Council Member Adrienne Adams,

21   would make threatening an impacted commercial tenant

22   a form of harassment punishable by a civil penalty of

23   between $10,000 or $50,000.  And Introduction 1932

24   which I co-sponsored with Council Member Rivera,

25   would suspend personal liability clauses, so that
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        12
2    city business owners don't face the loss of their
3    businesses and also personal bankruptcy.  I want to
4    thank everyone who has joined us, I know it is
5    especially challenging for small business owners to
6    take time to be here today and I know we can't solve
7    all of the issues that you are facing but I want you
8    to know the City Council is committed to doing
9    everything we can as quickly as we can and I will now
10   turn it back over to the Chairs.
11       Thank you very much.
12       CHAIRPERSON GJONAJ:  Thank you so much Speaker
13   Johnson.  I'd like to acknowledge that we've been
14   joined by colleagues since the start of the hearing
15   and we've been joined by Council Member Matteo and
16   Council Member Moya.
17       Good afternoon.  I'm Council Member Mark Gjonaj,
18   Chair of the Committee on Small Business and I'd like
19   to welcome you to our remote joint hearing today with
20   the Committee on Consumer Affairs and Business
21   Licensing Chaired by my dear friend Council Member
22   Andy Cohen.
23       As Chair of this Committee, I've had the honor of
24   being a voice in the City Council to advocate for and
25   support the over 200,000 small businesses in New York
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        13
 2   City.  The small businesses in the city are the
 3   living environment of what makes New York great.
 4   Nearly half of our small businesses are immigrant
 5   owned and, in some neighborhoods, these immigrant
 6   business owners employ up to 40 percent of the
 7   community.  Our small businesses deliver cultural,
 8   relevant goods that can't be found in larger
 9   businesses or in big box stores.  They beautify our
10   neighborhoods and serve as a meeting place for
11   citizen, city's residents to socialize.
12       Micro businesses with nine employees or fewer
13   capture the more common conception of the mom and pop
14   shop.  They are a symbol of the what hard work and an
15   entrepreneurial spirit can accomplish in our great
16   city.
17       The COVID-19 crisis perhaps presents the greatest
18   threat to our economy and small businesses in modern
19   history.  Our non-essential businesses are currently
20   closed and they must now decide whether they can
21   continue paying their staff rent, debt, real estate
22   taxes, sewer and water charges throughout the
23   duration of this crisis.
24       Our essential businesses may also be struggling
25   with the declined business and sales and now, have
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        14
 2  the added burden of providing personal protective
 3  equipment or PPE to protect their staff and
 4  customers.
 5      I look forward to hearing from Commissioner
 6  Bishop about the SBS's Loan and Grant program and
 7  their success and failures in getting necessary
 8  financial resources into the hands of small business
 9  owners.
10      I believe with the right amount of resources and
11  leeway; you could have done more to save our
12  businesses and you still can.  I have a number of
13  questions for the Commissioner, specifically how SBS
14  engaged without immigrant small business owners.  Why
15  these programs close so quickly and to get a
16  breakdown of which types of businesses and
17  neighborhoods benefited the most from these programs.
18  It is well documented that this virus had a
19  tremendous negative impact on the communities of
20  color.  And I want to make sure that the issuance of
21  financial relief did not disproportionately benefit
22  business owners living in certain areas or working in
23  certain industries or of a certain size.  And while
24  I'm eager to get answers from the Commissioner on the
25  Grant Loan program, I'd like to be honest.  I have
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS         15
 2   deep concerns that the Mayor may have taken his eye
 3   off the ball in protecting New York City small and
 4   micro businesses.  While he's out busy playing
 5   national politics, struggling business owners are
 6   left wondering if he would do his job and focus on
 7   protecting them during a crisis.
 8       To say he was MIA, we'd be putting it mildly.
 9   The Mayor needs to realize that he must work with
10   this body to ensure that we can maximize the city's
11   response.  Norkman[SP?] reminds us of when Washington
12   told New York City to go to hell in the 1970's by
13   allocating only $49 million in aid to our small
14   business.  In essence, he has told New York City
15   small businesses they can go to hell and they are not
16   relevant.
17       To put things in perspective, $49 million of the
18   200,000 businesses in New York City, equates to $245
19   per business.  We spend more on parades in New York
20   City.  This Administration spent more on parades.
21   This Administration is a $62.4 million in the FY 2021
22   Budget for Department of Transportation Executive at
23   Administration on other than personal service debt.
24       $172 million in contracts for legal services.
25   $129 million for contracts for security services.
```

**A-2107**

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        16
 2   $45.6 million for printing contracts and $30 million
 3   for advertising.  I suggest this Administration focus
 4   on the lifeblood of our economy.  Our small
 5   businesses contribute billions annually to our digit.
 6   They deserve more, they are entitled to more.  The
 7   city must be there for them in this time of crisis.
 8   This hearing is also a legislative one.  We will be
 9   hearing a package of bills today and intended to
10   provide immediate relief to our struggling small
11   businesses during this crisis.  We will be hearing
12   eight bills today that relate to third-party delivery
13   platforms.  We've had two oversight hearings on this
14   topic this legislative session and have spent almost
15   a year working on this legislation.  The bills we're
16   hearing today will ensure that the restaurants will
17   be able to weather the storm and reopen for business
18   after this crisis is over.
19       I'm especially proud of my bills, Intro.'s 1895,
20   1896, 1897, 1898, and 1921.  I am also co-sponsor of
21   my colleagues bill Council Member Francisco Moya's
22   bills Intro. 1907 and 1908.  The Committee will also
23   be hearing Into. 1914 and 1932.  I look forward to
24   beginning a dialogue with SBS and our advocates here
25   today on all these bills as they continue the
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1               INTERNATIONAL INTERGROUP RELATIONS        17
2   legislative process.  The package of bills we're
3   hearing today will provide small businesses with the
4   essential relief they need and deserve.
5       I fear after we open back up this city and life
6   begins to return to a new normal, we will see our
7   commercial corridors decimated and empty.  There were
8   signs of this before this crisis.  We can't even
9   imagine what our commercial corridors will look like
10  after this crisis.
11      We must prevent mass retail vacancies.  We must
12  save mom and pop shops; we must take advantage and
13  legislative action to ensure small businesses are
14  protected.  Now is the time to be proactive.  I
15  created a petition calling for City Hall in Albany to
16  wake up and delay business income tax, sales tax,
17  payroll tax, real estate taxes and water and sewer
18  charges.  Nearly 20,000 New Yorkers agreed that this
19  must be done.  With that said, I'd like to thank the
20  Speaker of the Council for adapting to this new
21  normal and allowing the Council to resume our work
22  despite these challenges.
23      I want to thank my Chief of Staff Regi Johnson,
24  our Legislative Council Stephanie Jones, our Policy
25
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1               INTERNATIONAL INTERGROUP RELATIONS        18
2  Analyst Noah Meixler and Financial Analyst Aliya Ali
3  for their hard work in preparing for this hearing.
4      I'd like to turn it over to Chair Cohen, who
5  Chairs the Committee on Consumer Affairs and Business
6  Licensing to say a few words and give an opening
7  statement.  Chair Cohen?
8      CO-CHAIR COHEN:  Mark, it's good to see your
9  face.
10     CHAIRPERSON GJONAJ:  Same here.
11     CO-CHAIR COHEN:  Alright, good afternoon.  My
12 name is Andrew Cohen and I am the Chair of the
13 Committee on Consumer Affairs and Business Licensing.
14 I'd like to thank everyone who has managed to join us
15 for this remote hearing and thank you Council Member
16 Gjonaj for convening this important hearing together.
17     The scope of today's hearing is extensive and it
18 has been mentioned, it is both an oversight hearing
19 and an opportunity to gather feedback on numerous
20 pieces of legislation.  I look forward to hearing
21 directly from small business owners about the impact
22 that this pandemic on their operations and their
23 experiences navigating government programs meant to
24 assist them.
25
```

```
              COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1                INTERNATIONAL INTERGROUP RELATIONS          19
  2        Small businesses are the lifeblood of our economy
  3   but we all know that even before this pandemic hit,
  4   maintaining a profitable one in the city was
  5   incredibly difficult.  So, it is hard to comprehend
  6   to tenacious small business owners are making it
  7   happen now.
  8        But many of you still are.  We've heard
  9   incredible stories of ingenuity and innovation in the
 10   ways that you have been able to utilize technology to
 11   reach your customers.  I hear that there are bodega's
 12   in the Bronx that are now taking orders online while
 13   others such as restaurants and food trucks are still
 14   operating and sending food to our frontline
 15   healthcare workers.
 16        While it is inspiring to hear about the
 17   generosity and resilience of our small business
 18   owners, we do not want you to bear this weight alone.
 19   Many of you have called for very specific legislation
 20   and governmental support to help you navigate this
 21   unprecedented crisis.  In response, Chair Gjonaj,
 22   myself and my fellow Council Members introduced a
 23   package of legislation geared toward reducing the
 24   burden on small business to help you maintain your
 25   operation and get through this crisis.
```

```
 1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
            INTERNATIONAL INTERGROUP RELATIONS        20
 2        My bill Intro. 1916 will require the Department
 3    of Consumer Affairs to waive and refund all fees
 4    related to sidewalk café licenses for the remainder
 5    of this year.  Sidewalk café's cost restaurant owners
 6    thousands of dollars in fees annually.  There are
 7    approximately 1,400 sidewalk café's in the city
 8    representing an annual cost to the industry of
 9    between $11 and $12 million.  It simply does not make
10    sense for the city to collect these fees when
11    restaurants are one of the hardest hit industries.
12        I look forward to hearing from Commissioner Salas
13    and the Administration regarding this legislation.
14    I'm also proud to be a co-sponsor on several of my
15    colleagues bills including the bills limiting the
16    fees, the commissions that restaurants and grocery
17    stores have to pay third party food delivery
18    companies.
19        In this time of need, these businesses and their
20    workers continuously put themselves on the front line
21    to help New Yorkers acquire basic necessities.  It is
22    distressing to hear that their already slim profit
23    margins are further diminished by exploitatively high
24    commissions and fees.
25
```

A-2112

```
              COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                 INTERNATIONAL INTERGROUP RELATIONS        21
 2         Finally, before we begin to hear the testimony, I
 3    would like to thank all the City Council staff who
 4    helped make this virtual hearing possible.  Specific
 5    from Consumer Affairs Balqees Mihirig, Senior Counsel
 6    Leah Skrzypiec, I hope I said that right and Policy
 7    Analyst Sebastian Bacchi, Senior Finance Analyst as
 8    well as my Legislative Director Patty Vandenack and a
 9    particular thank you to all the IT people who are
10    really making this miracle of technology take place.
11         These certainly are trying times but I hope New
12    Yorkers find it reassuring to know that the Council
13    can continue its work to serve the people of this
14    city.
15         I believe that Council Member Gjonaj acknowledged
16    all the members of my Committee.  I'm not sure he
17    acknowledged Council Member Koo, who has joined us
18    also.
19         And with that Mark, I'm going to turn it back
20    over to you.
21    CHAIRPERSON GJONAJ:  Thank you Council Member.  I
22    also want to acknowledge that with us, we have public
23    advocate Jumaane Williams and we've been joined by
24    Council Member Powers.  I want to acknowledge Council
25    Members Moya, who is a sponsor of Introduction 1907
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        22
 2   and 1908.  Council Member Adams the sponsor of Intro.
 3   1914, Council Member Matteo the sponsor of the pre-
 4   considered bill, Council Member Rivera the sponsor of
 5   Intro. 1932 and the Public Advocate who is the
 6   sponsor of the Resolution Number 1049.
 7       For ease of this virtual hearing, we will be
 8   limiting opening statements to five minutes for each
 9   sponsor.  I'd like to turn it over to Council Member
10   Moya for some remarks followed by Council Member
11   Adams.  Council Member Moya?
12       COUNCIL MEMBER MOYA:  Thank you Chair Gjonaj.  I
13   want to start by thanking my colleagues and of course
14   the Speaker of the City Council and Chair Gjonaj for
15   partnering with me on the package of legislation to
16   protect New York City's local restaurants that we are
17   going to be discussing here today.
18       When I introduced these bills back in February,
19   we lived in a much different city.  At the time, we
20   were concerned about family owned restaurants
21   struggling to keep their doors open because
22   commission fees from apps like Grubhub were really
23   causing an issue for them.
24       Now restaurants have no choice but to keep their
25   doors closed.  Many have already closed for good
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS       23
 2  because of the devastating effects of the COVID-19
 3  crisis.  With no one sitting down at their
 4  restaurants, countless front and back of house staff
 5  have been laid off.  Every restaurant felt the
 6  pressure to partner with third party food service
 7  apps, like seamless before but now, they have no
 8  choice.  Some people treated these apps like saviors
 9  for restaurants allowing them to reach customers who
10  were staying home and social distancing.
11      In March Grubhub made headlines when it announced
12  it would suspend commission fees as the restaurant
13  struggled to cope with the pandemic.  Good news for
14  restaurants on the brink of failure.  Outlets like
15  CNBC and others reported that Grubhub would and I
16  quote, for go or waive commission fees.  Except it
17  wasn't true.  In fact, there was so much confusion
18  and misrepresentation about what Grubhub was doing
19  that it later had to clarify its statement.
20      No, it wasn't waiving fees, it was just deferring
21  them to a later date.  So, another words, they were
22  telling restaurants, we hope you survive long enough
23  to pay us our money.  How generous of them.
24      Is there anyone who actually believes that these
25  restaurants barely hanging on will be able to pay off
```

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                    INTERNATIONAL INTERGROUP RELATIONS          24

 2   the commission fees by some unidentified date?  Of

 3   course not.  It's disingenuous to act otherwise.

 4       Restaurants needed help before COVID-19 epidemic.

 5   They are getting swallowed up by the exorbitant

 6   commission fees that reach as high as 30 percent and

 7   exceed the slim perfect margins most restaurants

 8   operate in.

 9       Now, as they perform the essential functions of

10   feeding New Yorkers, they need this help more than

11   ever.  This is why we've added a section to Intro.

12   1908, which would place a ten percent cap on

13   commission fees from third party food vendor services

14   to specifically address the needs during a crisis

15   like COVID.

16       The new section mandates that in times of

17   declared emergencies, where restaurants are limited

18   to pick up or delivery only, apps could only charge

19   restaurants for actually delivering meals.  When we

20   introduced this package of bills, I already could see

21   a nightmare version of New York that had nothing but

22   chain restaurants on every block because no locally

23   owned place could survive the cost of doing business

24   here.  Without putting in place the protections these

25   bills would create, that nightmare seems almost
```

A-2116

```
                 COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1                      INTERNATIONAL INTERGROUP RELATIONS        25

2     impossible to avoid.  Restaurants and the workers who

3     keep them running in the community that they serve

4     are demanding that we do something to give them a

5     chance at survival.  This was true before the

6     pandemic; it turned the world upside down but now

7     more than ever there is a greater urgency to get this

8     done.

9        So, I want to take this opportunity again to

10    thank the Speaker, Chair Gjonaj and my colleagues for

11    being a leader on this issue and a champion for New

12    York City small businesses and I urge my colleagues

13    to join us in supporting these bills.  Thank you

14    Chair Gjonaj for the opportunity to speak.

15       CHAIRPERSON GJONAJ:  Thank you Council Member

16    Moya.  I'd like to call on Council Member Adams for

17    some remarks, followed by Council Member Matteo.

18    Council Member Adams.

19       COUNCIL MEMBER ADAMS:  Thank you so much and good

20    afternoon.  I'd like to start by thanking Chair's

21    Gjonaj and Cohen for today's important hearing on the

22    impact of COVID-19 on New York City.  I'm proud to

23    sponsor Introduction 1914 with Speaker Johnson.  This

24    bill would make threatening a commercial tenant based

25    on their status as a COVID-19 impacted business or
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        26

 2   person a form of harassment punishable by a civil

 3   penalty of $10,000 to $50,000.  Our businesses,

 4   especially small businesses are extremely vital to

 5   the pulse of our neighborhoods.  Small businesses are

 6   suffering right now as they are forced to adapt to a

 7   new normal.  We need to act now to protect the

 8   businesses that make our neighborhoods vibrant and

 9   maintain the history and character of our communities

10   across the city.

11        Unfortunately, thousands of businesses in our

12   city are suffering as they've been forced to close

13   due to COVID-19.  As availability of federal loans is

14   limited, many businesses are unable to pay their

15   rent.  This leaves them vulnerable to harassment from

16   landlords in search of ways to collect or in essence

17   force the incumbent tenant to voluntarily abandon the

18   property, so that new tenants willing to pay higher

19   rents can move on in.

20        The threat of harassment will particularly impact

21   the city's small independently owned and immigrant

22   owned businesses, many of which were operating on

23   thin margins and struggling to pay rent even before

24   this crisis.

25
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS         27

 2      So, I thank the Speaker for his leadership and

 3   partnership and I certainly thank my colleagues for

 4   considering Intro. 1914 to protect our small

 5   businesses and protect commercial tenants.

 6      Thank you, Chair's.

 7      COUNCIL MEMBER GJONAJ:  Thank you so much Council

 8   Member.  I'd like to call on Council Member Matteo to

 9   give his remarks followed by Council Member Rivera.

10   Council Member Matteo?

11      COUNCIL MEMBER MATTEO:  Thank you Chair's Cohen

12   and Gjonaj for holding today's joint hearing.  Thank

13   you to the staff that has helped make it possible,

14   truly appreciate all your hard work.

15      Every one knows how terrible this pandemic has

16   been.  It has kept families and friends apart; it has

17   taken so many loved ones from us.  The toll on our

18   physical and mental health continues to be felt and

19   the hardship of this place and our small businesses

20   has also been unprecedented.

21      Small businesses are the backbone of our

22   communities and the engine of our economy.  They

23   employ more than half our city's workforce and most

24   of our residents.  They support non-for-profits that

25
```

```
                    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                    INTERNATIONAL INTERGROUP RELATIONS        28
 2   enhance our neighborhoods quality of life to a level
 3   that government can never accomplish on its own.
 4       We have to support them to get back on their feet
 5   so they can continue to fill that vital role in New
 6   York City.  That is why I have introduced this pre-
 7   considered Intro.  I appreciate that license and
 8   permits have been extended during the duration of
 9   these emergency but the agency response to Executive
10   Order 107 of 2020 has been uneven at best.  Some
11   agencies maintain that permits have to be renewed at
12   the expense of small businesses, so we need the Mayor
13   to clarify which permits and licenses have been
14   extended.
15       We also much ensure that our small businesses are
16   not burdened with red tape just as we are starting to
17   allow them to reopen.  That is why no permit or
18   license should have to be renewed for 90 days after
19   this emergency is over.  This will give small
20   businesses, our mom and pop establishments, our local
21   restaurants and others at least some breathing room
22   as they try to restart and to operate without
23   worrying about paper or a fine from the city.
24       I look forward to hearing from the Administration
25   and working with them to make sure that this burden
```

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        29
2   is lifted from small businesses before it hobbles
3   them in their come back.
4       Thank you, Chair's.
5       COUNCIL MEMBER GJONAJ:  Thank you Council Member
6   Matteo.  I'd like to call on Council Member Rivera
7   for some remarks, followed by Public Advocate
8   Williams.  Council Member Rivera.
9       COUNCIL MEMBER RIVERA:  Thank you.  Good
10  afternoon, I am Council Member Carlina Rivera and I'd
11  like to thank Chair Gjonaj and Chair Cohen and
12  members of the Small Business and Consumer Affairs
13  Committee's for letting me speak briefly at this
14  hearing on my bill, Introduction 1932 which would
15  prohibit the enforcement of personal liability
16  provisions in commercial leases or rental agreements
17  involving a COVID-19 impacted tenant.
18      This pandemic has already left a profound impact
19  on our city.  One that will be felt for years if not
20  decades.  No where will this long term effect be felt
21  more than in our small business community where
22  countless owners are facing the very real possibility
23  that their stores may never return.
24      We must do everything in our power through
25  legislation and advocacy to help these pillars of our
```

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1                 INTERNATIONAL INTERGROUP RELATIONS        30
2   communities and the thousands of New Yorkers they
3   employ.  My bill will ensure that business owners,
4   should they be forced to walk away or temporarily
5   shutter their stores, through no fault of their own
6   can do so without facing personal liability, ensuring
7   that one day they may be able to return and relaunch
8   or create a new thriving business in our
9   neighborhoods.
10      Sadly, I am already hearing from small businesses
11  in my district that some landlords who I understand
12  maybe suffering as well are going after small
13  business owners life savings and personal assets
14  during this national pandemic.  These are folks like
15  my constituents Mario, the owner of Follia, an
16  amazing Italian restaurant on 3rd Avenue.  Mario is
17  already getting rent due notices and threats from his
18  landlord that the personal liability clause in his
19  lease will soon be acted upon.  He has no where to
20  turn right now.
21      No matter the need, it is a moral and unethical
22  failure for landlords to seek such restitution for
23  people who have already lost their life's work.  Any
24  small business owners that's taken the right steps in
25  incorporating their business should be protected by
```

A-2122

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        31
2   this bill and I encourage all members of these
3   committees to please support Intro. 1932.
4      I also want to recognize that that bill's we are
5   hearing today wont do enough for every small business
6   owner and that this crisis has only deepen the
7   challenges our small businesses have faced for
8   decades in our city.
9      We must continue to fight for the assistance we
10  need from Albany and Washington both in the form of
11  rental forgiveness for small business tenants and
12  financial assistance as well.  And as part of any
13  relief package, our nonprofit and small landlords
14  must be taken into account through methods such as
15  property tax relief.
16     So, as long as they are actively working to
17  provide direct relieve to their tenants themselves.
18  When I go out to deliver food or assist folks in my
19  district, I have been both saddened and strengthened
20  by the store owners who while shuttered and stressed
21  continue to support and give back to their community
22  so selflessly.  It's time we stepped up and gave back
23  to them in this time of crisis.
24     Thank you.
25
```

A-2123

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        32
 2      CHAIRPERSON GJONAJ:  Thank you Council Member
 3   Rivera.  I want to call on Public Advocate Williams
 4   for some remarks.  Public Advocate.
 5      PUBLIC ADVOCATE WILLIAMS:  Thank you so much
 6   Chair Gjonaj and Chair Cohen.
 7      CHAIRPERSON GJONAJ:  Can't hear you.
 8      PUBLIC ADVOCATE WILLIAMS:  You can't hear me.
 9   Can you hear me now?  I want to thank Chair Gjonaj
10   and Chair Cohen for this.  I apologize, I have to
11   keep the mask on.  I'm in a crew distribution event
12   in Statin Island, but I'm used to the magic of
13   technology, I can still get my statement in this
14   hearing.  So, I appreciate the opportunity to speak.
15      I do want to thank Speaker as well for working
16   with the Council to get there hearing online and
17   showing leadership for our legislature that act the
18   core of the country that this can be done and I'd
19   also like to say the Speakers quarantine barrier much
20   better in the mind, so I appreciate that as well.
21      And I appreciate the attention for Consumer
22   Affairs and Business Licensing and Small Businesses
23   for holding an oversight hearing on the impact of
24   small businesses in New York City.  I know the
25   Committee is hearing several bills that will support
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        33
 2  our restaurants and delivery workers in our small
 3  businesses.  I support my colleagues efforts and
 4  thank them for introducing these bills.
 5     I'd also like to thank our first responders and
 6  frontline workers for helping our city battle
 7  coronavirus, as well as keep this city moving.  I'm
 8  calling and working with the City Council to make
 9  sure that our essential workers, who very often are
10  pushed out of [INAUDIBLE 31:37] for the rest of the
11  city will get the recourse that they need due to the
12  failures of our city exec, state exec and our federal
13  exec in decisions that were made.
14     To the residents of New York City, I want to
15  stress how important it is that we continue to
16  practice social distancing and stay home as much as
17  possible.
18     With that said, as this crisis continues, the
19  financial pressures on New Yorkers will only
20  increase.  My Resolution, Resolution 1049 aims to
21  address the major root cause of one of the financial
22  issues that many New Yorkers face, confession of
23  judgement in business loans.  A confession of
24  judgment is a written agreement which one signed by
25
```

1     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
          INTERNATIONAL INTERGROUP RELATIONS          34

2     the bar of monetary loan relinquishes the borrowers

3     right to dispute legal claims made by length.

4         In other words, a person is giving up their right

5     to due process if the debt is unpaid and there is a

6     dispute.  While confessions of judgement allow

7     lenders to resolve and receive [INAUDIBLE 32:28] in a

8     timely manner, these agreements have also lead to

9     predatory practices.  Lenders can use there

10    agreements to accuse borrowers of defaulting on their

11    loans and seize their assets without proof and prior

12    notification.

13        The Resolution calls on the Congress and New York

14    State to pass legislation to prohibit use of

15    confessions and judgement in business loans.  There

16    have been some points in our federal government, it's

17    a step in the right direction but it does not

18    prohibit confessions of judgement from being filed

19    against an instate debtor which leads many New

20    Yorkers vulnerable to predatory living practices.

21        One group of New Yorkers who have made this

22    vulnerable population, taxi medallion owners.  There

23    are 11,938 taxi medallions in New York City and

24    obtaining a taxi medallion is not a cheap endeavor.

25    With many taking out a business loan and they

A-2126

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
           INTERNATIONAL INTERGROUP RELATIONS          35

1

2 couldn't afford it.  Between 2002 and 2014, the price

3 of medallions $200,000 to more than 1 million even

4 though city records show that the taxi driver incomes

5 barely change.

6    Can you still hear me?  Sorry, the following

7 year, the cost of medallions began to fall as the

8 value of the taxi medallions fell, as the value of

9 the taxi medallions fell, lenders denied, borrows

10 appeals to refinance and instead issued confessions

11 of judgment.  Allowing the lender to seize the

12 borrowers assets.  In fact, several banks use

13 confessions of judgement in their lending activity

14 where the borrower has admitted to defaulting on a

15 loan even before borrowing any funds at all.

16    The ripple effect of the predatory lending

17 practices, much of which were based on confessions of

18 judgement have left taxi drivers and others who own

19 medallions and a lot of debt.

20    Incurably a number of medallion holders have

21 taken their lives due to the overwhelming stress from

22 their debt.

23    Now, the city has the opportunity to address this

24 outcome in a number of ways.  The city should look to

25 offer a debt forgiveness course [inaudible 34:25] the

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        36

 2   man the Council appointed the panel to uphold the

 3   bill for thousands of drivers and we applaud that.

 4   Although much of our city funds will be decimated to

 5   address the COVID-19 related issues, we need to look

 6   to how to make the promise bailout a reality for the

 7   taxi drivers as well.  Not only are they among the

 8   front line workers who are going outside every day to

 9   make sure people can get around safely, they are also

10   among those who are financially struggling during

11   this pandemic.

12      Small businesses are also at risk of confession

13   of judgments to use against them and probably even

14   more so as we move through this COVID responsive

15   recovery.  Whether a local restaurant or retail

16   store, the reality that small business owners are

17   vulnerable to the predatory practice.  This is the

18   especially true in our current environment as most

19   this is effectively stopping a steady stream of

20   income.  Businesses already have very tough decisions

21   to make, businesses that have signed loans with high

22   interest rates cannot afford to on because of a

23   missed payment.  The situation for these small

24   businesses that empower and strengthen our

25   communities is precarious at best.
```

A-2128

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS      37
 2      MODERATOR:  Time.
 3      PUBLIC ADVOCATE WILLIAMS:  Losing and these small
 4  businesses will be a catastrophe and we expect it
 5  might be more.  But it does not have to be this way
 6  and the legislation on a federal level and on the
 7  state, it's the best recourse.
 8      New Yorkers under stress cannot wait any longer
 9  for, as their collectors continue to misuse
10  confessions of judgement.  So, I'm asking my
11  colleagues to join me and this is just a resolution
12  but I think it helps New York City Council to make
13  sure that we are pushing as hard as we can in
14  conjunction with the other bills.  I think we will be
15  moving in the right way in protecting all New Yorkers
16  including all small businesses.
17      Thank you again.  I appreciate it.
18      CHAIRPERSON GJONAJ:  Thank you Public Advocate.
19  Before I turn it over to the moderator, I want to
20  acknowledge that we've been joined by Council Member
21  Rosenthal.
22      Counsel Stephanie Jones?
23      STEPHANIE JONES:  Thank you Chair.  We will now
24  call on members of the Administration to testify.
25  First, Commissioner Greg Bishop of the Department of
```

A-2129

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS         38
 2  Small Business Services followed by Commissioner
 3  Lorelei Salas of the Department of Consumer and
 4  Worker Protection.
 5      Before we begin, I will administer the oath.
 6  Commissioner Bishop, Commissioner Salas, First Deputy
 7  Commissioner Mallon, Executive Director Edinony and
 8  Deputy General Counsel Tiger.  I will call on each of
 9  you individually for response to the oath.
10      Please raise your right hands.  Do you affirm to
11  tell the truth, the whole truth and nothing but the
12  truth before these Committees and to respond honestly
13  to Council Member questions?
14      Commissioner Bishop?
15      GREG BISHOP:  I do.
16      STEPHANIE JONES:  Thank you.  Commissioner Salas?
17      LORELEI SALAS:  I do.
18      STEPHANIE JONES:  Thank you.  First Deputy
19  Commissioner Mallon?
20      JACQUELINE MALLON:  I do.
21      STEPHANIE JONES:  Thank you.  Executive Director
22  Edinony?
23      STEVEN EDINONY: I do.
24      STEPHANIE JONES:  Thank you.  Deputy General
25  Counsel Tiger?
```

A-2130

1     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
            INTERNATIONAL INTERGROUP RELATIONS        39

2     MIKE TIGER:  I do.

3     STEPHANIE JONES:  Thank you.  Commissioner

4  Bishop, you may begin when ready.

5     GREG BISHOP:  Thank you.  Good afternoon Mr.

6  Speaker, Mr. Public Advocate and of course Chair

7  Gjonaj, Chair Cohen and members of the Committee on

8  Small Business and the Committee on Consumer Affairs

9  and Business Licensing.

10     My name is Greg Bishop and I'm the Commissioner

11  of the New York City Department of Small Business

12  Services.  I'm joined by SBS First Deputy

13  Commissioner Jackie Mallon.  First and foremost, this

14  has been such a difficult moment for our city and

15  especially our small business community.  My staff

16  and I are working tirelessly for small businesses

17  through our programs and advocacy for additional

18  support.  I'm so grateful for the Council's

19  enthusiastic partnership and engagement as we

20  continue to reach constituents in your districts that

21  need help and to better understand the involving

22  impacts of COVID-19 on the city's small businesses.

23     New York City small business owners are facing

24  unprecedented challenges.  Our goal is to connect

25  them to the resources they need to preserve through

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS          40
 2   this crisis and come out on the other side stronger.
 3   Based on the concerns we heard in January and
 4   February, SBS worked quickly to launch two financial
 5   assistance programs.  The NYC Employee Retention
 6   Grant and the NYC Business Continuity Loan Fund.
 7       Through the NYC Employee Retention Grant, SBS has
 8   approved financial assistance totaling more than 419
 9   million for over 2,600 small businesses.  SBS's New
10   York City and NYC Business Continuity Loan Fund, has
11   also seen an enormous demand.
12       We received thousands of applications and are
13   expecting to award about $20 million in loans.  Thus
14   far over 170 loans have been approved totaling more
15   than $10 million for small businesses.  However, the
16   overwhelming needs of our small business community
17   can only be met by the resources of the federal
18   government.  To help New York City small business
19   owners access their fair share of federal funds from
20   the Care's Act, our agency has shifted our resources
21   to provide technical assistance of business owners
22   who need help applying to the U.S. Small Business
23   Administration's Emergency Response Products
24   including the Paycheck Protection Program.  Which
25
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          41

 2    reopened to applications earlier this week after

 3    initial funding was exhausted.

 4        Technical assistance ranges from overview of

 5    available funding options to communicating directly

 6    with lenders to address questions regarding

 7    applications.  SBS is providing this technical

 8    assistance through virtual information sessions,

 9    small group sessions in a one on one setting.

10        We will provide technical assistance in multiple

11    languages, so that immigrant entrepreneurs are not

12    excluded from these opportunities.  Beyond these

13    initiatives SBS has shifted all our operations to

14    support the most pressing needs of our constituents

15    as we whether this pandemic.

16        Our NYC Business Solution Centers experts are

17    available remotely to connect business owners with

18    services including identify additional financial

19    opportunities through our network of more than 40

20    lenders and local philanthropic partners.  Rent as we

21    heard, has been an enormous challenge for small

22    businesses.  Our commercial lease assistance program

23    is available to support small business owners as they

24    engage with their landlords to discuss changes to

25    their lease obligations, which might include a rent
```

```
           COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        42
 2   deferral, abatement or reduction among other actions.
 3   CLA lawyers can help review leases to determine what
 4   a business rights and obligations are, negotiate a
 5   payment plan for arrears.  And we know that Council
 6   is also committed to providing additional support for
 7   commercial tenants and we look forward to discussing
 8   Intro. 1914 and Intro. 1932 further.
 9      SBS is also providing targeted support for our
10   cities minority and women business enterprises.  In
11   additions to connecting MWBE's with relevant
12   information about SBS and SBA COVID relief
13   opportunities, SBS rapidly transitioned its existing
14   programming workshops.  One on one technical
15   assistance and contractor compliance operations to
16   remote service delivery.  SBS has collaborated with
17   the Mayor's Office of Minority and Women Owned
18   Enterprise and Mayor's Office of Contract Services to
19   identify MWBE firms that supply essential services
20   such as medical staffing, IT goods, childcare
21   services, cleaning services and food services to
22   connect these in demand MWBE firms with emerging
23   contracting opportunities.
24      SBS's Workforce One career center staff are
25   available to provide job seekers with 101 assistance
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1             INTERNATIONAL INTERGROUP RELATIONS        43
2   regarding job searches and preparation as well as
3   unemployment insurance.  We are focused on recruiting
4   for essential services such as healthcare, groceries,
5   pharmacies, and delivery companies as well as
6   identifying opportunities that are close to our job
7   seekers, so that's easier for them to travel to and
8   from work.
9     SBS is currently working with approximately 150
10  employees to fill 1,600 positions across the city.
11  We are building on these efforts by working with the
12  foods team to establish a workforce development
13  program that is specifically targeted towards the
14  essential businesses that sustain our food systems
15  including grocers.
16    To support the healthcare industry, SBS is
17  working directly with hospitals and nursing homes to
18  provide support in filling urgent staff needs and
19  develop a home heath aid training to meet the ongoing
20  demand of the home care and long term care facility
21  centers.
22    Since the onset of the pandemic, SBS has worked
23  to ensure that our partners and constituents have
24  access to the information they critically need.  We
25  share information through email correspondence,
```

A-2135

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        44
 2   social media, advertising campaigns and local and
 3   national print, television and radio broadcast media.
 4   We have created numerous resource pages with COVID
 5   specific guidance for small business owners and job
 6   seekers on our website.  These new COVID related
 7   patients have seen over 700,000 visits since the
 8   beginning of March.
 9      We have also activated our community partner
10   network to disseminate information and share details
11   regarding new or ongoing challenges faced by their
12   small business constituents and I have personally
13   held regular conference calls with elected officials
14   and with community partners and through our
15   neighborhood development team.  SBS is in close
16   communication with bids and other community based
17   development organizations.
18      To continue providing critical support to
19   neighborhood commercial corridors across the five
20   boroughs, SBS has worked with all of our Neighborhood
21   360 and Avenue NYC grantees to rescope their efforts
22   to align with our COVID response and recovery
23   strategies.
24      By providing technical assistance and working
25   with our community partners, SBS is working to ensure
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1            INTERNATIONAL INTERGROUP RELATIONS        45
2   that New York City business owners have greater
3   access to federal funding opportunities.  No matter
4   how we are able to improve the access challenges of
5   New York City small businesses, we must also
6   recognize and correct the structural problems of the
7   SBH, PPP, and idle programs.
8       For most among them, the timeline for loan
9   forgiveness needs to change to be fair to New York
10  City and businesses.  Congress needs to follow
11  businesses that receive PPP funding to bring their
12  employees back when their city reopens giving them a
13  fighting chance to sustain their business without
14  taking an insurmountable debt.
15      We are advocating for the extension of these
16  federal loan terms as increasing the timeline or
17  repayment would provide companies with the necessary
18  breathing room to emerge from this pandemic
19  financially sound.
20      Furthermore, many business sectors, especially
21  restaurants and our hospitality industry need
22  additional assistance with their fixed costs, like
23  rent, mortgage, and utilities in addition to the
24  expense of employee retention which is the focus of
25  the PPP.
```

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
                INTERNATIONAL INTERGROUP RELATIONS        46

1

2       And following, the federal government needs to do

3   more to ensure that our smallest, most vulnerable

4   businesses have access to the resources they need by

5   developing financial tools and routing more money to

6   business owners that have been left out of early

7   federal funding rounds, including undocumented New

8   Yorkers, some nonprofits and religious institutions

9   who desperately need more support.

10      With your help and continued leadership for our

11  congressional delegation, we will continue to

12  identify these gaps in resources and advocate to the

13  federal government to ensure that future stimulus

14  packages capture the unique needs of New York City's

15  small business economy.

16      I applaud the Council's leadership in developing

17  local solutions especially related to third party

18  delivery applications but I do want to ensure we are

19  not putting additional regulatory burdens on small

20  business owners at this time.  I look forward to

21  discussing further and continuing to work together to

22  effectively serve New Yorkers.

23      Thank you and I would be happy to take your

24  questions.

25

```
           COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        47
 2         STEPHANIE JONES:  Thank you Commissioner.  Next,
 3    we'd like to invite Commissioner Salas of the
 4    Department of Consumer and Worker Protection to
 5    testify.  Commissioner Salas.
 6         LORELEI SALAS:  Thank you.  Good afternoon
 7    Speaker Johnson and Chair's Cohen and Gjonaj and
 8    members of the Committee.  I am Lorelei Salas,
 9    Commissioner for the Department of Consumer and
10    Worker Protection.  First, I'd like to state that I
11    hope that each of you and your loved ones are staying
12    safe and healthy during this crisis.
13         My office has been in regular contact with many
14    of your offices but I look forward to at this hearing
15    officially update you on the work that my agency has
16    been doing.
17         The economic cost of COVID-19 crisis is
18    tremendous, as my colleague Greg Bishop just
19    testified to.  But for the over 200,000 small
20    businesses in New York City, including thousands of
21    DCWP Licensees, revenue streams are strained or
22    nonexistent.
23         Under this Administration, DCWP has been
24    especially attentive to small business needs by
25    promoting a culture of compliance through
```

```
          COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1              INTERNATIONAL INTERGROUP RELATIONS          48
  2   presentations, round table meetings and business.  In
  3   fact, just last month at our Preliminary Budget
  4   hearing, I testified to yet another consecutive year
  5   of decreased fines on businesses.
  6      DCWP's mission to protect and enhance the daily
  7   economic lives of New Yorkers to create thriving
  8   communities is more important than ever before.  This
  9   is why DCWP has and will continue to work to provide
 10   guidance to small businesses and work in good faith
 11   to address unforeseen matters of concern.
 12      In compliance with New York State on pause DCWP
 13   suspended in person customer visits to the New York
 14   City small business support center in Jamaica in our
 15   lower Manhattan main office on March 16th.
 16      Instead of in person visits, DCWP published
 17   guidance advising customers to use a suite of online
 18   services and published public facing contacts to
 19   further guide customer questions on issues including
 20   business compliance, collections and licensing.  This
 21   notice remains on our website home page and is
 22   available in multiple languages.  Less than three
 23   weeks after New York calls to extend that to June
 24   30th, upcoming license terms and provided additional
 25
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1               INTERNATIONAL INTERGROUP RELATIONS         49
2   grace periods for licensees to submit renewal
3   applications.
4       The Mayor has of course also issued Executive
5   Order 107 which extends license terms for the
6   duration of the state of emergency and if the state
7   of emergency extends beyond June 30th, we will extend
8   our deadlines accordingly.
9       DCWP has also been responsive to stakeholders.
10  Although prohibited by state statute from extending
11  the license expiration date of employment agencies,
12  we acted where we could and extend that the renewal
13  application grace period deadline to August 28, in
14  response to questions from the industry.  The
15  complete licensing extension guidance is available on
16  our website and in multiple languages as I said.
17      My staff and I have also been in close contact
18  with the City Council through the COVID-19 crisis.
19  Our partnership facilitated a Mayoral Executive order
20  waiving consent fees for sidewalk café's for
21  dependency of the state of emergency.  We are
22  processing refunds as quickly as possible and are on
23  track to complete final steps over the next few
24  weeks.
25
```

```
1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
           INTERNATIONAL INTERGROUP RELATIONS        50
2        In these difficult times for businesses, DCWP's
3    core function and mission to protect workers and
4    consumers must persist.  In order to prevent stores
5    from overcharging New Yorkers, I used my authority on
6    March 5th, to declare our face masks temporarily in
7    short supply.  Subsequently, I expanded the short
8    supply order to cover disinfectant wipes and hand
9    sanitizers.
10       By March 16th, our agency took further steps and
11   issued an emergency rule making price gouging illegal
12   for any service or personal or household good that is
13   needed to prevent or limit the spread of or treatment
14   of COVID-19.  Under the emergency rule, businesses
15   have an opportunity to provide evidence to DCWP if
16   prices were raised in excess of ten percent due to
17   increased costs to supply them.  DCWP has also
18   subpoenaed several suppliers to investigate claims at
19   businesses that they were being gouged.  Thus far,
20   the agency has reached out to several manufacturers
21   of products to request assistance with positive
22   results.
23       Information of flyers for business compliance are
24   available on our website in multiple languages and on
25   March 6th, DCWP physically distributed this flyer in
```

A-2142

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                   INTERNATIONAL INTERGROUP RELATIONS        51
 2    various business districts in New York City.  In late
 3    March, DCWP published updated COVID-19 guidelines for
 4    employers and employees as it relates to city, state
 5    and federal laws that govern New York City private
 6    sector workplaces.  DCWP received appreciation from
 7    stakeholders on updated paid sick leave guidance that
 8    clarified obligations as it related to new emergency
 9    protections passed by the state and congress.
10        I also want to take this opportunity to thank
11    Speaker Johnson for amplifying the regularly updated
12    guidance which is now available in multiple languages
13    on our website.  Both the guidance for workplace laws
14    in price gouging are the subject of ongoing virtual
15    outreach events, stakeholder communications, and
16    daily communication with sister agencies like SBS
17    that further amplify our work.  Today DCWP has
18    participated in 14 outreach events for small business
19    owners since the COVID-19 crisis began.
20        Before I discuss the broader package of bills,
21    I'd like to express the sentiment that my agency and
22    the administration generally, we agree with the
23    issues that the Council is trying to address with
24    these bills.
25
```

A-2143

```
1     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
           INTERNATIONAL INTERGROUP RELATIONS        52
2        Given the ongoing emergency in this difficult
3     situation, it would be challenging for us to
4     contemplate taking on a broad area of new regulation.
5        With that said, we want to work with the Council
6     to figure out the best pathway forward and what we
7     can do to help small businesses the most that need
8     this help right now.
9        Introductions 1846, 1896, 1897, 1898, 1907 and
10    1908-A; this package of bills aims to regulate third
11    party food delivery services.  We'd like to work
12    together on addressing fees as addressed in Intro.
13    1908-A by Council Members Moya and Gjonaj.  Intro.
14    1908-A would place a cap on the fees charged to
15    restaurants during this crisis.  We are discussing
16    with City Hall to identify the best agency to tackle
17    this pressing matter to protect small businesses and
18    would like to continue the conversations with the
19    Council to find a path forward.
20       Similarly, DCWP supports the intent of Intro.
21    1846 but we have several questions including but not
22    limited to the prudency of only requiring these
23    disclosures to consumers we use a third-party food
24    delivery service and not to those that order directly
25    from restaurants.
```

A-2144

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        53

 2       We're interested in working with you on the other

 3   bills as soon as the crisis is behind us.

 4   Introduction 1916 waives all license and consent fees

 5   for sidewalk café's that are due on or after January

 6   1, 2020 until December 31, 2020.  As noted earlier,

 7   DCWP worked successfully with the City Council to

 8   address sidewalk consent fees concerns for the

 9   dependency of the state of emergency by way of

10   Mayoral Executive Order.

11       Circumstances resulting from COVID-19 are

12   impacting the bottom lines of thousands of different

13   types of businesses.  DCWP alone licenses more than

14   75,000 businesses across over 50 business categories

15   and sidewalk café's represent less than 1,000 of

16   those businesses.

17       As a general matter, DCWP will continue to

18   explore ways that we can help businesses tie do

19   dependency of the state of emergency.  And we look

20   forward to working with the Council on this.

21       The pre-considered Introduction requires the

22   Mayor to issue guidance on license renewal deadline

23   extensions.  The legislation also provides that no

24   licenses or permits shall be required to be renewed

25   until 90 days after the COVID-19 emergency ends.
```

A-2145

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS       54
 2   This legislation impacts licenses and permits beyond
 3   those under the purview of DCWP.  The Law Department
 4   is currently reviewing the proposal along with the
 5   other bills in this package in its totality.
 6       In conclusion, I would just like to say that
 7   we're very, very grateful for the essential workers
 8   that are taken care of the sick and vulnerable and
 9   for those delivering a variety of services we
10   normally take for granted.
11       We're also grateful for the incredible sacrifices
12   in our communities.  The small businesses that had to
13   close their doors to protect New Yorkers.  The New
14   Yorkers to continue to abide by social distance
15   guidelines and our collective staff who have remained
16   steadfast in working for the greater good of the city
17   and on behalf of millions who are suffering in these
18   trying times.
19       Thank you for the opportunity to testify and I
20   look forward to hearing from you and answering any
21   questions you may have.
22   STEPHANIE JONES:  Thank you Commissioner.  I will
23   now turn it over to questions from Chair Gjonaj and
24   then Chair Cohen.  For these questions, again, we
25   will additionally be joined by First Deputy
```

A-2146

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
                INTERNATIONAL INTERGROUP RELATIONS        55

1

2    Commissioner Jackie Mallon from SBS and Executive

3    Director Steven Edinony and Deputy General Counsel

4    Mike Tiger from DCWP.

5        Panelists, please stay unmuted if possible,

6    during this question and answer period.  Thank you,

7    Chair Gjonaj, please begin.

8        CHAIRPERSON GJONAJ:  Thank you Stephanie.

9    Commissioner Bishop, thank you for your testimony.

10   What is the total dollar amount in loans that have

11   been allocated so far that have actually reached our

12   small businesses, whether it be in grants or loans?

13       GREG BISHOP:  So, first of all, it's good to see

14   you Council Member Gjonaj and I'm glad that you are

15   well.  As I had mentioned in my testimony, we have as

16   of today, in terms of our grants, we approved over

17   $19 million.  And as you know, when we make the

18   approval, it is a direct debit into someone's

19   account.  So, depending on their bank, once an

20   approval is done, it could take up to a week for the

21   money to actually get into the individuals bank

22   account.  And on the loan, we've approved over $10

23   million.

24

25

**A-2147**

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
INTERNATIONAL INTERGROUP RELATIONS          56

1

2       CHAIRPERSON GJONAJ:  That's $39 million in total.

3   Is that the total budget that as allocated for loans

4   and grants?

5       GREG BISHOP:  So, we actually, for the total

6   budget was around $50 million and as you know and I

7   know you talked about the allocation earlier in your

8   opening statement.  When we created these programs,

9   we actually, we were on the ground in early February

10   because we saw a lot of businesses experiencing the

11   impact of COVID-19 in the city, particularly you're

12   not trying to talk communities.

13       So, this program was designed for smaller

14   businesses that were already experiencing the impact.

15   When the Mayor made this announcement, the world

16   changed within five days as you can imagine and were

17   able to quickly pivot but we knew that the need was

18   going to be far outweigh the ability for these

19   programs to meet the need of the entire city.  And we

20   said, and the Mayor said, that we will need the

21   federal government to step in.

22       You know, from when we launched a program, it

23   took us five days from launching, excepting

24   applications to making the first disbursement for our

25

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        57
 2   grant program.  And for our loan program, it took us
 3   less than two weeks.
 4      So, our team moved as quickly as possible and for
 5   anyone that's in finance you know that you know
 6   standing up a program and making disbursements that
 7   quickly, it was task and we worked you know, well
 8   into late hours, weekends to get these programs up
 9   and running as quickly as possible.
10      But I share your concern in terms of the need.
11   We know that the federal government has the resources
12   as we all know, our budget situation we have as a
13   city, we have to have a balanced budget.  The state
14   has to have a balanced budget.  So, we need to depend
15   on the federal government in order to not only help
16   our small businesses but help the city in general.
17   So, we certainly agree with you that more needs to be
18   done.  We've been advocating and I want to thank our
19   New York Congressional Delegation because they have
20   been fighting for the little guys and I can talk a
21   little bit more about the federal programs but I just
22   wanted to let you know that we moved really quickly.
23   Money is out the door, there are companies that have
24   received dollars from our programs.
25
```

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        58
 2       CHAIRPERSON GJONAJ:  Thank you Commissioner, but
 3   I'm still not clear.  Is it $39 million or $49
 4   million that have been allocated in funds for loans
 5   and grants?
 6       GREG BISHOP:  So, the total number is $49
 7   million.  What you are seeing here is that we had and
 8   I'll ask First Deputy Jackie Mallon to give you the
 9   clarity in the dollars.  When we announced the
10   closure of our grant program, because when we
11   originally went out, there was a smaller number for
12   our grant program.  But instead of shutting the door
13   and saying no, we had a tremendous amount of
14   applications on the last day, I think double the
15   amount that we had throughout the entire program.
16       And remember this grant program was employee
17   retention.  So, when we decided that we were going to
18   pivot to now help our small businesses connect with
19   the federal employee retention program, that is why
20   we decided to sense out the out program.  Because the
21   out program is only for business with one to four
22   employees.  We did open it up to nonprofits and
23   individuals who immigrants could have also
24   participated in this but the federal program had a
25   much large catchment area.
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS        59
 2       So, we had a surge of applications and we are
 3   going through those applications, so that number that
 4   you're seeing, there is dollars that far exceeds the
 5   allocated budget that we're working on right now.
 6   Jackie.
 7       JACKIE MALLON:  Yes, $39 million is allocated for
 8   the grant program.  $10 million for the loan program,
 9   which we're also using private capital in the loan
10   program which is how we get $20 million-ish in loans
11   awarded.  And to date, it's about $19 million in the
12   grant that's been approved and $10 million, so it's
13   not $39 million so far, it's $29 million actually in
14   the loan, Council Member.
15       CHAIRPERSON GJONAJ:  So, how much has been
16   allocated already, $29 million or?
17       JACKIE MALLON:  No, no, awarded, so like, on it's
18   way to the customers is $19 million in the grant
19   program.  $10 million in the loans, that's $29
20   million out of the $49 million that's in the funding.
21       CHAIRPERSON GJONAJ:  Well, thank you Deputy
22   Commissioner but what's the hold up?  I mean, this
23   dollar amount is so small to begin with but only $29
24   million is out the door, that would mean we have
25   another $20 million that we could be allocating to
```

A-2151

```
 1        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS        60
 2   these small businesses that are in dire straits.  So,

 3   I'm not sure who can answer that question.

 4      GREG BISHOP:  So, I started by saying that you

 5   know, we moved very quickly and you know part of the

 6   and when we talk about out the door, we're talking

 7   about there's a financial process right.  So, once we

 8   make the approval, the money needs to move from

 9   different bank accounts and as I talked about,

10   depending on your account, some of these transactions

11   and depending on the dollar value, some of these

12   transactions do take a certain amount of time.

13      We also have for the loan, it is an underwriting

14   process and the underwriting process, our third-

15   party, we are not underwriting the loans, a third

16   party is underwriting the loans.  They have put all

17   the resources that they need to.  They process

18   roughly about 40 applications per day and they are

19   moving as quickly as possible.

20      So, we expect to have all of the dollars

21   disbursed for the grant program within the next week

22   and then of course shortly after for the loan

23   program.  But in the meantime, we're still continuing

24   to help our businesses connect with our federal

25   programs because we know this is just a stop gap, the
```

A-2152

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS        61
 2   city program was just a stop gap.  The federal
 3   programs are the programs that our small businesses
 4   need and we continue to advocate for changes for
 5   those federal programs to make sure that they match
 6   the needs of our New York City small businesses.
 7      CHAIRPERSON GJONAJ:  Thank you Commissioner.  I'm
 8   just going to reiterate that you need to get this
 9   money out the door sooner than later and the total
10   dollar amount of $49 million which equates to roughly
11   $204, how many loans and grants were made and what
12   was the total that was requested?
13      So, maybe I can ask this in a different form.
14   One, what was the dollar amount of the total loans
15   and grants that came in in the form of requests and
16   the total dollar amount?  Do you have that answer?
17      GREG BISHOP:  Yeah, so I think, we had over 8,000
18   applications for our loan program, and if you look at
19   how we are doing with the average size loan of like
20   $60,000.  That's about $1.5 to $2 billion in terms of
21   need.  That doesn't mean everyone will get you know,
22   everyone has that average but again, it highlights
23   the fact that you know, the need far outweighs our
24   ability to help on a local level which is why we were
25   so excited when the federal government came as
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS         62
 2   quickly as they did.  Because as you know, in the
 3   past, after Hurricane Sandy, the federal government
 4   took some time to bring in the additional resources
 5   that we needed.
 6      So, in terms of our ability to stand up this
 7   program, we knew that it was going to be a program
 8   that would just be a stop gap until the federal
 9   government brought in their programs.
10      In terms of numbers, we do have that information.
11   So, in terms of the rent, Jackie, do you have that
12   readily available?
13      JACKIE MALLON:  Sure, sure, we've received 8,800
14   grant applications and we have awarded 26— a little
15   over 2,600 to date which equate to that nearly $20
16   million that we're talking about.
17      CHAIRPERSON GJONAJ:  So, less than a quarter of
18   the applicants have received any funding?
19      JACKIE MALLON:  The approval rate is about 61
20   percent.  Some people that apply are actually not
21   eligible.  The larger businesses or whatever, a
22   number of different reasons.
23      GREG BISHOP:  Like, we saw some, the grant
24   program was specifically for small businesses.  We
25   wanted to make sure that we had you know, our very
```

A-2154

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS       63
 2   microbusinesses.  So, only businesses that have four
 3   or fewer employees were eligible for this program.
 4   But we had a number of applicants that had more than
 5   four employees.  So, what we have done is for those
 6   that were not eligible we've connected them to the
 7   paycheck protection program, meaning we've provided
 8   technical support to help them with the application
 9   process either through their lender or through a
10   lender that's accepting new applications.
11        CHAIRPERSON GJONAJ:  Thank you Commissioner.
12   Again, this is only a fraction of the need that's out
13   there and the total dollar amount of $49 million is
14   less than crumbs when it comes to the needs of our
15   small businesses.  And I broke down the number, the
16   total dollar amount versus business that we have in
17   New York City and that equates to about $245 per
18   business.  How small businesses contribute billions
19   of dollars a year to the city's budget, billions and
20   in their most time of need and crisis, all this
21   Administration could give back to them is a total of
22   $49 million.  And in my opening statement, I outlined
23   that we spend more or this Administration spends more
24   on parades.  They spent more on printing then they
25   gave out in a form of grants.
```

A-2155

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS          64

1

2      The message is clear from this Administration and

3 although you're going to say there is a stop gap

4 measure that was only temporary, the Mayor has gone

5 on the record quite a few times to say, that the

6 money is not coming in quick enough from Washington

7 to aid our small businesses.  It's time for our

8 Mayor, this Administration to start focusing on this

9 city with the resources that we have.  No matter how

10 limited they are, $49 million doesn't even come close

11 to showing the relevance and the sincerity that is

12 needed to our small businesses.  This is their dreams

13 that have been destroyed.  They see a dim future and

14 this City and Administration has failed to be there

15 for them in this time of crisis.

16      I don't want to take more time on this issue

17 because we have so many that are going to testify on

18 the other issues on the bills that we have.  I'm

19 going to open this up to Chair Cohen if he has any

20 questions for the Administration on the loans and

21 grants and as the Commissioner of Business of

22 Consumer Affairs.

23      CO-CHAIR COHEN:  Thank you Mark.  I will be

24 brief; I'm going to let the bill sponsors I think

25 focus on their bills.  So, I'm just going to say,

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        65
```

2   it's good to see you Commissioner Salas and

3   Commissioner Bishop.

4      GREG BISHOP:  Good to see you.

5      CO-CHAIR COHEN:  And you know, I appreciate the

6   collaboration.  Consumer Affairs, we've had regular

7   briefings together and I appreciate the transparency

8   and us being able to work together.  The one in your

9   testimony, you don't object to 1916.  I understand

10  that the agency is taking action on their own but you

11  don't have any objection to it do you?

12     LORELEI SALAS:  The question is addressed to me

13  right, Chair Cohen?

14     CO-CHAIR COHEN:  Yes, yes.

15     LORELEI SALAS:  Yes, so I think that what I did

16  testify to is that the bill implicates you know, many

17  more agencies than the Department of Consumer Worker

18  Protection, right.  And so, it is a logical

19  conversation for the Law Department to really

20  understand how this would effect the other agencies.

21  I would say one thing, that operationally, we had

22  timed our license expiration dates and renewal

23  expiration dates so that there would be staggered

24  deadlines, right.

25

A-2157

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        66
```

2      As you can imagine, operationally it could be a

3   challenge to not only have to process 70,000 licenses

4   at once, which could just add to waiting times for

5   license applicants or renewal applicants.

6      CO-CHAIR COHEN:  But as related specifically to a

7   sidewalk café, you don't have any objection to that

8   legislation?

9      LORELEI SALAS:  Oh, I'm sorry.  So, with respect

10  to the consent fees, waiver for the year generate

11  through December 2020.  So, as you know, we work

12  collaboratively to arrive at a waiver of the consent

13  fees for the March installing period.  These consent

14  fees are part of contractual agreements entered into

15  with the city, right.  The agency doesn't have its

16  own discretion to act without involving other

17  stakeholders that are you know, part of or involved

18  in these contracts, right.

19     And I would just say also that obviously this

20  would have an impact on revenue streams, so it's

21  something to just take into consideration.

22     CO-CHAIR COHEN:  Can you tell us what the status

23  is?  Have you refunded everybody who has paid so far

24  or are you still processing?  What percentage of the

25

```
           COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                 INTERNATIONAL INTERGROUP RELATIONS        67
 2   sidewalk café license holders didn't pay?  Can you
 3   just give us a little run down on that?
 4      LORELEI SALAS:  I can tell you that we are still
 5   processing the refunds, right.  We're in the middle
 6   of that.  Our finance division will be sending out
 7   checks to those who had already sent their consent
 8   fees within the next two to three weeks.
 9      As to the percentage, I'm not so clear on that
10   and I'm not sure Steve or Mike have access to that
11   information but if we don't have it right now, I'd be
12   happy to send it to you once we get it from the
13   office.
14      STEVEN EDINONY:  So, Chair Cohen, I appreciate
15   the question.  I think for us, it's a multistep
16   process.  The first of which involves our licensing
17   team identifying those records that need refunds and
18   then once we have that in order, working to have the
19   checks distributed.
20      So, I think our internal analysis is that over
21   the next two to three weeks we will have that
22   completed.
23      CO-CHAIR COHEN:  Did everybody who is entitled to
24   refund will have gotten it in three weeks or less?
25
```

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS         68

 2       STEVEN EDINONY:  That's, right now our analysis

 3    is that that will be the case, yes.  We're happy to

 4    continue to update you if that timeline changes but

 5    that is what we believe.

 6       CO-CHAIR COHEN:  I appreciate that and again, do

 7    you have any idea of the percentage of people who,

 8    licenses actually paid?

 9       LORELEI SALAS:  I don't have that right now.  I

10    think that when we take some of the estimates we were

11    talking about, about $300,000 in total fees paid, but

12    I don't know what that represents.  So, we'll have to

13    come back to you with an answer on that.

14       CO-CHAIR COHEN:  That sounds like a relatively

15    small percentage, that's great.  Chair Gjonaj, like I

16    said, I'm going to come back.  I think I'll let our

17    colleagues, the bill sponsors ask questions and then

18    I can come back if I have more.

19       STEPHANIE JONES:  Okay, Chair, did you want to

20    ask any more questions or you want me to call on the

21    Council Members?

22       CHAIRPERSON GJONAJ:  No, thank you Stephanie.

23    Thank you, Chair Cohen.  We have a slew of questions

24    that our colleagues can ask.

25
```

A-2160

1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
          INTERNATIONAL INTERGROUP RELATIONS        69

2    STEPHANIE JONES:  Okay, thank you.  Okay, so I

3    will now call on Council Members in the order they

4    have used the Zoom raise hand function.  If you would

5    like to ask a question and you have not yet used that

6    function, please raise it now.  Council Members,

7    please keep your questions to five minutes.

8        The Sergeant at Arms will keep a timer and we'll

9    let you know when the time is up.  You should begin

10   once I have called on you.  Okay, so first, we'll

11   hear from Council Member Rivera followed by Council

12   Member Lander.  Council Member Rivera?

13   MODERATOR:  Time.

14   COUNCIL MEMBER RIVERA:  Thank you so much.  Thank

15   you to the Commissioners, all of you and everyone

16   here.  I just wanted to follow up on a couple of

17   numbers that were kind of discussed.  I guess the

18   first one is, you have some numbers here for the SBS

19   the Business Continuity Loan Fund, Commissioner

20   Bishop and the Employee Retention Grant Program.  You

21   have 8,000 loans, I think you said, 170 have been

22   approved.  How many people actually qualified?  And

23   I'm asking because I heard from some of my

24   constituents that they were turned down, so I'm

25   trying to understand versus how many apply, how many

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        70

2   qualified and then of course the number you included

3   in your testimony which is 170 loans.

4       GREG BISHOP:  Right, so far.  So, we had 8,000

5   applications which represents the demand for a

6   program that, that far weighed the funding for the

7   loan program.  So, it's a two step process.  So, we

8   go through the approval process to make sure that

9   they have all of their documentation etc., and then

10  we send it over to the lender to actually make the

11  loan.  That's the underwriting process and so, the

12  loan is a traditional loan.  So —

13      COUNCIL MEMBER RIVERA:  I'm so sorry, I just

14  don't have a lot of time and I just wonder, do you

15  have the number of how many people qualified or not

16  really?

17      GREG BISHOP:  Yes, yes, we do.  Jackie do you

18  have the —

19      JACKIE MALLON:  So far 174.

20      COUNCIL MEMBER RIVERA:  174 out of 8,000?

21      JACKIE MALLON:  By the lender, that's what you're

22  asking right?  Yeah.

23      COUNCIL MEMBER RIVERA:  Okay, I just want to move

24  on.  How many small business owners have contacted

25  you about inability to pay rent and since the city's
```

A-2162

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        71
 2   applications are closed, where are you referring them
 3   to?
 4     GREG BISHOP:  So, we can get back to you on the
 5   terms of the number of businesses that we referred to
 6   our legal services.  But Council Member, I was going
 7   to tell you, so [INAUDIBLE 1:16:36] for example can
 8   use our commercial lease assistance to get a free
 9   attorney.  We've been partnering with other law firms
10   who are providing pro bono legal services to help our
11   businesses negotiate with their landlords.
12     COUNCIL MEMBER RIVERA:  Okay.  So, you are
13   referring them where?  Sorry.
14     GREG BISHOP:  To attorney's.  So, right now, if
15   anyone needs assistance with their landlords, we have
16   the commercial lease assistance program, so we are
17   referring them to pro bono legal attorney's.  We'll
18   help them review their lease, help them negotiate
19   with their landlord.  It's helpful to have an
20   attorney during this time, to have that conversation
21   with the landlord.
22     But we're also advising small landlords because a
23   number of the mortgage companies are issuing
24   forbearance.  So, if a small landlord has a mortgage,
25   they too can call their mortgage companies, most
```

A-2163

COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1        INTERNATIONAL INTERGROUP RELATIONS        72

2   banks have allowed a 90-day for forbearance, which

3   that information could actually, that relief can be

4   passed onto the small business owner.

5        COUNCIL MEMBER RIVERA:  Okay, have you heard from

6   business owners regarding personal liability concerns

7   either prior to or during COVID-19, and if so, how

8   would you assist them?

9        GREG BISHOP:  We have not, but again, we would

10  connect them to our attorney network.  That is one of

11  the services that we provide in general for legal

12  assistance, especially around contracts and leases.

13  So, that would be if someone contacted us and they

14  can do so either through 311 or nyc.gov/covid19biz we

15  can connect them to an attorney at no cost.

16       COUNCIL MEMBER RIVERA:  What is your position on

17  our bill Intro. 1932?

18       GREG BISHOP:  So, Intro. 1932, we are, sorry, so

19  1932 is the COVID related, I'm sorry.

20       COUNCIL MEMBER RIVERA:  Yeah, it's on personal

21  liability.

22       GREG BISHOP:  Yeah, so I think we you know, would

23  love to talk to you some more about that.  The Law

24  Department would love to look at some additional

25  details, but in general, anything that we can do to

A-2164

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1              INTERNATIONAL INTERGROUP RELATIONS        73
2   provide some relief to small business is things that
3   we would take a look at.
4      COUNCIL MEMBER RIVERA:  So, you don't have a
5   position at this time but your game to engage in
6   conversation and figure something out?
7      GREG BISHOP:  Absolutely.  There's some legal
8   questions around that, so we want to make sure we do
9   it right in terms of the concept, but the Law
10  Department would love to take some time to review.
11     COUNCIL MEMBER RIVERA:  Okay, and then I just
12  want, in the wake of the city shutting down its loan
13  and grant programs, do you think the city still has
14  a role to financially support businesses,
15  particularly those owned by or employing undocumented
16  New Yorkers and thus cannot apply for federal
17  programs?
18     GREG BISHOP:  So, and I've mentioned this and I
19  mentioned this in my testimony.
20     MODERATOR:  Time expired.
21     GREG BISHOP:  The private sector, we need to work
22  with the private sector but we've done it in the past
23  to help create a philanthropic pathway to get dollars
24  in the private sector that doesn't have the
25  restrictions of either federal dollars or city
```

A-2165

1    COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
             INTERNATIONAL INTERGROUP RELATIONS        74

2    dollars to be able to help on those vulnerable, which

3    is our undocumented entrepreneurs.  And that is

4    something that we are very much interested in

5    pursuing and we're working with you on how we can do

6    that officially.

7        COUNCIL MEMBER RIVERA:  Thank you.  I have a

8    couple more questions but thank you for the time, Mr.

9    Chair.

10       STEPHANIE JONES:  Thank you Council Member.

11   Next, we'll hear from Council Member Lander followed

12   by Council Member Powers.  Council Member Lander?

13       MODERATOR:  Clock.

14       COUNCIL MEMBER LANDER:  Thanks very much.  I'm

15   going to follow up in the later part of my time on

16   Council Member Rivera's question but I guess I just

17   want to start from like, what we can do on the PPE.

18   Because I spent a bunch of yesterday in advance to

19   this hearing talking to the small business, a bunch

20   of small business owners in my district and not a one

21   has either gotten, but in one case a person got but

22   just can't use the PPP because of the eight week

23   restriction.

24       So, they have zero federal relief, nothing.  They

25   are closed, they got no revenue.  Their employees are

A-2166

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
  1                 INTERNATIONAL INTERGROUP RELATIONS          75
  2   getting unemployment insurance, but they have
  3   absolutely nothing to cover rent and their own debt
  4   and their supplier leases, nothing.  And so, they're
  5   terrified they are not going to be able to make their
  6   rent payments.  They can't keep leasing the machines
  7   from their suppliers and so, unless we can make the
  8   PPP work and to me, the eight week issue seems like
  9   the one that is most, like, that doesn't even cost
 10   the federal government anything to let people have
 11   until the end of the year to rehire and use 75
 12   percent of the money for payroll and all of these
 13   other things are important.  And I'm signing on to
 14   all of these bills and I support them all and I thank
 15   their sponsors.  But if we can't get federal dollars
 16   to cover the loss of revenue, I just don't see what
 17   else is going to work to keep there being just mass
 18   business shutdowns of perfectly viable businesses.
 19       So, do you share that analysis and if so, what
 20   are going to do to change that?
 21       GREG BISHOP:  Absolutely.  So, there's actually
 22   four things.  Three things related to PPP and one
 23   I'll jump in really quickly because I see the time is
 24   ticking.  But you are absolutely right and I've been
 25   working with the New York Federal Delegation.  They
```

A-2167

```
     COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS        76
 2   share the same concerns that you have and they are
 3   advocating and they are working right now negotiating
 4   in the next stimulus package.  There needs to be a
 5   change in terms of the timing.
 6       Remember when the PPP was launched, no one knew
 7   how long this pandemic that sort of paused, would
 8   occur.  And I think you know, this hurts cities that
 9   have paused business operations.  So, we need to push
10   as delegation and they have been doing it to change
11   that time.  We need to change the percentage.  Only
12   25 percent of the PPP can be used for every other
13   expense and you hit the nail on the head, for New
14   York City business, we think based on the ratio, they
15   can borrow two and a half time at payroll.  It should
16   be a lower percentage that is required for payroll
17   and then they could use the rest for rent.
18       And then three, to make sure, ensure and
19   absolutely ensure that our smallest, most vulnerable
20   businesses have access.  We are also asking for
21   another tweak.  We got the tweak in the second round
22   where banks, small community banks and CDFI's had a
23   $60 billion allocation.  We are now going to advocate
24   that only CDFI's have an allocation that they could
25   work with and they can operate in.  Technical
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1                INTERNATIONAL INTERGROUP RELATIONS        77
2  assistance is so important and it take about a week
3  or two to get a small business in terms of the
4  technical assistance to apply.
5      And the last thing that I would say that we have
6  not talked about is our insurance industry.  Our
7  insurance industry is sitting on about $800 billion
8  of reserves.  They have hid behind the cloak of, you
9  know this is not a covered pandemic, but I say that
10 we should allow the congress to come up with a path.
11 Not necessarily bankrupt the industry but have some
12 type of percentage or allocation, so that way the
13 businesses that have business interruption insurance,
14 these are businesses that have been around for 20, 30
15 years that have paid their premiums every month and
16 now in the most needed time, insurance companies are
17 hiding behind the veil.
18     COUNCIL MEMBER LANDER:  It's even worse than
19 that, one of the businesses I talked to yesterday,
20 talked about the fact that they are still getting
21 their insurance bill.  So, like, not only are they
22 not getting their insurance, the are being expected
23 to continue to pay their insurance.  It's really
24 outrageous.  So, I just, you know, to me, it's like,
25 I'm open to other things that could matter at scale
```

```
                COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                   INTERNATIONAL INTERGROUP RELATIONS         78
 2    but if we don't change PPP so it could work for our
 3    small businesses, I just, I don't know what, all
 4    these things we're talking about are good but I don't
 5    think they are going to be enough to save a lot of
 6    them.
 7        I'm a little less worried about the percentages
 8    just because of people reopen and then they have
 9    revenue coming in, then they could use the PPP to pay
10    the wages of their workers and use the revenue that's
11    coming in to pay back the back rent.  But I hear you,
12    to me, it's really that —
13        GREG BISHOP:  And —
14        COUNCIL MEMBER LANDER:  Let me, just because my
15    time is running out.  I just do want to underline
16    what Council Member Rivera just spoke about because
17    I'm going to work hard and pray that we pass all
18    these bills, we get PPP fixed and at least like a lot
19    of our small businesses can benefit from that.
20    That's a big, big leap of faith but no one is coming
21    to help our immigrant entrepreneurs, our street
22    vendors, like a whole set of people that there's no
23    way they're going to be eligible for PPP.
24        So, we got to build a program at the city level
25    and that might need public debt.  You know, it might
```

```
       COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS         79
 2  need other but I don't think we can like hope someone
 3  else will ride to the rescue for those benefits.  No
 4  one else is going to come to their rescue.
 5      MODERATOR:  Time expired.
 6      COUNCIL MEMBER LANDER:  And I just would really
 7  reinforce what Council Member Rivera said about our
 8  need to stand up a program that does that.
 9      GREG BISHOP:  And we agree and we've worked with
10  the private sector before and we will look forward to
11  working with the private sector to address this
12  particular population.  So, thank you very much and
13  I'm happy to work with you and Council Member Rivera
14  to make sure that we get it right.
15      COUNCIL MEMBER LANDER:  Thank you.
16      STEPHANIE JONES:  Thank you.  Chair Cohen?
17      CO-CHAIR COHEN:  I just want to pipe up for one
18  second.  You know to be respectful of the clock, but
19  you don't have to be slavish to it.  I thought
20  Council Member Rivera might have gotten cut off.  So,
21  I'm just asking people to be respectful of the clock,
22  that's all.  Thank you.
23      STEPHANIE JONES:  Thank you Chair.  Next, we'll
24  hear from Council Member Powers, followed by Council
25  Member Yeger.  Council Member Powers?
```

A-2171

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1            INTERNATIONAL INTERGROUP RELATIONS       80

 2      COUNCIL MEMBER POWERS:  Thank you and thank you

 3   to the Chair's for allowing us the time here and to

 4   get into questions.  I had a couple of questions,

 5   one, I just have to echo on what Council Member

 6   Lander said, which is that those programs that are

 7   put in place while are really still great programs

 8   that are helping businesses still need so much more

 9   changes to be able to make them actually executable

10   at the city level.  But I know we all agree on that,

11   so I'm going to go to questions.

12      But first I want to add this, for the City

13   programs that were put in place, understandably there

14   was a misunderstanding of how their might be a lack

15   of clarity of how long this would last and so

16   resources were limited but can you give us any data

17   on the types of businesses.  Like, in terms of the

18   loans that went out and the grants that went out.  Do

19   you have a breakdown of what types of businesses

20   receive those?  Meaning what sector or what area

21   receive those grants and loans?

22      GREG BISHOP:  Yeah, so they vary.  So far, a loan

23   program you know, the top recipients of the loans

24   were accommodation in food services, so restaurants

25   etc., and then followed by what we describe in the
```

```
           COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1              INTERNATIONAL INTERGROUP RELATIONS          81
 2   mixed codes as professional scientific and technical
 3   services but that's like your architects,
 4   architectural firm, traffic designers and then
 5   followed by beauty salons, dry cleaners etc. and they
 6   have retail.  Then it goes down all the way to you
 7   know wholesale trade, healthcare, transportation and
 8   manufacturing.
 9      For our grant program, it skewed a little bit
10   differently simply because of the size standard that
11   we applied.  So, you saw a lot of professional and
12   technical services again, architectural firms and
13   retail, then hair salons, barber shops, nail salons.
14   Then you had your healthcare and then you had arts
15   and entertainment.  Then you had accommodations, so
16   food, restaurants, coffee shops.  So, it's a
17   widespread and I think you know one of the reasons
18   why we wanted to limit the employee count was to make
19   sure that we limited to our very micro businesses.
20   But again, first come first serve for as you said
21   with the federal program, it doesn't really help with
22   our small businesses, which is why the things that I
23   mentioned with Council Member Lander in terms of the
24   fixes for the PPP, I think will address the fact that
25
```

A-2173

```
              COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1                INTERNATIONAL INTERGROUP RELATIONS        82
 2    our small businesses got left out of the first round
 3    of the PPP.
 4        COUNCIL MEMBER POWERS:  Okay, and if you have any
 5    info you can send to us on that breakdown, it would
 6    be helpful just for us to have an understanding of
 7    it.
 8        GREG BISHOP:  Yeah, we can.
 9        COUNCIL MEMBER POWERS:  On the number of bills
10    that are related to — and this is for SBS or others,
11    so bills that related to commercial tenants and
12    harassment liability, evictions and things like that.
13    Do you have any data related to, one of the concerns
14    is obviously, I've talked to the owners who are
15    holding on to their lives and they are fearful of
16    having to put all their savings into it and
17    conversely I've heard from folks who are you know, we
18    are relying on in terms of tax revenue here in the
19    city.  About their concerns with what impact it may
20    be to the city on property tax and their ability to
21    pay.  Do you have any data on commercial rent
22    payments for the month of March or April at this
23    point?  Basically, in the coronavirus, is there any
24    data available to us about how many, like sort of
25    percent, like, who is paying and how many commercial
```

A-2174

```
         COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1             INTERNATIONAL INTERGROUP RELATIONS        83
 2  rent tenants are not able to pay the rent at this
 3  point?
 4     GREG BISHOP:  No, we do not have that information
 5  currently.  I know the Brooklyn Chamber did a quick
 6  survey of their members of businesses in Brooklyn and
 7  there seems to be about I think 30 percent were not
 8  able to pay the rent and only about half of them have
 9  been able to work with their landlords.  But what we
10  have, in everything that we have done, we've sent out
11  guidance to so many different businesses.  We've told
12  businesses to be proactive, contact their landlord
13  and use our legal services to have that conversation.
14     So, we can provide you information about how many
15  referrals we've made to our legal services, so you
16  can get an understanding of how many businesses —
17     COUNCIL MEMBER POWERS:  Yeah, well my point here
18  is like I talked to a restaurant owner last night who
19  was wonderful and was talking about his you know, his
20  difficulty right now some concerns of course on
21  liability and being able to pay.  I've heard
22  anecdotally some commercial landlords saying they
23  have collected in the 80, 90 percentile and others
24  are collecting in the 50, maybe even a lower point a
25  concern that legislation would impact that and then
```

```
            COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1               INTERNATIONAL INTERGROUP RELATIONS        84
 2   we would be having an inability to collect on
 3   property taxes for a number of these folks.  So, I am
 4   trying to monitor what impact people to the city's
 5   revenue and also to those owners as well.  And some
 6   are trying to do the right thing by their tenants.
 7   I've heard some that have not even been communicated
 8   or have not had positive communication from their
 9   landlord.
10       I just want to ask one more question since there
11   is so many topics on this.  On the topic of
12   surcharges on restaurants and deliveries and apps and
13   things like that.  I did not hear, I have to admit, I
14   did not hear the exact position of the Administration
15   on those bills but I did want to ask a question of
16   whether they thought those had apply during this
17   period.  Whether there should be a surcharge put on
18   at the moment where restaurants are closed and only
19   open for takeout or were in support of or had
20   thoughts on that beyond that period of time.
21   Meaning, this particular point and time seems unique
22   to the restaurant and hospitality industry relative
23   to the non-coronavirus period of time and whether
24   there was a distinction drawn between those two areas
25   when it comes to those bills.
```

A-2176

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        85

 2      GREG BISHOP:  And so, we and you know, we work

 3   closely with the Hospitality Alliance, Ed Drew[SP?],

 4   I saw him in this hearing.  You know the rest of the

 5   industry has already thin margins and so, we're very

 6   supportive of any efforts to limit their expenses.

 7   Especially during this emergency period.

 8      So, we are supportive of that.  I think it

 9   requires a broader conversation after this period but

10   certainly we want to be supportive of anything that

11   can help reduce the cost of our restaurants.

12   Primarily because our restaurants right now, they are

13   operating on just take out.  So, in some cases that

14   might not be enough revenue for them to actually

15   operate but some of them are just operating just to

16   be a resource to the community, so we are very

17   supportive of that.

18      COUNCIL MEMBER POWERS:  Thank you and I think

19   I'll end there.  Thanks, Chair.

20      STEPHANIE JONES:  Thanks Council Member.  Next,

21   we'll hear from Council Member Yeger followed by

22   Council Member Koslowitz.  Council Member Yeger?

23      COUNCIL MEMBER YEGER:  Thank you Mr. Chairman.

24   Thank you very much Mr. Chairman.  Commissioner, it's

25   good to see you again and I'm going to be easy
```

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1          INTERNATIONAL INTERGROUP RELATIONS          86
 2   because I'm not asking any questions.  I'm simply
 3   going to make a few statements and you can sit back
 4   and relax.
 5      I appreciate the work that SBS is doing for small
 6   businesses.  I do think that the city can do more,
 7   not necessarily from within your department but I'm
 8   going to use my free time at the microphone today to
 9   make a few points that I've been making over the last
10   days.
11      The city is continuing its standard process of
12   issuing summonses for example to sanitation. So, that
13   hasn't really laid off, sanitation employees are
14   going around writing summonses on businesses, on
15   homeowners.  The city is still doing what it can to
16   suck the life out of New Yorkers and get the cash and
17   I get that because we are facing tough times but I
18   also think that the city can and should do more.
19      For example, last real property tax payments were
20   done on April 1st, so that's going to be July 1st.
21   There are people who have not been able to make the
22   April 1st payment.  They may not be able to make the
23   July 1st and a lot of that particularly when it comes
24   to real property owners that are one and two family
25   owners, relies on rental income.  The city has an
```

A-2178

```
   COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
1          INTERNATIONAL INTERGROUP RELATIONS        87
2  obligation to help tenants of small businesses to
3  alleviate their rental burden but at the same time,
4  it can't be one direction.  The city must use the
5  resources that it has to alleviate the burdens on
6  those that have to pay the bills, the landlords who
7  have to give the money to the city.
8      If tenants can't pay rent and landlords can't pay
9  property taxes, the city gets hurt but if the city
10 can figure out a way to alleviate that burden a
11 little bit on landlords and one easy way to do it
12 right now is to give them a little breathing room.
13 For the city to tell them look, you may not have been
14 able to make your April 1st payment, the grace period
15 was 14 days ago, interest is accumulating, we are
16 waiving that.
17     Right now, the Mayor and the City Council can
18 make that announcement, well not me, but the Mayor
19 and the Council can make that announcement that
20 interest payments for interest debt being accrued on
21 payments that were due on April 1st will be waived.
22 Interest payments due on payments that cannot be made
23 by July 1st will be waived and a commitment to New
24 Yorkers that real property taxes will not go up this
25 year when we adopt the budget.  Not that the rate
```

A-2179

```
        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
 1           INTERNATIONAL INTERGROUP RELATIONS        88
 2   won't change because that's always the trick we play
 3   with New Yorkers.  We don't change the rate, but
 4   everybody gets a higher bill.  That the property tax
 5   itself will stay, whether that means grieving effect
 6   evaluations are rolling them back down, we have to do
 7   something to release the pressure on those pipes,
 8   otherwise they are going to burst.
 9       The focus on the private sector for relief and
10   the unwillingness of the city to do its part is
11   wrong.  And I think that the city and the Council,
12   the Administration and the Council can make those
13   commitments.  And the reality is, that tenants who
14   can't pay rent today and tenants who can't pay rent
15   on May 1st, may never, ever be able to recover the
16   loss of revenue to come current.  And we need to do
17   things that will fix that.  Which brings me to
18   Introduction 1932.
19       I spoke yesterday about another introduction and
20   seems I'm going to repeat myself in some regard.
21   It's important for us to come up with ways to help
22   tenants, it's necessary.  It's also important for us
23   to do it legally and for us to do it
24   constitutionally.
25
```

A-2180

```
 1        COMMITTEE ON CULTURAL AFFAIRS, LIBRARIES AND
              INTERNATIONAL INTERGROUP RELATIONS        89
 2        Intro. 1932 and I think and without speaking for

 3   the cooperation Council, I think one of the reasons

 4   that the city is not ready to [INAUDIBLE 1:36:24] on

 5   it, is because the city doesn't want to come before

 6   the Council and say this bill as it is written is

 7   unconstitutional.  Except it is.  The violation of

 8   Article 1 Section 10 is constitutional.  The city

 9   cannot retroactively adjust, amend a contract that

10   was entered into by two parties at arm's length.  You

11   can't do it, illegal.  We can think we can do it

12   because we always think we can do things that are

13   illegal and unconstitutional but its not lawful for

14   us to do it.  Emergency or not, and this is the real

15   epitome of an emergency.  There has been no emergency

16   like this, not just in the last 50 year but probably

17   in the last 100 years since the stock market crash of

18   the early 19— nearly 20th century, but we have an

19   obligation to actually be honest with New Yorker.

20   This feels unconstitutional.  We don't have a legal

21   authority to go backwards into a contract that was

22   entered into five, six, seven, three years ago, one

23   year ago, 16 months ago and amended retroactively to

24   remove a provision.  I want to make one more point

25   Mr. Chair.  I know my time is about to wrap up and
```