## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 20-4238                                    Caption [use short title]

**Motion for:** Extension of Time to Petition for Panel

Rehearing or Rehearing En Banc

_____

Set forth below precise, complete statement of relief sought:

Seeking an extension of time until December 10, 2021          **Melendez v. City of New York**

to petition for panel rehearing or rehearing en banc

_____

_____

_____

_____

**MOVING PARTY:** City of New York                **OPPOSING PARTY:** Plaintiffs-Appellants

☐ Plaintiff          ☑ Defendant

☐ Appellant/Petitioner   ☑ Appellee/Respondent

**MOVING ATTORNEY:** Jamison Davies          **OPPOSING ATTORNEY:** Claude Szyfer

[name of attorney, with firm, address, phone number and e-mail]

New York City Law Department                Stroock & Stroock & Lavan LLP

100 Church St., New York NY 10007            180 Maiden Lane, New York, NY 10038

212-356-2490 | jdavies@law.nyc.gov          212-806-5934 | cszyfer@stroock.com

Court- Judge/ Agency appealed from: United States District Court, S.D.N.Y. (Abrams, U.S.D.J.)

**Please check appropriate boxes:**                    **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):          Has this request for relief been made below?          ☐ Yes ☐ No
☑ Yes  ☐ No (explain):_____          Has this relief been previously sought in this court?   ☐ Yes ☐ No
_____          Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:                    _____
☑ Unopposed ☐ Opposed ☐ Don't Know          _____
Does opposing counsel intend to file a response:          _____
☐ Yes  ☑ No  ☐ Don't Know                    _____

Is oral argument on motion requested?  ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☑ Yes ☐ No  If yes, enter date: Argument held on May 3, 2021

**Signature of Moving Attorney:**

/s/ Jamison Davies          **Date:** 11/3/2021          Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

# 20-4238

United States Court of Appeals
for the Second Circuit

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC
LLC, LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE
LLC, ELIAS BOCHNER, and 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

*against*

CITY OF NEW YORK, a municipal entity, BILL DE BLASIO, as
Mayor of the City of New York, LOUISE CARROLL,
Commissioner of New York City Department of Housing
Preservation & Development, and JONNEL DORIS,
Commissioner of New York City Department of Small
Business Services,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## DECLARATION IN SUPPORT OF UNOPPOSED MOTION FOR EXTENSION OF TIME TO PETITION FOR PANEL REHEARING OR REHEARING EN BANC

RICHARD DEARING
DEVIN SLACK
JAMISON DAVIES
  *Of Counsel*

November 3, 2021

GEORGIA M. PESTANA
*Corporation Counsel*
*of the City of New York*
Attorney for Appellees
100 Church Street
New York, NY 10007
212-356-2490 or -0817
jdavies@law.nyc.gov

JAMISON DAVIES, an attorney admitted to practice in the courts of this state, declares under 28 U.S.C. § 1746 and subject to the penalties of perjury that the following is true and correct.

1.    I am an attorney in the office of Georgia M. Pestana, Corporation Counsel for the City of New York, attorney for defendants-appellees the City of New York, Bill De Blasio, Louise Carroll, and Jonnel Doris.

2.    In its judgment entered October 28, 2021, this Court affirmed in part, reversed in part, and vacated in part a judgment of the United States District Court for the Southern District of New York (Abrams, J.). A copy of this Court's judgment is attached, along with a copy of the Court's opinion and the partial dissent this Court published on the same day.

3.    In the opinion, this Court unanimously held that plaintiffs' First and Fourteenth Amendment claims challenging the City's tenant anti-harassment laws were properly dismissed. The majority also held that plaintiffs stated a plausible claim that the City's law limiting enforcement of guaranty agreements signed by natural persons backing commercial leases violates the

U.S. Constitution's Contracts Clause. The dissenting judge disagreed, and would have held that the plaintiffs' claims should be dismissed as a matter of law because the law was a reasonable and appropriate measure to address the COVID-19 pandemic, that the City Council's judgment in that regard is owed substantial deference and, therefore, that the law passes constitutional muster.

4.     Under Federal Appellate Rules of Appellate Procedure 35(c) and 40(a)(1), any petition by the City for panel rehearing or rehearing en banc must be filed within 14 days of this Court's judgment—here, by November 11, 2021. Plaintiffs-appellants do not oppose the City's request for an extension of time to December 10, 2021.

5.     An extension is warranted for two reasons. First, an extension will allow sufficient time for this office to complete the process of analyzing the lengthy majority and dissenting opinions and determining whether to file a motion for panel rehearing or rehearing en banc. Making that determination in this case requires extensive coordination and consultation within this office

and with other affected entities, including the New York City Council. In the event the City elects to seek rehearing, additional time will be required to prepare the petition, which must undergo multiple layers of review before filing.

6. Second, the requested extension will not prejudice plaintiffs, who do not oppose the request.

WHEREFORE, the City's motion for an extension until December 10, 2021 to petition for panel rehearing or rehearing en banc should be granted.

Dated:  New York, NY
          November 3, 2021

                                /s/ Jamison Davies
                               JAMISON DAVIES
                               Assistant Corporation Counsel

                               100 Church Street
                               New York, NY 10007
                               212-356-2490
                               jdavies@law.nyc.gov

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of October, two thousand twenty-one.

Before:        José A. Cabranes,
                    Reena Raggi,
                    Susan L. Carney,
                        *Circuit Judges.*

---

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, 287 7th Avenue Realty LLC, | **JUDGMENT** <br><br> Docket No. 20-4238 |

                Plaintiffs - Appellants,

v.

City of New York, a municipal entity, Mayor Bill de Blasio, as Mayor of the City of New York, Commissioner Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, Commissioner Jonnel Doris, Commissioner of New York City Department of Small Business Services,

                Defendants - Appellees.

---

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED IN PART, insofar as it dismissed plaintiffs' First Amendment and Fourteenth Amendment challenges to the Harassment Amendments; REVERSED IN PART, insofar as it dismissed plaintiffs' Contracts Clause challenge to the Guaranty Law; VACATED IN PART, insofar as it denied plaintiffs' motion for preliminary injunctive and declaratory relief

without review; and the case is REMANDED for further proceedings consistent with this Court's opinion.

For the Court:
Catherine O'Hagan Wolfe,
 Clerk of Court

20-4238
*Melendez v. City of New York*

# In the
# United States Court of Appeals
# for the Second Circuit

—————

AUGUST TERM 2020

No. 20-4238-cv

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC,
LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,
ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellants,*

v.

CITY OF NEW YORK, a municipal entity, MAYOR BILL DE BLASIO, as
Mayor of the City of New York, COMMISSIONER LOUISE CARROLL,
Commissioner of New York City Department of Housing
Preservation & Development, COMMISSIONER JONNEL DORIS,
Commissioner of New York City Department of Small Business
Services,

*Defendants-Appellees.*

—————

On Appeal from the United States District Court
for the Southern District of New York

—————

ARGUED: MAY 3, 2021
DECIDED: OCTOBER 28, 2021

—————

Before: CABRANES, RAGGI, and CARNEY, *Circuit Judges.*

CERTIFIED COPY ISSUED ON 10/28/2021

———————————

Plaintiffs, New York City landlords, appeal from a November 30, 2020 judgment of the United States District Court for the Southern District of New York (Abrams, *J.*), dismissing their constitutional challenges, brought pursuant to 42 U.S.C. § 1983, to certain New York City laws enacted in response to the COVID-19 pandemic. *See* Fed. R. Civ. P. 12(b)(6). Plaintiffs allege that amendments to the City's Residential and Commercial Harassment Laws, *see* N.Y.C. Admin. Code §§ 22-901 *et seq.*, 27-2004 *et seq.*, which prohibit "threatening" tenants based on their COVID-19 status, violate the Free Speech and Due Process Clauses of the First and Fourteenth Amendments by restricting commercial speech in the ordinary collection of rents and failing to provide fair notice of what constitutes proscribed threatening conduct. *See* U.S. Const. amends. I & XIV. They further allege that N.Y.C. Admin. Code § 22-1005 ("Guaranty Law") violates the Contracts Clause by rendering unenforceable certain personal guaranties of commercial lease obligations. *See* U.S. Const. art. I, § 10 cl. 1. While we agree that plaintiffs fail to allege plausible First and Fourteenth Amendment claims as to the amendments to the Harassment Laws, we conclude that they do allege a plausible Contracts Clause challenge to the Guaranty Law. We, therefore, further conclude that plaintiffs' Contracts Clause claim should not have been dismissed nor should their motion for preliminary injunctive and declaratory relief have been denied without review.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

Judge Carney concurs in the result in part and dissents in part in a separate opinion.

2

———————

CLAUDE G. SZYFER, Stroock & Stroock & Lavan LLP, New York, New York, *for Plaintiffs-Appellants.*

JAMISON DAVIES, Assistant Corporation Counsel (Richard Dearing, Devin Slack, *on the brief*), *for* James E. Johnson, Corporation Counsel of the City of New York, New York, New York, *for Defendants-Appellees.*

Deborah E. Riegel, Rosenberg & Estis, P.C., New York, New York, *for amici curiae Rent Stabilization Association of N.Y.C., Inc. and Community Housing Improvement Program.*

Michael J. Harris, Jonathan A. Herstoff, Haug Partners LLP, New York, New York; Arthur Kats, Volunteers of Legal Service, New York, New York, *for amicus curiae Volunteers of Legal Service.*

LiJia Gong, Public Rights Project, Brooklyn, New York, *for amici curiae the Cities of Chicago, Santa Monica, and 17 Additional Local Governments.*

Joshua A. Matz, Raymond P. Tolentino, Molly Webster, Kaplan Hecker & Fink LLP, New York, New York, *for amici curiae Constitutional Law Scholars.*

———————

3

REENA RAGGI, *Circuit Judge*:

In response to the COVID-19 pandemic, governments at all levels—federal, state, and local—enacted laws to address health, safety, and economic concerns. Some of these laws have operated affirmatively, with the federal government in particular appropriating trillions of dollars to fund vaccine development and distribution, to enhance unemployment benefits, to stimulate the economy, etc. Other laws have operated negatively to proscribe communal conduct, to limit or excuse financial obligations, to preclude or limit certain legal remedies, etc. At issue in this appeal are certain laws falling into the second category and enacted by New York City ("City") in May 2020, at the height of the pandemic, specifically, (1) amendments to the City's existing Residential and Non-Residential (*i.e.*, "Commercial") Harassment Laws, *see* N.Y.C. Admin. Code §§ 22-901 *et seq.*, 27-2004 *et seq.* (together the "Harassment Amendments"), which prohibit "threatening" residential or commercial tenants based on their COVID-19 status; and (2) N.Y.C. Admin. Code § 22-1005 (the "Guaranty Law"), which renders permanently unenforceable personal liability guaranties of commercial lease obligations arising between March 7, 2020, and June 30, 2021.

In this action, filed in the United States District Court for the Southern District of New York (Ronnie Abrams, *J.*), plaintiffs, Marcia Melendez, Ling Yang, Elias Bochner, and the corporate landlords in which they own interests, sue the City and various named City officials under 42 U.S.C. § 1983 for a judgment declaring the challenged laws unconstitutional and for an injunction permanently

enjoining their enforcement. They allege that the Harassment Amendments violate the Free Speech and Due Process Clauses of the United States and New York State Constitutions by impermissibly restricting commercial speech in the ordinary collection of rents and by failing to provide fair notice of what constitutes threatening conduct. *See* U.S. Const. amends. I & XIV; N.Y. Const., art. I § 8. Plaintiffs further allege that the Guaranty Law violates the United States Constitution's Contracts Clause, which prohibits "State . . . Law[s] impairing the Obligation of Contracts," U.S. Const. art. I, § 10, cl. 1.[1] Plaintiffs now appeal from a judgment of the district court entered on November 30, 2020, (1) granting defendants' motion to dismiss plaintiffs' amended complaint in its entirety for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6); and (2) denying plaintiffs' motion for preliminary injunctive and declaratory relief without review. *See Melendez v. City of New York*, 503 F. Supp. 3d 13 (S.D.N.Y. 2020).

Upon *de novo* review of the challenged judgment, we conclude, as the district court did, that plaintiffs fail to allege plausible free speech and due process claims. As to their Contracts Clause challenge to the Guaranty Law, however, we conclude that the amended complaint, viewed most favorably to plaintiffs, does not permit a court to dismiss this claim pursuant to Rule 12(b)(6). Accordingly, we affirm the dismissal of plaintiffs' challenges to the Harassment Amendments, but we reverse the dismissal of their Contracts Clause

---

[1] The Supreme Court has variously referred to this constitutional proscription as the "Contract Clause," *see, e.g.*, *United States Tr. Co. v. New Jersey*, 431 U.S. 1, 14 (1977), and the "Contracts Clause," *see, e.g.*, *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). In this opinion, we employ the latter, most recent appellation, except when quoted text does otherwise.

challenge to the Guaranty Law, vacate the denial of preliminary injunctive and declaratory relief, and remand the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

In recounting the background to this case, we follow the standard applicable to judicial review of motions to dismiss, *i.e.*, we accept all factual allegations in the plaintiffs' amended complaint as true, and we consider that pleading, together with all documents appended thereto or incorporated by reference, as well as all matters of proper judicial notice and public record, in the light most favorable to plaintiffs. *See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Automated Salvage Transp., Inc. v. Wheelabrator Env't Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998).[2]

### I.  COVID-19 Pandemic

The challenged Harassment Amendments and Guaranty Law were enacted in response to the COVID-19 pandemic.  The severity of that pandemic is not disputed by the parties and, thus, requires little elaboration here.  It suffices to note that to date the United States has

---

[2] To the extent that facts of which we might otherwise take judicial notice are disputed, we decline to consider them.  *See* Fed. R. Evid. 201(b) (providing for judicial notice of facts outside record that are "not subject to reasonable dispute"); *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (cautioning that, on Rule 12(b)(6) motion, district should have taken judicial notice of report only to determine what statements it contained, not for truth of matters asserted therein); *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (observing that judicial notice of disputed fact should not ordinarily be taken as basis for dismissal of complaint on its face).

identified 45,468,434 cases of coronavirus infection, resulting in 736,048 deaths.[3]

It is also undisputed that New York State was hit early and hard by the pandemic. By the end of March 2020, the state had become the nation's pandemic epicenter, reporting approximately one third of infection cases nationwide, with New York City alone then accounting for one quarter of the country's virus-related deaths.[4]

In addition to causing a nationwide public health emergency, the pandemic fomented an economic crisis as government-mandated mitigation measures limited personal interactions and forced businesses to suspend or reduce operations. A few statistics make the point. In the spring of 2020, the United States experienced its sharpest economic contraction since World War II, with April 2020 unemployment numbers climbing to a record 14.4%.[5] In New York, between February and June 2020, the unemployment rate climbed

---

[3] *See Covid Data Tracker*, C.D.C. (last accessed Oct. 27, 2021), https://covid.cdc.gov/covid-data-tracker/?cdc_aa_refval=https%3a%2f%2fwww.cdc.gov%2fcoronavirus%2f2019-ncov%2fcases-updates%2fcases-in-us.html#global-counts-rates.

[4] *See* Aylin Woodward, *One chart shows how quickly New York City became the epicenter of the US's coronavirus outbreak*, Bus. Insider (Mar. 30, 2020, 3:59 PM), https://www.businessinsider.com/new-york-city-coronavirus-cases-over-time-chart-2020-3.

[5] *See* Rakesh Kochhar, *Unemployment rose higher in three months of COVID-19 than it did in two years of the Great Recession*, Pew Rsch. Ctr. (June 11, 2020), https://www.pewresearch.org/fact-tank/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-two-years-of-the-great-recession/.

higher still, to 20.3%, with over 1.4 million people filing for benefits.[6] To address the issues on this appeal, it is useful to summarize at the outset how government, at various levels, responded and/or contributed to the economic challenges of the COVID-19 pandemic.[7]

### A. The Federal Response

Between March 2020 and March 2021, Congress appropriated an unprecedented five *trillion* dollars to address various aspects of the pandemic emergency. On March 25, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), a $2.2 trillion stimulus package—the largest in American history— which, among other things, appropriated $293.5 billion for one-time cash payments (usually $1,200/person) to qualifying individuals; $268 billion to increase unemployment benefits; $150 billion to aid state and local governments; and $349 billion to fund the new Paycheck Protection Program ("PPP"), which provided potentially forgivable loans to small businesses for use meeting payroll and, to a lesser extent, rent and other operating costs. *See* Pub. L. No. 116-136,

---

[6] *Popular Annual Financial Report (PAFR),* N.Y.C. Comptroller (Nov. 30, 2020), https://comptroller.nyc.gov/reports/popular-annual-financial-reports/. Plaintiffs report that, as of the date of their amended complaint, New York State had "paid over $10 billion in unemployment benefits, approximately 400% more than the State paid" the prior year. App'x at 4296.

[7] While plaintiffs have, correctly, urged the court to consider their constitutional challenges in the context of the broader relief accorded by various actors during the pandemic, they have not provided this court with a comprehensive account of the COVID-19 relief available to New Yorkers during the pandemic. We endeavor ourselves to summarize key government action in this area.

§§ 601(a), 1102(a), 1107(a)(1), 2102(d), 2201(a), (f).[8]  The CARES Act also increased funding for existing Small Business Administration ("SBA") loan programs, including for Economic Injury Disaster Loan grants, and imposed a 120-day eviction moratorium for certain residential properties.  *See id.* §§ 1107(a)(6), 1110, 4024(a), (b).

At the end of 2020, Congress made another $900 billion in pandemic relief available through the Consolidated Appropriations Act, *see generally* Pub. L. No. 116-260, with $25 billion directed to an Emergency Rental Assistance Program ("ERA") for residential tenants, *see id.* § 501.  In doing so, Congress also extended by one month a residential eviction moratorium previously imposed by the Centers for Disease Control and Prevention ("CDC") and discussed in the next paragraph.  *See id.* § 502.  Three months later, on March 11, 2021, Congress appropriated another $1.9 trillion in relief through the American Rescue Plan.  *See* Pub. L. No. 117-2.  Of this amount, $21.55 billion was earmarked as additional ERA funding, *see id.* § 3201,[9] and $28.6 billion was directed to the new Restaurant Revitalization Fund to help small restaurant businesses meet payroll, mortgage, rent, and other operating expenses, *see id.* § 5003(b)(2)(A), (c)(5).

Meanwhile, federal agencies also pronounced economic policies in response to the pandemic.  Notably, in September 2020,

---

[8] *See also What's in the $2 Trillion Coronavirus Relief Package?*, Comm. for a Resp. Fed. Budget (Mar. 25, 2020), https://www.crfb.org/blogs/whats-2-trillion-coronavirus-relief-package.

[9] Delays in state distribution of ERA funds have been reported.  *See, e.g.*, Glenn Thrush & Alan Rappeport, *About 89% of Rental Assistance Funds Have Not Been Distributed, Figures Show*, N.Y. Times (Aug. 25, 2021, 10:38 AM), https://www.nytimes.com/2021/08/25/us/politics/eviction-rental-assistance.html.

after the first congressional residential eviction moratorium expired, the CDC declared a temporary nationwide halt in residential evictions for persons submitting sworn declarations that they had been adversely affected by the pandemic. *See* 85 Fed. Reg. 55,292 (Sept. 1, 2020). The CDC extended this moratorium in various forms, most recently through October 3, 2021. *See* 86 Fed. Reg. 43,244 (Aug. 4, 2021).[10]

## B. New York State's Response

### 1. Gubernatorial Orders

In an effort to control the pandemic within New York, the state legislature, on March 3, 2020, granted then-Governor Andrew M. Cuomo broad authority to "issue any directive during a state disaster emergency" that he deemed "necessary to cope with the disaster," and expanded his existing authority temporarily to suspend "any statute, local law, ordinance, or orders, rules or regulations." N.Y. Exec. Law art. 2-B, § 29-a (2020); 2020 N.Y. Sess. Law Ch. 23 (McKinney).[11] Four days later, the Governor declared the COVID-19 pandemic a state disaster emergency, *see* Exec. Ord. 202, and proceeded, over the next weeks and months, to issue more than seventy executive orders to address the crisis.

---

[10] The CDC's eviction moratorium was enjoined after the Supreme Court deemed plaintiffs "virtually certain to succeed on the merits of their argument that the CDC has exceeded its authority." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2486 (2021).

[11] The former authority was revoked in March 2021. *See* 2021 N.Y. Sess. Law Ch. 71 (McKinney).

Certain orders issued between March 16 and 19, 2020, closed or severely limited the in-person operation of large numbers of New York businesses.[12] These shut-down orders were repeatedly extended and modified over the following months.[13]

Starting in the late spring of 2020, the Governor allowed some New York businesses slowly to reopen, varying operating restrictions based on industry and regional COVID-19 case counts.[14] Not until the following summer, however, did the Governor lift most pandemic-related restrictions, making state capacity limits and social

---

[12] *See* Exec. Ords. 202.3 (mandating closure of all "gym[s], fitness centers or classes, and movie theaters," and permitting restaurants and bars "only [to] serve food or beverage for off-premises consumption"), 202.7 (closing all "barbershops, hair salons, tattoo or piercing parlors and related personal care services . . . includ[ing] nail technicians, cosmetologists and estheticians" and businesses providing "electrolysis, [and] laser hair removal services"); *see also* Exec. Ords. 202.6 (requiring all non-essential businesses to reduce in-person workforces by 50%), 202.7 (raising in-person workforce reduction to 75%), 202.8 (mandating 100% in-person workforce reduction).

[13] *See, e.g.*, Exec. Ords. 202.13, 202.14, 202.18, 202.38, 202.48, 202.55.

[14] *See Amid Ongoing COVID-19 Pandemic, Governor Cuomo Outlines Phased Plan to Re-open New York Starting with Construction and Manufacturing*, N.Y. State (Apr. 26, 2020), https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-outlines-phased-plan-re-open-new-york-starting; *Governor Cuomo Announces Gyms and Fitness Centers Can Reopen Starting August 24*, N.Y. State (Aug. 17, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-gyms-and-fitness-centers-can-reopen-starting-august-24; *Governor Cuomo Announces Indoor Dining in New York City Allowed to Resume Beginning September 30 with 25 Percent Occupancy Limit*, N.Y. State (Sept. 9, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-indoor-dining-new-york-city-allowed-resume-beginning-september-30-25; *Governor Cuomo Announces New Cluster Action Initiative*, N.Y. State (Oct. 6, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-new-cluster-action-initiative.

distancing guidelines optional for offices, retail establishments, and nearly all businesses.[15]

A number of other executive orders pertained to commercial and residential real estate.  Notably, Executive Order 202.8, effective March 20, 2020, imposed a ninety-day moratorium on residential and commercial evictions and foreclosures.[16]  Executive Order 202.9, effective March 21, 2020, provided for the forbearance of mortgage payments by "any person or entity facing a financial hardship due to the COVID-19 pandemic."  Subsequent executive orders extended and expanded these protections until they were superseded by statute.  Meanwhile, Executive Order 202.28, issued on May 7, 2020, required landlords to allow residential tenants affected by the pandemic to use security deposits to pay rent, and prohibited late-fee demands for rent arrears.[17]  Executive Order 202.32, issued on May 1,

---

[15] *See Governor Cuomo Announces COVID-19 Restrictions Lifted as 70% of Adult New Yorkers Have Received First Dose of COVID-19 Vaccine*, N.Y. State (June 15, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-restrictions-lifted-70-adult-new-yorkers-have-received-first; *Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June 24*, N.Y. State (June 23, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24.

[16] Starting that same month, the State's Chief Administrative Judge issued a series of orders suspending commercial and residential evictions, *see, e.g.*, N.Y. Admin. Ords. Nos. 68/20 (Mar. 16, 2020), 160A/20 (Aug. 13, 2020), and limiting foreclosure proceedings on commercial properties, *see, e.g.*, N.Y. Admin. Ord. No. 157/20 (July 23, 2020).

[17] This court recently dismissed as moot a constitutionality challenge to now-expired Executive Order 202.28.  *See 36 Apartment Assocs., LLC v. Cuomo*, No. 20-2565-CV, 2021 WL 3009153, at *2 (2d Cir. July 16, 2021).

2020, permitted localities temporarily to extend deadlines for paying property taxes.

## 2. Legislative Enactments

The New York State legislature enacted various laws addressing pandemic-related real estate concerns. On June 17, 2020, it passed the Emergency Rent Relief Act of 2020, *see* 2020 N.Y. Sess. Laws Ch. 125 (McKinney), which provided for residential rent subsidies (in the form of vouchers) to be paid directly to landlords on behalf of tenants with the greatest need. *Id.* §§ 2.4, 2.7. That same day, the legislature amended the State Banking Law to require regulated entities to grant up to 180 days' forbearance of mortgage payments. *See* N.Y. Banking L. § 9-x (2020).

On June 30, 2020, the legislature passed the Tenant Safe Harbor Act ("TSHA"), 2020 N.Y. Sess. Laws Ch. 127 (McKinney), prohibiting eviction warrants and possession judgments against residential tenants suffering financial hardship for debts accrued from "March 7, 2020 until the date on which none of the . . . Executive Order[s] issued in response to the COVID-19 pandemic continue to apply in the county of the tenant's or lawful occupant's residence." *Id.* §§ 1, 2.1.[18] Thereafter, the COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 ("CEEFPA"), enacted in December 2020, *see* 2020 N.Y. Sess. Laws Ch. 381 (McKinney), and the COVID-19 Emergency Protect Our Small Businesses Act of 2021 ("CEPOSBA"), enacted in March 2021, *see* 2021 N.Y. Sess. Laws Ch. 73 (McKinney),

---

[18] In September 2021, the legislature extended the TSHA's coverage period through January 15, 2022. *See* 2021 N.Y. Sess. Law Ch. 417 (McKinney), pt. D, § 1.

provided relief from eviction for delinquent residential and commercial (specifically, small-business) tenants who submitted financial hardship declarations. *See* CEEFPA pt. A §§ 4, 6; CEPOSBA pt. A §§ 5, 7. The statutes also provided temporary protections from mortgage and tax foreclosures where certain hardship criteria are met. *See* CEEFPA pt. B, subpart A, §§ 5, 7, subpart B, § 3; CEPOSBA pt. B, subpart A, §§ 5, 7, subpart B, § 3.[19] More recently, the legislature appropriated $800 million to fund COVID-19 relief grants of $5,000 to $50,000 for "socially and economically disadvantaged" small businesses to meet payroll, rent, mortgage, and other operating costs.[20] Businesses receiving federal Restaurant Revitalization Fund grants are not eligible, nor are landlords.[21]

---

[19] Although CEEFPA and CEPOSBA were extended through August 31, 2021, *see* Act of May 4, 2021, 2021 N.Y. Sess. Laws Ch. 104 (McKinney), the Supreme Court preliminarily enjoined CEEFPA's residential eviction moratorium on due process grounds, *see Chrysafis v. Marks*, 141 S. Ct. 2482 (2021) (discussed *infra* at 101 n.76). On September 2, 2021, the New York State legislature extended foreclosure and eviction protections through January 15, 2022, and, in an apparent attempt to address the due process concerns identified in *Chrysafis*, created a mechanism for landlords to contest tenants' declarations of financial hardship. *See* 2021 N.Y. Sess. Law Ch. 417 (McKinney), § 2; pt. B, subparts A–C; pt. C, subparts A–C. This court has since dismissed the due process challenge to CEEFPA's residential eviction moratorium as moot and remanded the case to the district court with leave for the parties to amend their pleadings and for reconsideration in light of the intervening changes in New York law. *See Chrysafis v. Marks*, 15 F.4th 208 (2d Cir. 2021).

[20] *Governor Cuomo Announces Applications Now Open for $800 Million COVID-19 Pandemic Small Business Recovery Grant Program*, N.Y. State (June 10, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-applications-now-open-800-million-covid-19-pandemic-small-business.

[21] *See New York State COVID-19 Pandemic Small Business Recovery Grant Program*, N.Y. State (last accessed Aug. 19, 2021), https://nysmallbusinessrecovery.com/.

14

## II.     The Challenged New York City Actions

It is against this backdrop of extensive federal and state action in response to the pandemic that we consider the challenged New York City laws.  On April 21, 2020, the New York City Council ("Council") announced its intent to consider a COVID-19 relief package "to protect tenants, help small businesses survive, and find creative ways to address the public health crisis brought on by the virus."  App'x at 517.  None of the proposed laws appropriated funds for financial relief.  Rather, of thirteen acts considered, most regulated the food service industry's use of outdoor dining and food delivery as means to continue operating despite indoor shutdown orders.[22] The focus of this case, however, is on a trio of laws prohibiting the harassment of residential and commercial tenants based on their "status as a Covid-19 impacted business or person," *id.* at 521; *see also* N.Y.C. Admin. Code §§ 27-2004 *et seq.*, 22-901 *et seq.*, and making commercial lease guaranties permanently unenforceable for rent arrears arising between March 7, 2020, and June 30, 2021, *see* N.Y.C. Admin. Code § 22-1005.

---

[22] *See* App'x at 974–77; Int. No. 1846-2020 (requiring accurate disclosure of delivery services' gratuity policies); Int. No. 1895-2020 (requiring food to be delivered in tamper-evident packaging); Int. No. 1896-2020 (regulating disclosure of third-party delivery service fees); Int. No. 1897-2020 (requiring third-party delivery services to be licensed); Int. No. 1898-2020 (prohibiting third-party delivery services from charging for telephone orders not resulting in actual transaction); Int. No. 1907-2020 (prohibiting third-party delivery services from imposing limits on restaurant prices); Int. No. 1908-2020 (limiting third-party food delivery charges); Int. No. 1916-2020 (waiving sidewalk café fees); Int. No. 1921-2020 (requiring food delivery services to display sanitation inspection letter grades online); Int. No. 1940-2020 (requiring city agencies to publish information about license and permit renewal extensions).

15

## A. The Harassment Amendments

The proposed harassment laws were actually amendments to the City's existing Residential and Commercial Harassment Laws. To discuss plaintiffs' First and Fourteenth Amendment challenges to these Harassment Amendments, it is useful to place them in their larger textual contexts.

### 1. Pre-Pandemic Harassment Laws

Enacted in 2008, the Residential Harassment Law states, as pertinent here, that "[t]he owner of a dwelling shall not harass any tenants or persons lawfully entitled to occupancy of such dwelling as set forth in [section 27-2004(a)(48)] of this chapter." N.Y.C. Admin. Code § 27-2005(d). Subject to exceptions not here relevant, the referenced section defines "harassment" to mean

> any act or omission by or on behalf of an owner that (i) causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, and (ii) includes one or more of the following acts or omissions, provided that there shall be a rebuttable presumption that such acts or omissions were intended to cause such person to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy.

N.Y.C. Admin. Code § 27-2004(a)(48). Among the many enumerated "acts or omissions" that can support a claim of harassment are certain proscribed "threats." *See, e.g., id.* § 27-2004(a)(48)(a) (identifying "implied threats that force will be used against" any lawful tenant as act of harassment); § 27-2004(f-3)(1) (identifying use of "threatening"

16

language in "offering money or other valuable consideration" to induce lawful tenant "to vacate" premises "or to surrender or waive any rights" of occupancy as harassment).[23]

The Commercial Harassment Law, which took effect in 2016, affords commercial tenants similar, if not quite identical, protection from landlord harassment. *See One Wythe LLC v. Elevations Urb. Landscape Design Inc.*, 67 Misc. 3d 1207(A), at *8 n.18, 126 N.Y.S. 3d 622 (N.Y. Civ. Ct. 2020). In pertinent part, that law states that "[a] landlord shall not engage in commercial tenant harassment," which it defines as

> [a]ny act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following [enumerated acts or omissions].

N.Y.C. Admin. Code § 22-902(a). Like its residential counterpart, the Commercial Harassment Law identifies the implied threat of force among its list of harassing acts. *See id.* § 22-902(a)(1). At the same time, in a so-called "savings clause," the law states that "[a] landlord's *lawful* termination of a tenancy, *lawful* refusal to renew or extend a

---

[23] A residential tenant who proves landlord harassment can obtain a court order restraining the offending conduct, requiring the posting of a violation notice on the subject premises, and/or imposing civil penalties payable to the City. *See* N.Y.C. Admin. Code §§ 27-2110(b), 27-2115(m)(2). Willful or reckless violations can result in criminal penalties. *See id.* § 27-2118(a). At the same time, a tenant who files a frivolous harassment action can be sanctioned and/or ordered to pay the landlord's attorney's fees. *See id.* § 27-2115(m)(3)–(4).

17

lease or other rental agreement, or *lawful* reentry and repossession of the covered property shall not constitute commercial tenant harassment for purposes of this chapter." *Id.* § 22-902(b) (emphasis added).[24]

In 2018, the Council amended the Residential Harassment Law to add to its enumerated acts of harassment "threatening" a lawful occupant of a residential premises based on certain protected grounds, specifically, the occupant's

> actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, . . . sex offenses or stalking, lawful source of income, or because children are, may be or would be residing in such dwelling unit.

*Id.* § 27-2004(a)(48)(f-5).

In 2019, the Council similarly amended the Commercial Harassment Law to add as an enumerated act of harassment "threatening" a lawful commercial tenant

> based on . . . such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status,

---

[24] A tenant who proves a violation of the Commercial Harassment Law may obtain a court order restraining further harassment, limiting the landlord's ability to secure City construction approval and permits, and/or imposing a civil penalty of $10,000 to $50,000. *See id.* § 22-903(a).

18

status as a victim of domestic violence, . . . sex offenses or stalking.

*Id.* at § 22-902(a)(11)(i).

## 2. The Pandemic Amendments to the Harassment Laws

Effective May 26, 2020, the challenged Harassment Amendments added threatening a lawful tenant based on COVID-19 status to both laws' lists of protected classes. Thus, the Residential Harassment Law now prohibits "threatening" any lawful residential occupant "based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," with violators facing fines of $2,000 to $10,000. *Id.* §§ 27-2004(a)(48)(f-7), 27-2115(m)(2). The amended Commercial Harassment Law prohibits "threatening" a lawful commercial tenant based on such tenant's "status as a person or business impacted by COVID-19, or . . . receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," with violators facing fines of $10,000 to $50,000. *Id.* §§ 22-902a(11)(ii), 22-903(a). The Harassment Amendments define many of their key terms.[25] But neither of these

---

[25] The Residential Harassment Law amendment states,

(1) the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of any tenant residential or commercial set forth in executive order

19

number 202.8, as issued by the governor on March 20, 2020 and extended thereafter or (ii) September 30, 2020, inclusive;

(3) the term "essential employee" means a person employed or permitted to work at or for a business classified as an essential business by the New York state department of economic development in accordance with executive order number 202.6, as issued by the governor on March 18, 2020 and extended thereafter; and

(4) the term "person impacted by COVID-19" means a person who has experienced one or more of the following:

(i) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

(ii) a member of such person's household was diagnosed with COVID-19;

(iii) such person was providing care for a family member or a member of such person's household who was diagnosed with COVID-19;

(iv) such person became unemployed, partially unemployed, or could not commence employment as a direct result of COVID-19 or the state disaster emergency declared in executive order number 202, as issued by the governor on March 7, 2020; or

(v) such person became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19.

*Id.* § 27-2004(a)(f-7).

The Commercial Harassment Law amendment states,

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of any

20

tenant, residential or commercial, set forth in executive order number 202.8, as issued by the governor on March 20, 2020, and extended thereafter, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the [CARES Act] and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) the term "impacted by COVID-19" means a person who has experienced one or more of the following situations:

(1) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of such person's household was diagnosed with COVID-19;

(3) such person was providing care for a family member or a member of such person's household who was diagnosed with COVID-19;

(4) a member of such person's household for whom such person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) such person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency or because such person was advised by a health care provider to self-quarantine due to concerns related to COVID-19;

most recent amendments, nor any other provision of the Residential or Commercial Harassment Laws, defines "threatening."

## B. The Guaranty Law

The "Personal Liability Provisions in Commercial Leases" law, commonly referred to as the "Guaranty Law," took effect on May 26, 2020. *See* N.Y.C. Admin. Code § 22-1005. This law, the subject of plaintiffs' Contracts Clause challenge, renders permanently unenforceable personal liability guaranties on certain commercial leases for any rent obligations arising during a specified pandemic period. As the statutory text makes plain, the law pertains to leases held by commercial tenants who were required to cease or limit

---

(6) such person became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19;

(7) such person's business is closed as a direct result of the COVID-19 state disaster emergency; and

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue[d] by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same three-month period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster emergency. A revenue loss shall be deemed to be the direct result of the COVID-19 state disaster emergency when such disaster emergency was the proximate cause of such revenue loss.

*Id.* § 22-902(a)(11).

operations under Executive Orders 202.3, 202.6, or 202.7.[26]  As to those leases, the law applies retroactively to rent arrears dating from March

---

[26] The law states in pertinent part:

> A provision in a commercial lease or other rental agreement involving real property located within the city, or relating to such a lease or other rental agreement, that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph[s] 1 and 2 are satisfied:

> 1. The tenant satisfies the conditions of subparagraph (a), (b) or (c):

>> (a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020;

>> (b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or

>> (c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

> 2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and June 30, 2021, inclusive.

N.Y.C. Admin. Code § 22-1005.

> While the Guaranty Law applies to all tenants forced to cease on-premises food or drink service or cease operations under Executive Orders 202.3 and 202.7,

23

7, 2020, as well as prospectively through June 30, 2021, without regard to the financial circumstances of the tenant, the guarantor, or the landlord.[27]  In sum, for rent arrears arising during that almost sixteen-month period, the Guaranty Law does not simply defer a landlord's ability to enforce a personal guaranty; it forever extinguishes it.[28]

Because plaintiffs' Contracts Clause challenge will require us to consider the Guaranty Law's "purpose," some discussion of its legislative history here is helpful to that task.  The Guaranty Law was jointly sponsored by Council Speaker Corey Johnson and Council Member Carlina Rivera.  In introducing the legislation on April 22, 2020, Member Rivera stated that its purpose was to "ensure [that] city business owners"—the presumed guarantors—"don't face the loss of their businesses and personal financial ruin or bankruptcy as a result of this state of emergency."  App'x at 1571.  She stated that the law was necessary because, as a result of the state's closure and reduced

---

it is more circumscribed as to tenants subject to Executive Order 202.6.  Rather than applying to all non-essential businesses forced to reduce capacity under that order, it only applies to "non-essential *retail* establishment[s]."  N.Y.C. Admin. Code § 22-1005(1)(b) (emphasis added); *see 40 X Owner LLC v. Masi*, No. 156181/2020, 2021 WL 65431, at *2 (N.Y. Sup. Ct. Jan. 7, 2021) (finding Guaranty Law inapplicable to tenant that leased office space).

[27] Although originally set to expire on September 30, 2020, the law was twice extended so as to preclude the enforcement of qualifying commercial guaranties for debts accrued through June 30, 2021.  *See* N.Y.C. Local L. 2020/55 (setting end date as September 30, 2020); N.Y.C. Local L. 2020/98 (extending end date through March 31, 2021); N.Y.C. Local L. 2021/50 (extending end date through June 30, 2021).

[28] Thus, because the injury allegedly caused to plaintiffs by the Guaranty Law continues to this day, defendants do not—and could not—argue that plaintiffs' Contracts Clause challenge to that law is mooted by its June 30, 2021 expiration.

24

capacity orders, "businesses are closing and losing weeks of income through no fault of their own and allowing small business owners to keep their spaces will be integral to the city's ability to recover[] after the virus." *Id.*

A few days later, on April 29, 2020, the Council's Committees on Small Business and on Consumer Affairs and Business Licensing issued a report entitled, "OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City."[29]  As to the proposed Guaranty Law, the report's statement was brief:

> Businesses [that] experience a drop in revenue due to COVID-19 may face added legal pressure to meet financial obligations.  Commercial leases may contain provisions imposing personal liability on the tenant for non-payment of rent.  These personal guarantees can make the business, which may otherwise shield the owner from liability due to its corporate structure, answerable in a court of law for any unpaid debts or damages.

---

[29] The report was largely devoted to outlining the spread of the coronavirus in the state and the detrimental economic effects of the Governor's closure orders on small businesses.  While acknowledging the availability of federal assistance for such businesses and their employees, the report questioned the adequacy and accessibility of such relief and noted the limited availability of City resources to provide financial assistance.  The report further noted that state moratoria on residential and commercial property evictions were then scheduled to expire after ninety days.  As earlier indicated, these moratoria were repeatedly extended and eventually codified.

*Id.* at 1001–02.[30]

On the same day that this report issued, its authoring committees held a virtual hearing on the relief package, with numerous witnesses testifying remotely and with hundreds of others filing written submissions. With respect to the Guaranty Law, Member Rivera stated that she was sponsoring that legislation

> [to] ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own[,] can do so without facing personal liability, ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods.

*Id.* at 699. She stated that constituents had reported some landlords using lease guaranties to "go[] after small business owner[s'] life savings and personal assets," with one restaurant owner "getting rent due notices and threats from his landlord that the personal liability clause in his lease will soon be acted upon." *Id.*

In looking through the record of written submissions to the Council, the court sees that hundreds of persons identifying themselves as "operator[s]" of "restaurant and nightlife" businesses submitted brief, identically worded letters supporting the Guaranty

---

[30] The last quoted sentence is somewhat inaccurate insofar as personal guaranties do not make "the business" answerable at law for unpaid rent obligations. A business's rent obligation generally derives from other provisions in a lease. We assume that what the report intended to convey was that personal guaranties can make business *owners*, otherwise shielded from liability by the corporate structure of the business, "answerable in a court of law for any unpaid [business] debts" to the extent those owners are personal guarantors. *Id.* at 1002.

26

Law as "critical" to giving them "a fighting chance to survive" the pandemic. *See, e.g., id.* at 2528–3334.[31]  A few persons, writing separately, were more specific in their support for the law.  One restaurant operator submitted that a law "[s]uspending lease guarantees is the only way to force" landlords to renegotiate small business leases "based on the market conditions of today" or to allow tenants "to accept a calculable loss and move on." *Id.* at 2475. Another, who reported closing his eight Manhattan restaurants and laying off approximately 265 workers, stated that he supported the Guaranty Law because restauranteurs should not be held to personal guaranties in what were "NOT normal circumstances," *i.e.*, when "the reason for our failures and closures can be precisely attributed to the COVID-19 pandemic and subsequent government mandated closures." *Id.* at 2487–88 (emphasis in original).  He urged passage of the Guaranty Law

> [to] give me and all of my peers the comfort that if we fail and cannot reopen, or if we reopen and can't sustain our businesses, at least the failure of our business will be punishment enough—we won't also lose our personal

---

[31] Thousands of pages of written materials were submitted to this court wholesale, with no attempt to distinguish those pertaining primarily to the Guaranty Law and those pertaining to any of the other laws that were part of the City's relief package, many of which generated considerable public comment.  This presents the court with the task of looking through the proverbial "haystack" to identify those public comments relevant to the challenged law.  While the court has indeed conducted such a review, it reminds defendants that where, as on this appeal, the court's obligation is to view the allegations—including any information of which the court may properly take judicial notice—in the light most favorable to the plaintiffs, defendants might well be advised to highlight portions of the record they deem favorable to their arguments.

livelihoods, our life-savings and the protection we've afforded our families.

*Id.* at 2489–90. Other writers echoed these themes,[32] with support from various industry and advocacy groups.[33]

Still other individuals and groups opposed the legislation, with one landlord urging the Council to "take into account the health and financial well-being of both landlords and tenants in crafting legislation," and, at least, to "make it incumbent on tenants to show that they are unable to pay their rent due to COVID-19," and to "make

---

[32] *See id.* at 2492 ("Because of personal guarantees in our leases I not only have to deal with a potentially failing business, I too have to think about personal financial ruin and bankruptcy."); *id.* at 2526 ("[I]t is undisputed that many small businesses will ultimately close our doors forever once aid runs out through no fault of our own"; Guaranty Law "provides vital protection for individual owners who have personally guaranteed . . . commercial leases that are no longer viable."); *id.* at 2527 (stating that businesses "will NOT survive if we cannot completely renegotiate our leases . . . .  Suspending our personal liability for our commercial leases will go a long way towards persuading landlords to take us small business owners seriously" (emphasis in original)).

[33] *See id.* at 2244–45 (NYC Hospitality Alliance stating that "no one ever contemplated this situation where [small business owners] are technically in possession [of leased premises,] but the government says we cannot operate . . . or only minimally operate," and characterizing it as "unconscionable" in these circumstances for landlords to file civil actions jeopardizing savings, assets, and homes of small business owners); *see also id.* at 2423, 2503–04 (United for Business NYC and Volunteers of Legal Service Microenterprise Project Team urging suspension of guaranties beyond COVID-19 period and rent forgiveness legislation).

28

arrangements for them to catch up when the economic situation improves." *Id.* at 2411.[34]

In questioning witnesses testifying in person at the hearing, Council members did not identify any specific instances where personal guaranties had been enforced during the pandemic against the owners of shuttered businesses. When Member Rivera asked Greg Bishop, Commissioner of the City Department of Small Business Services ("SBS"), whether the department had heard from small business owners "regarding personal liability concerns," Bishop responded, "[w]e have not." *Id.* at 741. Similarly, when Andrew Riggie, Vice Chair of Community Board 7 and a supporter of the Guaranty Law, was asked "how many" of his members had been affected by personal guaranties during the pandemic, he stated that he did not have "the data." *Id.* at 809 (estimating "thousands").

Of further note here, when Member Rivera asked Commissioner Bishop for the SBS's position on the Guaranty Law, he

---

[34] This individual expressed concern that the Guaranty Law would, as a practical matter, encourage tenants "to withhold their rents and eventually to walk away from their leases when grace periods expire," while leaving building owners with "no way to enforce the collection of rent from anyone claiming, without any evidence, to have been negatively impacted by the COVID-19 crisis." *Id.* He cautioned against the Council making landlords "the city's safety net, with no discussion of how landlords"—not receiving rent—"are supposed to keep up with taxes, insurance, utilities, maintenance and so on." *Id.* (expressing concern about "losing [his] buildings" in those circumstances); *see also id.* at 2479 (Building Owners and Managers Association stating that, to date, "landlords and tenants have had to come together to reach agreements where everyone has the best opportunity to financially manage this pandemic," and urging Council not to "force one particular strategy on landlords and tenants [that] will only impede . . . discussions . . . that take into account specific aspects of each situation").

demurred, stating that, while SBS generally supported "anything" that "provide[s] some relief to small businesses," the Guaranty Law raised "some legal questions" warranting review by the City's Law Department. *Id.* at 741–42.[35]  Thereafter, Member Kalman Yeger voiced specific concern that the Guaranty Law might violate "Article I, Section 10" of the Constitution because "[t]he city cannot retroactively adjust, [or] amend a contract that was entered into by two parties at arm's length." *Id.* at 758; *cf. id.* at 814–15 (Member Andrew Cohen voicing reservations, in discussing other bills under consideration, "about changing the nature of contractual relationships" and suggesting that "better approach" might be for City itself "to be offering guarantees").  Member Rivera, however, submitted that the Guaranty Law raised no legal concern because "this is not an amendment to a contract[;] it's a temporary suspension and contract law does allow for broad changes based on emergency situations and . . . this is certainly an emergency." *Id*. at 808–09.

On May 13, 2020, by a vote of 44 to 6, the Council passed the Guaranty Law.

### III.  The Instant Action

On July 10, 2020, plaintiffs brought this action for declaratory and injunctive relief, alleging that the Harassment Amendments and Guaranty Law were unconstitutional or, in the alternative, preempted by state law.

---

[35] Because nothing in the record indicates that the Council sought a legal opinion about the Guaranty Law, we assume that none was obtained.

## A. Plaintiffs' Claims

### 1. Marcia Melendez, Jarican Realty Inc., and 1025 Pacific LLC

Plaintiff Marcia Melendez is a resident of Brooklyn who, together with her husband, operated various small businesses until their retirement in 2017. Through plaintiff companies, Jarican Realty Inc. and 1025 Pacific LLC, the Melendezes own two small, primarily residential Brooklyn rental buildings. The amended complaint asserts that the Melendezes depend on rent from these properties for their livelihood. It further asserts that multiple tenants are in arrears on their rent, which has jeopardized the landlords' ability to meet tax and mortgage obligations for the properties. Ms. Melendez submits that she has not sent tenants rent demand notices for fear that she would be accused of violating the Harassment Amendments.

### 2. Ling Yang, Haight Trade LLC, and Top East Realty LLC

Plaintiff Ling Yang is a resident of Queens who started a number of small businesses, one of which she presently operates from the sole commercial space at 4118 Haight Street in Queens, a six-unit residential property owned by Ms. Yang and her son through plaintiff Haight Trade LLC. Through plaintiff Top East Realty LLC, Ms. Yang and her son also own a condominium property with three commercial spaces at 4059 College Point Boulevard in Queens. The amended complaint alleges that during the pandemic, many of Ms. Yang's tenants have not paid rent, which may affect the landlords' ability to meet tax, mortgage, and maintenance obligations. It further pleads that although it had been Ms. Yang's pre-pandemic practice to send

tenants late-rent notices, she has stopped doing so for fear of being charged with violating the Harassment Amendments.

### 3. Elias Bochner and 287 7th Avenue Realty LLC

Plaintiff Elias Bochner is a Brooklyn resident who, with family members, owns 287 7th Avenue Realty LLC, which in turn owns the building located at that Manhattan address. A Bochner family business occupied the commercial space at that site before it was leased to Sunburger 1 LLC. The amended complaint alleges that the Sunburger lease is subject to a "good-guy" guaranty, an agreement that allows a personal guarantor of a corporate tenant to limit his rent-arrears liability through a specified advance notice period—in this case, six months—upon the tenant's timely surrender of the property. Mr. Bochner asserts that such guaranties are "critical" to commercial lease agreements and that he "would not have entered into" commercial leases on behalf of his real estate company without one. App'x at 4312.

The amended complaint further alleges that, starting in December 2019, Sunburger failed fully to meet its rent obligations and, on March 20, 2020, provided the six-months' notice of surrender required by the good-guy guaranty. This obligated Sunburger's principal, as personal guarantor of the lease, to pay approximately $110,000 in rent outstanding from December 2019 through September 20, 2020. But because the guarantor made no such payment, Mr. Bochner had to use personal funds to meet the landlord's July 2020 $35,000 tax obligation. The amended complaint asserts that there are no practical means to collect the unpaid rent because commercial tenant Sunburger has little-to-no assets, and the Guaranty Law

32

permanently absolves the personal guarantor of responsibility for rent outstanding from March 7, 2020 through September 20, 2020. Thus, the amended complaint maintains, the Guaranty Law renders the good-guy guaranty relied on by plaintiffs "virtually valueless." *Id*.

### B. The District Court's Dismissal of the Amended Complaint

On November 25, 2020, the district court granted defendants' motion to dismiss plaintiffs' amended complaint for failure to state a claim on which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6).

As to the Harassment Amendments, the district court concluded that plaintiffs failed to state a plausible First Amendment claim because nothing in the laws prevented landlords from "communicating with delinquent tenants about past-due rent and pursuing available remedies to either collect that rent or to repossess their property." *Melendez v. City of New York*, 503 F. Supp. 3d at 27. The court reasoned that the Commercial Harassment Law's savings clause, which expressly exempts lawful terminations and repossessions from the definition of proscribed harassment, by extension, permits the collection of rent and communications incident thereto. *See id.* at 28. As for the Residential Harassment Law, the district court concluded that New York caselaw distinguishing "improper threats" from "permissible warnings of adverse but legitimate consequences" for non-payment of past-due rent signaled that routine rent demands were not proscribed. *Id.* at 29 (internal quotation marks omitted). Indeed, in the absence of any citation to a case in which New York had ever applied the long-standing threat

33

prohibitions of the Commercial and Residential Harassment Laws to a routine rent demand, the court concluded that plaintiffs could not plausibly allege constitutional vagueness. *See id.* at 31.

As for the Guaranty Law, the district court concluded that plaintiff Bochner and his company, the only plaintiffs pursuing a Contracts Clause challenge, plausibly alleged a substantial impairment of their contract rights. Nevertheless, the district court concluded that dismissal was warranted because it found that the Guaranty Law advanced a legitimate public purpose and was a reasonable and necessary response to a "real emergency." *Id.* at 32–34.

Upon further determining that neither the Harassment Amendments nor the Guaranty Law were preempted by state law, declining to exercise supplemental jurisdiction over plaintiffs' state constitutional challenges, and denying plaintiffs' motion for preliminary injunctive and declaratory relief without review, the district court dismissed the amended complaint pursuant to Rule 12(b)(6) and entered judgment in favor of defendants.

Plaintiffs timely filed a notice of appeal, challenging only the district court's rejection of their federal constitutional challenges to the Harassment Amendments and Guaranty Law.

## DISCUSSION

### I. Standard of Review

Because a judgment of dismissal pursuant to Fed. R. Civ. P. 12(b)(6) can only be entered if a court determines that, as a matter of law, a plaintiff failed to state a claim upon which relief can be granted,

we review that legal determination *de novo.* *See Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining if a claim is sufficiently "plausible" to withstand dismissal, *see Ashcroft v. Iqbal*, 556 U.S. at 678, "we accept all factual allegations as true[,] . . . draw all reasonable inferences in favor of the plaintiff[s]," and we will not dismiss as long as the pleadings support "more than a sheer possibility that a defendant has acted unlawfully," *Montero v. City of Yonkers*, 890 F.3d 386, 391, 394 (2d Cir. 2018) (internal quotation marks and alterations omitted).

## II. Challenges to the Harassment Amendments

### A. First Amendment Challenge

Plaintiffs dispute the dismissal of their First Amendment challenge to the Harassment Amendments, arguing that the laws, as now added to the City's Residential and Commercial Harassment Laws, violate their right to engage in non-misleading commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*, 447 U.S. 557, 561 (1980) (recognizing First Amendment to protect commercial speech). Specifically, plaintiffs assert that the laws' prohibitions of threatening conduct based on a tenant's COVID-19 status can be understood to bar landlords from making even routine rent demands of delinquent tenants.[36] In granting dismissal, the district court

---

[36] When plaintiffs reference routine rent demands, we understand them to mean reasonable, lawful conduct presenting none of the time, manner, and place concerns that could constitute acts of harassment under provisions of the Residential and Commercial Harassment Laws not challenged here. *See* N.Y. Admin. Code § 27-2004(a)(48)(g); *Hilltop 161 LLC v. Philbert*, 62 Misc. 3d 1212(A),

concluded that because the laws do not support that construction, plaintiffs did not plausibly plead that their lawful commercial speech was infringed. We agree. The relevant statutory text, viewed in context and as construed by New York courts, indicates that the prohibitions of "threatening" conduct do not apply to reasonable, lawful demands for the payment of past-due rent.

In reaching that conclusion, we note at the outset that plaintiffs' First Amendment challenge is not to the Harassment Amendments on their face. Specifically, plaintiffs do not argue that the laws' prohibitions of "threatening" conduct lack *any* legitimate application. Certainly, they do not argue that the prohibition of threatening conduct is unconstitutional as applied to threats of violent force or other illegal means. Nor do they argue that a "substantial number" of the laws' applications are unconstitutional. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (discussing two kinds of First Amendment facial challenges). Rather, plaintiffs challenge these amendments as applied to a narrow area of conduct in which they would like to engage: making routine rent demands of delinquent tenants. We reject this as-applied challenge.[37]

at *2, 113 N.Y.S. 3d 479 (N.Y. Civ. Ct. 2019) (finding harassment under § 27-2004(a)(48)(g) where landlord taped twenty-two letters and nine handwritten notes on tenant's door over eight-month period and repeatedly threatened to report tenant to police for filing multiple complaints).

[37] Insofar as plaintiffs' requests for (1) a declaration that the challenged laws are overbroad, and (2) an injunction barring their enforcement might suggest a facial challenge, we reach no such conclusion in light of still-controlling precedent instructing that "the overbreadth doctrine does not apply to commercial speech." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982). To

36

As always, in construing a challenged statute, we start with its text.  *See*, *e.g.*, *Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020).  The Harassment Amendments prohibit "threatening" residential or commercial tenants based on their COVID-19 status.  N.Y.C. Admin. Code §§ 22-902(a)(11)(ii), 27-2004(a)(48)(f-7).  While these amendments define the particular COVID-19 status protected by the Harassment Amendments, *see id*. §§ 22-902(a)(11), 27-2004(a)(48)(f-7), they do not define the word "threatening."

In such circumstances, we ascertain the word's intended meaning by looking to (1) the word's "ordinary, contemporary, common meaning," *e.g.*, *United States v. Davila*, 461 F.3d 298, 302 (2d Cir. 2006) (construing "threat" as used in 18 U.S.C. §§ 2332a, 876(c)); (2) the context in which it is used, *see*, *e.g.*, *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) (assessing "plain meaning" by "placing the particular provision within the context of that statute"); and (3) relevant state court decisions, even if not controlling, *see C.I.R.*

---

be sure, this court, "in an abundance of caution," has sometimes assumed *arguendo* that the overbreadth doctrine might apply even to commercial-speech claims. *Expressions Hair Design v. Schneiderman*, 808 F.3d 118, 136 (2d Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1144 (2017).  If we were to do so here, plaintiffs would still not have stated a viable First Amendment claim.  That is because they fail to plead facts or to cite law indicating that New York courts have given, or would be likely to give, the challenged laws' prohibition on threatening conduct such "an expansive and arguably problematic reading" as to indicate facial unconstitutionality.  *Id*. at 139 (noting reluctance to "hold a duly enacted state law unconstitutional based entirely on speculation that the New York courts might give it an expansive and arguably problematic reading that its text does not require"); *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) (instructing that "state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, and its deterrent effect on legitimate expression is both real and substantial" (internal citation omitted)).

37

*v. Bosch's Est.*, 387 U.S. 456, 465 (1967) (instructing that "decrees of lower state courts should be attributed some weight" in interpreting state law (internal quotation marks omitted)); *Schoenefeld v. New York*, 748 F.3d 464, 469 (2d Cir. 2014) (observing that absence of controlling authority from state's highest court does not afford federal court "license to disregard lower court rulings nor to analyze the question as though we were presented with a blank slate").

For the common, ordinary meaning of the word "threatening," we look to its dictionary definition. *See, e.g., Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). In defining "threaten" and "threatening" together, the dictionary refers to the "utter[ance]" or "promise" of a "threat." Webster's Third New Int'l Dictionary (Unabridged) 2382 (2002). The primary dictionary definition of the word "threat" is in two parts:

> an indication of something impending and usu. undesirable or unpleasant . . . as **a:** an expression of an intention to inflict evil, injury, or damage on another usu. as retribution or punishment for something done or left undone . . . [or] **b:** expression of an intention to inflict loss or harm on another by *illegal* means and esp. by means involving coercion or duress of the person threatened.

*Id.* (emphasis added).

A routine rent demand would not qualify as a threat under the second part of this definition because such a demand is not an "illegal means" for seeking payment of delinquent rent. *Id.* Nor would a lawful, routine rent demand qualify under the seemingly more-expansive first part of the definition because such a demand, by itself, does not signal an intent "to inflict . . . injury[] or damage." *Id.* Rather,

it signals a desire for the tenant to pay past-due rent, to which the landlord is legally entitled.

Thus, to infer an injurious intent under the first part of the definition, a routine rent demand would have to be accompanied by something more. To the extent that "more" might be an expressed intent to evict upon non-payment of owed rent, we do not understand plaintiffs—who profess a wish to reference only lawful remedies—to be asserting a First Amendment right to express any such intent as long as eviction is proscribed by law. *See supra* at 9–10, 12–14 (discussing federal and state eviction moratoria). Indeed, to the extent eviction is unlawful, such a reference could support the second dictionary definition of "threat," without regard to the first.

Where eviction is, or becomes, a lawfully available remedy for landlords, plaintiffs point to no case in which simply referencing a legal remedy has ever been treated as "threatening" under applicable law. Rather, the law has long distinguished between communications putting someone wrongfully in fear of injury and those simply apprising of legal consequences. *See, e.g., People v. Lee*, 58 N.Y.2d 773, 775 (1982) (holding witness not "threaten[ed]" by trial judge who "did no more than advise" of possible consequences of self-incrimination); *see also Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (distinguishing between "improper threats or coercion and permissible warnings of adverse but legitimate consequences" in discussing Trafficking Victims Protection Act (internal quotation marks omitted)); *NLRB v. Dahlstrom Metallic Door Co.*, 112 F.2d 756, 758 (2d Cir. 1940) (holding that union organizers who simply

39

explained "legitimate consequences" of joining or not joining union did not "threat[en]" employees).

Context only reinforces the conclusion that the Harassment Amendments do not apply to lawful, routine rent demands. The amendments add "threatening" a tenant based on COVID-19 status to already existing lists of acts or omissions. Those lists inform the second parts of the Residential and Commercial Harassment Laws' definitions of proscribed harassment. The Residential Law defines "harassment" as

> any act or omission by or on behalf of an owner that (i) causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, and (ii) includes one or more of the [enumerated acts or omissions].

N.Y.C. Admin. Code § 27-2004(a)(48). The Commercial Law defines "harassment" as

> any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following [acts or omissions].

*Id.* § 22-902(a). From this context, it is evident that the two parts of each definition are linked, with the second part identifying acts constituting harassment to the extent they cause, are intended to cause, or (in the case of commercial harassment) would reasonably

cause tenants "to vacate" lawfully occupied premises or "to surrender or waive" legal rights. *Id*. §§ 22-902(a), 27-2004(a)(48).

When the word "threatening," as used in the challenged Harassment Amendments, is viewed in this definitional context, it is not reasonably construed to reach otherwise lawful, routine rent demands. Such demands, by themselves, are not likely to cause tenants to vacate premises or surrender rights. Nor are they likely made with the intent to cause such results. Rather, they are made to get tenants to pay past-due rent. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007) (finding claim implausible where "obvious alternative explanation" for challenged conduct existed). Thus, context as well as ordinary meaning weigh heavily against plaintiffs' assertion that the Harassment Amendments' prohibitions of "threatening" conduct prevent landlords from making routine rent demands in violation of their First Amendment right of commercial speech.

In the case of the Harassment Amendment to the Commercial Harassment Law, that conclusion is further supported by the law's savings clause, which expressly states that various lawful actions that landlords might take against tenants—all more serious than a routine rent demand—do "not constitute commercial tenant harassment." N.Y.C. Admin. Code § 22-902(b) (excluding "lawful termination of a tenancy, lawful refusal to renew or extend a lease . . . , or lawful reentry and repossession of the covered property"). Moreover, in reporting on this amendment, the Council's Committee on Small Business stated that nothing therein "is intended to limit any of the rights or obligations of landlords or commercial tenants under the

41

existing harassment law . . . , including, but not limited to (1) the right of a landlord to terminate a tenancy . . . and (2) the obligation of a commercial tenant to continue paying rent owed."  App'x at 3403.

As for New York precedent, neither the New York Court of Appeals nor the state's intermediate appellate courts have considered whether the Residential or Commercial Harassment Laws' proscription of "threatening" conduct applies to routine rent-collection activities.  But the state's lower courts have done so, and their rulings offer no support for plaintiffs' claim.  Notably, the New York City Civil Court, which hears large numbers of private actions brought pursuant to the Housing Maintenance Code, has held that lawful, routine rent demands do not constitute proscribed harassment, at least not where rent is due and owing.  *See Dunn v. 583 Riverside Dr LP*, 66 Misc. 3d 667, 669, 117 N.Y.S.3d 524, 525 (N.Y. Civ. Ct. 2019) ("[T]he Court does not find that respondent's service of a rent demand on petitioner is . . . conduct that constitutes harassment.").

Plaintiffs did not address *Dunn* in their appellate briefs, but at oral argument they attempted to distinguish the case as involving not a "routine rent request[]" but, rather, a notice of termination and/or notice to cure.  Tr. May 3, 2021, at 33:16–17.  We are not persuaded. What the *Dunn* landlord communicated was a demand for the payment of outstanding rent.  To be sure, the communication was served pursuant to Real Property Actions and Proceedings Law § 711(2), the first statutory step to obtain a "non-possessory money judgment."  *Dunn v. 583 Riverside Dr LP*, 117 N.Y.S.3d at 525; *see also 2626 Equities LLC v. Morillo*, 66 Misc. 3d 1211, at *2, 120 N.Y.S.3d 719

(N.Y. Civ. Ct. 2020) (describing *Dunn* as involving "statutory rent demand"). But nothing in *Dunn* suggests that rent demands must be made in pursuit of statutory relief to avoid being found "threatening." Rather, the critical factor appears to be that the rent demand was *lawfully* made, which comports with the precedent discussed *supra* at 39–40. *See also 138-77 Queens Blvd. LLC v. QB Wash LLC*, Index No. 715071/2020, slip op. at 2–3 (N.Y. Sup. Ct. Jan. 15, 2021) (holding notice to cure not "harassment" under Commercial Harassment Law where part of landlord's "lawful termination" of lease). Certainly, plaintiffs point to no case in which New York courts have ruled otherwise.

We need not here decide whether otherwise lawful conduct might ever constitute a threat. And we recognize that lawful conduct in particular circumstances can constitute harassment under other enumerated acts of the Residential and Commercial Harassment Laws not here at issue. In this case, we conclude simply that the word "threatening" as used in the challenged Harassment Amendments, when considered according to its ordinary meaning, in context, and in light of New York precedents, does not, as a matter of law, proscribe the otherwise lawful, routine rent demands that plaintiffs wish to communicate. Accordingly, plaintiffs fail to state a plausible claim for violation of their First Amendment rights of commercial speech, and we affirm the district court's dismissal of that claim.

### B. Due Process Challenge

The same conclusion obtains with respect to plaintiffs' due process challenge to the Harassment Amendments. Plaintiffs argue that the undefined word "threatening" is unconstitutionally vague

because it fails to provide landlords with adequate notice of the conduct prohibited and thus, chills their exercise of free speech.

The vagueness doctrine, derived from the Due Process Clause, ensures that persons need not "speculate" as to the meaning of statutes, but rather are "informed as to what the State commands or forbids." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). The Supreme Court instructs that

> [a] statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.

*Hill v. Colorado*, 530 U.S. 703, 732 (2000). The Court further cautions that "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Thus, laws imposing civil penalties generally require less demanding scrutiny than those with criminal consequences, *see id.* at 498–99, or those implicating constitutional rights, *see Advance Pharm., Inc. v. United States*, 391 F.3d 377, 397 (2d Cir. 2004).

The Harassment Amendments here at issue subject violators to civil penalties and, in the case of the Residential Law, possible criminal sanctions. Moreover, plaintiffs claim that the amendments' vagueness chills speech protected by the First Amendment, specifically, routine demands for the payment of overdue rent. If the

Harassment Amendments are, indeed, "capable of reaching expression sheltered by the First Amendment, the vagueness doctrine [would] demand[] a greater degree of specificity than in other contexts." *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 213 (2d Cir. 2012) (internal quotation marks and brackets omitted). Plaintiffs, however, cannot plausibly plead that the Amendments lack sufficient specificity to support their as-applied challenge.

As we have already explained in rejecting plaintiffs' First Amendment claim, the challenged amendments' prohibition on "threatening" conduct cannot reasonably be understood—or misunderstood—to prohibit routine rent demands. This is evident from the plain meaning of the word "threat," particularly when viewed in context. Further, to the extent that, "in evaluating a vagueness claim, we consider not only the text of the statute but also any judicial constructions," *Copeland v. Vance*, 893 F.3d 101, 115 (2d Cir. 2018), the New York lower courts that have considered the matter thus far have ruled that the Residential and Commercial Harassment Laws do not prohibit otherwise lawful, routine rent demands. *See Dunn v. 583 Riverside Dr LP*, 117 N.Y.S. 3d at 525; *138-77 Queens Blvd. LLC v. QB Wash LLC*, Index No. 715071/2020, slip op. at 3. Also, defendants represent that they do not understand the challenged laws to prohibit routine rent demands and would not seek to enforce them in such circumstances. *See Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (recognizing as "highly relevant" "any limiting construction that a state court or enforcement agency has proffered").

45

Plaintiffs nonetheless submit that the challenged amendments should be deemed vague because tenants might think that they can file harassment claims based only on routine rent demands. We are not persuaded. While due process protects against laws whose vagueness admits arbitrary law enforcement by public officials, *see Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972), plaintiffs point to no precedent indicating that due process demands laws incapable of misconstruction by civil litigants. In any event, where, as here, text, context, and precedent all indicate that the Harassment Amendments do not apply to routine rent demands, the hypothesized possibility of a civil litigant misconstruing the statutes and filing a meritless claim is insufficient to state a plausible claim for vagueness. *See Yamashita v. Scholastic Inc.*, 936 F.3d 98, 104 (2d Cir. 2019) (stating that complaint's factual allegations must rise "above the speculative level" (internal quotation marks and alteration omitted)). That conclusion is reinforced by the amendments' scienter requirement. A defendant charged with "threatening" a tenant can be found to violate the challenged Residential and Commercial Harassment Laws only if he acted because of the tenant's protected status and, in the case of the Residential Harassment Law, with the intent to cause the tenant to vacate or to surrender legal rights. *See Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. at 499 (observing that scienter requirement generally "mitigate[s]" vagueness); *accord Hill v. Colorado*, 530 U.S. at 732; *Advance Pharm., Inc. v. United States*, 391 F.3d at 398. Also, the Residential Harassment Law allows a landlord to recover attorney's fees when tenants file frivolous harassment claims, *see* N.Y. Admin. Code § 27-2115(m)(4), a deterrent to tenants filing harassment claims for threatening conduct on grounds lacking a

46

foundation in the statutory text and already rejected by New York courts.

In sum, because plaintiffs' challenge to the Harassment Amendments fails to plead either a plausible First Amendment or Due Process Clause claim, we affirm the district court's judgment dismissing both claims.

## III. Challenge to the Guaranty Law

Plaintiffs appeal the dismissal of their Contracts Clause challenge to the Guaranty Law, arguing that the district court misapplied that constitutional protection in concluding that they failed to state a plausible claim. When we view all factual allegations and draw all reasonable inference in favor of plaintiffs, as we must at this stage of the case, we agree that this claim cannot be dismissed as a matter of law under Rule 12(b)(6).

In granting dismissal, the district court applied a three-part balancing test derived from the Supreme Court's recent Contracts Clause jurisprudence. *See Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018); *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45 (1978). At the first step, the district court concluded that the challenged law did substantially impair plaintiffs' commercial leases. Nevertheless, at the second step, it concluded that the impairment served a significant and legitimate public purpose and, at the third step, that the challenged law was appropriate and reasonable to advance that purpose. We are bound by the same precedent, but we do not reach the same conclusion at the last step. Plaintiffs pleaded sufficient facts to preclude a court now finding as a matter of law that

47

the Guaranty Law is a reasonable and appropriate means to serve the City's proffered public purpose.

## A. The Contracts Clause's Evolving Jurisprudence

To explain, we observe at the outset that the three-step standard for evaluating Contracts Clause claims is of relatively recent vintage and represents a departure from both the Clause's strict textual construction in the Nineteenth Century and its near demise by the mid-Twentieth Century. Nevertheless, because the standard draws, to varying extents, on both traditions, a review of its evolution is useful to ensuring proper application. The review is necessarily lengthy because the jurisprudential route traveled has not been direct and, even now, some uncertainty attends the arrived-at destination.[38] We focus on four stages of Contracts Clause jurisprudence: (1) the initial textual construction of the Clause; (2) subsequent recognition that states entering into public contracts, particularly those granting public licenses, do not surrender police powers; (3) use of "balancing" to extend the police power rationale to impairments of private contracts; and (4) recent modifications to the balancing approach to ensure Contracts Clause vitality.[39]

---

[38] *Cf. Mathis v. United States*, 136 S. Ct. 2243, 2266–67 (2016) (Alito, J., dissenting) (drawing analogy—in discussing legal developments in another area—to planned one-hour trip to Brussels, Belgium that, two days later, left traveler in Zagreb, Croatia).

[39] Our dissenting colleague, Judge Carney, dismisses this discussion as "unnecessary." Dissenting Op. at 2, 15. But only by ignoring this evolution can Judge Carney construe modern Contracts Clause cases to compel judicial deference to virtually any impairments of private contracts except those that are

### 1. Textual Construction

The Contracts Clause states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  No comparable limitation is placed on the federal government which, in fact, has the ability to impair debt obligations through its bankruptcy authority.  *See id.* art. I, § 8, cl. 4.  The Contracts Clause was prompted, in large part, by a post-Revolutionary War economic crisis.  Certain states, in trying to afford relief to beleaguered small debtors, enacted legislation repudiating pre-existing debt obligations, thereby bringing credit markets to the brink of collapse.  *See generally Sveen v. Melin*, 138 S. Ct. at 1821; *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427–28 (1934).  The Clause, however, was not framed to address only that emergency.  Rather, its language is unqualified and, in the words of Chief Justice Marshall, "establish[es] a great principle, that contracts should be inviolable."  *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 206 (1819).[40]

This construction derives not only from the Clause's text but also from its context within Article 1, Section 10, the constitutional provision described by Chief Justice Marshall as "a bill of rights for

---

irrational.  As the following discussion shows, neither text, history, nor precedent supports that conclusion.

[40] In holding a state insolvency law unconstitutional insofar as it discharged debts owed on contracts made before the law's enactment, the Court in *Sturges* appears to have rejected the debtor's argument that the challenged law should be upheld as an exercise of the state's "natural, inherent and indispensable power of discharging poverty, distress, and absolute indigence and inability from payment."  *Id.* at 156–57 (summarizing argument).  This is noteworthy insofar as police power would become the linchpin for the balancing principle that now cabins the Contracts Clause's impairment prohibition.  *See infra* at 55–67.

the people of each state." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138 (1810).[41]   While the Constitution generally establishes the *federal* government as one of limited and express powers, Article I, Section 10 limits the sovereign powers of *states* joining the new republic.   Some of these limitations are qualified.   For example, although a state generally may not impose import or export duties, it may do so when "absolutely necessary for executing its inspection Laws."   U.S. Const. art. I, § 10, cl. 2.   Similarly, although a state is prohibited from waging war, it may do even that if it is "actually invaded" or facing "imminent Danger" not admitting delay.   *Id.* art. I, § 10, cl. 3.   But no

---

[41] In its entirety, § 10 states as follows:

> No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or *Law impairing the Obligation of Contracts*, or grant any Title of Nobility.

> No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

U.S. Const. art. I, § 10. (emphasis added).

qualifier tempers the Contracts Clause; its proscriptive language is absolute.[42]

Chief Justice Marshall championed this strict textual view of the Clause in a series of early Supreme Court decisions construing its "general" words as "applicable to contracts of every description," public as well as private. *Fletcher v. Peck*, 10 U.S. at 137 (holding Georgia law rescinding state's Yazoo land sales void under the Contracts Clause); *see also Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 590–91 & n.11 (1819) (holding that Clause precluded legislature from changing college charter granted prior to independence).[43]

─────────────

[42] Justice Gorsuch recently highlighted this fact:

> Of course, the framers knew how to impose more nuanced limits on state power. The very section of the Constitution where the Contracts Clause is found permits states to take otherwise unconstitutional action when "absolutely necessary," if "actually invaded," or "wit[h] the Consent of Congress." But in the Contracts Clause the framers were absolute. They took the view that treating existing contracts as "inviolable" would benefit society by ensuring that all persons could count on the ability to enforce promises lawfully made to them—even if they or their agreements later proved unpopular with some passing majority.

*Sveen v. Melin*, 138 S. Ct. at 1826–27 (Gorsuch, J., dissenting) (first quoting U.S. Const. art. I, § 10, cls. 2–3; and then quoting *Sturges v. Crowninshield*, 17 U.S. at 206).

[43] There was never any question that the Framers intended for the Contracts Clause to protect private contracts. In this respect, it is noteworthy that the Clause had an antecedent in the Confederation Congress's enactment of the Northwest Ordinance, which stated: "[N]o law ought ever to be made or have force in the said territory, that shall, in any manner whatever, interfere with or affect *private* contract, or engagements, bona fide, and without fraud previously formed." An

The original view of the Contracts Clause was perhaps best summarized in *Green v. Biddle*, 21 U.S. (8 Wheat.) 1 (1823) (invalidating Kentucky laws at odds with land interest protections afforded in compact effecting Kentucky's separation from Virginia). Justice Washington there stated:

> [T]he constitution of the United States embraces all contracts, executed or executory, whether between individuals, or between a State and individuals; and that a State has no more power to impair an obligation into which she herself has entered, than she can the contracts of individuals.

*Id.* at 92. Further, the prohibition reached impairments of any sort, without regard to degree or type:

> The objection to a law, on the ground of its impairing the obligation of a contract, can never depend upon the extent of the change which the law effects in it. Any deviation from its terms, by postponing, or accelerating, the period of performance which it prescribes, imposing

Ordinance for the Government of the Territory of the United States, North-West of the River Ohio (1787) (emphasis added) (quoted in James W. Ely, Jr., THE CONTRACT CLAUSE: A CONSTITUTIONAL HISTORY 11 (2016) (hereinafter, "Ely, THE CONTRACT CLAUSE"). At the Constitutional Convention, Massachusetts delegate Rufus King proposed a provision that would, "in the words used in the [Northwest] Ordinance," impose "a prohibition on the States to interfere in private contracts." *See* Ely, THE CONTRACT CLAUSE, at 12 (quoting 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 439 (Max Farrand ed., Yale University Press 1937)). It was the Convention's Committee on Style and Arrangements that, without debate, inserted into Article I the provision barring states from impairing contracts generally, *see id.* at 13, giving rise to the public contracts question resolved by Chief Justice Marshall in the above-cited decisions. This history signals caution in construing modern Contracts Clause cases to compel strong judicial deference to any legislative impairments of private contracts. *See* Dissenting Op. at 2.

conditions not expressed in the contract, or dispensing with the performance of those which are, however minute, or apparently immaterial, in their effect upon the contract of the parties, impairs its obligation.

*Id*. at 84.

This strict view persisted for almost one hundred years, making the Contracts Clause "perhaps the strongest single constitutional check on state legislation during our early years as a Nation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 241.[44] Consistent with this view, the Supreme Court repeatedly struck down state debt relief legislation throughout the Nineteenth Century, notwithstanding various economic and political crises. *See, e.g.*, *Bronson v. Kinzie*, 42 U.S. (1 How.) 311, 320 (1843) (invalidating debt-relief statutes enacted in response to financial Panic of 1837); *Gunn v. Barry*, 82 U.S. (15 Wall.) 610, 622–23 (1872) (declaring homestead exception law unconstitutional as applied to antecedent debt); *Delmas v. Ins. Co.*, 81 U.S. (14 Wall.) 661, 667, 669 (1871) (holding that Louisiana constitution's invalidation of agreements payable in Confederate money unconstitutionally "destroy[ed]" obligation of contract); *Walker v. Whitehead*, 83 U.S. (16 Wall.) 314, 317–18 (1872) (holding that Georgia declaration voiding contracts made in support of Confederacy violated Contracts Clause because it sought to "bar the

---

[44] *See also Barnitz v. Beverly*, 163 U.S. 118, 121 (1896) (observing that "[n]o provision of the constitution . . . has received more frequent consideration by" Supreme Court than Contracts Clause); *Murray v. Charleston*, 96 U.S. 432, 448 (1877) (stating "there is no more important provision in the federal Constitution than the one which prohibits States from passing laws impairing the obligation of contracts"); *Washington Univ. v. Rouse*, 75 U.S. (8 Wall.) 439, 442 (1869) (describing Contracts Clause as "one of the most beneficial provisions of the Federal Constitution").

debt and discharge the debtor" and, thus, impaired "validity, construction, discharge, and enforcement" of contract); *Barintz v. Beverly*, 163 U.S. 118, 131–32 (1896) (holding statute, enacted in wake of Depression of 1893 authorizing redemption of foreclosed property, substantially impaired rights under original mortgage contract).

Noteworthy here only because it bears some factual similarity to the guaranty scenario before us is *Hawthorne v. Calef*, 69 U.S. (2 Wall.) 10 (1864). There, the charter of a public corporation obligated shareholders for the company's debts to the extent of their stock holdings. After the debt at issue was incurred, the legislature repealed the charter's personal liability provision. In holding the repealing law unconstitutional, the Supreme Court explained that,

> by the clause in the charter subjecting the property of the stockholder, he becomes liable to the creditor, in case of the inability or insolvency of the company for its debts, to the extent of his stock. The creditor had this security when the debt was contracted with the company over and above its responsibility. This remedy the repealing act has not merely modified to the prejudice of the creditor, but has altogether abolished, and thereby impaired the obligation of his contract with the company.

*Id.* at 23.

Thus, under this initial strict textual understanding of the Contracts Clause, the challenged Guaranty Law would have to be deemed unconstitutional as an impairment of preexisting debt obligations.

## 2. Police Power – Public Contracts

At the same time that the Supreme Court regularly invalidated state laws affording relief from private debt obligations, it also signaled hesitancy to construe rights conferred by the states in public charters as overriding a state's police powers. At issue in *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420 (1837), was a Contracts Clause challenge to a state's grant of a second bridge charter on the ground that it impaired the first bridge charter's implicit promise of exclusivity. Rejecting the challenge, Chief Justice Taney stated, "[w]hile the rights of private property are sacredly guarded, we must not forget, that the community also have rights, and that the happiness and well-being of every citizen depends on their faithful preservation." *Id.* at 548.[45]

Not until the last quarter of the Nineteenth Century, however, did the Supreme Court come to view police powers as inalienable by state legislatures entering into public contracts. In *Boyd v. Alabama*, 94 U.S. 645 (1876), which held a state's repeal of a lottery privilege not to

---

[45] In dissent, Justice Story unsuccessfully maintained that just as the Contracts Clause prevented the legislature from revoking the first bridge charter, so it also prevented the legislature from effectively destroying the first charter's value by granting a second bridge charter. *See id.* at 614–15 (Story, J., dissenting). He submitted that if there were a public need for a new bridge, the grant of a second charter should be viewed, under the Massachusetts constitution, as a taking of property from the Charles River Bridge Company, warranting compensation. *See id.* at 638. This recognition of some overlap in the protections afforded to private property by takings clauses and the Contracts Clause may explain how compensation came to figure in a subsequent balancing approach to the Contracts Clause. *See, e.g., Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 441 (emphasizing required payment of rent during period of foreclosure moratorium in rejecting Contracts Clause challenge) (discussed further *infra* at 59–64, 101–05).

constitute an unconstitutional impairment of contract, the Court stated,

> [w]e are not prepared to admit that it is competent for one legislature, by any contract with an individual, to restrain the power of a subsequent legislature to legislate for the public welfare, and to that end to suppress any and all practices tending to corrupt the public morals.

*Id.* at 650. Similarly, in upholding a state's revocation of a lottery license on the ground that the license was not a contract but a "privilege" and, thus, received with "the implied understanding" that it could be withdrawn, the Supreme Court stated that "[n]o legislature can bargain away the public health or the public morals." *Stone v. Mississippi*, 101 U.S. 814, 819 (1879); *see also Northwestern Fertilizing Co. v. Vill. of Hyde Park*, 97 U.S. 659, 670 (1878) (upholding exercise of police power to abate public nuisance caused by publicly chartered company).[46]

---

[46] Insofar as these Nineteenth Century cases appear more tolerant of state impairments of public than private contracts, they strike an opposite balance from that which our dissenting colleague derives from modern jurisprudence. *See* Dissenting Op. at 2. It has been suggested that these Nineteenth Century cases might be viewed as a correction to the Court's earlier, "overly expansive reading of what constitutes a public contract," which "confuse[d] the state's prerogative as sovereign to establish the structures that are appropriate for doing business in its territory with its proprietary powers to contract, like any other entity, for goods or services from private individuals." Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L.Q. 525, 539, 541 (1987) (hereinafter "Kmiec & McGinnis, *The Contract Clause*") (submitting that Contracts Clause "should apply only to the latter situation"). Our own colleague, Judge Calabresi, recently emphasized the distinction as important to understanding modern Contracts Clause jurisprudence pertaining to public contracts. *See Sullivan v. Nassau Co. Interim Fin. Auth.*, 959 F.3d 54, 65 (2d Cir. 2020)

We need not discuss this line of cases further. The Guaranty Law acts on private, not public, contracts and, thus, these early police power precedents do not shield the law from constitutional attack. That possibility arose only with the next century's approved extension of police power to private contracts.

### 3. Police Power – Private Contracts

Can state police power support the impairment of private contracts? In *Chicago, Burlington & Quincy R.R. Co. v. Nebraska*, 170 U.S. 57 (1898), a unanimous Supreme Court seemed to answer that question in the negative. The Court explained that,

> where a [private] contract, not contrary to public policy, has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms, without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation.

*Id.* at 72. Only when persons' or corporations' "rights and powers were created for public purposes, by legislative acts," can such contracts be

> held to be within the supervising power and control of the legislature when exercised to protect the public safety, health, and morals, and that clause of the Federal

---

("The key to all this . . . is to determine whether the state in breaching a [public] contract is acting like a private party who reneges to get out of a bad deal, or is governing, which justifies its impairing the plaintiffs' contracts in the public interest," suggesting that modern "less deference" standard was developed to address former situation).

Constitution which protects contracts from legislative action cannot in every case be successfully invoked.

*Id.* (upholding impairment of public contract).

The distinction, however, was soon ignored. In *Manigault v. Springs*, 199 U.S. 473 (1905), a private contract between adjoining riparian owners required each to keep a navigable creek free of obstructions. When the state, seeking to promote land drainage, authorized one of the owners to erect a dam, compensating other owners for resulting injuries, another owner sued, arguing that the law impaired his contract rights. Rejecting the challenge, a unanimous Supreme Court concluded—with no mention of *Chicago, Burlington*—that the Contracts Clause,

> does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power . . . is paramount to any rights under contracts between individuals.

*Id.* at 480.

*Manigault* might have been cabined to its facts given the involvement of a public waterway. Certainly, the state's sovereign dominion over natural resources within its boundaries was emphasized in *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 357 (1908) (rejecting Contracts Clause challenge to state law prohibiting transportation of water from any river or lake into other jurisdictions). As Justice Holmes there stated, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of

58

the state by making a contract about them." *Id.* But this did not, in fact, become a limiting principle for police power impairments of private contracts.

When World War I catalyzed urban housing shortages and accompanying rent hikes, a sharply divided Court rejected a Contracts Clause challenge to a state rent control law, stating, "contracts are made subject to this exercise of the [police] power of the State when otherwise justified, as we have held this to be." *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198 (1921). Not insignificantly, what Justice Holmes was referencing in this allusion to what "we have held this to be" was his opinion in a companion case, *Block v. Hirsh*, 256 U.S. 135 (1921), upholding a District of Columbia rent control law enacted in response to the same housing shortage. That law, however, was enacted by Congress and, thus, raised no Contracts Clause issue.

It was a decade later, in *Home Building & Loan Association v. Blaisdell*, that the Supreme Court provided a full rationale for police power impairment of private contracts, replacing a strict textual view of the Contracts Clause with one that relied on a balancing principle. In a five-four decision—with forceful opinions by both Chief Justice Hughes for the majority and Justice Sutherland for the dissent—the Supreme Court upheld a state mortgage moratorium that, in response to another economic emergency, the Great Depression of 1929, delayed mortgagees' ability to procure deficiency judgments and afforded mortgagors extended protection from foreclosure.

The majority opinion begins with a seeming caveat: "Emergency does not create power," and "does not increase granted

59

power." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 425 (acknowledging that "Constitution was adopted in period of grave emergency"). The majority nevertheless observed that "emergency may afford a reason for the exertion of a living power already enjoyed." *Id.* at 426 (internal quotation marks omitted). Thus, for Chief Justice Hughes, "[t]he constitutional question presented in the light of an emergency is whether the power possessed" by a state "embraces the particular exercise of it in response to particular conditions." *Id.* In answering that question in favor of the state law, the majority (1) renounced any strict obligation to construe the Contracts Clause as understood by the Framers, *see id.* at 443, (2) pronounced it "beyond question that the [Clause's] prohibition is not an absolute one and is not to be read with literal exactness," *id.* at 428, and (3) announced that "the reservation of the reasonable exercise of the protective power of the state is read into all contracts," *id.* at 444. This laid a new foundation for Contracts Clause analysis based on what Chief Justice Hughes described as the necessary location of a "rational compromise between individual rights and public welfare." *Id.* at 442.

In concluding that the state mortgage moratorium law achieved this compromise, the *Blaisdell* majority identified five relevant factors. *First*, a genuine economic "emergency existed in Minnesota which furnished a proper occasion for the exercise of the reserved power of the state to protect the vital interests of the community." *Id.* at 444. *Second*, the challenged legislation protected "a basic interest of society" and "was not for the mere advantage of particular individuals." *Id.* at 445. *Third*, the relief afforded was "appropriate" to the emergency. *Id.* *Fourth*, the relief was granted

60

"upon reasonable conditions." *Id. Fifth*, the law was "temporary in operation." *Id.* at 447. Moreover, the time period within which the law operated could be reduced by a court based on changed circumstances, thus ensuring that it was "limited to the exigency which called it forth." *Id.*

As to factors three and four in particular, the majority emphasized that extending the mortgage redemption period did not impair "the integrity of the mortgage indebtedness"; if the mortgagor failed to redeem within the extended period, the mortgagee's right "to title or to . . . a deficiency judgment" remained. *Id.* at 445. And while the mortgagor was "not ousted from possession" during the extension period, he was obliged to compensate the mortgagee by paying "the rental value of the premises." *Id.* Thus, the *Blaisdell* majority concluded that the relief afforded paid due "regard to the interest of mortgagees as well as mortgagors[,] . . . prevent[ing] the impending ruin of both." *Id.* at 446.

The *Blaisdell* dissenters faulted almost everything about the majority decision, starting with its approach to constitutional construction: "The whole aim of construction, as applied to a provision of the Constitution, is to discover the meaning, to ascertain and give effect to the intent of its framers and the people who adopted it." *Id.* at 453 (Sutherland, J., dissenting). Reviewing the Contracts Clause's enactment history in some detail, *see id.* at 453–65, the dissent observed that the Clause was specifically "meant to foreclose state action impairing the obligation of contracts primarily and especially in respect of such action aimed at giving relief to debtors in time of

61

emergency," *id.* at 465.[47]  Thus, for the dissent, the question presented in *Blaisdell* was "not whether an emergency furnishes the occasion for the exercise of . . . state [police] power, but whether an emergency furnishes an occasion for the relaxation of the restrictions upon the power imposed by the contract impairment clause." *Id.* at 473.  Justice Sutherland maintained that the "difficulty" with answering that question in the affirmative, as the majority did, is that the Clause,

> forbids state action under any circumstances, if it have the effect of impairing the obligation of contracts. . . .  It does not contemplate that an emergency shall furnish an occasion for softening the restriction or making it any the less a restriction upon state action in that contingency than it is under strictly normal conditions.

*Id.*[48]  He warned that the majority, in taking a contrary view, opened the door for "future gradual but ever-advancing encroachments upon the sanctity of private and public contracts." *Id.* at 448.

---

[47] Justice Sutherland observed that not only had the Contracts Clause been prompted by debt-relief legislation responding to an economic emergency, but also, that it had been adopted over opposition arguments (at both the constitutional and state ratifying conventions) that unforeseen future emergencies might warrant such state relief.  *See id.* at 459–62 (referencing positions taken by Gouverneur Morris, George Mason, and Luther Martin).

[48] Viewing the Minnesota law through this prism, Justice Sutherland observed that if it "had been unconditional," it would undoubtedly have constituted an impairment of contract under *Bronson v. Kinzie*, which the *Blaisdell* majority did not overrule.  *Id.* at 480–81; *see id.* at 482 ("A statute which materially delays enforcement of the mortgagee's contractual right of ownership and possession does not modify the remedy merely; it destroys, for the period of delay, all remedy so far as the enforcement of that right is concerned.").  No different conclusion was warranted because Minnesota's mortgage relief was conditioned on rent payment

Indeed, critics—judicial and academic—have faulted this balancing approach to the Contracts Clause.[49] But to the extent we are obliged to employ it on this appeal, it is important to note that the *Blaisdell* majority recognized limits to what a balancing principle could support: "This principle precludes a construction [of the Contracts Clause] which would permit the state to adopt as its policy

---

as, in the dissent's view, rent was not "even the approximate equivalent of immediate ownership and possession." *Id.* at 481.

[49] *See, e.g.*, *Sveen v. Melin*, 138 S. Ct. at 1828 (Gorsuch, J., dissenting) (observing that balancing test for Contracts Clause fails to tell "people . . . today whether their lawful contracts will be enforced tomorrow, or instead [be] undone by a legislative majority with different sympathies"); *City of El Paso v. Simmons*, 379 U.S. 497, 522, 528–29 (1965) (Black, J., dissenting) (professing concern that balancing test subjects Contracts Clause to court's judgment as to "reasonableness" of challenged legislation; "men should not have to act at their peril, fearing always that the State might change its mind and alter the legal consequences of their past acts so as to take away their lives, their liberty or their property"); Ely, The Contract Clause, at 222 (observing that *Blaisdell* "cut the contract clause loose from the constitutional text as well as the views of the framers . . . open[ing] the door to virtually reading the contract clause out of the Constitution"); Richard A. Epstein, *Toward a Revitalization of the Contract Clause*, 51 U. Chi. L. Rev. 703, 738 (1984) (submitting that "*Blaisdell* trumpeted a false liberation from the constitutional text that has" allowed "the police power exception . . . to eviscerate the contracts clause"); *see also* Kmiec & McGinnis, *The Contract Clause*, at 544 (faulting Court for reading Clause as if it stated: "No state shall pass any law unreasonably impairing the obligation of contracts," when the text "is phrased in absolute terms and is grouped with other absolute prohibitions," and Framers elsewhere showed that they "knew how to phrase prohibitions in terms of reasonableness"). Justices Barrett and Kavanaugh made a point similar to the last one when, albeit in a different context, they questioned whether "[a]s a matter of text and structure," one constitutional clause could be read to offer less protection than others of which it is a group. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021) (Barrett, J., concurring in part) ("As a matter of text and structure, it is difficult to see why the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination.").

the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Id.* at 439.[50]

These limitations animated the Court's holdings in a trio of cases decided soon after *Blaisdell*, which upheld Contracts Clause challenges to state laws lacking one or more of the *Blaisdell* factors. *See W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 434 (1934) (invalidating state law exempting life insurance proceeds from levy because exemption was not cabined by either amount or emergency); *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 63 (1935) (holding unconstitutional law significantly postponing mortgagee's right to foreclose in absence of conditions requiring debtor to pay interest, taxes, or rent, or even to demonstrate inability to pay); *Treigle v. Acme Homestead Ass'n*, 297 U.S. 189, 195–96 (1936) (holding state law restricting withdrawals by savings and loan shareholders violative of Contracts Clause, noting that law did not purport to deal with existing emergency and restrictions were neither temporary nor conditional).  In *Kavanaugh* in particular, Justice Cardozo, writing for the Court, was unsparing in his criticism of the legislature's actions, observing that "[w]ith studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor."  295 U.S. at 60.

---

[50] By reading *Sturgis v. Crowninshield*, *Green v. Biddle*, and *Bronson v. Kinzie* to support this conclusion, Chief Justice Hughes avoided the need to overrule these cases.  *See id.* at 431–34.  Therefore, as construed in *Blaisdell*, these cases continue to control.

Even when rejecting Contracts Clause claims, the Court frequently emphasized that the challenged laws did not completely deprive the complaining party of that for which he had bargained. *See, e.g.*, *Richmond Mortg. & Loan Corp. v. Wachovia Bank & Tr. Co.*, 300 U.S. 124, 130 (1937) (stating that challenged law recognized party's right to "full enforcement" of his contract "but limits that right so as to prevent his obtaining more than his due"); *Honeyman v. Jacobs*, 306 U.S. 539, 542 (1939) (rejecting challenge to law that allowed "mortgagee [to] make himself whole" but prevented him from being "enriched at the expense of the debtor or realize more than what would repay the debt"); *Gelfert v. Nat'l City Bank of N.Y.*, 313 U.S. 221, 233 (1941) (observing, in rejecting challenge to state deficiency law, that "[m]ortgagees are constitutionally entitled to no more than payment in full"). At the same time, however, the Court demonstrated a willingness to uphold the exercise of state police power impairing contracts—at least in areas of long-standing regulation—even in the absence of the emergency and temporality factors emphasized in *Blaisdell*. *See Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 39–41 (1940) (rejecting Contracts Clause challenge to state law limiting withdrawals by shareholders in savings and loan associations).

The contraction of Contracts Clause protection appears to have reached its high-water mark in *East New York Savings Bank v. Hahn*, 326 U.S. 230 (1945), a case upholding the tenth extension of a state mortgage moratorium first enacted in response to the Great Depression. Writing for a unanimous Court, Justice Frankfurter professed to derive from *Blaisdell* and its progeny a "governing constitutional principle":

> [W]hen a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State to safeguard the vital interests of its people is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.

*Id.* at 232 (internal quotation marks omitted). On this principle, the Court further pronounced that a state's authority to exercise its police power "may be treated as an implied condition of every contract and, as such, as much part of the contract as though it were written into it." *Id.* And with that understanding, it concluded that "the State's exercise of its power enforces, and does not impair, a contract." *Id.*[51] Thus transforming impairment into enforcement, the Court went on severely to narrow judicial review of state exercises of police power affecting contracts: "Once we are in this domain of the reserve power of a State," courts "must respect the wide discretion on the part of the legislature in determining what is and what is not necessary." *Id.* at 233 (internal quotation marks omitted).

---

[51] A century earlier, Justice Story had disavowed both the premise and conclusion in *East New York Savings Bank*. *See* Joseph Story, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 248 (1833) ("Although the law of the place acts upon a contract, and governs its construction, validity, and obligation, it constitutes no part of it."); *Green v. Biddle*, 21 U.S. 1, 16–17 (1821) (Story, J.) (expansively construing Contracts Clause protection), *rehearing granted*, 21 U.S. at 18, 92–93 (1823) (Washington, J.) (holding similarly, *see supra* at 52). But the Court was now of a different mind. *See, e.g.*, *Gelfert v. Nat'l City Bank of N.Y.*, 313 U.S. at 235 (Douglas, J.) ("We cannot permit the broad language" of the Court's early Contract Clause decisions "to force legislatures to be blind to the lessons which another century has taught.").

Commentators have observed that such a highly deferential standard is more suited to the Due Process Clause than to the Contracts Clause and that *East New York Savings Bank*'s reasoning seems to leave the latter with little independent force.[52]  More recently, however, the Supreme Court has disavowed that conclusion, *see Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984) (stating that Supreme Court has "never held . . . that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts"), insisting that the Contracts Clause retains independent constitutional vitality, *see Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234; *United States Tr. Co. v. New Jersey*, 431 U.S. 1 (1977).  We proceed to consider these cases, which dictate the analytical framework we must apply here.[53]

---

[52] *See* Robert L. Hale, *The Supreme Court and the Contract Clause: III*, 57 Harv. L. Rev. 852, 890–91 (1944) (observing "tendency for the contract clause and the due process clause to coalesce" with same result as if "contract clause were dropped out of the Constitution"); *see also* Ely, THE CONTRACT CLAUSE, at 233 (observing with respect to standard identified in *East New York Savings Bank* that "if the police power is implied in every contract, and the courts simply defer to legislative judgments about the exercise of that power, the contract clause affords virtually no protection for agreements").

[53] While Judge Carney cites academic commentary suggesting that modern Contracts Clause jurisprudence remains analogous to rational basis review, *see* Dissenting Op. at 7–8, the above-cited precedents preclude this court from reaching that conclusion.  Indeed, to accord unquestioning deference to all but irrational contract impairments would effectively eliminate the "balancing" that, since *Blaisdell*, is at the core of modern Contracts Clause jurisprudence.

### 4. The Contracts Clause's Continued Vitality

At the outset, we note that the Court's recent professions of the Contracts Clause's vitality have not always been full throated or consistent. Nevertheless, one thing is clear: the Court has specifically rejected the idea that the Clause is "without meaning in modern constitutional jurisprudence, or that its limitation on state power [is] illusory." *United States Tr. Co. v. New Jersey*, 431 U.S. at 16.

At issue in *United States Trust* was a public contract, specifically, a public bond agreement, a provision of which prohibited the use of revenues to subsidize passenger rail service. In the midst of an oil crisis, the state repealed that prohibition, resulting in bondholder losses. In identifying a Contracts Clause violation, the Supreme Court reiterated that deference is generally owed to legislative judgments regarding the need for and reasonableness of social and economic legislation. *See id.* at 25–26. At the same time, however, Justice Blackmun, writing for a four-member majority, emphasized that such deference is not limitless. Particularly when a state "modifi[ies] . . . [its] own financial obligations . . . [,] complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Id.* at 25–26.[54] The Court explained that "[i]f a State could reduce its financial obligation whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would

---

[54] While reiterating the Nineteenth Century view that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty," *id.* at 23, the Court noted that it had regularly held states "bound by their debt contracts," *id.* at 24.

provide no protection at all." *Id.* at 26. To avoid that result, the Court concluded that a less deferential standard of review should apply in assessing whether a state's impairment of its own contract is "reasonable and necessary to serve an important public purpose." *Id.* at 25–26.

The analytical standard articulated in *United States Trust* presents some challenges because "reasonableness" generally signifies a relaxed standard of judicial inquiry, by contrast to "necessity," which informs the most penetrating constitutional review.[55] Also, some courts and scholars have criticized the idea of a less deferential standard of review for impairments of public contracts, as a matter of both practical application and constitutional grounding.[56] We need not here enter into these debates. For purposes

---

[55] *See id.* at 54 n.17 (Brennan, J., dissenting) (highlighting purported inconsistency).

[56] *See Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 370 (2d Cir. 2006) (questioning what "giving less deference to the legislature actually mean[s]"); *Troy, Ltd. v. Renna*, 727 F.2d 287, 295 (3d Cir. 1984) (observing that "laws alleged to impair the obligations of contracts between private parties were for many years scrutinized far more rigorously" than those with public parties); Ely, THE CONTRACT CLAUSE, at 243 (observing that Supreme Court's "abandonment of a unitary standard of judicial review . . . was a sharp departure from long-standing contract clause jurisprudence," which had long been "more vigilant to police infringements of private agreements and . . . more deferential to state power over public contracts); Michael W. McConnell, *Contract Rights and Property Rights: A Case Study in the Relationship Between Individual Liberties and Constitutional Structure*, 76 Calif. L. Rev. 267, 293–94 (1988) ("The modern thrust of contracts clause jurisprudence is precisely backwards. . . . [I]t is interference with private contracts that lies at the heart of the clause."); Thomas W. Merrill, *Public Contracts, Private Contracts, and the Transformation of the Constitutional Order*, 37 Case W. Rsrv. L. Rev. 597, 609 (1987) (stating that long-held "understanding was that private contracts were protected from state interference with *more* rigor than public contracts" (emphasis in

of this appeal, it suffices for us to recognize that the underlying purpose of the standard pronounced in *United States Trust* was to ensure the continued vitality of the Contracts Clause, there in the context of public contracts. The following year, the Court would do the same for Contracts Clause claims involving private contracts. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234.[57]

---

original)); Kmiec & McGinnis, *The Contracts Clause*, at 547 (observing that "Court's earlier jurisprudence ha[d] been more, not less, deferential to public contracts insofar as the contracts were more likely to implicate the police power or reserved authority," and urging that where state invokes police power to justify modifying public or private contract, modification "should be reviewed under the same standard"). The scholarly criticism finds support in the framing history referenced briefly *supra* at 51–52 n.43, which demonstrates a clear intent from the outset to protect private contracts from state impairment, and provides no indication that the Clause more easily allows states to impair private than public contracts.

[57] Before turning to *Allied Structural Steel*, we note that our dissenting colleague emphasizes cases since *United States Trust* reiterating that "[u]nless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure," *Energy Rsvs. Grp., Inc. v. Kans. Power & Light Co.*, 459 U.S. at 410; *see Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. at 505; *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006). In doing so, however, none expands on *United States Trust*'s state-self-interest rationale for the distinction. Thus, the principle we derive from *United States Trust* and its progeny is that, in conducting *Blaisdell* balancing of a public contract, a court properly recognizes that one factor—self-interest—can tilt the starting balance against the challenged impairment, such that "the presumption that a passed law is valid and done in the public interest does not immediately apply." *Sullivan v. Nassau Co. Interim Fin. Auth.*, 959 F.3d at 65–66 (stating that, if contract is public, court asks "whether there is some indicia that the state impaired the contract out of its own self-interest," in which case "less deference scrutiny applies"). By contrast, in cases of private contracts, a presumption in favor of social and economic legislation sets the starting balance, but it does not end the inquiry. *See generally* Fed. R. Evid. 301 ("In all civil actions and proceedings not otherwise provided for

At issue in *Allied Structural Steel* was a Minnesota law that imposed funding requirements on employers' pension plans. Writing for the Court, Justice Stewart adhered to precedent abandoning a literal construction of the Clause, lest it "obliterate the police power." *Id.* at 241. But at the same time, he stated that "[i]f the Contract Clause is to retain any meaning at all, . . . it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Id.* at 242 (emphasis in original). The Court located those limits in the five factors identified in *Blaisdell* (and in the absence of one or more of those factors in the trio of cases that followed it). *See id.* at 242–43. It derived from these cases and *United States Trust* a two-part test that asked whether the challenged state law, "in fact, operated as a substantial impairment of a contractual relationship" and, if it did, whether the legislation did so upon "reasonable conditions . . . of a character appropriate to the public purpose justifying its adoption." *Id.* at 244 (quoting *United States Tr. Co. v. New Jersey*, 431 U.S. at 22).

In distinguishing between minimal and substantial contract impairments, the Court—for the first time in several decades—

---

by Act of Congress or these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or to meet the presumption. . . ."). Rather, *Blaisdell* balancing is conducted to determine if the totality of relevant factors, nevertheless, outweighs the deference customarily accorded legislative judgments. *See United States Tr. Co. v. New Jersey*, 431 U.S. at 21–22 (observing that "existence of an important public interest is not always sufficient to overcome [Contracts Clause] limitation," and "private contracts are not subject to unlimited modification under the police power"). *Allied Structural Steel* informs this inquiry.

approvingly referenced "the Framers" in identifying how to assess a contract impairment:

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged those rights and obligations are binding under the law, and the parties are entitled to rely on them.

*Id.*[58] On this basis, the Court concluded that the challenged law worked a severe impairment on the pension provisions of the company's employment contracts because, "in an area where the element of reliance was vital—the funding of a pension plan"—the state had "impose[d] a completely unexpected liability in potentially disabling amounts." *Id.* at 246–47.

Proceeding to the second step of analysis, the Court observed that "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear." *Id.* at 245. While an impairment causing only "[m]inimal alteration of contractual obligations may end the inquiry at its first stage," *i.e.*, without consideration of purpose or means, "[s]evere impairment . . . will push the inquiry to a careful examination of the nature and purpose

---

[58] Last term, in identifying a Takings Clause violation, the Supreme Court also favorably referenced the "Founders[']" view "of private property [as] indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

of the state legislation." *Id.*[59]  This represents a step back—even if a small one—from the seemingly limitless deference to legislative judgments impairing contracts approved in *East New York Savings Bank.*  Indeed, *Allied Structural Steel* instructs that "[d]espite the customary deference courts give to state laws directed to social and economic problems," the Contracts Clause requires that "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption."  *Id.* at 244 (emphasis added and internal quotation marks omitted).[60]

---

[59] Judge Carney's suggestion that we afford these statements too much weight, *see* Dissenting Op. at 9, is unwarranted because (1) they express no novel idea, *see United States Tr. Co. v. New Jersey*, 431 U.S. at 27 ("The extent of impairment is certainly a relevant factor in determining its reasonableness."); and (2) the Supreme Court and this court have reiterated the point made in text, even in cases drawing a distinction between public and private contract impairment claims, *see Energy Rsvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. at 511 (citing *Allied Structural Steel* in stating that "severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected"); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. at 504 n.31 (citing *Energy Rsvs. Grp.* in observing that "severity of the impairment . . . in turn affects the level of scrutiny to which legislation will be [subjected]"); *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d at 371 ("The Supreme Court instructs that the extent of the impairment is a relevant factor in determining its reasonableness." (internal quotation marks omitted)).

[60] Judge Carney submits that this quoted language, when read in context, references only "the standard for analyzing impairments of public contracts set forth in *United States Trust*."  Dissenting Op. at 14.  Not so.  What context shows is that the quoted language states a general principle, applicable to private as much as to public contracts.  This is evident from the fact that *Allied Structural Steel*'s discussion of *United States Trust* concludes a larger discussion recognizing "*some*" limits on a state's police power to impair even private contracts.  438 U.S. at 242 (emphasis in original).  At the outset of the discussion, the Supreme Court observes that "the existence and nature of those limits were clearly indicated in a

series of cases" starting with *Blaisdell*, and continuing through *W.B. Worthen Co. v. Thomas*, *W.B. Worthen v. Kavanaugh*, and *Treigle v. Acme Homestead Ass'n*. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 242–43; *see also supra* at 59–64 (discussing these cases). It is after summarizing this quartet of private contract cases that the Court references its "most recent Contract Clause case," *United States Trust*. *Id*. at 243. With no initial mention of the fact that *United States Trust* involved a public contract, *Allied Structural Steel* states:

> In that case the court *again* recognized that although the absolute language of the Clause must leave room for "the 'essential attributes of sovereign power,' necessarily reserved by the States to safeguard the welfare of their citizens," [*United States Tr. Co. v. New Jersey*, 431 U.S.] at 21, that power has limits when its exercise effects substantial modifications of *private contracts*. Despite the customary deference courts give to state laws directed to social and economic problems, "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id*. at 22.

438 U.S. at 243–44 (emphasis added). The highlighted words "again" and "private contracts" in the first quoted sentence signal that *United States Trust* is consistent with past precedent in recognizing "*some* limits" on state police power to impair even private contracts. In this context, the second quoted sentence is properly understood to summarize a limiting principle applicable as much to private as to public contract impairments. Indeed, that conclusion is reinforced by the fact that language quoted in the second sentence derives from a paragraph in *United States Trust* discussing private—not public—contracts. *See* 431 U.S. at 22. Further, when, after that second sentence, the Court in *Allied Structural Steel* notes that the Contracts Clause challenge in *United States Trust* pertained to a public contract, *see id*. at 244 ("Evaluating with particular scrutiny a modification of a contract to which the State itself was a party, the Court in that case held that legislative alteration of the rights and remedies of Port Authority bondholders violated the Contract Clause because the legislation was neither necessary nor reasonable"), it quickly emphasizes that the more stringent review applied to a public contract impairment does "not" mean that private contracts are "subject to unlimited modification," *id*. at 244 n.15 (quoting *United States Trust*, 431 U.S. at 422). For all these reasons, then, we construe the language quoted in text from *Allied Structural Steel* to state a general principle applicable to private, as well as public, contract impairments.

74

Upon such examination of the challenged pension law in *Allied Structural Steel*, the Supreme Court concluded that the resulting substantial impairment of contract was not "necessary" for several reasons. *Id.* at 247. Specifically, the challenged law (1) was not enacted in response to any emergency, as in *Blaisdell*[61]; (2) did not operate in an area already subject to state regulation, as in *Veix*; (3) did not effect a temporary alteration in the contract but, rather, "irrevocably and retroactively" "worked a severe, permanent, and immediate change" in the parties' relationship; and (4) was aimed not at every state employer, but only at those who had been "sufficiently enlightened as voluntarily . . . to establish [employee] pension plans." *Id.* at 250.

In the years following *United States Trust* and *Allied Structural Steel*, the Supreme Court has sometimes indicated that Contracts Clause challenges should be reviewed in three steps and sometimes in two. *Compare Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. at 411–12 (identifying three-part test: (1) "substantial impairment," (2) "significant and legitimate public purpose," and (3) "reasonable" and "appropriate" means), *with Sveen v. Melin*, 138 S. Ct. at 1821–22 (referencing two-part test: (1) "substantial impairment," and (2) "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose" (internal quotation marks omitted)). No

---

[61] The dissenters in *Allied Structural Steel* disputed this view, submitting that the challenged law "was designed to remedy a serious social problem arising from the [underfunding] of private pension plans." *Id.* at 252 (Brennan, J., dissenting).

75

matter. The substance of the inquiry has remained the same[62] even if the results have not always been predictable or consistent. *See, e.g., Energy Rsrvs. Grp. v. Kan. Power & Light*, 459 U.S. at 413–19 (holding that state law regulating intrastate price of natural gas did not substantially impair private party's contract rights because industry was heavily regulated and company had no reasonable expectation of receiving windfall from deregulated prices); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 500–06 (1987) (rejecting both Takings Clause and Contracts Clause challenges to state law overriding damages waivers in mining contracts, holding, as to latter, that although contract impairment was substantial, state's strong public interest in both deterrence and restoration of environment made it reasonable to impose liability as well as restrictions); *Sveen v. Melin*, 138 S. Ct. at 1822 (holding that default revocation-on-divorce rule for beneficiary designation did not impair obligation of contract because its aim was to reflect policyholder's intent, it was not likely

---

[62] In his opinions in both *Energy Reserves Group* and *United States Trust*, Justice Blackmun appears to use "appropriate" and "necessary" interchangeably to identify the relevant standard of review. *See Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, at 412–13 (referring to "reasonable" and "appropriate" standard and "necessity and reasonableness" in same paragraph (internal quotation marks omitted)); *United States Tr. Co. v. New Jersey*, 421 U.S. at 22, 25 (stating, first, that "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption" and, later, that "[a]s with laws impairing the obligations of private contracts, an impairment [of a public contract] may be constitutional if it is reasonable and necessary to serve an important public purpose"). Thus, when the Court in *Sveen v. Melin* articulates the standard as "appropriate" and "reasonable," we do not assume it was pronouncing any different standard of review from that identified in *United States Trust* and *Allied Structural Steel*, particularly as *Sveen* was resolved at the substantial impairment step of analysis.

76

to disturb expectations, and it could easily be undone by policyholder).[63]

---

[63] As our dissenting colleague observes, the Ninth Circuit and some commentators have construed *Energy Reserves Group* and *Keystone Bituminous Coal* as a "retreat" from the careful review standard for substantial contract impairments identified in *Allied Structural Steel*. Dissenting Op. at 12–13 n.7 (quoting *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 268–69 & n.16 (2d Cir. 2009) (quoting *In re Seltzer*, 104 F.3d 234, 236 (9th Cir. 1996))). To be sure, in rejecting Contracts Clause challenges, these cases mark no expansion of the constitutional protections recognized in *United States Trust* and *Allied Structural Steel*, but in neither *Energy Reserves Group* nor *Keystone Bituminous Coal* does the Supreme Court distinguish, much less reverse, its earlier cases so as to sound retreat. Indeed, in *Energy Reserves Group*, the Contracts Clause claim failed at the first, substantial impairment step of analysis, making further consideration of purpose and means unnecessary. *See* 459 U.S. at 413–16; *see also id.* at 421 (Powell, J., joined by Rehnquist, C.J., concurring). The Contracts Clause claim in *CFCU Community Credit Union* also failed at the first step. *See* 552 F.3d at 268. As for *Keystone Bituminous Coal*, the Court there assumed a substantial impairment after noting "dearths in the record" at the first step of analysis. 480 U.S. at 504 n.31. In any event, and as already noted *supra* at 73 n.59, *Energy Reserves Group* and *Keystone Bituminous Coal* both acknowledge what *Allied Structural Steel* instructs: that "[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsvs. Grp. v. Kan. Power & Light Co.,* 459 U.S. at 411; *see Keystone Bituminous Coal v. DeBenedictis,* 480 U.S. at 504 n.31 (stating that severity of impairment "affects the level of scrutiny," and can "be critical in some cases"). And while both cases emphasize the importance of judicial deference to legislative judgment, both cases nevertheless identify *Blaisdell* factors that convincingly demonstrate the reasonableness and appropriateness of the challenged legislation. *See Energy Rsvs. Grp. v. Kan. Power & Light Co.,* 459 U.S. at 417–18 (*e.g.,* no impairment of reasonable contract expectations; public interest, in context of highly regulated industry, in denying windfall at expense of consumers; reasonable exemptions; temporary measure); *see also Keystone Bituminous Coal v. DeBenedictis*, 480 U.S. at 505–06 (*e.g.,* "strong public interest" in remedying and deterring environmental harm by very persons who caused it).

Critics have suggested that unpredictability is inherent in a Contracts Clause standard that relies on balancing.[64] Whether or not such criticism is warranted, we have reviewed the evolution of the Court's Contracts Clause jurisprudence in such detail in order faithfully to apply here the constitutional limits as presently recognized by the Supreme Court. That review indicates that the Clause's limits may no longer be defined with the firmness and clarity pronounced in *Green v. Biddle* and cases of that era. Rather, the Clause's textual prohibition is now understood to demand some flexibility to allow states to protect the public welfare as explained in *Blaisdell*. Nevertheless, the Clause's limits are not illusory or non-existent. As recognized in *Allied Structural Steel*, the Clause continues to afford individuals the right to use contracts to order their affairs and to rely thereon except as warranted by a significant and legitimate public purpose pursued through reasonable and appropriate means. That standard is more demanding than the rational basis review that applies when legislation is challenged under the Due Process Clause. But it is more deferential to legislative judgment than strict scrutiny, particularly when the impaired contract at issue is private and state self-interest is not an obvious concern. It is a standard that depends on balancing to ensure that Contracts Clause limitations both "do not destroy the reserved power" of the states "in its essential aspects," and that the reserved power of the states does not "destroy the limitations" of the Contracts Clause. *Home Bldg & Loan Ass'n v. Blaisdell*, 290 U.S. at 437; *see id.* at

---

[64] *See, e.g.*, Ely, THE CONTRACT CLAUSE, at 271 (submitting that "prevailing multifactor test for ascertaining contract clause violations" can be used "to reach almost any result").

442 (stating that Contracts Clause must be construed to permit "ground for a rational compromise between individual rights and public welfare").

Applying those principles here, as well as those that apply to Rule 12(b)(6) motions, we conclude that, on the existing record, plaintiffs state a sufficiently plausible Contracts Clause challenge to the Guaranty Law to withstand dismissal.

## B. Applying the Contracts Clause to the Guaranty Law

### 1. Impairment

To determine whether plaintiffs plead a plausible Contracts Clause claim, we ask first whether the Guaranty Law substantially impairs the contract rights of landlords, such as plaintiff Bochner, whose commercial lease agreements are secured by personal guaranties. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 244. In conducting that inquiry, we follow the Supreme Court's most recent Contracts Clause decision, which instructs us to consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. at 1822; *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997) ("The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted."). When we do that here, we conclude, as the district court did, that the Guaranty Law imposes a substantial impairment.

The Guaranty Law applies to the commercial leases of tenants who were subject to pandemic shut-down orders or other restrictions on their businesses' abilities to operate. The law renders unenforceable any personal guaranties of rent obligations arising under such leases from March 7, 2020, through June 30, 2021. While the relevant obligation period is thus temporally limited to approximately sixteen months, the unenforceability of the guaranty for rent arrears arising during that period is permanent. This contrasts with the impairment in *Blaisdell*, which temporarily extended a mortgage's foreclosure redemption period but left the "integrity of the mortgage indebtedness" and "conditions of redemption" unaltered once the extension expired. 290 U.S. at 445. Under the Guaranty Law, if a tenant fails to pay rent owed for any time between March 7, 2020, and June 30, 2021, the landlord can never seek to recover those amounts from the guarantor. Not during the pandemic period. Not after the emergency declaration is withdrawn. Not ever. This substantially undermines the landlord's contractual bargain, interferes with his reasonable expectations, and prevents him from safeguarding or ever reinstating rights to which he was entitled during a sixteen-month period. *See Sveen v. Melin*, 138 S. Ct. at 1822.

In urging otherwise, defendants argue that the rent obligation of commercial leases is not severely diminished by the Guaranty Law because the landlord may continue to seek unpaid rent from the tenant. The argument does not persuade, either practically or legally.

*First*, the practical likelihood of landlords such as plaintiff Bochner recovering rent arrears from delinquent small business tenants appears speculative at best. After all, a landlord invokes his

80

guaranty rights only when a tenant is not paying rent. Meanwhile state laws and regulations have limited landlords' ability to use eviction to minimize their rent losses. As for the possibility of collecting rent from delinquent tenants after the economic crisis abates, there is no guaranty that such entities will reopen or remain going concerns. Indeed, commercial tenants, including Mr. Bochner's, are frequently corporate entities, which can dissolve and/or use bankruptcy to avoid accumulated rent indebtedness. To the extent defendants think otherwise, they will have the opportunity to develop supporting evidence on remand. But viewing the pleadings record in the light most favorable to plaintiffs as we are required to do on review of a judgment of dismissal under Rule 12(b)(6), we are not now persuaded that, as a matter of law, tenants' continued obligations for unpaid rent compels a conclusion that the Guaranty Law's permanent impairment of guaranty obligations is not substantial.

*Second*, the law recognizes a secured obligation to establish effectively two contractual bargains, one between the principals and the other between a principal and the guarantor. So here, there is one contractual bargain between landlord and tenant and another contractual bargain between landlord and guarantor. *See Park Towers S. Co., LLC v. 57 W. Operating Co.*, 96 A.D.3d 443, at *1 (1st Dep't 2012) ("[T]he guarantees and the leases are entirely separate documents, the former imposing obligations on the guarantors and the latter imposing obligations on landlord and tenant."); *Hyman v. Golio*, 134 A.D.3d 992, 992 (2d Dep't 2015) ("The guaranty executed by the defendant is a separate undertaking and a self-standing document . . . ."). The fact that the Guaranty Law does not invalidate the first

81

bargain cannot gainsay its destruction of the second for guarantor obligations arising between March 7, 2020, and June 30, 2021. The law effectively repudiates those guarantor debts, rendering them permanently and completely unenforceable. This is certainly a substantial impairment of contract. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 439 (observing that state may afford "temporary relief" from contract obligations, but cannot "adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them"); *see also Hawthorne v. Calef*, 69 U.S. at 10 (holding law repealing personal liability obligation in corporate charter to violate Contracts Clause by "not merely modif[ying]" security to creditor's prejudice, but "altogether abolish[ing]" it).

Such a "permanent" and "irrevocabl[e]" repudiation of guaranty obligations seriously upsets landlords' reasonable expectations, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 250, and "undermines the contractual bargain," *Sveen v. Melin*, 138 S. Ct. at 1822. As the pleadings record indicates, commercial landlords generally, and plaintiffs Bochner and 287 7th Avenue Realty LLC in particular, will not rent commercial space to small businesses without the security of a personal guaranty. *See* App'x at 759 (Council Member Yeger explaining that personal guaranties are critical to inducing landlords to rent to new, small businesses lacking established revenues); *id.* at 4307–08 (amended complaint stating that, for landlords like Mr. Bochner, personal guaranties are "critical inducement[s] . . . to enter into leases with commercial tenants," without which "underlying leases would be rendered virtually worthless" due to small businesses' limited assets). Here again, on a motion to dismiss, we must accept as true plaintiffs' assertion that

82

personal guaranties play this indispensable role in commercial leases and infer therefrom that landlords reasonably rely on the protection of such guaranties when leasing to small businesses. By rendering personal guaranties completely unenforceable, the Guaranty Law seriously upsets this reliance and, thus, substantially impairs the guaranty agreement.

Nor is a contrary conclusion compelled by the fact that New York has sometimes, and to varying degrees, regulated its commercial real estate market. *See, e.g.*, *Twentieth Century Assocs. v. Waldman*, 294 N.Y. 571, 577–78, 582 (1945) (rejecting due process and equal protection challenges to commercial rent stabilization law during World War II). Nothing in the pleadings record suggests that such regulation has ever pertained to personal guaranties so as to alert New York commercial landlords, prior to the pandemic, to the possibility of state action in that regard. *See Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. at 38 (reasoning that plaintiff who "purchased into an enterprise already regulated in the particular to which he now objects . . . purchased subject to further legislation upon the same topic"). *Compare Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 250 (observing that challenged law "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken but invaded an area never before subject to regulation by the State"), *with Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. at 416 (stating that where price regulation already existed and contract specifically contemplated such regulation, it was "foreseeable as the type of law that would alter contract obligations" in natural gas industry).

83

Thus, because the Guaranty Law appears permanently and unexpectedly to repudiate commercial lease guaranties for arrears arising over a sixteen-month period, we conclude that plaintiffs have plausibly alleged a significant impairment of contract.

Before proceeding to the next two steps of analysis, however, we consider plaintiffs' argument, based on *Allied Structural Steel*, that the severity of the identified impairment in this case requires us strictly to scrutinize defendants' stated purpose and the means employed to serve it. *See* 438 U.S. at 245 ("The severity of the impairment measures the height of the hurdle the state must clear."). Defendants, on the other hand, argue that the "customary deference" that we must accord to legislative judgments dictates only rational-basis review. *Id.* at 244.

We here clarify that when we read *Allied Structural Steel*'s quoted language in context, we do not understand the Supreme Court to be mandating a particular standard of review. Rather, we understand the Court to instruct that, under its present balancing approach to Contracts Clause claims—which controls us here—the weight any purpose and means showing must bear to avoid unconstitutionality can vary with the degree of contract impairment. As the Court itself stated, an impairment effecting only "[m]inimal alteration of contractual obligations" may bear so little weight as to "end the [Contracts Clause] inquiry at its first stage." *Id.* at 245; *see Sveen v. Melin*, 138 S. Ct. at 1822 ("stop[ping inquiry] after step one because . . . statute does not substantially impair pre-existing contractual arrangements"). On the other hand, "[s]evere impairment . . . will push the inquiry to a careful examination of the

84

nature and purpose" of the challenged state legislation. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 245. Implicit in a "careful examination," is recognition that factors can bear different weights in different circumstances. *Id.* A purpose and means showing sufficient to support one contract impairment may be insufficient to support another coming closer to "the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 439. Such a variable standard may raise the unpredictability concerns noted by critics, but until the Supreme Court instructs otherwise, we must endeavor faithfully to apply it in conducting the "careful examination" of a substantial contract impairment that is required "[d]espite the customary deference courts give to state laws directed to social and economic problems." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 244–45.[65]

---

[65] Judge Carney submits that the law requires a distinction only between minimal and severe impairments, without regard to degrees of severity in the latter group. *See* Dissenting Op. at 9–11. We reject this approach as contrary not only to express language in *Allied Structural Steel* (which we have already discussed at length) but also to common sense. An example makes the point. A law that renders a contract permanently unenforceable *for* all obligations arising during a sixteen-month period and a law that renders the same contract unenforceable *during* a sixteen-month period, but fully enforceable thereafter for all outstanding obligations, may both substantially impair reasonable contract expectations, but the severity of the first impairment is greater than the second. The customary deference accorded legislative judgments does not require a court to blink this reality. Rather, the relative severity of an impairment is a factor that properly weighs in the *Blaisdell* balance when determining whether a law is an appropriate and reasonable way to advance a significant public purpose. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 245; *see also Energy Rsvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. at 511; *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. at 504 n.31; *United States Tr. Co. v. New Jersey*, 431 U.S. at 27.

## 2. Significant and Legitimate Public Interest

The district court concluded that the Guaranty Law serves a significant and legitimate purpose to mitigate the economic emergency experienced in New York City as a result of the COVID-19 pandemic. Defendants submit that the law does this by permitting individual guarantors of commercial leases—usually the owners of the tenant-businesses—to escape personal liability for rent that their shuttered businesses could not pay during sixteen months of the pandemic. They argue that such guarantor liability not only would be personally devastating to small business owners, but also would make it more likely that they would permanently close their businesses, leading to increased unemployment and a reduction in services to City residents.

That this was in fact the law's purpose finds some record support in Council Member Rivera's April 29, 2020 statement explaining that she was sponsoring the Guaranty Law,

> [to] ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own[,] can do so without facing personal liability, *ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods.*

App'x at 699 (emphasis added). It also finds support in the text of extending legislation, which states that the Guaranty Law serves to minimize "economic and social damage caused to the city" by the pandemic, which "will be greatly exacerbated and will be significantly worse than if these *businesses are able to temporarily close*

86

*and return or, failing that, to close later, gradually, and not all at once.*" N.Y.C. Local L. 2020/98 § 1.6 (emphasis added).

Plaintiffs do not dispute that the COVID-19 pandemic has prompted a serious economic, as well as health, emergency in New York City. Nor do plaintiffs deny that—the Contracts Clause's origins in economic crisis notwithstanding—controlling precedent recognizes the mitigation of economic emergencies as a public purpose that can support contract impairment. *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 444; *accord Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. at 411–12; *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006). Thus, even if emergency is not required to support every impairment of contract, *see Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. at 39–40, its presence here weighs in favor of the City's pursuit of a legitimate public purpose under the first *Blaisdell* factor.[66]

---

[66] While Judge Carney reports still more record support for this purpose conclusion, *see* Dissenting Op. at 17–24, we are not as convinced as our colleague that the quoted excerpts all speak clearly to the point. We do not pursue the point because, to the extent voluminous Council records were submitted by the City in opposing plaintiffs' motion for a preliminary injunction, our ability to consider them on review of a Rule 12(b)(6) dismissal is narrowly circumscribed. *See supra* at 6 (citing cases instructing that, on review of a motion to dismiss, court may consider only pleadings, together with documents appended thereto or incorporated by reference, as well as matters of judicial notice and public record). Plaintiffs' complaint neither appends nor incorporates the Council records, and while judicial notice and matters of public record allow us to recognize that certain statements were made on a public record, it is more questionable whether we can accept such statements as true when they pertain to matters in dispute or are not cast in the light most favorable to plaintiffs. *See supra* at 6 n.2. Thus, we here take judicial notice only of the fact that Council Member Rivera ascribed a particular

Plaintiffs nevertheless argue that the second *Blaisdell* factor precludes this conclusion because the Guaranty Law does not "protect a basic societal interest," but benefits only "a favored group": commercial-lease guarantors. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 242, 248–50 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 445, and concluding that state law benefitting only certain employers violated Contracts Clause). The argument is not wholly devoid of support in the pleadings record. Various Council hearing statements might be understood to support relieving guarantors of personal liability for unpaid rents regardless of whether they ever reopen their businesses. *See supra* at 24–28. Still others might suggest a certain hostility to landlords and sympathy for small business owners. *See, e.g.*, App'x at 468, 699 (describing landlord enforcement of guaranty clauses against small business owners as "moral and ethical failure"). But, this indicates only that the question of legitimate public purpose cannot now be decided as a matter of law for either party and would benefit from further record development.

Moreover, this case is not analogous to *Allied Structural Steel.* The Supreme Court there identified the challenged law to serve no public interest because it was "not even purportedly enacted to deal with a broad, generalized economic or social problem," and the record suggested the target was a single employer. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 247–50. By contrast, the legislative history referenced *supra* at 24–28, indicates that City Council

---

purpose to the Guaranty Law when proposing that legislation, and that a similar purpose is part of the text of subsequent legislation extending the Guaranty Law because that suffices to our limited determination of purpose on this appeal.

members may have thought shielding guarantors from liability for lease arrears would serve not simply those individuals, but society's larger interest in maintaining the small businesses necessary for functioning neighborhoods. As at least one New York court has observed,

> The Council wanted to avoid having business owners (who are often guarantors in commercial leases) close up shop to minimize their personal exposure. The Council clearly chose to try to protect the businesses that serve the local community—stores, restaurants, gyms—so that when the [shut-down] restrictions are lifted, the stores and restaurants would (hopefully) reopen and some semblance of community would return. The Council obviously wanted to avoid a situation where owners/guarantors, to protect their personal assets, had to turn in the keys and walk away from their restaurant or store; *if that happened, the neighborhoods would almost certainly be ghost towns with closed storefronts everywhere long after restrictions are lifted.*

*40 X Owner LLC v. Masi*, No. 156181/2020, 2020 WL 65431, at *3–4 (N.Y. Sup. Ct. Jan. 7, 2021) (emphasis added). Whether the Guaranty Law is a reasonable and appropriate means to serve this larger public purpose is another question, which we consider in the next section of this opinion. Here, we conclude only that because the City asserts a legitimate public purpose that appears at least plausible on the

89

pleadings record, we are obliged to conduct that further means inquiry.[67]

Thus, because the record before us plausibly suggests a significant and legitimate purpose for the Guaranty Law, we proceed to consider whether plaintiffs plausibly plead that the means employed by the City were not reasonable and appropriate to its professed public purpose.

---

[67] Out-of-circuit cases cited by plaintiffs do not compel a different conclusion here. At issue in *Association of Equipment Manufacturers v. Burgum*, 932 F.3d 737 (8th Cir. 2019), was a state law prohibiting manufacturers from imposing certain contract obligations on farm-equipment dealers. While defendants professed that the law's public purpose was to serve farmers and rural communities, the court of appeals ruled that the conclusion lacked any support in the law's text or history, which focused exclusively on restricting manufacturers to the benefit of dealers. *Id.* at 731–34. Similarly, in *In re Workers' Compensation Refund*, 46 F.3d 813 (8th Cir. 1995), the state professed that a law redirecting certain surplus insurance premium payments served the public purpose of lowering employers' costs and avoiding a windfall to insurance companies. But the court of appeals ruled that these purposes lacked record support, because premiums amassed between 1979 and 1992 were only being directed to a narrow category of employers and payment of the monies to insurance companies as provided by contract was no windfall. *See id.* at 817, 821. This case is distinguishable from both because, as already discussed, the pleadings record here indicates that the Guaranty Law focuses on guarantors in order to serve the larger public interest in preserving neighborhood businesses through an economic emergency.

Moreover, the posture of these cases is different, with *Burgum* reviewing the grant of a preliminary injunction and *In re Workers' Compensation Refund* reviewing an award of summary judgment. In both situations, therefore, the Eighth Circuit had the benefit of a more robust record in assessing the challenged laws' public purposes.

### 3. Reasonable and Appropriate Means

Upon careful consideration, we conclude that the means question cannot now be decided in defendants' favor as a matter of law and, therefore, that plaintiffs' Contracts Clause claim cannot be dismissed under Rule 12(b)(6). Applying the principles identified in *Blaisdell* and its progeny, five features of the Guaranty Law inform that conclusion. While we discuss them individually, it is the totality that precludes dismissal of the Contracts Clause claim.

*First*, the Guaranty Law is not a "temporary" or "limited" impairment of contract, a factor critical to the Supreme Court's conclusion in *Blaisdell* that a state moratorium law was a reasonable means to afford economic relief during the Great Depression. *See* 290 U.S. at 439 (contrasting repudiation of debt, destruction of contract, or denial of enforcement, which could not be justified by police power, with "limited and temporary interpositions," which "may be consistent with the spirit and purpose" of Contracts Clause).[68] The

---

[68] Our dissenting colleague cites the above parenthetical in attributing to the majority the "suggest[ion] that the repudiation of debt, destruction of contract, or denial of enforcement could not—as a categorical matter—be justified by police power." Dissenting Op. at 34–35 n.22. In fact, we reach no categorical conclusion here. *See infra* at 93. In the parenthetical, we simply note a point made by the Supreme Court, which comes directly from *Blaisdell*. In there rejecting a literal reading of the Contracts Clause, the Court held that a balance had to be struck between a state's reserved police power and Contracts Clause limitations. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 439 ("The reserved power cannot be construed so as to destroy the limitation nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other."). It was in that context that, in the next sentence, the Court stated: "This principle precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts

---

91

*Blaisdell* moratorium law was not permanent or unlimited. It deferred a mortgagor's obligations and a mortgagee's remedies, but it did not abolish them. Thus, when the moratorium period expired, the underlying "integrity of the mortgage indebtedness [was] not impaired" and the parties' remedies were "maintained." *Id.* at 445.

By contrast, although the Guaranty Law pertains only to rent arrears arising between March 7, 2020, and June 30, 2021, it does not simply defer guaranty obligations until the conclusion of that period. Rather, it permanently and entirely extinguishes them. Thus, far from affording temporary relief that leaves the "integrity" of commercial lease guaranties unimpaired, *id.*, the City destroys the guaranties by rendering them forever unenforceable for up to sixteen months of rent obligations.[69] This not only demonstrates a significant impairment of

---

or the denial of means to enforce them," *id.*, followed by another sentence explaining that such preclusion does not mean "that conditions may not arise in which a *temporary* restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community," *id.* (emphasis added). Nothing in *Keystone Bituminous Coal* repudiates *Blaisdell*'s quoted admonition. *See* Dissenting Op. at 34–35 n.22. In there emphasizing that modern jurisprudence did not read the Contracts Clause "literally," the Court observed that this pertained even in cases that were the "primary focus" of the Contracts Clause, *i.e.*, those challenging legislation "designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. at 503. This represents no departure from *Blaisdell*, which *Keystone*, in fact, cites to support its point. *See id.* (referencing *Blaisdell* upholding temporary foreclosure moratorium).

[69] Insofar as the Guaranty Law's sponsor characterized the legislation as a "temporary suspension" of guaranty obligations, *supra* at 30, the statutory text belies the assertion. The deference we owe exercises of police power does not extend to a legislature's characterizations of law at odds with text. *See also supra*

contract, but also weighs heavily against a legal determination at the pleadings stage that means so destructive of contract rights are reasonable to address the City's professed public interest. *See id*. at 445–47; *accord Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 250 (identifying unreasonable impairment of contract where law, among other things, permanently changed parties' relationship); *W.B. Worthen v. Kavanaugh*, 295 U.S. at 62.

In urging otherwise, defendants point to cases in which this court rejected Contracts Clause challenges to laws permanently impairing contracts. *See Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d at 367, 372; *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 69 (2d Cir. 2020). This misses the point. We do not here hold that, under the balancing test dictated by *Blaisdell* and its progeny, a permanent impairment of contract can never be deemed reasonable or appropriate. Rather, we understand those cases to instruct that a permanent and complete impairment of contract, by contrast to a temporary and limited one, will weigh heavily against a finding of reasonableness, particularly at the pleadings stage. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 245, 250; *see also United States Tr. Co. v. New Jersey*, 431 U.S. at 27 ("The extent of impairment is certainly a relevant factor in determining its reasonableness."); *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d at 371 (stating that extent of impairment is "relevant factor in determining [] reasonableness" at step 3).

---

at 26 & n.30 (noting further inaccuracy of Council's suggestion that personal guaranties make *businesses* answerable in court for unpaid debts, when, in fact, they make individual guarantors answerable).

In *Buffalo Teachers* and *Sullivan,* temporary freezes of bargained-for wage increases were permanent impairments of contracts in the sense that the increases, when they finally did take effect, were not made retroactive for the freeze periods. *See Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d at 367; *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d at 59. Nevertheless, employees continued to be paid for their services rendered, albeit at the frozen rates, and they remained free to seek better-paying employment elsewhere. Thus, the impairments, although permanent, do not weigh as heavily against reasonableness as the Guaranty Law. That law does not simply freeze, or even reduce, the amount a landlord can recoup from a guarantor for rent arrears arising from March 7, 2020, to June 30, 2021. Instead, it forever denies the landlord the full guaranteed amount for that sixteen-month period. Moreover, it does so in a legal context that effectively precludes the landlord from terminating a delinquent tenant's lease or reclaiming his premises. In these circumstances, *Buffalo Teachers* and *Sullivan* do not compel a conclusion that the Guaranty Law is a reasonable impairment of commercial lease agreements. Rather, the fact that the law is neither temporary nor limited raises reasonableness concerns precluding dismissal of plaintiffs' Contracts Clause claim as a matter of law.[70]

---

[70] The Ninth Circuit's recent rejection of a Contracts Clause claim in *Apartment Ass'n of Los Angeles County v. City of Los Angeles*, 10 F.4th 905 (9th Cir. 2021), is not to the contrary. The challenged eviction moratorium there did not destroy the integrity of the parties' underlying rent agreement but, rather, deferred payment of rent arrears for "up to 12 months" after the end of the mayor's declared pandemic emergency. *Id.* at 910. Further distinguishing that case from this one is the fact that the issue on appeal was plaintiff's entitlement to a preliminary

*Second*, that conclusion is reinforced by the fact that, on the pleadings record, we cannot conclude as a matter of law that the Guaranty Law is an appropriate means for achieving its professed public purpose: to help shuttered small businesses survive the pandemic so that they can reopen after the emergency, ensuring functioning neighborhoods throughout the City. To explain, we note three assumptions informing the City's enactment of the Guaranty Law: (a) that shuttered small businesses are usually owned by the individuals guaranteeing their leases, (b) that these owner-guarantors would be financially ruined if required to pay their businesses' rent arrears, and (c) that financially ruined owners would be unlikely to reopen shuttered businesses. It is to mitigate the last concern that the Guaranty Law absolves commercial-lease guarantors of their obligations for rent arrears arising between March 7, 2020, and June 30, 2021.

The problem with concluding that the Guaranty Law is an appropriate means to serve this public purpose is that the law does not condition the relief it affords on guarantors owning shuttered businesses or, even if they do, on their ever reopening those businesses. Rather, guarantors receive the full relief afforded by the Guaranty Law even if they never reopen (or intend to reopen) their businesses. In short, the Guaranty Law permanently excuses guarantors from pandemic-accrued rent liability even in

---

injunction on which it bore the burden of demonstrating likely success on its Contracts Clause claim, not simply its plausibility, as necessary here to withstand dismissal. *See id.* at 911; *see also New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (discussing different review standards for motions to dismiss and preliminary injunctions).

circumstances where they do nothing to serve the public interest in generally ensuring functioning neighborhoods. While we defer to legislative judgments about the means reasonable and appropriate to address a public emergency, such deference is not warranted in the absence of some record basis to link purpose and means that, otherwise, appears missing.[71] Defendant may be able to offer evidence on remand demonstrating the missing link. We note only that it is lacking in the record we review on this challenge to dismissal pursuant to Rule 12(b)(6).

The record of City Council proceedings leading to the enactment of the Guaranty Law does little to assuage this concern. Small business owners subject to shut-down orders submitted that guaranty enforcement would cause them personal hardships. *See supra* at 26–28. Even assuming *arguendo* that these statements might be accepted for their truth, in none did an owner promise to reopen a shuttered business if afforded Guaranty Law relief. Rather, some owners urged that they be granted guaranty relief to minimize personal loss so that they can "move on" if they "cannot reopen," predicting that "many small businesses will ultimately close our doors forever once aid runs out." *Supra* at 26–28 & n.32.

The omission of a reopening condition in the Guaranty Law is curious given that other pandemic relief serving a similar public purpose is specifically conditioned on a business's continued operation. For example, forgiveness of low-interest PPP loans to

---

[71] *See* Dissenting Op. at 7 (observing that, on review of Contracts Clause challenge, "record must support a finding that the legislature's chosen means are reasonable and appropriate" to its stated purpose).

96

small businesses is conditioned on maintenance of workforce and compensation levels.[72]  Similarly, the Restaurant Revitalization Fund will not provide benefits to restaurants that are "permanently closed" or that cannot certify in good faith that the relief funds are "necessary to support . . . ongoing or anticipated operations."[73]  We express no view on how these continuing operation conditions might inform challenges to these laws.  We conclude only that the absence of any such condition from the Guaranty Law calls into question the appropriateness of its permanently destructive contract impairment as a means for pursuing its professed public purpose.

Thus, concerns about the appropriateness of the Guaranty Law's impairment to its professed public purpose further caution against dismissal.

*Third*, these concerns are heightened by the Guaranty Law's allocation of its economic burden.  Permanently excusing guarantors from pandemic-accrued rent liabilities comes not at City expense (or, more precisely, that of the public that benefits from functioning neighborhoods) but, rather, at the expense of a discrete group of private persons: commercial landlords.  This raises Contracts Clause concerns similar to those identified in *Association of Surrogates and Supreme Court Reporters v. New York*, 940 F.2d 766 (2d Cir. 1991).

---

[72] *See PPP loan forgiveness*, U.S. Small Bus. Admin. (last accessed Aug. 17, 2021), https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness.

[73] *Restaurant Revitalization Funding Program*, U.S. Small Bus. Admin. 3, 6 (Apr. 28, 2021), https://www.sba.gov/sites/default/files/2021-04/Restaurant%20Revitalization%20Fund%20Program%20Guide%20as%20of%204.28.21-508_0.pdf.

There, a state payroll lag deprived judicial employees of ten days' pay over a twenty-week period, purportedly to be paid back upon termination of employment. *See id.* at 772. In holding the action violative of the Contracts Clause, we faulted the state for funding the expansion of the court system—its public purpose—by placing costs "on the few shoulders of judiciary employees instead of the many shoulders of the citizens of the state." *Id.* at 773 (referencing state's ability to cover costs by means of "raised taxes" or "another governmental program").

Here too, the City did not afford Guaranty Law relief by appropriating existing funds or raising taxes so as to place the burden of preserving neighborhoods on the citizenry that would benefit therefrom. Instead, it transferred the burden to the "few shoulders" of commercial landlords. *Id.* Moreover, the City did so by upsetting lawfully contracted-for expectations between landlords and guarantors, eliminating the former's rights and the latter's responsibilities with respect to tenants' rent defaults within the prescribed period. We recognize that *Association of Surrogates* is a public contract case. But even assuming that less deference was due the legislative judgment there than in this case, reasonableness and appropriateness concerns are raised by a legislative decision to provide financial relief to certain persons not through public funds but by destroying the contract expectations of other persons, particularly persons not responsible for the circumstances warranting relief.

Two other "permanent" impairment cases cited by defendants do not support such contract impairment. *See Keystone Bituminous*

98

*Coal Ass'n v. DeBenedictis*, 480 U.S. at 504–06 (rejecting Contracts Clause challenge to regulation invalidating contractual liability waivers for mine operators to prevent and remedy workers' damage to protected land); *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d at 990, 994 (rejecting Contracts Clause challenge to license provision for early contract terminations to address industry infiltration by organized crime). In both cases, the burden of contractual impairment was tailored to the party causing the public harm that the state sought to mitigate. By contrast, defendants here do not argue that landlords are in any way responsible for the economic problem that the Guaranty Law seeks to address.

Thus, in the circumstances of this case, the City's allocation of the full economic burden of the Guaranty Law to landlords raises further concerns about its impairment of contracts being a reasonable and appropriate means to serve its neighborhood-preserving purpose.[74]

---

[74] Judge Carney submits that strong deference to the City Council's judgment in enacting the Guaranty Law is further compelled by the Council's consideration of "alternative policies and policy designs," and "narrowed eligibility." Dissenting Op. at 32. None of these factors so assuage the concern raised by the identified burden and the other factors noted in the opinion as to compel dismissal. As noted *supra* at 15 n.22, most of the laws included in the package of which the Guaranty Law was a part regulated the outdoor service or delivery of food. None of these laws, nor the Harassment Amendments (which were also part of the package) provided economic relief to certain persons at the expense of others not responsible for the injury. And while it is not entirely clear what alternatives to the Guaranty Law Judge Carney is referencing beside one that determined eligibility by reference to diminished revenues rather than closure orders, *see* Dissenting Op. at 32 n.19, nothing in the record indicates consideration of alternatives that would not have impaired guaranty obligations (or would not

*Fourth*, adding to that reasonableness concern is the fact that the Guaranty Law relief is not conditioned on need. Instead, the law permanently absolves all small-business lease guarantors of any responsibility for up to sixteen months of rent arrears regardless of their ability to pay. The omission of any need condition weighed against the reasonableness of mortgage moratorium relief in *Kavanaugh*. *See* 295 U.S. at 61 (holding impairment of contract unreasonable where law did "not even" require debtor to satisfy court "of his inability to pay" rent); *see also W.B. Worthen Co. v. Thomas*, 292 U.S. at 434 (identifying Contracts Clause violation where law lacked "limitations as to time, amount, circumstances or need"). It does so here as well.

To be sure, the Guaranty Law only affords relief to natural-person guarantors of businesses forced to shutter or reduce operations during the pandemic. But that, by itself, does not mean that a particular guarantor cannot pay rent arrears, particularly when temporally cabined by a good-guy provision. *See supra* at 32–33. Nor does it necessarily mean that a particular landlord is better able than a particular guarantor to bear the financial burden of a tenant's inability to pay rent. *Cf. Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (recognizing that "[d]espite the CDC's determination that [residential] landlords should bear a significant financial cost of the pandemic, many landlords have modest means").

---

have done so permanently) or that would have placed the relief burden on society generally.

Many forms of pandemic financial relief are conditioned on individual applicants demonstrating need or hardship. For example, the CARES Act tied stimulus payments to individuals' adjusted gross incomes, *see* CARES Act § 2201(a); the American Rescue Plan's Restaurant Revitalization Fund provided financial assistance based on eligible businesses' pandemic-related revenue losses;[75] and even New York's statutory eviction moratoria apply only to those claiming pandemic-related hardship, *see* TSHA § 2.2; CEEFPA pt. A; CEPOSBA pt. A.[76] The rationale for doing so—to make sure public benefits are responsibly distributed to serve their public purpose—is no less applicable when the benefits derive from the state's impairment of private contract expectations as when they derive from the public fisc. *See generally Exxon Corp. v. Eagerton*, 462 U.S. 176, 191–92 (1983). The record indicates little Council discussion on the subject of guarantor need, much less a stated reason for not including such a condition in the challenged law. *Compare Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 446 (rejecting Contracts Clause challenge to moratorium law that had "regard to the interest of mortgagees as well as to the interest of mortgagors" and sought "to prevent the impending ruin of both"),

---

[75] *See Restaurant Revitalization Fund*, U.S. Small Bus. Admin. (last accessed Aug. 17, 2021), https://www.sba.gov/funding-programs/loans/covid-19-relief-options/restaurant-revitalization-fund.

[76] In temporarily enjoining New York's CEEFPA residential eviction moratorium, the Supreme Court identified a likely due process violation in the law's failure to afford landlords an opportunity to contest a tenant's hardship declaration. *See Chrysafis v. Marks*, 141 S. Ct. 2482. While the Contracts Clause was not at issue in *Chrysafis*, if the economic relief there afforded is likely unreasonable without an opportunity to challenge professed hardship, we can hardly conclude as a matter of law that the Guaranty Law's contract impairment is a reasonable means for providing economic relief in the absence of any hardship condition at all.

101

*with W.B. Worthen Co. v. Kavanaugh*, 295 U.S. at 60 (upholding Contracts Clause challenge where legislature showed "studied indifference" to mortgagee's interests in enacting moratorium that took from mortgage its "quality of an acceptable investment for a rational investor").

Certainly, legislatures may act based on "the general or typical situation," even if "there are, or may be, individual cases of another aspect." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 446. But in *Blaisdell*, record evidence supported a conclusion that, generally, mortgagees were large investors better able than individual mortgagors to bear the burden of a temporary and limited moratorium. *See id.* at 445–46. Here, the Guaranty Law is not temporary nor limited, and defendants point to nothing in the record to compel a conclusion that commercial landlords are better positioned financially than guarantors to absorb the economic blows of the pandemic on commercial real estate.[77] Certainly, nothing in the record indicates City Council review of any empirical evidence on this point either when first enacting the Guaranty Law in May 2020, or when renewing it in September 2020 and April 2021. Even if the first omission might be excused by the evolving pandemic emergency,

---

[77] In vetoing a proposed Maryland Guaranty Law that afforded only temporary relief from small business lease guaranties, *see* H.B. 719 (Md. 2021), the Governor voiced concern that the bill failed to account for the fact that many of the state's "commercial landlords are small businesses themselves," or to consider "circumstances where the commercial tenant is a larger entity and has more capital than their landlord." Letter from Lawrence J. Hogan, Jr., Governor, Md., to Bill Ferguson, President, Md. S., and Adrienne A. Jones, Speaker, Md. H.D. (May 28, 2021), https://governor.maryland.gov/wp-content/uploads/2021/05/HB719-Commercial-Tenants-VETO.pdf.

that conclusion does not easily obtain for the latter omissions given that between the summer of 2020 and the summer of 2021, businesses were slowly allowed to reopen,[78] and between March 2020 and March 2021, trillions of dollars in pandemic financial assistance were appropriated, including hundreds of billions to assist small businesses.  *See supra* at 8–9, 11–14.  The relative availability of such assistance—to tenants, guarantor-owners, and landlords—would bear not only on whether it was reasonable and appropriate for the City Council to place the Guaranty Law's financial burden on landlords without regard to guarantor need, but also on whether it was reasonable and appropriate to do so permanently, rather than temporarily, and for an extended sixteen-month period.  *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 447 (finding temporary mortgage moratorium reasonable where, among other things, law provided for moratorium period to be reduced as warranted by a "change in circumstances"); *cf. Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. at 2489 (observing, with respect to CDC revival of federal residential eviction moratorium, that distribution of federal rental assistance "diminished" government interest in maintaining moratorium).

Instead, the present record contains only anecdotal or conclusory statements by Council members that, even if properly considered on Rule 12(b)(6) review, are more indicative of shared

---

[78] These events preclude a conclusion at the dismissal stage that the Guaranty Law is "closely tied" to state shut-down orders.  Dissenting Op. at 31.

hardships than of a singular burden on guarantors or even tenants.[79] Even in *East New York Savings Bank*—which, as we observe *supra* at 65, signaled the high-water mark of judicial deference to a legislature's exercise of police power to impair private contracts—the Supreme Court emphasized that the legislature had not relied "merely upon the pooled general knowledge of its members," 326 U.S. at 234. Rather, the "whole course" of legislation there showed "the empiric process of legislation at its fairest: frequent reconsideration, intensive study of the consequences of what has been done, readjustment to changing conditions, and safeguarding the future on the basis of responsible forecasts." *Id.* at 234–35. The record here provides no similar showing.

To the extent defendants think they can adduce such evidence, they will have the opportunity to do so on remand. We here conclude only that, on the record before us, the failure to condition relief on guarantor need is a further reason why the Guaranty Law cannot be deemed reasonable and appropriate to its public purpose as a matter of law.

---

[79] *See* App'x at 699 (Council Member Rivera: "[S]ome landlords who I understand may be suffering as well are going after small business owners['] life savings and personal assets during this national pandemic."); *id.* at 759–60 (Council Member Yeger: "[I]t's not that the landlord's wrong. . . . [W]e are in tough times and everybody is hurting and it can't just be that the tenant is not going to pay rent because the tenant doesn't have income. We have to find a way . . . to reduce the burden on all New Yorkers that are trying to come out of this."); *id.* at 468 (Council Member Rivera: "[L]andlords are also facing struggles and the small and nonprofit landlords need further financial support, but I also find it . . . a moral and ethical failure that anyone would seek to take every last bit of someone['s] savings in the middle of a disaster, even after they have taken their businesses to the point of [bankruptcy].").

*Fifth*, the reasonableness of the Guaranty Law as a means to serve the City's stated public purpose is also called into question by the law's failure to provide for landlords or their principals to be compensated for damages or losses sustained as a result of their guaranties' impairment. On the present record, we must assume that such damages can be extensive. The amended complaint alleges that when an inability to collect rent or to enforce rent guaranties left landlord 287 7th Avenue Realty LLC unable to pay tax obligations, the LLC's principal, Mr. Bochner, drew on $35,000 of his own funds to make the payments. The Guaranty Law provides for no compensation of these losses, whether by the guarantor, the tenant, or even the government.[80]

A compensation condition was an important factor in identifying the mortgage moratorium in *Blaisdell* as a reasonable means to provide temporary and limited economic relief to mortgagors. The moratorium allowed a delinquent mortgagor to remain in possession of premises on the condition that he pay the mortgagee reasonable rent throughout the moratorium period. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 445 (observing that rent condition ensured mortgagee "not left without compensation for the withholding of possession"); *see also Manigault v. Springs*, 199 U.S. at 481–83 (rejecting Contracts Clause challenge to law authorizing

---

[80] The tax relief referenced by Judge Carney, *see* Dissenting Op. at 32, appears to authorize no tax forgiveness but only a 7.5% interest rate for unpaid taxes on certain qualifying properties between July 1, 2020, and October 15, 2020, for owners who document an adverse effect from the COVID-19 pandemic. *See* N.Y.C. Local L. 2020/62. On the existing record, we cannot conclude, as a matter of law, that this reasonably compensates for or mitigates a contract impairment that permanently repudiates up to sixteen months of guaranty obligations.

landowner to erect dam where conditioned on payment of damages to landowners).  Similarly, the absence of a compensation requirement informed the identification of a Contracts Clause violation in *Kavanaugh*.  *See* 295 U.S. at 61 (faulting law for affording debtor "undisturbed possession" of property with no condition that he pay "interest and taxes or the rental value of the premises").

This is not to suggest that compensation is always necessary to defeat a Contracts Clause challenge.[81]  But where, as here, a law permanently deprives a landlord of the protection of a lease guaranty for up to sixteen months of rent arrears and without regard to guarantor need, the failure to condition such relief on some compensation for, or mitigation of, tax and other obligations that the landlord (or his principal) is required to satisfy, is a further reason to question the reasonableness and appropriateness of the Guaranty Law.

On remand, the parties may, of course, identify still other circumstances relevant to determining whether the Guaranty Law is a reasonable and appropriate means to serve the City's professed

---

[81] Compensation is a *factor* in Contracts Clause analysis; it is a *requirement* under the Takings Clause.  *See generally Apartment Ass'n of L.A. Cnty. v. City of Los Angeles*, 10 F.4th at 915 (acknowledging that reasonable rent has been a "relevant consideration" in Contracts Clause challenges to eviction moratoria, but not a "constitutional floor").  While plaintiffs have not here pleaded a Takings Clause claim, nothing in this opinion is intended to preclude the parties or the district court from considering how these two constitutional protections might overlap in the circumstances of this case.

public purpose.[82]  We here conclude only that with five features of the law weighing heavily against that conclusion, the matter cannot be decided in favor of defendants as a matter of law on a motion to dismiss.  Thus, while we agree with the district court that the Guaranty Law significantly impairs guaranty agreements for what appears to be the plausible public purpose of ensuring functioning neighborhoods, we cannot conclude as a matter of law that the Guaranty Law is a reasonable and appropriate means to serve that purpose so as to warrant dismissal.  Rather, the case must proceed to discovery.[83]

To the extent plaintiffs urge this court not only to vacate the dismissal of their Contracts Clause claim but also to declare the Guaranty Law unconstitutional as a matter of law, we think such action premature.  Insofar as that argument was advanced in plaintiffs' motion for preliminary injunctive and declaratory relief, the district court did not rule on the question of whether plaintiffs would likely succeed.  It should do so in the first instance.  *See Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000) (stating that "it is

---

[82] The availability of other pandemic-related financial assistance to contracting parties may bear on the reasonableness of impairment without compensation, and the parties may wish to develop the record on this point further on remand.

[83] Judge Carney submits that plaintiffs "did not argue to the District Court that additional factual development was needed."  Dissenting Op. at 33 n.20.  But plaintiffs' concession disavowing the need for discovery pertained not to the case as a whole, but only to plaintiffs' motion for a preliminary injunction and declaratory relief.  *See* Letter at 1, *Melendez v. City of New York*, No. 20-CV-5301 (RA) (S.D.N.Y. Sept. 9, 2020), ECF No. 64.  In any event, defendants too are entitled to an opportunity to develop the record with respect to some of the points of concern identified in this opinion.

our distinctly preferred practice to remand" issues briefed but not decided below "for consideration by the district court in the first instance"); *see also New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 180–81 (2d Cir. 2020) (reversing dismissal of plaintiff's constitutional claim, but "leav[ing] it to the district court in the first instance to decide if [requested] equitable relief is warranted and its exact scope").

Thus, we reverse the dismissal of plaintiffs' Contracts Clause challenge and remand the case to the district court for it to allow the parties to develop the record further on issues identified in this opinion as well as any other matters relevant to the claim.

## CONCLUSION

To summarize,

1. Plaintiffs fail plausibly to plead that amendments to the City's Residential and Commercial Harassment Laws, *see* N.Y.C. Admin. Code §§ 22-901 *et seq.*, 27-2004 *et seq.*, which prohibit "threatening" residential or commercial tenants based on their COVID-19 status, violate either:

    a. the First Amendment by restricting commercial speech in the ordinary collection of rent, or

    b. the Fourteenth Amendment's Due Process Clause by failing to provide fair notice of what constitutes proscribed threatening conduct.

2. Plaintiffs state a plausible Contracts Clause challenge to N.Y.C. Admin. Code § 22-1005, which renders permanently

unenforceable certain personal guaranties of commercial lease obligations. Reviewing that claim by reference to balancing principles identified in the Supreme Court's most recent Contracts Clause jurisprudence, this court concludes that:

    a.  the challenged Guaranty Law significantly impairs personal guaranty agreements;

    b.  the record thus far demonstrates a plausible significant public purpose for the impairment; but

    c.  the same record raises at least five serious concerns about that law being a reasonable and appropriate means to pursue the professed public purpose, and, thus, that determination cannot now be made in favor of defendants as a matter of law.

Accordingly, the judgment of the district court is **AFFIRMED IN PART**, insofar as it dismissed plaintiffs' First Amendment and Fourteenth Amendment challenges to the Harassment Amendments; **REVERSED IN PART**, insofar as it dismissed plaintiffs' Contracts Clause challenge to the Guaranty Law; **VACATED IN PART**, insofar as it denied plaintiffs' motion for preliminary injunctive and declaratory relief without review; and the case is **REMANDED** for further proceedings consistent with this opinion, including prompt consideration of the merits of the reinstated preliminary injunction/declaratory judgment motion. The Clerk of Court is instructed that any appeals from further rulings by the district court in this case shall return to this panel.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

109

No. 20-4238
*Melendez v. City of New York*

CARNEY, *Circuit Judge*, concurring in the result in part and dissenting in part:

In the spring of 2020, New York State and New York City lay at the front lines of the global COVID-19 pandemic. It is undisputed that "New York State was hit early and hard by the pandemic," with New York City alone accounting for one quarter of the nation's COVID-19-related deaths in the early days of the pandemic. Maj. Op. at 7. The public health emergency sparked a severe economic contraction as citizens ceased their typical activities and governments required businesses to suspend or drastically reduce their operations. In New York, the Governor issued shutdown orders that closed or severely limited capacity for large numbers of New York businesses beginning in March 2020. As the pandemic continued, the Governor's shutdown orders were extended, in various forms, until June 15, 2021.

In the context of this public health and economic emergency, over the course of that spring, the New York City Council introduced, debated, and enacted several pieces of legislation to address related economic, housing, and health and safety issues. Among those that the City Council enacted are three laws affecting the rights and obligations of the City's commercial and residential tenants and landlords that are challenged in this lawsuit, which is brought against Defendants-Appellees the City of New York and certain City officers (together, the "City"). Two of the laws, together known as the "Harassment Laws," prohibit landlords from threatening commercial and residential tenants based on their status as persons or businesses affected by COVID-19. The third law, known as the "Guaranty Law," makes certain personal guarantees of commercial lease obligations unenforceable if three conditions apply: the guarantor is a natural person; the business was subject to certain shutdown orders or capacity restrictions; and the relevant sums became due between March 7, 2020, and June 30, 2021, and went unpaid. The guarantor in such agreements is typically an owner or other principal of the business that has signed a commercial lease with the landlord.

I concur with the Majority that the District Court's judgment dismissing the challenge to the Harassment Laws should be affirmed. But I respectfully disagree with the Majority's decision to reverse the District Court's judgment rejecting the Contracts Clause challenge brought by Plaintiffs-Appellants Elias Bochner and his company (together, "Bochner") against the Guaranty Law.

Since the 1980s, the Supreme Court and our Court have articulated and applied a strongly deferential standard to legislation facing Contracts Clause challenges, particularly when—as here—the legislation does not involve public contracts or the government's financial self-interest. The Supreme Court has "repeatedly held that unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."[1] *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987). We have "emphasize[d] that whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned" if the "governmental action [was] intended to serve the public good, as the government saw it." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 69 (2d Cir. 2020). Applying this deferential standard to the City Council's judgment in enacting the Guaranty Law, I would affirm the District Court's dismissal of Bochner's Contracts Clause challenge to the law.

In its decision to reverse and remand this portion of the District Court's decision, the Majority resists a straightforward application of our precedents. Instead, it undertakes a lengthy and unnecessary review of superseded case law and highlights one perspective that is critical of modern Contracts Clause jurisprudence. On this basis, it articulates an exacting standard of review for assessing the legislature's judgment—a

---

[1] Unless otherwise noted, in text quoted from caselaw, this dissent omits all alterations, citations, footnotes, and internal quotation marks.

standard that is consistent with its emphasis on viewpoints critical of the modern approach to Contracts Clause challenges, but inconsistent with the approach the Supreme Court and our Court have actually adopted and applied. As a result, the Majority's analysis of whether the Guaranty Law is a reasonable and appropriate measure bears a greater resemblance to an application of strict scrutiny than to the substantial deference that case law instructs us to accord the legislative judgment.

For these reasons and others discussed below, I respectfully dissent from the Majority's decision to reverse the District Court's judgment as to Bochner's Contracts Clause challenge to the Guaranty Law.

## I.      Contracts Clause standard of review

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1. Notwithstanding that the Contracts Clause is "facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983). It is well established that the Contracts Clause "does not trump the police power of a state to protect the general welfare of its citizens, a power which is paramount to any rights under contracts between individuals." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006).

Contracts Clause challenges, as the Majority correctly describes, are now evaluated using a three-part test. *See Energy Rsrvs. Grp.*, 459 U.S. at 411–13; *Buffalo Tchrs. Fed'n*, 464 F.3d at 368. Under the modern test, we must first determine whether the law at issue has "operated as a substantial impairment of a contractual relationship." *Energy Rsrvs. Grp.*, 459 U.S. at 411. At the second step, the inquiry turns to whether the legislation has "a significant and legitimate public purpose . . . , such as the remedying of a broad and general social or economic problem." *Id.* at 411–12. Third, and finally,

3

"[o]nce a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption."[2] *Id.* at 412.

I part ways with the Majority with respect to the level of scrutiny to be applied at the third step of this analysis, when determining whether the legislation is a reasonable and appropriate means for serving the identified public purpose. In my view, the standard articulated by the Majority is too exacting and is not in keeping with the weight of recent authority establishing that the legislative judgment should receive substantial deference at the third step.

A. <u>Under the modern Contracts Clause analysis, substantial deference is owed to the legislative judgment of whether a law is a reasonable and appropriate means to address a legitimate public purpose</u>

In *Energy Reserves*, the Supreme Court explained that "[u]nless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 412–13. A few years later, in *Keystone Bituminous Coal*, the Supreme Court emphasized that it had "repeatedly held" that, when private contracts

---

[2] The Supreme Court recently described this approach as a "two-step test" in which the court first determines if there is a "substantial impairment of a contractual relationship," and, if so, then asks "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018). I agree with the Majority when it explains that the Supreme Court's varying characterization of the number of steps in the test does not affect the substance of the inquiry. I use the three-step analysis derived from *Energy Reserves* in this dissent to mirror how the Majority evaluates the Contracts Clause challenge to the Guaranty Law in three parts, with separate sections addressing whether the law (1) substantially impairs a contract; (2) serves a significant and legitimate public purpose; and (3) is a reasonable and appropriate means of serving that public purpose.

are at issue, courts "properly defer to legislative judgment" at the third step. 480 U.S. at 505. In upholding the law at issue there, the Court "refuse[d] to second-guess the Commonwealth's determinations" that the legislative choices were "the most appropriate ways of dealing with the problem." *Id.* at 506.

Building on the Supreme Court cases handed down in the past forty years, our Court has consistently held that "[w]hen a law impairs a private contract, substantial deference is accorded to the legislature's judgments as to the necessity and reasonableness of a particular measure." *Buffalo Tchrs. Fed'n*, 464 F.3d at 369; *see Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) ("We must accord substantial deference to the Town's conclusion that its approach reasonably promotes the public purposes for which the ordinance was enacted."); *see also CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 266 (2d Cir. 2009) ("Unless the state is a party to the contract, courts generally should defer to legislative judgment as to the necessity and reasonableness of a particular measure."); *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997) ("When reviewing a law that purports to remedy a pervasive economic or social problem, our analysis is carried out with a healthy degree of deference to the legislative body that enacted the measure."). The deference that the judiciary owes to the legislative judgment of whether a measure is reasonable and necessary is especially strong when evaluating legislative action during an emergency. *See, e.g., United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22–23 n.19 (1977); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934); *Buffalo Tchrs. Fed'n*, 464 F.3d at 373; *see also* Constitutional Law Scholars' Amicus Brief at 6 ("The Judiciary's deferential approach in this field has encompassed a special solicitude for state authority to respond to emergency situations.").[3]

---

[3] The law professors who signed this amicus brief are Nikolas Bowie, Erwin Chemerinsky, Leah Litman, Bernadette Meyler, Laurence H. Tribe, and Laura Weinrib.

Our Circuit precedents have not explained in great detail what it means to "properly defer" or accord "substantial deference" to the legislative judgment. To some extent, this reticence may follow from our recognition of the Supreme Court's caution that "[e]very case must be determined upon its own circumstances." *Buffalo Tchrs. Fed'n*, 464 F.3d at 373 (quoting *Blaisdell*, 290 U.S. at 430). Still, we have established boundaries.

On one end, the level of deference that is owed the legislative judgment in cases involving private contracts must be more deferential than so-called "less deference" scrutiny, which we apply when evaluating legislation that involves public contracts or is otherwise "self-serving" to the government's direct financial interest.[4] *See Buffalo Tchrs. Fed'n*, 464 F.3d at 370 ("[A]ssuming the state's legislation was self-serving to the state, we are less deferential to the state's assessment of reasonableness and necessity than we would be in a situation involving purely private contracts[.]").

To survive a Contracts Clause challenge at step three under less-deference scrutiny, "it must be shown that the [legislature] did not (1) consider impairing the contracts on par with other policy alternatives or (2) impose a drastic impairment when an evident and more moderate course would serve its purpose equally well, nor (3) act

---

[4] The difference in the level of deference owed to the legislative judgment in Contracts Clause cases involving private contracts, as opposed to public contracts, is an important and enduring theme in the Supreme Court's and this Court's modern case law. As the Supreme Court has explained, when a State modifies its own financial obligations, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust*, 431 U.S. at 26. Because "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised," the "Contract Clause would provide no protection at all" if "a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose." *Id.*; *see also Buffalo Tchrs. Fed'n*, 464 F.3d at 369 ("Public contracts are examined through a more discerning lens."). We have extended that rationale for applying less-deference scrutiny to situations in which legislation impairs a contract to which the State is not a direct party, but the legislation is nonetheless "self-serving" to the State because it "welches on [the State's] obligations as a matter of political expediency." *Id.* at 370.

unreasonably in light of the surrounding circumstances." *Id.*; *accord Sullivan*, 959 F.3d at 65. Less-deference scrutiny does not, however, "require courts to reexamine all of the factors underlying the legislation at issue and to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem." *Buffalo Tchrs. Fed'n*, 464 F.3d at 370. Less deference "does not imply no deference," and it is not to be confused with strict scrutiny. *Id.* at 370–71.

At the other end, the substantial-deference standard is not so entirely deferential as to constitute rational basis review.[5] Under rational basis review, a legislature "need not actually articulate at any time the purpose or rationale supporting its classification," and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320–21 (1993). Unlike rational basis review, for a law to survive a Contracts Clause challenge under the substantial-deference standard, the legislature must actually articulate a significant and legitimate public purpose and the public record must support a finding that the legislature's chosen means are reasonable and appropriate.

Even so, it is telling that the modern standard of review for Contracts Clause challenges when private contracts are at issue is so deferential as to bear a resemblance

---

[5] In one instance, our Court explicitly equated the third step of Contracts Clause challenges to rational basis review. *See Ass'n of Surrogates & Supreme Ct. Reps. Within City of New York v. New York*, 940 F.2d 766, 771 (2d Cir. 1991) ("Generally, legislation which impairs the obligations of private contracts is tested under the contract clause by reference to a rational-basis test; that is, whether the legislation is a reasonable means to a legitimate public purpose."). But we have not equated the two standards in our more recent Contracts Clause cases, and doing so would appear to run counter to the Supreme Court's statements that it has "never held . . . that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts" and that the due process standard is "less searching." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).

to rational basis review. *See, e.g.*, Constitutional Law Scholars' Amicus Brief at 15 ("Analysis under the Contracts Clause is most closely analogous to deferential rational basis review."); Erwin Chemerinsky, *Constitutional Law: Principles & Policies* 689 (6th ed. 2019) ("As to the second and third prongs of the test, state and local laws are upheld, even if they interfere with contractual rights, so long as they meet a rational basis test."); James W. Ely, *The Contract Clause: A Constitutional History* 242 (2016) (The Supreme Court's "test is little different than rational basis review of economic legislation under the due process norm."); Geoffrey R. Stone, et al., *Constitutional Law* 986 (7th ed. 2013) (explaining that "[m]odern review under the contract clause is substantially identical to modern rationality review under the due process and equal protection clauses" and that, under this standard, "the fit between the legitimate interest and the measure under review need not be close."). As these comparisons suggest, our inquiry into the legislature's chosen means must be carefully limited under the substantial-deference standard. Rational basis review therefore represents the outermost boundary on the deference that we may accord the legislative judgment at step three.

We have also circumscribed our review at the third step in other important ways, particularly related to potential policy disagreements with legislative action. We have "emphasize[d] that whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned" if the "governmental action [was] intended to serve the public good, as the government saw it." *Sullivan*, 959 F.3d at 69; *see also Colon de Mejias v. Lamont*, 963 F.3d 196, 202 (2d Cir. 2020) ("[W]e must respect the wide discretion on the part of the legislature in determining what is and what is not necessary to safeguard the welfare of its citizens."). Furthermore, our precedents are clear that "it is not the province of this Court to substitute its judgement for that of . . . a legislative body" in Contracts Clause cases. *Sal Tinnerello & Sons*, 141 F.3d at 54.

B.    The Majority makes an unwarranted departure from the substantial-
deference standard

The Majority departs from these precedents without citing any Supreme Court or

Second Circuit case that has repudiated the deferential approach to legislation

established in these authorities. In doing so, it relies too heavily, in my view, on certain

phrases drawn from the Supreme Court's 1978 decision in *Allied Structural Steel Co. v.*

*Spannaus*, 438 U.S. 234. The Majority describes *Allied Structural Steel* as pronouncing a

standard intended "to ensure the continued vitality of the Contracts Clause" in the

context of private contracts. Maj. Op. at 70. In particular, the Majority emphasizes the

Supreme Court's statements there that "[t]he severity of the impairment measures the

height of the hurdle the state legislation must clear" and that "[s]evere impairment . . .

will push the inquiry to a careful examination of the nature and purpose of the state

legislation." *Allied Structural Steel*, 438 U.S. at 245.

This language provides the foundation for the Majority's sliding-scale approach

to the level of scrutiny to apply at the third step based on the severity of the Guaranty

Law's impairment. But it is far from clear that the Supreme Court intended it to have

any such effect. In my view, the Supreme Court's statements are better read as simply

confirming the straightforward and established proposition that "[m]inimal alteration

of contractual obligations may end the inquiry at its first stage," *id.*, while more severe

impairments must then satisfy the second and third prongs to survive a Contracts

Clause challenge. *See Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018) (stopping the inquiry

after step one because the challenged statute did "not substantially impair pre-existing

contractual arrangements"); *Castellano v. Bd. of Trustees of Police Officers' Variable*

*Supplements Fund*, 937 F.2d 752, 757 (2d Cir. 1991) ("[S]ince we find absolutely no

impairment of the city's obligations . . . , there is no contract clause 'hurdle' to leap, and

our inquiry ends.").

The sliding-scale approach to the level of scrutiny that the Majority derives from *Allied Structural Steel* is absent from more recent Supreme Court decisions involving private contracts. Contrary to the Majority's claim that the "substance of the [Contracts Clause] inquiry has remained the same" as what it draws from *Allied Structural Steel*, Maj. Op. at 76, in neither *Energy Reserves* (1983) nor *Keystone Bituminous Coal* (1987) did the Court renew the "careful examination" or "height of the hurdle" language referenced in *Allied Structural Steel* and relied on as foundational by the Majority. True, the Supreme Court stated in those cases that the "severity of the impairment" affects the "level of scrutiny," *Energy Reserves*, 459 U.S. at 411, *Keystone Bituminous Coal*, 480 U.S. at 504 n.31, but upon examination, those statements do not support the Majority's sliding-scale approach, which applies exacting scrutiny at the third step. In *Energy Reserves*, when introducing the "threshold inquiry" into "whether the state law has, in fact, operated as a substantial impairment," the Supreme Court stated that "[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." 459 U.S. at 411. It then explained factors relevant to determining at the first step whether a private contract has been substantially impaired—that is, whether it clears the "threshold inquiry." *Id.* If there is a substantial contractual impairment, then the state law receives further scrutiny through the application of the second and third steps: "the State, in justification, must have a significant and legitimate public purpose behind the regulation." *Id.*

Likewise, in *Keystone Bituminous Coal*, the Supreme Court explained that the record did not provide a basis "to determine the severity of the impairment, which in turn affects the level of scrutiny to which the legislation will be affected." 480 U.S. at 504 n.31. It then explained that "[w]hile these dearths in the record might be critical in some cases, they are not essential to our discussion here because the Subsidence Act withstands scrutiny even if it is assumed that it constitutes a total impairment." *Id.* Under the Majority's sliding-scale approach, a "total impairment" would have

necessarily led to the most exacting analysis at the third step. But that is not how the Supreme Court analyzed the challenged legislative action. Instead, the Court reiterated that, at the third step, it should "properly defer to legislative judgment" and "refuse to second-guess" that judgment. *Id.* at 505–06. After providing no more than a short paragraph of analysis, it concluded that the challenged law was reasonable and appropriate. *See id.* at 506. In my view, it is difficult to reconcile this approach with the exacting analysis that the Majority submits is required by *Allied Structural Steel*.

Thus, regardless of whether the "extent of impairment" is a "relevant factor in determining [the legislation's] reasonableness" in cases involving *public* contracts, *United States Trust*, 431 U.S. at 27, the Supreme Court has not adopted that reasoning or applied sliding-scale scrutiny in its modern cases involving private contracts. In sum: the "sliding-scale approach mischaracterizes the law" because "[t]here is simply no authority for the proposition that laws alleged to impose an extra-substantial impairment receive extra-demanding scrutiny under the Contracts Clause."[6] Constitutional Law Scholars' Br. at 9.

_____

[6] The Majority declares that such an interpretation is, in its view, "contrary . . . to common sense." Maj. Op. at 85 n.65. But there are good reasons for the Supreme Court to have not adopted the Majority's approach for Contracts Clause challenges involving private contracts—not least of which is that the sliding-scale approach is inherently in tension with the Court's repeated instruction that courts "properly defer to legislative judgment" at the third step. *Keystone Bituminous Coal*, 480 U.S. at 505. Varying the intensity of the inquiry at the third step invites second-guessing the legislature's policy decisions, which the Supreme Court has explained is inappropriate in private contracts cases, even when "assum[ing] that [a government action] constitutes a total [contractual] impairment." *Id.* at 504 n.31, 506; *cf. Donohue v. Cuomo*, 980 F.3d 53, 84 (2d Cir. 2020) (certifying question because "[a]n inquiry—even a deferential one—into whether a state legislature's potential impairment of its own contracts violated the U.S. Constitution is a delicate matter for a federal court to undertake and risks second-guessing, with the security of hindsight, difficult choices made by the legislature under demanding circumstances"), *certified question accepted*, 36 N.Y.3d 935 (2020). Indeed, the risk of second-guessing the legislative judgment under a sliding-scale approach materializes in the Majority's exacting analysis of the Guaranty Law as discussed *infra* at 33–36.

Scholars—including several the Majority cites for their criticisms of modern Contracts Clause jurisprudence—recognize that instead of adopting the Majority's exacting approach, after *Allied Structural Steel*, the Supreme Court "soon retreated to a more permissive standard in reviewing claims under the clause." Ely, *The Contract Clause: A Constitutional History* 245; *see also, e.g.*, Chemerinsky, *Constitutional Law: Principles & Policies* 691 (observing that, in *Allied Structural Steel*, "it seems that the Court was applying heightened scrutiny that is not usually used in evaluating government regulation of private contracts" and subsequent Supreme Court cases "have distinguished or ignored *Allied Structural Steel*"); Stone, *Constitutional Law* 984 ("*United States Trust* and *Spannaus* suggested that the Court might revive the contracts clause as a substantive constraint on legislation. But shortly thereafter the Court returned to its previous, more deferential approach."); Douglas W. Kmiec, *Contracts Clause*, *in The Oxford Companion to the Supreme Court of the United States* 224, 224 (2d ed. 2005) ("In modern times, the Court has all but forgotten the [contracts] clause as a consequence of its substantial deference to state legislative judgment in economic matters."); Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L.Q. 525, 552 (1987) (concluding that, after *Keystone Bituminous Coal*, "the revival of the Contract Clause, which began with *United States Trust* and *Allied Steel*, appears to have ended").

Recognizing this shift in the Supreme Court's jurisprudence after *Allied Structural Steel*, our Court has cautioned, "our older cases may not apply with the same force today as they do not appear to fully employ current Contract Clause jurisprudence to the extent that they fail to accord sufficient deference to state legislative judgments concerning whether a statute advances a significant and legitimate public purpose." *CFCU Cmty. Credit Union*, 552 F.3d at 268; *see also Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912, 916 (9th Cir. 2021) (describing *Energy Reserves* as representing a "shift in the law" in which "the Court clarified the modern approach to

12

the Contracts Clause post-*Blaisdell*, articulating the flexible considerations courts must consider in a Contracts Clause case"); *State of Nev. Emps. Ass'n, Inc. v. Keating*, 903 F.2d 1223, 1226 (9th Cir. 1990) (explaining that the Supreme Court's decision in *Energy Reserves* only five years later represented a "retreat[] from its holding in [*Allied Structural Steel v.*] *Spannaus*" because it "indicated a renewed willingness to defer to the decisions of state legislatures regarding the impairment of private contracts").[7]

Although the Majority acknowledges that the Supreme Court and this Court have held that review of private contract impairments should be deferential to the legislative judgment, it nonetheless consistently downplays the deference owed to the legislative judgment—often by way of reference to the purported *limits* of any such deference. *See, e.g.*, Maj. Op. at 67 & n.52 (highlighting scholars critical of a "highly deferential standard" for the Contracts Clause); *id.* at 70 n.57 (making brief mention of *Energy Reserves*, *Keystone Bituminous Coal*, and *Buffalo Teachers* before understating the importance that deference played in those cases).[8] The Majority emphasizes the *Allied*

---

[7] The Majority questions whether the Supreme Court has "retreat[ed]" from *Allied Structural Steel*, *see* Maj. Op. at 77 n.63, but as the authorities above establish, the characterization reflects an understanding that is shared by scholars and courts alike. Indeed, our Court has approvingly cited *State of Nevada Employees Association, Inc. v. Keating* and *In re Seltzer*, 104 F.3d 234 (9th Cir. 1996), two cases that recognized the "shift in the law created by *Energy Reserves*," for this very proposition. *See CFCU Cmty. Credit Union*, 552 F.3d at 268–69 & n.16 (citing *Seltzer*, 104 F.3d at 236, and *Keating*, 903 F.2d at 1226). In doing so, our Court highlighted the *Seltzer* court's point that "the Supreme Court has 'retreated from its prior case law, and has indicated a renewed willingness to defer to the decisions of state legislatures regarding the impairment of private contracts.'" *CFCU Cmty. Credit Union*, 552 F.3d at 269 n.16 (quoting *Seltzer*, 104 F.3d at 236). Our Court also noted that the *Seltzer* court distinguished a 1980 Ninth Circuit case addressing the same issue on the ground that it "was 'decided before' the Supreme Court's decision in '*Energy Reserves*, and thus did not give appropriate deference to legislative judgments.'" *CFCU Cmty. Credit Union*, 552 F.3d at 269 n.16 (quoting *Seltzer*, 104 F.3d at 236).

[8] The Majority argues that the deference owed to the legislative judgment in cases involving private contracts simply creates "a presumption in favor of social and economic legislation [that] sets the starting balance, but . . . does not end the inquiry." Maj. Op. at 70 n.57. I agree, of course, with the Majority that to accord substantial deference is not to end the inquiry. *See supra*

*Structural Steel* Court's statement that the multi-pronged Contracts Clause analysis is conducted "[d]espite the customary deference courts give to state laws directed to social and economic problems." 438 U.S. at 244; *see* Maj. Op. at 73–74 & n.60, 85. But, in my view, read in context, this language references the standard for analyzing impairment of *public* contracts set forth in *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977).[9] In

---

at 6–8. But the difference between applying a substantial-deference and less-deference standard does not lie simply in a *presumption* that precedes an otherwise identical inquiry; rather, the difference informs the deference that should infuse the entire third-step analysis. *See Buffalo Tchrs. Fed'n*, 464 F.3d at 369 (explaining that "[p]ublic contracts are examined through a more discerning lens" and "[w]hen a state's legislation is self-serving and impairs the obligations of its own contracts, courts are less deferential to the state's assessment of reasonableness and necessity"). *Sullivan* does not hold to the contrary: it explains that "when the state impairs a public contract the presumption that a passed law is valid and done in the public interest does not immediately apply," so "we must examine the record for indicia of self-serving, privately motivated[] action" to determine what level of deference to accord the legislative judgment. 959 F.3d at 66.

[9] The referenced quote appears in the following section of the Supreme Court's opinion:

> The most recent Contract Clause case in this Court was *United States Trust Co. v. New Jersey*, 431 U.S. 1. In that case the Court again recognized that although the absolute language of the Clause must leave room for "the 'essential attributes of sovereign power,' necessarily reserved by the States to safeguard the welfare of their citizens," *id.*, at 21, that power has limits when its exercise effects substantial modifications of private contracts. Despite the customary deference courts give to state laws directed to social and economic problems, "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.*, at 22. Evaluating with particular scrutiny a modification of a contract to which the State itself was a party, the Court in that case held that legislative alteration of the rights and remedies of Port Authority bondholders violated the Contract Clause because the legislation was neither necessary nor reasonable.

*Allied Structural Steel*, 438 U.S. at 243–44; *see also id*. at 244 n.15 ("The [*United States Trust*] Court indicated that impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties, 431 U.S., at 22–23, although it was careful to add that 'private contracts are not subject to unlimited modification under the police power.' *Id.*, at 22.").

any event, the Supreme Court's subsequent decisions in *Energy Reserves* and *Keystone Bituminous Coal* leave no doubt that, at step three, the customary deference is warranted when private contracts are at stake.

Similarly, to the extent that the Majority discusses the more recent Second Circuit cases, it does so mainly in the context of the first, "substantial impairment" prong, or in attempting to distinguish the cases' topline holdings, with little acknowledgement of the deferential standard actually articulated and applied in these cases. For example, the Majority's discussion of *Buffalo Teachers* does not directly refer to or discuss the substantial-deference standard for impairments of private contracts articulated in that decision. Likewise, when discussing *Association of Surrogates and Supreme Court Reporters*, the Majority focuses on one consideration that weighed against a finding that the legislature acted reasonably in that case involving impairment of public contracts, without acknowledging that the Court there distinguished its "more searching analysis" from the highly deferential standard properly applied in the context of private contracts. *Ass'n of Surrogates & Supreme Ct. Reps. Within City of New York v. New York*, 940 F.2d 766, 771 (2d Cir. 1991).

The Majority's departure from the well-established substantial-deference standard is all the more disquieting, in my view, because of the considerable space that it devotes to and emphasis that it places on centuries-old case law that is unnecessary to resolve this appeal. In the same way, the Majority highlights one distinct school of judicial and scholarly criticism of modern Contracts Clause jurisprudence, while largely choosing to ignore countervailing (and, so far as our cases reflect, currently predominating) views.[10] *See, e.g., Buffalo Tchrs. Fed'n*, 464 F.3d at 371 (suggesting that

---

[10] Several of the dissenting opinions and academic articles that the Majority cites—while critical of modern Contracts Clause jurisprudence and supportive of a change of course—at the same time recognize that the Supreme Court's current doctrine does not reflect the level of increased scrutiny they advocate for and that the Majority appears to adopt here. *See, e.g., Sveen*,

"heightened scrutiny under the Contracts Clause [is a] backdoor to *Lochner*-type jurisprudence" that "has long since been discarded") (citing Laurence H. Tribe, *Constitutional Choices* 182 (1985)); Constitutional Law Scholars' Amicus Brief.

I would not take the Majority's exacting approach. Instead, I would follow *Energy Reserves*, *Keystone Bituminous Coal*, and this Court's precedents, and accord substantial deference to the legislative judgment at step three of the Contracts Clause test—assessing whether the measure is reasonable and appropriate—when evaluating the Guaranty Law.

## II.    Application to the Guaranty Law

To determine whether the District Court correctly dismissed Bochner's Contracts Clause claim, I apply the three-step test described above and the well-established standard of review for evaluating a motion to dismiss under Federal Rule of Civil

---

138 S. Ct. at 1827 (Gorsuch, *J.*, dissenting) (recognizing that "the Court has charted a different course" in its modern cases than its prior interpretation of the Contracts Clause as a categorical prohibition on laws "destroy[ing] substantive contract rights"); Ely, *The Contract Clause: A Constitutional History* 247 (After *Keystone Bituminous Coal*, "any judicial inquiry on [the third prong] is evidently to be purely nominal."); Thomas W. Merrill, *Public Contracts, Private Contracts, and the Transformation of the Constitutional Order*, 37 Case W. Rsrv. L. Rev. 597, 598 (1987) ("Today, the contract clause is but a pale shadow of its former self. . . . Although the Court has never formally equated contract clause analysis with the 'rationality review' it applies to economic legislation under the due process and equal protection clauses, the tone of recent contract clause decisions approaches this same degree of extreme deference."); Kmiec & McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L.Q. at 549, 552 (suggesting that, after *Allied Structural Steel*, "the Court relaxed its standard of review" and lamenting that "*Keystone* demonstrates that the Court believes it can now dispose of a serious contract clause claim in a few conclusory paragraphs"); Richard A. Epstein, *Toward a Revitalization of the Contract Clause*, 51 U. Chi. L. Rev. 703, 750 (1984) (arguing that "we can be certain that the Supreme Court's present interpretation is both wrong and indefensible" because it "reduces the clause to yet another emaciated form of substantive due process," but recognizing that "[i]t would take a major change in constitutional doctrine to adopt the [author's] views" and that "[n]o court could be expected to adopt the [author's] position . . . within the compass of a single decision").

Procedure 12(b)(6). I accept as true the nonconclusory allegations in the complaint, draw reasonable inferences in Bochner's favor, and also consider materials incorporated into the complaint or properly subject to judicial notice. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). To survive dismissal, Bochner must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*

Applying these principles, I agree with the Majority and the District Court that Bochner has plausibly alleged that the Guaranty Law imposes a substantial impairment on his contract, and so I will proceed to the second and third steps of the Contracts Clause analysis without further elaboration. At the second step, I also agree with the Majority that the Guaranty Law advances a legitimate public purpose, although I believe the record fairly supports a more expansive rendering of the public purpose that the legislature aimed to serve than the one suggested by the Majority. My main disagreement with the Majority, however, comes at the third step: in my view, the record adequately establishes, even at the motion to dismiss stage, that the Guaranty Law is a reasonable and appropriate measure to serve its public purpose, and Bochner has therefore failed to state a plausible Contracts Clause claim.

A.   The second step: The Guaranty Law has a significant and legitimate public purpose

I agree with the Majority that the City has professed a legitimate public purpose, although I would define it somewhat more broadly than "society's larger interest in maintaining the small businesses necessary for functioning neighborhoods." Maj. Op. at 88–89.

The record reflects that the City Council was squarely focused on mitigating the economic crisis in New York City, and for its small businesses in particular, when it enacted the Guaranty Law. Many of those businesses were experiencing sharp declines

in revenue as continued operations were prohibited by the Governor's shutdown orders, which had been in effect for about one month, starting between March 16 and March 22, 2020. Specifically, the Governor's executive orders required restaurants and bars to cease in-person sales; nonessential businesses to cease in-person work; and gyms, fitness centers, movie theatres, barbershops, hair salons, tattoo or piercing parlors, and similar personal care–services businesses to close completely to the public.[11]

The Guaranty Law was introduced as part of a package of proposed legislation intended to support these small businesses, their owners, their employees, and the City's economy. Over a period of several weeks, the City Council considered the Guaranty Law at two full City Council hearings as well as two committee hearings.[12] The City Council also produced reports on the impact of the public health and economic crisis on the City's small businesses and the proposed legislation.[13] It received

---

[11] Under Executive Order 202.3, beginning March 16, 2020, at 8:00 p.m., restaurants and bars were required to cease serving patrons food or beverages on premises, and gyms, fitness centers, and movie theaters were required to close completely. App'x at 1375–76. Under Executive Order 202.6, all nonessential businesses were required to reduce their in-person workforce by 50% by March 20 at 8:00 p.m. *Id.* at 1383. The in-person workforce reduction was soon increased to 100% for these nonessential businesses, effective March 22 at 8:00 p.m., under Executive Order 202.8. *Id.* at 1389. Under Executive Order 202.7, beginning March 21 at 8:00 p.m., barbershops, hair salons, tattoo or piercing parlors, and related personal care–services businesses were required to close completely to the public. *Id.* at 1386.

[12] The Guaranty Law was introduced at a City Council hearing on April 22, 2020. *See* App'x at 1521, 1570–71. On April 29, the City Council's Committee on Small Business and Committee on Consumer Affairs and Business Licensing held a joint hearing on the proposed legislation related to small businesses, including the Guaranty Law. *See id.* at 2092–2380. The Committee on Small Business unanimously voted to approve a revised version of Guaranty Law at a hearing on May 13. *See id.* at 3435–36. At a hearing later that day, the full City Council voted to enact the Guaranty Law by a vote of 44 to 6. *See id.* at 3498. The New York City Mayor signed the Guaranty Law on May 26. *See id.* at 3517–18.

[13] On April 29, 2020, as the City Council began consideration of the proposed Guaranty Law and other small business legislation, its Governmental Affairs Division published a briefing

written input from hundreds of stakeholders, including "countless small business owners" affected by personal guaranty provisions, according to Guaranty Law co-sponsor Council Member Carlina Rivera. App'x at 3467. The hearing transcripts, written submissions, and reports constitute a substantial part of the 16-volume joint appendix before us on appeal.

When announcing the introduction of the Guaranty Law on April 21, 2020, the City Council announced that, "while the state of emergency is in effect," the law would "ensur[e] that City business owners don't face the loss of their businesses and personal financial ruin or bankruptcy." *Id.* at 521. Member Rivera reiterated that purpose when introducing the legislation on April 22. She also explained that "businesses are closing and losing weeks of income through no fault of their own and allowing small business owners to keep their spaces will be integral to the city's ability to recover[] after the virus." *Id.* at 1571.

A week later, on April 29, the City Council's Committee on Small Business and Committee on Consumer Affairs and Business Licensing held a more than five-hour joint public hearing on the legislation. *See id.* at 2092. When introducing the Guaranty Law, Member Rivera explained:

> This pandemic has already left a profound impact on our city. One that will be felt for years if not decades. No where will this long term effect be felt more than in our small business community where countless owners are facing the very real possibility that their stores may never return.
>
> We must do everything in our power through legislation and advocacy to help these pillars of our communities and the thousands of New Yorkers they employ. My bill will ensure that business

---

paper and Committee report entitled "OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City" (the "April 29 report"). *See* App'x at 1907–84. On May 13, the Governmental Affairs Division published an updated report in conjunction with the Small Business Committee's vote on the legislation (the "May 13 report"). *See id.* at 3369–3424.

owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own[,] can do so without facing personal liability, ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods.

*Id.* at 2120–21.

Other City Council Members emphasized similar themes when speaking about the legislative package that included the proposed Guaranty Law. City Council Speaker Corey Johnson, also a co-sponsor of the Guaranty Law, explained, "[W]e have no choice but to make sure [small businesses] are able to [weather] this unbelievably painful storm." App'x at 2101. If they are unable to, he warned:

> [H]undreds of thousands of workers will permanently lose their jobs and the city loses out on billions of dollars in sales tax, property tax and income tax revenue. Our economy runs on small businesses and now they are facing unprecedented losses. This could be the worst economic disaster that New York City has seen since the great depression.
>
> Many businesses will be forced to shut down for good if they don't get more help. That won't just devastate business owners and their workers, it will further destabilize our economy, our neighborhoods, and the lives of so many New Yorkers.

*Id.*[14]

---

[14] Council Members' statements regarding the scope and magnitude of the economic crisis and small businesses' importance to the City's overall economy were corroborated by research the City Council published in conjunction with hearings on the Guaranty Law as well as public statements by stakeholders. The Governmental Affairs Division's April 29 report stated that businesses were having to "severely reduce their capacities," with City restaurant sales "expected to drop by a staggering 80 percent" and hotels "projected to only maintain an occupancy rate of 20 percent." App'x at 1915–16. The report detailed the "massive reduction in the number of small businesses operating." *Id.* at 1916. It highlighted research by the National Bureau of Economic Research, which found that, in the Mid-Atlantic region including New York, over half of small businesses were closed, and staff employment had decreased by 47 percent since January 2020. *Id.* Both figures were more severe than the national average. *Id.* Among restaurant workers in New York State, 80 percent had lost their jobs. *Id.*

Speaker Johnson further expressed doubt that the federal Paycheck Protection Program ("PPP") would "end up helping the vast majority of New York City small businesses" because it was "too hard to access."[15] *Id.* at 2102. He declared, "We absolutely need more federal support here but there are some things that the city can do," including enact the Guaranty Law. *Id.*

Council Member Mark Gjonaj, the Chair of the Small Business Committee, explained that the committee was acting because the "COVID-19 crisis perhaps presents the greatest threat to our economy and small businesses in modern history." *Id.* at 2104. Businesses that were shut down "must now decide whether they can continue paying their staff rent, debt, real estate taxes, sewer and water charges throughout the duration of this crisis," and the legislative package was designed accordingly to "prevent mass retail vacancies," "save mom and pop shops," and "ensure small businesses are

---

Stakeholders also made similar statements in hearing testimony and written submissions to the City Council. *See, e.g., id.* at 2298 (Karen Narefski of the nonprofit Association for Neighborhood and Housing Development stating that, "[a]s the Speaker noted at the beginning of the meeting, 26 percent of all jobs in New York City are at [a] business with 20 or fewer employees. So, the result in closures and layoffs ripple through the community and have a broad economic impact."); *id.* at 2503 (Volunteers of Legal Service statement that "[i]t is beyond dispute that small businesses are the backbone of the American economy, and yet, existing relief does not go nearly far enough to save New York City small businesses from the detrimental effects of the COVID-19 pandemic").

[15] The Governmental Affairs Division's April 29 report also emphasized shortcomings of federal relief efforts like PPP. The report explained that "[t]he manner in which PPP was offered to the public and the complexity of its terms and conditions may have contributed to a lack of success for many small business owners." App'x at 1922. It further explained that PPP was poorly suited to small businesses in the City because it required 75 percent of funds to be spent on payroll expenses to qualify for forgiveness as grants rather than loans, leaving "less for businesses to spend on obligations such as rent and utilities, which may be disproportionately higher in our City." *Id.* at 1925; *see also id.* at 3809 (article in *The Wall Street Journal* on May 1, 2020, explaining that PPP's 25-percent cap on non-payroll expenses was "proving to be a deal breaker for many small businesses with modest payrolls and high rent costs, such as restaurants, salons and shops in urban areas including New York").

protected." *Id.* at 2104, 2108. Similarly, Council Member Andrew Cohen, the Chair of the Consumer Affairs and Business Licensing Committee, described the legislation as "geared toward reducing the burden on small business to help you maintain your operation and get through this crisis." *Id.* at 2110.

Council Members reiterated these points when the City Council voted to enact the Guaranty Law and other small business–related legislation on May 13, 2020. *See, e.g.*, *id.* at 3487 (Member Rivera explaining her vote for the Guaranty Law because "we all know that our small businesses have taken a major hit" and "we have to do everything in our power to make sure that they survive[] this virus and that they continue to provide for their own families. I know that they desperately want to bring their workers back on to the payroll and they want to be there with that extended family of all of their employees."); *id.* at 3454–55 (Speaker Johnson elucidating that "we are voting on bills to help small businesses and restaurants survive this crisis" and that the Guaranty Law "will benefit all kinds of business owners in our city"); *id.* at 3430 (Chair Gjonaj stating the legislation will "protect[] our small businesses during this pandemic" and enable them to "re-emerge strong after stay at home orders are lifted and the city begins to reopen").[16]

---

[16] The Majority suggests that it is "questionable" whether some unspecified portions of the legislative record discussed in this section can be taken as true at this stage of the litigation. Maj. Op. at 87 n.66. As do the Majority and the parties, when evaluating the Guaranty Law's public purpose, I consider the documents and transcripts drawn from the legislative record materials that were submitted by the parties to the Court in their joint appendix. The Majority cites the legislative record from the joint appendix (and materials outside the record), including by drawing from the same record materials that I cite in this dissent. *See, e.g.*, Maj. Op. at 6–14 (describing COVID-19 pandemic and state and federal response); *id.* at 22–30 (reviewing the Guaranty Law's legislative history); *id.* at 86–89 (referencing legislative history when evaluating the law's public purpose). A review of the legislative record is necessary, as the Majority recognizes, because determining whether Bochner states a plausible Contracts Clause claim "require[s] us to consider the Guaranty Law's 'purpose'" at the second step. *Id.* at 24. And the legislative record provides the appropriate materials from which to ascertain that purpose; as our Court has explained, "the record of what and why the state has acted is laid out in

When the City Council extended the Guaranty Law in September 2020 and March 2021, the legislative text reaffirmed that the City's goal by extending the law was to prevent the widespread closure of small businesses and the economic harm to the City that it would cause: "If these individual owners and natural persons are forced to close their businesses permanently now or to suffer grave personal economic losses like the loss of a home, the economic and social damage caused to the city will be greatly

---

committee hearings, public reports, and legislation, making what motivated the state not difficult to discern." *Buffalo Tchrs. Fed'n*, 464 F.3d at 365.

The Guaranty Law's legislative history is composed of materials that are properly subject to judicial notice. *See, e.g.*, *Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226–27 (1959). Moreover, the parties cite the legislative record extensively and urge us to examine it closely to determine the Guaranty Law's purpose. *See, e.g.*, Appellants' Br. at 28 (submitting that the district court "should have engaged [in] a closer analysis [of the law's purpose] aided by the record"); Appellees' Br. at 7, 20–21, 26–28 (citing legislative history materials in the appellate record); Appellants' Reply Br. at 7–10 (arguing that the record support for the law's public purpose is insufficient to have warranted the law's enactment but not arguing that the record itself is insufficient to evaluate the Guaranty Law's purpose or is not properly before this Court). The parties have not raised any doubts as to the authenticity of the legislative record or any objections to considering the materials submitted in their joint appendix as reflective of what the Council considered in enacting the Guaranty Law.

Nor is there any question that Bochner had ample notice of the materials in the legislative record: the complaint refers to the City Council proceedings in at least two places, and plaintiffs themselves offered many of the legislative materials in the record—including hearing transcripts and committee reports—in their motion for a preliminary injunction, which was filed before the City's motion to dismiss. *See* App'x at 516–1113, 4308, 4319; *cf. Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("A finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since . . . the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason—requiring notice so that the party against whom the motion to dismiss is made may respond—that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions."). Under these circumstances, it is appropriate for the Court to consider the legislative history to ascertain the City Council's purpose when enacting the Guaranty Law. Unlike the Majority, however, I see no obligation to end that inquiry after reaching a "limited determination of purpose on this appeal." Maj. Op. at 87 n.66.

23

exacerbated and will be significantly worse than if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once." N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50. Furthermore, the City Council explained that the extensions were designed to provide the businesses "with an opportunity to not only survive but also to generate sufficient revenues to defray owed financial obligations." N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50.

　　Based on all of these statements, it is fair to conclude that the City Council's purpose in enacting the Guaranty Law was to address the dire circumstances for small businesses and to support their owners, employees, and the City's economy overall, both during and after the pandemic. That purpose is certainly related to society's "interest in maintaining the small businesses necessary for functioning neighborhoods," as the Majority characterizes the City Council's purpose. Maj. Op. at 88–89. But it also reflects the City's broader short-term and long-term interests in keeping small businesses operating because of their substantial contribution to the City's economy more generally, including the economic growth they bring to the City, the tax revenue they generate, and the jobs they provide to City residents—as articulated in the Council Members' statements.

　　These interests that the City Council sought to advance by enacting the Guaranty Law in the face of an economic emergency are undoubtedly "a significant and legitimate public purpose . . . , such as the remedying of a broad and general social or economic problem." *Energy Rsrvs. Grp.*, 459 U.S. at 411–12. The City's professed fundamental economic interest in promoting the survival of its small businesses by passing the Guaranty Law is sufficient to satisfy this, the second step of the modern Contracts Clause analysis. *See Sal Tinnerello & Sons*, 141 F.3d at 54 ("The Supreme Court has held that the economic interest of the state alone may be sufficient to provide the necessary public purpose under the Contract Clause.").

24

B.    The third step: The Guaranty Law is a reasonable and appropriate measure to serve a legitimate public purpose

The Guaranty Law is a reasonable and appropriate measure to address the City's significant and legitimate public purpose of improving the dire circumstances of small businesses in order to support their owners, their employees, and the City's economy overall, both during and after the pandemic.

To start, it is undisputed that Bochner's Contracts Clause challenge involves private contracts; it does not relate to a public contract with the City. It is also uncontested that the City's purpose in enacting the Guaranty Law was not financially self-serving.[17] Finally, it is not contested that the City enacted the Guaranty Law in the context of an extraordinary health and economic emergency.

Under these circumstances, the legislature's "police power . . . to protect the general welfare of its citizens, a power which is paramount to any rights under contracts between individuals," is at its apex. *Buffalo Tchrs. Fed'n*, 464 F.3d at 367. We therefore must accord "substantial deference" to the "legislature's judgments as to the necessity and reasonableness of a particular measure." *Id.* at 369.

---

[17] Bochner suggests that the Guaranty Law is self-interested insofar as it is a political act by the City Council, but he does not point to any case holding that political interest can affect the deference properly accorded to the legislative judgment. Instead, as he concedes, the type of self-interest that influences the level of deference owed to the challenged legislative judgment is one in which the "legislature welches on its [own] obligations as a matter of political expediency," such as in cases involving impairments to public contracts. *Buffalo Tchrs. Fed'n*, 464 F.3d at 370. Likewise, regardless of whether Bochner believes "there is no need for the distinction" between public and private contracts and "scholarship supports putting them on equal footing," Appellants' Reply Br. at 20 n.9, the distinction is a well-established and well-founded aspect of the Supreme Court's and this Court's case law. *See, e.g., Energy Rsrvs. Grp.*, 459 U.S. at 412–13 & n.13; *United States Trust*, 431 U.S. at 25–26; *Buffalo Tchrs. Fed'n*, 464 F.3d at 369–70.

1.  *The City Council's legislative record*

Here, the City Council enacted the Guaranty Law during the early days of an unprecedented emergency. Amid a burgeoning death count, sharp economic contraction, spiking unemployment, and the particularly dire circumstances for small businesses described above, the City Council began considering a package of proposed legislation—including the Guaranty Law—intended to support small businesses, their owners, and the City's economy. Despite the City Council's recognition of the urgency of the situation, it solicited public input and revised the Guaranty Law over a three-week period before enactment. The legislative record is replete with support from small business owners and other stakeholders describing how the Guaranty Law would serve those purposes.

Numerous small business owners wrote to the City Council or made remarks at the Small Business Committee's public hearing about how the Guaranty Law would enable them to survive the pandemic and continue to employ workers.[18] For example:

- The owner of a food hall wrote, "I very much hope to re-open the food hall when the COVID dust settles, but uncertainty about my rent obligations is a huge barrier to my business's ability to survive." App'x at 2406. In the owner's view, the Guaranty Law would facilitate renegotiating leases with landlords; without it, "a large swath of us will go out of business for sure." *Id.*; *see also id.* at 2527 (same owner stating "I can guarantee that my business, along with so many other independently-owned hospitality and retail businesses in NYC, will NOT survive if we cannot completely renegotiate our leases post-COVID").

---

[18] I take these statements not for their truth—although I see no reason to question their veracity—but rather for the fact that they were offered to the City Council when it was considering whether to enact the Guaranty Law. The statements therefore represent an important part of the legislative record on the Guaranty Law's potential impact and are appropriate to consider when evaluating at the third step whether the law is a reasonable and appropriate measure.

- The owner of eight restaurants employing 270 people before the pandemic predicted that the Guaranty Law would make the difference between keeping his restaurants open and permanently closing them. According to this owner, each of his businesses was tens of thousands of dollars "in the red," and he had "done everything in [his] power to mitigate these circumstances directly with my landlords," but "most of [his] landlords remain unmoved." *Id.* at 2487–88. While he would reopen under almost any circumstance, he stated, still, "[i]f I am still personally liable for a failed business to my landlord – that I can't justify and I can't give a go." *Id.* at 2490. That would even be the case if he received PPP support because, although 75 percent of funding would keep his workers employed by covering payroll expenses, the remaining 25 percent would not be enough to cover rent expenses. *See id.* at 2489; *see also id.* at 3401 (Government Affairs Division's May 13 report highlighting this business owner's concern about the "hopelessness of relief efforts such as PPP"). As a result, the owner argued, the proposed Guaranty Law "is instrumental to [his] existence and that of most small businesses in this City." *Id.* at 2488.

- Another restaurant owner described how the Guaranty Law "would mean the difference between survival and bankruptcy for my small business specifically, a tried and true NYC restaurant company" that employed 80 workers before COVID. *Id.* at 2399. The owner expressed his view that "[s]uspending guarantees is the only way to force [a] fair and earnest [negotiation]" with landlords and is "absolutely essential to the survival of small businesses in our city." *Id.* at 2400.

- The owner of two stores told the City Council that she had "decided to give up and move out by April 31st" because her landlord demanded rent and refused to negotiate, and she would not be able to cover the more than $10,000 rent she would owe if she stayed open. *Id.* at 2368–69. She had applied for PPP and emergency loans but not received that support. *Id.* at 2368. This business owner implored the City Council to "pass a bill to protect tenants from the landlord" as soon as possible to help her "survive as a business owner." *Id.* at 2369.

- Another small business owner wrote, "The measures you have proposed with regard to tenants having large commercial rents would be very helpful to us and may have the effect of saving our business." *Id.* at 2418.

These sentiments were echoed by hundreds of other small business operators who wrote to the City Council to convey that the Guaranty Law was "critical legislation" to give them "a fighting chance to survive." *Id*. at 2528. The concerns of these operators about their businesses' ability "to survive" conveyed their views that they would face an increased risk of permanent closure—and the workers they employ would lose their jobs—if the Guaranty Law was not enacted.

Other supporters detailed the urgent need for the City Council to enact the Guaranty Law and other legislation to support small businesses and prevent wider economic damage to the City. Robert Bookman, counsel to the NYC Hospitality Alliance, explained that "the small business community . . . is in historic trouble," with a risk of "an unprecedented closing of thousands of neighborhood businesses forever." *Id.* at 2451. He urged the City Council that it "[m]ust act now" because "May rent is coming due and business owners are deciding should they give the keys back and permanently go out of business or risk another month of personal liability." *Id.* at 2452; *see also id.* at 224–45 (Bookman's hearing testimony). Similarly, Karen Narefski, a senior organizer at the nonprofit Association for Neighborhood and Housing Development ("ANHD"), stressed that "closures and layoffs ripple through the community and have a broad economic impact." *Id.* at 2298. She stated that "we really need swift and comprehensive action to protect commercial tenants from displacement and permanent closure." *Id.* at 2299.

Andrew Riggie, Vice Chair of Community Board 7, a citizen advisory board in Manhattan, emphasized that "businesses are in crisis," owners "are going to lose their livelihood," and they are "laying off all of their employees." *Id.* at 2229. When asked how many of his members had been impacted by the personal liability clauses, he stated that he did not know the precise number, but estimated that "we're talking about numbers in the thousands." *Id*. at 2231–32. He stated that the Guaranty Law and other legislation would be a "great step" toward addressing the small business crisis and

cautioned that "every minute we waste, we're losing more businesses and more jobs." *Id*. at 2234.

The nonprofit Volunteers of Legal Service ("VOLS") reported that, based on a survey of small business clients it conducted, 57 percent "reported that their businesses were completely closed as a result of government orders" and 88 percent reported decreased revenue as a result of the pandemic. *Id.* at 2503. Of those with commercial leases, 40 percent indicated they had already missed commercial rent payments, and 89 percent anticipated that they would in the future. *Id.* Yet, nine out of ten of clients who had "initiated conversations with their commercial landlords about the possibility of receiving a rent abatement, deferment, or cancellation for the period of the pandemic were either still negotiating, received no response, or received a negative response." *Id.* VOLS cautioned that, without support including the Guaranty Law, "we have no doubt that many of New York City's small businesses will face permanent closure." *Id.* at 2504.

Several organizations, while supportive of the Guaranty Law, urged the City Council to extend the law's provisions to cover a longer period of time, expand the definition of personal liability provisions, or provide funding for rent forgiveness. *See, e.g.*, *id.* at 2422–23 (United for Small Business NYC); *id.* at 2504 (VOLS); *id.* at 2299–2300 (ANHD).

Over the course of its deliberations, the City Council also heard opposition to the proposed Guaranty Law from landlords, trade groups, and others. *See, e.g.*, *id.* at 1810–11, 2402, 2411–12 (landlords opposed to Guaranty Law); *id.* at 2413 (building manager); *id.* at 1866–67, 2374–76 (Queens and Bronx Building Association and Building Industry Association of New York City); *id.* at 2309–10, 2397 (Real Estate Board of New York); *id.* at 2334 (New York City Bid Association); *id.* at 2478–79 (Building Owners and Managers Association of Greater New York). One Council Member, Kalman Yeger, expressed his opposition and his view that the proposed Guaranty Law was unconstitutional. *Id.* at 2180–82, 3496.

2.  *The Guaranty Law is a reasonable and appropriate measure under the substantial-deference standard*

Ultimately, the City Council passed legislation that was most responsive to the concerns raised by the small business owners directly affected by the Governor's shutdown orders and the economic crisis. As enacted, the Guaranty Law is tailored to protect guarantors who are natural persons and whose businesses "were impacted by mandated closures and service limitations in the Governor's executive orders" that became effective between March 16 and March 22, 2020. *Id.* at 3351 (City Council's "plain language summary" of Guaranty Law). These businesses included "(1) businesses that were required to stop serving food or beverages on-premises (restaurants and bars); (2) businesses that were required to cease operations altogether (gyms, fitness centers, movie theaters); (3) retail businesses that were required to close and/or subject to in-person restrictions; and (4) businesses that were required to close to the public (barbershops, hair salons, tattoo or piercing parlors and related personal care services)." *Id.*

The numerous written submissions and public statements offered by owners and operators of these types of small businesses—and other supporters—about the importance of the Guaranty Law to their ability to survive the pandemic, to continue to employ workers, and to contribute to the City's overall economic well-being supports the City Council's decision to make personal guarantees unenforceable for obligations arising during the public health and related economic crisis. The supporters described how the Guaranty Law in particular would help to keep small businesses open, and how important the provision is despite the potential availability of other assistance such as PPP. The extensive statements of support in the record therefore weigh heavily in favor of a finding that, in enacting the Guaranty Law, the City Council adopted a reasonable and appropriate means to serve its stated public purposes.

The Guaranty Law is also closely tied to the time periods during which the Governor's shutdown orders and capacity restrictions were in place. The Guaranty Law initially applied to personal liabilities arising from March 7, 2020, through September 30, 2020. With the pandemic persisting and the Governor's shutdown orders extending past September, the City Council twice extended the Guaranty Law, first through March 31, 2021, and then through June 30, 2021. *See* N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50. Each time the City Council extended the law, it made specific findings as to how the "operational limitations" have "contributed to the severe economic damage suffered by the City," and included job-loss statistics in sectors affected by the capacity restrictions. N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50. After the Governor's capacity restrictions were fully lifted on June 15, 2021, the City Council allowed the Guaranty Law to expire on June 30, 2021.

This calibration to the ongoing crisis—rather than enacting the Guaranty Law without a sunset provision, for example—suggests that the City Council was closely monitoring the City's needs as the crisis evolved and that it determined on two occasions that extending the Guaranty Law for six- and three-month periods, respectively, would continue to provide vital support for the City's small businesses and its economic recovery. Likewise, the Guaranty Law does not permanently repudiate contracts between landlords and guarantors, but instead applies to guarantors' obligations that arose during a fixed period. This temporal limitation weighs in favor of a finding that the law is a reasonable and necessary measure to achieve its purpose. *See Energy Rsrvs. Grp.*, 459 U.S. at 418 (reasoning that the legislation challenged there is reasonable and appropriate in part because it "is a temporary measure that expires when federal price regulation of certain categories of gas terminates").

Other circumstances further support a finding that the Guaranty Law is a reasonable and appropriate measure. The City Council treated the Guaranty Law as

part of an overall package to support small businesses impacted by the pandemic. In addition to the policies it eventually enacted, including the Guaranty Law, the City Council considered alternative policies and policy designs. After public hearings and debate, the City Council narrowed eligibility for the law's relief from the initial proposal so that the enacted law shielded only guarantors whose businesses were directly impacted by the Governor's capacity restrictions.[19] *See* App'x at 3492–93 (Council Member Paul Vallone announcing his vote in favor of the Guaranty Law by thanking Member Rivera "for listening to both sides of the story with her legislation" and "making some changes" to it). While the City Council ultimately did not adopt the position of the landlords and others who opposed the Guaranty Law, it did not limit landlords' other remedies to enforce commercial tenants' obligations through the Guaranty Law, and it later passed legislation to provide tax relief to certain property owners adversely impacted by COVID-19. *See* App'x at 3534–35 (reproducing NYC Local L. 2020/62). The City Council's consideration of alternative policy designs and other possible legislative provisions further weighs in favor of a finding that the Guaranty Law is reasonable and appropriate, even if it were to be evaluated under the

---

[19] As initially proposed, the law would have prohibited enforcement of guaranty provisions against guarantors whose businesses were "impacted by COVID-19," a group that the proposal defined to include businesses for which "revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020." App'x at 1041–43. The enacted Guaranty Law does not include that provision and instead provides relief only to guarantors whose businesses were (1) "required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020"; (2) "a non-essential retail establishment subject to in person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020"; or (3) "required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020." *Id.* at 3872–73.

less-deference scrutiny that applies to public contracts. *See Buffalo Tchrs. Fed'n*, 464 F.3d at 370–71; *Sullivan*, 959 F.3d at 65.

Under the totality of the circumstances, I conclude that the Guaranty Law passes the low threshold posed by step three of the modern Contracts Clause analysis for laws impairing private contracts. Because the record amply demonstrates that, under our precedents, the Guaranty Law is a reasonable and appropriate means to serve a legitimate public purpose, Bochner has not stated a plausible Contracts Clause claim.[20] Accordingly, I would affirm the District Court's dismissal of Bochner's challenge to the Guaranty Law.

C.    The Majority fails to accord the requisite deference to the City Council's judgment

The Majority takes a different approach that does not "properly defer to legislative judgment." *Energy Rsrvs. Grp.*, 459 U.S. at 413. Because it adopts a searching, sliding-scale standard for Contracts Clause challenges, as discussed above, its evaluation of whether the Guaranty Law is a reasonable and appropriate measure in Section III.B.3 is exacting and skeptical. The Majority suggests the City Council was

---

[20] Although in some cases remand might be appropriate for further factual development, that is not necessary here, where the "record of what and why the [City] has acted is laid out in committee hearings, public reports, and legislation." *Buffalo Tchrs. Fed'n*, 464 F.3d at 365. Because the parties do not dispute that such a record is properly before us, and because we can conclude based on that record that the Guaranty Law is a reasonable and appropriate means to serve a legitimate public purpose, dismissal is appropriate at this stage. *Cf. United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 45 (1st Cir. 2011). That is particularly true here, where the briefing of the City's motion to dismiss before the District Court was done in tandem with plaintiffs' motion for a preliminary injunction, generating the voluminous record in the parties' joint appendix before us on appeal. Plaintiffs did not argue to the District Court that additional factual development was needed to determine whether the Guaranty Law was reasonable and appropriate at the third step. Nor do plaintiffs argue before this Court that any further development of the record is necessary for a fair and complete adjudication of their claims.

insufficiently focused on guarantors' needs, despite the expansive record support showing small business owners' needs, as described above, and the understanding—acknowledged by Bochner—that these business owners or other principals are often the guarantors. *See* Appellants' Br. at 15. It faults the City Council for failing to use "empirical evidence," Maj. Op. at 102, and engaging in insufficiently "intensive study," *id.* at 104, even when acting rapidly to respond to a public health and economic emergency.[21] This approach is at odds with the "substantial deference" we must accord the legislative judgment. *Buffalo Tchrs. Fed'n*, 464 F.3d at 369. Indeed, the Majority engages in a much more demanding review at step three than our Court has explained is appropriate even for public contracts subject to less-deference scrutiny. *Id.* at 371.

Much of the Majority's analysis of whether the Guaranty Law is reasonable and appropriate focuses on policy concerns with the City Council's chosen means. The Majority criticizes the City Council's decision to permanently exempt, rather than defer, guarantors' obligations to the extent they arose during the period from March 7, 2020, until June 30, 2021.[22] It emphasizes what the law does *not* do, including that it does not

---

[21] To the extent that the Majority suggests that such requirements are implied by *East New York Savings Bank v. Hahn*, 326 U.S. 230, 234–35 (1945), I disagree. As the Majority recognizes elsewhere, the *East New York Savings Bank* court articulated a "governing constitutional principle" that "when a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State to safeguard the vital interests of its people is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment." *Id.* at 232. The Supreme Court elaborated on this principle as follows: "Once we are in this domain of the reserve power of a State we must respect the wide discretion on the part of the legislature in determining what is and what is not necessary." *Id.* at 233. The Majority's suggestion that the legislature must engage in certain types of analysis is inconsistent with the Supreme Court's conclusion that, "[s]o far as the constitutional issue is concerned, the power of the State when otherwise justified is not diminished because a private contract may be affected." *Id.*

[22] To the extent that the Majority might be read to suggest that the repudiation of debt, destruction of contract, or denial of enforcement could not—as a categorical matter—be justified by police power, *see* Maj. Op. at 91, the Supreme Court has explained—long after *Blaisdell*—that,

34

require that guarantors reopen their businesses, does not condition relief on demonstrated need, and does not provide compensation to affected landlords—even though the City Council went on to enact separate legislation to provide tax relief to certain property owners affected by COVID-19. And the Majority questions the legislature's policy decisions by drawing comparisons to the design features of other pandemic-related relief enacted at the federal and state levels.

To be sure, the policy concerns that the Majority highlights may be legitimate. The legislature's choice to permanently excuse guarantors from liability on commercial lease defaults accrued during a defined period may reasonably be questioned. As the District Court acknowledged, the Guaranty Law may lead to a harsh outcome for some commercial landlords because, if their tenants have few to no assets, "the money may prove impossible to collect" without an enforceable guaranty. *Melendez v. City of New York*, 503 F. Supp. 3d 13, 36 (S.D.N.Y. 2020). And the Majority's suggestions now for how the City Council could have more effectively targeted relief when it acted in response to the public health and economic emergency might indeed have improved the law.

Ultimately, however, "whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned." *Sullivan*, 959 F.3d at 69. We are bound to "refuse to second-guess the [City's] determinations that these are the most appropriate ways of dealing with the problem." *Keystone Bituminous Coal*, 480 U.S. at 506; *see also Apartment Ass'n of Los Angeles Cty.*, 10 F.4th at 914 ("Under current doctrine, we must refuse to second-guess the City's determination that the eviction moratorium constitutes the most appropriate way of dealing with the problems identified. That is

_____

"even in such cases" involving legislation "designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy," the Court has "refused to give the [Contracts] Clause a literal reading," *Keystone Bituminous Coal*, 480 U.S. at 503.

particularly so, based on modern Contracts Clause cases, in the face of a public health situation like COVID-19."). It is simply "not the province of this Court to substitute its judgement for that of . . . a legislative body," *Sal Tinnerello & Sons*, 141 F.3d at 54, even if we question the policy path the legislature chose to follow.

## CONCLUSION

The City Council enacted the Guaranty Law during an unprecedented economic and health emergency that was devastating to the City's small business community. The City Council's stated purpose was to support the owners and employees of small businesses impacted by pandemic-related shutdown orders, as well as the City's economy overall, both during and after the pandemic. It enacted the Guaranty Law after holding several hearings related to the legislation and after receiving input from hundreds of stakeholders—supporters and opponents alike.

Under our precedents, the City Council's action deserves substantial deference. It is not our role to second-guess the City Council's policy decisions; rather, we must conduct a carefully limited inquiry into whether the Guaranty Law is a reasonable and appropriate measure to serve a substantial and legitimate public purpose. In light of the considerable support for the Guaranty Law's design in the record, the ongoing economic and public health emergency in the City when it was enacted, and the substantial deference we owe the legislative judgment, I conclude that the Guaranty Law was a reasonable and appropriate measure to serve the City Council's stated purpose. I therefore would affirm the District Court's dismissal of the Contracts Clause challenge to the Guaranty Law.

I am concerned that the Majority's opinion strays from our precedents by articulating a far less deferential standard of review for Contracts Clause challenges involving private contracts. In my view, its analysis of whether the Guaranty Law is reasonable and appropriate takes an exacting approach that more closely resembles

strict scrutiny than the substantial-deference standard we must apply under our modern precedents. Although I disagree with the approach that the Majority takes and the conclusion that it reaches, I do not understand it to overrule our established precedents regarding the deference owed to the legislative judgment. Nor do I interpret the Majority to pre-determine that plaintiff Bochner has a likelihood of success on the merits. My understanding is that the Majority and I agree that, on remand, the District Court is bound to apply this Court's and the Supreme Court's precedents to determine whether the Guaranty Law withstands the Contracts Clause challenge that Bochner brings.

In the aspects discussed above, I respectfully dissent from the Majority's decision.